ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, Inc.*

**FILED**
DISTRICT COURT OF GUAM

JUL 17 2007 mba

**MARY L.M. MORAN
CLERK OF COURT**

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>        Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>        Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br>DEFENDANT DYNAMIC TECHNICAL SERVICES, INC.'S **MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF ROLAND F. MENDIOLA;** MEMORANDUM IN SUPPORT OF MOTION; EXHIBITS A-D; DECLARATION OF SERVICE |

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Dynamic Technical Services, Inc. (hereinafter referred to as "DTS"), Defendant in the above entitled and numbered action and, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, files this Motion for Summary Judgment as to all claims asserted by Plaintiff Roland F. Mendiola (hereinafter referred to as "Plaintiff"). This motion is made upon the attached memorandum, the record in this case, including without limitation the exhibits attached and filed contemporaneously herewith, and argument presented by counsel at the hearing.

WHEREFORE, PREMISES CONSIDERED, Defendant Dynamic Technical Services respectfully requests this court to enter and order dismissing all of Plaintiff Roland F. Mendiola's claims against DTS and for such further relief to which DTS shows itself justly entitled.

DATED this 16th day of July, 2007.

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, Inc.*

# IN THE UNITED STATES DISTRICT COURT OF GUAM

# FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. 05-00037 <br><br><br><br><br><br> **DEFENDANT DYNAMIC TECHNICAL SERVICES' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF ROLAND F. MENDIOLA** |

Defendant Dynamic Technical Services, Inc.'s Memorandum
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1.059759-00001

Page 1 of 17

# INDEX OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)                3

*Anderson v. Pacific Maritime Assoc.*, 336 F.3d 924 (9th Cir. 2003)                9

*Association of Mexican-American Educators v. California*,
231 F.3d 572 (9th Cir. 2000)                9-10

*Bonnette v. California Health and Welfare Agency*, 704 F.2d
1465 (9th Cir. 1983)                5

*Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213 (10th Cir. 2002)                6

*British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare
Fund*, 882 F.2d 371 (9th Cir. 1989)                4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)                3-4

*Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 123
S.Ct. 1673, 155 L.Ed.2d 615 (2003)                6

*E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003)                5

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)                12, 15

*Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983)                8, 10

*Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004 (D.Minn. 2003)                14

*Graves v. Lowery*, 117 F.3d 723 (3d Cir. 1997)                6

*Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)                15-16

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)                12, 15

*Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980)                8

*McZeal v. City of Seattle*, 2006 WL 3254504 (W.D.Wash. 2006)                13

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986)                13

*Merrick v. Farmers Ins.*, 892 F.2d 1434 (9th Cir. 1990)                16

*NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117 (3d. Cir. 1982)    5

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)    12

*Rivas v. Federacion de Asociaciones Pecuarias,* 929 F.2d 814 (1st Cir. 1991)    6

*Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971)    13

*Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d
385 (D.Conn. 2003)    13

*Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973)    7, 10

*Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir. 1978)    13, 15-16

*Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350 (11th Cir. 1994)    6

*Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067 (C.D.Cal. 2002)    5

**Statutes**

42 U.S.C. § 2000e(b)    4

42 U.S.C. § 2000e(f)    4

**Rules**

Federal Rule of Civil Procedure 56    3-4

## MEMORANDUM IN SUPPORT OF MOTION FOR
## SUMMARY JUDGMENT AGAINST PLAINTIFF ROLAND F. MENDIOLA

### I.
### GROUNDS FOR MOTION

Defendant DTS brings this Motion for Summary Judgment against Plaintiff Roland F. Mendiola ("Plaintiff") on the following grounds:[1]

A)    Defendant DTS was not an "employer" of Plaintiff Roland F. Mendiola as defined by Title VII of the Civil Rights Act of 1964 and cannot be subject to liability under the statute.

B)    There was no hostile work environment based upon the uncontroverted evidence.

C)    DTS did not have any knowledge of any alleged discrimination.

### II.
### SUMMARY JUDGMENT EVIDENCE

Defendant relies on the following exhibits, attached to this motion and incorporated by reference as if fully set forth herein:

A)    Selected pages of the deposition of Plaintiff Roland F. Mendiola;

B)    Selected pages of the deposition of John Healy;

C)    Affidavit of Dennis P. Clark; and

D)    Affidavit of Linda Hayes.

### III.
### FACTUAL BACKGROUND

Plaintiff Roland F. Mendiola filed this lawsuit along with twelve other plaintiffs on December 12, 2005. The Plaintiff filed his First Amended Complaint on February 24, 2006. All of Plaintiff's claims are brought under Title VII of Civil Rights Act of 1964. In Plaintiffs' First

---

[1] In Plaintiff's First Amended Complaint, the Plaintiff does not make any retaliation claims against DTS for termination. Plfs' 1st Am. Complaint ¶ 123.

Defendant Dynamic Technical Services, Inc.'s Memorandum                              Page 2 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1.059759-00001

Amended Complaint, it is alleged that the Plaintiff was employed by Defendant Calpac from April 2004 through December 2004. Pls. 1st Am. Complaint at ¶¶ 121 and 123. During his deposition, the Plaintiff could not remember when he started working for Calpac in 2004. Ex. A at p. 5, l. 19. During the course of his employment for Calpac, he worked on a construction project for MCI. Dennis Clark was the MCI "company representative" on this project and was an employee of DTS. Ex. C at ¶ 3. The Plaintiff alleges that Mr. Clark made discriminatory remarks in the presence of the Plaintiff on two occasions. Ex. A at p. 43, l. 14. The Plaintiff did not complain to anyone at DTS about the statements Dennis Clark allegedly made and no one at DTS became aware of Plaintiff's complaints until late December 2004 when Dennis Clark informed DTS of the existence of public protesters who were alleging that he made discriminatory comments. Ex. D at ¶ 9. Based upon these alleged statements made by Mr. Clark, the Plaintiff has filed the instant lawsuit seeking to recover damages from DTS under Title VII for hostile work environment.

## IV.
## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a court should grant summary judgment when, viewing the evidence in the light most favorable to the nonmoving party, the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's

Defendant Dynamic Technical Services, Inc.'s Memorandum                                    Page 3 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-1273.1 059759-00001

Case 1:05-cv-00037     Document 291     Filed 07/17/2007     Page 7 of 60

response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. Pro. 56(e). However, it is not necessary for the party moving for summary judgment to introduce evidence that negates the plaintiff's claim. *Celotex*, 477 U.S. 258, 323. Instead, the moving party may show in it motion that there is no evidence to support an essential element of the non-moving party's claim. *Id*. at 325. According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party: (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible. *British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989).

## V.
## ARGUMENTS & AUTHORITIES

### A.     DTS is not an "employer" of Plaintiff and cannot be liable under Title VII

In order to be subject to liability for a hostile work environment[2] under Title VII, a defendant must be an "employer" as the statute defines that term. An "employer" is a "person engaged in an industry affecting interstate commerce who has fifteen or more employees..." 42 U.S.C. § 2000e(b). An employee is an "individual employed by an employer." 42 U.S.C. § 2000e(f). In the present case, it is uncontested that Calpac, not DTS, was the direct employer of Plaintiff Mendiola. Ex. B at p. 88, ll. 18-23.

---

[2] Defendant expressly denies that Plaintiff was subjected to a hostile work environment as a matter of law. This topic is fully addressed in Section V.B. of this memorandum.

---

Defendant Dynamic Technical Services, Inc.'s Memorandum
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1.059759-00001

Page 4 of 17

**1.  Defendant DTS is not liable under Title VII as a joint employer.**

"Two or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment of the employee. *Swallows* [*v. Barnes & Noble Book Stores, Inc.*], 128 F.3d [990], 993 n. 4 [(6th Cir. 1997)] (citing *NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117, 1123 (3d. Cir. 1982))." *Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067, 1093 (C.D.Cal. 2002). In order to determine whether a joint employment relationship exists, the Ninth Circuit applies an "economic reality" test. *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983). Under that test, this court should consider all factors relevant to a particular situation when evaluating the economic realities of a relationship. *Id.* In determining joint employment, a large collection of factors has been suggested from the judiciary and governmental agencies. *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270, 1275 (9th Cir. 2003).

When determining if a joint employer relationship exists, the Third Circuit has explained it is a matter of determining which of the two, or whether both, of the parties control, in the capacity of employer, the labor relations of a given group of workers. *Browning-Ferris Indus. of Pa.*, 691 F.2d at 1122-23 (citing *NLRB v. Condenser Corp. of America*, 128 F.2d 67, 70 (3d Cir. 1942)). "The 'joint employer' concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment." *Id.*

The Supreme Court has summarized the various factors as to what it means to be an employer: "As the EEOC's standard reflects, an employer is the person, or group of persons, who owns and manages the enterprise. The employer can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of

Defendant Dynamic Technical Services, Inc.'s Memorandum                                    Page 5 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273 1 059759-00001

the business are to be distributed." *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 450, 123 S.Ct. 1673, 1680, 155 L.Ed.2d 615 (2003). The Ninth Circuit opined that the "Supreme Court seems to suggest that the *sine qua non* of determining whether one is an employer is that an 'employer' can hire and fire employees, can assign tasks to employees and supervise their performance." *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d at 1277 (citing *Clackamas*, 123 S.Ct. at 1680). "Logically, before a person or entity can be a joint employer, it must possess the attributes of an employer to some degree." *Id.* Numerous courts consider the key to joint employment to be the right to hire, supervise and fire employees. *See Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213, 1219 (10th Cir. 2002) (en banc); *Graves v. Lowery*, 117 F.3d 723, 727-728 (3d Cir. 1997); *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1361 (11th Cir. 1994); *Rivas v. Federacion de Asociaciones Pecuarias*, 929 F.2d 814, 820-821 (1st Cir. 1991).

In *E.E.O.C. v. Pacific Maritime Assoc.*, a Title VII sexual harassment action was brought against Pacific Maritime Association ("PMA"). 351 F.3d 1270 (9th Cir. 2003). PMA is an association of stevedoring companies ("member-employers") that performed organizational tasks on behalf of its members, negotiated a collective bargaining agreement, operated a dispatch hall jointly with a union, and provided payroll services for its members. *Id.* at 1274. The plaintiff alleged that, along with the member-employer of PMA that hired her, PMA was a joint employer of her. However, the Ninth Circuit found that PMA did not supervise the longshoremen, had no power to hire or fire longshoremen, had no power to discipline longshoremen, and did not supervise the work sites. The court found that it was undisputed that the monitoring and control over the work sites, as well as the control of the employees, was within the sole province of the member-employees. Accordingly, the Court held that PMA was not a joint employer of the plaintiff. *Id.* at 1274.

Defendant Dynamic Technical Services, Inc.'s Memorandum
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1.059759-00001

Page 6 of 17

Case 1:05-cv-00037    Document 291    Filed 07/17/2007    Page 10 of 60

Similarly, in the present case, DTS had no authority to hire or fire Calpac employees, did not supervise Calpac employees or give them work assignments, had no power to discipline Calpac employees, did not determine wages or benefits of Calpac employees, and did not decide how profits or losses of Calpac were to be distributed. *See* Exhibits C at ¶¶ 5-7 and D at ¶ 13. John Healy, the President of Calpac, testified that he did not have any communications with anyone at DTS prior to receiving the first EEOC complaint. Ex. B at p. 85, ll. 18-23. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Mr. Healy also testified that Mr. Clark was not a supervisor of the plaintiffs, did not give out daily work assignments, and did not hire any of the plaintiffs. *Id.* at pp. 88-89, ll. 12-17, 9-20. Therefore, as a matter of law, this uncontroverted evidence establishes that DTS was not a joint employer of the Plaintiff with Calpac.

### 2. Defendant DTS is not liable under Title VII as an indirect employer

The D.C. Circuit first addressed indirect-employer liability in *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973). The hospital ran a nursing office where patients could request the service of a private duty nurse. The hospital would then contact outside referral sources and request a private nurse be sent to the hospital. The private nurses were employees of the patients, not the hospital. In *Sibley*, a male nurse alleged that on at least two occasions hospital nurses rejected him upon arrival because he was male and the requesting patient was female. The male nurse subsequently sued under Title VII for discrimination.

On appeal, the court noted that one of the goals of Title VII was to equalize access to job opportunities. *Id.* at 1340. The court held that Title VII did not explicitly require a direct employer-employee relationship, but it did not mean that no relationship was required for a claim

Defendant Dynamic Technical Services, Inc.'s Memorandum                                     Page 7 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1.059759-00001

Case 1:05-cv-00037     Document 291     Filed 07/17/2007     Page 11 of 60

to fall under Title VII. The Court stated: "We think it is significant that [Title VII] has addressed the problems of interference with the direct employment relationship by labor unions and employment agencies-institutions which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties. On the facts as alleged…[the hospital] is so circumstanced, and its daily operations are of such a character as to have such nexus to the third parties in this case…" *Id.* at 1342.

The Ninth Circuit first addressed the issue of indirect-employer liability in *Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980). The court noted for Title VII to apply, "there must be some connection with an employment relationship" though the "connection…need not necessarily be direct." *Id.* at 883. The court explained "[t]his might occur where a defendant subject to Title VII interferes with an individual's employment opportunities with another employer." *Id.* at 883 n. 3.

The Ninth circuit addressed the issue again in *Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983). In this case, the plaintiff was a Hispanic physician working for a corporation named AES. On behalf of AES, the plaintiff submitted a proposal to the defendant to operate the hospital's emergency room. The hospital allegedly turned down the proposal because too many Hispanics worked for AES. *Id.* at 1020. The court reversed a summary judgment granted to the hospital on the basis that the plaintiff lacked standing under Title VII because he was an employee AES, not the hospital, and AES would have only been an independent contractor for the hospital. *Id.* The court held that AES's potential status as an independent contractor did not mean that the hospital had not interfered with the relationship between AES and the plaintiff. *Id.* at 1021. Additionally, the court noted the perverse result that would occur if an employer were allowed to discriminatorily interfere with an individual's

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 8 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1 059759-00001

Case 1:05-cv-00037     Document 291     Filed 07/17/2007     Page 12 of 60

employment opportunities with another employer, while it could not do so with its own employees. *Id.*

The issue of indirect-employer liability came before the court again in *Association of Mexican-American Educators v. California*, 231 F.3d 572 (9th Cir. 2000)(en banc). In this case, the plaintiffs, a class of prospective and current minority teachers, challenged the use of a skills test that was a prerequisite to employment in the public schools. *Id.* at 577. The plaintiffs alleged the test has a disparate impact on minorities. *Id.* at 578. The court found that Title VII covered the claims as the alleged discriminatory test interfered with future employment with public schools since it dictated whom the schools could hire. *Id.* at 581-82. The court emphasized that the ruling was based on the peculiar degree of control the state exercised over school districts because of the test. *Id.* at 581.

In *Anderson v. Pacific Maritime Assoc.*, the Ninth Circuit addressed the issue of whether the PMA could be liable under Title VII under indirect-employer liability. 336 F.3d 924 (9th Cir. 2003)(the PMA performed the same functions and duties as discussed in *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003), *supra*). The plaintiffs in the suit were African-American workers employed on the waterfront in Seattle and Tacoma. The plaintiffs alleged a "horrific and pervasive picture of racial animosity and discrimination" on the waterfront. *Id.* at 926. The allegations included the common use of racial slurs, racial innuendos, and racial jokes on the docks and well as the uses of racial slurs in the training materials. The plaintiffs also alleged direct, racially charged physical threats. *Id.*

The court held that the PMA could not be liable under Title VII. The court found that the alleged hostile work site was not controlled by the PMA and the PMA did not employ or supervise the plaintiffs or the alleged harassers. *Id.* at 931. "*Sibley* and its progeny extended

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 9 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1.059759-00001

Title VII coverage to indirect employers when those employers discriminated against *and* interfered with the employees' relationship with their employees." *Id.* (emphasis added). PMA did not interfere with the plaintiffs' relationship with their employers since it was the employers who allowed the allegedly hostile work environment. *Id.* "*Sibley* and its Ninth Circuit progeny condone liability when there exists discriminatory 'interference' by the indirect employer *and* where the indirect employer had some peculiar control of the employee's relationship with the direct employer." *Id.* at 932 (emphasis added).

In the present case, there was no discriminatory interference by DTS and DTS had no control over the Plaintiff's relationship with Calpac. In fact, none of the above-referenced cases lends support for a finding of indirect employer liability in this case. In *Sibley*, the hospital refused to allow the male nurse to see the patient; in *Gomez*, the hospital refused to hire the company with Hispanic doctors; and in *Association of Mexican-American Educators*, the state required the job applicants to take the test with the disparate impact on minorities. In all of the referenced cases, the "indirect employer" interfered with the employment relationship between the employee and direct employer. DTS did not have any control over the employment relationship between the Plaintiff and Calpac. DTS did not have the power to hire or fire employees, discipline employees, assign work assignments to employees, promote or demote employees, or perform employee evaluations. *See* Exhibits C at ¶¶ 5-7 and D at ¶ 13. John Healy testified that Dennis Clark never tried to influence Calpac to take any action that would affect the manner in which any of the plaintiffs were treated and did not make any comments to anyone at Calpac regarding any of the plaintiffs. Ex. B. at p. 87, ll. 2-6 and 12-15. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Furthermore,

Defendant Dynamic Technical Services, Inc.'s Memorandum                                    Page 10 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1.059759-00001

Healy testified that Clark and DTS never interfered in the relationship between Calpac and any of the Plaintiffs. *Id.* at p. 92, ll. 16-24.

Additionally, the work site involved in this lawsuit was not one that was controlled by DTS. Ex. D at ¶ 7. The worksite in question was a MCI worksite. Dennis Clark reported directly to MCI and took all work directives from MCI. DTS did not have any power to control the worksite, conduct any investigations on the worksite, or implement any rules for the worksite. *Id.* All of these functions were reserved to MCI. DTS did not even have the authority to remove Dennis Clark from the project. *Id.* at ¶ 6.

What the Plaintiff is essentially asking this Court to do is to create a new definition of employer for Title VII purposes. Nearly every type of construction job in the United States has a representative of some form at the construction site to accept the work performed by the contractor. In this case, MCI hired Dennis Clark to perform this function on their behalf. In cases of state road construction projects, the individual state's department of transportation sends out an inspector to ensure that the contract is being performed in accordance with contract specifications (i.e. the inspector will ensure the correct amount of asphalt is being laid and take samples of the asphalt for testing). In the residential construction industry, a governmental inspector will regularly come to a job site to inspect and approve electrical work and, if something is not correct, will communicate what needs to be corrected.

The Plaintiff claims that Mr. Clark could instruct him what to do on the jobsite, but all of the instructions were related to the inspection and approval of the project (i.e. ensuring that the work was being performed in accordance with the contract between Calpac and MCI). *See* Ex. A. at p. 35, ll. 11-19. Construction site inspectors are not employers and do not have any connection with an employment relationship. Inspectors do not hire or fire, supervise, discipline,

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 11 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1 059759-00001

Case 1:05-cv-00037    Document 291    Filed 07/17/2007    Page 15 of 60

evaluate, assign tasks, or perform any other functions of an employer in an employment relationship with respect to the workers on the job site. The position argued by the Plaintiff requires the extension of "employer" status under Title VII to any entity that desires to confirm that a construction project is being performed according to the terms of the contract or relevant construction codes.

## B.     Plaintiff's allegations do not amount to a hostile environment as a matter of law

Regardless of DTS' status as an "employer" under Title VII, the Plaintiff has failed to establish a claim for hostile work environment. A plaintiff may bring a lawsuit under Title VII for hostile work environment based upon racial or national origin harassment. To establish the existence of a hostile work environment plaintiff must prove that the workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(internal citations and quotation marks omitted). The hostile environment must be one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. *Id.* at 21-22. The Supreme Court in *Harris* held that the courts should look to the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance." *Id.* at 23. The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n. 1 (1998)(internal citation and quotation marks omitted).

The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the

Defendant Dynamic Technical Services, Inc.'s Memorandum                                    Page 12 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273 1 059759-00001

Case 1:05-cv-00037     Document 291     Filed 07/17/2007     Page 16 of 60

terms and conditions of employment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Not all workplace conduct that could be labeled as harassment affects a "term, condition, or privilege" of employment within the meaning of Title VII. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "The 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to sufficiently significant degree to violate Title VII." *Id.* (citing *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), cert. denied, 406 U.S. 957 (1972)).

The Western District of Washington held that the use of the phrase "Driving Miss Daisy" several times in the presence of an African-American worker and referring to another African-American driving a Caucasian within a two month period were not sufficient to create a racially hostile environment. *McZeal v. City of Seattle*, 2006 WL 3254504, at *5 (W.D.Wash. 2006). The court found that the comments were not so frequent or severe as to constitute a racially hostile work environment. *Id.* Furthermore, the Ninth Circuit found the use of the phrase "jungle bunny" in reference to an African-American did not create a hostile environment. *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978). The court commented that while the remark was a racially derogatory slur, it was not the sort of conduct to which Title VII was enacted to prohibit. *Id.* The court also observed that Title VII was not directed at ending all discrimination by individuals, but the eradication of discrimination by employers against employees. *Id.*

Additionally, the District Court of Connecticut found that isolated racially offensive comments did not create a hostile and abusive environment. *Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d 385, 396 (D.Conn. 2003)(complained of comments included: (1) coworker wished a hurricane over Puerto Rico would wipe out island and that "we could do without those people;" (2) "they should put Puerto Ricans on a plane and send them

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 13 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1.059759-00001

Case 1:05-cv-00037    Document 291    Filed 07/17/2007    Page 17 of 60

back to Puerto Rico;" and, (3) a nurse's negative comments that black and Puerto Rican patients were "low life pieces of shit, scum sucking dogs and welfare recipients). The District of Minnesota found that the use of the terms like "fag," "wimp," "sissy," "useless," "worthless," and "spic" failed to support a plaintiff's claim of hostile work environment based upon national origin and disability. *Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004, 1015 (D.Minn. 2003).

In the present case, Plaintiff testified that there were two incidents where Dennis Clark used the term "island monkeys" in reference to Calpac employees. Ex. A at p. 41, l. 14. The Plaintiff could not remember when these comments were made. Mr. Mendiola was employed with Calpac from April 2004 through December 7, 2004, a period of approximately ten months. Pls. 1st Am. Complaint at ¶¶ 120 and 123. Plaintiff alleges that, over the course of eight months of employment, two isolated statements were allegedly made by Mr. Clark. As a matter of law, this fails to amount to a hostile and abusive work environment according to the factors set out by the Supreme Court in *Harris*. The alleged discriminatory conduct was infrequent and not physically threatening, but rather a mere offensive utterance. Furthermore, if it is assumed that the two alleged statements were made, they did not unreasonably interfere with the Plaintiff's work performance. The Plaintiff testified after he heard the comments he continued working until the end of the day. Ex. A. at p. 46-47, ll. 24-25 and l. 1; p. 50, ll. 4-9. He further testified that no one ever complained about his work performance. *Id.* at p. 51, l. 25. The Plaintiff also testified that he was not mad at Dennis Clark for making the statements. *Id.* at p. 11, ll. 23-24. According to the Plaintiff's testimony, he could not remember when the second, and last, alleged discriminatory statement made by Clark occurred. It could have been up to four months before he was terminated. *Id.* at p. 52, l. 18. According to the Complaint, the last statement occurred in

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 14 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1 059759-00001

Case 1:05-cv-00037     Document 291     Filed 07/17/2007     Page 18 of 60

October 2004. Thus, Mr. Mendiola concedes that he did not encounter any discriminatory comments during at least the last two months of his employment. When looking at the "totality of the circumstances," the two alleged instances of racial slurs over the course of ten months were not "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. By his own testimony, the alleged remarks were not more than episodic and were not "sufficiently continuous and concerted in order to be deemed pervasive." *Farragher*, 524 U.S. at 787 n. 1. Therefore, DTS is entitled to summary judgment against Plaintiff on his Title VII causes of action.

**C.**   **DTS did not have any knowledge of any alleged discrimination and cannot be held liable under Title VII**

In the unlikely event that the court finds that DTS is an "employer" of the Plaintiff under Title VII and that Plaintiff has established a hostile environment claim, DTS cannot be held liable for the alleged actions of Clark because it did not have actual or constructive knowledge of the alleged discriminatory conduct. DTS was not made aware of any alleged discriminatory conduct by Dennis Clark until it was notified by Clark about the protesters which occurred in late December 2004. Ex. D at ¶ 9. There is no evidence, as none exists, that DTS had actual knowledge of Clark's alleged discriminatory statements until the EEOC complaint was received. Additionally, there are no allegations of harassment following the time of the protest or the time the complaint was received by DTS. In fact, according to the pleadings of the Plaintiff, there had been no incidents of alleged harassment in at least the two months preceding the protests on Guam. Pls. 1ˢᵗ Am. Complaint at ¶ 121.

An employer cannot be held liable for the harassment of an employee unless the employer both knows of it and fails to take remedial action. *Silver v. KCA, Inc.*, 586 F.2d 138,

Defendant Dynamic Technical Services, Inc.'s Memorandum                                    Page 15 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1.059759-00001

142 (9th Cir. 1978). This even holds true when there is a continuing course of harassment from an employee. *Id.* Occasional, sporadic remarks that occur in the workplace do not impose Title VII liability upon the employer. *Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)(citing *Merrick v. Farmers Ins.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990)). In *Greene*, the plaintiff's claim of a hostile work environment rested upon four instances of offensive language. The plaintiff reported one incident and racial harassment ceased from that time forward. The court held that the case was properly dismissed as against the employer and that the claim may have had substance if the employer knew of the conduct and failed to take action. *Id.*

In the present case, DTS did not learn of any allegations of discriminatory remarks until Mr. Clark informed DTS of the presence of the protesters in late December 2004, approximately four months after the last alleged discriminatory comment was allegedly made by Clark, according to the Plaintiff. Ex. D at ¶ 9. The Plaintiff never complained to anybody at DTS. Ex. A. at p. 56, ll. 20-22. The Plaintiff's EEOC Notice of Charge of Discrimination was not sent to DTS until February 24, 2005. Since DTS was not aware of the alleged harassment, it cannot be held liable under Title VII. *See Silver*, 892 F.2d at 1438-39.

Additionally, immediately upon learning that there were allegations that he had engaged in discriminatory conduct, Mr. Clark spoke at a meeting of Calpac employees and informed them that he did not make any such comments and would not discriminate against anyone based upon their Chamorro heritage. Mr. Clark informed DTS of this meeting and what he stated to the Calpac employees. There have been no allegations of discriminatory conduct by Clark or DTS subsequent to this meeting. In fact the Plaintiff does not make any allegations of any comments by Clark for at least the previous two months prior to him being layed-off from Calpac. There has not been one complaint of discriminatory comments by Clark subsequent to DTS learning of

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 16 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1.059759-00001

Case 1:05-cv-00037     Document 291     Filed 07/17/2007     Page 20 of 60

the Plaintiff's allegations in the EEOC complaint. *See* Ex. D at ¶¶ 9-11. Therefore, the Plaintiff cannot complain of any failure by DTS to take action after it acquired knowledge of the Plaintiff's complaints. DTS cannot be held liable under Title VII because: (1) DTS did not have any knowledge of Plaintiff's allegations prior to him filing a complaint with the EEOC and (2) once DTS became aware of the complaints, immediate remedial action was taken and no subsequent discriminatory acts have been alleged by Plaintiff.

## VI.
## CONCLUSION

DTS cannot be liable to Plaintiff under Title VII because: (1) DTS was not an employer of the Plaintiff as that term is defined under Title VII; (2) Based upon the Plaintiff's own testimony, he was not subjected to a hostile work environment for purposes of Title VII; and (3) DTS did not have actual or constructive knowledge of any of Plaintiff's complaints. For these reasons, DTS moves this Honorable Court to grant is Motion for Summary Judgment against Plaintiff Roland Mendiola.

DATED this 16th day of July, 2007.

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 17 of 17
in Support of Motion for Summary Judgment Against Plaintiff Roland F. Mendiola
4825-8965-4273.1.059759-00001

# Exhibit A

IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| HENRY G. VAN METER, ET AL, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| | § | |
| VS. | § | No. CIV05-00037 |
| | § | |
| | § | |
| CALPAC, ET AL | § | |
| | § | |
| | § | |
| Defendants | § | |

ORAL DEPOSITION OF:

ROLAND F. MENDIOLA

MAY 21, 2007

# COPY

# *Compex Legal Services*

*Houston    San Antonio    Dallas    Austin*

*(800) 969-6424*

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.      May 21, 2007

5

1          A.    Toto.

2          Q.    Where did you go to high school?

3          A.    GW.

4          Q.    What was your first job when you got out of high

5     school?

6          A.    Grocery store.

7          Q.    Which store?

8          A.    Gold Market.

9          Q.    And what year did you graduate high school?

10         A.    2002.

11         Q.    How long did you work for Gold Market?

12         A.    About a year.

13         Q.    What was your next job?

14         A.    I don't recall.  It's been a while back.

15         Q.    Okay.  Do you recall -- when did you start for

16    CalPac?

17         A.    2004.

18         Q.    Remember what month?

19         A.    I don't remember what month.

20         Q.    Okay.  Who hired you at CalPac?

21         A.    Dennis Harper.

22         Q.    And what position were you hired for?

23         A.    Fiber optics.

24         Q.    Can you explain what that means, what fiber optics

25    means?

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.        May 21, 2007

11

1       you personally?

2              A.    Yes.

3              Q.    How far away were you when he said that word?

4              A.    He was next to us in the trench.

5              Q.    Well, describe the job site at Tiyan when he used

6       that word.  Tell me what was occurring when he used that word.

7              A.    We were digging the trench, and I guess he was upset

8       because it was either too shallow or it was too deep, and

9       that's when he called us a bunch of island monkeys.

10                    MR. SMITH:   Objection, nonresponsive.

11             Q.    Who was present when he said that?

12             A.    A bunch of us, but I don't remember off the bat who

13      was there.

14             Q.    Did you feel insulted when he used that word?

15             A.    Yes.

16             Q.    Why?

17             A.    Because there's no reason for him to call us that

18      when -- you know, it's unprofessional.

19             Q.    Were you upset?

20             A.    Yes, I was.

21             Q.    Were you able to continue work that day?

22             A.    Yes.

23             Q.    Were you mad at him?

24             A.    No.

25             Q.    Okay.  Did you feel that you were insignificant

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.     May 21, 2007

35

1    A.    A couple of months, I guess.

2    Q.    Was there a representative of MCI on the job during

3    those couple of months before you first saw Mr. Clark?

4    A.    I don't remember.

5    Q.    And when -- after a few months of working on the job

6    and you first saw Mr. Clark, did anyone let you know who he was

7    there working for?

8    A.    I just knew that he was from MCI.

9    Q.    That he was their representative?

10   A.    Yes.

11   Q.    That he was there looking at your work to make sure

12   that it was done in the way the contract with MCI required it

13   to be done?

14   A.    Yes.

15   Q.    And from the contact that you had with Mr. Clark, did

16   it appear to you that the job he was doing was making sure that

17   the job was being done the way the contract required it to be

18   done?

19   A.    Yes.

20   Q.    Did you ever see at any time Dennis Clark out at a

21   job site doing anything besides inspecting the work and making

22   sure that it was being done the way the contract required it to

23   be done?

24   A.    What contract?

25   Q.    The contract between CalPac and MCI.

Case 1:05-cv-00037    Document 291    Filed 07/17/2007    Page 26 of 60

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.     May 21, 2007

41

1    A.    No.

2    Q.    Was he thin or overweight?

3    A.    Pretty heavy.

4    Q.    Did he appear to have --

5    A.    He wasn't thin.

6    Q.    Did he appear to have a large stomach?

7    A.    Yes.

8    Q.    Do you recall how old he was or how old he looked?

9    A.    Around the 50s.

10   Q.    Was anyone ever with him when he came?

11   A.    His wife.

12   Q.    Anyone else?

13   A.    I don't remember.

14   Q.    How often would his wife come with him?

15   A.    I don't remember.

16   Q.    Before the first time you heard Mr. Clark use the

17   term island monkeys, had you ever heard him use a term to

18   anyone that was a racial insult?

19   A.    No.

20   Q.    And do you recall what month it was in 2004 when you

21   for the first time heard Mr. Clark use the term island monkeys

22   when you and the other guys were working in the trench?

23   A.    No, I don't remember.

24   Q.    And do you recall what he was doing just before he

25   made the comment?

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.      May 21, 2007

43

 1   remember whether it was too shallow; or the complaint he was

 2   making, was it a correct complaint?

 3        A.   I don't remember whether it was too shallow or too

 4   deep, but he appeared upset.

 5        Q.   Did you have to correct any of the work that day

 6   after he made the comment?

 7        A.   No.  We just kept on doing what we were doing.

 8        Q.   Did he give you any instructions to do anything

 9   differently than you had been doing?

10        A.   I don't remember.

11        Q.   All right.  Now, you mentioned -- I want to talk

12   about this -- you said there were two times when you heard him

13   use the term island monkeys while you were around, correct?

14        A.   Yes.

15        Q.   The first time, did he -- what specifically did he

16   say when he used that term?

17        A.   I don't remember what he specifically said.

18        Q.   All right.  I mean, you agree he didn't just walk up

19   to the trench, look down and say island monkeys and then turn

20   around and leave.  He said some other things, right?

21        A.   Yes.

22        Q.   But you don't remember what they were?

23        A.   I don't remember.

24        Q.   And did he -- do you remember, when he said island

25   monkeys, what sentence he used that term in?

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.      May 21, 2007

46

1      Q.    What did you say to Mr. Van Meter?

2      A.    I reported it to him that Dennis called us island

3   monkeys.

4      Q.    Did you ask him to do anything about it?

5      A.    To report it to John Healy.

6      Q.    That's what you asked him to do?

7      A.    Yes, yes.

8      Q.    And did you ask him to -- for Mr. Healy to do

9   anything about it?

10     A.    I don't know.

11     Q.    Sir?

12     A.    I don't know.  I don't remember.

13     Q.    Now, when Mr. Clark made that comment, did he make it

14   directly to you or just the whole group?

15     A.    I think to all of us because he called all of us

16   island monkeys.

17     Q.    But he didn't say to you, "Roland, you're an island

18   monkey."  Is that right?

19     A.    No, he didn't say that.

20     Q.    Okay.  And he wasn't looking right at you personally

21   when he made this statement, was he?

22     A.    I don't remember.  I was in the trench.  I was too

23   busy digging.

24     Q.    Okay.  And you continued to keep busy digging right

25   after he made that comment, right?

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.    May 21, 2007

47

1        A.    Yes.

2        Q.    And kept doing your work all the way until the end of

3    the day, right?

4        A.    Yes.

5        Q.    And you were able to do that work just as hard as and

6    as good as you had done it before he made the comment, right?

7        A.    Pretty much, yeah.

8        Q.    And then how many days went by after that, between

9    that day and this second and last time you heard him use that

10    term?

11        A.    I don't recall.

12        Q.    Do you have any estimate at all as to whether it was

13    one day, one week, one month, two months?

14        A.    I don't remember.

15        Q.    Will was it closer to one day or closer to two

16    months?

17        A.    I don't remember.  It's been a while.

18        Q.    I understand.  You understand I'm just trying to find

19    out what you do remember.

20        A.    Yes.

21        Q.    I'm not criticizing you about it.  And between the

22    first day he said it and the second and last time he said it,

23    you didn't miss any days of work because of what he had said

24    that first time, did you?

25        A.    No.

Roland F. Mendiola  Henry C. Van Meter vs. CALPAC, et al.     May 21, 2007

50

1      Q.   And were you looking up at him at the time he made
2    the comment?
3      A.   No.  I was digging.
4      Q.   And after he made the comment, did you just keep
5    focusing on what you were doing?
6      A.   Yes.
7      Q.   Just keep digging all the way until the end of the
8    day?
9      A.   Yes.
10     Q.   And then did you complain again at the end of that
11   day?
12     A.   I complained to my supervisor about it.
13     Q.   Just like you had done the first time?
14     A.   Yes.
15     Q.   But again, you waited until the end of the day to do
16   that, right?
17     A.   No, I don't remember if it was the end of the day.
18     Q.   Just don't remember?
19     A.   Yes.
20     Q.   Do you remember what supervisor you complained to on
21   the second occasion?
22     A.   No.
23     Q.   Do you remember what else Mr. Clark said at all on
24   this second time when he used the term?
25     A.   No.

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.     May 21, 2007

51

1      Q.   Do you remember if he stuck around after he made the
2   comment or whether he made the comment and walked away?
3      A.   No, I don't remember.
4      Q.   Do you remember whether he came back to the job site
5   any other time that same day after making the comment?
6      A.   I don't recall.
7      Q.   So, for example, you can't recall whether he made the
8   comment in the morning and then came back two more times that
9   day before the end of the shift?
10     A.   I don't remember.
11     Q.   And then at the end of the day, do you remember which
12  supervisor you complained to?
13     A.   No.
14     Q.   Did you just say, "Hey, Mr. Clark made that comment
15  again."
16     A.   Yes, I said that.
17     Q.   Do you remember anything else that you said when you
18  complained about it?
19     A.   No, I don't remember.
20     Q.   After that second time that he made that comment, did
21  you miss any time from work because of it?
22     A.   No.
23     Q.   Did anyone ever, after that time, complain that you
24  weren't doing your job as well as you had been doing it before?
25     A.   No.

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.        May 21, 2007

52

1      Q.   Did the fact that Mr. Clark made those comments ever

2   change your attitude about how well you were going to do your

3   job or how hard you were going to work?

4      A.   No.

5      Q.   After those comments were made, did you work just as

6   hard and just as professionally as you had before he made those

7   comments?

8      A.   I had to.  It was my job.

9      Q.   And you took that seriously as a responsibility,

10  right?

11     A.   Yes, because it was my only job.

12     Q.   And after that second time, do you remember how many

13  more months went by that you worked for CalPac before you were

14  laid off?

15     A.   No, I don't remember.

16     Q.   Can't remember whether it was one week or four

17  months, right?

18     A.   Yes, I can't remember.

19     Q.   But whatever amount of time it was after that second

20  time, it never happened again, right?

21     A.   Yes.

22     Q.   And after that second time, whenever it was, no one

23  ever again made any, you know, comment to you that was related

24  to your race or your nationality, right?

25     A.   Right.

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.      May 21, 2007

56

1      A.    No, I don't remember.

2      Q.    The first time it was Mr. Van Meter, right?

3      A.    Yes.

4      Q.    The second time, you don't remember which one?

5      A.    No.

6      Q.    Did you ever complain to anybody else besides those

7    three guys?

8      A.    No.

9      Q.    Did you ever go to MCI and complain?

10      A.    No.

11      Q.    At the time that Mr. Clark was out there working on

12    the job, did you just assume he was an employee of MCI?

13      A.    No.  My supervisor told us he was from MCI.

14      Q.    Okay.  And did they ever tell you he worked for

15    anybody besides MCI?

16      A.    No.

17      Q.    Was it only after you got laid off that you heard

18    something about Dynamic Technical Services?

19      A.    Yes.

20      Q.    And so you would never complain to anybody at Dynamic

21    Technical Services about Mr. Clark, right?

22      A.    Right.

23      Q.    Do you have any reason to believe that MCI had

24    anything to do with having you terminated from your job?

25      A.    No.

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.      May 21, 2007

79

1                       IN THE DISTRICT COURT OF GUAM

2

    HENRY G. VAN METER, ET AL,        )

3                                      )
                                       )
4          Plaintiffs                  )
                                       )
5   VS.                                )   NO. CIV05-00037
                                       )
6                                      )
    CALPAC, ET AL                      )
7                                      )
                                       )
8          Defendants                  )
                                       )
9                                      )

10

                        REPORTER'S CERTIFICATION

11                  DEPOSITION OF ROLAND F. MENDIOLA
                              May 21, 2007

12

13       I, JOE A. WILLIAMS, Certified Shorthand Reporter in and

14   for the State of Texas, hereby certify to the following:

15       That the witness, ROLAND F. MENDIOLA, was duly sworn by

16   the officer and that the transcript of the oral deposition is a

17   true record of the testimony given by the witness;

18       That examination and signature of the witness to the

19   deposition transcript was waived by the witness and agreement

20   of the parties at the time of the deposition;

21       That the original deposition was delivered

22   to *Vincent Leon Guerrero*

23       That the amount of time used by each party at the

24   deposition is as follows:

25       DAVID LUJAN - 00 HOURS:00 MINUTE(S)

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.          May 21, 2007

80

1  ARTHUR K. SMITH - 1 HOURS: 1 MINUTE(S)

2  That $ _____ is the deposition officer's charges to

3  the DEFENDANT for preparing the original deposition transcript

4  and any copies of exhibits;

5  That pursuant to information given to the deposition

6  officer at the time said testimony was taken, the following

7  includes all parties of record:

8  DAVID LOGAN, Attorney for Plaintiffs

   THOMAS C. MOODY, III, Attorney for Defendant

9  CALPAC

   ARTHUR K. SMITH, Attorney for Defendant

10 PDS

11 That a copy of this certificate was served on all parties

12 shown herein on _____ and filed with the Clerk

13 pursuant to Rule 203.6.

14 I further certify that I am neither counsel for, related

15 to, nor employed by any of the parties or attorneys in the

16 action in which this proceeding was taken, and further that I

17 am not financially or otherwise interested in the outcome of

18 the action.

19 Certified to by me this _____ of June , 2007.

20

21

22                          JOE A. WILLIAMS, Texas CSR #422

                            Expiration Date: 12-31-08

23                          Firm Registration No. 281

24

25

COMPEX LEGAL SERVICES, INC.   (800) 969-6424

# Exhibit B

IN THE UNITED STATES DISTRICT COURT OF GUAM
FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, JAMES S. YEE, TEDDY C. CRUZ, JESSE B. CRUZ, TEDDY L.G. NAUTA, and JOHN B. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | ) CIVIL CASE NO. CIV05-00037 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

DEPOSITION TRANSCRIPT

OF

# JOHN T. HEALY

May 11, 2007

PREPARED BY:     GEORGE B. CASTRO
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates

1  Q  I -- we'll try to be as brief as
2  possible with you.  During the time that Mr.
3  Clark was working on the project, were you
4  aware of the fact that he had been hired by
5  Dynamic Technical Services to observe as the
6  MCI representative on the project?

7  A  Yes.

8  Q  At any time while Mr. Clark was on the
9  island and was performing any work related to
10  the project, did you ever have any
11  communication with any persons employed by
12  Dynamic Technical Services other than Mr.
13  Clark?

14  A  While Mr. Clark was working on the
15  project?

16  Q  Yes.

17  A  No, I did not.

18  Q  At any time before the first EEOC
19  complaint was filed by a plaintiff in this
20  lawsuit, did you ever have any communications
21  with any employees of Dynamic Technical
22  Services other than Mr. Clark?

23  A  No, I did not.

24  Q  Do you have any reason to believe that
25  before the first EEOC complaint was filed by

1  any of the plaintiffs in this lawsuit that
2  anyone at Dynamic Technical Services had
3  received any complaint about the manner in
4  which Dennis Clark had treated employees of
5  CalPac?

6      A   I don't know. I'm sorry, sir, what was
7  the question again?

8      Q   Do you have any reason to believe that
9  before the first EEOC complaint was filed,
10  anyone at Dynamic Technical Services had
11  received some notice or complaint about the
12  manner in which Dennis Clark had treated
13  employees of CalPac?

14      A   No, I have no reason to believe.

15      Q   All right. And was there any
16  communication by anyone at CalPac with Dennis
17  Clark, regarding the subject of whether any of
18  the plaintiffs should be terminated from their
19  employment with CalPac?

20      A   No.

21      Q   And before the protests in front of the
22  CalPac offices on December 20th of 2004, did
23  anyone at CalPac ever tell Dennis Clark that
24  any of the plaintiffs in this lawsuit had made
25  complaints about the way he was treating them?

1     A    No.

2     Q    Did Dennis Clark ever attempt to

3 influence you to take any action that would

4 affect the manner in which any of the

5 plaintiffs were treated by CalPac?

6     A    No.

7     Q    I'm sorry?

8     A    No. No, sir.

9     Q    Ever make any rude or insulting

10 comments to you about any of the plaintiffs?

11     A    No, never.

12     Q    To your knowledge, did he ever make any

13 such comments to anyone else at CalPac

14 regarding any of the plaintiffs?

15     A    Not to my knowledge.

16     Q    Did Mr. Clark ever ask you or try to

17 influence you to remove any of the plaintiffs

18 from the project?

19     A    No.

20     Q    Did Mr. Clark ever say anything to you

21 that caused you to change the way CalPac

22 treated any of the plaintiffs?

23     A    No. I mean, if Mr. Clark said the

24 project was falling behind, I may have told the

25 entire group to work smarter and faster and

1   more efficiently.

2       Q    Anything other than that?

3       A    No, sir.  No.

4       Q    Are you aware of any occasion where Mr.

5   Clark  said  anything  to  any  other  supervisor

6   personnel  at  CalPac  that  was  in  any  way  --  as

7   suggestion  on  his  part,  that  CalPac  should

8   mistreat  or  harass  or  in  some  way  take  any

9   action  to  harm  any  of  the  plaintiffs  in  this

10  lawsuit?

11      A    No, sir.

12      Q    At anytime before the -- let me back up

13  and  try  that  one  again.   It  is  true,  is  it  not,

14  that  Mr.  Clark  did  not  have  any  role  in  the

15  process  of  hiring  any  of  the  plaintiffs  to  work

16  for  CalPac,  correct?

17      A    Correct.

18      Q    It  is  also  correct  that  none  of  the

19  plaintiffs   during   the   course   of   their

20  performance  of  work  on  this  project  were  ever

21  employees   of   Dynamic   Technical   Services,

22  correct?

23      A    Correct.

24      Q    And  did  you  ever  witness  Mr.  Clark  ever

25  having  any  communication  directly  with  any  of

1    the plaintiffs, while they were on the job on

2    the project?

3       A   Yes, but I believe only to say "hello"

4    or --

5       Q   Just exchange pleasantries?

6       A   Exchange pleasantries, yes.

7       Q   Anything else?

8       A   Not that I recall.

9       Q   Did Dynamic Technical Services or Mr.

10   Clark have any authority to give out daily work

11   assignments to any of the plaintiffs with

12   respect to work that they will perform for

13   CalPac during the course of a given day?

14       A   No.

15       Q   Did anyone at CalPac ever call upon Mr.

16   Clark to perform supervision of the plaintiffs

17   that CalPac wanted to be performed of the

18   plaintiffs as they perform their work for

19   CalPac?

20       A   Not that I am aware of.

21       Q   Did CalPac ever consider Mr. Clark to

22   be a representative of CalPac?

23       A   No.

24       Q   Did CalPac ever consider Mr. Clark to

25   be someone who was providing services on the

1  A I'm sorry. Again, could you repeat

2 that question, sir?

3  Q Do you know of any reason why Mr.

4 Thompson and Mr. Camacho would not have brought

5 to your attention complaints that had been made

6 to them about the way Mr. Clark was treating

7 the workers?

8  A No.

9  Q If anyone had complained to Mr. Harper

10 about the manner in which Mr. Clark was

11 treating CalPac's -- the plaintiff's in this

12 lawsuit, are you aware of any reason why Mr.

13 Harper would not have brought that to your

14 attention?

15  A No.

16  Q So from -- would it be fair to say

17 based on the answers that you've provided to

18 the questions I've asked you, that Mr. Clark --

19 neither Mr. Clark nor anyone at Dynamic

20 Technical Services said or did anything that

21 interfered in the employer-employee

22 relationship that existed between CalPac and

23 the plaintiffs?

24  A That's correct.

25   MR. SMITH: I will pass the witness.

# REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 133 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 26th day of June, 2007.

_____

George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

# Exhibit C

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375


Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. 05-00037 <br><br><br><br><br><br> **AFFIDAVIT OF DENNIS P. CLARK** |

## AFFIDAVIT OF DENNIS P. CLARK

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF COLLIN | § |

BEFORE ME, the undersigned authority, on this day personally appeared Dennis P. Clark, who after being first duty sworn upon his oath deposed and said:

1. "My name is Dennis P. Clark. I am over the age of 18 and have no disabilities that would prevent me from giving this Affidavit. I have personal knowledge of the facts stated in this Affidavit, and they are true and correct.

2. I understand that Henry Van Meter, Jerry Apodaca, Jr., Joseph J. Hernandez, Joseph T. Mendiola, Larry L. Charfauros, Anthony C. Arriola, Robert Cruz, Roland F. Mendiola, James S. Yee, Teddy B. Cruz, Jesse B. Cruz, John L.G. Nauto, and John P. Babauta have filed claims against Calpac, Dynamic Technical Services, and other parties. When I use the term 'Plaintiffs' in this affidavit, I am referring to these thirteen individuals.

3. I worked for Dynamic Technical Services, Inc. as the MCI Company Representative on MCI's 'Guam International Ring' construction project. California Pacific Technical LLC ("Calpac") was the general contractor on this project. I was not an employee of Calpac and had no affiliation with Calpac other than my role as the MCI Company Representative under the contract between Calpac and MCI.

4. In my role as MCI Company Representative, my responsibilities included engineering; securing right-of-ways; verification of invoices; contracting and negotiating with the Historical Preservation Society, U.S. Military; the Department of Transportation, and Airport Authority; arranging a Environmental Protection Agency assessment; and inspections and

Case 1:05-cv-00037     Document 291     Filed 07/17/2007     Page 48 of 60

acceptance of Calpac's work under the terms of the contract. Less than half of my time was spent at the actual work sites where Calpac employees were present.

5.     My responsibilities as MCI Company Representative did not include being a supervisor of the Plaintiffs or any other Calpac employees. Under the express terms of the contract (including exhibits thereto) between Calpac and MCI, Calpac was responsible to provide all labor and all supervision of labor. It was not my role or responsibility under the contract to instruct Calpac employees how to do the work for the project, nor was it my responsibility to supervise their performance of such work. I was not responsible to ensure that Calpac employees followed applicable safety rules and Calpac company policies. I did not determine or have any say in how the Calpac work crews were assigned. I did not assign individual work assignments to Calpac employees. I did not determine the work schedule of Calpac employees, including when and where to report for work. Calpac employees did not contact me if they were sick or were going to be late for work. Calpac employees addressed any questions they had regarding their work to other Calpac employees. At the beginning of the project, I clearly told Calpac supervisory personnel, including Tim Camacho, Bill Thompson, and Don Harper, that my role on the project was not to supervise Calpac in the completion of the work they agreed to undertake in the contract with MCI.

6.     In my capacity as MCI company representative, I had no authority hire or fire employees of Calpac. More specifically, I did not hire or fire any of the Plaintiffs in this suit, nor did I participate in any way in Calpac's decision to hire or fire any of the Plaintiffs. I never recommended, demanded, suggested or implied that any of the Plaintiffs be hired or fired to Calpac.

7.    In my capacity as MCI company representative, I also had no authority regarding promotions, demotions, or discipline of employees of Calpac. Specifically, I never promoted, demoted, or disciplined any of the Plaintiffs or any other employees of Calpac. I did not determine and had no authority to determine the wages and benefits of Calpac employees. I never participated in any decision to promote, demote or discipline any of the Plaintiffs or any other employees of Calpac. Further, I did not have any authority to and did not perform employee evaluations of Calpac employees, including the Plaintiffs.

8.    In my capacity as MCI Company Representative, it was my duty to enforce all of MCI's rights under the contract with Calpac. One of my responsibilities in this regard was to inspect the work performed by Calpac to ensure that the work was completed in accordance with the terms of Calpac's contract with MCI. If, during the course of an inspection, I found work was not being performed in accordance with the terms of the contract, I would bring it to the attention of the Calpac superintendent or Forman on site. If a Calpac supervisor was not present at the site, I would communicate the problem to the laborers to prevent further delay and/or damage to the project. As MCI's Company Representative, it would not be beneficial to MCI to allow incorrect or improper work to continue causing delays and damages to equipment.

9.    I never used the terms 'monkey' or 'island monkey' in reference to any of the Plaintiffs or in any other regard at any time."

"FURTHER AFFIANT SAYETH NOT."

Dennis P. Clark

SUBSCRIBED AND SWORN TO BEFORE ME on this 23rd day of May, 2007, to certify which witness my hand and official seal.



Notary Public in and for the
State of Texas

My Commission expires:

_July 12, 2008_

# Exhibit D

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375


Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, L.P.*


## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br><br>**AFFIDAVIT OF LINDA G. HAYES** |

## AFFIDAVIT OF LINDA G. HAYES

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DENTON | § |

BEFORE ME, the undersigned authority, on this day personally appeared Linda G. Hayes, who after being first duty sworn upon his oath deposed and said:

1.      "My name is Linda G. Hayes. I am over the age of 18 and have no disabilities that would prevent me from giving this Affidavit. I have personal knowledge of the facts stated in this Affidavit, and they are true and correct.

2.      I know that Henry Van Meter, Jerry Apodaca, Jr., Joseph J. Hernandez, Joseph T. Mendiola, Larry L. Charfauros, Anthony C. Arriola, Robert Cruz, Roland F. Mendiola, James S. Yee, Teddy B. Cruz, Jesse B. Cruz, John L.G. Nauto, and John P. Babauta have filed claims against Calpac, Dynamic Technical Services, and other parties. When I use the term 'Plaintiffs' in this affidavit, I am referring to these thirteen individuals.

3.      I am the President of Dynamic Technical Services, L.P. ("DTS") and I have served in this capacity since May 1, 2006. Prior to being President and during the years 2004-2005, I was the Director of Recruiting for DTS. My duties as Director of Recruiting included interfacing with the customers concerning requests for personnel outsourcing services, providing the customers with names and resumes of qualified individuals for the customers' personnel requests, and interfacing with the customers regarding any personnel issues with any employee outsourced to the customer by DTS.

4.      I was contacted by MCI Worldcom Network Services, Inc. ("MCI") to locate an individual to serve as MCI's company representative on a construction project in Guam. I am personally familiar with the scope of services requested by MCI with regard to the project in

Guam. MCI did not request any other services from DTS other than locating potential candidates for the company representative position. I had worked with MCI in providing personnel for projects to them since 2001 and learned in the course of my employment that MCI and DTS have had a staffing relationship since 1996. I was personally involved in the collection of resumes from candidates interested in the position of MCI company representative and forwarded several resumes to MCI for their review, one of which was from Dennis Clark. While I was responsible for collecting the names of candidates for the position of company representative, MCI made the decision as to whom the position of company representative would be offered. MCI informed me that they wanted Dennis Clark to serve as its company representative on Guam. In my position as Director of Recruiting, I was MCI's point of contact at DTS regarding anything related to Dennis Clark. I was also Dennis Clark's point of contact at DTS regarding any matters concerning his employment.

5. After MCI selected Dennis Clark to serve as its company representative, I contacted Mr. Clark and arranged for him to come to Texas to meet with MCI representatives regarding the project. MCI requested to meet with Mr. Clark to go over the specifics of the project and his duties as company representative before he left for Guam. Mr. Clark told me that the project was discussed at this meeting and MCI informed him of the date that they wanted him to begin working on Guam. I did not attend this meeting, nor did any other employee or officer of DTS. At no point did I or any other employee or officer of DTS ever provide Mr. Clark with his duties on the Guam project, nor was anyone from DTS ever requested to perform this service by MCI.

6. After Mr. Clark was selected by MCI to serve as its company representative neither I, nor anyone else at DTS was involved in the project on Guam with the exception of

invoicing Mr. Clark's time to MCI for payment. During my communications with MCI regarding their project on Guam, MCI never requested that DTS instruct or supervise Dennis Clark regarding his role as MCI company representative. In my dealings with MCI prior to the Guam project, DTS was never involved of any aspect of the MCI project once MCI selected the personnel for the position other than invoicing the employee's time for payment. This course of dealing with MCI did not change with the project on Guam, nor did MCI request that it change. Mr. Clark informed me that he reported directly to Jeff Buehler of MCI and discussed any issues regarding the project with Mr. Buehler. Mr. Clark never called me with any questions regarding his duties and responsibilities for the project on Guam. All duties and responsibilities given to Dennis Clark regarding the project on Guam came from MCI, not from anyone at DTS. All issues that arose on the project were handled between Dennis Clark and MCI and did not involve myself or any other employees of DTS. DTS did not have the authority to remove Dennis Clark from the project. Only MCI could authorize the removal of Dennis Clark from the project. Any interaction between Dennis Clark and any of the Plaintiffs was in his role as company representative for MCI and not as an employee of DTS.

7.      As I was the individual contacted by MCI regarding the position of company representative, I have personal knowledge of the scope of DTS' obligations and responsibilities with regard to the project in Guam. The MCI project on Guam was not a DTS project and DTS did not have any right to control the project site under its agreement with MCI. From previous dealings with MCI and discussions with Dennis Clark, MCI was the party who had exclusive control over the project site. Neither I, nor any other employee or officer of DTS ever instituted any workplace rules for the Guam worksite or conducted any investigations regarding the Guam worksite. MCI never requested me or any other employee or officer of DTS to institute any

workplace rules for the Guam worksite or to conduct any investigations regarding the Guam worksite.

8.    In my former position of Director of Recruiting and current position of President, I am familiar with the position held by Dennis Clark with DTS. Mr. Clark did not have a supervisory or management position with DTS. He did not have the authority to hire, fire or discipline any employees of DTS or to create or institute any company policies.

9.    I never received any verbal or written allegations or complaints of discrimination until late December 2004 when Dennis Clark informed me and others at DTS that protesters on Guam were holding signs calling him a racist. There is no record of any communication received by DTS from anyone, including Calpac employees and management and MCI personnel, alleging discrimination or harassment by Dennis Clark before Mr. Clark informed DTS of the protesters in late December 2004. If anyone had called, written, or otherwise communicated a complaint, concern, or question regarding Dennis Clark to DTS, the communication would have been referred to me since one of my duties was to deal with personnel issues regarding employees contracted out to our customers. The first time that I, or anyone else at DTS, learned any specifics regarding the complaints of the Plaintiffs or even the identity of the Plaintiffs was when DTS received copies of the EEOC complaints filed by the Plaintiffs, beginning in 2005.

10.    When Mr. Clark informed me and others at DTS of the allegations, he stated that he had not made any discriminatory comments. Mr. Clark also informed me that he spoke at a meeting of all Calpac employees and informed the Calpac employees that he did not make any discriminatory statements and would not discriminate against any of the employees based upon their national origin or any other basis. I believed Mr. Clark's statement to Calpac's employees

at the meeting in late December 2004 was an appropriate action in response to the unspecified discrimination allegations we had received at that time. I have not received any complaints of any discriminatory comments allegedly made by Mr. Clark subsequent to this meeting.

11.     The first time myself or anyone else at DTS received any specific complaint regarding Dennis Clark, including the identity of the complaining party, was when I first received a copy of the notice of charge of discrimination from the EEOC in 2005. After I received the notice of charge of discrimination, I contacted Dennis Clark to discuss the allegations. During this conversation, I reiterated the non-discrimination policies of DTS to Mr. Clark and that it was not acceptable under DTS policy to use derogatory or discriminatory remarks in reference to others. Mr. Clark stated that he had never said the things that he was accused of saying in the complaint and that he never would say such things. Additionally, Mr. Clark stated that he understood the non-discrimination policies of DTS and would fully comply with them. I have not received any complaints of any discriminatory comments allegedly made by Mr. Clark subsequent to this telephone discussion and it is my understanding based upon the Plaintiffs' allegations, that there had not been any complaints regarding Dennis Clark for several months prior to this phone call.

12.     After the EEOC complaint was received, Carlos Morales, the President of DTS at the time, appointed Harry Reinwald, to respond to the complaint by informing the EEOC that the complainants were not employees of DTS and provide any other information requested by the EEOC.

13.     DTS did not hire or fire any of the Plaintiffs. DTS did not determine the wages, benefits, work schedules, or work assignments of any of the Plaintiffs. DTS did not institute any

work place rules or policies for any of the Plaintiffs. DTS did not discipline any of the employees and did not participate in any employee evaluations of any of the Plaintiffs."

"FURTHER AFFIANT SAYETH NOT."



Linda G. Hayes

SUBSCRIBED AND SWORN TO BEFORE ME on this 18th day of June, 2007, to certify which witness my hand and official seal.

Notary Public in and for the
State of Texas

My Commission expires:

10-22-09

PAT WYNN
My Commission Expires
October 22, 2009

## DECLARATION OF SERVICE

I, Elyze J. McDonald, hereby declare under penalty of perjury of the laws of the United States, that on July 17, 2007, I will cause to be served, via hand delivery, a true and correct copy of DEFENDANT DYNAMIC TECHNICAL SERVICES, INC.'S **MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF ROLAND F. MENDIOLA**; MEMORANDUM IN SUPPORT OF MOTION; EXHIBITS A-D; DECLARATION OF SERVICE upon the following Counsels of record:

>Delia Sablan Lujan, Esq.
>**LUJAN, AGUIGUI & PEREZ, LLP**
>Suite 300, Pacific News Building
>238 Archbishop F.C. Flores Street
>Hagåtña, Guam USA 96910
>Telephone: (671) 477-8064
>Facsimile: (671) 477-5297
>
>Attorneys for Plaintiffs Henry G. Van Meter, et al.

and

>William J. Blair, Esq.
>**BLAIR, STERLING, JOHNSON, MOODY,**
>**MARTINEZ & LEON GUERRERO, P.C.**
>Suite 1008, Pacific News Building
>238 Archbishop F.C. Flores Street
>Hagåtña, Guam USA 96910
>Telephone: (671) 477-7857
>Facsimile: (671) 472-4290
>
>Attorneys for Defendant California Pacific Technical Services, LLC
>John Healy, and William Ward

Executed this 16th day of July 2007 at Hagåtña, Guam.


_____
ELYZE J. McDONALD