ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, Inc.*



**FILED**
DISTRICT COURT OF GUAM

JUL 17 2007 mbo

MARY L.M. MORAN
CLERK OF COURT

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA. JR., JOSEPH J HERNANDEZ. JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC. DYNAMIC TECHNICAL SERVICES, MCI. JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES. and DOES 1 through 10,<br><br>Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br>DEFENDANT DYNAMIC TECHNICAL SERVICES, INC.'S **MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSEPH T. MENDIOLA**; MEMORANDUM IN SUPPORT OF MOTION; EXHIBITS A-D; DECLARATION OF SERVICE |

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Dynamic Technical Services, Inc. (hereinafter referred to as "DTS"), Defendant in the above entitled and numbered action and, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, files this Motion for Summary Judgment as to all claims asserted by Plaintiff Joseph T. Mendiola (hereinafter referred to as "Plaintiff"). This motion is made upon the attached memorandum, the record in this case, including without limitation the exhibits attached and filed contemporaneously herewith, and argument presented by counsel at the hearing.

WHEREFORE, PREMISES CONSIDERED, Defendant Dynamic Technical Services respectfully requests this court to enter and order dismissing all of Plaintiff Joseph T. Mediola's claims against DTS and for such further relief to which DTS shows itself justly entitled.

DATED this 16th day of July, 2007.

*Elyze Jmcdonald*

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola            Page 2 of 3
4826-7354-0353.1.059759-00001
Case 1:05-cv-00037     Document 294     Filed 07/17/2007     Page 2 of 54

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>          Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>          Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br><br><br><br><br>**DEFENDANT DYNAMIC TECHNICAL SERVICES' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSEPH T. MENDIOLA** |

Defendant Dynamic Technical Services, Inc.'s Memorandum         Page 1 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1.059759-00001

Case 1:05-cv-00037     Document 294     Filed 07/17/2007     Page 3 of 54

# INDEX OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) — 3

*Anderson v. Pacific Maritime Assoc.*, 336 F.3d 924 (9th Cir. 2003) — 9-10

*Association of Mexican-American Educators v. California*,
231 F.3d 572 (9th Cir. 2000) — 9-10

*Bonnette v. California Health and Welfare Agency*, 704 F.2d
1465 (9th Cir. 1983) — 5

*Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213 (10th Cir. 2002) — 6

*British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare
Fund*, 882 F.2d 371 (9th Cir. 1989) — 4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) — 3-4

*Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 123
S.Ct. 1673, 155 L.Ed.2d 615 (2003) — 6

*E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003) — 5-6

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) — 12, 14

*Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983) — 8, 10

*Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004 (D.Minn. 2003) — 13

*Graves v. Lowery*, 117 F.3d 723 (3d Cir. 1997) — 6

*Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991) — 15

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) — 12, 15

*Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980) — 8

*McZeal v. City of Seattle*, 2006 WL 3254504 (W.D.Wash. 2006) — 12

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986) — 12

*Merrick v. Farmers Ins.*, 892 F.2d 1434 (9th Cir. 1990) — 15

INDEX OF AUTHORITIES TO MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSEPH T. MENDIOLA          i
4828-9164-4161.1.059759-00001

Case 1:05-cv-00037     Document 294     Filed 07/17/2007     Page 4 of 54

*NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117 (3d. Cir. 1982)     5

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)     12

*Rivas v. Federacion de Asociaciones Pecuarias,* 929 F.2d 814 (1st Cir. 1991)     6

*Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971)     12

*Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d 385 (D.Conn. 2003)     13

*Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973)     7, 10

*Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir. 1978)     12, 15

*Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350 (11th Cir. 1994)     6

*Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067 (C.D.Cal. 2002)     5

**Statutes**

42 U.S.C. § 2000e(b)     4

42 U.S.C. § 2000e(f)     4

**Rules**

Federal Rule of Civil Procedure 56     3-4

## MEMORANDUM IN SUPPORT OF MOTION FOR
## SUMMARY JUDGMENT AGAINST PLAINTIFF JAMES S. YEE

### I.
### GROUNDS FOR MOTION

Defendant DTS brings this Motion for Summary Judgment against Plaintiff Joseph T. Mendiola on the following grounds:[1]

A)  Defendant DTS was not an "employer" of Plaintiff Joseph T. Mendiola as defined by Title VII of the Civil Rights Act of 1964 and cannot be subject to liability under the statute.

B)  There was no hostile work environment based upon the uncontroverted evidence.

C)  DTS did not have any knowledge of any alleged discrimination.

### II.
### SUMMARY JUDGMENT EVIDENCE

Defendant relies on the following exhibits, attached to this motion and incorporated by reference as if fully set forth herein:

A)  Selected pages of the deposition of Plaintiff Joseph T. Mendiola;

B)  Selected pages of the deposition of John Healy;

C)  Affidavit of Dennis P. Clark; and

D)  Affidavit of Linda Hayes.

### III.
### FACTUAL BACKGROUND

Plaintiff Joseph T. Mendiola filed this lawsuit along with twelve other plaintiffs on December 12, 2005. The Plaintiff filed his First Amended Complaint on February 24, 2006. All of Plaintiff's claims are brought under Title VII of Civil Rights Act of 1964. The Plaintiff was

---

[1] In Plaintiff's First Amended Complaint, the Plaintiff does not make any retaliation claims against DTS for termination. Plfs' 1st Am. Complaint ¶ 75.

Defendant Dynamic Technical Services, Inc.'s Memorandum                      Page 2 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1.059759-00001
Case 1:05-cv-00037     Document 294     Filed 07/17/2007     Page 6 of 54

employed by Defendant Calpac from April 2004 through December 7, 2004. Ex. A. at p. 35, ll. 17-18; Plfs. 1st Am. Complaint ¶ 72. During the course of his employment for Calpac, he worked on a construction project for MCI. Dennis Clark was the MCI "company representative" on this project and was an employee of DTS. Ex. C at ¶ 3. The Plaintiff alleges that Mr. Clark made discriminatory remarks in the presence of the Plaintiff on three occasions between September and October of 2004. Ex. A at p. 13, l. 12. The Plaintiff did not complain to anyone at DTS about the statements Dennis Clark allegedly made and no one at DTS became aware of Plaintiff's complaints until late December 2004 when Dennis Clark informed DTS of the existence of public protesters who were alleging that he made discriminatory comments. Ex. A at p/ 94, ll. 17-22; Ex. D at ¶ 9. Based upon these alleged statements made by Mr. Clark, the Plaintiff has filed the instant lawsuit seeking to recover damages from DTS under Title VII for hostile work environment.

## IV.
## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a court should grant summary judgment when, viewing the evidence in the light most favorable to the nonmoving party, the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing

Defendant Dynamic Technical Services, Inc.'s Memorandum    Page 3 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1.059759-00001
Case 1:05-cv-00037    Document 294    Filed 07/17/2007    Page 7 of 54

that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. Pro. 56(e). However, it is not necessary for the party moving for summary judgment to introduce evidence that negates the plaintiff's claim. *Celotex*, 477 U.S. 258, 323. Instead, the moving party may show in it motion that there is no evidence to support an essential element of the non-moving party's claim. *Id.* at 325. According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party: (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible. *British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989).

## V.
## ARGUMENTS & AUTHORITIES

### A. DTS is not an "employer" of Plaintiff and cannot be liable under Title VII

In order to be subject to liability for a hostile work environment[2] under Title VII, a defendant must be an "employer" as the statute defines that term. An "employer" is a "person engaged in an industry affecting interstate commerce who has fifteen or more employees..." 42 U.S.C. § 2000e(b). An employee is an "individual employed by an employer." 42 U.S.C. § 2000e(f). In the present case, it is uncontested that Calpac, not DTS, was the direct employer of Plaintiff J. Mendiola. Ex. A at p. 105 18-20; Ex. B at p. 88, ll. 18-23.

---

[2] Defendant expressly denies that Plaintiff was subjected to a hostile work environment as a matter of law. This topic is fully addressed in Section V.B. of this memorandum.

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 4 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297 1.059759-00001

Case 1:05-cv-00037     Document 294     Filed 07/17/2007     Page 8 of 54

## 1.    Defendant DTS is not liable under Title VII as a joint employer.

"Two or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment of the employee. *Swallows* [*v. Barnes & Noble Book Stores, Inc.*], 128 F.3d [990], 993 n. 4 [(6th Cir. 1997)] (citing *NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117, 1123 (3d. Cir. 1982))." *Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067, 1093 (C.D.Cal. 2002). In order to determine whether a joint employment relationship exists, the Ninth Circuit applies an "economic reality" test. *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983). Under that test, this court should consider all factors relevant to a particular situation when evaluating the economic realities of a relationship. *Id.* In determining joint employment, a large collection of factors has been suggested from the judiciary and governmental agencies. *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270, 1275 (9th Cir. 2003).

When determining if a joint employer relationship exists, the Third Circuit has explained it is a matter of determining which of the two, or whether both, of the parties control, in the capacity of employer, the labor relations of a given group of workers. *Browning-Ferris Indus. of Pa.*, 691 F.2d at 1122-23 (citing *NLRB v. Condenser Corp. of America*, 128 F.2d 67, 70 (3d Cir. 1942)). "The 'joint employer' concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment." *Id.*

The Supreme Court has summarized the various factors as to what it means to be an employer: "As the EEOC's standard reflects, an employer is the person, or group of persons, who owns and manages the enterprise. The employer can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of

Defendant Dynamic Technical Services, Inc.'s Memorandum                                    Page 5 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1 059759-00001
Case 1:05-cv-00037      Document 294      Filed 07/17/2007      Page 9 of 54

the business are to be distributed." *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 450, 123 S.Ct. 1673, 1680, 155 L.Ed.2d 615 (2003). The Ninth Circuit opined that the "Supreme Court seems to suggest that the *sine qua non* of determining whether one is an employer is that an 'employer' can hire and fire employees, can assign tasks to employees and supervise their performance." *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d at 1277 (citing *Clackamas*, 123 S.Ct. at 1680). "Logically, before a person or entity can be a joint employer, it must possess the attributes of an employer to some degree." *Id.* Numerous courts consider the key to joint employment to be the right to hire, supervise and fire employees. *See Bristol v. Bd. of County Comm'rs,* 312 F.3d 1213, 1219 (10th Cir. 2002) (en banc); *Graves v. Lowery,* 117 F.3d 723, 727-728 (3d Cir. 1997); *Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350, 1361 (11th Cir. 1994); *Rivas v. Federacion de Asociaciones Pecuarias,* 929 F.2d 814, 820-821 (1st Cir. 1991).

In *E.E.O.C. v. Pacific Maritime Assoc.*, a Title VII sexual harassment action was brought against Pacific Maritime Association ("PMA"). 351 F.3d 1270 (9th Cir. 2003). PMA is an association of stevedoring companies ("member-employers") that performed organizational tasks on behalf of its members, negotiated a collective bargaining agreement, operated a dispatch hall jointly with a union, and provided payroll services for its members. *Id.* at 1274. The plaintiff alleged that, along with the member-employer of PMA that hired her, PMA was a joint employer of her. However, the Ninth Circuit found that PMA did not supervise the longshoremen, had no power to hire or fire longshoremen, had no power to discipline longshoremen, and did not supervise the work sites. The court found that it was undisputed that the monitoring and control over the work sites, as well as the control of the employees, was within the sole province of the member-employees. Accordingly, the Court held that PMA was not a joint employer of the plaintiff. *Id.* at 1274.

Defendant Dynamic Technical Services, Inc.'s Memorandum                                    Page 6 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1.059759-00001
Case 1:05-cv-00037     Document 294     Filed 07/17/2007     Page 10 of 54

Similarly, in the present case, DTS had no authority to hire or fire Calpac employees, did not supervise Calpac employees or give them work assignments, had no power to discipline Calpac employees, did not determine wages or benefits of Calpac employees, and did not decide how profits or losses of Calpac were to be distributed. *See* Exhibits C at ¶¶ 5-7 and D at ¶ 13. John Healy, the President of Calpac, testified that he did not have any communications with anyone at DTS prior to receiving the first EEOC complaint. Ex. B at p. 85, ll. 18-23. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Mr. Healy also testified that Mr. Clark was not a supervisor of the plaintiffs, did not give out daily work assignments, and did not hire any of the plaintiffs. *Id.* at pp. 88-89, ll. 12-17, 9-20. Therefore, as a matter of law, this uncontroverted evidence establishes that DTS was not a joint employer of the Plaintiff with Calpac.

## 2. Defendant DTS is not liable under Title VII as an indirect employer

The D.C. Circuit first addressed indirect-employer liability in *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973). The hospital ran a nursing office where patients could request the service of a private duty nurse. The hospital would then contact outside referral sources and request a private nurse be sent to the hospital. The private nurses were employees of the patients, not the hospital. In *Sibley*, a male nurse alleged that on at least two occasions hospital nurses rejected him upon arrival because he was male and the requesting patient was female. The male nurse subsequently sued under Title VII for discrimination.

On appeal, the court noted that one of the goals of Title VII was to equalize access to job opportunities. *Id.* at 1340. The court held that Title VII did not explicitly require a direct employer-employee relationship, but it did not mean that no relationship was required for a claim

Defendant Dynamic Technical Services, Inc.'s Memorandum                                    Page 7 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1 059759-00001
Case 1:05-cv-00037          Document 294          Filed 07/17/2007          Page 11 of 54

to fall under Title VII. The Court stated: "We think it is significant that [Title VII] has addressed the problems of interference with the direct employment relationship by labor unions and employment agencies-institutions which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties. On the facts as alleged...[the hospital] is so circumstanced, and its daily operations are of such a character as to have such nexus to the third parties in this case..." *Id.* at 1342.

The Ninth Circuit first addressed the issue of indirect-employer liability in *Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980). The court noted for Title VII to apply, "there must be some connection with an employment relationship" though the "connection...need not necessarily be direct." *Id.* at 883. The court explained "[t]his might occur where a defendant subject to Title VII interferes with an individual's employment opportunities with another employer." *Id.* at 883 n. 3.

The Ninth circuit addressed the issue again in *Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983). In this case, the plaintiff was a Hispanic physician working for a corporation named AES. On behalf of AES, the plaintiff submitted a proposal to the defendant to operate the hospital's emergency room. The hospital allegedly turned down the proposal because too many Hispanics worked for AES. *Id.* at 1020. The court reversed a summary judgment granted to the hospital on the basis that the plaintiff lacked standing under Title VII because he was an employee of AES, not the hospital, and AES would have only been an independent contractor for the hospital. *Id.* The court held that AES's potential status as an independent contractor did not mean that the hospital had not interfered with the relationship between AES and the plaintiff. *Id.* at 1021. Additionally, the court noted the perverse result that would occur if an employer were allowed to discriminatorily interfere with an individual's

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 8 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1 059759-00001

Case 1:05-cv-00037     Document 294     Filed 07/17/2007     Page 12 of 54

employment opportunities with another employer, while it could not do so with its own employees. *Id.*

The issue of indirect-employer liability came before the court again in *Association of Mexican-American Educators v. California*, 231 F.3d 572 (9th Cir. 2000)(en banc). In this case, the plaintiffs, a class of prospective and current minority teachers, challenged the use of a skills test that was a prerequisite to employment in the public schools. *Id.* at 577. The plaintiffs alleged the test has a disparate impact on minorities. *Id.* at 578. The court found that Title VII covered the claims as the alleged discriminatory test interfered with future employment with public schools since it dictated whom the schools could hire. *Id.* at 581-82. The court emphasized that the ruling was based on the peculiar degree of control the state exercised over school districts because of the test. *Id.* at 581.

In *Anderson v. Pacific Maritime Assoc.*, the Ninth Circuit addressed the issue of whether the PMA could be liable under Title VII under indirect-employer liability. 336 F.3d 924 (9th Cir. 2003)(the PMA performed the same functions and duties as discussed in *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003), *supra*). The plaintiffs in the suit were African-American workers employed on the waterfront in Seattle and Tacoma. The plaintiffs alleged a "horrific and pervasive picture of racial animosity and discrimination" on the waterfront. *Id.* at 926. The allegations included the common use of racial slurs, racial innuendos, and racial jokes on the docks and well as the uses of racial slurs in the training materials. The plaintiffs also alleged direct, racially charged physical threats. *Id.*

The court held that the PMA could not be liable under Title VII. The court found that the alleged hostile work site was not controlled by the PMA and the PMA did not employ or supervise the plaintiffs or the alleged harassers. *Id.* at 931. "*Sibley* and its progeny extended

Defendant Dynamic Technical Services, Inc.'s Memorandum                     Page 9 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1 059759-00001
Case 1:05-cv-00037     Document 294     Filed 07/17/2007     Page 13 of 54

Title VII coverage to indirect employers when those employers discriminated against *and* interfered with the employees' relationship with their employees." *Id.* (emphasis added). PMA did not interfere with the plaintiffs' relationship with their employers since it was the employers who allowed the allegedly hostile work environment. *Id.* "*Sibley* and its Ninth Circuit progeny condone liability when there exists discriminatory 'interference' by the indirect employer *and* where the indirect employer had some peculiar control of the employee's relationship with the direct employer." *Id.* at 932 (emphasis added).

In the present case, there was no discriminatory interference by DTS and DTS had no control over the Plaintiff's relationship with Calpac. In fact, none of the above-referenced cases lends support for a finding of indirect employer liability in this case. In *Sibley*, the hospital refused to allow the male nurse to see the patient; in *Gomez*, the hospital refused to hire the company with Hispanic doctors; and in *Association of Mexican-American Educators*, the state required the job applicants to take the test with the disparate impact on minorities. In all of the referenced cases, the "indirect employer" interfered with the employment relationship between the employee and direct employer. DTS did not have any control over the employment relationship between the Plaintiff and Calpac. DTS did not have the power to hire or fire employees, discipline employees, assign work assignments to employees, promote or demote employees, or perform employee evaluations. *See* Ex. C at ¶¶ 5-7 and D at ¶ 13. John Healy testified that Dennis Clark never tried to influence Calpac to take any action that would affect the manner in which any of the plaintiffs were treated and did not make any comments to anyone at Calpac regarding any of the plaintiffs. Ex. B. at p. 87, ll. 2-6 and 12-15. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Furthermore, Healy testified that

Defendant Dynamic Technical Services, Inc.'s Memorandum
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1.059759-00001

Page 10 of 16

Case 1:05-cv-00037    Document 294    Filed 07/17/2007    Page 14 of 54

Clark and DTS never interfered in the relationship between Calpac and any of the Plaintiffs. *Id.* at p. 92, ll. 16-24.

Additionally, the work site involved in this lawsuit was not one that was controlled by DTS. Ex. D at ¶ 7. The worksite in question was a MCI worksite. Dennis Clark reported directly to MCI and took all work directives from MCI. DTS did not have any power to control the worksite, conduct any investigations on the worksite, or implement any rules for the worksite. *Id.* All of these functions were reserved to MCI. DTS did not even have the authority to remove Dennis Clark from the project. *Id.* at ¶ 6.

**B.    Plaintiff's allegations do not amount to a hostile environment as a matter of law**

Regardless of DTS' status as an "employer" under Title VII, the Plaintiff has failed to establish a claim for hostile work environment. A plaintiff may bring a lawsuit under Title VII for hostile work environment based upon racial or national origin harassment. To establish the existence of a hostile work environment plaintiff must prove that the workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)(internal citations and quotation marks omitted). The hostile environment must be one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. *Id.* at 21-22. The Supreme Court in *Harris* held that the courts should look to the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance." *Id.* at 23. The incidents "must be more than episodic; they must

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 11 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1.059759-00001

Case 1:05-cv-00037    Document 294    Filed 07/17/2007    Page 15 of 54

be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 n. 1 (1998)(internal citation and quotation marks omitted).

The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Not all workplace conduct that could be labeled as harassment affects a "term, condition, or privilege" of employment within the meaning of Title VII. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986). "The 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to sufficiently significant degree to violate Title VII." *Id.* (citing *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir. 1971), cert. denied, 406 U.S. 957 (1972)).

The Western District of Washington held that the use of the phrase "Driving Miss Daisy" several times in the presence of an African-American worker and referring to another African-American driving a Caucasian within a two month period were not sufficient to create a racially hostile environment. *McZeal v. City of Seattle,* 2006 WL 3254504, at *5 (W.D.Wash. 2006). The court found that the comments were not so frequent or severe as to constitute a racially hostile work environment. *Id.* Furthermore, the Ninth Circuit found the use of the phrase "jungle bunny" in reference to an African-American did not create a hostile environment. *Silver v. KCA, Inc.,* 586 F.2d 138, 141 (9th Cir. 1978). The court commented that while the remark was a racially derogatory slur, it was not the sort of conduct to which Title VII was enacted to prohibit. *Id.* The court also observed that Title VII was not directed at ending all discrimination by individuals, but the eradication of discrimination by employers against employees. *Id.*

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 12 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1.059759-00001
Case 1:05-cv-00037      Document 294      Filed 07/17/2007      Page 16 of 54

Additionally, the District Court of Connecticut found that isolated racially offensive comments did not create a hostile and abusive environment. *Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d 385, 396 (D.Conn. 2003)(complained of comments included: (1) coworker wished a hurricane over Puerto Rico would wipe out island and that "we could do without those people;" (2) "they should put Puerto Ricans on a plane and send them back to Puerto Rico;" and, (3) a nurse's negative comments that black and Puerto Rican patients were "low life pieces of shit, scum sucking dogs and welfare recipients). The District of Minnesota found that the use of the terms like "fag," "wimp," "sissy," "useless," "worthless," and "spic" failed to support a plaintiff's claim of hostile work environment based upon national origin and disability. *Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004, 1015 (D.Minn. 2003).

In the present case, the Plaintiff testified that there were three incidents where Dennis Clark referred to Calpac workers as "island monkeys" or "monkeys" between September and October 2004. Ex. A at p. 13, l. 12 and p. 72, l. 13. Mr. Mendiola was employed with Calpac from April 2004 through December 7, 2004, a period of approximately eight months. Plfs. 1st Am. Complaint ¶ 72. The Plaintiff testified that he never heard any racial remarks prior to September 2004 or after October 2004. Ex. A at p. 75, l. 1-4 and pp. 91-92, ll. 25 and 1-3. Plaintiff alleges that, over the course of over eight months of employment, three isolated statements were allegedly made by Mr. Clark. As a matter of law, this fails to amount to a hostile and abusive work environment according to the factors set out by the Supreme Court in *Harris*. The alleged discriminatory conduct was infrequent and not physically threatening, but rather a mere offensive utterance. According to the Plaintiff's testimony, the last alleged discriminatory statement made by Clark occurred in October of 2004. Thus, Mr. Mendiola

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 13 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1.059759-00001
Case 1:05-cv-00037      Document 294      Filed 07/17/2007      Page 17 of 54

concedes that he did not encounter any discriminatory comments during the last two months of his employment on the job. When looking at the "totality of the circumstances," the three alleged instances of racial slurs over the course of eight months were not "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. By his own testimony, the alleged remarks were not more than episodic and were not "sufficiently continuous and concerted in order to be deemed pervasive." *Farragher*, 524 U.S. at 787 n. 1. Therefore, DTS is entitled to summary judgment against Plaintiff on his Title VII causes of action.

## C. DTS did not have any knowledge of any alleged discrimination and cannot be held liable under Title VII

In the unlikely event that the court finds that DTS is an "employer" of the Plaintiff under Title VII and that Plaintiff has established a hostile environment claim, DTS cannot be held liable for the alleged actions of Clark because it did not have actual or constructive knowledge of the alleged discriminatory conduct. DTS was not made aware of any alleged discriminatory conduct by Dennis Clark until it was notified by Clark about the protesters which occurred in late December 2004. Ex. D at ¶ 9-11. There is no evidence, as none exists, that DTS had actual knowledge of Clark's alleged discriminatory statements until the EEOC complaint was received. The Plaintiff testified that he does not have any information that leads him to believe that anyone at DTS was aware of any complaints made against Clark. Ex. A. at p. 94, ll. 17-22. Additionally, there are no allegations of harassment following the time of the protest or the time the complaint was received by DTS. In fact, according to the testimony of the Plaintiff, there had been no incidents of alleged harassment in the three months preceding the protests on Guam. Ex. A. at 91-92, ll. 25 and 1-3.

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 14 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1.059759-00001

Case 1:05-cv-00037      Document 294      Filed 07/17/2007      Page 18 of 54

An employer cannot be held liable for the harassment of an employee unless the employer both knows of it and fails to take remedial action. *Silver v. KCA, Inc.*, 586 F.2d 138, 142 (9th Cir. 1978). This even holds true when there is a continuing course of harassment from an employee. *Id.* Occasional, sporadic remarks that occur in the workplace do not impose Title VII liability upon the employer. *Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)(citing *Merrick v. Farmers Ins.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990). In *Greene*, the plaintiff's claim of a hostile work environment rested upon four instances of offensive language. The plaintiff reported one incident and racial harassment ceased from that time forward. The court held that the case was properly dismissed as against the employer and that the claim may have had substance if the employer knew of the conduct and failed to take action. *Id.*

In the present case, DTS did not learn of any allegations of discriminatory remarks until Mr. Clark informed DTS of the presence of the protesters in late December 2004, approximately four months after the last alleged discriminatory comment was allegedly made by Clark, according to the Plaintiff. Ex. D at ¶ 9. The Plaintiff's EEOC Notice of Charge of Discrimination was not sent to DTS until February 24, 2005. Since DTS was not aware of the alleged harassment, it cannot be held liable under Title VII. *See Silver*, 892 F.2d at 1438-39.

Additionally, immediately upon learning that there were allegations that he had engaged in discriminatory conduct, Mr. Clark spoke at a meeting of Calpac employees and informed them that he did not make any such comments and would not discriminate against anyone based upon their Chamorro heritage. Mr. Clark informed DTS of this meeting and what he stated to the Calpac employees. There have been no allegations of discriminatory conduct by Clark or DTS subsequent to this meeting. In fact the Plaintiff does not make any allegations of any comments by Clark for approximately the previous four months leading up to this meeting. There has not

Defendant Dynamic Technical Services, Inc.'s Memorandum                    Page 15 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1.059759-00001
Case 1:05-cv-00037     Document 294     Filed 07/17/2007     Page 19 of 54

been one complaint of discriminatory comments by Clark subsequent to DTS learning of the Plaintiff's allegations in the EEOC complaint. Ex. D. at ¶¶ 9-11. Therefore, the Plaintiff cannot complain of any failure by DTS to take action after it acquired knowledge of the Plaintiff's complaints. DTS cannot be held liable under Title VII because: (1) DTS did not have any knowledge of Plaintiff's allegations prior to him filing a complaint with the EEOC and (2) once DTS became aware of the complaints, immediate remedial action was taken and no subsequent discriminatory acts have been alleged by Plaintiff.

## VI.
## CONCLUSION

DTS cannot be liable to Plaintiff under Title VII because: (1) DTS was not an employer of the Plaintiff as that term is defined under Title VII; (2) Based upon the Plaintiff's own testimony, he was not subjected to a hostile work environment for purposes of Title VII; and (3) DTS did not have actual or constructive knowledge of any of Plaintiff's complaints. For these reasons, DTS moves this Honorable Court to grant is Motion for Summary Judgment against Plaintiff Joseph T. Mendiola.

DATED this 16th day of July, 2007.

*Elyze McDonal*

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Defendant Dynamic Technical Services, Inc.'s Memorandum                Page 16 of 16
in Support of Motion for Summary Judgment Against Plaintiff Joseph T. Mendiola
4828-2453-5297.1.059759-00001
Case 1:05-cv-00037    Document 294    Filed 07/17/2007    Page 20 of 54

# Exhibit A

Case No. CIV05-00037

## Page 1

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY
APODACA, JR., JOSEPH J.
HERNANDEZ, JOSEPH T. MENDIOLA,
LARRY L. CHARFAUROS, ANTHONY
C. ARRIOLA, ROBERT B. CRUZ,
ROLAND F. MENDIOLA, JAMES S.
YEE, TEDDY B. CRUZ, JESSE B.
CRUZ, JOHN L.G. NAUTA, and
JOHN P. BABAUTA,

    Plaintiffs,

vs.

CALPAC, DYNAMIC TECHNICAL
SERVICES, MCI, JOHN HEALY,
DENNIS CLARK, WILLIAM WARD,
JAI JAMES and DOES 1 through
10,

    Defendants.

CASE NO. CIV05-00037

DEPOSITION OF
JOSEPH T. MENDIOLA
MAY 8, 2007

The deposition of Joseph T. Mendiola, called by Defendants CalPac, John Healy and William Ward, pursuant to Notice and pursuant to the Federal Rules of Civil Procedure, taken at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, P.C., Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam 96910, on Tuesday, the 8th day of May, 2007, at the hour of 9:10 o'clock a.m.

That at said time and place, there transpired the following:

Cecilia F. Flores
Freelance Stenotype Reporter
Tel: (671) 632-0727 • FAX: (671) 632-5353

## Page 2

Case No. CIV05-00037      2

A P P E A R A N C E S :

For the Plaintiffs     Delia B. Lujan, Esq.
                    LUJAN AGUIGUI & PEREZ
                    Suite 300, Pacific News Bldg.
                    238 Archbishop Flores Street
                    Hagatna, Guam 96910

For Defendant CalPac    Vincent Leon Guerrero, Esq.
John Healy and William   BLAIR STERLING JOHNSON
Ward                 MARTINEZ & LEON GUERRERO
                    Suite 1008 Pacific News Building
                    238 Archbishop F.C. Flores Street,
                    Hagatna, Guam 96910

For Defendant Dynamic   Arthur K. Smith, Esq.
Technical Services and   507 Prestige Circle
Dennis Clark          Allen, Texas 75002-3538

JOSEPH T. MENDIOLA: MAY 8, 2007

## Page 3

Case No. CIV05-00037      3

I N D E X

E X A M I N A T I O N

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| By Mr. Leon Guerrero | 4 |  | 111 |  |
| By Mr. Smith |  | 71 |  |  |
| By Ms. Lujan |  | 108 |  |  |

E X H I B I T S

| Defendants': | Description: | Page Marked: |
|---|---|---|
| Exhibit A - | Termination Letter from CalPac | 25 |
| Exhibit B - | Charge of Discrimination filed with EEOC | 36 |
| Exhibit C - | EEOC Questionnaire | 64 |

COPY

JOSEPH T. MENDIOLA: MAY 8, 2007

## Page 4

Case No. CIV05-00037      4

HAGATNA, GUAM: MAY 8, 2007; 9:10 o'clock A.M.

JOSEPH T. MENDIOLA

called by Defendant California Pacific Technical Services LLC to give his deposition at this time, being first duly sworn, was examined and testified on his oath, as follows:

DIRECT EXAMINATION

BY MR. LEON GUERRERO:

   Q. Okay, Mr. Mendiola, can you just state your full name for the record and spell your last name?

   A. Joseph Tenorio Mendiola; M-E-N-D-I-O-L-A.

   Q. Okay. This is the deposition of Joseph Mendiola in the District Court of Guam, Case Number 05-00037, Van Meter, et al. v. CalPac, et al. Present in our conference room is Mr. Mendiola along with his counsel, Delia Leon Guerrero.

   MS. LUJAN: Lujan.

   Q. (By Mr. Leon Guerrero) I'm sorry, Delia Lujan. And I'm Vince Leon Guerrero representing CalPac. Also present is Art Smith via telephone representing Dynamic Technical Services. I guess we'll just start with a little of your background. Mr. Mendiola, can you just start off with your education, how far did you go and that sort of stuff?

   A. I received my, uh, GED in 1980 -- 1993.

   Q. GED?

JOSEPH T. MENDIOLA: MAY 8, 2007

1  count that you are alleging; correct?  Beginning at page 10.
2      A.   Yes.
3      Q.   Okay.  Paragraph 73 of the Complaint refers to, I
4  guess, the incidents or the allegation of whether the remarks
5  were made; would that be about right?
6      A.   Yes.
7      Q.   Okay, and it says during the period on or about
8  September to October 2004 or thereafter, you were harassed
9  and discriminated against on the basis of race, national
10 origin and color by Defendant Clark who called you and other
11 plaintiffs island monkeys or monkey; correct?
12     A.   Correct.
13     Q.   Okay.  When was the first time that you believe you
14 were called an island monkey or a monkey?
15     A.   I believe the first time, uh, the first incident
16 occurred when, uh, it was up in Tiyan in front of Pass and
17 ID, the Pass and ID building.
18     Q.   Okay.  Who was there at that time?
19     A.   I don't recall.  The only one that I did recall
20 that was there at the time was, of course, Dennis Clark,
21 because he had made the racial remark, and my supervisor I
22 believe at that time was either Henry Van Meter or Henry
23 Quintanilla who I reported the, the remarks to.
24     Q.   And you said it was either Mr. Van Meter or Mr.
25 Quintanilla; right?

---

1      A.   Yes.
2      Q.   Do you remember which one it was?
3      A.   No.
4      Q.   And you also said you made a complaint to one of
5  them.
6      A.   Yes.
7      Q.   Do you remember making a complaint to which one?
8      A.   No.
9      Q.   You just know you made a complaint to either Mr.
10 Van Meter or Mr. Quintanilla?
11     A.   Yes, because they were the supervisors on site.
12     Q.   Did you make any complaints to anybody else?
13     A.   For that incident there; the first incident?
14     Q.   Yes.
15     A.   No, I believe it was just the two of them.
16     Q.   Okay, so are you saying that you made a complaint
17 to both of them?
18     A.   I'm saying one of them, I'm sorry.
19     Q.   Okay.  So you go and talk to one person about the
20 first incident; is that what you're saying?
21     A.   Yes.
22     Q.   Did you tell anyone else?
23     A.   Uh, no.
24     Q.   Okay.  Do you remember who else was with you
25 besides Mr. Van Meter or Mr. Quintanilla?

---

1      A.   No, I don't.  Although I do know that I, uh, had,
2  uh, you know, I co-workers, you know, there too, but as far as
3  who was there exactly I can't recall.
4      Q.   There are twelve other plaintiffs in this lawsuit;
5  correct?
6      A.   I believe so, yes.
7      Q.   Did you ever talk to any of these other plaintiffs
8  about what happened?
9      A.   Outspokenly?  Yes, we have.
10     Q.   Okay.  What do you recall talking to them about?
11     A.   Just about the remarks that was made.  The remark at
12 the time that was made and all that and, uh, we just made our
13 verbal complaint to the supervisors.  I believe it was Henry
14 Quintanilla or Henry Van Meter, or it could have been both,
15 but this was during our lunch break.
16     Q.   Well, let's just get into the specifics of who you
17 talked to.  Did you talk to any of the other plaintiffs about
18 the first incident at Tiyan?
19     A.   Yes, we -- like I said, we had spoken to it during
20 our lunch break.
21     Q.   Okay.  Do you remember talking to Jerry Apodaca
22 about the first incident?
23     A.   No.
24     Q.   Okay, who among the plaintiffs that are in this
25 lawsuit have you talked to about the first incident, that you

---

1  can remember?
2      A.   I can't recall.
3      Q.   Okay.  Not necessarily the first day that this
4  happened, but do you ever recall talking to any of the other
5  plaintiffs about the first incident?
6      A.   No, not about, not about the first incident.
7      Q.   Well, I think you filed a complaint with the EEOC;
8  correct?
9      A.   Yes.
10     Q.   Did you talk to any of the plaintiffs about the
11 first incident at the time you filed your complaint with the
12 EEOC?
13     A.   We had spoken about different occasions where it
14 had happened, you know, and some of the guys would say, well,
15 it had happened to them at this area, just the same way I
16 would say it would happen to me at this area.
17     Q.   Well, do you recall if any of the other plaintiffs
18 recall being present at the first incident that had happened
19 with you?
20     A.   No.
21     Q.   So none of the plaintiffs can recall being there
22 with you during the first incident; is that what you're
23 saying?
24     A.   I'm saying I cannot recall who were the plaintiffs
25 that were there with me.  The only one that I could recall

1  witness it?  Because you are familiar with the term hostile
2  environment; correct?
3      A.  Yes.
4      Q.  Let me rephrase the question.  Is that where you
5  learned what hostile environment was while you were working
6  at the Department of Corrections?
7          MS. LUJAN:  I'm going to have to object.  Mr.
8  Mendiola is not an attorney.  A hostile work environment is a
9  legal term of art and he does not, he's not aware of the
10  legal definition.  He can only speak to what he's -- how he
11  understands the term.
12      Q.  (By Mr. Leon Guerrero)  And that's what I'm trying
13  to find out.  What is your definition of hostile environment?
14      A.  Well, it could be ... when I was at Department of
15  Correction, you know, there was so much tension because of
16  the violence that was happening in there.
17      Q.  Okay.
18      A.  So I believe that would be a hostile environment,
19  you know, for me, you know, in the workforce.
20      Q.  Okay.
21      A.  But then also, it could be hostile towards the
22  inmates if they're trying to hurt each other.
23      Q.  Now you use the term hostile environment in this
24  case; correct?
25      A.  Yes.

1      Q.  What do you mean by hostile environment in this
2  case?
3      A.  Well, with CalPac it was hostile because we were
4  informed that, um, we had a timecard, uh, clock there with
5  our timecards beside it.  And we were informed that if our
6  timecard was not where it was supposed to be in the timecard
7  box, we were getting terminated.
8      Q.  Okay.
9      A.  Okay?  So then you don't know if you should pack
10  lunch the next day because you don't know if you're going to
11  be terminated or not.  So, you know, you want to go to work
12  but you dread to go to work, you know, because, you know,
13  you're, you're, before you turn off the car in the parking
14  lot, you're thinking man, am I going to get fired today; is
15  today my last day?  Hostile as far as Dennis Clark, with my
16  own experience itself, would be, you know, the racial remarks
17  he had made and on one occasion where he would blow his cigar
18  smoke into the trench at me, which I had requested from him
19  not to do.
20      Q.  Okay.
21      A.  That would be hostile.  Uh, also to me, hostile
22  environment. --
23      Q.  Well, before we go on, I just want -- could you
24  just elaborate more on this smoke blowing?  Was this during
25  the time between September and October 2004?

1      A.  Yes, this was during the time he had made the
2  racial remarks.
3      Q.  Okay.  And when was the next time?  Go ahead and
4  continue with your definition.
5      A.  For hostileness?
6      Q.  Yes, at CalPac.
7      A.  Well, with me personally, hostile was when it had
8  happened three times in three different occasions and I felt
9  that CalPac theself were doing nothing to protect its
10  employees.  Instead, what they did was, you know, terminated
11  me because -- I believe it was because of my complaints; it
12  wasn't because of my work performance.  And I don't believe
13  it was because the MCI project was almost complete.
14      Q.  So the last time it occurred, the remark was made,
15  was October 23, 2004 around that time; right?
16      A.  I believe so, yes.
17      Q.  And you were terminated on December 7, 2004; right?
18      A.  Yes.
19      Q.  So that was over a month after the statements had
20  stopped; correct?
21      A.  Yes.
22      Q.  Let me ask you this, do you have any problems ...
23  what's your relationship with Don Harper?
24      A.  He was just my immediate supervisor.
25      Q.  You said you made a complaint to Mr. Harper;

1  correct?
2      A.  Yes.
3      Q.  Do you believe that Mr. Harper failed you by not
4  helping you out as far as Mr. Clark's remarks?
5      A.  No, I don't believe he had failed me.
6      Q.  Okay.  You have no problem with Mr. Harper; correct?
7      A.  Correct.
8      Q.  Why is that?  Did Mr. Harper say he went up the
9  chain and talked to everybody else about the statements?
10      A.  His comment to me was he would take care of it with
11  CalPac, John Healy.
12      Q.  That was when the comment was initially made.  I
13  think that was at the second incident; correct?
14      A.  Correct.
15      Q.  Did Mr. Harper assist you in filing any complaints
16  with the EEOC?
17      A.  The, the only assistance that we got from Mr.
18  Harper was using his fax machine, okay, at his residence; his
19  telephone at his residence.
20              (Exhibit B marked: Charge
21                of Discrimination.)
22      Q.  Okay, Mr. Mendiola, I'm handing you what has been
23  marked as Exhibit B.  And tell me, have you ever seen Exhibit
24  B before?
25      A.  Yes.
26      Q.  This is the charge of discrimination filed with the

1  um, of his title. Um, I believe he was treated better
2  because of, uh, the responsibility that was given to him.
3      Q.   Okay. Let me just stop you for a second. This was
4  around December 2004; correct? That you were filling out this
5  form
6      A.   Yes, this, this is, uh –
7      Q.   Okay. And then you were terminated December 7?
8      A.   Yes.
9      Q.   But was Mr. Harper even employed at CalPac at that
10  time?
11     A.   On my termination, no.
12     Q.   He left CalPac; right?
13     A.   Yes.
14     Q.   Do you know why he left?
15     A.   No.
16     Q.   Anyway, go ahead and say how he was treated better.
17     A.   Well, because like I said besides his title, you
18  know, I guess the responsibilities that was, you know, put
19  upon him. Um, he was treated better, um, I would believe,
20  because of, uh, his skin color.
21     Q.   Okay. Do you know what kind of experience Mr.
22  Harper had as far as laying cable?
23     A.   No.
24     Q.   Do you know if he was treated better because he had
25  experience in this type of job?

---

1      A.   I would believe so.
2      Q.   You believe he was treated better because of
3  experience?
4      A.   I would believe so.
5      Q.   Okay. So there were other things besides the fact
6  that he was white; correct?
7      A.   Yes.
8      Q.   He had more knowledge; correct?
9      A.   I would assume.
10     Q.   More experience?
11     A.   Yes.
12         MR. LEON GUERRERO:  Okay, I guess I don't have
13  any other questions at this point. Mr. Smith, do you have
14  any questions?
15         MR. SMITH: Yeah, are you ready to go or do want
16  to take two minutes and then start up again, or how would you
17  like to do?
18         THE COURT REPORTER: The court reporter would
19  like to take a couple of minutes.
20             (off the record)
21             (Back on the record)
22         MR. SMITH: Just let me know when we're back on.
23         THE COURT REPORTER: We are.
24         MR. SMITH: Okay.
25  ///

---

1  ///
2                  CROSS-EXAMINATION
3  BY MR. SMITH:
4      Q.   Mr. Mendiola, my name is Art Smith and I represent
5  Dynamic Technical Services in the lawsuit. You understand
6  that I'm participating in the deposition by telephone;
7  correct?
8      A.   Yes.
9      Q.   And you and I have never met in person, have we?
10     A.   No.
11     Q.   And do you have any understanding of my present
12  location and where I am at the time I'm asking you these
13  questions?
14     A.   I would believe you're in Texas?
15     Q.   And how did you obtain that understanding?
16     A.   Uh, it would be through our, uh, the information we
17  received from EEOC.
18     Q.   That Dynamic Technical is a company that's located
19  in Texas?
20     A.   Yes.
21     Q.   All right. If at any time during the course of
22  today's proceedings you can't hear a question I ask you, will
23  you let me know that so that I can ask it again and make sure
24  you heard it before you answer?
25     A.   Yes, I will.

---

1      Q.   And if at any time I ask you a question and you
2  don't understand it, instead of answering it will you let me
3  know of your confusion so that I can repeat it before you
4  give an answer?
5      A.   Yes, I will.
6      Q.   So don't answer any of my questions unless you feel
7  like it makes sense to you; is that fair?
8      A.   Yes.
9      Q.   All right. You mentioned that there were three
10  separate occasions on which you heard Dennis Clark make a
11  statement that involved the use of the term monkey or island
12  monkey; correct?
13     A.   Yes.
14     Q.   And the first of those times was sometime in
15  September of 2004; would that be correct?
16     A.   I would believe so, yes.
17     Q.   And that occurred out at your job site during the
18  course of time that you and your fellow workers were involved
19  in performing labor; correct?
20     A.   Yes, sir.
21     Q.   Now prior to that date, you had seen Dennis Clark;
22  correct?
23     A.   Yes.
24     Q.   And you had seen him prior to that date over the
25  course of several months while he was representing MCI as the

1  inspector on the project; correct?

2      A.  Yes.

3      Q.  Prior to this first occasion on which the island

4  monkey comment was made by Mr. Clark, would it be fair to say

5  that you saw him on an almost every day basis that you worked

6  for the preceding four or five months?

7      A.  Yes.

8      Q.  And over that at least four to five month period,

9  on an average day, how often would he be in your presence?

10     A.  In my presence, I believe it would be, um, about

11  three or four times a day.

12     Q.  And for about how long on each of those times per

13  day would he be there in your presence normally?

14     A.  I would assume between, um, thirty to forty-five

15  minutes.

16     Q.  All right.  And prior to this first occasion on

17  which -- in September of 2004 when Mr. Clark first used the

18  term monkey or island monkey, had you ever had any

19  communication with him at any time?

20     A.  Yes.

21     Q.  And can you recall how many times there would have

22  been before this first incident where you and he actually

23  said something to each other, or one of you said something to

24  the other?

25     A.  No, I can't really recall.

1      Q.  Can you recall any specific instance prior to that

2  time when he first used that term when he or you said

3  something to him or he said something to you?

4      A.  Yes, um, there was a few, uh, uh, uh, how would you

5  say -- there was a few times where he would direct and

6  instruct me as far as the laying of the conduits, um, the

7  laying of the caution tape, uh, the procedure as far as, uh,

8  uh, padding the conduits with, uh, soft dirt, making sure

9  that there's no, uh, heavy rocks, uh, for the first layer and

10  the reasons behind that, so he would supervise basically, uh,

11  he had supervised the whole MCI project.

12     Q.  All right.  On any of those occasions, did you ever

13  say anything back to him?

14     A.  Yes, I had told him that I was, I was, uh, willing

15  to absorb the knowledge that he had because I was just trying

16  to learn the, the cable industry, um, field.

17     Q.  So it was basically thanks for the input and I'm

18  going to do what you suggested?

19     A.  Yes.

20     Q.  Anything else?

21     A.  No, basically that would be it.

22     Q.  And on any of those occasions, did Mr. Clark ever

23  say anything to you that you felt was an insult to you or was

24  anything like a racial slur?

25     A.  Can you please repeat that question again?

1      Q.  Yeah; on any of those occasions, did Mr. Clark ever

2  make any statements that you considered to be insulting to

3  you or in the nature of a racial slur?

4      A.  No.

5      Q.  Did he say anything that you took as though he was

6  acting in a hostile manner towards you?

7      A.  During those occasions, no.

8      Q.  And this would be prior to the first time in

9  September of 2004 when you heard him use the term island

10  monkey or monkey.

11     A.  Yes.

12     Q.  So the answer would be no; is that correct?

13     A.  No.

14     Q.  Is it correct that your answer would be no if we

15  were referring to that time frame?

16     A.  Yes, that would be correct.

17     Q.  Okay.  And then you said that before that first

18  instance in which he used one of those terms there had been a

19  couple of occasions where he had provided you with some

20  instructions directly on what to do in your job; correct?

21     A.  Yes.

22     Q.  But other than that, you didn't have any direct

23  contact with him?  He dealt strictly with others or your

24  supervisors; correct?

25     A.  Yes.

1      Q.  And prior to the time that you first heard Mr.

2  Clark use the term island monkey or monkey, had you ever

3  heard of him ever using that term prior to that occasion?

4      A.  No.

5      Q.  And prior to the first occasion on which you heard

6  Mr. Clark use the term monkey or island monkey, did you ever

7  hear him mention anything about who he worked for or what his

8  job title or employer was?

9      A.  No.

10     Q.  So any understanding you had in that regard just

11  came from the people who you worked with at CalPac?

12     A.  My supervisors, yes.

13     Q.  Either Henry Quintanilla or Henry Van Meter; is

14  that right?

15     A.  Correct.

16     Q.  Now on the first occasion of the three on which you

17  heard Mr. Clark either say island monkey or monkey, you were

18  working with your other CalPac workers, but don't remember

19  specifically which of them were there with you at the time;

20  right?

21     A.  Yes.

22     Q.  And did he make the comment directly to you or to

23  all of you as a group?

24     A.  Uh, I believe it was to all of us as a group.

25     Q.  And did he just use the term once and then walk

Mr. Clark said?

A.  Well, I can paraphrase what he was saying because we were all waiting for his, uh, his presence and his, uh, instructions. Uh, we were instructed by our supervisors that, uh, no one was to do the pull in the cable, or I believe fiber pulling, until, uh, Mr. Clark was present because he wanted to be present. And when he had, uh, driven up, um, we were standing around and, um, I believe, uh, there was a breakaway, uh, device that was not brought to the site and, I'm not quite sure, uh, if he was angry or not, but all I know was because I was probably about five or six feet away from him when he had called Don Harper on his cell phone and made the remark as of the monkeys are just standing around with their hands up their asses and that was it.

Q.  Okay. And he made that remark to Don Harper via a cell phone conversation; is that right?

A.  Yes.

Q.  On that date, did he make any statement using the term monkey or island monkeys before this time he did so in the cell phone conversation with Mr. Harper?

A.  No.

Q.  Did he do so at any time that day after you heard him make that statement to Mr. Harper on the cell phone?

A.  No.

Q.  And did he say anything else to you as a group on

---

that occasion after he got off the cell phone with Mr. Harper?

A.  No.

Q.  Did he just walk away?

A.  Yes.

Q.  And did he ever come back again that day?

A.  No, I believe the project was cancelled for that day so we were all sent home.

Q.  Okay. Who was it that actually communicated to you that you were being sent home?

A.  Our supervisors, I believe, uh, because Don Harper had, uh, arrived on the site and because we didn't have that, uh, breakaway device, uh, the project itself was cancelled.

Q.  All right. And is it true that you did need that breakaway device on that particular day for your work?

A.  Uh, yes. That's what the instructions of Mr. Clark, he wanted the breakaway device on that site.

Q.  Okay. And was there anything unreasonable, in your mind, about him wanting that to be used that day?

A.  We never did use it in the other pulling projects as far as a breakaway device only because from one, um, from one, uh, uh, volt to the next, uh, it wasn't that far away, you know, probably about a thousand feet and that wasn't, you know, it wouldn't be too strenuous as far as needing a breakaway device where you're going to damage the cable or

---

the fiber.

Q.  From a technical standpoint, are you critical of the decision that Mr. Clark made that day regarding his desire for that device to be used?

A.  I'm sorry, I don't understand that question.

Q.  Did you feel it was bad judgment on his part, technically speaking, to want that device to be used for that particular work?

A.  Yes.

Q.  Did you ultimately end up using the device, per his request?

A.  I would believe so, yes.

Q.  Do you recall specifically whether you did or not?

A.  No, I can't recall.

Q.  All right. At any time after that third incident where he used that term, did you ever hear him use it again?

A.  No.

Q.  Did you ever hear him, in your presence, make any statement that was in the form of a racial insult or slur?

A.  No.

Q.  Or that was in any way, in your mind, reflecting an attitude of hostility and that created a hostile work environment?

A.  I'm sorry, you have to repeat that again.

Q.  Yeah, after that third occasion, did you ever hear

---

him make any other statements that you considered to be hostile in nature?

A.  No.

Q.  And with regard to this third incident, did you take any action to complain about it to anyone?

A.  Yes, I complained to it to the supervisors that was on site. I believe it was Henry Van Meter and Henry Quintanilla.

Q.  And that would have been the same day that you heard that statement made by Mr. Clark on the cell phone?

A.  Yes.

Q.  And do you recall specifically what you said in your complaint to them?

A.  Basically, about, uh, the monkeys standing around with their hands up their asses.

Q.  No, I realize, that the communication was about what Mr. Clark said. I'm asking you what you said to your supervisors about what Mr. Clark said.

A.  That's what I said to my supervisors. Basically what Mr. Clark had said that the monkeys were standing around with their hands up their asses.

Q.  Okay. So you told them that's what Mr. Clark said?

A.  Yes.

Q.  They weren't there to hear it?

A.  I'm not sure.

1  Q.  Well, where were they at the time all of you were
2  standing around?
3  A.  They were just, they were just all standing around
4  waiting for him.
5  Q.  Well, were your supervisors standing around with
6  you?
7  A.  I don't remember.
8  Q.  How far away were you from Mr. Clark at the time he
9  made that comment on his cell phone?
10 A.  I was like probably about five to six feet because
11 he was walking, I guess, walking away from, from the,
12 group, but I was, I was further back when he had made that
13 comment.
14 Q.  So he was walking away from the group at the time
15 he made the comment and you just happened to be closer to him
16 than some others?
17 A.  Yes.
18 Q.  And did he continue walking further away as the
19 conversation went on?
20 A.  Yes.
21 Q.  And after you heard him make the statement, were
22 you able to continue hearing anything else he said to Mr.
23 Harper on the phone, or did he just get too far away for you
24 to hear him?
25 A.  He just got too far away for me to hear him.

1  Q.  Okay.  And when you complained shortly after that
2  to your supervisors about what Mr. Clark had said, what did
3  they say in response?
4  A.  They would let Don Harper know about it.
5  Q.  Did they say anything else about it?
6  A.  No.
7  Q.  Did they indicate to you that they would do
8  anything other than let Don Harper know about it?
9  A.  No.
10 Q.  Anything else?
11 A.  No.
12 Q.  And do you have any idea whether this third
13 instance of Mr. Clark using that term around you was ever
14 reported to anyone for whom Mr. Clark worked at Dynamic
15 Technical Services?
16 A.  Not to my knowledge, no.
17 Q.  Do you have any information that leads you to
18 believe that anyone who worked at Dynamic Technical Services
19 was ever made aware of any instance where Mr. Clark used a
20 racial slur such as island monkey or monkey to you or anyone
21 else?
22 A.  Not my knowledge, no.
23 Q.  And at the time that these statements were made on
24 these three different occasions, it was your belief that, at
25 that time, that Mr. Clark actually worked for MCI; is that

1  right?
2  A.  Yes.
3  Q.  And it was only after that, that you even heard
4  that his actual employer was Dynamic Technical Services;
5  correct?
6  A.  Yes.
7  Q.  And did you make an effort, at any time, to report
8  any of these incidents to MCI?
9  A.  To MCI?  No.
10 Q.  Did you ask anyone to make MCI aware of what Mr.
11 Clark had said, at any time?
12 A.  No.
13 Q.  And do you have any knowledge of any communications
14 that Mr. Healy or Mr. Harper actually had with Mr. Clark
15 about the subject of the complaints that you and your co-
16 workers made?
17 A.  Yes, that was just from Don Harper, who had said
18 that he had informed Mr. Healy, CalPac, about the -
19 Q.  Okay; let me be more clear.  Did Mr. Healy ever
20 communicate to you that the subject had ever been discussed
21 directly with Mr. Clark?
22 A.  No.
23 Q.  Did Mr. Harper ever communicate to you that anyone
24 had actually discussed these complaints about Mr. Clark
25 directly with Mr. Clark?

1  A.  No.
2  Q.  Do you have any information or have you heard
3  anything that indicates to you that anyone from CalPac ever
4  actually brought up with Mr. Clark the complaints that you
5  and your co-workers had made about the language that Mr.
6  Clark had used in your presence?
7  A.  I'm sorry, repeat that again?
8  Q.  Do you have any information or have you heard of
9  anything that indicates to you that anyone from CalPac ever
10 actually had a discussion with Mr. Clark about the complaints
11 that you and your co-workers had made in regard to the
12 language that Mr. Clark had used?
13 A.  No.
14 Q.  One second.  Do you have any reason to believe that
15 Mr. Clark ever talked with Mr. Healy or with Mr. Harper about
16 the complaints that any of you or your co-workers had made in
17 reference to Mr. Clark?
18 A.  I would believe so.  Uh, the reason being is, uh, I
19 believe it was, uh -
20 Q.  Is it just an assumption?
21 A.  Yes, and the reason being is that, uh, I believe it
22 was like two weeks or three weeks prior to me being, uh,
23 terminated from CalPac, I had never seen Dennis Clark on
24 site.
25 Q.  So you would assume from that, that CalPac had him

Q. Okay. Did anyone above you in the chain of command at CalPac ever indicate to you that you had been terminated because of any desire to discriminate against you?

A. No.

Q. Or treat you unfairly?

A. No.

Q. And it was CalPac that was actually your employer; right?

A. CalPac was writing my check, but I believed that when we were doing the MCI project, we were being employed by MCI because Dennis Clark was our supervisor.

Q. Well, isn't it correct that what you understood was that CalPac had been hired by MCI to do a job, you were working for CalPac and the company that hired CalPac to do the job was watching over it through people like Dennis Clark?

A. Yes.

Q. And the company that actually hired you was CalPac; right?

A. Yes.

Q. Your direct supervisors were Quintanilla and Van Meter who were also employed by CalPac; right?

A. And also Dennis Clark for the MCI project, yes.

Q. Okay. Can you just answer the question as I asked it?

A. Sure, yes.

Q. That your immediate supervisors Quintanilla and Van Meter were also employees of CalPac?

A. Yes.

Q. And that they reported to Don Harper who was also an employee of CalPac?

A. Yes.

Q. And then Mr. Harper reported to Mr. Healy, who was also an employee of CalPac?

A. Yes.

Q. And that the payroll checks you received were for work performed by you for your employer, CalPac?

A. Yes.

Q. And as far as employment evaluations that occurred during the course of your work for CalPac, did you ever receive anything like that?

A. Yes.

Q. And who provided you with the performance evaluation?

A. Uh, it would be Don Harper.

Q. And how many times did that occur?

A. Once.

Q. Do you remember when that was?

A. No, I'm not sure, but, uh, that's when I got my raise and I was making $9.00 an hour.

Q. So that would have been before September of 2004?

A. I would believe so.

Q. Between the first time you heard Mr. Clark make a statement that involved the use of the term island monkeys and the last time you heard him make that statement, did he ever give you any specific directions to do anything in your job? You personally?

A. Before the first and the last?

Q. Between the first and the last.

A. Um --

Q. Did he ever speak to you directly and say ... and instruct you to do anything in your job, specifically?

A. No.

Q. Are you aware of any action that anyone at Dynamic Technical has taken against you as a result of you submitting a complaint to the EEOC?

A. Not that I'm aware of.

Q. All right. And were you involved in a meeting that occurred in December of 2004 where Mr. Clark made statements to your co-workers about the complaints that had been made against him?

A. No.

Q. Had you heard about any meeting like that ever taking place?

A. Yes.

Q. So you know the one I'm talking about that and that you're sure you weren't there; is that correct?

A. Correct, because I was protesting.

MR. SMITH: I'll pass the witness.

MS. LUJAN: I think that I may have just a few follow-up questions.

CROSS-EXAMINATION

BY MS. LUJAN:

Q. Now Mr. Mendiola, I believe it was your testimony that the comments by Mr. Clark, the island monkey or monkey comments, to your knowledge, were made to Chamorros?

A. Yes.

Q. Okay. And, to your knowledge, were they made to non-Chamorros?

A. To my knowledge, no.

Q. Were these comments made to Guamanians?

A. Yes.

Q. To your knowledge, were they made to non-Guamanians?

MR. SMITH: Delia, could you speak up just a little bit?

MS. LUJAN: Sure.

MR. SMITH: Or move the speaker closer to you, you're fading on me.

MS. LUJAN: Okay.

1    A.    You mean like filing it with EEOC?

2    Q.    Well, do you know if he retracted his complaint?

3    A.    Yes.

4    Q.    He did retract his complaint?

5    A.    I've heard he had done that, yes.

6    Q.    Did you talk to him about that?

7    A.    No.

8    Q.    Okay. And then you were saying, to your knowledge,

9    the people, I'm not sure if I got this right and you might

10   have to correct me, people that complained were non-Chamorros

11   or were Chamorros?

12   A.    Were Chamorros.

13   Q.    And the people that were not Chamorros had no

14   problem working in CalPac; is that what you're saying?

15   A.    Had no problem working at CalPac, I don't know.

16   Q.    If they were non-Chamorro they would have no

17   problems working at CalPac?

18   A.    I don't know if they would have no problems.

19         MR. LEON GUERRERO: Okay. I don't have any

20   other questions. Thank you. Mr. Smith?

21         MR. SMITH: Nothing else from me.

22         MR. LEON GUERRERO: All right. Thank you very

23   much. I think that's it.

24         (Whereupon, at 11:55 o'clock a.m., the

25   deposition was concluded.)

1                    CERTIFICATE OF WITNESS

2

3         I, Joseph T. Mendiola, the deponent herein, do

4    hereby certify that I have read, or had read to me, the

5    foregoing typewritten pages 1 through 113 inclusive. My

6    changes thereof, if any, have been noted on a separate sheet

7    of paper, which I have signed, and which I understand will be

8    appended to and made a part of this deposition. I certify

9    that the same is now a true and correct transcript of my

10   testimony.

11

12                        _____
                              Joseph T. Mendiola
13                        (Dated)_____

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2

3         I, Cecilia F. Flores, Stenotype Reporter, do hereby

4    certify the foregoing 113 pages to be a true and correct

5    transcript of the stenographic shorthand notes and audio

6    recording taken by me in the within-entitled and numbered

7    case at the time and place as set forth herein.

8         Dated at Hagåtña, Guam, this 25th day of May,2007.

9

10                        _____
                              Cecilia F. Flores

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      CLERK'S CERTIFICATE

2

3    SUPERIOR COURT OF GUAM        ) ss

4         I, Cecilia F. Flores, Special Deputy Clerk,

5    Superior Court of Guam, do hereby certify that on the 8th day

6    of May, 2007, at the hour of 9:10 o'clock a.m. there appeared

7    before me Joseph T. Mendiola at the offices of Blair Sterling

8    Johnson Martinez & Leon Guerrero, the witness herein,

9    produced to give his deposition in the within-entitled and

10   numbered Case No. CIVOS-00037, in the District Court of Guam;

11   that prior to examination the witness was by me duly sworn

12   upon his oath; that thereafter the transcript was prepared by

13   me or under my supervision, and a certified copy of the

14   original deposition transcript was presented to Mr. Leon

15   Guerrero's office for the deponent's review, corrections, if

16   any, and execution.

17         I further certify that I am not a relative,

18   employee, attorney or counsel of any of the parties, nor a

19   relative or employee of such attorney or counsel, and that I

20   am not directly or indirectly interested in the matters in

21   controversy.

22         In testimony whereof, I have hereunto set my hand

23   and seal of court this 25th day of May, 2007.

24

25                        _____
          SPECIAL DEPUTY CLERK, SUPERIOR COURT OF GUAM

# Exhibit B

IN THE UNITED STATES DISTRICT COURT OF GUAM
FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, JAMES S. YEE, TEDDY C. CRUZ, JESSE B. CRUZ, TEDDY L.G. NAUTA, and JOHN B. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | ) CIVIL CASE NO. CIV05-00037 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

DEPOSITION TRANSCRIPT

OF

# JOHN T. HEALY

May 11, 2007

PREPARED BY:       GEORGE B. CASTRO
                   **DEPO RESOURCES**
                   #49 Anacoco Lane
                   Nimitz Hill Estates

1     Q   I -- we'll try to be as brief as

2 possible with you. During the time that Mr.

3 Clark was working on the project, were you

4 aware of the fact that he had been hired by

5 Dynamic Technical Services to observe as the

6 MCI representative on the project?

7     A   Yes.

8     Q   At any time while Mr. Clark was on the

9 island and was performing any work related to

10 the project, did you ever have any

11 communication with any persons employed by

12 Dynamic Technical Services other than Mr.

13 Clark?

14     A   While Mr. Clark was working on the

15 project?

16     Q   Yes.

17     A   No, I did not.

18     Q   At any time before the first EEOC

19 complaint was filed by a plaintiff in this

20 lawsuit, did you ever have any communications

21 with any employees of Dynamic Technical

22 Services other than Mr. Clark?

23     A   No, I did not.

24     Q   Do you have any reason to believe that

25 before the first EEOC complaint was filed by

1   any of the plaintiffs in this lawsuit that
2   anyone at Dynamic Technical Services had
3   received any complaint about the manner in
4   which Dennis Clark had treated employees of
5   CalPac?

6       A   I don't know.  I'm sorry, sir, what was
7   the question again?

8       Q   Do you have any reason to believe that
9   before the first EEOC complaint was filed,
10  anyone at Dynamic Technical Services had
11  received some notice or complaint about the
12  manner in which Dennis Clark had treated
13  employees of CalPac?

14      A   No, I have no reason to believe.

15      Q   All right.  And was there any
16  communication by anyone at CalPac with Dennis
17  Clark, regarding the subject of whether any of
18  the plaintiffs should be terminated from their
19  employment with CalPac?

20      A   No.

21      Q   And before the protests in front of the
22  CalPac offices on December 20th of 2004, did
23  anyone at CalPac ever tell Dennis Clark that
24  any of the plaintiffs in this lawsuit had made
25  complaints about the way he was treating them?

1      A   No.

2      Q   Did Dennis Clark ever attempt to

3 influence you to take any action that would

4 affect the manner in which any of the

5 plaintiffs were treated by CalPac?

6      A   No.

7      Q   I'm sorry?

8      A   No. No, sir.

9      Q   Ever make any rude or insulting

10 comments to you about any of the plaintiffs?

11     A   No, never.

12     Q   To your knowledge, did he ever make any

13 such comments to anyone else at CalPac

14 regarding any of the plaintiffs?

15     A   Not to my knowledge.

16     Q   Did Mr. Clark ever ask you or try to

17 influence you to remove any of the plaintiffs

18 from the project?

19     A   No.

20     Q   Did Mr. Clark ever say anything to you

21 that caused you to change the way CalPac

22 treated any of the plaintiffs?

23     A   No. I mean, if Mr. Clark said the

24 project was falling behind, I may have told the

25 entire group to work smarter and faster and

Case 1:05-cv-00037   Document 294   Filed 07/17/2007   Page 35 of 54

1   more efficiently.

2       Q    Anything other than that?

3       A    No, sir.  No.

4       Q    Are you aware of any occasion where Mr.

5   Clark said anything to any other supervisor

6   personnel at CalPac that was in any way -- as

7   suggestion on his part, that CalPac should

8   mistreat or harass or in some way take any

9   action to harm any of the plaintiffs in this

10  lawsuit?

11      A    No, sir.

12      Q    At anytime before the -- let me back up

13  and try that one again.  It is true, is it not,

14  that Mr. Clark did not have any role in the

15  process of hiring any of the plaintiffs to work

16  for CalPac, correct?

17      A    Correct.

18      Q    It is also correct that none of the

19  plaintiffs during the course of their

20  performance of work on this project were ever

21  employees of Dynamic Technical Services,

22  correct?

23      A    Correct.

24      Q    And did you ever witness Mr. Clark ever

25  having any communication directly with any of

1   the plaintiffs, while they were on the job on
2   the project?

3       A    Yes, but I believe only to say "hello"
4   or --

5       Q    Just exchange pleasantries?

6       A    Exchange pleasantries, yes.

7       Q    Anything else?

8       A    Not that I recall.

9       Q    Did Dynamic Technical Services or Mr.
10  Clark have any authority to give out daily work
11  assignments to any of the plaintiffs with
12  respect to work that they will perform for
13  CalPac during the course of a given day?

14      A    No.

15      Q    Did anyone at CalPac ever call upon Mr.
16  Clark to perform supervision of the plaintiffs
17  that CalPac wanted to be performed of the
18  plaintiffs as they perform their work for
19  CalPac?

20      A    Not that I am aware of.

21      Q    Did CalPac ever consider Mr. Clark to
22  be a representative of CalPac?

23      A    No.

24      Q    Did CalPac ever consider Mr. Clark to
25  be someone who was providing services on the

1    A    I'm  sorry.    Again, could  you  repeat

2  that question, sir?

3    Q    Do  you  know  of  any  reason  why  Mr.

4  Thompson and Mr. Camacho would not have brought

5  to your attention complaints that had been made

6  to them about the way Mr. Clark was treating

7  the workers?

8    A    No.

9    Q    If anyone had complained to Mr. Harper

10  about  the  manner  in  which  Mr.  Clark  was

11  treating CalPac's -- the plaintiff's in this

12  lawsuit, are you aware of any reason why Mr.

13  Harper  would  not  have  brought  that  to  your

14  attention?

15    A    No.

16    Q    So  from  --  would  it  be  fair  to  say

17  based on the answers that you've provided to

18  the questions I've asked you, that Mr. Clark --

19  neither  Mr.  Clark  nor  anyone  at  Dynamic

20  Technical  Services  said  or  did  anything that

21  interfered  in  the  employer-employee

22  relationship that existed between CalPac and

23  the plaintiffs?

24    A    That's correct.

25    MR.  SMITH:    I  will  pass  the  witness.

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

# REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 133 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 26th day of June, 2007.

George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

# Exhibit C

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>    Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>    Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br>**AFFIDAVIT OF DENNIS P. CLARK** |

---

Affidavit of Dennis P. Clark

Page 1 of 5

## AFFIDAVIT OF DENNIS P. CLARK

STATE OF TEXAS §
§
COUNTY OF COLLIN §

BEFORE ME, the undersigned authority, on this day personally appeared Dennis P. Clark, who after being first duty sworn upon his oath deposed and said:

1. "My name is Dennis P. Clark. I am over the age of 18 and have no disabilities that would prevent me from giving this Affidavit. I have personal knowledge of the facts stated in this Affidavit, and they are true and correct.

2. I understand that Henry Van Meter, Jerry Apodaca, Jr., Joseph J. Hernandez, Joseph T. Mendiola, Larry L. Charfauros, Anthony C. Arriola, Robert Cruz, Roland F. Mendiola, James S. Yee, Teddy B. Cruz, Jesse B. Cruz, John L.G. Nauto, and John P. Babauta have filed claims against Calpac, Dynamic Technical Services, and other parties. When I use the term 'Plaintiffs' in this affidavit, I am referring to these thirteen individuals.

3. I worked for Dynamic Technical Services, Inc. as the MCI Company Representative on MCI's 'Guam International Ring' construction project. California Pacific Technical LLC ("Calpac") was the general contractor on this project. I was not an employee of Calpac and had no affiliation with Calpac other than my role as the MCI Company Representative under the contract between Calpac and MCI.

4. In my role as MCI Company Representative, my responsibilities included engineering; securing right-of-ways; verification of invoices; contracting and negotiating with the Historical Preservation Society, U.S. Military; the Department of Transportation, and Airport Authority; arranging a Environmental Protection Agency assessment; and inspections and

acceptance of Calpac's work under the terms of the contract. Less than half of my time was spent at the actual work sites where Calpac employees were present.

5.    My responsibilities as MCI Company Representative did not include being a supervisor of the Plaintiffs or any other Calpac employees. Under the express terms of the contract (including exhibits thereto) between Calpac and MCI, Calpac was responsible to provide all labor and all supervision of labor. It was not my role or responsibility under the contract to instruct Calpac employees how to do the work for the project, nor was it my responsibility to supervise their performance of such work. I was not responsible to ensure that Calpac employees followed applicable safety rules and Calpac company policies. I did not determine or have any say in how the Calpac work crews were assigned. I did not assign individual work assignments to Calpac employees. I did not determine the work schedule of Calpac employees, including when and where to report for work. Calpac employees did not contact me if they were sick or were going to be late for work. Calpac employees addressed any questions they had regarding their work to other Calpac employees. At the beginning of the project, I clearly told Calpac supervisory personnel, including Tim Camacho, Bill Thompson, and Don Harper, that my role on the project was not to supervise Calpac in the completion of the work they agreed to undertake in the contract with MCI.

6.    In my capacity as MCI company representative, I had no authority hire or fire employees of Calpac. More specifically, I did not hire or fire any of the Plaintiffs in this suit, nor did I participate in any way in Calpac's decision to hire or fire any of the Plaintiffs. I never recommended, demanded, suggested or implied that any of the Plaintiffs be hired or fired to Calpac.

7.     In my capacity as MCI company representative, I also had no authority regarding promotions, demotions, or discipline of employees of Calpac. Specifically, I never promoted, demoted, or disciplined any of the Plaintiffs or any other employees of Calpac. I did not determine and had no authority to determine the wages and benefits of Calpac employees. I never participated in any decision to promote, demote or discipline any of the Plaintiffs or any other employees of Calpac. Further, I did not have any authority to and did not perform employee evaluations of Calpac employees, including the Plaintiffs.

8.     In my capacity as MCI Company Representative, it was my duty to enforce all of MCI's rights under the contract with Calpac. One of my responsibilities in this regard was to inspect the work performed by Calpac to ensure that the work was completed in accordance with the terms of Calpac's contract with MCI. If, during the course of an inspection, I found work was not being performed in accordance with the terms of the contract, I would bring it to the attention of the Calpac superintendent or Forman on site. If a Calpac supervisor was not present at the site, I would communicate the problem to the laborers to prevent further delay and/or damage to the project. As MCI's Company Representative, it would not be beneficial to MCI to allow incorrect or improper work to continue causing delays and damages to equipment.

9.     I never used the terms 'monkey' or 'island monkey' in reference to any of the Plaintiffs or in any other regard at any time."

"FURTHER AFFIANT SAYETH NOT."

_____
Dennis P. Clark

SUBSCRIBED AND SWORN TO BEFORE ME on this 23rd day of May, 2007, to certify which witness my hand and official seal.



UNA J. BROUSSARD
MY COMMISSION EXPIRES
July 12, 2008

_Una Brounard_
Notary Public in and for the
State of Texas

My Commission expires:

_July 12, 2008_

# Exhibit D

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375


Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, L.P.*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. 05-00037 <br><br><br><br><br><br><br> **AFFIDAVIT OF LINDA G. HAYES** |

Affidavit of Linda G. Hayes

## AFFIDAVIT OF LINDA G. HAYES

| STATE OF TEXAS | § |
| | § |
| COUNTY OF DENTON | § |

BEFORE ME, the undersigned authority, on this day personally appeared Linda G. Hayes, who after being first duty sworn upon his oath deposed and said:

1. "My name is Linda G. Hayes. I am over the age of 18 and have no disabilities that would prevent me from giving this Affidavit. I have personal knowledge of the facts stated in this Affidavit, and they are true and correct.

2. I know that Henry Van Meter, Jerry Apodaca, Jr., Joseph J. Hernandez, Joseph T. Mendiola, Larry L. Charfauros, Anthony C. Arriola, Robert Cruz, Roland F. Mendiola, James S. Yee, Teddy B. Cruz, Jesse B. Cruz, John L.G. Nauto, and John P. Babauta have filed claims against Calpac, Dynamic Technical Services, and other parties. When I use the term 'Plaintiffs' in this affidavit, I am referring to these thirteen individuals.

3. I am the President of Dynamic Technical Services, L.P. ("DTS") and I have served in this capacity since May 1, 2006. Prior to being President and during the years 2004-2005, I was the Director of Recruiting for DTS. My duties as Director of Recruiting included interfacing with the customers concerning requests for personnel outsourcing services, providing the customers with names and resumes of qualified individuals for the customers' personnel requests, and interfacing with the customers regarding any personnel issues with any employee outsourced to the customer by DTS.

4. I was contacted by MCI Worldcom Network Services, Inc. ("MCI") to locate an individual to serve as MCI's company representative on a construction project in Guam. I am personally familiar with the scope of services requested by MCI with regard to the project in

Guam. MCI did not request any other services from DTS other than locating potential candidates for the company representative position. I had worked with MCI in providing personnel for projects to them since 2001 and learned in the course of my employment that MCI and DTS have had a staffing relationship since 1996. I was personally involved in the collection of resumes from candidates interested in the position of MCI company representative and forwarded several resumes to MCI for their review, one of which was from Dennis Clark. While I was responsible for collecting the names of candidates for the position of company representative, MCI made the decision as to whom the position of company representative would be offered. MCI informed me that they wanted Dennis Clark to serve as its company representative on Guam. In my position as Director of Recruiting, I was MCI's point of contact at DTS regarding anything related to Dennis Clark. I was also Dennis Clark's point of contact at DTS regarding any matters concerning his employment.

5.     After MCI selected Dennis Clark to serve as its company representative, I contacted Mr. Clark and arranged for him to come to Texas to meet with MCI representatives regarding the project. MCI requested to meet with Mr. Clark to go over the specifics of the project and his duties as company representative before he left for Guam. Mr. Clark told me that the project was discussed at this meeting and MCI informed him of the date that they wanted him to begin working on Guam. I did not attend this meeting, nor did any other employee or officer of DTS. At no point did I or any other employee or officer of DTS ever provide Mr. Clark with his duties on the Guam project, nor was anyone from DTS ever requested to perform this service by MCI.

6.     After Mr. Clark was selected by MCI to serve as its company representative neither I, nor anyone else at DTS was involved in the project on Guam with the exception of

invoicing Mr. Clark's time to MCI for payment. During my communications with MCI regarding their project on Guam, MCI never requested that DTS instruct or supervise Dennis Clark regarding his role as MCI company representative. In my dealings with MCI prior to the Guam project, DTS was never involved of any aspect of the MCI project once MCI selected the personnel for the position other than invoicing the employee's time for payment. This course of dealing with MCI did not change with the project on Guam, nor did MCI request that it change. Mr. Clark informed me that he reported directly to Jeff Buehler of MCI and discussed any issues regarding the project with Mr. Buehler. Mr. Clark never called me with any questions regarding his duties and responsibilities for the project on Guam. All duties and responsibilities given to Dennis Clark regarding the project on Guam came from MCI, not from anyone at DTS. All issues that arose on the project were handled between Dennis Clark and MCI and did not involve myself or any other employees of DTS. DTS did not have the authority to remove Dennis Clark from the project. Only MCI could authorize the removal of Dennis Clark from the project. Any interaction between Dennis Clark and any of the Plaintiffs was in his role as company representative for MCI and not as an employee of DTS.

7.     As I was the individual contacted by MCI regarding the position of company representative, I have personal knowledge of the scope of DTS' obligations and responsibilities with regard to the project in Guam. The MCI project on Guam was not a DTS project and DTS did not have any right to control the project site under its agreement with MCI. From previous dealings with MCI and discussions with Dennis Clark, MCI was the party who had exclusive control over the project site. Neither I, nor any other employee or officer of DTS ever instituted any workplace rules for the Guam worksite or conducted any investigations regarding the Guam worksite. MCI never requested me or any other employee or officer of DTS to institute any

workplace rules for the Guam worksite or to conduct any investigations regarding the Guam worksite.

8.    In my former position of Director of Recruiting and current position of President, I am familiar with the position held by Dennis Clark with DTS. Mr. Clark did not have a supervisory or management position with DTS. He did not have the authority to hire, fire or discipline any employees of DTS or to create or institute any company policies.

9.    I never received any verbal or written allegations or complaints of discrimination until late December 2004 when Dennis Clark informed me and others at DTS that protesters on Guam were holding signs calling him a racist. There is no record of any communication received by DTS from anyone, including Calpac employees and management and MCI personnel, alleging discrimination or harassment by Dennis Clark before Mr. Clark informed DTS of the protesters in late December 2004. If anyone had called, written, or otherwise communicated a complaint, concern, or question regarding Dennis Clark to DTS, the communication would have been referred to me since one of my duties was to deal with personnel issues regarding employees contracted out to our customers. The first time that I, or anyone else at DTS, learned any specifics regarding the complaints of the Plaintiffs or even the identity of the Plaintiffs was when DTS received copies of the EEOC complaints filed by the Plaintiffs, beginning in 2005.

10.    When Mr. Clark informed me and others at DTS of the allegations, he stated that he had not made any discriminatory comments. Mr. Clark also informed me that he spoke at a meeting of all Calpac employees and informed the Calpac employees that he did not make any discriminatory statements and would not discriminate against any of the employees based upon their national origin or any other basis. I believed Mr. Clark's statement to Calpac's employees

at the meeting in late December 2004 was an appropriate action in response to the unspecified discrimination allegations we had received at that time. I have not received any complaints of any discriminatory comments allegedly made by Mr. Clark subsequent to this meeting.

11. The first time myself or anyone else at DTS received any specific complaint regarding Dennis Clark, including the identity of the complaining party, was when I first received a copy of the notice of charge of discrimination from the EEOC in 2005. After I received the notice of charge of discrimination, I contacted Dennis Clark to discuss the allegations. During this conversation, I reiterated the non-discrimination policies of DTS to Mr. Clark and that it was not acceptable under DTS policy to use derogatory or discriminatory remarks in reference to others. Mr. Clark stated that he had never said the things that he was accused of saying in the complaint and that he never would say such things. Additionally, Mr. Clark stated that he understood the non-discrimination policies of DTS and would fully comply with them. I have not received any complaints of any discriminatory comments allegedly made by Mr. Clark subsequent to this telephone discussion and it is my understanding based upon the Plaintiffs' allegations, that there had not been any complaints regarding Dennis Clark for several months prior to this phone call.

12. After the EEOC complaint was received, Carlos Morales, the President of DTS at the time, appointed Harry Reinwald, to respond to the complaint by informing the EEOC that the complainants were not employees of DTS and provide any other information requested by the EEOC.

13. DTS did not hire or fire any of the Plaintiffs. DTS did not determine the wages, benefits, work schedules, or work assignments of any of the Plaintiffs. DTS did not institute any

work place rules or policies for any of the Plaintiffs. DTS did not discipline any of the employees and did not participate in any employee evaluations of any of the Plaintiffs."

"FURTHER AFFIANT SAYETH NOT."

*Linda G. Hayes*

Linda G. Hayes

SUBSCRIBED AND SWORN TO BEFORE ME on this __18__ day of June, 2007, to certify which witness my hand and official seal.



Notary Public in and for the
State of Texas

My Commission expires:

__10-22 09__

PAT WYNN
My Commission Expires
October 22, 2009

# DECLARATION OF SERVICE

I, Elyze J. McDonald, hereby declare under penalty of perjury of the laws of the United States, that on July 17, 2007, I will cause to be served, via hand delivery, a true and correct copy of **DEFENDANT DYNAMIC TECHNICAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOSEPH T. MENDIOLA; MEMORANDUM IN SUPPORT OF MOTION; EXHIBITS A-D; DECLARATION OF SERVICE** upon the following:

> Delia Sablan Lujan, Esq.
> **LUJAN, AGUIGUI & PEREZ, LLP**
> Suite 300, Pacific News Building
> 238 Archbishop F.C. Flores Street
> Hagåtña, Guam USA 96910
> Telephone: (671) 477-8064
> Facsimile: (671) 477-5297
> Attorneys for Plaintiffs Henry G. Van Meter, et al.

and

> William J. Blair, Esq.
> **BLAIR, STERLING, JOHNSON,**
> **MARTINEZ & LEON GUERRERO, P.C.**
> Suite 1008, Pacific News Building
> 238 Archbishop F.C. Flores Street
> Hagåtña, Guam USA 96910
> Telephone: (671) 477-7857
> Facsimile: (671) 472-4290
> Attorneys for Defendant California Pacific
> Technical Services, LLC, John Healy, and William
> Ward

Executed this 16th day of July 2007 at Hagåtña, Guam.

*Elyze McDonald*

ELYZE J. McDONALD