VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

**FILED**
DISTRICT COURT OF GUAM
JUL 23 2007
MARY L.M. MORAN
CLERK OF COURT

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. CIV05-00037 <br><br><br> **MEMORANDUM PF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE ANTHONY C. ARRIOLA** |

## INTRODUCTION

This is a lawsuit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* Anthony C. Arriola ("Arriola") claims arise out of purported statements made by Dennis Clark ("Clark")[1]. Clark, in fact, was MCI's owner representative hired to ensure California Pacific Technical

//

---

[1] For the purpose of this motion only, CalPac will assume Clark made the purported statements.

ORIGINAL

Service, LLC ("CalPac") performed according to the terms of the contract.

Arriola alleges that on two occasions Clark called him and his fellow co-workers "monkeys" or "island monkeys." Arriola claims that he reported the statement to his supervisor and that CalPac retaliated and discharged him on November 27, 2004. CalPac asserts that Arriola was terminated for not showing up at work.

To the extent co-defendant Dynamic Technical Services ("DTS") asserts there was no hostile environment, CalPac hereby joins in such motion. Further, CalPac now moves for summary judgment on all issues alleged against CalPac by Arriola.

## FACTS

CalPac acquired a contract from MCI to lay fiber optic cables on Guam. The MCI project entailed laying fiber optic cable from Hagatna to NTCAM. Harper Deposition at p. 11. Initially, the MCI project was scheduled to be completed around December, 2004. See Healy Declaration. Clark was designated as MCI's representative charged with ensuring CalPac complied with the terms of the contract. Harper Deposition at p. 15. **It is not disputed that Clark was never an employee of CalPac**. Harper Deposition at p. 15.

In order to meet the terms of the MCI contract, CalPac hired additional laborers to trench and lay cables. Healy Declaration. Initially, the MCI project was scheduled to be

- 2 -

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1 completed around December, 2004. Healy Declaration. As the
2 project neared completion, CalPac began to lay-off its employees
3 since the MCI project was the only remaining major contract that
4 CalPac had. Healy Declaration
5
6 Arriola, one of the plaintiffs herein, began working for
7 CalPac around May, 2004. Arriola Deposition at p. 23. Although
8 Arriola attended Santa Barbara School in Dededo from 1st through
9 the 7th grades and went up to the 11th grade at JFK, Arriola
10 needed an interpreter to attend the deposition.

11 Arriola was part of the field crew of CalPac. Most, if not
12 all employees, of the field crew were local hires of Chamorro
13 descent. See Healy declaration. Because of the MCI contract,
14
15 CalPac had to hire additional employees. Harper Deposition at
16 p. 25. Around November, 2004, CalPac began downsizing because
17 the work was slowing down. Hatfield Deposition at p. 75.
18 Because of the reduced amount of work, the services of many of
19 the employees were no longer needed. Hatfield Deposition at p.
20 76.

21
22 Through Arriola's complaint, Arriola alleged that Clark (an
23 employee of DTS and not of CalPac), harassed Arriola by calling
24 Arriola a "monkey" or "island monkey." See Par. 97 of the
25 Complaint; Also see Arriola Deposition at p. 19.

26 Arriola alleged that the purported statements occurred
27 around September and October. See Para. 97 of the Complaint;

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1  Also see Arriola Deposition at p. 19. Arriola stated the first

2  time he encountered Clark was the first incident. Arriola

3  Deposition at p. 25. The second and last time Arriola

4  encountered Clark was during the second incident. Arriola

5  Deposition at p. 27. Arriola never talked to Clark and had no

6  idea who he was. Arriola Deposition at p. 28.

7

8  Arriola claims to have notified CalPac of the treatment

9  received from Clark. See Para. 98 of the Complaint; Also see

10  Arriola Deposition at p. 30. Arriola was later terminated for

11  not showing up at work. Arriola Deposition at p. 35.

12  Don Harper, whose duties included coordinating with the

13  CalPac's customers, testified that he was informed of three

14  incidents wherein Clark would refer to the employees as monkeys.

15  Harper Deposition at p. 22.

16

17  The first report purportedly resulted in Harper and Clark

18  having a heated discussion about the way to talk to people.

19  Harper Deposition at p. 22. It was Harper's impression that it

20  was just a phrase 'monkeys' and they [the crew] didn't like it."

21  Harper Deposition at p. 22. The second incident purportedly

22  resulted in the same action by Harper. Harper Deposition at p.

23  23. On the third and final incident, Harper purportedly

24  threatened Clark and told him to "get off my job or I'll whoop

25  your ass or something." Harper Deposition at p. 96.

26

27  //

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Although Harper claims to have informed Healy, Healy denies being informed about such statements until the protests began. Bill Ward, CalPac's general manager, testified that he was never informed about the statements until the December meeting.

## LAW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56. The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file" designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 at 324.

In determining whether the moving party has met its burden of establishing that no genuine issue of a material fact exists and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in a light most favorable to the nonmovant, in this case the Plaintiff, and resolve all reasonable doubts in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

- 5 -

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM  969 I0-6205
TELEPHONE: (671) 477-7857

(1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Ins.*, 210 F.3d 1099, 1106 (9th Cir. 2000). The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial. *Id.*

## I.  RACIAL HARASSMENT – HOSTILE ENVIRONMENT

### 1.  CALPAC SHOULD NOT BE LIABLE FOR THE ACTIONS OF A THIRD PARTY

In the instant case, Arriola alleges that a non-employee of CalPac called him a "monkey" or "island monkey" on two occasions. In order for an employer to be found liable for third party harassment, an employer must ratify or condone the conduct by failing to investigate and remedy it after learning of it. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002). Assuming for the sake of this motion that complaints were made to Harper, Harper testified that he

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 6 -

confronted Clark about the statements. After the third complaint to Harper, Harper threatened Clark and kicked Clark off the job site. Most importantly, there were no further complaints and the situation was remedied. Clearly, although Healy and Ward may have not known of the actions by Harper, action was taken nonetheless. CalPac, therefore, should not be liable for the actions of Clark.

### 2. PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT

The Supreme Court has repeatedly stated that Title VII **does not set forth "a general civility code for the American workplace."** (Emphasis added.) *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998); *Burlington Northern & Santa Fey Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006). Judicial standards for harassment must **"filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language**, gender-related jokes, **and occasional teasing.'"** *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998). Although CalPac concedes that referring to an employee as an island monkey may be offensive, these remarks, under the circumstances, do not qualify for Title VII protection. **"Conduct that is not so severe or pervasive enough to create an objectively or abusive work environment...is beyond Title VII purview."** (Emphasis added.) *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993).

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 7 -

In order to state a claim for hostile environment, Arriola must show that: (1) he was subject to verbal or physical conduct based on race or national origin; (2) that the conduct was unwelcomed; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and created an abusive environment. *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9ᵗʰ Cir. 2005). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment, for the purposes of Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d. 1027 (9ᵗʰ Cir. 2005). In determining whether conduct was sufficiently severe or pervasive, courts look at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening, or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9ᵗʰ Cir. 2002).

Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,115 (2002)("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1  based on the **cumulative effect** of individual acts"). (Emphasis
2  added.) *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th
3  Cir. 2001).

4  Arriola alleges that Clark directed two statements at him
5  during his tenure at CalPac. There is no allegation that Clark
6
7  physically threatened Arriola. This is not a situation where an
8  employee shows up to work and is subjected to a barrage of rude
9  or offensive remarks. Further, there is no showing that the
10  purported remarks altered the terms and conditions of Arriola's
11  employment. Indeed, Nauta met Clark only two times.

12  This is a situation where a third party may have made three
13  or four rude remarks of which Arriola may have heard two.
14
15  Clearly, Arriola failed to establish the frequency required to
16  establish a claim under Title VII especially in light of the
17  allegation that the remarks were not made by CalPac employees.

18  **3.    CALPAC DID NOT RETALIATE AGAINST ARRIOLA**

19  Title VII's anti-retaliation provision forbids an employer
20  from "discriminate[ing] against an employee or job applicant
21  because that individual "opposed any practice" made unlawful by
22  Title VII or "made a charge, testified, assisted or participated
23  in" a Title VII proceeding or investigation. 42 U.S.C. Section
24  2000e-3(a). **This provision, however, "covers those (and only**
25
26  **those) employer actions that would have been materially adverse**
27  **to a reasonable employee or job applicant**...to the point that
28  they could well dissuade a reasonable worker from making or

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 969 10-5205
TELEPHONE: (671) 477-7857

supporting a charge of discrimination. (Emphasis added.) *Burlington Northern & Santa Fey Ry. Co. v. White*, 126 S.Ct. 2405, 2409 (2006).

An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. LINDEMANN & P. GROSSMAN, *Employment Discrimination Law 669* (3d ed.1996) (noting that "courts have held that **personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable** under § 704(a)). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. (citations omitted.) It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid*. And normally **petty slights, minor annoyances, and simple lack of good manners will not create such deterrence**. (emphasis added.) *Burlington, at* 2415.

If the plaintiff makes a prima facie case, the burden of production shifts to the defendant to present a legitimate, non-retaliatory reason for the adverse action. *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000); *Cassimy v. Board of Education of the Rockford Public School, Dist. #205 (7th Cir. 2006).* If the defendant carries this burden, the plaintiff

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1  "must demonstrate a genuine issue of material fact as to whether
2  the reason advanced by the [defendant] was a pretext." *Brooks,*
3  *supra.*

4      Arriola claims he was "wrongfully and unlawfully terminated
5  by CalPac.    During his deposition, Arriola conceded he did not
6
7  show up at the dates stated in his time sheets which preceded
8  his termination.    Simply, CalPac terminated Arriola for not
9  showing up at work and not for any complaints made.

10                              **CONCLUSION**

11     Liability for hostile environment requires a showing that
12  the action was severe and pervasive.    For the reasons stated
13  above, it is respectfully suggested that the two remarks heard
14  by Arriola were not severe or pervasive enough to be protected
15  under Title VII.    Assuming the remarks were severe and
16
17  pervasive, third party discrimination requires a showing that
18  CalPac condone or authorized the act.    Such was not done.

19  Concerning Arriola's claims for retaliation, Arriola's discharge
20  was based on reasons unrelated to any purported complaint made.

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Arriola was terminated for not showing up at work. As such, CalPac respectfully requests this Court grant its motion for summary judgment.

**RESPECTFULLY SUBMITTED** this 23rd day of July, 2007.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION


BY: _____
**VINCENT LEON GUERRERO**
*Attorneys for Defendant California Pacific Technical Services LLC*

V63:49\08130-03
G:\WORDDOC\PLD\VLG\204B-MEMO OF P&A IN SUPP OF MSJ RE A
ARRIOLA RE VAN METER V. CALPAC.DOC

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 969 10-5205
TELEPHONE: (671) 477-7857

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA )  CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B. )           **ORIGINAL**
CRUZ, ROLAND F. MENDIOLA, JAMES )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA, )
)
                Plaintiffs, )
)
         vs. )
)
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10, )
)
              Defendants. )


## DEPOSITION OF ANTHONY C. ARRIOLA

*Taken on Behalf of Defendant CalPac*


      BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **ANTHONY C.**

**ARRIOLA** was taken before Cecille A. Flores, a Certified

Shorthand Reporter, on Wednesday, the 9th day of May 2007, at

9:00 in the offices of Blair Sterling & Johnson, Suite 1008,

Pacific News Building, 238 Archbishop Flores Street, Hagatna,

Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96921
Tel: (671) 734-1041 * Fax: (671) 734-1045

Case 1:05-cv-00037    Document 313    Filed 07/30/2007    Page 13 of 33

Q    Debra Cruz.

A    (Through Interpreter) Yes.

Q    Did Debra Cruz help you read the document that was filed with the District Court?

A    (Through Interpreter) Debra read it.

Q    She read it to you, correct?

A    (Through Interpreter) Yes.

Q    And then she translated it in Chamorro, correct?

A    (Through Interpreter) Yes.

Q    So you had a chance to read that document, the Complaint, correct?

A    (Through Interpreter) Yes.

Q    In the Complaint, when it refers to your allegations, it says that you were hired by CalPac around May 2004.

A    (Through Interpreter) Yes.

Q    So you were hired by CalPac around May or June 2004, correct?

A    (Through Interpreter) Yes.

Q    The next allegation says that "Around September to October 2004 or thereafter while Plaintiffs were under the supervision of Defendant Clark, Plaintiff Arriola," that would be you "was harassed and discriminated against on the basis of his race, national origin and color by Defendant Clark who called Plaintiff Arriola and other Plaintiffs

1   do you speak to him in Chamorro?

2        A    (Through Interpreter) I speak in Chamorro.

3        Q    And you also named Jesse Cruz, Robert Cruz, Joe

4   Mendiola and John Nauta.  Did you speak to them in Chamorro

5   or did you speak to them in English?

6        A    (Through Interpreter) Yes.

7        Q    Most of your discussions with these guys is in

8   Chamorro, is that what you're saying?

9        A    (Through Interpreter) Yes.

10       Q    Was Mr. Clark upset at you when he made that

11  statement the first time?

12       A    (Through Interpreter) No.

13       Q    Do you think he was joking around when he said that?

14       A    (Through Interpreter) No, what he said was bad.

15       Q    You say you started working around May or June of

16  2004 and the incident occurred in September of 2004, correct?

17       A    (Through Interpreter) No, I just got out.

18       Q    What do you mean you just got out?

19       A    (Through Interpreter) As soon as he said that, I

20  just got out of work.

21       Q    My question is, you started working at CalPac around

22  May or June 2004, correct?

23       A    (Through Interpreter) Yes.

24       Q    So you worked at CalPac for four months before

25  Mr. Clark made that statement, correct?

A      (Through Interpreter) No, nothing.

Q      So you're saying that Mr. Clark showed up the first time and made a statement, correct?

A      (Through Interpreter) Yes.

Q      Did you ask who he was?

A      (Through Interpreter) No, I didn't ask him.

Q      So at the time, Mr. Clark was a stranger, correct?

A      (Through Interpreter) Yes.

Q      So this stranger came up to you in September of 2004 and called you a monkey, is that what you're saying?

A      (Through Interpreter) Yes, it's true.

Q      Then that's when you went to Mr. Van Meter and said, hey -- is that what you said to Mr. Van Meter?

A      (Through Interpreter) Yes.

Q      What did Mr. Van Meter say to you?

A      (Through Interpreter) He said just move, never mind because he's making you mad.

Q      Did you wonder who he was?

A      (Through Interpreter) That's our boss.

Q      Who said that?  Mr. Van Meter?

A      (Witness in English) Yeah.

       (Through Interpreter) Mr. Van Meter said, that's your boss for underground.

Q      Did he say he works for CalPac?

A      (Through Interpreter) Yes.

A      (Through Interpreter) Yes.

Q      So which one is it?  Is Mr. Clark employed by CalPac
or is he employed by Dynamic Technical Services?  Who do you
believe Mr. Clark is employed by?

A      (Through Interpreter) CalPac.

Q      So you disagree with the allegation in the Complaint
that Mr. Clark is a Manager or Supervisor employed by Dynamic
Technical Services?

A      (Through Interpreter) Yes.

Q      How many times did you see Mr. Clark?

        MS. LUJAN:  What time period are we referring
to?

        MR. LEON GUERRERO:  Ever.

BY MR. LEON GUERRERO: (Continuing)

Q      How many times have you seen him?

A      (Through Interpreter) Two times only.

Q      Only two times, correct?

A      (Witness in English) Yeah.

        (Through Interpreter) Yes.

Q      The second time you saw him was the second time he
made the statement, correct?

A      (No response.)

Q      The second time you saw him was the second time he
made the statement, correct?

A      (Through Interpreter) Yes.

1    Q    Did you ever talk to Mr. Clark about anything?

2    A    (Through Interpreter) No.

3    Q    You never asked him any questions, correct?

4    A    (Through Interpreter) No.

5    Q    After he made those statements, you never went up to

6    him and talked to him, correct?

7    A    (Through Interpreter) No.

8    Q    Mr. Clark never told you what to do, correct?

9    A    (Through Interpreter) No.

10    Q    Did he ever tell you what to do?

11    A    (Through Interpreter) No.

12    Q    So you had no idea who Mr. Clark was, correct?

13    A    (Through Interpreter) I don't know.

14    Q    Mr. Clark never signed your paycheck, correct?

15    A    (Through Interpreter) Never.

16    Q    Do you know who John Healy is?

17    A    (Through Interpreter) Yes.

18    Q    Who is John Healy, to the best of your information?

19    A    (Through Interpreter) He is the highest boss.

20    Q    At CalPac, correct?

21    A    (Witness in English) Yeah.

22         (Through Interpreter) Yes.

23    Q    Directly under John Healy is who?

24    A    (No response.)

25    Q    I'm referring to around September, October of 2004.

1     Q    Who is Don Harper?

2     A    (Through Interpreter) That's our Supervisor.

3     Q    That's the person that Mr. Van Meter reports to,

4  correct?

5     A    (Through Interpreter) Yes.

6     Q    Did you ever talk to Mr. Harper?

7     A    (Through Interpreter) The one that's from Asan?

8     Q    I don't know where he's from.  Mr. Harper is a

9  Caucasian, correct?

10    A    (Through Interpreter) Yes.

11    Q    Did you ever talk to Mr. Harper?

12    A    (Through Interpreter) One time only.

13    Q    Does Mr. Harper speak Chamorro?

14    A    (Through Interpreter) No.

15    Q    So what were you talking about?

16    A    (Through Interpreter) I asked him where are we going

17 to go to work.

18    Q    He would be the one to tell you where to go,

19 correct?

20    A    (Through Interpreter) Yes.

21    Q    You said that you complained to CalPac about the

22 statements made by Mr. Clark, is that right?

23    A    (Through Interpreter) Yes.

24    Q    Who did you complain to?

25    A    (Through Interpreter) Van Meter.

1   you also translate what I say?

2              INTERPRETER:   That's what I was just doing.

3   BY MR. LEON GUERRERO: (Continuing)

4       Q    I'm going to change it a little bit.  Maybe you

5   didn't understand the question before.  I thought you said

6   that you just got out after you made the statements.  That's

7   what I thought you said.  Is that wrong?

8       A    (Through Interpreter) No.

9       Q    So now I'm really confused.  I thought earlier then

10  you said that you just got out, is that right?

11      A    (Through Interpreter) I just stopped working when

12  they told me that.

13      Q    When did you stop working?  Was that October 2004?

14      A    (Through Interpreter) Yes, I just stopped on that

15  day.

16      Q    The second time Mr. Clark made the statements,

17  correct?

18      A    (Through Interpreter) Yes, that's when I stopped.

19      Q    What were you talking about as far as your father

20  being sick and making phone calls?  What's that about?

21      A    (Through Interpreter) That day that I called in to

22  tell them that my father was sick, then he gave me the paper

23  to say that I was fired.

24      Q    Your last day at CalPac was November 24, 2004,

25  correct?

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **ANTHONY C. ARRIOLA** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 69, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 21st day of July 2007.


Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

## NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 9th day of May, 2007 at the hour of 9:00 a.m. there appeared before me **ANTHONY C. ARRIOLA** at the law offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 21st day of July, 2007.

_____

Cecille A. Flores

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.     )            **ORIGINAL**
CRUZ, ROLAND F. MENDIOLA, JAMES   )
S. YEE, TEDDY B. CRUZ, JESSE B.   )
CRUZ, JOHN L.G. NAUTA, and JOHN   )
P. BABAUTA,                       )
                                  )
              Plaintiffs,         )
                                  )
         vs.                      )
                                  )
CALPAC, DYNAMIC TECHNICAL         )
SERVICES, MCI, JOHN HEALY, DENNIS )
CLARK, WILLIAM WARD, JAI JAMES    )
and DOES 1 through 10,            )
                                  )
              Defendants.         )


## DEPOSITION OF DONALD J. HARPER

Taken on Behalf of California Pacific Technical Services


        BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **DONALD J. HARPER**

was taken before Cecille A. Flores, a Certified Shorthand

Reporter, on the 16th and 20th days of February 2007, in the

offices of Blair Sterling Johnson Martinez & Leon Guerrero,

Suite 1008, Pacific News Building, 238 Archbishop Flores

Street, Hagatna, Guam.

1    Q    Were your responsibilities limited to the MCI

2 contract?  Did you have other responsibilities as well?

3    A    I had a few other responsibilities at the time.

4    Q    What percentage of your time was devoted to the MCI

5 contract would you say?

6    A    95 percent.

7    Q    95 percent?

8    A    Guessing.

9    Q    Can you describe for us what the MCI contract was?

10   A    It was to install a fiber optic connection from the

11 MCI building in Agana to NCTAMS NASA complex.

12   Q    What was the route they took to get from MCI here in

13 Agana?

14   A    Up through Agana, through Tiyan, down the cliffline

15 through Harmon Industrial Park, back through the back road of

16 Fatima, come up Route 1, down Route 3, back through the

17 jungle into NCTAMS.

18   Q    Did the MCI project, was it divided into phases or

19 how did it go?

20   A    I believe it was -- I think there were three phases.

21 They called them three phases, yes.

22   Q    Do you remember what the three phases were?

23   A    Yeah, it wasn't really -- I don't know if there was

24 a contractual breakdown, but I know when it was broken down

25 into phases of making it through Agana.  It was kind of a

1        A     Just, I guess, for what an owner does.

2        Q     But he wasn't involved in the day-to-day operations

3    of the company?  That was you and Bob and Tim?

4        A     No, he was aware of the day-to-day.  There was daily

5    communication with him.  I mean, other than that, that's as

6    close as it got.

7        Q     Did he do the job interviews with the prospective

8    laborers?

9        A     No, I don't believe so.

10       Q     Who did that?

11       A     Either be me, Bob or Tim Camacho or Tim Camacho's

12   replacement and I can't remember his name.  After that.

13       Q     What was the role of Dennis Clark?

14       A     Dennis Clark was -- he was a representative of MCI.

15   He was basically quality control, I would guess.  For MCI.

16   He was there to make sure that the product was installed per

17   their specifications.

18       Q     You had MCI provide a set of specifications you were

19   supposed to follow?

20       A     Yes.

21       Q     Describe how those were presented to you.

22       A     Drawings with details.

23       Q     Do they also have a manual of specifications?

24       A     Not really.  Not that I know of.

25       Q     So you say he was the quality control.  Was he then

1    Q    Why aren't you on the site that day?

2    A    I was in the office doing some report for John

3  Healy.

4    Q    Do you remember when or about that was time wise?

5    A    No, I don't.  I mean, it's no --

6    Q    Was it still in Phase 1 or one of the later phases?

7    A    I think that's kind of the Phase 2.  I'm -- I can't

8  really remember but --

9    Q    So you don't recall the date?

10   A    No.

11   Q    Who was the employee that called you?

12   A    Henry Quintanilla.

13   Q    What did Henry Quintanilla tell you to the best as

14  you can recall?

15   A    When I arrived on site, I guess there was a deep

16  excavation area that Dennis wanted things to move faster,

17  didn't like the way they was doin' it and referred to them as

18  monkeys at this time, I believe.  It was just a phrase

19  "monkeys" and they didn't like it so I had conversation with

20  Dennis.

21   Q    Was it a heated conversation?

22   A    Yeah, it kind of got heated because he took it -- I

23  tried to keep it on a professional -- look, just don't treat

24  them this way, don't talk to people this way and -- yeah,

25  there was a lot of arrogance.

1    Q    When was the next incident that you can recall that

2  you had a disagreement with Mr. Clark?

3    A    I believe -- I'm not sure but I believe it was -- we

4  were on the back part of NCTAMS coming through the jungle

5  because there was an area that conduit was installed and they

6  called me, the same thing, and we were pulling fiber.

7    Q    You weren't there that day either?

8    A    I was en route. We were setting up for a fiber pull

9  and nobody had started yet.

10   Q    Who called you that time or told you about it?

11   A    I think it was Van Meter at this time.

12   Q    Who is Van Meter?

13   A    Henry Van Meter.

14   Q    Who was Henry Van Meter?

15   A    Henry Van Meter was another one that was not a

16 foreman but he was kind of like a lead man. If the crew

17 broke away, they were working a different area, he had the

18 responsibility of leadership of certain guys.

19   Q    Henry, his title wasn't foreman?

20   A    I don't believe so but I'm not sure.

21   Q    Did you hire Henry Van Meter also?

22   A    You know, I didn't directly hire anybody. I didn't

23 have the authority to, in my opinion, but I was part of the

24 interview of Henry Van Meter.

25   Q    Who else interviewed?

1  before was left in the right condition, and part of my job is

2  to explore the job ahead in advance to make sure that when

3  they leave that job site that day, of course they're

4  advancing forward and the reason for my performance was to be

5  on site so I covered kind of a wide area.

6      Q    How many lead men or foremen did you have?

7      A    Henry Quintanilla, Henry Van Meter, and basically as

8  guys that were left with any responsibility, I think they

9  were the only two.

10     Q    Was there a very high turnover of workers?

11     A    No.

12     Q    Did CalPac have to hire additional workers to do the

13  MCI project?

14     A    Yes.

15     Q    How many do you recall they had to hire?

16     A    I don't know.

17     Q    15, 20?  25?

18     A    I'd be guessing.  I'd just be guessing.

19     Q    When you interviewed these people, did you tell them

20  they were being hired for that specific job or just hired

21  generally?

22     A    I don't know that the name of the job was ever

23  mentioned to them, but their job role of what they would be

24  doing was explained.

25     Q    What was supposed to happen to them once the project

1      Q     Why do you say that?

2      A     Because he was.  It was my opinion.  I just feel he

3   was arrogant.

4      Q     Did he ever say anything that made you think he was

5   arrogant?

6      A     It was just arrogance.  Yeah, I guess he said a lot

7   of things, obviously, that made me feel that way but I can't

8   pinpoint one isolated situation.  It was just being around

9   somebody for long enough in a working condition that you feel

10  that attitude superiority and he felt like he was working in

11  a third world all the time.

12     Q     Did he ever say anything like that?

13     A     Yes.

14     Q     What did he say?

15     A     He just referred to Guam as being very backwards and

16  he would make comments about another job he did somewhere

17  else.  I may be wrong about South America and he would

18  compare it to that.

19     Q     Have you ever made any verbal threats to Dennis

20  Clark?

21     A     Yes.

22     Q     Could you tell us about the first time you made a

23  verbal threat to him?

24     A     I think I told him that one time I -- I forget what

25  I said.  Get off my job or I'll whoop your ass or something.

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that DONALD J. HARPER personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 188, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd day of March 2007.


_____
Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

# IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE. TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, | ) ) ) ) ) ) ) ) ) ) ) | CIVIL CASE NO. CIV05-00037 |
| Plaintiffs, | ) ) | **DECLARATION OF JOHN T. HEALY IN SUPPORT OF EACH OF CALPAC'S MOTIONS FOR SUMMARY JUDGMENT** |
| vs. | ) ) | |
| CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, | ) ) ) ) ) | |
| Defendants. | ) ) | |

I, **JOHN T. HEALY**, under penalty of perjury, do hereby declare and state as follows:

1. I am a shareholder of California Technical Services LLC ("CalPac") and its Vice President whose duties include, the field operation of CalPac.

2. Included within Calpac's field operation is the "underground crew" of which plaintiffs were formerly employed.

//

3.    In early 2004, CalPac was working on a contact with MCI to lay fiber optics.

4.    The MCI contract was initially to be completed in December 2004.

5.    CalPac hired additional laborers to assist the underground crew in the completion of the MCI project.

6.    The vast majority of the underground crew were of Chamorro descent.

7.    In the latter part of 2004, CalPac essentially had one contract (i.e. the MCI Contract) which was nearing completion.

8.    Although the MCI contract was not officially completed until June/July of 2005, the services of most of the laborers were no longer needed.

9.    CalPac laid off employees based on economic reasons.

10.   James Yee and Robert Cruz were not laid off, rather they were terminated for cause.

11.   Joseph Hernandez was hurt on the job and received Worker's Compensation. He is officially on CalPac's books.

12.   After the lay offs were completed, the vast majority of the remaining underground employees were of Chamorro descent.

13.   Sometime in December, 2004, I became aware that some employees were claiming they were being discriminated against based on Clark's purported remarks. A meeting was called to answer any questions and alleviate any concerns, concerning Clark's statements. CalPac did not threaten.

STERLING JOHNSON
INTZ & LEON GUERRERO
PROFESSIONAL CORPORATION
1008 Pacific News Building
238 Archbishop F.C. Flores Street
HAGÅTÑA, GUAM 96910-5205
PHONE: (671) 477-7857

- 2 -

I declare under penalty of perjury and the laws of the United States that the foregoing statements are true and correct.

DATED: JULY ___, 2007

_____
JOHN T. HEALY

V63\-08130-03
G:\WORDDOC\PLD\VLC\194-DECLARATION OF JOHN HEALY RE VAN METER
ET AL V CALPAC ET AL.DOC

R STERLING JOHNSON
FINCE & LEON GUERRERO
ROFESSIONAL CORPORATION
1008 Pacific News Building
238 Archbishop F.C. Flores Street
ATÑA, GUAM 96910-5205
PHONE: (671) 477-7857

- 3 -