VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

FILED

DISTRICT COURT OF GUAM

JUL 23 2007 *nba*

MARY L.M. MORAN
CLERK OF COURT

# IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, | ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL CASE NO. CIV05-00037 |
| Plaintiffs, | ) ) | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE JERRY APODACA, JR** |
| vs. | ) ) ) | |
| CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10, | ) ) ) ) ) | |
| Defendants. | ) | |

## INTRODUCTION

This is a lawsuit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e, et. seq. Jerry Apodaca's ("Apodaca") claims arise out of two purported statements made by Dennis Clark ("Clark")[1] who, Apodaca acknowledges, was an employee of Dynamic Technical Services.

---

[1] For the purpose of this Motion only, CalPac will assume Clark made the purported statements.

1 Clark, in fact, was MCI's owner representative hired to ensure
2 CalPac performed according to the terms of the contract.

3 Apodaca alleges that on **two** occasions, Clark called him and
4 his fellow co-workers "monkeys" or "island monkeys." Apodaca
5 claims that he reported the statement to his supervisor and that
6
7 CalPac retaliated and discharged him on November 27, 2004.
8 CalPac declares that Apodaca was laid off because the MCI
9 project was nearing completion and CalPac no longer needed the
10 services of most of CalPac's employees.

11 To the extent co-defendant Dynamic Technical Services
12 ("DTS") asserts there was no hostile environment, CalPac hereby
13 joins in such motion. Further, CalPac now moves for summary
14 judgment on all issues alleged against CalPac by Apodaca.
15
16 **FACTS**

17 CalPac acquired a contract from MCI to lay fiber optic
18 cables on Guam. The MCI project entailed laying fiber optic
19 cable from Hagatna to NTCAM. Harper Deposition at p. 11.
20 Initially, the MCI project was scheduled to be completed around
21 December, 2004. See Healy Declaration. Clark was designated as
22 MCI's representative charged with ensuring CalPac complied with
23 the terms of the contract. Harper Deposition at p. 15.
24
25 **It is not disputed that Clark was never an employee of**
26 **CalPac.** Harper Deposition at p. 15. In order to meet the terms
27 of the MCI contract, CalPac hired additional laborers to trench
28 and lay cables. Healy Declaration. Initially, the MCI project

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 2 -

1 was scheduled to be completed around December, 2004. Healy
2 Declaration. As the project neared completion, CalPac began to
3 lay-off its employees since the MCI project was the only
4 remaining major contract that CalPac had. Healy Declaration.

5
6 Apodaca, one of the plaintiffs herein, began working for
7 CalPac around April, 2004. Apodaca Deposition at p. 11.
8 Apodaca was part of the field crew of CalPac. Apodaca testified
9 that he had no problems with Ward, Van Meter or Healy. Apodaca
10 Deposition at p. 51. The only things Apodaca did not like were
11 Clark's comments (Apodaca Deposition at p. 50) which he heard
12 twice (Apodaca Deposition at p. 61). The first time was
13 September 21, 2004. (Apodaca Deposition at p. 61). The second
14 and last time was in September 25, 2004. See EEOC Questionnaire
15 attached as Exhibit "D" to Apodaca Disposition. At no time did
16
17 Apodaca feel he was getting different treatment from his co-
18 workers. Apodaca Deposition at p. 70. Apodaca felt everyone
19 was treated the same. Apodaca Deposition at p. 71.

20 Most, if not all employees, of the field crew were local
21 hires of Chamorro descent. See Healy declaration. Around
22 November, 2004, CalPac began downsizing because the work was
23 slowing down. Hatfield Deposition at p. 75. Because of the
24 reduced amount of work, the services of many of the employees
25
26 were no longer needed. Hatfield Deposition at p. 76.

27 //

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 969 10-5205
TELEPHONE: (671) 477-7857

- 3 -

1   Through Apodaca's complaint, Apodaca alleged that Clark (an
2   employee of DTS and not of CalPac), harassed Apodaca by calling
3   Apodaca a "monkey" or "island monkey." See Par. 133 of the
4   Complaint; also see Apodaca Deposition at p. 20. Apodaca
5   alleged that the purported statements occurred in September
6
7   2004. See Apodaca Deposition at p. 32. Apodaca claims to have
8   notified CalPac of the treatment received from Clark. See
9   Apodaca Deposition at p. 43.

10   Don Harper, whose duties included coordinating with the
11   CalPac's customers, testified that he was informed of three
12   incidents wherein Clark would refer to the employees as monkeys.
13   Harper Deposition at p. 22. The first report purportedly
14   resulted in Harper and Clark having a heated discussion about
15
16   the way to talk to people. Harper Deposition at p. 22. It was
17   Harper's impression that it was just a phrase 'monkeys' and they
18   [the crew] didn't like it." Harper Deposition at p. 22. The
19   second incident purportedly resulted in the same action by
20   Harper. Harper Deposition at p. 23. On the third and final
21   incident, Harper purportedly threatened Clark and told him to
22   "get off my job or I'll whoop your ass or something." Harper
23   Deposition at p. 96.
24
25   Although Harper claims to have informed Healy, Healy denies
26   being informed about such statements until the protests began.
27   //
28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 969IO-5205
TELEPHONE: (671) 477-7857

- 4 -

Bill Ward, CalPac's general manager, testified that he was never informed about the statements until the December meeting.

Contrary to Apodaca's belief, certain CalPac management were unaware of which employees made complaints. As an example, Hatfield did not know that Norman Santos filed a complaint with the EEOC. Hatfield Deposition at p. 70. Through Norman Santos' deposition it is undisputed that Santos worked for CalPac in 2004 (Santos Deposition at p. 12); filed an EEOC complaint for discrimination (Santos Deposition at p. 27); and withdrew his EEOC complaint almost a year later (Santos Deposition at p. 33). As of April 2007, Norman Santos remained an employee with CalPac. Santos Deposition at p. 12.

## LAW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56. The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file" designate

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F C. FLORES STREET
HAGÅTÑA, GUAM 969 IO-5205
TELEPHONE: (671) 477-7857

- 5 -

1 specific facts showing there is a genuine issue for trial.
2 *Celotex*, 477 at 324.

3 In determining whether the moving party has met its burden
4 of establishing that no genuine issue of a material fact exists
5
6 and that it is entitled to judgment as a matter of law, the
7 Court must draw inferences from the evidence in a light most
8 favorable to the nonmovant, in this case the Plaintiff, and
9 resolve all reasonable doubts in that party's favor. *Matsushita*
10 *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587
11 (1986). A material fact is one "that might affect the outcome
12 of the suit under the governing law." *Anderson v. Liberty*
13
*Lobby, Inc.*, 477 U.S. 242 (1986). A disputed fact presents a
14
15 genuine issue "if the evidence is such that a reasonable jury
16 could return a verdict for the non-moving party. *Id*.

17 Where the moving party does not bear the burden of proof on
18 an issue at trial, the moving party may discharge its burden of
19 production by either of two methods. *Nissan Fire & Marine Ins.*
20 *Co., Ltd., v. Fritz Cos., Ins.*, 210 F.3d 1099, 1106 (9th Cir.
21 2000). The moving party may produce evidence negating an
22
23 essential element of the nonmoving party's case, or, after
24 suitable discovery, the moving party may show that the nonmoving
25 party does not have enough evidence of an essential element of
26 its claim or defense to carry its ultimate burden of persuasion
27 at trial. *Id*.

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

# I. RACIAL HARASSMENT – HOSTILE ENVIRONMENT

## 1. CALPAC SHOULD NOT BE LIABLE FOR THE ACTIONS OF A THIRD PARTY

In the instant case, Apodaca alleges that a non-employee of CalPac called him a "monkey" or "island monkey" on two occasions. In order for an employer to be found liable for third party harassment, an employer must ratify or condone the conduct by failing to investigate and remedy it after learning of it. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002). Assuming for the sake of this motion that complaints were made to Harper, Harper testified that he confronted Clark about the statements. After the third complaint to Harper, Harper threatened Clark and kicked Clark off the job site. Most importantly, there were no further complaints and the situation was remedied. Clearly, although Healy and Ward may have not known of the actions by Harper, action was taken nonetheless. CalPac, therefore, should not be liable for the actions of Clark.

## 2. PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT

The Supreme Court has repeatedly stated that Title VII **does not set forth "a general civility code for the American workplace**." (Emphasis added.) *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006). Judicial standards for harassment must **"filter out complaints attacking 'the ordinary tribulations of the workplace, such as**

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 7 -

the sporadic use of **abusive language**, gender-related jokes, **and occasional teasing.**'" *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998).

Although CalPac concedes that referring to an employee as an island monkey may be offensive, these remarks, under the circumstances, do not qualify for Title VII protection. "**Conduct that is not so severe or pervasive enough to create an objectively or abusive work environment...is beyond Title VII purview.**" (Emphasis added.) *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21 (1993).

In order to state a claim for hostile environment, Apodaca must show that: (1) he was subject to verbal or physical conduct based on race or national origin; (2) that the conduct was unwelcomed; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and created an abusive environment. *Galdamez v. Potter,* 415 F.3d 1015, 1023 (9th Cir. 2005). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment, for the purposes of Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept.,* 424 F.3d. 1027 (9th Cir. 2005). In determining whether conduct was sufficiently severe or pervasive, courts look at all the circumstances, including the frequency of the discriminatory conduct, its

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 8 -

severity, whether it is physically threatening, or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

Unlike other, more direct and indiscrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101,115 (2002)("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the **cumulative effect** of individual acts"). (Emphasis added.) *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001).

Apodaca alleges that Clark directed only two statements at him during his tenure at CalPac. There is no allegation that Clark physically threatened Apodaca. This is not a situation where an employee shows up to work and is subjected to a barrage of rude or offensive remarks. Further, there is no showing that the purported remarks altered the terms and conditions of Apodaca's employment. Indeed, Apodaca testified that his duties and pay remained the same.

This is a situation where a third party may have made three or four rude remarks of which Apodaca may have heard two. Clearly, Apodaca failed to establish the frequency required to

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 9 -

establish a claim under Title VII especially in light of the allegation that the remarks were not made by CalPac employees.

### 3. CALPAC DID NOT RETALIATE AGAINST APODACA

Title VII's anti-retaliation provision forbids an employer from "discriminate[ing] against an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted or participated in" a Title VII proceeding or investigation. 42 U.S.C. Section 2000e-3(a). **This provision, however, "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant**...to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination. (Emphasis added.) *Burlington Northern & Santa Fey Ry. Co. v. White*, 126 S.Ct. 2405, 2409 (2006).

An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. LINDEMANN & P. GROSSMAN, *Employment Discrimination Law* 669 (3d ed.1996) (noting that "courts have held that **personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable** under § 704(a)). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. (citations omitted.) It does so

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid*. And normally **petty slights, minor annoyances, and simple lack of good manners will not create such deterrence**. (emphasis added.) *Burlington, at* 2415.

If the plaintiff makes a prima facie case, the burden of production shifts to the defendant to present a legitimate, non-retaliatory reason for the adverse action. *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000); *Cassimy v. Board of Education of the Rockford Public School, Dist. #205 (7th Cir. 2006)*. If the defendant carries this burden, the plaintiff "must demonstrate a genuine issue of material fact as to whether the reason advanced by the [defendant] was a pretext." *Brooks, supra.*

Apodaca claims he was "wrongfully and unlawfully terminated by CalPac. CalPac declares that CalPac essentially had one contract that was nearing completion and the services of most of the crew, to include Apodaca, were no longer needed nor could they be afforded. See Healy Declaration.

### CONCLUSION

Liability for hostile environment requires a showing that the action was severe and pervasive. For the reasons stated above, it is respectfully suggested that the two remarks heard by Apodaca were not severe or pervasive enough to be protected under Title VII. Assuming the remarks were severe and

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1 | pervasive, third party discrimination requires a showing that
2 | CalPac condone or authorized the act.  Such was not done.

3 |     Concerning Apodaca's claims for retaliation, Apodaca's
4 | discharge was based on reasons unrelated to any purported
5 | complaint made.  Other workers, some of whom did not file
6 | complaints, along with Apodaca's were laid off for financial or
7 | economic reasons.  As such, CalPac respectfully requests this
9 | Court grant its motion for summary judgment.

10 |     **RESPECTFULLY SUBMITTED** this 23rd day of July, 2007.

                              **BLAIR STERLING JOHNSON**
                              **MARTINEZ & LEON GUERRERO**
                              A PROFESSIONAL CORPORATION

BY: _____
                              **VINCENT LEON GUERRERO**
                              *Attorneys for Defendant California Pacific Technical*
                              *Services LLC*

V63:49\08130-03
G:\WORDDOC\PLD\VLG\198B-MEMO OF P&A IN SUPP OF MSJ RE
APODACA RE VAN METER V CALPAC.DOC

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

　IN THE DISTRICT COURT OF GUAM

2

3　HENRY G. VAN METER, JERRY　　) CASE NO. CIV05-00037
　APODACA, JR., JOSEPH J.　　　)
　HERNANDEZ, JOSEPH T. MENDIOLA, )
4　LARRY L. CHARFAUROS, ANTHONY　)
　C. ARRIOLA, ROBERT B. CRUZ,　)
5　ROLAND F. MENDIOLA, JAMES S.　)　　DEPOSITION OF
　YEE, TEDDY B. CRUZ, JESSE B.　)　JERRY APODACA, JR.
6　CRUZ, JOHN L.G. NAUTA, and　　)　　APRIL 12, 2007
　JOHN P. BABAUTA,　　　　　　　)
7　　　　　　　　　　　　　　　　)
　　　　　　Plaintiffs,　　　　 )
8　　　　　　　　　　　　　　　　)
　　　　vs.　　　　　　　　　　 )
9　　　　　　　　　　　　　　　　)
　CALPAC, DYNAMIC TECHNICAL　　 )
10　SERVICES, MCI, JOHN HEALY,　　)
　DENNIS CLARK, WILLIAM WARD,　 )
11　JAI JAMES and DOES 1 through　)
　10,　　　　　　　　　　　　　　)
12　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　)
13　_____)

14

15　　　　　The deposition of Jerry Apodaca, Jr., called by
　Defendants CalPac, John Healy and William Ward, pursuant to
16　Notice and pursuant to the Federal Rules of Civil Procedure,
　taken at the law offices of Blair Sterling Johnson Martinez &
17　Leon Guerrero, P.C., Suite 1008, Pacific News Building, 238
　Archbishop Flores Street, Hagatna, Guam 96910, on Thursday,
18　the 12th day of April, 2007, at the hour of 3:05 o'clock p.m.

19　　　　　That at said time and place, there transpired the
　following:
20

21

22

23

24

25　　　　　　　　　　　　　　　　　　　　ORIGINAL

1  Corporation.

2      Q.    Okay.  When was that?

3      A.    I can't recall.

4      Q.    Was it shortly after you left Southern?

5      A.    No, it was after CalPac, if I'm not mistaken.

6      Q.    Okay.  I want to talk about your employment history

7  before CalPac.

8      A.    Nothing.

9      Q.    So from the time you left Southern to the time you

10 started working at CalPac –

11     A.    I was, I was fishing.

12                          (Exhibit A marked: Application

13                           For Employment.)

14     Q.    (By Mr. Leon Guerrero)  This is Exhibit A.  Mr.

15 Apodaca, I'm handing you what has been marked as Exhibit A;

16 maybe this will help you remember some of this stuff.  Have

17 you ever seen Exhibit A before?

18     A.    Umm, no, I haven't.

19     Q.    On the second page, or the back page of Exhibit A,

20 take a look at that. There is a signature line there.

21     A.    Okay.

22     Q.    And it's dated April 13, 2004; do you see that

23 signature line?

24     A.    Yes, sir.

25     Q.    And there's a, it looks like somebody signed the

JERRY APODACA, JR.:  APRIL 12, 2007

1    Q.    Why was this amended do you know?

2    A.    No, I don't know.

3    Q.    How many times did you fill out a charge of

4    discrimination against CalPac?  If you know.

5    A.    I don't.

6    Q.    Looking at the first paragraph again where it says

7    "particulars," can you read that, please, for the record?

8    A.    "I was hired by CalPac to work in the established

9    project of underground cable in Guam for MCI."

10   Q.    It seems to indicate that you were hired to work on

11   a project for MCI; is that what I'm hearing correctly?

12   A.    Yes, sir.

13   Q.    So when you were hired, you were told that you were

14   going to be working on an MCI project; correct?

15   A.    Yes, sir.

16   Q.    Go on to the second paragraph.  Or let me read it

17   for you, okay?  It says, "from September 21, 2004 to

18   September 25, 2004 I was harassed by Dennis Clark, a

19   representative of MCI. On separate occasions Dennis Clark

20   made racially derogatory comments to me and fellow co-workers

21   by referring to us as 'monkeys' and as 'island monkeys'."

22   That's what paragraph 2 says; correct?

23   A.    Yes, sir.

24   Q.    Is there anything you'd like to change in paragraph

25   2?

1    you're referring to that Dennis Clark made?

2        Q.    The comments about monkeys and island monkeys that

3    took place on September 21, 2004 through September 25, 2004

4    that you heard; correct?

5        A.    Correct.

6        Q.    Okay.   Now, let's move forward in time before that.

7    Did you hear from anyone at CalPac that you might be laid off

8    at CalPac?

9            MS. LUJAN:   You're talking about before.   You

10   said forward in time when you said before.   I think that

11   might be confusing.   You mean before September 21, 2004?

12           MR. LEON GUERRERO: That's right.

13           MS. LUJAN:   Okay.

14       Q.    (By Mr. Leon Guerrero)  As an example, did they

15   tell you on September 20, 2004 that you might be laid off?

16   Just as an example.

17       A.    Yeah.   Before September; you said 22nd?

18       Q.    Before Mr. Clark made those comments that you heard

19   -

20       A.    Okay.

21       Q.    -- did you ever think that you might be laid off

22   from CalPac?

23       A.    No, I didn't think I would get laid off.

24       Q.    Are you familiar with construction work?

25       A.    Not really.

1      Q.    Who did you tell at CalPac that Mr. Clark made some

2   offensive statements?

3      A.    My foreman.

4      Q.    And your foreman was Mr. Van Meter?

5      A.    Henry, yes.

6      Q.    Okay.  Did you tell anybody else at CalPac about

7   the statements?

8      A.    Umm –

9      Q.    Well, let me ask you this.  Did you tell Mr.

10  Quintanilla that Mr. Clark made some statements?

11     A.    I believe so.

12     Q.    When did you tell Mr. Quintanilla?

13     A.    The same day that I told Mr. Van Meter.

14     Q.    And that would be the same day that Mr. Clark made

15  the statements?

16     A.    Yes, sir.

17     Q.    Okay.  What did Mr. Van Meter say he would do about

18  your complaints?

19     A.    He'll go and talk to Mr. Quintanilla and then Mr.

20  Quintanilla will tell, uh, the boss.

21     Q.    You just said that Mr. Van Meter said he would talk

22  to Mr. Quintanilla; correct?

23     A.    Correct.

24     Q.    Did Mr. Quintanilla say that he will do something

25  about Mr. Clark making those comments?

JERRY APODACA, JR.:   APRIL 12, 2007

1      Q.   Okay. And you didn't even deal with Mr. Healy;

2  correct?

3      A.   No, I didn't.

4      Q.   And Mr. Ward didn't create a hostile environment

5  for you did he?

6      A.   Mr. Ward?

7      Q.   Mr. Ward.  I believe it's William Ward; Bill Ward.

8      A.   I don't recall Mr. Ward being around.

9      Q.   Okay.  So he didn't create a hostile environment

10 for you then; correct?

11     A.   No.

12     Q.   If anything, the only thing that you didn't like

13 was Mr. Clark; correct?

14     A.   Correct.

15     Q.   And you didn't like him because of the comments

16 that he made to you?

17     A.   Correct.

18     Q.   Correct?  It appears to me that the only person

19 that you have the problem with is Mr. Clark; would that be

20 correct?

21     A.   I can't say.

22     Q.   I'm sorry?

23     A.   I cannot say.

24     Q.   Okay.  Well, let's go through each one of them if

25 you want then.  Do you have a problem with Mr. Quintanilla?

1      A.   No, I don't.

2      Q.   Do you have a problem with Mr. Van Meter?

3      A.   No, I don't.

4      Q.   I mean, when I say you have a problem, you may not

5  agree with everything they say, but they didn't make any

6  offensive remarks to you or anything like that.

7      A.   No.

8      Q.   Okay.  And when Mr. Van Meter says, go dig a ditch,

9  you may not like doing digging the ditch, but that's not a

10 problem with you; correct?

11     A.   Correct.

12     Q.   That's part of your job; right?

13     A.   Yes.

14     Q.   Okay.  William Ward; you didn't have a problem with

15 Mr. Ward; correct?

16     A.   Correct.

17     Q.   And you didn't have a problem with Mr. Healy;

18 correct?

19     A.   Correct.

20     Q.   Do you know who Jai James is?

21     A.   Jai James?

22     Q.   Yes.

23     A.   Jai James.

24     Q.   Look at paragraph 23 of your Complaint.  I think

25 paragraph 23 says "Defendant Jai James is, upon information

1    Q.   No?  You know, you said earlier there were two

2  times that you heard him say monkey; is that correct?

3    A.   Yes.

4    Q.   Okay.  Tell me about the first time, do you recall

5  what day that happened?

6    A.   I don't recall the day.

7    Q.   Okay.  I think you put on Exhibit B September 21st.

8  Would that be accurate?

9    A.   September 21st?

10   Q.   2004.  It says on Exhibit B –

11   A.   Yeah, I think so.

12   Q.   Yeah?  September 21st?

13   A.   Yes.

14   Q.   Okay, so what did he say, exactly?

15   A.   At first he said, "look at those monkeys."  And

16  then I turned to the closest one to me and then asked him,

17  "did you hear what he said?" And he goes, "no, what did he

18  say?"  And then he said it again.  He said, "look at those

19  bunch of island monkeys."

20   Q.   He said it two times –

21   A.   Yeah.

22   Q.   -- that incident?  So you turned and who did you

23  talk to?

24   A.   Umm, I think it was Tony.

25   Q.   Tony?

JERRY APODACA, JR.:  APRIL 12, 2007

1      A.    Not that I know of.

2      Q.    You don't know?

3      A.    No, I don't.

4      Q.    Did Henry Quintanilla ever tell you that he talked

5   to John Healy?

6      A.    No.

7      Q.    No? Did you ever ask him, you know, what happened

8   to your complaint?

9      A.    I didn't have any chance to ask him.

10     Q.    You never asked him after –

11     A.    No, I never asked him.

12     Q.    -- you made the complaint?

13     A.    No.

14     Q.    Did you ever hear Dennis Clark talk about any of

15  your co-plaintiffs?

16     A.    No.

17     Q.    No? Do you think that non-Chamorros were treated

18  better than you?

19     A.    Non-Chamorros?

20          MS. LUJAN:   I would just ask to clarify

21  treated; treated by whom?  Who would treat him better or

22  treat non-Chamorros better?

23     Q.    (By Mr. Leon Guerrero)  When you were working at

24  CalPac, did you feel that your employers were treating

25  anybody different from you?

1    A.    No.

2    Q.    No?

3    A.    No.

4    Q.    You were all treated the same?

5    A.    Yeah.

6    Q.    You didn't know about Dynamic Technical Services

7    during the time you were employed at CalPac; is that right?

8    A.    Yeah.

9    Q.    So you never submitted a complaint to Dynamic

10   Technical Services about Dennis Clark; is that right?

11   A.    Yeah, until later that we found out that he was

12   employed by them.

13   Q.    Okay.  Do you have any idea if anybody at CalPac or

14   MCI told Dynamic Technical Services about your complaint?

15   A.    Uh, not that I'm aware of.

16   Q.    Okay.  According to Exhibit C, you were laid off on

17   November 27, 2004; is that right?

18   A.    Yeah.

19   Q.    Yeah?  Okay.  And it says "Best regards, William J.

20   Ward, General Manager" and it's on CalPac letterhead; is that

21   right?  The letter's from CalPac?

22   A.    Yes.

23   Q.    Okay.  Do you know what role Dennis Clark had in

24   the layoff?

25   A.    No, I don't.

JERRY APODACA, JR.:  APRIL 12, 2007

U.S. EQ~~~~. EMPLOYMENT OPPORTUNIT~~~~ ~~~~MMISSION

Honolulu Local Office

*JERRY APODACA Jr,*

308 Ala Moana Boulevard, Room 7-127
Honolulu, HI 96850-0051
(808) 541-3120
TTY (808) 541-3131
FAX (808) 541-3390

## <u>PLEASE PRINT OR WRITE LEGIBLY</u>

## Questionnaire

I understand this document is not a charge. This information is provided to EEOC for informational purposes only to help me decide whether to file a charge. PLEASE CHECK THE FOLLOWING TO INDICATE YOU UNDERSTAND THE ABOVE. ( )

If you base your charge on your disability, please complete page 6.

1. *Please fill in the following information:*
   a. Your full name: _Jerry Apodaca Jr._
   b. Your address: _P.O. Box 7577_
      City/State: _AgAat Guam_
      Zip Code: _96928_
   c. Your daytime phone number:
      Your evening phone number: _(689) 4223_
   d. Your social security number: _( )_
   e. Your date of birth: _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_
   f. Your sex: _may 12 1980_
      _male_

   g. Your race: _Chamorro_

   h. Your national origin: _Guam_
   i. Your skin color: _Brown_
   j. Person who can always contact you
      Name: _Henry Avanmeter_
      Address: _25-2 Tai Taino Rd, apartment #63 D_
      City/State: _P.O. Box 7537 AgAt Guam_
      Zip code: _96928_
      Phone number: _(___)649-7600_

2. *Please give the following information about the employer:*

   a. Company name: _MCI/ CALPAC_

   b. Describe company business: _Istallation of communication cable_

Questionnaire - Page 1 of 6



EXHIBIT

①

*Jerry Apodaca Jr.*

c.   Address where you worked: CALPAC
    Street: P.O.BOX 8950
    City/State: Tamuning Guam
    Zip code: 96931
    Phone number: (646) 3646
    County: Guam

*MCI Glen*
*2400*
*Richardson,*
*75082*

2.   Corporate address to mail charge to:
    Corporate name: CALPAC / MCI
    Name/Title of person to receive charge (personnel/HR director/CEO):
      Name John Healy
      Title owner
      Street/P.O. Box: 8950
      City/State: Tamuning Guam
      Zip code: 96931
      Phone number: (646) 3646

d.   Name and title of immediate supervisor: Super Entendent
John Healy

Approximate number of employees working for the whole company. Circle one.

1-14    (15-100)    101-200    201-500    More than 500

i.   Date of hire: 04-14-04
j.   Last or current job title at company: 11-04-04
k.   Last or current unit/department in company: Underground
l.   Last or current rate of pay at company: SAME

3.   *Identify the employment event(s) that caused you to contact the EEOC. (e.g. hiring, layoff, promotion, accommodation, discipline, harassment, sexual harassment, etc.)* Layoff, Discrimenition (RAScial)

Date event occurred: 9/25/04

*Note: This information will be used by the EEOC to determine jurisdiction. Generally, charges must be filed within 300 days of the date of notification of an alleged act of discrimination.*

*Jerry Apodaca Jr,*

**4.** *What was the employer's stated reason for taking this action?*
not enaph work and not enaph pay.

**5.** *What makes you think this event is discriminatory?*
do to the fact that it was piscrimenition, from Dennises clarck.

**6.** *List the persons in your unit/department who were treated better than yourself with respect to this event. State their name, job title, race, age, color, national origin, sex and disability, if known.* Don Harper who is white

**7.** *List the persons in your unit/department who were treated the same as you with respect to this event. State their name, job title, race, age, color, national origin, sex and disability, if known.* Joe mendoillo, Ted cruz, Tony areoilla, Larry chaferus, Normand santos, Henry Vanmeter, rabanmendoi

John navta

**8.** *List the name and job title, race, skin color, sex and approximate age of the employers' representatives who recommended and approved the decision which resulted in the discriminatory event.* John Healy  Ownere Russell, max

Lay off

**9.** *Have you complained to your employer about this matter? If yes, explain the situation. When did you complain, to whom and what was the result? Please attach copies of supporting documentation.*
Dennises clarck / rasciec Remarckes
my forman      Yes I conplan to Henry Vanmeter
mavnckes,        that Dennis clarck called us a iskand
09-21-04
09-25-04

# JERRY Apodaca Jr,

*If you are complaining about <u>harassment</u> or <u>sexual harassment</u> please attach a brief chronology of events (e.g. two or three pages). Include dates of each incident, a description of what happened and harasser's name and job title. For each incident, provide witness names, if any. Also state when you complained, name and job title of person(s) to whom you complained and action take in response to your complaints. Attach any supporting documentation.*

*Have you filed a charge regarding this matter with the Hawaii Civil Rights Commission or any another agency? If yes, provide the agency name and date filed.*

*Write a paragraph about your employment situation and explain what happened and why you feel the incident is discriminatory. Be thorough. This information is very important for our evaluation of your situation.* I Jerry Apodaca and Tongareoilia were trenching the hole when Dennis clarck wokk by us and ~~said~~ sesd you all look like a bonch of maunckes that woos on. 09-21-04. ~~scribbled~~

Case 1:05-cv-00037    Document 316    Filed 07/23/2007    Page 26 of 51

*Jerry Apodaca Jr.*

Please state what your performance was like (in other words, tell us whether you were performing below standards, at standard or above standard) and how you can prove this is true (performance evaluations, awards, etc.). *above sanded*

*07-06-04*

What are your expectations in filing this charge? What do you want to happen (e.g. reinstatement, policy change, promotion, back pay, etc.)? 

*policy change, backpay, damiges*

Are you interested in mediation? Please circle one of the following:

Yes          (No)

Were you ever asked to sign an agreement that required that all disputes between you and your employer be resolved solely through binding arbitration? Circle one.

Yes          (No)

* If yes, attach a copy of the agreement. If you do not have a copy, briefly describe the terms of the agreement as you understood them and indicate when it was presented to you.

17. Have you ever been asked to sign a general release in which you released all claims against your employer in exchange for money or other benefits? Circle one.

Yes          (No)

* If yes, attach a copy of the release. If you do not have a copy, briefly describe the terms of the release as you understand them an indicate when it was presented to you.

Does anyone represent you in this matter (e.g. union, attorney, etc.)? If yes, please provide their name, title, address and phone number. *NO*

Provide any other information that you have available (e.g. witness names with their telephone numbers, any other supporting documentation). Be sure to state what each person witnessed.

# DISABILITY QUESTIONS:

*...u base your charge on your <u>disability</u>, answer the following questions:*

1. Identify the name of your disability:  _____

2. When did you first contract this disability:  _____

3. Describe in general what *major life activities* (such as walking, lifting, seeing, breathing, hearing, etc.) are affected by the disability.

4. Describe any limitations or restrictions placed on you by a physician because of your disability.

5. Explain how your disability affects your ability to perform your job.

6. Describe how your disability limits your activities outside of work.

7. Have any managers treated you differently because of your disability? If yes, describe how. Include the manager's name, job, title, and date(s).

8. Do (or did) you need a reasonable accommodation in order to perform your job? If yes, explain.

9. To whom did you make your request for reasonable accommodation? (Include name, job title, and date of request)

10. Did they deny your reasonable accommodation request? When? What reason did they give for the denial?

*...ait all documentation regarding your disability showing the diagnosis, prognosis, and/or ...ical limitations and all correspondence between you/your doctor and your company ...ding your disability and reasonable accommodation requests.*

REPORTER'S CERTIFICATE

1

2

3        I, Cecilia F. Flores, Stenotype Reporter, do hereby
certify the foregoing 94 pages to be a true and correct
4
transcript of the stenographic shorthand notes and audio
5
recording taken by me in the within-entitled and numbered
6
case at the time and place as set forth herein.
7
        Dated at Hagåtña, Guam, this 10th day of June, 2007.
8

9

10                                        _____
                                              Cecilia F. Flores
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JERRY APODACA, JR.:   APRIL 12, 2007

CLERK'S CERTIFICATE

1

2

3    SUPERIOR COURT OF GUAM          ) ss

4          I, Cecilia F. Flores, Special Deputy Clerk,

5    Superior Court of Guam, do hereby certify that on the 12th

6    day of April, 2007, at the hour of 2:05 o'clock p.m. there

7    appeared before me Jerry Apodaca, Jr. at the offices of Blair

8    Sterling Johnson Martinez & Leon Guerrero, the witness

9    herein, produced to give his deposition in the within-

10   entitled and numbered Case No. CIV05-00037, in the District

11   Court of Guam; that prior to examination the witness was by

12   me duly sworn upon his oath; that thereafter the transcript

13   was prepared by me or under my supervision, and a certified

14   copy of the original deposition transcript was presented to

15   Mr. Leon Guerrero's office for the deponent's review,
corrections, if any, and execution.

16         I further certify that I am not a relative,

17   employee, attorney or counsel of any of the parties, nor a

18   relative or employee of such attorney or counsel, and that I

19   am not directly or indirectly interested in the matters in

20   controversy.

21         In testimony whereof, I have hereunto set my hand

22   and seal of Court this 15th day of June, 2007.

23

24   _____
SPECIAL DEPUTY CLERK, SUPERIOR COURT OF GUAM

25

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                 Plaintiffs,     )
                                 )
        vs.                      )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                 Defendants.     )

**⬚ COPY**

## DEPOSITION OF RUSSELL A. HATFIELD

Taken on Behalf of CalPac

BE IT REMEMBERED That, pursuant to the Guam
Rules of Civil Procedure, the deposition of **RUSSELL A.**
**HATFIELD** was taken before Cecille A. Flores, a Certified
Shorthand Reporter, on Monday, the 19th day of February 2007,
at 10:00 a.m. in the offices of Blair Sterling Johnson
Martinez & Leon Guerrero, Suite 1008, Pacific News Building,
238 Archbishop Flores Street, Hagatna, Guam.

1   is that correct?

2       A    That's correct.  Norman is still there as far as I

3   know.

4       Q    When did you become aware that Norman made a

5   complaint with the EEOC?

6       A    I wasn't aware that he made a complaint.  I don't

7   think I said that.

8       Q    How often was Dennis Clark on the job site?

9       A    Every day.

10      Q    How many hours a day?

11      A    Four hours a day.

12      Q    Where would he be the rest of the time?

13      A    I have no knowledge.

14      Q    How many hours would you spend at the CalPac

15  warehouse on a daily basis?

16      A    Me?

17      Q    Yes.

18      A    Three.

19      Q    How long is a work day for you?  How long was a work

20  day for you at CalPac?

21      A    You want from the time I got up in the morning until

22  the time I went to bed or just physical work?

23      Q    Physically being there at CalPac on the job.

24      A    12 to 18.  I mean, 12 to 14, I'm sorry.

25      Q    What time of the day would you spend those three

1    A    Who I would keep if given a choice of keeping some
2    and letting others go, yes.

3    Q    Now, at the time these people were let go, would
4    people be let go in favor of other employees that were local?
5    Do you understand my question?

6    A    My recommendation has nothing to do with race. The
7    employees that were let go were based on their skill levels
8    and the job requirements that I needed the individuals to do.
9    So if Joe Blow was multi-taskable, I'd put him in this
10   category. If Joe Blow was not, he'd stay over here. If I
11   didn't need his particular skills because we were downsizing
12   at the time because the job was slowing down and you don't
13   keep people on the payroll if you don't have any work for
14   them to do. And that's what we were doing. We were
15   downsizing because the work was slowing down. Yes, there was
16   a long period of work leftover, but we didn't need the
17   humongous payroll and staff that we had at the time.

18   Q    Just for the record, some of the people that stayed
19   on as employees were locals, would that be correct?

20   A    That's correct.

21   Q    I believe you indicated earlier that you weren't
22   aware that various people were filing complaints. You knew
23   there were complaints but you didn't know who they were,
24   would that be correct?

25   A    Uh-huh.

1      Q     I believe that was in reference to -- I believe you

2   indicated Norman Santos, correct?

3      A     I think she was talking about James Lee.

4      Q     James?

5      A     Yee or Lee or whatever his name was.  I made the

6   statement that James -- until I got here and I saw it right

7   here, James, down as a defendant.  I have -- to this day,

8   other than what's on this piece of paper is the only people

9   that I know have filed a suit.

10     Q     You're referring to the Plaintiffs in this lawsuit?

11     A     That's correct.

12     Q     In your opinion, were the service of the people that

13  were let go around November of 2004, were their services

14  needed at CalPac?

15     A     The ones that were let go, no.

16     Q     So when you're saying let go, they weren't

17  necessarily fired, would that be correct?

18     A     Nobody was fired.  Everybody was laid off with the

19  understanding that if work picked up and if we needed your

20  skills back, that you would be given first opportunity to

21  accept the job if you so desired it.

22     Q     And it wouldn't be unusual for somebody to be let go

23  at CalPac and then later picked up?

24     A     No.

25     Q     Did you actually observe that situation?

BARRIGADA ) ss

        I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 19th day of February, 2007 at the hour of 10:00 a.m. there appeared before me **RUSSELL A. HATFIELD** at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

        I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

        In testimony whereof, I have hereunto set my hand this 5th day of March, 2007.

                    Cecille A. Flores

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.     )
CRUZ, ROLAND F. MENDIOLA, JAMES   )
S. YEE, TEDDY B. CRUZ, JESSE B.   )
CRUZ, JOHN L.G. NAUTA, and JOHN   )
P. BABAUTA,                       )
                                  )
                 Plaintiffs,      )
                                  )
            vs.                   )
                                  )
CALPAC, DYNAMIC TECHNICAL         )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES    )
and DOES 1 through 10,            )
                                  )
                 Defendants.      )

**ORIGINAL**

## DEPOSITION OF DONALD J. HARPER

Taken on Behalf of California Pacific Technical Services

BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **DONALD J. HARPER**

was taken before Cecille A. Flores, a Certified Shorthand

Reporter, on the 16th and 20th days of February 2007, in the

offices of Blair Sterling Johnson Martinez & Leon Guerrero,

Suite 1008, Pacific News Building, 238 Archbishop Flores

Street, Hagatna, Guam.

1    Q    Were your responsibilities limited to the MCI

2    contract?  Did you have other responsibilities as well?

3    A    I had a few other responsibilities at the time.

4    Q    What percentage of your time was devoted to the MCI

5    contract would you say?

6    A    95 percent.

7    Q    95 percent?

8    A    Guessing.

9    Q    Can you describe for us what the MCI contract was?

10   A    It was to install a fiber optic connection from the

11   MCI building in Agana to NCTAMS NASA complex.

12   Q    What was the route they took to get from MCI here in

13   Agana?

14   A    Up through Agana, through Tiyan, down the cliffline

15   through Harmon Industrial Park, back through the back road of

16   Fatima, come up Route 1, down Route 3, back through the

17   jungle into NCTAMS.

18   Q    Did the MCI project, was it divided into phases or

19   how did it go?

20   A    I believe it was -- I think there were three phases.

21   They called them three phases, yes.

22   Q    Do you remember what the three phases were?

23   A    Yeah, it wasn't really -- I don't know if there was

24   a contractual breakdown, but I know when it was broken down

25   into phases of making it through Agana.  It was kind of a

1      A      Just, I guess, for what an owner does.

2      Q      But he wasn't involved in the day-to-day operations

3  of the company?  That was you and Bob and Tim?

4      A      No, he was aware of the day-to-day.  There was daily

5  communication with him.  I mean, other than that, that's as

6  close as it got.

7      Q      Did he do the job interviews with the prospective

8  laborers?

9      A      No, I don't believe so.

10     Q      Who did that?

11     A      Either be me, Bob or Tim Camacho or Tim Camacho's

12  replacement and I can't remember his name.  After that.

13     Q      What was the role of Dennis Clark?

14     A      Dennis Clark was -- he was a representative of MCI.

15  He was basically quality control, I would guess.  For MCI.

16  He was there to make sure that the product was installed per

17  their specifications.

18     Q      You had MCI provide a set of specifications you were

19  supposed to follow?

20     A      Yes.

21     Q      Describe how those were presented to you.

22     A      Drawings with details.

23     Q      Do they also have a manual of specifications?

24     A      Not really.  Not that I know of.

25     Q      So you say he was the quality control.  Was he then

1    Q    Why aren't you on the site that day?

2    A    I was in the office doing some report for John

3    Healy.

4    Q    Do you remember when or about that was time wise?

5    A    No, I don't.  I mean, it's no --

6    Q    Was it still in Phase 1 or one of the later phases?

7    A    I think that's kind of the Phase 2.  I'm -- I can't

8    really remember but --

9    Q    So you don't recall the date?

10   A    No.

11   Q    Who was the employee that called you?

12   A    Henry Quintanilla.

13   Q    What did Henry Quintanilla tell you to the best as

14   you can recall?

15   A    When I arrived on site, I guess there was a deep

16   excavation area that Dennis wanted things to move faster,

17   didn't like the way they was doin' it and referred to them as

18   monkeys at this time, I believe.  It was just a phrase

19   "monkeys" and they didn't like it so I had conversation with

20   Dennis.

21   Q    Was it a heated conversation?

22   A    Yeah, it kind of got heated because he took it -- I

23   tried to keep it on a professional -- look, just don't treat

24   them this way, don't talk to people this way and -- yeah,

25   there was a lot of arrogance.

1     Q    When was the next incident that you can recall that

2   you had a disagreement with Mr. Clark?

3     A    I believe -- I'm not sure but I believe it was -- we

4   were on the back part of NCTAMS coming through the jungle

5   because there was an area that conduit was installed and they

6   called me, the same thing, and we were pulling fiber.

7     Q    You weren't there that day either?

8     A    I was en route.  We were setting up for a fiber pull

9   and nobody had started yet.

10    Q    Who called you that time or told you about it?

11    A    I think it was Van Meter at this time.

12    Q    Who is Van Meter?

13    A    Henry Van Meter.

14    Q    Who was Henry Van Meter?

15    A    Henry Van Meter was another one that was not a

16  foreman but he was kind of like a lead man.  If the crew

17  broke away, they were working a different area, he had the

18  responsibility of leadership of certain guys.

19    Q    Henry, his title wasn't foreman?

20    A    I don't believe so but I'm not sure.

21    Q    Did you hire Henry Van Meter also?

22    A    You know, I didn't directly hire anybody.  I didn't

23  have the authority to, in my opinion, but I was part of the

24  interview of Henry Van Meter.

25    Q    Who else interviewed?

1     Q     Why do you say that?

2     A     Because he was.  It was my opinion.  I just feel he
3   was arrogant.

4     Q     Did he ever say anything that made you think he was
5   arrogant?

6     A     It was just arrogance.  Yeah, I guess he said a lot
7   of things, obviously, that made me feel that way but I can't
8   pinpoint one isolated situation.  It was just being around
9   somebody for long enough in a working condition that you feel
10   that attitude superiority and he felt like he was working in
11   a third world all the time.

12     Q     Did he ever say anything like that?

13     A     Yes.

14     Q     What did he say?

15     A     He just referred to Guam as being very backwards and
16   he would make comments about another job he did somewhere
17   else.  I may be wrong about South America and he would
18   compare it to that.

19     Q     Have you ever made any verbal threats to Dennis
20   Clark?

21     A     Yes.

22     Q     Could you tell us about the first time you made a
23   verbal threat to him?

24     A     I think I told him that one time I -- I forget what
25   I said.  Get off my job or I'll whoop your ass or something.

# REPORTER'S CERTIFICATE


I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **DONALD J. HARPER** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 188, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd day of March 2007.


Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA ) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS, )
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES )
S. YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA, )
                           )
               Plaintiffs, )
                           )
                 vs. )
                           )
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS )
CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10, )
                           )
               Defendants. )

COPY

## DEPOSITION OF NORMAN S. SANTOS

Taken on Behalf of Defendant CalPac

        BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **NORMAN S. SANTOS**

was taken before Cecille A. Flores, a Certified Shorthand

Reporter, on Friday, the 13th day of April 2007, at 3:00 p.m.

in the offices of Blair Sterling Johnson Martinez & Leon

Guerrero, Suite 1008, Pacific News Building, 238 Archbishop

Flores Street, Hagatna, Guam.

```
 1    Q    How long have you been working at CalPac?

 2    A    Going for three years.

 3    Q    So you started working at CalPac in 2004?

 4    A    Yeah.

 5    Q    What is your position now at CalPac?

 6    A    Used to be Laborer.  Now I'm a Supervisor in the

 7  field.

 8    Q    When did you become a Supervisor at CalPac?

 9    A    One year, three months.

10    Q    So 2006 you became a Supervisor, is that about

11  right?

12    A    Two years after.  A year and a half.  One year, four

13  months.

14    Q    So around 2006, correct?

15    A    Yeah.

16    Q    So from 2004 through 2006 you were a Laborer?

17    A    Yeah.

18    Q    Somewhere around there, right?

19    A    Uh-huh.

20    Q    What was your wage as a Supervisor?  What is your

21  wage?

22    A    11.50.

23    Q    As a Laborer, how much were you making?

24    A    Used to be $6.  Two months later they give $9.

25    Q    When was that?
```

 1  on them.  The two guys laid off, the company gonna be going

 2  slow.

 3      Q    How long has CalPac had that policy?  As long as

 4  you've been working there?

 5      A    No.

 6      Q    So how long?

 7      A    That's a new policy.

 8      Q    What about in 2004?  Did they have a policy about

 9  showing up --

10      A    No, no.

11      Q    Earlier you filed a charge of discrimination with

12  the EEOC, correct?

13      A    Yes.

14      Q    That was about the time I guess the other

15  Co-Plaintiffs were filing?

16      A    Yes.

17      Q    The same time they were filing with the EEOC?

18      A    Yes.

19      Q    I think there was something that was filed with the

20  EEOC around February 2005.  Did Don Harper help you file the

21  charge of discrimination?  Do you remember?

22      A    Yes.

23      Q    Did Mr. Harper help you file it?

24      A    He help us to call Hawaii.

25      Q    Then you used his fax machine?

1    the complaint and the time you withdrew it?  Do you know how

2    many months or weeks that was?

3         A    Almost a year.

4         Q    Almost a year that you had a complaint with the

5    EEOC?

6         A    Uh-huh.

7         Q    During that time you were still employed at CalPac?

8         A    Yes.

9         Q    Did anybody at CalPac say anything to you about your

10   complaint?

11        A    No.

12        Q    No?  They let you work?

13        A    (Witness nodded head.)

14        Q    Did you feel that you were treated unfairly when you

15   were working at CalPac during that one year?

16        A    No.

17        Q    We were talking to Mr. Leon Guerrero about a meeting

18   that was held at CalPac when Dennis Clark said he never made

19   the statements.  Do you recall that?

20        A    Yes.

21        Q    During that meeting, did anybody at CalPac, the

22   management, ever say if you make a complaint you'll get fired

23   or you'll --

24        A    No.

25        Q    Nobody said that?

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **NORMAN S. SANTOS** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 51, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 18th day of May 2007.


_____
Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for
Guam, do hereby certify that on the 13th day of April, 2007
at the hour of 3:00 p.m. there appeared before me **NORMAN S.
SANTOS** at the law offices of Blair Sterling & Johnson, Suite
1008, Pacific News Building, 238 Archbishop Flores Street,
Hagatna, Guam. The witness herein, produced to give his
deposition in the within-numbered Civil Case No. CIV05-00037;
that prior to examination the witness was by me duly sworn
upon his oath; that thereafter the transcript was prepared by
me or under my supervision, and the original deposition
transcript was presented to Mr. Leon Guerrero's office for
the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative,
employee, attorney or counsel of any of the parties, nor a
relative or employee of such attorney or counsel, and that I
am not directly or indirectly interested in the matters in
controversy.

In testimony whereof, I have hereunto set my
hand this 18th day of May, 2007.

_____
Cecille A. Flores

VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 Pacific News Building
238 Archbishop F.C. Flores Street
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

# IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL CASE NO. CIV05-00037<br><br><br><br><br>**DECLARATION OF JOHN T. HEALY IN SUPPORT OF EACH OF CALPAC'S MOTIONS FOR SUMMARY JUDGMENT** |

I, **JOHN T. HEALY**, under penalty of perjury, do hereby declare and state as follows:

1.   I am a shareholder of California Technical Services LLC ("CalPac") and its Vice President whose duties include, the field operation of CalPac.

2.   Included within Calpac's field operation is the "underground crew" of which plaintiffs were formerly employed.

//

3.   In early 2004, CalPac was working on a contact with MCI to lay fiber optics.

4.   The MCI contract was initially to be completed in December 2004.

5.   CalPac hired additional laborers to assist the underground crew in the completion of the MCI project.

6.   The vast majority of the underground crew were of Chamorro descent.

7.   In the latter part of 2004, CalPac essentially had one contract (i.e. the MCI Contract) which was nearing completion.

8.   Although the MCI contract was not officially completed until June/July of 2005, the services of most of the laborers were no longer needed.

9.   CalPac laid off employees based on economic reasons.

10.  James Yee and Robert Cruz were not laid off, rather they were terminated for cause.

11.  Joseph Hernandez was hurt on the job and received Worker's Compensation. He is officially on CalPac's books.

12.  After the lay offs were completed, the vast majority of the remaining underground employees were of Chamorro descent.

13.  Sometime in December, 2004, I became aware that some employees were claiming they were being discriminated against based on Clark's purported remarks. A meeting was called to answer any questions and alleviate any concerns, concerning Clark's statements. CalPac did not threaten.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F C FLORES STREET
HAGATNA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 2 -

I declare under penalty of perjury and the laws of the United States that the foregoing statements are true and correct.

DATED: JULY 19, 2007

JOHN T. HEALY

V63\-08130-03
G:\WORDDOC\PLD\VLG\194-DECLARATION OF JOHN HEALY RE VAN METER ET AL V CALPAC ET AL.DOC

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
38 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE (671) 477-7857