VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

**FILED**
DISTRICT COURT OF GUAM
JUL 23 2007 nb
MARY L.M. MORAN
CLERK OF COURT

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10,<br><br>                    Defendants. | CIVIL CASE NO. CIV05-00037<br><br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE JESSE B. CRUZ** |

## INTRODUCTION

This is a lawsuit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et. seq.* Jesse B Cruz' ("Cruz") claims arise out of **one** purported statements made by Dennis Clark ("Clark")[1] who, Cruz acknowledges, was neither a co-employee of the plaintiffs nor an employee of California

---

[1] For the purpose of this Motion only, CalPac will assume Clark made the purported statements.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857



Case 1:05-cv-00037    Document 319    Filed 07/23/2007    Page 1 of 39

Technical Services, LLC ("CalPac"). Clark, in fact, was MCI's owner representative hired to ensure CalPac performed according to the terms of the contract.

Cruz alleges that on one occasion Clark called him and his fellow co-workers "monkeys" or "island monkeys." Cruz claims that he reported the statement to his supervisor and that CalPac retaliated and discharged him in May of 2005. CalPac declares that Cruz was laid off because the MCI project was near completion and that CalPac no longer needed the services of most of CalPac's laborers.

To the extent co-defendant Dynamic Technical Services ("DTS") asserts there was no hostile environment, CalPac hereby joins in such motion. Further, CalPac now moves for summary judgment on all issues alleged against CalPac by Cruz.

## FACTS

CalPac acquired a contract from MCI to lay fiber optic cables on Guam. The MCI project entailed laying fiber optic cable from Hagatna to NTCAM. Harper Deposition at p. 11. Initially, the MCI project was scheduled to be completed around December, 2004. See Healy Declaration. Clark was designated as MCI's representative charged with ensuring CalPac complied with the terms of the contract. Harper Deposition at p. 15. **It is not disputed that Clark was never an employee of CalPac**.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÁTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Case 1:05-cv-00037    Document 319    Filed 07/23/2007    Page 2 of 39

In order to meet the terms of the MCI contract, CalPac hired additional laborers to trench and lay cables. Healy Declaration. Initially, the MCI project was scheduled to be completed around December, 2004. Healy Declaration. As the project neared completion, CalPac began to lay-off its employees since the MCI project was the only remaining major contract that CalPac had. Healy Declaration.

Cruz, one of the plaintiffs herein, began working for CalPac around February, 2004 and left after one month. Cruz Deposition at p. 14. Cruz returned to CalPac in October 2004. Cruz Deposition at p. 13. Cruz was part of the field crew of CalPac. Most, if not all employees, of the field crew were local hires of Chamorro descent. See Healy declaration. Because of the MCI contract, CalPac had to hire additional employees. Harper Deposition at p. 25. Around November, 2004, CalPac began downsizing because the work was slowing down. Hatfield Deposition at p. 75. Because of the reduced amount of work, the services of many of the employees were no longer needed. Hatfield Deposition at p. 76.

Through Cruz's complaint, Cruz alleged that Clark (an employee of DTS and not of CalPac), harassed Cruz by calling Cruz a "monkey" or "island monkey." See Par. 133 of the Complaint; see also Cruz Deposition at 20.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F. C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 3 -

Cruz alleged that the purported statements occurred around October, 2004. See Para. 172 of the Complaint; *see also* Cruz Deposition at pp. 34-35. Cruz claims to have notified CalPac of the treatment received from Clark. See Para. 174 of the Complaint; *see also* Cruz Deposition at p. 54.

Don Harper, whose duties included coordinating with the CalPac's customers, testified that he was informed of three incidents wherein Clark would refer to the employees as monkeys. Harper Deposition at p. 22.

The first report purportedly resulted in Harper and Clark having a heated discussion about the way to talk to people. Harper Deposition at p. 22. It was Harper's impression that it was just a phrase 'monkeys' and they [the crew] didn't like it." Harper Deposition at p. 22. The second incident purportedly resulted in the same action by Harper. Harper Deposition at p. 23. On the third and final incident, Harper purportedly threatened Clark and told him to "get off my job or I'll whoop your ass or something." Harper Deposition at p. 96.

Although Harper claims to have informed Healy, Healy denies being informed about such statements until the protests began. Bill Ward, CalPac's general manager, testified that he was never informed about the statements until the December meeting.

Through his Complaint at Par. 176, Cruz alleged that a meeting on December, 2004 took place informing CalPac employees

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

that they would be terminated if they complained to authorities or if they communicated with the protesters. Cruz clarified that all he could recall was someone talking about safety issues and Healy saying to choose wisely who to support. Cruz Deposition at p. 6.

Concerning the protest Hatfield, a disinterested witness,[2] testified that Healy called the meeting to answer any questions concerning the allegations of discrimination. Hatfield Deposition at p. 9. Hatfield further testified that Healy stated that he was unaware of any complaints of discriminatory remarks and that Healy encouraged employees to report such remarks to management or the EEOC.

## LAW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56. The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions,

---

[2] Hatfield, a Caucasian, left CalPac in June 2005 due to the winding down of CalPac's projects and unavailability of work. Hatfield Deposition at 17.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

answers to interrogatories, and admissions on file" designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 at 324.

In determining whether the moving party has met its burden of establishing that no genuine issue of a material fact exists and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in a light most favorable to the nonmovant, in this case the Plaintiff, and resolve all reasonable doubts in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Ins.*, 210 F.3d 1099, 1106 (9th Cir. 2000). The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1 its claim or defense to carry its ultimate burden of persuasion
2 at trial. *Id.*

### I. RACIAL HARASSMENT – HOSTILE ENVIRONMENT

#### 1. CALPAC SHOULD NOT BE LIABLE FOR THE ACTIONS OF A THIRD PARTY

In the instant case, Cruz alleges that a non-employee of CalPac called him a "monkey" or "island monkey" on two occasions. In order for an employer to be found liable for third party harassment, an employer must ratify or condone the conduct by failing to investigate and remedy it after learning of it. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002). Assuming for the sake of this motion that complaints were made to Harper, Harper testified that he confronted Clark about the statements. After the third complaint to Harper, Harper threatened Clark and kicked Clark off the job site. Most importantly, there were no further complaints and the situation was remedied. Clearly, although Healy and Ward may have not known of the actions by Harper, action was taken nonetheless. CalPac, therefore, should not be liable for the actions of Clark.

#### 2. PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT

The Supreme Court has repeatedly stated that Title VII **does not set forth "a general civility code for the American workplace."** (Emphasis added.) *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006).

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Judicial standards for harassment must **"filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language**, gender-related jokes, **and occasional teasing.'"** *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998). Although CalPac concedes that referring to an employee as an island monkey may be offensive, these remarks, under the circumstances, do not qualify for Title VII protection. **"Conduct that is not so severe or pervasive enough to create an objectively or abusive work environment...is beyond Title VII purview**." (Emphasis added.) *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21 (1993).

In order to state a claim for hostile environment, Cruz must show that: (1) he was subject to verbal or physical conduct based on race or national origin; (2) that the conduct was unwelcomed; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and created an abusive environment. *Galdamez v. Potter,* 415 F.3d 1015, 1023 (9th Cir. 2005). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment, for the purposes of Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept.,* 424 F.3d 1027 (9th Cir. 2005). In determining whether conduct was sufficiently severe or pervasive, courts look at all the circumstances,

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1  including the frequency of the discriminatory conduct, its

2  severity, whether it is physically threatening, or humiliating,

3  or a mere offensive utterance, and whether it unreasonably

4  interferes with an employee's work performance. *Little v.*

5  *Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

6  Unlike other, more direct and discrete unlawful employment

7  practices, hostile work environments generally result only after

8  an accumulation of discrete instances of harassment. *See Nat'l*

9
10  *R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,115 (2002)("Hostile

11  environment claims are different in kind from discrete acts.

12  Their very nature involves repeated conduct.... Such claims are

13  based on the **cumulative effect** of individual acts"). (Emphasis

14  added.) *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th

15  Cir. 2001).

16
17  Cruz alleges that Clark directed one statement at him

18  during his tenure at CalPac. There is no allegation that Clark

19  physically threatened Cruz. This is not a situation where an

20  employee shows up to work and is subjected to a barrage of rude

21  or offensive remarks. Further, there is no showing that the

22  purported remarks altered the terms and conditions of Cruz's

23  employment. Indeed, Cruz testified that his duties and pay

24  remained the same.

25
26  This is a situation where a third party may have made three

27  or four rude remarks of which Cruz may have heard one. Clearly,

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Cruz failed to establish the frequency required to establish a claim under Title VII especially in light of the allegation that the remarks were not made by CalPac employees.

### 3. CALPAC DID NOT RETALIATE AGAINST CRUZ

Title VII's anti-retaliation provision forbids an employer from "discriminate[ing] against an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted or participated in" a Title VII proceeding or investigation. 42 U.S.C. §§ 2000e-3(a). **This provision, however, "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant**...to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination. (Emphasis added.) *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2409 (2006).

An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. LINDEMANN & P. GROSSMAN, *Employment Discrimination Law 669* (3d ed.1996) (noting that "courts have held that **personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable** under § 704(a)). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Title VII's remedial mechanisms. (citations omitted.) It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid*. And normally **petty slights, minor annoyances, and simple lack of good manners will not create such deterrence**. (emphasis added.) *Burlington, at* 2415.

If the plaintiff makes a prima facie case, the burden of production shifts to the defendant to present a legitimate, non-retaliatory reason for the adverse action. *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000); *Cassimy v. Board of Education of the Rockford Public School, Dist. #205 (7ᵗʰ Cir. 2006)*. If the defendant carries this burden, the plaintiff "must demonstrate a genuine issue of material fact as to whether the reason advanced by the [defendant] was a pretext." *Brooks, supra.*

In Cruz's deposition, Cruz testified that CalPac retaliated by being snubbed. He testified that two or three times he would be the last person to receive an assignment. Cruz Deposition at 86.

Cruz claims he was "wrongfully and unlawfully terminated by CalPac. CalPac declares that CalPac essentially had one contract that was nearing completion and the services of most of the crew, to include Cruz, were no longer needed nor could they be afforded. See Healy Declaration.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM GMO 10-5205
TELEPHONE: (671) 477-7857

## CONCLUSION

Liability for hostile environment requires a showing that the action was severe and pervasive. For the reasons stated above, it is respectfully suggested that the two remarks heard by Cruz were not severe or pervasive enough to be protected under Title VII. Assuming the remarks were severe and pervasive, third party discrimination requires a showing that CalPac condone or authorized the act. Such was not done.

Concerning Cruz' claims for retaliation, Cruz' discharge was based on reasons unrelated to any purported complaint made. Other workers, some of whom did not file complaints, along with Cruz were laid off for financial or economic reasons. As such, CalPac respectfully requests this Court grant its motion for summary judgment.

**RESPECTFULLY SUBMITTED** this 23rd day of July, 2007.

**BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO**
A PROFESSIONAL CORPORATION

BY: _____
**VINCENT LEON GUERRERO**
*Attorneys for Defendant California Pacific Technical Services LLC*

V63:49\08130-03
G:\WORDDOC\PLD\VLG\207B-MEMO OF P&A IN SUPP OF MSJ RE J E
CRUZ RE VAN METER V. CALPAC.DOC

- 12 -

Case 1:05-cv-00037   Document 319   Filed 07/23/2007   Page 12 of 39

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA )   CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.     )
CRUZ, ROLAND F. MENDIOLA, JAMES )
S. YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA,                        )
                                )
               Plaintiffs, )
                            )
            vs.                  )
                            )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10,          )
                            )
             Defendants. )

**△ ORIGINAL**

## DEPOSITION OF JESSE B. CRUZ

*Taken on Behalf of Defendant CalPac*

         BE IT REMEMBERED That, pursuant to the Guam

Rules of Civil Procedure, the deposition of **JESSE B. CRUZ** was

taken before Cecille A. Flores, a Certified Shorthand

Reporter, on the 20th day of April 2007, at 9:00 a.m. in the

offices of Blair Sterling & Johnson.

*Van Meter, et al vs. CalPac, et al: CIV05-00037*

6

1    A    Okay.

2    Q    So if I say is that a yes or a no, maybe because

3  you're nodding your head or shaking your head, that's the

4  reason we're going to be doing that, okay?

5    A    (Witness nodded head.)

6    Q    Do you have any questions about the procedure so

7  far?

8    A    No.

9    Q    So we're here because of a lawsuit.  You're one of

10  the Plaintiffs in this case that was filed in the District

11  Court, correct?

12    A    Correct.

13    Q    And you are alleging discrimination, among other

14  things, correct?

15    A    Correct.

16    Q    So let's start off with your background.  Are you

17  employed right now?

18    A    Yes, I am.

19    Q    Where are you employed at?

20    A    Hyatt.

21    Q    What is your position at the Hyatt?

22    A    I work for the Engineering department.  I'm a

23  Welder/Plumber.

24    Q    What is your hourly rate there?

25    A    $8.

1    Q    No benefits?

2    A    No benefits.

3    Q    How did you find out about the opening at CalPac?

4    A    Ted.

5    Q    Who is Ted?

6    A    My brother Ted.

7    Q    So Teddy Cruz?

8    A    Yes.

9    Q    What did Teddy tell you?

10    A    He told me that -- do I want to come back 'cause --

11   do I want to come back and work again with CalPac.

12    Q    So you worked at CalPac before?

13    A    Yes, February, then I took a break at February.  I

14   only last like a month then I went to DI subbing.

15    Q    I'm a little confused.

16    A    February was hired CalPac.  I stayed there for a

17   month.

18    Q    What year in February?

19    A    I can't recall what year.

20    Q    Let's start off.  You say you worked at CalPac from

21   October 2004 to May 5, 2004?

22    A    Four.

23    Q    Four?

24    A    Four.

25    Q    Then you indicated there was another time you were

1   working for CalPac and that was February?

2       A    Correct, start February.  I took a break then went

3   to subbing.

4       Q    I'm still getting confused.  When you were talking

5   about your employment when you started working at CalPac in

6   February, was that before or after the time you were working

7   at CalPac?

8       A    Before.

9       Q    So it would be February 2004 you were working at

10  CalPac?

11      A    Yes.

12      Q    Then you went to DI subbing?

13      A    Yes.

14      Q    How long did you work at CalPac the first time?

15      A    About a month.

16      Q    How much were you making then?

17      A    I don't recall.  Was it 5 -- I think it was 5 or 6.

18  I'm not too sure.

19      Q    5 to $6 an hour?

20      A    Yes.

21      Q    Any benefits at that time?

22      A    No.

23      Q    Then DI instruction. was that Astumbo?

24      A    Astumbo Elementary.

25      Q    So that would be around March 2004 you went to work

1      A      Now?

2      Q      Yes.

3      A      No.

4      Q      Were you ever a journeyman welder?

5      A      The only time I did my welding experience is through

6   my dad, okay?  Whatever equipment he has is what he taught me

7   on.

8      Q      Your father was a journeyman, correct?

9      A      Yes.

10      Q      He got that from SRF?

11      A      Yes.

12      Q      Did you ever work at SRF?

13      A      No.  I worked for -- after I came back '85, I was

14   employed with NSD as a material handler.

15      Q      What is NSD?

16      A      NSD, it's almost like a supply depo.

17      Q      Naval supply depo?

18      A      Yes.

19      Q      Do you have a chauffeur's license?

20      A      Yes, I do.

21      Q      What kind of vehicles are you allowed to operate?

22      A      Anything -- not above two ton which means tractor, I

23   cannot operate that.  I can operate cargo trucks like one and

24   a half ton.

25      Q      So you can't drive a dump truck, is that right?

1    Q    What day was this?

2    A    I can't give you the day.  I know it was in October.

3    Q    Approximately two weeks after you started?

4    A    Yes.

5    Q    Was it --

6         MS. LUJAN:  Just to correct, the earlier

7    testimony was in about two weeks, not two months.  I believe

8    you said two months.

9         MR. LEON GUERRERO:  I thought I said two weeks.

10   If I said two months, I apologize.

11   BY MR. LEON GUERRERO:  (Continuing)

12   Q    So after two weeks, you finally met Mr. Harper,

13   right?

14   A    Clark.

15   Q    You met Mr. Clark and you see him, he's smoking a

16   cigar, I guess?

17   A    I had my back -- as soon as I -- I could smell the

18   cigar and turn -- I'm in the trench, you know, two feet down

19   so you're always looking up at him like this.

20   Q    First of all, did he drive up or something?

21   A    No, he had his vehicle parked down further.

22   Q    So he walked up?

23   A    Yeah, he drives a blue van.

24   Q    It was his personal van, is that what it was, to

25   your knowledge?

1    A    No.  You know, I don't know if that was his personal
2    van.
3    Q    He would normally be driving a blue van?
4    A    Yes, he was driving a blue van.
5    Q    Is that an MCI van?
6    A    Not that I know of.
7    Q    Did it have any logo on the van itself?
8    A    At that time, when I first met him?
9    Q    Yes.
10   A    No, it's just painted blue with dark tint.
11   Q    So he comes walking up and he's smoking a cigar?
12   A    Uh-huh.
13   Q    And then what happened?
14   A    He looked at us, me and Tony, and said good morning
15   island monkeys so I was like stunned.  I have no idea who
16   this guy was and then Tony turned around -- and Tony turned
17   around and told me that that's Dennis Clark, he's one of the
18   upper management.
19   Q    Who said that again?
20   A    Tony.  Tony Arriola.
21   Q    So you asked him if he was upper management.  Did
22   you verify that?  Tony said he's upper management, right?
23   A    (Witness nodded head.)
24   Q    Did he say what he --
25   A    Upper management referring to -- Tony referring as

1    A    Yes, my Supervisor, Henry Quintanilla.

2    Q    When did you report it?

3    A    The same day he called me, that same day and then --

4    that same day at lunch. We had lunch at 12 so I told him

5    that guy over there -- I didn't know who he was and he just

6    tell me that's Dennis Clark. He greet me with good morning

7    monkeys, and so he just told me, he said okay, he'll take

8    care of it. He'll talk to Don Harper.

9    Q    You told Mr. Quintanilla that you didn't know who

10   this guy was, right?

11   A    Correct.

12   Q    Did Mr. Quintanilla say who he was?

13   A    He told me who he was.

14   Q    What did Mr. Quintanilla say?

15   A    He told me he was a representative of MCI and he's

16   overseeing the project, what we were doing.

17   Q    So around October 22, 2004, you realized that

18   Mr. Clark was a representative of MCI, correct?

19   A    Yes.

20   Q    I imagine Mr. Quintanilla said that he's not an

21   employee of CalPac, correct?

22   A    Correct.

23   Q    Did you ever follow up with Mr. Quintanilla and say,

24   what ever happened with my report or my complaint?

25   A    I did ask him and he told me he forwarded it up the

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand
Reporter, hereby certify that **JESSE B. CRUZ** personally
appeared before me at the time and place set forth in the
caption hereof; that at said time and place I reported in
stenotypy all testimony adduced and other oral proceedings
had in the foregoing matter; that thereafter my notes were
reduced to typewriting under my direction; and the foregoing
transcript, pages 1 to 120, both inclusive, constitutes a
full, true, and correct record of such testimony adduced and
oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 23rd
day of July 2007.


Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

## NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

        I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 20th day of April, 2007 at the hour of 9:00 a.m. there appeared before me **JESSE B. CRUZ** at the law offices of Blair Sterling & Johnson. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

        I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

        In testimony whereof, I have hereunto set my hand this 23rd day of July, 2007.

_____
                    Cecille A. Flores

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>            Plaintiffs,<br><br>     vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10,<br><br>            Defendants. | CIVIL CASE NO. CIV05-00037<br><br>🗋 COPY |

DEPOSITION OF RUSSELL A. HATFIELD

Taken on Behalf of CalPac

BE IT REMEMBERED That, pursuant to the Guam Rules of Civil Procedure, the deposition of RUSSELL A. HATFIELD was taken before Cecille A. Flores, a Certified Shorthand Reporter, on Monday, the 19th day of February 2007, at 10:00 a.m. in the offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

1  |  your memory.   Earlier you were talking about a meeting at the
2  |  warehouse.

3  |      A     Uh-huh.

4  |      Q     Does this refresh your memory as to when the meeting
5  |  at the warehouse took place?

6  |      A     Yeah, it says right here the 20th of December.

7  |      Q     So in Exhibit A, the meeting that was referred to is
8  |  the same --

9  |      A     That's the meeting I'm referring to.

10 |      Q     Do you know why they had this meeting on December
11 |  20th, 2004?

12 |      A     To settle any questions -- answer any questions, put
13 |  any fears out -- fires out, fears, in reference to the
14 |  allegations that were going on at the time.

15 |      Q     Around this time that the meeting took place, was
16 |  Donald Harper employed at CalPac?

17 |      A     No, he was not.

18 |      Q     So you were the sole Project Manager at the time?

19 |      A     That's correct.

20 |      Q     I hate to say this but because we're having it
21 |  transcribed, it's just easier if one person's talking.

22 |      A     Okay.

23 |      Q     A lot of times I know what your answers are going to
24 |  be but I'm going to try to wait for you to finish yours --

25 |      A     Okay.

1  Q    Did you discuss whether Mr. Quintanilla should be

2  laid off?

3      A    His name was never brought up.

4      Q    You said you worked at CalPac up to June 2005,

5  correct?

6      A    Approximately there.  I had to go to the states.

7      Q    You weren't laid off, were you?

8      A    No.  I was never hired to be a permanent employee

9  anyway.

10     Q    Was it your understanding that a significant amount

11 of employees at CalPac would be furloughed after the MCI

12 project?

13     A    No.

14     Q    What was your understanding?

15     A    Just like any other construction job.  Construction

16 work works -- if you got work, you need the employees.  If

17 you don't have work, you let your employees go.

18     Q    Would it be unusual for you to see CalPac or other

19 companies like CalPac furloughing its employees?

20     A    No, that's a normal every day occurrence.

21     Q    Do you remember having an interview with somebody by

22 the name of Mr. Yao at the EEOC?

23     A    No, I have no idea of that name.  I -- the only

24 interview I ever had was in this office by phone with

25 somebody out of Hawaii.  It was another deposition.  I'm

A    Who I would keep if given a choice of keeping some and letting others go, yes.

Q    Now, at the time these people were let go, would people be let go in favor of other employees that were local? Do you understand my question?

A    My recommendation has nothing to do with race. The employees that were let go were based on their skill levels and the job requirements that I needed the individuals to do. So if Joe Blow was multi-taskable, I'd put him in this category. If Joe Blow was not, he'd stay over here. If I didn't need his particular skills because we were downsizing at the time because the job was slowing down and you don't keep people on the payroll if you don't have any work for them to do. And that's what we were doing. We were downsizing because the work was slowing down. Yes, there was a long period of work leftover, but we didn't need the humongous payroll and staff that we had at the time.

Q    Just for the record, some of the people that stayed on as employees were locals, would that be correct?

A    That's correct.

Q    I believe you indicated earlier that you weren't aware that various people were filing complaints. You knew there were complaints but you didn't know who they were, would that be correct?

A    Uh-huh.

Q    I believe that was in reference to -- I believe you

2   indicated Norman Santos, correct?

3       A    I think she was talking about James Lee.

4       Q    James?

5       A    Yee or Lee or whatever his name was. I made the

6   statement that James -- until I got here and I saw it right

7   here, James, down as a defendant. I have -- to this day,

8   other than what's on this piece of paper is the only people

9   that I know have filed a suit.

10      Q    You're referring to the Plaintiffs in this lawsuit?

11      A    That's correct.

12      Q    In your opinion, were the service of the people that

13  were let go around November of 2004, were their services

14  needed at CalPac?

15      A    The ones that were let go, no.

16      Q    So when you're saying let go, they weren't

17  necessarily fired, would that be correct?

18      A    Nobody was fired. Everybody was laid off with the

19  understanding that if work picked up and if we needed your

20  skills back, that you would be given first opportunity to

21  accept the job if you so desired it.

22      Q    And it wouldn't be unusual for somebody to be let go

23  at CalPac and then later picked up?

24      A    No.

25      Q    Did you actually observe that situation?

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

       I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 19th day of February, 2007 at the hour of 10:00 a.m. there appeared before me **RUSSELL A. HATFIELD** at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

       I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

       In testimony whereof, I have hereunto set my hand this 5th day of March, 2007.

_____

Cecille A. Flores

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.     )
CRUZ, ROLAND F. MENDIOLA, JAMES   )
S. YEE, TEDDY B. CRUZ, JESSE B.   )
CRUZ, JOHN L.G. NAUTA, and JOHN   )
P. BABAUTA,                       )
                                  )
                 Plaintiffs,      )
                                  )
            vs.                   )
                                  )
CALPAC, DYNAMIC TECHNICAL         )
SERVICES, MCI, JOHN HEALY, DENNIS )
CLARK, WILLIAM WARD, JAI JAMES    )
and DOES 1 through 10,            )
                                  )
                 Defendants.      )

**ORIGINAL**

DEPOSITION OF DONALD J. HARPER

Taken on Behalf of California Pacific Technical Services

BE IT REMEMBERED That, pursuant to the Federal
Rules of Civil Procedure, the deposition of **DONALD J. HARPER**
was taken before Cecille A. Flores, a Certified Shorthand
Reporter, on the 16th and 20th days of February 2007, in the
offices of Blair Sterling Johnson Martinez & Leon Guerrero,
Suite 1008, Pacific News Building, 238 Archbishop Flores
Street, Hagatna, Guam.

1    Q    Were your responsibilities limited to the MCI

2  contract?  Did you have other responsibilities as well?

3    A    I had a few other responsibilities at the time.

4    Q    What percentage of your time was devoted to the MCI

5  contract would you say?

6    A    95 percent.

7    Q    95 percent?

8    A    Guessing.

9    Q    Can you describe for us what the MCI contract was?

10    A    It was to install a fiber optic connection from the

11  MCI building in Agana to NCTAMS NASA complex.

12    Q    What was the route they took to get from MCI here in

13  Agana?

14    A    Up through Agana, through Tiyan, down the cliffline

15  through Harmon Industrial Park, back through the back road of

16  Fatima, come up Route 1, down Route 3, back through the

17  jungle into NCTAMS.

18    Q    Did the MCI project, was it divided into phases or

19  how did it go?

20    A    I believe it was -- I think there were three phases.

21  They called them three phases, yes.

22    Q    Do you remember what the three phases were?

23    A    Yeah, it wasn't really -- I don't know if there was

24  a contractual breakdown, but I know when it was broken down

25  into phases of making it through Agana.  It was kind of a

A    Just, I guess, for what an owner does.

Q    But he wasn't involved in the day-to-day operations of the company?  That was you and Bob and Tim?

A    No, he was aware of the day-to-day.  There was daily communication with him.  I mean, other than that, that's as close as it got.

Q    Did he do the job interviews with the prospective laborers?

A    No, I don't believe so.

Q    Who did that?

A    Either be me, Bob or Tim Camacho or Tim Camacho's replacement and I can't remember his name.  After that.

Q    What was the role of Dennis Clark?

A    Dennis Clark was -- he was a representative of MCI. He was basically quality control, I would guess.  For MCI. He was there to make sure that the product was installed per their specifications.

Q    You had MCI provide a set of specifications you were supposed to follow?

A    Yes.

Q    Describe how those were presented to you.

A    Drawings with details.

Q    Do they also have a manual of specifications?

A    Not really.  Not that I know of.

Q    So you say he was the quality control.  Was he then

1      Q      Why aren't you on the site that day?

2      A      I was in the office doing some report for John

3  Healy.

4      Q      Do you remember when or about that was time wise?

5      A      No, I don't.  I mean, it's no --

6      Q      Was it still in Phase 1 or one of the later phases?

7      A      I think that's kind of the Phase 2.  I'm -- I can't

8  really remember but --

9      Q      So you don't recall the date?

10     A      No.

11     Q      Who was the employee that called you?

12     A      Henry Quintanilla.

13     Q      What did Henry Quintanilla tell you to the best as

14  you can recall?

15     A      When I arrived on site, I guess there was a deep

16  excavation area that Dennis wanted things to move faster,

17  didn't like the way they was doin' it and referred to them as

18  monkeys at this time, I believe.  It was just a phrase

19  "monkeys" and they didn't like it so I had conversation with

20  Dennis.

21     Q      Was it a heated conversation?

22     A      Yeah, it kind of got heated because he took it -- I

23  tried to keep it on a professional -- look, just don't treat

24  them this way, don't talk to people this way and -- yeah,

25  there was a lot of arrogance.

Q    When was the next incident that you can recall that
you had a disagreement with Mr. Clark?

A    I believe -- I'm not sure but I believe it was -- we
were on the back part of NCTAMS coming through the jungle
because there was an area that conduit was installed and they
called me, the same thing, and we were pulling fiber.

Q    You weren't there that day either?

A    I was en route.  We were setting up for a fiber pull
and nobody had started yet.

Q    Who called you that time or told you about it?

A    I think it was Van Meter at this time.

Q    Who is Van Meter?

A    Henry Van Meter.

Q    Who was Henry Van Meter?

A    Henry Van Meter was another one that was not a
foreman but he was kind of like a lead man.  If the crew
broke away, they were working a different area, he had the
responsibility of leadership of certain guys.

Q    Henry, his title wasn't foreman?

A    I don't believe so but I'm not sure.

Q    Did you hire Henry Van Meter also?

A    You know, I didn't directly hire anybody.  I didn't
have the authority to, in my opinion, but I was part of the
interview of Henry Van Meter.

Q    Who else interviewed?

1    before was left in the right condition, and part of my job is

2    to explore the job ahead in advance to make sure that when

3    they leave that job site that day, of course they're

4    advancing forward and the reason for my performance was to be

5    on site so I covered kind of a wide area.

6         Q    How many lead men or foremen did you have?

7         A    Henry Quintanilla, Henry Van Meter, and basically as

8    guys that were left with any responsibility, I think they

9    were the only two.

10        Q    Was there a very high turnover of workers?

11        A    No.

12        Q    Did CalPac have to hire additional workers to do the

13   MCI project?

14        A    Yes.

15        Q    How many do you recall they had to hire?

16        A    I don't know.

17        Q    15, 20?  25?

18        A    I'd be guessing.  I'd just be guessing.

19        Q    When you interviewed these people, did you tell them

20   they were being hired for that specific job or just hired

21   generally?

22        A    I don't know that the name of the job was ever

23   mentioned to them, but their job role of what they would be

24   doing was explained.

25        Q    What was supposed to happen to them once the project

Q     Why do you say that?

A     Because he was. It was my opinion. I just feel he was arrogant.

Q     Did he ever say anything that made you think he was arrogant?

A     It was just arrogance. Yeah, I guess he said a lot of things, obviously, that made me feel that way but I can't pinpoint one isolated situation. It was just being around somebody for long enough in a working condition that you feel that attitude superiority and he felt like he was working in a third world all the time.

Q     Did he ever say anything like that?

A     Yes.

Q     What did he say?

A     He just referred to Guam as being very backwards and he would make comments about another job he did somewhere else. I may be wrong about South America and he would compare it to that.

Q     Have you ever made any verbal threats to Dennis Clark?

A     Yes.

Q     Could you tell us about the first time you made a verbal threat to him?

A     I think I told him that one time I -- I forget what I said. Get off my job or I'll whoop your ass or something.

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that DONALD J. HARPER personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 188, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd day of March 2007.


_____

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. CIV05-00037 <br><br> **DECLARATION OF JOHN T. HEALY IN SUPPORT OF EACH OF CALPAC'S MOTIONS FOR SUMMARY JUDGMENT** |

I, **JOHN T. HEALY**, under penalty of perjury, do hereby declare and state as follows:

1.  I am a shareholder of California Technical Services LLC ("CalPac") and its Vice President whose duties include, the field operation of CalPac.

2.  Included within Calpac's field operation is the "underground crew" of which plaintiffs were formerly employed.

//

3.   In early 2004, CalPac was working on a contact with MCI to lay fiber optics.

4.   The MCI contract was initially to be completed in December 2004.

5.   CalPac hired additional laborers to assist the underground crew in the completion of the MCI project.

6.   The vast majority of the underground crew were of Chamorro descent.

7.   In the latter part of 2004, CalPac essentially had one contract (i.e. the MCI Contract) which was nearing completion.

8.   Although the MCI contract was not officially completed until June/July of 2005, the services of most of the laborers were no longer needed.

9.   CalPac laid off employees based on economic reasons.

10.   James Yee and Robert Cruz were not laid off, rather they were terminated for cause.

11.   Joseph Hernandez was hurt on the job and received Worker's Compensation.  He is officially on CalPac's books.

12.   After the lay offs were completed, the vast majority of the remaining underground employees were of Chamorro descent.

13.   Sometime in December, 2004, I became aware that some employees were claiming they were being discriminated against based on Clark's purported remarks.  A meeting was called to answer any questions and alleviate any concerns, concerning Clark's statements.  CalPac did not threaten.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
38 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 2 -

1    I declare under penalty of perjury and the laws of the

2 United States that the foregoing statements are true and correct.

3

4 DATED: JULY ___, 2007

5                                    JOHN T. HEALY

6

7 V63\-08130-03
  G:\WORDDOC\PLD\VLG\194-DECLARATION OF JOHN HEALY RE VAN METER
8 ET AL V CALPAC ET AL.DOC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F C FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE (671) 477-7857

Case 1:05-cv-00037    Document 319    Filed 07/23/2007    Page 39 of 39