VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

**FILED**
DISTRICT COURT OF GUAM

JUL 23 2007 ~~b~~

**MARY L.M. MORAN**
**CLERK OF COURT**

*Attorneys for Defendant California Pacific Technical Services LLC*

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. HERNANDEZ, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. HERNANDEZ, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. CIV05-00037 <br><br><br> **MEMORANDUM PF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE JOSEPH HERNANDEZ** |

## INTRODUCTION

This is a lawsuit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* Joseph J. Hernandez' ("Hernandez") claims arise out of purported statements made by Dennis Clark ("Clark") [1] who was neither a co-employee of the plaintiffs nor an employee of California Technical Services, LLC ("CalPac"). Clark, in fact, was MCI's

//

---

[1] For the purpose of this motion only, CalPac will assume Clark made the purported statements.

1 owner representative hired to ensure CalPac performed according
2 to the terms of the contract.

3 Hernandez alleged that Clark, on four occasions referred to
4 him and his fellow co-workers "monkeys" or "island monkeys."
5 Hernandez alleged that he made two complaints to his supervisor,
6 and that CalPac retaliated and discharged him in November 27,
7 2004. CalPac declares that Hernandez was not laid off because
8 the Hernandez sustained a work related injury and was receiving
9 workers compensation. Hernandez is still listed as an employee.
10 CalPac now moves for summary judgment on the issue all issues
11 alleged against CalPac by Hernandez.

### FACTS

CalPac acquired a contract from MCI to lay fiber optic
cables on Guam. The MCI project entailed laying fiber optic
cable from Hagatna to NTCAM. Harper Deposition at p. p. 11.
Initially, the MCI project was scheduled to be completed around
December, 2004. See Healy Declaration. Clark were designated
as MCI's representative charged with ensuring CalPac complied
with the terms of the contract. Harper Deposition at p. 15. **It
is not disputed that Clark was never an employees of CalPac.**
Harper Deposition at p. 15.

In order to meet the terms of the MCI contract, CalPac
hired additional laborers to trench and lay cables. Healy
Declaration. Initially, the MCI project was scheduled to be
completed around December, 2004. Healy Declaration. As the

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 2 -

1 project neared completion, CalPac began to lay-off its employees
2 since the MCI project was the only remaining major contract that
3 CalPac had. Healy Declaration.

4 Hernandez, one of the plaintiffs herein, began working for
5 CalPac in February, 2004. Hernandez Deposition at p. 12.
6 Hernandez went on disability leave on September 28, 2004.
7 Hernandez Deposition at p. 12. Although Hernandez' Complaint
8 states he was terminated as a result of his complaints (see
9 Complaint at Paragraph 63), Hernandez later admitted the
10 allegation was not correct and that CalPac, in fact, did not
11 terminate him. Hernandez Deposition at p. 39. Hernandez did
12 not return to CalPac or attempt to get his job back. Hernandez
13 Deposition at p. 40.
14

15 Hernandez was part of the field crew of CalPac. Most, if
16 not all employees, of the field crew were local hires of
17 Chamorro descent. See Healy declaration. Because of the MCI
18 contract, CalPac had to hire additional employees. Harper
19 Deposition at p. 25. Around November, 2004, CalPac began
20 downsizing because the work was slowing down. Hatfield
21 Deposition at p. 75. Because of the reduced amount of work, the
22 services of many of the employees were no longer needed.
23 Hatfield Deposition at p. 76.
24

25 Through Hernandez' complaint, Hernandez alleged that Clark
26 (an employee of DTS and not of CalPac), harassed Hernandez by
27

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 3 -

1 calling Hernandez a "monkey" or "island monkey." See Par. 61 of
2 the Complaint; Also see Hernandez Deposition at p. 41. The
3 questionnaire filled out by Hernandez, shows that on four
4 occasions (7/26/04, 7/28/04, 9/21/04, and 9/25/04), Clark made
5 references to Hernandez about monkeys (three times) and island
6
7 monkeys (once). Hernandez Deposition at p. 114; also see EEOC
8 questionnaire attached to Hernandez Deposition as Exhibit "B."
9 Hernandez did not report the first two remarks. Hernandez
10 Deposition at p. 81. Hernandez claims to have notified CalPac
11 of the third statement (which occurred around September 12,
12 2004) and fourth statement (which occurred around Sept 25, 2004)
13 made by Clark. Hernandez Deposition at p. 81.
14
15 Don Harper, whose duties included coordinating with the
16 CalPac's customers, testified that he was informed of three
17 incidents wherein Clark would refer to the employees as monkeys.
18 Harper Deposition at p. 22.

19 The first report purportedly resulted in Harper and Clark
20 having a heated discussion about the way to talk to people.
21 Harper Deposition at p. 22. It was Harper's impression that it
22 was just a phrase 'monkeys' and they [the crew] didn't like it."
23 Harper Deposition at p. 22. The second incident purportedly
24 resulted in the same action by Harper. Harper Deposition at p.
25 23. On the third and final incident, Harper purportedly
26 threatened //
27

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1  Clark and told him to "get off my job or I'll whoop your ass or

2  something." Harper Deposition at p. 96.

3  Healy denies being informed about such statements until

4  the protests began. Healy Declaration. Bill Ward, CalPac's

5

6  general manager, testified that he was never informed about the

7  statements until the December meeting.

8  Contrary to Hernandez' belief, certain CalPac's management

9  was unaware of which employees made complaints. As an example,

10  Hatfield was did not know that Norman Santos filed a complaint

11  with the EEOC. Hatfield Deposition at p. 70. Through Norman

12  Santos' deposition it is undisputed that Santos worked for

13

14  CalPac in 2004 (Santos Deposition at p. 12); filed an EEOC

15  complaint for discrimination (Santos Deposition at p. 27); and

16  withdrew his EEOC complaint almost a year later (Santos

17  Deposition at p. 33). As of April 2007, Norman Santos remained

18  an employee with CalPac. Santos Deposition at p. 12.

19

## LAW

20  Summary judgment is appropriate "if the pleadings,

21  depositions, answers to interrogatories and admissions on file,

22  together with the affidavits, if any, show that the moving party

23

24  is entitled to judgment as a matter of law." FED.R.CIV.P. 56.

25  The moving party bears the initial burden of showing the Court,

26  by reference to materials on file, that there are no genuine

27  issues of material fact that should be decided at trial. *Celotex*

28  *Corp. v. Catrett*, 477 U.S. 317 (1986). When a moving party has

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 5 -

discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file" designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 at 324.

In determining whether the moving party has met its burden of establishing that no genuine issue of a material fact exists and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in a light most favorable to the nonmovant, in this case the Plaintiff, and resolve all reasonable doubts in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Ins.*, 210 F.3d 1099, 1106 (9th Cir. 2000). The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Case 1:05-cv-00037    Document 322    Filed 07/23/2007    Page 6 of 48

party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial. *Id.*

## I. RACIAL HARASSMENT – HOSTILE ENVIRONMENT

### 1. CALPAC SHOULD NOT BE LIABLE FOR THE ACTIONS OF A THIRD PARTY

In the instant case, Hernandez alleges that a non-employee of CalPac called him a "monkey" or "island monkey" on four occasions.[2] In order for an employer to be found liable for third party harassment, an employer must ratify or condone the conduct by failing to investigate and remedy it after learning of it. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002). Assuming for the sake of this motion that complaints were made to Harper, Harper testified that he confronted Clark about the statements. After the third complaint to Harper, Harper threatened Clark and kicked Clark off the job site. Most importantly, there were no further complaints and the situation was remedied. Clearly, although Healy and Ward may have not known of the actions by Harper, action was taken nonetheless. CalPac, therefore, should not be liable for the actions of Clark.

### 2. PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT

The Supreme Court has repeatedly stated that Title VII **does not set forth "a general civility code for the American**

---

[2]    It is noteworthy that the Questionnaire to the EEOC uses the term "monkey" for three occasions and the "island monkey" for one occasion.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1  **workplace**." (Emphasis added.)  *Oncale v. Sundowner Offshore*
2  *Services, Inc.,* 523 U.S. 75, 80 (1998);  *Burlington Northern &*
3  *Santa Fey Ry. Co. v. White*,  126 S.Ct. 2405, 2415 (2006).
4  Judicial standards for harassment must **"filter out complaints**
5
6  **attacking 'the ordinary tribulations of the workplace, such as**
7  **the sporadic use of abusive language**, gender-related jokes, **and**
8  **occasional teasing.'**"  *Faragher v. Boca Raton,* 524 U.S. 775, 788
9  (1998).  Although CalPac concedes that referring to an employees
10 as an island monkey may be offensive, these remarks, under the
11 circumstances, do not qualify for Title VII protection.
12 "**Conduct that is not so severe or pervasive enough to create an**
13 **objectively or abusive work environment...is beyond Title VII**
14
15 **purview**."  (Emphasis added.)  *Harris v. Forklift Sys. Inc.*, 510
16 U.S. 17, 21 (1993).

17      In order to state a claim for hostile environment,
18 Hernandez must show that: (1) he was subject to verbal or
19 physical conduct based on race or national origin; (2) that the
20 conduct was unwelcomed; and (3) the conduct was sufficiently
21 severe or pervasive to alter the conditions of employment and
22 created an abusive environment.  *Galdamez v. Potter*, 415 F.3d
23 1015, 1023 (9th Cir. 2005).  Simple teasing, offhand comments,
24
25 and isolated incidents, unless extremely serious, will not
26 amount to discriminatory changes in the terms and conditions of
27 employment, for the purposes of Title VII hostile environment

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM  969 10-5205
TELEPHONE: (671) 477-7857

- 8 -

claim. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d. 1027 (9th Cir. 2005). In determining whether conduct was sufficiently severe or pervasive, courts look at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening, or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

Unlike other, more direct unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the **cumulative effect** of individual acts"). (Emphasis added.)

In Hernandez' case, Hernandez alleges that Clark directed four statements at him during his tenure at CalPac. There is no allegation that Clark physically threatened Hernandez. This is not a situation where an employee shows up to work and is subjected to a barrage of rude or offensive remarks. Further, there is no showing that the purported remarks altered the terms and conditions of Hernandez' employment.

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 969 10-5205
TELEPHONE. (671) 477-7857

Case 1:05-cv-00037    Document 322    Filed 07/23/2007    Page 9 of 48

1  This is a situation where a third party may have made three
2  or four rude remarks which Hernandez may have heard.  Clearly,
3  Hernandez failed to establish the frequency required to
4  establish a claim under Title VII especially in light of the
5
6  allegation that the remarks were not made by CalPac employees.

7      3.   **CALPAC DID NOT RETALIATE AGAINST HERNANDEZ**

8      Title VII's anti-retaliation provision forbids an employer
9  from "discriminate[ing] against an employee or job applicant
10 because that individual "opposed any practice" made unlawful by
11 Title VII or "made a charge, testified, assisted or participated
12 in" a Title VII proceeding or investigation.  42 U.S.C.
13 §§ 2000e-3(a).  **This provision, however, "covers those (and only**
14 **those) employer actions that would have been materially adverse**
15
16 **to a reasonable employee or job applicant**...to the point that
17 they could well dissuade a reasonable worker from making or
18 supporting a charge of discrimination.    (Emphasis added.)
19 *Burlington Northern & Santa Fey Ry. Co. v. White*,   126 S.Ct.
20 2405, 2409 (2006).

21     If the plaintiff makes a prima facie case, the burden of
22 production shifts to the defendant to present a legitimate, non-
23
24 retaliatory reason for the adverse action. *Brooks v. City of San*
25 *Mateo,* 229 F.3d 917, 928 (9th Cir. 2000); *Cassimy v. Board of*
26 *Education of the Rockford Public School, Dist. #205 (7th Cir.*
27 *2006).* If the defendant carries this burden, the plaintiff "must
28 demonstrate a genuine issue of material fact as to whether the

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 10 -

Case 1:05-cv-00037   Document 322   Filed 07/23/2007   Page 10 of 48

1 reason advanced by the [defendant] was a pretext." *Brooks,*
2 *supra.*

3    Hernandez initially claimed he was "wrongfully and
4 unlawfully terminated by CalPac." In Hernandez' deposition,
5 however, Hernandez, himself, testified that he did not return to
6 CalPac and that he was not terminated.

**CONCLUSION**

9    Liability for hostile environment requires a showing that
10 the action was severe or pervasive. For the reasons stated
11 above, it is respectfully suggested that the remarks heard by
12 Hernandez were not severe or pervasive enough to be protected
13 under Title VII. Assuming the remarks were severe and
14 pervasive, however, liability for third party discrimination
15 requires a showing that CalPac condone or authorized the act.
16 Such was not done.

18    Concerning Hernandez' claims for retaliation, Hernandez'
19 was not discharged. As such, CalPac respectfully requests this
20 Court grant its motion for summary judgment.

21    **RESPECTFULLY SUBMITTED** this 23rd day of July, 2007.

23    **BLAIR STERLING JOHNSON**
      **MARTINEZ & LEON GUERRERO**
24    A PROFESSIONAL CORPORATION

26    BY: _Vincent Ly Gm_
      **VINCENT LEON GUERRERO**
27    *Attorneys for Defendant California Pacific Technical*
      *Services LLC*

V63:49\08130-03
G:\WORDDOC\PLD\VLG\200B-MEMO OF P&A IN SUPP OF MSJ RE J
28 HERNANDEZ RE VAN METER V CALPAC.DOC

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÁTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 11 -

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA,)Civil Case No. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS, )
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES S.)
YEE, TEDDY B. CRUZ, JESSE B. CRUZ,)
JOHN L.G. NAUTA, and JOHN P. )
BABAUTA, )
              Plaintiffs, )
                        )
      vs. )
                        )
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS )
CLARK, WILLIAM WARD, JAI JAMES and)
DOES 1 through 10, )
                        )
_____Defendants.____)

🗎 **COPY**

## DEPOSITION OF JOSEPH HERNANDEZ

### Taken on Behalf of the Defendants

        BE IT REMEMBERED That, pursuant to the Guam

Rules of Civil Procedure, the deposition of JOSEPH HERNANDEZ

was taken before Veronica F. Reilly, Certified Shorthand

Reporter, on Thursday, the 8th day of February 2007, at 10:00

a.m. in the Law Offices of Blair Sterling Johnson Martinez &

Leon Guerrero, Suite 1008, Pacific News Building, 238

Archbishop Flores Street, Hagatna, Guam.

1   underground cables in Guam for MCI." Do you see that?

2       A.   Yes.

3       Q.   And that allegation that you stated in the

4   complaint, you have no problems with that allegation? With

5   the facts that are stated in the complaint?

6       A.   Yes.

7       Q.   So in essence, you're reaffirming that you were

8   hired by CalPac around on or about February 2004; correct?

9       A.   Yes.

10      Q.   Then the next paragraph goes on to read that "On or

11  about July to October 2004 or thereafter, while plaintiffs

12  were under the supervision of Defendant Clark, Plaintiff

13  Hernandez was harassed and discriminated against on the basis

14  of race, national origin and color by Defendant Clark, who

15  called Plaintiff Hernandez and other plaintiffs, island

16  monkeys or monkeys." That's the allegation in paragraph 61;

17  correct?

18      A.   Yes.

19      Q.   I want to break that down a little bit. You went on

20  disability leave; correct?

21      A.   Yes.

22      Q.   Was that about the time that you were referring to

23  in the complaint? Do you understand my question?

24      A.   Yes.  I went on disability on September 28.

25      Q.   September 28?

1     A.    But how can I go back to the job when I was hurt?

2     Q.    My question is, did they ever terminate you?

3     A.    No.

4     Q.    And, in fact, you talked to the insurance people

5     saying, hey, I was never terminated; correct?

6     A.    Yes.

7     Q.    So you told the insurance people that you were not

8     terminated from CalPac; correct?

9     A.    Yes.

10    Q.    So this statement says that you were terminated.   I

11    want to know which one is it.  Were you terminated or were

12    you telling people that you were not terminated?  I mean,

13    which is the correct statement?

14    A.    I felt I was terminated because I wasn't working,

15    they wasn't giving me enough support.  When I told them about

16    what Dennis Clark did, they worked me to work -- they worked

17    me.

18    Q.    Okay.

19    A.    Till I got my injury.

20    Q.    And then you were covered by worker's compensation;

21    correct?

22    A.    Yes, but it wasn't paying me enough.

23    Q.    Did you ever go back to CalPac and say, hey, I'm

24    fine, I want my job back?  Did you ever do that?

25    A.    No.

1    Q.    And that's because the advice of the insurance

2    person saying you should not do that; correct?

3    A.    Yes.

4    Q.    Did anyone from CalPac say you should not work

5    there?

6    A.    No.

7    Q.    Okay.  So you don't even know whether or not CalPac

8    would have taken you back; correct?

9    A.    (No response.)

10    Q.    You didn't even try; correct?

11    A.    No.

12    Q.    Is that correct or is that a no, I'm incorrect?

13    A.    (No response.)

14    Q.    Did you even try to get your position back at

15    CalPac?

16    A.    Because I'm still injury, I'm still hurt.

17    Q.    My question is, and you said no to that; correct?

18    A.    Yes.

19         MS. LUJAN:  I'm sorry, said no to what?

20         MR. LEON GUERRERO:  Want to read that?

21              (Reporter read back.)

22    BY MR. LEON GUERRERO: (CONTINUING)

23    Q.    I'm going to ask the question one more time.  Did

24    you even try to get your job back or your position back at

25    CalPac?  Yes or no?

1    A.    No.

2    Q.    Thank you.   Paragraph 64 says, "The actions of

3  Mr. Clark were approved, condoned or authorized by Defendants

4  CalPac, DTS, MCI and Healy."  Do you believe that CalPac said

5  it was okay for Mr. Clark to make that statement?

6    A.    Yes.

7    Q.    Do you believe DTS said it was okay for Mr. Clark to

8  make that statement?

9    A.    Yes.

10    Q.    Do you believe MCI said it was okay for Mr. Clark to

11  make that statement?

12    A.    Yes.

13    Q.    And you also indicated Healy, Mr. Healy, do you

14  believe Mr. Healy said it was okay for Mr. Clark to make that

15  statement?

16    A.    Yes.

17    Q.    Did you ever hear them say specifically that it's

18  okay for Mr. Clark to make that statement?

19    A.    Can you repeat the question?

20    Q.    Did you ever hear any of those people or any of

21  those entities say, guys, it's okay for Mr. Clark to make

22  that statement?  Something like that?

23    A.    I don't understand that question.

24    Q.    You're saying that CalPac approved Mr. Clark's

25  statements?

1      A.    Yes, that happened.  Yes, it happened, ma'am.

2      Q.    And what about the last one?

3      A.    Dennis Clark, MCI was angry about mixing -- cement

4    not being poured into the trench and called me and other

5    co-workers a bunch of monkeys.

6      Q.    That says next to it, 9/25/04?

7      A.    Yes.

8      Q.    Is there any reason to think that's not correct?

9      A.    No, that's pretty --

10     Q.    Okay.  Do you remember when you filled out the

11   questionnaire?

12     A.    No, I don't recall, ma'am, but -- This

13   questionnaire?

14     Q.    Yes, this one.

15     A.    I think I filled it out -- I'm pretty sure, but -- I

16   can't recall the date, ma'am.

17     Q.    Do you recall how long it would have been after the

18   events happened?

19     A.    It could have been -- no, ma'am, I can't give you

20   that --

21     Q.    When you had your girlfriend write this out and she

22   wrote the date 7/26/04, 7/28/04, did you tell her to write

23   those dates?

24     A.    No, I put them dates in there.

25     Q.    Oh, you wrote those dates down?

1    Q.    Let's talk about the reporting.  With respect to the

2    Tiyan incident, did you report that to anybody?

3    A.    I reporter several -- as I recall, I reported like

4    three times, two times.

5    Q.    So did you ever report the Tiyan incident?

6    A.    No, because that's the time I was already being

7    worked.  They were overworking me when we got to Tiyan.

8    Q.    Was Tiyan the first time though that you --

9    A.    Tiyan was like -- I was already getting tired of

10   listening to Don -- Dennis Clark.

11   Q.    I thought you had mentioned Tiyan was the first time

12   you heard it so --

13   A.    There was different occasions, ma'am, I just cannot

14   recall the date.

15   Q.    You don't recall which one is first?

16   A.    I don't recall if Tiyan was the first one, but

17   that's when he said -- he called me monkey or when I was in

18   the trench.  There was different occasions where he called me

19   monkey.

20   Q.    Do you remember the first time that you reported?

21   A.    The first time, I think it was on September 21, I

22   think.

23   Q.    The first time you reported was September 21?

24   A.    Yeah.

25   Q.    Did you report it the same day that the statements



**U.S. E( _,.L EMPLOYMENT OPPORTUNITY COMMISSION**
Honolulu Local Office

*Joseph Jr Hernandez*

C-0653-13
446-13

300 Ala Moana Boulevard, Room 7-127
Honolulu, HI 96850-0051
(808) 541-3120
TTY (808) 541-3131
FAX (808) 541-3390

## PLEASE PRINT OR WRITE LEGIBLY

## Questionnaire

I understand this document is not a charge. This information is provided to EEOC for informational purposes only to help me decide whether to file a charge. PLEASE CHECK THE FOLLOWING TO INDICATE YOU UNDERSTAND THE ABOVE. ( )

If you base your charge on your disability, please complete page 6.

1. *Please fill in the following information:*
   a. Your full name: *Joseph Junior Hernandez*
   b. Your address: *P.O. Box 2673*
      City/State: *Hagatna, Guam*
      Zip Code: *96932*
   c. Your daytime phone number: *(671) 686-9538*
      Your evening phone number: *(671) 477-3718*
   d. Your social security number: *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*
   e. Your date of birth: *4/14/71*
   f. Your sex: *MALE*

   g. Your race: *Chamorro*

   h. Your national origin: *Guam*
   i. Your skin color: *Brown*
   j. Person who can always contact you
      Name: *Antoinette San Nicolas*
      Address: *P.O. Box 2673*
      City/State: *Hagatna, Gu 96932*
      Zip code: *96932*
      Phone number: *(671) 477-3718*

2. *Please give the following information about the employer:*
   a. Company name: *California Pacific Technical Services*
   b. Describe company business: *Communication Cable*

*Questionnaire - Page 1 of 6*



EXHIBIT
B

Joseph Jr Hernandez

c.    Address where you worked:
        Street: 150 East Harmon Industrial Park Road
        City/State: Tamuning Guam
        Zip code: 96913
        Phone number: (671) 646 - 3645 or 06
        County:

        CAL Pac Inc
        P.O. Box 8950
        Tamuning Guam 96931

.2.    Corporate address to mail charge to:
        Corporate name: CAL Pac, MCI
        Name/Title of person to receive charge (personnel/HR director/CEO):
        Name John Healy
        Title Owner
        Street/P.O. Box: P.O. Box 8950
        City/State: Tamuning, Guam
        Zip code: 9693
        Phone number: ( )

        M.C.I.
        2400 Glenville Dr
        Richardson, Texas
        75082

.    Name and title of immediate supervisor: Don Harpetz, Superintendent

—    Approximate number of employees working for the whole company. Circle one.

        1-14        (15-100)        · 101-200        201-500        More than 500

i.    Date of hire: June 14, 2004
j.    Last or current job title at company: Laborer, Underground MCI, Project
k.    Last or current unit/department in company: Same as Above
l.    Last or current rate of pay at company: $16.50 hr

3.    Identify the employment event(s) that caused you to contact the EEOC. (e.g. hiring, layoff, promotion, accommodation, discipline, harassment, sexual harassment, etc.)
        Racial Discrimination

Date event occurred: 9/27/04 — 9/25/04    7/26/04

Note: This information will be used by the EEOC to determine jurisdiction. Generally, charges must be filed within 300 days of the date of notification of an alleged act of discrimination.

Questionnaire - Page 2 of 6

Jose, Jr Hernandez

**4.** What was the employer's stated reason for taking this action?

NA

**5.** What makes you think this event is discriminatory?

I ~~fell~~ feel that the ~~special~~ recial remarks were made towards my race,

**6.** List the persons in your unit/department who were _treated better_ than yourself with respect to this event. State their name, job title, race, age, color, national origin, sex and disability, if known.

Don Harper, soperintenpant, white male

**7.** List the persons in your unit/department who were _treated the same_ as you with respect to this event. State their name, job title, race, age, color, national origin, sex and disability, if known,

Noragan Santos   John Nauta
Henry Vanmrotr   Joseph Mehdiola
Roland mehdiola   Robert Cruz

**8.** List the name and job title, race, skin color, sex and approximate age of the employers' representatives who recommended and approved the decision which resulted in the discriminatory event.

Dennis Clark, M.C.I Representative, white male
Racial remark

**9.** Have you complained to your employer about this matter? If yes, explain the situation. When did you complain, to whom and what was the result? Please attach copies of supporting documentation.

9/21/04  Henry Quintanilla, Reported management
9/25/04  Henry Vanmetr ) Reported management

Questionnaire - Page 3 of 6

7. *If you are complaining about <u>harassment</u> or <u>sexual harassment</u> please attach a brief chronology of events (e.g. two or three pages). Include dates of each incident, a description of what happened and harasser's name and job title. For each incident, provide witness names, if any. Also state when you complained, name and job title of person(s) to whom you complained and action take in response to your complaints. Attach any supporting documentation.*

*Have you filed a charge regarding this matter with the Hawaii Civil Rights Commission or any another agency? If yes, provide the agency name and date filed.*

ON

*Write a paragraph about your employment situation and explain what happened and why you feel the incident is discriminatory. Be thorough. This information is very important for our evaluation of your situation.*

See Attachment

*Joseph Jr Hernandez 62*

3. *Please state what your performance was like (in other words, tell us whether you were performing below standards, at standard or above standard) and how you can prove this is true (performance evaluations, awards, etc.).*

*Standard / Don Harpar*

14. *What are your expectations in filing this charge? What do you want to happen (e.g. reinstatement, policy change, promotion, back pay, etc.)?*

*Policy change, Damages*

*Are you interested in mediation? Please circle one of the following:*

Yes        No

*Were you ever asked to sign an agreement that required that all disputes between you and your employer be resolved solely through binding arbitration? Circle one.*

Yes        No

*\* If yes, attach a copy of the agreement. If you do not have a copy, briefly describe the terms of the agreement as you understood them and indicate when it was presented to you.*

17. *Have you ever been asked to sign a general release in which you released all claims against your employer in exchange for money or other benefits? Circle one.*

Yes        No

*\* If yes, attach a copy of the release. If you do not have a copy, briefly describe the terms of the release as you understand them an indicate when it was presented to you.*

*Does anyone represent you in this matter (e.g. union, attorney, etc.)? If yes, please provide their name, title, address and phone number.*

No

18. *Provide any other information that you have available (e.g. witness names with their telephone numbers, any other supporting documentation). Be sure to state what each person witnessed.*

7/26/04 — MR. Dennis Clark made a remark to me about "the monkey's in the jungle are slowing progress". This happen while I was getting a ladder from the vehicle to pull fiber into AT&T Bldg.

7/28/04 — mr. Dennis Clark (MCI) told me to go down towards the other end of the cable pulling grd. at the reflection Bldg. in Agana, and to tell those monkeys to stop pulling the cable.

7/31/04 — mr. Dennis Clark (MCI) made a phone call to Don Harper (superintendant) that the island monkeys are standing around with their hands up their ass. This was at the preparation of fiber pulling in Phase one.

7/25/04 — mr. Dennis Clark (MCI) was angry about cement not being poured into the trench and called me and other co-workers a bunch of monkeys.

Joseph Jr Hernandez

# Recently laid off employees protest against CalPac, MCI



## Terminations related to race, group alleges

By Steve Limtiaco
Pacific Daily News
slimtiaco@guampdn.com

A handful of employees who recently were laid off by CalPac protested in Hagåtña and Harmon yesterday, saying they are victims of racial discrimination.

The group alleges that Cal-Pac laid them off this month after they complained about derogatory, race-related statements allegedly made by an employee of MCI. CalPac was hired by MCI to install underground fiberoptic cables be-

tween Hagåtña and Dededo, the protesters said, so their work was supervised by MCI.

Officials at CalPac did not return a call for comment yesterday. An employee who answered the phone at MCI declined comment and declined to give his name.

Joe Mendiola, 36, of Dededo said he started working for Cal-Pac in April and was laid off Dec. 7. He said when he was hired he was told that CalPac had enough work lined up to keep him employed for at least 5 years.

"I'm always prompt, I'm on time, things like that, and I do the job professionally — what they expect us to do. I strongly feel that because of our complaints over and over ... that we

got laid off," Mendiola said.

He said about 15 employees were laid off by CalPac during the past several weeks.

"We were just laid off, weren't given time to prepare ourselves as far as layoffs are concerned," he said. Mendiola said the company told him it was reducing the size of its work force, but said he believes the company still is hiring for similar positions.

"We made a complaint to (Equal Employment Opportunity Commission) in Hawaii. We sent our forms in already," said 46-year-old Henry Van Meter, who was laid off by CalPac Dec. 10 after about 9 months on the job.

Van Meter said he heard derogatory comments from an MCI employee on more than one occasion.

"It just saddens me because of Christmas, you know. The rest of the guys here that have families. It's really sad," Van Meter said. "It took my spirit away, not just me, the rest of

**Demonstration:** Larry L. Charfauros, 35, of Agat, right, was among some workers demonstrating yesterday in Hagåtña against CalPac and MCI. The demonstrators said they were fired by CalPac after complaining of racially disparaging comments made to them by a representative of MCI. They were working on an MCI project con-

# Recently laid off employees protest against CalPac, MCI



Mandac Watanabe/Pacific Daily News/mwatanabe@guampdn.com

## Terminations related to race, group alleges

**By Steve Limtiaco**
*Pacific Daily News*
slimtiaco@guampdn.com

A handful of employees who recently were laid off by CalPac protested in Hagåtña and Harmon yesterday, saying they are victims of racial discrimination.

The group alleges the CalPac laid them off this month after they complained about derogatory, race-related statements allegedly made by an employee of MCI. CalPac was hired by MCI to install underground fiberoptic cables be-

tween Hagåtña and Dededo, the protesters said, so their work was supervised by MCI.

Officials at CalPac did not return a call for comment yesterday. An employee who answered the phone at MCI declined comment and declined to give his name.

Joe Mendiola, 36, of Dededo said he started working for Cal-Pac in April and was laid off Dec. 7. He said when he was hired he was told the CalPac had enough work lined up to keep him employed for at least 5 years.

"I'm always prompt. I'm on time, things I do that, and I do the job professionally — what they expect us to do. I strongly feel that because of our complaints over and over ... that we

got laid off," Mendiola said. He said about 15 employees were laid off by CalPac during the past several weeks.

"We were just laid off. We weren't given time to prepare ourselves as far as layoffs concerned," he said. Mendiola said the company told him it was reducing the size of its work force, but said he believes the company still is hiring for similar positions.

"We made a complaint (Equal Employment Opportunity Commission) in Hawaii. We sent our forms in already, said 46-year-old Henry Van Meter, who was laid off by CalPac Dec. 10 after about 9 months on the job.

Van Meter said he heard derogatory comments from an MCI employee on more than one occasion.

"It just saddens me because of Christmas, you know. The rest of the guys here that have families. It's really sad," Van Meter said. "It took my appa away, not just me, the rest of the guys."

Demonstrator Larry L Chorfuros, 35, of Agat, right, was among some workers demonstrating yesterday in Hagåtña against CalPac and MCI. The demonstrators said they were fired by CalPac other complaining of racially disparaging comments made to them by a representative of MCI. They were working on an MCI project contracted to CalPac.

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                  Plaintiffs,    )
                                 )
          vs.                    )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                  Defendants.    )

**ORIGINAL**

## DEPOSITION OF DONALD J. HARPER

Taken on Behalf of California Pacific Technical Services


          BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **DONALD J. HARPER**

was taken before Cecille A. Flores, a Certified Shorthand

Reporter, on the 16th and 20th days of February 2007, in the

offices of Blair Sterling Johnson Martinez & Leon Guerrero,

Suite 1008, Pacific News Building, 238 Archbishop Flores

Street, Hagatna, Guam.

1    Q    Were your responsibilities limited to the MCI

2  contract?  Did you have other responsibilities as well?

3    A    I had a few other responsibilities at the time.

4    Q    What percentage of your time was devoted to the MCI

5  contract would you say?

6    A    95 percent.

7    Q    95 percent?

8    A    Guessing.

9    Q    Can you describe for us what the MCI contract was?

10   A    It was to install a fiber optic connection from the

11 MCI building in Agana to NCTAMS NASA complex.

12   Q    What was the route they took to get from MCI here in

13 Agana?

14   A    Up through Agana, through Tiyan, down the cliffline

15 through Harmon Industrial Park, back through the back road of

16 Fatima, come up Route 1, down Route 3, back through the

17 jungle into NCTAMS.

18   Q    Did the MCI project, was it divided into phases or

19 how did it go?

20   A    I believe it was -- I think there were three phases.

21 They called them three phases, yes.

22   Q    Do you remember what the three phases were?

23   A    Yeah, it wasn't really -- I don't know if there was

24 a contractual breakdown, but I know when it was broken down

25 into phases of making it through Agana.  It was kind of a

1       A    Just, I guess, for what an owner does.

2       Q    But he wasn't involved in the day-to-day operations

3   of the company?  That was you and Bob and Tim?

4       A    No, he was aware of the day-to-day.  There was daily

5   communication with him.  I mean, other than that, that's as

6   close as it got.

7       Q    Did he do the job interviews with the prospective

8   laborers?

9       A    No, I don't believe so.

10      Q    Who did that?

11      A    Either be me, Bob or Tim Camacho or Tim Camacho's

12  replacement and I can't remember his name.  After that.

13      Q    What was the role of Dennis Clark?

14      A    Dennis Clark was -- he was a representative of MCI.

15  He was basically quality control, I would guess.  For MCI.

16  He was there to make sure that the product was installed per

17  their specifications.

18      Q    You had MCI provide a set of specifications you were

19  supposed to follow?

20      A    Yes.

21      Q    Describe how those were presented to you.

22      A    Drawings with details.

23      Q    Do they also have a manual of specifications?

24      A    Not really.  Not that I know of.

25      Q    So you say he was the quality control.  Was he then

1     Q    Why aren't you on the site that day?

2     A    I was in the office doing some report for John

3   Healy.

4     Q    Do you remember when or about that was time wise?

5     A    No, I don't. I mean, it's no --

6     Q    Was it still in Phase 1 or one of the later phases?

7     A    I think that's kind of the Phase 2. I'm -- I can't

8   really remember but --

9     Q    So you don't recall the date?

10     A    No.

11     Q    Who was the employee that called you?

12     A    Henry Quintanilla.

13     Q    What did Henry Quintanilla tell you to the best as

14   you can recall?

15     A    When I arrived on site, I guess there was a deep

16   excavation area that Dennis wanted things to move faster,

17   didn't like the way they was doin' it and referred to them as

18   monkeys at this time, I believe. It was just a phrase

19   "monkeys" and they didn't like it so I had conversation with

20   Dennis.

21     Q    Was it a heated conversation?

22     A    Yeah, it kind of got heated because he took it -- I

23   tried to keep it on a professional -- look, just don't treat

24   them this way, don't talk to people this way and -- yeah,

25   there was a lot of arrogance.

1     Q     When was the next incident that you can recall that

2     you had a disagreement with Mr. Clark?

3     A     I believe -- I'm not sure but I believe it was -- we

4     were on the back part of NCTAMS coming through the jungle

5     because there was an area that conduit was installed and they

6     called me, the same thing, and we were pulling fiber.

7     Q     You weren't there that day either?

8     A     I was en route.  We were setting up for a fiber pull

9     and nobody had started yet.

10     Q     Who called you that time or told you about it?

11     A     I think it was Van Meter at this time.

12     Q     Who is Van Meter?

13     A     Henry Van Meter.

14     Q     Who was Henry Van Meter?

15     A     Henry Van Meter was another one that was not a

16     foreman but he was kind of like a lead man.  If the crew

17     broke away, they were working a different area, he had the

18     responsibility of leadership of certain guys.

19     Q     Henry, his title wasn't foreman?

20     A     I don't believe so but I'm not sure.

21     Q     Did you hire Henry Van Meter also?

22     A     You know, I didn't directly hire anybody.  I didn't

23     have the authority to, in my opinion, but I was part of the

24     interview of Henry Van Meter.

25     Q     Who else interviewed?

1   before was left in the right condition, and part of my job is

2   to explore the job ahead in advance to make sure that when

3   they leave that job site that day, of course they're

4   advancing forward and the reason for my performance was to be

5   on site so I covered kind of a wide area.

6       Q     How many lead men or foremen did you have?

7       A     Henry Quintanilla, Henry Van Meter, and basically as

8   guys that were left with any responsibility, I think they

9   were the only two.

10      Q     Was there a very high turnover of workers?

11      A     No.

12      Q     Did CalPac have to hire additional workers to do the

13  MCI project?

14      A     Yes.

15      Q     How many do you recall they had to hire?

16      A     I don't know.

17      Q     15, 20?  25?

18      A     I'd be guessing.  I'd just be guessing.

19      Q     When you interviewed these people, did you tell them

20  they were being hired for that specific job or just hired

21  generally?

22      A     I don't know that the name of the job was ever

23  mentioned to them, but their job role of what they would be

24  doing was explained.

25      Q     What was supposed to happen to them once the project

1    Q    Why do you say that?

2    A    Because he was. It was my opinion. I just feel he

3    was arrogant.

4    Q    Did he ever say anything that made you think he was

5    arrogant?

6    A    It was just arrogance. Yeah, I guess he said a lot

7    of things, obviously, that made me feel that way but I can't

8    pinpoint one isolated situation. It was just being around

9    somebody for long enough in a working condition that you feel

10   that attitude superiority and he felt like he was working in

11   a third world all the time.

12   Q    Did he ever say anything like that?

13   A    Yes.

14   Q    What did he say?

15   A    He just referred to Guam as being very backwards and

16   he would make comments about another job he did somewhere

17   else. I may be wrong about South America and he would

18   compare it to that.

19   Q    Have you ever made any verbal threats to Dennis

20   Clark?

21   A    Yes.

22   Q    Could you tell us about the first time you made a

23   verbal threat to him?

24   A    I think I told him that one time I -- I forget what

25   I said. Get off my job or I'll whoop your ass or something.

REPORTER'S CERTIFICATE


I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **DONALD J. HARPER** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 188, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd day of March 2007.


Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA ) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES )
S. YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA, )
                         )
              Plaintiffs, )
                         )
          vs. )
                         )
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10, )
                         )
            Defendants. )

**COPY**

## DEPOSITION OF RUSSELL A. HATFIELD

Taken on Behalf of CalPac

BE IT REMEMBERED That, pursuant to the Guam
Rules of Civil Procedure, the deposition of **RUSSELL A.**
**HATFIELD** was taken before Cecille A. Flores, a Certified
Shorthand Reporter, on Monday, the 19th day of February 2007,
at 10:00 a.m. in the offices of Blair Sterling Johnson
Martinez & Leon Guerrero, Suite 1008, Pacific News Building,
238 Archbishop Flores Street, Hagatna, Guam.

1    is that correct?

2        A    That's correct.  Norman is still there as far as I

3    know.

4        Q    When did you become aware that Norman made a

5    complaint with the EEOC?

6        A    I wasn't aware that he made a complaint.  I don't

7    think I said that.

8        Q    How often was Dennis Clark on the job site?

9        A    Every day.

10       Q    How many hours a day?

11       A    Four hours a day.

12       Q    Where would he be the rest of the time?

13       A    I have no knowledge.

14       Q    How many hours would you spend at the CalPac

15   warehouse on a daily basis?

16       A    Me?

17       Q    Yes.

18       A    Three.

19       Q    How long is a work day for you?  How long was a work

20   day for you at CalPac?

21       A    You want from the time I got up in the morning until

22   the time I went to bed or just physical work?

23       Q    Physically being there at CalPac on the job.

24       A    12 to 18.  I mean, 12 to 14, I'm sorry.

25       Q    What time of the day would you spend those three

1      A      Who I would keep if given a choice of keeping some

2   and letting others go, yes.

3      Q      Now, at the time these people were let go, would

4   people be let go in favor of other employees that were local?

5   Do you understand my question?

6      A      My recommendation has nothing to do with race.  The

7   employees that were let go were based on their skill levels

8   and the job requirements that I needed the individuals to do.

9   So if Joe Blow was multi-taskable, I'd put him in this

10  category.  If Joe Blow was not, he'd stay over here.  If I

11  didn't need his particular skills because we were downsizing

12  at the time because the job was slowing down and you don't

13  keep people on the payroll if you don't have any work for

14  them to do.  And that's what we were doing.  We were

15  downsizing because the work was slowing down.  Yes, there was

16  a long period of work leftover, but we didn't need the

17  humongous payroll and staff that we had at the time.

18     Q      Just for the record, some of the people that stayed

19  on as employees were locals, would that be correct?

20     A      That's correct.

21     Q      I believe you indicated earlier that you weren't

22  aware that various people were filing complaints.  You knew

23  there were complaints but you didn't know who they were,

24  would that be correct?

25     A      Uh-huh.

1      Q      I believe that was in reference to -- I believe you

2  indicated Norman Santos, correct?

3      A      I think she was talking about James Lee.

4      Q      James?

5      A      Yee or Lee or whatever his name was.  I made the

6  statement that James -- until I got here and I saw it right

7  here, James, down as a defendant.  I have -- to this day,

8  other than what's on this piece of paper is the only people

9  that I know have filed a suit.

10      Q      You're referring to the Plaintiffs in this lawsuit?

11      A      That's correct.

12      Q      In your opinion, were the service of the people that

13  were let go around November of 2004, were their services

14  needed at CalPac?

15      A      The ones that were let go, no.

16      Q      So when you're saying let go, they weren't

17  necessarily fired, would that be correct?

18      A      Nobody was fired.  Everybody was laid off with the

19  understanding that if work picked up and if we needed your

20  skills back, that you would be given first opportunity to

21  accept the job if you so desired it.

22      Q      And it wouldn't be unusual for somebody to be let go

23  at CalPac and then later picked up?

24      A      No.

25      Q      Did you actually observe that situation?

# NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 19th day of February, 2007 at the hour of 10:00 a.m. there appeared before me **RUSSELL A. HATFIELD** at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 5th day of March, 2007.

_____

Cecille A. Flores

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES )
S. YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA, )
                         )
            Plaintiffs, )
                         )
        vs. )
                         )
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10, )
                         )
            Defendants. )

COPY

## DEPOSITION OF NORMAN S. SANTOS

Taken on Behalf of Defendant CalPac

         BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **NORMAN S. SANTOS**

was taken before Cecille A. Flores, a Certified Shorthand

Reporter, on Friday, the 13th day of April 2007, at 3:00 p.m.

in the offices of Blair Sterling Johnson Martinez & Leon

Guerrero, Suite 1008, Pacific News Building, 238 Archbishop

Flores Street, Hagatna, Guam.

1    Q    How long have you been working at CalPac?

2    A    Going for three years.

3    Q    So you started working at CalPac in 2004?

4    A    Yeah.

5    Q    What is your position now at CalPac?

6    A    Used to be Laborer.  Now I'm a Supervisor in the

7  field.

8    Q    When did you become a Supervisor at CalPac?

9    A    One year, three months.

10   Q    So 2006 you became a Supervisor, is that about

11  right?

12   A    Two years after.  A year and a half.  One year, four

13  months.

14   Q    So around 2006, correct?

15   A    Yeah.

16   Q    So from 2004 through 2006 you were a Laborer?

17   A    Yeah.

18   Q    Somewhere around there, right?

19   A    Uh-huh.

20   Q    What was your wage as a Supervisor?  What is your

21  wage?

22   A    11.50.

23   Q    As a Laborer, how much were you making?

24   A    Used to be $6.  Two months later they give $9.

25   Q    When was that?

1    on them.  The two guys laid off, the company gonna be going

2    slow.

3        Q    How long has CalPac had that policy?  As long as

4    you've been working there?

5        A    No.

6        Q    So how long?

7        A    That's a new policy.

8        Q    What about in 2004?  Did they have a policy about

9    showing up --

10       A    No, no.

11       Q    Earlier you filed a charge of discrimination with

12   the EEOC, correct?

13       A    Yes.

14       Q    That was about the time I guess the other

15   Co-Plaintiffs were filing?

16       A    Yes.

17       Q    The same time they were filing with the EEOC?

18       A    Yes.

19       Q    I think there was something that was filed with the

20   EEOC around February 2005.  Did Don Harper help you file the

21   charge of discrimination?  Do you remember?

22       A    Yes.

23       Q    Did Mr. Harper help you file it?

24       A    He help us to call Hawaii.

25       Q    Then you used his fax machine?

1   the complaint and the time you withdrew it?  Do you know how

2   many months or weeks that was?

3       A    Almost a year.

4       Q    Almost a year that you had a complaint with the

5   EEOC?

6       A    Uh-huh.

7       Q    During that time you were still employed at CalPac?

8       A    Yes.

9       Q    Did anybody at CalPac say anything to you about your

10  complaint?

11      A    No.

12      Q    No?  They let you work?

13      A    (Witness nodded head.)

14      Q    Did you feel that you were treated unfairly when you

15  were working at CalPac during that one year?

16      A    No.

17      Q    We were talking to Mr. Leon Guerrero about a meeting

18  that was held at CalPac when Dennis Clark said he never made

19  the statements.  Do you recall that?

20      A    Yes.

21      Q    During that meeting, did anybody at CalPac, the

22  management, ever say if you make a complaint you'll get fired

23  or you'll --

24      A    No.

25      Q    Nobody said that?

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that NORMAN S. SANTOS personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 51, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 18th day of May 2007.


Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

        I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 13th day of April, 2007 at the hour of 3:00 p.m. there appeared before me **NORMAN S. SANTOS** at the law offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

        I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

        In testimony whereof, I have hereunto set my hand this 18th day of May, 2007.

                             Cecille A. Flores

VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

## IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE. TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL CASE NO. CIV05-00037<br><br><br>**DECLARATION OF JOHN T. HEALY IN SUPPORT OF EACH OF CALPAC'S MOTIONS FOR SUMMARY JUDGMENT** |

I, **JOHN T. HEALY**, under penalty of perjury, do hereby declare and state as follows:

1. I am a shareholder of California Technical Services LLC ("CalPac") and its Vice President whose duties include, the field operation of CalPac.

2. Included within Calpac's field operation is the "underground crew" of which plaintiffs were formerly employed.

//

3. In early 2004, CalPac was working on a contact with MCI to lay fiber optics.

4. The MCI contract was initially to be completed in December 2004.

5. CalPac hired additional laborers to assist the underground crew in the completion of the MCI project.

6. The vast majority of the underground crew were of Chamorro descent.

7. In the latter part of 2004, CalPac essentially had one contract (i.e. the MCI Contract) which was nearing completion.

8. Although the MCI contract was not officially completed until June/July of 2005, the services of most of the laborers were no longer needed.

9. CalPac laid off employees based on economic reasons.

10. James Yee and Robert Cruz were not laid off, rather they were terminated for cause.

11. Joseph Hernandez was hurt on the job and received Worker's Compensation. He is officially on CalPac's books.

12. After the lay offs were completed, the vast majority of the remaining underground employees were of Chamorro descent.

13. Sometime in December, 2004, I became aware that some employees were claiming they were being discriminated against based on Clark's purported remarks. A meeting was called to answer any questions and alleviate any concerns, concerning Clark's statements. CalPac did not threaten.

IR STERLING JOHNSON
TINIZ & LEON GUERRERO
ROFESSIONAL CORPORATION
1008 Pacific News Building
INETRANSON F.C. FLORES Street
ITNA, GUAM 9696 I D-5205
PHONE (671) 477-7857

- 2 -

I declare under penalty of perjury and the laws of the United States that the foregoing statements are true and correct.

DATED: JULY ___, 2007

_____
JOHN T. HEALY

V63\-08130-03
G:\WORDDOC\PLD\VLG\194-DECLARATION OF JOHN HEALY RE VAN METER
ET AL V CALPAC ET AL.DOC

JR STERLING JOHNSON
TINEZ & LEON GUERRERO
PROFESSIONAL CORPORATION
E 1008 PACIFIC NEWS BUILDING
ANCHORSHOP F.C. FLORES STREET
ATNA, GUAM 96910-5205
EPHONE: (671) 477-7857