1  VINCENT LEON GUERRERO
2  BLAIR STERLING JOHNSON
   MARTINEZ & LEON GUERRERO
   A PROFESSIONAL CORPORATION
3  SUITE 1008 PACIFIC NEWS BUILDING
   238 ARCHBISHOP F.C. FLORES STREET
   HAGÅTÑA, GUAM 96910-5205
4  TELEPHONE: (671) 477-7857

5  *Attorneys for Defendant California Pacific Technical Services LLC*

6

7  ## IN THE DISTRICT COURT OF GUAM

8

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. VAN METER, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10, )<br><br>Defendants. ) | CIVIL CASE NO. CIV05-00037<br><br><br>**MEMORANDUM PF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE HENRY VAN METER** |

19

**INTRODUCTION**

20    This is a lawsuit brought under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* Plaintiff Henry

Van Meter's ("Van Meter") claims arise out of purported

statements made by Dennis Clark ("Clark")[1] who, Van Meter

acknowledges, was neither a co-employee of the plaintiffs nor an

employee of California Technical Services, LLC ("CalPac").

---

[1] For the purpose of this motion only, CalPac will assume Clark made the
purported statements.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

ORIGINAL

1 Clark, in fact, was MCI's owner representative hired to ensure
2 CalPac performed according to the terms of the contract.

3 Van Meter alleged that Clark, on two occasions during the
4 period between September and October or November[2], called him
5 and his fellow co-workers "monkeys" or "island monkeys." Van
6 Meter alleged that he made a complaint to his supervisor after
7
8 the first incident, and that CalPac retaliated and discharged
9 him in December 10, 2004. CalPac declares that Van Meter was
10 laid off because the MCI project was near completion and that
11 CalPac no longer needed the services of most of CalPac's
12 laborers.
13
14 To the extent co-defendant Dynamic Technical Services
15 ("DTS") asserts there was no hostile environment, CalPac hereby
16 joins in such motion. Further, CalPac now moves for summary
17 judgment on the issue all issues alleged against CalPac by Van
18 Meter.

19 **FACTS**

20 CalPac acquired a contract from MCI to lay fiber optic
21 cables on Guam. The MCI project entailed laying fiber optic
22 cable from Hagatna to NTCAM. Harper Deposition at p. 11.
23 Initially, the MCI project was scheduled to be completed around
24
25 December, 2004. See Healy Declaration. Clark was designated as

26

27 [2] Van Meter believed Harper was present during the last incident. As such the second incident would have occurred in October since Harper left on October 26, 2004. See Ward Deposition at p. 29.

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F C FLORES STREET
HAGÅTÑA, GUAM 96910-5208
TELEPHONE: (671) 477-7857

- 2 -

Case 1:05-cv-00037   Document 325   Filed 07/23/2007   Page 2 of 47

MCI's representative charged with ensuring CalPac complied with the terms of the contract. Harper Deposition at p. 15. **Clark was never an employees of CalPac**. Harper Deposition at p. 15.

In order to meet the terms of the MCI contract, CalPac hired additional laborers to trench and lay cables. Healy Declaration. Initially, the MCI project was scheduled to be completed around December, 2004. Healy Declaration. As the project neared completion, CalPac began to lay-off its laborers since the MCI project was the only remaining major contract that CalPac had. Healy Declaration.

Van Meter, one of the plaintiffs herein, began working for CalPac around February, 2004. Van Meter Deposition at p. 22. Around February 2, 2005, Van Meter signed a "Charge of Discrimination" under penalty of perjury stating that he knew he was hired "to work on an installation project of underground cable in Guam for MCI." Van Meter Deposition at p. 23. Van Meter later admitted that his charge was inaccurately filled out. Van Meter Deposition at p. 24.

Van Meter was part of the field crew of CalPac. Most, if not all employees, of the field crew were local hires of Chamorro descent. See Healy declaration. Because of the MCI contract, CalPac had to hire additional employees. Harper Deposition at p. 25. Around November, 2004, CalPac began downsizing because the work was slowing down. Hatfield

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1 Deposition at p. 75. Because of the reduced amount of work, the
2 services of many of the employees were no longer needed.
3 Hatfield Deposition at p. 76. Around December 10, 2004, Van
4 Meter was told there would be a reduction in force and that Van
5 Meter would be laid off. Van Meter Deposition at p. 47.
6
7 Through Van Meter's complaint, Van Meter alleged that Clark
8 (an employee of DTS and not of CalPac), harassed Van Meter by
9 calling Van Meter a "monkey" or "island monkey." See Par. 37 of
10 the Complaint; During his deposition Van Meter stated that the
11 first incident occurred around September 25, 2004. Van Meter
12 Deposition at p. 35. In the first incident, Clark said "Henry,
13 you guys look like a bunch on monkeys." Van Meter Deposition at
14 p. 33.
15
16 The best Van Meter could recall for the second incident was
17 that it took place in "October, November. I don't remember."
18 Van Meter Deposition at p. 36. On this occasion Clark
19 purportedly asked in response to a rope breaking: "What asshole
20 monkey did that?" Van Meter Deposition at p. 36. During Van
21 Meter's deposition, **no reference to "island" monkey was made**.
22
23 Van Meter claims to have notified CalPac of the first
24 statement made by Clark. See Para. 38 of the Complaint; Also
25 see Van Meter Deposition at p. 41. The second statement was not
26 reported to CalPac. Van Meter Deposition at p. 44.
27 //
28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 4 -

Don Harper, whose duties included coordinating with the CalPac's customers, testified that he was informed of three incidents wherein Clark would refer to the employees as monkeys. Harper Deposition at p. 22.

The first report purportedly resulted in Harper and Clark having a heated discussion about the way to talk to people. Harper Deposition at p. 22. **It was Harper's impression that it was just a phrase 'monkeys' and they [the crew] didn't like it**." Harper Deposition at p. 22. The second incident purportedly resulted in the same action by Harper. Harper Deposition at p. 23. On the third and final incident, Harper purportedly threatened Clark and told him to "get off my job or I'll whoop your ass or something." Harper Deposition at p. 96.

Healy denies being informed about such statements until the protests began. Healy Declaration. Bill Ward, CalPac's general manager, testified that he was never informed about the statements until the December meeting.

Certain CalPac's management were unaware of which employees made complaints. As an example, Hatfield was did not know that Norman Santos filed a complaint with the EEOC. Hatfield Deposition at p. 70. Through Norman Santos' deposition it is undisputed that Santos worked for CalPac in 2004 (Santos Deposition at p. 12); filed an EEOC complaint for discrimination (Santos Deposition at p. 27); and withdrew his EEOC complaint

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Case 1:05-cv-00037   Document 325   Filed 07/23/2007   Page 5 of 47

almost a year later (Santos Deposition at p. 33). As of April 2007, Norman Santos remained an employee with CalPac. Santos Deposition at p. 12.

When further examined, Van Meter testified that with the exception of getting "shitty jobs like laying asphalt, he could not recall how the environment changed. Van Meter Deposition at p. 76.

### LAW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56. The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file" designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 at 324.

In determining whether the moving party has met its burden of establishing that no genuine issue of a material fact exists and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in a light most

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

favorable to the nonmovant, in this case the Plaintiff, and resolve all reasonable doubts in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Ins.*, 210 F.3d 1099, 1106 (9th Cir. 2000). The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial. *Id.*

## I. RACIAL HARASSMENT – HOSTILE ENVIRONMENT

### 1. CALPAC SHOULD NOT BE LIABLE FOR THE ACTIONS OF A THIRD PARTY

In the instant case, Van Meter alleges that a non-employee of CalPac called him a "monkey" or "island monkey" on two occasions. In order for an employer to be found liable for third party harassment, an employer must ratify or condone the conduct by failing to investigate and remedy it after learning

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1  of it. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968

2  (9th Cir. 2002). Assuming for the sake of this motion that

3  complaints were made to Harper, Harper testified that he

4  confronted Clark about the statements. After the third

5

6  complaint to Harper, Harper threatened Clark and kicked Clark

7  off the job site. Most importantly, there were no further

8  complaints and the situation was remedied. Clearly, although

9  Healy and Ward may have not known of the actions by Harper,

10  action was taken nonetheless. CalPac, therefore, should not be

11  liable for the actions of Clark.

12
13
   **2.   PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT**

14      The Supreme Court has repeatedly stated that Title VII **does**

15  **not set forth "a general civility code for the American**

16  **workplace**." (Emphasis added.)   *Oncale v. Sundowner Offshore*

17  *Services, Inc.*, 523 U.S. 75, 80 (1998);   *Burlington Northern &*

18  *Santa Fey Ry. Co. v. White*,   126 S.Ct. 2405, 2415 (2006).

19
   Judicial standards for harassment must **"filter out complaints**
20
   **attacking 'the ordinary tribulations of the workplace, such as**
21
22  **the sporadic use of abusive language**, gender-related jokes, **and**

23  **occasional teasing.**'" *Faragher v. Boca Raton,* 524 U.S. 775, 788

24  (1998). Although CalPac concedes that referring to an employees

25  as an island monkey may be offensive, these remarks, under the

26  circumstances, do not qualify for Title VII protection.

27
   **"Conduct that is not so severe or pervasive enough to create an**

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 8 -
Case 1:05-cv-00037   Document 325   Filed 07/23/2007   Page 8 of 47

**objectively or abusive work environment...is beyond Title VII purview.**" (Emphasis added.) *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993).

In order to state a claim for hostile environment, Van Meter must show that: (1) he was subject to verbal or physical conduct based on race or national origin; (2) that the conduct was unwelcomed; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and created an abusive environment. *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment, for the purposes of Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027 (9th Cir. 2005). In determining whether conduct was sufficiently severe or pervasive, courts look at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening, or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

Unlike other, more direct unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment. *See Nat'l*

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 9 -

*R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115 (2002)("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the **cumulative effect** of individual acts"). (Emphasis added.)

In Van Meter's case, Van Meter alleges that Clark directed two statements at him during his ten month tenure at CalPac. There is no allegation that Clark physically threatened Van Meter. This is not a situation where an employee shows up to work and is subjected to a barrage of rude or offensive remarks. Further, there is no showing that the purported remarks altered the terms and conditions of Van Meter's employment.

This is a situation where a third party may have made three or four rude remarks of which Van Meter may have heard two. Clearly, Van Meter failed to establish the frequency required to establish a claim under Title VII especially in light of the allegation that the remarks were not made by CalPac employees. It is also noteworthy that Van Meter could not recall the events.

### 3. CALPAC DID NOT RETALIATE AGAINST VAN METER

Title VII's anti-retaliation provision forbids an employer from "discriminate[ing] against an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted or participated in" a Title VII proceeding or investigation. 42 U.S.C.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Case 1:05-cv-00037   Document 325   Filed 07/23/2007   Page 10 of 47

1  §§ 2000e-3(a). **This provision, however, "covers those (and only**
2  **those) employer actions that would have been materially adverse**
3  **to a reasonable employee or job applicant**...to the point that
4  they could well dissuade a reasonable worker from making or
5  supporting a charge of discrimination. (Emphasis added.)
6
7  *Burlington Northern & Santa Fey Ry. Co. v. White*, 126 S.Ct.
8  2405, 2409 (2006).

9  If the plaintiff makes a prima facie case, the burden of
10 production shifts to the defendant to present a legitimate, non-
11 retaliatory reason for the adverse action. *Brooks v. City of San*
12 *Mateo,* 229 F.3d 917, 928 (9th Cir. 2000); *Cassimy v. Board of*
13
14 *Education of the Rockford Public School, Dist. #205 (7th Cir.*
15 *2006).* If the defendant carries this burden, the plaintiff "must
16 demonstrate a genuine issue of material fact as to whether the
17 reason advanced by the [defendant] was a pretext." *Brooks,*
18 *supra.*

19 Van Meter claims he was "wrongfully and unlawfully
20 terminated by CalPac. CalPac declares that CalPac essentially
21 had one contract that was nearing completion and the services of
22
23 most of the crew were no longer needed nor could they be
24 afforded. See Healy Declaration.

25                                **CONCLUSION**
26 Liability for hostile environment requires a showing that
27 the action was severe or pervasive. For the reasons stated
28 above, it is respectfully suggested that the two remarks heard

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

                                - 11 -

1  by Van Meter were not severe or pervasive enough to be protected

2  under Title VII. Indeed, Van Meter could not recall how he

3  thought the environment was hostile. Assuming the remarks were

4  severe and pervasive, however, liability for third party

5  discrimination requires a showing that CalPac condoned or

6  authorized the act. Such was not done.

7

8  Concerning Van Meter's claims for retaliation, Van Meter's

9  discharge was based on reasons unrelated to any purported

10  complaint made. Other workers, some of whom did not file

11  complaints, along with Van Meter were laid off for financial or

12  economic reasons. As such, CalPac respectfully requests this

13  Court grant its motion for summary judgment.

14

**RESPECTFULLY SUBMITTED** this 23rd day of July, 2007.

15

16
**BLAIR STERLING JOHNSON**
**MARTINEZ & LEON GUERRERO**
17
A PROFESSIONAL CORPORATION

18

19
BY:

**VINCENT LEON GUERRERO**
20
*Attorneys for Defendant California Pacific Technical*
*Services LLC*

21

V63:49\08130-03
22
G:\WORDDOC\PLD\VLG\206B-MEMO OF P&A IN SUPP OF MSJ RE VAN
METER RE VAN METER V. CALPAC.DOC

23

24

25

26

27

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 12 -

## IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES )
S. YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA, )
                     )
           Plaintiffs, )
                     )
           vs. )
                     )
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10, )
                     )
           Defendants. )



### DEPOSITION OF HENRY G. VAN METER
Taken on Behalf of Defendant CalPac

BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **HENRY G. VAN**

**METER** was taken before Cecille A. Flores, a Certified

Shorthand Reporter, on Wednesday, the 11th day of April 2007,

at 2:00 p.m. in the offices of Blair Sterling Johnson

Martinez & Leon Guerrero, Suite 1008, Pacific News Building,

238 Archbishop Flores Street, Hagatna, Guam.

1    A    Correct.

2    Q    There's a signature found at the bottom left corner.

3    Do you see that?

4    A    Uh-huh.

5    Q    Is that your signature?

6    A    Yes.

7    Q    It seems to indicate that it was signed on February

8    2, 2005, correct?

9    A    Right here, yes.

10   Q    To the left of your signature.

11   A    February 2?  To the left?

12   Q    Yes.

13   A    February 2, 2005.

14   Q    Okay.  It seems to indicate that there's a little

15   line above it.  It says "I declare under penalty of perjury

16   that the above is true and correct."  Do you see that?

17   A    Yes.

18   Q    So you're essentially saying what you filed with

19   EEOC at the time was true and correct, right?

20   A    Okay.

21   Q    I'm looking at the first paragraph there.  Can you

22   see under where it says "the particulars are"?  Do you see

23   what I'm talking about?

24   A    Where at?

25   Q    There's a part in there that you fill in.  It begins

1   with "I was hired by CalPac." Do you see that?

2        A    Uh-huh.

3        Q    It says you were hired by CalPac in February 2004.

4        A    Uh-huh.

5        Q    Can you go ahead and finish the rest of that

6   sentence?

7        A    "To work on installation project of underground

8   cable in Guam for MCI."

9        Q    Okay. So earlier, just to clarify, you were hired

10  by CalPac to work on a project and I want to know which

11  project you were hired for.

12       A    (No response.)

13       Q    Do you understand what I'm saying?

14       A    Yes.

15       Q    Because earlier you said you were hired to do AT&T.

16  I just want to clarify this.

17       A    Yeah, I was hired to work for CalPac and whatever

18  project they have there I will work for them. Now, if MCI is

19  in the near future then it will be MCI because I can't

20  predict what's going on with management or what. But when I

21  first started working for CalPac, AT&T was the project.

22       Q    So the first paragraph on Exhibit A saying that you

23  were hired to work --

24       A    I was hired to work for CalPac on an installation

25  project underground cable in Guam for MCI.

1     Q     Would that be an incorrect statement then?

2     A     Yes.

3     Q     So it should say you were working for CalPac to do

4  the AT&T contract, correct?

5     A     No.   It should say I was working for CalPac from

6  February 2004.  And whatever project is there, it's MCI or

7  AT&T, whatever comes down the line, I don't know, but this is

8  -- yeah, this is --

9     Q     Did you fill that in by yourself?

10    A     Yes.

11    Q     So you typed in the information for the EEOC charge,

12  would that be correct?

13    A     Yes.

14    Q     This was sent to the EEOC, correct?

15    A     Yes.

16    Q     We'll come back to this later.  So you had

17  essentially a few people working under you as the Foreman at

18  CalPac, correct?

19    A     (Witness nodded head.)

20    Q     Who would be above you, do you remember?

21    A     Henry Quintanilla was my Lead Foreman, and after

22  that would be Don Harper.

23    Q     Don Harper, you indicated, was a Superintendent,

24  correct?

25    A     Yeah.

1    A    Well, Dennis Clark came up to me and said -- first
2    of all, I said how -- how are you doing Dennis? Oh, doing
3    all right.  Then he said, Henry, you guys look like a bunch
4    of monkeys.  And I questioned him and I said, what did you
5    say? Did you just call us monkeys?  And then I turned around
6    and the crew was -- hey, Henry, you better get this guy out
7    of here.  So I went and I complained to Henry Quintanilla and
8    I told Henry Quintanilla, hey, Dennis Clark just called us
9    monkeys.

10    Q    Did Mr. Quintanilla indicate that he heard that
11    comment from Mr. Clark?

12    A    No.

13    Q    Do you think that Mr. Quintanilla heard the comment?

14    A    No.

15    Q    He was --

16    A    He heard it from me.

17    Q    You indicated that Mr. Clark said that in front of
18    the crew, correct?

19    A    Yes.

20    Q    Who were members of the crew at that time?

21    A    If I remember, Tony Arriola, Ted Cruz, and Robert
22    Cruz, and some other -- some other guys.  I don't remember.
23    I think Joe Hernandez was there.  I don't remember but I know
24    that these were the guys that was there.

25    Q    You think that maybe Joseph Hernandez might be

1     A     Yes.

2     Q     And then Robert Cruz would be Robert B. Cruz who is

3   also a Plaintiff in this case, correct?

4     A     Yeah.

5     Q     Were there any other people that were part of the

6   crew that are not Plaintiffs to this case?

7     A     No.

8     Q     I'm sorry?

9     A     (Witness shook head.)

10    Q     If you know.

11    A     I don't know.

12    Q     I think you testified about one incident.  Were

13  there other incidents where Mr. Clark would make that

14  specific comment to you guys?

15    A     I remember one over in Two Lovers' Point.

16    Q     Before we go to that one, where did this first

17  incident take place at?

18    A     Over in Tiyan.

19    Q     This is September?

20    A     About September 25.  September.  End part of

21  September.

22    Q     The next one is at Two Lover's Point, correct?

23    A     Yes.

24    Q     About what time was that?  What day?

25    A     Maybe October, November.  I don't remember.  That

1   was our last pull.

2       Q    If you can recall, how many members were at the Two

3   Lovers' Point incident?

4       A    The whole crew was there.  I mean, everyone was

5   there.  Don Harper, Dennis Clark, Henry Quintanilla, myself,

6   the whole CalPac was there except for Healy and them, but the

7   whole CalPac crew were there because that was the last pull

8   on that area so we had to finish it.  That's about it.  I

9   can't -- I can sit down here and tell you the names but then

10  there'll be other guys I don't remember so --

11      Q    Give me an estimate now.  How many people were

12  present when Mr. Clark made the comment at Two Lovers' Point?

13      A    About maybe 20.

14      Q    What did he say?

15      A    He said -- when Robert broke the rope, he goes --

16  what -- can I say it or --

17      Q    Yes, go ahead and say it.

18      A    What asshole monkey did that?  And we all looked at

19  each other and said, oh, here we go again.  The monkey word,

20  you know?  So all I remember was Robert just jumping out of

21  the hole and just running to the warehouse trying to get

22  something to correct that -- so we can flush out the broken

23  rope there.  That's about -- it's been a while.  That's all I

24  remember.

25      Q    When you were referring to Robert, you're referring

1   refer to you, okay?  I'm going to ask you stuff about how you

2   feel, okay?

3        A    (Witness nodded head.)

4        Q    Even though, like I said, it refers to the plural,

5   I'm just going to be talking about you.  It says that you

6   notified CalPac, that you complained to CalPac, correct?

7        A    Yes.

8        Q    Who did you complain to or who did you tell at

9   CalPac?

10       A    By chain of command, Henry, and then it went to Don

11  Harper.

12       Q    We'll start off with the first incident.  There are

13  two incidents, right?

14       A    There's two incidents.

15       Q    Are there any others before we go on to the next

16  one?

17       A    Not that I know of.

18       Q    So the first one was at Tiyan?

19       A    Yes.

20       Q    That was with a crew of approximately five, six,

21  somewhere around there?

22       A    More than six.

23       Q    That was the one where Teddy Cruz was present?

24       A    Yes.

25       Q    I believe Mr. Quintanilla may have showed up later,

1      A     It could --

2      Q     It could have gone on, you don't know?

3      A     It could have.  I'm just going by chain of command.

4      Q     Let's move on to the next incident.  That's the one

5   at two Lovers' Point.  You indicated you made a complaint to

6   CalPac, correct, about that second incident?

7      A     No, I didn't make a complaint about the second

8   incident.  You asked me if I remembered if there's another

9   incident.

10     Q     Okay.

11     A     And there is another incident that I remember but I

12  didn't make a complaint because we --

13     Q     The only reason I'm asking, Mr. Van Meter, is

14  because in your Complaint it says you notified or you

15  complained to CalPac and that's Paragraph 38.  That's what I

16  want to find out is what's going on with Paragraph 38.  The

17  second incident you never made a complaint to CalPac?

18     A     No.

19     Q     In your Complaint, Paragraph 38, it says you

20  notified CalPac and Mr. Healy, correct?

21     A     Uh-huh.

22     Q     First of all, did you talk to Mr. Healy about the

23  two incidents?

24     A     I talked to Henry Quintanilla.

25     Q     I'm talking about Mr. Healy.

1  and read that.

2     A   "As a result of Van Meter's complaints to Defendants

3  CalPac and Healy, Defendant CalPac and Healy wrongfully and

4  unlawfully terminated Plaintiff Van Meter from his employment

5  on or about December 10, 2004."

6     Q   So you were saying that you were terminated by

7  CalPac, correct?

8     A   Yes.

9            MR. LEON GUERRERO:  Can we go off the record for

10 a second?

11                           (Off the record at 3:18 p.m.)

12                           (Back on the record at 3:27 p.m.)

13                           (Exhibit B marked: Letter to Van

14                           Meter from CalPac.)

15 BY MR. LEON GUERRERO: (Continuing)

16    Q   Mr. Van Meter, I'm handing you what's been marked as

17 Exhibit B.  Have you ever seen Exhibit B before?

18    A   Yes.

19    Q   What is Exhibit B?

20    A   (No response.)

21    Q   Exhibit B is a memo to you, correct?

22    A   Yes.

23    Q   It references reduction in work force, would that be

24 correct?

25    A   Yes.

1       Q    Is there anything else that had changed about your
2   work environment?

3       A    I don't remember.  That's -- that's all.

4       Q    After you were laid off from CalPac, did you ever
5   call them up and ask them if they had any employment
6   positions available?

7       A    I don't remember.  I don't remember calling them up.
8   All I know -- all I know is that I got terminated and that
9   really upset me because I put my heart and my sweat in this
10  company, okay?  And this is what I get?  I don't -- I was
11  really upset.  I don't think I called them back.

12      Q    You mentioned that they --

13      A    I don't remember.

14      Q    Okay.  You mentioned that they hired other people,
15  is that what you said?

16      A    Yes.

17      Q    Do you know who they hired?  The names of the people
18  that they hired?

19      A    No, no, but I just heard they hired other people
20  before us -- before they called us.  Before us.  They hired
21  other people.

22      Q    How did you find out that they hired other people?

23      A    Just through friends, ex-workers.  I don't know who
24  I talked to.  I don't remember but it just -- all I know is
25  we heard it.

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **HENRY G. VAN METER** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 97, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 15th day of May 2007.

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 11th day of May, 2007 at the hour of 2:00 p.m. there appeared before me **HENRY G. VAN METER** at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 15th day of May, 2007.

Cecille A. Flores

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES )
S. YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA, )
)
              Plaintiffs, )
)
        vs. )
)
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10, )
)
              Defendants. )

**ORIGINAL**

## DEPOSITION OF DONALD J. HARPER

Taken on Behalf of California Pacific Technical Services

BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **DONALD J. HARPER**

was taken before Cecille A. Flores, a Certified Shorthand

Reporter, on the 16th and 20th days of February 2007, in the

offices of Blair Sterling Johnson Martinez & Leon Guerrero,

Suite 1008, Pacific News Building, 238 Archbishop Flores

Street, Hagatna, Guam.

Q    Were your responsibilities limited to the MCI

contract?  Did you have other responsibilities as well?

A    I had a few other responsibilities at the time.

Q    What percentage of your time was devoted to the MCI

contract would you say?

A    95 percent.

Q    95 percent?

A    Guessing.

Q    Can you describe for us what the MCI contract was?

A    It was to install a fiber optic connection from the

MCI building in Agana to NCTAMS NASA complex.

Q    What was the route they took to get from MCI here in

Agana?

A    Up through Agana, through Tiyan, down the cliffline

through Harmon Industrial Park, back through the back road of

Fatima, come up Route 1, down Route 3, back through the

jungle into NCTAMS.

Q    Did the MCI project, was it divided into phases or

how did it go?

A    I believe it was -- I think there were three phases.

They called them three phases, yes.

Q    Do you remember what the three phases were?

A    Yeah, it wasn't really -- I don't know if there was

a contractual breakdown, but I know when it was broken down

into phases of making it through Agana.  It was kind of a

1       A      Just, I guess, for what an owner does.

2       Q      But he wasn't involved in the day-to-day operations

3   of the company?  That was you and Bob and Tim?

4       A      No, he was aware of the day-to-day.  There was daily

5   communication with him.  I mean, other than that, that's as

6   close as it got.

7       Q      Did he do the job interviews with the prospective

8   laborers?

9       A      No, I don't believe so.

10      Q      Who did that?

11      A      Either be me, Bob or Tim Camacho or Tim Camacho's

12  replacement and I can't remember his name.  After that.

13      Q      What was the role of Dennis Clark?

14      A      Dennis Clark was -- he was a representative of MCI.

15  He was basically quality control, I would guess.  For MCI.

16  He was there to make sure that the product was installed per

17  their specifications.

18      Q      You had MCI provide a set of specifications you were

19  supposed to follow?

20      A      Yes.

21      Q      Describe how those were presented to you.

22      A      Drawings with details.

23      Q      Do they also have a manual of specifications?

24      A      Not really.  Not that I know of.

25      Q      So you say he was the quality control.  Was he then

1    Q    Why aren't you on the site that day?

2    A    I was in the office doing some report for John

3   Healy.

4    Q    Do you remember when or about that was time wise?

5    A    No, I don't.  I mean, it's no --

6    Q    Was it still in Phase 1 or one of the later phases?

7    A    I think that's kind of the Phase 2.  I'm -- I can't

8   really remember but --

9    Q    So you don't recall the date?

10    A    No.

11    Q    Who was the employee that called you?

12    A    Henry Quintanilla.

13    Q    What did Henry Quintanilla tell you to the best as

14   you can recall?

15    A    When I arrived on site, I guess there was a deep

16   excavation area that Dennis wanted things to move faster,

17   didn't like the way they was doin' it and referred to them as

18   monkeys at this time, I believe.  It was just a phrase

19   "monkeys" and they didn't like it so I had conversation with

20   Dennis.

21    Q    Was it a heated conversation?

22    A    Yeah, it kind of got heated because he took it -- I

23   tried to keep it on a professional -- look, just don't treat

24   them this way, don't talk to people this way and -- yeah,

25   there was a lot of arrogance.

1     Q     When was the next incident that you can recall that

2     you had a disagreement with Mr. Clark?

3     A     I believe -- I'm not sure but I believe it was -- we

4     were on the back part of NCTAMS coming through the jungle

5     because there was an area that conduit was installed and they

6     called me, the same thing, and we were pulling fiber.

7     Q     You weren't there that day either?

8     A     I was en route.  We were setting up for a fiber pull

9     and nobody had started yet.

10     Q     Who called you that time or told you about it?

11     A     I think it was Van Meter at this time.

12     Q     Who is Van Meter?

13     A     Henry Van Meter.

14     Q     Who was Henry Van Meter?

15     A     Henry Van Meter was another one that was not a

16     foreman but he was kind of like a lead man.  If the crew

17     broke away, they were working a different area, he had the

18     responsibility of leadership of certain guys.

19     Q     Henry, his title wasn't foreman?

20     A     I don't believe so but I'm not sure.

21     Q     Did you hire Henry Van Meter also?

22     A     You know, I didn't directly hire anybody.  I didn't

23     have the authority to, in my opinion, but I was part of the

24     interview of Henry Van Meter.

25     Q     Who else interviewed?

1  before was left in the right condition, and part of my job is

2  to explore the job ahead in advance to make sure that when

3  they leave that job site that day, of course they're

4  advancing forward and the reason for my performance was to be

5  on site so I covered kind of a wide area.

6      Q    How many lead men or foremen did you have?

7      A    Henry Quintanilla, Henry Van Meter, and basically as

8  guys that were left with any responsibility, I think they

9  were the only two.

10      Q    Was there a very high turnover of workers?

11      A    No.

12      Q    Did CalPac have to hire additional workers to do the

13  MCI project?

14      A    Yes.

15      Q    How many do you recall they had to hire?

16      A    I don't know.

17      Q    15, 20?  25?

18      A    I'd be guessing.  I'd just be guessing.

19      Q    When you interviewed these people, did you tell them

20  they were being hired for that specific job or just hired

21  generally?

22      A    I don't know that the name of the job was ever

23  mentioned to them, but their job role of what they would be

24  doing was explained.

25      Q    What was supposed to happen to them once the project

1     Q     Why do you say that?

2     A     Because he was.  It was my opinion.  I just feel he

3  was arrogant.

4     Q     Did he ever say anything that made you think he was

5  arrogant?

6     A     It was just arrogance.  Yeah, I guess he said a lot

7  of things, obviously, that made me feel that way but I can't

8  pinpoint one isolated situation.  It was just being around

9  somebody for long enough in a working condition that you feel

10  that attitude superiority and he felt like he was working in

11  a third world all the time.

12     Q     Did he ever say anything like that?

13     A     Yes.

14     Q     What did he say?

15     A     He just referred to Guam as being very backwards and

16  he would make comments about another job he did somewhere

17  else.  I may be wrong about South America and he would

18  compare it to that.

19     Q     Have you ever made any verbal threats to Dennis

20  Clark?

21     A     Yes.

22     Q     Could you tell us about the first time you made a

23  verbal threat to him?

24     A     I think I told him that one time I -- I forget what

25  I said.  Get off my job or I'll whoop your ass or something.

# REPORTER'S CERTIFICATE

        I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that DONALD J. HARPER personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 188, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

        Witness my hand at Barrigada, Guam this 2nd day of March 2007.


_____
Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.   )
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                    Plaintiffs,  )
                                 )
            vs.                  )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                    Defendants.  )

COPY

## DEPOSITION OF RUSSELL A. HATFIELD

Taken on Behalf of CalPac

BE IT REMEMBERED That, pursuant to the Guam

Rules of Civil Procedure, the deposition of RUSSELL A.

HATFIELD was taken before Cecille A. Flores, a Certified

Shorthand Reporter, on Monday, the 19th day of February 2007,

at 10:00 a.m. in the offices of Blair Sterling Johnson

Martinez & Leon Guerrero, Suite 1008, Pacific News Building,

238 Archbishop Flores Street, Hagatna, Guam.

is that correct?

    A    That's correct.  Norman is still there as far as I know.

    Q    When did you become aware that Norman made a complaint with the EEOC?

    A    I wasn't aware that he made a complaint.  I don't think I said that.

    Q    How often was Dennis Clark on the job site?

    A    Every day.

    Q    How many hours a day?

    A    Four hours a day.

    Q    Where would he be the rest of the time?

    A    I have no knowledge.

    Q    How many hours would you spend at the CalPac warehouse on a daily basis?

    A    Me?

    Q    Yes.

    A    Three.

    Q    How long is a work day for you?  How long was a work day for you at CalPac?

    A    You want from the time I got up in the morning until the time I went to bed or just physical work?

    Q    Physically being there at CalPac on the job.

    A    12 to 18.  I mean, 12 to 14, I'm sorry.

    Q    What time of the day would you spend those three

1      A      Who I would keep if given a choice of keeping some

2   and letting others go, yes.

3      Q      Now, at the time these people were let go, would

4   people be let go in favor of other employees that were local?

5   Do you understand my question?

6      A      My recommendation has nothing to do with race.  The

7   employees that were let go were based on their skill levels

8   and the job requirements that I needed the individuals to do.

9   So if Joe Blow was multi-taskable, I'd put him in this

10  category.  If Joe Blow was not, he'd stay over here.  If I

11  didn't need his particular skills because we were downsizing

12  at the time because the job was slowing down and you don't

13  keep people on the payroll if you don't have any work for

14  them to do.  And that's what we were doing.  We were

15  downsizing because the work was slowing down.  Yes, there was

16  a long period of work leftover, but we didn't need the

17  humongous payroll and staff that we had at the time.

18     Q      Just for the record, some of the people that stayed

19  on as employees were locals, would that be correct?

20     A      That's correct.

21     Q      I believe you indicated earlier that you weren't

22  aware that various people were filing complaints.  You knew

23  there were complaints but you didn't know who they were,

24  would that be correct?

25     A      Uh-huh.

1      Q    I believe that was in reference to -- I believe you

2  indicated Norman Santos, correct?

3      A    I think she was talking about James Lee.

4      Q    James?

5      A    Yee or Lee or whatever his name was.  I made the

6  statement that James -- until I got here and I saw it right

7  here, James, down as a defendant.  I have -- to this day,

8  other than what's on this piece of paper is the only people

9  that I know have filed a suit.

10     Q    You're referring to the Plaintiffs in this lawsuit?

11     A    That's correct.

12     Q    In your opinion, were the service of the people that

13 were let go around November of 2004, were their services

14 needed at CalPac?

15     A    The ones that were let go, no.

16     Q    So when you're saying let go, they weren't

17 necessarily fired, would that be correct?

18     A    Nobody was fired.  Everybody was laid off with the

19 understanding that if work picked up and if we needed your

20 skills back, that you would be given first opportunity to

21 accept the job if you so desired it.

22     Q    And it wouldn't be unusual for somebody to be let go

23 at CalPac and then later picked up?

24     A    No.

25     Q    Did you actually observe that situation?

## NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

      I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 19th day of February, 2007 at the hour of 10:00 a.m. there appeared before me **RUSSELL A. HATFIELD** at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

      I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

      In testimony whereof, I have hereunto set my hand this 5th day of March, 2007.

                    _____
                        Cecille A. Flores

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                Plaintiffs,      )
                                 )
        vs.                      )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                Defendants.      )

⌐▟ COPY

DEPOSITION OF NORMAN S. SANTOS

Taken on Behalf of Defendant CalPac


        BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of NORMAN S. SANTOS

was taken before Cecille A. Flores, a Certified Shorthand

Reporter, on Friday, the 13th day of April 2007, at 3:00 p.m.

in the offices of Blair Sterling Johnson Martinez & Leon

Guerrero, Suite 1008, Pacific News Building, 238 Archbishop

Flores Street, Hagatna, Guam.

1      Q      How long have you been working at CalPac?

2      A      Going for three years.

3      Q      So you started working at CalPac in 2004?

4      A      Yeah.

5      Q      What is your position now at CalPac?

6      A      Used to be Laborer.  Now I'm a Supervisor in the

7  field.

8      Q      When did you become a Supervisor at CalPac?

9      A      One year, three months.

10     Q      So 2006 you became a Supervisor, is that about

11  right?

12     A      Two years after.  A year and a half.  One year, four

13  months.

14     Q      So around 2006, correct?

15     A      Yeah.

16     Q      So from 2004 through 2006 you were a Laborer?

17     A      Yeah.

18     Q      Somewhere around there, right?

19     A      Uh-huh.

20     Q      What was your wage as a Supervisor?  What is your

21  wage?

22     A      11.50.

23     Q      As a Laborer, how much were you making?

24     A      Used to be $6.  Two months later they give $9.

25     Q      When was that?

1  on them.  The two guys laid off, the company gonna be going

2  slow.

3      Q    How long has CalPac had that policy?  As long as

4  you've been working there?

5      A    No.

6      Q    So how long?

7      A    That's a new policy.

8      Q    What about in 2004?  Did they have a policy about

9  showing up --

10      A    No, no.

11      Q    Earlier you filed a charge of discrimination with

12  the EEOC, correct?

13      A    Yes.

14      Q    That was about the time I guess the other

15  Co-Plaintiffs were filing?

16      A    Yes.

17      Q    The same time they were filing with the EEOC?

18      A    Yes.

19      Q    I think there was something that was filed with the

20  EEOC around February 2005.  Did Don Harper help you file the

21  charge of discrimination?  Do you remember?

22      A    Yes.

23      Q    Did Mr. Harper help you file it?

24      A    He help us to call Hawaii.

25      Q    Then you used his fax machine?

1    the complaint and the time you withdrew it?  Do you know how

2    many months or weeks that was?

3         A    Almost a year.

4         Q    Almost a year that you had a complaint with the

5    EEOC?

6         A    Uh-huh.

7         Q    During that time you were still employed at CalPac?

8         A    Yes.

9         Q    Did anybody at CalPac say anything to you about your

10   complaint?

11        A    No.

12        Q    No?  They let you work?

13        A    (Witness nodded head.)

14        Q    Did you feel that you were treated unfairly when you

15   were working at CalPac during that one year?

16        A    No.

17        Q    We were talking to Mr. Leon Guerrero about a meeting

18   that was held at CalPac when Dennis Clark said he never made

19   the statements.  Do you recall that?

20        A    Yes.

21        Q    During that meeting, did anybody at CalPac, the

22   management, ever say if you make a complaint you'll get fired

23   or you'll --

24        A    No.

25        Q    Nobody said that?

# REPORTER'S CERTIFICATE


I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **NORMAN S. SANTOS** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 51, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 18th day of May 2007.


_____
Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

# NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

       I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 13th day of April, 2007 at the hour of 3:00 p.m. there appeared before me **NORMAN S. SANTOS** at the law offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

       I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

       In testimony whereof, I have hereunto set my hand this 18th day of May, 2007.

_____
           Cecille A. Flores

HENRY G. VAN METER, JERRY ) CIVIL CASE NO. CIV05-00037
APODACA, JR., JOSEPH J. )
HERNANDEZ, JOSEPH T. MENDIOLA, )
LARRY L. CHARFAUROS, ANTHONY )
C. ARRIOLA, JAMES S. YEE, TEDDY)
C. CRUZ, JESSE B. CRUZ, JOHN )
L.G. NAUTA and JOHN P. BABAUTA,)
)
        Plaintiffs, )
)
)
    vs. )
)
)
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, )
DENNIS CLARK, WILLIAM WARD, )
JAI JAMES and DOES 1 through )
10, )
        Defendants )
_____)

DEPOSITION TRANSCRIPT

OF

# WILLIAM J. WARD

May 16, 2007

**COPY**

PREPARED BY:    GEORGE B. CASTRO
               **DEPO RESOURCES**
               #49 Anacoco Lane
               Nimitz Hill Estates
               Piti, Guam 96915
               Tel:(671)688-**DEPO** * Fax:(671)472-3094

1     Q   Okay.   All   right.   So,   then   besides

2 Gloria, who else assisted you in the area of

3 billings, after Gloria left?

4     A   After Gloria left, most of the billings

5 were handled by myself.

6     Q   Okay.   All   right.   So in order for you

7 to know what you could bill for, you didn't

8 find the need to review the Construction

9 Agreement?

10     A   No.

11     Q   Now, who was in charge of the project

12 when you first came into -- began working at

13 CalPac?  Who handled the MCI project for CalPac

14 out in the fields?

15     A   Harper, Donald Harper.

16     Q   Uh-huh.  And he handled the project up

17 until the time he quit working on October 26,

18 2004?

19     A   Okay.

20     Q   Is that correct?

21     A   Yes.

22     Q   And the date, sir, those are dates that

23 are in the, I believe, some of the documents in

24 here, plus Mr. Healy's already testified to

25 that --

# REPORTER'S CERTIFICATE

I, **George B. Castro,** Court Reporter, do hereby certify the foregoing 118 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 10th day of July, 2007.

# COPY

_____

George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094