VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

**FILED**
DISTRICT COURT OF GUAM
JUL 23 2007 nbo
MARY L.M. MORAN
CLERK OF COURT

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CRUZ, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. CRUZ, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10,<br><br>Defendants. | CIVIL CASE NO. CIV05-00037<br><br><br>**MEMORANDUM PF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE ROBERT B. CRUZ** |

**INTRODUCTION**

This is a lawsuit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* Robert B. Cruz' ("Cruz") claims arise out of **one** purported statement made by Dennis Clark ("Clark")[1] who, Cruz acknowledges, was neither a co-employee of the plaintiffs nor an employee of California

---
[1] For the purpose of this Motion only, CalPac will assume Clark made the purported statement.

ORIGINAL

Technical Services, LLC ("CalPac"). Clark, in fact, was MCI's owner representative hired to ensure CalPac performed according to the terms of the contract.

Cruz alleged that Clark, on one occasion referred to him and his fellow co-workers "monkeys." Cruz alleged that he made a complaint to his supervisor after the incident, and that CalPac retaliated and discharged him in November 28, 2004. CalPac declares that Cruz was terminated for cause.

To the extent co-defendant Dynamic Technical Services ("DTS") asserts there was no hostile environment, CalPac hereby joins in such motion. Further, CalPac now moves for summary judgment on all issues alleged against CalPac by Cruz.

### FACTS

CalPac acquired a contract from MCI to lay fiber optic cables on Guam. The MCI project entailed laying fiber optic cable from Hagatna to NTCAM. Harper Deposition at p. 11. Initially, the MCI project was scheduled to be completed around December, 2004. *See* Healy Declaration. Clark was designated as MCI's representative charged with ensuring CalPac complied with the terms of the contract. Harper Deposition at p. 15. **It is not disputed that Clark was never an employees of CalPac.** Cruz Deposition at p. 39; also Harper Deposition at p. 15.

In order to meet the terms of the MCI contract, CalPac hired additional laborers to trench and lay cables. Healy Declaration. Initially, the MCI project was scheduled to be

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 2 -

completed around December, 2004. Healy Declaration. As the project neared completion, CalPac began to lay-off its employees since the MCI project was the only remaining major contract that CalPac had. Healy Declaration.

Cruz, one of the plaintiffs herein, began working for CalPac in mid 2003. Cruz Deposition at p. 15. **Cruz did not believe that his supervisors** (Quintanilla and Van Meter), **the superintendent** (Don Harper) **or John Healy discriminated against Cruz or retaliated against Cruz.** R. Cruz Deposition at pp. 16-18. Cruz did not believe CalPac authorized or approved of Clark's purported statements. R.Cruz Deposition at pp. 27 and 28. Indeed, Cruz felt that Healy treated him with respect (R. Cruz Deposition at p. 18) and that "it was a pretty good environment" at CalPac (R. Cruz Deposition at 32).

Cruz was part of the field crew of CalPac. Most, if not all employees, of the field crew were local hires of Chamorro descent. *See* Healy declaration. Because of the MCI contract, CalPac had to hire additional employees. Harper Deposition at 25. Around November, 2004, CalPac began downsizing because the work was slowing down. Hatfield Deposition at p. 75. Because of the reduced amount of work, the services of many of the employees were no longer needed. Hatfield Deposition at p. 76.

Through Cruz' complaint, Cruz alleged that Clark (an employee of DTS and not of CalPac), harassed Cruz by calling

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Cruz a "monkey" or "island monkey." *See* Par. 109 of the Complaint; *see also* Cruz Deposition at p. 41. Cruz claims to have notified CalPac of the statement made by Clark. *See* Para. 110 of the Complaint; *see also* Cruz Deposition at p. 43.

Don Harper, whose duties included coordinating with CalPac's customers, testified that he was informed of three incidents wherein Clark would refer to the employees as monkeys. Harper Deposition at p. 22. The first report purportedly resulted in Harper and Clark having a heated discussion about the way to talk to people. Harper Deposition at p. 22. It was Harper's impression that it was just a phrase 'monkeys' and they [the crew] didn't like it." Harper Deposition at p. 22. The second incident purportedly resulted in the same action by Harper. Harper Deposition at p. 23. On the third and final incident, Harper purportedly threatened Clark and told him to "get off my job or I'll whoop your ass or something." Harper Deposition at p. 96.

Healy denies being informed about such statements until the protests in December began. Healy Declaration. Bill Ward, CalPac's general manager, testified that he was never informed about the statements until the December meeting.

Contrary to Cruz' belief, certain CalPac's management were unaware of which employees made complaints. As an example, Hatfield was did not know that Norman Santos filed a complaint

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 4 -

1 with the EEOC.   Hatfield Deposition at p. 70.   Through Norman

2 Santos' deposition it is undisputed that Santos worked for

3 CalPac in 2004 (Santos Deposition at p. 12); filed an EEOC

4 complaint for discrimination (Santos Deposition at p. 27); and

5 withdrew his EEOC complaint almost a year later (Santos

6
7 Deposition at p. 33).   As of April 2007, Norman Santos remained

8 an employee with CalPac.   Santos Deposition at p. 12.

9 **LAW**

10 Summary judgment is appropriate "if the pleadings,

11 depositions, answers to interrogatories and admissions on file,

12 together with the affidavits, if any, show that the moving party

13 is entitled to judgment as a matter of law."   FED.R.CIV.P. 56.

14
15 The moving party bears the initial burden of showing the Court,

16 by reference to materials on file, that there are no genuine

17 issues of material fact that should be decided at trial. *Celotex*

18 *Corp. v. Catrett*, 477 U.S. 317 (1986).   When a moving party has

19 discharged its burden, the non-moving party must then "go beyond

20 the pleadings," and by its own affidavits, or by "depositions,

21
22 answers to interrogatories, and admissions on file" designate

23 specific facts showing there is a genuine issue for trial.

24 *Celotex*, 477 at 324.

25 In determining whether the moving party has met its burden

26 of establishing that no genuine issue of a material fact exists

27 and that it is entitled to judgment as a matter of law, the

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Court must draw inferences from the evidence in a light most favorable to the nonmovant, in this case the Plaintiff, and resolve all reasonable doubts in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Ins.*, 210 F.3d 1099, 1106 (9th Cir. 2000). The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial. *Id.*

## I. RACIAL HARASSMENT – HOSTILE ENVIRONMENT

### 1. CALPAC SHOULD NOT BE LIABLE FOR THE ACTIONS OF A THIRD PARTY

In the instant case, Cruz alleges that a non-employee of CalPac called him a "monkey" or "island monkey" on three

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 6 -

occasions.[2] In order for an employer to be found liable for third party harassment, an employer must ratify or condone the conduct by failing to investigate and remedy it after learning of it. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002). Assuming for the sake of this motion that complaints were made to Harper, Harper testified that he confronted Clark about the statements. After the third complaint to Harper, Harper threatened Clark and kicked Clark off the job site. Most importantly, there were no further complaints and the situation was remedied. Clearly, although Healy and Ward may have not known of the actions by Harper, action was taken nonetheless. CalPac, therefore, should not be liable for the actions of Clark.

### 2. PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT

The Supreme Court has repeatedly stated that Title VII **does not set forth "a general civility code for the American workplace."** (Emphasis added.) *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *Burlington Northern & Santa Fey Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006). Judicial standards for harassment must **"filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language**, gender-related jokes, **and**

---

[2]   It is noteworthy that the Questionnaire to the EEOC uses the term "monkey" while the EEOC charge uses the phrase "monkey or island monkey." (Underscore added.) Additionally, Cruz could not recall whether it was one, two or three times. Apparently, the events were not too memorable.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 7 -

**occasional teasing.'"** *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998). Although CalPac concedes that referring to an employees as an island monkey may be offensive, these remarks, under the circumstances, do not qualify for Title VII protection. **"Conduct that is not so severe or pervasive enough to create an objectively or abusive work environment...is beyond Title VII purview."** (Emphasis added.) *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21 (1993).

In order to state a claim for hostile environment, Cruz must show that: (1) he was subject to verbal or physical conduct based on race or national origin; (2) that the conduct was unwelcomed; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and created an abusive environment. *Galdamez v. Potter,* 415 F.3d 1015, 1023 (9ᵗʰ Cir. 2005). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment, for the purposes of Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept.,* 424 F.3d. 1027 (9ᵗʰ Cir. 2005). In determining whether conduct was sufficiently severe or pervasive, courts look at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening, or humiliating, or a mere offensive utterance, and whether it unreasonably

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

interferes with an employee's work performance. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

Unlike other, more direct unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115 (2002)("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the **cumulative effect** of individual acts"). (Emphasis added.)

In Cruz' case, Cruz alleges that Clark made one reference to him during his tenure at CalPac. There is no allegation that Clark physically threatened Cruz. This is not a situation where an employee shows up to work and is subjected to a barrage of rude or offensive remarks. Further, there is no showing that the purported remarks altered the terms and conditions of Cruz' employment.

This is a situation where a third party may have made three or four rude remarks of which Cruz may have heard one. Cruz testified that the environment was pretty good and the CalPac management did not discriminate or retaliate against him. Cruz felt that he was treated with respect while employed at CalPac. Clearly, Cruz failed to establish the frequency required to

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 9 -

establish a claim under Title VII especially in light of the allegation that the remarks were not made by CalPac employees.

### 3. CALPAC DID NOT RETALIATE AGAINST CRUZ

Title VII's anti-retaliation provision forbids an employer from "discriminate[ing] against an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a). **This provision, however, "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant**...to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination. (Emphasis added.) *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2409 (2006).

If the plaintiff makes a prima facie case, the burden of production shifts to the defendant to present a legitimate, non-retaliatory reason for the adverse action. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000); *Cassimy v. Board of Education of the Rockford Public School, Dist. #205 (7th Cir. 2006)*. If the defendant carries this burden, the plaintiff "must demonstrate a genuine issue of material fact as to whether the reason advanced by the [defendant] was a pretext." *Brooks, supra.*

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BULDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1 **Cruz believed there was no retaliation** on the part of
2 Harper, Healy, Quintanilla, or Van Meter. Of the thirteen
3 plaintiffs Cruz was one of two discharged for cause. See Healy
4 Declaration.

**CONCLUSION**

6
7 Liability for hostile environment requires a showing that
8 the action was severe or pervasive. For the reasons stated
9 above, it is respectfully suggested that the one remark heard by
10 Cruz were not severe or pervasive enough to be protected under
11 Title VII. Indeed, Cruz thought the environment was pretty
12 good. Assuming the remarks were severe and pervasive, however,
13 liability for third party discrimination requires a showing that
14 CalPac condoned or authorized the act. Such was not done.
15
16 Concerning Cruz' claims for retaliation, Cruz' discharge
17 was based on reasons unrelated to any purported complaint made.
18 Cruz felt that Healy did not retaliate against him. As such,
19 CalPac respectfully requests this Court grant its motion for
20 summary judgment.

21 **RESPECTFULLY SUBMITTED** this 23rd day of July, 2007.
22

23 **BLAIR STERLING JOHNSON**
   **MARTINEZ & LEON GUERRERO**
24 A PROFESSIONAL CORPORATION
25

26 BY:

   **VINCENT LEON GUERRERO**
27 *Attorneys for Defendant California Pacific Technical
   Services LLC*

V63:49\08130-03
G:\WORDDOC\PLD\VLG\201B-MEMO OF P&A IN SUPP O FMSJ RE R
28 CRUZ RE VAN METER V CALPAC.DOC

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 11 -

Case 1:05-cv-00037   Document 328   Filed 07/23/2007   Page 11 of 45

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA,)Civil Case No. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH  )
T. MENDIOLA, LARRY L. CHARFAUROS, )
ANTHONY C. ARRIOLA, ROBERT B.     )
CRUZ, ROLAND F. MENDIOLA, JAMES S.)
YEE, TEDDY B. CRUZ, JESSE B. CRUZ,)
JOHN L.G. NAUTA, and JOHN P.      )
BABAUTA,                          )
                Plaintiffs,       )
                                  )
          vs.                     )
                                  )
CALPAC, DYNAMIC TECHNICAL         )
SERVICES, MCI, JOHN HEALY, DENNIS )
CLARK, WILLIAM WARD, JAI JAMES and)
DOES 1 through 10,                )
                                  )
                Defendants.       )
_____)

🗐 **COPY**

DEPOSITION OF ROBERT CRUZ

Taken on Behalf of the Defendants

BE IT REMEMBERED That, pursuant to the Guam

Rules of Civil Procedure, the deposition of ROBERT CRUZ was

taken before Veronica F. Reilly, Certified Shorthand

Reporter, on Wednesday, the 7th day of February 2007, at 4:25

p.m. in the Law Offices of Blair Sterling Johnson Martinez &

Leon Guerrero, Suite 1008, Pacific News Building, 238

Archbishop Flores Street, Hagatna, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
E-mail: veronica.reilly@hotmail.com
Case 1:05-cv-00037 Document 328 Filed 07/23/2007 Page 12 of 45

A.    Almost a year and a couple of months.

Q.    So you were discharged in November 2004, so you probably started working around mid 2003? Would that be about right?

A.    Right.

Q.    So for a couple months, you worked with John Taitano and that would be about mid 2003; correct?

A.    Yes, sir.

Q.    Then Don Harper was doing the underground stuff?

A.    Yes, sir, then I transferred over.

Q.    Any other supervisors?

A.    Besides with Don Harper, maybe Henry Quintanilla, Henry Van Meter. Those are the two supervisors I was working with.

Q.    Mr. Quintanilla and Mr. Van Meter?

A.    Yes, sir.

Q.    And Don Harper would supervise those two people; correct?

A.    Yes, sir.

Q.    And then your charge of discrimination alleges that on or about the 25th of November 2004, you were harassed by Dennis Clark; correct?

A.    Yes, sir.

Q.    And in your charge of discrimination, you indicate that Dennis Clark is a representative of MCI; is that

correct?

A.　Uhm --

Q.　It might be cut off.　That's why I'm asking you.

A.　Can you repeat that again?

Q.　I'm reading directly off of your charge of discrimination.　It seems to indicate at least that Dennis Clark was a representative of MCI?

A.　Yes, sir.

Q.　And he was also an employee of Dynamic Technical Services?

A.　Yes, sir.

Q.　Did Henry Quintanilla ever make any remarks to you about your race?

A.　No.

Q.　Did he make any remarks to you about your color?

A.　No.

Q.　Did he make any remarks to you about your national origin?

A.　No.

Q.　Did he retaliate against you at any time?

A.　No.

Q.　The same question with Henry Van Meter.　Did he make any remarks about your race?

A.　No.

Q.　Did he discriminate you based on your race?

A.    No.

Q.    Did he discriminate you based on color?

A.    No.

Q.    Did he discriminate you based on national origin?

A.    No.

Q.    And he never retaliated; correct?

A.    (No response.)

Q.    Did he retaliate?

A.    No.

Q.    The next person going up the chain would be Don Harper?

A.    Yes, sir.

Q.    Did he discriminate against you based on race?

A.    No.

Q.    Did he discriminate against you based on color?

A.    No.

Q.    Did he discriminate against you based on national origin?

A.    No.

Q.    And did he retaliate against you at any time?

A.    No.

Q.    Who's above Don Harper?

A.    John Healy.

Q.    Let's talk about John Healy. Did John Healy ever discriminate against you based on race?

|   |    |                                                       |
|---|----|-------------------------------------------------------|
| l | A. | No.                                                   |
| ? | Q. | Did he ever discriminate against you based on color?  |
| } | A. | No.                                                   |
| ı | Q. | National origin, did he --                            |
| ; | A. | No.                                                   |
| ; | Q. | And he didn't retaliate against you; correct?         |
| ? | A. | No.                                                   |
| } | Q. | Did he retaliate?                                     |
| } | A. | No.                                                   |

Q. Your biggest gripe or the biggest person you have a problem with is Dennis Clark; correct?

A. Yes, sir.

Q. And that's because of the remark that he supposedly made; correct?

A. Yes, sir.

Q. Now, John Healy, did he ever make any remarks about that to you?

A. No.

Q. One of the last questions I asked Mr. Yee was whether John Healy treated him with respect and his response was that Healy did treat him with respect. I'm going to ask you the same thing. Did he treat you with respect?

A. Yes

**MS. LUJAN:** I'm going to object to that last question. First of all, I believe that that's

1       A.   Yes, sir.

2       Q.   And Mr. Healy does not work for, to your knowledge,

3    Dynamic Technical Services; correct?

4       A.   Yes, sir.

5       Q.   I asked you about Mr. Healy and now I'm going to ask

6    you about CalPac.  Do you think CalPac approved of Dennis

7    Clark's actions?

8       A.   No, sir.

9       Q.   When I say actions, I'm referring to the actions

10   that you are referring to in your complaint.  Okay?

11      A.   (Witness nodded head.)

12      Q.   Do you think that CalPac condoned Dennis Clark's

13   actions?

14      A.   No, sir.

15      Q.   Do you think that CalPac authorized any of Clark's

16   actions?

17      A.   Yes, sir.

18      Q.   Yes, sir?

19      A.   (Witness nodded head.)

20      Q.   So you believe that CalPac authorized Clark to say

21   what he said?

22      A.   (No response.)

23      Q.   Your biggest gripe is that he made some statements

24   to you?  Mr. Clark did, right?

25      A.   Right.

1    Q.    My question to you is, do you think CalPac

2    authorized Clark to make those statements to you?

3    A.    Oh, no, sir.

4    Q.    I'm going to jump down to paragraph 116 and it says,

5    the defendants.  Do you see that?

6    A.    Yes, sir, I see it.

7    Q.    When you say defendants, who are you referring to?

8    Is that all the defendants?

9    A.    Yes, sir.

10    Q.    That would be John Healy; correct?

11    A.    No, sir.

12    Q.    So John Healy is not included in the defendants in

13    paragraph 116?

14    A.    (No response.)

15    Q.    I'm not trying to confuse you and I may be confusing

16    and I apologize.  Paragraph 116 says, the defendants, by

17    their harassment and discriminatory actions, created a

18    hostile work environment for Plaintiff R. Cruz; correct?

19    A.    Yes, sir.

20    Q.    Now, I just want to know, when you say defendants,

21    who are you referring to?

22    A.    I was referring to CalPac and John Healy.

23    Q.    You are referring to CalPac and John Healy?

24    A.    (Witness nodded head.)  Yes, sir.

25    Q.    So when you say defendants, you're specifically

CROSS-EXAMINATION

BY MS. McDONALD:

Q.   Mr. Cruz, when you worked at CalPac, what was your typical work day like?  If you can take us from the moment you start your day until the end.

A.   It was a pretty good environment, you know, working with the boys.  The boys were into getting the job done.

Q.   Just let me know, what time would you come to work and where would you go?

A.   We will be -- depending where the job site is going to be, we were usually there before eight.

Q.   You would go directly to the job site?

A.   No, we go straight to the office, then prep up and then head out to the field.

Q.   You're talking about the CalPac office?

A.   Yes, sir.  I mean, yes, ma'am.  Sorry.

Q.   And what happened when you got to the office?  Was there a meeting?  Did you --

A.   No, we just -- our supervisor just tells us what's the game ball, what's the plan.

Q.   And who would those supervisors be?

A.   That's John Thomas, JT.

Q.   Okay.  Anybody else?

A.   At that time, that was him.

Q.   You mean at the time the statements were made?

1       A.    He was the one relaying the information to those

2    guys, what places.

3       Q.    Did Don Harper ever tell you directly what to do?

4       A.    Sometimes.

5       Q.    Okay.  For example?

6       A.    Sometimes he just like say just load the pipes and

7    bring it down to Tiyan and meet Henry and those guys up

8    there.

9       Q.    Do you know if Don Harper reported to anybody else?

10      A.    He has to report to John Healy.

11      Q.    Do you claim that Dennis Clark was your supervisor?

12      A.    No.

13      Q.    When a supervisor told you what to do, did you

14   generally follow those instructions?

15      A.    Yes, ma'am.

16      Q.    Do you know who Dennis Clark reported to?

17      A.    Dynamic Technical Services.

18      Q.    But in terms of a person, do you know who his boss

19   might have been?

20      A.    No, no.

21      Q.    Do you know where Dynamic Technical Services is

22   based?

23      A.    I heard Texas.

24      Q.    Do you know from personal knowledge?

25      A.    No.

A.    We were working on the trench.

Q.    Okay.  Who's we?

A.    Me and the rest of the boys that was there.

Q.    Would those be Teddy Cruz, Henry Van Meter, Henry
Quintanilla, Joe Hernandez, Joe Mendiola and John Thomas?

A.    John Thomas wasn't there but the rest of the guys
were there.

Q.    Anybody else that I didn't mention?

A.    Yes, they had Larry Charfauros, Norman Santos.
That's the only names I can recall so far.

Q.    And you said September '04.  I think on Exhibit A,
it says September 25, '04; would that be the date of the
statement?

A.    Yes.

Q.    So you're working on the trench and what happens?

A.    We're working the trench, I didn't even know he
pulled in.  It was a hot day and he came up and he goes,
"What are you island monkeys doing?"  He just said it out
loud.

Q.    And what happened after that?

A.    After that -- Don Harper was there.  Don Harper --
oh, he pulled him to the side and he was talking to him.  I
don't know what the conversation was about.

Q.    Did anybody respond after he asked the question,
what are you island monkeys doing?

1   the side.

2       Q.   Okay.

3       A.   And then they were talking.  I don't know what they

4   were talking about.

5       Q.   Did you make a complaint to a supervisor?

6       A.   Right there on the spot.  He was right there.

7       Q.   So which supervisor did you complain to?

8       A.   Henry Quintanilla.

9       Q.   What did Mr. Quintanilla say or do?

10      A.   We just made a complaint to him and then I don't

11  know what he did after that.

12      Q.   Did you ever follow-up?

13      A.   No.

14      Q.   And how long did it take for you to make that

15  complaint to Mr. Quintanilla?

16      A.   Not long, he was just right there.  We went up and

17  go, "Hey, H, this person just yelled at us island monkeys and

18  I don't think that's right, you know.  He just said it out

19  loud."  And we made a complaint to him because he was the

20  supervisor on the field and even Don Harper was there when he

21  heard that.

22      Q.   Did you resume work right after?

23      A.   Yes, we went back to work.

24      Q.   And what did Dennis Clark do?

25      A.   He left.

# REPORTER'S CERTIFICATE

DISTRICT COURT OF GUAM    )

I, Veronica F. Reilly, Certified Shorthand Reporter, hereby certify that Robert Curz personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 46, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam, this 25th day of February 2007.

/S/
_____
Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>                Plaintiffs,<br><br>          vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10,<br><br>                Defendants. | CIVIL CASE NO. CIV05-00037<br><br>📄 **COPY** |

## DEPOSITION OF RUSSELL A. HATFIELD

Taken on Behalf of CalPac

      BE IT REMEMBERED That, pursuant to the Guam Rules of Civil Procedure, the deposition of **RUSSELL A. HATFIELD** was taken before Cecille A. Flores, a Certified Shorthand Reporter, on Monday, the 19th day of February 2007, at 10:00 a.m. in the offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

1    is that correct?

2        A    That's correct.  Norman is still there as far as I

3    know.

4        Q    When did you become aware that Norman made a

5    complaint with the EEOC?

6        A    I wasn't aware that he made a complaint.  I don't

7    think I said that.

8        Q    How often was Dennis Clark on the job site?

9        A    Every day.

10       Q    How many hours a day?

11       A    Four hours a day.

12       Q    Where would he be the rest of the time?

13       A    I have no knowledge.

14       Q    How many hours would you spend at the CalPac

15   warehouse on a daily basis?

16       A    Me?

17       Q    Yes.

18       A    Three.

19       Q    How long is a work day for you?  How long was a work

20   day for you at CalPac?

21       A    You want from the time I got up in the morning until

22   the time I went to bed or just physical work?

23       Q    Physically being there at CalPac on the job.

24       A    12 to 18.  I mean, 12 to 14, I'm sorry.

25       Q    What time of the day would you spend those three

1      A    Who I would keep if given a choice of keeping some

2    and letting others go, yes.

3      Q    Now, at the time these people were let go, would

4    people be let go in favor of other employees that were local?

5    Do you understand my question?

6      A    My recommendation has nothing to do with race. The

7    employees that were let go were based on their skill levels

8    and the job requirements that I needed the individuals to do.

9    So if Joe Blow was multi-taskable, I'd put him in this

10   category. If Joe Blow was not, he'd stay over here. If I

11   didn't need his particular skills because we were downsizing

12   at the time because the job was slowing down and you don't

13   keep people on the payroll if you don't have any work for

14   them to do. And that's what we were doing. We were

15   downsizing because the work was slowing down. Yes, there was

16   a long period of work leftover, but we didn't need the

17   humongous payroll and staff that we had at the time.

18     Q    Just for the record, some of the people that stayed

19   on as employees were locals, would that be correct?

20     A    That's correct.

21     Q    I believe you indicated earlier that you weren't

22   aware that various people were filing complaints. You knew

23   there were complaints but you didn't know who they were,

24   would that be correct?

25     A    Uh-huh.

1      Q     I believe that was in reference to -- I believe you

2   indicated Norman Santos, correct?

3      A     I think she was talking about James Lee.

4      Q     James?

5      A     Yee or Lee or whatever his name was.  I made the

6   statement that James -- until I got here and I saw it right

7   here, James, down as a defendant.  I have -- to this day,

8   other than what's on this piece of paper is the only people

9   that I know have filed a suit.

10     Q     You're referring to the Plaintiffs in this lawsuit?

11     A     That's correct.

12     Q     In your opinion, were the service of the people that

13  were let go around November of 2004, were their services

14  needed at CalPac?

15     A     The ones that were let go, no.

16     Q     So when you're saying let go, they weren't

17  necessarily fired, would that be correct?

18     A     Nobody was fired.  Everybody was laid off with the

19  understanding that if work picked up and if we needed your

20  skills back, that you would be given first opportunity to

21  accept the job if you so desired it.

22     Q     And it wouldn't be unusual for somebody to be let go

23  at CalPac and then later picked up?

24     A     No.

25     Q     Did you actually observe that situation?

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for
Guam, do hereby certify that on the 19th day of February,
2007 at the hour of 10:00 a.m. there appeared before me
**RUSSELL A. HATFIELD** at the law offices of Blair Sterling
Johnson Martinez & Leon Guerrero, 238 Archbishop Flores
Street, Hagatna, Guam. The witness herein, produced to give
his deposition in the within-numbered Civil Case No.
CIV05-00037; that prior to examination the witness was by me
duly sworn upon his oath; that thereafter the transcript was
prepared by me or under my supervision, and the original
deposition transcript was presented to Mr. Leon Guerrero's
office for the deponent's review, corrections, if any, and
execution.

I further certify that I am not a relative,
employee, attorney or counsel of any of the parties, nor a
relative or employee of such attorney or counsel, and that I
am not directly or indirectly interested in the matters in
controversy.

In testimony whereof, I have hereunto set my
hand this 5th day of March, 2007.

_____

Cecille A. Flores

## IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )        *ORIGINAL*
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                Plaintiffs,      )
                                 )
        vs.                      )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                Defendants.      )

### DEPOSITION OF DONALD J. HARPER

Taken on Behalf of California Pacific Technical Services

BE IT REMEMBERED That, pursuant to the Federal
Rules of Civil Procedure, the deposition of **DONALD J. HARPER**
was taken before Cecille A. Flores, a Certified Shorthand
Reporter, on the 16th and 20th days of February 2007, in the
offices of Blair Sterling Johnson Martinez & Leon Guerrero,
Suite 1008, Pacific News Building, 238 Archbishop Flores
Street, Hagatna, Guam.

1      Q    Were your responsibilities limited to the MCI
2  contract?  Did you have other responsibilities as well?
3      A    I had a few other responsibilities at the time.
4      Q    What percentage of your time was devoted to the MCI
5  contract would you say?
6      A    95 percent.
7      Q    95 percent?
8      A    Guessing.
9      Q    Can you describe for us what the MCI contract was?
10     A    It was to install a fiber optic connection from the
11 MCI building in Agana to NCTAMS NASA complex.
12     Q    What was the route they took to get from MCI here in
13 Agana?
14     A    Up through Agana, through Tiyan, down the cliffline
15 through Harmon Industrial Park, back through the back road of
16 Fatima, come up Route 1, down Route 3, back through the
17 jungle into NCTAMS.
18     Q    Did the MCI project, was it divided into phases or
19 how did it go?
20     A    I believe it was -- I think there were three phases.
21 They called them three phases, yes.
22     Q    Do you remember what the three phases were?
23     A    Yeah, it wasn't really -- I don't know if there was
24 a contractual breakdown, but I know when it was broken down
25 into phases of making it through Agana.  It was kind of a

1      A     Just, I guess, for what an owner does.

2      Q     But he wasn't involved in the day-to-day operations

3   of the company?  That was you and Bob and Tim?

4      A     No, he was aware of the day-to-day.  There was daily

5   communication with him.  I mean, other than that, that's as

6   close as it got.

7      Q     Did he do the job interviews with the prospective

8   laborers?

9      A     No, I don't believe so.

10     Q     Who did that?

11     A     Either be me, Bob or Tim Camacho or Tim Camacho's

12  replacement and I can't remember his name.  After that.

13     Q     What was the role of Dennis Clark?

14     A     Dennis Clark was -- he was a representative of MCI.

15  He was basically quality control, I would guess.  For MCI.

16  He was there to make sure that the product was installed per

17  their specifications.

18     Q     You had MCI provide a set of specifications you were

19  supposed to follow?

20     A     Yes.

21     Q     Describe how those were presented to you.

22     A     Drawings with details.

23     Q     Do they also have a manual of specifications?

24     A     Not really.  Not that I know of.

25     Q     So you say he was the quality control.  Was he then

1    Q    Why aren't you on the site that day?

2    A    I was in the office doing some report for John

3    Healy.

4    Q    Do you remember when or about that was time wise?

5    A    No, I don't. I mean, it's no --

6    Q    Was it still in Phase 1 or one of the later phases?

7    A    I think that's kind of the Phase 2. I'm -- I can't

8    really remember but --

9    Q    So you don't recall the date?

10   A    No.

11   Q    Who was the employee that called you?

12   A    Henry Quintanilla.

13   Q    What did Henry Quintanilla tell you to the best as

14   you can recall?

15   A    When I arrived on site, I guess there was a deep

16   excavation area that Dennis wanted things to move faster,

17   didn't like the way they was doin' it and referred to them as

18   monkeys at this time, I believe. It was just a phrase

19   "monkeys" and they didn't like it so I had conversation with

20   Dennis.

21   Q    Was it a heated conversation?

22   A    Yeah, it kind of got heated because he took it -- I

23   tried to keep it on a professional -- look, just don't treat

24   them this way, don't talk to people this way and -- yeah,

25   there was a lot of arrogance.

1    Q    When was the next incident that you can recall that
2  you had a disagreement with Mr. Clark?

3    A    I believe -- I'm not sure but I believe it was -- we
4  were on the back part of NCTAMS coming through the jungle
5  because there was an area that conduit was installed and they
6  called me, the same thing, and we were pulling fiber.

7    Q    You weren't there that day either?

8    A    I was en route.  We were setting up for a fiber pull
9  and nobody had started yet.

10   Q    Who called you that time or told you about it?

11   A    I think it was Van Meter at this time.

12   Q    Who is Van Meter?

13   A    Henry Van Meter.

14   Q    Who was Henry Van Meter?

15   A    Henry Van Meter was another one that was not a
16  foreman but he was kind of like a lead man.  If the crew
17  broke away, they were working a different area, he had the
18  responsibility of leadership of certain guys.

19   Q    Henry, his title wasn't foreman?

20   A    I don't believe so but I'm not sure.

21   Q    Did you hire Henry Van Meter also?

22   A    You know, I didn't directly hire anybody.  I didn't
23  have the authority to, in my opinion, but I was part of the
24  interview of Henry Van Meter.

25   Q    Who else interviewed?

1    before was left in the right condition, and part of my job is

2    to explore the job ahead in advance to make sure that when

3    they leave that job site that day, of course they're

4    advancing forward and the reason for my performance was to be

5    on site so I covered kind of a wide area.

6        Q    How many lead men or foremen did you have?

7        A    Henry Quintanilla, Henry Van Meter, and basically as

8    guys that were left with any responsibility, I think they

9    were the only two.

10       Q    Was there a very high turnover of workers?

11       A    No.

12       Q    Did CalPac have to hire additional workers to do the

13   MCI project?

14       A    Yes.

15       Q    How many do you recall they had to hire?

16       A    I don't know.

17       Q    15, 20?  25?

18       A    I'd be guessing.  I'd just be guessing.

19       Q    When you interviewed these people, did you tell them

20   they were being hired for that specific job or just hired

21   generally?

22       A    I don't know that the name of the job was ever

23   mentioned to them, but their job role of what they would be

24   doing was explained.

25       Q    What was supposed to happen to them once the project

1     Q     Why do you say that?

2     A     Because he was.  It was my opinion.  I just feel he
3     was arrogant.

4     Q     Did he ever say anything that made you think he was
5     arrogant?

6     A     It was just arrogance.  Yeah, I guess he said a lot
7     of things, obviously, that made me feel that way but I can't
8     pinpoint one isolated situation.  It was just being around
9     somebody for long enough in a working condition that you feel
10    that attitude superiority and he felt like he was working in
11    a third world all the time.

12    Q     Did he ever say anything like that?

13    A     Yes.

14    Q     What did he say?

15    A     He just referred to Guam as being very backwards and
16    he would make comments about another job he did somewhere
17    else.  I may be wrong about South America and he would
18    compare it to that.

19    Q     Have you ever made any verbal threats to Dennis
20    Clark?

21    A     Yes.

22    Q     Could you tell us about the first time you made a
23    verbal threat to him?

24    A     I think I told him that one time I -- I forget what
25    I said.  Get off my job or I'll whoop your ass or something.

## REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand
Reporter, hereby certify that **DONALD J. HARPER** personally
appeared before me at the time and place set forth in the
caption hereof; that at said time and place I reported in
stenotypy all testimony adduced and other oral proceedings
had in the foregoing matter; that thereafter my notes were
reduced to typewriting under my direction; and the foregoing
transcript, pages 1 to 188, both inclusive, constitutes a
full, true, and correct record of such testimony adduced and
oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd
day of March 2007.


Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                 Plaintiffs,     )
                                 )
        vs.                      )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                 Defendants.     )

⊿ COPY

## DEPOSITION OF NORMAN S. SANTOS

Taken on Behalf of Defendant CalPac

        BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **NORMAN S. SANTOS**

was taken before Cecille A. Flores, a Certified Shorthand

Reporter, on Friday, the 13th day of April 2007, at 3:00 p.m.

in the offices of Blair Sterling Johnson Martinez & Leon

Guerrero, Suite 1008, Pacific News Building, 238 Archbishop

Flores Street, Hagatna, Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96913
Tel: (671) 734-1041 * Fax: (671) 734-1045

Case 1:05-cv-00037   Document 328   Filed 07/23/2007   Page 37 of 45

1    Q    How long have you been working at CalPac?

2    A    Going for three years.

3    Q    So you started working at CalPac in 2004?

4    A    Yeah.

5    Q    What is your position now at CalPac?

6    A    Used to be Laborer.  Now I'm a Supervisor in the

7  field.

8    Q    When did you become a Supervisor at CalPac?

9    A    One year, three months.

10   Q    So 2006 you became a Supervisor, is that about

11 right?

12   A    Two years after.  A year and a half.  One year, four

13 months.

14   Q    So around 2006, correct?

15   A    Yeah.

16   Q    So from 2004 through 2006 you were a Laborer?

17   A    Yeah.

18   Q    Somewhere around there, right?

19   A    Uh-huh.

20   Q    What was your wage as a Supervisor?  What is your

21 wage?

22   A    11.50.

23   Q    As a Laborer, how much were you making?

24   A    Used to be $6.  Two months later they give $9.

25   Q    When was that?

1   on them.  The two guys laid off, the company gonna be going

2   slow.

3        Q    How long has CalPac had that policy?  As long as

4   you've been working there?

5        A    No.

6        Q    So how long?

7        A    That's a new policy.

8        Q    What about in 2004?  Did they have a policy about

9   showing up --

10       A    No, no.

11       Q    Earlier you filed a charge of discrimination with

12   the EEOC, correct?

13       A    Yes.

14       Q    That was about the time I guess the other

15   Co-Plaintiffs were filing?

16       A    Yes.

17       Q    The same time they were filing with the EEOC?

18       A    Yes.

19       Q    I think there was something that was filed with the

20   EEOC around February 2005.  Did Don Harper help you file the

21   charge of discrimination?  Do you remember?

22       A    Yes.

23       Q    Did Mr. Harper help you file it?

24       A    He help us to call Hawaii.

25       Q    Then you used his fax machine?

1    the complaint and the time you withdrew it?  Do you know how

2    many months or weeks that was?

3         A    Almost a year.

4         Q    Almost a year that you had a complaint with the

5    EEOC?

6         A    Uh-huh.

7         Q    During that time you were still employed at CalPac?

8         A    Yes.

9         Q    Did anybody at CalPac say anything to you about your

10   complaint?

11        A    No.

12        Q    No?  They let you work?

13        A    (Witness nodded head.)

14        Q    Did you feel that you were treated unfairly when you

15   were working at CalPac during that one year?

16        A    No.

17        Q    We were talking to Mr. Leon Guerrero about a meeting

18   that was held at CalPac when Dennis Clark said he never made

19   the statements.  Do you recall that?

20        A    Yes.

21        Q    During that meeting, did anybody at CalPac, the

22   management, ever say if you make a complaint you'll get fired

23   or you'll --

24        A    No.

25        Q    Nobody said that?

# REPORTER'S CERTIFICATE


I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **NORMAN S. SANTOS** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 51, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 18th day of May 2007.


Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for
Guam, do hereby certify that on the 13th day of April, 2007
at the hour of 3:00 p.m. there appeared before me **NORMAN S.
SANTOS** at the law offices of Blair Sterling & Johnson, Suite
1008, Pacific News Building, 238 Archbishop Flores Street,
Hagatna, Guam. The witness herein, produced to give his
deposition in the within-numbered Civil Case No. CIV05-00037;
that prior to examination the witness was by me duly sworn
upon his oath; that thereafter the transcript was prepared by
me or under my supervision, and the original deposition
transcript was presented to Mr. Leon Guerrero's office for
the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative,
employee, attorney or counsel of any of the parties, nor a
relative or employee of such attorney or counsel, and that I
am not directly or indirectly interested in the matters in
controversy.

In testimony whereof, I have hereunto set my
hand this 18th day of May, 2007.

_____

Cecille A. Flores

VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

## IN THE DISTRICT COURT OF GUAM

|  |  |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE. TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. CIV05-00037 <br><br><br> **DECLARATION OF JOHN T. HEALY IN SUPPORT OF EACH OF CALPAC'S MOTIONS FOR SUMMARY JUDGMENT** |

I, **JOHN T. HEALY**, under penalty of perjury, do hereby declare and state as follows:

1.    I am a shareholder of California Technical Services LLC ("CalPac") and its Vice President whose duties include, the field operation of CalPac.

2.    Included within Calpac's field operation is the "underground crew" of which plaintiffs were formerly employed.

//

3.    In early 2004, CalPac was working on a contact with MCI to lay fiber optics.

4.    The MCI contract was initially to be completed in December 2004.

5.    CalPac hired additional laborers to assist the underground crew in the completion of the MCI project.

6.    The vast majority of the underground crew were of Chamorro descent.

7.    In the latter part of 2004, CalPac essentially had one contract (i.e. the MCI Contract) which was nearing completion.

8.    Although the MCI contract was not officially completed until June/July of 2005, the services of most of the laborers were no longer needed.

9.    CalPac laid off employees based on economic reasons.

10.   James Yee and Robert Cruz were not laid off, rather they were terminated for cause.

11.   Joseph Hernandez was hurt on the job and received Worker's Compensation.  He is officially on CalPac's books.

12.   After the lay offs were completed, the vast majority of the remaining underground employees were of Chamorro descent.

13.   Sometime in December, 2004, I became aware that some employees were claiming they were being discriminated against based on Clark's purported remarks.  A meeting was called to answer any questions and alleviate any concerns, concerning Clark's statements.  CalPac did not threaten.

ıR STERLING JOHNSON
ıTINEZ & LEON GUERRERO
PROFESSIONAL CORPORATION
T. 1008 PACIFIC NEWS BUILDING
ARCHBISHOP F.C. FLORES STREET
ıATNA, GUAM 96910-5205
EPHONE: (671) 477-7857

- 2 -

1    I declare under penalty of perjury and the laws of the

2   United States that the foregoing statements are true and correct.

3

4   DATED: JULY ___, 2007

5                                         JOHN T. HEALY

6

7   V63\-08130-03
    G:\WORDDOC\PLD\VLG\194-DECLARATION OF JOHN HEALY RE VAN METER
8   ET AL V CALPAC ET AL.DOC

AIR STERLING JOHNSON
RTINEZ & LEON GUERRERO
PROFESSIONAL CORPORATION
ITE 1008 PACIFIC NEWS BUILDING
1 ARCHBISHOP F C FLORES STREET
GATNA, GUAM 96910-5205
LEPHONE: (671) 477-7857