VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

**FILED**

DISTRICT COURT OF GUAM

JUL 23 2007 nba

**MARY L.M. MORAN**
**CLERK OF COURT**

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. CIV05-00037 <br><br> **MEMORANDUM PF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE JAMES S. YEE** |

**INTRODUCTION**

This is a lawsuit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* James S. Yee's ("Yee") claims arise out of purported statements made by Dennis Clark ("Clark")[1] who, Yee acknowledges, was neither a co-employee of the plaintiffs nor an employee of California Technical Services, LLC ("CalPac"). Clark, in fact, was MCI's owner

---

[1] For the purpose of this Motion only, CalPac will assume Clark made the purported statements.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Case 1:05-cv-00037     Document 331     Filed 07/23/2007     Page 1 of 54

ORIGINAL

1 representative hired to ensure CalPac performed according to the
2 terms of the contract.

3 Yee alleges that on two occasions (once in September and
4 once in October), Clark called him and his fellow co-workers
5
6 "monkeys" or "island monkeys." Yee claims that he immediately
7 reported the statements to his supervisor after each incident,
8 and that CalPac retaliated and discharged him in March of 2005.
9 However, it is CalPac's position that Yee was terminated because
10 he was not showing up for work.

11 To the extent co-defendant Dynamic Technical Services
12 ("DTS") asserts there was no hostile environment, CalPac hereby
13
joins in such motion. Further, CalPac now moves for summary
14
15 judgment on all issues alleged against CalPac by Yee.

16 **FACTS**

17 CalPac acquired a contract from MCI to lay fiber optic
18 cables on Guam. The MCI project entailed laying fiber optic
19 cable from Hagatna to NTCAM. Harper Deposition at p. 11.
20 Initially, the MCI project was scheduled to be completed around
21 December, 2004. See Healy Declaration. Clark was designated as
22 MCI's representative charged with ensuring CalPac complied with
23 the terms of the contract. Harper Deposition at p. 15.
24
25 **It is not disputed that Clark was never an employee of**
26 **CalPac.** Yee Deposition at p. 69; also Harper Deposition at p.
27 15. In deed, it was Yee's belief that everyone knew Clark was
28 employed by DTS. Yee Deposition at p. 67-69. It was also Yee's

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÁTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 2 -

belief, and not disputed by CalPac, that MCI was CalPac's customer. Yee Deposition at p. 67.

In order to meet the terms of the MCI contract, CalPac hired additional laborers to trench and lay cables. Healy Declaration. Initially, the MCI project was scheduled to be completed around December, 2004. Healy Declaration. As the project neared completion, CalPac began to lay-off its employees since the MCI project was the only remaining major contract that CalPac had. Healy Declaration

Yee, one of the plaintiffs herein, began working for CalPac around August, 2004. Yee Deposition at p. 12; also See First Amended Complaint filed February 24, 2006 ("Complaint") and Charge of Discrimination ("EEOC Charge") attached as Exhibit "I" to Yee Deposition. Through the EEOC Charge, Yee stated he was hired to **assist in the underground installation of cable for MCI**. See EEOC charge.

Yee was part of the field crew of CalPac. Most, if not all employees, of the field crew were local hires of Chamorro descent. See Healy declaration. Because of the MCI contract, CalPac had to hire additional employees. Harper Deposition at p. 25. Around November, 2004, CalPac began downsizing because the work was slowing down. Hatfield Deposition at p. 75. Because of the reduced amount of work, the services of many of the employees were no longer needed. Hatfield Deposition at p.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE (671) 477-7857

76.   Yee, however, was not laid off.   CalPac repeatedly warned Yee about driving heavy equipment at an excessive speed and in an unsafe manner and that further incidents could result in his release from employment.   Yee Deposition at p. 53.   Indeed, Harper's   successor   as   project   manager,   Russell   Hatfield, recognized Yee's skills as an operator but also recognized that **his methods were dangerous**.   Hatfield Deposition at p. 82.

On January 26, 2005, Yee was given written warning that failure to follow company policies would result in his release from employment.   See Exhibit "G" ("Written Warning to Yee") attached to Yee Deposition.   In   March, 2005, CalPac released Yee for cause. Yee Deposition at p. 54.   Yee acknowledged CalPac's change of status form.   Exhibit "H" attached to Yee Deposition.   The change of status form stated, among other things, that "[o]n March 28, 2005, James Yee failed to show for work or call.   He has been released for 'no-call-no show.'"   See change of status form.   Yee did not protest his release.   Yee Deposition at p. 54.

Through Yee's complaint, Yee alleged that Clark (an employee of DTS and not of CalPac), harassed Yee by calling Yee a "monkey" or "island monkey."   See Par. 133 of the Complaint; Also see Yee Deposition at p. 20.

Yee alleged that the purported statements occurred around September and October.   See Para. 133 of the Complaint; Also see

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1 Yee Deposition at p. 20. Yee claims to have notified CalPac of
2 the treatment received from Clark. See Para. 134 of the
3 Complaint; Also see Yee Deposition at p. 20. This notification
4 purportedly was done through the chain of command. See Yee
5 Deposition at p. 24. Don Harper, whose duties included
6 coordinating with the CalPac's customers, testified that he was
7 informed of three incidents wherein Clark would refer to the
8 employees as monkeys. Harper Deposition at p. 22.
9

10 The first report purportedly resulted in Harper and Clark
11 having a heated discussion about the way to talk to people.
12 Harper Deposition at p. 22. It was Harper's impression that it
13 was just a phrase 'monkeys' and they [the crew] didn't like it."
14 Harper Deposition at p. 22. The second incident purportedly
15 resulted in the same action by Harper. Harper Deposition at p.
16 23. On the third and final incident, Harper purportedly
17 23. On the third and final incident, Harper purportedly
18 threatened Clark and told him to "get off my job or I'll whoop
19 your ass or something." Harper Deposition at p. 96.

20 Although Harper claims to have informed Healy, Healy denies
21 being informed about such statements until the protests began.
22 Bill Ward, CalPac's general manager, testified that he was never
23 informed about the statements until the December meeting.
24

25 Through his Complaint at Par. 136, Yee alleged that a
26 meeting on December, 2004 took place informing CalPac employees
27 that they would be terminated if they complained to authorities.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 5 -

1  Yee, in fact did not attend the meeting. Yee Deposition at p.

2  87. Hatfield, a disinterested witness,[2] testified that Healy

3  called the meeting to answer any questions concerning the

4  allegations of discrimination. Hatfield Deposition at p. 9.

5  Hatfield further testified that Healy stated that he was unaware

6  of any complaints of discriminatory remarks and that Healy

7  encouraged employees to report such remarks to management or the

8

9  EEOC.

10    The atmosphere was appropriately described by Yee during

11  his deposition.

12        Q.   But you at least felt comfortable to ask him for
             an advance
13

14        A.   I had to.  I had no other choice.

15        Q.   And did he treat you with respect when you were
             asking him for an advance?
16

17        A.   Same way I treated him, with respect.

18        Q.   So **he treated you with respect** is what I'm
             asking?
19

20        A.   **Yes**

21        Q.   You said he was the overall, basically in charge
             of CalPac?
22

23        A.   He was the owner.  (emphasis added.)

24  Contrary to Yee's belief, certain CalPac's management were

25  unaware of which employees made complaints. As an example,

26

27  _____

[2]   Hatfield, a Caucasian, left CalPac in June 2005 due to the winding down
of CalPac's projects and unavailability of work.  Hatfield Deposition at p.
28  17.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE. (671) 477-7857

- 6 -

1 Hatfield was did not know that Norman Santos filed a complaint
2 with the EEOC. Hatfield Deposition at p. 70. Through Norman
3 Santos' deposition it is undisputed that Santos worked for
4 CalPac in 2004 (Santos Deposition at p. 12); filed an EEOC
5 complaint for discrimination (Santos Deposition at p. 27); and
6
7 withdrew his EEOC complaint almost a year later (Santos
8 Deposition at p. 33). As of April 2007, Norman Santos remained
9 an employee with CalPac. Santos Deposition at p. 12.

10 **LAW**

11 Summary judgment is appropriate "if the pleadings,
12 depositions, answers to interrogatories and admissions on file,
13 together with the affidavits, if any, show that the moving party
14 is entitled to judgment as a matter of law." FED.R.CIV.P. 56.
15
16 The moving party bears the initial burden of showing the Court,
17 by reference to materials on file, that there are no genuine
18 issues of material fact that should be decided at trial. *Celotex*
19 *Corp. v. Catrett*, 477 U.S. 317 (1986). When a moving party has
20 discharged its burden, the non-moving party must then "go beyond
21 the pleadings," and by its own affidavits, or by "depositions,
22 answers to interrogatories, and admissions on file" designate
23 specific facts showing there is a genuine issue for trial.
24 *Celotex*, 477 at 324.
25

26 In determining whether the moving party has met its burden
27 of establishing that no genuine issue of a material fact exists
28 and that it is entitled to judgment as a matter of law, the

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 7 -

1 Court must draw inferences from the evidence in a light most
2 favorable to the nonmovant, in this case the Plaintiff, and
3 resolve all reasonable doubts in that party's favor. *Matsushita*
4 *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587
5 (1986). A material fact is one "that might affect the outcome
6
7 of the suit under the governing law." *Anderson v. Liberty*
8 *Lobby, Inc.*, 477 U.S. 242 (1986). A disputed fact presents a
9 genuine issue "if the evidence is such that a reasonable jury
10 could return a verdict for the non-moving party. *Id*.

11 Where the moving party does not bear the burden of proof on
12 an issue at trial, the moving party may discharge its burden of
13 production by either of two methods. *Nissan Fire & Marine Ins.*
14 *Co., Ltd., v. Fritz Cos., Ins.*, 210 F.3d 1099, 1106 (9th Cir.
15
16 2000). The moving party may produce evidence negating an
17 essential element of the nonmoving party's case, or, after
18 suitable discovery, the moving party may show that the nonmoving
19 party does not have enough evidence of an essential element of
20 its claim or defense to carry its ultimate burden of persuasion
21 at trial. *Id*.
22
## I. RACIAL HARASSMENT – HOSTILE ENVIRONMENT
23
### 1. CALPAC SHOULD NOT BE LIABLE FOR THE ACTIONS OF A THIRD PARTY
24
In the instant case, Yee alleges that a non-employee of
25
CalPac called him a "monkey" or "island monkey" on two
26
occasions. In order for an employer to be found liable for
27
28 third party harassment, an employer must ratify or condone the

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5206
TELEPHONE (671) 477-7857

- 8 -

conduct by failing to investigate and remedy it after learning of it. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002). Assuming for the sake of this motion that complaints were made to Harper, Harper testified that he confronted Clark about the statements. After the third complaint to Harper, Harper threatened Clark and kicked Clark off the job site. Most importantly, there were no further complaints and the situation was remedied. Clearly, although Healy and Ward may have not known of the actions by Harper, action was taken nonetheless. CalPac, therefore, should not be liable for the actions of Clark.

### 2. PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT

The Supreme Court has repeatedly stated that Title VII **does not set forth "a general civility code for the American workplace**." (Emphasis added.) *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *Burlington Northern & Santa Fey Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006). Judicial standards for harassment must **"filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language**, gender-related jokes, **and occasional teasing.'"** *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998). Although CalPac concedes that referring to an employee as an island monkey may be offensive, these remarks, under the circumstances, do not qualify for Title VII protection.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 9 -

"**Conduct that is not so severe or pervasive enough to create an objectively or abusive work environment...is beyond Title VII purview**." (Emphasis added.) *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993).

In order to state a claim for hostile environment, Yee must show that: (1) he was subject to verbal or physical conduct based on race or national origin; (2) that the conduct was unwelcomed; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and created an abusive environment. *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment, for the purposes of Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d. 1027 (9th Cir. 2005). In determining whether conduct was sufficiently severe or pervasive, courts look at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening, or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

an accumulation of discrete instances of harassment.   *See Nat'l*

*R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)

("Hostile environment claims are different in kind from discrete

acts.   Their very nature involves repeated conduct.... Such

claims are based on the **cumulative effect** of individual acts").

(Emphasis added.)   *Spriggs v. Diamond Auto Glass*, 242 F.3d 179,

184 (4th Cir. 2001).

Yee alleges that Clark directed two statements at him during his tenure at CalPac.   There is no allegation that Clark physically threatened Yee.   This is not a situation where an employee shows up to work and is subjected to a barrage of rude or offensive remarks.   Further, there is no showing that the purported remarks altered the terms and conditions of Yee's employment.   Indeed, Yee testified that his duties and pay remained the same.

This is a situation where a third party may have made three or four rude remarks of which Yee may have heard two.   Clearly, Yee failed to establish the frequency required to establish a claim under Title VII especially in light of the allegation that the remarks were not made by CalPac employees.

### 3.   CALPAC DID NOT RETALIATE AGAINST YEE

Title VII's anti-retaliation provision forbids an employer from "discriminate[ing] against an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted or participated

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Case 1:05-cv-00037    Document 331    Filed 07/23/2007    Page 11 of 54

in" a Title VII proceeding or investigation. 42 U.S.C. §§ 2000e-3(a). **This provision, however, "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant**...to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination. (Emphasis added.) *Burlington Northern & Santa Fey Ry. Co. v. White*, 126 S.Ct. 2405, 2409 (2006).

An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. LINDEMANN & P. GROSSMAN, *Employment Discrimination Law*, 669 (3d ed.1996) (noting that "courts have held that **personality conflicts at work that generate antipathy**" and **"'snubbing' by supervisors and co-workers"** are **not actionable** under § 704(a)). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. (citations omitted.) It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid.* And normally **petty slights, minor annoyances, and simple lack of good manners will not create such deterrence**. (emphasis added.) *Burlington, at* 2415.

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F C. FLORES STREET
HAGÁTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

If the plaintiff makes a prima facie case, the burden of production shifts to the defendant to present a legitimate, non-retaliatory reason for the adverse action. *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000); *Cassimy v. Board of Education of the Rockford Public School, Dist. #205 (7th Cir. 2006).* If the defendant carries this burden, the plaintiff "must demonstrate a genuine issue of material fact as to whether the reason advanced by the [defendant] was a pretext." *Brooks, supra.*

In Yee's deposition, Yee testified that CalPac retaliated by being snubbed by Ward. He testified after the December meeting, "I would always greet everybody in the morning. It's a manly thing to do...and I say good morning and you ignore me, I don't feel right." Yee Deposition at p. 47. Yet, Yee admitted that Ward's superior, Healy, treated him with respect. This type of perceived bad manners is simply not the type of conduct that Title VII was designed to prohibit.

Finally, Yee claims he was "wrongfully and unlawfully constructively terminated by CalPac." Complaint at Paragraph 141. Yee, however, admitted in his deposition that he did not report to work and that CalPac told him that he was being terminated for cause. Yee did not dispute that the charges. The decision to terminate Yee was not based on Yee's complaints.

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÁTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 13 -

Rather the termination was based Yee's failure to report to work.

**CONCLUSION**

Liability for hostile environment requires a showing that the action was severe and pervasive. For the reasons stated above, it is respectfully suggested that the two remarks heard by Yee were not severe or pervasive enough to be protected under Title VII. Assuming the remarks were severe and pervasive, third party discrimination requires a showing that CalPac condone or authorized the act. Such was not done.

Concerning Yee's claims for retaliation, Yee's discharge was based on reasons unrelated to any purported complaint made. Simply stated, Yee's actions of not reporting to work should not be protected under Title VII. As such, CalPac respectfully requests this Court grant its motion for summary judgment.

**RESPECTFULLY SUBMITTED** this 23rd day of July, 2007.

**BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO**
A PROFESSIONAL CORPORATION

BY: _Vincent Leon Guerrero_
**VINCENT LEON GUERRERO**
*Attorneys for Defendant California Pacific Technical
Services LLC*

V63:49\08130-03
G:\WORDDOC\PLD\VLG\197B-MEMO OF P&A IN SUPP OF MSJ RE YEE
RE VAN METER V CALPAC.DOC

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA,) Civil Case No. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS, )
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES S.)
YEE, TEDDY B. CRUZ, JESSE B. CRUZ,)
JOHN L.G. NAUTA, and JOHN P. )
BABAUTA, )
               Plaintiffs, )
 )
      vs. )
 )
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS )
CLARK, WILLIAM WARD, JAI JAMES and)
DOES 1 through 10, )
 )
            Defendants. )

🗐 **COPY**

## DEPOSITION OF JAMES S. YEE

Taken on Behalf of the Defendants

        BE IT REMEMBERED That, pursuant to the Guam
Rules of Civil Procedure, the deposition of JAMES S. YEE was
taken before Veronica F. Reilly, Certified Shorthand
Reporter, on Wednesday, the 7th day of February 2007, at
10:00 a.m. in the Law Offices of Blair Sterling Johnson
Martinez & Leon Guerrero, Suite 1008, Pacific News Building,
238 Archbishop Flores Street, Hagatna, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Case 1:05-cv-00037 Document 104 Filed 07/23/2007 Page 15 of 54
E-mail: veronica.reilly@hotmail.com

A.   Benavente.  And the last four are from Annaliza.

Q.   Can you spell Annaliza, please?

A.   A-N-N-A-L-I-Z-A Mafnas.

Q.   Are you currently living with Ms. Mafnas?

A.   No.

Q.   Did you at any time live with Ms.--

A.   Oh, yes.

Q.   How long did you live with her?  What time frame?

A.   That was before we separated.  That was -- geez, that was in Yigo -- We lived together for six years up there in Yigo and we were living at my mom's place at her residence maybe you can say another two years before.

Q.   What time frame was that?

A.   The twins were born.  That was nine years ago, so probably from 2002 back to maybe what, '96, I think.

Q.   So let me just back up a second.  When did you start working with CalPac or for CalPac?

A.   That was three years ago.

Q.   We're now at February 2007.  Are you saying around February 2004 that you started working for CalPac?

A.   The year is probably -- four is when I started, '04, up to maybe -- I don't remember this.

Q.   In your complaint, it says you were terminated around March or April 2005.  Would that be about right?

A.   About eight months after August.  Yeah, about March,



September to October 2004 thereafter, while plaintiffs were
under the supervision of Defendant Clark, Plaintiff Yee,"
that would be you, "was harassed and discriminated against on
the basis of his race, national origin and color by Defendant
Clark, who called Plaintiff Yee and other plaintiffs, island
monkeys or monkeys"?

     A.    Right.

     Q.    That would be a correct allegation?

     A.    (Witness nodded head.)

              MR. PEREZ:  You have to say yes or no.

              THE WITNESS:  Oh, yes, yes.

BY MR. LEON GUERRERO: (CONTINUING)

     Q.    Paragraph 134 reads, "Due to Defendant Clark's
discriminatory action, Plaintiff Yee notified and complained
to or caused to be notified and complained to Defendant
CalPac and Healy about the discriminatory and disparate
treatment experienced by plaintiffs."  Do you see that
paragraph?

     A.    Uh-huh.

     Q.    That's correct?  That allegation is correct?

     A.    Yes, to CalPac.

     Q.    Let's stop there at this point.  That paragraph
seems to indicate that you complained to CalPac about the
statements that Defendant Clark made; correct?

     A.    Correct.

complained to Henry Van Meter? Or everybody else complained
--

    A.    Yeah, we all did.

    Q.    What did Mr. Van Meter say?

    A.    He just, well, okay, he nodded his head all right,
that wasn't right.

    Q.    And earlier you indicated you complained to Van
Meter because he was the supervisor?

    A.    Yes, he's a field supervisor.

    Q.    Did he tell you what he would do?

    A.    No, he didn't say what he was going to do.

    Q.    Did he take down any notes?

    A.    Not in front of me, no.

    Q.    Do you know if he ever prepared a memo bringing up
your complaints or your concerns?

    A.    Excuse me?

    Q.    Do you know if Mr. Van Meter ever prepared a memo or
anything in writing saying or discussing about your
complaints?

    A.    I don't know any of that.

    Q.    With the exception of what Mr. Van Meter filed, you
don't know if he wrote anything else. Would that be correct?

    A.    I guess. What he filed?

    Q.    Mr. Van Meter is a co-plaintiff in this case;
correct?

to conflict of interest; do you have a problem with that one?

A.    No.

Q.    Then my last exhibit, I believe, I'll have is the last two coming up.

(Exhibit G marked.)

BY MR. LEON GUERRERO: (CONTINUING)

Q.    I'm handing you what has been marked as Exhibit G. If I can get the other exhibit back.  Mr. Yee, have you ever seen Exhibit G before?

A.    I don't recall but I see I signed it.

Q.    It's signed by Max R. Long.  Do you see that?

A.    Uh-huh.

Q.    And there seems to be another signature there dated January 27, 2005.  Do you see that?

A.    Yes.

Q.    Is that your signature?

A.    Yes.

Q.    So it appears that you did receive a copy of Exhibit G before; correct?

A.    Correct.

Q.    It appears that Exhibit G is a memo going to your personnel file dealing with problems with -- I guess associated with your driving of CalPac equipment.  Would that be correct?

A.    Right.

Q.   And in the third paragraph, it says, Final Warning;
do you see that?

A.   Yes.

Q.   And you do recall receiving this thing; correct?

A.   Yes, I do.

Q.   The last exhibit I have is Exhibit H.

(Exhibit H marked.)

BY MR. LEON GUERRERO: (CONTINUING)

Q.   Have you ever seen Exhibit H before?

A.   Yes, I do.

Q.   What is Exhibit H to your knowledge?

A.   This is a form they make you sign when you've been
released.

Q.   And there's a signature line there for employee
signature.  Is that your signature?

A.   Yes.

Q.   And it's dated March 7, 2005; correct?

A.   Correct.

Q.   And in it, it seems to indicate that you're released
for cause.  Do you see that?

A.   Yes.

Q.   Did you ever protest this?

A.   No, I did not.

MR. LEON GUERRERO:  I have no other questions at
this time.

with CalPac?  What was their relationship?

    A.    MCI we were doing MCI job.

    Q.    You were doing an MCI job?

    A.    So MCI was our customer, I believe.

    Q.    And then what was the relationship with Dynamic
Technical?

    A.    I was to believe that Dynamic Tech was hired by MCI
to oversee this job that CalPac was doing.

    Q.    You said Dynamic hired by MCI to oversee --

    A.    Yeah, MCI had Dynamic Tech oversee this job they
were doing.

    Q.    How did you come to that understanding?

    A.    Well, it's the only way to do it because this is MCI
ring for Guam.  CalPac was doing this MCI communication ring
that they had on Guam and Dennis Clark, who was working for
Dynamic Tech, was telling us how to do it.  So that's just
like, how would you say, MCI hired QC to quality control this
job that's going on, on Guam.

    Q.    How do you know that Dennis Clark worked for
Dynamic Technical Services?

    A.    Everybody knew that by now.

    Q.    But how did you know?

    A.    Hard to say.  Everybody knew.  This is how everybody
spoke about that all the time, even the management brought
that up when they're having their conversations, you know.



Black and white, I'm not sure.  There's a lot of, how do you

say -- Do you have a rest room around here?

(Recess taken.)

(Back on the record.)

BY MS. McDONALD: (CONTINUING)

Q.    Mr. Yee, I believe when we left off, I had asked

you, how did you know that Dennis Clark was an employee of

Dynamic Technical Services?

A.    That was probably the first time when I met him, I

was probably sitting on the trencher.

Q.    Sitting on what?

A.    I was sitting on the trenching machine.

Q.    Okay.

A.    And I probably asked my spotter, I said who's that,

and at the time, who was my spotter, I forget who, I had a

few.  He probably said, it's Dennis Clark, and I said, well,

he's working with us?  They told me he's working for Dynamic

Tech.  Everybody knew him.

Q.    When was that?

A.    This is probably when I first met him.

Q.    When was that?  Can you recall?

A.    Hard to say.  The first time I met Dennis Clark, I'm

not sure when that was.

Q.    That time, did you actually meet him or you just

asked who he was?

A.    Oh, he came around and probably -- first time is --
What did he say?  I saw him walking around a job pointing
fingers and telling guys what to do, so I asked my spotter,
who's the dude, he said that's Dennis Clark.  I said, well
does he work with us, then -- who was it, man?  Darryl or
Norman, I'm not sure who.  He said, no, he works for Dynamic
Tech.

Q.    And at that time you were asking that question, what
was your understanding of Dynamic Tech's role?

A.    I had no idea at that time.  That was the first time
I heard the name.

Q.    That's the first time you heard the name?

A.    Yeah.

Q.    Did you ask what is Dynamic Tech?

A.    No, not at the time.

Q.    Did you eventually come to an understanding of what
Dynamic Technical did on the work site?

A.    Eventually, yes.

Q.    And what's that understanding?

A.    I understand that they oversee the job for MCI on
Guam.

Q.    And did you come to an understanding of what Dennis
Clark did or what his role was with Dynamic Tech?

A.    I understood he was like an inspector for our work.
He checked everything we did.  Everything.

A.    I said if I was there, I wouldn't have wrote that there but I'm sure --

Q.    So you were not present at the December --

A.    Yeah, I have no idea.

                MS. McDONALD:  I don't have anything further.

                        CROSS-EXAMINATION

BY MS. LUJAN:

Q.    I just have a few questions.  Now, if I could just go back to one of the exhibits.  It was Exhibit F.  Can we see Exhibit F?  I left mine at the office.  It was the memo, the final warning memo.

        Now, is this the first time, Mr. Yee, that you ever received a memo such as this accusing you of committing some kind of work violation?

A.    First time.

Q.    So that's the first time?

A.    Yes.

Q.    And do you recall receiving any other memos accusing you of committing other work violations?

A.    No.

Q.    So this is the only one that you ever got and this memo was given to you after -- that was October 1, 2004; correct?

A.    Correct.

Q.    Is it true that this memo was given to you after



when CalPac had nothing to do with it.

A.    After the file -- after we filed everything, I could not even greet Mr. Bill Ward who is from CalPac, okay.  It was terrible walking up the stairs two feet away from an individual who used to greet you.

Q.    Do you know if Mr. Ward was given anything from the EEOC about talking to you?

A.    I don't know.

Q.    You don't know?

A.    (Witness shook head.)

Q.    After this all took place, you still felt comfortable talking to Mr. Healy though; correct?

A.    No, that was very -- I only spoke to him when I needed to because he was barely around either.

Q.    He was what?

A.    He was hardly around either.

Q.    But you at least felt comfortable to ask him for an advance?

A.    I had to.  I had no choice.

Q.    And did he treat you with respect when you were asking him for an advance?

A.    Same way I treated him, with respect.

Q.    So he treated you with respect is what I'm saying?

A.    Yes.

Q.    You said he was the overall, basically in charge of



*Personnel File*

CALIFORNIA PACIFIC TECHNICAL SERVICES, LLC.
P.O. BOX 8950   TAMUNING, GU  96931

PHONE:      (671) 646-3645/46
FAX:           (671) 646-3643



**To:** James Yee

**CC:** Personnel File

**From:** Equipment Operations Manager

**Date:** 1/26/2005

**Re:** Equipment Operations

---

On 24 January, 2005 at approximately 13:15, I received a report of CalPac's backhoe traveling North on Marine Corps Drive (near K-mart) being driven too fast and without the proper escort vehicle.

You have been warned repeatedly about excessive speed and operating heavy equipment in an unsafe manner. On 27 November, 2004 you were personally instructed by me with regards to the company policy concerning vehicle escorts when roading or moving equipment on the public roads.

This letter documents your failure to follow company policies concerning safe operation of heavy equipment and utilizing proper vehicle escorts. This will serve as your <u>Final Warning</u>. Any further incidents or reports concerning the violation of company safety or operations policies will result in your release.


Regards,

Max R. Long
California Pacific Technical Services
Equipment Operations Manager

1/27/05






CALIFORNIA PACIFIC TECHNICAL SERVICES, LLC.
PO BOX 8950  TAMUNING, GU  96931
TEL: (671) 646-3645/46   FAX: (671) 646-3643

## Change of Status Form

EXHIBIT

H

PENGAD-Bayonne, N. J.

Date: _____ 29-Mar-05 _____

Employee: _____ James Yee _____

Change Effective: _____ 29-Mar-05 _____

The above named employee has received a change in his employment status with California Pacific
Technical Services, LLC.  Check mark the appropriate line item below and indicate changes in the space provided.

A) _____ Salary or Wage: _____

B) _____ Position/Title: _____

C) _____ Job Capacity: _____

D) _____ Resignation: _____ Eligible for re-hire:   Yes [ ]  No [ ]

E) __XX__ Other: _____ Release for cause _____

James Yee failed to show for work on March 21, 2005 and did not call.  When asked for a reason the following day,
he told me he had phone problems.

On March 28, 2005 James Yee failed to show for work or call.
He has been released for "no-call - no show"

Employee Signature: _____          Date: 3/2/05

Gen. Manager Signature: _____      Date: _____ 29-Mar-05 _____



# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | **AMENDED** |
| ☒ EEOC | 378-2005-00215 |

and EEOC

State or local Agency, if any

(Include Mr., Ms., Mrs.)
...mes S. Yee

| Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|
| (671) 868-1304 | 10-10-1971 |

Address — City, State and ZIP Code

Harmon Villa Dndado, GU 06939

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | 500 or More | |

Address — City, State and ZIP Code

...t Glenville Dr., Richardson, TX 75082

| | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Address — City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE   ☒ COLOR   ☐ SEX   ☐ RELIGION   ☒ NATIONAL ORIGIN

☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 09-21-2004 | 12-20-2004 |

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

...was hired by Cal Pac on August 15, 2004, to work on an installation project of underground cable ...Guam for Respondent, MCL

...eginning on September 21, 2004, and continuing until October 23, 2004, I have complained to the ...anagement about verbal harassment by Dennis Clark, Superintendent of MCL. He has made ...acially derogatory comments to me and fellow co-workers by referring to us as "Monkeys" and ...lland Monkeys."

...n December 20, 2004, John Healy, Owner of Cal Pac, held a meeting in which he announced that ...orkers would be immediately fired for notifying any authorities or agencies concerning their ...omplaints of discrimination. *NOT PRESENT*

...believe that I have been discriminated against due to my racial background and national origin. I ...urther believe that Non-Caucasian employees as a class have been subjected to discrimination and ...etaliation.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 12/23/04  _(signature)_<br>Date   Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

EXHIBIT

RECEIVED
FEB 2 3 2005
EEOC HLO

# REPORTER'S CERTIFICATE

DISTRICT COURT OF GUAM    )

      I, Veronica F. Reilly, Certified Shorthand Reporter, hereby certify that James S. Yee personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 111, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

      Witness my hand at Barrigada, Guam, this 22nd day of February 2007.


_____
Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )    📄 **COPY**
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                  Plaintiffs,    )
                                 )
             vs.                 )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                  Defendants.    )

## DEPOSITION OF RUSSELL A. HATFIELD

Taken on Behalf of CalPac

BE IT REMEMBERED That, pursuant to the Guam

Rules of Civil Procedure, the deposition of **RUSSELL A.**

**HATFIELD** was taken before Cecille A. Flores, a Certified

Shorthand Reporter, on Monday, the 19th day of February 2007,

at 10:00 a.m. in the offices of Blair Sterling Johnson

Martinez & Leon Guerrero, Suite 1008, Pacific News Building,

238 Archbishop Flores Street, Hagatna, Guam.

1   your memory.  Earlier you were talking about a meeting at the

2   warehouse.

3          A     Uh-huh.

4          Q     Does this refresh your memory as to when the meeting

5   at the warehouse took place?

6          A     Yeah, it says right here the 20th of December.

7          Q     So in Exhibit A, the meeting that was referred to is

8   the same --

9          A     That's the meeting I'm referring to.

10         Q     Do you know why they had this meeting on December

11  20th, 2004?

12         A     To settle any questions -- answer any questions, put

13  any fears out -- fires out, fears, in reference to the

14  allegations that were going on at the time.

15         Q     Around this time that the meeting took place, was

16  Donald Harper employed at CalPac?

17         A     No, he was not.

18         Q     So you were the sole Project Manager at the time?

19         A     That's correct.

20         Q     I hate to say this but because we're having it

21  transcribed, it's just easier if one person's talking.

22         A     Okay.

23         Q     A lot of times I know what your answers are going to

24  be but I'm going to try to wait for you to finish yours --

25         A     Okay.

1    Q    Did you discuss whether Mr. Quintanilla should be
2   laid off?

3    A    His name was never brought up.

4    Q    You said you worked at CalPac up to June 2005,
5   correct?

6    A    Approximately there.  I had to go to the states.

7    Q    You weren't laid off, were you?

8    A    No.  I was never hired to be a permanent employee
9   anyway.

10   Q    Was it your understanding that a significant amount
11  of employees at CalPac would be furloughed after the MCI
12  project?

13   A    No.

14   Q    What was your understanding?

15   A    Just like any other construction job.  Construction
16  work works -- if you got work, you need the employees.  If
17  you don't have work, you let your employees go.

18   Q    Would it be unusual for you to see CalPac or other
19  companies like CalPac furloughing its employees?

20   A    No, that's a normal every day occurrence.

21   Q    Do you remember having an interview with somebody by
22  the name of Mr. Yao at the EEOC?

23   A    No, I have no idea of that name.  I -- the only
24  interview I ever had was in this office by phone with
25  somebody out of Hawaii.  It was another deposition.  I'm

1   is that correct?

2       A    That's correct.  Norman is still there as far as I

3   know.

4       Q    When did you become aware that Norman made a

5   complaint with the EEOC?

6       A    I wasn't aware that he made a complaint.  I don't

7   think I said that.

8       Q    How often was Dennis Clark on the job site?

9       A    Every day.

10      Q    How many hours a day?

11      A    Four hours a day.

12      Q    Where would he be the rest of the time?

13      A    I have no knowledge.

14      Q    How many hours would you spend at the CalPac

15   warehouse on a daily basis?

16      A    Me?

17      Q    Yes.

18      A    Three.

19      Q    How long is a work day for you?  How long was a work

20   day for you at CalPac?

21      A    You want from the time I got up in the morning until

22   the time I went to bed or just physical work?

23      Q    Physically being there at CalPac on the job.

24      A    12 to 18.  I mean, 12 to 14, I'm sorry.

25      Q    What time of the day would you spend those three

1      A    Who I would keep if given a choice of keeping some
2   and letting others go, yes.

3      Q    Now, at the time these people were let go, would
4   people be let go in favor of other employees that were local?
5   Do you understand my question?

6      A    My recommendation has nothing to do with race.  The
7   employees that were let go were based on their skill levels
8   and the job requirements that I needed the individuals to do.
9   So if Joe Blow was multi-taskable, I'd put him in this
10  category.  If Joe Blow was not, he'd stay over here.  If I
11  didn't need his particular skills because we were downsizing
12  at the time because the job was slowing down and you don't
13  keep people on the payroll if you don't have any work for
14  them to do.  And that's what we were doing.  We were
15  downsizing because the work was slowing down.  Yes, there was
16  a long period of work leftover, but we didn't need the
17  humongous payroll and staff that we had at the time.

18     Q    Just for the record, some of the people that stayed
19  on as employees were locals, would that be correct?

20     A    That's correct.

21     Q    I believe you indicated earlier that you weren't
22  aware that various people were filing complaints.  You knew
23  there were complaints but you didn't know who they were,
24  would that be correct?

25     A    Uh-huh.

1    Q    I believe that was in reference to -- I believe you

2    indicated Norman Santos, correct?

3    A    I think she was talking about James Lee.

4    Q    James?

5    A    Yee or Lee or whatever his name was.  I made the

6    statement that James -- until I got here and I saw it right

7    here, James, down as a defendant.  I have -- to this day,

8    other than what's on this piece of paper is the only people

9    that I know have filed a suit.

10   Q    You're referring to the Plaintiffs in this lawsuit?

11   A    That's correct.

12   Q    In your opinion, were the service of the people that

13   were let go around November of 2004, were their services

14   needed at CalPac?

15   A    The ones that were let go, no.

16   Q    So when you're saying let go, they weren't

17   necessarily fired, would that be correct?

18   A    Nobody was fired.  Everybody was laid off with the

19   understanding that if work picked up and if we needed your

20   skills back, that you would be given first opportunity to

21   accept the job if you so desired it.

22   Q    And it wouldn't be unusual for somebody to be let go

23   at CalPac and then later picked up?

24   A    No.

25   Q    Did you actually observe that situation?

1    A    Yes.

2    Q    How was his performance?

3    A    When he worked, he's an excellent performer.

4    Q    Was he goofing off also?

5    A    James Lee is a dangerous person.

6    Q    James Yee?

7    A    Or Lee or Yee.  James Yee.  He's a dangerous
8  equipment operator.

9    Q    Did he know how to operate the equipment?

10   A    He's a very good equipment operator but he's very
11 dangerous.

12   Q    What do you mean by dangerous?

13   A    He takes chances.  Way too many chances.

14   Q    How so?

15   A    He'll put the equipment in an unsafe operating
16 condition and continue to do it even though you know and he
17 knows it's not safe.  He's trying to do it to prove to
18 everybody that he can do it and assist in getting the job
19 done.  His heart's there for the company, but his methods are
20 very dangerous, if you can understand what I'm trying to say.

21   Q    Sort of.  I mean, are you --

22   A    He'll take any -- he'll bust his butt for the
23 company when he has to and he'll do it any way he can and if
24 it means taking a risk of getting himself hurt or something
25 like that, he'll do it with no regard to that.

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for
Guam, do hereby certify that on the 19th day of February,
2007 at the hour of 10:00 a.m. there appeared before me
**RUSSELL A. HATFIELD** at the law offices of Blair Sterling
Johnson Martinez & Leon Guerrero, 238 Archbishop Flores
Street, Hagatna, Guam. The witness herein, produced to give
his deposition in the within-numbered Civil Case No.
CIV05-00037; that prior to examination the witness was by me
duly sworn upon his oath; that thereafter the transcript was
prepared by me or under my supervision, and the original
deposition transcript was presented to Mr. Leon Guerrero's
office for the deponent's review, corrections, if any, and
execution.

I further certify that I am not a relative,
employee, attorney or counsel of any of the parties, nor a
relative or employee of such attorney or counsel, and that I
am not directly or indirectly interested in the matters in
controversy.

In testimony whereof, I have hereunto set my
hand this 5th day of March, 2007.

_____
Cecille A. Flores

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )        **ORIGINAL**
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                Plaintiffs,      )
                                 )
        vs.                      )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                Defendants.      )

## DEPOSITION OF DONALD J. HARPER

Taken on Behalf of California Pacific Technical Services

                BE IT REMEMBERED That, pursuant to the Federal
Rules of Civil Procedure, the deposition of **DONALD J. HARPER**
was taken before Cecille A. Flores, a Certified Shorthand
Reporter, on the 16th and 20th days of February 2007, in the
offices of Blair Sterling Johnson Martinez & Leon Guerrero,
Suite 1008, Pacific News Building, 238 Archbishop Flores
Street, Hagatna, Guam.

1    Q    Were your responsibilities limited to the MCI
2  contract?  Did you have other responsibilities as well?
3    A    I had a few other responsibilities at the time.
4    Q    What percentage of your time was devoted to the MCI
5  contract would you say?
6    A    95 percent.
7    Q    95 percent?
8    A    Guessing.
9    Q    Can you describe for us what the MCI contract was?
10   A    It was to install a fiber optic connection from the
11 MCI building in Agana to NCTAMS NASA complex.
12   Q    What was the route they took to get from MCI here in
13 Agana?
14   A    Up through Agana, through Tiyan, down the cliffline
15 through Harmon Industrial Park, back through the back road of
16 Fatima, come up Route 1, down Route 3, back through the
17 jungle into NCTAMS.
18   Q    Did the MCI project, was it divided into phases or
19 how did it go?
20   A    I believe it was -- I think there were three phases.
21 They called them three phases, yes.
22   Q    Do you remember what the three phases were?
23   A    Yeah, it wasn't really -- I don't know if there was
24 a contractual breakdown, but I know when it was broken down
25 into phases of making it through Agana.  It was kind of a

1    A    Just, I guess, for what an owner does.

2    Q    But he wasn't involved in the day-to-day operations

3  of the company?  That was you and Bob and Tim?

4    A    No, he was aware of the day-to-day.  There was daily

5  communication with him.  I mean, other than that, that's as

6  close as it got.

7    Q    Did he do the job interviews with the prospective

8  laborers?

9    A    No, I don't believe so.

10    Q    Who did that?

11    A    Either be me, Bob or Tim Camacho or Tim Camacho's

12  replacement and I can't remember his name.  After that.

13    Q    What was the role of Dennis Clark?

14    A    Dennis Clark was -- he was a representative of MCI.

15  He was basically quality control, I would guess.  For MCI.

16  He was there to make sure that the product was installed per

17  their specifications.

18    Q    You had MCI provide a set of specifications you were

19  supposed to follow?

20    A    Yes.

21    Q    Describe how those were presented to you.

22    A    Drawings with details.

23    Q    Do they also have a manual of specifications?

24    A    Not really.  Not that I know of.

25    Q    So you say he was the quality control.  Was he then

1    Q    Why aren't you on the site that day?

2    A    I was in the office doing some report for John

3    Healy.

4    Q    Do you remember when or about that was time wise?

5    A    No, I don't.  I mean, it's no --

6    Q    Was it still in Phase 1 or one of the later phases?

7    A    I think that's kind of the Phase 2.  I'm -- I can't

8    really remember but --

9    Q    So you don't recall the date?

10    A    No.

11    Q    Who was the employee that called you?

12    A    Henry Quintanilla.

13    Q    What did Henry Quintanilla tell you to the best as

14    you can recall?

15    A    When I arrived on site, I guess there was a deep

16    excavation area that Dennis wanted things to move faster,

17    didn't like the way they was doin' it and referred to them as

18    monkeys at this time, I believe.  It was just a phrase

19    "monkeys" and they didn't like it so I had conversation with

20    Dennis.

21    Q    Was it a heated conversation?

22    A    Yeah, it kind of got heated because he took it -- I

23    tried to keep it on a professional -- look, just don't treat

24    them this way, don't talk to people this way and -- yeah,

25    there was a lot of arrogance.

1     Q    When was the next incident that you can recall that
2   you had a disagreement with Mr. Clark?

3     A    I believe -- I'm not sure but I believe it was -- we
4   were on the back part of NCTAMS coming through the jungle
5   because there was an area that conduit was installed and they
6   called me, the same thing, and we were pulling fiber.

7     Q    You weren't there that day either?

8     A    I was en route.  We were setting up for a fiber pull
9   and nobody had started yet.

10    Q    Who called you that time or told you about it?

11    A    I think it was Van Meter at this time.

12    Q    Who is Van Meter?

13    A    Henry Van Meter.

14    Q    Who was Henry Van Meter?

15    A    Henry Van Meter was another one that was not a
16  foreman but he was kind of like a lead man.  If the crew
17  broke away, they were working a different area, he had the
18  responsibility of leadership of certain guys.

19    Q    Henry, his title wasn't foreman?

20    A    I don't believe so but I'm not sure.

21    Q    Did you hire Henry Van Meter also?

22    A    You know, I didn't directly hire anybody.  I didn't
23  have the authority to, in my opinion, but I was part of the
24  interview of Henry Van Meter.

25    Q    Who else interviewed?

1  before was left in the right condition, and part of my job is

2  to explore the job ahead in advance to make sure that when

3  they leave that job site that day, of course they're

4  advancing forward and the reason for my performance was to be

5  on site so I covered kind of a wide area.

6      Q    How many lead men or foremen did you have?

7      A    Henry Quintanilla, Henry Van Meter, and basically as

8  guys that were left with any responsibility, I think they

9  were the only two.

10     Q    Was there a very high turnover of workers?

11     A    No.

12     Q    Did CalPac have to hire additional workers to do the

13 MCI project?

14     A    Yes.

15     Q    How many do you recall they had to hire?

16     A    I don't know.

17     Q    15, 20?  25?

18     A    I'd be guessing.  I'd just be guessing.

19     Q    When you interviewed these people, did you tell them

20 they were being hired for that specific job or just hired

21 generally?

22     A    I don't know that the name of the job was ever

23 mentioned to them, but their job role of what they would be

24 doing was explained.

25     Q    What was supposed to happen to them once the project

1    Q    Why do you say that?

2    A    Because he was.  It was my opinion.  I just feel he
3    was arrogant.

4    Q    Did he ever say anything that made you think he was
5    arrogant?

6    A    It was just arrogance.  Yeah, I guess he said a lot
7    of things, obviously, that made me feel that way but I can't
8    pinpoint one isolated situation.  It was just being around
9    somebody for long enough in a working condition that you feel
10   that attitude superiority and he felt like he was working in
11   a third world all the time.

12   Q    Did he ever say anything like that?

13   A    Yes.

14   Q    What did he say?

15   A    He just referred to Guam as being very backwards and
16   he would make comments about another job he did somewhere
17   else.  I may be wrong about South America and he would
18   compare it to that.

19   Q    Have you ever made any verbal threats to Dennis
20   Clark?

21   A    Yes.

22   Q    Could you tell us about the first time you made a
23   verbal threat to him?

24   A    I think I told him that one time I -- I forget what
25   I said.  Get off my job or I'll whoop your ass or something.

REPORTER'S CERTIFICATE


I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **DONALD J. HARPER** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 188, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd day of March 2007.


_____
Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>                          Plaintiffs,<br><br>          vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10,<br><br>                          Defendants. | CIVIL CASE NO. CIV05-00037<br><br>🗐 **COPY** |

## DEPOSITION OF NORMAN S. SANTOS

Taken on Behalf of Defendant CalPac


          BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **NORMAN S. SANTOS**

was taken before Cecille A. Flores, a Certified Shorthand

Reporter, on Friday, the 13th day of April 2007, at 3:00 p.m.

in the offices of Blair Sterling Johnson Martinez & Leon

Guerrero, Suite 1008, Pacific News Building, 238 Archbishop

Flores Street, Hagatna, Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96913
Tel: (671) 734-1041 * Fax: (671) 734-1045

Case 1:05-cv-00037     Document 334     Filed 07/23/2007     Page 46 of 54

1    Q    How long have you been working at CalPac?

2    A    Going for three years.

3    Q    So you started working at CalPac in 2004?

4    A    Yeah.

5    Q    What is your position now at CalPac?

6    A    Used to be Laborer.  Now I'm a Supervisor in the

7    field.

8    Q    When did you become a Supervisor at CalPac?

9    A    One year, three months.

10   Q    So 2006 you became a Supervisor, is that about

11   right?

12   A    Two years after.  A year and a half.  One year, four

13   months.

14   Q    So around 2006, correct?

15   A    Yeah.

16   Q    So from 2004 through 2006 you were a Laborer?

17   A    Yeah.

18   Q    Somewhere around there, right?

19   A    Uh-huh.

20   Q    What was your wage as a Supervisor?  What is your

21   wage?

22   A    11.50.

23   Q    As a Laborer, how much were you making?

24   A    Used to be $6.  Two months later they give $9.

25   Q    When was that?

1   on them.  The two guys laid off, the company gonna be going

2   slow.

3       Q    How long has CalPac had that policy?  As long as

4   you've been working there?

5       A    No.

6       Q    So how long?

7       A    That's a new policy.

8       Q    What about in 2004?  Did they have a policy about

9   showing up --

10      A    No, no.

11      Q    Earlier you filed a charge of discrimination with

12  the EEOC, correct?

13      A    Yes.

14      Q    That was about the time I guess the other

15  Co-Plaintiffs were filing?

16      A    Yes.

17      Q    The same time they were filing with the EEOC?

18      A    Yes.

19      Q    I think there was something that was filed with the

20  EEOC around February 2005.  Did Don Harper help you file the

21  charge of discrimination?  Do you remember?

22      A    Yes.

23      Q    Did Mr. Harper help you file it?

24      A    He help us to call Hawaii.

25      Q    Then you used his fax machine?

1   the complaint and the time you withdrew it?  Do you know how

2   many months or weeks that was?

3        A    Almost a year.

4        Q    Almost a year that you had a complaint with the

5   EEOC?

6        A    Uh-huh.

7        Q    During that time you were still employed at CalPac?

8        A    Yes.

9        Q    Did anybody at CalPac say anything to you about your

10  complaint?

11       A    No.

12       Q    No?  They let you work?

13       A    (Witness nodded head.)

14       Q    Did you feel that you were treated unfairly when you

15  were working at CalPac during that one year?

16       A    No.

17       Q    We were talking to Mr. Leon Guerrero about a meeting

18  that was held at CalPac when Dennis Clark said he never made

19  the statements.  Do you recall that?

20       A    Yes.

21       Q    During that meeting, did anybody at CalPac, the

22  management, ever say if you make a complaint you'll get fired

23  or you'll --

24       A    No.

25       Q    Nobody said that?

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **NORMAN S. SANTOS** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 51, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 18th day of May 2007.

_____
Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 13th day of April, 2007 at the hour of 3:00 p.m. there appeared before me **NORMAN S. SANTOS** at the law offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 18th day of May, 2007.

_____
Cecille A. Flores

VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE. TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. CIV05-00037 <br><br><br><br> **DECLARATION OF JOHN T. HEALY IN SUPPORT OF EACH OF CALPAC'S MOTIONS FOR SUMMARY JUDGMENT** |

I, **JOHN T. HEALY**, under penalty of perjury, do hereby declare and state as follows:

1.    I am a shareholder of California Technical Services LLC ("CalPac") and its Vice President whose duties include, the field operation of CalPac.

2.    Included within Calpac's field operation is the "underground crew" of which plaintiffs were formerly employed.

//

3.   In early 2004, CalPac was working on a contact with MCI to lay fiber optics.

4.   The MCI contract was initially to be completed in December 2004.

5.   CalPac hired additional laborers to assist the underground crew in the completion of the MCI project.

6.   The vast majority of the underground crew were of Chamorro descent.

7.   In the latter part of 2004, CalPac essentially had one contract (i.e. the MCI Contract) which was nearing completion.

8.   Although the MCI contract was not officially completed until June/July of 2005, the services of most of the laborers were no longer needed.

9.   CalPac laid off employees based on economic reasons.

10.   James Yee and Robert Cruz were not laid off, rather they were terminated for cause.

11.   Joseph Hernandez was hurt on the job and received Worker's Compensation. He is officially on CalPac's books.

12.   After the lay offs were completed, the vast majority of the remaining underground employees were of Chamorro descent.

13.   Sometime in December, 2004, I became aware that some employees were claiming they were being discriminated against based on Clark's purported remarks. A meeting was called to answer any questions and alleviate any concerns, concerning Clark's statements. CalPac did not threaten.

R STERLING JOHNSON
1812 & LEON GUERRERO
PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
TNA, GUAM 96910-5205
PHONE: (671) 477-7857

- 2 -

I declare under penalty of perjury and the laws of the United States that the foregoing statements are true and correct.

DATED: JULY ___, 2007

_____
JOHN T. HEALY

V63\-08130-03
G:\WORDDOC\PLD\VLG\194-DECLARATION OF JOHN HEALY RE VAN METER
ET AL V CALPAC ET AL.DOC

R STERLING JOHNSON
HINES & LYON GUERRERO
PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGATNA, GUAM 96910-5208
PHONE: (671) 477-7857