FILED

DISTRICT COURT OF GUAM

JUL 23 2007 *nba*

MARY L.M. MORAN
CLERK OF COURT

VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 Pacific News Building
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Attorneys for Defendant California Pacific Technical Services LLC

# IN THE DISTRICT COURT OF GUAM

| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, | CIVIL CASE NO. CIV05-00037 |
|---|---|
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE JOHN P. BABAUTA** |
| vs. | |
| CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10, | |
| Defendants. | |

## INTRODUCTION

This is a lawsuit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et. seq.* John P. Babauta ("Babauta") claims arise out of **one** purported statement made by Dennis Clark ("Clark")[1] who, Babauta acknowledges, was neither a co-employee of the plaintiffs nor an employee of California

---

[1] For the purpose of this Motion only, CalPac will assume Clark made the purported statement.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Case 1:05-cv-00037     Document 334     Filed 07/23/2007     Page 1 of 46

ORIGINAL

Technical Services, LLC ("CalPac"). Clark, in fact, was MCI's owner representative hired to ensure CalPac performed according to the terms of the contract.

Babauta alleges that on one occasion, Clark called him and his fellow co-workers "monkeys" or "island monkeys." Babauta claims that he reported the statement to his supervisor after the incident, and that CalPac retaliated and discharged him in May of 2005. CalPac declares that Babauta was laid off because the MCI project was near completion and that CalPac no longer needed the services of most of CalPac's laborers. For the purposes of this motion only, CalPac will assume Clark made offensive statements that were reported his supervisors.

To the extent co-defendant Dynamic Technical Services ("DTS") asserts there was no hostile environment, CalPac hereby joins in such motion. Further, CalPac now moves for summary judgment on all issues alleged against CalPac by Babauta.

**FACTS**

CalPac acquired a contract from MCI to lay fiber optic cables on Guam. The MCI project entailed laying fiber optic cable from Hagatna to NTCAM. Harper Deposition at p. 11. Initially, the MCI project was scheduled to be completed around December, 2004. See Healy Declaration. Clark was designated as MCI's representative charged with ensuring CalPac complied with the terms of the contract. Harper Deposition at p. 15. **It is**

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 2 -

**not disputed that Clark was never an employee of CalPac.**
Babauta Deposition at p. 32; also Harper Deposition at p. 15.

In order to meet the terms of the MCI contract, CalPac hired additional laborers to trench and lay cables. Healy Declaration. Initially, the MCI project was scheduled to be completed around December, 2004. Healy Declaration. As the project neared completion, CalPac began to lay-off its employees since the MCI project was the only remaining major contract that CalPac had. Healy Declaration

Babauta, one of the plaintiffs herein, began working for CalPac around October, 2004. Babauta Deposition at p. 10; also See First Amended Complaint filed February 24, 2006 ("Complaint") at Paragraph 214. Babauta was part of the field crew of CalPac. Most, if not all employees, of the field crew were local hires of Chamorro descent. See Healy declaration. Because of the MCI contract, CalPac had to hire additional employees. Harper Deposition at p. 25. Around November, 2004, CalPac began downsizing because the work was slowing down. Hatfield Deposition at p. 75. Because of the reduced amount of work, the services of many of the employees were no longer needed. Hatfield Deposition at p. 76. Through Babauta's complaint, Babauta alleged that Clark (an employee of DTS and not of CalPac), harassed Babauta by calling Babauta a "monkey"

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F. C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Case 1:05-cv-00037    Document 334    Filed 07/23/2007    Page 3 of 46

or "island monkey." *See* Par. 214 of the Complaint; *see also* Babauta Deposition at p. 34.

Babauta alleged that the purported statement occurred around October. *See* Para. 214 of the Complaint; *see also* Babauta Deposition at p. 34. Babauta claims to have notified CalPac of the treatment received from Clark. See Para. 215 of the Complaint; *see also* Babauta Deposition at p. 20. This notification purportedly was done through the chain of command. *See* Babauta Deposition at p. 33. Before Babauta's knee operation, and with the exception of the purported statement of Clark, Babauta had no problem working at CalPac. Babauta Deposition at p. 49.

Don Harper, whose duties included coordinating with CalPac's customers, testified that he was informed of three incidents wherein Clark would refer to the employees as monkeys. Harper Deposition at p. 22.

The first report purportedly resulted in Harper and Clark having a heated discussion about the way to talk to people. Harper Deposition at p. 22. It was Harper's impression that it was just a phrase 'monkeys' and they [the crew] didn't like it." Harper Deposition at p. 22. The second incident purportedly resulted in the same action by Harper. Harper Deposition at p. 23. On the third and final incident, Harper purportedly

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 4 -
Case 1:05-cv-00037    Document 334    Filed 07/23/2007    Page 4 of 46

threatened Clark and told him to "get off my job or I'll whoop your ass or something." Harper Deposition at p. 96.

Although Harper claims to have informed Healy, Healy denies being informed about such statements until the protests began. Bill Ward, CalPac's general manager, testified that he was never informed about the statements until the December meeting.

Through his Complaint at Par. 136, Babauta alleged that a meeting on December, 2004 took place informing CalPac employees that they would be terminated if they complained to authorities. Hatfield, a disinterested witness,[2] testified that Healy called the meeting to answer any questions concerning the allegations of discrimination. Hatfield Deposition at p. 9. Hatfield further testified that Healy stated that he was unaware of any complaints of discriminatory remarks and that Healy encouraged employees to report such remarks to management or the EEOC.

Contrary to Babauta's belief, certain CalPac's management were unaware of which employees made complaints. As an example, Hatfield was did not know that Norman Santos filed a complaint with the EEOC. Hatfield Deposition at p. 70. Through Norman Santos' deposition it is undisputed that Santos worked for CalPac in 2004 (Santos Deposition at p. 12); filed an EEOC complaint for discrimination (Santos Deposition at p. 27); and withdrew his EEOC complaint almost a year later (Santos

---

[2] Hatfield, a Caucasian, left CalPac in June 2005 due to the winding down of CalPac's projects and unavailability of work. Hatfield Deposition at 17.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F. C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 5 -

Deposition at p. 33). As of April 2007, Norman Santos remained an employee with CalPac. Santos Deposition at p. 12.

## LAW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file" designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 at 324.

In determining whether the moving party has met its burden of establishing that no genuine issue of a material fact exists and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in a light most favorable to the nonmovant, in this case the Plaintiff, and resolve all reasonable doubts in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty*

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 969 I0-5205
TELEPHONE: (671) 477-7857

- 6 -

*Lobby, Inc.*, 477 U.S. 242 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Ins.*, 210 F.3d 1099, 1106 (9th Cir. 2000). The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial. *Id.*

## I. RACIAL HARASSMENT – HOSTILE ENVIRONMENT

### 1. CALPAC SHOULD NOT BE LIABLE FOR THE ACTIONS OF A THIRD PARTY

In the instant case, Babauta alleges that a non-employee of CalPac called him a "monkey" or "island monkey" on two occasions. In order for an employer to be found liable for third party harassment, an employer must ratify or condone the conduct by failing to investigate and remedy it after learning of it. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002). Assuming for the sake of this motion that complaints were made to Harper, Harper testified that he confronted Clark about the statements. After the third complaint to Harper, Harper threatened Clark and kicked Clark

- 7 -

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Case 1:05-cv-00037    Document 334    Filed 07/23/2007    Page 7 of 46

off the job site. Most importantly, there were no further complaints and the situation was remedied. Clearly, although Healy and Ward may have not known of the actions by Harper, action was taken nonetheless. CalPac, therefore, should not be liable for the actions of Clark.

### 2. PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT

The Supreme Court has repeatedly stated that Title VII **does not set forth "a general civility code for the American workplace."** (Emphasis added.) *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998); *Burlington Northern & Santa Fey Ry. Co. v. White,* 126 S.Ct. 2405, 2415 (2006). Judicial standards for harassment must **"filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language**, gender-related jokes, **and occasional teasing.'"** *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998). Although CalPac concedes that referring to an employee as an island monkey may be offensive, these remarks, under the circumstances, do not qualify for Title VII protection. **"Conduct that is not so severe or pervasive enough to create an objectively or abusive work environment...is beyond Title VII purview."** (Emphasis added.) *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21 (1993).

In order to state a claim for hostile environment, Babauta must show that: (1) he was subject to verbal or physical conduct

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F. C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

based on race or national origin; (2) that the conduct was unwelcomed; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and created an abusive environment. *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment, for the purposes of Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F3d. 1027 (9th Cir. 2005). In determining whether conduct was sufficiently severe or pervasive, courts look at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening, or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101,115 (2002)("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the **cumulative effect** of individual acts"). (Emphasis

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1  added.)  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th

2  Cir. 2001).

3   Babauta alleges that Clark directed one statement at him

4  during his tenure at CalPac. There is no allegation that Clark

5

6  physically threatened Babauta. This is not a situation where an

7  employee shows up to work and is subjected to a barrage of rude

8  or offensive remarks. Further, there is no showing that the

9  purported remarks altered the terms and conditions of Babauta's

10  employment. Indeed, Babauta testified that his duties and pay

11  remained the same.

12   This is a situation where a third party may have made three

13  or four rude remarks of which Babauta may have heard one.

14  Clearly, Babauta failed to establish the frequency required to

15  establish a claim under Title VII especially in light of the

16

17  allegation that the remarks were not made by CalPac employees.

18                 **3. CALPAC DID NOT RETALIATE AGAINST BABAUTA**

19   Title VII's anti-retaliation provision forbids an employer

20  from "discriminate[ing] against an employee or job applicant

21  because that individual "opposed any practice" made unlawful by

22  Title VII or "made a charge, testified, assisted or participated

23  in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-

24  3(a). **This provision, however, "covers those (and only those)**

25

26  **employer actions that would have been materially adverse to a**

27  **reasonable employee or job applicant**...to the point that they

28  could well dissuade a reasonable worker from making or

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

supporting a charge of discrimination. (Emphasis added.) *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2409 (2006).

An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. LINDEMANN & P. GROSSMAN, *Employment Discrimination Law 669* (3d ed.1996) (noting that "courts have held that **personality conflicts at work that generate antipathy"** and **"'snubbing' by supervisors and co-workers" are not actionable** under § 704(a)). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. (citations omitted.) It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid.* And normally **petty slights, minor annoyances, and simple lack of good manners will not create such deterrence**. (emphasis added.) *Burlington, at* 2415.

If the plaintiff makes a prima facie case, the burden of production shifts to the defendant to present a legitimate, non-retaliatory reason for the adverse action. *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000); *Cassimy v. Board of Education of the Rockford Public School, Dist. #205 (7th Cir. 2006).* If the defendant carries this burden, the plaintiff "must

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

demonstrate a genuine issue of material fact as to whether the reason advanced by the [defendant] was a pretext." *Brooks, supra.*

Finally, Babauta claims he was "wrongfully and unlawfully constructively terminated by CalPac." Complaint at Paragraph 223. CalPac declares that CalPac essentially had one contract that was nearing completion and the services of most of the crew, to include Babauta, were no longer needed nor could they be afforded. See Healy Declaration.

## CONCLUSION

Liability for hostile environment requires a showing that the action was severe and pervasive. For the reasons stated above, it is respectfully suggested that the one remark heard by Babauta were not severe or pervasive enough to be protected under Title VII. Assuming the remark were severe and pervasive, third party discrimination requires a showing that CalPac condone or authorized the act. Such was not done.

Concerning Babauta's claims for retaliation, Babauta's discharge was based on reasons unrelated to any purported

//
//
//
//
//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 12 -

1  complaint made.  In essence, there was no work to provide.  As

2  such, CalPac respectfully requests this Court grant its motion

3  for summary judgment.

4      **RESPECTFULLY SUBMITTED** this 23rd day of July, 2007.

5

6                          **BLAIR STERLING JOHNSON**
                           **MARTINEZ & LEON GUERRERO**
7                          A PROFESSIONAL CORPORATION

8

9      BY: _____
                           **VINCENT LEON GUERRERO**
10                         *Attorneys for Defendant California Pacific Technical*
                           *Services LLC*

11  V63:49\08130-03
    G:\WORDDOC\PLD\VLG\203B- MEMO OF P&A IN SUPP OF MSJ RE J.
12  BABAUTA RE VAN METER V CALPAC.DOC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 13 -

Case 1:05-cv-00037    Document 334    Filed 07/23/2007    Page 13 of 46

1          IN THE DISTRICT COURT OF GUAM

2

3  HENRY G. VAN METER, JERRY       )  CIVIL CASE NO. CIV05-00037
   APODACA, JR., JOSEPH J.         )
4  HERNANDEZ, JOSEPH T. MENDIOLA,  )
   LARRY L. CHARFAUROS, ANTHONY    )
5  C. ARRIOLA, ROBERT B. CRUZ,     )
   ROLAND F. MENDIOLA, JAMES S.    )        DEPOSITION OF
6  YEE, TEDDY B. CRUZ, JESSE B.    )      JOHN P. BABAUTA
   CRUZ, JOHN L.G. NAUTA, and      )       APRIL 20, 2007
7  JOHN P. BABAUTA,                )
                                   )
8            Plaintiffs,           )
                                   )
9       vs.                        )
                                   )
10 CALPAC, DYNAMIC TECHNICAL       )
   SERVICES, MCI, JOHN HEALY,      )
11 DENNIS CLARK, WILLIAM WARD,     )
   JAI JAMES and DOES 1 through    )
12 10,                             )
                                   )
13           Defendants.           )
                                   )

14

15

        The deposition of John P. Babauta, called by
16 Defendant California Pacific Technical Services LLC, pursuant
   to Notice and pursuant to Rule 30 of the Federal Rules of
17 Civil Procedure, taken at the law offices of Blair Sterling
   Johnson Martinez & Leon Guerrero P.C., 238 Archbishop F.C.
18 Flores Street, Suite 1008, Hagåtña, Guam, on Friday, the 20th
   day of April, 2007, at the hour of 2:10 o'clock p.m.

19

        That at said time and place, there transpired the
20 following:

21

22

23

24

25                                    ◢ ORIGINAL

1   After that I just stopped calling.

2       Q.   Were they asking you for a doctor's excuse or

3   doctor's okay for you to work?

4       A.   Um, no, they didn't ask me any of that.  But I

5   turned in my paper, though, telling them that, uh, I was able

6   to, you know, I was able to come back.

7       Q.   When did you turn in the paper?

8       A.   Uh, I can't recall but I know it was on May.  I

9   don't recall what day, but it was on May.

10      Q.   And then what happened when you turned it in?

11      A.   That's it.  They just told me to, uh, to be

12  calling, 'cause right now there is no job.

13      Q.   So when you came in, in May, and they said there

14  were no jobs available; is that correct?

15      A.   Exactly.

16      Q.   Okay.  When did you start working at Calpac?

17      A.   About October, 2004.  Or, yeah, November, I think,

18  November or October.

19      Q.   Okay.  How much were you making at Calpac?

20      A.   Six fifty.

21      Q.   Did you ever get a raise while you were at Calpac?

22      A.   No.

23      Q.   Before Calpac, what was the last job you had?

24      A.   Before Calpac, I think it was, I think the last one

25  was Raytheon.

1   plaintiffs, do you know if any of them have criminal

2   convictions?

3        A.   Um, no, not that I know of.

4        Q.   Anyway, going back to the picnic. John Healy would

5   be mingling with the laborers; right?, the crew?

6        A.   Mmm, yeah.

7        Q.   Was he drinking beer with the boys?

8        A.   Um, that -- drinking I'm not too sure.

9        Q.   Who else was present at the picnic?  The

10  administrative staff also?

11       A.   Yeah.  I forgot what's her name.  She was there;

12  um, John Thomas; John Taitano.

13       Q.   At that picnic, how was John Healy?  Was he

14  treating you okay?

15       A.   Mmm -

16       Q.   Or did you even talk to him at that picnic?

17       A.   Well, just a little bit.  Because I was, um, I was

18  majority barbecuing.  It was, so it was just, um, when he

19  would come over and maybe want to try a piece of chicken or

20  something while I was barbecuing; that's about it.  But after

21  I was done, I did not mingle with him.

22       Q.   You say that around October of 2005 ...  Well,

23  first of all, who is Dennis Clark, to your knowledge?

24       A.   Who's Dennis Clark to my knowledge?

25       Q.   Yes.

1      A.    Excuse me?

2      Q.    Dennis Clark was not an employee; correct?

3      A.    Of Calpac?

4      Q.    Right.

5      A.    Yes.

6      Q.    Did any of the Calpac employees call you or any of

7   the other guys monkeys?

8      A.    No.

9      Q.    That would include Mr. Healy; correct?

10     A.    Correct.

11     Q.    And Mr. Ward didn't say anything like that either;

12  correct?

13     A.    Correct.

14     Q.    So, one of the things that you are complaining

15  about is how Calpac treated you after you made the complaint?

16     A.    Yes.

17     Q.    And that complaint was what Mr. Clark said;

18  correct?

19     A.    Yes.

20     Q.    Who did you complain to?

21     A.    Well, actually, um, we were talking about it when

22  he called us.  Our supervisor, our foreman was there already.

23  So we were talking about it, and he said he would take care

24  of it.  He'll go on, um, he'll go on the chain of command.

25  So that's how, that's how, um, that's how it went.

1       Q.    Who was your foreman at the time?

2       A.    Henry Van Meter and Teddy Cruz.

3       Q.    Did they say they're going to go report it to

4   management?

5       A.    Well, they said they were going to go on the chain

6   of command.  So, uh, I don't know how, I think it went from

7   them to HQ, then to Don Harper, then up further.  It was

8   going on a ...

9       Q.    Did you ever follow up with Mr. Van Meter

10  concerning your complaint?

11      A.    Yes.

12      Q.    And what did he say?

13      A.    Uh, he said it's, uh, he's been reporting it.  He

14  reported it, and they told him that they're going to go as,

15  uh, chain of command.

16      Q.    So said that they were going to go up the chain of

17  command?

18      A.    Right.

19      Q.    Is that what he said?

20      A.    Yeah.

21      Q.    How many times did you follow up with Mr. Van

22  Meter?

23      A.    Uh, I don't recall.

24      Q.    What about Mr. Cruz, did you follow up with him?

25      A.    Hm, yes.

1       Q.   And did he say essentially the same thing as Mr.
2    Van Meter?

3       A.   Well, yeah.  He said it was, it went through Van
4    Meter.

5       Q.   Now looking at Exhibit A, it appears that you heard
6    the statement once; is that right?

7       A.   Where's that?

8       Q.   Well, you only made one complaint and that was on
9    October 25, 2004 about Mr. Clark; correct?

10      A.   Yes.

11      Q.   Did he say it any time else besides the October 25,
12   2004 incident?

13      A.   No.

14      Q.   Prior to you getting your operation, your knee
15   operation, did Calpac treat you differently?

16      A.   Prior?  Before I got my operation?

17      Q.   Yeah, that was around February, I believe, or March
18   of 2005 that you had your operation; right?

19      A.   Right.

20      Q.   Okay.  Just before you went in for your operation,
21   did you think Calpac treated you differently?

22      A.   Um, yes.

23      Q.   How did they treat you differently?

24      A.   Um, like, um, we would be the one to do the, like
25   the crappy job.

```
 1  │  hostile work environment, okay?
 2  │       A.   Right.
 3  │       Q.   With the exception of that incident on October 25,
 4  │  2004, did you have a problem with working at Calpac?
 5  │       A.   Did I have a problem?
 6  │       Q.   Yes.
 7  │       A.   Working?
 8  │       Q.   Yes.
 9  │       A.   Before my surgery?  Is that what you're trying to
10  │  say?
11  │       Q.   Yeah, okay; well, before your surgery.
12  │       A.   Um, no.
13  │       Q.   Paragraph 229 says you suffered emotional harm.
14  │       A.   After, yes.
15  │       Q.   Okay.  And this is after the surgery?
16  │       A.   No.  After he -- yes, after the surgery, and
17  │  actually it was after he called me an island monkey.  That's
18  │  when I -- you know ...
19  │       Q.   You're saying you received emotional harm from Mr.
20  │  Clark; right?
21  │       A.   Right.
22  │       Q.   After you filed your Complaint against Calpac ...
23  │  Well, you filed your Complaint against Calpac around December
24  │  of 2004; right?
25  │       A.   Right.
```

JOHN P. BABAUTA:   April 20, 2007

## REPORTER'S CERTIFICATE

I, Cecilia F. Flores, Stenotype Reporter, do hereby certify the foregoing 94 pages to be a true and correct transcript of the stenographic shorthand notes and audio recording taken by me in the within-entitled and numbered case at the time and place as set forth herein.

Dated at Hagåtña, Guam, this 4th day of June, 2007.


_____
Cecilia F. Flores

1 | CLERK'S CERTIFICATE

2

3 | SUPERIOR COURT OF GUAM          ) ss

4 | I, Cecilia F. Flores, Special Deputy Clerk,

5 | Superior Court of Guam, do hereby certify that on the 20th

6 | day of April, 2007, at the hour of 2:10 p.m. there appeared

7 | before me John P. Babauta at the offices of Blair Sterling

8 | Johnson Martinez & Leon Guerrero P.C., the witness herein,

9 | produced to give his deposition in the within-entitled and

10 | numbered Case No. CIV05-00037, in the District Court of Guam;

11 | that prior to examination the witness was by me duly sworn

12 | upon his oath; that thereafter the transcript was prepared by

| me or under my supervision, and a certified copy of the

13 | original deposition transcript was presented to Mr. Leon

14 | Guerrero's office for the deponent's review; corrections, if

15 | any, and execution.

16 | I further certify that I am not a relative,

17 | employee, attorney or counsel of any of the parties, nor a

18 | relative or employee of such attorney or counsel, and that I

19 | am not directly or indirectly interested in the matters in

20 | controversy.

21 | In testimony whereof, I have hereunto set my hand

22 | and seal of Court this 4th day of June, 2007.

23

24 | _____

25 | SPECIAL DEPUTY CLERK, SUPERIOR COURT OF GUAM

JOHN P. BABAUTA:   April 20, 2007

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES )
S. YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA, )
 )
                    Plaintiffs, )
 )
          vs. )
 )
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10, )
 )
                    Defendants. )

## DEPOSITION OF RUSSELL A. HATFIELD

Taken on Behalf of CalPac

BE IT REMEMBERED That, pursuant to the Guam
Rules of Civil Procedure, the deposition of RUSSELL A.
HATFIELD was taken before Cecille A. Flores, a Certified
Shorthand Reporter, on Monday, the 19th day of February 2007,
at 10:00 a.m. in the offices of Blair Sterling Johnson
Martinez & Leon Guerrero, Suite 1008, Pacific News Building,
238 Archbishop Flores Street, Hagatna, Guam.

1   your memory.  Earlier you were talking about a meeting at the

2   warehouse.

3        A    Uh-huh.

4        Q    Does this refresh your memory as to when the meeting

5   at the warehouse took place?

6        A    Yeah, it says right here the 20th of December.

7        Q    So in Exhibit A, the meeting that was referred to is

8   the same --

9        A    That's the meeting I'm referring to.

10       Q    Do you know why they had this meeting on December

11  20th, 2004?

12       A    To settle any questions -- answer any questions, put

13  any fears out -- fires out, fears, in reference to the

14  allegations that were going on at the time.

15       Q    Around this time that the meeting took place, was

16  Donald Harper employed at CalPac?

17       A    No, he was not.

18       Q    So you were the sole Project Manager at the time?

19       A    That's correct.

20       Q    I hate to say this but because we're having it

21  transcribed, it's just easier if one person's talking.

22       A    Okay.

23       Q    A lot of times I know what your answers are going to

24  be but I'm going to try to wait for you to finish yours --

25       A    Okay.

1     Q     Did you discuss whether Mr. Quintanilla should be

2   laid off?

3     A     His name was never brought up.

4     Q     You said you worked at CalPac up to June 2005,

5   correct?

6     A     Approximately there.  I had to go to the states.

7     Q     You weren't laid off, were you?

8     A     No.  I was never hired to be a permanent employee

9   anyway.

10     Q     Was it your understanding that a significant amount

11   of employees at CalPac would be furloughed after the MCI

12   project?

13     A     No.

14     Q     What was your understanding?

15     A     Just like any other construction job.  Construction

16   work works -- if you got work, you need the employees.  If

17   you don't have work, you let your employees go.

18     Q     Would it be unusual for you to see CalPac or other

19   companies like CalPac furloughing its employees?

20     A     No, that's a normal every day occurrence.

21     Q     Do you remember having an interview with somebody by

22   the name of Mr. Yao at the EEOC?

23     A     No, I have no idea of that name.  I -- the only

24   interview I ever had was in this office by phone with

25   somebody out of Hawaii.  It was another deposition.  I'm

1   is that correct?

2       A    That's correct.  Norman is still there as far as I

3   know.

4       Q  . When did you become aware that Norman made a

5   complaint with the EEOC?

6       A    I wasn't aware that he made a complaint.  I don't

7   think I said that.

8       Q    How often was Dennis Clark on the job site?

9       A    Every day.

10      Q    How many hours a day?

11      A    Four hours a day.

12      Q    Where would he be the rest of the time?

13      A    I have no knowledge.

14      Q    How many hours would you spend at the CalPac

15  warehouse on a daily basis?

16      A    Me?

17      Q    Yes.

18      A    Three.

19      Q    How long is a work day for you?  How long was a work

20  day for you at CalPac?

21      A    You want from the time I got up in the morning until

22  the time I went to bed or just physical work?

23      Q    Physically being there at CalPac on the job.

24      A    12 to 18.  I mean, 12 to 14, I'm sorry.

25      Q    What time of the day would you spend those three

1    A    Who I would keep if given a choice of keeping some

2   and letting others go, yes.

3    Q    Now, at the time these people were let go, would

4   people be let go in favor of other employees that were local?

5   Do you understand my question?

6    A    My recommendation has nothing to do with race. The

7   employees that were let go were based on their skill levels

8   and the job requirements that I needed the individuals to do.

9   So if Joe Blow was multi-taskable, I'd put him in this

10  category. If Joe Blow was not, he'd stay over here. If I

11  didn't need his particular skills because we were downsizing

12  at the time because the job was slowing down and you don't

13  keep people on the payroll if you don't have any work for

14  them to do. And that's what we were doing. We were

15  downsizing because the work was slowing down. Yes, there was

16  a long period of work leftover, but we didn't need the

17  humongous payroll and staff that we had at the time.

18    Q    Just for the record, some of the people that stayed

19  on as employees were locals, would that be correct?

20    A    That's correct.

21    Q    I believe you indicated earlier that you weren't

22  aware that various people were filing complaints. You knew

23  there were complaints but you didn't know who they were,

24  would that be correct?

25    A    Uh-huh.

1      Q    I believe that was in reference to -- I believe you

2   indicated Norman Santos, correct?

3      A    I think she was talking about James Lee.

4      Q    James?

5      A    Yee or Lee or whatever his name was.  I made the

6   statement that James -- until I got here and I saw it right

7   here, James, down as a defendant.  I have -- to this day,

8   other than what's on this piece of paper is the only people

9   that I know have filed a suit.

10     Q    You're referring to the Plaintiffs in this lawsuit?

11     A    That's correct.

12     Q    In your opinion, were the service of the people that

13  were let go around November of 2004, were their services

14  needed at CalPac?

15     A    The ones that were let go, no.

16     Q    So when you're saying let go, they weren't

17  necessarily fired, would that be correct?

18     A    Nobody was fired.  Everybody was laid off with the

19  understanding that if work picked up and if we needed your

20  skills back, that you would be given first opportunity to

21  accept the job if you so desired it.

22     Q    And it wouldn't be unusual for somebody to be let go

23  at CalPac and then later picked up?

24     A    No.

25     Q    Did you actually observe that situation?

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 19th day of February, 2007 at the hour of 10:00 a.m. there appeared before me RUSSELL A. HATFIELD at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 5th day of March, 2007.

_____
Cecille A. Flores

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )        ⌐ ~ ORIGINAL
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                 Plaintiffs,     )
                                 )
      vs.                        )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                 Defendants.     )

## DEPOSITION OF DONALD J. HARPER

Taken on Behalf of California Pacific Technical Services

BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **DONALD J. HARPER**

was taken before Cecille A. Flores, a Certified Shorthand

Reporter, on the 16th and 20th days of February 2007, in the

offices of Blair Sterling Johnson Martinez & Leon Guerrero,

Suite 1008, Pacific News Building, 238 Archbishop Flores

Street, Hagatna, Guam.

1      Q     Were your responsibilities limited to the MCI

2   contract?  Did you have other responsibilities as well?

3      A     I had a few other responsibilities at the time.

4      Q     What percentage of your time was devoted to the MCI

5   contract would you say?

6      A     95 percent.

7      Q     95 percent?

8      A     Guessing.

9      Q     Can you describe for us what the MCI contract was?

10     A     It was to install a fiber optic connection from the

11  MCI building in Agana to NCTAMS NASA complex.

12     Q     What was the route they took to get from MCI here in

13  Agana?

14     A     Up through Agana, through Tiyan, down the cliffline

15  through Harmon Industrial Park, back through the back road of

16  Fatima, come up Route 1, down Route 3, back through the

17  jungle into NCTAMS.

18     Q     Did the MCI project, was it divided into phases or

19  how did it go?

20     A     I believe it was -- I think there were three phases.

21  They called them three phases, yes.

22     Q     Do you remember what the three phases were?

23     A     Yeah, it wasn't really -- I don't know if there was

24  a contractual breakdown, but I know when it was broken down

25  into phases of making it through Agana.  It was kind of a

1     A     Just, I guess, for what an owner does.

2     Q     But he wasn't involved in the day-to-day operations

3 of the company? That was you and Bob and Tim?

4     A     No, he was aware of the day-to-day. There was daily

5 communication with him. I mean, other than that, that's as

6 close as it got.

7     Q     Did he do the job interviews with the prospective

8 laborers?

9     A     No, I don't believe so.

10     Q     Who did that?

11     A     Either be me, Bob or Tim Camacho or Tim Camacho's

12 replacement and I can't remember his name. After that.

13     Q     What was the role of Dennis Clark?

14     A     Dennis Clark was -- he was a representative of MCI.

15 He was basically quality control, I would guess. For MCI.

16 He was there to make sure that the product was installed per

17 their specifications.

18     Q     You had MCI provide a set of specifications you were

19 supposed to follow?

20     A     Yes.

21     Q     Describe how those were presented to you.

22     A     Drawings with details.

23     Q     Do they also have a manual of specifications?

24     A     Not really. Not that I know of.

25     Q     So you say he was the quality control. Was he then

1     Q    Why aren't you on the site that day?

2     A    I was in the office doing some report for John

3  Healy.

4     Q    Do you remember when or about that was time wise?

5     A    No, I don't. I mean, it's no --

6     Q    Was it still in Phase 1 or one of the later phases?

7     A    I think that's kind of the Phase 2. I'm -- I can't

8  really remember but --

9     Q    So you don't recall the date?

10    A    No.

11    Q    Who was the employee that called you?

12    A    Henry Quintanilla.

13    Q    What did Henry Quintanilla tell you to the best as

14  you can recall?

15    A    When I arrived on site, I guess there was a deep

16  excavation area that Dennis wanted things to move faster,

17  didn't like the way they was doin' it and referred to them as

18  monkeys at this time, I believe. It was just a phrase

19  "monkeys" and they didn't like it so I had conversation with

20  Dennis.

21    Q    Was it a heated conversation?

22    A    Yeah, it kind of got heated because he took it -- I

23  tried to keep it on a professional -- look, just don't treat

24  them this way, don't talk to people this way and -- yeah,

25  there was a lot of arrogance.

1      Q    When was the next incident that you can recall that

2    you had a disagreement with Mr. Clark?

3      A    I believe -- I'm not sure but I believe it was -- we

4    were on the back part of NCTAMS coming through the jungle

5    because there was an area that conduit was installed and they

6    called me, the same thing, and we were pulling fiber.

7      Q    You weren't there that day either?

8      A    I was en route.  We were setting up for a fiber pull

9    and nobody had started yet.

10     Q    Who called you that time or told you about it?

11     A    I think it was Van Meter at this time.

12     Q    Who is Van Meter?

13     A    Henry Van Meter.

14     Q    Who was Henry Van Meter?

15     A    Henry Van Meter was another one that was not a

16   foreman but he was kind of like a lead man.  If the crew

17   broke away, they were working a different area, he had the

18   responsibility of leadership of certain guys.

19     Q    Henry, his title wasn't foreman?

20     A    I don't believe so but I'm not sure.

21     Q    Did you hire Henry Van Meter also?

22     A    You know, I didn't directly hire anybody.  I didn't

23   have the authority to, in my opinion, but I was part of the

24   interview of Henry Van Meter.

25     Q    Who else interviewed?

1   before was left in the right condition, and part of my job is

2   to explore the job ahead in advance to make sure that when

3   they leave that job site that day, of course they're

4   advancing forward and the reason for my performance was to be

5   on site so I covered kind of a wide area.

6        Q    How many lead men or foremen did you have?

7        A    Henry Quintanilla, Henry Van Meter, and basically as

8   guys that were left with any responsibility, I think they

9   were the only two.

10       Q    Was there a very high turnover of workers?

11       A    No.

12       Q    Did CalPac have to hire additional workers to do the

13  MCI project?

14       A    Yes.

15       Q    How many do you recall they had to hire?

16       A    I don't know.

17       Q    15, 20?  25?

18       A    I'd be guessing.  I'd just be guessing.

19       Q    When you interviewed these people, did you tell them

20  they were being hired for that specific job or just hired

21  generally?

22       A    I don't know that the name of the job was ever

23  mentioned to them, but their job role of what they would be

24  doing was explained.

25       Q    What was supposed to happen to them once the project

1      Q    Why do you say that?

2      A    Because he was. It was my opinion. I just feel he

3  was arrogant.

4      Q    Did he ever say anything that made you think he was

5  arrogant?

6      A    It was just arrogance. Yeah, I guess he said a lot

7  of things, obviously, that made me feel that way but I can't

8  pinpoint one isolated situation. It was just being around

9  somebody for long enough in a working condition that you feel

10  that attitude superiority and he felt like he was working in

11  a third world all the time.

12      Q    Did he ever say anything like that?

13      A    Yes.

14      Q    What did he say?

15      A    He just referred to Guam as being very backwards and

16  he would make comments about another job he did somewhere

17  else. I may be wrong about South America and he would

18  compare it to that.

19      Q    Have you ever made any verbal threats to Dennis

20  Clark?

21      A    Yes.

22      Q    Could you tell us about the first time you made a

23  verbal threat to him?

24      A    I think I told him that one time I -- I forget what

25  I said. Get off my job or I'll whoop your ass or something.

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that DONALD J. HARPER personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 188, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd day of March 2007.

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES )
S. YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA, )
                                 )
              Plaintiffs, )
                                 )
        vs. )
                                 )
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10, )
                                 )
              Defendants. )

**COPY**

## DEPOSITION OF NORMAN S. SANTOS

Taken on Behalf of Defendant CalPac


        BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of NORMAN S. SANTOS

was taken before Cecille A. Flores, a Certified Shorthand

Reporter, on Friday, the 13th day of April 2007, at 3:00 p.m.

in the offices of Blair Sterling Johnson Martinez & Leon

Guerrero, Suite 1008, Pacific News Building, 238 Archbishop

Flores Street, Hagatna, Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96913
Tel: (671) 734-1041 * Fax: (671) 734-1045

Case 1:05-cv-00037    Document 334    Filed 07/23/2007    Page 38 of 46

*Van Meter vs. CalPac: Civil Case No. CIV05-00037*

12

1     Q    How long have you been working at CalPac?

2     A    Going for three years.

3     Q    So you started working at CalPac in 2004?

4     A    Yeah.

5     Q    What is your position now at CalPac?

6     A    Used to be Laborer.  Now I'm a Supervisor in the

7 field.

8     Q    When did you become a Supervisor at CalPac?

9     A    One year, three months.

10    Q    So 2006 you became a Supervisor, is that about

11 right?

12    A    Two years after.  A year and a half.  One year, four

13 months.

14    Q    So around 2006, correct?

15    A    Yeah.

16    Q    So from 2004 through 2006 you were a Laborer?

17    A    Yeah.

18    Q    Somewhere around there, right?

19    A    Uh-huh.

20    Q    What was your wage as a Supervisor?  What is your

21 wage?

22    A    11.50.

23    Q    As a Laborer, how much were you making?

24    A    Used to be $6.  Two months later they give $9.

25    Q    When was that?

1　on them.　The two guys laid off, the company gonna be going

2　slow.

3　　　Q　　How long has CalPac had that policy?　As long as

4　you've been working there?

5　　　A　　No.

6　　　Q　　So how long?

7　　　A　　That's a new policy.

8　　　Q　　What about in 2004?　Did they have a policy about

9　showing up --

10　　　A　　No, no.

11　　　Q　　Earlier you filed a charge of discrimination with

12　the EEOC, correct?

13　　　A　　Yes.

14　　　Q　　That was about the time I guess the other

15　Co-Plaintiffs were filing?

16　　　A　　Yes.

17　　　Q　　The same time they were filing with the EEOC?

18　　　A　　Yes.

19　　　Q　　I think there was something that was filed with the

20　EEOC around February 2005.　Did Don Harper help you file the

21　charge of discrimination?　Do you remember?

22　　　A　　Yes.

23　　　Q　　Did Mr. Harper help you file it?

24　　　A　　He help us to call Hawaii.

25　　　Q　　Then you used his fax machine?

1  the complaint and the time you withdrew it?  Do you know how

2  many months or weeks that was?

3      A    Almost a year.

4      Q    Almost a year that you had a complaint with the

5  EEOC?

6      A    Uh-huh.

7      Q    During that time you were still employed at CalPac?

8      A    Yes.

9      Q    Did anybody at CalPac say anything to you about your

10 complaint?

11     A    No.

12     Q    No?  They let you work?

13     A    (Witness nodded head.)

14     Q    Did you feel that you were treated unfairly when you

15 were working at CalPac during that one year?

16     A    No.

17     Q    We were talking to Mr. Leon Guerrero about a meeting

18 that was held at CalPac when Dennis Clark said he never made

19 the statements.  Do you recall that?

20     A    Yes.

21     Q    During that meeting, did anybody at CalPac, the

22 management, ever say if you make a complaint you'll get fired

23 or you'll --

24     A    No.

25     Q    Nobody said that?

# REPORTER'S CERTIFICATE


I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that NORMAN S. SANTOS personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 51, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 18th day of May 2007.


_____
Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

   I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 13th day of April, 2007 at the hour of 3:00 p.m. there appeared before me **NORMAN S. SANTOS** at the law offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

   I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

   In testimony whereof, I have hereunto set my hand this 18th day of May, 2007.

      _____
      Cecille A. Flores

VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE. TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. CIV05-00037 <br><br><br> **DECLARATION OF JOHN T. HEALY IN SUPPORT OF EACH OF CALPAC'S MOTIONS FOR SUMMARY JUDGMENT** |

I, **JOHN T. HEALY**, under penalty of perjury, do hereby declare and state as follows:

1.    I am a shareholder of California Technical Services LLC ("CalPac") and its Vice President whose duties include, the field operation of CalPac.

2.    Included within Calpac's field operation is the "underground crew" of which plaintiffs were formerly employed.

//

3. In early 2004, CalPac was working on a contact with MCI to lay fiber optics.

4. The MCI contract was initially to be completed in December 2004.

5. CalPac hired additional laborers to assist the underground crew in the completion of the MCI project.

6. The vast majority of the underground crew were of Chamorro descent.

7. In the latter part of 2004, CalPac essentially had one contract (i.e. the MCI Contract) which was nearing completion.

8. Although the MCI contract was not officially completed until June/July of 2005, the services of most of the laborers were no longer needed.

9. CalPac laid off employees based on economic reasons.

10. James Yee and Robert Cruz were not laid off, rather they were terminated for cause.

11. Joseph Hernandez was hurt on the job and received Worker's Compensation. He is officially on CalPac's books.

12. After the lay offs were completed, the vast majority of the remaining underground employees were of Chamorro descent.

13. Sometime in December, 2004, I became aware that some employees were claiming they were being discriminated against based on Clark's purported remarks. A meeting was called to answer any questions and alleviate any concerns, concerning Clark's statements. CalPac did not threaten.

STERLING JOHNSON
VEZ & LEON GUERRERO
PROFESSIONAL CORPORATION
DOB Pacific News Building
Wishop F.C. Flores Street
HA, GUAM, 9096 10-5205
ICME: (671) 477-7857

- 2 -

1    I declare under penalty of perjury and the laws of the

2   United States that the foregoing statements are true and correct.

3

4   DATED: JULY ___, 2007

5                                              JOHN T. HEALY

6

7   V63\-08130-03
    G:\WORDDOC\PLD\VLG\194-DECLARATION OF JOHN HEALY RE VAN METER
8   ET AL V CALPAC ET AL.DOC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STERLING JOHNSON
NTZ & LEON GUERRERO
PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
PHONE: (671) 477-7857