VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

FILED
DISTRICT COURT OF GUAM
JUL 23 2007
MARY L.M. MORAN
CLERK OF COURT

**IN THE DISTRICT COURT OF GUAM**

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, Plaintiffs, vs. CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10, Defendants. | CIVIL CASE NO. CIV05-00037<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE JOSEPH T. MENDIOLA** |

**INTRODUCTION**

This is a lawsuit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* Joseph T. Mendiola's ("Mendiola") claims arise out of purported statements made by Dennis Clark ("Clark")[1] who, Mendiola acknowledges, was neither a co-employee of the plaintiffs nor an employee of

[1] For the purpose of this Motion only, CalPac will assume Clark made the purported statements.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

ORIGINAL

California Technical Services, LLC ("CalPac"). Clark, in fact, was MCI's owner representative hired to ensure CalPac performed according to the terms of the contract.

Mendiola alleges that on **three** occasions Clark called him and his fellow co-workers "monkeys" or "island monkeys." Mendiola claims that he reported the statement to his supervisor and that CalPac retaliated and discharged him on December 7, 2004. CalPac declares that Mendiola was laid off because the MCI project was near completion and that CalPac no longer needed the services of most of CalPac's laborers.

To the extent co-defendant Dynamic Technical Services ("DTS") asserts there was no hostile environment, CalPac hereby joins in such motion. Further, CalPac now moves for summary judgment on all issues alleged against CalPac by Mendiola.

## FACTS

CalPac acquired a contract from MCI to lay fiber optic cables on Guam. The MCI project entailed laying fiber optic cable from Hagatna to NTCAM. Harper Deposition at p. 11. Initially, the MCI project was scheduled to be completed around December, 2004. See Healy Declaration. Clark was designated as MCI's representative charged with ensuring CalPac complied with the terms of the contract. Harper Deposition at p. 15.

**It is not disputed that Clark was never an employee of CalPac** Harper Deposition at p. 15.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

In order to meet the terms of the MCI contract, CalPac hired additional laborers to trench and lay cables. Healy Declaration. Initially, the MCI project was scheduled to be completed around December, 2004. Healy Declaration. As the project neared completion, CalPac began to lay-off its employees since the MCI project was the only remaining major contract that CalPac had. Healy Declaration

Mendiola, one of the plaintiffs herein, began working for CalPac around April, 2004. Mendiola Deposition at p. 10; also See First Amended Complaint filed February 24, 2006 ("Complaint").

Mendiola was part of the field crew of CalPac. Most, if not all employees, of the field crew were local hires of Chamorro descent. See Healy declaration. Because of the MCI contract, CalPac had to hire additional employees. Harper Deposition at p. 25. Around November, 2004, CalPac began downsizing because the work was slowing down. Hatfield Deposition at p. 75. Because of the reduced amount of work, the services of many of the employees were no longer needed. Hatfield Deposition at p. 76.

Through Mendiola's complaint, Mendiola alleged that Clark (an employee of DTS and not of CalPac), harassed Mendiola by calling Mendiola a "monkey" or "island monkey." <u>See</u> Par. 73 of the Complaint; *see also* Mendiola Deposition at pp. 19, 20, & 22.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Mendiola alleged that the purported statements occurred around September and October. See Para. 73 of the Complaint; Mendiola claims to have notified CalPac of the treatment received from Clark. See Para. 74 of the Complaint; *see also* Mendiola Deposition at p. 14. This notification purportedly was done through the chain of command. *See* Mendiola Deposition at p. 17. Mendiola testified that with the exception of the three incidents with Clark and his discharge on December 7, 2004, Mendiola had no problems with CalPac. Mendiola Deposition at pp. 59 and 62.

Don Harper, whose duties included coordinating with the CalPac's customers, testified that he was informed of three incidents wherein Clark would refer to the employees as monkeys. Harper Deposition at p. 22.

The first report purportedly resulted in Harper and Clark having a heated discussion about the way to talk to people. Harper Deposition at p. 22. It was Harper's impression that it was just a phrase 'monkeys' and they [the crew] didn't like it." Harper Deposition at p. 22. The second incident purportedly resulted in the same action by Harper. Harper Deposition at p. 23. On the third and final incident, Harper purportedly threatened Clark and told him to "get off my job or I'll whoop your ass or something." Harper Deposition at p. 96. Contrary to Mendiola's belief, certain CalPac management were unaware of

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

which employees made complaints. As an example, Hatfield was did not know that Norman Santos filed a complaint with the EEOC. Hatfield Deposition at p. 70. Through Norman Santos' deposition it is undisputed that Santos worked for CalPac in 2004 (Santos Deposition at p. 12); filed an EEOC complaint for discrimination (Santos Deposition at p. 27); and withdrew his EEOC complaint almost a year later (Santos Deposition at p. 33). As of April 2007, Norman Santos remained an employee with CalPac. Santos Deposition at p. 12.

**LAW**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56. The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file" designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 at 324. In determining whether the moving party has met its burden of establishing that no genuine issue of a material fact exists and that it is entitled to judgment as a

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

matter of law, the Court must draw inferences from the evidence in a light most favorable to the nonmovant, in this case the Plaintiff, and resolve all reasonable doubts in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Ins.*, 210 F.3d 1099, 1106 (9th Cir. 2000). The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial. *Id.*

## I. RACIAL HARASSMENT – HOSTILE ENVIRONMENT

### 1. CALPAC SHOULD NOT BE LIABLE FOR THE ACTIONS OF A THIRD PARTY

In the instant case, Mendiola alleges that a non-employee of CalPac called him a "monkey" or "island monkey" on two occasions. In order for an employer to be found liable for

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

third party harassment, an employer must ratify or condone the conduct by failing to investigate and remedy it after learning of it. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002). Assuming for the sake of this motion that complaints were made to Harper, Harper testified that he confronted Clark about the statements. After the third complaint to Harper, Harper threatened Clark and kicked Clark off the job site. Most importantly, there were no further complaints and the situation was remedied. Clearly, although Healy and Ward may have not known of the actions by Harper, action was taken nonetheless. CalPac, therefore, should not be liable for the actions of Clark.

**2. PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT**

The Supreme Court has repeatedly stated that Title VII **does not set forth "a general civility code for the American workplace."** (Emphasis added.) *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006). Judicial standards for harassment must **"filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language**, gender-related jokes, **and occasional teasing.'"** *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998). Although CalPac concedes that referring to an employee as an island monkey may be offensive, these remarks, under the

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

circumstances, do not qualify for Title VII protection. "**Conduct that is not so severe or pervasive enough to create an objectively or abusive work environment...is beyond Title VII purview**." (Emphasis added.) *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993).

In order to state a claim for hostile environment, Mendiola must show that: (1) he was subject to verbal or physical conduct based on race or national origin; (2) that the conduct was unwelcomed; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and created an abusive environment. *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment, for the purposes of Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d. 1027 (9th Cir. 2005). In determining whether conduct was sufficiently severe or pervasive, courts look at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening, or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,115 (2002)("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the **cumulative effect** of individual acts"). (Emphasis added.) *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001).

Mendiola alleges that Clark directed three statements at him during his tenure at CalPac. There is no allegation that Clark physically threatened Mendiola. This is not a situation where an employee shows up to work and is subjected to a barrage of rude or offensive remarks. Further, there is no showing that the purported remarks altered the terms and conditions of Mendiola's employment.

This is a situation where a third party may have made three or four rude remarks of which Mendiola may have heard three. Clearly, Mendiola failed to establish the frequency required to establish a claim under Title VII especially in light of the allegation that the remarks were not made by CalPac employees.

**3. CALPAC DID NOT RETALIATE AGAINST MENDIOLA**

Title VII's anti-retaliation provision forbids an employer from "discriminate[ing] against an employee or job applicant because that individual "opposed any practice" made unlawful by

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Title VII or "made a charge, testified, assisted or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a). **This provision, however, "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant**...to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination. (Emphasis added.) *Burlington Northern & Santa Fey Ry. Co. v. White*, 126 S.Ct. 2405, 2409 (2006).

An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. LINDEMANN & P. GROSSMAN, *Employment Discrimination Law 669* (3d ed.1996) (noting that "courts have held that **personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable** under § 704(a)). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. (citations omitted.) It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid.* And normally **petty slights, minor annoyances, and simple lack of good manners will not create such deterrence**. (emphasis added.) *Burlington, at* 2415.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

If the plaintiff makes a prima facie case, the burden of production shifts to the defendant to present a legitimate, non-retaliatory reason for the adverse action. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000); *Cassimy v. Board of Education of the Rockford Public School, Dist. #205 (7th Cir. 2006)*. If the defendant carries this burden, the plaintiff "must demonstrate a genuine issue of material fact as to whether the reason advanced by the [defendant] was a pretext." *Brooks, supra*.

Mendiola claims he was "wrongfully and unlawfully terminated by CalPac. CalPac declares that CalPac essentially had one contract that was nearing completion and the services of most of the crew, to include Mendiola, were no longer needed nor could they be afforded. See Healy Declaration.

**CONCLUSION**

Liability for hostile environment requires a showing that the action was severe and pervasive. For the reasons stated above, it is respectfully suggested that the two remarks heard by Mendiola were not severe or pervasive enough to be protected under Title VII. Assuming the remarks were severe and pervasive, third party discrimination requires a showing that CalPac condone or authorized the act. Such was not done.

Concerning Mendiola's claims for retaliation, Mendiola's discharge was based on reasons unrelated to any purported complaint made. Other workers, some of whom did not file

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

complaints, along with Mendiola's were laid off for financial or economic reasons. As such, CalPac respectfully requests this Court grant its motion for summary judgment.

**RESPECTFULLY SUBMITTED** this 23rd day of July, 2007.

**BLAIR STERLING JOHNSON**
**MARTINEZ & LEON GUERRERO**
A PROFESSIONAL CORPORATION

BY: [signature]
**VINCENT LEON GUERRERO**
*Attorneys for Defendant California Pacific Technical Services LLC*

V49\08130-03
G:\WORDDOC\PLD\VLG\205B-MEMO OF P&A IN SUPP OF MSJ RE J T MENDIOLA RE VAN METER V. CALPAC.DOC

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,

Plaintiffs,

vs.

CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10,

Defendants.

CASE NO. CIV05-00037

DEPOSITION OF
JOSEPH T. MENDIOLA
MAY 8,2007

The deposition of **Joseph T. Mendiola**, called by Defendants CalPac, John Healy and William Ward, pursuant to Notice and pursuant to the Federal Rules of Civil Procedure, taken at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, P.C., Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam 96910, on Tuesday, the 8th day of May, 2007, at the hour of 9:10 o'clock a.m.

That at said time and place, there transpired the following:

ORIGINAL

I'll usually have like two guys with me.

Q. And then you would kind of mentor them, I guess, on how to install cable?

A. Correct. I make sure that the, the project is done correctly.

Q. Okay. Prior to your employment at Cable Services Group, where was the last place that you were working at?

A. CalPac.

Q. Can you give me the dates that you were working at CalPac?

A. If I recall correctly, I believe I started at CalPac on, um, April 2004 and I was terminated by CalPac, I believe it was in, um, December of 2004.

Q. What was your position at CalPac?

A. I was a laborer.

Q. How much were you making as a laborer at CalPac?

A. $9.00 an hour.

Q. Did you ever, while you were working at CalPac, act as a foreman?

A. No.

Q. What about your benefits at CalPac; did you receive any benefits?

A. Uh, none.

Q. Now we're here because of lawsuit that you are participating in; correct?

A. Yes.

Q. Do you remember which one it was?

A. No.

Q. And you also said you made a complaint to one of them.

A. Yes.

Q. Do you remember making a complaint to which one?

A. No.

Q. You just know you made a complaint to either Mr. Van Meter or Mr. Quintanilla?

A. Yes, because they were the supervisors on site.

Q. Did you make any complaints to anybody else?

A. For that incident there; the first incident?

Q. Yes.

A. No, I believe it was just the two of them.

Q. Okay, so are you saying that you made a complaint to both of them?

A. I'm saying one of them, I'm sorry.

Q. Okay. So you go and talk to one person about the first incident; is that what you're saying?

A. Yes.

Q. Did you tell anyone else?

A. Uh, no.

Q. Okay. Do you remember who else was with you besides Mr. Van Meter or Mr. Quintanilla?

that was there was a person, I believe like I said, was either Henry Van Meter or Henry Quintanilla, that I had made the complaint to because they were my immediate supervisor.

Q. Okay. My question, and I'm sorry to keep asking it, but I'm not sure I'm getting the correct -- or maybe you're not understanding my question. My question is, you filed a Complaint in the District Court of Guam alleging discrimination; right?

A. Yes.

Q. I want to know if any other plaintiffs talked to you, either shortly after the incident occurred or at any time, even up to the present, about the first incident where Mr. Clark said what he said?

A. We had spoken about it.

Q. Okay.

A. Okay? Exactly who were the plaintiffs, I don't recall who they were. But yes, we have spoken about the incidents.

Q. Okay, so let's say Mr. Joseph Hernandez says Joseph Mendiola was present at the first time; would you recall that?

A. No.

Q. So you can't say with any certainty whether any of the other co-plaintiffs were present with you at the time the first incident occurred?

A. No, I don't.

Q. You just believed that Healy was one of the owners of CalPac and that's why you're saying Healy was notified; correct?

A. Yes.

Q. Okay. And again with CalPac, you said CalPac was notified and this was through the supervisors; correct?

A. Yes.

Q. Did you talk to anyone else at CalPac about the first incident?

A. About the first incident?

Q. Yes.

A. Besides the plaintiffs itself?

Q. Yes.

A. Just the plaintiffs and the supervisors.

Q. Do you recall any other incident where Mr. Clark made a statement?

A. Yes.

Q. When was that?

A. The second incident was, uh, in the housing area in Tiyan. I believe that was the second incident.

Q. Who was present there?

A. As I recall correctly, I believe, uh, of course Dennis Clark was there because he made the racial discrimination - remarks again. Um, I know we had my co-

workers which I can't recall who exactly, but I do believe I spoke directly to Don Harper, who was the superintendent for CalPac about the, the, the racial remarks.

Q. And what did he say, exactly; do you remember?

A. Uh, he -

Q. I'm talking about Mr. Clark, I'm sorry. What did Mr. Clark say on the second incident?

A. He had called us, again, I believe, it was island monkeys or monkeys.

Q. And that's the same thing as the first incident?

A. Yes.

Q. Do you remember if he said island monkeys or do you remember if he said monkeys by itself?

A. I don't remember exactly, but I do remember that I heard both the terms monkeys and island monkeys being said. But, uh, as far as to what incident that occurred or, uh, I can't remember right now.

Q. Okay, I'm a little confused. Are you saying that you're not sure whether Mr. Harper -- Mr. Clark -- I'm getting the names all mixed up, even myself. Do you remember if Mr. Clark on the first incident said island monkeys; is that what you're saying, or you can't recall?

A. I can't recall at the time. Um, you're talking about the first incident?

Q. Yeah. I'll be switching between all the incidents.

A. I'm not sure exactly who.

Q. Other than this thing with Dennis Clark, assuming it never happened, how would you characterize your employment with CalPac? Well, I'll take it back. Prior these things happened, prior to September 2004, how would you characterize your employment with CalPac?

A. Uh, my employment with CalPac, personally, I would characterize it as, uh, a future in the cable industry.

Q. Okay.

A. Uh –

Q. Well, did you like it?

A. Of course.

Q. Did you like the people that were working at CalPac?

A. Yes.

Q. And you liked your supervisors?

A. Sure.

Q. That would be Mr. Q. and Van Meter; right?

A. Well, there's other supervisors too.

Q. Did you have any problems with any other supervisors?

A. No.

Q. Did you know who Mr. Ward is?

A. Yes.

Q. Did you have a problem with Mr. Ward?

Q. So other than that, everything was fine with Mr. Ward; correct?

A. Yes.

Q. Did you even interact with John Healy at that time?

A. At the time of –

Q. Well, at any time when you were working at CalPac?

A. Yes.

Q. Did you have any problems with Mr. Healy other than the three times they didn't do anything –

A. None.

Q. Let me finish my question.

A. I'm sorry.

Q. Other than the three times you're saying CalPac didn't do anything and then the time they discharged you, did you have any complaints with Mr. Healy?

A. None.

Q. Well, there was a party -- well, that may have been after you left. Did you participate in the, there was a picnic that CalPac threw in January. Did you go to that picnic?

A. No.

Q. Okay. Okay, moving on down to paragraph 82, it says that you lost income; right?

A. Yes.

Q. So I mean, you said you were out of a job for two

REPORTER'S CERTIFICATE

I, Cecilia F. Flores, Stenotype Reporter, do hereby certify the foregoing 113 pages to be a true and correct transcript of the stenographic shorthand notes and audio recording taken by me in the within-entitled and numbered case at the time and place as set forth herein.

Dated at Hagåtña, Guam, this 25th day of May,2007.

Cecilia F. Flores

CLERK'S CERTIFICATE

SUPERIOR COURT OF GUAM ) ss

I, Cecilia F. Flores, Special Deputy Clerk, Superior Court of Guam, do hereby certify that on the 8th day of May, 2007, at the hour of 9:10 o'clock a.m. there appeared before me Joseph T. Mendiola at the offices of Blair Sterling Johnson Martinez & Leon Guerrero, the witness herein, produced to give his deposition in the within-entitled and numbered Case No. CIV05-00037, in the District Court of Guam; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and a certified copy of the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 25th day of May, 2007.

SPECIAL DEPUTY CLERK, SUPERIOR COURT OF GUAM

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,

Plaintiffs,

vs.

CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10,

Defendants.

CIVIL CASE NO. CIV05-00037

COPY

**DEPOSITION OF RUSSELL A. HATFIELD**

Taken on Behalf of CalPac

BE IT REMEMBERED That, pursuant to the Guam Rules of Civil Procedure, the deposition of **RUSSELL A. HATFIELD** was taken before Cecille A. Flores, a Certified Shorthand Reporter, on Monday, the 19th day of February 2007, at 10:00 a.m. in the offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

is that correct?

    A    That's correct.  Norman is still there as far as I
know.

    Q    When did you become aware that Norman made a
complaint with the EEOC?

    A    I wasn't aware that he made a complaint.  I don't
think I said that.

    Q    How often was Dennis Clark on the job site?

    A    Every day.

    Q    How many hours a day?

    A    Four hours a day.

    Q    Where would he be the rest of the time?

    A    I have no knowledge.

    Q    How many hours would you spend at the CalPac
warehouse on a daily basis?

    A    Me?

    Q    Yes.

    A    Three.

    Q    How long is a work day for you?  How long was a work
day for you at CalPac?

    A    You want from the time I got up in the morning until
the time I went to bed or just physical work?

    Q    Physically being there at CalPac on the job.

    A    12 to 18.  I mean, 12 to 14, I'm sorry.

    Q    What time of the day would you spend those three

A Who I would keep if given a choice of keeping some and letting others go, yes.

Q Now, at the time these people were let go, would people be let go in favor of other employees that were local? Do you understand my question?

A My recommendation has nothing to do with race. The employees that were let go were based on their skill levels and the job requirements that I needed the individuals to do. So if Joe Blow was multi-taskable, I'd put him in this category. If Joe Blow was not, he'd stay over here. If I didn't need his particular skills because we were downsizing at the time because the job was slowing down and you don't keep people on the payroll if you don't have any work for them to do. And that's what we were doing. We were downsizing because the work was slowing down. Yes, there was a long period of work leftover, but we didn't need the humongous payroll and staff that we had at the time.

Q Just for the record, some of the people that stayed on as employees were locals, would that be correct?

A That's correct.

Q I believe you indicated earlier that you weren't aware that various people were filing complaints. You knew there were complaints but you didn't know who they were, would that be correct?

A Uh-huh.

Q I believe that was in reference to -- I believe you indicated Norman Santos, correct?
A I think she was talking about James Lee.
Q James?
A Yee or Lee or whatever his name was. I made the statement that James -- until I got here and I saw it right here, James, down as a defendant. I have -- to this day, other than what's on this piece of paper is the only people that I know have filed a suit.
Q You're referring to the Plaintiffs in this lawsuit?
A That's correct.
Q In your opinion, were the service of the people that were let go around November of 2004, were their services needed at CalPac?
A The ones that were let go, no.
Q So when you're saying let go, they weren't necessarily fired, would that be correct?
A Nobody was fired. Everybody was laid off with the understanding that if work picked up and if we needed your skills back, that you would be given first opportunity to accept the job if you so desired it.
Q And it wouldn't be unusual for somebody to be let go at CalPac and then later picked up?
A No.
Q Did you actually observe that situation?

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 19th day of February, 2007 at the hour of 10:00 a.m. there appeared before me **RUSSELL A. HATFIELD** at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 5th day of March, 2007.

Cecille A. Flores

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,

Plaintiffs,

vs.

CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10,

Defendants.

CIVIL CASE NO. CIV05-00037

ORIGINAL

**DEPOSITION OF DONALD J. HARPER**

Taken on Behalf of California Pacific Technical Services

BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of **DONALD J. HARPER** was taken before Cecille A. Flores, a Certified Shorthand Reporter, on the 16th and 20th days of February 2007, in the offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

Q Were your responsibilities limited to the MCI contract? Did you have other responsibilities as well?
A I had a few other responsibilities at the time.
Q What percentage of your time was devoted to the MCI contract would you say?
A 95 percent.
Q 95 percent?
A Guessing.
Q Can you describe for us what the MCI contract was?
A It was to install a fiber optic connection from the MCI building in Agana to NCTAMS NASA complex.
Q What was the route they took to get from MCI here in Agana?
A Up through Agana, through Tiyan, down the cliffline through Harmon Industrial Park, back through the back road of Fatima, come up Route 1, down Route 3, back through the jungle into NCTAMS.
Q Did the MCI project, was it divided into phases or how did it go?
A I believe it was -- I think there were three phases. They called them three phases, yes.
Q Do you remember what the three phases were?
A Yeah, it wasn't really -- I don't know if there was a contractual breakdown, but I know when it was broken down into phases of making it through Agana. It was kind of a

A Just, I guess, for what an owner does.
Q But he wasn't involved in the day-to-day operations of the company? That was you and Bob and Tim?
A No, he was aware of the day-to-day. There was daily communication with him. I mean, other than that, that's as close as it got.
Q Did he do the job interviews with the prospective laborers?
A No, I don't believe so.
Q Who did that?
A Either be me, Bob or Tim Camacho or Tim Camacho's replacement and I can't remember his name. After that.
Q What was the role of Dennis Clark?
A Dennis Clark was -- he was a representative of MCI. He was basically quality control, I would guess. For MCI. He was there to make sure that the product was installed per their specifications.
Q You had MCI provide a set of specifications you were supposed to follow?
A Yes.
Q Describe how those were presented to you.
A Drawings with details.
Q Do they also have a manual of specifications?
A Not really. Not that I know of.
Q So you say he was the quality control. Was he then

Q Why aren't you on the site that day?

A I was in the office doing some report for John Healy.

Q Do you remember when or about that was time wise?

A No, I don't. I mean, it's no --

Q Was it still in Phase 1 or one of the later phases?

A I think that's kind of the Phase 2. I'm -- I can't really remember but --

Q So you don't recall the date?

A No.

Q Who was the employee that called you?

A Henry Quintanilla.

Q What did Henry Quintanilla tell you to the best as you can recall?

A When I arrived on site, I guess there was a deep excavation area that Dennis wanted things to move faster, didn't like the way they was doin' it and referred to them as monkeys at this time, I believe. It was just a phrase "monkeys" and they didn't like it so I had conversation with Dennis.

Q Was it a heated conversation?

A Yeah, it kind of got heated because he took it -- I tried to keep it on a professional -- look, just don't treat them this way, don't talk to people this way and -- yeah, there was a lot of arrogance.

Q When was the next incident that you can recall that you had a disagreement with Mr. Clark?

A I believe -- I'm not sure but I believe it was -- we were on the back part of NCTAMS coming through the jungle because there was an area that conduit was installed and they called me, the same thing, and we were pulling fiber.

Q You weren't there that day either?

A I was en route. We were setting up for a fiber pull and nobody had started yet.

Q Who called you that time or told you about it?

A I think it was Van Meter at this time.

Q Who is Van Meter?

A Henry Van Meter.

Q Who was Henry Van Meter?

A Henry Van Meter was another one that was not a foreman but he was kind of like a lead man. If the crew broke away, they were working a different area, he had the responsibility of leadership of certain guys.

Q Henry, his title wasn't foreman?

A I don't believe so but I'm not sure.

Q Did you hire Henry Van Meter also?

A You know, I didn't directly hire anybody. I didn't have the authority to, in my opinion, but I was part of the interview of Henry Van Meter.

Q Who else interviewed?

before was left in the right condition, and part of my job is to explore the job ahead in advance to make sure that when they leave that job site that day, of course they're advancing forward and the reason for my performance was to be on site so I covered kind of a wide area.

Q How many lead men or foremen did you have?

A Henry Quintanilla, Henry Van Meter, and basically as guys that were left with any responsibility, I think they were the only two.

Q Was there a very high turnover of workers?

A No.

Q Did CalPac have to hire additional workers to do the MCI project?

A Yes.

Q How many do you recall they had to hire?

A I don't know.

Q 15, 20? 25?

A I'd be guessing. I'd just be guessing.

Q When you interviewed these people, did you tell them they were being hired for that specific job or just hired generally?

A I don't know that the name of the job was ever mentioned to them, but their job role of what they would be doing was explained.

Q What was supposed to happen to them once the project

Q Why do you say that?

A Because he was. It was my opinion. I just feel he was arrogant.

Q Did he ever say anything that made you think he was arrogant?

A It was just arrogance. Yeah, I guess he said a lot of things, obviously, that made me feel that way but I can't pinpoint one isolated situation. It was just being around somebody for long enough in a working condition that you feel that attitude superiority and he felt like he was working in a third world all the time.

Q Did he ever say anything like that?

A Yes.

Q What did he say?

A He just referred to Guam as being very backwards and he would make comments about another job he did somewhere else. I may be wrong about South America and he would compare it to that.

Q Have you ever made any verbal threats to Dennis Clark?

A Yes.

Q Could you tell us about the first time you made a verbal threat to him?

A I think I told him that one time I -- I forget what I said. Get off my job or I'll whoop your ass or something.

REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that DONALD J. HARPER personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 188, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd day of March 2007.

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,

Plaintiffs,

vs.

CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10,

Defendants.

CIVIL CASE NO. CIV05-00037

COPY

DEPOSITION OF NORMAN S. SANTOS

Taken on Behalf of Defendant CalPac

BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of **NORMAN S. SANTOS** was taken before Cecille A. Flores, a Certified Shorthand Reporter, on Friday, the 13th day of April 2007, at 3:00 p.m. in the offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96913
Tel: (671) 734-1041 * Fax: (671) 734-1045

Q How long have you been working at CalPac?
A Going for three years.
Q So you started working at CalPac in 2004?
A Yeah.
Q What is your position now at CalPac?
A Used to be Laborer. Now I'm a Supervisor in the field.
Q When did you become a Supervisor at CalPac?
A One year, three months.
Q So 2006 you became a Supervisor, is that about right?
A Two years after. A year and a half. One year, four months.
Q So around 2006, correct?
A Yeah.
Q So from 2004 through 2006 you were a Laborer?
A Yeah.
Q Somewhere around there, right?
A Uh-huh.
Q What was your wage as a Supervisor? What is your wage?
A 11.50.
Q As a Laborer, how much were you making?
A Used to be $6. Two months later they give $9.
Q When was that?

on them. The two guys laid off, the company gonna be going slow.

Q How long has CalPac had that policy? As long as you've been working there?

A No.

Q So how long?

A That's a new policy.

Q What about in 2004? Did they have a policy about showing up --

A No, no.

Q Earlier you filed a charge of discrimination with the EEOC, correct?

A Yes.

Q That was about the time I guess the other Co-Plaintiffs were filing?

A Yes.

Q The same time they were filing with the EEOC?

A Yes.

Q I think there was something that was filed with the EEOC around February 2005. Did Don Harper help you file the charge of discrimination? Do you remember?

A Yes.

Q Did Mr. Harper help you file it?

A He help us to call Hawaii.

Q Then you used his fax machine?

 the complaint and the time you withdrew it? Do you know how many months or weeks that was?

A Almost a year.

Q Almost a year that you had a complaint with the EEOC?

A Uh-huh.

Q During that time you were still employed at CalPac?

A Yes.

Q Did anybody at CalPac say anything to you about your complaint?

A No.

Q No? They let you work?

A (Witness nodded head.)

Q Did you feel that you were treated unfairly when you were working at CalPac during that one year?

A No.

Q We were talking to Mr. Leon Guerrero about a meeting that was held at CalPac when Dennis Clark said he never made the statements. Do you recall that?

A Yes.

Q During that meeting, did anybody at CalPac, the management, ever say if you make a complaint you'll get fired or you'll --

A No.

Q Nobody said that?

REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **NORMAN S. SANTOS** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 51, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 18th day of May 2007.

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 13th day of April, 2007 at the hour of 3:00 p.m. there appeared before me **NORMAN S. SANTOS** at the law offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 18th day of May, 2007.

Cecille A. Flores

VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

## IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,

Plaintiffs,

vs.

CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,

Defendants.

CIVIL CASE NO. CIV05-00037

**DECLARATION OF JOHN T. HEALY IN SUPPORT OF EACH OF CALPAC'S MOTIONS FOR SUMMARY JUDGMENT**

I, **JOHN T. HEALY**, under penalty of perjury, do hereby declare and state as follows:

1. I am a shareholder of California Technical Services LLC ("CalPac") and its Vice President whose duties include, the field operation of CalPac.

2. Included within Calpac's field operation is the "underground crew" of which plaintiffs were formerly employed.

//

3. In early 2004, CalPac was working on a contact with MCI to lay fiber optics.

4. The MCI contract was initially to be completed in December 2004.

5. CalPac hired additional laborers to assist the underground crew in the completion of the MCI project.

6. The vast majority of the underground crew were of Chamorro descent.

7. In the latter part of 2004, CalPac essentially had one contract (i.e. the MCI Contract) which was nearing completion.

8. Although the MCI contract was not officially completed until June/July of 2005, the services of most of the laborers were no longer needed.

9. CalPac laid off employees based on economic reasons.

10. James Yee and Robert Cruz were not laid off, rather they were terminated for cause.

11. Joseph Hernandez was hurt on the job and received Worker's Compensation. He is officially on CalPac's books.

12. After the lay offs were completed, the vast majority of the remaining underground employees were of Chamorro descent.

13. Sometime in December, 2004, I became aware that some employees were claiming they were being discriminated against based on Clark's purported remarks. A meeting was called to answer any questions and alleviate any concerns, concerning Clark's statements. CalPac did not threaten.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE (671) 477-7857

I declare under penalty of perjury and the laws of the United States that the foregoing statements are true and correct.

DATED: JULY 19, 2007

JOHN T. HEALY

V63\-08130-03
G:\WORDDOC\PLD\VLG\194-DECLARATION OF JOHN HEALY RE VAN METER ET AL V CALPAC ET AL.DOC

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857