VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

FILED
DISTRICT COURT OF GUAM
JUL 23 2007
MARY L.M. MORAN
CLERK OF COURT

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CRUZ, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. CRUZ, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10,<br><br>Defendants. | CIVIL CASE NO. CIV05-00037<br><br><br>**MEMORANDUM PF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE TEDDY B. CRUZ** |

### INTRODUCTION

This is a lawsuit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* Teddy B. Cruz' ("Cruz") claims arise out of two purported statements made by Dennis Clark ("Clark")[1] who, Cruz acknowledges, was an employee of Dynamic Technical Services ("DTS"). Clark, in fact, was MCI's owner representative hired to ensure California Technical

---

[1] For the purpose of this motion only, CalPac will assume Clark made the purported statements.

ORIGINAL

Services, LLC ("CalPac") performed according to the terms of the contract.

Cruz alleged that Clark, on two occasions called him and his fellow co-workers "monkeys" or "island monkeys." Cruz alleged that he made a complaint to his supervisor and that CalPac retaliated and discharged him in May 5, 2005. CalPac declares that Cruz was laid off because the MCI project was near completion and that CalPac no longer needed the services of most of CalPac's laborers.

To the extent co-defendant Dynamic Technical Services ("DTS") asserts there was no hostile environment, CalPac hereby joins in such motion. Further, CalPac now moves for summary judgment on the issue all issues alleged against CalPac by Cruz.

**FACTS**

CalPac acquired a contract from MCI to lay fiber optic cables on Guam. The MCI project entailed laying fiber optic cable from Hagatna to NTCAM. Harper Deposition at p. 11. Initially, the MCI project was scheduled to be completed around December, 2004. See Healy Declaration. Clark was designated as MCI's representative charged with ensuring CalPac complied with the terms of the contract. Harper Deposition at p. 15. **It is not disputed that Clark was never an employees of CalPac**. Harper Deposition at p. 15.

In order to meet the terms of the MCI contract, CalPac hired additional laborers to trench and lay cables. Healy

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 969 I 0-5205
TELEPHONE: (67 I) 477-7857

- 2 -

Declaration. Initially, the MCI project was scheduled to be completed around December, 2004. Healy Declaration. As the project neared completion, CalPac began to lay-off its employees since the MCI project was the only remaining major contract that CalPac had. Healy Declaration.

Cruz, one of the plaintiffs herein, began working for CalPac around February, 2004. Cruz Deposition at p. 18. Cruz was part of the field crew of CalPac. Most, if not all employees, of the field crew were local hires of Chamorro descent. See Healy declaration. When Cruz was brought on board, he was informed that his job would be installing fiber optic for MCI. T. Cruz Deposition at p. 18.

Because of the MCI contract, CalPac had to hire additional employees. Harper Deposition at p. 25. Around November, 2004, CalPac began downsizing because the work was slowing down. Hatfield Deposition at p. 75. Because of the reduced amount of work, the services of many of the employees were no longer needed. Hatfield Deposition at p. 76.

Through Cruz' complaint, Cruz alleged that Clark (an employee of DTS and not of CalPac), harassed Cruz by calling Cruz a "monkey" or "island monkey." See Par. 153 of the Complaint; also see Cruz Deposition at p. 23. Cruz claims to have notified CalPac in September, 200 of the first statement

//

- 3 -

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1  made by Clark. See Para. 154 of the Complaint; also see Cruz
2  Deposition at p. 23.

3  Don Harper, whose duties included coordinating with the
4  CalPac's customers, testified that he was informed of three
5  incidents wherein Clark would refer to the employees as monkeys.
6
7  Harper Deposition at p. 22.

8  The first report purportedly resulted in Harper and Clark
9  having a heated discussion about the way to talk to people.
10  Harper Deposition at p. 22. It was Harper's impression that it
11  was just a phrase 'monkeys' and they [the crew] didn't like it."
12  Harper Deposition at p. 22. The second incident purportedly
13  resulted in the same action by Harper. Harper Deposition at p.
14  23. On the third and final incident, Harper purportedly
15
16  threatened Clark and told him to "get off my job or I'll whoop
17  your ass or something." Harper Deposition at p. 96.

18  Healy denies being informed about such statements until the
19  protests began. Healy Declaration. Bill Ward, CalPac's general
20  manager, testified that he was never informed about the
21  statements until the December meeting.

22
23  Contrary to Cruz' belief, certain CalPac's management were
24  unaware of which employees made complaints. As an example,
25  Hatfield was did not know that Norman Santos filed a complaint
26  with the EEOC. Hatfield Deposition at p. 70. Through Norman
27  Santos' deposition it is undisputed that Santos worked for

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 4 -

CalPac in 2004 (Santos Deposition at p. 12); filed an EEOC complaint for discrimination (Santos Deposition at p. 27); and withdrew his EEOC complaint almost a year later (Santos Deposition at p. 33). As of April 2007, Norman Santos remained an employee with CalPac. Santos Deposition at p. 12.

Generally, Cruz liked working with Healy. T. Cruz Deposition at p. 28.

## LAW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56. The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file" designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 at 324.

In determining whether the moving party has met its burden of establishing that no genuine issue of a material fact exists and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in a light most

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 5 -

favorable to the nonmovant, in this case the Plaintiff, and resolve all reasonable doubts in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Ins.*, 210 F.3d 1099, 1106 (9th Cir. 2000). The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial. *Id.*

## I. RACIAL HARASSMENT – HOSTILE ENVIRONMENT

### 1. CALPAC SHOULD NOT BE LIABLE FOR THE ACTIONS OF A THIRD PARTY

In the instant case, Cruz alleges that a non-employee of CalPac called him a "monkey" or "island monkey" on two occasions. In order for an employer to be found liable for third party harassment, an employer must ratify or condone the conduct by failing to investigate and remedy it after learning

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

of it. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002). Assuming for the sake of this motion that complaints were made to Harper, Harper testified that he confronted Clark about the statements. After the third complaint to Harper, Harper threatened Clark and kicked Clark off the job site. Most importantly, there were no further complaints and the situation was remedied. Clearly, although Healy and Ward may have not known of the actions by Harper, action was taken nonetheless. CalPac, therefore, should not be liable for the actions of Clark.

2. **PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT**

The Supreme Court has repeatedly stated that Title VII **does not set forth "a general civility code for the American workplace.**" (Emphasis added.) *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998); *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006). Judicial standards for harassment must **"filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language**, gender-related jokes, **and occasional teasing.'"** *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998). Although CalPac concedes that referring to an employees as an island monkey may be offensive, these remarks, under the circumstances, do not qualify for Title VII protection. **"Conduct that is not so severe or pervasive enough to create an**

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1 **objectively or abusive work environment...is beyond Title VII**
2 **purview**." (Emphasis added.) *Harris v. Forklift Sys. Inc.*, 510
3 U.S. 17, 21 (1993).

4 In order to state a claim for hostile environment, Cruz
5 must show that: (1) he was subject to verbal or physical conduct
6 based on race or national origin; (2) that the conduct was
7 unwelcomed; and (3) the conduct was sufficiently severe or
8
9 pervasive to alter the conditions of employment and created an
10 abusive environment. *Galdamez v. Potter*, 415 F.3d 1015, 1023
11 (9th Cir. 2005). Simple teasing, offhand comments, and isolated
12 incidents, unless extremely serious, will not amount to
13 discriminatory changes in the terms and conditions of
14 employment, for the purposes of Title VII hostile environment
15 claim. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d. 1027
16
17 (9th Cir. 2005). In determining whether conduct was sufficiently
18 severe or pervasive, courts look at all the circumstances,
19 including the frequency of the discriminatory conduct, its
20 severity, whether it is physically threatening, or humiliating,
21 or a mere offensive utterance, and whether it unreasonably
22 interferes with an employee's work performance. *Little v.*
23 *Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).
24
25 Unlike other, more direct unlawful employment practices,
26 hostile work environments generally result only after an
27 accumulation of discrete instances of harassment. *See Nat'l*

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 8 -

*R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the **cumulative effect** of individual acts"). (Emphasis added.)

In Cruz' case, Cruz alleges that Clark directed two statements at him during his tenure at CalPac. There is no allegation that Clark physically threatened Cruz. This is not a situation where an employee shows up to work and is subjected to a barrage of rude or offensive remarks. Further, there is no showing that the purported remarks altered the terms and conditions of Cruz' employment.

This is a situation where a third party may have made three or four rude remarks of which Cruz may have heard two. Clearly, Cruz failed to establish the frequency required to establish a claim under Title VII especially in light of the allegation that the remarks were not made by CalPac employees.

### 3. CALPAC DID NOT RETALIATE AGAINST CRUZ

Title VII's anti-retaliation provision forbids an employer from "discriminate[ing] against an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted or participated in" a Title VII proceeding or investigation. 42 U.S.C. §§ 2000e-3(a). **This provision, however, "covers those (and only those) employer actions that would have been materially adverse**

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 9 -

**to a reasonable employee or job applicant**...to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination. (Emphasis added.) *Burlington Northern & Santa Fey Ry. Co. v. White*, 126 S.Ct. 2405, 2409 (2006).

If the plaintiff makes a prima facie case, the burden of production shifts to the defendant to present a legitimate, non-retaliatory reason for the adverse action. *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000); *Cassimy v. Board of Education of the Rockford Public School, Dist. #205 (7th Cir. 2006).* If the defendant carries this burden, the plaintiff "must demonstrate a genuine issue of material fact as to whether the reason advanced by the [defendant] was a pretext." *Brooks, supra.*

Cruz claims he was "wrongfully and unlawfully terminated by CalPac." It is noteworthy that Cruz was laid off in May, 2005 almost eight months after the Cruz reported the incident to Quintanilla. CalPac declares that CalPac essentially had one contract that was nearing completion and the services of most of the crew were no longer needed nor could they be afforded. See Healy Declaration.

## CONCLUSION

Liability for hostile environment requires a showing that the action was severe or pervasive. For the reasons stated above, it is respectfully suggested that the two remarks heard

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

by Cruz were not severe or pervasive enough to be protected under Title VII. Indeed, Cruz could not recall how he was treated differently T. Cruz Deposition at p. 54. Assuming the remarks were severe and pervasive, however, liability for third party discrimination requires a showing that CalPac condoned or authorized the act. Such was not done.

Concerning Cruz' claims for retaliation, Cruz' discharge was based on reasons unrelated to any purported complaint made. Other workers, some of whom did not file complaints, along with Cruz were laid off for financial or economic reasons. In essence, there was no work to provide. As such, CalPac respectfully requests this Court grant its motion for summary judgment.

**RESPECTFULLY SUBMITTED** this 23rd day of July, 2007.

**BLAIR STERLING JOHNSON**
**MARTINEZ & LEON GUERRERO**
A PROFESSIONAL CORPORATION

BY: *Vincent Leon Guerrero*
**VINCENT LEON GUERRERO**
*Attorneys for Defendant California Pacific Technical Services LLC*

V63:49\08130-03
G:\WORDDOC\PLD\VLG\202B- MEMO OF P&A IN SUPP OF MSJ RE T
CRUZ RE VAN METER V CALPAC.DOC

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA ) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES )
S. YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA, )
)
              Plaintiffs, )
)
         vs. )
)
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10, )
)
          Defendants. )

🖺 **COPY**

## DEPOSITION OF RUSSELL A. HATFIELD

Taken on Behalf of CalPac

BE IT REMEMBERED That, pursuant to the Guam

Rules of Civil Procedure, the deposition of **RUSSELL A.**

**HATFIELD** was taken before Cecille A. Flores, a Certified

Shorthand Reporter, on Monday, the 19th day of February 2007,

at 10:00 a.m. in the offices of Blair Sterling Johnson

Martinez & Leon Guerrero, Suite 1008, Pacific News Building,

238 Archbishop Flores Street, Hagatna, Guam.

1    is that correct?

2        A    That's correct.  Norman is still there as far as I

3    know.

4        Q    When did you become aware that Norman made a

5    complaint with the EEOC?

6        A    I wasn't aware that he made a complaint.  I don't

7    think I said that.

8        Q    How often was Dennis Clark on the job site?

9        A    Every day.

10       Q    How many hours a day?

11       A    Four hours a day.

12       Q    Where would he be the rest of the time?

13       A    I have no knowledge.

14       Q    How many hours would you spend at the CalPac

15   warehouse on a daily basis?

16       A    Me?

17       Q    Yes.

18       A    Three.

19       Q    How long is a work day for you?  How long was a work

20   day for you at CalPac?

21       A    You want from the time I got up in the morning until

22   the time I went to bed or just physical work?

23       Q    Physically being there at CalPac on the job.

24       A    12 to 18.  I mean, 12 to 14, I'm sorry.

25       Q    What time of the day would you spend those three

1      A     Who I would keep if given a choice of keeping some

2   and letting others go, yes.

3      Q     Now, at the time these people were let go, would

4   people be let go in favor of other employees that were local?

5   Do you understand my question?

6      A     My recommendation has nothing to do with race. The

7   employees that were let go were based on their skill levels

8   and the job requirements that I needed the individuals to do.

9   So if Joe Blow was multi-taskable, I'd put him in this

10  category. If Joe Blow was not, he'd stay over here. If I

11  didn't need his particular skills because we were downsizing

12  at the time because the job was slowing down and you don't

13  keep people on the payroll if you don't have any work for

14  them to do. And that's what we were doing. We were

15  downsizing because the work was slowing down. Yes, there was

16  a long period of work leftover, but we didn't need the

17  humongous payroll and staff that we had at the time.

18     Q     Just for the record, some of the people that stayed

19  on as employees were locals, would that be correct?

20     A     That's correct.

21     Q     I believe you indicated earlier that you weren't

22  aware that various people were filing complaints. You knew

23  there were complaints but you didn't know who they were,

24  would that be correct?

25     A     Uh-huh.

1    Q    I believe that was in reference to -- I believe you

2  indicated Norman Santos, correct?

3    A    I think she was talking about James Lee.

4    Q    James?

5    A    Yee or Lee or whatever his name was.  I made the

6  statement that James -- until I got here and I saw it right

7  here, James, down as a defendant.  I have -- to this day,

8  other than what's on this piece of paper is the only people

9  that I know have filed a suit.

10    Q    You're referring to the Plaintiffs in this lawsuit?

11    A    That's correct.

12    Q    In your opinion, were the service of the people that

13  were let go around November of 2004, were their services

14  needed at CalPac?

15    A    The ones that were let go, no.

16    Q    So when you're saying let go, they weren't

17  necessarily fired, would that be correct?

18    A    Nobody was fired.  Everybody was laid off with the

19  understanding that if work picked up and if we needed your

20  skills back, that you would be given first opportunity to

21  accept the job if you so desired it.

22    Q    And it wouldn't be unusual for somebody to be let go

23  at CalPac and then later picked up?

24    A    No.

25    Q    Did you actually observe that situation?

## NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 19th day of February, 2007 at the hour of 10:00 a.m. there appeared before me **RUSSELL A. HATFIELD** at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 5th day of March, 2007.

_____

Cecille A. Flores

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )      **ORIGINAL**
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                 Plaintiffs,     )
                                 )
        vs.                      )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                 Defendants.     )


## DEPOSITION OF DONALD J. HARPER

Taken on Behalf of California Pacific Technical Services


        BE IT REMEMBERED That, pursuant to the Federal
Rules of Civil Procedure, the deposition of **DONALD J. HARPER**
was taken before Cecille A. Flores, a Certified Shorthand
Reporter, on the 16th and 20th days of February 2007, in the
offices of Blair Sterling Johnson Martinez & Leon Guerrero,
Suite 1008, Pacific News Building, 238 Archbishop Flores
Street, Hagatna, Guam.

1    Q    Were your responsibilities limited to the MCI

2    contract?  Did you have other responsibilities as well?

3    A    I had a few other responsibilities at the time.

4    Q    What percentage of your time was devoted to the MCI

5    contract would you say?

6    A    95 percent.

7    Q    95 percent?

8    A    Guessing.

9    Q    Can you describe for us what the MCI contract was?

10   A    It was to install a fiber optic connection from the

11   MCI building in Agana to NCTAMS NASA complex.

12   Q    What was the route they took to get from MCI here in

13   Agana?

14   A    Up through Agana, through Tiyan, down the cliffline

15   through Harmon Industrial Park, back through the back road of

16   Fatima, come up Route 1, down Route 3, back through the

17   jungle into NCTAMS.

18   Q    Did the MCI project, was it divided into phases or

19   how did it go?

20   A    I believe it was -- I think there were three phases.

21   They called them three phases, yes.

22   Q    Do you remember what the three phases were?

23   A    Yeah, it wasn't really -- I don't know if there was

24   a contractual breakdown, but I know when it was broken down

25   into phases of making it through Agana.  It was kind of a

1     A     Just, I guess, for what an owner does.

2     Q     But he wasn't involved in the day-to-day operations

3  of the company?  That was you and Bob and Tim?

4     A     No, he was aware of the day-to-day.  There was daily

5  communication with him.  I mean, other than that, that's as

6  close as it got.

7     Q     Did he do the job interviews with the prospective

8  laborers?

9     A     No, I don't believe so.

10    Q     Who did that?

11    A     Either be me, Bob or Tim Camacho or Tim Camacho's

12  replacement and I can't remember his name.  After that.

13    Q     What was the role of Dennis Clark?

14    A     Dennis Clark was -- he was a representative of MCI.

15  He was basically quality control, I would guess.  For MCI.

16  He was there to make sure that the product was installed per

17  their specifications.

18    Q     You had MCI provide a set of specifications you were

19  supposed to follow?

20    A     Yes.

21    Q     Describe how those were presented to you.

22    A     Drawings with details.

23    Q     Do they also have a manual of specifications?

24    A     Not really.  Not that I know of.

25    Q     So you say he was the quality control.  Was he then

1    Q    Why aren't you on the site that day?

2    A    I was in the office doing some report for John

3  Healy.

4    Q    Do you remember when or about that was time wise?

5    A    No, I don't.  I mean, it's no --

6    Q    Was it still in Phase 1 or one of the later phases?

7    A    I think that's kind of the Phase 2.  I'm -- I can't

8  really remember but --

9    Q    So you don't recall the date?

10   A    No.

11   Q    Who was the employee that called you?

12   A    Henry Quintanilla.

13   Q    What did Henry Quintanilla tell you to the best as

14 you can recall?

15   A    When I arrived on site, I guess there was a deep

16 excavation area that Dennis wanted things to move faster,

17 didn't like the way they was doin' it and referred to them as

18 monkeys at this time, I believe.  It was just a phrase

19 "monkeys" and they didn't like it so I had conversation with

20 Dennis.

21   Q    Was it a heated conversation?

22   A    Yeah, it kind of got heated because he took it -- I

23 tried to keep it on a professional -- look, just don't treat

24 them this way, don't talk to people this way and -- yeah,

25 there was a lot of arrogance.

1      Q     When was the next incident that you can recall that

2   you had a disagreement with Mr. Clark?

3      A     I believe -- I'm not sure but I believe it was -- we

4   were on the back part of NCTAMS coming through the jungle

5   because there was an area that conduit was installed and they

6   called me, the same thing, and we were pulling fiber.

7      Q     You weren't there that day either?

8      A     I was en route.  We were setting up for a fiber pull

9   and nobody had started yet.

10     Q     Who called you that time or told you about it?

11     A     I think it was Van Meter at this time.

12     Q     Who is Van Meter?

13     A     Henry Van Meter.

14     Q     Who was Henry Van Meter?

15     A     Henry Van Meter was another one that was not a

16  foreman but he was kind of like a lead man.  If the crew

17  broke away, they were working a different area, he had the

18  responsibility of leadership of certain guys.

19     Q     Henry, his title wasn't foreman?

20     A     I don't believe so but I'm not sure.

21     Q     Did you hire Henry Van Meter also?

22     A     You know, I didn't directly hire anybody.  I didn't

23  have the authority to, in my opinion, but I was part of the

24  interview of Henry Van Meter.

25     Q     Who else interviewed?

1    before was left in the right condition, and part of my job is

2    to explore the job ahead in advance to make sure that when

3    they leave that job site that day, of course they're

4    advancing forward and the reason for my performance was to be

5    on site so I covered kind of a wide area.

6        Q    How many lead men or foremen did you have?

7        A    Henry Quintanilla, Henry Van Meter, and basically as

8    guys that were left with any responsibility, I think they

9    were the only two.

10       Q    Was there a very high turnover of workers?

11       A    No.

12       Q    Did CalPac have to hire additional workers to do the

13   MCI project?

14       A    Yes.

15       Q    How many do you recall they had to hire?

16       A    I don't know.

17       Q    15, 20?  25?

18       A    I'd be guessing.  I'd just be guessing.

19       Q    When you interviewed these people, did you tell them

20   they were being hired for that specific job or just hired

21   generally?

22       A    I don't know that the name of the job was ever

23   mentioned to them, but their job role of what they would be

24   doing was explained.

25       Q    What was supposed to happen to them once the project

1    Q    Why do you say that?

2    A    Because he was. It was my opinion. I just feel he

3    was arrogant.

4    Q    Did he ever say anything that made you think he was

5    arrogant?

6    A    It was just arrogance. Yeah, I guess he said a lot

7    of things, obviously, that made me feel that way but I can't

8    pinpoint one isolated situation. It was just being around

9    somebody for long enough in a working condition that you feel

10   that attitude superiority and he felt like he was working in

11   a third world all the time.

12   Q    Did he ever say anything like that?

13   A    Yes.

14   Q    What did he say?

15   A    He just referred to Guam as being very backwards and

16   he would make comments about another job he did somewhere

17   else. I may be wrong about South America and he would

18   compare it to that.

19   Q    Have you ever made any verbal threats to Dennis

20   Clark?

21   A    Yes.

22   Q    Could you tell us about the first time you made a

23   verbal threat to him?

24   A    I think I told him that one time I -- I forget what

25   I said. Get off my job or I'll whoop your ass or something.

# REPORTER'S CERTIFICATE


I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that DONALD J. HARPER personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 188, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd day of March 2007.


_____
Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA) | CIVIL CASE NO. CIV05-00037 |
| JR., JOSEPH J. HERNANDEZ, JOSEPH ) | |
| T. MENDIOLA, LARRY L. CHARFAUROS,) | 🗋 **COPY** |
| ANTHONY C. ARRIOLA, ROBERT B.    ) | |
| CRUZ, ROLAND F. MENDIOLA, JAMES  ) | |
| S. YEE, TEDDY B. CRUZ, JESSE B.  ) | |
| CRUZ, JOHN L.G. NAUTA, and JOHN  ) | |
| P. BABAUTA,                      ) | |
|                                  ) | |
|                     Plaintiffs,  ) | |
|                                  ) | |
|           vs.                    ) | |
|                                  ) | |
| CALPAC, DYNAMIC TECHNICAL        ) | |
| SERVICES, MCI, JOHN HEALY, DENNIS) | |
| CLARK, WILLIAM WARD, JAI JAMES   ) | |
| and DOES 1 through 10,           ) | |
|                                  ) | |
|                     Defendants.  ) | |

### DEPOSITION OF NORMAN S. SANTOS

Taken on Behalf of Defendant CalPac

BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of **NORMAN S. SANTOS** was taken before Cecille A. Flores, a Certified Shorthand Reporter, on Friday, the 13th day of April 2007, at 3:00 p.m. in the offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

1    Q    How long have you been working at CalPac?

2    A    Going for three years.

3    Q    So you started working at CalPac in 2004?

4    A    Yeah.

5    Q    What is your position now at CalPac?

6    A    Used to be Laborer.  Now I'm a Supervisor in the
7    field.

8    Q    When did you become a Supervisor at CalPac?

9    A    One year, three months.

10   Q    So 2006 you became a Supervisor, is that about
11   right?

12   A    Two years after.  A year and a half.  One year, four
13   months.

14   Q    So around 2006, correct?

15   A    Yeah.

16   Q    So from 2004 through 2006 you were a Laborer?

17   A    Yeah.

18   Q    Somewhere around there, right?

19   A    Uh-huh.

20   Q    What was your wage as a Supervisor?  What is your
21   wage?

22   A    11.50.

23   Q    As a Laborer, how much were you making?

24   A    Used to be $6.  Two months later they give $9.

25   Q    When was that?

 1   on them.  The two guys laid off, the company gonna be going

 2   slow.

 3        Q     How long has CalPac had that policy?  As long as

 4   you've been working there?

 5        A     No.

 6        Q     So how long?

 7        A     That's a new policy.

 8        Q     What about in 2004?  Did they have a policy about

 9   showing up --

10        A     No, no.

11        Q     Earlier you filed a charge of discrimination with

12   the EEOC, correct?

13        A     Yes.

14        Q     That was about the time I guess the other

15   Co-Plaintiffs were filing?

16        A     Yes.

17        Q     The same time they were filing with the EEOC?

18        A     Yes.

19        Q     I think there was something that was filed with the

20   EEOC around February 2005.  Did Don Harper help you file the

21   charge of discrimination?  Do you remember?

22        A     Yes.

23        Q     Did Mr. Harper help you file it?

24        A     He help us to call Hawaii.

25        Q     Then you used his fax machine?

1    the complaint and the time you withdrew it?  Do you know how

2    many months or weeks that was?

3        A    Almost a year.

4        Q    Almost a year that you had a complaint with the

5    EEOC?

6        A    Uh-huh.

7        Q    During that time you were still employed at CalPac?

8        A    Yes.

9        Q    Did anybody at CalPac say anything to you about your

10   complaint?

11       A    No.

12       Q    No?  They let you work?

13       A    (Witness nodded head.)

14       Q    Did you feel that you were treated unfairly when you

15   were working at CalPac during that one year?

16       A    No.

17       Q    We were talking to Mr. Leon Guerrero about a meeting

18   that was held at CalPac when Dennis Clark said he never made

19   the statements.  Do you recall that?

20       A    Yes.

21       Q    During that meeting, did anybody at CalPac, the

22   management, ever say if you make a complaint you'll get fired

23   or you'll --

24       A    No.

25       Q    Nobody said that?

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that NORMAN S. SANTOS personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 51, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 18th day of May 2007.

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

       I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 13th day of April, 2007 at the hour of 3:00 p.m. there appeared before me **NORMAN S. SANTOS** at the law offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

       I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

       In testimony whereof, I have hereunto set my hand this 18th day of May, 2007.

_____
Cecille A. Flores

VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

## IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, | ) ) ) ) ) ) ) ) ) ) | CIVIL CASE NO. CIV05-00037 |
| Plaintiffs, | ) ) | **DECLARATION OF JOHN T. HEALY IN SUPPORT OF EACH OF CALPAC'S MOTIONS FOR SUMMARY JUDGMENT** |
| vs. | ) ) ) | |
| CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

I, **JOHN T. HEALY**, under penalty of perjury, do hereby declare and state as follows:

1.    I am a shareholder of California Technical Services LLC ("CalPac") and its Vice President whose duties include, the field operation of CalPac.

2.    Included within Calpac's field operation is the "underground crew" of which plaintiffs were formerly employed.

//

3. In early 2004, CalPac was working on a contact with MCI to lay fiber optics.

4. The MCI contract was initially to be completed in December 2004.

5. CalPac hired additional laborers to assist the underground crew in the completion of the MCI project.

6. The vast majority of the underground crew were of Chamorro descent.

7. In the latter part of 2004, CalPac essentially had one contract (i.e. the MCI Contract) which was nearing completion.

8. Although the MCI contract was not officially completed until June/July of 2005, the services of most of the laborers were no longer needed.

9. CalPac laid off employees based on economic reasons.

10. James Yee and Robert Cruz were not laid off, rather they were terminated for cause.

11. Joseph Hernandez was hurt on the job and received Worker's Compensation. He is officially on CalPac's books.

12. After the lay offs were completed, the vast majority of the remaining underground employees were of Chamorro descent.

13. Sometime in December, 2004, I became aware that some employees were claiming they were being discriminated against based on Clark's purported remarks. A meeting was called to answer any questions and alleviate any concerns, concerning Clark's statements. CalPac did not threaten.

- 2 -

R STERLING JOHNSON
INLE & LEON GUERRERO
A PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGATNA, GUAM 96910-5205
PHONE: (671) 477-7857

I declare under penalty of perjury and the laws of the United States that the foregoing statements are true and correct.

DATED: JULY ___, 2007

_____
JOHN T. HEALY

V63\-08130-03
G:\WORDDOC\PLD\VLG\194-DECLARATION OF JOHN HEALY RE VAN METER
ET AL V CALPAC ET AL.DOC

R STERLING JOHNSON
FINEZ & LEON GUERRERO
PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BUILDING
ARCHBISHOP F.C. FLORES STREET
ITNA, GUAM 96910-5205
PHONE: (671) 477-7857

- 3 -

# IN THE SUPERIOR COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                Plaintiffs,      )
                                 )
        vs.                      )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES,  )
and DOES 1 through 10,           )
                                 )
                Defendants.      )

**ORIGINAL**

## DEPOSITION OF TEDDY B. CRUZ

*Taken on Behalf of Defendant CalPac*

            BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **TEDDY B. CRUZ** was

taken before Cecille A. Flores, a Certified Shorthand

Reporter, on Monday, the 16th day of April 2007, at 9:00 a.m.

in the offices of Blair Sterling & Johnson, Suite 1008,

Pacific News Building, 238 Archbishop Flores Street, Hagatna,

Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96913

Case 1:05-cv-00037    Document 340    Filed 05/23/2007    Page 34 of 40

Tel: (671) 734-1041 * Fax: (671) 734-1045

1    office?  Did you look at that?

2        A    I got that copy.

3        Q    I want to just start with your Complaint.  I'm going

4    to refer to Paragraph 152.  Do you want to look at it?  Take

5    a look at Paragraph 152 and then once you find it can you

6    just read it for the record?

7        A    Paragraph 152, "Cruz was hired by CalPac in or

8    around February 2004 for a construction project underground

9    cable for Guam MCI."

10       Q    So you were hired by CalPac to do work on the MCI

11   project, correct?

12       A    Yes.

13       Q    That was the installation project for MCI?

14       A    Yes.

15       Q    Don Harper hired you on that one?

16       A    Yeah.

17       Q    Did you know Don Harper, by the way, before that?

18       A    No.

19       Q    What did Mr. Harper tell you when he hired you?

20       A    We will be installing fiber optic for MCI.

21       Q    Had you worked on construction before CalPac?

22       A    Only for Choi's Equipment Rental.

23       Q    Would Choi's Equipment Rental be considered

24   construction?  I don't know, I'm just --

25       A    It's a rental equipment.

1     A     'Cause it was MCI's project.

2     Q     CalPac was named as a Defendant in this case.  Do

3 you know why CalPac was named as a Defendant?

4     A     'Cause CalPac didn't do nothing when I made a

5 complaint.

6     Q     What was the complaint that you made?

7     A     That I was called island monkeys.

8     Q     Who did you make the complaint to?

9     A     I made it to Don Harper.

10    Q     When did you make this complaint to Mr. Harper?

11    A     September.

12    Q     What did Mr. Harper say about your complaint?

13    A     He'll take it up with the management.

14    Q     He said he would take it up with management?

15    A     (Witness nodded head.)

16    Q     Correct?

17    A     Yes.

18    Q     Did you ever follow up with Mr. Harper about your

19 complaint?

20    A     No.

21    Q     Let's just go back and we'll come back to your

22 Complaint.  I believe in your Complaint that you filed with

23 the court you stated that around September to October 2004,

24 Dennis Clark made some statements, correct?

25    A     Yes.

1   the EEOC?

2        A    No.

3        Q    Did he say anything about the Department of Labor?

4        A    No.

5        Q    Do you know, first of all, who James Yee is?

6        A    One of CalPac.

7        Q    I'm sorry?

8        A    Employee.

9        Q    He's one of the guys --

10       A    Yeah.

11       Q    He's a Plaintiff in this lawsuit, right?

12       A    Yes.

13       Q    Would it surprise you that Mr. Yee said he had no

14  problem with Mr. Healy?

15       A    That one I don't know.

16       Q    Would it surprise you that Mr. Yee said that

17  Mr. Healy treated Mr. Yee with respect?

18       A    Yes.

19       Q    What's that?

20       A    Yes.

21       Q    It would surprise you or --

22       A    It would surprise me.

23       Q    So you didn't like Mr. Healy, correct?

24       A    I like the guy working with him.

25       Q    Did he treat you with respect?

1     A    No.

2     Q    Who are the upper management or supervisors that

3  you're referring to in Exhibit A?

4     A    Hatfield.

5     Q    How would Hatfield treat you differently?  Because I

6  believe earlier you indicated you rarely talked to

7  Mr. Hatfield.

8     A    Because I was doing the shitty jobs.  Reduced hours.

9     Q    Further on in Exhibit A, the next sentence says

10  "However, after the charges were filed, when I would greet

11  the upper management and supervisors, I was blatantly

12  ignored."  Okay?

13     A    Yes.

14     Q    Did Mr. Hatfield ignore you after you filed the

15  charges?

16     A    I can't remember.

17     Q    Did Mr. Healy ignore you after you filed the

18  charges?

19     A    Yes.

20     Q    Did he ignore you more than he did before because

21  you said you never talked to Mr. Healy before or rarely

22  talked to Mr. Healy.

23     A    Rarely.

24     Q    Did you talk more to Mr. Healy?  Is that what you're

25  saying?  And he was ignoring you more?

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand
Reporter, hereby certify that **TEDDY B. CRUZ** personally
appeared before me at the time and place set forth in the
caption hereof; that at said time and place I reported in
stenotypy all testimony adduced and other oral proceedings
had in the foregoing matter; that thereafter my notes were
reduced to typewriting under my direction; and the foregoing
transcript, pages 1 to 112, both inclusive, constitutes a
full, true, and correct record of such testimony adduced and
oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd
day of July 2007.


Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

                I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 16th day of April, 2007 at the hour of 9:00 a.m. there appeared before me **TEDDY B. CRUZ** at the law offices of Blair Sterling & Johnson, Suite 1008, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

                I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

                In testimony whereof, I have hereunto set my hand this 2nd day of July, 2007.

                          Cecille A. Flores