

**FILED**

DISTRICT COURT OF GUAM

JUL 23 2007 nba

**MARY L.M. MORAN
CLERK OF COURT**

1 VINCENT LEON GUERRERO
2 BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
3 SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
4 TELEPHONE: (671) 477-7857

5 *Attorneys for Defendant California Pacific Technical Services LLC*

6

7

# IN THE DISTRICT COURT OF GUAM

8 HENRY G. VAN METER, JERRY )      CIVIL CASE NO. CIV05-00037
APODACA, JR., JOSEPH J. HERNANDEZ, )
9 JOSEPH T. MENDIOLA, LARRY L. )
CHARFAUROS, ANTHONY C. )
10 ARRIOLA, ROBERT B. CRUZ, ROLAND )
F. MENDIOLA, JAMES S. YEE, TEDDY )      **MEMORANDUM PF POINTS AND**
11 B. CRUZ, JESSE B. CRUZ, JOHN L.G. )      **AUTHORITIES IN SUPPORT OF**
NAUTA, and JOHN P. BABAUTA, )      **MOTION FOR SUMMARY JUDGMENT**
12 )      **RE JOHN L.G. NAUTA**
         Plaintiffs, )
13 )
)
14 vs. )
)
15 CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS )
16 CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10, )
17 )
         Defendants. )
18

19                      **INTRODUCTION**

20      This is a lawsuit brought under Title VII of the Civil

21 Rights Act of 1964, 42 U.S.C. Section 2000e, et. seq. John L.G.

22 Nauta ("Nauta") claims arise out of two purported statements

23 made by Dennis Clark ("Clark").[1] Clark, in fact, was MCI's owner

24 representative hired to ensure CalPac performed according to the

25

26 terms of the contract.

27

28    [1] For the purpose of this motion only, CalPac will assume Clark made the
purported statements.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Nauta alleges that on two occasions Clark called him and his fellow co-workers "monkeys" or "island monkeys." Nauta claims that he reported the statement to his supervisor and that CalPac retaliated and discharged him in May of 2005. CalPac declares that Nauta was laid off because the MCI project was near completion and that CalPac no longer needed the services of most of CalPac's laborers.

To the extent co-defendant Dynamic Technical Services ("DTS") asserts there was no hostile environment, CalPac hereby joins in such motion. Further, CalPac now moves for summary judgment on all issues alleged against CalPac by Nauta.

## FACTS

CalPac acquired a contract from MCI to lay fiber optic cables on Guam. The MCI project entailed laying fiber optic cable from Hagatna to NTCAM. Harper Deposition at p. 11. Initially, the MCI project was scheduled to be completed around December, 2004. See Healy Declaration. Clark were designated as MCI's representative charged with ensuring CalPac complied with the terms of the contract. Harper Deposition at p. 15. **It is not disputed that Clark was never an employee of CalPac.** Harper Deposition at p. 15.

In order to meet the terms of the MCI contract, CalPac hired additional laborers to trench and lay cables. Healy Declaration. Initially, the MCI project was scheduled to be completed around December, 2004. Healy Declaration. As the

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 969 10-5205
TELEPHONE: (671) 477-7857

- 2 -

1  project neared completion, CalPac began to lay-off its employees
2  since the MCI project was the only remaining major contract that
3  CalPac had.  Healy Declaration

4
5      Nauta, one of the plaintiffs herein, began working for
6  CalPac around February, 2004.  Nauta Deposition at p. 12.  Nauta
7  was part of the field crew of CalPac.  Most, if not all
8  employees, of the field crew were local hires of Chamorro
9  descent.  See Healy declaration.  Because of the MCI contract,
10 CalPac had to hire additional employees.  Harper Deposition at
11 p. 25.  Around  November, 2004, CalPac began downsizing because
12 the work was  slowing down.  Hatfield Deposition at p.  75.
13
14 Because of the reduced amount of work, the services of many of
15 the employees were no longer needed.  Hatfield Deposition at p.
16 76.

17     Through Nauta's complaint, Nauta alleged that Clark (an
18 employee of DTS and not of CalPac), harassed Nauta by calling
19 Nauta a "monkey" or "island monkey."  See Par. 194 of the
20 Complaint; Also see Nauta Deposition at p. 20.

21
22     Nauta alleged that the purported statements occurred around
23 September and October.  See Para. 133 of the Complaint; Also see
24 Nauta Deposition at p. 40.  Nauta claims to have notified CalPac
25 of the treatment received from Clark.  See Para. 134 of the
26 Complaint;  Also  see  Nauta  Deposition  at  p.  44.  This
27
28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM  969 10-5206
TELEPHONE: (671) 477-7857

1 notification purportedly was done through Henry Van Meter. See
2 Nauta Deposition at p. 43.

3 Nauta filed a declaration with the EEOC stating "the
4 Earliest Date of [CalPac's] Violation is December 2004." See
5 EEOC Declaration of John L.G. Nauta attached to Nauta Deposition
6 as Exhibit "A." Under examination, however, Nauta did not know
7 to what the date referred. Nauta Deposition at p. 34.
8 Initially, Nauta believed it referred to a reduction in work
9 hours. Nauta Deposition at p. 35. Later, Nauta recanted and
10 testified he could when his work hours were reduced. Nauta
11 Deposition at p. 132.

12 Don Harper, whose duties included coordinating with the
13 CalPac's customers, testified that he was informed of three
14 incidents wherein Clark would refer to the employees as monkeys.
15 Harper Deposition at p. 22.

16 The first report purportedly resulted in Harper and Clark
17 having a heated discussion about the way to talk to people.
18 Harper Deposition at p. 22. It was Harper's impression that it
19 was just a phrase 'monkeys' and they [the crew] didn't like it."
20 Harper Deposition at p. 22. The second incident purportedly
21 resulted in the same action by Harper. Harper Deposition at p.
22 23. On the third and final incident, Harper purportedly
23 //

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM  96910-5205
TELEPHONE: (671) 477-7857

threatened Clark and told him to "get off my job or I'll whoop your ass or something." Harper Deposition at p. 96.

Although Harper claims to have informed Healy, Healy denies being informed about such statements until the protests began. Bill Ward, CalPac's general manager, testified that he was never informed about the statements until the December meeting.

Through his Complaint at Par. 136, Nauta alleged that a meeting on December, 2004 took place informing CalPac employees that they would be terminated if they complained to authorities. Nauta, in fact did not attend the meeting. Nauta Deposition at p. 87. Hatfield, a disinterested witness,[2] testified that Healy called the meeting to answer any questions concerning the allegations of discrimination. Hatfield Deposition at p. 9. Hatfield further testified that Healy stated that he was unaware of any complaints of discriminatory remarks and that Healy encouraged employees to report such remarks to management or the EEOC.

Contrary to Nauta's belief, certain CalPac's management were unaware of which employees made complaints. As an example, Hatfield was did not know that Norman Santos filed a complaint with the EEOC. Hatfield Deposition at p. 70. Through Norman Santos' deposition it is undisputed that Santos worked for

---

[2]    Hatfield, a Caucasian, left CalPac in June 2005 due to the winding down of CalPac's projects and unavailability of work. Hatfield Deposition at p. 17.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 5 -

CalPac in 2004 (Santos Deposition at p. 12); filed an EEOC complaint for discrimination (Santos Deposition at p. 27); and withdrew his EEOC complaint almost a year later (Santos Deposition at p. 33). As of April 2007, Norman Santos remained an employee with CalPac. Santos Deposition at p. 12.

## LAW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56. The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file" designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 at 324.

In determining whether the moving party has met its burden of establishing that no genuine issue of a material fact exists and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in a light most favorable to the nonmovant, in this case the Plaintiff, and resolve all reasonable doubts in that party's favor. *Matsushita*

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1 *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

2 (1986). A material fact is one "that might affect the outcome

3 of the suit under the governing law." *Anderson v. Liberty*

4 *Lobby, Inc.*, 477 U.S. 242 (1986). A disputed fact presents a

5 genuine issue "if the evidence is such that a reasonable jury

6 could return a verdict for the non-moving party. *Id.*

7

8 Where the moving party does not bear the burden of proof on

9 an issue at trial, the moving party may discharge its burden of

10 production by either of two methods. *Nissan Fire & Marine Ins.*

11 *Co., Ltd., v. Fritz Cos., Ins.*, 210 F.3d 1099, 1106 (9th Cir.

12 2000). The moving party may produce evidence negating an

13 essential element of the nonmoving party's case, or, after

14 suitable discovery, the moving party may show that the nonmoving

15 party does not have enough evidence of an essential element of

16 its claim or defense to carry its ultimate burden of persuasion

17 at trial. *Id.*

18

19 ## I. RACIAL HARASSMENT – HOSTILE ENVIRONMENT

20 ### 1. CALPAC SHOULD NOT BE LIABLE FOR THE ACTIONS OF A THIRD PARTY

21 In the instant case, Nauta alleges that a non-employee of

22 CalPac called him a "monkey" or "island monkey" on two

23 occasions. In order for an employer to be found liable for

24 third party harassment, an employer must ratify or condone the

25 conduct by failing to investigate and remedy it after learning

26 of it. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968

27 (9th Cir. 2002). Assuming for the sake of this motion that

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 7 -

complaints were made to Harper, Harper testified that he confronted Clark about the statements. After the third complaint to Harper, Harper threatened Clark and kicked Clark off the job site. Most importantly, there were no further complaints and the situation was remedied. Clearly, although Healy and Ward may have not known of the actions by Harper, action was taken nonetheless. CalPac, therefore, should not be liable for the actions of Clark.

## 2. PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT

The Supreme Court has repeatedly stated that Title VII **does not set forth "a general civility code for the American workplace**." (Emphasis added.) *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *Burlington Northern & Santa Fey Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006). Judicial standards for harassment must **"filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language**, gender-related jokes, **and occasional teasing.'"** *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998). Although CalPac concedes that referring to an employee as an island monkey may be offensive, these remarks, under the circumstances, do not qualify for Title VII protection. **"Conduct that is not so severe or pervasive enough to create an objectively or abusive work environment...is beyond Title VII**

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 8 -

1 **purview.**" (Emphasis added.) *Harris v. Forklift Sys. Inc.*, 510
2 U.S. 17, 21 (1993).

3 In order to state a claim for hostile environment, Nauta
4 must show that: (1) he was subject to verbal or physical conduct
5 based on race or national origin; (2) that the conduct was
6 unwelcomed; and (3) the conduct was sufficiently severe or
7
8 pervasive to alter the conditions of employment and created an
9 abusive environment. *Galdamez v. Potter*, 415 F.3d 1015, 1023
10 (9th Cir. 2005). Simple teasing, offhand comments, and isolated
11 incidents, unless extremely serious, will not amount to
12 discriminatory changes in the terms and conditions of
13
14 employment, for the purposes of Title VII hostile environment
15 claim. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d. 1027
16 (9th Cir. 2005). In determining whether conduct was sufficiently
17 severe or pervasive, courts look at all the circumstances,
18 including the frequency of the discriminatory conduct, its
19 severity, whether it is physically threatening, or humiliating,
20 or a mere offensive utterance, and whether it unreasonably
21 interferes with an employee's work performance. *Little v.*
22
23 *Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

24 Unlike other, more direct and discrete unlawful employment
25 practices, hostile work environments generally result only after
26 an accumulation of discrete instances of harassment. *See Nat'l*
27 *R.R. Passenger Corp. v. Morgan,* 536 U.S. 101,115 (2002)("Hostile

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 969 10-5205
TELEPHONE: (671) 477-7857

environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the **cumulative effect** of individual acts"). (Emphasis added.) *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001).

Nauta alleges that Clark directed two statements at him during his tenure at CalPac. These statements occurred in September and perhaps October. Nauta, however, stated in his declaration that the earliest violation occurred in December, 2004. This an indication that the incidents were not severe such that Nauta forgot.

Further, there is no allegation that Clark physically threatened Nauta. This is not a situation where an employee shows up to work and is subjected to a barrage of rude or offensive remarks. Further, there is no showing that the purported remarks altered the terms and conditions of Nauta's employment. Indeed, Nauta testified that his duties and pay remained the same and he was unsure when CalPac reduced his hours.

This is a situation where a third party may have made three or four rude remarks of which Nauta may have heard two. Clearly, Nauta failed to establish the frequency required to establish a claim under Title VII especially in light of the allegation that the remarks were not made by CalPac employees.

**3. CALPAC DID NOT RETALIATE AGAINST NAUTA**

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Title VII's anti-retaliation provision forbids an employer from "discriminate[ing] against an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted or participated in" a Title VII proceeding or investigation. 42 U.S.C. Section 2000e-3(a). **This provision, however, "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant**...to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination. (Emphasis added.) *Burlington Northern & Santa Fey Ry. Co. v. White*, 126 S.Ct. 2405, 2409 (2006).

An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. LINDEMANN & P. GROSSMAN, *Employment Discrimination Law* 669 (3d ed.1996) (noting that "courts have held that **personality conflicts at work that generate antipathy"** **and "'snubbing' by supervisors and co-workers" are not actionable** under § 704(a)). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. (citations omitted.) It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 11 -

1 courts, and their employers. *Ibid.* And normally **petty slights,**
2 //
3 **minor annoyances, and simple lack of good manners will not**
4 **create such deterrence.** (emphasis added.) *Burlington, at* 2415.
5
6 If the plaintiff makes a prima facie case, the burden of
7 production shifts to the defendant to present a legitimate, non-
8 retaliatory reason for the adverse action. *Brooks v. City of San*
9 *Mateo,* 229 F.3d 917, 928 (9th Cir. 2000); *Cassimy v. Board of*
10 *Education of the Rockford Public School, Dist. #205 (7th Cir.*
11 *2006).* If the defendant carries this burden, the plaintiff "must
12 demonstrate a genuine issue of material fact as to whether the
13 reason advanced by the [defendant] was a pretext." *Brooks,*
14 *supra.*
15
16 In Nauta's deposition, Nauta testified that CalPac
17 retaliated by being snubbed by management. Yet he recalls Healy
18 drinking with the boys. This type of perceived bad manners is
19 simply not the type of conduct that Title VII was designed to
20 prohibit.
21 Nauta claims he was "wrongfully and unlawfully terminated
22 by CalPac. CalPac declares that CalPac essentially had one
23 contract that was nearing completion and the services of most of
24 the crew, to include Nauta, were no longer needed nor could they
25 be afforded. See Healy Declaration.
26
27 **CONCLUSION**
28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Liability for hostile environment requires a showing that the action was severe and pervasive. For the reasons stated above, it is respectfully suggested that the two remarks heard by Nauta were not severe or pervasive enough to be protected under Title VII. Assuming the remarks were severe and pervasive, third party discrimination requires a showing that CalPac condone or authorized the act. Such was not done.

Concerning Nauta's claims for retaliation, Nauta's reduced hours and discharge was based on reasons unrelated to any purported complaint made. Other workers, some of whom did not file complaints, along with Nauta were laid off for financial or economic reasons. As such, CalPac respectfully requests this Court grant its motion for summary judgment.

**RESPECTFULLY SUBMITTED** this 23rd day of July, 2007.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION


BY: _____
VINCENT LEON GUERRERO
*Attorneys for Defendant California Pacific Technical Services LLC*

V63:49\08130-03
G:\WORDDOC\PLD\VLG\209B-MEMO OF P&A IN SUPP OF MSJ RE J
NAUTA RE VAN METER V. CALPAC.DOC

– 13 –

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Case 1:05-cv-00037     Document 343     Filed 07/23/2007     Page 13 of 47

VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 100B PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE. TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>Defendants. | CIVIL CASE NO. CIV05-00037<br><br><br><br>**DECLARATION OF JOHN T. HEALY IN SUPPORT OF EACH OF CALPAC'S MOTIONS FOR SUMMARY JUDGMENT** |

I, **JOHN T. HEALY**, under penalty of perjury, do hereby declare and state as follows:

1.      I am a shareholder of California Technical Services LLC ("CalPac") and its Vice President whose duties include, the field operation of CalPac.

2.      Included within Calpac's field operation is the "underground crew" of which plaintiffs were formerly employed.

//

3. In early 2004, CalPac was working on a contact with MCI to lay fiber optics.

4. The MCI contract was initially to be completed in December 2004.

5. CalPac hired additional laborers to assist the underground crew in the completion of the MCI project.

6. The vast majority of the underground crew were of Chamorro descent.

7. In the latter part of 2004, CalPac essentially had one contract (i.e. the MCI Contract) which was nearing completion.

8. Although the MCI contract was not officially completed until June/July of 2005, the services of most of the laborers were no longer needed.

9. CalPac laid off employees based on economic reasons.

10. James Yee and Robert Cruz were not laid off, rather they were terminated for cause.

11. Joseph Hernandez was hurt on the job and received Worker's Compensation. He is officially on CalPac's books.

12. After the lay offs were completed, the vast majority of the remaining underground employees were of Chamorro descent.

13. Sometime in December, 2004, I became aware that some employees were claiming they were being discriminated against based on Clark's purported remarks. A meeting was called to answer any questions and alleviate any concerns, concerning Clark's statements. CalPac did not threaten.

- 2 -

STERLING JOHNSON
SIZ & LEON GUERRERO
CLINICAL CORPORATION
008 PACIFIC NEWS Building
238HOP F.C. FLORES Street
HA, GUAM, 0a6I 0-5302
HOME (871)477-7657

1  I declare under penalty of perjury and the laws of the

2  United States that the foregoing statements are true and correct.

3

4  DATED: JULY ___, 2007

5                                    JOHN T. HEALY

6

7  V63\-08130-03
   G:\WORDDOC\PLD\VLG\194-DECLARATION OF JOHN HEALY RE VAN METER
8  ET AL V CALPAC ET AL.DOC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STERLING JOHNSON
NED & LYON GUERRERO
PROFESSIONAL CORPORATION
1008 PACIFIC NEWS BUILDING
CHEMOF F.C. FLORES STREET
HA, GUAM 96910-5205
PHONE: (671) 477-7857

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA.                      )
                                 )
                Plaintiffs,      )
                                 )
        vs.                      )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                Defendants.      )

## DEPOSITION OF DONALD J. HARPER

Taken on Behalf of California Pacific Technical Services

BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of **DONALD J. HARPER** was taken before Cecille A. Flores, a Certified Shorthand Reporter, on the 16th and 20th days of February 2007, in the offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

1        Q    Were your responsibilities limited to the MCI

2    contract?  Did you have other responsibilities as well?

3        A    I had a few other responsibilities at the time.

4        Q    What percentage of your time was devoted to the MCI

5    contract would you say?

6        A    95 percent.

7        Q    95 percent?

8        A    Guessing.

9        Q    Can you describe for us what the MCI contract was?

10       A    It was to install a fiber optic connection from the

11   MCI building in Agana to NCTAMS NASA complex.

12       Q    What was the route they took to get from MCI here in

13   Agana?

14       A    Up through Agana, through Tiyan, down the cliffline

15   through Harmon Industrial Park, back through the back road of

16   Fatima, come up Route 1, down Route 3, back through the

17   jungle into NCTAMS.

18       Q    Did the MCI project, was it divided into phases or

19   how did it go?

20       A    I believe it was -- I think there were three phases.

21   They called them three phases, yes.

22       Q    Do you remember what the three phases were?

23       A    Yeah, it wasn't really -- I don't know if there was

24   a contractual breakdown, but I know when it was broken down

25   into phases of making it through Agana.  It was kind of a

1        A     Just, I guess, for what an owner does.

2        Q     But he wasn't involved in the day-to-day operations

3    of the company?  That was you and Bob and Tim?

4        A     No, he was aware of the day-to-day.  There was daily

5    communication with him.  I mean, other than that, that's as

6    close as it got.

7        Q     Did he do the job interviews with the prospective

8    laborers?

9        A     No, I don't believe so.

10       Q     Who did that?

11       A     Either be me, Bob or Tim Camacho or Tim Camacho's

12   replacement and I can't remember his name.  After that.

13       Q     What was the role of Dennis Clark?

14       A     Dennis Clark was -- he was a representative of MCI.

15   He was basically quality control, I would guess.  For MCI.

16   He was there to make sure that the product was installed per

17   their specifications.

18       Q     You had MCI provide a set of specifications you were

19   supposed to follow?

20       A     Yes.

21       Q     Describe how those were presented to you.

22       A     Drawings with details.

23       Q     Do they also have a manual of specifications?

24       A     Not really.  Not that I know of.

25       Q     So you say he was the quality control.  Was he then

1    Q    Why aren't you on the site that day?

2    A    I was in the office doing some report for John

3  Healy.

4    Q    Do you remember when or about that was time wise?

5    A    No, I don't. I mean, it's no --

6    Q    Was it still in Phase 1 or one of the later phases?

7    A    I think that's kind of the Phase 2. I'm -- I can't

8  really remember but --

9    Q    So you don't recall the date?

10   A    No.

11   Q    Who was the employee that called you?

12   A    Henry Quintanilla.

13   Q    What did Henry Quintanilla tell you to the best as

14  you can recall?

15   A    When I arrived on site, I guess there was a deep

16  excavation area that Dennis wanted things to move faster,

17  didn't like the way they was doin' it and referred to them as

18  monkeys at this time, I believe. It was just a phrase

19  "monkeys" and they didn't like it so I had conversation with

20  Dennis.

21   Q    Was it a heated conversation?

22   A    Yeah, it kind of got heated because he took it -- I

23  tried to keep it on a professional -- look, just don't treat

24  them this way, don't talk to people this way and -- yeah,

25  there was a lot of arrogance.

1    Q    When was the next incident that you can recall that

2    you had a disagreement with Mr. Clark?

3    A    I believe -- I'm not sure but I believe it was -- we

4    were on the back part of NCTAMS coming through the jungle

5    because there was an area that conduit was installed and they

6    called me, the same thing, and we were pulling fiber.

7    Q    You weren't there that day either?

8    A    I was en route.  We were setting up for a fiber pull

9    and nobody had started yet.

10    Q    Who called you that time or told you about it?

11    A    I think it was Van Meter at this time.

12    Q    Who is Van Meter?

13    A    Henry Van Meter.

14    Q    Who was Henry Van Meter?

15    A    Henry Van Meter was another one that was not a

16    foreman but he was kind of like a lead man.  If the crew

17    broke away, they were working a different area, he had the

18    responsibility of leadership of certain guys.

19    Q    Henry, his title wasn't foreman?

20    A    I don't believe so but I'm not sure.

21    Q    Did you hire Henry Van Meter also?

22    A    You know, I didn't directly hire anybody.  I didn't

23    have the authority to, in my opinion, but I was part of the

24    interview of Henry Van Meter.

25    Q    Who else interviewed?

1    before was left in the right condition, and part of my job is

2    to explore the job ahead in advance to make sure that when

3    they leave that job site that day, of course they're

4    advancing forward and the reason for my performance was to be

5    on site so I covered kind of a wide area.

6        Q    How many lead men or foremen did you have?

7        A    Henry Quintanilla, Henry Van Meter, and basically as

8    guys that were left with any responsibility, I think they

9    were the only two.

10       Q    Was there a very high turnover of workers?

11       A    No.

12       Q    Did CalPac have to hire additional workers to do the

13   MCI project?

14       A    Yes.

15       Q    How many do you recall they had to hire?

16       A    I don't know.

17       Q    15, 20?   25?

18       A    I'd be guessing.  I'd just be guessing.

19       Q    When you interviewed these people, did you tell them

20   they were being hired for that specific job or just hired

21   generally?

22       A    I don't know that the name of the job was ever

23   mentioned to them, but their job role of what they would be

24   doing was explained.

25       Q    What was supposed to happen to them once the project

1    Q    Why do you say that?

2    A    Because he was. It was my opinion. I just feel he
3  was arrogant.

4    Q    Did he ever say anything that made you think he was
5  arrogant?

6    A    It was just arrogance. Yeah, I guess he said a lot
7  of things, obviously, that made me feel that way but I can't
8  pinpoint one isolated situation. It was just being around
9  somebody for long enough in a working condition that you feel
10  that attitude superiority and he felt like he was working in
11  a third world all the time.

12    Q    Did he ever say anything like that?

13    A    Yes.

14    Q    What did he say?

15    A    He just referred to Guam as being very backwards and
16  he would make comments about another job he did somewhere
17  else. I may be wrong about South America and he would
18  compare it to that.

19    Q    Have you ever made any verbal threats to Dennis
20  Clark?

21    A    Yes.

22    Q    Could you tell us about the first time you made a
23  verbal threat to him?

24    A    I think I told him that one time I -- I forget what
25  I said. Get off my job or I'll whoop your ass or something.

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that DONALD J. HARPER personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 188, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd day of March 2007.

_____

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                  Plaintiffs,    )
                                 )
          vs.                    )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                  Defendants.    )

⬛ COPY

## DEPOSITION OF RUSSELL A. HATFIELD

Taken on Behalf of CalPac

          BE IT REMEMBERED That, pursuant to the Guam

Rules of Civil Procedure, the deposition of **RUSSELL A.**

**HATFIELD** was taken before Cecille A. Flores, a Certified

Shorthand Reporter, on Monday, the 19th day of February 2007,

at 10:00 a.m. in the offices of Blair Sterling Johnson

Martinez & Leon Guerrero, Suite 1008, Pacific News Building,

238 Archbishop Flores Street, Hagatna, Guam.

1   your memory.  Earlier you were talking about a meeting at the
2   warehouse.

3       A    Uh-huh.

4       Q    Does this refresh your memory as to when the meeting
5   at the warehouse took place?

6       A    Yeah, it says right here the 20th of December.

7       Q    So in Exhibit A, the meeting that was referred to is
8   the same --

9       A    That's the meeting I'm referring to.

10      Q    Do you know why they had this meeting on December
11  20th, 2004?

12      A    To settle any questions -- answer any questions, put
13  any fears out -- fires out, fears, in reference to the
14  allegations that were going on at the time.

15      Q    Around this time that the meeting took place, was
16  Donald Harper employed at CalPac?

17      A    No, he was not.

18      Q    So you were the sole Project Manager at the time?

19      A    That's correct.

20      Q    I hate to say this but because we're having it
21  transcribed, it's just easier if one person's talking.

22      A    Okay.

23      Q    A lot of times I know what your answers are going to
24  be but I'm going to try to wait for you to finish yours --

25      A    Okay.

1    Q    Did you discuss whether Mr. Quintanilla should be

2  laid off?

3    A    His name was never brought up.

4    Q    You said you worked at CalPac up to June 2005,

5  correct?

6    A    Approximately there.  I had to go to the states.

7    Q    You weren't laid off, were you?

8    A    No.  I was never hired to be a permanent employee

9  anyway.

10    Q    Was it your understanding that a significant amount

11  of employees at CalPac would be furloughed after the MCI

12  project?

13    A    No.

14    Q    What was your understanding?

15    A    Just like any other construction job.  Construction

16  work works -- if you got work, you need the employees.  If

17  you don't have work, you let your employees go.

18    Q    Would it be unusual for you to see CalPac or other

19  companies like CalPac furloughing its employees?

20    A    No, that's a normal every day occurrence.

21    Q    Do you remember having an interview with somebody by

22  the name of Mr. Yao at the EEOC?

23    A    No, I have no idea of that name.  I -- the only

24  interview I ever had was in this office by phone with

25  somebody out of Hawaii.  It was another deposition.  I'm

1    A    Who I would keep if given a choice of keeping some

2   and letting others go, yes.

3    Q    Now, at the time these people were let go, would

4   people be let go in favor of other employees that were local?

5   Do you understand my question?

6    A    My recommendation has nothing to do with race.  The

7   employees that were let go were based on their skill levels

8   and the job requirements that I needed the individuals to do.

9   So if Joe Blow was multi-taskable, I'd put him in this

10  category.  If Joe Blow was not, he'd stay over here.  If I

11  didn't need his particular skills because we were downsizing

12  at the time because the job was slowing down and you don't

13  keep people on the payroll if you don't have any work for

14  them to do.  And that's what we were doing.  We were

15  downsizing because the work was slowing down.  Yes, there was

16  a long period of work leftover, but we didn't need the

17  humongous payroll and staff that we had at the time.

18   Q    Just for the record, some of the people that stayed

19  on as employees were locals, would that be correct?

20   A    That's correct.

21   Q    I believe you indicated earlier that you weren't

22  aware that various people were filing complaints.  You knew

23  there were complaints but you didn't know who they were,

24  would that be correct?

25   A    Uh-huh.

1       Q    I believe that was in reference to -- I believe you

2    indicated Norman Santos, correct?

3       A    I think she was talking about James Lee.

4       Q    James?

5       A    Yee or Lee or whatever his name was.  I made the

6    statement that James -- until I got here and I saw it right

7    here, James, down as a defendant.  I have -- to this day,

8    other than what's on this piece of paper is the only people

9    that I know have filed a suit.

10      Q    You're referring to the Plaintiffs in this lawsuit?

11      A    That's correct.

12      Q    In your opinion, were the service of the people that

13   were let go around November of 2004, were their services

14   needed at CalPac?

15      A    The ones that were let go, no.

16      Q    So when you're saying let go, they weren't

17   necessarily fired, would that be correct?

18      A    Nobody was fired.  Everybody was laid off with the

19   understanding that if work picked up and if we needed your

20   skills back, that you would be given first opportunity to

21   accept the job if you so desired it.

22      Q    And it wouldn't be unusual for somebody to be let go

23   at CalPac and then later picked up?

24      A    No.

25      Q    Did you actually observe that situation?

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 19th day of February, 2007 at the hour of 10:00 a.m. there appeared before me RUSSELL A. HATFIELD at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 5th day of March, 2007.

_____
Cecille A. Flores

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA ) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES )
S. YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA, )
                                )
               Plaintiffs, )
                                )
       vs. )
                                  )
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10, )
                                  )
              Defendants. )

📄 COPY

## DEPOSITION OF NORMAN S. SANTOS

Taken on Behalf of Defendant CalPac


        BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of NORMAN S. SANTOS

was taken before Cecille A. Flores, a Certified Shorthand

Reporter, on Friday, the 13th day of April 2007, at 3:00 p.m.

in the offices of Blair Sterling Johnson Martinez & Leon

Guerrero, Suite 1008, Pacific News Building, 238 Archbishop

Flores Street, Hagatna, Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96913
Tel: (671) 734-1041 ∙ Fax: (671) 734-1045

Case 1:05-cv-00037   Document 343   Filed 07/23/2007   Page 31 of 47

Van Meter vs. CalPac: Civil Case No. CIV05-00037

12

1    Q    How long have you been working at CalPac?

2    A    Going for three years.

3    Q    So you started working at CalPac in 2004?

4    A    Yeah.

5    Q    What is your position now at CalPac?

6    A    Used to be Laborer.  Now I'm a Supervisor in the

7    field.

8    Q    When did you become a Supervisor at CalPac?

9    A    One year, three months.

10   Q    So 2006 you became a Supervisor, is that about

11   right?

12   A    Two years after.  A year and a half.  One year, four

13   months.

14   Q    So around 2006, correct?

15   A    Yeah.

16   Q    So from 2004 through 2006 you were a Laborer?

17   A    Yeah.

18   Q    Somewhere around there, right?

19   A    Uh-huh.

20   Q    What was your wage as a Supervisor?  What is your

21   wage?

22   A    11.50.

23   Q    As a Laborer, how much were you making?

24   A    Used to be $6.  Two months later they give $9.

25   Q    When was that?

Van Meter vs. CalPac: Civil Case No. CIV05-00037

27

1  on them.  The two guys laid off, the company gonna be going

2  slow.

3      Q      How long has CalPac had that policy?  As long as

4  you've been working there?

5      A      No.

6      Q      So how long?

7      A      That's a new policy.

8      Q      What about in 2004?  Did they have a policy about

9  showing up --

10     A      No, no.

11     Q      Earlier you filed a charge of discrimination with

12  the EEOC, correct?

13     A      Yes.

14     Q      That was about the time I guess the other

15  Co-Plaintiffs were filing?

16     A      Yes.

17     Q      The same time they were filing with the EEOC?

18     A      Yes.

19     Q      I think there was something that was filed with the

20  EEOC around February 2005.  Did Don Harper help you file the

21  charge of discrimination?  Do you remember?

22     A      Yes.

23     Q      Did Mr. Harper help you file it?

24     A      He help us to call Hawaii.

25     Q      Then you used his fax machine?

1    the complaint and the time you withdrew it?  Do you know how

2    many months or weeks that was?

3        A    Almost a year.

4        Q    Almost a year that you had a complaint with the

5    EEOC?

6        A    Uh-huh.

7        Q    During that time you were still employed at CalPac?

8        A    Yes.

9        Q    Did anybody at CalPac say anything to you about your

10   complaint?

11       A    No.

12       Q    No?  They let you work?

13       A    (Witness nodded head.)

14       Q    Did you feel that you were treated unfairly when you

15   were working at CalPac during that one year?

16       A    No.

17       Q    We were talking to Mr. Leon Guerrero about a meeting

18   that was held at CalPac when Dennis Clark said he never made

19   the statements.  Do you recall that?

20       A    Yes.

21       Q    During that meeting, did anybody at CalPac, the

22   management, ever say if you make a complaint you'll get fired

23   or you'll --

24       A    No.

25       Q    Nobody said that?

Norman S. Santos: April 13, 2007

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand
Reporter, hereby certify that NORMAN S. SANTOS personally
appeared before me at the time and place set forth in the
caption hereof; that at said time and place I reported in
stenotypy all testimony adduced and other oral proceedings
had in the foregoing matter; that thereafter my notes were
reduced to typewriting under my direction; and the foregoing
transcript, pages 1 to 51, both inclusive, constitutes a
full, true, and correct record of such testimony adduced and
oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 18th
day of May 2007.


_____
Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

## NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

     I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 13th day of April, 2007 at the hour of 3:00 p.m. there appeared before me **NORMAN S. SANTOS** at the law offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

     I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

     In testimony whereof, I have hereunto set my hand this 18th day of May, 2007.

                            _____

                              Cecille A. Flores

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA) JR., JOSEPH J. HERNANDEZ, JOSEPH ) T. MENDIOLA, LARRY L. CHARFAUROS,) ANTHONY C. ARRIOLA, ROBERT B. ) CRUZ, ROLAND F. MENDIOLA, JAMES ) S. YEE, TEDDY B. CRUZ, JESSE B. ) CRUZ, JOHN L.G. NAUTA, and JOHN ) P. BABAUTA, ) )               Plaintiffs, ) )     vs. ) ) CALPAC, DYNAMIC TECHNICAL ) SERVICES, MCI, JOHN HEALY, DENNIS) CLARK, WILLIAM WARD, JAI JAMES ) and DOES 1 through 10, ) )           Defendants. ) | CIVIL CASE NO. CIV05-00037     🖰 **ORIGINAL** |

## DEPOSITION OF JOHN L.G. NAUTA

Taken on Behalf of the Defendants CalPac

BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of **JOHN L.G. NAUTA** was taken before Cecille A. Flores, a Certified Shorthand Reporter, on April 16 & 18, 2007, at the law offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

1    A    Probably in 2005.  Late.

2    Q    Late 2005?

3    A    Late 2005.

4    Q    We'll come back to CSG in a second.  Prior to that,

5    where were you employed at?

6    A    CalPac.

7    Q    You know when you were laid off or not working at

8    CalPac, right?

9    A    (No response.)

10   Q    Do you know when you started working at CalPac?

11   A    Somewhere in 2004?

12   Q    Why don't we just refer to your Complaint for a

13   second, okay?  Page 29, Paragraph 193.  That paragraph

14   alleges that you were hired by CalPac around February 2004.

15   Is that about right?

16   A    Yes, sir.

17   Q    And that you were hired to work on the installation

18   project of underground cable on Guam for MCI.

19   A    Yes, sir.

20   Q    So February 2004.  Do you remember when you stopped

21   working at CalPac?

22   A    I believe 2005.

23   Q    Do you remember when in 2005?

24   A    I don't recall.  September or May.

25   Q    I'm sorry?  May 2005?

1      Q      Did you send a letter to the EEOC or did you send a

2   fax?

3      A      Well, it's more like a -- they sent a fax, I guess.

4      Q      Did you fill out a form that was faxed to Hawaii?

5      A      I don't recall.

6      Q      You don't remember?

7      A      (No response.)

8      Q      Okay, let's have this marked as Exhibit A.

9                           (Exhibit A marked: EEOC

10                              Declaration.)

11          Mr. Nauta, I'm giving you Exhibit A.  Tell me if

12   you've ever seen Exhibit A before.

13      A      (No response.)

14      Q      Can we go off the record for a second?

15                           (Off the record at 2:35 p.m.)

16                           (Back on the record at 2:38 p.m.)

17      Q      Mr. Nauta, what is Exhibit A?

18      A      Excuse me?

19      Q      Do you know what Exhibit A is?

20      A      Not really.

21      Q      Look at the last page on Exhibit A.  There's a

22   signature line there.  Do you see that?

23      A      Yeah.

24      Q      Is that your signature there?

25      A      Yes, sir.

1    correct?

2              MR. LEON GUERRERO:  I'm trying to find out what

3    the problem is with CalPac.

4    BY MR. LEON GUERRERO: (Continuing)

5        Q     Unless, Mr. Nauta, there's other charges that you

6    have filed against CalPac with the EEOC, is this the only

7    one?

8        A     (No response.)

9        Q     Did you file other charges?

10       A     No.

11       Q     There's only one charge you filed with the EEOC,

12   correct?

13       A     With CalPac?

14       Q     Against CalPac with the EEOC.

15       A     (Witness nodded head.)

16       Q     One charge?

17       A     I think so.

18       Q     Because I notice on Exhibit B it says amended.

19   There might be something else here.  I'm not sure.  All I

20   have is an amended charge.  Going back to Exhibit A,

21   Paragraph 6 states "the earliest date of violation is

22   December 2004."  Do you see that?

23       A     Yes, sir.

24       Q     What does that refer to?

25       A     I don't know.  Earliest date of violation of 2004 --

1  December 2004.

2     Q    Mr. Nauta, Exhibit A seems to be your complaint that

3  you have with CalPac.

4     A    Oh.

5     Q    Okay?  Correct me if I'm wrong.

6     A    Yes.

7     Q    This is your complaint that you have with CalPac,

8  correct?

9     A    Yes, sir.

10    Q    There's no other complaints that you filed with the

11 EEOC, there's only one charge number, is that correct?

12         MS. LUJAN:  I'd have to object.  The documents

13 speak for themselves.  Exhibits A and B both speak for

14 themselves.  They're separate charge numbers.

15         MR. LEON GUERRERO:  That's what I'm trying to

16 find out.

17 BY MR. LEON GUERRERO: (Continuing)

18    Q    What is your complaint that you have with CalPac?

19    A    Well, it's my --

20    Q    I'm referring to Paragraph 6.  What happened in

21 December 2004?

22    A    I guess loss of work and working time.

23    Q    Maybe this will help you.  Look at Exhibit B, the

24 third paragraph it says "On December 20, 2004, there was a

25 meeting that took place."

1      A      Correct.

2      Q      So Mr. Clark made some comments that you did not

3  like, correct?

4      A      True, which is not right.

5      Q      This is September, October 2004, right?

6      A      Yes, sir.

7      Q      I want you to take a look at Paragraph 205.  That

8  would be Page 32 on the Complaint.  I'm just going to read

9  205 for you and tell me if I read it wrong, okay?  The

10  allegation of Paragraph 205 is "The actions of Defendant

11  Clark," this would be Dennis Clark, correct?

12      A      Uh-huh.

13      Q      "The actions of Defendant Clark were approved,

14  condoned or authorized by Defendants CalPac, DTS and others,"

15  is that right?

16      A      True.

17      Q      You're saying that CalPac, among others, authorized

18  the comments by Mr. Clark, correct?

19      A      True.

20      Q      Do you have any documents that show that CalPac

21  authorized Mr. Clark to make those statements?

22      A      It's not the first time that he --

23      Q      My question, Mr. Nauta, is do you have any

24  documents?  We'll start with that.  Do you know of any

25  documents that show that CalPac authorized Mr. Clark --

1      Q     Who is Henry Van Meter?

2      A     He was my Supervisor.

3      Q     Did you tell anybody else?

4      A     I only told my Supervisor.  I figure he'll let the

5   management know about it.

6      Q     This is for the first one in Tiyan, correct?

7      A     Yes, sir.

8      Q     What about the one in Two Lovers' Point?  Who did

9   you tell?

10     A     Henry Quintanilla.

11     Q     Did you tell anyone else?

12     A     No, sir.

13     Q     So the only person you told was Henry Van Meter,

14   correct?

15     A     I told my supervisor that --

16     Q     Did you follow up with Mr. Van Meter and say what's

17   going on with this complaint?

18     A     No.

19     Q     What about with Mr. Quintanilla?  Did you ever ask

20   him what's happening with your complaint against Mr. Clark?

21     A     No.  I figure they would talk to management about

22   it.

23     Q     Mr. Van Meter is one of the Plaintiffs in this case,

24   correct?

25     A     True.

1     Q     Then all of a sudden you were sponsored back on to

2   base.   What did they tell you about why you were going back

3   to the MCI project?

4     A     They don't say.  They just -- you know, tell you to

5   go out there and do your job.

6     Q     Okay.  Do you recall what your job was after you did

7   those couple of days on base?

8     A     We were in base, but then afterwards they changed

9   our job site to go to Tycom.

10    Q     But I'm talking about the days you were sponsored.

11    A     But then I guess after Tycom, going back into the

12  base, that's when we -- our ID is expired or gotta renew.

13  And -- but then we were just being sponsored.

14    Q     Right.  But you were being sponsored for a few days

15  was what you said, right?

16    A     Yeah.

17    Q     So do you remember what you did after those few

18  days?  What project you worked on?

19    A     I don't recall.

20    Q     You don't recall?

21    A     (Witness shook head.)

22    Q     Do you recall if you were still working on the MCI

23  project after you were done being sponsored?

24    A     I believe that was just the same project.  It's one

25  whole thing from Agana all the way up to Two Lovers' Point

1      A     Not quite, sir.

2      Q     Looking at Page 3, it says "During the period of

3    about three and a half weeks before my termination, my hours

4    were greatly reduced as I was working only a total of 14.5

5    hours."  Okay?

6      A     (Witness nodded head.)

7      Q     I'm asking you, should this thing be changed to say

8    in December of 2004 your hours were reduced?

9      A     (No response.)

10     Q     If you know the answer to that.

11     A     No, sir, I don't know.

12     Q     So you don't remember if your hours were reduced in

13   December 2004, would that be correct?

14     A     Not to my knowledge.  I don't remember when.

15     Q     So I guess your answer is you don't recall if your

16   hours were reduced in December 2004, right?

17     A     I don't recall.

18     Q     What about in February?  Do you remember if your

19   hours were reduced in February of 2005?

20     A     I don't recall.

21     Q     Around April of 2005 is when you remember that your

22   hours were reduced, correct?  At least as far as your --

23     A     Yeah.

24     Q     What about March?  I skipped March.  March of 2005,

25   do you remember if your hours were reduced while you were

## REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **JOHN L.G. NAUTA** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 140, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 19th day of July 2007.

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 16th day of April, 2007 at the hour of 2:00 p.m. there appeared before me **JOHN L.G. NAUTA** at the law offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 19th day of July, 2007.

Cecille A. Flores