VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

FILED
DISTRICT COURT OF GUAM
JUL 23 2007 nbo
MARY L.M. MORAN
CLERK OF COURT

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. CHARFAUROS, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. CIV05-00037 <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE LARRY L. CHARFAUROS** |

### INTRODUCTION

This is a lawsuit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* Larry L. Charfauros' ("Charfauros") claims arise out of purported statements made by Dennis Clark ("Clark")[1] who, Charfauros

---

[1] For the purpose of this Motion only, CalPac will assume Clark made the purported statements.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Case 1:05-cv-00037     Document 346     Filed 07/23/2007     Page 1 of 55

ORIGINAL

1  acknowledges, was neither a co-employee of the plaintiffs nor an
2  employee of California Technical Services, LLC ("CalPac").
3  Clark, in fact, was MCI's owner representative hired to ensure
4  CalPac performed according to the terms of the contract.

6  Larry L. Charfauros ("Charfauros") alleged that Clark, on
7  three occasions (twice in September and once in October) called
8  him and his fellow co-workers "monkeys" or "island monkeys."
9  Charfauros alleged that he made a complaint to his supervisor
10 immediately after each incident, and that CalPac retaliated and
11 discharged him in November 27, 2004. CalPac declares that
12 Charfauros was laid off because the MCI project was near
13 completion and that CalPac no longer needed the  services of
14 most of CalPac's laborers.

16 Rather than sticking with the "script" that CalPac
17 retaliated against its employees who complained, Charfauros, the
18 last plaintiff to be deposed, slipped and admitted that he
19 thought CalPac's decisions to lay-off its employees was based on
20 economic decisions (i.e. **cutting down the expense by cutting
21 off the high payers**). See Charfauros Deposition at p. 57.

23 To the extent co-defendant Dynamic Technical Services
24 ("DTS") asserts there was no hostile environment, CalPac hereby
25 joins in such motion. Further, CalPac now moves for summary
26 judgment on the issue all issues alleged against CalPac by
27 Charfauros.

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 2 -

## FACTS

CalPac acquired a contract from MCI to lay fiber optic cables on Guam. The MCI project entailed laying fiber optic cable from Hagatna to NTCAM. Harper Deposition at p. 11. Initially, the MCI project was scheduled to be completed around December, 2004. See Healy Declaration. Clark was designated as MCI's representative charged with ensuring CalPac complied with the terms of the contract. Harper Deposition at p. 15. **It is not disputed that Clark was never an employees of CalPac**. Charfauros Deposition at p. 39; also Harper Deposition at p. 15.

In order to meet the terms of the MCI contract, CalPac hired additional laborers to trench and lay cables. Healy Declaration. Initially, the MCI project was scheduled to be completed around December, 2004. Healy Declaration. As the project neared completion, CalPac began to lay-off its employees since the MCI project was the only remaining major contract that CalPac had. Healy Declaration.

Charfauros, one of the plaintiffs herein, began working for CalPac around July, 2004. Charfauros Deposition at p. 29. On February 23, 2005, Charfauros filed an "Amended Charge of Discrimination" admitting that he knew he was hired "to work on an installation project of underground cable in Guam for MCI." See "Charge of Discrimination" attached to Charfauros Deposition as Exhibit "D."

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 3 -

1  Charfauros was part of the field crew of CalPac.   Most, if
2  not all employees, of the field crew were local hires of
3  Chamorro descent.   See Healy declaration.   Because of the MCI
4  contract, CalPac had to hire additional employees.   Harper
5
6  Deposition at p. 25.   Around  November, 2004, CalPac began
7  downsizing because the work was slowing down.   Hatfield
8  Deposition at p. 75.   Because of the reduced amount of work, the
9  services of many of the employees were no longer needed.
10 Hatfield Deposition at p. 76.

11    Through Charfauros' complaint, Charfauros alleged that
12 Clark (an employee of DTS and not of CalPac), harassed
13
14 Charfauros by calling Charfauros a "monkey" or "island monkey."
15 See Par. 85 of the Complaint; see also Charfauros Deposition at
16 p. 41.   The questionnaire filled out by Charfauros, shows that
17 on three occasions (9/21/04, 9/25/04, 10/23/04), Charfauros
18 wrote "go down there an [sic] tell those monkeys to stop pulling
19 I [sic] was feeding the fiber [sic] optic cable.   Exhibit "G" to
20 Charfauros Deposition.
21
22    Charfauros claims to have notified CalPac of the first
23 statement made by Clark.   See Para. 86 of the Complaint; see
24 also Charfauros Deposition at p. 44.   The remaining statements
25 were not reported to CalPac.   Charfauros Deposition at p. 48.
26    Don Harper, whose duties included coordinating with
27 CalPac's customers, testified that he was informed of three

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 4 -
Case 1:05-cv-00037   Document 346   Filed 07/23/2007   Page 4 of 55

incidents wherein Clark would refer to the employees as monkeys. Harper Deposition at p. 22.

The first report purportedly resulted in Harper and Clark having a heated discussion about the way to talk to people. Harper Deposition at p. 22. It was Harper's impression that it was just a phrase 'monkeys' and they [the crew] didn't like it." Harper Deposition at p. 22. The second incident purportedly resulted in the same action by Harper. Harper Deposition at p. 23. On the third and final incident, Harper purportedly threatened Clark and told him to "get off my job or I'll whoop your ass or something." Harper Deposition at p. 96.

Healy denies being informed about such statements until the protests began. Healy Declaration. Bill Ward, CalPac's general manager, testified that he was never informed about the statements until the December meeting.

Contrary to Charfauros' belief, certain CalPac's management were unaware of which employees made complaints. As an example, Hatfield was did not know that Norman Santos filed a complaint with the EEOC. Hatfield Deposition at p. 70. Through Norman Santos' deposition it is undisputed that Santos worked for CalPac in 2004 (Santos Deposition at p. 12); filed an EEOC complaint for discrimination (Santos Deposition at p. 27); and withdrew his EEOC complaint almost a year later (Santos

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1 Deposition at p. 33). As of April 2007, Norman Santos remained
2 an employee with CalPac. Santos Deposition at p. 12.

3 Generally, Charfauros had no problems with the way CalPac's
4 management treated him. See Charfauros Deposition at pp. 69 and
5
6 70. With the exception of the three incidents and his lay off,
7 Charfauros had no other complaints. Charfauros Deposition at p.
8 74. When further examined, Charfauros testified that he could
9 not recall how the environment was hostile. Charfauros
10 Deposition at p. 91.

11 Charfauros admitted most of CalPac's work was under the MCI
12 project (Charfauros Deposition at p. 53); Charfauros admitted
13
14 the MCI project was "pretty much done" around the time of his
15 lay-off (Charfauros Deposition at p. 52); and he expressed his
16 opinion that he believed "**the guys that got terminated were the**
17 **high payers. Most of them**." Charfauros Deposition at p. 55.

18 LAW

19 Summary judgment is appropriate "if the pleadings,
20 depositions, answers to interrogatories and admissions on file,
21 together with the affidavits, if any, show that the moving party
22 is entitled to judgment as a matter of law." FED.R.CIV.P. 56.
23
24 The moving party bears the initial burden of showing the Court,
25 by reference to materials on file, that there are no genuine
26 issues of material fact that should be decided at trial. *Celotex*
27 *Corp. v. Catrett*, 477 U.S. 317 (1986). When a moving party has
28 discharged its burden, the non-moving party must then "go beyond

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F C FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

the pleadings," and by its own affidavits, or by "depositions,
answers to interrogatories, and admissions on file" designate
specific facts showing there is a genuine issue for trial.
*Celotex*, 477 at 324.

In determining whether the moving party has met its burden
of establishing that no genuine issue of a material fact exists
and that it is entitled to judgment as a matter of law, the
Court must draw inferences from the evidence in a light most
favorable to the nonmovant, in this case the Plaintiff, and
resolve all reasonable doubts in that party's favor. *Matsushita
Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587
(1986). A material fact is one "that might affect the outcome
of the suit under the governing law." *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242 (1986). A disputed fact presents a
genuine issue "if the evidence is such that a reasonable jury
could return a verdict for the non-moving party. *Id.*

Where the moving party does not bear the burden of proof on
an issue at trial, the moving party may discharge its burden of
production by either of two methods. *Nissan Fire & Marine Ins.
Co., Ltd., v. Fritz Cos., Ins.*, 210 F.3d 1099, 1106 (9th Cir.
2000). The moving party may produce evidence negating an
essential element of the nonmoving party's case, or, after
suitable discovery, the moving party may show that the nonmoving
party does not have enough evidence of an essential element of

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 969 10-6205
TELEPHONE: (671) 477-7857

1 its claim or defense to carry its ultimate burden of persuasion
2 at trial. *Id*.

### I.   RACIAL HARASSMENT – HOSTILE ENVIRONMENT

#### 1.   CALPAC SHOULD NOT BE LIABLE FOR THE ACTIONS OF A THIRD PARTY

In the instant case, Charfauros alleges that a non-employee of CalPac called him a "monkey" or "island monkey" on three occasions.[2] In order for an employer to be found liable for third party harassment, an employer must ratify or condone the conduct by failing to investigate and remedy it after learning of it. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002). Assuming for the sake of this motion that complaints were made to Harper, Harper testified that he confronted Clark about the statements. After the third complaint to Harper, Harper threatened Clark and kicked Clark off the job site. Most importantly, there were no further complaints and the situation was remedied. Clearly, although Healy and Ward may have not known of the actions by Harper, action was taken nonetheless. CalPac, therefore, should not be liable for the actions of Clark.

#### 2.   PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT

The Supreme Court has repeatedly stated that Title VII **does not set forth "a general civility code for the American**

---

[2]   It is noteworthy that the Questionnaire to the EEOC uses the term "monkey" while the EEOC charge uses the phrase "monkey <u>or</u> island monkey." (Underscore added.) Additionally, Charfauros could not recall whether it was one, two or three times. Apparently, the events were not too memorable.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 8 -

**workplace**." (Emphasis added.)    *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998);  *Burlington Northern & Santa Fey Ry. Co. v. White*,  126 S.Ct. 2405, 2415 (2006). Judicial standards for harassment must **"filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language**, gender-related jokes, **and occasional teasing.'"**  *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998).  Although CalPac concedes that referring to an employees as an island monkey may be offensive, these remarks, under the circumstances,  do  not  qualify  for  Title  VII  protection. "**Conduct that is not so severe or pervasive enough to create an objectively or abusive work environment...is beyond Title VII purview**."  (Emphasis added.)  *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993).

In  order  to  state  a  claim  for  hostile  environment, Charfauros  must  show  that:  (1)  he  was  subject  to  verbal  or physical conduct based on race or national origin; (2) that the conduct  was  unwelcomed;  and  (3)  the  conduct  was  sufficiently severe  or  pervasive  to  alter  the  conditions  of  employment  and created  an  abusive  environment.    *Galdamez v. Potter*, 415 F.3d 1015,  1023  (9th Cir. 2005).   Simple  teasing,  offhand  comments, and  isolated  incidents,  unless  extremely  serious,  will  not amount  to  discriminatory  changes  in  the  terms  and  conditions  of employment,  for  the  purposes  of  Title  VII  hostile  environment

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 9 -

claim. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d. 1027 (9th Cir. 2005). In determining whether conduct was sufficiently severe or pervasive, courts look at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening, or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

Unlike other, more direct unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the **cumulative effect** of individual acts"). (Emphasis added.)

In Charfauros' case, Charfauros alleges that Clark directed three statements at him during his tenure at CalPac. There is no allegation that Clark physically threatened Charfauros. This is not a situation where an employee shows up to work and is subjected to a barrage of rude or offensive remarks. Further, there is no showing that the purported remarks altered the terms and conditions of Charfauros' employment.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

1    This is a situation where a third party may have made three

2  or four rude remarks of which Charfauros may have heard three.

3  Clearly, Charfauros failed to establish the frequency required

4  to establish a claim under Title VII especially in light of the

5  allegation that the remarks were not made by CalPac employees.

6

7          **3.   CALPAC DID NOT RETALIATE AGAINST CHARFAUROS**

8          Title VII's anti-retaliation provision forbids an employer

9  from "discriminate[ing]" against an employee or job applicant

10 because that individual "opposed any practice" made unlawful by

11 Title VII or "made a charge, testified, assisted or participated

12 in" a Title VII proceeding or investigation.   42 U.S.C. Section

13 2000e-3(a).   **This provision, however, "covers those (and only**

14 **those) employer actions that would have been materially adverse**

15 **to a reasonable employee or job applicant**...to the point that

16

17 they could well dissuade a reasonable worker from making or

18 supporting a charge of discrimination.   (Emphasis added.)

19 *Burlington Northern & Santa Fey Ry. Co. v. White*,   126 S.Ct.

20 2405, 2409 (2006).

21          If the plaintiff makes a prima facie case, the burden of

22 production shifts to the defendant to present a legitimate, non-

23

24 retaliatory reason for the adverse action. *Brooks v. City of San*

25 *Mateo,* 229 F.3d 917, 928 (9th Cir. 2000); *Cassimy v. Board of*

26 *Education of the Rockford Public School, Dist. #205 (7th Cir.*

27 *2006).* If the defendant carries this burden, the plaintiff "must

28 demonstrate a genuine issue of material fact as to whether the

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5206
TELEPHONE: (671) 477-7857

- 11 -
Case 1:05-cv-00037    Document 346    Filed 07/23/2007    Page 11 of 55

1  reason advanced by the [defendant] was a pretext." *Brooks,*
2  *supra.*

3  Charfauros claims he was "wrongfully and unlawfully
4  terminated by CalPac." In Charfauros' deposition, however,
5
6  Charfauros, himself, admitted that he believed CalPac's decision
7  to lay-off was based on financial or economical reasons -
8  perhaps due to the MCI project nearing completion. Most
9  importantly, CalPac declares that Charfauros was correct in this
10 regard. CalPac essentially had one contract that was nearing
11 completion and the services of most of the crew were no longer
12 needed nor could they be afforded. See Healy Declaration.
13

**CONCLUSION**

14 Liability for hostile environment requires a showing that
15
16 the action was severe or pervasive. For the reasons stated
17 above, it is respectfully suggested that the three remarks heard
18 by Charfauros were not severe or pervasive enough to be
19 protected under Title VII. Indeed, Charfauros could not recall
20 how he thought the environment was hostile. Assuming the
21 remarks were severe and pervasive, however, liability for third
22
23 party discrimination requires a showing that CalPac condoned or
24 authorized the act. Such was not done.

25 Concerning Charfauros' claims for retaliation, Charfauros'
26 discharge was based on reasons unrelated to any purported
27 complaint made. Other workers, some of whom did not file

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 12 -

Case 1:05-cv-00037   Document 346   Filed 07/23/2007   Page 12 of 55

complaints, along with Charfauros were laid off for financial or economic reasons. In essence, there was no work to provide. As such, CalPac respectfully requests this Court grant its motion for summary judgment.

**RESPECTFULLY SUBMITTED** this 23rd day of July, 2007.

> **BLAIR STERLING JOHNSON**
> **MARTINEZ & LEON GUERRERO**
> A PROFESSIONAL CORPORATION
>
> BY: _____
> **VINCENT LEON GUERRERO**
> *Attorneys for Defendant California Pacific Technical*
> *Services LLC*

V63:49\08130-03
G:\WORDDOC\PLD\VLG\208B-MEMO OF P&A IN SUPP OF MSJ RE L
CHARFAUROS RE VAN METER V. CALPAC.DOC

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                 Plaintiffs,     )
                                 )
         vs.                     )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                 Defendants.     )

## DEPOSITION OF LARRY L. CHARFAUROS

*Taken on Behalf of CalPac*

BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **LARRY L.**

**CHARFAUROS** was taken before Cecille A. Flores, a Certified

Shorthand Reporter, on Thursday, the 24th day of May 2007, at

9:00 a.m. in the offices of Blair Sterling & Johnson, Suite

1008, Pacific News Building, 238 Archbishop Flores Street,

Hagatna, Guam.

Flores Court Reporting
Suite 2E. Jugo Building
Barrigada. Guam 96913

Case 1:05-cv-00037    Document 346-8    Filed 07/23/2007    Page 14 of 55

1    Q    You will agree that you were working at CalPac in

2  the year 2004, correct?

3    A    December?

4    Q    No, in the year 2004.

5    A    Yes, probably.

6    Q    Why don't we just go ahead and refer to your

7  Complaint then.  You had a chance to read your Complaint in

8  this case filed in the District Court, correct?

9    A    Yes.

10    Q    Referring to Page 12 of the First Amended Complaint,

11  there's Count 5.  Do you see that?

12    A    Yes.

13    Q    Read Action 4, please.

14    A    You want me to read it?

15    Q    Go ahead and read it.

16    A    "Plaintiff Larry L. Charfauros was hired by CalPac

17  in or about July 2004 to work on installation project of

18  underground cables in Guam for MCI."

19    Q    Okay.  So this refreshes your memory?

20    A    Yes.

21    Q    So you started working at CalPac around July 2004,

22  correct?

23    A    Yes.

24    Q    Do you remember when you stopped working at CalPac?

25    A    Roughly probably October.

1      Q     Can you tell me anywhere in this Complaint that it
2   says that Dennis Clark is employed by CalPac?  If you want to
3   take a  --
4      A     Take a break.
5      Q     Okay.
6                              (Recess taken at 10:04 a.m.)
7                              (Back on the record at 10:06 a.m.)
8   BY MR. LEON GUERRERO: (Continuing)
9      Q     Mr. Charfauros, having had a chance to look at the
10  Complaint, is there anywhere in the Complaint that it says
11  Mr. Clark was employed by CalPac?
12     A     No.
13     Q     Do you wish to change and add an allegation to this
14  Complaint that says Mr. Clark is employed by CalPac?
15     A     No.
16     Q     So you would agree with me that Mr. Clark was not
17  employed by CalPac, correct?
18     A     Correct.
19     Q     Going back to Paragraph 2 of Exhibit D it says "On
20  separate occasions, Dennis Clark made racially derogatory
21  comments to me and fellow workers by referring to us as
22  monkeys and island monkeys."  Do you remember his statements
23  referring to you guys as monkeys or island monkeys?
24     A     Mostly all the job sites.
25     Q     How many times did he say this, do you remember?

1  the comment?

2      A    I don't recall.

3      Q    Did you have a Supervisor there at that time?

4      A    Supervisor comes around once in a while.

5      Q    Supervisor would be who?

6      A    Henry Quintanilla.

7      Q    Do you know if Mister --

8      A    Oh, no, no, no.  That would be Don Harper rather.

9      Q    Don Harper is your Supervisor?

10     A    Superintendent, I believe.  Our Foreman is Henry

11  Quintanilla.

12     Q    Was your Foreman present the first time he --

13     A    He's only around when -- I don't know if he was

14  there.  I don't recall.

15     Q    Do you know who else was there at all?  Do you

16  remember?

17     A    I can't remember whoever was there.

18     Q    Do you know if there were like three people there?

19  More than three people?

20     A    I believe there's more than three of us, yeah.

21     Q    What happened at that time?

22     A    We were trenching, we're inside the trench and we're

23  all covered with red dirt and he just comment to us that we

24  look like a bunch of island monkeys down in the trench.

25     Q    Was he upset?

1    A    Yes.

2    Q    This was before the second incident took place?

3    A    Yes.

4    Q    The second incident, who did you report it to?

5    A    I didn't report it. Nothing was done so what's the

6    use of reporting it?

7    Q    So you didn't make any reports afterwards?

8    A    I already made a report the first time. That's all

9    you have to do.

10    Q    So you didn't talk to anybody else about the --

11    A    Just the guys. We were talking about it in the

12    field why this thing happened. That's it.

13    Q    Okay.

14    A    Why are they calling us monkeys in this trench. We

15    work 12 hours a day, 7 days a week trying to make a living

16    and we're called island monkeys -- called monkeys.

17    Q    So you said nothing was done, right?

18    A    That's right. Well, something was done because we

19    got terminated. That's what's done.

20    Q    And you were terminated in November 2004, right?

21    A    I believe so.

22    Q    Do you know if he made these comments to anybody

23    else that has not filed a lawsuit?

24    A    Excuse me?

25    Q    There are 12 other Plaintiffs, correct?

1    A    Not months.

2    Q    I'm sorry?

3    A    It's not months that went by.  Weeks.  Maybe two

4  weeks probably.  I got laid off before Thanksgiving.

5    Q    Okay, go back to Exhibit D.  It says "Beginning on

6  September 21, 2004," right?

7    A    Yes.

8    Q    And then if you go to the next paragraph it says you

9  were discharged November 27, 2004.  That's about three

10  months, correct?

11    A    Okay, yeah, yeah, you're correct.

12    Q    So about three months happened you weren't

13  discharge, correct?

14    A    Right, right.

15    Q    So you weren't immediately discharged after you made

16  a complaint?

17    A    No.

18    Q    What was happening with the MCI contract at that

19  time around November 27, 2004, do you know?

20    A    What do you mean what was happening?

21    Q    Do you know if it was almost done?

22    A    MCI?

23    Q    The MCI project.

24    A    Yeah.

25    Q    It was pretty much done?

1    A    It was pretty much done.

2    Q    Just a lot of clean-up work, correct?

3    A    No, it was more trenching but not as much as we used

4    to do. We're almost to the end of the project.

5    Q    Did you work on any other projects at CalPac?

6    A    Other than MCI?

7    Q    Other than MCI.

8    A    MCV.

9    Q    When did you work on the MCV project?

10   A    I don't remember when, but we did some pulling of

11   cable lines. But most of our jobs is under MCI.

12   Q    Was the MCV contract completed while you were there?

13   A    No, it was wasn't completed.

14   Q    To your knowledge, was the MCV contract a big

15   contract?

16   A    I don't recall. I know that most of the job we were

17   doing was for MCI.

18   Q    Going back to the other question I had, when I say

19   "big contract," I'm referring to does it require a lot of

20   crew.

21   A    On the MCV?

22   Q    Yes.

23   A    Well, let's put it this way. Sometimes we'll all be

24   transferred at once, but I don't recall if it was a big

25   project. I only recall the main project we had was MCI.

1   inform you that you are being laid off effective close of

2   business on November 27, 2004.  Thank you and if our business

3   requires further labor in the future you will be considered

4   for re-employment."

5        Q    So it's correct that they told you that they were

6   laying you off because the project was almost finished?

7        A    It was correct they told us the same day we got

8   terminated and then there was no extra employees that was

9   hired.  And then again --

10       Q    I'm a little confused by what your last statement

11  was.

12       A    If you read it, it says here --

13       Q    What are you referring to?

14       A    "Increased the number of employees" which means they

15  hired someone, right?  "Increased the number of its

16  employees.

17       Q    Well, let me ask you this.  Did you ever ask anybody

18  at CalPac what this letter meant?

19       A    Did I ask anybody what this letter meant?

20       Q    Or did you just take it and leave?

21       A    I just took it with my last paycheck and my envelope

22  and left.

23       Q    So you didn't ask anybody what that meant by --

24       A    Well, my understanding here where it says we're

25  almost to completion and we only need so many people, what

1   right here front page were getting $9 an hour so they cut

2   down the pay by -- cut down the expense by cutting off the

3   high payers and hired the lower payers which is the Trukese

4   that they hired.

5        Q    So they hired the Chuukese because they were

6   cheaper, is that what you're saying?

7        A    That's the way I see it because most of the guys

8   that I said that were laid off with us were $9 an hour and I

9   guess they didn't wanna pay us anymore.

10       Q    So you know who James Yi is, right?

11       A    Yeah, James Yi.

12       Q    He was a --

13       A    Backhoe operator.

14       Q    And they were paying him more than what they were

15  paying you, right?

16       A    (Witness nodded head.)

17       Q    You're thinking that's why they --

18       A    That's what I'm thinking.

19       Q    Mr. Van Meter was a Foreman, right?

20       A    Yes.

21       Q    And he was making more than you?

22       A    (Witness nodded head.)

23       Q    And you think that's why they terminated him?  Why

24  did you think they terminated Mr. Quintanilla?

25       A    Oh, I don't know anything about Mr. Quintanilla now,

1    BY MR. LEON GUERRERO: (Continuing)

2        Q    You don't remember who else would have given you

3    instructions?

4        A    No.

5        Q    Again, if they did give you instructions, it would

6    have been --

7        A    Most of the time it would be Henry and Henry.  HQ or

8    HV.

9        Q    Do you know, after Mr. Harper left, who

10   Mr. Quintanilla and Mr. Van Meter received instructions from?

11       A    I don't know.  I don't recall.

12       Q    Getting back to what I was originally asking, did

13   you have any problems with the way Mr. Van Meter treated you?

14       A    No.

15       Q    Did you have any problems with --

16       A    The way Mr. Van Meter treated me?

17       Q    Yes.

18       A    No.

19       Q    Do you have any problems with the way

20   Mr. Quintanilla treated you?

21       A    No.

22       Q    Neither of those two people made any remarks about

23   you specifically referring to you as a monkey or an island

24   monkey, correct?

25       A    One more time.

1      Q    Neither Mr. Van Meter nor Mr. Quintanilla ever

2   referred to you as a monkey or an island monkey, would that

3   be correct?

4      A    That would be correct.

5      Q    Even ingest they didn't call you that, correct?

6      A    Correct.

7      Q    This is after Mr. Harper left, okay?  The next

8   person who may have said something to you, may have given you

9   instructions, the next one up after Mr. Van Meter or

10  Mr. Quintanilla never referred to you as a monkey or an

11  island monkey?  I'm talking about specifically with CalPac.

12     A    The only one that calls us monkeys is Dennis Clark.

13     Q    He is the only one?

14     A    He's the only one.

15     Q    So Mr. Healy never called you that, correct?

16     A    Mr. Healy never called me that.

17     Q    I apologize because I'm getting all the names mixed

18  up.  Sometimes I forget my name.  Mr. Ward, that would be

19  William Ward, correct?

20     A    Correct.

21     Q    He never referred to you as an island monkey,

22  correct?

23     A    Not that I recall.

24     Q    Did you have a lot of interaction with Mr. Ward?

25     A    We hardly see Mr. Ward unless it's payday or

1      A     Correct.

2      Q     So essentially, it was just those statements that

3   you were complaining about?

4      A     Correct.

5      Q     So it says "the actions of Defendant Clark were

6   approved, condoned or authorized by Defendants CalPac, DTS,

7   MCI and John Healy."  I'm only representing CalPac at this

8   time, okay?

9      A     Okay.

10     Q     Do you understand that?  I don't represent DTS and

11  I'm not representing MCI and Mr. Healy not at this point for

12  this lawsuit, okay?

13     A     You're not representing who?

14     Q     I am representing CalPac only so I'm going to refer

15  only to CalPac, okay?

16     A     Okay.

17     Q     CalPac the --

18     A     Okay.

19     Q     -- LLC, okay?  So I want to clarify, "the actions of

20  Defendant Clark were approved, condoned or authorized by

21  CalPac" and I don't care about anything else, okay?

22     A     Okay.

23     Q     So let's just focus in on that.  Do you believe

24  there's any written memos or any written documents showing

25  that CalPac approved the statements made by Mr. Clark?



| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | AMENDED  378-2005-00202 |

|  |  | and EEOC |
|---|---|---|

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone No. (incl Area Code) | Date of Birth |
|---|---|---|
| **Mr. Larry L. Charfauros** | (671) 565-7067 | 05-17-1969 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 210 Santa Rosa Santa Rita, GU 96915 | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **CAL PAC** | 15 - 100 | (671) 646-3646 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| P.O. Box 8950, Tamuning, GU 96931 | | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

DISCRIMINATION BASED ON (Check appropriate box(es).)   L.L.C.

☒ RACE   ☒ COLOR   ☐ SEX   ☐ RELIGION   ☒ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 09-21-2004 | 11-27-2004 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired by Cal Pac to work on an installation project of underground cable in Guam for MCI.

Beginning on September 21, 2004, and continuing until October 23, 2004, I was harassed by Dennis Clark, a representative of MCI. On separate occasions, Dennis Clark made racially derogatory comments to me and fellow co-workers by referring to us as "monkeys" and "island monkeys."

On November 27, 2004, I was discharged from the project, which I feel is due to my complaints to my supervisors about Dennis Clark's racially derogatory comments.

I believe that I have been discriminated and retaliated against due to my racial background, Pacific Islander, and my national origin, Chamorro. I further believe that non-Caucasian employees as a class have been subjected to discrimination and retaliation.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT |
| 1-4-05   [signature]  Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

RECEIVED
FEB 2 3 2005
EEOC HLO

**DEPOSITION EXHIBIT**

D

5/29/09 L.Charfauros



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Honolulu Local Office

300 Ala Moana Boulevard, Room 7-127
Honolulu, HI 96850-0051
(808) 541-3120
TTY (808) 541-3131
FAX (808) 541-3390

LARRY LIZAMA CHARFAUROS

# PLEASE PRINT OR WRITE LEGIBLY

## Questionnaire

I understand this document is not a charge. This information is provided to EEOC for informational purposes only to help me decide whether to file a charge. PLEASE CHECK THE FOLLOWING TO INDICATE YOU UNDERSTAND THE ABOVE. ( )

If you base your charge on your disability, please complete page 6.

1.  Please fill in the following information:
a.   Your full name:   LARRY LIZAMA CHARFAUROS
b.   Your address:   #210 SANTA ROSA SANTA RITA 96915
     City/State:   SANTA RITA
     Zip Code:   96915
c.   Your daytime phone number:   (671) 565-0567 7107
     Your evening phone number:   (671) 565-5089
d.   Your social security number:   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
e.   Your date of birth:   5-17-69
f.   Your sex:   MALE

g.   Your race:   CHAMORRO

h.   Your national origin:   GUAM
i.   Your skin color:   BROWN
j.   Person who can always contact you
     Name:   GEORGE/JUNE CHARFAUROS
     Address:   AGAT
     City/State:   GUAM 96928
     Zip code:
     Phone number:   (671) 565-5089

2.  Please give the following information about the employer:
a.   Company name:   CAL PAL
b.   Describe company business:   DISTRIBUTION COMMUNICATION CABLE

**DEPOSITION EXHIBIT**

G

CRAZY LIZAMA CHAFFAUROS

c.  Address where you worked:
   Street:
   City/State:
   Zip code:
   Phone number:(      )
   County:

.1.  Corporate address to mail charge to:
   Corporate name:
   Name/Title of person to receive charge (personnel/HR director/CEO):
      Name CAL PAC CORP.
      Title (OWNER) JOHN HEALY
      Street/P.O. Box: 8950
      City/State: TAMUNING GUAM
      Zip code: 96931
      Phone number:(671) 646-3646

M.C.I.
2400 GLEN VI
DR.
RICHARDSON TE
75082

A.  Name and title of immediate supervisor: DON HARPER /SUPERINTENDENT

~  Approximate number of employees working for the whole company. Circle
   one.

   1-14    (15-100)    ·101-200    201-500    More than 500

i.  Date of hire: 7/2004
j.  Last or current job title at company: UNDERGROUND /MCI
k.  Last or current unit/department in company: SAME
i.  Last or current rate of pay at company: $6.50

3.  *Identify the employment event(s) that caused you to contact the EEOC. (e.g.
    hiring, layoff, promotion, accommodation, discipline, harassment, sexual
    harassment, etc.)* DISCRIMINATION /LAYOFF
         (RACIAL)

Date event occurred: 9-21-04/9-25-04/10-23-04

*Note: This information will be used by the EEOC to determine jurisdiction. Generally,
charges must be filed within 300 days of the date of notification of an alleged act of
discrimination.*

Questionnaire - Page 2 of 6

LARRY LRAMA CHARAUROS

4. **What was the employer's stated reason for taking this action?**
OVER EMPLOYED BREDUCTION OF WORK FORCE

5. **What makes you think this event is discriminatory?**
DUE TO MY COMPLAINTS TO RACIAL COMMENTS
(DENNIS CLARK)

6. **List the persons in your unit/department who were _treated better_ than yourself with respect to this event. State their name, job title, race, age, color, national origin, sex and disability, if known.**
DON HARPER (WHITE)

7. **List the persons in your unit/department who were _treated the same_ as you with respect to this event. State their name, job title, race, age, color, national origin, sex and disability, if known.** JOE MENDIOLA, JOHN NAUTA, RAYMOND-
MENDIOLA, NORMAN SANTOS, JOHN VILLORIA.

8. **List the name and job title, race, skin color, sex and approximate age of the employers' representatives who recommended and approved the decision which resulted in the discriminatory event.**
BILL YARD GENERAL MANAGER (WHITE)
WARD (LAY OFF) M.B.I.
RACIAL REMARKS (DENNIS CLAR

9. **Have you complained to your employer about this matter? If yes, explain the situation. When did you complain, to whom and what was the result? Please attach copies of supporting documentation.**
DON HARPER 9/21/04 9/25/04 10/23/04

'1. *If you are complaining about harassment or sexual harassment please attach a brief chronology of events (e.g. two or three pages). Include dates of each incident, a description of what happened and harasser's name and job title. For each incident, provide witness names, if any. Also state when you complained, name and job title of person(s) to whom you complained and action taken in response to your complaints. Attach any supporting documentation.*

' . *Have you filed a charge regarding this matter with the Hawaii Civil Rights Commission or any another agency? If yes, provide the agency name and date filed.* YES

DEPARTMENT OF LABOR (GUAM)

*Write a paragraph about your employment situation and explain what happened and why you feel the incident is discriminatory. Be thorough. This information is very important for our evaluation of your situation.*

9/21/04    9/25/04   10/23/04
GO DOWN THERE AN TELL THOSE MONKEYS
TO STOP PULLING I WAS FEEDING THE
FRIBER OPPIC CABLE.



# DISABILITY QUESTIONS:

*...u base your charge on your <u>disability</u>, answer the following questions:*

1. Identify the name of your disability: _____

2. When did you first contract this disability: _____

3. Describe in general what *major life activities* (such as walking, lifting, seeing, breathing, hearing, etc.) are affected by the disability.

4. Describe any limitations or restrictions placed on you by a physician because of your disability.

5. Explain how your disability affects your ability to perform your job.

6. Describe how your disability limits your activities outside of work.

7. Have any managers treated you differently because of your disability? If yes, describe how. Include the manager's name, job, title, and date(s).

8. Do (or did) you need a reasonable accommodation in order to perform your job? If yes, explain.

9. To whom did you make your request for reasonable accommodation? (Include name, job title, and date of request)

10. Did they deny your reasonable accommodation request? When? What reason did they give for the denial?

...mit all documentation regarding your disability showing the diagnosis, prognosis, and/or ...iical limitations and all correspondence between you/your doctor and your company ...ding your disability and reasonable accommodation requests.

Questionnaire - Page 6 of 6

REPORTER'S CERTIFICATE


I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **LARRY L. CHARFAUROS** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 114, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 25th day of June 2007.



Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 24th day of May, 2007 at the hour of 9:00 a.m. there appeared before me **LARRY L. CHARFAUROS** at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 25th day of June, 2007.

_____

Cecille A. Flores

IN THE DISTRICT COURT OF GUAM


HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                    Plaintiffs,  )
                                 )
              vs.                )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                    Defendants.  )

⌐COPY

DEPOSITION OF RUSSELL A. HATFIELD

Taken on Behalf of CalPac



        BE IT REMEMBERED That, pursuant to the Guam

Rules of Civil Procedure, the deposition of RUSSELL A.

HATFIELD was taken before Cecille A. Flores, a Certified

Shorthand Reporter, on Monday, the 19th day of February 2007,

at 10:00 a.m. in the offices of Blair Sterling Johnson

Martinez & Leon Guerrero, Suite 1008, Pacific News Building,

238 Archbishop Flores Street, Hagatna, Guam.

is that correct?

   A    That's correct.  Norman is still there as far as I
know.

   Q    When did you become aware that Norman made a
complaint with the EEOC?

   A    I wasn't aware that he made a complaint.  I don't
think I said that.

   Q    How often was Dennis Clark on the job site?

   A    Every day.

   Q    How many hours a day?

   A    Four hours a day.

   Q    Where would he be the rest of the time?

   A    I have no knowledge.

   Q    How many hours would you spend at the CalPac
warehouse on a daily basis?

   A    Me?

   Q    Yes.

   A    Three.

   Q    How long is a work day for you?  How long was a work
day for you at CalPac?

   A    You want from the time I got up in the morning until
the time I went to bed or just physical work?

   Q    Physically being there at CalPac on the job.

   A    12 to 18.  I mean, 12 to 14, I'm sorry.

   Q    What time of the day would you spend those three

A     Who I would keep if given a choice of keeping some
and letting others go, yes.

Q     Now, at the time these people were let go, would
people be let go in favor of other employees that were local?
Do you understand my question?

A     My recommendation has nothing to do with race.  The
employees that were let go were based on their skill levels
and the job requirements that I needed the individuals to do.
So if Joe Blow was multi-taskable, I'd put him in this
category.  If Joe Blow was not, he'd stay over here.  If I
didn't need his particular skills because we were downsizing
at the time because the job was slowing down and you don't
keep people on the payroll if you don't have any work for
them to do.  And that's what we were doing.  We were
downsizing because the work was slowing down.  Yes, there was
a long period of work leftover, but we didn't need the
humongous payroll and staff that we had at the time.

Q     Just for the record, some of the people that stayed
on as employees were locals, would that be correct?

A     That's correct.

Q     I believe you indicated earlier that you weren't
aware that various people were filing complaints.  You knew
there were complaints but you didn't know who they were,
would that be correct?

A     Uh-huh.

Q    I believe that was in reference to -- I believe you
indicated Norman Santos, correct?

A    I think she was talking about James Lee.

Q    James?

A    Yee or Lee or whatever his name was. I made the
statement that James -- until I got here and I saw it right
here, James, down as a defendant. I have -- to this day,
other than what's on this piece of paper is the only people
that I know have filed a suit.

Q    You're referring to the Plaintiffs in this lawsuit?

A    That's correct.

Q    In your opinion, were the service of the people that
were let go around November of 2004, were their services
needed at CalPac?

A    The ones that were let go, no.

Q    So when you're saying let go, they weren't
necessarily fired, would that be correct?

A    Nobody was fired. Everybody was laid off with the
understanding that if work picked up and if we needed your
skills back, that you would be given first opportunity to
accept the job if you so desired it.

Q    And it wouldn't be unusual for somebody to be let go
at CalPac and then later picked up?

A    No.

Q    Did you actually observe that situation?

## NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

       I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 19th day of February, 2007 at the hour of 10:00 a.m. there appeared before me RUSSELL A. HATFIELD at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

       I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

       In testimony whereof, I have hereunto set my hand this 5th day of March, 2007.

_____
Cecille A. Flores

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, ROLAND F. MENDIOLA, JAMES  )        *L* ⸱ **ORIGINAL**
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                Plaintiffs,      )
                                 )
            vs.                  )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                Defendants.      )

## DEPOSITION OF DONALD J. HARPER

Taken on Behalf of California Pacific Technical Services


            BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **DONALD J. HARPER**

was taken before Cecille A. Flores, a Certified Shorthand

Reporter, on the 16th and 20th days of February 2007, in the

offices of Blair Sterling Johnson Martinez & Leon Guerrero,

Suite 1008, Pacific News Building, 238 Archbishop Flores

Street, Hagatna, Guam.

1     Q    Were your responsibilities limited to the MCI

2 contract? Did you have other responsibilities as well?

3     A    I had a few other responsibilities at the time.

4     Q    What percentage of your time was devoted to the MCI

5 contract would you say?

6     A    95 percent.

7     Q    95 percent?

8     A    Guessing.

9     Q    Can you describe for us what the MCI contract was?

10     A    It was to install a fiber optic connection from the

11 MCI building in Agana to NCTAMS NASA complex.

12     Q    What was the route they took to get from MCI here in

13 Agana?

14     A    Up through Agana, through Tiyan, down the cliffline

15 through Harmon Industrial Park, back through the back road of

16 Fatima, come up Route 1, down Route 3, back through the

17 jungle into NCTAMS.

18     Q    Did the MCI project, was it divided into phases or

19 how did it go?

20     A    I believe it was -- I think there were three phases.

21 They called them three phases, yes.

22     Q    Do you remember what the three phases were?

23     A    Yeah, it wasn't really -- I don't know if there was

24 a contractual breakdown, but I know when it was broken down

25 into phases of making it through Agana. It was kind of a

1        A    Just, I guess, for what an owner does.

2        Q    But he wasn't involved in the day-to-day operations

3    of the company?  That was you and Bob and Tim?

4        A    No, he was aware of the day-to-day.  There was daily

5    communication with him.  I mean, other than that, that's as

6    close as it got.

7        Q    Did he do the job interviews with the prospective

8    laborers?

9        A    No, I don't believe so.

10       Q    Who did that?

11       A    Either be me, Bob or Tim Camacho or Tim Camacho's

12   replacement and I can't remember his name.  After that.

13       Q    What was the role of Dennis Clark?

14       A    Dennis Clark was -- he was a representative of MCI.

15   He was basically quality control, I would guess.  For MCI.

16   He was there to make sure that the product was installed per

17   their specifications.

18       Q    You had MCI provide a set of specifications you were

19   supposed to follow?

20       A    Yes.

21       Q    Describe how those were presented to you.

22       A    Drawings with details.

23       Q    Do they also have a manual of specifications?

24       A    Not really.  Not that I know of.

25       Q    So you say he was the quality control.  Was he then

1    Q    Why aren't you on the site that day?

2    A    I was in the office doing some report for John

3    Healy.

4    Q    Do you remember when or about that was time wise?

5    A    No, I don't.  I mean, it's no --

6    Q    Was it still in Phase 1 or one of the later phases?

7    A    I think that's kind of the Phase 2.  I'm -- I can't

8    really remember but --

9    Q    So you don't recall the date?

10   A    No.

11   Q    Who was the employee that called you?

12   A    Henry Quintanilla.

13   Q    What did Henry Quintanilla tell you to the best as

14   you can recall?

15   A    When I arrived on site, I guess there was a deep

16   excavation area that Dennis wanted things to move faster,

17   didn't like the way they was doin' it and referred to them as

18   monkeys at this time, I believe.  It was just a phrase

19   "monkeys" and they didn't like it so I had conversation with

20   Dennis.

21   Q    Was it a heated conversation?

22   A    Yeah, it kind of got heated because he took it -- I

23   tried to keep it on a professional -- look, just don't treat

24   them this way, don't talk to people this way and -- yeah,

25   there was a lot of arrogance.

1    Q    When was the next incident that you can recall that

2  you had a disagreement with Mr. Clark?

3    A    I believe -- I'm not sure but I believe it was -- we

4  were on the back part of NCTAMS coming through the jungle

5  because there was an area that conduit was installed and they

6  called me, the same thing, and we were pulling fiber.

7    Q    You weren't there that day either?

8    A    I was en route. We were setting up for a fiber pull

9  and nobody had started yet.

10    Q    Who called you that time or told you about it?

11    A    I think it was Van Meter at this time.

12    Q    Who is Van Meter?

13    A    Henry Van Meter.

14    Q    Who was Henry Van Meter?

15    A    Henry Van Meter was another one that was not a

16  foreman but he was kind of like a lead man. If the crew

17  broke away, they were working a different area, he had the

18  responsibility of leadership of certain guys.

19    Q    Henry, his title wasn't foreman?

20    A    I don't believe so but I'm not sure.

21    Q    Did you hire Henry Van Meter also?

22    A    You know, I didn't directly hire anybody. I didn't

23  have the authority to, in my opinion, but I was part of the

24  interview of Henry Van Meter.

25    Q    Who else interviewed?

1    before was left in the right condition, and part of my job is

2    to explore the job ahead in advance to make sure that when

3    they leave that job site that day, of course they're

4    advancing forward and the reason for my performance was to be

5    on site so I covered kind of a wide area.

6         Q    How many lead men or foremen did you have?

7         A    Henry Quintanilla, Henry Van Meter, and basically as

8    guys that were left with any responsibility, I think they

9    were the only two.

10        Q    Was there a very high turnover of workers?

11        A    No.

12        Q    Did CalPac have to hire additional workers to do the

13   MCI project?

14        A    Yes.

15        Q    How many do you recall they had to hire?

16        A    I don't know.

17        Q    15, 20?  25?

18        A    I'd be guessing.  I'd just be guessing.

19        Q    When you interviewed these people, did you tell them

20   they were being hired for that specific job or just hired

21   generally?

22        A    I don't know that the name of the job was ever

23   mentioned to them, but their job role of what they would be

24   doing was explained.

25        Q    What was supposed to happen to them once the project

1    Q    Why do you say that?

2    A    Because he was. It was my opinion. I just feel he

3  was arrogant.

4    Q    Did he ever say anything that made you think he was

5  arrogant?

6    A    It was just arrogance. Yeah, I guess he said a lot

7  of things, obviously, that made me feel that way but I can't

8  pinpoint one isolated situation. It was just being around

9  somebody for long enough in a working condition that you feel

10  that attitude superiority and he felt like he was working in

11  a third world all the time.

12   Q    Did he ever say anything like that?

13   A    Yes.

14   Q    What did he say?

15   A    He just referred to Guam as being very backwards and

16  he would make comments about another job he did somewhere

17  else. I may be wrong about South America and he would

18  compare it to that.

19   Q    Have you ever made any verbal threats to Dennis

20  Clark?

21   A    Yes.

22   Q    Could you tell us about the first time you made a

23  verbal threat to him?

24   A    I think I told him that one time I -- I forget what

25  I said. Get off my job or I'll whoop your ass or something.

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that DONALD J. HARPER personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 188, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd day of March 2007.

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA ) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                    Plaintiffs,  )
                                 )
          vs.                    )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                    Defendants.  )

**COPY**

## DEPOSITION OF NORMAN S. SANTOS

Taken on Behalf of Defendant CalPac

BE IT REMEMBERED That, pursuant to the Federal
Rules of Civil Procedure, the deposition of **NORMAN S. SANTOS**
was taken before Cecille A. Flores, a Certified Shorthand
Reporter, on Friday, the 13th day of April 2007, at 3:00 p.m.
in the offices of Blair Sterling Johnson Martinez & Leon
Guerrero, Suite 1008, Pacific News Building, 238 Archbishop
Flores Street, Hagatna, Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96913
Tel: (671) 734-1041 * Fax: (671) 734-1045

Case 1:05-cv-00037    Document 348    Filed 07/23/2007    Page 47 of 55

1    Q    How long have you been working at CalPac?

2    A    Going for three years.

3    Q    So you started working at CalPac in 2004?

4    A    Yeah.

5    Q    What is your position now at CalPac?

6    A    Used to be Laborer.  Now I'm a Supervisor in the

7  field.

8    Q    When did you become a Supervisor at CalPac?

9    A    One year, three months.

10    Q    So 2006 you became a Supervisor, is that about

11  right?

12    A    Two years after.  A year and a half.  One year, four

13  months.

14    Q    So around 2006, correct?

15    A    Yeah.

16    Q    So from 2004 through 2006 you were a Laborer?

17    A    Yeah.

18    Q    Somewhere around there, right?

19    A    Uh-huh.

20    Q    What was your wage as a Supervisor?  What is your

21  wage?

22    A    11.50.

23    Q    As a Laborer, how much were you making?

24    A    Used to be $6.  Two months later they give $9.

25    Q    When was that?

1    on them.  The two guys laid off, the company gonna be going

2    slow.

3        Q    How long has CalPac had that policy?  As long as

4    you've been working there?

5        A    No.

6        Q    So how long?

7        A    That's a new policy.

8        Q    What about in 2004?  Did they have a policy about

9    showing up --

10       A    No, no.

11       Q    Earlier you filed a charge of discrimination with

12   the EEOC, correct?

13       A    Yes.

14       Q    That was about the time I guess the other

15   Co-Plaintiffs were filing?

16       A    Yes.

17       Q    The same time they were filing with the EEOC?

18       A    Yes.

19       Q    I think there was something that was filed with the

20   EEOC around February 2005.  Did Don Harper help you file the

21   charge of discrimination?  Do you remember?

22       A    Yes.

23       Q    Did Mr. Harper help you file it?

24       A    He help us to call Hawaii.

25       Q    Then you used his fax machine?

1  the complaint and the time you withdrew it?  Do you know how

2  many months or weeks that was?

3      A    Almost a year.

4      Q    Almost a year that you had a complaint with the

5  EEOC?

6      A    Uh-huh.

7      Q    During that time you were still employed at CalPac?

8      A    Yes.

9      Q    Did anybody at CalPac say anything to you about your

10 complaint?

11     A    No.

12     Q    No?  They let you work?

13     A    (Witness nodded head.)

14     Q    Did you feel that you were treated unfairly when you

15 were working at CalPac during that one year?

16     A    No.

17     Q    We were talking to Mr. Leon Guerrero about a meeting

18 that was held at CalPac when Dennis Clark said he never made

19 the statements.  Do you recall that?

20     A    Yes.

21     Q    During that meeting, did anybody at CalPac, the

22 management, ever say if you make a complaint you'll get fired

23 or you'll --

24     A    No.

25     Q    Nobody said that?

# REPORTER'S CERTIFICATE


I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **NORMAN S. SANTOS** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 51, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 18th day of May 2007.


Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 13th day of April, 2007 at the hour of 3:00 p.m. there appeared before me **NORMAN S. SANTOS** at the law offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 18th day of May, 2007.

_____
Cecille A. Flores

VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

## IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL CASE NO. CIV05-00037<br><br><br><br><br>**DECLARATION OF JOHN T. HEALY IN SUPPORT OF EACH OF CALPAC'S MOTIONS FOR SUMMARY JUDGMENT** |

I, **JOHN T. HEALY**, under penalty of perjury, do hereby declare and state as follows:

1.    I am a shareholder of California Technical Services LLC ("CalPac") and its Vice President whose duties include, the field operation of CalPac.

2.    Included within Calpac's field operation is the "underground crew" of which plaintiffs were formerly employed.

//

3. In early 2004, CalPac was working on a contact with MCI to lay fiber optics.

4. The MCI contract was initially to be completed in December 2004.

5. CalPac hired additional laborers to assist the underground crew in the completion of the MCI project.

6. The vast majority of the underground crew were of Chamorro descent.

7. In the latter part of 2004, CalPac essentially had one contract (i.e. the MCI Contract) which was nearing completion.

8. Although the MCI contract was not officially completed until June/July of 2005, the services of most of the laborers were no longer needed.

9. CalPac laid off employees based on economic reasons.

10. James Yee and Robert Cruz were not laid off, rather they were terminated for cause.

11. Joseph Hernandez was hurt on the job and received Worker's Compensation. He is officially on CalPac's books.

12. After the lay offs were completed, the vast majority of the remaining underground employees were of Chamorro descent.

13. Sometime in December, 2004, I became aware that some employees were claiming they were being discriminated against based on Clark's purported remarks. A meeting was called to answer any questions and alleviate any concerns, concerning Clark's statements. CalPac did not threaten.

AIR STERLING JOHNSON
ARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
ITE 1008 PACIFIC NEWS BUILDING
6 ARCHBISHOP F C FLORES STREET
GÁTNA, GUAM 96910-5205
LEPHONE: (671) 477-7857

- 2 -

I declare under penalty of perjury and the laws of the United States that the foregoing statements are true and correct.

DATED: JULY 19, 2007

JOHN T. HEALY

V63\-08130-03
G:\WORDDOC\PLD\VLG\194-DECLARATION OF JOHN HEALY RE VAN METER ET AL V CALPAC ET AL.DOC