VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

**FILED**
DISTRICT COURT OF GUAM
JUL 2 3 2007 nbo
**MARY L.M. MORAN**
**CLERK OF COURT**

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. CIV05-00037 <br><br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT RE ROLAND F. MENDIOLA** |

## INTRODUCTION

This is a lawsuit brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et. seq.* Roland F. Mendiola's ("Mendiola") claims arise out of **two** purported statements made by Dennis Clark ("Clark")[1]. Clark, in fact, was MCI's owner representative hired to ensure CalPac performed

//

---

[1] For the purpose of this Motion only, CalPac will assume Clark made the purported statements.

ORIGINAL

according to the terms of the contract and not an employee of California Pacific Technical Services LLC ("CalPac").

Mendiola alleges that on two occasions Clark called him and his fellow co-workers "monkeys" or "island monkeys." Mendiola claims that he reported the statement to his supervisor and that CalPac retaliated and discharged him on December 7, 2004. CalPac declares that Mendiola was laid off because the MCI project was near completion and that CalPac no longer needed the services of most of CalPac's laborers.

To the extent co-defendant Dynamic Technical Services ("DTS") asserts there was no hostile environment, CalPac hereby joins in such motion. Further, CalPac now moves for summary judgment on all issues alleged against CalPac by Mendiola.

**FACTS**

CalPac acquired a contract from MCI to lay fiber optic cables on Guam. The MCI project entailed laying fiber optic cable from Hagatna to NTCAM. Harper Deposition at p. 11. Initially, the MCI project was scheduled to be completed around December, 2004. See Healy Declaration. Clark was designated as MCI's representative charged with ensuring CalPac complied with the terms of the contract. Harper Deposition at p. 15. **It is not disputed that Clark was never an employee of CalPac** Harper Deposition at p. 15.

In order to meet the terms of the MCI contract, CalPac hired additional laborers to trench and lay cables. Healy

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Declaration. Initially, the MCI project was scheduled to be completed around December, 2004. Healy Declaration. As the project neared completion, CalPac began to lay-off its employees since the MCI project was the only remaining major contract that CalPac had. Healy Declaration

Mendiola, one of the plaintiffs herein, began working for CalPac around April, 2004. Mendiola Deposition at p. 33; also See First Amended Complaint filed February 24, 2006 ("Complaint"). Mendiola was part of the field crew of CalPac. Most, if not all employees, of the field crew were local hires of Chamorro descent. See Healy declaration. Because of the MCI contract, CalPac had to hire additional employees. Harper Deposition at p. 25. Around November, 2004, CalPac began downsizing because the work was slowing down. Hatfield Deposition at p. 75. Because of the reduced amount of work, the services of many of the employees were no longer needed. Hatfield Deposition at p. 76.

Through Mendiola's complaint, Mendiola alleged that Clark (an employee of DTS and not of CalPac), harassed Mendiola by calling Mendiola a "monkey" or "island monkey." See Par. 121 of the Complaint; Also see R. Mendiola Deposition at p. 15.

Mendiola alleged that the purported statements occurred around September and October. See Para. 121 of the Complaint. That both incidents occurred in Tiyan. R. Mendiola Deposition at

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 3 -

p. 12. When asked, Mendiola could not recall if the remarks occurred on the same day. R. Mendiola Deposition at p. 12. Mendiola claims to have notified CalPac of the treatment received from Clark. See Para. 122 of the Complaint; Also see R. Mendiola Deposition at p. 14. Afterwards, Mendiola went back to work just like he did before. R. Mendiola Deposition at p. 48. Indeed his supervisors continued to treat Mendiola as they had previously treated Mendiola. R. Mendiola Deposition at p. 48. Mendiola was laid off and told it was due to a reduction in force. R. Mendiola Deposition at p. 9.

Don Harper, whose duties included coordinating with the CalPac's customers, testified that he was informed of three incidents wherein Clark would refer to the employees as monkeys. Harper Deposition at p. 22. The first report purportedly resulted in Harper and Clark having a heated discussion about the way to talk to people. Harper Deposition at p. 22. It was Harper's impression that it was just a phrase 'monkeys' and they [the crew] didn't like it." Harper Deposition at p. 22. The second incident purportedly resulted in the same action by Harper. Harper Deposition at p. 23. On the third and final incident, Harper purportedly threatened Clark and told him to "get off my job or I'll whoop your ass or something." Harper Deposition at p. 96.

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 969 I 0-5205
TELEPHONE (671) 477-7857

- 4 -

1      Contrary to Mendiola's belief, certain CalPac management

2 were unaware of which employees made complaints. As an example,

3 Hatfield did not know that Norman Santos filed a complaint with

4 the EEOC. Hatfield Deposition at p. 70. Through Norman Santos'

5
6 deposition it is undisputed that Santos worked for CalPac in

7 2004 (Santos Deposition at p. 12); filed an EEOC complaint for

8 discrimination (Santos Deposition at p. 27); and withdrew his

9 EEOC complaint almost a year later (Santos Deposition at p. 33).

10 As of April 2007, Norman Santos remained an employee with

11 CalPac. Santos Deposition at p. 12.

12

**LAW**

13      Summary judgment is appropriate "if the pleadings,

14 depositions, answers to interrogatories and admissions on file,

15
16 together with the affidavits, if any, show that the moving party

17 is entitled to judgment as a matter of law." FED.R.CIV.P. 56.

18 The moving party bears the initial burden of showing the Court,

19 by reference to materials on file, that there are no genuine

20 issues of material fact that should be decided at trial. *Celotex*

21 *Corp. v. Catrett*, 477 U.S. 317 (1986). When a moving party has

22 discharged its burden, the non-moving party must then "go beyond

23 the pleadings," and by its own affidavits, or by "depositions,

24 answers to interrogatories, and admissions on file" designate

25 answers to interrogatories, and admissions on file" designate

26 specific facts showing there is a genuine issue for trial.

27 *Celotex*, 477 at 324.

28

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Case 1:05-cv-00037    Document 349    Filed 07/23/2007    Page 5 of 43

In determining whether the moving party has met its burden of establishing that no genuine issue of a material fact exists and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in a light most favorable to the nonmovant, in this case the Plaintiff, and resolve all reasonable doubts in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Ins.*, 210 F.3d 1099, 1106 (9ᵗʰ Cir. 2000). The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial. *Id.*

//

//

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 6 -

# I.   RACIAL HARASSMENT – HOSTILE ENVIRONMENT

## 1.   CALPAC SHOULD NOT BE LIABLE FOR THE ACTIONS OF A THIRD PARTY

In the instant case, Mendiola alleges that a non-employee of CalPac called him a "monkey" or "island monkey" on two occasions. In order for an employer to be found liable for third party harassment, an employer must ratify or condone the conduct by failing to investigate and remedy it after learning of it. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002). Assuming for the sake of this motion that complaints were made to Harper, Harper testified that he confronted Clark about the statements. After the third complaint to Harper, Harper threatened Clark and kicked Clark off the job site. Most importantly, there were no further complaints and the situation was remedied. Clearly, although Healy and Ward may have not known of the actions by Harper, action was taken nonetheless. CalPac, therefore, should not be liable for the actions of Clark.

## 2.   PLAINTIFF FAILED TO ESTABLISH A PRIMA FACIE CASE OF HOSTILE ENVIRONMENT

The Supreme Court has repeatedly stated that Title VII **does not set forth "a general civility code for the American workplace."** (Emphasis added.) *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006). Judicial standards for harassment must **"filter out complaints attacking 'the ordinary tribulations of the workplace, such as**

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

**the sporadic use of abusive language**, gender-related jokes, **and occasional teasing.'"** *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998). Although CalPac concedes that referring to an employee as an island monkey may be offensive, these remarks, under the circumstances, do not qualify for Title VII protection. "**Conduct that is not so severe or pervasive enough to create an objectively or abusive work environment...is beyond Title VII purview.**" (Emphasis added.) *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21 (1993).

In order to state a claim for hostile environment, Mendiola must show that: (1) he was subject to verbal or physical conduct based on race or national origin; (2) that the conduct was unwelcomed; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and created an abusive environment. *Galdamez v. Potter,* 415 F.3d 1015, 1023 (9th Cir. 2005). Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment, for the purposes of Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept.,* 424 F.3d. 1027 (9th Cir. 2005). In determining whether conduct was sufficiently severe or pervasive, courts look at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening, or humiliating,

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM  96910-5205
TELEPHONE: (671) 477-7857

- 8 -

or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101,115 (2002)("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the **cumulative effect** of individual acts"). (Emphasis added.) *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 184 (4th Cir. 2001).

Mendiola alleges that Clark directed two statements at him during his tenure at CalPac. It is significant that Mendiola can not recall if the statements occurred on the same day. There is no allegation that Clark physically threatened Mendiola. This is not a situation where an employee shows up to work and is subjected to a barrage of rude or offensive remarks. Further, there is no showing that the purported remarks altered the terms and conditions of Mendiola's employment. In fact, he went back to work and his supervisors treated him in the usual way.

This is a situation where a third party may have made three or four rude remarks of which Mendiola may have heard two.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

Clearly, Mendiola failed to establish the frequency required to establish a claim under Title VII especially in light of the allegation that the remarks were not made by CalPac employees.

### 3. CALPAC DID NOT RETALIATE AGAINST MENDIOLA

Title VII's anti-retaliation provision forbids an employer from "discriminate[ing] against an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a). **This provision, however, "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant**...to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination. (Emphasis added.) *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2409 (2006).

An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. LINDEMANN & P. GROSSMAN, *Employment Discrimination Law 669* (3d ed.1996) (noting that "courts have held that **personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers"** are **not actionable** under § 704(a)). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-6205
TELEPHONE: (671) 477-7857

1 Title VII's remedial mechanisms. (citations omitted.) It does so
2 by prohibiting employer actions that are likely "to deter
3 victims of discrimination from complaining to the EEOC," the
4 courts, and their employers. *Ibid*. And normally **petty slights,**
5 **minor annoyances, and simple lack of good manners will not**
6 **create such deterrence.** (emphasis added.) *Burlington, at* 2415.
7
8 If the plaintiff makes a prima facie case, the burden of
9 production shifts to the defendant to present a legitimate, non-
10 retaliatory reason for the adverse action. *Brooks v. City of San*
11 *Mateo,* 229 F.3d 917, 928 (9th Cir. 2000); *Cassimy v. Board of*
12 *Education of the Rockford Public School, Dist. #205 (7th Cir.*
13 *2006)*. If the defendant carries this burden, the plaintiff "must
14 demonstrate a genuine issue of material fact as to whether the
15 reason advanced by the [defendant] was a pretext." *Brooks,*
16
17 *supra.*

18 Mendiola claims he was "wrongfully and unlawfully
19 terminated by CalPac. CalPac declares that CalPac essentially
20 had one contract that was nearing completion and the services of
21 most of the crew, to include Mendiola, were no longer needed nor
22 could they be afforded. See Healy Declaration.
23
24 **CONCLUSION**
25 Liability for hostile environment requires a showing that
26 the action was severe and pervasive. For the reasons stated
27 above, it is respectfully suggested that the two remarks heard
28 by Mendiola were not severe or pervasive enough to be protected

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

- 11 -

under Title VII. Assuming the remarks were severe and pervasive, third party discrimination requires a showing that CalPac condone or authorized the act. Such was not done.

Concerning Mendiola's claims for retaliation, Mendiola's discharge was based on reasons unrelated to any purported complaint made. Other workers, some of whom did not file complaints, along with Mendiola's were laid off for financial or economic reasons. As such, CalPac respectfully requests this Court grant its motion for summary judgment.

**RESPECTFULLY SUBMITTED** this 23rd day of July, 2007.

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION

BY: _____
VINCENT LEON GUERRERO
*Attorneys for Defendant California Pacific Technical Services LLC*

V63:49\08130-03
G:\WORDDOC\PLD\VLG\199B-MEMO OF P&A IN SUPP OF MSJ RE R
MENDIOLA RE VAN METER V CALPAC.DOC

BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

– 12 –

Case 1:05-cv-00037    Document 349    Filed 07/23/2007    Page 12 of 43

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, ET AL,  )
                            )
                            )
    Plaintiffs              )
                            )
VS.                         )
                            )    NO. CIV05-00037
                            )
CALPAC, ET AL               )
                            )
                            )
    Defendants              )
                            )
                            )

------------------------------------

ORAL DEPOSITION OF

ROLAND F. MENDIOLA

May 21, 2007

------------------------------------

ORAL DEPOSITION OF ROLAND F. MENDIOLA, produced as a
witness at the instance of the DEFENDANT, and duly sworn, was
taken in the above-styled and numbered cause on May 21, 2007,
from 9:00 a.m. to 10:43 a.m., before JOE A. WILLIAMS, CSR in
and for the State of Texas, reported by machine shorthand, at
the law offices of CLAY HOLLIS, 9518 Tioga Drive, San Antonio,
Texas 78230-3118, pursuant to the Guam Rules of Civil
Procedure.

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.    May 21, 2007

9

1   the job on the job site?

2       A.   Yes.

3       Q.   Was that on a daily basis?

4       A.   Yes.  He was there mostly every day.

5            MR. SMITH:  Objection, nonresponsive.

6       Q.   Between the time you worked for -- as a stocker at

7   Gold Market and the time you were employed at CalPac, did you

8   have any other work?

9       A.   Yes, I did, but I don't remember the jobs.

10      Q.   Do you remember what kind of work it might have been?

11      A.   Construction.

12      Q.   Do you remember the name of the management you worked

13  for?

14      A.   I can't remember.  That's way back.

15      Q.   When were you laid off from CalPac?

16      A.   2004.

17      Q.   Do you remember what month?

18      A.   No, I don't remember.

19      Q.   Do you recall the reason why you were laid off?

20      A.   Mentioned that reduction of force, work reduction.

21      Q.   Do you have any reason to believe that there was any

22  other reason for you being laid off than reduction in

23  workforce?

24      A.   Yes.

25      Q.   Okay.  Tell me what that is.

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.        May 21, 2007

12

1    because he called you island monkeys?

2          A.    I don't understand.

3          Q.    Okay.  Did you feel that you were inadequate to

4    perform your job because he had called you those words?

5          A.    No.

6          Q.    Other than this one occasion in Tiyan, did Dennis

7    Clark ever call you island monkey again?

8          A.    I believe twice when he mentioned it.

9                MR. SMITH:  Objection, nonresponsive.

10         Q.    Did Dennis Clark call you island monkey once again

11   after the incident at Tiyan?

12         A.    Twice.

13         Q.    Tell me when that was.

14         A.    On the same area.

15         Q.    Was it the same day?

16         A.    I don't remember if it was the same day.

17         Q.    What was the other job site then?  You said the same

18   area, but where was it at?

19         A.    In Tiyan, same.

20         Q.    Same job?

21         A.    Yes, same job.

22         Q.    Same trench?

23         A.    Yes.

24         Q.    Is it reasonable that was the same day then?

25         A.    I don't remember.

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.      May 21, 2007

14

1      Q.    Did you tell anyone at CalPac about Mr. Clark's

2    comments to you and make a complaint?

3      A.    Yes.

4      Q.    Who did you complain to?

5      A.    To my supervisors, Don Harper and Henry Van Meter.

6      Q.    And when did you complain in time?  What time period

7    was it when you complained after that incident in Tiyan?

8      A.    The same day.

9      Q.    You complained to both Don Harper and Henry Van Meter

10   on the same day?

11     A.    Yes, yes.

12     Q.    And what did they say in response to your complaint?

13     A.    That they were going to bring it up to John Healy.

14     Q.    Do you know whether or not they did bring it up with

15   John Healy?

16     A.    I don't recall.

17     Q.    Was there any verbal warning made to Mr. Clark by Mr.

18   Healy or any other manager at CalPac; do you know?

19     A.    No.

20     Q.    Okay.  Was there any written warning or other writing

21   that was given out to the employees about Mr. Clark's comments?

22     A.    I don't remember.

23     Q.    Okay.  Did Mr. Clark ever bring up the issue about

24   calling you island monkeys and apologize?

25     A.    No.

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.      May 21, 2007

15

1     Q.    Did you complain to anyone at CalPac in management

2     about Dennis Clark's comments other than that one time you

3     complained?

4          A.    No.

5          Q.    Okay.   What motivated you to join this complaint

6     filed by the law firm of Attorney Lujan?

7          A.    By being discriminated.

8          Q.    Okay.   How do you feel that you were discriminated

9     against?

10         A.    Because of Dennis Clark calling me an island monkey.

11         Q.    Did anyone else from CalPac make any other racial

12    comments or any other discriminatory comments to you while you

13    were employed?

14         A.    No.

15         Q.    Did John Healy make any comments to you?

16         A.    No.

17         Q.    Did any other manager that was employed by CalPac

18    make any other discriminatory comments to you?

19         A.    No.

20         Q.    Did anyone else from DTS make any comments to you

21    that you felt were discriminatory?

22              MR. SMITH:   Objection, form.

23         A.    Dennis Clark.

24         Q.    Other than Dennis Clark, did anyone else from DTS

25    make any discriminatory comments to you that you recall?

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.       May 21, 2007

33

```
 1        Q.    Do you remember when in 2003, what part of the year?

 2        A.    June, July.

 3        Q.    You were hired by CalPac in late April of 2004; is

 4   that right?

 5        A.    2004.   I don't remember the month.

 6        Q.    Did you look for employment between the time you

 7   returned to Guam in June or July of 2003 and the time you were

 8   hired by CalPac in --

 9        A.    Yes.

10        Q.    -- 2004?

11        A.    Yes.

12        Q.    And were you given any job offers over that time?

13        A.    No.

14        Q.    And when you applied for the job at CalPac, did you

15   let them know that you had a criminal record and had been in

16   prison?

17        A.    No.

18        Q.    Did anyone ask you whether you had ever been

19   convicted of a crime?

20        A.    No.

21        Q.    And then when you were hired by CalPac, do you

22   remember who it was that hired you for CalPac?

23        A.    Don Harper.

24        Q.    Did you have an interview with Mr. Harper?

25        A.    Yes.
```

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.        May 21, 2007

48

1       Q.    So, between the first time he said it and the second

2     time he said it, you just went back to work every day and did

3     your job just like you had always been doing it, right?

4          A.    Yes.

5          Q.    And your supervisors continued to treat you just the

6     way they had always treated you, right?

7          A.    Yes.

8          Q.    And I'm talking about Mr. Quintanilla and Mr. Van

9     Meter and Mr. Harper, right?

10         A.    Yes.

11         Q.    And then the second time that it happened, you were

12    still out in that same section of the job, right?

13         A.    Yes.

14         Q.    You were doing the same thing that you were the first

15    time it happened; you were digging in the trenches, right?

16         A.    Yes.

17         Q.    And so between the first time it happened and the

18    second time it happened, there would have been -- you would

19    have seen Mr. Clark every day out there on the average of about

20    three times a day, right?

21         A.    Yes.

22         Q.    Between the first time he said it and the second

23    time, right?

24         A.    Yes.  He was out every day.

25         Q.    And between the first time that happened and the

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.    May 21, 2007

79

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, ET AL,          )
                                    )
                                    )
      Plaintiffs                    )
                                    )
VS.                                 )   NO. CIV05-00037
                                    )
                                    )
CALPAC, ET AL                       )
                                    )
                                    )
      Defendants                    )
                                    )
                                    )

REPORTER'S CERTIFICATION
DEPOSITION OF ROLAND F. MENDIOLA
May 21, 2007

     I, JOE A. WILLIAMS, Certified Shorthand Reporter in and
for the State of Texas, hereby certify to the following:
     That the witness, ROLAND F. MENDIOLA, was duly sworn by
the officer and that the transcript of the oral deposition is a
true record of the testimony given by the witness;
     That examination and signature of the witness to the
deposition transcript was waived by the witness and agreement
of the parties at the time of the deposition;
     That the original deposition was delivered
to Vincent Leon Guerrero;
     That the amount of time used by each party at the
deposition is as follows:
     DAVID LUJAN - 00 HOURS:00 MINUTE(S)

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.     May 21, 2007

80

1      ARTHUR K. SMITH - 1 HOURS: 1 MINUTE(S)
2          That $ _____ is the deposition officer's charges to
3      the DEFENDANT for preparing the original deposition transcript
4      and any copies of exhibits;
5          That pursuant to information given to the deposition
6      officer at the time said testimony was taken, the following
7      includes all parties of record:
8          DAVID LUJAN, Attorney for Plaintiffs
           THOMAS C. MOODY, III, Attorney for Defendant
9              CALPAC
           ARTHUR K. SMITH, Attorney for Defendant
10             DTS
11         That a copy of this certificate was served on all parties
12     shown herein on _____ and filed with the Clerk
13     pursuant to Rule 203.3.
14         I further certify that I am neither counsel for, related
15     to, nor employed by any of the parties or attorneys in the
16     action in which this proceeding was taken, and further that I
17     am not financially or otherwise interested in the outcome of
18     the action.
19         Certified to by me this _____ of _____ , 2007.
20
21
22                         JOE A. WILLIAMS, Texas CSR #422
                           Expiration Date:  12-31-08
23                         Firm Registration No. 281
24
25

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA ) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
            Plaintiffs,          )
                                 )
       vs.                       )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
            Defendants.          )

🖨 COPY

## DEPOSITION OF RUSSELL A. HATFIELD

Taken on Behalf of CalPac


        BE IT REMEMBERED That, pursuant to the Guam

Rules of Civil Procedure, the deposition of RUSSELL A.

HATFIELD was taken before Cecille A. Flores, a Certified

Shorthand Reporter, on Monday, the 19th day of February 2007,

at 10:00 a.m. in the offices of Blair Sterling Johnson

Martinez & Leon Guerrero, Suite 1008, Pacific News Building,

238 Archbishop Flores Street, Hagatna, Guam.

1   is that correct?

2       A    That's correct.  Norman is still there as far as I

3   know.

4       Q    When did you become aware that Norman made a

5   complaint with the EEOC?

6       A    I wasn't aware that he made a complaint.  I don't

7   think I said that.

8       Q    How often was Dennis Clark on the job site?

9       A    Every day.

10      Q    How many hours a day?

11      A    Four hours a day.

12      Q    Where would he be the rest of the time?

13      A    I have no knowledge.

14      Q    How many hours would you spend at the CalPac

15  warehouse on a daily basis?

16      A    Me?

17      Q    Yes.

18      A    Three.

19      Q    How long is a work day for you?  How long was a work

20  day for you at CalPac?

21      A    You want from the time I got up in the morning until

22  the time I went to bed or just physical work?

23      Q    Physically being there at CalPac on the job.

24      A    12 to 18.  I mean, 12 to 14, I'm sorry.

25      Q    What time of the day would you spend those three

1      A     Who I would keep if given a choice of keeping some

2   and letting others go, yes.

3      Q     Now, at the time these people were let go, would

4   people be let go in favor of other employees that were local?

5   Do you understand my question?

6      A     My recommendation has nothing to do with race.  The

7   employees that were let go were based on their skill levels

8   and the job requirements that I needed the individuals to do.

9   So if Joe Blow was multi-taskable, I'd put him in this

10  category.  If Joe Blow was not, he'd stay over here.  If I

11  didn't need his particular skills because we were downsizing

12  at the time because the job was slowing down and you don't

13  keep people on the payroll if you don't have any work for

14  them to do.  And that's what we were doing.  We were

15  downsizing because the work was slowing down.  Yes, there was

16  a long period of work leftover, but we didn't need the

17  humongous payroll and staff that we had at the time.

18     Q     Just for the record, some of the people that stayed

19  on as employees were locals, would that be correct?

20     A     That's correct.

21     Q     I believe you indicated earlier that you weren't

22  aware that various people were filing complaints.  You knew

23  there were complaints but you didn't know who they were,

24  would that be correct?

25     A     Uh-huh.

1      Q    I believe that was in reference to -- I believe you

2 indicated Norman Santos, correct?

3      A    I think she was talking about James Lee.

4      Q    James?

5      A    Yee or Lee or whatever his name was.  I made the

6 statement that James -- until I got here and I saw it right

7 here, James, down as a defendant.  I have -- to this day,

8 other than what's on this piece of paper is the only people

9 that I know have filed a suit.

10      Q    You're referring to the Plaintiffs in this lawsuit?

11      A    That's correct.

12      Q    In your opinion, were the service of the people that

13 were let go around November of 2004, were their services

14 needed at CalPac?

15      A    The ones that were let go, no.

16      Q    So when you're saying let go, they weren't

17 necessarily fired, would that be correct?

18      A    Nobody was fired.  Everybody was laid off with the

19 understanding that if work picked up and if we needed your

20 skills back, that you would be given first opportunity to

21 accept the job if you so desired it.

22      Q    And it wouldn't be unusual for somebody to be let go

23 at CalPac and then later picked up?

24      A    No.

25      Q    Did you actually observe that situation?

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 19th day of February, 2007 at the hour of 10:00 a.m. there appeared before me **RUSSELL A. HATFIELD** at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 5th day of March, 2007.

_____

Cecille A. Flores

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.   )
CRUZ, ROLAND F. MENDIOLA, JAMES )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA,                     )
                                )
                Plaintiffs,     )
                                )
        vs.                     )
                                )
CALPAC, DYNAMIC TECHNICAL       )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,          )
                                )
                Defendants.     )

**ORIGINAL**

## DEPOSITION OF DONALD J. HARPER

Taken on Behalf of California Pacific Technical Services

BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of **DONALD J. HARPER** was taken before Cecille A. Flores, a Certified Shorthand Reporter, on the 16th and 20th days of February 2007, in the offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

1    Q    Were your responsibilities limited to the MCI

2 contract?  Did you have other responsibilities as well?

3    A    I had a few other responsibilities at the time.

4    Q    What percentage of your time was devoted to the MCI

5 contract would you say?

6    A    95 percent.

7    Q    95 percent?

8    A    Guessing.

9    Q    Can you describe for us what the MCI contract was?

10    A    It was to install a fiber optic connection from the

11 MCI building in Agana to NCTAMS NASA complex.

12    Q    What was the route they took to get from MCI here in

13 Agana?

14    A    Up through Agana, through Tiyan, down the cliffline

15 through Harmon Industrial Park, back through the back road of

16 Fatima, come up Route 1, down Route 3, back through the

17 jungle into NCTAMS.

18    Q    Did the MCI project, was it divided into phases or

19 how did it go?

20    A    I believe it was -- I think there were three phases.

21 They called them three phases, yes.

22    Q    Do you remember what the three phases were?

23    A    Yeah, it wasn't really -- I don't know if there was

24 a contractual breakdown, but I know when it was broken down

25 into phases of making it through Agana.  It was kind of a

1        A     Just, I guess, for what an owner does.

2        Q     But he wasn't involved in the day-to-day operations

3    of the company?  That was you and Bob and Tim?

4        A     No, he was aware of the day-to-day.  There was daily

5    communication with him.  I mean, other than that, that's as

6    close as it got.

7        Q     Did he do the job interviews with the prospective

8    laborers?

9        A     No, I don't believe so.

10       Q     Who did that?

11       A     Either be me, Bob or Tim Camacho or Tim Camacho's

12   replacement and I can't remember his name.  After that.

13       Q     What was the role of Dennis Clark?

14       A     Dennis Clark was -- he was a representative of MCI.

15   He was basically quality control, I would guess.  For MCI.

16   He was there to make sure that the product was installed per

17   their specifications.

18       Q     You had MCI provide a set of specifications you were

19   supposed to follow?

20       A     Yes.

21       Q     Describe how those were presented to you.

22       A     Drawings with details.

23       Q     Do they also have a manual of specifications?

24       A     Not really.  Not that I know of.

25       Q     So you say he was the quality control.  Was he then

1    Q    Why aren't you on the site that day?

2    A    I was in the office doing some report for John

3  Healy.

4    Q    Do you remember when or about that was time wise?

5    A    No, I don't.  I mean, it's no --

6    Q    Was it still in Phase 1 or one of the later phases?

7    A    I think that's kind of the Phase 2.  I'm -- I can't

8  really remember but --

9    Q    So you don't recall the date?

10   A    No.

11   Q    Who was the employee that called you?

12   A    Henry Quintanilla.

13   Q    What did Henry Quintanilla tell you to the best as

14  you can recall?

15   A    When I arrived on site, I guess there was a deep

16  excavation area that Dennis wanted things to move faster,

17  didn't like the way they was doin' it and referred to them as

18  monkeys at this time, I believe.  It was just a phrase

19  "monkeys" and they didn't like it so I had conversation with

20  Dennis.

21   Q    Was it a heated conversation?

22   A    Yeah, it kind of got heated because he took it -- I

23  tried to keep it on a professional -- look, just don't treat

24  them this way, don't talk to people this way and -- yeah,

25  there was a lot of arrogance.

1    Q    When was the next incident that you can recall that
2  you had a disagreement with Mr. Clark?

3    A    I believe -- I'm not sure but I believe it was -- we
4  were on the back part of NCTAMS coming through the jungle
5  because there was an area that conduit was installed and they
6  called me, the same thing, and we were pulling fiber.

7    Q    You weren't there that day either?

8    A    I was en route.  We were setting up for a fiber pull
9  and nobody had started yet.

10   Q    Who called you that time or told you about it?

11   A    I think it was Van Meter at this time.

12   Q    Who is Van Meter?

13   A    Henry Van Meter.

14   Q    Who was Henry Van Meter?

15   A    Henry Van Meter was another one that was not a
16 foreman but he was kind of like a lead man.  If the crew
17 broke away, they were working a different area, he had the
18 responsibility of leadership of certain guys.

19   Q    Henry, his title wasn't foreman?

20   A    I don't believe so but I'm not sure.

21   Q    Did you hire Henry Van Meter also?

22   A    You know, I didn't directly hire anybody.  I didn't
23 have the authority to, in my opinion, but I was part of the
24 interview of Henry Van Meter.

25   Q    Who else interviewed?

1    before was left in the right condition, and part of my job is

2    to explore the job ahead in advance to make sure that when

3    they leave that job site that day, of course they're

4    advancing forward and the reason for my performance was to be

5    on site so I covered kind of a wide area.

6        Q    How many lead men or foremen did you have?

7        A    Henry Quintanilla, Henry Van Meter, and basically as

8    guys that were left with any responsibility, I think they

9    were the only two.

10       Q    Was there a very high turnover of workers?

11       A    No.

12       Q    Did CalPac have to hire additional workers to do the

13   MCI project?

14       A    Yes.

15       Q    How many do you recall they had to hire?

16       A    I don't know.

17       Q    15, 20?  25?

18       A    I'd be guessing.  I'd just be guessing.

19       Q    When you interviewed these people, did you tell them

20   they were being hired for that specific job or just hired

21   generally?

22       A    I don't know that the name of the job was ever

23   mentioned to them, but their job role of what they would be

24   doing was explained.

25       Q    What was supposed to happen to them once the project

1    Q    Why do you say that?

2    A    Because he was.  It was my opinion.  I just feel he

3  was arrogant.

4    Q    Did he ever say anything that made you think he was

5  arrogant?

6    A    It was just arrogance.  Yeah, I guess he said a lot

7  of things, obviously, that made me feel that way but I can't

8  pinpoint one isolated situation.  It was just being around

9  somebody for long enough in a working condition that you feel

10  that attitude superiority and he felt like he was working in

11  a third world all the time.

12    Q    Did he ever say anything like that?

13    A    Yes.

14    Q    What did he say?

15    A    He just referred to Guam as being very backwards and

16  he would make comments about another job he did somewhere

17  else.  I may be wrong about South America and he would

18  compare it to that.

19    Q    Have you ever made any verbal threats to Dennis

20  Clark?

21    A    Yes.

22    Q    Could you tell us about the first time you made a

23  verbal threat to him?

24    A    I think I told him that one time I -- I forget what

25  I said.  Get off my job or I'll whoop your ass or something.

REPORTER'S CERTIFICATE


I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **DONALD J. HARPER** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 188, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd day of March 2007.


_____

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA) JR., JOSEPH J. HERNANDEZ, JOSEPH ) T. MENDIOLA, LARRY L. CHARFAUROS,) ANTHONY C. ARRIOLA, ROBERT B. ) CRUZ, ROLAND F. MENDIOLA, JAMES ) S. YEE, TEDDY B. CRUZ, JESSE B. ) CRUZ, JOHN L.G. NAUTA, and JOHN ) P. BABAUTA, ) )                Plaintiffs, ) )          vs. ) ) CALPAC, DYNAMIC TECHNICAL ) SERVICES, MCI, JOHN HEALY, DENNIS) CLARK, WILLIAM WARD, JAI JAMES ) and DOES 1 through 10, ) )             Defendants. ) | CIVIL CASE NO. CIV05-00037 ⬜ **COPY** |

## DEPOSITION OF NORMAN S. SANTOS

Taken on Behalf of Defendant CalPac

BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of **NORMAN S. SANTOS** was taken before Cecille A. Flores, a Certified Shorthand Reporter, on Friday, the 13th day of April 2007, at 3:00 p.m. in the offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96913
Tel: (671) 734-1041 * Fax: (671) 734-1045

Case 1:05-cv-00037     Document 343     Filed 07/23/2007     Page 35 of 43

1    Q    How long have you been working at CalPac?

2    A    Going for three years.

3    Q    So you started working at CalPac in 2004?

4    A    Yeah.

5    Q    What is your position now at CalPac?

6    A    Used to be Laborer.  Now I'm a Supervisor in the

7    field.

8    Q    When did you become a Supervisor at CalPac?

9    A    One year, three months.

10   Q    So 2006 you became a Supervisor, is that about

11   right?

12   A    Two years after.  A year and a half.  One year, four

13   months.

14   Q    So around 2006, correct?

15   A    Yeah.

16   Q    So from 2004 through 2006 you were a Laborer?

17   A    Yeah.

18   Q    Somewhere around there, right?

19   A    Uh-huh.

20   Q    What was your wage as a Supervisor?  What is your

21   wage?

22   A    11.50.

23   Q    As a Laborer, how much were you making?

24   A    Used to be $6.  Two months later they give $9.

25   Q    When was that?

1    on them.  The two guys laid off, the company gonna be going

2    slow.

3        Q    How long has CalPac had that policy?  As long as

4    you've been working there?

5        A    No.

6        Q    So how long?

7        A    That's a new policy.

8        Q    What about in 2004?  Did they have a policy about

9    showing up --

10       A    No, no.

11       Q    Earlier you filed a charge of discrimination with

12   the EEOC, correct?

13       A    Yes.

14       Q    That was about the time I guess the other

15   Co-Plaintiffs were filing?

16       A    Yes.

17       Q    The same time they were filing with the EEOC?

18       A    Yes.

19       Q    I think there was something that was filed with the

20   EEOC around February 2005.  Did Don Harper help you file the

21   charge of discrimination?  Do you remember?

22       A    Yes.

23       Q    Did Mr. Harper help you file it?

24       A    He help us to call Hawaii.

25       Q    Then you used his fax machine?

1    the complaint and the time you withdrew it?  Do you know how

2    many months or weeks that was?

3        A    Almost a year.

4        Q    Almost a year that you had a complaint with the

5    EEOC?

6        A    Uh-huh.

7        Q    During that time you were still employed at CalPac?

8        A    Yes.

9        Q    Did anybody at CalPac say anything to you about your

10   complaint?

11       A    No.

12       Q    No?  They let you work?

13       A    (Witness nodded head.)

14       Q    Did you feel that you were treated unfairly when you

15   were working at CalPac during that one year?

16       A    No.

17       Q    We were talking to Mr. Leon Guerrero about a meeting

18   that was held at CalPac when Dennis Clark said he never made

19   the statements.  Do you recall that?

20       A    Yes.

21       Q    During that meeting, did anybody at CalPac, the

22   management, ever say if you make a complaint you'll get fired

23   or you'll --

24       A    No.

25       Q    Nobody said that?

# REPORTER'S CERTIFICATE


I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **NORMAN S. SANTOS** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 51, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 18th day of May 2007.


_____

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

     I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 13th day of April, 2007 at the hour of 3:00 p.m. there appeared before me **NORMAN S. SANTOS** at the law offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

     I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

     In testimony whereof, I have hereunto set my hand this 18th day of May, 2007.

_____

Cecille A. Flores

VINCENT LEON GUERRERO
BLAIR STERLING JOHNSON
MARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
SUITE 1008 PACIFIC NEWS BUILDING
238 ARCHBISHOP F.C. FLORES STREET
HAGÅTÑA, GUAM 96910-5205
TELEPHONE: (671) 477-7857

*Attorneys for Defendant California Pacific Technical Services LLC*

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>Defendants. | CIVIL CASE NO. CIV05-00037<br><br><br><br><br><br>**DECLARATION OF JOHN T. HEALY IN SUPPORT OF EACH OF CALPAC'S MOTIONS FOR SUMMARY JUDGMENT** |

I, **JOHN T. HEALY**, under penalty of perjury, do hereby declare and state as follows:

1.    I am a shareholder of California Technical Services LLC ("CalPac") and its Vice President whose duties include, the field operation of CalPac.

2.    Included within Calpac's field operation is the "underground crew" of which plaintiffs were formerly employed.

//

3. In early 2004, CalPac was working on a contact with MCI to lay fiber optics.

4. The MCI contract was initially to be completed in December 2004.

5. CalPac hired additional laborers to assist the underground crew in the completion of the MCI project.

6. The vast majority of the underground crew were of Chamorro descent.

7. In the latter part of 2004, CalPac essentially had one contract (i.e. the MCI Contract) which was nearing completion.

8. Although the MCI contract was not officially completed until June/July of 2005, the services of most of the laborers were no longer needed.

9. CalPac laid off employees based on economic reasons.

10. James Yee and Robert Cruz were not laid off, rather they were terminated for cause.

11. Joseph Hernandez was hurt on the job and received Worker's Compensation. He is officially on CalPac's books.

12. After the lay offs were completed, the vast majority of the remaining underground employees were of Chamorro descent.

13. Sometime in December, 2004, I became aware that some employees were claiming they were being discriminated against based on Clark's purported remarks. A meeting was called to answer any questions and alleviate any concerns, concerning Clark's statements. CalPac did not threaten.

AIR STERLING JOHNSON
ARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
UITE 1008 PACIFIC NEWS BUILDING
8 ARCHBISHOP F.C. FLORES STREET
AGATNA, GUAM 96910-5205
:LEPHONE: (671) 477-7857

1    I declare under penalty of perjury and the laws of the

2    United States that the foregoing statements are true and correct.

3

4    DATED: JULY ___, 2007

5                                    JOHN T. HEALY

6

7    V63\-08130-03
     G:\WORDDOC\FLD\VLG\194-DECLARATION OF JOHN HEALY RE VAN METER
8    ET AL V CALPAC ET AL.DOC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAIR STERLING JOHNSON
ARTINEZ & LEON GUERRERO
A PROFESSIONAL CORPORATION
ITE 1008 PACIFIC NEWS BUILDING
18 ARCHBISHOP F.C. FLORES STREET
AGÁTNA, GUAM 969 IO-520S
TELEPHONE: (671) 477-7857