# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF GUAM

| | |
|---|---|
| HENRY VAN METER, JERRY APODACA,JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, | ) CIVIL CASE NO. 05-00037 ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) ) |
| CALPAC, DYNAMIC TECHICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, | ) ) ) ) ) |
| Defendants. | ) ) ) |

TRANSCRIPT DEPOSITION

OF

# JOHN DOUGLAS CRUIKSHANK

May 21, 2007

COPY

PREPARED BY:      GEORGE B. CASTRO
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates
Piti, Guam 96915
Tel:(671)688-**DEPO** * Fax:(671)472-3094

1     A   Yes, he did.

2     Q   All right.  Okay.  But it was your

3 understanding that that was something to occur

4 in the future?

5     A   Correct.

6     Q   And --

7     A   Well, he informed me before he made the

8 purchase that he was trying to purchase them.

9     Q   Right.  But I guess my question is, you

10 know, if I understand you correctly, is that

11 you did not know he had an ownership interest

12 until sometime in December of 2004; am I

13 correct?

14     A   I did not know that he had a prior

15 ownership interest --

16     Q   Yes, sir.

17     A   -- until December 2004, that is correct

18     Q   Right.  Okay. And before he left on

19 October 14, 2004, he did tell you that the

20 reason why he was leaving UMDA was because he

21 was going to purchase an interest in CalPac?

22     A   That's correct.

23     Q   Okay.  Now, sir, what I want to do is,

24 I want to ask you about the discussions you had

25 with Mr. Healy in October of 2004.  Okay?  And

1 in which I believe there was a conversation or
2 meeting you were having with him that was
3 interrupted and cut short because Mr. Healy had
4 to address some incident that had occurred with
5 his workers.

6     A   Correct.

7     Q   Okay. Now, tell me, sir -- and my
8 understanding is that in this meeting, that
9 John Healy mentioned to you that the incident
10 involved Dennis Clark calling the workers
11 monkeys and island monkeys.

12     A   I honestly don't recall right now. I
13 would say that he told me there was an incident
14 involving Dennis Clark when he left my office.

15     Q   Okay.

16     A   I think he told me what the incident
17 was shortly thereafter.

18     Q   All right. So --

19     A   And as to the exact date, October or,
20 you know, it sounds about right --

21     Q   Okay.

22     A   -- but, you know, I couldn't tell you
23 exactly anything more than that.

24     Q   All right. So, let's begin with the
25 date of the incident. Was it before or after

1  he had quit UMDA?

2      A    I would say right around the same time,

3  because it was a period where he had given a

4  formal date on his resignation. And my

5  understanding was the ownership was going to --

6  what do you call it, transfer sometime around

7  that date and I -- (pauses). You know, it

8  seems to me that was about mid-October.

9      Q    Okay.

10     A    But there was a period where he was

11 probably, because he didn't know the exact

12 date, we'd accepted his resignation based on a

13 certain date with the agreement that were off

14 post a few days before, that was fine.

15     Q    Uh-huh.

16     A    We'd already told him that we wanted,

17 you know, for example, somebody else involved

18 with the signing off of things to do with

19 CalPac after he told us he was acquiring.

20     Q    All right. So, in other words, he gave

21 advanced notice.

22     A    Yes.

23     Q    And whatever it was and that you know

24 ultimately his, you know, the date he left

25 would be around October 14 or shortly right

1  before --

2      A    Right around there I would say, yeah.

3      Q    Okay.  And so the meeting that we're

4  talking about occurred during that time frame?

5      A    Yeah, right around there.

6      Q    Okay.  And according to what you just

7  said, he told you that there was an incident,

8  and that this involved Dennis Clark.

9      A    Yes.

10      Q    Okay.  Now, where was this meeting at,

11  sir?

12      A    The meeting he's having with me?

13      Q    Yes.

14      A    It was in my office.

15      Q    In your office?

16      A    Yeah.

17      Q    And so --

18      A    I believe he got a call on his cell

19  phone.

20      Q    Okay.  So, tell me.  You know, I mean,

21  did he -- was it a planned meeting?  Did he

22  come there you know, I mean, --

23      A    No.

24      Q    Did you call him or what?

25      A    No.  He was just in to talk.  I mean

1    you know, I deal with the contractors that way.

2         Q    Right.

3         A    You know, they get work, it's ongoing

4    there in the office.  So, it would have been

5    something that was set up before him to have a

6    meeting.

7         Q    Okay.  All right.  So, in other words,

8    it wasn't unusual for a contractor to walk in

9    and talk to you?

10        A    No.  Still isn't, yeah.

11        Q    And at that point, John Healy really

12   was not an employee, he was a contractor now?

13        A    He was either in his last, like I said,

14   like, last a little bit with us, but it was

15   after he had obtained ownership.  That was my

16   understanding.

17        Q    Okay.  All right.  So, he received a

18   phone call on his cellphone?

19        A    Right.

20        Q    And do you know who called him?

21        A    I do not.

22        Q    And tell me as much as you can, you

23   know, of what you remember as to what he said

24   after that phone -- after receiving that phone

25   call.

1    A   Oh, he said he had to go, he had some

2 type of -- some type of employee incident that

3 he had to care of.  And, I don't think he told

4 me that day what the incident was.

5    Q   But he told you though that that day

6 that it involved Dennis Clark?

7    A   Yes, I believe he did.

8    Q   Okay.

9    A   Dennis Clark was the MCI person.

10    Q   All right.  Okay.  So, then according

11 to your statement a few minutes ago, it was at

12 a subsequent meeting that he told you about

13 that he mentioned about monkey or island

14 monkeys?

15    A   Yeah, I asked him -- we were talking,

16 and I can't remember if that was at my place or

17 his place or we're out for lunch.

18    Q   Uh-huh.

19    A   But I asked him, you know, how things

20 were going and he said, Oh, he said, "I have

21 this incident surrounding Dennis Clark and the

22 underground crew."  He said, something along

23 lines that Dennis was out on the site, didn't

24 like what he saw and had referred to the crew

25 as island monkeys.  And I said, "Wow, that's,

1  you know, that's kind of strange." He said,

2  "No, no, he didn't mean it to be prejudice."

3  He said, that's like in United States, if

4  they're talking about people that work in

5  construction or in the -- what they call that,

6  the warehouse yards, they call them -- he said,

7  "yard apes". It doesn't mean to be anything --

8      Q   Derogatory?

9      A   Yeah.    Well,  not  derogatory,  but

10  prejudice.

11      Q   Okay. All right. So, anything further

12  that  was  discussed  regarding  that  incident

13  during this meeting?

14      A   No, I told I was rather surprised

15  somebody would say that. And, like I said, he

16  assured me that -- because I met Dennis and he

17  said that he doesn't mean anything by it, so.

18  And I think the only other thing that was

19  talked about was that -- and, again, it may

20  have been at that meeting or it may have been

21  at one before that, that, or one after that

22  rather, that really wasn't of too bigger

23  concern with him because he'd been planning to

24  change out a lot of the workers and bring in

25  statesiders because they had a better work

1 ethic.

2     Q   Okay.  So, in other words, he had been
3 planning to remove the local workers and bring
4 in statesiders because of work ethics?

5     A   Yeah.  We had a discussion over that.

6     Q   Uh-huh.

7     A   Because I told them I said our workers
8 at MCV are pretty much all local.  When I say
9 local, most are actually raised on the island -
10 -

11     Q   Yeah.

12     A   -- and they're a mixture of Chamorro,
13 and some Filipino and also some, you know, like
14 Ponapei, whatever.

15     Q   Or statesiders?

16     A   At time I don't know that we had a
17 statesider, actually.

18     Q   Okay.  All right.

19     A   Because it's kind of a company policy
20 that we hire locally when we can.  And that had
21 been the case in the period John had been with
22 us.

23     Q   Uh-huh.

24     A   So, you know, I told him, I said I was
25 surprised by that comment, because I thought

1   our people were as productive as any place I've
2   ever worked.

3        Q    Uh-huh.

4        A    And he said that the people we employed
5   were somewhat different than the construction
6   people he had at CalPac.

7        Q    Okay.

8        A    So --

9        Q    All right. So, how soon do you think
10  that this meeting occurred after the first
11  meeting where he said, where he received this,
12  you know, phone call on his cellphone regarding
13  Dennis Clark?

14       A    Well, it couldn't have been very long
15  because we weren't actually having those kinds
16  of conversations after, you know, after I found
17  out that he was possibly the owner of -- prior
18  to -- (pauses).

19       Q    Yeah.

20       A    Anyway.  Once I found that out, I
21  didn't really socialize very much with him.

22       Q    Okay. So, would it have been still in
23  October?

24       A    Yeah, it could have been.

25       Q    Okay.  Now, did you ever have any

1 conversation with Dennis Clark regarding this
2 comment?

3     A   I really do not recall having any
4 conversation with Dennis Clark about this.

5     Q   Okay. All right. Now, it is also my
6 understanding, sir, that you had a meeting with
7 Mr. Healy in December of 2004 and in which Mr.
8 Healy told you that the discrimination charges
9 has been filed with the EEOC with a product of
10 a bunch of ex-convicts trying to rip them off?

11     A   Yeah.

12     Q   Okay. Tell me about that meeting, sir.

13     A   Well, yeah, it was just -- we were
14 meeting on something else, and he just wasn't -
15 - (pauses). You know, I knew -- thought I knew
16 John pretty well. I mean, we went to lunch a
17 lot. We're -- you know -- anyway. So, he
18 seemed disturbed or bothered and I said,
19 "What's up?" And then he told me it was being
20 sued and it was basically a bunch of ex-
21 convicts trying to get rich on him.

22     Q   Okay. Now --

23     A   And I asked him -- I think I asked
24 whether or not, you know, whether he'd seen a
25 lawyer at this point or not. And I'm not sure

1  whether he told me that he had. I know he told
2  me that he wasn't very worried about it.
3     Q   Uh-huh.
4     A   Because of, if it was necessary, he was
5  going to transfer his land into his brother's
6  name and there'd be nothing for anybody to sue
7  for anyway. So, he wasn't very concerned.
8     Q   Okay. All right. Now, did this
9  meeting occur -- well, can you tell me where
10  this meeting took place?
11     A   Not on top of my head. It could have
12  been at his place. We usually met three
13  places. My office, his place, or we'd have
14  lunch.
15     Q   Okay. When you say "his place", you
16  mean CalPac's office?
17     A   Yes, sorry. CalPac's office.
18     Q   Okay. Now, it is also my understanding
19  that Mr. Healy at this meeting asked you to, if
20  you could use your resources to investigate
21  CalPac workers for any illegal activities such
22  as, you know, stealing cable or hooking up
23  cable illegally?
24     A   Yes. He did.
25     Q   So, tell me about that conversation.

1    A    Well, that was pretty much the source

2  of it.    He said he thought that a number of

3  them were probably stealing cable and he would

4  give me a list and could we cross-check that.

5    Q    Uh-huh.

6    A    He did fax over a list, I believe, or

7  else it was hand-delivered.    And it was right

8  during that, roughly that time when I

9  discovered that there was this other ownership

10 question there, and I thought I would just not

11 do anything with the list.

12   Q    Okay.

13   A    And so I didn't.    Well, I guess I

14 probably put it in a file somewhere.

15   Q    All right.    So, do you think you still

16 have that list, sir?

17   A    Well, probably.

18   Q    Okay.

19   A    You know, I don't know, I -- it's three

20 years ago, and maybe, you know, the secretary -

21 - (pauses).    Probably it's still there.

22   Q    Okay, good.    Now, sir, what is your

23 opinion of Mr. Healy, you know, for, I guess,

24 veracity since, you know -- (pauses). Did your

25 opinion of Mr. Healy change once you found out

1 call, that cellphone call, you didn't remember
2 if, or you recall that specifics were not
3 mentioned, is that right?

4     A   Correct.  He said he had a situation
5 with -- you know, and I can't remember if he
6 told me with who and Dennis along the job site
7 at that point.  I know he did later, but at
8 that time, you know, I just can't recall.

9     Q   You also indicated when Mr. Lujan was
10 asking you questions that you recall an
11 interview that took place in January 2005 with
12 a representative of the EEOC; correct?

13     A   Do I recall it?  I recall somebody
14 calling me, I don't remember who, and talking
15 to me.

16     Q   Do you remember how your discussions
17 with that representative from the EEOC, did you
18 remember how many times you said you met with
19 Mr. Healy concerning this incident?

20     A   No.

21     Q   Okay.  And you also said that was
22 subsequent to your first meeting on October
23 2004, that you learned that statements were
24 made, or supposedly made, by Dennis Clark.  Did
25 you learn that from Mr. Healy?

1    A    Correct.

2    Q    Was that around December of 2004 that
3 that subsequent meeting took place?

4    A    No.    I would say before that.    I met
5 with John many times.    I saw John probably at
6 least once a week all the way along.    I think
7 in December he talked about being sued.    But
8 the comments I would say were probably closer
9 to, let's say -- you know, some period between
10 mid-October, mid-November, I would say.

11    Q    Did he say that people had made
12 complaints or employees had made complaints
13 with the EEOC concerning the statements made by
14 Mr. Clark?

15    A    He may have told me that in December.

16    Q    Okay.

17    A    He may have.

18    Q    Well, I'm talking the time that you
19 found out that monkeys or island monkeys made
20 by Mr. Clark.

21    A    No, I don't think he told me at that
22 point.    He told me that the very first time,
23 I'm not sure he told me the complaint went to
24 the -- whatever you just said, the EEOC?

25    Q    Yeah.

1    A   I don't know if they all signed off on

2  those revisions or not to be honest.

3    Q  Okay.

4    MR. LEON GUERRERO:  Thank you.  I don't

5  have any further questions.

6    MR. LUJAN:  Are you done?

7    MR. LEON GUERERRO:  Yeah.

8    MR. LUJAN:  Okay.  Mr. Ewert, do you

9  have any questions?

10    MR. EWERT:  No.  I'm just listening

11  here.  No questions.

12    MR. LUJAN:  You have no questions.

13  Well, I have some questions myself.  Okay.

14

15

16          **RE-DIRECT EXAMINATION**

17  BY MR. LUJAN:

18    Q  Mr. Cruikshank, let me show you what

19  we'll mark as Exhibit 1 for your deposition.

20  And it is my understanding that this is a copy

21  of the interview, a typewritten report,

22  prepared by the EEOC worker, what's his name,

23  James Yao, in regards to the interview he

24  conducted on January 21st, 2005 of you.  And

25  please take a few moments to review it and

1  then, you know, I'll ask you some questions
2  regarding it. Okay?
3       (Plaintiff's Exhibit 1 was marked for
4  identification)
5    A   Uh-huh.   (pauses; peruses document)
6  Okay.
7    Q   All right. The first paragraph, you
8  know, regarding the first sentence, states, "I
9  recall that in October 2004, I had a meeting
10 with John Healy, CalPac owner, which was
11 interrupted and cut short because Healy had to
12 address some incident that had occurred with
13 his workers." Is that a fair statement?
14   A   Yeah.
15   Q   Okay.   Next sentence, "John Healy
16 mentioned to me that the incident involved
17 Dennis Clark calling the workers 'monkeys' and
18 'island monkeys.'" Was that a fair statement?
19   A   You know, like I said today, I gave
20 this in January 21st, 2005, that's two years and
21 a bit ago.
22   Q   Uh-huh.
23   A   If you're asking me now, which I assume
24 you are, is this a more correct statement than
25 me saying I'm not sure when he said it to me?

1    Q    Yes, sir.

2    A    Well, I would say that my memory was

3    probably fresher in January 21st, 2005 than this

4    today.    I can't recall, as I said today, I

5    can't recall whether it was at that meeting or

6    a subsequent meeting.    But I know it was around

7    the same time.

8    Q    All right.    Okay.    But, the other thing

9    that you do know is that your memory would have

10   been, I guess, fresher back then, you know, as

11   to a conversation you had maybe three month

12   earlier --

13   A    Correct.

14   Q    -- as opposed to now?

15   A    Yeah.

16   Q    Okay.    Then the last sentence, "When

17   John Healy left our meeting he said, 'I've got

18   to go, I've got to fire someone.'"    Was that a

19   fair statement?

20   A    That was fair.

21   Q    Okay.    Second paragraph, he states, "In

22   a subsequent meeting with Healy in December of

23   2004, I understood Healy's firing comment to

24   mean Don Harper."

25   A    Yeah, that's true.

1     Q   Okay.   So, "Furthermore, Healy stated

2 that the discrimination charges (being filed

3 with EEOC) were the product of 'a bunch of ex-

4 convicts trying to rip him off.'"

5     A   Yeah, that's a fair statement.

6     Q   "Healy asked me to utilize my resources

7 to investigate the CalPac workers for any

8 illegal activities, for example stealing cable

9 or hooking up cable illegally."

10    A   Yes.

11    Q   Is that a fair statement?

12    A   Yeah.

13    Q   "Healy presented me with a roster of

14 names with addresses that included the names of

15 workers who had filed discrimination charges as

16 well as the names of other CalPac underground

17 workers."

18    A   Yes, that's what I was told.

19    Q   Okay.  So, in other words, he presented

20 you with a roster of names at this meeting?

21    A   Yeah.   Well, at which meeting?  Sorry.

22 Yeah, in December roughly.

23    Q   Yes.  Okay.  So, it was at the meeting

24 that he presented you --

25    A   Hang on.  Let me just think about what

# REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 78 pages to be a true and correct transcript of the audio recording made by a Notary Public Officer of Depo Resources in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 31st day of July, 2007.

_____

George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094