1
LUJAN AGUIGUI & PEREZ LLP
Attorneys at Law
2
Pacific News Building, Suite 300
238 Archbishop Flores Street
3
Hagåtña, Guam 96910
Telephone (671) 477-8064/5
4
Facsimile (671) 477-5297
5
*Attorneys for Plaintiffs*

**FILED**
DISTRICT COURT OF GUAM

AUG 1 0 2007 *nbc*

**JEANNE G. QUINATA**
**Clerk of Court**

6 IN THE UNITED STATES DISTRICT COURT OF GUAM

7 FOR THE TERRITORY OF GUAM

8

9 HENRY G. VAN METER, JERRY
APODACA, JR., JOSEPH J.
10 HERNANDEZ, JOSEPH T. MENDIOLA,
LARRY L. CHARFAUROS, ANTHONY
11 C. ARRIOLA, ROBERT B. CRUZ,
ROLAND F. MENDIOLA, JAMES S.
12 YEE, TEDDY B. CRUZ, JESSE B. CRUZ,
JOHN L.G. NAUTA, and JOHN P.
13 BABAUTA,

14                                  Plaintiffs,
                    -vs-
15
CALPAC, DYNAMIC TECHNICAL
16 SERVICES, MCI, JOHN HEALY,
DENNIS CLARK, WILLIAM WARD, JAI
17 JAMES, and DOES 1 through 10,

18                                  Defendants.

CIVIL CASE NO. 05-00037

**SECOND DECLARATION OF DELIA
LUJAN IN SUPPORT OF EACH OF
PLAINTIFFS' OPPOSITIONS TO
DEFENDANT CALPAC'S MOTION FOR
SUMMARY JUDGMENT**

19

20 I, DELIA LUJAN, hereby declare and state as follows:

21     1. I am an attorney representing all the plaintiffs in this matter.

22     2. This declaration is submitted in support of each of the plaintiffs' oppositions to

23         Defendant Calpac's motions for summary judgment.

24     3. Attached hereto as Exhibits 1a, 1b, 1c, and 1d are true and correct copies of the cover

25         pages, various excerpts, and the Reporter's Certificates of the deposition of John

26
27         Healy taken on April 30, May 3, May 10, and May 11, 2007.

28

Henry G. Van Meter, et al., v. CAL PAC, et al.
Civil Case No. 05-00037
Second Declaration of Delia Lujan

1

ORIGINAL

Case 1:05-cv-00037   Document 387   Filed 08/10/2007   Page 1 of 34

4. Attached hereto as Exhibit 2 are true and correct copies of the cover page, various excerpts, the Reporter's Certificate, and the Clerk's Certificate of the deposition transcript of Larry L. Charfauros' deposition taken on May 24, 2007, which was received by my office from Cecilia F. Flores, Freelance Stenotype Reporter.

5. Attached hereto as Exhibit 3 are true and correct copies of the cover page, various excerpts, and the Reporter's Certificate of the deposition of James S. Yee taken on February 7, 2007.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 10th day of August, 2007, in Hagåtña, Guam.


**DELIA LUJAN**

Henry G. Van Meter, et al., v. CAL PAC, et al.
Civil Case No. 05-00037
Second Declaration of Delia Lujan

# EXHIBIT 1a

IN THE UNITED STATES DISTRICT COURT OF GUAM
FOR THE TERRITORY OF GUAM

HENRY G. VAN METER, JERRY ) CIVIL CASE NO. CIV05-00037
APODACA, JR., JOSEPH J. )
HERNANDEZ, JOSEPH T. MENDIOLA, )
LARRY L. CHARFAUROS, ANTHONY )
C. ARRIOLA, JAMES S. YEE, )
TEDDY C. CRUZ, JESSE B. CRUZ, )
TEDDY L.G. NAUTA, and JOHN B. )
BABAUTA, )
)
              Plaintiffs, )
)
          vs. )
)
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, )
DENNIS CLARK, WILLIAM WARD, )
JAI JAMES, and DOES 1 through )
10, )
)
              Defendants. )
_____ )

DEPOSITION TRANSCRIPT

OF

# JOHN T. HEALY

April 30, 2007

ORIGINAL

PREPARED BY:    GEORGE B. CASTRO
                **DEPO RESOURCES**
                #49 Anacoco Lane
                Nimitz Hill Estates
                Piti, Guam 96915
                Tel:(671)688-**DEPO** * Fax:(671)472-3094

1    Q    Okay.   No problem.   So, specifically

2  and, you know, I guess, if you can tell me,

3  just what did the agreement provide?   Besides

4  Roger, you know, and reinvesting the profits

5  back to the company?

6    A    Right.

7    Q    Okay.  What did it provide, you know, I

8  guess, as in regards to you?

9    A    It forgot what it was called, but it

10 basically allowed me to buy Leslie's shares for

11 a predetermined amount of money upon execution

12 of a document and written notice to Leslie.

13   Q    Okay.

14   A    I believe.

15   Q    That what?

16   A    I believe that was it.

17   Q    Okay.  And so it was an option on your

18 part?

19   A    Yes.

20   Q    That gave you the rights when to buy

21 and for how much?

22   A    Yes.

23   Q    Okay.  And when was the earliest you

24 could buy it for, as far as your recollection?

25   A    I believe I could have purchased it

1     A    Yes, I believe so.

2     Q    All right. So, this would have been on

3 or after October 14, 2004?

4     A    Yes.

5     Q    And so, what did you tell --

6     A    I'm pretty sure.

7     Q    Yeah. What did you tell him in regards

8 to you've got to fire someone?

9     A    We were having a conversation, I don't

10 recall what conversation was about, and I got a

11 phone call from Dennis Clark as I sat in John

12 Cruikshank's office. And Dennis Clark said to

13 me, "John, I just got into another

14 confrontation with Don Harper and I'm tired of

15 it. And he was in my face threatening me and

16 whatever." And he said that "I had simply come

17 up to the job site, noticed that the men

18 weren't putting concrete over the pipe where

19 they should have, and told Henry that they

20 should have been concrete. Henry apologized,

21 said 'No problem, we'll do that.'" Don Harper

22 showed up on the job site, started yelling at

23 Dennis and so I hung up and said to John

24 Cruikshank, "Sorry, I gotta go. I gotta go

25 fire somebody." Something to that effect.

1    Q   Okay.  So, now I noticed you said that

2  Dennis   Clark   said,   he   just   had   another

3  confrontation --

4    A   Yes.

5    Q   With Don Harper?

6    A   Yes.

7    Q   So, would I be correct in understanding

8  that   you   and   Clark   have   had   another

9  conversation   in   regards   to   another

10  confrontation he had with Harper before this?

11    A   I don't recall Dennis telling me that

12  he had a confrontation.  And I'll say, and --

13  how should I phrase it, an angry confrontation,

14  although he may have.

15    Q   But   am   I   correct   in   understanding

16  that's  what  you  just  told  us,  that  Dennis

17  Clark,  while  you  were  with  Cruikshank  on  the

18  phone told you he just had another --

19    A   Another, yes, sir.

20    Q   Okay.   So,  tell  me  about  the  other

21  confrontation, the prior?

22    A   I  just  said  to  you,  I  don't  recall

23  Dennis  Clark  specifically  discussing  with  me

24  the other confrontation.

25    Q   Okay.  All right.  So, this would have

1  been the first one that you recall where Clark

2  was complaining about Harper?

3      A    You    just    rephrased    that,    and    Clark

4  complained about Harper often times.

5      Q    Okay.  Tell me --

6      A    I'm not saying 'confrontation', I said

7  complained.

8      Q    All    right.    Tell    me    about    the

9  complaints   that   Clark   had,   you   know,   about

10  Harper   to   the   best   of   your   recollection

11  beginning with the first two, I guess, this one

12  that led to you firing Harper.

13     Q    Who firing Harper?

14     A    Yeah.  Because you said you were going

15  to go fire someone.

16     Q    But I didn't.

17     A    Okay.   On   the   record,   I   didn't   fire

18  Harper.    I    made    that    comment    to    John

19  Cruikshank, but I did not go and fire Harper.

20     Q    Okay.

21     A    Yeah.

22     Q    Well,   let's   clear   that   up.   So,   what

23  did you do after you had this discussion with

24  Clark   on   the   phone   and   made   this   comment   to

25  Cruikshank, what did you do?

1     A    I left Cruikshank's office. I went

2 back to my office, which I shared with my

3 General Manager. I walked in, my General

4 Manager looked up and he said, Don Harper -- he

5 said, I got a call from -- I think he said "I

6 got a call from Dennis Clark and Don Harper was

7 out there yelling at Dennis Clark again." And

8 I said, "Yeah, I know".

9     Q    Now, who was your General Manager then?

10     A    His name is William Ward.

11     Q    Is he still with CalPac?

12     A    No.

13     Q    Do you know where Mr. Ward is now?

14     A    Yes. He works for Black Construction.

15     Q    In Guam?

16     A    Yes.

17     Q    All right. Okay. So --

18     A    So, I said, disgustingly I said, "Yeah,

19 I know, I already heard." In other words,

20 Dennis had phoned me. And within a moment or

21 two Don Harper walked in the office and said --

22 and Bill and I looked at him, sort of

23 disgustingly, and he said, "I just got into it

24 with Dennis again". And I said "Yeah, we

25 know". And he turned around, walked out, left.

1  after that?

2      A    I hired Bill Ward.

3      Q    Now, Camacho went and formed another
4  company which was a competitor of CalPac; am I
5  correct?

6      A    Yes, you're correct.

7      Q    And what's the name of that company?

8      A    Cable Services Group, which was formed
9  in July, over a month before Tim left CalPac.

10     Q    Okay.    So,   going   back   to   your
11 discussion with Healy -- I'm sorry, with the
12 Cruikshank and Clark regarding Harper.    All
13 right.   So, you know, I believe when Harper
14 came in, he told you and Ward that -- what was
15 it again, he had another --

16     A    "I just got into it again with --"

17     Q    Again with Clark.

18     A    Clark.

19     Q    Okay.   Now --

20     A    That's exactly what he said.   "I just
21 got into it again with Clark".

22     Q    All right.   Now, did you ask him what
23 do you mean by "again"?

24     A    No, I did not.

25     Q    Had he told you in the past problems he

1  what's the problem? What happened?"

2      A    No, did not.

3      Q    Why not?

4      A    I already knew.

5      Q    What did you know?

6      A    I knew that -- Dennis Clark phoned me

7  and said "I just got into it again with Don,

8  and he came screaming and yelling" And, I went

9  back to the office and Bill Ward said "Just got

10  a call from Dennis". I said "Yeah, I know".

11  And Don walked in, sort of with his head down,

12  and said, "I just got into again with Dennis".

13  And I said, "Yeah, I know."

14      Q    Okay.

15      A    Disgustingly just --

16      Q    Now, how long had you known Dennis

17  Clark before this, October 2004?

18      A    Oh, I knew Dennis from the beginning of

19  the contract.

20      Q    Okay. Which was?

21      A    Whenever Dennis came to island, which

22  I'm going to say was probably -- when was the

23  contract signed in February? So, I supposed

24  Dennis was here in January.

25      Q    Okay. We have Exhibit 6, which is

1   what was it again, the Managing Partner, as far
2   as you're concerned, you weren't wearing that
3   hat, that CalPac hat. Whatever dealings you
4   had with Dennis Clark, it was in your role as
5   an MCV representative. That's what you're
6   saying?

7       A   That's what I'm saying, yes.

8       Q   Until October 14, 2004 when you took
9   that MCV hat off and put on your full-time
10  CalPac hat; am I correct?

11      A   Yes.

12      Q   Okay. Now --

13      A   There may have been a little overlap,
14  but I can't recall. I tried very, very hard to
15  keep the two separated.

16      Q   When you said overlap, so there would
17  be times when you go into the relationship with
18  Clark wearing both hats?

19      A   I knew Dennis Clark after hours.
20  Dennis Clark lived in Malesso. I lived in
21  Inarajan. And I would visit his home in
22  Malesso, along with his wife. We might have a
23  beer at the Agat Marina after work. And so, I
24  think most of our discussions were there. Let
25  me explain that --

1    A    Yes, sir.

2    Q    Right.    I    understand    he    worked    for

3    Dynamic Technical Services?

4    A    Yes.

5    Q    Or whatever that company's name is?

6    A    Yes.

7    Q    Which had been hired by MCI to oversee

8    the work of CalPac and to ensure that CalPac's,

9    you    know,    rather    perform    according    to    the

10   specifications?

11   A    He was hired to do pre-engineering for

12   the    project,    to    do    route    review,    route

13   assessment    to    ensure    that    any    easements    were

14   obtained,    to    represent    MCI    with    respect    to    the

15   issues    with    the    Department    of    Public    Works,

16   Highway    Encroachment    Division,    so    on    and    so

17   forth    and    also    to    ensure    that    the    project    was

18   done on time, primarily.

19   Q    So,    he    was    MCI    representative    for

20   whatever was needed for on behalf of MCI and to

21   oversee CalPac's work?

22   A    Yes.

23   Q    That    it    complied    with    the

24   specifications?

25   A    Yes.

1    Q    Okay.   And he was guy that, what do you
2  call that -- he was the hands-on guy for MCI;
3  isn't that correct?

4    A    He was the one who would ensure that
5  the trench was dug deep enough, or concrete was
6  put over the pipe where concrete was required.
7  I don't think I saw him doing much physical
8  work.

9    Q    Okay.   But let me ask you this, you
10 would have no reason to see him do a lot of
11 physical work until after October 14, 2004;
12 isn't that correct?

13   A    That's correct.

14   Q    Because before that you were wearing
15 your MCV hat and had nothing to do with CalPac;
16 isn't that correct?

17   A    I was wearing my MCV hat, that is
18 correct.

19   Q    Uh-huh.

20   A    Having absolutely nothing to do with
21 CalPac is not correct.

22   Q    Okay.   All right.   So, what were you
23 doing on behalf of CalPac, let's say between
24 February 13, 2004 and October 14, 2004, in
25 regards to the contract between CalPac and MCI?

1  to him say that, you know, I think to the
2  effect that "I got into it again with Clark."

3      A    Right.   Yes.

4      Q    And my question is, did you have any
5  further discussions with Dennis Clark in
6  regards to what transpired between him and
7  Harper that day?

8      A    No.   Only the phone call that was made
9  to me by Dennis Harper, I'm sorry -- by Dennis
10 Clark while I was sitting in John Cruikshank's
11 office.

12     Q    Okay.   All right.   So, that was the
13 full extent of any discussions you had
14 regarding that incident with anyone, meaning,
15 you know, between Harper and Dennis Clark?
16 Excluding your discussion with --

17     A    You asked me a little while ago, a
18 couple of questions ago, if I discussed it with
19 Don Harper when Don Harper came in to Bill and
20 my office and I said "no".

21          And the only discussion I had later,
22 I'm sure I discussed it with Bill Ward, you
23 know, "This is becoming a problem, and the
24 job's not getting done.   Not getting done
25 right".

1       And then one evening at Don Harper --
2 I'm sorry, at Dennis Clark's home in Malesso,
3 Dennis Clark said to me, "John, I have already
4 talked to Jeff Buehler and you need to take
5 care of the Don Harper problem."

6       Q    Okay.  So, let me ask you, what did you
7 understand that to mean?

8       A    Well, I understood that to mean, was
9 that Dennis was fed up with Don Harper's
10 actions or inactions, and wanted me to replace
11 him, get him off --

12      Q    Did he say that?

13      A    No, he did not say that.

14      Q    How do you know he wanted you to
15 replace him if you didn't say that?

16      A    You just asked me what I thought he
17 meant by that, and that's what I thought he
18 meant by that.

19      Q    All right.  And so, him saying you need
20 to --

21      A    Deal with.

22      Q    -- deal with the Harper problem.

23      A    Problem, yes.  Deal with the Harper's
24 problem

25      Q    Okay.  The conclusion you reached was

1 that he wanted you to get rid or to fire
2 Harper?

3    A   He wanted me to deal with the problem.
4 He didn't want me, I don't -- didn't say he
5 wanted me to fire Harper, didn't say he wanted
6 me to -- maybe that could have meant counseling
7 Harper or could have meant --

8    Q   Now, we're talking about your
9 impression.

10    A   My impression was just, when he said
11 "deal with the problem". And I chose to deal
12 with the problem by telling Don Harper that
13 this conflict he has, or this conflict that
14 exists between he and Dennis is having a
15 negative effect on the project, and I'd like to
16 take -- I'm going to take you off this project
17 and put you on another project.

18    Q   Okay. Which other project were you
19 going to put him on?

20    A   We had another large project that we
21 were doing and I felt that Don would handle
22 that, and handle it well.

23    Q   Was that the TyCo, TyCo project?

24    A   Yeah, that's what we referred to it as,
25 yes.

1    Q    My question is, was it completed on
2  time?

3    A    No.

4    Q    And did CalPac lose money as a result
5  of the project not being completed on time?

6    A    Yes.

7    Q    How much did it lose?

8    A    I don't know.

9    Q    Now, I understand, you now own 49
10 percent of CalPac?

11   A    That's correct.

12   Q    The amended Exhibit 1 shows that.

13   A    Yes.

14   Q    And your wife owns 51 percent.

15   A    Yes, sir.

16   Q    Okay.  And so the project was delayed
17 by what, about two or three months?

18   A    I believe it was delayed by two to
19 three months.

20   Q    Okay.  And so the delay is what, would
21 you agree, contributed to the CalPac losing
22 money on the project?

23   A    That's what I would -- yes.

24   Q    Okay.  As of -- I'm sorry.

25   A    Pardon me.  Or, not making as much.

1    Q    Sure.   We already know it didn't make

2  money.   You've already told us it lost money.

3  Right?  So.

4    A    Did I tell you it lost money?

5    Q    Yeah.   I thought that's -- you know, it

6  lost money.

7    A    I don't think I said that.

8    Q    Okay.   What did you say then?   Why

9  don't we go back there?  Can we see that?

10    A    I don't know what was the question?   Do

11  you remember the question you asked?

12    Q    I asked you, but, you know, did the

13  delay result in CalPac losing money?

14    A    And I said, yes.

15    Q    You said yes.   Yeah.

16    A    But I didn't say we didn't make money.

17    Q    Of course you made money, but you spent

18  more than what you make.  I think we're -- you

19  and I both --

20    A    Okay.

21    Q    -- speaking the same English.

22    A    Okay.

23    Q    Except yours is Malesso.   I'm Windward

24  Hills.  Okay?

25    A    Okay.   The delay on the project, the

1    longer the project took, the more money it
2    caused CalPac.

3    Q    Sure.  Uh-huh.  Now, did it cost CalPac
4    more than the $464,000.00 contract price?

5    A    This was only part of the contract.

6    Q    Well, is there another contract?

7    A    I believe this is used for one phase of
8    it.

9    Q    I thought -- well, I don't know.  I'm
10   just -- I'm new to this case.

11   A    Well, I --

12   Q    I'll tell you what, why don't we look
13   at the very back of Exhibit 6 and I think --

14   A    This was one -- this is a phase.

15   Q    Right.  Look all the way back.  Then
16   you've got, you know, the --let's see   --
17   (peruses document).

18         MR. LEON GUERRERO:  What page are you
19   on?

20   BY MR. LUJAN:

21   Q    you've got Exhibit A, then there's a
22   *Statement of Work.*  Then after that, you have
23   Attachment 1.  Okay?

24   A    Okay.

25   Q    Then, you know, it tells us, I believe

1    Q    So, what do you think the total price
2  of this contract was?

3    A    It was over a million.

4    Q    Okay.

5    A    (pauses)

6    Q    So, obviously there are more documents.
7  Rather, there's more to this contract than
8  Exhibit 6.

9    A    Yeah, what followed this would have
10 been, what MCI referred to as Phase 2 Purchase
11 Order, Phase 3 Purchase Order, which -- so they
12 really only gave us one phase at the beginning.
13 and it was, 'If you guys are doing well, then
14 we'll give you the next phase'.

15   Q    Okay.  All right.

16   A    Because they wanted to protect
17 themselves.

18   Q    So, how many phases were there a total
19 of?  What, three phases?

20   A    Three phases, yes.

21   Q    And all three phases were done before
22 March 29, 2005?

23   A    Yes, sir.

24   Q    Okay.  Now, you gave us a document this
25 morning, that lists the, you know, the

```
 1   Association meeting.  And then the --
 2       Q    Would  that  be  on  December  of  2004  or
 3   after?
 4       A    Probably December or --
 5       Q    Okay.  All right.  But it would have --
 6       A    December or January.
 7       Q    All  right.  Okay.  And  then  the  GTA
 8   one?
 9       A    Yes.
10       Q    When was that?
11       A    Same time frame.
12       Q    Was  it  on  same  day  as  the  Contractors
13   Association?
14       A    No.
15       Q    Okay.  So afterwards?
16       A    Yes.
17       Q    Was Dennis Clark still in Guam?
18       A    I believe he was.
19       Q    Okay.
20       A    Yes.
21       Q    Now,  when  was  the  first  time  you
22   learned  that  the  employees  were  complaining
23   about  being  called  "monkeys"  or  "island
24   monkeys"?
25       A    When  one  day  on  our  fax  machine  we
```

received a fax of a EEOC complaint filed by Jesse Cruz, alleging that he was hired to work on the MCI project. That he was discriminated against by being called "a bunch of monkeys". And, I believe that was the first.

Q   Okay. Would that have been before or after December 20, 2004?

A   After.

Q   After?

A   Yes.

Q   Okay. How much after?

A   (pauses)

Q   Would it still be in 2004?

A   May have been the end of December or the beginning of January. Well, let me -- we have a copy of that, and I know the facsimile date is on it.

Q   Well, Exhibit, I believe, 2 of your lawyer's letter to Mr. Riera, the Honolulu, I guess, the EEOC commissioner. Obviously, the--

        (Plaintiff's Exhibit 2 was marked for identification)

        MR. GUERRERO: What date was that?

        Mr. LUJAN: I'm sorry. January 14, Exhibit 2.

1    A    Exhibit 2.  We need little tabs.

2  BY MR. LUJAN:

3    Q    Okay?  Tells us that at least as of

4  January 14, 2005, on your behalf, your lawyer

5  was respondent to the EEOC; am I correct?

6    A    This exhibit?

7    Q    Yeah.

8    A    Yeah, okay.  (peruses document).

9    Q    Isn't that correct?

10   A    (pauses; continues to peruse document)

11  Yes, he's responding.  I don't recall if he

12  responded -- Mr. Cruz; Mr. Cruz.  That was the

13  first one we received, so I suspect, yes, that

14  he is referring -- I'm not sure he's responding

15  to all of them.

16   Q    Well --

17   A    Because it was on --

18   Q    -- he was --

19   A    -- specific charge.

20   Q    -- responding by attaching a Position

21  Statement of CalPac; isn't that correct?

22   A    Yes, sir.

23   Q    And, look at this Position Statement on

24  page 2, the paragraph -- just a second, that

25  starts with, "On the afternoon of December 20,

1  2004". Okay?

2      A    Yes, sir.

3      Q    "… the day of initial protests, Mr.

4  Clark asked John Healy if he could have the

5  opportunity to speak to the CalPac employees as

6  they return to the CalPac offices at the end of

7  their work there.   Mr. Clark addressed the

8  employees and discussed that day's protest.  He

9  stated to the employees that the allegations

10  being made about him were untrue".

11     A    Yes.

12     Q    Now, apparently you were present at

13  this.

14     A    I was. Yes, sir.

15     Q    And apparently, you allowed Clark to

16  address the employees.  Right?

17     A    Yes.

18     Q    And to address the employees so that he

19  could talk to the employees about the

20  allegations that were being made about him

21  being untrue, right?  Isn't that correct?

22     A    He simply asked me if he could address

23  the employees.  He didn't say anything to me

24  prior to the meeting about telling the

25  employees that the allegation made against him

1   were not true.

2       Q   Well, that --

3       A   He simply asked if he could address the

4   people because there were signs that referred

5   him as a racist.  And this is what he explained

6   to me.

7       Q   So, as of December 20, 2004, Dennis

8   Clark himself admitted that there were these

9   allegations about him being a racist; that's

10   what you're saying, isn't that correct?

11       A   He admitted what?

12       Q   That there were allegations being made

13   about him being a racist?

14       A   Yes, there were signs that said, Dennis

15   Clark is a racist.

16       Q   Uh-huh.  Isn't true there were also

17   signs that said, you know, "monkeys" and

18   "island monkeys"?

19       A   I never saw any of the signs, except in

20   the newspaper.  I saw signs when they were in

21   front GTA, and I do recall "monkeys".  I don't

22   know if I recall the signs saying anything

23   about "island monkeys" but I do recall

24   "monkeys".

25       Q   Okay.  All right.  So, when Clark asked

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1   you to address the employees regarding the

2   allegations about him being a racist, you

3   allowed him to address the employees, right?

4         A    Yes.

5         Q    Now, did you ask Clark, "What is this

6   all about?"   I mean, "Why would anyone accuse

7   you of being a racist?"

8         A    He had phoned me earlier in the day and

9   -- well, the first phone call came to me from

10  someone at his office in Hagatna, letting me

11  know that there were these people protesting in

12  front of MCI.   And Donna Cruz and Arlene

13  Sanchez, I believe, phoned and --

14        Q    Arlene who?

15        A    I think her last name is Sanchez.

16        Q    You mean is Steffy?

17        A    Is it Steffy?

18        Q    I don't know.

19        A    Okay.

20        Q    Are we talking about the reporter?

21        A    No, she works for MCI.

22        Q    Okay.   I'm sorry.

23        A    Okay; yeah.

24        Q    Okay.   Uh-huh.

25        A    So, they phoned me to let me know that

1  happened.

2      Q    Okay.  Let me ask you this.  When Clark

3  first called you on the 20th, was that in the

4  morning or in the afternoon?

5      A    I believe it was in the late morning.

6      Q    All right.

7      A    I would say probably late morning.

8      Q    All right.  So, that would have been

9  while the protest was going on over at MCI?

10     A    Yes.

11     Q    Okay.  And when he --

12     A    But he hadn't seen it, I think he was

13 in Malesso at that time.

14     Q    But and he had heard about?

15     A    From his office --

16     Q    Yes.

17     A    -- from his staff.

18     Q    And he also asked you if you heard Don

19 Harper on the radio?

20     A    Yes, he asked me that.

21     Q    Okay.  And was he referring to Don

22 Harper being on the radio that day?

23     A    Yes.

24     Q    That morning?

25     A    Yes, I believe so.

1     Q    Okay.   All right.   So, did you ask him
2  what's going on?

3     A    No.

4     Q    Why wouldn't you ask him?   Here's a
5  protest   going   on,   you   have   a   former
6  superintendent on the radio talking about, you
7  know, this Company Representative, and you're
8  not curious to find out what's going on?

9     A    I suspected what was going on.

10    Q    Okay.   What did you suspect what's
11 going on?

12    A    I suspect that Don Harper -- because I
13 wouldn't pay his extortion, got all these guys
14 together and organized this protest because he
15 hated Dennis Clark and he's -- I believe him to
16 be a sociopath, and that's just his way of
17 reacting.

18    Q    So, you believe that Don Harper is that
19 influential, that he could get a bunch of
20 people to lie, that they were called "monkeys"
21 and "island monkeys" by Dennis Clark?

22    A    Absolutely.

23    Q    Okay.   So, you believe that Henry Van
24 Meter is lying when he makes the allegation
25 that he had been called "monkey" and an "island

1   that day from Clark?

2       A    One, I believe.

3       Q    Okay.  When did he ask that?

4       A    He came to our office around 4:30 or

5   5:00 in the evening of the 20th.

6       Q    Okay.  So, the phone call though, the

7   discussion in the phone call had to do with,

8   you know, did you hear Don Harper on the radio?

9       A    He said something to the effect of, Don

10  Harper's on the radio, or was on the radio, did

11  you hear him?  And I said, no.

12      Q    Okay.  Did he tell you what Don Harper

13  said?

14      A    No.

15      Q    Did you ask him what did Don Harper

16  say?

17      A    No.

18      Q    You weren't curious to know what this

19  guy that was extorting you or trying to extort

20  you was saying publicly?

21      A    I think I didn't want to know.

22      Q    Okay.

23      A    So, I did not ask.

24      Q    Now, you mentioned that Harper is an

25  extortionist.

1    A    I  believe  I  raised  him  from  --  I
2  believe  his  salary  was  $40,000  or  45,  and  I
3  raised  him  to  75.

4    Q    $30,000  raise?

5    A    (pauses)

6    Q    Now,  so  other  than  that,  do  you  have
7  any    other    reasons    for    calling    him    an
8  extortionist?

9    A    Yes.

10    Q    Okay.   What's  the  other  reason?

11    A    When  he  left  CalPac,  he  sent  me  --  he
12  faxed  me  a  letter  stating  that  every  phone  call
13  to  me  he  gets  more  upset,  and  I  promised  him  a
14  bonus,  and  he  wanted  that  bonus,  and  "I  want
15  $25,000  or  I  will  do  X-X-X-Y-Z."    And  I
16  consider  that  extortion.

17    Q    All  right.   So,  here's  a  man  that  you
18  had  just  given  a  raise,  a  $30,000  raise  about
19  three  months  earlier,  three  or  four  months
20  earlier.

21    A    July,  August,  September,  October.   Yes.
22  Uh-huh.

23    Q    And,  you  know,  then  demanding  what?   A
24  bonus?

25    A    Uh-huh.

1    Q    Okay.  Which attorney?

2    A    Bill Blair.

3    Q    All right.  Okay.  So, this was before

4  you paid --

5    A    Yes.

6    Q    -- anything --

7    A    Yes.

8    Q    -- on this extortion?

9    A    Yes.

10   Q    All right.  So, you had a discussion

11 with your lawyer.

12   A    Yes.

13   Q    Then after that -- and don't tell me

14 what your lawyer said or what you said to your

15 lawyer.

16   A    I'm not going to.

17   Q    Okay.  So, what happened afterwards?

18   A    After that, I got a phone call from Don

19 saying something like, "You know, tonight's

20 your last day." or "Today's your last day."

21 You now, "I want the money by five o'clock

22 tonight" or something to that effect.  So, I

23 went to his house with a check for $12,500, and

24 I gave him that.

25        And again, I told him that I still

1    wanted him to take care of the TyCo project and
2    we had some other conversation. And he said,
3    "What about the rest of the money?" And I
4    said, "Well, I'm not giving you anymore money
5    unless you take on the TyCo project. And I
6    need your help finishing the MCI project but
7    not on site."

8         And then I did -- he called me another
9    time and he asked me something about my lawyer
10    writing up some document. And I said, "My
11    lawyer's not writing up any document." And
12    then he sent me another fax letter, again
13    demanding the $12,500, and if you didn't pay me
14    by this particular date, I will do this and
15    that.

16    Q   Okay.

17    A   Do all these things.

18    Q   So, this was after his resignation?

19    A   Yes, sir.

20    Q   Okay. So, there's now two instances --
21    rather, three instances where this man was, in
22    your opinion, committing extortion.

23    A   Yes.

24    Q   Okay. First one, where, he extorted
25    $30,000 pay raise from you for himself and

REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 174 pages to be a true and correct transcript of the audio recording made by a Notary Public Officer of Depo Resources in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 11th day of June, 2007.

George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094