# EXHIBIT 1b

IN THE UNITED STATES DISTRICT COURT OF GUAM
FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, JAMES S. YEE, TEDDY C. CRUZ, JESSE B. CRUZ, TEDDY L.G. NAUTA, and JOHN B. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | ) CIVIL CASE NO. CIV05-00037 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

DEPOSITION TRANSCRIPT

OF

# JOHN T. HEALY

May 3, 2007

ORIGINAL

PREPARED BY:     GEORGE B. CASTRO
                 **DEPO RESOURCES**
                 #49 Anacoco Lane
                 Nimitz Hill Estates
                 Piti, Guam 96915
                 Tel:(671)688-**DEPO** * Fax:(671)472-3094

1   older.

2       Q   Yeah.   So anyhow.   All right.   So, you

3   gave  in  to  the  guy  because  he's  tough,  he's

4   mean,  you're  afraid  that  he  could  whip  your

5   ass.   Right?

6       A   No.   I gave it to him to -- so that he

7   wouldn't start trouble for CalPac and --

8       Q   So, now --

9       A   -- that's it.

10      Q   Okay.   At this point, had Don Harper

11  ever discuss with you the employees alleged, or

12  rather  the  employees  complained  of  an  alleged

13  discriminatory remark by Dennis Clark?

14      A   Never.

15      Q   So, you're saying that throughout his

16  entire  employment  and  that  is  up  through

17  October  28,  2004,  Harper  never  once  approach

18  the  topic  that  the  employees  were  complaining

19  that Dennis Clark, you know, called them island

20  monkeys or monkeys?

21      A   No, sir.   Never.

22      Q   Okay.   So, and the first time you knew

23  there was an issue with Clark and the employees

24  was around November 25-26 when you were copied

25  -- or given a copy rather of the e-mail traffic

1  completion date?

2      A    Two reasons.    One, he was screwing up

3  the project.    He was absent from work a lot.

4  He was already working for somebody else at the

5  same time.    And Number 2, Dennis Clark had told

6  me that he was fed up with Don Harper, with the

7  confrontations that Don Harper would have with

8  him and that he wanted -- and he had already

9  discussed it with Jeff Buehler and that 'I

10  expect you to do something about it'.    So, I

11  was not happy with his performance and then I

12  had Dennis Clark telling me that he wanted him

13  off the job, if you will.

14      Q    And he expected you to do something

15  about it?

16      A    Yes, sir.

17      Q    Let me ask you this.    I mean, who the

18  hell is Dennis Clark?    He doesn't work for you?

19      A    He's a customer.    I saw him as a

20  customer.

21      Q    Sure.    He's not your boss, though.    Is

22  he?

23      A    Customer is your boss.

24      Q    Okay.    Well, does the boss -- does

25  customer have the power to say get rid of your

1 lawyer?

2     A   Get rid of your lawyer?

3     Q   Yeah. Or get rid of your wife? Or get

4 rid of your employee?

5     A   (Laughs). In some cases, yes.

6     Q   Okay. When? When does he have that

7 right? The customer. Tell me.

8     A   When I feel that it would be -- it

9 would adversely affect the company if I didn't.

10 I've gotten rid of plenty people because the

11 customer didn't like them.

12     Q   Okay. So, in this case the customer

13 was MCI?

14     A   Yes.

15     Q   And Clark --

16     A   Yes.

17     Q   -- did not work for MCI?

18     A   I saw Dennis Clark as my customer

19 because it was Dennis Clark who was reporting

20 back to MCI on the progress of the job.

21 Whether CalPac is doing good or CalPac's doing

22 bad.

23     Q   So Dennis Clark had the ability to

24 influence MCI's -- or rather CalPac's fate with

25 MCI; is that correct?

1    A    Of course.    Contractually,  if  we  fell
2  behind,  there  could  be  monetary  damages  for  all
3  sorts of things.
4    Q    Was   that   provided   in   the   contract?
5  That if you fell behind --
6    A    I believe tit was.
7    Q    Okay.   So,  when  did  this  conversation
8  with  --  well,  in  order  for  you  to  have  removed
9  Harper  by  October  28,  2004,  the  discussion  you
10  had   with   Dennis   Clark   occurred   before   that
11  date; am I correct?
12    A    Yes, you are correct.
13    Q    So,  when  before  that  date  did  you  know
14  that  the  contract,  you  know,  that  under  the
15  contract,  I  believe  you  could  --  what  was  it
16  you just said?  You could lose money?  What was
17  it?  I'm sorry.
18    A    I  believe  the  contract,  I  was  told
19  early  on,  that  there  was  a  provision  in  the
20  contract that if the contractor, meaning CalPac
21  --
22    Q    Uh-huh.
23    A    --  fell  behind  the  production  schedule
24  for  --  that'd  be  their  fault.   Not  because  of
25  rain  or  earthquake  or  whatever  you  guys  call  it

# REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 211 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 11th day of June, 2007.

George B. Castro

# EXHIBIT 1c

IN THE UNITED STATES DISTRICT COURT OF GUAM
FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY<br>APODACA, JR., JOSEPH J.<br>HERNANDEZ, JOSEPH T. MENDIOLA,<br>LARRY L. CHARFAUROS, ANTHONY<br>C. ARRIOLA, JAMES S. YEE,<br>TEDDY C. CRUZ, JESSE B. CRUZ,<br>TEDDY L.G. NAUTA, and JOHN B.<br>BABAUTA,<br><br>        Plaintiffs,<br><br>      vs.<br><br>CALPAC, DYNAMIC TECHNICAL<br>SERVICES, MCI, JOHN HEALY,<br>DENNIS CLARK, WILLIAM WARD,<br>JAI JAMES, and DOES 1 through<br>10,<br><br>        Defendants. | ) CIVIL CASE NO. CIV05-00037<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DEPOSITION TRANSCRIPT

OF

# JOHN T. HEALY

May 10, 2007

ORIGINAL

PREPARED BY:     GEORGE B. CASTRO
                **DEPO RESOURCES**
                #49 Anacoco Lane
                Nimitz Hill Estates
                Piti, Guam 96915
                Tel:(671)688-**DEPO** * Fax:(671)472-3094

1    A    That is not correct. I don't believe –

2    –

3    Q    That was your fear; isn't that correct,

4    Mr. Healy?

5    A    It was not a conflict of interest.

6    Q    Hmm?

7    A    It was not a conflict of interest and –

8    –

9    Q    Are you aware that Mr. Cruikshank has

10   made certain allegations about you, that you

11   exploited your position with MCV in order to

12   give contracts to CalPac without disclosing

13   your ownership interest in CalPac?

14   A    Yeah, and that's a lie.

15   Q    Oh, so Cruikshank is a liar too?

16   A    Cruikshank is a liar, yes. Yes, he is.

17   Yes.

18   Q    Okay. All right. So, Cruikshank is a

19   liar. Harper is a liar.

20   A    Yes.

21   Q    Now, let me ask you this, sir. In --

22   you know, talking about this delusional Harper,

23   you know, and concluding that he's delusional

24   from his October 1st, 2004 letter to you, isn't

25   it true that the delusion became a reality, at

1   that time period to October 26, 2004, the date

2   that Harper resigned. Now, between Harper and

3   Ward, who do you think did most of the -- more

4   work on the daily production sheets?

5        A   Don Harper.

6        Q   Don Harper did?

7        A   Yes.

8        Q   Okay.      Now,   the   Daily   Production

9   Reports,  they  have  boxes  for,  you  know,  a

10  comment    box    that   shows    satisfactory,

11  unsatisfactory, and then the reason, if there's

12  a box of, you know, for reason why, you  know,

13  for   example,  whether  it's  satisfactory  or

14  unsatisfactory --

15       A   I don't recall.

16       Q   -- isn't that correct?

17       A   I don't recall if there's a little box

18  for  satisfactory  or  unsatisfactory.  I  know

19  there's a comment box.

20       Q   Yes, a comment box, right?

21       A   I believe there's a comment box, yes.

22       Q   And --

23       A   In  other  words,  it  rained  all  day,

24  today, so we couldn't get any progress done, or

25  whatever.

1    Q    So, it would be a document where Dennis

2    Clark would have the opportunity to put down

3    his, you know, whatever comments he wanted to

4    make in regards to CalPac's performance or his

5    relationship with Don Harper; isn't that

6    correct?

7    A    That would be correct, I suspect.

8    Q    Have you seen any comments made by

9    Dennis Clark in regards to CalPac's

10   performance, let's say, you know, from the time

11   the project began until let's say October 26,

12   2004?

13   A    I just testified that I don't believe I

14   ever saw one of these production reports that

15   Dennis Clark sent to Jeff Buehler.

16   Q    Okay.

17   A    Remember, we prepared one --

18   Q    Uh-huh.

19   A    -- in shorthand, I believe, and faxed

20   it to Dennis Clark, I think, and then Dennis

21   Clark would take it and take the same form and

22   type it up, add, or delete, or whatever, maybe

23   make a comment.  We did have, as I remember,

24   seeing them handwritten comments in hours.  And

25   the only document, again, which I testified

# REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 213 pages to be a true and correct transcript of the audio recording made by a Notary Public Officer of Depo Resources in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 11th day of June, 2007.

George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

# EXHIBIT 1d

IN THE UNITED STATES DISTRICT COURT OF GUAM
FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, JAMES S. YEE, TEDDY C. CRUZ, JESSE B. CRUZ, TEDDY L.G. NAUTA, and JOHN B. BABAUTA, | ) CIVIL CASE NO. CIV05-00037 ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, | ) ) ) ) ) |
| Defendants. | ) ) ) |

DEPOSITION TRANSCRIPT

OF

# JOHN T. HEALY

May 11, 2007

ORIGINAL

PREPARED BY:    GEORGE B. CASTRO
                **DEPO RESOURCES**
                #49 Anacoco Lane
                Nimitz Hill Estates
                Piti, Guam 96915
                Tel:(671)688-**DEPO** * Fax:(671)472-3094

1  of the deposition, you mentioned that you lived

2  in Malesso and that Larry lives in Malesso,

3  too?

4      A   I don't think I mentioned that Larry

5  lives in Malesso.

6      Q   Okay.  But do you know if he lives

7  there?

8      A   I do not.

9      Q   Okay.  Now, did you ever meet Larry

10 Charfauros or see Larry Charfauros around

11 October 18 or October 19 2006, at the Umatac's

12 Magellan's Landing Restaurant?

13      MR. LEON GUERRERO:   I think I -- is

14 this going to be in reference to the new

15 complaint that is attempting to be added for

16 the motion to amend the complaint?  Is that the

17 count for the assault for Larry Charfauros?  Is

18 that what you're going to go refer to?

19      MR. LUJAN:   Well, yeah.  That's where

20 I'm going to be going to.

21      MR. LEON GUERRERO:   Yeah.  You know,

22 that's all after, it's like it hasn't been

23 resolved yet.  Can we hold off on that until

24 the judge or until the court decides on whether

25 that amendment can be made?

1      MR. LUJAN:   Yeah.  But --

2      MR. LEON GUERRERO:  Otherwise --

3      MR. LUJAN:   But wouldn't this help me

4   to get the amendment?

5      MR. LEON GUERRERO:  I'm not sure, it's

6   already too late, but --

7      MR. LUJAN:   Well,  then  if  it's  too

8   late, you can put your objection on the record.

9   And, you know, but I'm still entitled to ask

10  and to get my question's answered.

11     MR. LEON GUERRERO:  Well, what I was

12  going to offer to you is if they do allow you

13  to amend the complaint, then we can always come

14  back in to have that part taken care of.  I'm

15  just concerned about the time and stuff.

16     MR. LUJAN:   Okay.

17     MR. GUERREO:   That's all I am referring

18  to.

19     MR. LUJAN:   Okay.

20     MR. LEON GUERRERO:  If you want to ask

21  him questions later on, then we will  -- I'm

22  just saying we can come back in later on and do

23  it.

24     MR. LUJAN:   I have a bunch of clients,

25  you know, that first of all --

1        MR. LEON GUERRERO:  It's just an offer
2   Mr. Lujan, if you want to go ahead and --
3        MR. LUJAN:  No, no, no.  I need to go
4   through.
5        MR. LEON GUERRERO:  Okay.
6        MR. LUJAN:  If you don't mind.
7        MR. LEON GUERRERO:  All right.
8        MR. LUJAN:  Yeah.
9   BY MR. LUJAN:
10       Q   Did you meet with, you know, or see
11  Larry Charfauros on October 18 or 19, 2006, at
12  the Umatac Magellan's Landing Restaurant?
13       A   I'd saw Larry Charfauros, I don't know
14  the date, at the Magellan's Landing Restaurant
15  in Umatac, yes.
16       Q   Sir, isn't it true that you got into an
17  argument with him?
18       A   Yes, that is true.
19       Q   And that you told him to follow you to
20  your house and that, you know, to fight?
21       A   I said, "If you think you're such a
22  tough guy, why don't you leave your thug friend
23  here and come on down to my house, you know
24  exactly where it is."
25       Q   You said, "Why don't you leave" who?

1     A    Your thug friend.

2     Q    Oh.

3     A    He was sitting with another --

4     Q    Oh.  Okay.

5     A    -- fellow.

6     Q    Okay.  And did you tell him --

7     A    And I said, "Let's see how tough you

8  are."

9     Q    Okay.  And did you tell him that all he

10  wanted was money?

11     A    I don't recall that.

12     Q    Now, when you say you don't recall,

13  you're not denying that it's possible you said

14  that.  Am I correct?

15     A    I do not recall saying that.

16     Q    Okay.  Sir, you were with your wife.

17  Am I correct?

18     A    You're correct.

19     Q    And wasn't Larry with his wife?

20     A    No.

21     Q    So, who did you see Larry with?

22     A    Another fellow sitting at the table

23  with Larry.

24     Q    Uh-huh.

25     A    Larry approached me.  I didn't approach

1  him.

2     Q    In what way?  How did he approach you?

3     A    "Hi, John."

4     Q    Okay.  All  right.  Is  that  it?   "Hi,

5  John?"

6     A    "Hi,  John.  How are you?"  I said, "I'm

7  sorry.  I don't recognize you."

8     Q    And  is  it  true,  you  didn't  recognize

9  him?

10    A    Yes, it's true.

11    Q    Okay.  So then what?

12    A    Then he said, "I used to work for you."

13  I said, "Oh, I'm sorry."

14    Q    Okay.

15    A    I  said,  "Oh,  I'm  sorry.   I  didn't

16  recognize -- I don't recognize you."  And  he

17  said,  "My  name  is  Larry  Charfauros."   And  I

18  said, "Oh."  And still didn't put two and two

19  together.   And  then  he  said,  "I'm  one  of  the

20  guys  you  fired."  And  I  said,  "No,  you're  one

21  of the guys I laid off."  And he said, "Well,

22  we'll  see  about  that  in  June  when  I  take  your

23  house,  your  business,  your  --  everything  you

24  own."  And then he looked at my wife.

25    Q    Okay.  Then what?  What does that mean?

1    A    Then  I  said  something  to  the  effect
2  that "If you won't take shit.  And if you think
3  you're  such  a  tough  fuck,  why  don't  you  leave
4  your friend here and --"
5    Q    Your thug friend?
6    A    I'm sorry?
7    Q    You said "your thug friend".
8    A    Yeah.  Your thug friend.
9    Q    Uh-huh.
10    A    "Why don't  you  leave  your  thug  friend
11  here.  You know where I live, you can come on
12  down to my house --
13    Q    Uh-huh.
14    A    --  and  you  think  you're  so  tough?
15  We'll see all about that."
16    Q    Okay.  Let me ask you --
17    A    "I'm not afraid of you."
18    Q    Uh-huh.
19    A    "And so don't think I am afraid of you
20  and you're not going to intimidate me."
21    Q    Okay.
22    A    And it was my opinion that a guy who
23  had  been  arrested  for  possession  of  a  hand
24  grenade and so on and so forth, I didn't want
25  intimidating me, my wife or thinking,  and so I

1  feel, Mr. Lujan, that the way you deal with
2  people like that is through strength, not
3  through weakness.   So end of story.
4      Q   All right.  Let me ask you this.  This
5  friend with Larry, had you met him before?
6      A   Not that I am aware of.
7      Q   Had you ever --
8      A   Or not that I recall.
9      Q   Had you ever seen him before?
10     A   I don't know, Mr. Lujan.
11     Q   Do you know his name?
12     A   I do not know his name.
13     Q   Do you know how old he is?
14     A   Well, he's a young man.
15     Q   Okay.  You know nothing about the man?
16     A   I know nothing about the man.
17     Q   And yet you called him a thug.
18     A   Yeah.
19     Q   I mean, you had no basis to call the
20  guy a thug?
21     A   I did.   The guy was sitting there
22  smirking and, you know, doing -- you know,
23  doing the tough guy routine and, you know,
24  trying to stare me down and intimidate me along
25  with Larry and so that was my reaction, and I

1   think it was the right reaction.

2       Q    Was it before or after Larry said "Hi,

3   John", when the guy was making all this --

4       A    After.

5       Q    -- you know -- after?

6       A    Yes.

7       Q    Okay.    So   in   other   words,   you   said

8   "your thug friend" before the man began acting

9   like a thug?

10      A    No.    That's not what I said.

11      Q    Well, that's what you just said.

12      A    I did not just say that.

13      Q    You   said   the   man   was   acting   this   way,

14  that way.   You were demonstrating it.

15      A    Right.    After --

16      Q    And he was staring you down after --

17      A    -- right, after Larry and I had our --

18  after Larry said that he'd take everything that

19  I had --

20      Q    Uh-huh.

21      A    --   and   he   said   that   I   had   fired   him,

22  and I said "No.   I laid you off."   and that's

23  when the verbal confrontation began.

24      Q    Did you report this to the Guam Police

25  or what?

1  A   No.  No need to.

2  Q   Okay.  And so did Larry take you up on

3  your offer to go to your house?

4  A   I don't know.  He may have.  I went

5  home, went to bed.  I didn't --

6  Q   No, I mean --

7  A   -- leave the lights on for him.

8  (Laughs)

9  Q   Did he follow you to fight you at home?

10  A   I don't know.  He may have.  He may

11  have.

12  Q   Well, you didn't fight with him at your

13  house, right?

14  A   No.  No.  No, I went to bed.

15  Q   Okay.  What time was this, sir?

16  A   I don't know.  Maybe 9, 10:00 at night.

17  Q   At night?

18  A   It was in the evening.  Yes, it was at

19  night.

20  Q   Okay.  Sir, besides this contract with

21  MCI that, you know, that is the subject of this

22  lawsuit, sir.  Did CalPac try to obtain other

23  projects with MCI?  And I'm talking about from

24  February 13, 2004, sir, onwards.

25  A   Did CalPac try to -- I don't think

1   there were any other contracts. We got a
2   maintenance contract.

3       Q   With MCI?

4       A   For this pro- -- for the -- in
5   reference to this project.

6       Q   For this ring --

7       A   Maintenance.

8       Q   For this contract. Let's see now, what
9   do they call it?

10      A   It's not -- we don't have --

11      Q   Guam International Ring.

12      A   Ring. Right.

13      Q   So, do you have a maintenance contract
14  with them?

15      A   Yes, we do.

16      Q   And when did that begin, sir?

17      A   I believe April or May of 2005.

18      Q   Okay. So after the completion of the
19  project?

20      A   Yeah -- we were negotiating with MCI
21  prior to the completion of the project.

22      Q   Yeah.

23      A   Yes.

24      Q   Now, we know that the completion was
25  around April of 2005. Isn't that correct?

1    A    My wife would be able to tell us.    She

2 could go back into the Quickbook records.

3    Q    Okay.    Does your wife work at CalPac?

4    A    Yes.

5    Q    All right.    What's her position?

6    A    Her title is president.

7    Q    Okay.

8    A    And her position is everything.

9    Q    Everything.    Okay.    Good.    All right.

10 So your wife would know that, sir?

11    A    She can look it up.

12    Q    Yeah.    The    maintenance    contract    you

13 have    with    MCI,    you    said    that    it    was    being

14 negotiated    before    the    completion    of    this    Guam

15 international Ring contract.

16    A    I believe that's correct.

17    Q    Now,    when    did    the    negotiations    begin,

18 sir?

19    A    I don't recall exactly.

20    Q    Well,    give    me    your    best    estimate.    Was

21 it before --

22    A    That    would    be    a    guess,    Mr.    Lujan,    I'm

23 sorry.

24    Q    It's okay.

25    A    Before what?

1    Q    Would it be before December 31st, 2004?

2    A    No.

3    Q    It was then, after?

4    A    Yes.

5    Q    Okay.  Who negotiated for on behalf of

6 CalPac?

7    A    They asked us to submit a proposal.

8    Q    My question is on behalf of CalPac, you

9 know, who negotiated with MCI?

10    A    There really wasn't a negotiation.

11 They asked us to give them a proposal.

12    Q    Okay.  You say "they".  Who's they?

13    A    MCI.

14    Q    Okay.  MCI, you know, is a name out

15 there.  Operates by human beings.  So give me a

16 name of a human being, sir.

17    A    I don't remember the name of a human

18 being.  They have contracts divisions -- we

19 have paperwork in the office that would have

20 the individual's name on it.  I remember --

21    Q    Was it any of the names that we've

22 spoken of earlier?

23    A    I don't believe so.

24    Q    Okay.  All right.  So, you folks were

25 requested to submit a proposal.

1     A    Yes.

2     Q    And who submitted it on behalf of

3 CalPac?

4     A    Bill Ward did.  Bill put it together.

5     Q    Bill Ward?

6     A    Yes.

7     Q    Okay.  And, what was the ultimate

8 contract for?

9     A    What was it for?

10     Q    Yes.

11     A    You mean what work was to be performed?

12     Q    Yes, sir.

13     A    A weekly route review.

14     Q    Okay.

15     A    We were required to have on hand

16 available 24/7, certain equipment and material

17 to respond within two hours of an interruption

18 in service.

19     Q    Okay.

20     A    We are responsible upon request of MCI

21 to do, to mark their underground fiber cable in

22 the event a contractor will be digging in the

23 area of their fiber cable.  And we are required

24 to perform a number of these locations in a

25 monthly period for a set dollar amount.  And

# REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 133 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 26th day of June, 2007.

_____

George B. Castro

# EXHIBIT 2



IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA  CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH
T. MENDIOLA, LARRY L. CHARFAUROS,
ANTHONY C. ARRIOLA, ROBERT B.
CRUZ, ROLAND F. MENDIOLA, JAMES
S. YEE, TEDDY B. CRUZ, JESSE B.
CRUZ, JOHN L.G. NAUTA, and JOHN
P. BABAUTA,

                    Plaintiffs,

        vs.

CALPAC, DYNAMIC TECHNICAL
SERVICES, MCI, JOHN HEALY, DENNIS
CLARK, WILLIAM WARD, JAI JAMES
and DOES 1 through 10,

                    Defendants.

DEPOSITION OF LARRY L. CHARFAUROS

Taken on Behalf of CalPac

BE IT REMEMBERED That, pursuant to the Federal
Rules of Civil Procedure, the deposition of LARRY L.
CHARFAUROS was taken before Cecille A. Flores, a Certified
Shorthand Reporter, on Thursday, the 24th day of May 2007, at
9:00 a.m. in the offices of Blair Sterling & Johnson, Suite
1008, Pacific News Building, 238 Archbishop Flores Street,
Hagatna, Guam.

INDEX

Examination

                    Direct    Cross

By Mr. Leon Guerrero:    4

By Ms. Lujan:            None

EXHIBITS

Description:                    Page Marked:

Exhibit A: Application for Employment...............16

Exhibit B: Confession of Judgment...................19

Exhibit C: Superseding of Indictment................26

Exhibit D: Charge of Discrimination.................27

Exhibit E: Furlough Letter..........................84

Exhibit F: PDN article.............................100

Exhibit G: Questionnaire...........................102

APPEARANCES

Appearing on behalf of the Plaintiffs:

    LUJAN AGUIGUI & PEREZ
    Suite 300, Pacific News Building
    238 Archbishop Flores Street
    Hagatna, Guam 96910
    By: Ms. Delia S. Lujan, Esq.
    Phone: (671) 477-8064

Appearing on behalf of CalPac:

    BLAIR STERLING & JOHNSON
    Suite 1008, Pacific News Building
    238 Archbishop Flores Street
    Hagatna, Guam 96910
    By: Mr. Vincent E. Leon Guerrero, Esq.
    Phone: (671) 477-7857

4

COURT REPORTER:  Good morning, my name is
Cecille Flores. My address is Suite 2E, Jugo Building, 618
Route 8, Barrigada, Guam. We are here today for the
deposition of Larry Charfauros and the date is May 24, the
time is about 9:12 a.m. We're here in the offices of Blair,
Sterling, Johnson, Martinez & Leon Guerrero. Present is
Mr. Leon Guerrero, attorney for CalPac, and Delia Lujan,
attorney for the Plaintiffs.

LARRY L. CHARFAUROS,
was thereupon called as a witness on behalf of Defendant
CalPac, and after having been first duly sworn, was examined
and testified as follows:

DIRECT EXAMINATION
BY MR. LEON GUERRERO:
    Q   Mr. Charfauros just for the record, can you state
your full name and spell your last name?
    A   Larry L. Charfauros, C-H-A-R-F-A-U-R-O-S.
    Q   Mr. Charfauros, we're here to take your deposition.
Have you ever had your deposition taken before?
    A   No.
    Q   You understand that the deposition is one of the
means that we can use to get information from you, correct?
    A   Yes.

**37**

1    A    Correct.
2    Q    How did you feel you were being discriminated
3  against?
4    A    Well, I was put down because I was called an island
5  monkey. You know what I mean?
6    Q    Maybe we should go to Paragraph 2 then. It says,
7  Beginning on September 21, 2004, you were harassed by Dennis
8  Clark, correct?
9    A    Correct.
10   Q    Dennis Clark was a representative of MCI, correct?
11   A    Correct.
12   Q    Did you believe Mr. Clark was working for CalPac?
13   A    Yes.
14   Q    Why do you believe that?
15   A    He was out there inspecting our jobs.
16   Q    Did anybody tell you he worked for CalPac?
17   A    No, all we knew he was inspector for our job site.
18   Q    Who told you that?
19   A    (No response.)
20   Q    When you say "we," you're referring to everybody in
21  the crew, right?
22   A    Right.
23   Q    Who told the crew he was an inspector for --
24   A    I don't remember who told the crew.
25   Q    Okay.

**38**

1    A    All I remember is he was an inspector checking our
2  trench.
3    Q    Let's take a look at Page 3 of the Complaint,
4  Paragraph 21. Why don't you go ahead and read that.
5    A    Paragraph 21?
6    Q    Yes.
7    A    "Defendant MCI is upon information and belief a
8  telecommunications business having its principal place of
9  business or primary offices in Texas and engaged in business
10  in Guam."
11   Q    Is that 21?
12   A    Yes. Oh, 21. "Defendant Dennis Clark is upon
13  information and belief a manager or supervisor employed by
14  DTS."
15   Q    That's an allegation that you and the rest of the
16  Plaintiffs made about Dennis Clark, correct?
17   A    Correct.
18   Q    Do you want to change your allegations about Dennis
19  Clark at this point?
20   A    No.
21   Q    At least specifically as it relates to Paragraph 21?
22   A    No.
23   Q    So you believe that Dennis Clark is a Manager
24  employed by DTS?
25   A    Yes.

**39**

1    Q    Can you tell me anywhere in this Complaint that it
2  says that Dennis Clark is employed by CalPac? If you want to
3  take a --
4    A    Take a break.
5    Q    Okay.
6              (Recess taken at 10:04 a.m.)
7              (Back on the record at 10:06 a.m.)
8  BY MR. LEON GUERRERO: (Continuing)
9    Q    Mr. Charfauros, having had a chance to look at the
10  Complaint, is there anywhere in the Complaint that it says
11  Mr. Clark was employed by CalPac?
12   A    No.
13   Q    Do you wish to change and add an allegation to this
14  Complaint that says Mr. Clark is employed by CalPac?
15   A    No.
16   Q    So you would agree with me that Mr. Clark was not
17  employed by CalPac, correct?
18   A    Correct.
19   Q    Going back to Paragraph 2 of Exhibit D it says 'On
20  separate occasions, Dennis Clark made racially derogatory
21  comments to me and fellow workers by referring to us as
22  monkeys and island monkeys." Do you remember his statements
23  referring to you guys as monkeys or island monkeys?
24   A    Mostly all the job sites.
25   Q    How many times did he say this, do you remember?

**40**

1    A    I don't remember how many times but pretty much he
2  would be calling us island monkeys.
3    Q    Are you saying he called you island monkey each time
4  that you saw him?
5    A    I don't recall each time, but I remember him calling
6  us island monkeys.
7    Q    The other Plaintiffs in this case say it happened
8  twice. A lot of them say it happened twice. I think one
9  other says it happened three times. Mr. Harper said it
10  happened three times. Do you disagree with their --
11   A    Well, I don't recall how many times he called us
12  island monkeys because I wouldn't wanna count it.
13   Q    Okay. Well, what happened the first time? Do you
14  remember that?
15   A    First time?
16   Q    Yes.
17   A    Yeah, I remember the first time. I'll never forget
18  that.
19   Q    Who was there?
20   A    That was back at the job site in Two Lovers' Point.
21   Q    Who was there?
22   A    I don't recall who was there.
23   Q    Were there other people there at least?
24   A    Yeah. Yes, there's always a bunch of us.
25   Q    How many people do you think were there when he made



**41**

1  the comment?
2    A    I don't recall.
3    Q    Did you have a Supervisor there at that time?
4    A    Supervisor comes around once in a while.
5    Q    Supervisor would be who?
6    A    Henry Quintanilla.
7    Q    Do you know if Mister --
8    A    Oh, no, no, no. That would be Don Harper rather.
9    Q    Don Harper is your Supervisor?
10   A    Superintendent, I believe. Our Foreman is Henry
11  Quintanilla.
12   Q    Was your Foreman present the first time he --
13   A    He's only around when -- I don't know if he was
14  there. I don't recall.
15   Q    Do you know who else was there at all? Do you
16  remember?
17   A    I can't remember whoever was there.
18   Q    Do you know if there were like three people there?
19  More than three people?
20   A    I believe there's more than three of us, yeah.
21   Q    What happened at that time?
22   A    We were trenching, we're inside the trench and we're
23  all covered with red dirt and he just comment to us that we
24  look like a bunch of island monkeys down in the trench.
25   Q    Was he upset?

**42**

1    A    I don't know if he was upset or what but that's the
2  only thing I remember was him saying that straight up.
3    Q    There are 12 other Plaintiffs in this case, correct?
4    A    Correct.
5    Q    Did you talk to any of the Plaintiffs about the
6  statements that Mr. Clark may have made?
7    A    Would you explain what you mean did I talk to --
8  what do you mean by that?
9    Q    Did you talk to them about this lawsuit?
10   A    About the lawsuit?
11   Q    Yes.
12   A    Did we talk about the lawsuit?
13   Q    Yes.
14   A    That we're gonna get together and go do this? Is
15  that what you're talking about?
16   Q    Did you talk to them about anything concerning this
17  lawsuit?
18   A    I don't recall talking to them.
19   Q    Well, there are general allegations, correct, that
20  all of you agree with. If you look at Page 4.
21   A    Okay.
22   Q    These are general allegations, correct?
23   A    Correct.
24   Q    When it comes to specifics for you, it goes to Page
25  12 and Count 5, right?

**43**

1    A    Right.
2    Q    So at least in the very beginning you guys have
3  things in common, correct?
4    A    Yes.
5    Q    As far as the general allegations? So did you talk
6  to them about the statements that Mr. Clark may have made?
7         MS. LUJAN: I'll object. The question's been
8  asked and answered.
9  BY MR. LEON GUERRERO: (Continuing)
10   Q    Go ahead and answer it.
11   A    I don't recall.
12   Q    That is a different answer, I believe, is what
13  you're saying than what you said earlier. You don't recall,
14  is that what you're saying?
15   A    Explain one more time.
16   Q    What I want to know specifically, Mr. Charfauros, is
17  the times that Mr. Clark made those statements, who was
18  there? I need to know, did you talk to anybody else about --
19   A    I don't recall, like I said, who was there.
20   Q    Okay. Let me ask you this because you said you
21  remember the first incident, right?
22   A    Yeah, which back -- the first job site, yes.
23   Q    When did that happen?
24   A    I don't recall when it happened.
25   Q    Did it happen in the year 2004?

**44**

1    A    I don't recall *lai*. Sorry *lai*.
2    Q    What did you do once he made that statement?
3    A    What I do?
4    Q    Yes.
5    A    I couldn't do anything. What am I supposed to do?
6    Q    That's why I'm asking you what did you do. Did you
7  go up to him and say, hey, you can't say that to me?
8    A    I went up to Don Harper and told Don Harper about
9  that.
10   Q    So you told Don Harper specifically, right?
11   A    Yes.
12   Q    I don't know if you said he was present at the time.
13  I believe you said he wasn't.
14   A    I don't recall if he was present at the time when it
15  happened.
16   Q    But then afterwards you remember going up to
17  Mr. Harper on the same day, correct?
18   A    I don't recall if it's the same day or what. All I
19  recall is I didn't appreciate being called island monkey and
20  I made a complaint to Don Harper.
21   Q    Was it shortly after he made the first --
22   A    I don't recall if it was shortly after.
23   Q    Did you complain to anybody else besides that?
24   A    Dont Harper.
25   Q    Just Don Harper?

**45**

1    A    And I went up to John Healy.
2    Q    I'm sorry?
3    A    John Healy too.
4    Q    You talked to John Healy yourself?
5    A    Yes.
6    Q    When did you talk to Mr. Healy?
7    A    I don't recall when but I did tell him 'cause
8    nothing was being done.
9    Q    This was while you were still employed at CalPac,
10   correct?
11   A    Yes.
12   Q    Was this shortly after Mr. Clark made that first
13   statement?
14   A    I don't recall.
15   Q    Do you remember talking to the rest of the crew
16   about the statements made by Mr. Clark?
17   A    All I remember we're just -- we didn't appreciate
18   being called that remarks. That's what I recall.
19   Q    And you guys didn't get together and say, hey, we
20   should report this to anybody in particular?
21   A    Well, I believe when we got back from the field -- I
22   don't recall if we all did but a couple of us went up to Don
23   and told Don about it.
24   Q    You didn't call up Mr. Harper, did you?
25   A    Did we what?

**46**

1    Q    Did you call him on the phone?
2    A    No, we have no phone on the field.
3    Q    I'm sorry?
4    A    We have no phone on the field or radio.
5    Q    So that's the first incident, correct?
6    A    Yes.
7    Q    What about the second incident? By the way, the
8    first one was at Two Lovers' Point?
9    A    Yes. Continuing all the way to NCTAMS if you wanna
10   know that.
11   Q    I'm sorry?
12   A    It continued all the way into NCTAMS.
13   Q    He kept on saying it every day, is that what you're
14   saying?
15   A    Let's put it this way. Everytime he comes up to the
16   job site, that's mostly what you'll be hearing from his
17   mouth.
18   Q    The second time, do you remember the second time?
19   A    I believes it's going into NCTAMS. I'm not sure.
20   That one I'm not so accurate.
21   Q    Were you by yourself when that happened?
22   A    We're never alone.
23   Q    Did you report it to anybody? Was Mr. Harper there?
24   A    Already I report it to Mr. Don Harper and then I
25   went up to John Healy about it. Nothing was done so I

**47**

1    stopped complaining about it.
2    Q    How soon after the first incident did the second
3    incident take place?
4    A    I don't recall.
5    Q    You made a complaint to Mr. Harper, correct?
6    A    Correct.
7    Q    Was this before the second incident?
8    A    No, that's the first incident. Right when it
9    happened.
10   Q    Right when it happened?
11   A    (Witness nodded head.) But I don't recall how many
12   days or what or hours or what. All I just remember coming in
13   from the field I told Don.
14   Q    My question was, when you made your report to
15   Mr. Harper it was after the first incident but before the
16   second one, correct?
17   A    Yes.
18   Q    And then your complaint to Mr. Healy, was that
19   after?
20   A    Same.
21   Q    Same thing?
22   A    Maybe about a week after that, but not before the
23   second incident happened.
24   Q    A week after that you reported it to Mr. Harper,
25   correct?

**48**

1    A    Yes.
2    Q    This was before the second incident took place?
3    A    Yes.
4    Q    The second incident, who did you report it to?
5    A    I didn't report it. Nothing was done so what's the
6    use of reporting it?
7    Q    So you didn't make any reports afterwards?
8    A    I already made a report the first time. That's all
9    you have to do.
10   Q    So you didn't talk to anybody else about the --
11   A    Just the guys. We were talking about it in the
12   field why this thing happened. That's it.
13   Q    Okay.
14   A    Why are they calling us monkeys in this trench. We
15   work 12 hours a day, 7 days a week trying to make a living
16   and we're called island monkeys -- called monkeys.
17   Q    So you said nothing was done, right?
18   A    That's right. Well, something was done because we
19   got terminated. That's what's done.
20   Q    And you were terminated in November 2004, right?
21   A    I believe so.
22   Q    Do you know if he made these comments to anybody
23   else that has not filed a lawsuit?
24   A    Excuse me?
25   Q    There are 12 other Plaintiffs, correct?

**53**

1   A   It was pretty much done.
2   Q   Just a lot of clean-up work, correct?
3   A   No, it was more trenching but not as much as we used
4   to do. We're almost to the end of the project.
5   Q   Did you work on any other projects at CalPac?
6   A   Other than MCI?
7   Q   Other than MCI.
8   A   MCV.
9   Q   When did you work on the MCV project?
10  A   I don't remember when, but we did some pulling of
11  cable lines. But most of our jobs is under MCI.
12  Q   Was the MCV contract completed while you were there?
13  A   No, it was wasn't completed.
14  Q   To your knowledge, was the MCV contract a big
15  contract?
16  A   I don't recall. I know that most of the job we were
17  doing was for MCI.
18  Q   Going back to the other question I had, when I say
19  'big contract,' I'm referring to does it require a lot of
20  crew.
21  A   On the MCV?
22  Q   Yes.
23  A   Well, let's put it this way. Sometimes we'll all be
24  transferred at once, but I don't recall if it was a big
25  project. I only recall the main project we had was MCI.

**54**

1   Q   Mr. Charfauros, when you left CalPac, did they tell
2   you why you were --
3   A   When I left CalPac?
4   Q   Yes.
5   A   Or when I was terminated from CalPac? I did not
6   leave on my own.
7           (Exhibit E marked: Furlough
8           letter.)
9   Q   Mr. Charfauros, this is what should be marked as
10  Exhibit E. Have you ever seen Exhibit E before?
11  A   Yes.
12  Q   Did they give this to you on your last day of
13  employment at CalPac?
14  A   I believe so.
15  Q   Why don't you go ahead and read the last paragraph.
16  A   "As you are aware, California Pacific Technical
17  Services LLC, increased a number of its employees
18  significantly over the past few months. This build up was
19  primarily for work to complete the MCI International Ring
20  Project." This is --
21  Q   Finish it up.
22  A   "Majority of the project is now complete and we have
23  evaluated the personnel requirements needed to get us to the
24  end of the project. Everyone who has contributed to this
25  project should be proud of their effort. Regretfully, I must

**55**

1   inform you that you are being laid off effective close of
2   business on November 27, 2004. Thank you and if our business
3   requires further labor in the future you will be considered
4   for re-employment."
5   Q   So it's correct that they told you that they were
6   laying you off because the project was almost finished?
7   A   It was correct they told us the same day we got
8   terminated and then there was no extra employees that was
9   hired. And then again --
10  Q   I'm a little confused by what your last statement
11  was.
12  A   If you read it, it says here --
13  Q   What are you referring to?
14  A   "Increased the number of employees' which means they
15  hired someone, right? "Increased the number of its
16  employees.
17  Q   Well, let me ask you this. Did you ever ask anybody
18  at CalPac what this letter meant?
19  A   Did I ask anybody what this letter meant?
20  Q   Or did you just take it and leave?
21  A   I just took it with my last paycheck and my envelope
22  and left.
23  Q   So you didn't ask anybody what that meant by --
24  A   Well, my understanding here where it says we're
25  almost to completion and we only need so many people, what

**56**

1   happened was when they laid us off, they hired Trukese to
2   pay cheaper. That's what the answer is right now to this
3   letter.
4   Q   Do you know that for a fact?
5   A   Oh, yes, I do.
6   Q   Who are these people?
7   A   I don't know their names because when we were
8   protesting, they had a lot of new faces on that project that
9   we never saw in our time.
10  Q   You don't know who these Chuukese were?
11  A   No, I don't know.
12  Q   When you were laid off, they told you that the
13  majority of the work for the MCI project was completed,
14  correct?
15  A   Yes.
16  Q   Did you disagree with that at that time?
17  A   Yes, I did disagree with it because we had to go
18  back and reconnect the box that wasn't connected and that's
19  still underground job. To put it this way, the guys that got
20  terminated were the high payers. Most of them.
21  Q   So you were one of the higher paid --
22  A   I was about to get a raise; supposedly get a raise.
23  Q   Do you know if anybody took a cut in pay?
24  A   Not cut but terminated 'cause the pay was too high.
25  Most of these guys that's working -- that's in this lawsuit



**61**

1    A   I believe he did. I'm not too sure.

2    Q   He was one of you guys that showed up at

3  Mr. Harper's place?

4    A   Actually, I never met Norman there.

5    Q   How do you know Mr. Santos made a complaint with the

6  EEOC?

7    A   Because we received his documents or we were told

8  that he had it down at Don's place and he had to come pick it

9  up and Henry was trying to get ahold of him.

10   Q   Let's just go directly to your allegations, okay?

11 Go to Paragraph 85. It says that you were "harassed and

12 discriminated against on the basis of your race, national

13 origin and color by Defendant Clark who called Plaintiff

14 Charfauros and other Plaintiffs island monkeys or monkeys."

15 Do you see that?

16   A   Yes.

17   Q   Let's do a process of elimination. The other

18 Plaintiffs, do you know who these other Plaintiffs are?

19   A   Excuse me? Do I know who these other Plaintiffs

20 what?

21   Q   Who are these other Plaintiffs that you refer to in

22 Paragraph 85?

23   A   The rest of us that filed this complaint.

24   Q   So that's all the Plaintiffs?

25   A   I believe so.

**62**

1    Q   Would that include Mr. Santos?

2    A   I don't see Mr. Santos' name here.

3    Q   You know he filed a complaint with the EEOC?

4    A   I'm not too sure if he did.

5    Q   Okay.

6    A   Okay?

7    Q   What you're saying is that Mr. Clark called you and

8  all the other Plaintiffs monkeys or island monkeys, correct?

9    A   Correct.

10   Q   But you don't remember who else was with you when

11 Mr. Clark may have made those statements, correct?

12   A   Not all that I remember.

13   Q   You don't know who was there, though, so you don't

14 know which Plaintiffs were there, correct?

15   A   No.

16   Q   My --

17   A   But I know for a fact that these guys mentioned to

18 me that they were called island monkeys at their job site

19 too.

20   Q   That's what I was asking you.

21   A   But you're asking me if they were there at the same

22 job site. I don't recall that.

23   Q   Earlier I was asking if you talked to them about the

24 substance of this lawsuit. Do you remember that? You talked

25 to them about this lawsuit?

**63**

1    A   Yes.

2    Q   I don't remember your answer but now I'm asking you

3  again because it seems like it's a little different --

4    A   We didn't talk about the lawsuit, okay?

5    Q   I'm not talking about the lawsuit.

6    A   All we talked about was the EEOC complaint.

7    Q   Okay. So let's talk about that.

8    A   Okay?

9    Q   Let's talk about that. Who did you talk to about

10 the statements made by Mr. Clark?

11   A   Who did we talk to about the statements we made?

12   Q   Who among the Plaintiffs did you talk to?

13   A   Me and Henry.

14   Q   Just Henry?

15   A   I believe so.

16   Q   You didn't talk to any other Plaintiff?

17   A   I don't recall. Can we take a break, man?

18   Q   Sure. Do you need a drink?

19   A   No, I need fresh air.

20                    (Off the record.)

21                    (Back on the record.)

22 BY MR. LEON GUERRERO: (Continuing)

23   Q   Okay. Mr. Charfauros, going back to Paragraph 85

24 and other Plaintiffs, you say that you only talked to Mr. Van

25 Meter about this, correct?

**64**

1    A   I believe so.

2    Q   So you don't know for sure who the other Plaintiffs

3  should be in this case, right? It just should be other

4  people? You don't know for a fact, as an example, that Jerry

5  Apodaca heard the comment the same time you did?

6    A   I don't recall.

7    Q   You don't remember any of the other Plaintiffs,

8  correct, except for Van Meter?

9    A   Yes.

10   Q   Paragraph 85 probably would be more accurate to say

11 "Plaintiff Charfauros and Mr. Van Meter were called island

12 monkeys or monkeys," to your knowledge?

13   A   No, actually -- when he discussed when we were all

14 together, hearing them too saying they were called island

15 monkeys.

16   Q   But you don't know, you only heard it from them?

17   A   Right.

18   Q   I'm asking what you know specifically, okay?

19   A   Okay.

20   Q   Other people have their own memories and stuff. I

21 need to know what you remember, okay?

22   A   (Witness nodded head.)

23   Q   Specifically what you remember.

24   A   (Witness nodded head.)

25   Q   All right? So it was Mr. Clark who made these

73

1    A   I believe so.
2    Q   What you're upset about is you're saying that CalPac
3 terminated you because you made a complaint about Mr. Clark's
4 statements, correct?
5    A   Yes.
6    Q   I want you to look at Paragraph 88. Why don't you
7 go ahead and read that for the record.
8    A   "The action of Defendant Clark was approved,
9 condoned, authorized by Defendant CalPac, DTS, MCI, and
10 Healy."
11    Q   The actions of Defendant Clark specifically refer to
12 the statements made by Mr. Clark, correct?
13    A   Correct.
14    Q   And they don't refer to anything else, would that be
15 correct?
16    A   I don't understand. Can you say it again?
17    Q   I want to know what you mean by the actions of
18 Defendant Clark. I take that to mean the actions of
19 Defendant Clark were the statements that he made, correct?
20    A   Right.
21    Q   Nothing else? Mr. Clark never showed you a finger,
22 correct?
23    A   Correct.
24    Q   He didn't do anything else besides make those
25 statements, correct?

74

1    A   Correct.
2    Q   So essentially, it was just those statements that
3 you were complaining about?
4    A   Correct.
5    Q   So it says "the actions of Defendant Clark were
6 approved, condoned or authorized by Defendants CalPac, DTS,
7 MCI and John Healy." I'm only representing CalPac at this
8 time, okay?
9    A   Okay.
10    Q   Do you understand that? I don't represent DTS and
11 I'm not representing MCI and Mr. Healy not at this point for
12 this lawsuit, okay?
13    A   You're not representing who?
14    Q   I am representing CalPac only so I'm going to refer
15 only to CalPac, okay?
16    A   Okay.
17    Q   CalPac the --
18    A   Okay.
19    Q   -- LLC, okay? So I want to clarify, "the actions of
20 Defendant Clark were approved, condoned or authorized by
21 CalPac" and I don't care about anything else, okay?
22    A   Okay.
23    Q   So let's just focus in on that. Do you believe
24 there's any written memos or any written documents showing
25 that CalPac approved the statements made by Mr. Clark?

75

1    A   Yes, I believe because CalPac was -- Dennis Clark --
2 CalPac is contracted through Dennis Clark's own job.
3    Q   But you think that CalPac approved and said, hey,
4 Mr. Clark --
5    A   I believe so 'cause Mr. CalPac didn't do anything
6 about it but terminated us.
7    Q   I think my initial question was, do you believe
8 there are any written documents that show that --
9    A   No.
10    Q   -- CalPac approved of the statements made by
11 Mr. Clark?
12    A   I don't recall there's any written documents.
13    Q   Did you hear anybody say that CalPac approved of
14 Mr. Clark's statements?
15    A   I don't recall.
16    Q   You're saying there may have been people that said
17 that?
18    A   I don't recall, I said.
19    Q   Let's go on to the next one. It says "the actions"
20 again, referring to the statements by Mr. Clark "were
21 condoned by Defendant CalPac." Do you know of any written
22 documents showing that Defendant CalPac condoned the
23 statements Mister --
24    A   I don't recall any documents. I don't recall
25 anything.

76

1    Q   Did you hear from anywhere that Defendant CalPac
2 condoned the statements made by Mr. Clark?
3    A   I don't recall.
4    Q   The last one is authorized. It says "Defendant
5 Clark's actions were authorized by Defendant CalPac." Are
6 you aware, again, of any written document --
7    A   I don't recall.
8    Q   Let me just finish. I understand your answer but I
9 want to finish it, okay? Are you aware of any written
10 document that shows that Defendant CalPac authorized the
11 statements made by Mr. Clark?
12    A   I don't recall.
13    Q   I'm not sure if I said authorized or approved the
14 first time.
15    A   I think you said approved.
16    Q   Okay. Did you hear of anything that said CalPac
17 authorized the statement made by Mr. Clark?
18    A   I don't recall.
19    Q   Anytime you need to take a break, okay?
20    A   No.
21    Q   Paragraph 91. It's the next page.
22    A   Excuse me? Paragraph what?
23    Q   91.
24    A   91?
25    Q   Yes.

**81**

1  Q  Yes.
2  A  Okay?
3  Q  I understand that. Isn't it correct that most of
4  the Laborers at CalPac were the underground crew were Pacific
5  Islanders, correct?
6  A  Correct.
7  Q  Were there any that were not Pacific Islanders?
8  A  I don't remember.
9  Q  So the vast majority of them were Pacific Islanders,
10 correct?
11 A  Chamorros, yes.
12 Q  So most of them were Chamorros, right? Most of them
13 were from Guam?
14 A  Correct.
15 Q  There were some from Saipan or CNMI?
16 A  Yeah.
17 Q  Do you think that they were treated better than you
18 guys? These people from CNMI?
19 A  I guess we were treated all the same probably.
20 Q  CNMI people and the people from Guam were treated
21 basically the same, correct?
22 A  Correct.
23 Q  Most of the people that were employed at underground
24 were of "dark color," right?
25 A  Correct.

**82**

1  Q  Are you aware of anybody that was not dark color?
2  A  Don't recall.
3  Q  The last part where it says "the actions by CalPac
4  were discriminatory as" --
5  A  Where are you at? The action of what?
6  Q  Paragraph 91. "The actions by Defendant CalPac were
7  discriminatory in that it did not apply to individuals who
8  did not complain about the discriminatory actions." Okay?
9  This seems to me to read that people that did not complain
10 were not punished. Was that your understanding?
11 A  I believe so.
12 Q  And everybody that complained was punished?
13 A  Yes.
14 Q  Everybody that complained, CalPac would retaliate,
15 correct?
16 A  Yes.
17 Q  Are you aware of people that complained that did not
18 get terminated?
19 A  No, I don't remember.
20 Q  Going back to Norman Santos, do you know if he was
21 terminated?
22 A  No.
23 Q  You don't know?
24 A  I don't know.
25 Q  So you wouldn't know for sure if people complained

**83**

1  and they didn't --
2  A  I wasn't around. I was already gone.
3  Q  But --
4  A  I don't know anything about Norman or the rest. All
5  I know is about me.
6  Q  So you have no idea about anybody else, would that
7  be correct?
8  A  Like nobody else like who?
9  Q  Well, that's what you're saying. I want to make
10 sure.
11 A  I don't know what happened when I left.
12 Q  After you left, you have no idea what happened at
13 CalPac?
14 A  I'm not saying no idea, but I'm saying you have to
15 refresh my mind.
16 Q  Well, let's talk about -- what can you remember
17 about the --
18 A  Right now nothing.
19 Q  Did you want to take a break?
20 A  No, let's just finish. I gotta get to work.
21 Q  What time do you have to go?
22 A  As soon as we're done.
23 Q  Okay. Did you ever reapply for a job at CalPac?
24 A  No.
25 Q  Let's go to Paragraph 92. It says "the Defendants,

**84**

1  by the harassment and discriminatory actions, created a
2  hostile work environment for Plaintiff Charfauros." Do you
3  see that?
4  A  Yes.
5  Q  You said that the Defendants could have been DTS and
6  all those other people. You said earlier that Mr. Clark
7  worked for DTS, correct?
8  A  Yes.
9  Q  CalPac employees. Were they harassing you?
10 A  CalPac employees?
11 Q  Yes. Anybody working at CalPac.
12 A  Well, yeah, most likely they were harassing, teasing
13 us that we're monkeys.
14 Q  Who is that?
15 A  I don't remember their names.
16 Q  So you're saying other CalPac employees were teasing
17 you?
18 A  Well, not really teasing, you know, but joking
19 around.
20 Q  So who were these people?
21 A  I don't recall their names.
22 Q  Were any of them Plaintiffs?
23 A  No, I don't think so.
24 Q  Were these guys Chamorros also?
25 A  Yeah.



**85**

1    Q   Were they local?
2    A   Yeah.
3    Q   Were they --
4    A   But they're working for Aerial not Underground. We
5 were two separate crews. They got Underground, they got
6 Aerial.
7    Q   These other guys were harassing you --
8    A   Not harassing. Joking with us while we're
9 protesting.
10    Q   Would you consider the jokes to be harassment?
11    A   Nah. They were our friends, co-workers, friends.
12    Q   So now going back to what we're talking about, I
13 asked you if any CalPac employees harassed you.
14    A   No, that I recall.
15    Q   Going back to the joke. Who was it that was joking
16 with you?
17    A   I don't recall I said.
18    Q   But you said they were Aerial?
19    A   Aerial crews.
20    Q   What is that?
21    A   That's the people that does the aerial lines.
22    Q   All these guys would be joking with you or just a
23 few guys?
24    A   There's one guy but that guy's not there no more.
25    Q   What's his name?

**86**

1    A   Matt.
2    Q   Matt what?
3    A   I don't know his last name. I only meet up with him
4 once in a while after work, have a couple beers.
5    Q   Matt, again, is Chamorro?
6    A   Not really Chamorro. He's -- I believe white --
7 half white but I don't know his last name.
8    Q   Then the other would also joke with you?
9    A   Mainly just Matt.
10    Q   Mainly, but some others would also joke with you
11 too?
12    A   Not as much I recall but mainly Matt.
13    Q   Mainly Matt, but others would joke with you?
14    A   Mainly Matt.
15    Q   Okay. I'm just trying to find out what you mean by
16 "mainly Matt," that's what I'm asking you.
17    A   Matt.
18    Q   Okay. CalPac's discriminatory actions. You said no
19 employees harassed you, right? I'm going to the next one.
20 I'm back at Paragraph 92. "Defendant CalPac, by its
21 discriminatory action." Do you see that?
22    A   Uh-huh.
23    Q   What were the discriminatory actions that you're
24 referring to?
25    A   By allowing Mr. Dennis Clark to call us monkeys.

**87**

1    Q   How do you believe that was discriminatory?
2    A   Because they haven't done anything about it but laid
3 us off.
4    Q   Let's not talk about the lay-off at this point
5 because I think this means the work environment so this was
6 while you were still working, okay? Would you agree with me
7 on that? "Created a hostile work environment."
8    A   Right.
9    Q   So that's while you were working there so this is
10 prior to your termination. Would you agree with me on that?
11    A   Because they kept on calling us monkeys. That's why
12 it's hostile.
13    Q   I'm just talking about -- the discriminatory action
14 at this point was not because --
15    A   I don't understand what you're talking about.
16    Q   I'm trying to figure out what your Complaint says.
17 It says "CalPac's discriminatory actions," correct?
18    A   Correct.
19    Q   I want to know about those discriminatory actions.
20 You said by not doing anything and --
21    A   Because they're white and we're -- we're brown.
22 Dark color, right? And we don't hear us calling them or
23 giving them a hard time hostile out there.
24    Q   Okay. How is that discriminatory, though, is what
25 I'm saying.

**88**

1    A   Because the way I feel because I'm not white, you
2 know --
3    Q   Well, they may have said some stuff to you but that
4 would be derogatory. Would you agree with me on that?
5    A   I don't know what you're trying to say.
6    Q   They were saying stuff to you that you would find
7 offensive, correct?
8    A   Maybe.
9    Q   Okay. The statements about the island monkeys is
10 offensive to you, correct? It's offensive to a lot of people
11 I would think.
12    A   (Witness nodded head.)
13    Q   Right?
14    A   Correct.
15    Q   So we would agree that's an offensive statement for
16 purposes of this deposition, okay?
17    A   Correct.
18    Q   How would that offensive statement be
19 discriminatory? Let me give you an example. Let's say
20 somebody called somebody else stupid or dumb. That's
21 offensive, correct?
22    A   Correct.
23    Q   But that's not discriminatory. Would you agree with
24 me on that?
25    A   I don't know.

**89**

1    Q   I understand what you're saying you didn't like the
2  statements made by Mr. Clark but I want to know how it was
3  discriminatory.
4    A   Well, I just said I'm brown skinned and he's white
5  skinned.
6    Q   Okay.
7    A   If I call him white trash, would that be the same
8  thing?
9    Q   Well, I'm asking you. How is it discriminatory? I
10  would say that would be offensive. I'm not sure that would
11  be discriminatory. That's what I'm asking because this is
12  your Complaint.
13    A   If I'm being called island monkey, I don't feel like
14  I'm being discriminated?
15    Q   I don't know. I'm just asking you. That's
16  essentially it.
17    A   Are you local?
18    MS. LUJAN: You're only here to answer the
19  questions, not ask Mr. Leon Guerrero questions.
20    A   Okay.
21  BY MR. LEON GUERRERO: (Continuing)
22    Q   Just the fact that he called you an island monkey
23  was the discriminatory action, correct?
24    A   Correct.
25    Q   All right. How often did you see Mr. Clark on a

**90**

1  daily --
2    A   As much as he comes out to inspect the trench.
3    Q   So would he do it every day?
4    A   I don't remember if it's every day but it's a lot of
5  times he come out.
6    Q   How often would you see him in a day?
7    A   How often would I see him on a day?
8    Q   Yes.
9    A   I don't recall again.
10    Q   Not like 15 minutes, 20 minutes?
11    A   I don't recall. All I recall is when he comes
12  around to inspect the trench. That's it.
13    Q   How often on a daily basis, just on an average,
14  would you interact with Mr. Clark?
15    A   Maybe twice probably. Probably. Roughly.
16    Q   Twice a day?
17    A   Probably.
18    Q   How long would those meetings take place?
19    A   Oh, I don't remember. I don't recall.
20    Q   I want you to estimate.
21    A   I can't estimate if I can't recall, right?
22    Q   Would you think it was an hour at a time?
23    A   I don't recall.
24    Q   You have no idea whether --
25    A   It's not that I have no idea, it's just that I don't

**91**

1  recall. I don't remember. You're talking about almost three
2  years ago.
3    Q   Okay. That's fair.
4    A   Yeah.
5    Q   I want you to describe how it was a hostile work
6  environment for you then.
7    A   How was it hostile work environment?
8    Q   Yes.
9    A   We were not supposed to be doing most of the time.
10    Q   I'm sorry?
11    A   We're not -- let's put it this way. I don't know.
12  I don't recall how hostile it was.
13    Q   Do you need to take a break and think about it? We
14  can go on to the next one and come back to this. We'll just
15  move on.
16    A   We can just finish this right now.
17    Q   I need to know how you felt it was a --
18    A   How I felt it was hostile because I was called
19  monkey. That's it.
20    Q   I need to know how often, what happened? How long
21  would you meet with Mr. Clark?
22    A   Mr. Clark will come out, like I said, and inspect
23  our job site. You're asking me how often and I can't
24  remember back then. I don't remember. So I can't just
25  suggest or give you a guess.

**92**

1    Q   It was hostile only when Mr. Clark was there?
2    A   Yes.
3    Q   Would that be correct?
4    A   Yes.
5    Q   Let's go on to Paragraph 93. "Direct results of
6  Defendants" again, referring specifically to CalPac, okay?
7    A   Okay.
8    Q   As a direct result of CalPac's unlawful actions,
9  discrimination, harassment and differential disparate
10  treatment, you suffered emotional harm. Do you agree with
11  that?
12    A   Yeah.
13    Q   Did you see any doctor about the emotional harm you
14  suffered?
15    A   Do you want me to explain my emotional?
16    Q   No, not yet. I want to ask if you talked to any
17  treating physician --
18    A   No, I did not.
19    Q   Did you have a girlfriend at this time?
20    A   Yeah, I had a wife and kids.
21    Q   Did you tell your wife and kids what you were going
22  through?
23    A   Do you want to know --
24    Q   No, I'm going to ask the specific questions.
25    A   And I'm going to answer you straight up.

## 93

1  Q  Okay. Answer my question. Did you explain to your
2  wife and your children what kind of mental or emotional harm
3  you were going through?
4  A  Let's put it this way. I lost my family because of
5  this.
6  Q  How did you lose your family?
7  A  How? I can't be a husband and father without paying
8  bills, my rent. My kids had to move out and go live with
9  their mother-in-law -- with their grandparents 'cause I
10  couldn't afford to make them live. Okay? And then I had to
11  stay in an eight-man tent for eight months by myself with no
12  power, no water.
13  Q  Where was this at?
14  A  Down at my mom's ranch.
15  Q  Where was that at?
16  A  In Agat.
17  Q  So you lost your house is what you said?
18  A  Yes.
19  Q  You lost your family?
20  A  Lost my family.
21  Q  Did you have a house that you lost?
22  A  Yeah, we were renting.
23  Q  Where are your kids at now?
24  A  They're living with their mother now.
25  Q  Anything else as far as emotional harm besides that?

## 94

1  A  A lot.
2  Q  Well, you have to tell me what. This is my chance
3  to ask you questions. I can't ask you questions outside of
4  this.
5  A  I almost thought of taking myself away already.
6  Q  Because of this?
7  A  Because of what happened.
8  Q  Because you were --
9  A  Because I lost my family. Because I couldn't
10  support my family.
11  Q  Because you were laid off?
12  A  Because I was laid off with a job.
13  Q  Did you get another job?
14  A  Yes.
15  Q  Where did you --
16  A  Well, I was looking for a job. I just got one now.
17  Q  Did you ever work for Cable Services?
18  A  Yeah, I did.
19  Q  When did you start working for Cable Services?
20  A  I don't recall when.
21  Q  Was it the year 2004?
22  A  I don't recall when. Probably. Probably. I don't
23  know. If you have a copy of my application, it will probably
24  say there when I applied.
25  Q  But you don't remember?

## 95

1  A  I don't remember.
2  Q  Would it be, to your knowledge, within a year after
3  you worked at CalPac?
4  A  I don't remember like I said.
5  Q  When did you lose your wife and children?
6  A  As soon as we got laid off. Maybe about a week or
7  so. Maybe a month or so.
8  Q  A month or so?
9  A  Yes.
10  Q  You got an actual divorce?
11  A  No, no, no, no, not divorce. We were just living
12  together.
13  Q  So you didn't go through the court?
14  A  No, no, no, no.
15  Q  How long had you been living with her?
16  A  Seven years prior to that thing happen.
17  Q  This is the same one that was an alleged victim in
18  the family violence case?
19  A  That was before this thing happened.
20  Q  The question is, is the --
21  A  Same woman, yes.
22  Q  Okay. Mental anguish would be the same thing? The
23  emotional harm?
24  A  Yes.
25  Q  Loss of enjoyment. Would that be the same thing

## 96

1  also?
2  A  Yes.
3  Q  The other non-pecuniary losses in amounts to be
4  proved at trial. Do you have any idea of any out-of-pocket
5  expenses that you had or anything else?
6  A  Not right now.
7  Q  Okay.
8  A  I'll work on it for you if you want.
9  Q  Okay. And if you can give that to your lawyer would
10  you mind?
11      MS. LUJAN: Well, it's subject to proof at
12  trial.
13  BY MR. LEON GUERRERO: (Continuing)
14  Q  Okay. Then I guess we'll have to ask about it now
15  then. Can you think of any off the top of your head?
16  A  Top of my head what?
17  Q  Of your other non-pecuniary losses?
18  A  I lost everything, man. How you want me to explain
19  that?
20  Q  Go through each one.
21  A  Go through each one?
22  Q  Yes. I understand you said you lost your wife and
23  your kids. Anything else?
24  A  Bills I had to pay.
25  Q  Okay. What were the bills?

## Page 105

1  A  I don't recall it.
2  Q  Do you know if it happened in 2004?
3  A  I don't recall lai.
4  Q  Look at Exhibit D, I believe.
5  A  "D."
6  Q  "D." That was a --
7  A  Okay, yeah, yeah. I think this is the response
8  back.
9  Q  So you filled out Exhibit G and then in response to
10 Exhibit G you got Exhibit D, would that be right?
11 A  I believe, I believe.
12 Q  So "G" was before "D," correct?
13 A  I believe.
14 Q  To the best of your knowledge?
15 A  Yes.
16 Q  I'm not going to hold you to that. There is no date
17 on Exhibit G, right?
18 A  No, I don't believe so.
19 Q  This exhibit was sent to the EEOC from Mr. Harper's
20 fax, correct?
21 A  Correct.
22 Q  Who are George and June Charfauros?
23 A  My brother-in-law -- my brother and my
24 sister-in-law.
25 Q  These are the people you don't communicate with?

## Page 106

1  A  Not communication by talking often. I live in Yigo
2  now. At this time, I was still living in Agat. That was my
3  contact number.
4  Q  Do you know if George or June saw the picture --
5  A  I don't know. You can call them if you want.
6  Q  Where did the protest take place, do you remember?
7  Approximately.
8  A  Where it took place? I believe up in CalPac and in
9  front of MCI's building.
10 Q  How many protests were there, do you know?
11 A  This is it pretty much, but I don't remember when or
12 what days.
13 Q  So you protested at MCI, right?
14 A  MCI, CalPac's office in Harmon and GTA, I think.
15 Right in front of GTA.
16 Q  So there were at least three protests?
17 A  I believe so.
18 Q  There could have been more?
19 A  There could have been more in the same areas but I
20 don't remember.
21 Q  Did they all take place at the same time?
22 A  What do you mean by "the same time"?
23 Q  Did the MCI protest take place on the same day as
24 say at CalPac?
25 A  I don't remember.

## Page 107

1  Q  Do you remember when the protest stopped?
2  A  I don't remember.
3  Q  Exhibit G was done before or after the protest, do
4  you know?
5  A  I don't remember.
6  Q  Look at Page 2 of Exhibit G. It says on No. 3, do
7  you see "identify the employment events"? Do you see that?
8  A  Number where?
9  Q  No. 3.
10 A  This one here?
11 Q  Yes.
12 A  Okay.
13 Q  No. 3 says "identify the employment events that
14 caused you to contact EEOC, (e.g., hiring, layoff, promotion,
15 accommodation, discipline, harassment, sexual harassment,
16 etc." Okay?
17 A  Uh-huh.
18 Q  Is this your handwriting, by the way?
19 A  Yes.
20 Q  You put in 'discrimination/layoff (racial).'
21 A  Yes.
22 Q  Then further down it says "date event occurred." Do
23 you see that?
24 A  Yes.
25 Q  You indicated "9-21-04/9-25-04/10-23-04." Correct?

## Page 108

1  A  Correct.
2  Q  So 9-21-04 refers to September 21, 2004, correct?
3  A  Correct.
4  Q  Then 9-25-04 refers to September 25, 2004, correct?
5  A  Correct.
6  Q  And then 10-23-04 refers to October 23, 2004, would
7  that be correct?
8  A  Correct.
9  Q  You indicated three days that the events took place.
10 The events would be Mister --
11 A  Dennis Clark.
12 Q  -- Clark.
13 A  Right.
14 Q  Mr. Clark's statements. I'm laughing because I'm
15 getting the names always mixed up, not at you. Those are the
16 remarks made by Mr. Clark, correct?
17 A  Correct.
18 Q  So there were three events that you reported to the
19 EEOC?
20 A  I believe so, yes.
21 Q  Does this refresh your memory of those three events?
22 A  Well, it looks like it.
23 Q  You told the EEOC that CalPac told you they were
24 laying you off because of reduction of work force, correct?
25 A  Correct.

## NOTARY PUBLIC'S CERTIFICATE

BARRIGADĀ }

.  I, Cecilia A. Flores, Notary Public in and for
Guam, do hereby certify that on the 24th day of May, 2007 at
the hour of 9:00 a.m. there appeared before me LARRY L.
CHARFAUROS at the law offices of Blair Sterling Johnson
Martinez & Leon Guerrero, Suite 1008, Pacific News Building,
238 Archbishop Flores Street, Hagatna, Guam.  The witness
herein, produced to give his deposition in the
within-numbered Civil Case No. CIV05-00037; that prior to
examination the witness was by me duly sworn upon his oath;
that thereafter the transcript was prepared by me or under my
supervision, and the original deposition transcript was
presented to Mr. Leon Guerrero's office for the deponent's
review, corrections, if any, and execution.

   I further certify that I am not a relative,
employee, attorney or counsel of any of the parties, nor a
relative or employee of such attorney or counsel, and that I
am not directly or indirectly interested in the matters in
controversy.

   In testimony whereof, I have hereunto set my
hand this 25th day of June, 2007.

                    Cecilia A. Flores

# EXHIBIT 3

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA, )Civil Case No. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH  )
T. MENDIOLA, LARRY L. CHARFAUROS,  )
ANTHONY C. ARRIOLA, ROBERT B.      )
CRUZ, ROLAND F. MENDIOLA, JAMES S.)
YEE, TEDDY B. CRUZ, JESSE B. CRUZ,)
JOHN L.G. NAUTA, and JOHN P.       )
BABAUTA,                           )
                    Plaintiffs,    )
                                   )
            vs.                    )
                                   )
CALPAC, DYNAMIC TECHNICAL          )
SERVICES, MCI, JOHN HEALY, DENNIS )
CLARK, WILLIAM WARD, JAI JAMES and)
DOES 1 through 10,                 )
                                   )
                    Defendants.    )

**⬛ COPY**

DEPOSITION OF JAMES S. YEE

Taken on Behalf of the Defendants

BE IT REMEMBERED That, pursuant to the Guam
Rules of Civil Procedure, the deposition of JAMES S. YEE was
taken before Veronica F. Reilly, Certified Shorthand
Reporter, on Wednesday, the 7th day of February 2007, at
10:00 a.m. in the Law Offices of Blair Sterling Johnson
Martinez & Leon Guerrero, Suite 1008, Pacific News Building,
238 Archbishop Flores Street, Hagatna, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
E-mail: veronica.reilly@hotmail.com

Case 1:05-cv-00037   Document 337-2   Filed 09/10/2007   Page 45 of 50

1    A.   I said if I was there, I wouldn't have wrote that

2    there but I'm sure --

3        Q.   So you were not present at the December --

4        A.   Yeah, I have no idea.

5             MS. McDONALD:   I don't have anything further.

6                      CROSS-EXAMINATION

7    BY MS. LUJAN:

8        Q.   I just have a few questions.  Now, if I could just

9    go back to one of the exhibits.  It was Exhibit F.  Can we

10   see Exhibit F?  I left mine at the office.  It was the memo,

11   the final warning memo.

12             Now, is this the first time, Mr. Yee, that you ever

13   received a memo such as this accusing you of committing some

14   kind of work violation?

15       A.   First time.

16       Q.   So that's the first time?

17       A.   Yes.

18       Q.   And do you recall receiving any other memos accusing

19   you of committing other work violations?

20       A.   No.

21       Q.   So this is the only one that you ever got and this

22   memo was given to you after -- that was October 1, 2004;

23   correct?

24       A.   Correct.

25       Q.   Is it true that this memo was given to you after

1   Dennis Clark first called you an island monkey?

2       A.   Yes, I believe so.

3       Q.   So this memo was given after you -- say the first

4   time you were called an island monkey?

5       A.   It's hard to say the timing.  Yeah, probably, yeah,

6   because I was driving in front of KMart when this happened.

7   I was bringing it back to the shop.

8       Q.   Now, I'm looking at the first paragraph.  Oh, you

9   know, I'm sorry.  I'm looking at the wrong document.  It's

10  Exhibit -- it's the final warning letter.  It's Exhibit G.

11  This is what I'm talking about.  This is January 26, 2005.

12  Is this the first kind of letter that you received from

13  CalPac accusing of you committing a work violation?

14      A.   (Witness nodded head.)

15      Q.   Yes?

16      A.   Yup, first one.

17      Q.   And this is January 26, 2005.  You received this

18  before or after Dennis Clark called you an island monkey?

19      A.   After.

20      Q.   After Two Lovers' Point and Tiyan?

21      A.   Yes.  Tiyan, yes.

22      Q.   And you did not receive any other letters accusing

23  of you work violations; correct?

24      A.   No, this is the only one.

25      Q.   Now, you received this from Max Long?

1    A.    Correct.

2    Q.    There was a report of you driving too fast and

3    without the proper escort vehicle.  Do you recall what this

4    is referring to?

5    A.    This is referring to me being on a backhoe passing

6    in front of KMart heading north.

7    Q.    And do you recall driving too fast on the backhoe?

8    A.    This backhoe you could never drive too fast.  It was

9    just too old.

10    Q.    What speed do you estimate --

11    A.    It must have been going at least less than 20 but it

12    was screaming.  It sounded like it was probably going fast

13    but a backhoe with that condition, no.

14    Q.    So you don't recall driving too fast on the backhoe?

15    A.    No, you can't drive too fast on that thing.  It

16    would make a lot of noise.

17    Q.    Now, it says here that you were driving too fast and

18    without the proper escort vehicle.  Do you recall ever being

19    required or being told by CalPac that when you drive a

20    backhoe, you have to have an escort vehicle?

21    A.    No.

22    Q.    You don't remember ever being told that?

23    A.    I 've done it before going without an escort with

24    CalPac.

25    Q.    So they never told you that you had to use an

1  escort?

2      A.    No.

3      Q.    Prior to receiving this letter or signing this at

4  the bottom, were you ever asked by anyone from CalPac whether

5  or not you committed these alleged violations?

6      A.    No.

7      Q.    So no one asked you whether it was true?

8      A.    No.

9      Q.    And did anyone tell you to sign your name here at

10 the bottom?

11     A.    Yes, Max Long.  Max told me there's something in the

12 office for me to sign.

13     Q.    Okay.  And what did he tell you?

14     A.    He goes there's something in the office, James, for

15 you to sign, okay, and that was it.

16     Q.    You received this after you filed your charges with

17 the EEOC?

18     A.    Yes, ma'am.

19     Q.    Now, we looked earlier at some pay advance requests.

20 Those were Exhibits A and Exhibit C.  One was dated March 11,

21 2005.  That was regarding a van for a funeral.  The other one

22 was February 25, 2005, Five Hundred Seven Dollars for rent.

23 Do you recall any other times that you ever asked for advance

24 in your pay?

25     A.    No, I don't.

# REPORTER'S CERTIFICATE

DISTRICT COURT OF GUAM     )

       I, Veronica F. Reilly, Certified Shorthand Reporter, hereby certify that James S. Yee personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 111, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

       Witness my hand at Barrigada, Guam, this 22nd day of February 2007.


_____
Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter