**LUJAN AGUIGUI & PEREZ LLP**
Attorneys at Law
Pacific News Building, Suite 300
238 Archbishop Flores Street
Hagåtña, Guam 96910
Telephone (671) 477-8064/5
Facsimile (671) 477-5297

*Attorneys for Plaintiffs*

**FILED**
DISTRICT COURT OF GUAM

NOV - 7 2007

**JEANNE G. QUINATA**
**Clerk of Court**

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

|  |  |
|---|---|
| HENRY G. VAN METER, et al., | CIVIL CASE NO. 05-00037 |
| Plaintiffs, | |
| -vs- | **PLAINTIFFS' OPPOSITION TO DEFENDANT DYNAMIC TECHNICAL SERVICES' MOTION FOR SUMMARY JUDGMENT AGAINST ALL PLAINTIFFS** |
| CALPAC, et al., | |
| Defendants. | |

COME NOW Plaintiffs Henry G. Van Meter, Jerry Apodaca, Jr., Joseph J. Hernandez, Joseph T. Mendiola, Larry L. Charfauros, Anthony C. Arriola, Robert B. Cruz, Roland F. Mendiola, James S. Yee, Teddy B. Cruz, Jesse B. Cruz, John L.G. Nauta, and John P. Babauta (collectively "Plaintiffs"), respectfully submitting their opposition to Defendant Dynamic Technical Services' Motion for Summary Judgment Against All Plaintiffs, filed herein June 18, 2007.

## I. INTRODUCTION

Plaintiffs instituted this Title VII action on December 12, 2005, alleging that they were subjected to employment discrimination by defendants Calpac, Dynamic Technical Services ("DTS"), MCI, John Healy, Dennis Clark ("Clark"), William Ward, Jai James, and Does 1

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against All Pls.

1

ORIGINAL

1   through 10 (collectively "Defendants"). The First Amended Complaint ("the complaint") was

2   filed February 24, 2006. The complaint was amended on September 7, 2007.

3       On June 18, 2007, DTS filed a motion for summary judgment against all Plaintiffs on the

4   basis that it lacks 15 employees.

5

6   **II. ARGUMENT**

7       DTS moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56,

8   arguing that it is not subject to Title VII liability since it has fewer than 15 employees.

9       Summary judgment is appropriate if the evidence, construed in the light most favorable to

10  the nonmoving party, shows that there is no genuine issue as to any material fact and that the

11  moving party is entitled to a judgment as a matter of law. Tzung v. State Farm Fire & Cas. Co.,

12
    873 F. 2d 1338, 1339-40 (9th Cir. 1989). The party moving for summary judgment always bears
13
14  the initial responsibility of informing the district court of the basis for its motion, identifying

15  those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

16  together with the affidavits, if any," which the moving party believes indicates the absence of a

17  genuine issue of material fact. Fed. R. Civ. P. 56(c); Celotex v. Catrett, 477 U.S. 317, 323, 106 S.

18  Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); Rasmusson v. Copeland Lumber Yards, Inc., 988 F.
19
    Supp. 1294, 1296 (D. Nev. 1997). If the moving party has met its initial responsibility, the
20
21  burden then shifts to the opposing party to demonstrate that a genuine issue as to any material fact

22  exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89

23  L. Ed. 2d 538 (1986). To establish the existence of a factual dispute, the nonmoving party need

24  not establish a material issue conclusively; only that "the claimed factual dispute be shown to

25  require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec.

26  Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F. 2d 626, 630 (9th Cir. 1987).

27      DTS should be denied summary judgment for the following reasons:

28

1   through 10 (collectively "Defendants"). The First Amended Complaint ("the complaint") was

2   filed February 24, 2006. The complaint was amended on September 7, 2007.

3       On June 18, 2007, DTS filed a motion for summary judgment against all Plaintiffs on the

4   basis that it lacks 15 employees.

5

6   **II. ARGUMENT**

7       DTS moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56,

8   arguing that it is not subject to Title VII liability since it has fewer than 15 employees.

9       Summary judgment is appropriate if the evidence, construed in the light most favorable to

10  the nonmoving party, shows that there is no genuine issue as to any material fact and that the

11  moving party is entitled to a judgment as a matter of law. Tzung v. State Farm Fire & Cas. Co.,

12
    873 F. 2d 1338, 1339-40 (9th Cir. 1989). The party moving for summary judgment always bears
13
14  the initial responsibility of informing the district court of the basis for its motion, identifying

15  those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

16  together with the affidavits, if any," which the moving party believes indicates the absence of a

17  genuine issue of material fact. Fed. R. Civ. P. 56(c); Celotex v. Catrett, 477 U.S. 317, 323, 106 S.

18  Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); Rasmusson v. Copeland Lumber Yards, Inc., 988 F.
19
    Supp. 1294, 1296 (D. Nev. 1997). If the moving party has met its initial responsibility, the
20
21  burden then shifts to the opposing party to demonstrate that a genuine issue as to any material fact

22  exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89

23  L. Ed. 2d 538 (1986). To establish the existence of a factual dispute, the nonmoving party need

24  not establish a material issue conclusively; only that "the claimed factual dispute be shown to

25  require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec.

26  Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F. 2d 626, 630 (9th Cir. 1987).

27      DTS should be denied summary judgment for the following reasons:

28

1   through 10 (collectively "Defendants"). The First Amended Complaint ("the complaint") was

2   filed February 24, 2006. The complaint was amended on September 7, 2007.

3       On June 18, 2007, DTS filed a motion for summary judgment against all Plaintiffs on the

4   basis that it lacks 15 employees.

5

6   **II. ARGUMENT**

7       DTS moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56,

8   arguing that it is not subject to Title VII liability since it has fewer than 15 employees.

9       Summary judgment is appropriate if the evidence, construed in the light most favorable to

10  the nonmoving party, shows that there is no genuine issue as to any material fact and that the

11  moving party is entitled to a judgment as a matter of law. Tzung v. State Farm Fire & Cas. Co.,

12
    873 F. 2d 1338, 1339-40 (9th Cir. 1989). The party moving for summary judgment always bears
13
14  the initial responsibility of informing the district court of the basis for its motion, identifying

15  those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

16  together with the affidavits, if any," which the moving party believes indicates the absence of a

17  genuine issue of material fact. Fed. R. Civ. P. 56(c); Celotex v. Catrett, 477 U.S. 317, 323, 106 S.

18  Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); Rasmusson v. Copeland Lumber Yards, Inc., 988 F.
19
    Supp. 1294, 1296 (D. Nev. 1997). If the moving party has met its initial responsibility, the
20
21  burden then shifts to the opposing party to demonstrate that a genuine issue as to any material fact

22  exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89

23  L. Ed. 2d 538 (1986). To establish the existence of a factual dispute, the nonmoving party need

24  not establish a material issue conclusively; only that "the claimed factual dispute be shown to

25  require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec.

26  Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F. 2d 626, 630 (9th Cir. 1987).

27      DTS should be denied summary judgment for the following reasons:

28

Henry G. Van Meter, et al., v. Calpac, et al.                                                    2
Civil Case No. 05-00037
Opp. to Def. DTS MSJ Summ. J. Against All Pls.     Filed 11/07/2007     Page 2 of 33
Case 1:05-cv-00037     Document 148

**A. DTS, as the party moving for summary judgment, failed to meet its initial burdens of production and persuasion.**

A movant without the ultimate burden of persuasion at trial has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F. 3d 1099, 1102 (9th Cir. 2000). To successfully carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmovant does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. Id. In order to carry its ultimate burden of persuasion on the motion, the movant must persuade the court that there is no genuine issue of material fact. Id. If the nonmovant fails to carry its initial burden of production, the nonmovant has no obligation to produce anything, even if the nonmovant would have the ultimate burden of persuasion at trial. Id. at 1102-1103. In such a case, the nonmovant may defeat the summary judgment motion without producing anything. Id. at 1103. If, however, a movant carries its burden of production, the nonmovant must produce evidence to support its claim or defense. Id.

In this case, DTS, as the party moving for summary judgment, has failed to meet its initial burdens of production and persuasion. In Celotex, the central question before the United States Supreme Court was whether moving party had carried its initial burden of production by showing that the nonmoving party did not have enough evidence to carry its ultimate burden of persuasion at trial. In that case, the court held that the movant could meet its initial burden of production "by 'showing' –that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Id. at 325. The court found that it was sufficient, for this purpose, for the movant to direct the district court's attention to the plaintiff's answer to interrogatories admitting that she had no witnesses who could testify that her husband had been

Henry G. Van Meter, et al., v. Calpac, et al.                                          3
Civil Case No. 05-00037
Opp. to Def. DTS' Mot. Summ. J. Against All Pls.

Case 1:05-cv-00037     Document 448     Filed 11/07/2007     Page 3 of 33

exposed during the statutory period to asbestos manufactured by the defendant, and to the absence of any other evidence of exposure in the materials compiled during discovery. Id. at 320, 328.

In Nissan, the Ninth Circuit interpreted the Celotex ruling. According to the Ninth Circuit, Celotex did not hold that a moving party without the ultimate burden of persuasion at trial may use a summary judgment motion as a substitute for discovery. 210 F. 3d at 1105. "A moving party may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." Id. (citing Clark v. Coates & Clark, Inc., 929 F. 2d 604, 608 (11th Cir. 1991) ("Even after Celotex it is never enough simply to state that the non-moving party cannot meet its burden at trial.")). Typically, in order to carry its initial burden of production by pointing to the absence of evidence to support the nonmoving party's claim or defense, the moving party will have made reasonable efforts, using the normal tools of discovery, to discover whether the nonmoving party has enough evidence to carry its burden of persuasion at trial. Id. (citing Clark, 929 F. 2d at 608 (noting that a moving party must "point to materials on file which demonstrate that a party will not be able to meet that burden")). An absence of evidence may be established either by an affirmative showing with the moving party's own evidence or by a review of all the nonmoving party's evidence and the contention that such proof of an element is lacking. See Martin B. Louis, FEDERAL SUMMARY JUDGMENT DOCTRINE: A CRITICAL ANALYSIS, 83 Yale L.J. 745, 750 (1974).

Here, in the motion for summary judgment, DTS attempts to meet its initial burdens of production and persuasion by merely stating:

> ... The Plaintiffs filed their Original Complaint on December 12, 2005. The discovery cut-off date in the Scheduling Order and Discovery Plan was May 24, 2007. Therefore, an adequate time for discovery has passed. The pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits demonstrate that Plaintiffs have no evidence to establish the element of the threshold number of employees for the application of Title VII to Defendant DTS. There is no genuine issue as to any material fact, since the Plaintiffs have

Henry G. Van Meter, et al., v. Calpac, et al.                                                                    4
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against All Pls.

Case 1:05-cv-00037   Document 448   Filed 11/07/2007   Page 4 of 33

no proof concerning an essential element of the Plaintiff's case which renders all other facts immaterial.

Although DTS gives a blanket statement that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits demonstrate" an absence of evidence, DTS does not actually point to any materials on file to specifically show an absence of evidence. DTS is practically stating, simply, that Plaintiffs have no proof concerning the employee-numerosity element. However, as the Ninth Circuit stated in Nissan, the movant may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence. 210 F. 3d at 1105. Thus, DTS failed to meet its initial burdens of production and persuasion and therefore summary judgment should not be granted in its favor.

### B. Contrary to DTS' contention, summary judgment is inappropriate since there is a genuine issue of fact whether DTS lacks 15 employees.

Federal statutes remedial in nature, such as Title VII, should be liberally construed and given a broad meaning. NLRB v. Hearst Publ'ns, 322 U.S. 111, 124, 64 S. Ct. 851, 88 L. Ed. 1170 (1944); United States ex rel. Kent v. Aiello, 836 F. Supp. 720, 725 (E.D. Cal. 1993). "In keeping with the remedial goals of the statute [Title VII], [the Ninth Circuit has] repeatedly held that the statute itself, the procedural framework, and the pleadings must be liberally construed in favor of those who are alleged victims of discrimination." Ramirez v. Nat'l Distillers & Chem. Corp., 586 F. 2d 1315, 1321 (9th Cir. 1978).

The term "employer" has been given an expansive definition when used in federal statutes. Goldberg v. Whitaker House Coop. Inc., 366 U.S. 28, 81 S. Ct. 933, 6 L. Ed. 2d 100 (1961); Aiello, 836 F. Supp. at 725 (E.D. Cal. 1993). Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each

Henry G. Van Meter, et al., v. Calpac, et al.                                      5
Civil Case No. 05-00037
Opp'n to DTS' Mot. Summ. J. Against All Pls.
Case 1:05-cv-00037    Document 448    Filed 11/07/2007    Page 5 of 33

working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person ...." 42 U.S.C. § 2000e(b).

### 1. DTS admits to evidence showing that it employs at least 15 individuals.

In <u>Virgo v. Riviera Beach Assocs., Ltd.</u>, the Eleventh Circuit ruled that the record contained an adequate and reasonable basis for the district court's finding that the 15-employee requirement was met. Although the record did not elaborately set forth the number of hours and days worked, nine employees were specifically identified, and many other positions were described, including the restaurant staff, maintenance staff, housekeeper, and lounge staff. 30 F. 3d 1350, 1361 (11th Cir. 1994). The Eleventh Circuit found that it was not wrong to assume that persons employed in these types of jobs would at a minimum satisfy the statutory requirement. <u>Id.</u>

Here, the affidavits on file and DTS' discovery responses to Plaintiffs' requests for production of documents show that DTS had at least 15 employees. For instance, in the Affidavit of Linda G. Hayes, Ms. Hayes states that, during the years 2004-2005, she was the Director of Recruiting for DTS. (Hayes Aff. ¶ 3.) Ms. Hayes also stated in DTS' Answers and Objections to Plaintiffs' first sets of interrogatories that she has worked for DTS for the past 6 years and 10 months. (<u>See, e.g.</u>, Ex. 1 at 3.) Also, in the Affidavit of Dennis P. Clark, Mr. Clark states that he worked for DTS as the MCI Company Representative on MCI's "Guam International Ring" construction project, which is the project all Plaintiffs worked on. (Clark Aff. ¶ 3.) Clark's employment with DTS is also evident from Clark's timesheets during the MCI project, which show that Clark was an employee of DTS. (<u>See, e.g.</u>, Lujan Decl. Ex. 4 at 3.) Furthermore, DTS' website, a photocopy of which was provided to the EEOC in relation to Plaintiffs' EEOC charges, shows approximately 31 employee positions at DTS, including PBX Installers & Engineers, Power Installers, FCC Licensed Technicians, Field Engineers & Inspectors, Right-of-Way

Henry G. Van Meter, et al., v. Calpac, et al.                                    6
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against All Pls.

Case 1:05-cv-00037   Document 448   Filed 11/07/2007   Page 6 of 33

Agents, Surveyors [Registered Land Man], RF Engineers, Antenna & Line Installers, Civil Construction Superintendents, Civil Field Engineers, Application Developers, Computer Technicians, Database Analysts, Internet Network Engineers, LAN/WAN Engineers, Product Development Specialists, Systems Analysts, Technical Support, Technical Writers, Translation Technicians, Engineering Project Managers, and Network Consulting Engineers. (Id. Ex. 5 at bate-stamp 270-71.) Therefore, the evidence shows that DTS had as employees Hayes, Clark, and a total of at least 31 employees. Accordingly, a genuine issue of fact exists regarding whether DTS meets the employee-numerosity requirement, and DTS' motion for summary judgment must be denied.

**2. DTS was a joint employer of Plaintiffs and therefore clearly employed at least 15 individuals.**

Two or more employers may be considered "joint employers" under Title VII if both employers control the terms and conditions of employment of the employee. EEOC v. Pac. Mar. Ass'n, 351 F. 3d 1270, 1275 (9th Cir. 2003). The question of joint employer status is a factual one and requires an examination into whether an employer who is claimed to be a "joint employer" "possessed sufficient control over the work of the employees to qualify as 'joint employer' with [the actual employer]." Boire v. Greyhound Corp., 376 U.S. 473, 481, 84 S. Ct. 894, 11 L. Ed. 2d 849 (1964). "A finding that companies are 'joint employers' assumes in the first instance that companies are 'what they appear to be' independent legal entities that have merely 'historically chosen to handle jointly ... important aspects of their employer-employee relationship.' " NLRB v. Browning-Ferris Indus. of Pa., Inc., 691 F. 2d 1117, 1122 (3d Cir. 1982) (quoting NLRB v. Checker Cab Co., 367 F. 2d 692, 698 (6th Cir. 1966)). The Ninth Circuit has applied an "economic reality" test to determine whether a joint employment relationship exists. Pac. Mar. Ass'n, 351 F. 3d at 1275.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against All Pls.                                7

Case 1:05-cv-00037   Document 448   Filed 11/07/2007   Page 7 of 33

The determination of whether there is a "joint employer" situation looks to which of two, or whether both, companies control, in the capacity of employer, the labor relations of a given group of workers. Browning-Ferris, 691 F. 2d at 1122-23 (quoting NLRB v. Condenser Corp. of Am., 128 F. 2d 67, 72 (3d Cir. 1942)). The basis of a finding of "joint employer" status is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Id. at 1123. Joint employers share or co-determine those matters governing the essential terms and conditions of employment. Id. Joint employer status depends on a company's authority to control work conditions of employees, not on its exercise, in fact, of that authority. See, e.g., Jewel Tea Co., 53 NLRB 508, 510 (1966).

In determining whether two employing entities may be considered "joint employers," the following factors have been considered: (1) the nature and degree of control over the employers; (2) day-to-day supervision, direct or indirect, including discipline; (3) authority to hire and fire the employee and set conditions of employment; (4) power to control pay rates or methods of payment; (5) control of the employee records including payroll. Torres-Lopez v. May, 111 F. 3d 6633, 639-40 (9th Cir. 1997). These factors are not exhaustive as other relevant factors may be considered. Id.

In Gallenkamp Stores Co. v. Nat'l Labor Relations Bd., the Ninth Circuit affirmed the finding of joint employer status between K-Mart and its licensees. 402 F. 2d 525, 528, 535 (9th Cir. 1968). In that case, Kmart promulgated Rules and Regulations which provided that K-Mart's manager was responsible for the over-all operation of the store, and that he was permitted to request immediate action from the licensee if he believed that the licensee had not provided sufficient help, or if any employees were inefficient or objectionable. Id. at 528. Although the Rules declared hiring and terminations to be under the supervision of each licensee's manager,

Henry G. Van Meter, et al., v. Calpac, et al.                                                    8
Civil Case No. 05-00037
Opp'n to Def. DYS's Mot. Summ. J. Against All Pls.

Case 1:05-cv-00037    Document 446    Filed 11/07/2007    Page 8 of 33

they authorized K-Mart's personnel supervisor to receive applications from persons desiring employment. Id. The Rules included provisions for employee discipline, smoking restrictions, rest periods, places where employees were permitted to keep their personal belongings, employee purchases, employee wearing apparel, and identification badges, and the greeting of customers. Id. at 528-29. Under the license agreement, K-Mart alone had the authority to issue uniform Rules and Regulations for the benefit of the common enterprise, and to amend, modify or revise them. Violation of these Rules subjects the offending licensee to termination of its license by K-Mart. Id. at 529. Under the Rules, K-Mart was allowed to prescribe the number of employees it deemed necessary to operate a licensee's department. Id.

In Ref-Chem Co. v. NLRB, the Fifth Circuit affirmed a finding of joint employer status between El Paso and two companies. 418 F. 2d 127, 129 (5th Cir. 1969). The terms of the agreements with these two companies gave El Paso the right to approve employees, control the number of employees, have an employee removed, inspect and approve work, and pass on changes in pay and overtime allowed. Id. In practice, El Paso exercised its control though in varying degrees. Id. The evidence showed that El Paso shared or co-determined those matters governing essential terms and conditions of employment. Id.

In Browning-Ferris, the Third Circuit affirmed a finding that Browning Ferris Industries of Pennsylvania, Inc. (BFI) was a joint employer with independent trucking brokers over discharged drivers. According to the court, there was substantial evidence to support a "joint employer" finding: BFI shared with the brokers the right to hire and fire the drivers, and BFI's supervisor considered himself the "boss" and acted as "boss" with respect to the employees' functions. 691 F. 2d at 1124. BFI established the work hours of the drivers, determining when the two shifts it established would start and end. Id. at 1124-25. BFI provided the drivers with the same uniforms it provided its own employees. Id. at 1125. BFI and the brokers together

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DYS' Mot. Summ. J. Against All Pls.

9

Case 1:05-cv-00037   Document 448   Filed 11/07/2007   Page 9 of 33

determined the drivers' compensation and shared in the day to day supervision of the drivers. Id. BFI directed the drivers at the transfer and landfill sites as if they were their own employees, and BFI forms were used for record keeping purposes. Id. Finally, BFI shared with the brokers the power to approve drivers, and devised the rules under which the drivers were to operate at BFI sites. Id.

In Spencer v. Byrd, the district court found that the county was a joint employer of a deputy sheriff for purposes of Title VII even though the county was not the employer of the sheriff's deputy under state law. 899 F. Supp. 1439 (M.D.N.C. 1995). In that case, the sheriff, rather than the county, had the exclusive right to hire, discharge, and supervise the plaintiff, the deputy sheriff. Id. at 1441. However, the county had the power to limit the sheriff to two deputies, and to establish the number of deputies. Id. The county also provided the deputy sheriff's compensation as it provided such compensation out of budgeted funds. Id. Thus, the county had the power to fund or to decide not to fund the deputy positions. Id.

In this case, DTS exercised significant control over Calpac employees, including Plaintiffs, and in the work environment, just as in the above-cited cases. DTS acted as the Company Representative of MCI on project and the rights and responsibilities of Calpac and DTS were set forth in a Construction Agreement between Calpac and MCI. (Lujan Decl. Ex. 6, Statement of Work ¶ 13.1.) According to the Agreement, the results of Calpac's work on the MCI project had to be done to the "complete satisfaction of the Company Representative (DTS) ...." (Id. Ex. 6 ¶ 3.2.) DTS, as Company Representative of MCI (now Verizon Defendants), had the power to inspect all of Calpac's work and materials. (Id. Ex. 6 ¶ 7.1.) Calpac was required, at all times, to furnish to DTS access and acceptable accommodation to the work wherever it was in progress. (Id. Ex. 6 ¶ 7.2.) As to Calpac's superintendents, if DTS did not consider the superintendent or necessary assistants to be satisfactory, MCI could have objected to the use of

Henry G. Van Meter, et al., v. Calpac, et al.                                          10
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against All Pls.    Filed 11/07/2007    Page 10 of 33

1   that person or persons, and Calpac had to address and resolve MCI's objections. (Id. Ex. 6 ¶

2   11.1.) Regarding Calpac employees, such as Plaintiffs, Calpac was obligated to remove or have

3   removed from the work site any employee, agent, servant, or subcontractor who, in DTS' opinion,

4   was not strictly disciplined and orderly. (Id. Ex. 6 ¶ 11.2.) If goodwill among landowners,

5   tenants, lessees, and other inhabitants in the community(es)surrounding the work was at risk,

6   Calpac was required to consult with  DTS and follow DTS' recommendation for restoring

7   goodwill. (Id. Ex. 6 ¶ 12.1.) As to additions and changes in the work, DTS executed the Change

8   Orders which made material changes to the work Calpac would perform for the MCI project. (Id.

9   Ex. 6 ¶ 13.3.) If Calpac had a claim for extra compensation, such claim had to be substantiated

10  with supporting data satisfactory to DTS. (Id. Ex. 6 ¶ 15.2.) DTS had the power to correct and

11  approve Calpac's invoices for the work it performed, and only after such correction and approval

12  by DTS and approval by MCI would MCI pay to Calpac ninety percent (90%) of the amount

13
    shown on each invoice. (Id. Ex. 6 ¶ 16.2.) At DTS' sole discretion, money could be withheld

14  from Calpac, such as the amount necessary to protect MCI from loss when, in DTS' sole

15  discretion, there was evidence to indicate that the work to be performed by Calpac could not be

16  completed. (Id. Ex. 6 ¶ 16.6.) If Calpac's work was suspended by MCI and MCI decided to pay

17  Calpac's standby costs, Calpac was required to remain at a location designated by DTS and to be

18  available to resume work immediately upon notice from DTS. (Id. Ex. 6 ¶ 19.2.) If, during

19
    suspension, MCI chose to allow Calpac to leave the work site and to pay Calpac additional

20  mobilization and demobilization costs, Calpac was obligated to be available to resume work

21  within ten (10) days' written notice from DTS that the suspension had ended and the work will

22  resume. (Id. Ex. 6 ¶ 19.2.) In the event Calpac failed to perform the work to MCI's satisfaction

23  by the agreed upon completion date, or failed to perform the work in conformity with the

24  agreement with MCI, or otherwise breached any provision of the agreement with MCI, MCI

Henry G. Van Meter, et al., v. Calpac, et al.                                                    11
Civil Case No. 05-00037
Opp'n to Def: DTS' Mot. Summ. J. Against All Pls.       Filed 11/07/2007     Page 11 of 33

could have required Calpac to correct the deficiencies to the satisfaction of DTS. (Id. Ex. 6 ¶ 20.1(b).) In the event of such failure or breach by Calpac, MCI could have required Calpac to make an equitable deduction, to be determined by DTS, from the contract price if the deficiencies complained of were not corrected to the satisfaction of DTS and in such case Calpac would not be entitled to any further payment until the deficiencies were corrected. (Id. Ex. 6 ¶ 20.1(c).) In the event of such failure or breach by Calpac, MCI could have terminated the work if the deficiencies complained of were not corrected to the satisfaction of DTS and in such case Calpac would not be entitled to any further payment until the deficiencies were corrected. (Id. Ex. 6 ¶ 20.1(d).) DTS also had the authority to direct Calpac to segregate and promptly remove from the work site and vicinity of the work site any work failing to conform to the terms and conditions of the agreement with MCI. (Id. Ex. 6 ¶ 20.3.) In the event Calpac had engaged a subcontractor on the MCI project, if DTS did not consider such subcontractor to be satisfactory, MCI could have objected to the use of that subcontractor and Calpac and MCI had to address and resolve MCI's objections. (Id. Ex. 6 ¶ 26.1.) If work done by any other party was contiguous to the work performed under the agreement with MCI, the respective rights of the various interests involved had to be established by DTS. (Id. Ex. 6 ¶ 27.3.) Calpac was required to enforce DTS' instructions regarding signs and advertisements. (Id. Ex. 6 ¶ 8.3.) DTS had the power to withhold signature approval of the Weekly Production Summary if Calpac failed to comply with certain cleanup procedures. (Id. Ex. 6 Statement of Work ¶ 7.1.) In the event work was performed in or around a private or public facility, DTS and Calpac were required to coordinate work operations to suit the building management's access and movement requirements. (Id. Ex. 6 Statement of Work ¶ 7.2.) DTS had the sole authority to order the cutting of any existing cable. (Id. Ex. 6 Statement of Work ¶ 11.1.) Prior to performing any work near an existing cable, Calpac was required to

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS Mot. Summ. J. Against All Pls.

12

Case 1:05-cv-00037   Document 448   Filed 11/07/2007   Page 12 of 33

consult with DTS to ensure that the work was undertaken in such a manner that existing cable was properly protected. (Id. Ex. 6 Statement of Work ¶ 11.1.)

DTS' role, authority, and responsibilities in the MCI project were also set forth in Work Orders executed between MCI and DTS. (Lujan Decl. Exs. 7-8.) DTS was responsible for coordinating the activities of Calpac within an assigned geographic area. (Id. Exs. 7-8.) DTS was responsible for researching, evaluating, and recommending routes; providing engineering services; supporting, coordinating, and assuring the quality of product produced by Calpac. (Id. Exs. 7-8.) DTS was required to coordinate the efforts of MCI and Calpac's forces in assisting to acquire permits, both public and environmental; review and approve for submission information to be used in ordering materials and preparing construction and splicing contracts. (Id. Exs. 7-8.) DTS was obligated to coordinate pre-bid job showings and pre-construction meetings; monitor and evaluate construction activities, including presenting required design changes to MCI for approval, review, and approve for submission to Calpac quantities provided to MCI for preparation of progress payment statements. (Id. Exs. 7-8.) DTS was required to supervise all phases of MCI-supplied material acceptance, storage, and distribution, including preparing reports of material deficiencies and surpluses; monitor and approve for submittal to MCI final audit of splicing and construction contracts. (Id. Exs. 7-8.) DTS was required to prepare, supervise, and approve for submittal to MCI all engineering and as-built documentation; perform other duties as assigned by MCI to include meeting of deadlines and maintaining effective cost controls. (Id. Exs. 7-8.) DTS also had a duty to ensure effective coordination with MCI's departments and personnel actively working on the project. (Id. Exs. 7-8.)

Deposition testimony provided by Don Harper ("Harper"), a superintendent employed by Calpac during Plaintiffs' employment, demonstrates the authority DTS, through Clark, had over Plaintiffs and the work environment. According to Harper, Clark (i.e., DTS) had to be pleased

Henry G. Van Meter, et al., v. Calpac, et al.                                                                    13
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against All Pls.

Case 1:05-cv-00037    Document 449    Filed 11/07/2007    Page 13 of 33

and satisfied. (Lujan Decl. Ex. 1 at 183.) Harper testified that Clark worked out of the Calpac office where he had set up his computer. (Id. Ex. 1 at 173.) Harper testified that Clark was present on the work site with Calpac employees "85 to 90 percent of the time," (id. Ex. 1 at 18-19), and that he knew of the Calpac employees by name since he was there every day with them, (id. Ex. 1 at 179). When asked who was the person responsible for supervising the work of the Calpac employees, Harper testified that "[t]he quality of the work was basically driven by Mr. Clark." (Id. Ex. 1 at 59.) Harper testified that Clark would measure the quantity of work completed and that Clark was "always wheeling out, measuring, doing logs, keeping maps where we were at and measuring depths. Things like that." (Id. Ex. 1 at 71.) Harper testified that Clark would make daily reports to MCI on the progress of the project. (Id. Ex. 1 at 148.) Harper would prepare the reports, sign them, and then send them to Clark. (Id. Ex. 1 at 148-49.) Clark would then revise the reports, remove Harper's name, put his name on the reports, and then send them to MCI. (Id. Ex. 1 at 148-49.) Harper testified that Clark would communicate with "everybody." (Id. Ex. 1 at 73.) Harper testified that Clark gave direct instructions to Calpac employees "a lot." (Id. Ex. 1 at 60.) Harper stated that if Clark did not like the quality of the work performed by Calpac employees, then he would instruct them to do the work over again. (Id. Ex. 1 at 59.) "He [Clark] would want fiber handled differently and if somebody was doing it the way he didn't like it, he would stop them and tell them to do it like this or if he wanted more coverage over his conduit, he would tell someone to shovel some more right here and walk them along, tell them to shovel some more over there." (Id. Ex. 1 at 60.) When asked to give examples of direct instructions Clark would give to Calpac employees, Harper testified that Clark "would want a certain way of stacking fiber, bend radiuses, placement of conduits, the amount of backfill to be placed, the amount of compaction, separation of rock from soil." (Id. Ex. 1 at 95.) If Clark thought a Calpac employee was shoving too many rocks in the trench, Clark would stop him and

Henry G. Van Meter, et al., v. Calpac, et al.                                          14
Civil Case No. 05-00037
Opp'n to Def. D's Mot. Summ. J. Against All Pls.

Case 1:05-cv-00037   Document 446   Filed 11/07/2007   Page 14 of 33

tell him not to put anything in the trench, Harper stated. (Id. Ex. 1 at 95.) Harper also testified that "[i]f he [Clark] didn't like the way the traffic control was set up or something like that, he would say something." (Id. Ex. 1 at 60.) Harper also testified that Clark instructed Calpac to perform work outside of the guidelines of the permit and that Calpac just followed the guidelines of Clark. (Id. Ex. 1 at 109-112.) Harper testified that Clark complained to Calpac about Calpac employees and usually mentioned the employee by name. (Id. Ex. 1 at 165.) Harper testified that Clark had screamed and yelled at Calpac employees, including Plaintiffs, on the job site regarding their covering up of conduits without putting dry mix concrete on the conduits in the area. (Id. Ex. 1 at 26.) Harper also testified that on one occasion Clark was cussing and screaming at Calpac employees regarding the work and telling them "they were ripping him off. It was almost like it was his [Clark's] project. He [Clark] referred to it as ripping 'me' off." (Id. Ex. 1 at 91-92.) Harper testified that if Clark made a complaint that he did not agree with, he still followed Clark's instruction. (Id. Ex. 1 at 166-67.) Harper further testified that he himself was removed by Calpac from the MCI project at the request of Clark (i.e., DTS) due to confrontations he had with him. (Id. Ex. 1 at 30, 170.) Also, in Calpac's position statement to the EEOC, Calpac stated that Harper was removed from the MCI project on Clark's orders. (Id. Ex. 2 at 28, 52-53.) Moreover, John Cruikshank testified in a deposition that Healy indicated to him in October 2004, after learning of Clark's discriminatory comments, that Healy (i.e., Calpac) was going to fire Harper. (Id. Ex. 3 at 64.)

For the reasons stated herein and in Plaintiffs' oppositions to Calpac's motions for summary judgment, and Plaintiffs' supporting documents, including each Plaintiff's and Plaintiffs' counsel's declarations, DTS was a joint employer of all 13 Plaintiffs for Title VII purposes. Therefore, with Clark, Hayes, and the 13 Plaintiffs, DTS employed at least 15

Henry G. Van Meter, et al., v. Calpac, et al.                                              15
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot./Summ.J. Against All Pls.

Case 1:05-cv-00037   Document 449   Filed 11/07/2007   Page 15 of 33

employees. Hence, a grant of summary judgment on DTS' motion is not warranted since there is a genuine issue of material fact on whether DTS had at least 15 employees.

## III. CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that DTS' summary judgment motion be denied.

**RESPECTFULLY SUBMITTED** this 7th day of November, 2007, in Hagåtña, Guam.

**LUJAN AGUIGUI & PEREZ LLP**

By: _____
**DELIA LUJAN**
*Attorneys for Plaintiffs*

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against All Pls.

16

Case 1:05-cv-00037    Document 448    Filed 11/07/2007    Page 16 of 33

# EXHIBIT "1"

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Seeking admission *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>                   Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>                   Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br><br><br>**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS TO PLAINTIFF HENRY G. VAN METER'S FIRST SET OF INTERROGATORIES** |

**TO:** **Plaintiff Henry G. Van Meter, by and through his attorney of record, Delia Lujan, Lujan Aguigui & Perez, LLP, Pacific News Building, Suite 300, 238 Archbishop Flores St., Hagåtña, Guam 96910.**

ORIGINAL

DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS
TO PLAINTIFF HENRY G. VAN METER'S FIRST SET OF INTERROGATORIES      Page 1 of 16
Case 1:05-cv-00037     Document 448     Filed 11/07/2007     Page 18 of 33

COMES NOW Dynamic Technical Services, Defendant in the above-entitled and numbered action, and makes the following answers and objections to the below-enumerated interrogatories contained in Plaintiff Henry G. Van Meter's First Set of Interrogatories:

## OBJECTIONS TO DEFINITIONS

**Definition of "You," or "Your" and "Defendant".** Plaintiffs ask that DTS construe these terms in such a way to include DTS and its attorneys, employees, and agents. DTS objects to Plaintiffs' inclusion of persons and entities other than DTS, acting through its officers and employees, in the definition of these terms because it distorts the ordinary meaning of these terms, is overbroad, and causes unnecessary confusion and complexity. DTS further objects to this definition because it encompasses information and documentation protected by attorney-client and work-product privileges. Accordingly, in responding to Plaintiffs' interrogatories, DTS will construe these terms to include DTS, acting through its officers and employees.

# ANSWERS AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1:**  With respect to the persons answering, or providing information used to answer, these Interrogatories, state his or her:

      (a)    Name;

      (b)    Address;

      (c)    Business address;

      (d)    Business or other telephone number;

      (e)    Job title;

      (f)    Occupation;

      (g)    Name of immediate superior;

      (h)    Employer:

      (i)    Length of employment with Defendant; and

      (j)    Length of time in current position.

**ANSWER:**    (a)    Linda G. Hayes

                 (b)    2303 Mallory Dr.
                            Corinth, Texas 76210

                 (c)    1125 E. Highway 121
                            Lewisville, Texas 75057

                 (d)    (469) 635-1301

                 (e)    President

                 (f)    Management

                 (g)    Mickey Redwine

                 (h)    Dynamic Technical Services, LP

                 (i)    6 years – 10 months

**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS
TO PLAINTIFF HENRY G. VAN METER'S FIRST SET OF INTERROGATORIES**    **Page 3 of 16**

Case 1:05-cv-00037    Document 448    Filed 11/07/2007    Page 20 of 33

(j)    9 months

**INTERROGATORY NO. 2:**  State the following information:

    (a)    Job classification of Plaintiff during the period from January 2000 to the present.

    (b)    Dates of employment of Plaintiff with Defendant from January 2000 to the present.

**ANSWER:**    (a)    Plaintiff never held a job with Dynamic Technical Services.  The classification of his jobs, if any, with other employers, is unknown.

    (b)    None.

**INTERROGATORY NO. 3:**  For each year the Plaintiff worked for the Defendant, state each and every position change and salary change, indicating as part of your answer the reason for each such change.

**ANSWER:**  Plaintiff never worked for Dynamic Technical Services.

**INTERROGATORY NO. 4:**  State whether the Defendant maintains evaluations or appraisals of Plaintiff's or Defendant Calpac's work performance from January 2000 to the present.  If yes, attach copies of all evaluations of Plaintiff's or Calpac's work performance.

**ANSWER:**  It does not.

**INTERROGATORY NO. 5:**  State the date, place, and reason for Plaintiff's reduced work hours, termination or other separation from Defendant or Defendant Calpac.

**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS
TO PLAINTIFF HENRY G. VAN METER'S FIRST SET OF INTERROGATORIES**    **Page 4 of 16**
Case 1:05-cv-00037    Document 448    Filed 11/07/2007    Page 21 of 33

**ANSWER:** Plaintiff was never employed by, and never worked for, Dynamic Technical Services. Dynamic Technical Services has no knowledge regarding Plaintiff's employment relationship, if any, with Calpac.

**INTERROGATORY NO. 6:** State whether Plaintiff's reduced work hours, termination or other separation was in accordance with Defendant's written rules and regulations. If yes, attach a copy of the subject rules and regulations, identifying the provisions relied upon in connection with the termination and when, if at all, the Plaintiff was advised of these rules and regulations.

**ANSWER:** This question improperly and incorrectly assumes that Plaintiff was an employee of Dynamic Technical Services. Plaintiff was never employed by, and never worked for, Dynamic Technical Services.

**INTERROGATORY NO. 7:** If no written rules and regulations exist, describe the Defendant's policy with respect to the type of conduct involved in Plaintiff's complaint. If Plaintiff's reduced work hours, termination or other separation was in accordance with such policy, state when and in what manner, if at all, Plaintiff was advised of this policy.

**ANSWER:** This question improperly and incorrectly assumes that Plaintiff was an employee of Dynamic Technical Services. Plaintiff was never employed by, and never worked for, Dynamic Technical Services.

**INTERROGATORY NO. 8:** If Plaintiff's termination resulted from any specific act(s), describe in detail the act(s) for which the Plaintiff had his work hours reduced, or was

terminated or otherwise separated. Include the names, addresses, and telephone numbers of all witnesses, if any, to each specific act.

**ANSWER:** Plaintiff was never employed by, and never worked for, Dynamic Technical Services. Dynamic Technical Services has no knowledge regarding Plaintiff's employment by, or termination of employment by, other parties.

**INTERROGATORY NO. 9:** State whether any oral or written warnings were issued to the Plaintiff concerning any matter relating to the reason(s) for the Plaintiff's reduced work hours, termination or other separation. If yes, state the date, person(s) present and circumstances pertaining to such warnings and attach hereto copies of any records reflecting these warnings.

**ANSWER:** Plaintiff was never employed by, and never worked for, Dynamic Technical Services. Dynamic Technical Services has no knowledge regarding Plaintiff's employment by, or termination of employment by, other parties.

**INTERROGATORY NO. 10:** State the following information for each person who participated in the decision to reduce Plaintiff's work hours, or terminate or otherwise separate Plaintiff from employment with Defendant and indicate the role that each played in that decision:

    (a)    Name.

    (b)    Address and telephone number.

    (c)    Present occupation.

    (d)    Occupation at the time of Plaintiff's reduced work hours, termination or other separation.

DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS
TO PLAINTIFF HENRY G. VAN METER'S FIRST SET OF INTERROGATORIES    **Page 6 of 16**
Case 1:05-cv-00037    Document 448    Filed 11/07/2007    Page 23 of 33

(e)     Present employer.

(f)     Employer at the time of Plaintiff's reduced work hours, termination or other separation.

(g)     Date of entry into job position held at the time of Plaintiff's reduced work hours, termination or other separation.

(h)     Race, sex, age, national origin, ancestry.

(i)     Role.

**ANSWER:**     This question improperly and incorrectly assumes that Plaintiff was an employee of Dynamic Technical Services. Plaintiff was never employed by, and never worked for, Dynamic Technical Services.

**INTERROGATORY NO. 11:**     State whether Plaintiff ever complained of receiving discriminatory treatment while working for Defendant or Defendant Calpac. If yes, specify the nature of the complaint(s), date(s) of the complaint(s), and explain what was done, if anything, in response to the complaint(s).

**ANSWER:**     Plaintiff was never employed by, and never worked for, Dynamic Technical Services. Dynamic Technical Services has no knowledge regarding Plaintiff's employment relationship, if any, with Calpac.

**INTERROGATORY NO. 12:**     Please identify and describe in detail all communications (written or oral) you, including any of your employees or agents such as Defendant Dennis P. Clark, have had the Plaintiff, during the period from January 2003 to the present.

**ANSWER:** Dynamic Technical Services has never had any communications with Plaintiff. Dynamic Technical Services has no knowledge of any communications between Plaintiff and Dennis Clark.

**INTERROGATORY NO. 13:** For each year the Plaintiff worked for the Defendant or Defendant Calpac, state each and every supervisor under whom she worked, indicating the name, address, telephone number, position, race, and national origin of each supervisor.

**ANSWER:** Plaintiff was never employed by, and never worked for, Dynamic Technical Services. Dynamic Technical Services has no knowledge regarding Plaintiff's employment relationship, if any, with Calpac.

**INTERROGATORY NO. 14:** State forth in full and complete detail the name, address, race, national origin, and job duties and responsibilities of all the persons who replaced the Plaintiff at his job position.

**ANSWER:** This question improperly and incorrectly assumes that Plaintiff was an employee of Dynamic Technical Services. Plaintiff was never employed by, and never worked for, Dynamic Technical Services.

**INTERROGATORY NO. 15:** Set forth in full and complete detail a description of the work duties and responsibilities of the Plaintiff prior to his termination or other separation from the Defendant.

**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS TO PLAINTIFF HENRY G. VAN METER'S FIRST SET OF INTERROGATORIES** **Page 8 of 16**

Case 1:05-cv-00037 Document 448 Filed 11/07/2007 Page 25 of 33

**ANSWER:** This question improperly and incorrectly assumes that Plaintiff was an employee of Dynamic Technical Services. Plaintiff was never employed by, and never worked for, Dynamic Technical Services.

**INTERROGATORY NO. 16:** State all the facts upon which you rely as an affirmative defense in your answer to the complaint that:

    (a)    there was a failure to mitigate damages;

    (b)    each "cause of action" alleged in the complaint fails to state facts sufficient to constitute a true cause of action;

    (c)    Plaintiff has suffered no cognizable injury or damage;

    (d)    workers' compensation laws provide the sole remedy for the injuries alleged;

    (e)    all actions taken by the Defendant with respect to Plaintiff were at all times relevant to this action in good faith without any intent to discriminate against Plaintiff in any manner prohibited by law or public policy;

    (f)    the complaint and each "cause of action" alleged therein are barred by the applicable statute of limitations;

    (g)    Defendant did not directly or indirectly perform or fail to perform any act or acts that constitute a violation of any rights, if any, of Plaintiff, or a violation of any duty or obligation, if any, owed to Plaintiff;

    (h)    Plaintiff is estopped by his own conduct from recovering any relief by the complaint or any cause of action or purported cause of action alleged therein;

_____
**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS
TO PLAINTIFF HENRY G. VAN METER'S FIRST SET OF INTERROGATORIES**     **Page 9 of 16**
Case 1:05-cv-00037    Document 448    Filed 11/07/2007    Page 26 of 33

(i)     Plaintiff is not entitled to recover exemplary or punitive damages because Defendant never acted willfully, oppressively, or fraudulently, or ratify such conduct;

(j)     Plaintiff's claims are barred by the doctrine of waiver;

(k)     Plaintiff's claims are barred by the doctrine of laches;

(l)     Plaintiff failed to mitigate damages, nor use due diligence to mitigate damages;

(m)     Plaintiff has unclean hands; and

(n)     Plaintiff failed to exhaust internal and administrative remedies and jurisdictional prerequisites.

**ANSWER:**     (a)     See Dynamic Technical Services' answer to Interrogatory No. 16(l).

(b)     See Dynamic Technical Services' motion to dismiss filed on April 21, 2006.

(c)     See Dynamic Technical Services' answer to Interrogatory No. 16(i).

(d)     Dynamic Technical Services will supplement after Plaintiffs' depositions are completed.

(e)     See Dynamic Technical Services' answer to Interrogatory No. 16(i).

(f)     See Dynamic Technical Services' motion for summary judgment filed on October 10, 2006.

(g)     See Dynamic Technical Services' answer to Interrogatory No. 16(i).

(h)     See Dynamic Technical Services' answer to Interrogatory Nos. 16(i) and (m)

(i)     Dynamic Technical Services never employed the Plaintiff. Dynamic Technical Services has never even had any communication or dealings of any kind with Plaintiff.

**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS**
**TO PLAINTIFF HENRY G. VAN METER'S FIRST SET OF INTERROGATORIES**     **Page 10 of 16**
Case 1:05-cv-00037    Document 448    Filed 11/07/2007    Page 27 of 33

Plaintiff contends that Dennis Clark directed racist remarks to him. However, Dynamic Technical Services denies that Clark made any such statements as alleged, and denies that Clark ever interacted with Plaintiff as a representative of Plaintiff's employer. In addition, Dynamic Technical Services denies that Clark ever took any actions for the purposes of harming Plaintiff, or that had any effect on Plaintiff's employment by other parties. Also, in connection with the Guam project, Clark served as a Project Manager for MCI, working under MCI's direction and control, and Dynamic Technical Services did not exercise any control over the manner in which Clark performed his work as a manager for MCI. Also, Plaintiff never made any complaints to Dynamic Technical Services about Clark, and, in failing to do so, deprived Dynamic Technical Services of an opportunity to investigate and address the complaints.

(j) Plaintiff never made any complaints to Dynamic Technical Services about Clark, and has waived them in failing to provide Dynamic Technical Services with notice and an opportunity to investigate and address the complaints.

(k) Plaintiff never made any complaints to Dynamic Technical Services about Clark, and, in failing to do so, deprived Dynamic Technical Services of an opportunity to investigate and address the complaints.

(l) Dynamic Technical Services will supplement after Plaintiffs' depositions and further discovery is completed regarding Plaintiff's employment history and efforts to obtain employment since the end of employment by Calpac.

(m) For purposes of harming Dynamic Technical Services and its employees and its business, Plaintiff has combined with other Plaintiffs to falsely accuse Dennis Clark of making racist statements and falsely claiming that Plaintiff was employed by Dynamic Technical Services.

(n)     See Dynamic Technical Services' motion for summary judgment filed on October 10, 2006.

**INTERROGATORY NO. 17:** State in detail the Defendant's evaluation of the Plaintiff's work performance during his period of employment with the Defendant or Defendant Calpac.

**ANSWER:**     Plaintiff was never employed by, and never worked for, Dynamic Technical Services. Dynamic Technical Services has no knowledge regarding Plaintiff's employment relationship, if any, with Calpac.

**INTERROGATORY NO. 18:** State whether the Defendant, or any of its agents or employees such as Dennis P. Clark, informed or promised to the Plaintiff that he would be promoted or receive a bonus.

**ANSWER:**     This question improperly and incorrectly assumes that Plaintiff was an employee of Dynamic Technical Services. Plaintiff was never employed by, and never worked for, Dynamic Technical Services.

**INTERROGATORY NO. 19:** Describe in detail the reasons why Defendant did not promote the Plaintiff or provide a bonus to Plaintiff.

**ANSWER:**     This question improperly and incorrectly assumes that Plaintiff was an employee of Dynamic Technical Services. Plaintiff was never employed by, and never worked for, Dynamic Technical Services.

**INTERROGATORY NO. 20:** Identify the name, address, telephone number, job position, race, and national origin of the person(s) who played a role in deciding to not promote or provide a bonus to the Plaintiff.

**ANSWER:** This question improperly and incorrectly assumes that Plaintiff was an employee of Dynamic Technical Services. Plaintiff was never employed by, and never worked for, Dynamic Technical Services.

**INTERROGATORY NO. 21:** State the date when the Defendant determined it would not promote the Plaintiff or provide a bonus to the Plaintiff.

**ANSWER:** This question improperly and incorrectly assumes that Plaintiff was an employee of Dynamic Technical Services. Plaintiff was never employed by, and never worked for, Dynamic Technical Services.

**INTERROGATORY NO. 22:** State the date of employment, job position, compensation, and any changes of job position or compensation, of Dennis P. Clark with Defendant.

**ANSWER:** Dennis P. Clark start date: January 5, 2004

End date: June 4, 2005

Job position: MCI Project Manager

Compensation: $180 per day wage, with $185 daily per diem and $25 daily cell/laptop allowance and $65 daily vehicle allowance.

**INTERROGATORY NO. 23:** State the full legal name (including middle name), business address, home address(es), telephone numbers (including business and home), employer, and job position of Dennis P. Clark.

**ANSWER:**     Dennis P. Clark
Last known address:
665 Mason Dr.
Harpers Ferry, WV 25425

Previous address:
1726 NE 11th St.
St. Cape Coral, FL 33909

Cell: (239) 443-9195

Last known home telephone no.: (239) 574-2353

Last/current employer and job title unknown

**INTERROGATORY NO. 24:** State the circumstances (including the date and persons involved) in which the Defendant first learned of the Plaintiff's charge of discrimination with the Equal Employment Opportunity Commission against the Defendant and describe in detail all actions taken by the Defendant in response to the Plaintiff's EEOC charge of discrimination.

**ANSWER:**     Dynamic Technical Services received via mail from the EEOC a "Notice of Charge of Discrimination" on or about January 7, 2005. Defendant replied to the EEOC in a letter stating the Plaintiff had never been employed by Dynamic Technical Services.

**INTERROGATORY NO. 25:** Describe in detail the circumstances in which Defendant terminated or participated in the termination of the Plaintiff's employment with Defendant or Defendant Calpac.

**ANSWER:**    This question improperly and incorrectly assumes that Plaintiff was an employee of Dynamic Technical Services.  Plaintiff was never employed by, and never worked for, Dynamic Technical Services.

Dated: March 20, 2007

_[signature]_

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

and

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Seeking admission *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555

*Attorneys for Defendant Dynamic Technical Service. Inc.*

36307.24\Rsp.ROGS-VanMeter