

1  **LUJAN AGUIGUI & PEREZ LLP**
   Attorneys at Law
2  Pacific News Building, Suite 300
   238 Archbishop Flores Street
3  Hagåtña, Guam 96910
   Telephone (671) 477-8064/5
4  Facsimile (671) 477-5297

5  *Attorneys for Plaintiffs*

**FILED**
DISTRICT COURT OF GUAM

NOV - 7 2007 mbo

**JEANNE G. QUINATA**
**Clerk of Court**

6        IN THE UNITED STATES DISTRICT COURT OF GUAM

7              FOR THE TERRITORY OF GUAM

8

9  HENRY G. VAN METER, JERRY           CIVIL CASE NO. 05-00037
   APODACA, JR., JOSEPH J.
10 HERNANDEZ, JOSEPH T. MENDIOLA,
   LARRY L. CHARFAUROS, ANTHONY
11 C. ARRIOLA, ROBERT B. CRUZ,          **DECLARATION OF DELIA LUJAN IN**
   ROLAND F. MENDIOLA, JAMES S.         **SUPPORT OF EACH OF PLAINTIFFS'**
12 YEE, TEDDY B. CRUZ, JESSE B. CRUZ,   **OPPOSITIONS TO DEFENDANT**
   JOHN L.G. NAUTA, and JOHN P.         **DYNAMIC TECHNICAL SERVICES'**
13 BABAUTA,                             **MOTION FOR SUMMARY JUDGMENT**
                                        **AGAINST ALL PLAINTIFFS**
14                       Plaintiffs,
              -vs-
15
   CALPAC, DYNAMIC TECHNICAL
16 SERVICES, MCI, JOHN HEALY,
   DENNIS CLARK, WILLIAM WARD, JAI
17 JAMES, and DOES 1 through 10,

18                       Defendants.

19

20       I, DELIA LUJAN, hereby declare and state as follows:

21       1.  I am an attorney representing all the plaintiffs in this matter.

22       2.  This declaration is submitted in support of Plaintiffs' Opposition to Defendant

23       Dynamic Technical Services' Motion for Summary Judgment, which is filed

24       contemporaneously herewith.

25
26       3.  Attached hereto as Exhibit 1 are true and correct copies of the cover page, various

27       excerpts, and the Reporter's Certificate of the deposition of Donald J. Harper taken on

28       February 16 and 20, 2007.

Henry G. Van Meter, et al., v. CAL PAC, et al.                                    1
Civil Case No. 05-00037
Decl. Delia Lujan re Pls' Opp'n to Def. DTS' Mot. Summ. J.

4. Attached hereto as Exhibit 2 are true and correct copies of the cover pages, various excerpts, and the Reporter's Certificate of the deposition of William Ward taken on May 16 and 23, 2007.

5. Attached hereto as Exhibit 3 are true and correct copies of the cover page, various excerpts, and the Reporter's Certificate of the deposition of John Douglas Cruikshank taken on May 21, 2007.

6. Attached hereto as Exhibit 4 is a true and correct copy of a time sheet of Dennis Clark which was received by me from defendant DTS's counsel in DTS' first supplemental response to Plaintiffs' first request for production of documents.

7. Attached hereto as Exhibit 5 is a true and correct copy of DTS' web site which was received by me from defendant DTS's counsel in DTS' first supplemental response to Plaintiffs' first request for production of documents.

8. Attached hereto as Exhibit 6 is a true and correct copy of the Construction Agreement between California Pacific Technical Services and WorldCom Purchasing LLC dated February 13, 2004, which was received by me from defendant Calpac's counsel in response to Plaintiffs' first request for production of documents.

9. Attached hereto as Exhibit 7 is a true and correct copy of a Work Order between Dynamic Technical Services and WorldCom Purchasing LLC which was received by me from defendant Calpac's counsel in response to Plaintiffs' first request for production of documents.

10. Attached hereto as Exhibit 8 is a true and correct copy of a Work Order between Dynamic Technical Services and WorldCom Purchasing LLC which was received by me from defendant Calpac's counsel in response to Plaintiffs' first request for production of documents.

Henry G. Van Meter, et al., v. CAL PAC, et al.
Civil Case No. 05-00037
Decl. Delia Lujan re Pls' Opp'n to Def. DTS' Mot. Summ. J.

2

Case 1:05-cv-00037   Document 449   Filed 11/07/2007   Page 2 of 29

1    I declare under penalty of perjury under the laws of the United States that the foregoing is

2    true and correct.

3    Executed this 7th day of November, 2007, in Hagåtña, Guam.

4

5

6                                    _____

7                                    **DELIA LUJAN**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Henry G. Van Meter, et al., v. CAL PAC, et al.
Civil Case No. 05-00037
Decl. Delia Lujan re Pls' Opp'n to Def. DTS' Mot. Summ. J.

Case 1:05-cv-00037    Document 449    Filed 11/07/2007    Page 3 of 29

3

# EXHIBIT "1"

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA)  CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.  )
CRUZ, ROLAND F. MENDIOLA, JAMES )
S. YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA,  )
 )
             Plaintiffs, )
 )
      vs.  )
 )
CALPAC, DYNAMIC TECHNICAL  )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10,  )
 )
          Defendants. )

**COPY**

## DEPOSITION OF DONALD J. HARPER

Taken on Behalf of California Pacific Technical Services

BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of **DONALD J. HARPER** was taken before Cecille A. Flores, a Certified Shorthand Reporter, on the 16th and 20th days of February 2007, in the offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96913
Tel: (671) 734-1041 * Fax: (671) 734-1045

Case 1:05-cv-00037   Document 449   Filed 11/07/2007   Page 5 of 29

1      A      Yeah, I think -- I think it was his replacement.  He

2   moved into his office.  His name was Bill but I cannot

3   remember his last name.

4      Q      Does Bill Ward sound familiar?

5      A      Yes, Bill Ward.

6      Q      Do you remember when that was?

7      A      No, I don't remember the exact date.

8      Q      In your prior construction experience, did you work

9   with any telecommunications installations, fiber optics,

10  communication lines?

11     A      Yes.

12     Q      What was that experience?

13     A      About the same.  Basically, the installation of the

14  trunk line, the conduit, replacement of the fiber.

15     Q      Where was that?

16     A      In California, Kansas a little bit, Alaska.

17     Q      What was your relationship with Dennis Clark?

18     A      Working relationship, basically.  Basically,

19  day-to-day conversations about the project.

20     Q      Were you in the field 100 percent of the time?

21     A      100 percent?  No.

22     Q      How much of your time do you think you spent in the

23  field with your crew?

24     A      90 percent.

25     Q      How much time did Dennis Clark spend with the crew?

1      A     I don't know how much Dennis Clark worked, but he

2   was there on site, I would say, 85 to 90 percent of the time.

3      Q     85 to 90 percent of the time?

4      A     Yeah.

5      Q     So certain hours a day or six or seven hours a day

6   he was right there with the crew?

7      A     Yeah, pretty much.  I mean, except for long lunches

8   and stuff, he was -- he was there.

9      Q     Did your relationship with Dennis Clark deteriorate

10  at any point in time?

11     A     My working relationship?

12     Q     Yes.

13     A     Yes.

14     Q     When was that, do you recall?

15     A     Probably the last six weeks of my employment with

16  CalPac.

17     Q     What was the cause of that?

18     A     It was his comments and things that he would make

19  and the working relationship that was between him and the

20  employees.

21     Q     Did you ever have disagreements about the quality of

22  the work that your crew was performing?

23     A     Yes.

24     Q     What were some of those disagreements?  Describe

25  them.

*Donald J. Harper: February 16, 2007*

1  was completed if there was no other work?

2      A    I don't know.

3      Q    You started to describe this fourth incident.  You

4  went back to Tiyan and there was another incident you said

5  that was a more worse one or a worse one.  Can you describe

6  your recollection of that one?

7      A    I pulled up to the site to see Dennis Clark yelling

8  and screaming at the guys on site.  It was -- I don't think

9  Henry Quintanilla was there.  I think it was Henry Van Meter

10 and a few other guys.  There was probably five or six men on

11 site at the time and it became heated about the same

12 comments.  He felt they were covering up conduits without

13 putting the dry mix concrete on the conduits in this area.

14 And basically, when I got there, it got heated between him

15 and I, and he got in his vehicle and left.

16     Q    What did you do?

17     A    I didn't do anything.  I went to the guys and asked

18 them, did you bury any conduit without putting in the dry mix

19 concrete?  And they said yes, they did, so I made them dig it

20 up and fix it.

21     Q    So Mr. Clark's complaint about the quality of the

22 work was valid at that time?

23     A    Well, yeah, except it was his way of handling the

24 complaint was wrong.

25     Q    Okay.  Did you report these complaints or these

*Donald J. Harper: February 16, 2007*

1  Marianas Trench and telling Mr. Richard Wyatt that you

2  slashed his tires?

3      A    Absolutely not.

4      Q    Did you ever threaten Mr. Clark?

5      A    No.

6      Q    Did you ever tell him an incident about people

7  getting their knees broken if they crossed you?

8      A    Absolutely not.

9      Q    After this last Tiyan incident, what happened after

10  you had your conversation with John Healy, this longer

11  conversation you say?

12     A    The next day he said he'd rather not be on the MCI

13  project anymore because the working relationship between

14  Dennis and I just wasn't there and he asked me to take over

15  the Tyco project.

16     Q    What was your reaction to that?

17     A    I resigned.

18     Q    Do you know if Mr. Clark had anything to do with

19  Mr. Healy's decision to remove you?

20     A    No, I don't.

21     Q    Do you remember when you resigned?

22     A    Not the exact date, no.

23     Q    Does October 26, 2004 sound about right?

24     A    I don't know.  It could have been.  After that --

25  not 2006.

1    missions from time to time, is that fair to say?

2    A    Yes.

3    Q    And you say that Mr. Clark was there 60 to 70

4    percent of the time?

5    A    No, I thought I said 80 to 90 but --

6    Q    I probably stand corrected.  80 to 90 percent of the

7    time?

8    A    Yeah.

9    Q    Do you recall telling Mr. Yao that he was there

10   maybe one hour a day?

11   A    No.

12   Q    You didn't tell them that?  You don't recall that?

13   A    I don't recall that.

14   Q    Now, who was the person responsible for supervising

15   the work of the employees?

16   A    The quality of the work was basically driven by

17   Mr. Clark.

18   Q    The quality, yeah.  I mean, he would look at the

19   quality and if he didn't like it, he'd say do it over again,

20   is that fair to say?

21   A    That's fair to say.

22   Q    But he wasn't standing there looking over your

23   shoulder at every moment.  Who was he telling what to do and

24   how to do it?

25   A    Henry Van Meter and Henry Quintanilla.

1    Q    And you would be supervising?

2    A    If I had things -- any concerns or anything, I would

3  usually go to Henry, either Henrys, and they relate it to

4  their crews.

5    Q    Are you aware of any occasions when Mr. Clark

6  directly gave instructions to the employees?

7    A    Yeah, a lot.

8    Q    What would be the nature of those instructions?

9    A    He would want fiber handled differently and if

10  somebody was doing it the way he didn't like, he would stop

11  them and tell them to do it like this or if he wanted more

12  coverage over his conduit, he would tell someone to shovel

13  some more right here and walk them along, tell them to shovel

14  some more over there.  If he didn't like the way the traffic

15  control was set up or something like that, he would say

16  something.

17    Q    But that would be part of his job as a quality

18  control person?

19    A    Yeah.  Yeah.

20    Q    Could Mr. Clark fire anybody at CalPac?

21    A    I don't know.

22    Q    Did you ever consult with him with regard to hiring

23  people for CalPac when you were interviewing and hiring

24  people?

25    A    No.

*Donald J. Harper: February 16, 2007*

1    explain the bending radius, not to exceed certain bending

2    radiuses to protect the fiber, the integrity of the product,

3    things along that line.

4        Q    Was he speaking to the entire group?

5        A    Yes.

6        Q    What about the end of the day?  Were there meetings

7    at the end of the day?

8        A    No, not really.

9        Q    No?

10       A    Not with the crew.

11       Q    During the day, I think you mentioned Dennis Clark

12   would be there about 80 percent, is that what you said?

13       A    It's a guess, yes.

14       Q    It's a guess?  What would he be doing during the

15   time that he was on the field?

16       A    He would measure the quantity of work completed.

17   Everything was built on a unit cost so he was always wheeling

18   out, measuring, doing logs, keeping maps where we were at and

19   measuring depths.  Things like that.

20       Q    Who would he have the most communication with?

21       A    His wife.

22       Q    Okay.  What do you mean by that?

23       A    She was always with him.

24       Q    She was always with him on the site?

25       A    50 percent of the time.

*Donald J. Harper: February 16, 2007*

1   at CalPac?

2       A    I don't know.  She never gave me an impression.

3       Q    So what was she mostly doing on the job?

4       A    Again, I thought it was like Dennis was training

5   her.  Wasn't like he tried to involve us, but I would see him

6   explaining to her the bending radiuses.  And when the guys

7   were doing figurate on fiber, he would leave her there to

8   watch to make sure the bend radius was okay while he would go

9   to the other end where it was being fed in off the spool and

10  I assumed that he was trying to train her.

11      Q    Who else would he have communication with on the

12  site?

13      A    Myself and everybody.

14      Q    Everybody?

15      A    Yeah.

16      Q    Okay.  Are you familiar with Dynamic Technical

17  Services?

18      A    I'm familiar with the name.

19      Q    What do you know about it?

20      A    Only that it was at the bottom of every report by

21  Dennis' name.

22      Q    Did you ever ask any questions about who they were

23  or where they were from?

24      A    No, I just pretty much assumed it was an outside

25  firm that MCI hired to do the quality control for the

1    areas that were considered DPW right of way, public property.

2    The airport property sections which were very vague were on

3    the maps we actually had to mark on the road.  They insisted

4    they be concrete encased with what they call a concrete sand

5    mix -- something dry mix.  So it was very -- it wasn't a

6    common practice that it went in the trench line, but if you

7    happened to be in that area where it happened to be airport

8    property, you had to put it in.

9         And I had marked in advance -- I would mark on the

10   roadway with marking paint that from this point up airport

11   property or DPW.  If it was DPW, it was just dirt backfill.

12   If it was airport between these two areas, you had to do the

13   cement sand mix.  One of the guys parked a truck on my paint

14   mark where the dirt backfill was supposed to end and the

15   cement sand mix was supposed to begin.  The crew had parked

16   the truck on it so they went about 50 feet into this airport

17   property just backfilling with dirt and Dennis came and

18   thought somebody was cheating him and it was basically just

19   that somebody had painted over -- I mean, parked over the

20   paint mark.  It was an oversight.

21       Q    So when the laborer or person called you, what did

22   they say?

23       A    That Dennis was making his remarks but he was

24   cussing and screaming at the guys.  It was mostly calling me

25   telling me he was yelling and screaming at the guys telling

*Donald J. Harper: February 16, 2007*

1    them they were ripping him off.  It was almost like it was

2    his project.  He referred to it as ripping "me" off.

3         Q    What did you do?

4         A    I was pretty upset.  I mean, this was the third time

5    into it and when I pulled up I could see him.  He was in

6    their face and he was really yelling and screaming at them

7    and I went full pace.  You know, to have -- have my words

8    with him.  And he spun and went and jumped in his vehicle and

9    left the job site.  Never really had anything that I could

10   talk -- he went right straight to the office.

11        Q    So you didn't have a conversation?

12        A    No.

13        Q    When you were there, was he still cussing and

14   screaming?

15        A    He was screaming.  I couldn't personally hear the

16   words.  When I was getting out, I could still hear him

17   yelling and there was obviously being words said between them

18   because he stopped -- he was heading towards his van and he

19   stopped and turned.  I could still tell he was giving remarks

20   back towards the guys he was arguing with.  You know, the

21   conversation obviously hadn't finished for him but he left.

22        Q    Did you ever talk to him after he left about what

23   happened?

24        A    It kind of ended there.  The conversations didn't

25   get into any more about what happened.  It was just between

1    Q    Would it happen on a daily basis?

2    A    No.

3    Q    No?  Could you give me some examples of the direct

4    instructions he would give?

5    A    Yeah.  Again, basically, he would want a certain way

6    of stacking fiber, bend radiuses, placement of conduits, the

7    amount of backfill to be placed, the amount of compaction,

8    separation of rock from soil.  You know, if he thought a guy

9    was shoveling too many rocks in the trench, he would stop him

10   and tell him not to put anything in the trench.  I think it

11   was over an inch and a half.

12   Q    Did Clark ever complain about specific employees to

13   you?

14   A    He -- yeah, he complained about specific employees

15   when they were doing specifically he didn't like, if that

16   makes any sense.  That's the best I can answer that.

17   Q    Do you recall any specific time that he spoke about

18   somebody?

19   A    I can't recall specific details, but I can remember

20   if he thought a guy was handling the fiber too rough or

21   something, he would say something or -- again, if he thought

22   the placement of things weren't what he wanted or what was

23   called for.

24   Q    What was Clark's demeanor on the job site?

25   A    Arrogant.

*Donald J. Harper: February 16, 2007*

1 of your frustrations regarding the contract?

2      A     If I remember correctly, he directed me to talk to

3 someone else that was -- he said he'd check into it and then

4 basically told me to call someone else in an office in Texas,

5 I believe, if I'm not mistaken.

6      Q     Do you recall contacting that other person in Texas?

7      A     I actually don't recall having any luck getting

8 ahold of anybody else.

9      Q     When you said that Dennis Clark was instructing

10 CalPac to do things outside of the -- that would be outside

11 of the permits?  Permit?

12      A     What I thought were the permitted guidelines, yes.

13      Q     Permitted guidelines established by Guam law?

14      A     By DPW for sure.  I don't know.

15      Q     Okay, DPW permits, okay.  In what ways was Dennis

16 Clark instructing CalPac to do things outside the permitted

17 guidelines?

18      A     There was a depth dig zone in the beginning of the

19 project that we were not supposed to go below two feet

20 because of the archaeological remains of tribes and stuff, I

21 guess.  I'm not sure what their exact terminology for the

22 restriction was, and when we come to a utility that would hit

23 within the same 24 inch depth window, he always wanted a

24 minimum of 12 to 18 inches difference in clearance -- I'm

25 guessing on the measurement now, but he would make us go

1    under it which would always take us outside that window and I

2    didn't feel comfortable doing it because I felt the company's

3    bonding was at risk.

4         Q    In what other ways did he instruct CalPac to go

5    outside the permitted guidelines?

6         A    That was basically my biggest frustration right

7    there.

8         Q    Did you voice your frustrations to Mr. Healy?

9         A    No.  Not -- because Mr. Healy wasn't really part of

10   the entire contract situation in the beginning from when we

11   first started the contract.  He wasn't present, he was still

12   -- not in the office at that time.

13        Q    Did you voice your frustrations to anyone else from

14   CalPac?

15        A    I did and I was just basically given free reign.

16   You know, do whatever you want, whatever you can to follow up

17   on it.  I think Tim Camacho was in charge at that time and

18   Bob Thompson.  Bob Thompson was still semi-active Navy, I

19   think, on and off so he wasn't there all the time so --

20        Q    During those times when Mr. Clark would direct

21   CalPac to go outside what you felt were the permitted

22   guidelines, what did CalPac instruct you to do in response to

23   those directions from Mr. Clark?

24        A    CalPac didn't instruct me to do anything.  It was

25   basically -- I'm just following the guidelines of Dennis, but

1  again, there was about a three or four week period there that

2  I was kind of left in charge of the field for the decision in

3  -- and once we were out of Agana, it was over with so we just

4  did it and got the job finished.  I just let the company know

5  what I felt about it and I felt it was their job -- that time

6  because no one else was there besides Tim and Bob part-time

7  so I let them know my concern and I let them know I tried to

8  do something and I felt I did my job as the superintendent to

9  let them know that I think there was a risk and I just

10 carried on with the job.

11      Q    So basically, when you would voice your frustrations

12 and tell Mr. Camacho and Mr. Thompson that there was a risk,

13 their response was just to give you free reign over the

14 situation?

15      A    Well, I told them I thought I should get ahold of

16 MCI and let them know that Guam had some guidelines that

17 restricted us from meeting MCI's requirements, but by the

18 time we got any response from anybody or could even try to

19 get someone to talk to because I felt like I was getting

20 brushed off, we were out of Agana and we were outside that

21 restriction.

22      Q    What have you heard about a maintenance contract

23 with MCI?

24      A    I know that there's a maintenance contract, I guess,

25 that comes up every couple years where you -- they'll pay a

*Donald J. Harper: February 20, 2007*

1    the states?

2         A      No, not the construction industry.

3         Q      Does that make you a racist?

4         A      No.

5         Q      Okay.  Do you think the education levels here are

6    the same as they are in the states?

7         A      No.

8         Q      Does that make you think you're a racist?

9         A      No.

10        Q      Do you think that the workers here have the same

11   work ethic as they do in other places in the United States?

12        A      I don't think that's -- I don't think they have

13   better or worse work ethics.

14        Q      Okay.

15        A      People here work very hard.

16        Q      Some do, I'm sure.  You had mentioned earlier that

17   Mr. Clark would make daily reports to MCI on the progress of

18   the project.  Did you have any hand in preparing those

19   reports?

20        A      Yes, I was instructed to do them for him.

21        Q      You would prepare the reports and send them to him?

22   Did he revise them after you sent them to him or what

23   happened?

24        A      Yes, he would.

25        Q      Did you sign them?



1    A    I would put my name on them and then he would take

2  my name off and then put his on, I believe, to send to MCI.

3    Q    Have you ever saw one of the final reports sent to

4  MCI?

5    A    Yes.

6    Q    You said you signed them and then he took your name

7  off?

8    A    Yes.

9    Q    Do you recall if any of these incidents on the job

10 sites were ever reflected in these reports?



11   A    Yes.

12   Q    Did you put them on the report?

13   A    Yes.

14   Q    So you would say, there was an incident on the job

15 site today, altercation between me and Mister -- how exactly

16 would you describe one of these incidents?

17   A    The -- the excavation down in Agana, there was at

18 least ten days of complaints.

19   Q    And you would put these on the daily reports?

20   A    Yes.

21   Q    Did you keep copies of those daily reports?

22   A    No.

23   Q    What about the later incidents after the Phase 1

24 incident?

25   A    No.  I -- I -- there wasn't -- I didn't feel the

1     Q    Okay. Did Dennis Clark ever complain to you about

2 any CalPac employees?

3     A    On occasion, yes.

4     Q    Do you recall what he said?

5     A    He felt -- yeah, he'd complain about the way they

6 were handling fiber or they weren't getting enough coverage

7 on his conduit or putting his tape -- his MCI marking tape at

8 the right level. There were times he thought the guys could

9 just work faster.

10     Q    Did he mention anybody in particular?

11     A    When he was making the complaint, usually he did,

12 yes, but I don't remember specifics that -- at the moment,

13 but yeah, he'd tell you then on the spot.

14     Q    He would name a specific person?

15     A    Yeah.

16     Q    Do you recall today any of those specific employees?

17     A    No, I can just recall -- we'd be on the site --

18 because he knew all the guys by name and so and so isn't

19 putting near enough backfill on the conduit or so and so is

20 not separating the rocks on the backfill or they're not

21 handling the fiber correctly.

22     Q    What did you do with what Mr. Clark said?

23     A    I'd take care of the situation. I'd go talk to

24 them.

25     Q    Did you agree with what Mr. Clark was saying?

1    A    No, not always.

2    Q    Can you give an example?

3    A    Yeah, we were supposed to have -- the marking tape

4 was supposed to be 12 inches from the top of the finish grade

5 and that's based on an engineer's drawing that shows

6 everything in a straight flat line.  You'd have to understand

7 what we do for a living and Dennis had the habit of walking

8 along, taking his tape measure and measuring about every 20

9 feet and if it was 14 inches, he'd say, throw a little dirt

10 here and raise the tape up.  And I just thought it was petty

11 but we'd do it.

12    Q    When he made a complaint like that, would he

13 reference a specific employee?

14    A    Yeah, because usually guys are in the area so it

15 would -- he got to the point where we actually painted a line

16 on the shovel so the employee could check the depth as he

17 went and if the guy in his section -- they'd usually work a

18 20 foot section so they weren't elbow to elbow so it was

19 pretty easy to see who was working the area.  Because he

20 wasn't bashful about measuring while they were shovelling.

21 And if he didn't feel they had enough -- if I wasn't right

22 there, I'd look down and see him telling them to put more in

23 and he'd measure it again.

24    Q    During an instance in which you didn't agree with

25 what he was saying, did you ever not do what he complained

1    about?

2        A    No.

3        Q    On a typical work day, who established which person

4    worked where or on which job?

5        A    It was kind of considered all the same job that we

6    worked on for the MCI project, but I'd usually give Henry the

7    call on where he wanted his guys.  Either Henry.  Whoever

8    happened to be in charge of that.

9        Q    Did anybody tell you what to tell either Henry?

10       A    No, it was my job to organize the crews.

11       Q    So you set the conditions of which people would do

12   which job on any given day?

13       A    No, I would kind of give my foremen the reign to --

14   who they felt best in their team unless something made me

15   completely disagree and they wanted to put a laborer on a

16   backhoe or something.  But other than that, I'd give them the

17   free reign.

18       Q    Okay.  So if I understand you, if there was a job to

19   be done, you would tell one of the foremen or supervisors

20   there's this job to be done and they decided who to put which

21   employee on that job?  Or they decided which employee to put

22   on that job?

23       A    Basically, it all revolved around just one job.  It

24   was just the MCI job.  We didn't really go outside that

25   window and we were basically just trenching across Guam so it

*Donald J. Harper: February 20, 2007*

1    Q    Which working relationship?

2    A    Mine with Dennis Clark, for the most part.

3    Q    When you left CalPac, were you being transferred

4    over to the Tycom project?

5    A    When -- yeah, sort of.  John Healy came to me and

6    said he was gonna have me take over and do the Tycom.

7    Q    Was Dennis Clark involved in the Tycom project?

8    A    No.

9    Q    So why didn't you take him up on the offer to go

10   work somewhere where Dennis Clark was not?

11   A    I just wasn't happy with the way it came about.  The

12   lack of support.  I just didn't feel that -- if I didn't get

13   support at that time, I would never get it so it was better

14   just to move on.

15   Q    What do you mean by the lack of support?

16   A    I didn't feel John Healy was supportive to me in the

17   situation and I just felt it was better to move on.

18   Q    How did you feel that John Healy was unsupportive?

19   A    I didn't feel that -- I didn't personally feel there

20   was any steps being taken to correct or improve the working

21   conditions with Dennis Clark.

22            MS. McDONALD:  I have nothing further.

23                          (Recess taken at 4:02 p.m.)

24                          (Back on the record at 4:09 p.m.)

25            RE-CROSS EXAMINATION



1    talking to former CalPac employees?

2        A    Yes.

3        Q    What else was she yelling that you can recall?

4        A    That's about all I heard.

5        Q    Was anyone else from CalPac yelling from across the

6    street?

7        A    No.

8        Q    Was anyone else from CalPac showing the middle

9    finger or any finger gestures?

10       A    No.

11       Q    Who was Mrs. Healy with at the time she was making

12   these finger gestures and yelling these statements?

13       A    Nobody.  She came out by herself.

14       Q    Where did Dennis Clark work out of?  What office or

15   what building?

16       A    The CalPac office and his car while he was on the

17   job site, I guess, but he'd set up his computer in the CalPac

18   office.

19       Q    How much time would you spend on a daily basis

20   working at the warehouse?

21       A    I was probably in my office probably an hour before

22   anybody arrived and probably an hour after everybody had left

23   -- or not everybody but after the field crew and everybody

24   had come in and left.

25       Q    Now, you just stated a little while ago that you

1  prospective employees?

2      A    Yes.  Bob, myself, and Tim.

3      Q    Okay.  She asked if you hired any locals.  When she

4  says "locals," what do you think she meant when she said

5  "locals"?

6      A    People that live in Guam.

7      Q    Okay.  Locals, would that include Chamorros?

8      A    Yeah.

9      Q    People who consider themselves Chamorros?

10     A    Yeah.

11     Q    How about Filipinos?  Did you hire any Filipinos?

12     A    I think so.  I'm not sure.

13     Q    Did you hire any blacks?

14     A    Yes.

15     Q    Any Asians?

16     A    Yes.

17     Q    Any Micronesians?

18     A    I'm not sure.  I don't think so.  I'm not sure.

19     Q    Did you consider their color at all when you were

20  hiring them?

21     A    No.

22     Q    You said you did evaluations on these employees and

23  we went through and I think I had asked you that same

24  question on Friday.  These evaluations, how did that process

25  work?

1   It was the only issue I really had.

2       Q    But Dennis Clark was the customer, right?

3       A    That's right.

4       Q    And he's the person that had to be pleased?

5       A    That's right.

6       Q    And satisfied?

7       A    That's why -- that's what he said.

8       Q    You mentioned that he would go along with his

9   measuring tape and he went to the state where you actually

10  put paint on a shovel so they could measure it.  He was just

11  really enforcing the specifications, isn't that what he was

12  doing?

13      A    No, I painted the shovels.

14      Q    But you did that to help them comply with the

15  specification that Dennis Clark insisted be followed, is that

16  right?

17      A    Yes.

18      Q    Do you know whether the conditions improved after

19  you left or not?

20      A    No, I don't.

21      Q    You have no idea whether after you left things got

22  better or not?

23      A    I don't know.

24      Q    You don't know?

25      A    I don't know.

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **DONALD J. HARPER** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 188, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd day of March 2007.

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA