# EXHIBIT "2"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE TERRITORY OF GUAM

HENRY G. VAN METER, JERRY ) CIVIL CASE NO. CIV05-00037
APODACA, JR., JOSEPH J. )
HERNANDEZ, JOSEPH T. MENDIOLA, )
LARRY L. CHARFAUROS, ANTHONY )
C. ARRIOLA, JAMES S. YEE, TEDDY)
C. CRUZ, JESSE B. CRUZ, JOHN )
L.G. NAUTA and JOHN P. BABAUTA,)
                   )
        Plaintiffs, )
                  )
      vs. )
                  )
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, )
DENNIS CLARK, WILLIAM WARD, )
JAI JAMES and DOES 1 through )
10, )
        Defendants )
_____)

## DEPOSITION TRANSCRIPT

### OF

# WILLIAM J. WARD

**May 16, 2007**

**COPY**

PREPARED BY:     **GEORGE B. CASTRO**
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates
Piti, Guam 96915
Tel:(671)688-DEPO • Fax:(671)472-3094

1  this with Healy?

2     A   Yes.

3     Q   Okay.    So,  tell  me  about  that

4  conversation with Healy.

5     A   I asked him why he paid it.

6     Q   Okay.  So, what did he say?

7     A   He said it was his decision.

8     Q   Were you aware it was a bonus?

9     A   No.

10    Q   You're seeing it now?

11    A   I see it now, yeah.

12    Q   Okay?

13    A   Yeah, I see it now, yeah.

14    Q   Now,  were  you  ever  promised  a  bonus

15  yourself?

16    A   No.  Not promised.

17    Q   Were you paid a bonus?

18    A   I was paid a bonus -- I was paid a

19  bonus, yes.

20    Q   Uh-huh.  For the MCI job?

21    A   Not necessarily, no.

22    Q   Okay.  And when were you paid a bonus

23  by CalPac?

24    A   February.    At  February  or  March  of

25  2005.

1    Q   Okay.  And what was the amount for?

2    A   Right around $5,000.00, I think.

3    Q   Okay.  All right.  So, approximately

4 when did you have the conversation with Don --

5 I'm sorry, with Healy, regarding this payment

6 to Harper?

7    A   Whenever it was I first realized that

8 he had paid it.

9    Q   Now, you are not a signatory to the

10 account; am I correct?

11    A   I was a signatory to the account.  It

12 was in, you know, it was a -- what would you

13 call to it -- you know, either person.

14    Q   All right.

15    A   But it didn't require two signatures.

16 Either I could sign or John.

17    Q   But there were several people that

18 could -- well, at least two persons that could

19 sign for the company?

20    A   Right.  Myself and John.

21    Q   And either signature, not dual

22 signature.

23    A   That's correct.

24    Q   Okay.  Besides yourself and Don Harper,

25 who else received a bonus?

1       (Plaintiff's Exhibit 11 was marked for

2  identification)

3    A   You know I did.

4    Q   I'm sorry?

5    A   You know I did.  I wrote it.

6    Q   Well, I have to ask that question.

7    A   Okay.

8    Q   It's how we lay -- it's what is called

9  laying the foundation.  Okay.

10    A   Yes, I wrote it.

11    Q   All right.  Okay.  And, sir, what is

12  Exhibit 11?

13    A   It's notifying -- this particular one

14  is notifying Jerry Apodaca that he is being

15  laid off.

16    Q   Apodaca.

17    A   Apodaca, that he is being laid off.

18    Q   All right.  And the date there is

19  November 26, 2004.

20    A   That's correct.

21    Q   Okay.  And it's a layoff notice to

22  Jerry Apodaca as to a reduction in work force;

23  isn't that correct?

24    A   That's correct.

25    Q   And it states, "As you are aware,

1   CalPac increased the number of its employees
2   significantly over the past few months.  This
3   build up was primarily for work to complete the
4   MCI International Ring Project.  The majority
5   of the project is now complete and we have
6   evaluated the personnel requirements needed to
7   get us to the end of the project."
8        A   Right.
9        Q   "Everyone who was contributed to this
10  project should be proud of their effort.
11  Regretfully, I must inform you that you are
12  being laid-off effective close of business on
13  November 27, 2004.  Thank you and if our
14  business requires additional labor in the
15  future, you will be considered for re-
16  employment.  Best regards, William Ward,
17  General Manager."
18       Now, sir, isn't it true, that the
19  CalPac -- the MCI project was far from being
20  completed as of November 22nd, 2004?
21       A   I wouldn't say far.
22       Q   Well, sir.
23       A   It could be anticipated when the
24  project would be coming to a close and what the
25  income would be.

1    Q   Now, sir, isn't it true that, I've

2  shown you already that we've determined that

3  the original completion date was December 31st,

4  2004?

5    A   That's right.

6    Q   And isn't it true that the completion

7  of this project didn't occur until April or May

8  of 2005?

9    A   In 2005, yes.

10    Q   Yeah.  April or May.

11    A   Okay.

12    Q   Mr. Healy has testified to that.

13    A   I don't remember exactly when.

14    Q   So, it was about four months or five

15  months delayed; isn't that correct?

16    A   Right.

17    Q   Okay.  And so, it's not true then that

18  on November 26, 2004 that the project was --

19  that the majority of the project is not

20  complete; isn't that correct?

21    A   It was true.

22    Q   It is true?

23    A   Yes, it is true.

24    Q   Okay.  For a project that was delayed

25  five months?

1    A   Well, still the -- it was the amount of

2    work that you could do concurrently on the

3    project. They were down to the last phase of

4    the project. And only so many employees were

5    needed to do that work.

6    Q   Okay. Now, did CalPac hire any

7    additional employees after laying off Jerry

8    Apodaca?

9    A   I believe so. Yes.

10    Q   Okay. Let me show you what we'll mark

11    as the next one, would be -- (pauses). Just a

12    second, sir.

13        COURT REPORTER: Exhibit 12?

14        MR. LUJAN: (pauses; peruses documents)

15    Exhibit, I guess, 12, will be the next one?

16        COURT REPORTER: Yes.

17        (Plaintiff's Exhibit 12 was marked for

18    identification)

19    Q   And Exhibit 12 is the -- it's the same

20    letter form, Reduction in Work Force. This

21    time it's dated December 7, 2004 to Joseph P.

22    Mendiola; isn't that correct?

23    A   That's right.

24    Q   Then the -- we'll mark as Exhibit 13,

25    next one we'll mark as Exhibit 13, another

# REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 118 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 10th day of July, 2007.

**COPY**

_____

George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

IN THE UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, JAMES S. YEE, TEDDY C. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA and JOHN P. BABAUTA, | ) CIVIL CASE NO. CIV05-00037 ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) |
| CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10, | ) ) ) ) ) ) ) ) |
| Defendants | ) ) |

DEPOSITION TRANSCRIPT

OF

# WILLIAM J. WARD

May 23, 2007

**COPY**

PREPARED BY:    **GEORGE B. CASTRO**
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates
Piti, Guam 96915
Tel:(671)688-**DEPO** • Fax:(671)472-3094

1      Q   18.   Okay.   Now,   what   I'd   like   you   to

2 do,   sir,   is   go   pass   18   to   the   next   page.   And

3 what   we'll   do   is   --   let's   mark   that   as   Exhibit

4 Number   19.   And   Exhibit   Number   19,   sir,   is   a

5 January   14,   2005   letter   from   Mr.   Blair   to   a

6 Timothy   Riera   of   the   EEOC,   Honolulu   office.

7 Okay?

8      (Plaintiff's   Exhibit   19   was   marked   for

9 identification)

10      A   Okay.

11      Q   And,   first   of   all,   have   you   seen   a   copy

12 of   this   before,   sir?

13      A   Yes.

14      Q   Apparently   you   were   copied.

15      A   Yes,   I   was.

16      Q   All   right.   And   so   in   this   letter   Mr.

17 Blair   was   attaching   CalPac's   position   statement

18 which   is   found   on   the   second   page   here;   isn't

19 that   correct?

20      A   Yes.

21      Q   And   what   was   your   understanding,   sir,

22 as   to   the   completion   date   for   the   MCI   contract?

23      A   (pauses)

24      Q   What   was   your   understanding   as   to   the

25 completion   date   for   the   MCI   contract?

1  2005 was way off the mark?  Since --

2      A   I don't remember exactly when it

3  finished.

4      Q   Well, would --

5      A   So, I don't know if that was off the

6  mark of not.

7      Q   Okay.  If I were to tell you that Mr.

8  Healy testified that it was completed the end

9  of April or early May, would you have any

10  reason to -- let's say disagree with that

11  statement?

12      A   Not to disagree with it, no.

13      Q   Okay.  Well, does that sound fair from

14  -- you were there until December 2005?

15      A   Right.   I'm saying I don't remember

16  whether it was mid-February, the end of April

17  or -- I don't remember.

18      Q   Okay.   So, if it was not completed

19  until end of April, early May, then it would

20  have meant that by the time the layoffs began

21  in November -- latter November 2004, CalPac

22  knew that there was still another five to six

23  months of work that remained to be done before

24  the project would be completed; isn't that a

25  fair statement?

1      A    Yes.

2      Q    Okay.   So, in essence really -- in

3  essence the -- laying the people off in late

4  November was not due to -- that the project was

5  just about to the finished, because it was not

6  just about to be finished; isn't that correct,

7  sir?

8      A    Not in November, no.

9      Q    Yeah.   Okay.   Now look at -- turn to

10  page 2 of the Respondent's Position paper.   And

11  the first paragraph of page 2 talks about that,

12  "On December 20, 2004, that a group of persons,

13  including some of the laid off CalPac workers,

14  showed up outside the offices of MCI in

15  Hagatna, Guam, to protest alleged actions of

16  employees of MCI and CalPac and to urge a

17  boycott of MCI and CalPac.   Television and

18  print media were present.   The protestors later

19  moved to a location near the CalPac offices.

20  The protestors have since demonstrated outside

21  the offices of TeleGuam Holdings, which

22  recently purchased the assets of the Guam

23  Telephone Authority.   TeleGuam is a potential

24  customer of CalPac."

25            Now, sir, did you see the boycotts

1 (sic) that occurred on December 20, 2004? Did

2 you witness that?

3     A   The ones outside of CalPac.

4     Q   Okay. There were two -- (pauses). I

5 just got corrected by -- protest not boycott.

6 I stand -- thank you. You're right, you know

7 (laughs). Okay. The protest, okay. So, but

8 there were two protests that day; am I correct?

9     A   Yes.

10     Q   The first protest was in front of the

11 MCI Office in Agana; right?

12     A   That's what I was told.

13     Q   And CalPac's office was the -- the

14 second protest occurred much later on in the

15 day.

16     A   That's correct.

17     Q   And it was by the CalPac office up in

18 Tiyan; isn't that correct?

19     A   In Harmon.

20     Q   Oh, I'm sorry, Harmon. You're right.

21 So, let me ask you this. When did you first

22 become aware, if you did become aware, on

23 December 20, that there was a protest occurring

24 outside of the MCI Office?

25     A   I said the last time you ask me that

1  question --

2      Q    Uh-huh.  Okay.

3      A    -- I told you it was when we received

4  the call from the -- I believe it may have been

5  the administrative assistant at the MCI

6  offices.

7      Q    Okay.  And the call was simply that

8  there's a protest going on?

9      A    Yeah, I believe so.  I believe that --

10 actually I believe, in fact, I know the call

11 was myself and directly to Mr. Healy.

12     Q    Okay.

13     A    They didn't call the office.

14     Q    Now, what other information did you

15 receive regarding this protest from this person

16 from MCI?

17     A    I believe they actually e-mailed us

18 some pictures.

19     Q    Okay.  Of the protestors?

20     A    Yes.

21     Q    And the signs that were being held?

22     A    Well, as I recall from the shot of the

23 pictures, someone went out onto the balcony of

24 the MCI offices and just took some pictures.

25     Q    Okay.  And do you recall what some of

1 those signs stated?

2      A    No.

3      Q    Okay.      Did    it    say    "MCI    supports

4 racism?"

5      A    It may have.   I don't recall.

6      Q    Okay.   Did they accuse Dennis Clark of

7 being a racist?

8      A    That one I think it did say.

9      Q    Okay.   Now, let me ask you this, sir,

10 when you first, I mean -- you saw this by way

11 of e-mail, right?

12      A    Yes.

13      Q    When    you    saw    that,    what    was    your

14 thought?

15      A    Confusion.

16      Q    Okay.   In what way?

17      A    I didn't understand what it was about.

18 In other words, nothing that would've led me to

19 believe    that    there    was    any    incidents    that

20 would've led up to something like that.

21      Q    Okay.    Now,    were    you    aware    who    the

22 protestors were that morning?

23      A    No.

24      Q    Did    you    have    any    information    from

25 anyone    as    to    the    identity    of    any    of    the

1  protestors later?

2     A    Later, some of the -- they were able to

3  -- they're identified through the pictures.

4     Q    Okay.   And this is the one that was e-

5  mailed?

6     A    Yeah.   Because I think some of them

7  were like wives and girlfriends even.

8     Q    Okay.

9     A    They weren't all -- so, I didn't know

10  most of the people in the pictures.

11     Q    You didn't know most of them?   But did

12  you know any of them?

13     A    I probably recognized a couple of them,

14  yeah, once I've seen the picture of them, yeah.

15     Q    Did you have any discussion with John

16  Healy as to -- about this racist allegation?

17     A    Of course we discussed it.   I'm sure we

18  did.

19     Q    Okay.   So, what was your discussion?

20     A    I don't remember exactly.   We tried to

21  figure out what it was all about.   What

22  could've generated it?

23     Q    Okay.   So, you know, you're having this

24  discussion.   Did you discuss about how you

25  could get down to the bottom of this, if there

1  was any truth to it?

2      A   We didn't understand what -- we just

3  seen a bunch -- there's people out there with

4  posters.

5      Q   Sure.

6      A   So, we had no idea what you would even

7  investigate, what you would even check into.

8      Q   So, in other words, am I correct in

9  understanding that, at that point after

10 discussing with Mr. Healy was that you didn't

11 know how go about investigating if there was

12 any truth to this allegation?

13     A   Not that, we were just -- we were

14 blindsided by it.

15     Q   Okay.  So, were you curious enough to

16 ask some of these former employees "what the

17 hell do you mean by racist?"

18     A   Ask who?

19     Q   Some of those employees that were

20 protesting.

21     A   The ones that were across the street or

22 downtown?

23     Q   Yes, sir.

24     A   I never spoke to any of them.

25     Q   Okay.  So, you weren't curious enough

1  to want to speak to them?

2  A  I was probably curious enough but I

3  knew better than to go speak to them.  I wasn't

4  going to --

5  Q  Okay.

6  A  -- approach anything, anybody.

7  Q  All right.  Did you ask any of the guys

8  that were working for CalPac to, you know, "can

9  you go and talk to those guys and find out what

10  the hell?"

11  A  Oh, heavens, no.  We don't just -- no,

12  no.

13  Q  Why not?

14  A  Because we didn't want to cause any

15  problems.  Because, you know --

16  Q  What about Dennis Clark?  Did you ask

17  Dennis Clark, "Dennis, why you've been accused

18  of being a racist?"

19  A  No, I didn't ask Dennis Clark that.

20  Q  So, it was just a momentary --

21  A  It was just there.

22  Q  -- concern, yup, and so --

23  A  It was just out of the blue.  Somebody

24  standing outside your office with a sign

25  calling somebody a racist or, you know, telling

1   somebody to boycott your company. It's like --
2   you know, "Uh, what is this all about?"

3   Q   Now, so, when was the first contact you
4   had with Dennis Clark that day, sir? December
5   20?

6   A   I believe it would've been towards the
7   end of the day when he had called and said that
8   he wanted to come up and, you know, address the
9   guy at the warehouse.

10   Q   Okay. So, did he speak to you or Mr.
11   Healy?

12   A   I don't recall.

13   Q   Okay. And what time did he come to
14   CalPac's Offices, to address the guys.

15   A   I believe it probably would have been
16   towards the close of the day. So, I would have
17   to guess between 3 and 3:30.

18   Q   Okay. Was that normally the time that
19   the guys -- that work ends for CalPac?

20   A   Normally they ended anywhere between 3
21   and 4, yes. Depending on what work was going
22   on.

23   Q   Okay. And then they would all come
24   back to the office?

25   A   That's correct.

1    Q    Uh-huh.

2    A    But that was -- that was it.

3    Q    Okay.  So, who -- well, Buehler is MCI;

4  isn't that correct?

5    A    As far as I know, yes.

6    Q    Okay.  Did you raise -- did you think

7  it would have been important for CalPac to talk

8  to someone from DTS besides Dennis Clark

9  regarding the allegations of racism being

10  levied against Mr. Clark?

11    A    I'm sure they knew about it.

12    Q    Well, I'm asking you, did you think it

13  was important?

14    A    Of course it would be important that

15  they would know about it.

16    Q    Well, did you personally take any

17  steps?

18    A    No.  To notify MCI?

19    Q    Yes, sir.

20    A    No, I did not take personally take any

21  steps.

22    Q    Okay.  All right.  I think I was asking

23  about DTS.  Did you personally take any steps

24  to inform someone at DTS other than Dennis

25  Clark about the allegations being raised

1 against Mr. Clark?

2     A   I knew nothing of DTS except that

3 Dennis Clark worked for them. I never had any

4 correspondence with DTS.

5     Q   Uh-huh.

6     A   At that time, I'd never spoken to

7 anyone from DTS, at that time.

8     Q   All right. And you didn't feel it was

9 important to find out who --

10     A   I didn't even know who DTS was.

11     Q   Well, you --

12     A   I just knew Dennis worked for them.

13     Q   Yeah. You knew he worked for them.

14     A   That's it.

15     Q   Okay.

16     A   I didn't need to know.

17     Q   You didn't need to know.

18     A   No, I didn't need to know.

19     Q   You didn't care to know?

20     A   I didn't care to know.

21     Q   Okay. You said DTS, you're sure DTS

22 knew about it. Right?

23     A   I'm sure Dennis called them or e-mailed

24 them, perhaps.

25     Q   Well, my question is how do you know

1   that says when.

2       Q   No.  My --

3       A   I don't remember.  It was after all

4   this.

5       Q   Was it after the completion of the

6   contract?

7       A   Oh, I don't remember.  I really don't

8   remember exactly when.

9       Q   Okay.  Now, to your knowledge, or

10  recollection rather, when did Dennis Clark

11  leave Guam?

12      A   Right at the completion of the project.

13  If you say it was April, then it was probably

14  sometime at the end of the April.

15      Q   Okay.  Why did you talk to Morales?

16      A   Why?

17      Q   Yes.

18      A   Because we hired a -- CalPac had hired

19  a private investigator.

20      Q   That would be Mr. Greg Hall?

21      A   That's correct.

22      Q   Okay.  That was in September of 2005?

23      A   It could have been.

24      Q   Oh, July probably 2005?

25      A   I don't remember.  That's why I say, I

1    talking to Morales?

2        A    Repeat that once more.

3        Q    Yes.    Did you have any follow-up

4    conversation with anyone at DTS besides Morales

5    --

6        A    No.

7        Q    -- after the initial conversation?

8        A    Never.    I said before, the only person

9    I ever spoke to at DTS was Morales.

10       Q    Okay.    To your knowledge, besides

11   yourself, did anyone speak to Morales on behalf

12   of CalPac?

13       A    I do not know.

14       Q    Do you know if John Healy ever spoke to

15   Morales?

16       A    I do not know.

17       Q    Do you know if Greg Hall spoke to

18   Morales?

19       A    No, I do not know.

20       Q    The next sentence on page 2 states,

21   "CalPac believes the protestors have been

22   organized by Don Harper, a former CalPac

23   supervisory employee who quit CalPac on October

24   26, 2004, after he was removed from the MCI

25   project by John Healy.    Mr. Harper was removed

1  from the MCI project at the request of Dennis

2  Clark due to confrontations that had occurred

3  between Mr. Harper and Mr. Clark on the

4  worksites of the MCI project.   After he was

5  taken off the MCI project, Mr. Harper demanded

6  to be paid $25,000 by CalPac.   He vowed to make

7  trouble for CalPac if it did not accede to his

8  extortionate demand.   Mr. Harper is also known

9  to have made threats to cause trouble for

10 Dennis Clark.   Mr. Harper reportedly solicited

11 at least one current employee of CalPac to join

12 the protestors during the weekend of December

13 25-26, 2004 (Henry Quintanilla)."

14         Now, sir, what information do you have

15 that the protestors or the protest was

16 organized by Don Harper?

17       A    Factual?

18       Q    Yes, sir.

19       A    None.

20       Q    None?   So, in other words, if there's a

21 belief, it's simply based on speculation; isn't

22 that correct?

23       A    The knowledge that I had.

24       Q    Okay.   Well, I'm asking you what's your

25 knowledge.

1  period --

2      Q   Two week period --

3      A   -- no, it wouldn't have delayed it at

4  all.

5      Q   Okay.   Did CalPac ever asked Dennis

6  Clark to stop going to the worksite after the

7  protest?

8      A   Repeat your question.

9      Q   Yes.   Did CalPac, or anyone on behalf

10 of CalPac, ever asked Dennis Clark not to go to

11 the worksite after the protest?   Let's say --

12     A   The answer to that is, I don't know.

13     Q   So, you never did ask?

14     A   No, I never asked Dennis Clark not to

15 go to the jobsite.

16     Q   Did anyone on behalf of CalPac ask

17 Dennis Clark to limit or decrease his visits to

18 the jobsite?

19     A   I do not know.

20     Q   Okay.   Why don't we take a break now?

21     (Off the record from 3:45 p.m. to 4:01

22 p.m.)

23     MR. LUJAN:   We're back on the record,

24 Robert.

25     MR. EWERT: Okay.

1  being raised against Mr. Clark?

2      A    I do not know.

3      Q    What about, did any -- to your

4  knowledge, did any of the lawyers representing

5  CalPac discuss with anyone on behalf of DTS,

6  regarding the allegations against Dennis Clark?

7      A    I do not know.

8      Q    To your knowledge, did MCI, or anyone

9  on behalf of MCI, ask Dennis Clark to stop

10  going to the worksite after December 20?

11      A    Not that I am aware of, no.

12      Q    What about if I ask the same question,

13  but instead of stop, but to decrease his visits

14  to the worksite?

15      A    Not that I am aware of.

16      Q    Did anyone ask Mr. Clark to limit his

17  interactions with the workers, CalPac workers?

18      A    I never did.

19      Q    To your knowledge, did anyone on behalf

20  of CalPac do that?

21      A    I do not know.

22      Q    Are you aware of anyone, regardless of

23  what company, instructing or informing Dennis

24  Clark to limit his interaction with CalPac

25  workers?

1      A    I'm not aware of anybody, no.

2      Q    Okay.    Were you ever present at any

3 meeting with your lawyers in which Mr. Clark

4 was present?

5      A    No.

6      Q    In all the meetings -- well, did you

7 have meetings with Mr. Blair?

8      A    Yes.

9      Q    How many meetings do you think you had

10 regarding this issue?

11      A    With me personally, maybe two, three at

12 the very, very most.

13      Q    Okay.    Besides yourself and Mr. Blair,

14 who else was present?

15      A    It would have been John.

16      Q    Okay.   Anyone else?

17      A    No.    Wait, wait, yes, there was one

18 meeting.   There was one meeting, yes.

19      Q    Okay, who?

20      A    There was a meeting that was held with

21 Mr. Blair and myself, Russell Hatfield, Max

22 Long, and Bruce Williams.   John Healy was not

23 present at that meeting.

24      Q    Okay.    Were you ever present when

25 Captain Paul Suba was present --

1  A    Exhibit 23 now.  Okay.

2  Q    Yeah, paragraph 5.

3  A    Okay.

4  Q    Removal of Don Harper.

5  A    Okay.

6  Q    Okay?  And it talks about the removal

7 and it says, (a), talking about who made the

8 decision.

9  A    Right.

10  Q    Then (b) talks about Clark.  Right?

11  A    Right.

12  Q    And then it talks about the attack --

13 let's say Harper -- look at the last sentence

14 of paragraph 5 there.  "The next time Harper

15 verbally attacked Clark, Clark told John Healy,

16 CalPac's Operating Manager, that Harper must be

17 removed from the MCI project."  Right?

18  A    That's what it says.

19  Q    Yeah.  And then on Paragraph 5(b), it

20 talks about certain threats that Harper

21 supposedly made to Clark; right?

22  A    That's right.

23  Q    Now on Paragraph (sic( 21, Item 5, "We

24 need John to write down all that he remembers -

25 -

## REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 147 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 10th day of July, 2007.

**COPY**

_____
George B. Castro

DEPO RESOURCES
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

# EXHIBIT "3"

# UNITED STATES DISTRICT COURT
## DISTRICT OF GUAM

| | |
|---|---|
| HENRY VAN METER, JERRY APODACA,JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>          Plaintiffs,<br><br>      vs.<br><br>CALPAC, DYNAMIC TECHICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>          Defendants. | ) CIVIL CASE NO. 05-00037<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

TRANSCRIPT DEPOSITION

OF

## JOHN DOUGLAS CRUIKSHANK

May 21, 2007

COPY

PREPARED BY:    GEORGE B. CASTRO
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates
Piti, Guam 96915
Tel:(671)688-**DEPO** * Fax:(671)472-3094

1    A   Yes, he did.

2    Q   All right.  Okay.  But it was your

3 understanding that that was something to occur

4 in the future?

5    A   Correct.

6    Q   And --

7    A   Well, he informed me before he made the

8 purchase that he was trying to purchase them.

9    Q   Right.  But I guess my question is, you

10 know, if I understand you correctly, is that

11 you did not know he had an ownership interest

12 until sometime in December of 2004; am I

13 correct?

14    A   I did not know that he had a prior

15 ownership interest --

16    Q   Yes, sir.

17    A   -- until December 2004, that is correct

18    Q   Right.  Okay.  And before he left on

19 October 14, 2004, he did tell you that the

20 reason why he was leaving UMDA was because he

21 was going to purchase an interest in CalPac?

22    A   That's correct.

23    Q   Okay.  Now, sir, what I want to do is,

24 I want to ask you about the discussions you had

25 with Mr. Healy in October of 2004.  Okay?  And

1   in which I believe there was a conversation or
2   meeting you were having with him that was
3   interrupted and cut short because Mr. Healy had
4   to address some incident that had occurred with
5   his workers.
6       A   Correct.
7       Q   Okay.   Now, tell me, sir -- and my
8   understanding is that in this meeting, that
9   John Healy mentioned to you that the incident
10  involved Dennis Clark calling the workers
11  monkeys and island monkeys.
12      A   I honestly don't recall right now.   I
13  would say that he told me there was an incident
14  involving Dennis Clark when he left my office.
15      Q   Okay.
16      A   I think he told me what the incident
17  was shortly thereafter.
18      Q   All right.   So --
19      A   And as to the exact date, October or,
20  you know, it sounds about right --
21      Q   Okay.
22      A   -- but, you know, I couldn't tell you
23  exactly anything more than that.
24      Q   All right.   So, let's begin with the
25  date of the incident.   Was it before or after

1 he had quit UMDA?

2     A   I would say right around the same time,

3 because it was a period where he had given a

4 formal date on his resignation. And my

5 understanding was the ownership was going to --

6 what do you call it, transfer sometime around

7 that date and I -- (pauses). You know, it

8 seems to me that was about mid-October.

9     Q   Okay.

10     A   But there was a period where he was

11 probably, because he didn't know the exact

12 date, we'd accepted his resignation based on a

13 certain date with the agreement that were off

14 post a few days before, that was fine.

15     Q   Uh-huh.

16     A   We'd already told him that we wanted,

17 you know, for example, somebody else involved

18 with the signing off of things to do with

19 CalPac after he told us he was acquiring.

20     Q   All right. So, in other words, he gave

21 advanced notice.

22     A   Yes.

23     Q   And whatever it was and that you know

24 ultimately his, you know, the date he left

25 would be around October 14 or shortly right

1  before --

2      A   Right around there I would say, yeah.

3      Q   Okay.   And so the meeting that we're

4  talking about occurred during that time frame?

5      A   Yeah, right around there.

6      Q   Okay.   And according to what you just

7  said, he told you that there was an incident,

8  and that this involved Dennis Clark.

9      A   Yes.

10      Q   Okay.   Now, where was this meeting at,

11  sir?

12      A   The meeting he's having with me?

13      Q   Yes.

14      A   It was in my office.

15      Q   In your office?

16      A   Yeah.

17      Q   And so --

18      A   I believe he got a call on his cell

19  phone.

20      Q   Okay.   So, tell me.   You know, I mean,

21  did he -- was it a planned meeting?   Did he

22  come there you know, I mean, --

23      A   No.

24      Q   Did you call him or what?

25      A   No.   He was just in to talk.   I mean

1  you know, I deal with the contractors that way.

2      Q    Right.

3      A    You know, they get work, it's ongoing

4  there in the office.  So, it would have been

5  something that was set up before him to have a

6  meeting.

7      Q    Okay.  All right.  So, in other words,

8  it wasn't unusual for a contractor to walk in

9  and talk to you?

10     A    No.  Still isn't, yeah.

11     Q    And at that point, John Healy really

12  was not an employee, he was a contractor now?

13     A    He was either in his last, like I said,

14  like, last a little bit with us, but it was

15  after he had obtained ownership.  That was my

16  understanding.

17     Q    Okay.  All right.  So, he received a

18  phone call on his cellphone?

19     A    Right.

20     Q    And do you know who called him?

21     A    I do not.

22     Q    And tell me as much as you can, you

23  know, of what you remember as to what he said

24  after that phone -- after receiving that phone

25  call.

1    A   Oh, he said he had to go, he had some

2 type of -- some type of employee incident that

3 he had to care of. And, I don't think he told

4 me that day what the incident was.

5    Q   But he told you though that that day

6 that it involved Dennis Clark?

7    A   Yes, I believe he did.

8    Q   Okay.

9    A   Dennis Clark was the MCI person.

10    Q   All right. Okay. So, then according

11 to your statement a few minutes ago, it was at

12 a subsequent meeting that he told you about

13 that he mentioned about monkey or island

14 monkeys?

15    A   Yeah, I asked him -- we were talking,

16 and I can't remember if that was at my place or

17 his place or we're out for lunch.

18    Q   Uh-huh.

19    A   But I asked him, you know, how things

20 were going and he said, Oh, he said, "I have

21 this incident surrounding Dennis Clark and the

22 underground crew." He said, something along

23 lines that Dennis was out on the site, didn't

24 like what he saw and had referred to the crew

25 as island monkeys. And I said, "Wow, that's,

1   you know, that's kind of strange." He said,
2   "No, no, he didn't mean it to be prejudice."
3   He said, that's like in United States, if
4   they're talking about people that work in
5   construction or in the -- what they call that,
6   the warehouse yards, they call them -- he said,
7   "yard apes". It doesn't mean to be anything --
8       Q   Derogatory?
9       A   Yeah.    Well, not derogatory, but
10  prejudice.
11      Q   Okay. All right. So, anything further
12  that was discussed regarding that incident
13  during this meeting?
14      A   No, I told I was rather surprised
15  somebody would say that. And, like I said, he
16  assured me that -- because I met Dennis and he
17  said that he doesn't mean anything by it, so.
18  And I think the only other thing that was
19  talked about was that -- and, again, it may
20  have been at that meeting or it may have been
21  at one before that, that, or one after that
22  rather, that really wasn't of too bigger
23  concern with him because he'd been planning to
24  change out a lot of the workers and bring in
25  statesiders because they had a better work

1  ethic.

2  Q  Okay.  So, in other words, he had been

3  planning to remove the local workers and bring

4  in statesiders because of work ethics?

5  A  Yeah.  We had a discussion over that.

6  Q  Uh-huh.

7  A  Because I told them I said our workers

8  at MCV are pretty much all local.  When I say

9  local, most are actually raised on the island –

10  –

11  Q  Yeah.

12  A  –– and they're a mixture of Chamorro,

13  and some Filipino and also some, you know, like

14  Ponapei, whatever.

15  Q  Or statesiders?

16  A  At time I don't know that we had a

17  statesider, actually.

18  Q  Okay.  All right.

19  A  Because it's kind of a company policy

20  that we hire locally when we can.  And that had

21  been the case in the period John had been with

22  us.

23  Q  Uh-huh.

24  A  So, you know, I told him, I said I was

25  surprised by that comment, because I thought

1   our people were as productive as any place I've

2   ever worked.

3       Q   Uh-huh.

4       A   And he said that the people we employed

5   were somewhat different than the construction

6   people he had at CalPac.

7       Q   Okay.

8       A   So --

9       Q   All right.  So, how soon do you think

10  that this meeting occurred after the first

11  meeting where he said, where he received this,

12  you know, phone call on his cellphone regarding

13  Dennis Clark?

14      A   Well, it couldn't have been very long

15  because we weren't actually having those kinds

16  of conversations after, you know, after I found

17  out that he was possibly the owner of -- prior

18  to -- (pauses).

19      Q   Yeah.

20      A   Anyway.  Once I found that out, I

21  didn't really socialize very much with him.

22      Q   Okay.  So, would it have been still in

23  October?

24      A   Yeah, it could have been.

25      Q   Okay.  Now, did you ever have any

1  conversation with Dennis Clark regarding this
2  comment?
3      A    I really do not recall having any
4  conversation with Dennis Clark about this.
5      Q    Okay.  All right.  Now, it is also my
6  understanding, sir, that you had a meeting with
7  Mr. Healy in December of 2004 and in which Mr.
8  Healy told you that the discrimination charges
9  has been filed with the EEOC with a product of
10 a bunch of ex-convicts trying to rip them off?
11     A    Yeah.
12     Q    Okay.  Tell me about that meeting, sir.
13     A    Well, yeah, it was just -- we were
14 meeting on something else, and he just wasn't -
15 - (pauses).  You know, I knew -- thought I knew
16 John pretty well.  I mean, we went to lunch a
17 lot.  We're -- you know -- anyway.  So, he
18 seemed disturbed or bothered and I said,
19 "What's up?"  And then he told me it was being
20 sued and it was basically a bunch of ex-
21 convicts trying to get rich on him.
22     Q    Okay.  Now --
23     A    And I asked him -- I think I asked
24 whether or not, you know, whether he'd seen a
25 lawyer at this point or not.  And I'm not sure

1   whether he told me that he had.  I know he told

2   me that he wasn't very worried about it.

3       Q    Uh-huh.

4       A    Because of, if it was necessary, he was

5   going to transfer his land into his brother's

6   name and there'd be nothing for anybody to sue

7   for anyway.  So, he wasn't very concerned.

8       Q    Okay.    All    right.    Now,   did   this

9   meeting occur -- well, can you tell me where

10  this meeting took place?

11      A    Not on top of my head.  It could have

12  been at his place.   We usually met three

13  places.   My office, his place, or we'd have

14  lunch.

15      Q    Okay.   When you say "his place", you

16  mean CalPac's office?

17      A    Yes, sorry.  CalPac's office.

18      Q    Okay.  Now, it is also my understanding

19  that Mr. Healy at this meeting asked you to, if

20  you could use your resources to investigate

21  CalPac workers for any illegal activities such

22  as, you know, stealing cable or hooking up

23  cable illegally?

24      A    Yes.  He did.

25      Q    So, tell me about that conversation.

1    A    Well, that was pretty much the source
2  of it.    He said he thought that a number of
3  them were probably stealing cable and he would
4  give me a list and could we cross-check that.
5    Q    Uh-huh.
6    A    He did fax over a list, I believe, or
7  else it was hand-delivered.    And it was right
8  during that, roughly that time when I
9  discovered that there was this other ownership
10  question there, and I thought I would just not
11  do anything with the list.
12    Q    Okay.
13    A    And so I didn't.    Well, I guess I
14  probably put it in a file somewhere.
15    Q    All right.    So, do you think you still
16  have that list, sir?
17    A    Well, probably.
18    Q    Okay.
19    A    You know, I don't know, I -- it's three
20  years ago, and maybe, you know, the secretary -
21  - (pauses).    Probably it's still there.
22    Q    Okay, good.    Now, sir, what is your
23  opinion of Mr. Healy, you know, for, I guess,
24  veracity since, you know -- (pauses). Did your
25  opinion of Mr. Healy change once you found out

call, that cellphone call, you didn't remember
if, or you recall that specifics were not
mentioned, is that right?

A    Correct.    He said he had a situation
with -- you know, and I can't remember if he
told me with who and Dennis along the job site
at that point.    I know he did later, but at
that time, you know, I just can't recall.

Q    You also indicated when Mr. Lujan was
asking you questions that you recall an
interview that took place in January 2005 with
a representative of the EEOC; correct?

A    Do I recall it?    I recall somebody
calling me, I don't remember who, and talking
to me.

Q    Do you remember how your discussions
with that representative from the EEOC, did you
remember how many times you said you met with
Mr. Healy concerning this incident?

A    No.

Q    Okay.    And you also said that was
subsequent to your first meeting on October
2004, that you learned that statements were
made, or supposedly made, by Dennis Clark.    Did
you learn that from Mr. Healy?

A    Correct.

Q    Was that around December of 2004 that
that subsequent meeting took place?

A    No.  I would say before that.  I met
with John many times.  I saw John probably at
least once a week all the way along.  I think
in December he talked about being sued.  But
the comments I would say were probably closer
to, let's say -- you know, some period between
mid-October, mid-November, I would say.

Q    Did he say that people had made
complaints or employees had made complaints
with the EEOC concerning the statements made by
Mr. Clark?

A    He may have told me that in December.

Q    Okay.

A    He may have.

Q    Well, I'm talking the time that you
found out that monkeys or island monkeys made
by Mr. Clark.

A    No, I don't think he told me at that
point.  He told me that the very first time,
I'm not sure he told me the complaint went to
the -- whatever you just said, the EEOC?

Q    Yeah.

1      A   I don't know if they all signed off on

2  those revisions or not to be honest.

3      Q   Okay.

4      MR. LEON GUERRERO:  Thank you.  I don't

5  have any further questions.

6      MR. LUJAN:  Are you done?

7      MR. LEON GUERERRO:  Yeah.

8      MR. LUJAN:   Okay.   Mr. Ewert, do you

9  have any questions?

10      MR. EWERT:   No.   I'm just listening

11  here.  No questions.

12      MR. LUJAN:    You have no questions.

13  Well, I have some questions myself.  Okay.

14

15

16            **RE-DIRECT EXAMINATION**

17  BY MR. LUJAN:

18      Q  Mr. Cruikshank, let me show you what

19  we'll mark as Exhibit 1 for your deposition.

20  And it is my understanding that this is a copy

21  of the interview, a typewritten report,

22  prepared by the EEOC worker, what's his name,

23  James Yao, in regards to the interview he

24  conducted on January 21st, 2005 of you.  And

25  please take a few moments to review it and

1  then, you know, I'll ask you some questions

2  regarding it.  Okay?

3          (Plaintiff's Exhibit 1 was marked for

4  identification)

5     A   Uh-huh.     (pauses; peruses document)

6  Okay.

7     Q   All right.   The first paragraph, you

8  know, regarding the first sentence, states, "I

9  recall that in October 2004, I had a meeting

10  with John Healy, CalPac owner, which was

11  interrupted and cut short because Healy had to

12  address some incident that had occurred with

13  his workers."  Is that a fair statement?

14     A   Yeah.

15     Q   Okay.    Next sentence, "John Healy

16  mentioned to me that the incident involved

17  Dennis Clark calling the workers 'monkeys' and

18  'island monkeys.'"  Was that a fair statement?

19     A   You know, like I said today, I gave

20  this in January 21st, 2005, that's two years and

21  a bit ago.

22     Q   Uh-huh.

23     A   If you're asking me now, which I assume

24  you are, is this a more correct statement than

25  me saying I'm not sure when he said it to me?

1    Q    Yes, sir.

2    A    Well, I would say that my memory was

3  probably fresher in January 21st, 2005 than this

4  today.    I can't recall, as I said today, I

5  can't recall whether it was at that meeting or

6  a subsequent meeting.    But I know it was around

7  the same time.

8    Q    All right.    Okay.    But, the other thing

9  that you do know is that your memory would have

10  been, I guess, fresher back then, you know, as

11  to a conversation you had maybe three month

12  earlier --

13    A    Correct.

14    Q    -- as opposed to now?

15    A    Yeah.

16    Q    Okay.    Then the last sentence, "When

17  John Healy left our meeting he said, 'I've got

18  to go, I've got to fire someone.'"    Was that a

19  fair statement?

20    A    That was fair.

21    Q    Okay.    Second paragraph, he states, "In

22  a subsequent meeting with Healy in December of

23  2004, I understood Healy's firing comment to

24  mean Don Harper."

25    A    Yeah, that's true.

1    Q    Okay.  So, "Furthermore, Healy stated

2  that  the  discrimination  charges  (being  filed

3  with EEOC) were the product of 'a bunch of ex-

4  convicts trying to rip him off.'"

5    A    Yeah, that's a fair statement.

6    Q    "Healy asked me to utilize my resources

7  to  investigate  the  CalPac  workers  for  any

8  illegal activities, for example stealing cable

9  or hooking up cable illegally."

10    A    Yes.

11    Q    Is that a fair statement?

12    A    Yeah.

13    Q    "Healy presented me with a roster of

14  names with addresses that included the names of

15  workers who had filed discrimination charges as

16  well as the names of other CalPac underground

17  workers."

18    A    Yes, that's what I was told.

19    Q    Okay.  So, in other words, he presented

20  you with a roster of names at this meeting?

21    A    Yeah.  Well, at which meeting?  Sorry.

22  Yeah, in December roughly.

23    Q    Yes.  Okay.  So, it was at the meeting

24  that he presented you --

25    A    Hang on.  Let me just think about what

# REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 78 pages to be a true and correct transcript of the audio recording made by a Notary Public Officer of Depo Resources in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 31st day of July, 2007.

_____
George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

# EXHIBIT "4"

# MCI CONTRACTOR TIME SHEET

| LAST NAME: | Clark | | | | | |
|---|---|---|---|---|---|---|
| FIRST NAME: | Dennis | | | | | |
| COMPANY: | Dynamic Technical Services | | | | | |
| P.O. # | | | | | | |
| SUPERVISOR: | Jeff Buehler | | | | | |
| WEEK ENDING : | 10/30/04 | | | | | |

| REG SITE       DAY | DATE | HOURS | PROJ # | SITE CODE | REFUNDABLE YES/NO | MCI SUPERVISOR |
|---|---|---|---|---|---|---|
| Sunday | 10/24/2004 | 0 | 41998 | | No | Jeff Buehler |
| Monday | 10/25/2004 | 0 | 41998 | | No | Jeff Buehler |
| Tuesday | 10/26/2004 | 10 | 41998 | | No | Jeff Buehler |
| Wednesday | 10/27/2004 | 10 | 41998 | | No | Jeff Buehler |
| Thursday | 10/28/2004 | 10 | 41998 | | No | Jeff Buehler |
| Friday | 10/29/2004 | 10 | 41998 | | No | Jeff Buehler |
| Saturday | 10/30/2004 | 10 | 41998 | | No | Jeff Buehler |
| | | | | | | |
| REGULAR HOURS | | 50 | | | | |

| DYNAMIC | | |
|---|---|---|
| Week Ending Date: | 10/30/04 | Sheet 1 OF 1 |
| NAME: | Dennis Clark | |
| LOCATION: | Guam | |
| Project Name: | Guam International Ring | |
| Project Number: | 41998 | |
| Dynamic Technical P.O. | 7100025400 | |

| DATE | EXPLANATION OF EXPENDITURES | AMOUNT |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | $0.00 |
| | | $0.00 |
| I CERTIFY THAT THE ABOVE EXPENSES HAVE BEEN INCURRED IN BEHALF OF THE COMPANY | TOTAL EXPENSES | $0.00 |
| EMP. SIGNATURE: | LESS ADVANCES | $0.00 |
| *Dennis P. Clark* | | |
| APPROVALS | AMOUNT OWED TO EMPLOYEE | $0.00 |

4 (-1 adjust from 10/23/04)

RECEIVED

MAR 0 4 2005

EEOC HLO

Defendant DTS
00224

# EXHIBIT "5"





**TECHNICAL**
S E R V I C E S, L. P.

We offer Industry Leading Outsourcing Personnel and Service

▲ DTS Home

▲ Clients - Why DTS?

▲ Employees - Why DTS?

▲ Implementation Services

▲ DTS News Engineering & Construction

▲ Client Portfolio

▲ Contact Us

▲ Related Links

▲ Site Map

## Dynamic Technical Services' Professional Resource Overview:

### Central Office Equipment Services Personnel

- Install
- Test
- Fiber Optics Test & Splice

- PBX Installers & Engineers
- Power Installers
- FCC Licensed Technicians

### Outside Plant Services Personnel

- Field Engineers & Inspectors
- Right-of-Way Agents

- Surveyors [Registered Land Man]
- Fiber Optics Install, Test & Splice

### Wireless Services Personnel

- RF Engineers

- Antenna & Line Installers

### Engineering (P.E. if required) & Civil Construction Services Personnel

- Civil

- Software



1/5/2005

http://www.dynamic-technical.com/page3.html

Defendant DTS 06270

· Personnel Outsourcing Services

- Electrical
- Industrial
- Mechanical

- Civil Construction
- Superintendents
- Civil Field Engineers

Information Technology Services Personnel

- Application Developers
- Computer Technicians
- Database Analysts
- Internet Network
Engineers
- LAN/WAN Engineers
- Product Development
Specialists

- Systems Analysts
- Technical Support
- Technical Writers
- Translation Technicians
- Engineering Project Managers
- Network Consulting Engineers

Defendant DTS
00271