ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375



**FILED**
DISTRICT COURT OF GUAM

NOV 1 4 2007 9ː15

JEANNE G. QUINATA
Clerk of Court

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>             Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>             Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br>**DEFENDANT DYNAMIC TECHNICAL SERVICES' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST ALL PLAINTIFFS; DECLARATION OF DAVID P. LEDGER; EXHIBITS A-C; DECLARATION OF SERVICE** |

Case 1:05-cv-00037     Document 451     Filed 11/14/2007     Page 1 of 34

## REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT AGAINST ALL PLAINTIFFS

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Dynamic Technical Services, Inc. (hereinafter referred to as "DTS"), Defendant in the above entitled and numbered action and files this Reply Memorandum in Support of Motion for Summary Judgment as to all claims asserted by all Plaintiffs and in support thereof respectfully would show unto the Court the following:

**A.     INTRODUCTION**

On June 18, 2007, DTS filed its Motion for Summary Judgment against All Plaintiffs pursuant to Federal Rule of Civil Procedure 56(c), on the grounds that there is no evidence to support an essential element of Plaintiffs' cause of action. More specifically, there is no evidence that DTS has fifteen employees and qualifies as an "employer" as that term is defined under Title VII, thus entitling DTS to summary judgment as a matter of law.

**B.     DTS met its burden in its Motion for Summary Judgment**

The Plaintiffs argue that DTS failed to meets its burden of production. The Plaintiffs argue that DTS did not meet its burden because it did not point to materials on file with the court demonstrating that the Plaintiff would not be able to meet its burden at trial. In support of this argument, the Plaintiffs rely on *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.* 210 F.3d 1099 (9th Cir. 2000)(citing *Clark v. Coates & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)). The moving party must point to materials on file which demonstrate that a party will not be able to meet its burden. *Clark*, 929 F.2d at 608. However, in its Motion for Summary Judgment, DTS pointed to numerous materials on file which met its burden of production. DTS pointed to the Plaintiffs' Complaints on file with the Court, neither of which even alleges or claims that DTS has fifteen or more employees. DTS also pointed to pleadings, which include all of the

motions for summary judgment that were on file and all of the exhibits attached thereto. DTS also pointed to deposition testimony on file, none of which provides evidence that DTS had fifteen or more employees. DTS, Calpac, and the Plaintiffs have all filed deposition testimony in dispositive motions or responses to dispositive motions on file with the Court, which include the depositions of the Plaintiffs and John Healy. None of this testimony provides any evidence that DTS has fifteen or more employees. Additionally, the affidavits of Linda Hayes and Dennis Clark referred to in Plaintiffs' Opposition also fail to provide any evidence that DTS had the threshold number of employees. None of the evidence on file with the Court at the time summary judgment was granted provided any evidence as to the number of DTS employees.

**C. There is no evidence that DTS had at least 15 employees**

The Plaintiffs argue that the website pages establish that DTS had fifteen or more employees. In support of this assertion, the Plaintiffs cite to *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350 (11th Cir. 1994). However, the facts in *Virgo* are clearly distinguishable from those of the present case. In *Virgo*, the defendant operated a hotel and nine employees were specifically identified in the record. The court also noted that, in addition to the nine employees, many other positions were described in the record including the restaurant staff, maintenance staff, housekeeper, and lounge staff. *Id.* at 1361. These were positions that were actually filled by employees of the hotel. The Court of Appeals held that it was not wrong to assume that the employees that actually filled these positions worked the minimum amount of days and hours to count as employees under Title VII. In the present case, the website pages merely provide a list of positions for which DTS *could* locate candidates to staff if it were so requested by a client. No where on the website pages presented does it state that DTS employs people in all of those positions and the *Virgo* case does not stand for the proposition that court can assume that these

positions were filled by employees. This evidence does not provide probative evidence of their claim that DTS has fifteen or more employees.

Additionally, while the website pages were produced by DTS in response to discovery, it was part of the EEOC file on this matter. The Plaintiffs fail to state what request the EEOC documents were produced in response to and whether that request or interrogatory had anything to do with the number of employees of DTS. Furthermore, it does not show the number of employees of DTS for any time relevant to this suit and the determination of whether DTS qualified as an employer under Title VII. Therefore, it is not competent evidence of the number of employees DTS had at the time relevant to this lawsuit.

## D. DTS is not a joint employer of the Plaintiffs

In an attempt to create a fact issue as to the number of employees DTS had, the Plaintiffs argue that DTS was a joint employer of the Plaintiffs. This argument has no merit. "Two or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment of the employee. *Swallows* [*v. Barnes & Noble Book Stores, Inc.*], 128 F.3d [990], 993 n. 4 [(6th Cir. 1997)] (citing *NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117, 1123 (3d. Cir. 1982))." *Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067, 1093 (C.D.Cal. 2002). In order to determine whether a joint employment relationship exists, the Ninth Circuit applies an "economic reality" test. *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983). Under that test, this court should consider all factors relevant to a particular situation when evaluating the economic realities of a relationship. *Id.* In determining joint employment, a large collection of factors has been suggested from the judiciary and governmental agencies. *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270, 1275 (9th Cir. 2003).

When determining if a joint employer relationship exists, the Third Circuit has explained it is a matter of determining which of the two, or whether both, of the parties control, in the capacity of employer, the labor relations of a given group of workers. *Browning-Ferris Indus. of Pa.*, 691 F.2d at 1122-23 (citing *NLRB v. Condenser Corp. of America*, 128 F.2d 67, 70 (3d Cir. 1942)). "The 'joint employer' concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment." *Id.*

The Supreme Court has summarized the various factors as to what it means to be an employer: "As the EEOC's standard reflects, an employer is the person, or group of persons, who owns and manages the enterprise. The employer can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of the business are to be distributed." *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 450, 123 S.Ct. 1673, 1680, 155 L.Ed.2d 615 (2003). The Ninth Circuit opined that the "Supreme Court seems to suggest that the *sine qua non* of determining whether one is an employer is that an 'employer' can hire and fire employees, can assign tasks to employees and supervise their performance." *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d at 1277 (citing *Clackamas*, 123 S.Ct. at 1680). "Logically, before a person or entity can be a joint employer, it must possess the attributes of an employer to some degree." *Id.* Numerous courts consider the key to joint employment to be the right to hire, supervise and fire employees. *See Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213, 1219 (10th Cir. 2002) (en banc); *Graves v. Lowery*, 117 F.3d 723, 727-728 (3d Cir. 1997); *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1361 (11th Cir. 1994); *Rivas v. Federacion de Asociaciones Pecuarias*, 929 F.2d 814, 820-821 (1st Cir. 1991).

In *E.E.O.C. v. Pacific Maritime Assoc.*, a Title VII sexual harassment action was brought against Pacific Maritime Association ("PMA"). 351 F.3d 1270 (9th Cir. 2003). PMA is an association of stevedoring companies ("member-employers") that performed organizational tasks on behalf of its members, negotiated a collective bargaining agreement, operated a dispatch hall jointly with a union, and provided payroll services for its members. *Id.* at 1274. The plaintiff alleged that, along with the member-employer of PMA that hired her, PMA was a joint employer of her. However, the Ninth Circuit found that PMA did not supervise the longshoremen, had no power to hire or fire longshoremen, had no power to discipline longshoremen, and did not supervise the work sites. The court found that it was undisputed that the monitoring and control over the work sites, as well as the control of the employees, was within the sole province of the member-employees. Accordingly, the Court held that PMA was not a joint employer of the plaintiff. *Id.* at 1274.

Similarly, in the present case, DTS had no authority to hire or fire Calpac employees, did not supervise Calpac employees or give them work assignments, had no power to discipline Calpac employees, did not determine wages or benefits of Calpac employees, and did not decide how profits or losses of Calpac were to be distributed. *See* Exhibits A at ¶¶ 5-7 and B at ¶ 13. John Healy, the President of Calpac, testified that he did not have any communications with anyone at DTS prior to receiving the first EEOC complaint. Ex. C at p. 85, ll. 18-23. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Mr. Healy also testified that Mr. Clark was not a supervisor of the plaintiffs, did not give out daily work assignments, and did not hire any of the plaintiffs. *Id.* at pp. 88-89, ll. 12-17, 9-20. Therefore, as

a matter of law, this uncontroverted evidence establishes that DTS was not a joint employer of the Plaintiff with Calpac.

The cases cited by the Plaintiffs in their Opposition are not applicable to the present case and wholly fail to support the Plaintiffs' allegation of joint employers. The Plaintiffs cite to *Torres-Lopez v. May*, 111 F.3d 633 (9th Cir. 1997) for a list of factors in determining whether two entities may be considered joint employers. This reliance is misguided as that case deals with joint employment under the FLSA and AWPA and not Title VII. Additionally, the Plaintiff cites to *Gallenkamp Stores v. NLRB* in support of their assertion of joint employment. However, this case dealt specifically with a licensor and licensee relationship which is not at issue in this case and, therefore, inapplicable to the present case.

The Plaintiff then attempts to use the contract between MCI and Calpac to establish a joint employer relationship. The contract provisions cited to by the Plaintiff do not create a fact issue on joint employment. The Ninth Circuit opined that the "Supreme Court seems to suggest that the *sine qua non* of determining whether one is an employer is that an 'employer' can hire and fire employees, can assign tasks to employees and supervise their performance." *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d at 1277 (citing *Clackamas*, 123 S.Ct. at 1680). The affidavits of Clark and Hayes, as well as the testimony of Healy, all establish that DTS did not have the power to hire or fire the Plaintiffs, DTS did not assign tasks to the Plaintiffs, and did not supervise the Plaintiffs. In fact, the hiring, firing, pay rates, and assignment of daily tasks to Calpac employees were the sole province of Calpac. The only thing the contract evidences is that Clark, as representative of MCI, had the right to inspect and approve the work that Calpac contracted to perform in its contract with MCI. The Plaintiffs do not cite to any case law which

supports that a MCI's right to have it's chosen representative inspect and approve work prior to payment creates a joint employer situation under Title VII.

**F.     CONCLUSION**

Despite an adequate time for discovery, there is no evidence that DTS has fifteen or more employees. Therefore, the Plaintiffs have failed to establish a genuine issue of material fact as to an essential element of their cause of action. Therefore, DTS is entitled to summary judgment as a matter of law.

DATED this _14_ day of November, 2007.

CARLSMITH BALL LLP

ELYZE J. MCDONALD

Attorneys for Defendant Dynamic Technical Services

## DECLARATION OF DAVID P. LEDGER

I, David P. Ledger, declare under penalty of perjury that the following statements are true and correct:

1.    1 have personal knowledge of the facts stated in this declaration except as otherwise indicated.

2.    I would testify competently as to these facts if called upon by the Court.

3.    I am an attorney authorized to practice law in the territory of Guam and presently employed with the law firm of Carlsmith Ball LLP, attorneys for Defendant Dynamic Technical Services, Inc. in the above-captioned action.

4.    This declaration is submitted in support of Defendant Dynamic Technical Services, L.P.'s Reply Memorandum in Support of Motion for Summary Judgment Against All Plaintiffs, filed on November 14, 2007.

5.    Defendant Dynamic Technical Services, L.P. is a necessary and proper party Defendant in this action.

6.    Attached to Defendant Dynamic Technical Services, L.P.'s Reply Memorandum in Support of Motion for Summary Judgment Against All Plaintiffs as Exhibit "A" is a true and correct copy of the Affidavit of Dennis P. Clark the original of which is filed concurrently herewith.

7.    Attached to Defendant Dynamic Technical Services, L.P.'s Reply Memorandum in Support of Motion for Summary Judgment Against All Plaintiffs as Exhibit "B" is a true and correct copy of the Affidavit of Linda G. Hayes the original of which is filed concurrently herewith.

8.    Attached to Defendant Dynamic Technical Services, L.P.'s Reply Memorandum

in Support of Motion for Summary Judgment Against All Plaintiffs as Exhibit "C" is a true and correct copy of the pertinent pages of the deposition testimony of John T. Healy.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and accurate to the best of my knowledge.

EXECUTED: this 14 day of November 2007 at Hagåtña, Guam.

DAVID P. LEDGER

# Exhibit A

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375


Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, Inc.*


# IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>  Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>  Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br><br>**AFFIDAVIT OF DENNIS P. CLARK** |

<u>**AFFIDAVIT OF DENNIS P. CLARK**</u>

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF COLLIN** | § |

BEFORE ME, the undersigned authority, on this day personally appeared Dennis P. Clark, who after being first duty sworn upon his oath deposed and said:

1.    "My name is Dennis P. Clark. I am over the age of 18 and have no disabilities that would prevent me from giving this Affidavit. I have personal knowledge of the facts stated in this Affidavit, and they are true and correct.

2.    I understand that Henry Van Meter, Jerry Apodaca, Jr., Joseph J. Hernandez, Joseph T. Mendiola, Larry L. Charfauros, Anthony C. Arriola, Robert Cruz, Roland F. Mendiola, James S. Yee, Teddy B. Cruz, Jesse B. Cruz, John L.G. Nauto, and John P. Babauta have filed claims against Calpac, Dynamic Technical Services, and other parties. When I use the term 'Plaintiffs' in this affidavit, I am referring to these thirteen individuals.

3.    I worked for Dynamic Technical Services, Inc. as the MCI Company Representative on MCI's 'Guam International Ring' construction project. California Pacific Technical LLC ("Calpac") was the general contractor on this project. I was not an employee of Calpac and had no affiliation with Calpac other than my role as the MCI Company Representative under the contract between Calpac and MCI.

4.    In my role as MCI Company Representative, my responsibilities included engineering; securing right-of-ways; verification of invoices; contracting and negotiating with the Historical Preservation Society, U.S. Military; the Department of Transportation, and Airport Authority; arranging a Environmental Protection Agency assessment; and inspections and

Case 1:05-cv-00037    Document 451    Filed 11/14/2007    Page 13 of 34

acceptance of Calpac's work under the terms of the contract. Less than half of my time was spent at the actual work sites where Calpac employees were present.

5.    My responsibilities as MCI Company Representative did not include being a supervisor of the Plaintiffs or any other Calpac employees. Under the express terms of the contract (including exhibits thereto) between Calpac and MCI, Calpac was responsible to provide all labor and all supervision of labor. It was not my role or responsibility under the contract to instruct Calpac employees how to do the work for the project, nor was it my responsibility to supervise their performance of such work. I was not responsible to ensure that Calpac employees followed applicable safety rules and Calpac company policies. I did not determine or have any say in how the Calpac work crews were assigned. I did not assign individual work assignments to Calpac employees. I did not determine the work schedule of Calpac employees, including when and where to report for work. Calpac employees did not contact me if they were sick or were going to be late for work. Calpac employees addressed any questions they had regarding their work to other Calpac employees. At the beginning of the project, I clearly told Calpac supervisory personnel, including Tim Camacho, Bill Thompson, and Don Harper, that my role on the project was not to supervise Calpac in the completion of the work they agreed to undertake in the contract with MCI.

6.    In my capacity as MCI company representative, I had no authority hire or fire employees of Calpac. More specifically, I did not hire or fire any of the Plaintiffs in this suit, nor did I participate in any way in Calpac's decision to hire or fire any of the Plaintiffs. I never recommended, demanded, suggested or implied that any of the Plaintiffs be hired or fired to Calpac.

7.     In my capacity as MCI company representative, I also had no authority regarding promotions, demotions, or discipline of employees of Calpac. Specifically, I never promoted, demoted, or disciplined any of the Plaintiffs or any other employees of Calpac. I did not determine and had no authority to determine the wages and benefits of Calpac employees. I never participated in any decision to promote, demote or discipline any of the Plaintiffs or any other employees of Calpac. Further, I did not have any authority to and did not perform employee evaluations of Calpac employees, including the Plaintiffs.

8.     In my capacity as MCI Company Representative, it was my duty to enforce all of MCI's rights under the contract with Calpac. One of my responsibilities in this regard was to inspect the work performed by Calpac to ensure that the work was completed in accordance with the terms of Calpac's contract with MCI. If, during the course of an inspection, I found work was not being performed in accordance with the terms of the contract, I would bring it to the attention of the Calpac superintendent or Forman on site. If a Calpac supervisor was not present at the site, I would communicate the problem to the laborers to prevent further delay and/or damage to the project. As MCI's Company Representative, it would not be beneficial to MCI to allow incorrect or improper work to continue causing delays and damages to equipment.

9.     I never used the terms 'monkey' or 'island monkey' in reference to any of the Plaintiffs or in any other regard at any time."

"FURTHER AFFIANT SAYETH NOT."

Dennis P. Clark

SUBSCRIBED AND SWORN TO BEFORE ME on this 23rd day of May, 2007, to certify which witness my hand and official seal.



UNA J. BROUSSARD
MY COMMISSION EXPIRES
July 12, 2008

Notary Public in and for the
State of Texas

My Commission expires:

July 12, 2008

# Exhibit B

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375


Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, L.P.*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. 05-00037 <br><br><br><br><br><br> **AFFIDAVIT OF LINDA G. HAYES** |

# AFFIDAVIT OF LINDA G. HAYES

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF DENTON** | § |

BEFORE ME, the undersigned authority, on this day personally appeared Linda G. Hayes, who after being first duly sworn upon his oath deposed and said:

1.     "My name is Linda G. Hayes. I am over the age of 18 and have no disabilities that would prevent me from giving this Affidavit. I have personal knowledge of the facts stated in this Affidavit, and they are true and correct.

2.     I know that Henry Van Meter, Jerry Apodaca, Jr., Joseph J. Hernandez, Joseph T. Mendiola, Larry L. Charfauros, Anthony C. Arriola, Robert Cruz, Roland F. Mendiola, James S. Yee, Teddy B. Cruz, Jesse B. Cruz, John L.G. Nauto, and John P. Babauta have filed claims against Calpac, Dynamic Technical Services, and other parties. When I use the term 'Plaintiffs' in this affidavit, I am referring to these thirteen individuals.

3.     I am the President of Dynamic Technical Services, L.P. ("DTS") and I have served in this capacity since May 1, 2006. Prior to being President and during the years 2004-2005, I was the Director of Recruiting for DTS. My duties as Director of Recruiting included interfacing with the customers concerning requests for personnel outsourcing services, providing the customers with names and resumes of qualified individuals for the customers' personnel requests, and interfacing with the customers regarding any personnel issues with any employee outsourced to the customer by DTS.

4.     I was contacted by MCI Worldcom Network Services, Inc. ("MCI") to locate an individual to serve as MCI's company representative on a construction project in Guam. I am personally familiar with the scope of services requested by MCI with regard to the project in

---

Guam. MCI did not request any other services from DTS other than locating potential candidates for the company representative position. I had worked with MCI in providing personnel for projects to them since 2001 and learned in the course of my employment that MCI and DTS have had a staffing relationship since 1996. I was personally involved in the collection of resumes from candidates interested in the position of MCI company representative and forwarded several resumes to MCI for their review, one of which was from Dennis Clark. While I was responsible for collecting the names of candidates for the position of company representative, MCI made the decision as to whom the position of company representative would be offered. MCI informed me that they wanted Dennis Clark to serve as its company representative on Guam. In my position as Director of Recruiting, I was MCI's point of contact at DTS regarding anything related to Dennis Clark. I was also Dennis Clark's point of contact at DTS regarding any matters concerning his employment.

5. After MCI selected Dennis Clark to serve as its company representative, I contacted Mr. Clark and arranged for him to come to Texas to meet with MCI representatives regarding the project. MCI requested to meet with Mr. Clark to go over the specifics of the project and his duties as company representative before he left for Guam. Mr. Clark told me that the project was discussed at this meeting and MCI informed him of the date that they wanted him to begin working on Guam. I did not attend this meeting, nor did any other employee or officer of DTS. At no point did I or any other employee or officer of DTS ever provide Mr. Clark with his duties on the Guam project, nor was anyone from DTS ever requested to perform this service by MCI.

6. After Mr. Clark was selected by MCI to serve as its company representative neither I, nor anyone else at DTS was involved in the project on Guam with the exception of

invoicing Mr. Clark's time to MCI for payment. During my communications with MCI regarding their project on Guam, MCI never requested that DTS instruct or supervise Dennis Clark regarding his role as MCI company representative. In my dealings with MCI prior to the Guam project, DTS was never involved of any aspect of the MCI project once MCI selected the personnel for the position other than invoicing the employee's time for payment. This course of dealing with MCI did not change with the project on Guam, nor did MCI request that it change. Mr. Clark informed me that he reported directly to Jeff Buehler of MCI and discussed any issues regarding the project with Mr. Buehler. Mr. Clark never called me with any questions regarding his duties and responsibilities for the project on Guam. All duties and responsibilities given to Dennis Clark regarding the project on Guam came from MCI, not from anyone at DTS. All issues that arose on the project were handled between Dennis Clark and MCI and did not involve myself or any other employees of DTS. DTS did not have the authority to remove Dennis Clark from the project. Only MCI could authorize the removal of Dennis Clark from the project. Any interaction between Dennis Clark and any of the Plaintiffs was in his role as company representative for MCI and not as an employee of DTS.

7.     As I was the individual contacted by MCI regarding the position of company representative, I have personal knowledge of the scope of DTS' obligations and responsibilities with regard to the project in Guam. The MCI project on Guam was not a DTS project and DTS did not have any right to control the project site under its agreement with MCI. From previous dealings with MCI and discussions with Dennis Clark, MCI was the party who had exclusive control over the project site. Neither I, nor any other employee or officer of DTS ever instituted any workplace rules for the Guam worksite or conducted any investigations regarding the Guam worksite. MCI never requested me or any other employee or officer of DTS to institute any

workplace rules for the Guam worksite or to conduct any investigations regarding the Guam worksite.

8.     In my former position of Director of Recruiting and current position of President, I am familiar with the position held by Dennis Clark with DTS. Mr. Clark did not have a supervisory or management position with DTS. He did not have the authority to hire, fire or discipline any employees of DTS or to create or institute any company policies.

9.     I never received any verbal or written allegations or complaints of discrimination until late December 2004 when Dennis Clark informed me and others at DTS that protesters on Guam were holding signs calling him a racist. There is no record of any communication received by DTS from anyone, including Calpac employees and management and MCI personnel, alleging discrimination or harassment by Dennis Clark before Mr. Clark informed DTS of the protesters in late December 2004. If anyone had called, written, or otherwise communicated a complaint, concern, or question regarding Dennis Clark to DTS, the communication would have been referred to me since one of my duties was to deal with personnel issues regarding employees contracted out to our customers. The first time that I, or anyone else at DTS, learned any specifics regarding the complaints of the Plaintiffs or even the identity of the Plaintiffs was when DTS received copies of the EEOC complaints filed by the Plaintiffs, beginning in 2005.

10.    When Mr. Clark informed me and others at DTS of the allegations, he stated that he had not made any discriminatory comments. Mr. Clark also informed me that he spoke at a meeting of all Calpac employees and informed the Calpac employees that he did not make any discriminatory statements and would not discriminate against any of the employees based upon their national origin or any other basis. I believed Mr. Clark's statement to Calpac's employees

at the meeting in late December 2004 was an appropriate action in response to the unspecified discrimination allegations we had received at that time. I have not received any complaints of any discriminatory comments allegedly made by Mr. Clark subsequent to this meeting.

11. The first time myself or anyone else at DTS received any specific complaint regarding Dennis Clark, including the identity of the complaining party, was when I first received a copy of the notice of charge of discrimination from the EEOC in 2005. After I received the notice of charge of discrimination, I contacted Dennis Clark to discuss the allegations. During this conversation, I reiterated the non-discrimination policies of DTS to Mr. Clark and that it was not acceptable under DTS policy to use derogatory or discriminatory remarks in reference to others. Mr. Clark stated that he had never said the things that he was accused of saying in the complaint and that he never would say such things. Additionally, Mr. Clark stated that he understood the non-discrimination policies of DTS and would fully comply with them. I have not received any complaints of any discriminatory comments allegedly made by Mr. Clark subsequent to this telephone discussion and it is my understanding based upon the Plaintiffs' allegations, that there had not been any complaints regarding Dennis Clark for several months prior to this phone call.

12. After the EEOC complaint was received, Carlos Morales, the President of DTS at the time, appointed Harry Reinwald, to respond to the complaint by informing the EEOC that the complainants were not employees of DTS and provide any other information requested by the EEOC.

13. DTS did not hire or fire any of the Plaintiffs. DTS did not determine the wages, benefits, work schedules, or work assignments of any of the Plaintiffs. DTS did not institute any

work place rules or policies for any of the Plaintiffs. DTS did not discipline any of the employees and did not participate in any employee evaluations of any of the Plaintiffs."

"FURTHER AFFIANT SAYETH NOT."

Linda G. Hayes

SUBSCRIBED AND SWORN TO BEFORE ME on this 18th day of June, 2007, to certify which witness my hand and official seal.

Notary Public in and for the
State of Texas

My Commission expires:

10-22-09



PAT WYNN
My Commission Expires
October 22, 2009

---

Affidavit of Linda G. Hayes

Page 7 of 7

# Exhibit C

IN THE UNITED STATES DISTRICT COURT OF GUAM
FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, JAMES S. YEE, TEDDY C. CRUZ, JESSE B. CRUZ, TEDDY L.G. NAUTA, and JOHN B. BABAUTA, | ) CIVIL CASE NO. CIV05-00037 ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, | ) ) ) ) ) |
| Defendants. | ) ) |

DEPOSITION TRANSCRIPT

OF

# JOHN T. HEALY

May 11, 2007

PREPARED BY:     GEORGE B. CASTRO
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates

1    Q   I -- we'll try to be as brief as
2    possible with you.   During the time that Mr.
3    Clark was working on the project, were you
4    aware of the fact that he had been hired by
5    Dynamic Technical Services to observe as the
6    MCI representative on the project?
7        A   Yes.
8        Q   At any time while Mr. Clark was on the
9    island and was performing any work related to
10   the project, did you ever have any
11   communication with any persons employed by
12   Dynamic Technical Services other than Mr.
13   Clark?
14       A   While Mr. Clark was working on the
15   project?
16       Q   Yes.
17       A   No, I did not.
18       Q   At any time before the first EEOC
19   complaint was filed by a plaintiff in this
20   lawsuit, did you ever have any communications
21   with any employees of Dynamic Technical
22   Services other than Mr. Clark?
23       A   No, I did not.
24       Q   Do you have any reason to believe that
25   before the first EEOC complaint was filed by

1 any of the plaintiffs in this lawsuit that

2 anyone at Dynamic Technical Services had

3 received any complaint about the manner in

4 which Dennis Clark had treated employees of

5 CalPac?

6  A I don't know. I'm sorry, sir, what was

7 the question again?

8  Q Do you have any reason to believe that

9 before the first EEOC complaint was filed,

10 anyone at Dynamic Technical Services had

11 received some notice or complaint about the

12 manner in which Dennis Clark had treated

13 employees of CalPac?

14  A No, I have no reason to believe.

15  Q All right. And was there any

16 communication by anyone at CalPac with Dennis

17 Clark, regarding the subject of whether any of

18 the plaintiffs should be terminated from their

19 employment with CalPac?

20  A No.

21  Q And before the protests in front of the

22 CalPac offices on December 20th of 2004, did

23 anyone at CalPac ever tell Dennis Clark that

24 any of the plaintiffs in this lawsuit had made

25 complaints about the way he was treating them?

1    A   No.

2    Q   Did Dennis Clark ever attempt to

3 influence you to take any action that would

4 affect the manner in which any of the

5 plaintiffs were treated by CalPac?

6    A   No.

7    Q   I'm sorry?

8    A   No.  No, sir.

9    Q   Ever make any rude or insulting

10 comments to you about any of the plaintiffs?

11    A   No, never.

12    Q   To your knowledge, did he ever make any

13 such comments to anyone else at CalPac

14 regarding any of the plaintiffs?

15    A   Not to my knowledge.

16    Q   Did Mr. Clark ever ask you or try to

17 influence you to remove any of the plaintiffs

18 from the project?

19    A   No.

20    Q   Did Mr. Clark ever say anything to you

21 that caused you to change the way CalPac

22 treated any of the plaintiffs?

23    A   No.  I mean, if Mr. Clark said the

24 project was falling behind, I may have told the

25 entire group to work smarter and faster and

1  more efficiently.

2      Q    Anything other than that?

3      A    No, sir.  No.

4      Q    Are you aware of any occasion where Mr.

5  Clark said anything to any other supervisor

6  personnel at CalPac that was in any way -- as

7  suggestion on his part, that CalPac should

8  mistreat or harass or in some way take any

9  action to harm any of the plaintiffs in this

10 lawsuit?

11     A    No, sir.

12     Q    At anytime before the -- let me back up

13 and try that one again.  It is true, is it not,

14 that Mr. Clark did not have any role in the

15 process of hiring any of the plaintiffs to work

16 for CalPac, correct?

17     A    Correct.

18     Q    It is also correct that none of the

19 plaintiffs during the course of their

20 performance of work on this project were ever

21 employees of Dynamic Technical Services,

22 correct?

23     A    Correct.

24     Q    And did you ever witness Mr. Clark ever

25 having any communication directly with any of

1    the plaintiffs, while they were on the job on

2    the project?

3        A    Yes, but I believe only to say "hello"

4    or --

5        Q    Just exchange pleasantries?

6        A    Exchange pleasantries, yes.

7        Q    Anything else?

8        A    Not that I recall.

9        Q    Did Dynamic Technical Services or Mr.

10   Clark have any authority to give out daily work

11   assignments to any of the plaintiffs with

12   respect to work that they will perform for

13   CalPac during the course of a given day?

14       A    No.

15       Q    Did anyone at CalPac ever call upon Mr.

16   Clark to perform supervision of the plaintiffs

17   that CalPac wanted to be performed of the

18   plaintiffs as they perform their work for

19   CalPac?

20       A    Not that I am aware of.

21       Q    Did CalPac ever consider Mr. Clark to

22   be a representative of CalPac?

23       A    No.

24       Q    Did CalPac ever consider Mr. Clark to

25   be someone who was providing services on the

1   A   I'm sorry.   Again, could you repeat
2   that question, sir?
3   Q   Do you know of any reason why Mr.
4   Thompson and Mr. Camacho would not have brought
5   to your attention complaints that had been made
6   to them about the way Mr. Clark was treating
7   the workers?
8   A   No.
9   Q   If anyone had complained to Mr. Harper
10  about the manner in which Mr. Clark was
11  treating CalPac's -- the plaintiff's in this
12  lawsuit, are you aware of any reason why Mr.
13  Harper would not have brought that to your
14  attention?
15  A   No.
16  Q   So from -- would it be fair to say
17  based on the answers that you've provided to
18  the questions I've asked you, that Mr. Clark --
19  neither Mr. Clark nor anyone at Dynamic
20  Technical Services said or did anything that
21  interfered in the employer-employee
22  relationship that existed between CalPac and
23  the plaintiffs?
24  A   That's correct.
25      MR. SMITH:   I will pass the witness.

# REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 133 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 26th day of June, 2007.

_____

George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

## DECLARATION OF SERVICE

I, David P. Ledger, hereby declare under penalty of perjury of the laws of the United States, that on November 14, 2007, I will cause to be served, via hand delivery, a true and correct copy of REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST ALL PLAINTIFFS; DECLARATION OF DAVID P. LEDGER; EXHIBITS A-C; DECLARATION OF SERVICE upon the following Counsels of record:

> Delia Sablan Lujan, Esq.
> **LUJAN, AGUIGUI & PEREZ, LLP**
> Suite 300, Pacific News Building
> 238 Archbishop F.C. Flores Street
> Hagåtña, Guam USA 96910
> Telephone: (671) 477-8064
> Facsimile: (671) 477-5297
> Attorneys for Plaintiffs Henry G. Van Meter, et al.

and

> Vincent Leon Guerrero, Esq.
> **BLAIR, STERLING, JOHNSON, MOODY,**
> **MARTINEZ & LEON GUERRERO, P.C.**
> Suite 1008, Pacific News Building
> 238 Archbishop F.C. Flores Street
> Hagåtña, Guam USA 96910
> Telephone: (671) 477-7857
> Facsimile: (671) 472-4290
> Attorneys for Defendant California Pacific Technical Services, LLC
> John Healy, and William Ward

and

> G. Patrick Civille, Esq.
> **CIVILLE & TANG, PLLC**
> 330 Hernan Cortez Avenue, Suite 200
> Hagatna, Guam 96910
> Attorneys for Verizon Business Purchasing LLC and Verizon Business Network Services, Inc. substituted for MCI

Executed this 14 day of November 2007 at Hagåtña, Guam.

DAVID P. LEDGER