ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

**FILED**
DISTRICT COURT OF GUAM

JAN 0 4 2008 ~bo~

**JEANNE G. QUINATA**
**Clerk of Court**

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555

*Attorneys for Defendant Dynamic Technical Services*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>            Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>            Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br>**DEFENDANT DYNAMIC TECHNICAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOHN P. BABAUTA; MEMORANDUM IN SUPPORT OF MOTION; DECLARATION OF ELYZE J. MCDONALD; EXHIBITS A-D; DECLARATION OF SERVICE** |

ORIGINAL

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Dynamic Technical Services, Inc. (hereinafter referred to as "DTS"), Defendant in the above entitled and numbered action and, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, files this Motion for Summary Judgment as to all claims asserted by Plaintiff John P. Babauta (hereinafter referred to as "Plaintiff"). This motion is made upon the attached memorandum, the record in this case, including without limitation the exhibits attached and filed contemporaneously herewith, and argument presented by counsel at the hearing.

WHEREFORE, PREMISES CONSIDERED, Defendant Dynamic Technical Services respectfully requests this court to enter and order dismissing all of Plaintiff John P. Babauta's claims against DTS and for such further relief to which DTS shows itself justly entitled.

DATED this 4th day of January, 2008.

CARLSMITH BALL LLP

_Elyze McDonald_
ELYZE J. MCDONALD
Attorneys for Defendant
Dynamic Technical Service. Inc.

Motion for Summary Judgment Against Plaintiff John P. Babauta                    Page 2 of 22
4848-0991-5650.1.059759-00001
Case 1:05-cv-00037     Document 471     Filed 01/04/2008     Page 2 of 32

# INDEX OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)      6

*Anderson v. Pacific Maritime Assoc.*, 336 F.3d 924 (9th Cir. 2003)      12-13

*Association of Mexican-American Educators v. California*,
231 F.3d 572 (9th Cir. 2000)      12-13

*Bonnette v. California Health and Welfare Agency*, 704 F.2d
1465 (9th Cir. 1983)      8

*Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213 (10th Cir. 2002)      9

*British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare
Fund*, 882 F.2d 371 (9th Cir. 1989)      7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)      6-7

*Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 123
S.Ct. 1673, 155 L.Ed.2d 615 (2003)      8

*Dominguez-Curry v. Nevada Transp. Dept*, 424 F.3d 1027 (9th Cir. 2005)      15

*E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003)      8-9

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)      15, 17

*Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983)      11, 13

*Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004 (D.Minn. 2003)      16

*Graves v. Lowery*, 117 F.3d 723 (3d Cir. 1997)      9

*Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)      18

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)      14, 17

*Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980)      11

*McZeal v. City of Seattle*, 2006 WL 3254504 (W.D.Wash. 2006)      15

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986)      15

Motion for Summary Judgment Against Plaintiff John P. Babauta      Page 3 of 22
4848-0991-5650.1.059759-00001
Case 1:05-cv-00037    Document 471    Filed 01/04/2008    Page 3 of 32

*Merrick v. Farmers Ins.*, 892 F.2d 1434 (9th Cir. 1990)     18

*NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117 (3d. Cir. 1982)     8

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)     15

*Rivas v. Federacion de Asociaciones Pecuarias,* 929 F.2d 814 (1st Cir. 1991)     9

*Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971)     15

*Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d
385 (D.Conn. 2003)     16

*Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973)     10, 13

*Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir. 1978)     15, 17-18

*Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350 (11th Cir. 1994)     9

*Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067 (C.D.Cal. 2002)     8

**Statutes**

42 U.S.C. § 2000e(b)     7

42 U.S.C. § 2000e(f)     7

**Rules**

Federal Rule of Civil Procedure 56     6

# MEMORANDUM IN SUPPORT OF MOTION FOR
## SUMMARY JUDGMENT AGAINST PLAINTIFF JOHN P. BABAUTA

## I.
## GROUNDS FOR MOTION

Defendant DTS brings this Motion for Summary Judgment against Plaintiff John P. Babauta on the following grounds:[1]

A)  Defendant DTS was not an "employer" of Plaintiff John P. Babauta as defined by Title VII of the Civil Rights Act of 1964 and cannot be subject to liability under the statute.

B)  There was no hostile work environment based upon the uncontroverted evidence.

C)  DTS did not have any knowledge of any alleged discrimination.

To the extent co-defendant Calpac asserts there was no hostile work environment, DTS hereby joins in such motion.

## II.
## SUMMARY JUDGMENT EVIDENCE

Defendant relies on the following exhibits, attached to this motion and incorporated by reference as if fully set forth herein:

A)  Selected pages of the deposition of Plaintiff John P. Babauta;
B)  Selected pages of the deposition of John Healy;
C)  Affidavit of Dennis P. Clark; and
D)  Affidavit of Linda Hayes.

## III.
## FACTUAL BACKGROUND

Plaintiff John P. Babauta filed this lawsuit along with twelve other plaintiffs on December 12, 2005. The Plaintiff filed his Second Amended Complaint on September 7, 2007. All of Plaintiff's claims are brought under Title VII of Civil Rights Act of 1964. The Plaintiff

---

[1] In Plaintiff's Second Amended Complaint, the Plaintiff does not make any retaliation claims against DTS. Plfs' 2nd Am. Complaint ¶¶ 262-264.

was employed by Defendant Calpac from October 2004 through May 2005. Ex. A. at p. 10, ll. 16-18; p. 8, ll. 4-7. During the course of his employment for Calpac, he worked on a construction project for MCI. Dennis Clark was the MCI "company representative" on this project and was an employee of DTS. Ex. C at ¶ 3. The Plaintiff alleges that Mr. Clark made discriminatory remarks in the presence of the Plaintiff on one occasion. Ex. A at p. 34, l. 13. The Plaintiff did not complain to anyone at DTS about the statements Dennis Clark allegedly made and no one at DTS became aware of Plaintiff's complaints until late December 2004 when Dennis Clark informed DTS of the existence of public protesters who were alleging that he made discriminatory comments. Ex. A. at p. 7, l. 17; Ex. D at ¶ 9. Based upon these alleged statements made by Mr. Clark, the Plaintiff has filed the instant lawsuit seeking to recover damages from DTS under Title VII for hostile work environment.

## IV.
## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a court should grant summary judgment when, viewing the evidence in the light most favorable to the nonmoving party, the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. Pro. 56(e).

Motion for Summary Judgment Against Plaintiff John P. Babauta                    Page 6 of 22
4848-0991-5650.1.059759-00001
Case 1:05-cv-00037      Document 471      Filed 01/04/2008      Page 6 of 32

However, it is not necessary for the party moving for summary judgment to introduce evidence that negates the plaintiff's claim. *Celotex*, 477 U.S. 258, 323. Instead, the moving party may show in it motion that there is no evidence to support an essential element of the non-moving party's claim. *Id.* at 325. According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party: (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible. *British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989).

## V.
## ARGUMENTS & AUTHORITIES

### A.  DTS is not an "employer" of Plaintiff and cannot be liable under Title VII

In order to be subject to liability for a hostile work environment[2] under Title VII, a defendant must be an "employer" as the statute defines that term. An "employer" is a "person engaged in an industry affecting interstate commerce who has fifteen or more employees..." 42 U.S.C. § 2000e(b). An employee is an "individual employed by an employer." 42 U.S.C. § 2000e(f). In the present case, it is uncontested that Calpac, not DTS, was the direct employer of the Plaintiff. Ex. A at p. 64, ll. 19-22; Ex. B at p. 88, ll. 18-23.

### 1.  Defendant DTS is not liable under Title VII as a joint employer.

"Two or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment of the employee. *Swallows [v. Barnes & Noble Book*

---

[2] Defendant expressly denies that Plaintiff was subjected to a hostile work environment as a matter of law. This topic is fully addressed in Section V.B. of this memorandum.

Case 1:05-cv-00037    Document 471    Filed 01/04/2008    Page 7 of 32

*Stores, Inc.*], 128 F.3d [990], 993 n. 4 [(6th Cir. 1997)] (citing *NLRB v. Browning-Ferris Indus.*
*of Pa.*, 691 F.2d 1117, 1123 (3d. Cir. 1982))." *Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067,
1093 (C.D.Cal. 2002). In order to determine whether a joint employment relationship exists, the
Ninth Circuit applies an "economic reality" test. *Bonnette v. California Health and Welfare
Agency*, 704 F.2d 1465 (9th Cir. 1983). Under that test, this court should consider all factors
relevant to a particular situation when evaluating the economic realities of a relationship. *Id.* In
determining joint employment, a large collection of factors has been suggested from the judiciary
and governmental agencies. *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270, 1275 (9th Cir.
2003).

When determining if a joint employer relationship exists, the Third Circuit has explained
it is a matter of determining which of the two, or whether both, of the parties control, in the
capacity of employer, the labor relations of a given group of workers. *Browning-Ferris Indus. of
Pa.*, 691 F.2d at 1122-23 (citing *NLRB v. Condenser Corp. of America*, 128 F.2d 67, 70 (3d Cir.
1942)). "The 'joint employer' concept recognizes that the business entities involved are in fact
separate but that they *share* or co-determine those matters governing the essential terms and
conditions of employment." *Id.*

The Supreme Court has summarized the various factors as to what it means to be an
employer: "As the EEOC's standard reflects, an employer is the person, or group of persons,
who owns and manages the enterprise. The employer can hire and fire employees, can assign
tasks to employees and supervise their performance, and can decide how the profits and losses of
the business are to be distributed." *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440,
450, 123 S.Ct. 1673, 1680, 155 L.Ed.2d 615 (2003). The Ninth Circuit opined that the "Supreme
Court seems to suggest that the *sine qua non* of determining whether one is an employer is that

Motion for Summary Judgment Against Plaintiff John P. Babauta                      Page 8 of 22
4848-0991-5650.1.059750-00001
Case 1:05-cv-00037    Document 471    Filed 01/04/2008    Page 8 of 32

an 'employer' can hire and fire employees, can assign tasks to employees and supervise their performance." *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d at 1277 (citing *Clackamas*, 123 S.Ct. at 1680). "Logically, before a person or entity can be a joint employer, it must possess the attributes of an employer to some degree." *Id.* Numerous courts consider the key to joint employment to be the right to hire, supervise and fire employees. *See Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213, 1219 (10th Cir. 2002) (en banc); *Graves v. Lowery*, 117 F.3d 723, 727-728 (3d Cir. 1997); *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1361 (11th Cir. 1994); *Rivas v. Federacion de Asociaciones Pecuarias*, 929 F.2d 814, 820-821 (1st Cir. 1991).

In *E.E.O.C. v. Pacific Maritime Assoc.*, a Title VII sexual harassment action was brought against Pacific Maritime Association ("PMA"). 351 F.3d 1270 (9th Cir. 2003). PMA is an association of stevedoring companies ("member-employers") that performed organizational tasks on behalf of its members, negotiated a collective bargaining agreement, operated a dispatch hall jointly with a union, and provided payroll services for its members. *Id.* at 1274. The plaintiff alleged that, along with the member-employer of PMA that hired her, PMA was a joint employer of her. However, the Ninth Circuit found that PMA did not supervise the longshoremen, had no power to hire or fire longshoremen, had no power to discipline longshoremen, and did not supervise the work sites. The court found that it was undisputed that the monitoring and control over the work sites, as well as the control of the employees, was within the sole province of the member-employees. Accordingly, the Court held that PMA was not a joint employer of the plaintiff. *Id.* at 1274.

Similarly, in the present case, DTS had no authority to hire or fire Calpac employees, did not supervise Calpac employees or give them work assignments, had no power to discipline Calpac employees, did not determine wages or benefits of Calpac employees, and did not decide

how profits or losses of Calpac were to be distributed. *See* Exhibits C at ¶¶ 5-7 and D at ¶ 13. John Healy, the President of Calpac, testified that he did not have any communications with anyone at DTS prior to receiving the first EEOC complaint. Ex. B at p. 85, ll. 18-23. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Mr. Healy also testified that Mr. Clark was not a supervisor of the plaintiffs, did not give out daily work assignments, and did not hire any of the plaintiffs. *Id.* at pp. 88-89, ll. 12-17, 9-20. Therefore, as a matter of law, this uncontroverted evidence establishes that DTS was not a joint employer of the Plaintiff with Calpac.

## 2. Defendant DTS is not liable under Title VII as an indirect employer

The D.C. Circuit first addressed indirect-employer liability in *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973). The hospital ran a nursing office where patients could request the service of a private duty nurse. The hospital would then contact outside referral sources and request a private nurse be sent to the hospital. The private nurses were employees of the patients, not the hospital. In *Sibley*, a male nurse alleged that on at least two occasions hospital nurses rejected him upon arrival because he was male and the requesting patient was female. The male nurse subsequently sued under Title VII for discrimination.

On appeal, the court noted that one of the goals of Title VII was to equalize access to job opportunities. *Id.* at 1340. The court held that Title VII did not explicitly require a direct employer-employee relationship, but it did not mean that no relationship was required for a claim to fall under Title VII. The Court stated: "We think it is significant that [Title VII] has addressed the problems of interference with the direct employment relationship by labor unions and employment agencies-institutions which have not a remote but a highly visible nexus with

Motion for Summary Judgment Against Plaintiff John P. Babauta          Page 10 of 22
4848-0991-5650.1.059759-00001
Case 1:05-cv-00037     Document 471     Filed 01/04/2008     Page 10 of 32

the creation and continuance of direct employment relationships between third parties. On the facts as alleged…[the hospital] is so circumstanced, and its daily operations are of such a character as to have such nexus to the third parties in this case…" *Id.* at 1342.

The Ninth Circuit first addressed the issue of indirect-employer liability in *Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980). The court noted for Title VII to apply, "there must be some connection with an employment relationship" though the "connection…need not necessarily be direct." *Id.* at 883. The court explained "[t]his might occur where a defendant subject to Title VII interferes with an individual's employment opportunities with another employer." *Id.* at 883 n. 3.

The Ninth circuit addressed the issue again in *Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983). In this case, the plaintiff was a Hispanic physician working for a corporation named AES. On behalf of AES, the plaintiff submitted a proposal to the defendant to operate the hospital's emergency room. The hospital allegedly turned down the proposal because too many Hispanics worked for AES. *Id.* at 1020. The court reversed a summary judgment granted to the hospital on the basis that the plaintiff lacked standing under Title VII because he was an employee of AES, not the hospital, and AES would have only been an independent contractor for the hospital. *Id.* The court held that AES's potential status as an independent contractor did not mean that the hospital had not interfered with the relationship between AES and the plaintiff. *Id.* at 1021. Additionally, the court noted the perverse result that would occur if an employer were allowed to discriminatorily interfere with an individual's employment opportunities with another employer, while it could not do so with its own employees. *Id.*

Motion for Summary Judgment Against Plaintiff John P. Babauta      Page 11 of 22
4848-0991-5650.L059759-00001
Case 1:05-cv-00037     Document 471     Filed 01/04/2008     Page 11 of 32

The issue of indirect-employer liability came before the court again in *Association of Mexican-American Educators v. California*, 231 F.3d 572 (9th Cir. 2000)(en banc). In this case, the plaintiffs, a class of prospective and current minority teachers, challenged the use of a skills test that was a prerequisite to employment in the public schools. *Id.* at 577. The plaintiffs alleged the test has a disparate impact on minorities. *Id.* at 578. The court found that Title VII covered the claims as the alleged discriminatory test interfered with future employment with public schools since it dictated whom the schools could hire. *Id.* at 581-82. The court emphasized that the ruling was based on the peculiar degree of control the state exercised over school districts because of the test. *Id.* at 581.

In *Anderson v. Pacific Maritime Assoc.*, the Ninth Circuit addressed the issue of whether the PMA could be liable under Title VII under indirect-employer liability. 336 F.3d 924 (9th Cir. 2003)(the PMA performed the same functions and duties as discussed in *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003), *supra*). The plaintiffs in the suit were African-American workers employed on the waterfront in Seattle and Tacoma. The plaintiffs alleged a "horrific and pervasive picture of racial animosity and discrimination" on the waterfront. *Id.* at 926. The allegations included the common use of racial slurs, racial innuendos, and racial jokes on the docks and well as the uses of racial slurs in the training materials. The plaintiffs also alleged direct, racially charged physical threats. *Id.*

The court held that the PMA could not be liable under Title VII. The court found that the alleged hostile work site was not controlled by the PMA and the PMA did not employ or supervise the plaintiffs or the alleged harassers. *Id.* at 931. "*Sibley* and its progeny extended Title VII coverage to indirect employers when those employers discriminated against *and* interfered with the employees' relationship with their employees." *Id.* (emphasis added). PMA

Motion for Summary Judgment Against Plaintiff John P. Babauta          Page 12 of 22
4848-0991-5650.1 059759-00001
Case 1:05-cv-00037     Document 471     Filed 01/04/2008     Page 12 of 32

did not interfere with the plaintiffs' relationship with their employers since it was the employers who allowed the allegedly hostile work environment. *Id.* "*Sibley* and its Ninth Circuit progeny condone liability when there exists discriminatory 'interference' by the indirect employer *and* where the indirect employer had some peculiar control of the employee's relationship with the direct employer." *Id.* at 932 (emphasis added).

In the present case, there was no discriminatory interference by DTS and DTS had no control over the Plaintiff's relationship with Calpac. In fact, none of the above-referenced cases lends support for a finding of indirect employer liability in this case. In *Sibley*, the hospital refused to allow the male nurse to see the patient; in *Gomez*, the hospital refused to hire the company with Hispanic doctors; and in *Association of Mexican-American Educators*, the state required the job applicants to take the test with the disparate impact on minorities. In all of the referenced cases, the "indirect employer" interfered with the employment relationship between the employee and direct employer. DTS did not have any control over the employment relationship between the Plaintiff and Calpac. DTS did not have the power to hire or fire employees, discipline employees, assign work assignments to employees, promote or demote employees, or perform employee evaluations. *See* Ex. C at ¶¶ 5-7 and D at ¶ 13. John Healy testified that Dennis Clark never tried to influence Calpac to take any action that would affect the manner in which any of the plaintiffs were treated and did not make any comments to anyone at Calpac regarding any of the plaintiffs. Ex. B. at p. 87, ll. 2-6 and 12-15. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Furthermore, Healy testified that Clark and DTS never interfered in the relationship between Calpac and any of the Plaintiffs. Ex.

Motion for Summary Judgment Against Plaintiff John P. Babauta          Page 13 of 22
4848-0991-5650.1.059759-00001
Case 1:05-cv-00037     Document 471     Filed 01/04/2008     Page 13 of 32

B. at p. 92, ll. 16-24. Finally, the Plaintiff testified that he never received any instructions from Dennis Clark. Ex. A at p. 67, ll. 16-18.

Additionally, the work site involved in this lawsuit was not one that was controlled by DTS. Ex. D at ¶ 7. The worksite in question was a MCI worksite. Dennis Clark reported directly to MCI and took all work directives from MCI. DTS did not have any power to control the worksite, conduct any investigations on the worksite, or implement any rules for the worksite. *Id.* All of these functions were reserved to MCI. DTS did not even have the authority to remove Dennis Clark from the project. *Id.* at ¶ 6.

**B.      Plaintiff's allegations do not amount to a hostile environment as a matter of law**

Regardless of DTS' status as an "employer" under Title VII, the Plaintiff has failed to establish a claim for hostile work environment. A plaintiff may bring a lawsuit under Title VII for hostile work environment based upon racial or national origin harassment. To establish the existence of a hostile work environment plaintiff must prove that the workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(internal citations and quotation marks omitted). The hostile environment must be one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. *Id.* at 21-22. The Supreme Court in *Harris* held that the courts should look to the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance." *Id.* at 23. The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of*

Motion for Summary Judgment Against Plaintiff John P. Babauta                Page 14 of 22
4848-0991-5650.1 059759-00001
Case 1:05-cv-00037      Document 471      Filed 01/04/2008      Page 14 of 32

*Boca Raton*, 524 U.S. 775, 787 n. 1 (1998)(internal citation and quotation marks omitted). Judicial standards for harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment for the purposes of a Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept*, 424 F.3d 1027 (9ᵗʰ Cir. 2005).

The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Not all workplace conduct that could be labeled as harassment affects a "term, condition, or privilege" of employment within the meaning of Title VII. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "The 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to sufficiently significant degree to violate Title VII." *Id.* (citing *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), cert. denied, 406 U.S. 957 (1972)).

The Western District of Washington held that the use of the phrase "Driving Miss Daisy" several times in the presence of an African-American worker and referring to another African-American driving a Caucasian within a two month period were not sufficient to create a racially hostile environment. *McZeal v. City of Seattle*, 2006 WL 3254504, at *5 (W.D.Wash. 2006). The court found that the comments were not so frequent or severe as to constitute a racially hostile work environment. *Id.* Furthermore, the Ninth Circuit found the use of the phrase "jungle bunny" in reference to an African-American did not create a hostile environment. *Silver*

Motion for Summary Judgment Against Plaintiff John P. Babauta          Page 15 of 22
4848-0991-5650.1 059759-00001
Case 1:05-cv-00037     Document 471     Filed 01/04/2008     Page 15 of 32

*v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978). The court commented that while the remark was a racially derogatory slur, it was not the sort of conduct to which Title VII was enacted to prohibit. *Id.* The court also observed that Title VII was not directed at ending all discrimination by individuals, but the eradication of discrimination by employers against employees. *Id.*

Additionally, the District Court of Connecticut found that isolated racially offensive comments did not create a hostile and abusive environment. *Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d 385, 396 (D.Conn. 2003)(complained of comments included: (1) coworker wished a hurricane over Puerto Rico would wipe out island and that "we could do without those people;" (2) "they should put Puerto Ricans on a plane and send them back to Puerto Rico;" and, (3) a nurse's negative comments that black and Puerto Rican patients were "low life pieces of shit, scum sucking dogs and welfare recipients). The District of Minnesota found that the use of the terms like "fag," "wimp," "sissy," "useless," "worthless," and "spic" failed to support a plaintiff's claim of hostile work environment based upon national origin and disability. *Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004, 1015 (D.Minn. 2003).

In the present case, the Plaintiff testified that there was one incident on October 25, 2005 where Dennis Clark allegedly referred to a group of Calpac workers as "island monkeys." Ex. A at p. 25, ll. 13-18; p. 34, l. 13. Mr. Babauta was employed with Calpac from October 2004 through May 2005, a period of approximately seven months. Ex. A. at p. 10, ll. 16-18; p. 8, ll. 4-7. Plaintiff alleges that, over the course of eight months of employment, one isolated statement was allegedly made by Mr. Clark. As a matter of law, this fails to amount to a hostile and abusive work environment according to the factors set out by the Supreme Court in *Harris*. The alleged discriminatory conduct was infrequent and not physically threatening, but rather a mere

Motion for Summary Judgment Against Plaintiff John P. Babauta          Page 16 of 22
4848-0991-5650.1.059759-00001
Case 1:05-cv-00037     Document 471     Filed 01/04/2008     Page 16 of 32

offensive utterance. According to the Plaintiff's testimony, the only instance of alleged discriminatory statement made by Clark occurred on October 25, 2004. Thus, Mr. Babauta concedes that he did not encounter any discriminatory comments during the last six months of his employment on the job. When looking at the "totality of the circumstances," the one alleged instance of a racial slur over the course of seven months were not "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. By his own testimony, the alleged remarks were not more than episodic and were not "sufficiently continuous and concerted in order to be deemed pervasive." *Farragher*, 524 U.S. at 787 n. 1. Therefore, DTS is entitled to summary judgment against Plaintiff on his Title VII causes of action.

## C. DTS did not have any knowledge of any alleged discrimination and cannot be held liable under Title VII

In the unlikely event that the court finds that DTS is an "employer" of the Plaintiff under Title VII and that Plaintiff has established a hostile environment claim, DTS cannot be held liable for the alleged actions of Clark because it did not have actual or constructive knowledge of the alleged discriminatory conduct. DTS was not made aware of any alleged discriminatory conduct by Dennis Clark until it was notified by Clark about the protesters which occurred in late December 2004. Ex. D at ¶¶ 9-11. There is no evidence, as none exists, that DTS had actual knowledge of Clark's alleged discriminatory statements until the EEOC complaint was received. In fact, the Plaintiff testified that he never complained to anyone at DTS. Ex. A at p. 78, ll. 16-17. Additionally, there are no allegations of harassment following the time of the protest or the time the complaint was received by DTS. In fact, according to the testimony of the Plaintiff, there had been no incidents of alleged harassment in the two months preceding the protests on Guam.

An employer cannot be held liable for the harassment of an employee unless the employer both knows of it and fails to take remedial action. *Silver v. KCA, Inc.*, 586 F.2d 138, 142 (9th Cir. 1978). This even holds true when there is a continuing course of harassment from an employee. *Id.* Occasional, sporadic remarks that occur in the workplace do not impose Title VII liability upon the employer. *Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)(citing *Merrick v. Farmers Ins.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990). In *Greene*, the plaintiff's claim of a hostile work environment rested upon four instances of offensive language. The plaintiff reported one incident and racial harassment ceased from that time forward. The court held that the case was properly dismissed as against the employer and that the claim may have had substance if the employer knew of the conduct and failed to take action. *Id.*

In the present case, DTS did not learn of any allegations of discriminatory remarks until Mr. Clark informed DTS of the presence of the protesters in late December 2004, approximately four months after the last alleged discriminatory comment was allegedly made by Clark, according to the Plaintiff. Ex. D at ¶ 9. The Plaintiff's EEOC Notice of Charge of Discrimination was not sent to DTS until February 24, 2005. Since DTS was not aware of the alleged harassment, it cannot be held liable under Title VII. *See Silver*, 892 F.2d at 1438-39.

Additionally, immediately upon learning that there were allegations that he had engaged in discriminatory conduct, Mr. Clark spoke at a meeting of Calpac employees and informed them that he did not make any such comments and would not discriminate against anyone based upon their Chamorro heritage. Mr. Clark informed DTS of this meeting and what he stated to the Calpac employees. There have been no allegations of discriminatory conduct by Clark or DTS subsequent to this meeting. In fact the Plaintiff does not make any allegations of any comments by Clark for approximately the previous four months leading up to this meeting. There has not

Motion for Summary Judgment Against Plaintiff John P. Babauta                    Page 18 of 22
4848-0991-5650.1 059759-00001
Case 1:05-cv-00037    Document 471    Filed 01/04/2008    Page 18 of 32

been one complaint of discriminatory comments by Clark subsequent to DTS learning of the Plaintiff's allegations in the EEOC complaint. *See* Ex. D at ¶¶ 9-11. Therefore, the Plaintiff cannot complain of any failure by DTS to take action after it acquired knowledge of the Plaintiff's complaints. DTS cannot be held liable under Title VII because: (1) DTS did not have any knowledge of Plaintiff's allegations prior to him filing a complaint with the EEOC and (2) once DTS became aware of the complaints, immediate remedial action was taken and no subsequent discriminatory acts have been alleged by Plaintiff.

## VI.
## CONCLUSION

DTS cannot be liable to Plaintiff under Title VII because: (1) DTS was not an employer of the Plaintiff as that term is defined under Title VII; (2) Based upon the Plaintiff's own testimony, he was not subjected to a hostile work environment for purposes of Title VII; and (3) DTS did not have actual or constructive knowledge of any of Plaintiff's complaints. For these reasons, DTS moves this Honorable Court to grant is Motion for Summary Judgment against Plaintiff John Babauta.

DATED this 4th day of January, 2008.

CARLSMITH BALL LLP

ELYZE J. MCDONALD
Attorneys for Defendant
Dynamic Technical Services

Motion for Summary Judgment Against Plaintiff John P. Babauta                    Page 19 of 22
4848-0091-5650.1.059759-00001
Case 1:05-cv-00037     Document 471     Filed 01/04/2008     Page 19 of 32

## DECLARATION OF ELYZE J. MCDONALD

I, Elyze J. McDonald, declare under penalty of perjury that the following statements are true and correct:

1.    1 have personal knowledge of the facts stated in this declaration except as otherwise indicated.

2.    I would testify competently as to these facts if called upon by the Court.

3.    I am an attorney authorized to practice law in the territory of Guam and presently employed with the law firm of Carlsmith Ball LLP, attorneys for Defendant Dynamic Technical Services in the above-captioned action.

4.    This declaration is submitted in support of Defendant Dynamic Technical Services' Motion for Summary Judgment Against John B. Babauta, filed on January 4, 2008.

5.    Defendant Dynamic Technical Services is a necessary and proper party Defendant in this action.

6.    Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against John B. Babauta as Exhibit "A" is a true and correct copy of the pertinent pages of the deposition testimony of John B. Babauta.

7.    Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against John B. Babauta as Exhibit "B" is a true and correct copy of the pertinent pages of the deposition testimony of John T. Healy.

8.    Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against John B. Babauta as Exhibit "C" is a true and correct copy of the Affidavit of Dennis P. Clark the original of which has been previously filed with the Court.

Motion for Summary Judgment Against Plaintiff John P. Babauta                    Page 20 of 22
4848-0991-5650 1.059759-00001
Case 1:05-cv-00037    Document 471    Filed 01/04/2008    Page 20 of 32

9.      Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against John B. Babauta as Exhibit "D" is a true and correct copy of the Affidavit of Linda G. Hayes the original of which has been previously filed with the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and accurate to the best of my knowledge.

DATED:     this **4th** day of January 2008 at Hagåtña, Guam.


_____
ELYZE J. MCDONALD

# Exhibit A

## Page 1

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY ) CIVIL CASE NO. CIV05-00037
APODACA, JR., JOSEPH J. )
HERNANDEZ, JOSEPH T. MENDIOLA, )
LARRY L. CHARFAUROS, ANTHONY )
C. ARZOLA, ROBERT B. CRUZ, )
ROLAND F. MENDIOLA, JAMES S. ) DEPOSITION OF
YEE, TEDDY B. CRUZ, JESSE B. ) JOHN P. BABAUTA
CRUZ, JOHN L.G. NAUTA, and ) APRIL 20, 2007
JOHN P. BABAUTA, )
                                )
        Plaintiffs,             )
                                )
    vs.                         )
                                )
CALPAC, DYNAMIC TECHNICAL       )
SERVICES, MCI, JOHN HEALY,      )
DENNIS CLARK, WILLIAM WARD,     )
JAI JAMES and DOES 1 through    )
10,                             )
                                )
        Defendants.             )

        The deposition of JOHN P. BABAUTA, called by
Defendant California Pacific Technical Services LLC, pursuant
to Notice and pursuant to Rule 30 of the Federal Rules of
Civil Procedure, taken at the law offices of Blair Sterling
Johnson Martinez & Leon Guerrero P.C., 238 Archbishop F.C.
Flores Street, Suite 1008, Hagåtña, Guam, on Friday, the 20th
day of April, 2007, at the hour of 2:10 o'clock p.m.

        That at said time and place, there transpired the
following:

## Page 2

A P P E A R A N C E S:

For the Plaintiffs            Delia Lujan, Esq.
                              LUJAN AGUIGUI & PEREZ
                              Suite 300, Pacific News Building
                              238 Archbishop Flores Street
                              Hagatna, Guam 96910

For Defendant California      Vincent Leon Guerrero, Esq.
Pacific Technical             BLAIR STERLING JOHNSON MARTINEZ
Services LLC, John Healy        & LEON GUERRERO P.C.
and William Ward              238 Archbishop F.C. Flores Street
                              Suite 1008, Pacific News Building
                              Hagåtña, Guam 96910

For Defendant Dynamic         Elyza McDonald, Esq.
Technical Services            CARLSMITH BALL
and Dennis Clark              134 West Soledad Avenue
                              Suite 400, Bank of Hawaii Bldg.
                              Hagåtña, Guam 96910

## Page 3

I N D E X

E X A M I N A T I O N

                        Direct   Cross   Redirect   Recross
By Mr. Leon Guerrero      4                 88
By Ms. McDonald                   55                  93
By Ms. Lujan                      83

E X H I B I T S

Defendants':         Description:                        Page
                                                        Marked:
Exhibit A -  Charge of Discrimination                     22
Exhibit B -  Request for Advance Payment                  50
Exhibit C -  Declaration of John P. Babauta               51

**COPY**

## Page 4

        HAGÅTÑA, GUAM: APRIL 20, 2007; 2:10 P.M.

        JOHN P. BABAUTA,
called by Defendant California Pacific Technical Services LLC
to give his deposition at this time, being first duly sworn,
was examined and testified on his oath, as follows:

        DIRECT EXAMINATION
BY MR. LEON GUERRERO:

    Q.  Good afternoon, Mr. Babauta.  My name is Vince Leon
Guerrero and I represent Calpac.  We're here to take your
deposition today.  I guess you know what's going to happen
today.  We'll be asking you questions; right?

    A.  Okay.

    Q.  And your answers are under oath.  Because we're
going to have it transcribed, please remember to state your
answers orally.

    A.  Okay.

    Q.  And let's try to have it so that one person talks
at a time so it won't jumble up the transcript; okay?

    A.  All right.

    Q.  If you don't understand my question or you didn't
hear it, just ask to rephrase it or repeat it; all right?

    A.  Okay.

    Q.  We're here because you filed, you and a few other
people filed a lawsuit against Calpac and a few others;

```
 1    right?
 2         A.   Yes.
 3         Q.   Okay.  Why don't we just start with a little
 4    background about yourself, okay?  Are you currently employed?
 5         A.   No.
 6         Q.   What was the last job that you had?
 7         A.   Um, actually I've been just getting like small jobs
 8    like for five days, like that.  That's how I've been, um,
 9    working.
10         Q.   Okay.  When was the last job that you had for, say,
11    over a month?
12         A.   Um, J. T. Angoco.
13         Q.   All right.  And when did you work there?
14         A.   If I'm not mistaken, it was like maybe last month.
15    Last month.
16         Q.   And how long did you work there?
17         A.   Only five days.
18         Q.   All right.  Before Angoco's, what was the last job
19    you had?
20         A.   Well, if I'm not believe, um, about last year too,
21    J. T. Angoco.  Same thing.
22         Q.   Okay.
23         A.   Yeah, I only help them in the sand run, that's why.
24         Q.   Sand run?
25         A.   Yeah, every time there's sand that comes into, uh,
```

```
 1    to Guam, I, I work for them.
 2         Q.   Okay.  What was your position at Angoco's?
 3         A.   Laborer.
 4         Q.   Laborer?
 5         A.   Yes.
 6         Q.   Okay.  Any other places that you worked for -
 7         A.   Well, uh, I tried to work for Allutiq.
 8         Q.   What is that?  Can you spell it?
 9         A.   Uh, A-L-L-U, or, uh, yeah, U-T-I-Q, or something
10    like that.  Allutiq.
11         Q.   What is that?
12         A.   Well, that's just, uh, that's, um, food services.
13    They, you know like when the ships come in, we deliver food.
14    We're the one that's off-loading and loading.
15         Q.   What was your position there?
16         A.   Same thing.
17         Q.   Laborer?
18         A.   Yes.
19         Q.   How much were you making over there?
20         A.   There I was making, like, uh -- oh, I'm not sure.
21    I think like, it was I think like nine, nine-some, ten.  I'm
22    not sure.
23         Q.   And at Angoco's, how much were you making there?
24         A.   Um, man it was, they'll like pay us like sometimes
25    nine, ten dollars.
```

```
 1         Q.   How long did you work at that food services place?
 2         A.   Man, it wasn't long.  It wasn't long.  That thing
 3    was like only on-call basis.
 4         Q.   All right.
 5         A.   That thing was like sometimes I only worked two
 6    hours a day.  Maybe two days a week.
 7         Q.   Okay.
 8         A.   It was only, uh, 'cause there was a bunch of us.
 9    There was a lot of us, so it was like, oh, uh, you know,
10    taking turns.
11         Q.   Can you give me a time frame that you were working
12    at that food services place?  Time frame?  An estimate.
13         A.   An estimate?  Maybe a month or two.  That's about
14    it.
15         Q.   Okay, but from when to when?
16         A.   Oh, man, uh, I'm not sure.  I'm not sure when.  But
17    I know it was, um, like 2006 maybe.  The beginning of 2006 or
18    the ending of 2005.
19         Q.   All right.  Well, let's go to the year 2005.  Did
20    you get any jobs then?
21         A.   No.
22         Q.   Not at all?
23         A.   Not at all.
24         Q.   What about 2004; did you get any jobs then?
25         A.   2004?  Yes.
```

```
 1         Q.   Why don't we start with the last job you had in
 2    2004?
 3         A.   The last job I had was Calpac.
 4         Q.   And when did you quit working at Calpac?
 5         A.   If I'm not mistaken, um, 2005.
 6         Q.   All right.  When in 2005?
 7         A.   About May.
 8         Q.   How did you stop working at Calpac?
 9         A.   Actually, uh, how did I stop?  Actually after my
10    surgery.  When I called ... I went back in to turn in my
11    surgery form that I was able to go back, and they were
12    telling me to call.  So I was doing this calling, and they
13    were giving me the runaround.
14         Q.   Who's they?
15         A.   Ward.  William Ward, um, Russell Hatfield.
16         Q.   Okay.
17         A.   Yeah.
18         Q.   Now let's talk ... I'm a little confused about what
19    you are talking about.  Now you said around May, 2005 you no
20    longer worked at Calpac; right?
21         A.   Well, it wasn't, it wasn't no longer, but after my
22    surgery. [illegible] 200[illegible]
23         Q.   [illegible] kind of surgery did you have?
24         A.   Knee.
25         Q.   Was it a reconstruction or something?
```

1    A.   It was, uh, I had, uh, a torn cartilage.

2    Q.   Okay.  So how long were you out or unable to work

3    because of your knee?

4    A.   What's that?  Excuse me.

5    Q.   How long were you unable to work because of your

6    knee?

7    A.   Well, um, it like, um, maybe a month.

8    Q.   Okay.  So you went through the surgery in January,

9    2005?

10   A.   No.  Um, I went in in, um, like March or April.

11   Q.   Okay.  So for one month you were unable to work;

12   correct?

13   A.   Yes, sir.

14   Q.   All right.  So what happened; you stopped working

15   at Calpac because of your knee; right?

16   A.   No.

17   Q.   Okay.  Tell me what happened.

18   A.   I didn't stop working at all.

19   Q.   Okay.

20   A.   It's, um, they, they were just giving me the

21   runaround, so I was just tired calling.

22   Q.   What runaround were they giving you?

23   A.   As in when I called, they said call up Russell.

24   When I call Russell, they're like call William or Art.  You

25   know, they were giving me all that.  So I ... that was it.

---

1    After that I just stopped calling.

2    Q.   Were they asking you for a doctor's excuse or

3    doctor's okay for you to work?

4    A.   Um, no, they didn't ask me any of that.  But I

5    turned in my paper, though, telling them that, uh, I was able

6    to, you know, I was able to come back.

7    Q.   When did you turn in the paper?

8    A.   Uh, I can't recall but I know it was on May.  I

9    don't recall what day, but it was on May.

10   Q.   And then what happened when you turned it in?

11   A.   That's it.  They just told me to, uh, to be

12   calling, 'cause right now there is no job.

13   Q.   So when you came in, in May, and they said there

14   were no jobs available; is that correct?

15   A.   Exactly.

16   Q.   Okay.  When did you start working at Calpac?

17   A.   About October, 2004.  Or, yeah, November, I think,

18   November or October.

19   Q.   Okay.  How much were you asking at Calpac?

20   A.   Six fifty.

21   Q.   Did you ever get a raise while you were at Calpac?

22   A.   No.

23   Q.   Before Calpac, what was the last job you had?

24   A.   Before Calpac, I think it was, I think the last one

25   was Raytheon.

---

1    Q.   And what were you doing at Raytheon?

2    A.   I was, a, warehouse specialist.

3    Q.   How much were you making at Raytheon?

4    A.   Twelve thirty-three.

5    Q.   And how long did you work at Raytheon?

6    A.   About a year.

7    Q.   Why did you stop working at Raytheon?

8    A.   Um, I got, um, forced to resign.

9    Q.   Who forced you to resign?

10   A.   Well, actually because I was positive.  They were

11   zero tolerance.

12   Q.   What do you mean by you were positive?

13   A.   Yes, um, I was positive on THC.

14   Q.   Okay, so you were tested for drugs and you –

15   A.   Yes.

16   Q.   Okay.  By the way, do you have a criminal record?

17   A.   Yes.

18   Q.   What was the last thing you were convicted of?

19   A.   Oh; right?, uh; right? now, um, for, for drugs.

20   Q.   Are you currently on probation or parole?

21   A.   Yes, I'm on probation.

22   Q.   When were you convicted?

23   A.   Well, uh, actually, according to, um, according to

24   my PO is that I'm not convicted because I'm going through

25   classes right now and everything and, um, and my case will be

---

1    expunged.

2    Q.   Okay.  Well, let me ask you, did you plead guilty

3    at that time?

4    A.   Uh, yes.

5    Q.   And then if you stay out of trouble, you're ...

6    You got a deferred plea; right?

7    A.   Um, excuse me?  Could you repeat that?

8    Q.   You got a deferred plea.  Do you know what a

9    deferred plea is?

10   A.   No.

11   Q.   You're going to plea where if you stay out of

12   trouble, your plea goes away; right?

13   A.   Yes.  Yes, yes, yes, yes.

14   Q.   And it's expunged –

15   A.   After two years, yes.

16   Q.   Do you have any other criminal convictions besides

17   that?

18   A.   Well, actually, um, uh, for, uh, rioting and

19   aggravated assault, and warrant of arrest, that's about it.

20   Q.   Was the rioting and aggravated assault, is that one

21   time, it happened as a result of one incident?

22   A.   Yes.

23   Q.   And when did that happen?

24   A.   In 2000 ... yeah, in 2000.

25   Q.   And is that one finished?  Is it resolved?

```
 1    safety shoes and I was going to start that day.  That was
 2    about it.  I didn't see -- I wasn't interviewed.
 3         Q.   Was Don Harper working for Calpac at that time?
 4         A.   Yes, sir.
 5         Q.   Do you know if it was Don Harper who said it was
 6    okay for you to work there?
 7         A.   I believe so.
 8         Q.   Who helped you fill out Exhibit A; was this your
 9    writing?
10         A.   Yes.
11         Q.   Why don't you go ahead and read the second
12    paragraph?  I'll read it for you, it will be faster.
13              "On or about October 25, 2004 I was harassed by
14    Dennis Clark, a representative of MCI and an employee of
15    Dynamic Technical Services.  Dennis Clark made a racially
16    derogatory remark to me and other co-workers by calling us
17    island monkeys."  Is that right?
18         A.   Yes, sir.
19         Q.   Where did this take place; this incident on October
20    25, 2004.
21         A.   Tiyan.
22         Q.   And who was there with you at that time?
23         A.   Um, John Nauta; Jesse -- I mean, uh, Teddy Cruz;
24    Robert Cruz; Henry Van Meter; Joseph Mendiola; Roland
25    Mendiola; Larry Charfauros, um -- that's about it.
```

```
 1         Q.   You essentially named most of the people that's
 2    involved in this lawsuit; right?
 3         A.   Um-hmm.
 4         Q.   Joseph Fernandez wasn't there; correct?
 5         A.   Um, I don't recall.
 6         Q.   Do you recall, or do you know who Norman Santos is?
 7         A.   Yes.
 8         Q.   Was he there?
 9         A.   Yes, he was.
10         Q.   Around October or December of 2004, there was a
11    meeting that took place at Calpac; right?
12         A.   Yes.
13         Q.   And that was in response to a protest that was
14    taking place against Calpac; correct?
15         A.   Yes.
16         Q.   Did you know the people who were protesting against
17    Calpac?
18         A.   Yes.
19         Q.   You knew who some of them were?
20         A.   Yes.
21         Q.   Bad question; I'm sorry.  Are any of the
22    co-plaintiffs in this case related to you?
23         A.   Yes.
24         Q.   Why don't you go ahead and name who they are and
25    what the relationship is.
```

```
 1         A.   Okay.
 2         Q.   I'll just call their first name.  Henry Van Meter;
 3    are you related to him?
 4         A.   Um, no.
 5         Q.   Are you related to Jerry Apodaca?
 6         A.   No.
 7         Q.   Are you related to Joseph Hernandez?
 8         A.   No.
 9         Q.   Are you related to Joseph Mendiola?
10         A.   Um, that I'm not too sure, though.  But, uh, I'm
11    not too sure 'cause, um, my mom is, um, Mendiola too, so I'm
12    not too sure.
13         Q.   Okay, when I say related, I'm saying like maybe
14    first cousins or closer.
15         A.   Okay, no.  No.
16         Q.   Are you related to Larry Charfauros?
17         A.   No.
18         Q.   Are you related to Anthony Arriola?
19         A.   No.
20         Q.   Are you related to Robert Cruz?
21         A.   No.
22         Q.   Are you related to Roland Mendiola?
23         A.   No.
24         Q.   Are you related to James Yee?
25         A.   No.
```

```
 1         Q.   Are you related to John Nauta?
 2         A.   No.
 3         Q.   Are you related to Teddy Cruz?
 4         A.   No.
 5         Q.   Are you related to Jesse Cruz?
 6         A.   Yes.
 7         Q.   Teddy Cruz and Jesse Cruz are brothers; correct?
 8         A.   Yes.
 9         Q.   So you're related to Jesse Cruz through his wife?
10         A.   Yes.
11         Q.   Who is his wife?
12         A.   My sister, Debbie.
13         Q.   I'm sorry?
14         A.   My sister, Debbie.
15         Q.   Was your sister participating in the protest
16    against Calpac?
17         A.   Yes.
18         Q.   And this is while you were working; correct?
19         A.   Right.
20         Q.   Do you know if she held up any signs referring to
21    Calpac?
22         A.   I'm -- I don't recall.
23         Q.   Did you ask her why she was protesting?
24         A.   No.
25         Q.   So they had a meeting at Calpac because of this
```

1    Q.   Who was your foreman at the time?

2    A.   Henry Van Meter and Teddy Cruz.

3    Q.   Did they say they're going to go report it to

4  management?

5    A.   Well, they said they were going to go on the chain

6  of command.  So, uh, I don't know how, I think it went from

7  them to HQ, then to Don Harper, then up further.  It was

8  going on a ...

9    Q.   Did you ever follow up with Mr. Van Meter

10  concerning your complaint?

11    A.   Yes.

12    Q.   And what did he say?

13    A.   Uh, he said it's, uh, he's been reporting it.  He

14  reported it, and they told him that they're going to go as,

15  uh, chain of command.

16    Q.   So said that they were going to go up the chain of

17  command?

18    A.   Right.

19    Q.   Is that what he said?

20    A.   Yeah.

21    Q.   How many times did you follow up with Mr. Van

22  Meter?

23    A.   Uh, I don't recall.

24    Q.   What about Mr. Cruz, did you follow up with him?

25    A.   Hm, yes.

---

1    Q.   And did he say essentially the same thing as Mr.

2  Van Meter?

3    A.   Well, yeah.  He said it was, it went through Van

4  Meter.

5    Q.   Now looking at Exhibit A, it appears that you heard

6  the statement once; is that right?

7    A.   Where's that?

8    Q.   Well, you only made one complaint and that was on

9  October 25, 2004 about Mr. Clark; correct?

10    A.   Yes.

11    Q.   Did he say it any time else besides the October 25,

12  2004 incident?

13    A.   No.

14    Q.   Prior to you getting your operation, your knee

15  operation, did Calpac treat you differently?

16    A.   Prior?  Before I got my operation?

17    Q.   Yeah, that was around February, I believe, or March

18  of 2005 that you had your operation; right?

19    A.   Yes.

20    Q.   Okay.  Just before you went in for your operation,

21  did you think Calpac treated you differently?

22    A.   Um, yes.

23    Q.   How did they treat you differently?

24    A.   Um, like, um, we would be the one to do the, like

25  the crappy job.

---

1    Q.   Okay.  What kind of crappy job was that?

2    A.   You know, like, um, I believe, um, we would have to

3  clean people's mess.

4    Q.   Okay.  Who's mess would you have to clean?

5    A.   The co-workers.  The rest of our co-workers.

6    Q.   So you're saying that if a co-worker were to leave

7  trash behind, you'd have to pick it up?

8    A.   Exactly.

9    Q.   All right.  Anything else besides that as far as

10  treatment?

11    A.   No.  No.

12    Q.   So the only thing you have a problem with is that

13  you had to clean up your co-workers mess?

14    A.   Right.

15    Q.   How many people were tasked with cleaning up the

16  mess?

17    A.   Well, we were a group, so I'll be like with, um,

18  Teddy.

19    Q.   Do you know if any other laborers had to clean up

20  the mess, the trash?

21    A.   No, not uh, no.

22    Q.   No, you don't know?

23    A.   No; not that I recall.

24    Q.   So you're saying you don't know if anybody else had

25  to pick up trash?

---

1    A.   Right.

2    Q.   Paragraph 216 of your complaint says that you filed

3  a charge of discrimination on December, 2004.  Do you know if

4  that was actually done?

5    A.   Yes.

6    Q.   Was Jesse Cruz picketing or protesting, by the way?

7    A.   No.

8    Q.   Did you associate with anybody, any of the

9  protestors, after Mr. Healy said don't associate with them?

10    A.   No.

11    Q.   In your Complaint, or in your allegations, and I'm

12  referring specifically to paragraph 218, it mentions that

13  somebody or an agent, a foreman or an agent of Calpac

14  contacted you about this charge; correct?

15    A.   Excuse me?  Could you re –

16    Q.   Okay.  I'm just going to read paragraph 218, okay?

17    A.   Okay.

18    Q.   Also before Plaintiff Babauta's unlawful

19  termination of employment, Plaintiff Babauta was informed by

20  a foreman or other agent of Defendant Calpac that Plaintiff

21  Babauta should be careful about what he signs regarding the

22  charge of discrimination, and that if Plaintiff Babauta

23  dismissed the charge against Calpac, then good things might

24  happen to Plaintiff Babauta.

25    A.   No.

1     Q.   Before the talk or after the talk?

2     A.   Uh, actually it was after the, after the talk.  I

3   mean during lunch, yes, that's when I made a complaint.

4     Q.   And what did you say to Henry Van Meter?

5     A.   I told him, I said, "I don't believe Clark called

6   me an island monkey."  He goes, "yeah, we heard it, all of us

7   heard it, he called us island monkeys."  So, yeah.

8     Q.   But did you ask him to do something about it?

9     A.   Yes.

10    Q.   But did you ask him to do something about it?

11    A.   Yes.

12    Q.   And what did you say?

13    A.   I told him, I said, um, "you've got, eh, you know,

14  I want you to do something about it because I don't dig it.

15  You know, I was embarrassed, I was frustrated, I was

16  everything."

17    Q.   What did you expect him to do?

18    A.   Henry?

19    Q.   Yes.

20    A.   I expected him to, um, actually, um, I expected him

21  to go up to Dennis Clark personally.  I wasn't expecting him

22  to go chain of command.

23    Q.   Okay.

24    A.   You know, I thought he was just going to go up to

25  Dennis and just tell him that, you know, that wasn't nice.

JOHN P. BABAUTA:  April 20, 2007

1   you know, or something like that.  But I guess he went

2   through the chain of command instead of going up to Dennis.

3     Q.   Okay.  Did you tell him you should go and talk to

4   Dennis Clark?

5     A.   No.

6     Q.   No?

7     A.   I didn't tell him he should go and talk to Dennis

8   Clark.  I just said you should do something about it.

9     Q.   Okay.  So you said he went up the chain of command?

10    A.   Yes.

11    Q.   What did he do?  What did Henry Van Meter do?

12    A.   I don't know how did he do it.  I don't know, I

13  don't know.

14    Q.   So you don't know if he did anything, at all?

15    A.   Well, uh, I know it got to HQ and, um, I believe

16  Don Harper, but after that, I didn't know if it got to

17  wherever it was supposed to go to, but ...

18    Q.   You said you believe he said HQ and –

19    A.   Yeah, I believe he told HQ, yes.

20    Q.   Okay.  Why do you believe that?

21    A.   Because, um, HQ knew about it, and he, uh, he was

22  asking us if it was true.

23    Q.   Oh, okay.  So Henry Quintanilla came back and

24  talked to you guys about it?

25    A.   Well not really come back.  It was like after

JOHN P. BABAUTA:  April 20, 2007

1   working hours, he was like, dude, you know, so and so, and I

2   said yeah.

3     Q.   When did he come, when did he talk to you guys?

4     A.   That, the same day.

5     Q.   That same day; after work?

6     A.   Yes.

7     Q.   Okay.  And so did you talk more about it?

8     A.   No, no.

9     Q.   No?

10    A.   No.

11    Q.   So you didn't say anything to him?

12    A.   No.

13    Q.   And what about Don Harper?  Did you know whether or

14  not he knew or didn't know?

15    A.   I'm not sure.

16    Q.   You're not sure?

17    A.   No.

18    Q.   So you get most of your assignments from Teddy

19  Cruz; is that correct?

20    A.   Yes.

21    Q.   Anybody else give you assignments?

22    A.   Hmm, like I said it was HV, but HV got, um, HV was

23  down so ... no, it was mostly all Teddy where my assignments

24  came from.

25    Q.   Okay.  Were you part of a morning meeting at

JOHN P. BABAUTA:  April 20, 2007

1   Calpac?

2     A.   It all depends because, um, usually, um, if it's

3   safety first, then we're all involved.  Now if it's meetings

4   with the supervisors, then ... or foreman, like that, we're

5   not involved.

6     Q.   Okay.  So when you showed up to work, how did you

7   know what you were supposed to do that day?

8     A.   Oh, when I come in Teddy will be, um ... Actually,

9   I won't really know what I'm going to do until I get into the

10  vehicle with Teddy.  That's when I really know what we're

11  going to do.

12    Q.   Oh, okay.  So you would look for Teddy; is that

13  what you would do?

14    A.   Yes, because already we're grouped.  So every time

15  I come in, he's already my foreman.

16    Q.   Okay.

17    A.   That's who I go to and that's ... whatever.  I

18  don't go to anybody else, just straight to Teddy.

19    Q.   Okay.  Who employed you to work on the MCI project?

20    A.   Who employed me?

21    Q.   Yes.

22    A.   Calpac.

23    Q.   Calpac?  They hired you?

24    A.   Right.

25    Q.   And they paid your salary?

JOHN P. BABAUTA:  April 20, 2007

1    A.  Right.

2    Q.  Okay. Did you ever get an evaluation of your work

3 performance?

4    A.  Not that I recall.

5    Q.  Okay.

6    A.  Well, not from them, but only from like HQ.

7    Q.  What do you mean?

8    A.  HQ would tell me, like, oh, you're doing good.

9 He'll talk to the boss to see if he, um, he can give me a

10 raise, or like that. But to me, um, I wasn't really ·

11 believing in it until it happened -- you know, until it

12 happens. But as far as just mouth, um, I won't take it into

13 consideration. I'll just –

14    Q.  Okay.

15    A.  -- wait until it happens. If it happens, it

16 happens. If it doesn't, it doesn't.

17    Q.  And he would just give you encouraging words; is

18 that what you're saying?

19    A.  Yes.

20    Q.  Okay. Do you know who Teddy Cruz reported to?

21    A.  Excuse me?

22    Q.  Who did Teddy Cruz report to?

23    A.  Oh, I don't know.

24    Q.  Do you know who Dennis Clark's boss was?

25    A.  No.

1    Q.  Do you know who his employer was?

2    A.  Well, um, actually I thought, um, his employer was

3 Calpac because he was always driving that Calpac van.

4    Q.  Okay.

5    A.  I never knew, actually ... I always thought he was

6 working for Calpac. That he was under Calpac because he was

7 always driving that Calpac van.

8    Q.  Okay. Do you have a different understanding of who

9 his employer was, now?

10    A.  Yes.

11    Q.  Who do you think his employer is?

12    A.  DTS.

13    Q.  Is that Dynamic Technical Services?

14    A.  Yes, ma'am.

15    Q.  Now, how did you hear of DTS?

16    A.  Uh, EEOC, right here, this thing. The EEOC, yes.

17    Q.  From the EEOC?

18    A.  Yes.

19    Q.  What do you know right now of DTS?

20    A.  What do I know right now?

21    Q.  Yes. What do you know about them?

22    A.  As in?

23    Q.  What do you know about them? Where they're based?

24    A.  No.

25    Q.  What they do?

1    A.  No. I don't know anything.

2    Q.  You don't know who the president is?

3    A.  No.

4    Q.  Do you know how many employees they have?

5    A.  No.

6    Q.  Did you know who Dennis Clark reported to? Who

7 Dennis Clark reported to?

8    A.  Who? Um, I never ... no, I never knew who he

9 reported to.

10    Q.  Okay. Did you ever see Dennis Clark talk to anyone

11 about you?

12    A.  No.

13    Q.  Did you say that Dennis Clark gave you direct

14 instructions once; is that what you said?

15    A.  Did I?

16    Q.  Yeah. Well, let me ask you again. Did Dennis

17 Clark ever give you any direct instructions?

18    A.  No.

19    Q.  No? Okay; sorry. We had one earlier this morning

20 so I might be getting confused.

21        How often would you see Dennis Clark throughout the

22 workday?

23    A.  Throughout the workday? I'd say throughout the day

24 maybe once.

25    Q.  Once?

1    A.  Yeah.

2    Q.  And for how long of a period?

3    A.  Uh, sometimes not even long. Like either he would

4 just talk, or I'd see how the job was done and just take off,

5 or we'd just see him pass by and stop at the next crew down

6 the line, you know? We'd just see him, like, I'll see him

7 like once maybe a day.

8    Q.  Once a day?

9    A.  Yeah.

10    Q.  And just for how long?

11    A.  Not long.

12    Q.  Ten minutes?

13    A.  Maybe even less sometimes. Sometimes, sometimes

14 it'll be more than ten minutes. Like if he has to get down

15 and walk through the, the job site we're doing, or it all

16 depends. It can be one hour; it can be less than one hour;

17 it can be more than one hour. It all depends on what he's

18 doing.

19    Q.  On average?

20    A.  On average? To tell you, I don't really ... on

21 average I really don't see him more than an hour.

22    Q.  Okay.

23    A.  It's always less, so ...

24    Q.  Would he ever say anything to you if he saw you on

25 the site?

1   being called an island monkey?

2   A.   Well, um, actually it's  they didn't really talk

3   about it.  But they just, like, I just heard them say they

4   don't believe that they were called island monkeys.  And I

5   just overheard, but I didn't ... no, we don't, I don't know.

6   Q.   No.

7   A.   I just overhear some of them say it.

8   Q.   You would overhear it?

9   A.   Yeah, like they don't believe we were called island

10  monkey, you know.

11  Q.   Did you overhear them talking about it before you

12  heard him say it?

13  A.   Um, no.

14  Q.   No.  So you hadn't heard anything about that, about

15  him saying monkeys or island monkeys before you heard it?

16  A.   Yeah.

17  Q.   No?

18  A.   Yeah.

19  Q.   Okay.  And then how many times would you overhear

20  people talking about it after?

21  A.   After we were told?  Not much.

22  Q.   No, no, after you heard him make the statement.

23  A.   How many times?

24  Q.   Yeah; how many times?

25  A.   No, I don't recall.  It's not much.  It wasn't

1   much.  It's just within us that heard it, it was the one

2   that, you know, like, they'll look at each other and say

3   "Man, I don't believe we were called island monkeys," you

4   know.

5   Q.   Yeah.

6   A.   It's not with any outsiders or anybody.  It was

7   just within us.

8   Q.   Did you ever hear Dennis Clark talk about any of

9   the other plaintiffs in this case?

10  A.   No.

11  Q.   No?

12  A.   None of them.

13  Q.   And you hadn't heard of DTS before the EEOC told

14  you about them; right?

15  A.   Right.

16  Q.   Right.  So you didn't submit a complaint to DTS?

17  A.   No.

18  Q.   Did you go to a meeting with the other plaintiffs

19  at Don Harper's house?

20  A.   Yes.  I've been there.

21  Q.   Okay.  And did you talk to Jesse Cruz, for example,

22  about going to the meeting?

23  A.   Um, no.  Um, no.

24  Q.   No?

25  A.   No.

1   Q.   When you went to the meeting, was he there?

2   A.   Yes.

3   Q.   Yes.  So did you expect him to be there?

4   A.   Um, yes.

5   Q.   Why did you expect him to be there?

6   A.   Because we, um, I know we were all, um, we were all

7   supposed to meet there for a meeting but, uh, yeah, we were

8   all supposed to be there.

9   Q.   Who told you there was a meeting there?

10  A.   Um, Debbie.

11  Q.   Your sister?

12  A.   Yes.

13  Q.   Oh, okay.  And how did she know?

14  A.   Who?

15  Q.   Your sister; about the meeting.

16  A.   No, I don't know.  That now I don't know.

17  Q.   So what did she tell you?

18  A.   She just said go down to Don Harper at a certain

19  time; and that's it.

20  Q.   Did you tell your sister that -

21  A.   I didn't ask her why and how did she know, or ...

22  you know.  It was ...

23  Q.   Did you tell your sister about what happened with

24  Dennis Clark?

25  A.   No.

1   Q.   No?  So then why did you think there was a meeting

2   for that?

3   A.   Because I knew, I knew her ... I didn't tell her.

4   Q.   Yes.

5   A.   I know definitely I'm not going to tell her.

6   Somebody had to tell her, but then she knew I was involved

7   maybe, and ... I don't know.

8   Q.   Okay.  So she told you to go to the meeting?

9   A.   Yes.

10  Q.   And you didn't know whether or not her husband knew

11  about it or was going to be there?

12  A.   Yes, I'm pretty sure I knew he was going to be

13  there.

14  Q.   But did you know if he had ever heard Dennis Clark

15  say island monkeys?

16  A.   Who?

17  Q.   Jesse.

18  A.   What?

19  Q.   Did you ever, before you went to the meeting, did

20  you ever know or hear whether or not he had heard Dennis

21  Clark say island monkeys?

22  A.   No.

23  Q.   You didn't know?

24  A.   No.

25  Q.   Do you know who made the decision to lay you off?

1  project owner, I guess?
2      A.  Yes.
3      Q.  So he wasn't really ... I mean, if anything, he
4  gave instructions to Calpac; correct?
5      A.  Yes.
6      Q.  Calpac didn't give instructions to Mr. Clark?
7      A.  Um -- now, that I don't know.
8          MR. LEON GUERRERO:  I don't have any other
9  questions.  Thank you very much.
10         THE WITNESS:  All right.
11         RE-CROSS EXAMINATION
12  BY MS. MCDONALD:
13     Q.  This last series of questions about him giving
14 instructions to Calpac; why do you say that?
15     A.  Because, um, like if he was out on the field, I'll
16 hear, uh, like he would talk to like the supervisor and then
17 the supervisor, like would come back to us and tell us,
18 "okay, um, we gotta go back and do this according to Mr.
19 Clark."
20     Q.  Okay.  Who would be the supervisor?
21     A.  Well, it don't matter; HV, Henry Van Meter; Teddy.
22     Q.  He would talk to Teddy directly?
23     A.  Um, if, if Teddy's around, yes, I'm pretty sure,
24 yes, he will talk to Teddy.  Whoever's running, whoever's
25 running the crew is who he'll talk to.  If Henry Van Meter's

1  not there, then it'll be Teddy.  If Teddy's not there,
2  it's ... I don't know who he'll talk to next, if none of them
3  is there.
4      Q.  Okay.
5      A.  Maybe he'll just go straight down to Healy and tell
6  Healy that, "okay, um, so and so needs to be done.  The
7  foremen weren't there."
8      Q.  You saw him talking to John Healy?
9      A.  No.  But I'm just saying it's -- you know, maybe if
10 he didn't see any of the foremen out there on the site, maybe
11 he'll go directly to Healy or -- I don't know.
12     Q.  Okay.
13     A.  You know, that's what I'm saying.
14     Q.  Okay.  You didn't observe -
15     A.  Right; exactly.
16     Q.  Did you ever observe him talking to Don Harper?
17     A.  No.
18         MS. MCDONALD:  Okay; nothing further.
19         (whereupon, at 4:25 o'clock p.m., the
20 deposition was concluded.)
21
22
23
24
25

1              CERTIFICATE OF WITNESS
2
3      I, John P. Babauta, the deponent herein, do hereby
4  certify that I have read, or had read to me, the foregoing
5  typewritten pages 1 through 94 inclusive.  My changes
6  thereof, if any, have been noted on a separate sheet of
7  paper, which I have signed, and which I understand will be
8  appended to and made a part of this deposition.  I certify
9  that the same is now a true and correct transcript of my
10 testimony.
11
12
13         _____
14              John P. Babauta
15
16         (Dated)_____
17
18
19
20
21
22
23
24
25

1              REPORTER'S CERTIFICATE
2
3      I, Cecilia F. Flores, Stenotype Reporter, do hereby
4  certify the foregoing 94 pages to be a true and correct
5  transcript of the stenographic shorthand notes and audio
6  recording taken by me in the within-entitled and numbered
7  case at the time and place as set forth herein.
8          Dated at Hagåtña, Guam, this 4th day of June, 2007.
9
10         _____
11              Cecilia F. Flores
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          CLERK'S CERTIFICATE

2

3    SUPERIOR COURT OF GUAM        ) ss

4          I, Cecilia F. Flores, Special Deputy Clerk,

5    Superior Court of Guam, do hereby certify that on the 20th

6    day of April, 2007, at the hour of 2:10 p.m. there appeared

7    before me John P. Babauta at the offices of Blair Sterling

8    Johnson Martinez & Leon Guerrero P.C., the witness herein,

9    produced to give his deposition in the within-entitled and

10   numbered Case No. CIV05-00037, in the District Court of Guam;

11   that prior to examination the witness was by me duly sworn

12   upon his oath; that thereafter the transcript was prepared by

13   me or under my supervision, and a certified copy of the

14   original deposition transcript was presented to Mr. Leon

15   Guerrero's office for the deponent's review; corrections, if

     any, and execution.

16         I further certify that I am not a relative,

17   employee, attorney or counsel of any of the parties, nor a

18   relative or employee of such attorney or counsel, and that I

19   am not directly or indirectly interested in the matters in

20   controversy.

21         In testimony whereof, I have hereunto set my hand

22   and seal of Court this 4th day of June, 2007.

23

24   _____

25   SPECIAL DEPUTY CLERK, SUPERIOR COURT OF GUAM

JOHN P. BABAUTA:  April 20, 2007