ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555

**FILED**
DISTRICT COURT OF GUAM

JAN 0 4 2008 ꝓbᵔ

**JEANNE G. QUINATA**
**Clerk of Court**

*Attorneys for Defendant Dynamic Technical Services*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. 05-00037 <br><br><br><br> **DEFENDANT DYNAMIC TECHNICAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JERRY APODACA, JR.; MEMORANDUM IN SUPPORT OF MOTION; DECLARATION OF ELYZE J. MCDONALD; EXHIBITS A-D; DECLARATION OF SERVICE** |

ORIGINAL

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.      Page 1 of 22
4835-3465-0626.1.059759.00001
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 1 of 32

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Dynamic Technical Services, Inc. (hereinafter referred to as "DTS"), Defendant in the above entitled and numbered action and, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, files this Motion for Summary Judgment as to all claims asserted by Plaintiff Jerry Apodaca, Jr. (hereinafter referred to as "Plaintiff"). This motion is made upon the attached memorandum, the record in this case, including without limitation the exhibits attached and filed contemporaneously herewith, and argument presented by counsel at the hearing.

WHEREFORE, PREMISES CONSIDERED, Defendant Dynamic Technical Services respectfully requests this court to enter and order dismissing all of Plaintiff Jerry Apodaca, Jr.'s claims against DTS and for such further relief to which DTS shows itself justly entitled.

DATED this 4th day of January, 2008.

CARLSMITH BALL LLP

ELYZE J. MCDONALD
Attorneys for Defendant
Dynamic Technical Services

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.                    Page 2 of 22
4835-3465-0626.1.059750-00001
Case 1:05-cv-00037     Document 472     Filed 01/04/2008     Page 2 of 32

# INDEX OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)     6

*Anderson v. Pacific Maritime Assoc.*, 336 F.3d 924 (9th Cir. 2003)     12

*Association of Mexican-American Educators v. California*,
231 F.3d 572 (9th Cir. 2000)     12-13

*Bonnette v. California Health and Welfare Agency*, 704 F.2d
1465 (9th Cir. 1983)     8

*Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213 (10th Cir. 2002)     9

*British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare
Fund*, 882 F.2d 371 (9th Cir. 1989)     7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)     6-7

*Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 123
S.Ct. 1673, 155 L.Ed.2d 615 (2003)     8

*E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003)     8-9

*Dominguez-Curry v. Nevada Transp. Dept*, 424 F.3d 1027 (9th Cir. 2005).     15

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)     14-15, 17

*Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983)     11, 13

*Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004 (D.Minn. 2003)     13

*Graves v. Lowery*, 117 F.3d 723 (3d Cir. 1997)     9

*Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)     18-19

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)     14, 16

*Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980)     11

*McZeal v. City of Seattle*, 2006 WL 3254504 (W.D.Wash. 2006)     15

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986)     15

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.     Page 3 of 22
4835-3465-0626.1 059759-00001
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 3 of 32

*Merrick v. Farmers Ins.*, 892 F.2d 1434 (9th Cir. 1990)  18

*NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117 (3d. Cir. 1982)  8

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)  14-15

*Rivas v. Federacion de Asociaciones Pecuarias*, 929 F.2d 814 (1st Cir. 1991)  9

*Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971)  115

*Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d 385 (D.Conn. 2003)  15

*Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973)  10, 13

*Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir. 1978)  15, 17

*Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350 (11th Cir. 1994)  9

*Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067 (C.D.Cal. 2002)  8

**Statutes**

42 U.S.C. § 2000e(b)  7

42 U.S.C. § 2000e(f)  7

**Rules**

Federal Rule of Civil Procedure 56  6

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.  Page 4 of 22
4835-3465-0626.1.059759-0000.1
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 4 of 32

## MEMORANDUM IN SUPPORT OF MOTION FOR
## SUMMARY JUDGMENT AGAINST PLAINTIFF JERRY APODACA, JR.

### I.
### GROUNDS FOR MOTION

Defendant DTS brings this Motion for Summary Judgment against Plaintiff Jerry Apodaca, Jr. on the following grounds:[1]

A)   Defendant DTS was not an "employer" of Plaintiff Jerry Apodaca, Jr. as defined by Title VII of the Civil Rights Act of 1964 and cannot be subject to liability under the statute.

B)   There was no hostile work environment based upon the uncontroverted evidence.

C)   DTS did not have any knowledge of any alleged discrimination.

To the extent co-defendant Calpac asserts there was no hostile work environment, DTS hereby joins in such motion.

### II.
### SUMMARY JUDGMENT EVIDENCE

Defendant relies on the following exhibits, attached to this motion and incorporated by reference as if fully set forth herein:

A)   Selected pages of the deposition of Plaintiff Jerry Apodaca, Jr.;
B)   Selected pages of the deposition of John Healy;
C)   Affidavit of Dennis P. Clark; and
D)   Affidavit of Linda Hayes.

### III.
### FACTUAL BACKGROUND

Plaintiff Jerry Apodaca, Jr. filed this lawsuit along with twelve other plaintiffs on December 12, 2005. The Plaintiff filed his Second Amended Complaint on September 7, 2007. All of Plaintiff's claims are brought under Title VII of Civil Rights Act of 1964. The Plaintiff

---

[1] In Plaintiff's Second Amended Complaint, the Plaintiff does not make any retaliation claims against DTS for termination. Plfs' 2nd Am. Complaint ¶ 70.

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.                    Page 5 of 22
4835-3465-0626, v. 059759-00001
Case 1:05-cv-00037     Document 472     Filed 01/04/2008     Page 5 of 32

was employed by Defendant Calpac from April 2004 through November 26, 2004. Ex. A. at p. 10, ll. 2; p. 23, ll. 21-25. During the course of his employment for Calpac, he worked on a construction project for MCI. Dennis Clark was the MCI "company representative" on this project and was an employee of DTS. Ex. C at ¶ 3. The Plaintiff alleges that Mr. Clark made discriminatory remarks in the presence of the Plaintiff on one occasion. Ex. A at pp. 67-68, ll. 24-25 and 1. The Plaintiff did not complain to anyone at DTS about the statements Dennis Clark allegedly made and no one at DTS became aware of Plaintiff's complaints until late December 2004 when Dennis Clark informed DTS of the existence of public protesters who were alleging that he made discriminatory comments. Ex. A. at p. 71, ll. 9-11; Ex. D at ¶ 9. Based upon these alleged statements made by Mr. Clark, the Plaintiff has filed the instant lawsuit seeking to recover damages from DTS under Title VII for hostile work environment.

## IV.
## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a court should grant summary judgment when, viewing the evidence in the light most favorable to the nonmoving party, the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. Pro. 56(e).

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.                    Page 6 of 22
4835-3465-0626.1 059759-00001
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 6 of 32

However, it is not necessary for the party moving for summary judgment to introduce evidence that negates the plaintiff's claim. *Celotex*, 477 U.S. 258, 323. Instead, the moving party may show in it motion that there is no evidence to support an essential element of the non-moving party's claim. *Id.* at 325. According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party: (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible. *British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989).

## V.
## ARGUMENTS & AUTHORITIES

### A.     DTS is not an "employer" of Plaintiff and cannot be liable under Title VII

In order to be subject to liability for a hostile work environment[2] under Title VII, a defendant must be an "employer" as the statute defines that term. An "employer" is a "person engaged in an industry affecting interstate commerce who has fifteen or more employees..." 42 U.S.C. § 2000e(b). An employee is an "individual employed by an employer." 42 U.S.C. § 2000e(f). In the present case, it is uncontested that Calpac, not DTS, was the direct employer of the Plaintiff. Ex. A at p. 57, ll. 9-10; Ex. B at p. 88, ll. 18-23.

### 1.     Defendant DTS is not liable under Title VII as a joint employer.

"Two or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment of the employee. *Swallows [v. Barnes & Noble Book*

---

[2] Defendant expressly denies that Plaintiff was subjected to a hostile work environment as a matter of law. This topic is fully addressed in Section V.B. of this memorandum.

Case 1:05-cv-00037     Document 472     Filed 01/04/2008     Page 7 of 32

*Stores, Inc.*], 128 F.3d [990], 993 n. 4 [(6th Cir. 1997)] (citing *NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117, 1123 (3d. Cir. 1982))." *Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067, 1093 (C.D.Cal. 2002). In order to determine whether a joint employment relationship exists, the Ninth Circuit applies an "economic reality" test. *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983). Under that test, this court should consider all factors relevant to a particular situation when evaluating the economic realities of a relationship. *Id.* In determining joint employment, a large collection of factors has been suggested from the judiciary and governmental agencies. *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270, 1275 (9th Cir. 2003).

When determining if a joint employer relationship exists, the Third Circuit has explained it is a matter of determining which of the two, or whether both, of the parties control, in the capacity of employer, the labor relations of a given group of workers. *Browning-Ferris Indus. of Pa.*, 691 F.2d at 1122-23 (citing *NLRB v. Condenser Corp. of America*, 128 F.2d 67, 70 (3d Cir. 1942)). "The 'joint employer' concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment." *Id.*

The Supreme Court has summarized the various factors as to what it means to be an employer: "As the EEOC's standard reflects, an employer is the person, or group of persons, who owns and manages the enterprise. The employer can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of the business are to be distributed." *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 450, 123 S.Ct. 1673, 1680, 155 L.Ed.2d 615 (2003). The Ninth Circuit opined that the "Supreme Court seems to suggest that the *sine qua non* of determining whether one is an employer is that

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.                    Page 8 of 22
4835-3465-0626.1 059759-00001
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 8 of 32

an 'employer' can hire and fire employees, can assign tasks to employees and supervise their performance." *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d at 1277 (citing *Clackamas*, 123 S.Ct. at 1680). "Logically, before a person or entity can be a joint employer, it must possess the attributes of an employer to some degree." *Id.* Numerous courts consider the key to joint employment to be the right to hire, supervise and fire employees. *See Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213, 1219 (10th Cir. 2002) (en banc); *Graves v. Lowery*, 117 F.3d 723, 727-728 (3d Cir. 1997); *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1361 (11th Cir. 1994); *Rivas v. Federacion de Asociaciones Pecuarias*, 929 F.2d 814, 820-821 (1st Cir. 1991).

In *E.E.O.C. v. Pacific Maritime Assoc.*, a Title VII sexual harassment action was brought against Pacific Maritime Association ("PMA"). 351 F.3d 1270 (9th Cir. 2003). PMA is an association of stevedoring companies ("member-employers") that performed organizational tasks on behalf of its members, negotiated a collective bargaining agreement, operated a dispatch hall jointly with a union, and provided payroll services for its members. *Id.* at 1274. The plaintiff alleged that, along with the member-employer of PMA that hired her, PMA was a joint employer of her. However, the Ninth Circuit found that PMA did not supervise the longshoremen, had no power to hire or fire longshoremen, had no power to discipline longshoremen, and did not supervise the work sites. The court found that it was undisputed that the monitoring and control over the work sites, as well as the control of the employees, was within the sole province of the member-employees. Accordingly, the Court held that PMA was not a joint employer of the plaintiff. *Id.* at 1274.

Similarly, in the present case, DTS had no authority to hire or fire Calpac employees, did not supervise Calpac employees or give them work assignments, had no power to discipline Calpac employees, did not determine wages or benefits of Calpac employees, and did not decide

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.       Page 9 of 22
4835-3465-0626.1.059759-00001
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 9 of 32

how profits or losses of Calpac were to be distributed. *See* Exhibits C at ¶¶ 5-7 and D at ¶ 13. John Healy, the President of Calpac, testified that he did not have any communications with anyone at DTS prior to receiving the first EEOC complaint. Ex. B at p. 85, ll. 18-23. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Mr. Healy also testified that Mr. Clark was not a supervisor of the plaintiffs, did not give out daily work assignments, and did not hire any of the plaintiffs. *Id.* at pp. 88-89, ll. 12-17, 9-20. Therefore, as a matter of law, this uncontroverted evidence establishes that DTS was not a joint employer of the Plaintiff with Calpac.

### 2. Defendant DTS is not liable under Title VII as an indirect employer

The D.C. Circuit first addressed indirect-employer liability in *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973). The hospital ran a nursing office where patients could request the service of a private duty nurse. The hospital would then contact outside referral sources and request a private nurse be sent to the hospital. The private nurses were employees of the patients, not the hospital. In *Sibley*, a male nurse alleged that on at least two occasions hospital nurses rejected him upon arrival because he was male and the requesting patient was female. The male nurse subsequently sued under Title VII for discrimination.

On appeal, the court noted that one of the goals of Title VII was to equalize access to job opportunities. *Id.* at 1340. The court held that Title VII did not explicitly require a direct employer-employee relationship, but it did not mean that no relationship was required for a claim to fall under Title VII. The Court stated: "We think it is significant that [Title VII] has addressed the problems of interference with the direct employment relationship by labor unions and employment agencies-institutions which have not a remote but a highly visible nexus with

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.                    Page 10 of 22
4835-3465-0626.1 059759.00001
Case 1:05-cv-00037   Document 472   Filed 01/04/2008   Page 10 of 32

the creation and continuance of direct employment relationships between third parties. On the facts as alleged...[the hospital] is so circumstanced, and its daily operations are of such a character as to have such nexus to the third parties in this case..." *Id.* at 1342.

The Ninth Circuit first addressed the issue of indirect-employer liability in *Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980). The court noted for Title VII to apply, "there must be some connection with an employment relationship" though the "connection...need not necessarily be direct." *Id.* at 883. The court explained "[t]his might occur where a defendant subject to Title VII interferes with an individual's employment opportunities with another employer." *Id.* at 883 n. 3.

The Ninth circuit addressed the issue again in *Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983). In this case, the plaintiff was a Hispanic physician working for a corporation named AES. On behalf of AES, the plaintiff submitted a proposal to the defendant to operate the hospital's emergency room. The hospital allegedly turned down the proposal because too many Hispanics worked for AES. *Id.* at 1020. The court reversed a summary judgment granted to the hospital on the basis that the plaintiff lacked standing under Title VII because he was an employee of AES, not the hospital, and AES would have only been an independent contractor for the hospital. *Id.* The court held that AES's potential status as an independent contractor did not mean that the hospital had not interfered with the relationship between AES and the plaintiff. *Id.* at 1021. Additionally, the court noted the perverse result that would occur if an employer were allowed to discriminatorily interfere with an individual's employment opportunities with another employer, while it could not do so with its own employees. *Id.*

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.                    Page 11 of 22
4835-3465-0626 1.059759-00001
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 11 of 32

The issue of indirect-employer liability came before the court again in *Association of Mexican-American Educators v. California*, 231 F.3d 572 (9th Cir. 2000)(en banc). In this case, the plaintiffs, a class of prospective and current minority teachers, challenged the use of a skills test that was a prerequisite to employment in the public schools. *Id.* at 577. The plaintiffs alleged the test has a disparate impact on minorities. *Id.* at 578. The court found that Title VII covered the claims as the alleged discriminatory test interfered with future employment with public schools since it dictated whom the schools could hire. *Id.* at 581-82. The court emphasized that the ruling was based on the peculiar degree of control the state exercised over school districts because of the test. *Id.* at 581.

In *Anderson v. Pacific Maritime Assoc.*, the Ninth Circuit addressed the issue of whether the PMA could be liable under Title VII under indirect-employer liability. 336 F.3d 924 (9th Cir. 2003)(the PMA performed the same functions and duties as discussed in *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003), *supra*). The plaintiffs in the suit were African-American workers employed on the waterfront in Seattle and Tacoma. The plaintiffs alleged a "horrific and pervasive picture of racial animosity and discrimination" on the waterfront. *Id.* at 926. The allegations included the common use of racial slurs, racial innuendos, and racial jokes on the docks and well as the uses of racial slurs in the training materials. The plaintiffs also alleged direct, racially charged physical threats. *Id.*

The court held that the PMA could not be liable under Title VII. The court found that the alleged hostile work site was not controlled by the PMA and the PMA did not employ or supervise the plaintiffs or the alleged harassers. *Id.* at 931. "*Sibley* and its progeny extended Title VII coverage to indirect employers when those employers discriminated against *and* interfered with the employees' relationship with their employees." *Id.* (emphasis added). PMA

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.                    Page 12 of 22
4835-3465-0626.1.059759-00001
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 12 of 32

did not interfere with the plaintiffs' relationship with their employers since it was the employers who allowed the allegedly hostile work environment. *Id.* "*Sibley* and its Ninth Circuit progeny condone liability when there exists discriminatory 'interference' by the indirect employer *and* where the indirect employer had some peculiar control of the employee's relationship with the direct employer." *Id.* at 932 (emphasis added).

In the present case, there was no discriminatory interference by DTS and DTS had no control over the Plaintiff's relationship with Calpac. In fact, none of the above-referenced cases lends support for a finding of indirect employer liability in this case. In *Sibley*, the hospital refused to allow the male nurse to see the patient; in *Gomez*, the hospital refused to hire the company with Hispanic doctors; and in *Association of Mexican-American Educators*, the state required the job applicants to take the test with the disparate impact on minorities. In all of the referenced cases, the "indirect employer" interfered with the employment relationship between the employee and direct employer. DTS did not have any control over the employment relationship between the Plaintiff and Calpac. DTS did not have the power to hire or fire employees, discipline employees, assign work assignments to employees, promote or demote employees, or perform employee evaluations. *See* Ex. C at ¶¶ 5-7 and D at ¶ 13. John Healy testified that Dennis Clark never tried to influence Calpac to take any action that would affect the manner in which any of the plaintiffs were treated and did not make any comments to anyone at Calpac regarding any of the plaintiffs. Ex. B. at p. 87, ll. 2-6 and 12-15. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Furthermore, Healy testified that Clark and DTS never interfered in the relationship between Calpac and any of the Plaintiffs. Ex. B. at p. 92, ll. 16-24.

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.  Page 13 of 22
4835-3465-0626.1 059759.0000l
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 13 of 32

Additionally, the work site involved in this lawsuit was not one that was controlled by DTS. Ex. D at ¶ 7. The worksite in question was a MCI worksite. Dennis Clark reported directly to MCI and took all work directives from MCI. DTS did not have any power to control the worksite, conduct any investigations on the worksite, or implement any rules for the worksite. *Id.* All of these functions were reserved to MCI. DTS did not even have the authority to remove Dennis Clark from the project. *Id.* at ¶ 6.

**B.    Plaintiff's allegations do not amount to a hostile environment as a matter of law**

Regardless of DTS' status as an "employer" under Title VII, the Plaintiff has failed to establish a claim for hostile work environment. A plaintiff may bring a lawsuit under Title VII for hostile work environment based upon racial or national origin harassment. To establish the existence of a hostile work environment plaintiff must prove that the workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(internal citations and quotation marks omitted). The hostile environment must be one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. *Id.* at 21-22. The Supreme Court in *Harris* held that the courts should look to the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance." *Id.* at 23. The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 n. 1 (1998)(internal citation and quotation marks omitted). Judicial standards for harassment must "filter out complaints attacking 'the ordinary tribulations

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.                    Page 14 of 22
4835-3465-0626.1 059759.00001
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 14 of 32

of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment for the purposes of a Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept*, 424 F.3d 1027 (9th Cir. 2005).

The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Not all workplace conduct that could be labeled as harassment affects a "term, condition, or privilege" of employment within the meaning of Title VII. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "The 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to sufficiently significant degree to violate Title VII." *Id.* (citing *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), cert. denied, 406 U.S. 957 (1972)).

The Western District of Washington held that the use of the phrase "Driving Miss Daisy" several times in the presence of an African-American worker and referring to another African-American driving a Caucasian within a two month period were not sufficient to create a racially hostile environment. *McZeal v. City of Seattle*, 2006 WL 3254504, at *5 (W.D.Wash. 2006). The court found that the comments were not so frequent or severe as to constitute a racially hostile work environment. *Id.* Furthermore, the Ninth Circuit found the use of the phrase "jungle bunny" in reference to an African-American did not create a hostile environment. *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978). The court commented that while the remark was a racially derogatory slur, it was not the sort of conduct to which Title VII was enacted to

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.                    Page 15 of 22
4835-3465-0626.1.059759-00001
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 15 of 32

prohibit. *Id.* The court also observed that Title VII was not directed at ending all discrimination by individuals, but the eradication of discrimination by employers against employees. *Id.*

Additionally, the District Court of Connecticut found that isolated racially offensive comments did not create a hostile and abusive environment. *Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d 385, 396 (D.Conn. 2003)(complained of comments included: (1) coworker wished a hurricane over Puerto Rico would wipe out island and that "we could do without those people;" (2) "they should put Puerto Ricans on a plane and send them back to Puerto Rico;" and, (3) a nurse's negative comments that black and Puerto Rican patients were "low life pieces of shit, scum sucking dogs and welfare recipients). The District of Minnesota found that the use of the terms like "fag," "wimp," "sissy," "useless," "worthless," and "spic" failed to support a plaintiff's claim of hostile work environment based upon national origin and disability. *Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004, 1015 (D.Minn. 2003).

In the present case, the Plaintiff testified that there was one incident where Dennis Clark allegedly twice referred to a group of Calpac workers as "island monkeys" or "monkeys." Ex. A at pp. 67-68, ll. 24-25 and 1-8. Mr. Apodaca was employed with Calpac from April 2004 through November 26, 2004, a period of approximately eight months. Ex. A. at p. 10, ll. 2; p. 23, ll. 21-25. Plaintiff alleges that, over the course of eight months of employment, two isolated statements during one day were allegedly made by Mr. Clark. As a matter of law, this fails to amount to a hostile and abusive work environment according to the factors set out by the Supreme Court in *Harris*. The alleged discriminatory conduct was infrequent and not physically threatening, but rather a mere offensive utterance. Furthermore, if it is assumed that the two alleged statements were made, they did not unreasonably interfere with the Plaintiff's work

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.                    Page 16 of 22
4835-3465-0626.1 059759-00001
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 16 of 32

performance. The Plaintiff testified that he was good at what he did and never got any complaints about his work. Ex. A. at p. 58, ll. 1-3. According to the Plaintiff's testimony, the only instance of alleged discriminatory statement made by Clark occurred between September 21 and September 25, 2004. Ex. A. at pp. 22-23, ll. 16-25 and 1. Thus, Mr. Apodaca concedes that he did not encounter any discriminatory comments during the last two months of his employment on the job. When looking at the "totality of the circumstances," the two alleged instances of racial slurs over the course of seven months were not "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. By his own testimony, the alleged remarks were not more than episodic and were not "sufficiently continuous and concerted in order to be deemed pervasive." *Farragher*, 524 U.S. at 787 n. 1. Therefore, DTS is entitled to summary judgment against Plaintiff on his Title VII causes of action.

**C.     DTS did not have any knowledge of any alleged discrimination and cannot be held liable under Title VII**

In the unlikely event that the court finds that DTS is an "employer" of the Plaintiff under Title VII and that Plaintiff has established a hostile environment claim, DTS cannot be held liable for the alleged actions of Clark because it did not have actual or constructive knowledge of the alleged discriminatory conduct. DTS was not made aware of any alleged discriminatory conduct by Dennis Clark until it was notified by Clark about the protesters which occurred in late December 2004. Ex. D at ¶¶ 9-11. There is no evidence, as none exists, that DTS had actual knowledge of Clark's alleged discriminatory statements until the EEOC complaint was received. In fact, the Plaintiff testified that he never complained to anyone at DTS and that Clark did not have any knowledge of his complaints. Ex. A at p. 71, ll. 9-11; p. 72, ll. 23-25. Additionally, there are no allegations of harassment following the time of the protest or the time the complaint

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.                    Page 17 of 22
4835-3465-0626 l.059759-00001
Case 1:05-cv-00037     Document 472     Filed 01/04/2008     Page 17 of 32

was received by DTS. In fact, according to the testimony of the Plaintiff, there had been no incidents of alleged harassment in the three months preceding the protests on Guam.

An employer cannot be held liable for the harassment of an employee unless the employer both knows of it and fails to take remedial action. *Silver v. KCA, Inc.*, 586 F.2d 138, 142 (9th Cir. 1978). This even holds true when there is a continuing course of harassment from an employee. *Id.* Occasional, sporadic remarks that occur in the workplace do not impose Title VII liability upon the employer. *Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)(citing *Merrick v. Farmers Ins.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990). In *Greene*, the plaintiff's claim of a hostile work environment rested upon four instances of offensive language. The plaintiff reported one incident and racial harassment ceased from that time forward. The court held that the case was properly dismissed as against the employer and that the claim may have had substance if the employer knew of the conduct and failed to take action. *Id.*

In the present case, DTS did not learn of any allegations of discriminatory remarks until Mr. Clark informed DTS of the presence of the protesters in late December 2004, approximately four months after the last alleged discriminatory comment was allegedly made by Clark, according to the Plaintiff. Ex. D at ¶ 9. The Plaintiff's EEOC Notice of Charge of Discrimination was not sent to DTS until February 24, 2005. Since DTS was not aware of the alleged harassment, it cannot be held liable under Title VII. *See Silver*, 892 F.2d at 1438-39.

Additionally, immediately upon learning that there were allegations that he had engaged in discriminatory conduct, Mr. Clark spoke at a meeting of Calpac employees and informed them that he did not make any such comments and would not discriminate against anyone based upon their Chamorro heritage. Mr. Clark informed DTS of this meeting and what he stated to the Calpac employees. There have been no allegations of discriminatory conduct by Clark or DTS

subsequent to this meeting. In fact the Plaintiff does not make any allegations of any comments by Clark for approximately the previous four months leading up to this meeting. There has not been one complaint of discriminatory comments by Clark subsequent to DTS learning of the Plaintiff's allegations in the EEOC complaint. *See* Ex. D at ¶¶ 9-11. Therefore, the Plaintiff cannot complain of any failure by DTS to take action after it acquired knowledge of the Plaintiff's complaints. DTS cannot be held liable under Title VII because: (1) DTS did not have any knowledge of Plaintiff's allegations prior to him filing a complaint with the EEOC and (2) once DTS became aware of the complaints, immediate remedial action was taken and no subsequent discriminatory acts have been alleged by Plaintiff.

## VI.
## CONCLUSION

DTS cannot be liable to Plaintiff under Title VII because: (1) DTS was not an employer of the Plaintiff as that term is defined under Title VII; (2) Based upon the Plaintiff's own testimony, he was not subjected to a hostile work environment for purposes of Title VII; and (3) DTS did not have actual or constructive knowledge of any of Plaintiff's complaints. For these reasons, DTS moves this Honorable Court to grant is Motion for Summary Judgment against Plaintiff Jerry Apodaca, Jr.

DATED this 4th day of January, 2008.

CARLSMITH BALL LLP

ELYZE J. MCDONALD
Attorneys for Defendant
Dynamic Technical Services

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.     Page 19 of 22
4835-3465-0626.1.059759-00001
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 19 of 32

## DECLARATION OF ELYZE J. MCDONALD

I, Elyze J. McDonald, declare under penalty of perjury that the following statements are true and correct:

1.    1 have personal knowledge of the facts stated in this declaration except as otherwise indicated.

2.    I would testify competently as to these facts if called upon by the Court.

3.    I am an attorney authorized to practice law in the territory of Guam and presently employed with the law firm of Carlsmith Ball LLP, attorneys for Defendant Dynamic Technical Services in the above-captioned action.

4.    This declaration is submitted in support of Defendant Dynamic Technical Services' otion for Summary Judgment Against Jerry Apodaca, filed on January 4, 2008.

5.    Defendant Dynamic Technical Services is a necessary and proper party Defendant in this action.

6.    Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Jerry Apodaca as Exhibit "A" is a true and correct copy of the pertinent pages of the deposition testimony of Jerry Apodaca.

7.    Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Jerry Apodaca as Exhibit "B" is a true and correct copy of the pertinent pages of the deposition testimony of John T. Healy.

8.    Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Jerry Apodaca as Exhibit "C" is a true and correct copy of the Affidavit of Dennis P. Clark the original of which has been previously filed with the Court.

9.    Attached to Defendant Dynamic Technical Services' Motion for Summary

Motion for Summary Judgment Against Plaintiff Jerry Apodaca, Jr.          Page 20 of 22
4835-3465-0626.1.059759-00001
Case 1:05-cv-00037    Document 472    Filed 01/04/2008    Page 20 of 32

Judgment Against Jerry Apodaca as Exhibit "D" is a true and correct copy of the Affidavit of Linda G. Hayes the original of which has been previously filed with the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and accurate to the best of my knowledge.

DATED:     this __4th__ day of January 2008 at Hagåtña, Guam.

_(signature)_

ELYZE J. MCDONALD

# Exhibit A

IN THE DISTRICT COURT OF GUAM

1

2

3  HENRY G. VAN METER, JERRY          CASE NO. CIV03-00037
   APODACA, JR., JOSEPH J.
4  HERNANDEZ, JOSEPH T. MENDIOLA,
   LARRY L. CHARFAUROS, ANTHONY
5  C. ARRIOLA, ROBERT B. CRUZ,
   ROLAND F. MENDIOLA, JAMES S.              DEPOSITION OF
6  YEE, TEDDY B. CRUZ, JESSE B.           JERRY APODACA, JR.
   CRUZ, JOHN L.G. NAUTA, and                APRIL 12, 2007
7  JOHN P. BABAUTA,

8          Plaintiffs,

9      vs.

10 CALPAC, DYNAMIC TECHNICAL
   SERVICES, MCI, JOHN HEALY,
11 DENNIS CLARK, WILLIAM WARD,
   JAI JAMES and DOES 1 through
12 10,

13         Defendants.

14

15     The deposition of Jerry Apodaca, Jr., called by
   Defendants CalPac, John Healy and William Ward, pursuant to
16 Notice and pursuant to the Federal Rules of Civil Procedure,
   takes at the law offices of Blair Sterling Johnson Martinez &
17 Leon Guerrero, P.C., Suite 1008, Pacific News Building, 238
   Archbishop Flores Street, Hagatna, Guam 96910, on Thursday,
18 the 12th day of April, 2007, at the hour of 3:05 o'clock p.m.

19     That at said time and place, there transpired the
   following:

20

21

22

23

24

25



Cecilia F. Flores
Freelance Stenotype Reporter
Tel: (671) 632-6727 - FAX: (671) 632-5353

---

1

2              A P P E A R A N C E S:

3  For the Plaintiffs          Delia B. Lujan, Esq.
                               LUJAN AGUIGUI & PEREZ
4                              Suite 300, Pacific News Bldg.
                               238 Archbishop Flores Street
5                              Hagatna, Guam 96910

6  For Defendant CalPac        Vincent Leon Guerrero, Esq.
   John Healy and William      BLAIR STERLING JOHNSON
7  Ward                        MARTINEZ & LEON GUERRERO
                               Suite 1008 Pacific News Building
8                              238 Archbishop F.C. Flores Street
                               Hagatna, Guam 96910

9
   For Defendant Dynamic       Elyze McDonald, Esq.
10 Technical Services and      CARLSMITH BALL
   Dennis Clark                Suite 401, Bank of Hawaii Bldg.
11                             134 West Soledad Avenue
                               Hagatna, Guam 96910
12

13

14

15

16

17

18

19

20

21

22

23

24

25

JERRY APODACA, JR.:  APRIL 12, 2007

---

1               I N D E X

2         E X A M I N A T I O N

3

4                  Direct   Cross  Redirect  Recross

5  By Mr. Leon Guerrero    4           80, 91,
                                       93
6  By Ms. McDonald              54                88

7  By Ms. Lujan                     77        90, 93

8

9            E X H I B I T S

10

11 Defendants':      Description:              Page
                                               Marked:
12
   Exhibit A -  (1 page)                        11
13             Application for Employment of Jerry
               Apodaca, Jr. Dated 04/13/04
14
   Exhibit B -  (1 page)                        19
15             EEOC Charge of Discrimination
               (Amended) dated 01/04/04
16
   Exhibit C -  (1 page)                        23
17             Termination letter dated 11/26/04 from
               William J. Ward to Jerry Apodaca
18
   Exhibit D -  (6 pages)                        52
19             EEOC Questionnaire

20

21

22

23

24

25

JERRY APODACA, JR.:  APRIL 12, 2007

---

1  HAGATÑA, GUAM: APRIL 12, 2007; 2:05 o'clock p.m.

2

3              JERRY APODACA, JR.

4  called by Defendant CalPac to give his deposition at this

5  time, being first duly sworn, was examined and testified on

6  his oath, as follows:

7                 DIRECT EXAMINATION

8  BY MR. LEON GUERRERO:

9      Q.   For the record, this is the deposition of Jerry

10 Apodaca in Civil Case Number CV05-0037. It's Van Meter v.

11 CalPac.

12         Mr. Apodaca, you've had an opportunity to talk to

13 your lawyer about what happens today, I imagine; is that

14 correct?

15     A.   Correct.

16     Q.   So you know people will be asking you questions and

17 that your answers are under oath, under penalty of perjury;

18 okay?

19     A.   Yes, sir.

20     Q.   And then I'm going to ask that you answer orally so

21 that we can have it transcribed later on and you'll have a

22 chance to review it and you can make changes to it. But if

23 you make changes to it, then we make comments on those

24 changes; okay?

25     A.   Okay.

JERRY APODACA, JR.:  APRIL 12, 2007

correct?

A.   Yes, sir.

Q.   So you were working at the Mayor's office in 1998; this is while you were still going to high school; would that be right?

A.   I wasn't in high school, sir.  I was like a dropout.  Let's just say, uh, I was a –

Q.   Okay.  But after you worked at the Mayor's office, you went back to high school; is that right?

A.   Yes.

Q.   Okay.  After you went to Southern High School, what was the first job that you got?

A.   After Southern?

Q.   After Southern.

A.   Umm, construction.

Q.   Okay.  Where was that at?

A.   Umm, I worked ... My first construction was CalPac.

Q.   And when did you start working for CalPac?

A.   2000.

Q.   You started working in the year 2000?

A.   No, I don't really recall what, what year, what date I started.

Q.   I believe somewhere there's an indication that you started working around April of 2004 for CalPac.  That was the last time you worked for CalPac; would that be about

---

right?

A.   Yeah.

Q.   Did you work for CalPac before that?

A.   I was with CalPac before 2000; before -- that was my ... Where I got laid off, right, you're talking about?

Q.   I'm asking you.  I need --

A.   You're asking me like when I got laid off was in 2004?

Q.   I'm asking you, I'm trying to find out your work history.  So I take it to mean that you were working at CalPac more than once; would that be right?

A.   No.  That was just my first time.

Q.   Okay.  So you started working at CalPac in 2004; correct?

A.   Yes, sir.

Q.   All right.  Before CalPac, did you have any other jobs?  Before CalPac and after Southern High?

A.   No.

Q.   So from 2000 to the time you started working at CalPac, you weren't working at a job; correct?

A.   I was on and off jobs.

Q.   Okay.  What kind of jobs did you have on and off?

A.   Construction.

Q.   Okay.  Let's talk about those.

A.   EMI too; I tried EMI, Advance Management

---

Corporation.

Q.   Okay.  When was that?

A.   I can't recall.

Q.   Was it shortly after you left Southern?

A.   No, it was after CalPac, if I'm not mistaken.

Q.   Okay.  I want to talk about your employment history before CalPac.

A.   Nothing.

Q.   So from the time you left Southern to the time you started working at CalPac –

A.   I was, I was fishing.

                    (Exhibit A marked: Application
                     For Employment.)

Q.   (By Mr. Leon Guerrero)  This is Exhibit A.  Mr. Apodaca, I'm handing you what has been marked as Exhibit A; maybe this will help you remember some of this stuff.  Have you ever seen Exhibit A before?

A.   Umm, no, I haven't.

Q.   On the second page, or the back page of Exhibit A, take a look at that.  There is a signature line there.

A.   Okay.

Q.   And it's dated April 13, 2004; do you see that signature line?

A.   Yes, sir.

Q.   And there's a, it looks like somebody signed the

---

name Jerry Apodaca; do you see that?

A.   Um-hum.

Q.   Did you sign that?

A.   Yes, sir.  That's my signature.

Q.   Okay, so you wrote on Exhibit A before; correct?

A.   Yes.

Q.   Okay.  So do you know what Exhibit A is?

A.   Yeah.

Q.   It's an application for employment with CalPac, right?

A.   Um-hum.

Q.   Correct?

A.   Yes.

Q.   I'm sorry if I'm saying it like that.  It's just that "uh-huh" doesn't pick up too well in a transcript so I have to ask you to say "yes" or "no," okay?

A.   All right.

Q.   I'm not trying to be rude, okay?  Now, the second page it says, just to help you refresh your memory, it seems that you were working for Advance Management prior to working at CalPac.  Do you see that?  It says that you were working from February '03 to May '03 at Advance Management; would that be about right?

A.   Mmm, okay.  Yeah.

Q.   Okay.  So did you work at Advance Management prior

1  to working at CalPac?
2      A.  Yes.  Before CalPac, yes.
3      Q.  Did you fill out Exhibit A, by the way?
4      A.  Yes, I did.
5      Q.  It's all in your handwriting?
6      A.  Yes, sir.
7      Q.  Well, go down to where it says do not write below
8  this line on Exhibit A.  There's a date there that says
9  4/15/04; do you see that?
10     A.  Um-hmm.
11     Q.  Was that about the time you started working for
12 CalPac?
13     A.  I don't recall.
14     Q.  Okay.  And it shows that the salary or wage was
15 $6.50.  I guess that's $6.50 an hour.  Is that about the
16 amount of money you were making at CalPac?
17     A.  I was making nine, sir.
18     Q.  Okay, when you first started working at CalPac?
19     A.  Yes, $6.50.
20     Q.  And so that $6.50 was what you were when you first
21 started at CalPac; right?
22     A.  Yes.
23     Q.  When did you start making $9.00 an hour; do you
24 know?  Do you remember?
25     A.  No, I don't remember.

1      Q.  Your position at CalPac was as a laborer; would
2  that be right?
3      A.  Yes, sir.
4      Q.  Who was your supervisor?
5      A.  Henry.
6      Q.  Henry Quintanilla or is that Henry Van Meter?
7      A.  Henry Van Meter.
8      Q.  Do you know who Henry Quintanilla is?
9      A.  Yes, sir.
10     Q.  Was he --
11     A.  He's another supervisor.
12     Q.  Was he somebody that was above Mr. Van Meter?
13     A.  Yes, sir.
14     Q.  So he was a higher supervisor; correct?
15     A.  Yes, sir.
16     Q.  Did you believe that Mr. Van Meter took
17 instructions from Mr. Quintanilla?
18     A.  Yes, sir.
19     Q.  And then you took instructions from Mr. Van Meter;
20 correct?
21     A.  Yeah.
22     Q.  Now you're alleging that you were discriminated
23 against; correct?
24     A.  Yes, sir.
25     Q.  And you're saying that Dynamic Technical Services

1  was one of the people or companies that discriminated against
2  you; correct?
3      A.  Yes, sir.
4      Q.  And you also said that CalPac was one of the people
5  or companies that discriminated against you; correct?
6      A.  Yes, sir.
7      Q.  And then you also mentioned Dennis Clark; remember
8  that?
9      A.  Um-hmm.
10     Q.  Who is Dennis Clark?
11     A.  Dennis Clark is an employer of Dynamic Technical --
12 or employee of Dynamic, uh, Dynamic Technical Services.
13     Q.  How do you know that?
14     A.  From EEOC.
15     Q.  So Mr. Clark is not another employee of CalPac;
16 correct?
17     A.  No, sir.
18     Q.  Okay, my question is -
19     A.  Yes.
20     Q.  Yes, he is an employee?
21     A.  Yes.
22     Q.  You're saying that Dennis Clark is employed by
23 CalPac?
24     A.  Yes.
25     Q.  Why do you say that?

1      A.  He supervised it, the trenching.  Tells us -- tells
2  the, umm, Henry -- Henry Quintanilla like how deep to go; how
3  -- how much he shouldn't be making the conduits stay above.
4      Q.  So you heard Dennis Clark tell Henry Quintanilla,
5  or give instructions to Henry Quintanilla; correct?
6      A.  Uh, Henry Van Meter.
7      Q.  You heard Mr. Clark give instructions to Henry Van
8  Meter; correct?
9      A.  Yes.
10     Q.  So you're saying Mr. Van Meter was taking
11 instructions from Mr. Clark; correct?
12     A.  At the time, yes.
13     Q.  At the time, you think that Mr. Clark was employed
14 by CalPac?
15     A.  No, sir.
16     Q.  Who did you think he was employed with at that
17 time?
18     A.  MCI.
19     Q.  So he was kind of like the owner; correct?
20     A.  That's what I thought he was.
21     Q.  He was a representative of the owner; correct?
22     A.  Yes.
23     Q.  Let me ask you this, if you were to hire somebody
24 to help you build a barbecue pit, okay, and you told the
25 person what to do, how you wanted your barbecue pit made, do

1  you think that you would be employed by the person that
2  you're telling how to make the barbecue pit?
3      A.   I can't say.
4      Q.   Well, are you saying because Mr. Clark told CalPac
5  how to -- what specifications it wanted completed, that Mr.
6  Clark is now an employee of CalPac?
7      A.   What are you saying?
8      Q.   I'm sorry?
9      A.   What are you saying?
10     Q.   I'm asking you why do you believe that Dennis Clark
11 was an employee of CalPac when Mr. Clark was telling CalPac
12 what to do?
13     A.   Dennis Clark to CalPac?
14     Q.   Yeah.  I believe you indicated earlier that you
15 thought Mr. Clark was an employee of CalPac; correct?
16     A.   Isn't he --
17     Q.   I'm asking you.
18     A.   -- an employee?
19     Q.   I'm asking you the question.  You believe that Mr.
20 Clark was an employee of CalPac; correct?
21     A.   Yes.
22     Q.   And that belief came, I believe you indicated it
23 was because Dennis Clark would tell Mr. Van Meter what to do?
24     A.   Yes, sir.
25     Q.   Mr. Van Meter was an employee of CalPac; correct?

1      A.   Yes, sir.
2      Q.   So you made that assumption, or you made that
3  belief that Dennis Clark is now an employee of CalPac;
4  correct?
5      A.   Yes, sir.
6      Q.   Because he tells CalPac what to do?
7      A.   Yeah.
8      Q.   So if an owner tells somebody they hire what to do,
9  the owner then becomes an employee of the person he's telling
10 what to do; is that what you're saying?
11     A.   Umm, yeah.
12     Q.   Yes?
13     A.   I guess so.
14     Q.   You guess so?  Okay.  In your complaint that you
15 filed with the District Court, you indicated that on or about
16 September to October 2004, Dennis Clark would make some
17 statements about you guys; correct?
18     A.   Yes, sir.
19     Q.   How many times did he make those statements?
20     A.   Twice.
21     Q.   Twice --
22     A.   That I know of.
23     Q.   I'm sorry?
24     A.   Twice, verbally, in front of me.
25     Q.   You heard two incidences; correct?

1      A.   Yes.
2      Q.   And the first one occurred around September 21,
3  2004; correct?
4      A.   Yes, sir.
5                              (Exhibit B marked: Charge
6                              of Discrimination.)
7      Q.   (By Mr. Leon Guerrero)  Okay, Mr. Apodaca, I'm
8  giving Exhibit B.  Have you seen Exhibit B before?
9      A.   Now I have.
10     Q.   I'm sorry?
11     A.   Now I have.
12     Q.   Have you ever seen it before today?
13     A.   Today?  Yes.
14     Q.   What is Exhibit B?
15     A.   Charge of discrimination.
16     Q.   Was that something that you filled out?
17     A.   Yes, sir.
18     Q.   Okay.  This is a charge of discrimination that was
19 filed with the EEOC; correct?
20     A.   Yes, sir.
21     Q.   And you signed it on January 4?
22     A.   2004.
23     Q.   2004.  That should be 2005; correct?  That's just a
24 mistake on your part?
25     A.   Hmm?

1      Q.   It should be 2005?
2      A.   That's when I received it; 2005?
3      Q.   Okay.  The date next to your signature?
4      A.   Um-hmm.
5      Q.   Take a look at it.  It's dated January 4, 2004; do
6  you see that?
7      A.   Yes, sir.
8      Q.   That's a mistake on your part, correct?
9      A.   I guess so.
10     Q.   Well, the only reason I'm saying that is if you
11 look further up it says that you were discriminated against
12 on September 21, 2004, so you could not have signed this
13 thing before you were being discriminated against; correct?
14 So it's probably January 2005 that you signed that thing; is
15 that correct?  Do you understand what I'm saying?
16     A.   That I signed this --
17     Q.   You signed this on -- it says January 4 --
18     A.   2004, yes.
19     Q.   2004.  But you're saying that you were
20 discriminated against on September 25, 2004.  So you could
21 not have signed this before you were discriminated against;
22 correct?
23     A.   Yeah.
24     Q.   Okay, so --
25     A.   So that's my mistake.

1  Q.  Okay.  Now look at the first paragraph where it
2  says "particulars are;" do you see that?  First of all, who
3  helped you fill out this Exhibit B?
4      A.  I don't recall.
5      Q.  Somebody helped you, correct?
6      A.  Yes, sir.
7      Q.  Was it somebody that was -- one of the co-
8  plaintiffs filled this out for you?
9      A.  Yes, sir.
10     Q.  What about Don Harper?  Did Don Harper help you?
11     A.  Yes, sir, he did.
12     Q.  Don Harper was your superintendent at CalPac;
13 correct?
14     A.  Yes, sir.
15     Q.  And was Don Harper the one that actually hired you
16 at CalPac?
17     A.  Yes.
18     Q.  So Don Harper interviewed you for your job at
19 CalPac; correct?
20     A.  Yes, he did.
21     Q.  Would you consider Don Harper a friend of yours?
22     A.  Yes, sir.
23     Q.  Looking at the top right corner, it says "amended;"
24 do you see that?
25     A.  Yeah.

1  Q.  Why was this amended do you know?
2      A.  No, I don't know.
3      Q.  How many times did you fill out a charge of
4  discrimination against CalPac?  If you know.
5      A.  I don't.
6      Q.  Looking at the first paragraph again where it says
7  "particulars," can you read that, please, for the record?
8      A.  "I was hired by CalPac to work in the established
9  project of underground cable in Guam for MCI."
10     Q.  It seems to indicate that you were hired to work on
11 a project for MCI; is that what I'm hearing correctly?
12     A.  Yes, sir.
13     Q.  So when you were hired, you were told that you were
14 going to be working on an MCI project; correct?
15     A.  Yes, sir.
16     Q.  Go on to the second paragraph.  Or let me read it
17 for you, okay?  It says, "from September 21, 2004 to
18 September 25, 2004 I was harassed by Dennis Clark, a
19 representative of MCI.  On separate occasions Dennis Clark
20 made racially derogatory comments to me and fellow co-workers
21 by referring to us as 'monkeys' and 'island monkeys'."
22 That's what paragraph 2 says; correct?
23     A.  Yes, sir.
24     Q.  Is there anything you'd like to change in paragraph
25 2?

1      A.  No, sir.
2      Q.  And then the next paragraph aggrieves "on November
3  26, 2004 I was discharged from the project which I feel is
4  due to my complaints to my supervisor about Dennis Clark's
5  racially derogatory comments".  That's what paragraph 3 says;
6  correct?
7      A.  Correct.
8      Q.  Is there anything you'd like to change in paragraph
9  3?
10     A.  No, sir.
11                           (Exhibit C marked: Letter
12                            Dated Nov. 26, 2004 from
13                            CalPac to Jerry Apodaca.)
14     Q.  (By Mr. Leon Guerrero)  Mr. Apodaca, I'm handing
15 you what has been marked as Exhibit C.  And can you tell
16 me if you've ever seen Exhibit C before?
17     A.  I don't recall.
18     Q.  How do you recall that you were told that you were
19 going to be no longer work for CalPac?
20     A.  What do you mean?
21     Q.  Well, you indicated in Exhibit B that you were
22 discharged on November 26, 2004.  I asked you if wanted to
23 make any changes, and you said no changes to it; correct?  So
24 you were discharged around November 26, 2004; correct?
25     A.  Yes, sir.

1  Q.  Okay.  How were you informed that you were no
2  longer going to work for CalPac?
3      A.  A week before I was -- a week before.
4      Q.  Okay.  So what happened a week before?
5      A.  A week before?  They just -- after they told --
6  told most of us that they're going to be laying off, uh, some
7  of us, so they made us work twice as hard for that week then
8  they started laying off.
9      Q.  Okay.  When did this happen?
10     A.  I don't recall.
11     Q.  You do recall that you stopped working at CalPac
12 around November 26, 2004; correct?
13     A.  Um-hmm.  Yes, sir.
14     Q.  And so are you saying that a week before your
15 actual termination with CalPac is when they told you they
16 were going to start laying off people?  So correct me if I'm
17 wrong, I'm just going to rephrase it and tell me if I'm
18 wrong, okay?  If you were discharged on November 26, 2004, so
19 you were told around November 19, 2004 that some people would
20 be laid off; correct?
21     A.  Yeah.
22     Q.  Did they tell you who was going to be laid off
23 around November 19, 2004?
24     A.  No.
25     Q.  So everybody was working harder; correct?

1    Q.   Do you know how many employees they have?
2    A.   No, I don't.
3    Q.   Who hired you to work on the MCI project?
4    A.   Don Harper.
5    Q.   Don Harper.  And he's a CalPac employee?
6    A.   Yes.
7    Q.   Okay.  And who paid your salary?
8    A.   I don't know that information.
9    Q.   You were a CalPac employee; right?
10   A.   Yes.
11   Q.   Did CalPac pay your salary?
12   A.   Yes.
13   Q.   Okay.  Were you ever evaluated on your work
14   performance?
15   A.   No.
16   Q.   No?  And your daily work schedule, that came from
17   Don Harper?
18   A.   Yes.
19   Q.   And you said your other supervisor was Henry Van
20   Meter?
21   A.   Yes.
22   Q.   And he's a CalPac employee?
23   A.   Yes.
24   Q.   At the time?
25   A.   Yes.

1    Q.   Okay.  Did you do a good job when you were at
2    CalPac?
3    A.   Every day.
4    Q.   Every day?  Did Henry Van Meter ever tell you that
5    you did a good job?
6    A.   Yes.
7    Q.   Did anybody ever tell you you didn't do a good job?
8    A.   No.
9    Q.   Did you ever hear anybody complain about your work
10   performance?
11   A.   No.
12   Q.   Do you know who Dennis Clark reported to?
13   A.   If I'm not mistaken, John Healy.
14   Q.   Did you ever see him talk to John Healy?
15   A.   Twice, I think.
16   Q.   Twice?  Were you part of that conversation?
17   A.   No, I wasn't.
18   Q.   Why do you think that he reported to John Healy?
19   A.   Umm, because John Healy's a part owner of CalPac.
20   Q.   Okay.  So you think he was giving him information
21   because he was the owner?
22   A.   Yeah.
23   Q.   Okay.  At the time, who did you think Dennis Clark
24   was employed by?
25   A.   MCI.

1    Q.   MCI.  Did anybody ever tell you that he was
2    employed by MCI?
3    A.   No.
4    Q.   Why do you think he, at that time, he was employed
5    by MCI?
6    A.   Because he comes around the -- our job site with
7    MCI's, uh, vehicle.
8    Q.   There was an MCI sign on his vehicle?
9    A.   Yeah, on the door; yes.
10   Q.   So you assumed that he --
11   A.   Yes.
12   Q.   -- was part of MCI?
13   A.   Yes.
14   Q.   Did you ever see Dennis Clark talk to anyone about
15   you?
16   A.   No.
17   Q.   Did Dennis Clark ever tell you what to do directly?
18   A.   Directly?  No.
19   Q.   No?  Do you know what Dennis Clark thought about
20   your work?
21   A.   No.
22   Q.   No?  Did you ever ask him?
23   A.   No, ma'am.
24   Q.   Okay.  How many hours per day did you work on the
25   job site?

1    A.   Eight hours.
2    Q.   Eight hours a day?
3    A.   Sometimes.
4    Q.   Most of the time how many hours would you be on the
5    job site?
6    A.   Nine; ten hours.
7    Q.   Okay.  Somewhere between eight to ten hours a day?
8    A.   Yeah.
9    Q.   And how many times per day would you see Dennis
10   Clark?
11   A.   A few times.  Like twice a day.
12   Q.   Twice a day?  And what would he be doing when you
13   saw him?
14   A.   Umm, measuring the trenching holes.
15   Q.   Anything else?
16   A.   That's about it.
17   Q.   Each time you saw him, how long would that be that
18   he was --
19   A.   An hour.
20   Q.   -- in your sight?  An hour?  A total -
21   A.   Yeah.
22   Q.   -- per day?
23   A.   Um-hmm.
24   Q.   Did he say anything to you when he saw you?
25   A.   Nope.

1   Q.  Okay.  So what happened after he made that second
2   statement?
3       A.  Then that's when Tony looked at me and he goes, "I
4   heard it" and everybody just stood up and looked and then
5   just continued working.
6       Q.  You continued to work?
7       A.  Yeah.
8       Q.  What did Henry Van Meter do?
9       A.  Uh, he got on the -- I think he got on the phone
10  and started talking to somebody.
11      Q.  Okay.
12      A.  I don't know who he was talking to.
13      Q.  Was Henry Quintanilla around?
14      A.  Uh, he was down further.
15      Q.  Was he able to hear Dennis Clark -
16      A.  No.
17      Q.  -- make those statements?  Did you complain that he
18  made that statement that day?
19      A.  Yes.
20      Q.  Who did you complain to?
21      A.  Umm, Henry Van Meter and Henry Quintanilla.
22      Q.  When did you make your complaint?
23      A.  When we got to CalPac.  The office, when we got to
24  the office.
25      Q.  Okay.  What time was that?

---

1       A.  Umm, we get off at, uh, 3:30.
2       Q.  Okay.  So at the end of the work day?
3       A.  Yes.
4       Q.  And what time do you think, if you recall, he made
5   those statements?
6       A.  Right after lunch.
7       Q.  Okay.  What time was the lunch hour?
8       A.  Lunch hour's 12:00 to 12:30.
9       Q.  Okay.
10      A.  Thirty minute lunch.
11      Q.  So it was a couple of hours between the statement
12  and then when you --
13      A.  Yeah.
14      Q.  -- complained about it?
15      A.  Um-hm.
16      Q.  And what did you tell Henry Van Meter?
17      A.  Just like, "did you hear what he called us?" And he
18  was like, "yeah".  And then I go, "I'll go talk to Henry
19  Quintanilla about it."
20      Q.  That's what Mr. Van Meter said?
21      A.  Yeah.
22      Q.  Oh.  And then you said you complained to Henry
23  Quintanilla?
24      A.  Yeah.  I -- I asked him -- or, actually I told him
25  what, uh, Mr. Clark said.

---

1       Q.  What did he say?
2       A.  He said he'll talk to, umm, John, John, Mr. John
3   Healy.
4       Q.  Okay.  Did you make the complaint to Henry
5   Quintanilla also at CalPac?
6       A.  Yes.
7       Q.  That's in the afternoon?
8       A.  In the evening.
9       Q.  Okay.
10      A.  Like 3:00 o'clock.
11      Q.  3:00 o'clock.
12      A.  3:30.
13      Q.  Okay.  So you said you heard Dennis Clark make a
14  discriminatory statement two times; is that correct?
15      A.  Yes.
16      Q.  Is it just one day, those two times that one
17  day or is there a second day?
18      A.  There's another time he said it, but not in our
19  group.  It was up in Two Lover's I think.
20      Q.  Okay.
21      A.  If I'm not mistaken, with another group.
22      Q.  Okay.  Were you part of that group?
23      A.  No.
24      Q.  No?  So the only time you heard him say monkey or
25  island monkey was that one day you were in the trench?

---

1       A.  Yeah.
2       Q.  What job site was that?
3       A.  Tiyan.
4       Q.  Okay.  So the only time you heard him say it was at
5   Tiyan?
6       A.  Yes.
7       Q.  Twice in this one day?
8       A.  Yeah.
9       Q.  But you heard of another incident at Two Lover's?
10      A.  Yeah.
11      Q.  What do you know about that incident at Two Lover's
12  Point?
13      A.  That he said it there?
14      Q.  Do you know what day that was?
15      A.  Umm, no.  I was -- I was off that day.
16      Q.  Who told you about it?
17      A.  Uh, gossips.
18      Q.  Gossip?
19      A.  At work.
20      Q.  Do you recall who?
21      A.  No.
22      Q.  Do you know how soon after this incident at Tiyan
23  you heard the gossip?
24      A.  Umm, no.
25      Q.  No?  Was it within days or weeks or months?

A.   I don't recall.

Q.   Okay.  Did you ever confront Mr. Clark?

A.   No.

Q.   Had you ever been called an island monkey before?

A.   No, this was my first.

Q.   Have you ever been called a monkey before?

A.   No.

Q.   Have you ever called anybody a monkey or –

A.   No.

Q.   -- an island monkey?  After Dennis Clark made those statements on that one day you just continued to work; is that correct?

A.   Yes.

Q.   Did Henry Van Meter continue to work also?

A.   Everybody else.

Q.   Everybody went back to work?

A.   Yes.

Q.   Did Dennis Clark, did you hear him giving any further instructions that day on what to do?

A.   No.

Q.   No?  Did he say anything else besides those statements?

A.   No, not that I recall.

Q.   Do know if Henry Quintanilla talked to John Healy about your complaint?

---

A.   Not that I know of.

Q.   You don't know?

A.   No, I don't.

Q.   Did Henry Quintanilla ever tell you that he talked to John Healy?

A.   No.

Q.   No?  Did you ever ask him, you know, what happened to your complaint?

A.   I didn't have any chance to ask him.

Q.   You never asked him after –

A.   No, I never asked him.

Q.   -- you made the complaint?

A.   No.

Q.   Did you ever hear Dennis Clark talk about any of your co-plaintiffs?

A.   No.

Q.   No?  Do you think that non-Chamorros were treated better than you?

A.   Non-Chamorros?

MS. LUJAN:  I would just ask to clarify treated; treated by whom?  Who would treat him better or treat non-Chamorros better?

Q.   (By Mr. Leon Guerrero)  When you were working at CalPac, did you feel that your employers were treating anybody different from you?

---

A.   No.

Q.   No?

A.   No.

Q.   You were all treated the same?

A.   Yeah.

Q.   You didn't know about Dynamic Technical Services during the time you were employed at CalPac; is that right?

A.   Yeah.

Q.   So you never submitted a complaint to Dynamic Technical Services about Dennis Clark; is that right?

A.   Yeah, until later that we found out that he was employed by them.

Q.   Okay.  Do you have any idea if anybody at CalPac or MCI told Dynamic Technical Services about your complaint?

A.   No, not that I'm aware of.

Q.   Okay.  According to Exhibit C, you were laid off on November 27, 2004; is that right?

A.   Yeah.

Q.   Yeah?  Okay.  And it says "Best regards, William J. Ward, General Manager" and it's on CalPac letterhead; is that right?  The letter's from CalPac?

A.   Yes.

Q.   Okay.  Do you know what role Dennis Clark had in the layoff?

A.   No, I don't.

---

Q.   No?  Do you think he had a role in the layoff?

A.   Just by the discrimination.

Q.   What do you mean by that?

A.   A role meaning ... what was your question?

Q.   I asked you what does Dennis Clark have to do with the layoff and you said just by the discrimination.  So I'm asking what you mean by your answer.

A.   Oh.  Umm, that he called us a bunch of island monkeys.

Q.   Okay.

A.   That's how I think that we got laid off.

Q.   How would his statements get you laid off?

A.   Because we, we complained to them, complained that, uh, Mr. Clark, uh, had told us that we're a bunch of monkeys and I guess that got to Mr. Healy and, uh, from there he started laying us off, the ones that were complaining.

Q.   Do you know if Dennis Clark ever told John Healy to lay you off?

A.   Not that I know of.

Q.   Do you know if Dennis Clark told William Ward to lay you off?

A.   Not that I know of.

Q.   Do you know if Dennis Clark knew you complained to Henry Van Meter or Henry Quintanilla?

A.   Umm, no, he didn't know.

FURTHER RE-CROSS EXAMINATION

BY MS. LUJAN:

1    Q.    Just one follow-up question.  Now you said earlier
2 when I asked you a question, you said that John Healy fired
3 you; correct?
4    A.    Correct.
5    Q.    By firing you, was he respecting you?
6    A.    I don't know.  He was just probably doing his job.
7    Q.    Okay.  But you said earlier you were fired because
8 of the complaints that you made regarding Dennis Clark;
9 correct?
10    A.    Correct.
11    Q.    So did you agree with the fact that you were fired
12 by John Healy?
13    A.    No.
14    Q.    Was it the right thing to fire you?
15    A.    It's discrimination; no.
16         MS. LUJAN:  Okay.  I have no further questions.
17 Thank you.
18         FURTHER RE-DIRECT EXAMINATION
19 BY MR. LEON GUERRERO:
20    Q.    One last follow-up.  If Mr. Healy or CalPac fired
21 you because of discrimination, that would be wrong; correct?
22    A.    Correct.
23    Q.    But if they let you go because they didn't have any

---

1 job, would you agree that it had nothing to do with
2 discrimination, it had nothing to do with respect at all?  Do
3 you understand my question?
4    A.    What was your question?
5    Q.    Did you understand my question?
6    A.    (No audible response).
7    Q.    I was saying, would you agree with me that if
8 CalPac laid you off because it didn't have any jobs, and not
9 because of any discrimination, but if they let you go because
10 they didn't have any jobs, that had nothing to do with
11 respect; correct?
12    A.    Correct.
13         MR. LEON GUERRERO:  Okay.  Nothing further.
14         MS. MCDONALD:  Nothing.
15         MS. LUJAN:  I don't have anything either.  Thank
16 you.
17         MR. LEON GUERRERO:  Thank you, Mr. Apodaca.
18         (Whereupon, at 4:43 o'clock p.m., the
19 deposition was concluded.)

---

CERTIFICATE OF WITNESS

1
2
3        I, Jerry Apodaca, Jr., the deponent herein, do
4 hereby certify that I have read, or had read to me, the
5 foregoing typewritten pages 1 through 94 inclusive.  My
6 changes thereof, if any, have been noted on a separate sheet
7 of paper, which I have signed, and which I understand will be
8 appended to and made a part of this deposition.  I certify
9 that the same is now a true and correct transcript of my
10 testimony.
11
12                         _____
13                              Jerry Apodaca, Jr.
14         (Dated)_____

---

REPORTER'S CERTIFICATE

1
2
3        I, Cecilia F. Floras, Stenotype Reporter, do hereby
4 certify the foregoing 94 pages to be a true and correct
5 transcript of the stenographic shorthand notes and audio
6 recording taken by me in the within-entitled and numbered
7 case at the time and place as set forth herein.
8        Dated at Hagåtña, Guam, this 10th day of June, 2007.
9
10                         _____
                                Cecilia F. Floras
11
12

1

2

3                                    CLERK'S CERTIFICATE

4    SUPERIOR COURT OF GUAM        ) ss

5            I, Cecilia F. Flores, Special Deputy Clerk,

6    Superior Court of Guam, do hereby certify that on the 12th

7    day of April, 2007, at the hour of 2:05 o'clock p.m. there

8    appeared before me Jerry Apodaca, Jr. at the offices of Blair

9    Sterling Johnson Martinez & Leon Guerrero, the witness

10   herein, produced to give his deposition in the within-

11   entitled and numbered Case No. CIV05-00037, in the District

12   Court of Guam; that prior to examination the witness was by

13   me duly sworn upon his oath; that thereafter the transcript

14   was prepared by me or under my supervision, and a certified

15   copy of the original deposition transcript was presented to

16   Mr. Leon Guerrero's office for the deponent's review,

17   corrections, if any, and execution.

18           I further certify that I am not a relative,

19   employee, attorney or counsel of any of the parties, nor a

20   relative or employee of such attorney or counsel, and that I

21   am not directly or indirectly interested in the matters in

22   controversy.

23           In testimony whereof, I have hereunto set my hand

24   and seal of Court this 15th day of June, 2007.

25

                            _Cececes_
                    SPECIAL DEPUTY CLERK, SUPERIOR COURT OF GUAM

JERRY APODACA, JR.:  APRIL 12, 2007