ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

# FILED
### DISTRICT COURT OF GUAM

JAN 0 7 2008 

### JEANNE G. QUINATA
### Clerk of Court

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555

*Attorneys for Defendant Dynamic Technical Services*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>Defendants. | CIVIL CASE NO. 05-00037<br><br><br>**DEFENDANT DYNAMIC TECHNICAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF ROBERT B. CRUZ; MEMORANDUM IN SUPPORT OF MOTION; DECLARATION OF ELYZE J. MCDONALD; EXHIBITS A-D; DECLARATION OF SERVICE** |

ORIGINAL

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Dynamic Technical Services, Inc. (hereinafter referred to as "DTS"), Defendant in the above entitled and numbered action and, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, files this Motion for Summary Judgment as to all claims asserted by Plaintiff Robert B. Cruz (hereinafter referred to as "Plaintiff"). This motion is made upon the attached memorandum, the record in this case, including without limitation the exhibits attached and filed contemporaneously herewith, and argument presented by counsel at the hearing.

WHEREFORE, PREMISES CONSIDERED, Defendant Dynamic Technical Services respectfully requests this court to enter and order dismissing all of Plaintiff Robert B. Cruz's claims against DTS and for such further relief to which DTS shows itself justly entitled.

DATED this 7th day of January, 2008.

CARLSMITH BALL LLP

ELYZE J. MCDONALD
Attorneys for Defendant
Dynamic Technical Services

Motion for Summary Judgment Against Plaintiff Robert B. Cruz          Page 2 of 22
4838-7052-2626.1.059759-00001
Case 1:05-cv-00037      Document 473      Filed 01/07/2008      Page 2 of 57

# INDEX OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)                  6

*Anderson v. Pacific Maritime Assoc.*, 336 F.3d 924 (9th Cir. 2003)     12

*Association of Mexican-American Educators v. California*,
231 F.3d 572 (9th Cir. 2000)                                           12-13

*Bonnette v. California Health and Welfare Agency*, 704 F.2d
1465 (9th Cir. 1983)                                                    8

*Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213 (10th Cir. 2002)      9

*British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare
Fund*, 882 F.2d 371 (9th Cir. 1989)                                     7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)                        6-7

*Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 123
S.Ct. 1673, 155 L.Ed.2d 615 (2003)                                     9

*Dominguez-Curry v. Nevada Transp. Dept*, 424 F.3d 1027 (9th Cir. 2005)  15

*E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003)    8-9, 12

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)                  15, 17

*Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983)    11, 13

*Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004 (D.Minn. 2003)   16

*Graves v. Lowery*, 117 F.3d 723 (3d Cir. 1997)                        9

*Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)       18

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)                    14, 17

*Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980)    11

*McZeal v. City of Seattle*, 2006 WL 3254504 (W.D.Wash. 2006)          15

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986)              15

Motion for Summary Judgment Against Plaintiff Robert B. Cruz                Page 3 of 22
4838-7052-2626.1.059759-00001
Case 1:05-cv-00037    Document 473    Filed 01/07/2008    Page 3 of 57

*Merrick v. Farmers Ins.*, 892 F.2d 1434 (9th Cir. 1990)                     18

*NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117 (3d. Cir. 1982)         8

*NLRB v. Condenser Corp. of America*, 128 F.2d 67, 70 (3d Cir. 1942)           8

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)                15

*Rivas v. Federacion de Asociaciones Pecuarias,* 929 F.2d 814 (1st Cir. 1991)  9

*Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971)                                 15

*Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d
385 (D.Conn. 2003)                                                             16

*Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973)            10, 13

*Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir. 1978)                            15, 18

*Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350 (11th Cir. 1994)          9

*Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067 (C.D.Cal. 2002)                 8

**Statutes**

42 U.S.C. § 2000e(b)                                                           7

42 U.S.C. § 2000e(f)                                                           7

**Rules**

Federal Rule of Civil Procedure 56                                            6

Motion for Summary Judgment Against Plaintiff Robert B. Cruz          Page 4 of 22
4838-7052-2626.1.059759-00001
Case 1:05-cv-00037      Document 473      Filed 01/07/2008      Page 4 of 57

# MEMORANDUM IN SUPPORT OF MOTION FOR
# SUMMARY JUDGMENT AGAINST PLAINTIFF ROBERT CRUZ

## I.
## GROUNDS FOR MOTION

Defendant DTS brings this Motion for Summary Judgment against Plaintiff Robert Cruz ("Plaintiff") on the following grounds:[1]

A) Defendant DTS was not an "employer" of Plaintiff Robert Cruz as defined by Title VII of the Civil Rights Act of 1964 and cannot be subject to liability under the statute.

B) There was no hostile work environment based upon the uncontroverted evidence.

C) DTS did not have any knowledge of any alleged discrimination.

To the extent co-defendant Calpac asserts there was no hostile work environment, DTS hereby joins in such motion.

## II.
## SUMMARY JUDGMENT EVIDENCE

Defendant relies on the following exhibits, attached to this motion and incorporated by reference as if fully set forth herein:

A) Selected pages of the deposition of Plaintiff Robert Cruz;
B) Selected pages of the deposition of John Healy;
C) Affidavit of Dennis P. Clark; and
D) Affidavit of Linda Hayes.

## III.
## FACTUAL BACKGROUND

Plaintiff Robert Cruz filed this lawsuit along with twelve other plaintiffs on December 12, 2005. The Plaintiff filed his Second Amended Complaint on September 7, 2007. All of Plaintiff's claims are brought under Title VII of Civil Rights Act of 1964. The Plaintiff was

---

[1] In Plaintiff's Second Amended Complaint, the Plaintiff does not make any retaliation claims against DTS for termination. Plfs' 2nd Am. Complaint ¶ 140.

Motion for Summary Judgment Against Plaintiff Robert B. Cruz — Page 5 of 22
4838-7052-2626.1 059759-00001
Case 1:05-cv-00037    Document 473    Filed 01/07/2008    Page 5 of 57

employed by Defendant Calpac from the middle of 2003 through November 28, 2004. Ex. A. at pp. 15, ll. 2-5; p. 9 ll. 18-21. During the course of his employment for Calpac, he worked on a construction project for MCI. Dennis Clark was the MCI "company representative" on this project and was an employee of DTS. Ex. C at ¶ 3. The Plaintiff alleges that Mr. Clark made discriminatory remarks in the presence of the Plaintiff on one occasion. Ex. A at pp. 12-13, ll. 24-45 and 1-2; p. 40, ll. 17-24. The Plaintiff did not complain to anyone at DTS about the statements Dennis Clark allegedly made and no one at DTS became aware of Plaintiff's complaints until late December 2004 when Dennis Clark informed DTS of the existence of public protesters who were alleging that he made discriminatory comments. Ex. D at ¶ 9. Based upon these alleged statements made by Mr. Clark, the Plaintiff has filed the instant lawsuit seeking to recover damages from DTS under Title VII for hostile work environment.

## IV.
## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a court should grant summary judgment when, viewing the evidence in the light most favorable to the nonmoving party, the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. Pro. 56(e).

Motion for Summary Judgment Against Plaintiff Robert B. Cruz        Page 6 of 22
4838-7052-2626.1 059759-00001
Case 1:05-cv-00037    Document 473    Filed 01/07/2008    Page 6 of 57

However, it is not necessary for the party moving for summary judgment to introduce evidence that negates the plaintiff's claim. *Celotex*, 477 U.S. 258, 323. Instead, the moving party may show in it motion that there is no evidence to support an essential element of the non-moving party's claim. *Id.* at 325. According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party: (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible. *British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989).

**V.**
**ARGUMENTS & AUTHORITIES**

**A.     DTS is not an "employer" of Plaintiff and cannot be liable under Title VII**

In order to be subject to liability for a hostile work environment[2] under Title VII, a defendant must be an "employer" as the statute defines that term. An "employer" is a "person engaged in an industry affecting interstate commerce who has fifteen or more employees..." 42 U.S.C. § 2000e(b). An employee is an "individual employed by an employer." 42 U.S.C. § 2000e(f). In the present case, it is uncontested that Calpac, not DTS, was the direct employer of the Plaintiff. Ex. A at p. 37, ll. 8-13; Ex. B at p. 88, ll. 18-23. Additionally, the Plaintiff did not consider Dennis Clark his supervisor. Ex. A at p. 39, ll. 11-12.

---

[2] Defendant expressly denies that Plaintiff was subjected to a hostile work environment as a matter of law. This topic is fully addressed in Section V.B. of this memorandum.

Motion for Summary Judgment Against Plaintiff Robert B. Cruz                    Page 7 of 22
4838-7052-2626.1.059759-00001
Case 1:05-cv-00037     Document 473     Filed 01/07/2008     Page 7 of 57

### 1. Defendant DTS is not liable under Title VII as a joint employer.

"Two or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment of the employee. *Swallows* [*v. Barnes & Noble Book Stores, Inc.*], 128 F.3d [990], 993 n. 4 [(6th Cir. 1997)] (citing *NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117, 1123 (3d. Cir. 1982))." *Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067, 1093 (C.D.Cal. 2002). In order to determine whether a joint employment relationship exists, the Ninth Circuit applies an "economic reality" test. *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983). Under that test, this court should consider all factors relevant to a particular situation when evaluating the economic realities of a relationship. *Id.* In determining joint employment, a large collection of factors has been suggested from the judiciary and governmental agencies. *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270, 1275 (9th Cir. 2003).

When determining if a joint employer relationship exists, the Third Circuit has explained it is a matter of determining which of the two, or whether both, of the parties control, in the capacity of employer, the labor relations of a given group of workers. *Browning-Ferris Indus. of Pa.*, 691 F.2d at 1122-23 (citing *NLRB v. Condenser Corp. of America*, 128 F.2d 67, 70 (3d Cir. 1942)). "The 'joint employer' concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment." *Id.*

The Supreme Court has summarized the various factors as to what it means to be an employer: "As the EEOC's standard reflects, an employer is the person, or group of persons, who owns and manages the enterprise. The employer can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of

Motion for Summary Judgment Against Plaintiff Robert B. Cruz          Page 8 of 22
4838-7052-2626.1 059759-0000]
Case 1:05-cv-00037    Document 473    Filed 01/07/2008    Page 8 of 57

the business are to be distributed." *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 450, 123 S.Ct. 1673, 1680, 155 L.Ed.2d 615 (2003). The Ninth Circuit opined that the "Supreme Court seems to suggest that the *sine qua non* of determining whether one is an employer is that an 'employer' can hire and fire employees, can assign tasks to employees and supervise their performance." *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d at 1277 (citing *Clackamas*, 123 S.Ct. at 1680). "Logically, before a person or entity can be a joint employer, it must possess the attributes of an employer to some degree." *Id*. Numerous courts consider the key to joint employment to be the right to hire, supervise and fire employees. *See Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213, 1219 (10th Cir. 2002) (en banc); *Graves v. Lowery*, 117 F.3d 723, 727-728 (3d Cir. 1997); *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1361 (11th Cir. 1994); *Rivas v. Federacion de Asociaciones Pecuarias*, 929 F.2d 814, 820-821 (1st Cir. 1991).

In *E.E.O.C. v. Pacific Maritime Assoc.*, a Title VII sexual harassment action was brought against Pacific Maritime Association ("PMA"). 351 F.3d 1270 (9th Cir. 2003). PMA is an association of stevedoring companies ("member-employers") that performed organizational tasks on behalf of its members, negotiated a collective bargaining agreement, operated a dispatch hall jointly with a union, and provided payroll services for its members. *Id*. at 1274. The plaintiff alleged that, along with the member-employer of PMA that hired her, PMA was a joint employer of her. However, the Ninth Circuit found that PMA did not supervise the longshoremen, had no power to hire or fire longshoremen, had no power to discipline longshoremen, and did not supervise the work sites. The court found that it was undisputed that the monitoring and control over the work sites, as well as the control of the employees, was within the sole province of the member-employees. Accordingly, the Court held that PMA was not a joint employer of the plaintiff. *Id*. at 1274.

Motion for Summary Judgment Against Plaintiff Robert B. Cruz                    Page 9 of 22
4838-7052-2626.1 059759-00001
Case 1:05-cv-00037     Document 473     Filed 01/07/2008     Page 9 of 57

Similarly, in the present case, DTS had no authority to hire or fire Calpac employees, did not supervise Calpac employees or give them work assignments, had no power to discipline Calpac employees, did not determine wages or benefits of Calpac employees, and did not decide how profits or losses of Calpac were to be distributed. *See* Exhibits C at ¶¶ 5-7 and D at ¶ 13. John Healy, the President of Calpac, testified that he did not have any communications with anyone at DTS prior to receiving the first EEOC complaint. Ex. B at p. 85, ll. 18-23. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Mr. Healy also testified that Mr. Clark was not a supervisor of the plaintiffs, did not give out daily work assignments, and did not hire any of the plaintiffs. *Id.* at pp. 88-89, ll. 12-17, 9-20. Therefore, as a matter of law, this uncontroverted evidence establishes that DTS was not a joint employer of the Plaintiff with Calpac.

## 2. Defendant DTS is not liable under Title VII as an indirect employer

The D.C. Circuit first addressed indirect-employer liability in *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973). The hospital ran a nursing office where patients could request the service of a private duty nurse. The hospital would then contact outside referral sources and request a private nurse be sent to the hospital. The private nurses were employees of the patients, not the hospital. In *Sibley*, a male nurse alleged that on at least two occasions hospital nurses rejected him upon arrival because he was male and the requesting patient was female. The male nurse subsequently sued under Title VII for discrimination.

On appeal, the court noted that one of the goals of Title VII was to equalize access to job opportunities. *Id.* at 1340. The court held that Title VII did not explicitly require a direct employer-employee relationship, but it did not mean that no relationship was required for a claim

Motion for Summary Judgment Against Plaintiff Robert B. Cruz        Page 10 of 22
4838-7052-2626.1 059759-00001
Case 1:05-cv-00037    Document 473    Filed 01/07/2008    Page 10 of 57

to fall under Title VII. The Court stated: "We think it is significant that [Title VII] has addressed the problems of interference with the direct employment relationship by labor unions and employment agencies-institutions which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties. On the facts as alleged...[the hospital] is so circumstanced, and its daily operations are of such a character as to have such nexus to the third parties in this case..." *Id.* at 1342.

The Ninth Circuit first addressed the issue of indirect-employer liability in *Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980). The court noted for Title VII to apply, "there must be some connection with an employment relationship" though the "connection...need not necessarily be direct." *Id.* at 883. The court explained "[t]his might occur where a defendant subject to Title VII interferes with an individual's employment opportunities with another employer." *Id.* at 883 n. 3.

The Ninth circuit addressed the issue again in *Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983). In this case, the plaintiff was a Hispanic physician working for a corporation named AES. On behalf of AES, the plaintiff submitted a proposal to the defendant to operate the hospital's emergency room. The hospital allegedly turned down the proposal because too many Hispanics worked for AES. *Id.* at 1020. The court reversed a summary judgment granted to the hospital on the basis that the plaintiff lacked standing under Title VII because he was an employee of AES, not the hospital, and AES would have only been an independent contractor for the hospital. *Id.* The court held that AES's potential status as an independent contractor did not mean that the hospital had not interfered with the relationship between AES and the plaintiff. *Id.* at 1021. Additionally, the court noted the perverse result that would occur if an employer were allowed to discriminatorily interfere with an individual's

Motion for Summary Judgment Against Plaintiff Robert B. Cruz                    Page 11 of 22
4838-7052-2626.1.059759-00001
Case 1:05-cv-00037     Document 473     Filed 01/07/2008     Page 11 of 57

employment opportunities with another employer, while it could not do so with its own employees. *Id.*

The issue of indirect-employer liability came before the court again in *Association of Mexican-American Educators v. California*, 231 F.3d 572 (9th Cir. 2000)(en banc). In this case, the plaintiffs, a class of prospective and current minority teachers, challenged the use of a skills test that was a prerequisite to employment in the public schools. *Id.* at 577. The plaintiffs alleged the test has a disparate impact on minorities. *Id.* at 578. The court found that Title VII covered the claims as the alleged discriminatory test interfered with future employment with public schools since it dictated whom the schools could hire. *Id.* at 581-82. The court emphasized that the ruling was based on the peculiar degree of control the state exercised over school districts because of the test. *Id.* at 581.

In *Anderson v. Pacific Maritime Assoc.*, the Ninth Circuit addressed the issue of whether the PMA could be liable under Title VII under indirect-employer liability. 336 F.3d 924 (9th Cir. 2003)(the PMA performed the same functions and duties as discussed in *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003), *supra*). The plaintiffs in the suit were African-American workers employed on the waterfront in Seattle and Tacoma. The plaintiffs alleged a "horrific and pervasive picture of racial animosity and discrimination" on the waterfront. *Id.* at 926. The allegations included the common use of racial slurs, racial innuendos, and racial jokes on the docks and well as the uses of racial slurs in the training materials. The plaintiffs also alleged direct, racially charged physical threats. *Id.*

The court held that the PMA could not be liable under Title VII. The court found that the alleged hostile work site was not controlled by the PMA and the PMA did not employ or supervise the plaintiffs or the alleged harassers. *Id.* at 931. "*Sibley* and its progeny extended

Motion for Summary Judgment Against Plaintiff Robert B. Cruz          Page 12 of 22
4838-7052-2626.1 059759.00001
Case 1:05-cv-00037     Document 473     Filed 01/07/2008     Page 12 of 57

Title VII coverage to indirect employers when those employers discriminated against *and* interfered with the employees' relationship with their employees." *Id.* (emphasis added). PMA did not interfere with the plaintiffs' relationship with their employers since it was the employers who allowed the allegedly hostile work environment. *Id.* "*Sibley* and its Ninth Circuit progeny condone liability when there exists discriminatory 'interference' by the indirect employer *and* where the indirect employer had some peculiar control of the employee's relationship with the direct employer." *Id.* at 932 (emphasis added).

In the present case, there was no discriminatory interference by DTS and DTS had no control over the Plaintiff's relationship with Calpac. In fact, none of the above-referenced cases lends support for a finding of indirect employer liability in this case. In *Sibley*, the hospital refused to allow the male nurse to see the patient; in *Gomez*, the hospital refused to hire the company with Hispanic doctors; and in *Association of Mexican-American Educators*, the state required the job applicants to take the test with the disparate impact on minorities. In all of the referenced cases, the "indirect employer" interfered with the employment relationship between the employee and direct employer. DTS did not have any control over the employment relationship between the Plaintiff and Calpac. DTS did not have the power to hire or fire employees, discipline employees, assign work assignments to employees, promote or demote employees, or perform employee evaluations. *See* Exhibits C at ¶¶ 5-7 and D at ¶ 13. The Plaintiff testified that he never had any interaction with Mr. Clark. Ex. A. at p. 40, ll. 5-7. Additionally, the Plaintiff did not consider Dennis Clark his supervisor. Ex. A at p. 39, ll. 11-12. John Healy testified that Dennis Clark never tried to influence Calpac to take any action that would affect the manner in which any of the plaintiffs were treated and did not make any comments to anyone at Calpac regarding any of the plaintiffs. Ex. B. at p. 87, ll. 2-6 and 12-15.

Motion for Summary Judgment Against Plaintiff Robert B. Cruz          Page 13 of 22
4838-7052-2626.1.059759-00001
Case 1:05-cv-00037     Document 473     Filed 01/07/2008     Page 13 of 57

He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Furthermore, Healy testified that Clark and DTS never interfered in the relationship between Calpac and any of the Plaintiffs. *Id.* at p. 92, ll. 16-24.

Additionally, the work site involved in this lawsuit was not one that was controlled by DTS. Ex. D at ¶ 7. The worksite in question was a MCI worksite. Dennis Clark reported directly to MCI and took all work directives from MCI. DTS did not have any power to control the worksite, conduct any investigations on the worksite, or implement any rules for the worksite. *Id.* All of these functions were reserved to MCI. DTS did not even have the authority to remove Dennis Clark from the project. *Id.* at ¶ 6.

**B.    Plaintiff's allegations do not amount to a hostile environment as a matter of law**

Regardless of DTS' status as an "employer" under Title VII, the Plaintiff has failed to establish a claim for hostile work environment. A plaintiff may bring a lawsuit under Title VII for hostile work environment based upon racial or national origin harassment. To establish the existence of a hostile work environment plaintiff must prove that the workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(internal citations and quotation marks omitted). The hostile environment must be one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. *Id.* at 21-22. The Supreme Court in *Harris* held that the courts should look to the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the

Motion for Summary Judgment Against Plaintiff Robert B. Cruz          Page 14 of 22
4838-7052-2626.1 059759-00001
Case 1:05-cv-00037     Document 473     Filed 01/07/2008     Page 14 of 57

employee's work performance." *Id.* at 23. The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 n. 1 (1998)(internal citation and quotation marks omitted). Judicial standards for harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment for the purposes of a Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept,* 424 F.3d 1027 (9th Cir. 2005).

The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998). Not all workplace conduct that could be labeled as harassment affects a "term, condition, or privilege" of employment within the meaning of Title VII. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986). "The 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to sufficiently significant degree to violate Title VII." *Id.* (citing *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir. 1971), cert. denied, 406 U.S. 957 (1972)).

The Western District of Washington held that the use of the phrase "Driving Miss Daisy" several times in the presence of an African-American worker and referring to another African-American driving a Caucasian within a two month period were not sufficient to create a racially hostile environment. *McZeal v. City of Seattle,* 2006 WL 3254504, at *5 (W.D.Wash. 2006). The court found that the comments were not so frequent or severe as to constitute a racially

Motion for Summary Judgment Against Plaintiff Robert B. Cruz          Page 15 of 22
4838-7052-2626.1 059759-00001
Case 1:05-cv-00037     Document 473     Filed 01/07/2008     Page 15 of 57

hostile work environment. *Id.* Furthermore, the Ninth Circuit found the use of the phrase "jungle bunny" in reference to an African-American did not create a hostile environment. *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978). The court commented that while the remark was a racially derogatory slur, it was not the sort of conduct to which Title VII was enacted to prohibit. *Id.* The court also observed that Title VII was not directed at ending all discrimination by individuals, but the eradication of discrimination by employers against employees. *Id.*

Additionally, the District Court of Connecticut found that isolated racially offensive comments did not create a hostile and abusive environment. *Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d 385, 396 (D.Conn. 2003)(complained of comments included: (1) coworker wished a hurricane over Puerto Rico would wipe out island and that "we could do without those people;" (2) "they should put Puerto Ricans on a plane and send them back to Puerto Rico;" and, (3) a nurse's negative comments that black and Puerto Rican patients were "low life pieces of shit, scum sucking dogs and welfare recipients). The District of Minnesota found that the use of the terms like "fag," "wimp," "sissy," "useless," "worthless," and "spic" failed to support a plaintiff's claim of hostile work environment based upon national origin and disability. *Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004, 1015 (D.Minn. 2003).

In the present case, Plaintiff testified that there was one incident where Dennis Clark used the term "monkeys" in reference to Calpac employees. Ex. A at pp. 12-13, ll. 24-45 and 1-2; p. 40, ll. 17-24. Mr. Cruz was employed with Calpac from middle of 2003 through November 28, 2004, a period of approximately eighteen months. Ex. A. at pp. 15, ll. 2-5; p. 9 ll. 18-21. Plaintiff alleges that, over the course of approximately eighteen months of employment, one isolated statement was allegedly made by Mr. Clark. As a matter of law, this fails to amount to a

Motion for Summary Judgment Against Plaintiff Robert B. Cruz          Page 16 of 22
4838-7052-2626.1.059759-00001
Case 1:05-cv-00037    Document 473    Filed 01/07/2008    Page 16 of 57

hostile and abusive work environment according to the factors set out by the Supreme Court in *Harris*. The alleged discriminatory conduct was infrequent and not physically threatening, but rather a mere offensive utterance. Furthermore, if it is assumed that the two alleged statements were made, they did not unreasonably interfere with the Plaintiff's work performance. The Plaintiff testified that resumed working immediately after he heard the alleged comment and never discussed the incident after it occurred. Ex. A. at p. 43, ll. 22-23; p. 44, ll. 10-11. Thus, Mr. Cruz concedes that he did not encounter any discriminatory comments during the last two months of his employment on the job. When looking at the "totality of the circumstances," the two alleged instances of racial slurs over the course of ten months were not "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. By his own testimony, the alleged remark was not more than episodic and were not "sufficiently continuous and concerted in order to be deemed pervasive." *Farragher*, 524 U.S. at 787 n. 1. Therefore, DTS is entitled to summary judgment against Plaintiff on his Title VII causes of action.

**C.     DTS did not have any knowledge of any alleged discrimination and cannot be held liable under Title VII**

In the unlikely event that the court finds that DTS is an "employer" of the Plaintiff under Title VII and that Plaintiff has established a hostile environment claim, DTS cannot be held liable for the alleged actions of Clark because it did not have actual or constructive knowledge of the alleged discriminatory conduct. DTS was not made aware of any alleged discriminatory conduct by Dennis Clark until it was notified by Clark about the protesters which occurred in late December 2004. Ex. D at ¶ 9-11. There is no evidence, as none exists, that DTS had actual knowledge of Clark's alleged discriminatory statements until the EEOC complaint was received. Additionally, there are no allegations of harassment following the time of the protest or the time

Motion for Summary Judgment Against Plaintiff Robert B. Cruz       Page 17 of 22
4838-7052-2626.1.059759-00001
Case 1:05-cv-00037      Document 473      Filed 01/07/2008      Page 17 of 57

the complaint was received by DTS. In fact, according to the testimony of the Plaintiff, there had been no incidents of alleged harassment in at least the three months preceding the protests on Guam. Ex. A at pp. 12-13, ll. 24-45 and 1-2; p. 40, ll. 17-24.

An employer cannot be held liable for the harassment of an employee unless the employer both knows of it and fails to take remedial action. *Silver v. KCA, Inc.*, 586 F.2d 138, 142 (9th Cir. 1978). This even holds true when there is a continuing course of harassment from an employee. *Id.* Occasional, sporadic remarks that occur in the workplace do not impose Title VII liability upon the employer. *Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)(citing *Merrick v. Farmers Ins.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990). In *Greene*, the plaintiff's claim of a hostile work environment rested upon four instances of offensive language. The plaintiff reported one incident and racial harassment ceased from that time forward. The court held that the case was properly dismissed as against the employer and that the claim may have had substance if the employer knew of the conduct and failed to take action. *Id.*

In the present case, DTS did not learn of any allegations of discriminatory remarks until Mr. Clark informed DTS of the presence of the protesters in late December 2004, approximately four months after the last alleged discriminatory comment was allegedly made by Clark, according to the Plaintiff. Ex. D at ¶ 9. The Plaintiff's EEOC Notice of Charge of Discrimination was not sent to DTS until February 24, 2005. Since DTS was not aware of the alleged harassment, it cannot be held liable under Title VII. *See Silver*, 892 F.2d at 1438-39.

Additionally, immediately upon learning that there were allegations that he had engaged in discriminatory conduct, Mr. Clark spoke at a meeting of Calpac employees and informed them that he did not make any such comments and would not discriminate against anyone based upon their Chamorro heritage. Mr. Clark informed DTS of this meeting and what he stated to the

Motion for Summary Judgment Against Plaintiff Robert B. Cruz                Page 18 of 22
4838-7052-2626.1.059759-00001
Case 1:05-cv-00037    Document 473    Filed 01/07/2008    Page 18 of 57

Calpac employees. There have been no allegations of discriminatory conduct by Clark or DTS subsequent to this meeting. In fact the Plaintiff does not make any allegations of any comments by Clark for at least the previous two months prior to him being layed-off from Calpac. There has not been one complaint of discriminatory comments by Clark subsequent to DTS learning of the Plaintiff's allegations in the EEOC complaint. *See* Ex. D at ¶¶ 9-11. Therefore, the Plaintiff cannot complain of any failure by DTS to take action after it acquired knowledge of the Plaintiff's complaints. DTS cannot be held liable under Title VII because: (1) DTS did not have any knowledge of Plaintiff's allegations prior to him filing a complaint with the EEOC and (2) once DTS became aware of the complaints, immediate remedial action was taken and no subsequent discriminatory acts have been alleged by Plaintiff.

## VI.
## CONCLUSION

DTS cannot be liable to Plaintiff under Title VII because: (1) DTS was not an employer of the Plaintiff as that term is defined under Title VII; (2) Based upon the Plaintiff's own testimony, he was not subjected to a hostile work environment for purposes of Title VII; and (3) DTS did not have actual or constructive knowledge of any of Plaintiff's complaints. For these reasons, DTS moves this Honorable Court to grant is Motion for Summary Judgment against Plaintiff Robert Cruz.

DATED this 7th day of January, 2008.

CARLSMITH BALL LLP

ELYZE J. MCDONALD
Attorneys for Defendant
Dynamic Technical Services

Motion for Summary Judgment Against Plaintiff Robert B. Cruz     Page 19 of 22
4838-7052-2626.1.059759-00001
Case 1:05-cv-00037    Document 473    Filed 01/07/2008    Page 19 of 57

## DECLARATION OF ELYZE J. MCDONALD

I, Elyze J. McDonald, declare under penalty of perjury that the following statements are true and correct:

1.      1 have personal knowledge of the facts stated in this declaration except as otherwise indicated.

2.      I would testify competently as to these facts if called upon by the Court.

3.      I am an attorney authorized to practice law in the territory of Guam and presently employed with the law firm of Carlsmith Ball LLP, attorneys for Defendant Dynamic Technical Services in the above-captioned action.

4.      This declaration is submitted in support of Defendant Dynamic Technical Services' Motion for Summary Judgment Against Robert B. Cruz, filed on January 7, 2008.

5.      Defendant Dynamic Technical Services is a necessary and proper party Defendant in this action.

6.      Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Robert B. Cruz as Exhibit "A" is a true and correct copy of the pertinent pages of the deposition testimony of Robert B. Cruz.

7.      Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Robert B. Cruz as Exhibit "B" is a true and correct copy of the pertinent pages of the deposition testimony of John T. Healy.

8.      Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Robert B. Cruz as Exhibit "C" is a true and correct copy of the Affidavit of Dennis P. Clark the original of which has been previously filed with the Court.

9.      Attached to Defendant Dynamic Technical Services' Motion for Summary

Motion for Summary Judgment Against Plaintiff Robert B. Cruz                    Page 20 of 22
4838-7052-2626.1.059759-00001
Case 1:05-cv-00037     Document 473     Filed 01/07/2008     Page 20 of 57

Judgment Against Robert B. Cruz as Exhibit "D" is a true and correct copy of the Affidavit of Linda G. Hayes the original of which has been previously filed with the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and accurate to the best of my knowledge.

DATED: this 7th day of January 2008 at Hagåtña, Guam.

_____
ELYZE J. MCDONALD

Motion for Summary Judgment Against Plaintiff Robert B. Cruz      Page 21 of 22
4838-7052-2626.1.059759-00001
Case 1:05-cv-00037    Document 473    Filed 01/07/2008    Page 21 of 57

# Exhibit A

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA,) Civil Case No. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS, )
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES S.)
YEE, TEDDY B. CRUZ, JESSE B. CRUZ,)
JOHN L.G. NAUTA, and JOHN P. )
BABAUTA, )
              Plaintiffs, )
                   )
     vs. )
                   )
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS )
CLARK, WILLIAM WARD, JAI JAMES and)
DOES 1 through 10, )
                 )
           Defendants. )

🗐 **COPY**

### DEPOSITION OF ROBERT CRUZ

Taken on Behalf of the Defendants

BE IT REMEMBERED That, pursuant to the Guam Rules of Civil Procedure, the deposition of ROBERT CRUZ was taken before Veronica F. Reilly, Certified Shorthand Reporter, on Wednesday, the 7th day of February 2007, at 4:25 p.m. in the Law Offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
E-mail: veronica.reilly@hotmail.com

1   on for special training and a lot of things that we can end

2   up doing.

3       Q.   Are you working the power lines or are you working

4   at the motor pool?

5       A.   Power plant.

6       Q.   So you're working with the high voltage stuff?

7       A.   Right.

8       Q.   So now you have to go out and get special training

9   or how to deal with that kind of stuff?

10      A.   Right.

11      Q.   So you're not breaking away from your job as a

12  mechanic?

13      A.   No, it's still -- I'm helping out the mechanics as

14  for right now.

15      Q.   How long were you unemployed, the time from your

16  work at CalPac to your next employment?

17      A.   Maybe couple of months.

18      Q.   When were you terminated from CalPac?

19      A.   November 28.

20      Q.   What year was that?

21      A.   2004.

22      Q.   And then you were picked up by GPA?

23      A.   No, I was picked up by Hyatt.

24      Q.   Okay.

25      A.   And then I got transferred to GPA.

*February 7, 2007: Mr. Robert Cruz*

1    Meter?

2        A.    Could have been.

3        Q.    Could it have been Mr. Harper?

4        A.    Not too sure.

5        Q.    Could have been?

6        A.    No.

7        Q.    Mr. Yee, could he have typed this for you?

8        A.    No, no.

9        Q.    What about Mr. Quintanilla?  Henry Quintanilla?

10       A.    No.

11       Q.    A bunch of other employees from CalPac filed EEOC

12   complaints, to your knowledge; correct?

13       A.    Yes, sir.

14       Q.    And they all filed about the same time?

15       A.    Yes, sir.

16       Q.    Did you guys get together and figure out what to put

17   down in your charge of discrimination?

18       A.    No, sir.  We did get together, but it's not what --

19   everybody had your own.

20       Q.    Okay.  In your charge of discrimination, it says

21   that you were discharged because you were making a complaint

22   about Dennis Clark; correct?

23       A.    Yes, sir.

24       Q.    And then I believe you indicated that Dennis Clark

25   made a statement around September 25, 2004, calling you and

*February 7, 2007:  Mr. Robert Cruz*

1    fellow co-workers monkeys?

2         A.   Yes, sir.

3         Q.   About the time you were discharged, were there other

4    people being discharged?

5         A.   Not that I know, because I was already discharged.

6    I just left.

7         Q.   You just left and you never talked with anybody else

8    from CalPac?

9         A.   No, never did.

10        Q.   These were CalPac employees when you filed?

11        A.   Yes, but besides knowing who got discharged after

12   me, no.

13        Q.   Your charge of discrimination is based on race;

14   correct?

15        A.   Yes, sir.

16        Q.   Based on color; correct?

17        A.   Yes, sir.

18        Q.   Based on national origin?

19        A.   Yes, sir.

20        Q.   And based on retaliation?

21        A.   Yes, sir.

22        Q.   Let's talk about your employment with CalPac, find

23   out what you know about CalPac.  Is that a corporation to

24   your knowledge?

25        A.   Yes.

*February 7, 2007:  Mr. Robert Cruz*

1    A.   Almost a year and a couple of months.

2    Q.   So you were discharged in November 2004, so you

3 probably started working around mid 2003? Would that be

4 about right?

5    A.   Right.

6    Q.   So for a couple months, you worked with John Taitano

7 and that would be about mid 2003; correct?

8    A.   Yes, sir.

9    Q.   Then Don Harper was doing the underground stuff?

10    A.   Yes, sir, then I transferred over.

11    Q.   Any other supervisors?

12    A.   Besides with Don Harper, maybe Henry Quintanilla,

13 Henry Van Meter. Those are the two supervisors I was working

14 with.

15    Q.   Mr. Quintanilla and Mr. Van Meter?

16    A.   Yes, sir.

17    Q.   And Don Harper would supervise those two people;

18 correct?

19    A.   Yes, sir.

20    Q.   And then your charge of discrimination alleges that

21 on or about the 25th of November 2004, you were harassed by

22 Dennis Clark; correct?

23    A.   Yes, sir.

24    Q.   And in your charge of discrimination, you indicate

25 that Dennis Clark is a representative of MCI; is that

*February 7, 2007: Mr. Robert Cruz*

1    A.    He just told us that he works for DTS, he's the one

2  that comes around making sure that the job is in the right

3  track.

4    Q.    And do you remember when that was?

5    A.    Probably 2004.

6    Q.    Do you know what month approximately?

7    A.    Not that I recall.

8    Q.    Who was your employer during the project?

9    A.    CalPac.

10   Q.    CalPac?

11   A.    (Witness nodded head.)

12   Q.    Anybody else that you consider your employer?

13   A.    No.

14   Q.    Did CalPac hire you?

15   A.    Yes, ma'am.

16   Q.    Did anybody else hire you at that time?

17   A.    No, ma'am.

18   Q.    Did CalPac pay your salary?

19   A.    Yes, ma'am.

20   Q.    Did anybody else pay your salary?

21   A.    No.

22   Q.    Did CalPac offer you employment benefits?

23   A.    No.

24   Q.    No employment benefits?

25   A.    No employment.

*February 7, 2007:  Mr. Robert Cruz*

1      A.    He was the one relaying the information to those

2   guys, what places.

3      Q.    Did Don Harper ever tell you directly what to do?

4      A.    Sometimes.

5      Q.    Okay.  For example?

6      A.    Sometimes he just like say just load the pipes and

7   bring it down to Tiyan and meet Henry and those guys up

8   there.

9      Q.    Do you know if Don Harper reported to anybody else?

10     A.    He has to report to John Healy.

11     Q.    Do you claim that Dennis Clark was your supervisor?

12     A.    No.

13     Q.    When a supervisor told you what to do, did you

14  generally follow those instructions?

15     A.    Yes, ma'am.

16     Q.    Do you know who Dennis Clark reported to?

17     A.    Dynamic Technical Services.

18     Q.    But in terms of a person, do you know who his boss

19  might have been?

20     A.    No, no.

21     Q.    Do you know where Dynamic Technical Services is

22  based?

23     A.    I heard Texas.

24     Q.    Do you know from personal knowledge?

25     A.    No.

*February 7, 2007:  Mr. Robert Cruz*

1    Q.   Do you know how big the company is?

2    A.   No.

3    Q.   Do you know how many employees it has?

4    A.   No.

5    Q.   Did you ever have any personal interaction with

6    Dennis Clark?

7    A.   No.

8    Q.   Did you ever see him or hear him talk about you to

9    somebody else?

10   A.   No.

11   Q.   Did you ever see him talk to CalPac employees or

12   representatives about you?

13   A.   Can you repeat that again?

14   Q.   Did you ever see Dennis Clark talk to CalPac

15   representatives or employees about you?

16   A.   No.

17   Q.   Did you ever witness any conversations between

18   Dennis Clark and CalPac employees or representatives about

19   anything?

20   A.   The only one I -- was when he mentioned you island

21   monkeys.  That was the only one.

22   Q.   Let's talk about that statement, the phrase island

23   monkeys.  Could you tell me when that happened?

24   A.   That happened on September 2004.

25   Q.   What were you doing --

1   the side.

2      Q.   Okay.

3      A.   And then they were talking.  I don't know what they

4   were talking about.

5      Q.   Did you make a complaint to a supervisor?

6      A.   Right there on the spot.  He was right there.

7      Q.   So which supervisor did you complain to?

8      A.   Henry Quintanilla.

9      Q.   What did Mr. Quintanilla say or do?

10     A.   We just made a complaint to him and then I don't

11  know what he did after that.

12     Q.   Did you ever follow-up?

13     A.   No.

14     Q.   And how long did it take for you to make that

15  complaint to Mr. Quintanilla?

16     A.   Not long, he was just right there.  We went up and

17  go, "Hey, H, this person just yelled at us island monkeys and

18  I don't think that's right, you know.  He just said it out

19  loud."  And we made a complaint to him because he was the

20  supervisor on the field and even Don Harper was there when he

21  heard that.

22     Q.   Did you resume work right after?

23     A.   Yes, we went back to work.

24     Q.   And what did Dennis Clark do?

25     A.   He left.

*February 7, 2007:  Mr. Robert Cruz*

1   Q.   How long was his conversation with Don Harper?

2   A.   Maybe a good ten minutes.

3   Q.   Okay.  Did he leave right thereafter or did he stand

4   around and --

5   A.   No, he just left and then we went back to work.

6   Q.   Did you ever discuss with anybody else what

7   happened?

8   A.   No.  Only the guys that was there when we made a

9   complaint to Henry.

10  Q.   After that, did you guys have a discussion about it?

11  A.   No.

12  Q.   No?  You haven't discussed what happened with

13  anybody since the statement was made?

14  A.   No.

15  Q.   Any other incidents with Dennis Clark?

16  A.   I wasn't there but I heard the other boys

17  mentioning, complaining about it.  Because we're all

18  separated.

19  Q.   About that same statement?

20  A.   About the same statement, you island monkeys or you

21  monkeys.

22  Q.   Not just same statement but same incident with you

23  at the trench?

24  A.   Yes.  But they were in the other side.

25  Q.   I'm sorry?

# REPORTER'S CERTIFICATE

DISTRICT COURT OF GUAM    )


         I, Veronica F. Reilly, Certified Shorthand
Reporter, hereby certify that Robert Curz personally appeared
before me at the time and place set forth in the caption
hereof; that at said time and place I reported in stenotype
all testimony adduced and other oral proceedings had in the
foregoing matter; that thereafter my notes were reduced to
typewriting under my direction; and the foregoing transcript,
pages 1 to 46, both inclusive, constitutes a full, true, and
correct record of such testimony adduced and oral proceedings
had and of the whole thereof.

         Witness my hand at Barrigada, Guam, this 25th
day of February 2007.



                        _____
                        Veronica F. Reilly, CSR-RPR
                        Certified Shorthand Reporter

# Exhibit B

IN THE UNITED STATES DISTRICT COURT OF GUAM
FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, JAMES S. YEE, TEDDY C. CRUZ, JESSE B. CRUZ, TEDDY L.G. NAUTA, and JOHN B. BABAUTA,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>                    Defendants. | )  CIVIL CASE NO. CIV05-00037<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DEPOSITION TRANSCRIPT

OF

# JOHN T. HEALY

May 11, 2007

PREPARED BY:     GEORGE B. CASTRO
                     **DEPO RESOURCES**
                     #49 Anacoco Lane
                     Nimitz Hill Estates

1    Q   I -- we'll try to be as brief as
2  possible with you.  During the time that Mr.
3  Clark was working on the project, were you
4  aware of the fact that he had been hired by
5  Dynamic Technical Services to observe as the
6  MCI representative on the project?

7    A   Yes.

8    Q   At any time while Mr. Clark was on the
9  island and was performing any work related to
10  the project, did you ever have any
11  communication with any persons employed by
12  Dynamic Technical Services other than Mr.
13  Clark?

14    A   While Mr. Clark was working on the
15  project?

16    Q   Yes.

17    A   No, I did not.

18    Q   At any time before the first EEOC
19  complaint was filed by a plaintiff in this
20  lawsuit, did you ever have any communications
21  with any employees of Dynamic Technical
22  Services other than Mr. Clark?

23    A   No, I did not.

24    Q   Do you have any reason to believe that
25  before the first EEOC complaint was filed by

Case 1:05-cv-00037   Document 473   Filed 01/07/2008   Page 36 of 57

1   any of the plaintiffs in this lawsuit that
2   anyone at Dynamic Technical Services had
3   received any complaint about the manner in
4   which Dennis Clark had treated employees of
5   CalPac?

6       A   I don't know.  I'm sorry, sir, what was
7   the question again?

8       Q   Do you have any reason to believe that
9   before the first EEOC complaint was filed,
10  anyone at Dynamic Technical Services had
11  received some notice or complaint about the
12  manner in which Dennis Clark had treated
13  employees of CalPac?

14      A   No, I have no reason to believe.

15      Q   All right.   And was there any
16  communication by anyone at CalPac with Dennis
17  Clark, regarding the subject of whether any of
18  the plaintiffs should be terminated from their
19  employment with CalPac?

20      A   No.

21      Q   And before the protests in front of the
22  CalPac offices on December 20th of 2004, did
23  anyone at CalPac ever tell Dennis Clark that
24  any of the plaintiffs in this lawsuit had made
25  complaints about the way he was treating them?

1    A    No.

2    Q    Did   Dennis   Clark   ever   attempt   to

3  influence you to take any action that would

4  affect   the   manner   in   which   any   of   the

5  plaintiffs were treated by CalPac?

6    A    No.

7    Q    I'm sorry?

8    A    No.   No, sir.

9    Q    Ever   make   any   rude   or   insulting

10  comments to you about any of the plaintiffs?

11    A    No, never.

12    Q    To your knowledge, did he ever make any

13  such   comments   to   anyone   else   at   CalPac

14  regarding any of the plaintiffs?

15    A    Not to my knowledge.

16    Q    Did   Mr.   Clark   ever   ask   you   or   try   to

17  influence you to remove any of the plaintiffs

18  from the project?

19    A    No.

20    Q    Did Mr. Clark ever say anything to you

21  that   caused   you   to   change   the   way   CalPac

22  treated any of the plaintiffs?

23    A    No.   I   mean,   if   Mr.   Clark   said   the

24  project was falling behind, I may have told the

25  entire   group   to   work   smarter   and   faster   and

1  more efficiently.

2      Q    Anything other than that?

3      A    No, sir.  No.

4      Q    Are you aware of any occasion where Mr.

5  Clark  said  anything  to  any  other  supervisor

6  personnel at CalPac that was in any way -- as

7  suggestion  on  his  part,  that  CalPac  should

8  mistreat  or  harass  or  in  some  way  take  any

9  action  to  harm  any  of  the  plaintiffs  in  this

10  lawsuit?

11     A    No, sir.

12     Q    At anytime before the -- let me back up

13  and try that one again.  It is true, is it not,

14  that  Mr.  Clark  did  not  have  any  role  in  the

15  process of hiring any of the plaintiffs to work

16  for CalPac, correct?

17     A    Correct.

18     Q    It  is  also  correct  that  none  of  the

19  plaintiffs  during  the  course  of  their

20  performance  of  work  on  this  project  were  ever

21  employees  of  Dynamic  Technical  Services,

22  correct?

23     A    Correct.

24     Q    And  did  you  ever  witness  Mr.  Clark  ever

25  having  any  communication  directly  with  any  of

1 the plaintiffs, while they were on the job on
2 the project?
3     A    Yes, but I believe only to say "hello"
4 or --
5     Q    Just exchange pleasantries?
6     A    Exchange pleasantries, yes.
7     Q    Anything else?
8     A    Not that I recall.
9     Q    Did Dynamic Technical Services or Mr.
10 Clark have any authority to give out daily work
11 assignments to any of the plaintiffs with
12 respect to work that they will perform for
13 CalPac during the course of a given day?
14     A    No.
15     Q    Did anyone at CalPac ever call upon Mr.
16 Clark to perform supervision of the plaintiffs
17 that CalPac wanted to be performed of the
18 plaintiffs as they perform their work for
19 CalPac?
20     A    Not that I am aware of.
21     Q    Did CalPac ever consider Mr. Clark to
22 be a representative of CalPac?
23     A    No.
24     Q    Did CalPac ever consider Mr. Clark to
25 be someone who was providing services on the

1    A    I'm    sorry.    Again,    could    you    repeat

2  that question, sir?

3    Q    Do    you    know    of    any    reason    why    Mr.

4  Thompson and Mr. Camacho would not have brought

5  to your attention complaints that had been made

6  to them about the way Mr. Clark was treating

7  the workers?

8    A    No.

9    Q    If anyone had complained to Mr. Harper

10  about    the    manner    in    which    Mr.    Clark    was

11  treating CalPac's -- the plaintiff's in this

12  lawsuit, are you aware of any reason why Mr.

13  Harper    would    not    have    brought    that    to    your

14  attention?

15    A    No.

16    Q    So    from    --    would    it    be    fair    to    say

17  based on the answers that you've provided to

18  the questions I've asked you, that Mr. Clark --

19  neither    Mr.    Clark    nor    anyone    at    Dynamic

20  Technical Services said or did anything that

21  interfered        in        the        employer-employee

22  relationship that existed between CalPac and

23  the plaintiffs?

24    A    That's correct.

25        MR. SMITH:    I will pass the witness.

## REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 133 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 26th day of June, 2007.

_____

George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

# Exhibit C

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

**FILED**
DISTRICT COURT OF GUAM

JUL 1 9 2007

MARY L.M. MORAN
CLERK OF COURT

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

### FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, | CIVIL CASE NO. 05-00037 |
| Plaintiffs, | |
| vs. | **AFFIDAVIT OF DENNIS P. CLARK** |
| CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, | |
| Defendants. | |



# AFFIDAVIT OF DENNIS P. CLARK

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF COLLIN** | § |

BEFORE ME, the undersigned authority, on this day personally appeared Dennis P. Clark, who after being first duty sworn upon his oath deposed and said:

1. "My name is Dennis P. Clark. I am over the age of 18 and have no disabilities that would prevent me from giving this Affidavit. I have personal knowledge of the facts stated in this Affidavit, and they are true and correct.

2. I understand that Henry Van Meter, Jerry Apodaca, Jr., Joseph J. Hernandez, Joseph T. Mendiola, Larry L. Charfauros, Anthony C. Arriola, Robert Cruz, Roland F. Mendiola, James S. Yee, Teddy B. Cruz, Jesse B. Cruz, John L.G. Nauto, and John P. Babauta have filed claims against Calpac, Dynamic Technical Services, and other parties. When I use the term 'Plaintiffs' in this affidavit, I am referring to these thirteen individuals.

3. I worked for Dynamic Technical Services, Inc. as the MCI Company Representative on MCI's 'Guam International Ring' construction project. California Pacific Technical LLC ("Calpac") was the general contractor on this project. I was not an employee of Calpac and had no affiliation with Calpac other than my role as the MCI Company Representative under the contract between Calpac and MCI.

4. In my role as MCI Company Representative, my responsibilities included engineering; securing right-of-ways; verification of invoices; contracting and negotiating with the Historical Preservation Society, U.S. Military; the Department of Transportation, and Airport Authority; arranging a Environmental Protection Agency assessment; and inspections and

Case 1:05-cv-00037    Document 473    Filed 01/07/2008    Page 45 of 57

acceptance of Calpac's work under the terms of the contract. Less than half of my time was spent at the actual work sites where Calpac employees were present.

     5.     My responsibilities as MCI Company Representative did not include being a supervisor of the Plaintiffs or any other Calpac employees. Under the express terms of the contract (including exhibits thereto) between Calpac and MCI, Calpac was responsible to provide all labor and all supervision of labor. It was not my role or responsibility under the contract to instruct Calpac employees how to do the work for the project, nor was it my responsibility to supervise their performance of such work. I was not responsible to ensure that Calpac employees followed applicable safety rules and Calpac company policies. I did not determine or have any say in how the Calpac work crews were assigned. I did not assign individual work assignments to Calpac employees. I did not determine the work schedule of Calpac employees, including when and where to report for work. Calpac employees did not contact me if they were sick or were going to be late for work. Calpac employees addressed any questions they had regarding their work to other Calpac employees. At the beginning of the project, I clearly told Calpac supervisory personnel, including Tim Camacho, Bill Thompson, and Don Harper, that my role on the project was not to supervise Calpac in the completion of the work they agreed to undertake in the contract with MCI.

     6.     In my capacity as MCI company representative, I had no authority hire or fire employees of Calpac. More specifically, I did not hire or fire any of the Plaintiffs in this suit, nor did I participate in any way in Calpac's decision to hire or fire any of the Plaintiffs. I never recommended, demanded, suggested or implied that any of the Plaintiffs be hired or fired to Calpac.

7.      In my capacity as MCI company representative, I also had no authority regarding promotions, demotions, or discipline of employees of Calpac. Specifically, I never promoted, demoted, or disciplined any of the Plaintiffs or any other employees of Calpac. I did not determine and had no authority to determine the wages and benefits of Calpac employees. I never participated in any decision to promote, demote or discipline any of the Plaintiffs or any other employees of Calpac. Further, I did not have any authority to and did not perform employee evaluations of Calpac employees, including the Plaintiffs.

8.      In my capacity as MCI Company Representative, it was my duty to enforce all of MCI's rights under the contract with Calpac. One of my responsibilities in this regard was to inspect the work performed by Calpac to ensure that the work was completed in accordance with the terms of Calpac's contract with MCI. If, during the course of an inspection, I found work was not being performed in accordance with the terms of the contract, I would bring it to the attention of the Calpac superintendent or Forman on site. If a Calpac supervisor was not present at the site, I would communicate the problem to the laborers to prevent further delay and/or damage to the project. As MCI's Company Representative, it would not be beneficial to MCI to allow incorrect or improper work to continue causing delays and damages to equipment.

9.      I never used the terms 'monkey' or 'island monkey' in reference to any of the Plaintiffs or in any other regard at any time."

"FURTHER AFFIANT SAYETH NOT."

Dennis P. Clark

SUBSCRIBED AND SWORN TO BEFORE ME on this 23rd day of May, 2007, to certify which witness my hand and official seal.

UNA J. BROUSSARD
MY COMMISSION EXPIRES
July 12, 2008

Notary Public in and for the
State of Texas

My Commission expires:

July 12, 2008

# Exhibit D

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

# FILED

DISTRICT COURT OF GUAM

## JUL 1 9 2007

## MARY L.M. MORAN
## CLERK OF COURT

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, L.P.*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs, <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. 05-00037 <br><br><br><br><br><br><br><br> **AFFIDAVIT OF LINDA G. HAYES** |



## AFFIDAVIT OF LINDA G. HAYES

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF DENTON** | § |

BEFORE ME, the undersigned authority, on this day personally appeared Linda G. Hayes, who after being first duty sworn upon his oath deposed and said:

1.   "My name is Linda G. Hayes. I am over the age of 18 and have no disabilities that would prevent me from giving this Affidavit. I have personal knowledge of the facts stated in this Affidavit, and they are true and correct.

2.   I know that Henry Van Meter, Jerry Apodaca, Jr., Joseph J. Hernandez, Joseph T. Mendiola, Larry L. Charfauros, Anthony C. Arriola, Robert Cruz, Roland F. Mendiola, James S. Yee, Teddy B. Cruz, Jesse B. Cruz, John L.G. Nauto, and John P. Babauta have filed claims against Calpac, Dynamic Technical Services, and other parties. When I use the term 'Plaintiffs' in this affidavit, I am referring to these thirteen individuals.

3.   I am the President of Dynamic Technical Services, L.P. ("DTS") and I have served in this capacity since May 1, 2006. Prior to being President and during the years 2004-2005, I was the Director of Recruiting for DTS. My duties as Director of Recruiting included interfacing with the customers concerning requests for personnel outsourcing services, providing the customers with names and resumes of qualified individuals for the customers' personnel requests, and interfacing with the customers regarding any personnel issues with any employee outsourced to the customer by DTS.

4.   I was contacted by MCI Worldcom Network Services, Inc. ("MCI") to locate an individual to serve as MCI's company representative on a construction project in Guam. I am personally familiar with the scope of services requested by MCI with regard to the project in

---

Guam. MCI did not request any other services from DTS other than locating potential candidates for the company representative position. I had worked with MCI in providing personnel for projects to them since 2001 and learned in the course of my employment that MCI and DTS have had a staffing relationship since 1996. I was personally involved in the collection of resumes from candidates interested in the position of MCI company representative and forwarded several resumes to MCI for their review, one of which was from Dennis Clark. While I was responsible for collecting the names of candidates for the position of company representative, MCI made the decision as to whom the position of company representative would be offered. MCI informed me that they wanted Dennis Clark to serve as its company representative on Guam. In my position as Director of Recruiting, I was MCI's point of contact at DTS regarding anything related to Dennis Clark. I was also Dennis Clark's point of contact at DTS regarding any matters concerning his employment.

5.      After MCI selected Dennis Clark to serve as its company representative, I contacted Mr. Clark and arranged for him to come to Texas to meet with MCI representatives regarding the project. MCI requested to meet with Mr. Clark to go over the specifics of the project and his duties as company representative before he left for Guam. Mr. Clark told me that the project was discussed at this meeting and MCI informed him of the date that they wanted him to begin working on Guam. I did not attend this meeting, nor did any other employee or officer of DTS. At no point did I or any other employee or officer of DTS ever provide Mr. Clark with his duties on the Guam project, nor was anyone from DTS ever requested to perform this service by MCI.

6.      After Mr. Clark was selected by MCI to serve as its company representative neither I, nor anyone else at DTS was involved in the project on Guam with the exception of

invoicing Mr. Clark's time to MCI for payment. During my communications with MCI regarding their project on Guam, MCI never requested that DTS instruct or supervise Dennis Clark regarding his role as MCI company representative. In my dealings with MCI prior to the Guam project, DTS was never involved of any aspect of the MCI project once MCI selected the personnel for the position other than invoicing the employee's time for payment. This course of dealing with MCI did not change with the project on Guam, nor did MCI request that it change. Mr. Clark informed me that he reported directly to Jeff Buehler of MCI and discussed any issues regarding the project with Mr. Buehler. Mr. Clark never called me with any questions regarding his duties and responsibilities for the project on Guam. All duties and responsibilities given to Dennis Clark regarding the project on Guam came from MCI, not from anyone at DTS. All issues that arose on the project were handled between Dennis Clark and MCI and did not involve myself or any other employees of DTS. DTS did not have the authority to remove Dennis Clark from the project. Only MCI could authorize the removal of Dennis Clark from the project. Any interaction between Dennis Clark and any of the Plaintiffs was in his role as company representative for MCI and not as an employee of DTS.

7.     As I was the individual contacted by MCI regarding the position of company representative, I have personal knowledge of the scope of DTS' obligations and responsibilities with regard to the project in Guam. The MCI project on Guam was not a DTS project and DTS did not have any right to control the project site under its agreement with MCI. From previous dealings with MCI and discussions with Dennis Clark, MCI was the party who had exclusive control over the project site. Neither I, nor any other employee or officer of DTS ever instituted any workplace rules for the Guam worksite or conducted any investigations regarding the Guam worksite. MCI never requested me or any other employee or officer of DTS to institute any

workplace rules for the Guam worksite or to conduct any investigations regarding the Guam worksite.

8.      In my former position of Director of Recruiting and current position of President, I am familiar with the position held by Dennis Clark with DTS. Mr. Clark did not have a supervisory or management position with DTS. He did not have the authority to hire, fire or discipline any employees of DTS or to create or institute any company policies.

9.      I never received any verbal or written allegations or complaints of discrimination until late December 2004 when Dennis Clark informed me and others at DTS that protesters on Guam were holding signs calling him a racist. There is no record of any communication received by DTS from anyone, including Calpac employees and management and MCI personnel, alleging discrimination or harassment by Dennis Clark before Mr. Clark informed DTS of the protesters in late December 2004. If anyone had called, written, or otherwise communicated a complaint, concern, or question regarding Dennis Clark to DTS, the communication would have been referred to me since one of my duties was to deal with personnel issues regarding employees contracted out to our customers. The first time that I, or anyone else at DTS, learned any specifics regarding the complaints of the Plaintiffs or even the identity of the Plaintiffs was when DTS received copies of the EEOC complaints filed by the Plaintiffs, beginning in 2005.

10.     When Mr. Clark informed me and others at DTS of the allegations, he stated that he had not made any discriminatory comments. Mr. Clark also informed me that he spoke at a meeting of all Calpac employees and informed the Calpac employees that he did not make any discriminatory statements and would not discriminate against any of the employees based upon their national origin or any other basis. I believed Mr. Clark's statement to Calpac's employees

at the meeting in late December 2004 was an appropriate action in response to the unspecified discrimination allegations we had received at that time. I have not received any complaints of any discriminatory comments allegedly made by Mr. Clark subsequent to this meeting.

11.     The first time myself or anyone else at DTS received any specific complaint regarding Dennis Clark, including the identity of the complaining party, was when I first received a copy of the notice of charge of discrimination from the EEOC in 2005. After I received the notice of charge of discrimination, I contacted Dennis Clark to discuss the allegations. During this conversation, I reiterated the non-discrimination policies of DTS to Mr. Clark and that it was not acceptable under DTS policy to use derogatory or discriminatory remarks in reference to others. Mr. Clark stated that he had never said the things that he was accused of saying in the complaint and that he never would say such things. Additionally, Mr. Clark stated that he understood the non-discrimination policies of DTS and would fully comply with them. I have not received any complaints of any discriminatory comments allegedly made by Mr. Clark subsequent to this telephone discussion and it is my understanding based upon the Plaintiffs' allegations, that there had not been any complaints regarding Dennis Clark for several months prior to this phone call.

12.     After the EEOC complaint was received, Carlos Morales, the President of DTS at the time, appointed Harry Reinwald, to respond to the complaint by informing the EEOC that the complainants were not employees of DTS and provide any other information requested by the EEOC.

13.     DTS did not hire or fire any of the Plaintiffs. DTS did not determine the wages, benefits, work schedules, or work assignments of any of the Plaintiffs. DTS did not institute any

work place rules or policies for any of the Plaintiffs. DTS did not discipline any of the employees and did not participate in any employee evaluations of any of the Plaintiffs."

"FURTHER AFFIANT SAYETH NOT."

Linda G. Hayes

SUBSCRIBED AND SWORN TO BEFORE ME on this 18<sup>d</sup> day of June, 2007, to certify which witness my hand and official seal.

Notary Public in and for the
State of Texas

My Commission expires:

10-22-09



PAT WYNN
My Commission Expires
October 22, 2009

# DECLARATION OF SERVICE

I, Elyze J. McDonald, hereby declare under penalty of perjury of the laws of the United States, that on January 7, 2008, I will cause to be served, via hand delivery, a true and correct copy of MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF ROBERT B. CRUZ; MEMORANDUM IN SUPPORT OF MOTION; DECLARATION OF ELYZE J. MCDONALD; EXHIBITS A-D; DECLARATION OF SERVICE upon the following Counsels of record:

> Delia Sablan Lujan, Esq.
> **LUJAN, AGUIGUI & PEREZ, LLP**
> Suite 300, Pacific News Building
> 238 Archbishop F.C. Flores Street
> Hagåtña, Guam USA 96910
> Telephone: (671) 477-8064
> Facsimile: (671) 477-5297
> Attorneys for Plaintiffs Henry G. Van Meter, et al.

> Vincent Leon Guerrero, Esq.
> **BLAIR, STERLING, JOHNSON, MOODY, MARTINEZ & LEON GUERRERO, P.C.**
> Suite 1008, Pacific News Building
> 238 Archbishop F.C. Flores Street
> Hagåtña, Guam USA 96910
> Telephone: (671) 477-7857
> Facsimile: (671) 472-4290
> Attorneys for Defendant California Pacific Technical Services, LLC

> G. Patrick Civille
> **CIVILLE & TANG, PLLC**
> 330 Hernan Cortez Avenue, Suite 200
> Hagåtña, Guam USA 96910
> Telephone: (671) 472-8869
> Facsimile: (671) 477-2511
> Attorneys for Verizon Business Purchasing, LLC and Verizon Business Network Services, Inc.

Executed this 7th day of January 2008 at Hagåtña, Guam.

_(signature)_

ELYZE J. McDONALD

Motion for Summary Judgment Against Plaintiff Robert B. Cruz                    Page 22 of 22
4838-7052-2626.1.059759-00001
Case 1:05-cv-00037    Document 473    Filed 01/07/2008    Page 57 of 57