ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services*

FILED
DISTRICT COURT OF GUAM
JAN 07 2008
JEANNE G. QUINATA
Clerk of Court

**IN THE UNITED STATES DISTRICT COURT OF GUAM**

**FOR THE TERRITORY OF GUAM**

HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,

Plaintiffs,

vs.

CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,

Defendants.

CIVIL CASE NO. 05-00037

**DEFENDANT DYNAMIC TECHNICAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF ANTHONY C. ARRIOLA; MEMORANDUM IN SUPPORT OF MOTION; DECLARATION OF ELYZE J. McDONALD; EXHIBITS A-D; DECLARATION OF SERVICE**

ORIGINAL

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Dynamic Technical Services (hereinafter referred to as "DTS"), Defendant in the above entitled and numbered action and, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, files this Motion for Summary Judgment as to all claims asserted by Plaintiff Anthony C. Arriola (hereinafter referred to as "Plaintiff"). This motion is made upon the attached memorandum, the record in this case, including without limitation the exhibits attached and filed contemporaneously herewith, and argument presented by counsel at the hearing.

WHEREFORE, PREMISES CONSIDERED, Defendant Dynamic Technical Services respectfully requests this court to enter and order dismissing all of Plaintiff Anthony C. Arriola's claims against DTS and for such further relief to which DTS shows itself justly entitled.

DATED this 7th day of January, 2008.

CARLSMITH BALL LLP

ELYZÉ J. MCDONALD
Attorneys for Defendant
Dynamic Technical Services

# INDEX OF AUTHORITIES

**Cases**

| | |
|---|---|
| *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) | 6 |
| *Anderson v. Pacific Maritime Assoc.*, 336 F.3d 924 (9th Cir. 2003) | 12 |
| *Association of Mexican-American Educators v. California*, 231 F.3d 572 (9th Cir. 2000) | 12-13 |
| *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983) | 8 |
| *Bristol v. Bd. of County Comm'rs,* 312 F.3d 1213 (10th Cir. 2002) | 9 |
| *British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371 (9th Cir. 1989) | 7 |
| *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) | 6-7 |
| *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 123 S.Ct. 1673, 155 L.Ed.2d 615 (2003) | 8 |
| *Dominguez-Curry v. Nevada Transp. Dept*, 424 F.3d 1027 (9th Cir. 2005) | 15 |
| *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003) | 8-9 |
| *Faragher v. City of Boca Raton, 524 U.S. 775 (1998)* | 14-15, 17 |
| *Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983) | 11, 13 |
| *Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004 (D.Minn. 2003) | 16 |
| *Graves v. Lowery,* 117 F.3d 723 (3d Cir. 1997) | 9 |
| *Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991) | 18 |
| *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) | 14, 17 |
| *Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980) | 11 |
| *McZeal v. City of Seattle*, 2006 WL 3254504 (W.D.Wash. 2006) | 15 |
| *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986) | 15 |

| | |
|---|---|
| *Merrick v. Farmers Ins.*, 892 F.2d 1434 (9th Cir. 1990) | 18 |
| *NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117 (3d. Cir. 1982) | 8 |
| *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) | 15 |
| *Rivas v. Federacion de Asociaciones Pecuarias,* 929 F.2d 814 (1st Cir. 1991) | 9 |
| *Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971) | 15 |
| *Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d 385 (D.Conn. 2003) | 16 |
| *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973) | 10, 13 |
| *Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir. 1978) | 15, 18 |
| *Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350 (11th Cir. 1994) | 9 |
| *Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067 (C.D.Cal. 2002) | 8 |

**Statutes**

| | |
|---|---|
| 42 U.S.C. § 2000e(b) | 7 |
| 42 U.S.C. § 2000e(f) | 7 |

**Rules**

| | |
|---|---|
| Federal Rule of Civil Procedure 56 | 6 |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF ANTHONY C. ARRIOLA

### I. GROUNDS FOR MOTION

Defendant DTS brings this Motion for Summary Judgment against Plaintiff Anthony C. Arriola on the following grounds:[1]

A) Defendant DTS was not an "employer" of Plaintiff Anthony Arriola as defined by Title VII of the Civil Rights Act of 1964 and cannot be subject to liability under the statute.

B) There was no hostile work environment based upon the uncontroverted evidence.

C) DTS did not have any knowledge of any alleged discrimination.

To the extent co-defendant Calpac asserts there was no hostile work environment, DTS hereby joins in such motion.

### II. SUMMARY JUDGMENT EVIDENCE

Defendant relies on the following exhibits, attached to this motion and incorporated by reference as if fully set forth herein:

A) Selected pages of the deposition of Plaintiff Anthony C. Arriola;
B) Selected pages of the deposition of John Healy;
C) Affidavit of Dennis P. Clark; and
D) Affidavit of Linda Hayes.

### III. FACTUAL BACKGROUND

Plaintiff Anthony Arriola filed this lawsuit along with twelve other plaintiffs on December 12, 2005. The Plaintiff filed his Second Amended Complaint on September 7, 2007. All of Plaintiff's claims are brought under Title VII of Civil Rights Act of 1964. The Plaintiff

[1] In Plaintiff's Second Amended Complaint, the Plaintiff does not make any retaliation claims against DTS for termination. Plfs' 2nd Am. Complaint ¶ 126.

was employed by Defendant Calpac from May or June 2004 through November 26, 2004. Ex. A. at p. 19, ll. 17-19; p. 35-36, ll. 24-25 and 1. During the course of his employment for Calpac, he worked on a construction project for MCI. Dennis Clark was the MCI "company representative" on this project and was an employee of DTS. Ex. C at ¶ 3. The Plaintiff alleges that Mr. Clark made discriminatory remarks in the presence of the Plaintiff on two occasions. Ex. A at pp. 20-21, ll. 25 and 1. The Plaintiff did not complain to anyone at DTS about the statements Dennis Clark allegedly made and no one at DTS became aware of Plaintiff's complaints until late December 2004 when Dennis Clark informed DTS of the existence of public protesters who were alleging that he made discriminatory comments. Ex. D at ¶ 9. Based upon these alleged statements made by Mr. Clark, the Plaintiff has filed the instant lawsuit seeking to recover damages from DTS under Title VII for hostile work environment.

## IV.
## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a court should grant summary judgment when, viewing the evidence in the light most favorable to the nonmoving party, the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. Pro. 56(e).

However, it is not necessary for the party moving for summary judgment to introduce evidence that negates the plaintiff's claim. *Celotex*, 477 U.S. 258, 323. Instead, the moving party may show in it motion that there is no evidence to support an essential element of the non-moving party's claim. *Id.* at 325. According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party: (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible. *British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989).

## V.
## ARGUMENTS & AUTHORITIES

### A. DTS is not an "employer" of Plaintiff and cannot be liable under Title VII

In order to be subject to liability for a hostile work environment[2] under Title VII, a defendant must be an "employer" as the statute defines that term. An "employer" is a "person engaged in an industry affecting interstate commerce who has fifteen or more employees..." 42 U.S.C. § 2000e(b). An employee is an "individual employed by an employer." 42 U.S.C. § 2000e(f). In the present case, it is uncontested that Calpac, not DTS, was the direct employer of the Plaintiff. Ex. A at p. 19, ll. 17-19; Ex. B at p. 88, ll. 18-23.

#### 1. Defendant DTS is not liable under Title VII as a joint employer.

"Two or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment of the employee. *Swallows* [*v. Barnes & Noble Book*

[2] Defendant expressly denies that Plaintiff was subjected to a hostile work environment as a matter of law. This topic is fully addressed in Section V.B. of this memorandum.

*Stores, Inc.*], 128 F.3d [990], 993 n. 4 [(6th Cir. 1997)] (citing *NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117, 1123 (3d. Cir. 1982))." *Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067, 1093 (C.D.Cal. 2002). In order to determine whether a joint employment relationship exists, the Ninth Circuit applies an "economic reality" test. *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983). Under that test, this court should consider all factors relevant to a particular situation when evaluating the economic realities of a relationship. *Id.* In determining joint employment, a large collection of factors has been suggested from the judiciary and governmental agencies. *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270, 1275 (9th Cir. 2003).

When determining if a joint employer relationship exists, the Third Circuit has explained it is a matter of determining which of the two, or whether both, of the parties control, in the capacity of employer, the labor relations of a given group of workers. *Browning-Ferris Indus. of Pa.*, 691 F.2d at 1122-23 (citing *NLRB v. Condenser Corp. of America*, 128 F.2d 67, 70 (3d Cir. 1942)). "The 'joint employer' concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment." *Id.*

The Supreme Court has summarized the various factors as to what it means to be an employer: "As the EEOC's standard reflects, an employer is the person, or group of persons, who owns and manages the enterprise. The employer can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of the business are to be distributed." *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 450, 123 S.Ct. 1673, 1680, 155 L.Ed.2d 615 (2003). The Ninth Circuit opined that the "Supreme Court seems to suggest that the *sine qua non* of determining whether one is an employer is that

an 'employer' can hire and fire employees, can assign tasks to employees and supervise their performance." *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d at 1277 (citing *Clackamas*, 123 S.Ct. at 1680). "Logically, before a person or entity can be a joint employer, it must possess the attributes of an employer to some degree." *Id.* Numerous courts consider the key to joint employment to be the right to hire, supervise and fire employees. *See Bristol v. Bd. of County Comm'rs,* 312 F.3d 1213, 1219 (10th Cir. 2002) (en banc); *Graves v. Lowery,* 117 F.3d 723, 727-728 (3d Cir. 1997); *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1361 (11th Cir. 1994); *Rivas v. Federacion de Asociaciones Pecuarias,* 929 F.2d 814, 820-821 (1st Cir. 1991).

In *E.E.O.C. v. Pacific Maritime Assoc.*, a Title VII sexual harassment action was brought against Pacific Maritime Association ("PMA"). 351 F.3d 1270 (9th Cir. 2003). PMA is an association of stevedoring companies ("member-employers") that performed organizational tasks on behalf of its members, negotiated a collective bargaining agreement, operated a dispatch hall jointly with a union, and provided payroll services for its members. *Id.* at 1274. The plaintiff alleged that, along with the member-employer of PMA that hired her, PMA was a joint employer of her. However, the Ninth Circuit found that PMA did not supervise the longshoremen, had no power to hire or fire longshoremen, had no power to discipline longshoremen, and did not supervise the work sites. The court found that it was undisputed that the monitoring and control over the work sites, as well as the control of the employees, was within the sole province of the member-employees. Accordingly, the Court held that PMA was not a joint employer of the plaintiff. *Id.* at 1274.

Similarly, in the present case, DTS had no authority to hire or fire Calpac employees, did not supervise Calpac employees or give them work assignments, had no power to discipline Calpac employees, did not determine wages or benefits of Calpac employees, and did not decide

how profits or losses of Calpac were to be distributed. *See* Exhibits C at ¶¶ 5-7 and D at ¶ 13. John Healy, the President of Calpac, testified that he did not have any communications with anyone at DTS prior to receiving the first EEOC complaint. Ex. B at p. 85, ll. 18-23. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Mr. Healy also testified that Mr. Clark was not a supervisor of the plaintiffs, did not give out daily work assignments, and did not hire any of the plaintiffs. *Id.* at pp. 88-89, ll. 12-17, 9-20. Therefore, as a matter of law, this uncontroverted evidence establishes that DTS was not a joint employer of the Plaintiff with Calpac.

**2. Defendant DTS is not liable under Title VII as an indirect employer**

The D.C. Circuit first addressed indirect-employer liability in *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973). The hospital ran a nursing office where patients could request the service of a private duty nurse. The hospital would then contact outside referral sources and request a private nurse be sent to the hospital. The private nurses were employees of the patients, not the hospital. In *Sibley*, a male nurse alleged that on at least two occasions hospital nurses rejected him upon arrival because he was male and the requesting patient was female. The male nurse subsequently sued under Title VII for discrimination.

On appeal, the court noted that one of the goals of Title VII was to equalize access to job opportunities. *Id.* at 1340. The court held that Title VII did not explicitly require a direct employer-employee relationship, but it did not mean that no relationship was required for a claim to fall under Title VII. The Court stated: "We think it is significant that [Title VII] has addressed the problems of interference with the direct employment relationship by labor unions and employment agencies-institutions which have not a remote but a highly visible nexus with

the creation and continuance of direct employment relationships between third parties. On the facts as alleged...[the hospital] is so circumstanced, and its daily operations are of such a character as to have such nexus to the third parties in this case..." *Id.* at 1342.

The Ninth Circuit first addressed the issue of indirect-employer liability in *Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980). The court noted for Title VII to apply, "there must be some connection with an employment relationship" though the "connection...need not necessarily be direct." *Id.* at 883. The court explained "[t]his might occur where a defendant subject to Title VII interferes with an individual's employment opportunities with another employer." *Id.* at 883 n. 3.

The Ninth circuit addressed the issue again in *Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983). In this case, the plaintiff was a Hispanic physician working for a corporation named AES. On behalf of AES, the plaintiff submitted a proposal to the defendant to operate the hospital's emergency room. The hospital allegedly turned down the proposal because too many Hispanics worked for AES. *Id.* at 1020. The court reversed a summary judgment granted to the hospital on the basis that the plaintiff lacked standing under Title VII because he was an employee of AES, not the hospital, and AES would have only been an independent contractor for the hospital. *Id.* The court held that AES's potential status as an independent contractor did not mean that the hospital had not interfered with the relationship between AES and the plaintiff. *Id.* at 1021. Additionally, the court noted the perverse result that would occur if an employer were allowed to discriminatorily interfere with an individual's employment opportunities with another employer, while it could not do so with its own employees. *Id.*

The issue of indirect-employer liability came before the court again in *Association of Mexican-American Educators v. California*, 231 F.3d 572 (9th Cir. 2000)(en banc). In this case, the plaintiffs, a class of prospective and current minority teachers, challenged the use of a skills test that was a prerequisite to employment in the public schools. *Id.* at 577. The plaintiffs alleged the test has a disparate impact on minorities. *Id.* at 578. The court found that Title VII covered the claims as the alleged discriminatory test interfered with future employment with public schools since it dictated whom the schools could hire. *Id.* at 581-82. The court emphasized that the ruling was based on the peculiar degree of control the state exercised over school districts because of the test. *Id.* at 581.

In *Anderson v. Pacific Maritime Assoc.*, the Ninth Circuit addressed the issue of whether the PMA could be liable under Title VII under indirect-employer liability. 336 F.3d 924 (9th Cir. 2003)(the PMA performed the same functions and duties as discussed in *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003), *supra*). The plaintiffs in the suit were African-American workers employed on the waterfront in Seattle and Tacoma. The plaintiffs alleged a "horrific and pervasive picture of racial animosity and discrimination" on the waterfront. *Id.* at 926. The allegations included the common use of racial slurs, racial innuendos, and racial jokes on the docks and well as the uses of racial slurs in the training materials. The plaintiffs also alleged direct, racially charged physical threats. *Id.*

The court held that the PMA could not be liable under Title VII. The court found that the alleged hostile work site was not controlled by the PMA and the PMA did not employ or supervise the plaintiffs or the alleged harassers. *Id.* at 931. "*Sibley* and its progeny extended Title VII coverage to indirect employers when those employers discriminated against *and* interfered with the employees' relationship with their employees." *Id.* (emphasis added). PMA

did not interfere with the plaintiffs' relationship with their employers since it was the employers who allowed the allegedly hostile work environment. *Id.* "*Sibley* and its Ninth Circuit progeny condone liability when there exists discriminatory 'interference' by the indirect employer *and* where the indirect employer had some peculiar control of the employee's relationship with the direct employer." *Id.* at 932 (emphasis added).

In the present case, there was no discriminatory interference by DTS and DTS had no control over the Plaintiff's relationship with Calpac. In fact, none of the above-referenced cases lends support for a finding of indirect employer liability in this case. In *Sibley*, the hospital refused to allow the male nurse to see the patient; in *Gomez*, the hospital refused to hire the company with Hispanic doctors; and in *Association of Mexican-American Educators*, the state required the job applicants to take the test with the disparate impact on minorities. In all of the referenced cases, the "indirect employer" interfered with the employment relationship between the employee and direct employer. DTS did not have any control over the employment relationship between the Plaintiff and Calpac. DTS did not have the power to hire or fire employees, discipline employees, assign work assignments to employees, promote or demote employees, or perform employee evaluations. *See* Ex. C at ¶¶ 5-7 and D at ¶ 13. John Healy testified that Dennis Clark never tried to influence Calpac to take any action that would affect the manner in which any of the plaintiffs were treated and did not make any comments to anyone at Calpac regarding any of the plaintiffs. Ex. B. at p. 87, ll. 2-6 and 12-15. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Furthermore, Healy testified that Clark and DTS never interfered in the relationship between Calpac and any of the Plaintiffs. Ex. B. at p. 92, ll. 16-24.

Additionally, the work site involved in this lawsuit was not one that was controlled by DTS. Ex. D at ¶ 7. The worksite in question was a MCI worksite. Dennis Clark reported directly to MCI and took all work directives from MCI. DTS did not have any power to control the worksite, conduct any investigations on the worksite, or implement any rules for the worksite. *Id.* All of these functions were reserved to MCI. DTS did not even have the authority to remove Dennis Clark from the project. *Id.* at ¶ 6.

**B. Plaintiff's allegations do not amount to a hostile environment as a matter of law**

Regardless of DTS' status as an "employer" under Title VII, the Plaintiff has failed to establish a claim for hostile work environment. A plaintiff may bring a lawsuit under Title VII for hostile work environment based upon racial or national origin harassment. To establish the existence of a hostile work environment plaintiff must prove that the workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(internal citations and quotation marks omitted). The hostile environment must be one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. *Id.* at 21-22. The Supreme Court in *Harris* held that the courts should look to the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance." *Id.* at 23. The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n. 1 (1998)(internal citation and quotation marks omitted). Judicial standards for harassment must "filter out complaints attacking 'the ordinary tribulations

of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment for the purposes of a Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept*, 424 F.3d 1027 (9th Cir. 2005).

The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See* Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). Not all workplace conduct that could be labeled as harassment affects a "term, condition, or privilege" of employment within the meaning of Title VII. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "The 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to sufficiently significant degree to violate Title VII." *Id.* (citing *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), cert. denied, 406 U.S. 957 (1972)).

The Western District of Washington held that the use of the phrase "Driving Miss Daisy" several times in the presence of an African-American worker and referring to another African-American driving a Caucasian within a two month period were not sufficient to create a racially hostile environment. *McZeal v. City of Seattle*, 2006 WL 3254504, at *5 (W.D.Wash. 2006). The court found that the comments were not so frequent or severe as to constitute a racially hostile work environment. *Id.* Furthermore, the Ninth Circuit found the use of the phrase "jungle bunny" in reference to an African-American did not create a hostile environment. *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978). The court commented that while the remark was a racially derogatory slur, it was not the sort of conduct to which Title VII was enacted to

prohibit. *Id.* The court also observed that Title VII was not directed at ending all discrimination by individuals, but the eradication of discrimination by employers against employees. *Id.*

Additionally, the District Court of Connecticut found that isolated racially offensive comments did not create a hostile and abusive environment. Sanchez v. University of Connecticut Health Care, 292 F.Supp.2d 385, 396 (D.Conn. 2003)(complained of comments included: (1) coworker wished a hurricane over Puerto Rico would wipe out island and that "we could do without those people;" (2) "they should put Puerto Ricans on a plane and send them back to Puerto Rico;" and, (3) a nurse's negative comments that black and Puerto Rican patients were "low life pieces of shit, scum sucking dogs and welfare recipients). The District of Minnesota found that the use of the terms like "fag," "wimp," "sissy," "useless," "worthless," and "spic" failed to support a plaintiff's claim of hostile work environment based upon national origin and disability. *Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004, 1015 (D.Minn. 2003).

In the present case, the Plaintiff testified that there were two incidents where Dennis Clark allegedly referred to a group of Calpac workers as "island monkeys" or "monkeys." Ex. A at pp. 20-21, ll. 24 and 1. Mr. Apodaca was employed with Calpac from May or June 2004 through November 24, 2004, a period of approximately six months. Ex. A. at p. 19, ll. 17-19; pp. 35-36, ll. 24-25 and 1. Plaintiff alleges that, over the course of six months of employment, two isolated statements were allegedly made by Mr. Clark. In fact, the Plaintiff does not speak English and did not know what Mr. Clark allegedly said until he was told by a co-worker. Ex. A. at p. 64, ll. 9-25. As a matter of law, this fails to amount to a hostile and abusive work environment according to the factors set out by the Supreme Court in *Harris*. The alleged discriminatory conduct was infrequent and not physically threatening, but rather a mere

offensive utterance. Furthermore, if it is assumed that the two alleged statements were made, they did not unreasonably interfere with the Plaintiff's work performance. The Plaintiff testified that he only saw Mr. Clark on two occasions during his entire employment with Calpac. Ex. A. at p. 27, ll. 15-16. According to the Plaintiff's testimony, the only instance of alleged discriminatory statements made by Clark occurred in September and October 2004. Ex. A. at p. 32, ll. 6-10. Thus, Mr. Arriola concedes that he did not encounter any discriminatory comments during the at least the last month of his employment on the job. When looking at the "totality of the circumstances," the two alleged instances of racial slurs over the course of six months were not "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. By his own testimony, the alleged remarks were not more than episodic and were not "sufficiently continuous and concerted in order to be deemed pervasive." *Farragher*, 524 U.S. at 787 n. 1. Therefore, DTS is entitled to summary judgment against Plaintiff on his Title VII causes of action.

**C. DTS did not have any knowledge of any alleged discrimination and cannot be held liable under Title VII**

In the unlikely event that the court finds that DTS is an "employer" of the Plaintiff under Title VII and that Plaintiff has established a hostile environment claim, DTS cannot be held liable for the alleged actions of Clark because it did not have actual or constructive knowledge of the alleged discriminatory conduct. DTS was not made aware of any alleged discriminatory conduct by Dennis Clark until it was notified by Clark about the protesters which occurred in late December 2004. Ex. D at ¶¶ 9-11. There is no evidence, as none exists, that DTS had actual knowledge of Clark's alleged discriminatory statements until the EEOC complaint was received. Additionally, there are no allegations of harassment following the time of the protest or the time

the complaint was received by DTS. In fact, according to the testimony of the Plaintiff, there had been no incidents of alleged harassment in the three months preceding the protests on Guam.

An employer cannot be held liable for the harassment of an employee unless the employer both knows of it and fails to take remedial action. *Silver v. KCA, Inc.*, 586 F.2d 138, 142 (9th Cir. 1978). This even holds true when there is a continuing course of harassment from an employee. *Id.* Occasional, sporadic remarks that occur in the workplace do not impose Title VII liability upon the employer. *Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)(citing *Merrick v. Farmers Ins.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990). In *Greene*, the plaintiff's claim of a hostile work environment rested upon four instances of offensive language. The plaintiff reported one incident and racial harassment ceased from that time forward. The court held that the case was properly dismissed as against the employer and that the claim may have had substance if the employer knew of the conduct and failed to take action. *Id.*

In the present case, DTS did not learn of any allegations of discriminatory remarks until Mr. Clark informed DTS of the presence of the protesters in late December 2004, approximately four months after the last alleged discriminatory comment was allegedly made by Clark, according to the Plaintiff. Ex. D at ¶ 9. The Plaintiff's EEOC Notice of Charge of Discrimination was not sent to DTS until February 24, 2005. Since DTS was not aware of the alleged harassment, it cannot be held liable under Title VII. *See Silver*, 892 F.2d at 1438-39.

Additionally, immediately upon learning that there were allegations that he had engaged in discriminatory conduct, Mr. Clark spoke at a meeting of Calpac employees and informed them that he did not make any such comments and would not discriminate against anyone based upon their Chamorro heritage. Mr. Clark informed DTS of this meeting and what he stated to the Calpac employees. There have been no allegations of discriminatory conduct by Clark or DTS

subsequent to this meeting. In fact the Plaintiff does not make any allegations of any comments by Clark for approximately the previous two months leading up to this meeting. There has not been one complaint of discriminatory comments by Clark subsequent to DTS learning of the Plaintiff's allegations in the EEOC complaint. *See* Ex. D at ¶¶ 9-11. Therefore, the Plaintiff cannot complain of any failure by DTS to take action after it acquired knowledge of the Plaintiff's complaints. DTS cannot be held liable under Title VII because: (1) DTS did not have any knowledge of Plaintiff's allegations prior to him filing a complaint with the EEOC and (2) once DTS became aware of the complaints, immediate remedial action was taken and no subsequent discriminatory acts have been alleged by Plaintiff.

## VI.
## CONCLUSION

DTS cannot be liable to Plaintiff under Title VII because: (1) DTS was not an employer of the Plaintiff as that term is defined under Title VII; (2) Based upon the Plaintiff's own testimony, he was not subjected to a hostile work environment for purposes of Title VII; and (3) DTS did not have actual or constructive knowledge of any of Plaintiff's complaints. For these reasons, DTS moves this Honorable Court to grant is Motion for Summary Judgment against Plaintiff Anthony C. Arriola.

DATED this 7th day of January, 2008.

CARLSMITH BALL LLP

[signature]

ELYZE J. MCDONALD
Attorneys for Defendant
Dynamic Technical Services

## DECLARATION OF SERVICE

I, Elyze J. McDonald, declare under penalty of perjury that the following statements are true and correct:

1. I have personal knowledge of the facts stated in this declaration except as otherwise indicated.

2. I would testify competently as to these facts if called upon by the Court.

3. I am an attorney authorized to practice law in the territory of Guam and presently employed with the law firm of Carlsmith Ball LLP, attorneys for Defendant Dynamic Technical Services in the above-captioned action.

4. This declaration is submitted in support of Defendant Dynamic Technical Services' Motion for Summary Judgment Against Anthony C. Arriola, filed on January 7, 2008.

5. Defendant Dynamic Technical Services is a necessary and proper party Defendant in this action.

6. Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Anthony C. Arriola as Exhibit "A" is a true and correct copy of the pertinent pages of the deposition testimony of Anthony C. Arriola.

7. Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Anthony C. Arriola as Exhibit "B" is a true and correct copy of the pertinent pages of the deposition testimony of John T. Healy.

8. Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Anthony C. Arriola as Exhibit "C" is a true and correct copy of the Affidavit of Dennis P. Clark the original of which has been previously filed with the Court.

9. Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Anthony C. Arriola as Exhibit "D" is a true and correct copy of the Affidavit of Linda G. Hayes the original of which has been previously filed with the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and accurate to the best of my knowledge.

Executed this 7th day of January 2008 at Hagåtña, Guam.

ELYZE J. MCDONALD

# Exhibit A

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,

Plaintiffs,

vs.

CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10,

Defendants.

CIVIL CASE NO. CIV05-00037

DEPOSITION OF ANTHONY C. ARRIOLA

*Taken on Behalf of Defendant CalPac*

BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of ANTHONY C. ARRIOLA was taken before Cecilie A. Flores, a Certified Shorthand Reporter, on Wednesday, the 9th day of May 2007, at 9:00 in the offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

APPEARANCES

Appearing on behalf of the Plaintiffs:

LUJAN AGUIGUI & PEREZ
Suite 300, Pacific News Building
238 Archbishop Flores Street
Hagatna, Guam 96910
By: Ms. Delia S. Lujan, Esq.
Phone: (671) 477-8064

Appearing on behalf of Defendant CalPac:

BLAIR STERLING & JOHNSON
Suite 1008, Pacific News Building
238 Archbishop Flores Street
Hagatna, Guam 96910
By: Mr. Vincent E. Leon Guerrero, Esq.
Phone: (671) 477-7857

Appearing on behalf of Dynamic Technical Services:

CARLSMITH BALL
Suite 401, Bank of Hawaii Building
134 West Soledad Avenue
Hagatna, Guam 96910
By: Mr. Robert Ewert & Mr. Arthur Smith
*(appeared via telephone)*
Phone: (671) 472-6813

INDEX

EXAMINATION

| | Direct | Cross |
|---|---|---|
| By Mr. Leon Guerrero: | 4 | |
| By Ms. Lujan: | | 65 |
| By Mr. Smith: | | 58,68 |

EXHIBITS

| Description: | Page Marked: |
|---|---|
| Exhibit A: Charge of Discrimination | 36 |
| Exhibit B: Time Card | 39 |
| Exhibit C: EEOC Questionnaire | 46 |

4

ANNA MARIE B. ARCEO,

was duly sworn to render all questions put to the witness in the English language into the Chamorro language, and his answers thereto from the Chamorro language into the English language, to the best of her ability. The witness was then sworn by the interpreter.

ANTHONY C. ARRIOLA,

was thereupon called as a witness on behalf of Defendant CalPac, and after having been first duly sworn, was examined and testified as follows:

MR. LEON GUERRERO: You have to answer for him.

INTERPRETER: Oh, yes. He says yes.

DIRECT EXAMINATION

BY MR. LEON GUERRERO:

Q Mr. Arriola, can you just state your full name for the record and just spell your last name?

MR. LEON GUERRERO: You can't have conversations with him going back and forth. If he says something just translate it and if he gets stuck and that's where he's at then we'll go to the next question, okay?

INTERPRETER: Okay. All right.

MR. LEON GUERRERO: So no conversations.

INTERPRETER: Arriola, Anthony. I'm just trying

COPY

Q You say you're working for your brother, right?
A (Through Interpreter) I'm helping for outside job.
Q You're brother got the contract, right?
A (Through Interpreter) Yes.
Q So your brother gets paid, right, from the old lady?
A (Through Interpreter) Yes.
Q Then your brother gives you some of the money, correct?
A (Through Interpreter) Yes.
Q Your brother is giving you $50 a day, is that right?
A (Through Interpreter) Yes.
Q Before this project, what was the last job that you had?
A (Through Interpreter) Total Body.
Q You don't know how to spell that, do you?
A (Through Interpreter) I don't know.
Q So you worked in an auto body shop, correct?
A (Through Interpreter) No. Metal, the junkyard where we collect all the cars in the outside.
Q So you were working at a metal shop?
A (Through Interpreter) Yes.
Q You worked at CalPac in 2004, correct?
A (Through Interpreter) Yes.
Q When did you start working at CalPac?
A (Through Interpreter) On June.

Q Sometime in June of 2004, correct?
A (Through Interpreter) Yes.
MR. LEON GUERRERO: I just want to step out for a second. I forgot one of the documents. I'll be right back. Can we go off the record for like a minute or so?
(Off the record at 9:49 a.m.)
(Back on the record at 9:51 a.m.)
MR. LEON GUERRERO: I guess we're back on the record. Are you still there? Hello?
MR. EWERT: Still here. Is there a way to get the translator a little closer to the speaker phone?
MR. LEON GUERRERO: Okay, she moved.
BY MR. LEON GUERRERO: (Continuing)
Q Mr. Arriola, did you have a chance to review the paper that you filed with the District Court starting this lawsuit?
A (Through Interpreter) I can't read it.
Q But did somebody go over the document with you before it was filed with the Court? And by that I mean not counting your lawyer but somebody that interpreted for you.
A (No response.)
Q Let me ask you this then. The lady who was willing to interpret for the last deposition, that was Mrs. Cruz, right?
A (No response.)

Q Debra Cruz.
A (Through Interpreter) Yes.
Q Did Debra Cruz help you read the document that was filed with the District Court?
A (Through Interpreter) Debra read it.
Q She read it to you, correct?
A (Through Interpreter) Yes.
Q And then she translated it in Chamorro, correct?
A (Through Interpreter) Yes.
Q So you had a chance to read that document, the Complaint, correct?
A (Through Interpreter) Yes.
Q In the Complaint, when it refers to your allegations, it says that you were hired by CalPac around May 2004.
A (Through Interpreter) Yes.
Q So you were hired by CalPac around May or June 2004, correct?
A (Through Interpreter) Yes.
Q The next allegation says that "Around September to October 2004 or thereafter while Plaintiffs were under the supervision of Defendant Clark, Plaintiff Arriola," that would be you "was harassed and discriminated against on the basis of his race, national origin and color by Defendant Clark who called Plaintiff Arriola and other Plaintiffs

island monkeys or monkeys." Is that what that allegation says?
A (Through Interpreter) Yes.
Q I want to go over that allegation, okay?
A (Through Interpreter) Yes.
Q It says that Mr. Clark called you and other people island monkeys and monkeys, right?
A (Through Interpreter) Yes.
Q Were you there when he actually made that statement?
A (Through Interpreter) Yes, we were inside the hole.
Q Did you actually hear Mr. Clark say that?
A (Through Interpreter) Yes.
Q What did Mr. Clark say? I'm talking about the first time a statement was made like that.
A (Through Interpreter) He told me down into the hole, you guys are island monkeys Chamorro.
Q You actually heard him say that, right?
A (Through Interpreter) Yes.
Q When was that?
A (Through Interpreter) I don't know when. I don't know when.
Q Your Complaint says between September and October 2004, correct?
A (Through Interpreter) Yes.
Q How many times did he make that statement?

A (Through Interpreter) Two times.
Q Would you say the first one occurred around September 25, 2004?
A (Through Interpreter) Yes.
Q What did you do when he made that comment?
A (Through Interpreter) I was hurt when he said that out.
Q What were you doing at the time? Were you digging a hole? What were you doing?
A (Through Interpreter) We were digging down.
Q Who is we? Who was there?
A (Through Interpreter) Henry -- Henry Meter (sic)? And Jesse Cruz, Robert Cruz and Joe.
Q Joe Mendiola?
A (Through Interpreter) Yes, Joe Mendiola and John.
Q Is that John Nauta?
A (Witness in English) Yeah.
Q Henry Van Meter was your Supervisor, right?
A (Through Interpreter) Yes.
Q Did you talk with these people that you mentioned about the statements made by Mr. Clark?
A (Through Interpreter) Yes.
Q Did you talk to them immediately after the statement was made?
A (Through Interpreter) Yes.

Q What did Mr. Van Meter say?
A (Witness in English) *U falsen -- u sangani, lekhu, lana*, dude, that guy call us Chamorro monkeys.
(Through Interpreter) I asked him, shit, dude, that guy called us Chamorro monkeys.
Q Are you saying you said that to Mr. Van Meter or did Mr. Van Meter say that to you?
A (Through Interpreter) I told him 'cause we were together inside.
Q I notice that you said it in English, correct?
A (Through Interpreter) Yes.
Q You said *lana*, dude, that guy called us Chamorro monkeys, right?
A (Witness nodded head.)
Q In English?
A (Witness nodded head.)
(Through Interpreter) Yes.
Q Why were you speaking to him in English? I'm just kind of curious.
A (Through Interpreter) He knows how to speak Chamorro too.
Q But why were you speaking in English to Mr. Van Meter at that time?
A (Through Interpreter) Because I only speak a little.
Q Do you normally speak to Mr. Van Meter in English or

do you speak to him in Chamorro?
A (Through Interpreter) I speak in Chamorro.
Q And you also named Jesse Cruz, Robert Cruz, Joe Mendiola and John Nauta. Did you speak to them in Chamorro or did you speak to them in English?
A (Through Interpreter) Yes.
Q Most of your discussions with these guys is in Chamorro, is that what you're saying?
A (Through Interpreter) Yes.
Q Was Mr. Clark upset at you when he made that statement the first time?
A (Through Interpreter) No.
Q Do you think he was joking around when he said that?
A (Through Interpreter) No, what he said was bad.
Q You say you started working around May or June of 2004 and the incident occurred in September of 2004, correct?
A (Through Interpreter) No, I just got out.
Q What do you mean you just got out?
A (Through Interpreter) As soon as he said that, I just got out of work.
Q My question is, you started working at CalPac around May or June 2004, correct?
A (Through Interpreter) Yes.
Q So you worked at CalPac for four months before Mr. Clark made that statement, correct?

A (Witness nodded head.)
(Through Interpreter) Yes.
Q You nodded your head, is that correct?
A (Through Interpreter) Yes.
Q How often would you see Mr. Clark for the first four months?
A (Through Interpreter) Sometimes only two times.
Q Are you talking about in a day or a week? What are you talking about?
A (Through Interpreter) Everytime he checks on us, he just leaves and let's us go.
Q How often would you see Mr. Clark in a day on average?
A (Through Interpreter) Two times only.
Q Two times a day, correct?
A (Through Interpreter) Yes.
Q Since the time you started working at CalPac, was Mr. Clark at the sites that you were working at?
A (Through Interpreter) Sometimes he doesn't come.
Q When was the first time you saw Mr. Clark? Was that in May or June of 2004?
A (Through Interpreter) Just that day when we were in the hole.
Q Are you saying before the first time he made that statement you never saw Mr. Clark?

A (Through Interpreter) No, nothing.
Q So you're saying that Mr. Clark showed up the first time and made a statement, correct?
A (Through Interpreter) Yes.
Q Did you ask who he was?
A (Through Interpreter) No, I didn't ask him.
Q So at the time, Mr. Clark was a stranger, correct?
A (Through Interpreter) Yes.
Q So this stranger came up to you in September of 2004 and called you a monkey, is that what you're saying?
A (Through Interpreter) Yes, it's true.
Q Then that's when you went to Mr. Van Meter and said, hey -- is that what you said to Mr. Van Meter?
A (Through Interpreter) Yes.
Q What did Mr. Van Meter say to you?
A (Through Interpreter) He said just move, never mind because he's making you mad.
Q Did you wonder who he was?
A (Through Interpreter) That's our boss.
Q Who said that? Mr. Van Meter?
A (Witness in English) Yeah.
(Through Interpreter) Mr. Van Meter said, that's your boss for underground.
Q Did he say he works for CalPac?
A (Through Interpreter) Yes.

Q So to your knowledge, Mr. Clark works for CalPac, correct?
A (Through Interpreter) Yes.
Q You're suing MCI also, correct?
A (Through Interpreter) Yes.
Q And you are also suing Dynamic Technical Services, correct?
A (Through Interpreter) Yes.
Q Why are you suing MCI?
A (Through Interpreter) Because they're with CalPac.
Q What do you mean they are with CalPac?
A (Through Interpreter) Company. Both of them are companies.
Q What about Dynamic Technical Services? Why are you suing that company?
A (Through Interpreter) Because they called us Chamorro monkeys.
Q In your Complaint, there's a document that was filed with the Court. It says that "Dennis Clark is, upon information and belief, a Manager and Supervisor employed by Dynamic Technical Services." Are you saying you're changing your allegation now? Is that what you're saying?
A (Through Interpreter) No.
Q In the Complaint it says that Dennis Clark is employed by Dynamic Technical Services.

A (Through Interpreter) Yes.
Q So which one is it? Is Mr. Clark employed by CalPac or is he employed by Dynamic Technical Services? Who do you believe Mr. Clark is employed by?
A (Through Interpreter) CalPac.
Q So you disagree with the allegation in the Complaint that Mr. Clark is a Manager or Supervisor employed by Dynamic Technical Services?
A (Through Interpreter) Yes.
Q How many times did you see Mr. Clark?
MS. LUJAN: What time period are we referring to?
MR. LEON GUERRERO: Ever.
BY MR. LEON GUERRERO: (Continuing)
Q How many times have you seen him?
A (Through Interpreter) Two times only.
Q Only two times, correct?
A (Witness in English) Yeah.
(Through Interpreter) Yes.
Q The second time you saw him was the second time he made the statement, correct?
A (No response.)
Q The second time you saw him was the second time he made the statement, correct?
A (Through Interpreter) Yes.

Q Did you ever talk to Mr. Clark about anything?
A (Through Interpreter) No.
Q You never asked him any questions, correct?
A (Through Interpreter) No.
Q After he made those statements, you never went up to him and talked to him, correct?
A (Through Interpreter) No.
Q Mr. Clark never told you what to do, correct?
A (Through Interpreter) No.
Q Did he ever tell you what to do?
A (Through Interpreter) No.
Q So you had no idea who Mr. Clark was, correct?
A (Through Interpreter) I don't know.
Q Mr. Clark never signed your paycheck, correct?
A (Through Interpreter) Never.
Q Do you know who John Healy is?
A (Through Interpreter) Yes.
Q Who is John Healy, to the best of your information?
A (Through Interpreter) He is the highest boss.
Q At CalPac, correct?
A (Witness in English) Yeah.
(Through Interpreter) Yes.
Q Directly under John Healy is who?
A (No response.)
Q I'm referring to around September, October of 2004.

A (Through Interpreter) Just him. He's the only one I know.
Q Did you go to work almost every day from May 2004 through November 2004?
A (Through Interpreter) Yes.
Q When you showed up at work, who did you report to?
A (Through Interpreter) We check where we're supposed to go.
Q But who did you report to?
A (Through Interpreter) Henry.
Q Henry Van Meter, correct?
A (Through Interpreter) Yes.
Q Do you know who Henry Van Meter's Supervisor was?
A (Through Interpreter) I don't know who.
Q So all you know is Henry Van Meter is your Supervisor and John Healy is the big boss, correct?
A (Through Interpreter) Yes.
Q Do you know who Larry Hatfield is?
MS. LUJAN: You mean Russell Hatfield?
MR. LEON GUERRERO: I mean Russell Hatfield. I'm sorry. There I go again.
A (Through Interpreter) No, I don't know.
BY MR. LEON GUERRERO: (Continuing)
Q Do you know who Don Harper is?
A (Through Interpreter) Yes.

Q Who is Don Harper?
A (Through Interpreter) That's our Supervisor.
Q That's the person that Mr. Van Meter reports to, correct?
A (Through Interpreter) Yes.
Q Did you ever talk to Mr. Harper?
A (Through Interpreter) The one that's from Asan?
Q I don't know where he's from. Mr. Harper is a Caucasian, correct?
A (Through Interpreter) Yes.
Q Did you ever talk to Mr. Harper?
A (Through Interpreter) One time only.
Q Does Mr. Harper speak Chamorro?
A (Through Interpreter) No.
Q So what were you talking about?
A (Through Interpreter) I asked him where are we going to go to work.
Q He would be the one to tell you where to go, correct?
A (Through Interpreter) Yes.
Q You said that you complained to CalPac about the statements made by Mr. Clark, is that right?
A (Through Interpreter) Yes.
Q Who did you complain to?
A (Through Interpreter) Van Meter.

Q Anyone else?
A (Through Interpreter) Just him.
Q So you didn't talk to Mr. Harper, correct?
A (Through Interpreter) No.
Q Did you ever talk to Mr. Harper about the statements made by Mr. Clark?
A (Through Interpreter) I don't know.
Q Did you talk to John Healy about the statements made by Mr. Clark?
A (Through Interpreter) No.
Q Before Mr. Clark made the statements around September of 2004, did you have any problems working at CalPac?
A (Through Interpreter) I don't know.
Q Did you like working at CalPac before Mr. Clark made the statements?
A (Through Interpreter) No, I just got out.
Q What do you mean you got out? You just got out of where?
A (Through Interpreter) When he finished saying Chamorro monkey.
Q I'm saying before September of 2004. I'm saying before he made that statement, did you like working at CalPac?
A (Through Interpreter) When they made me upset,

that's why I just got out because I don't like it anymore.
Q I'm saying, before he made the statement, let's start with say August 2004, you had not seen Mr. Clark at that time, correct?
A (Through Interpreter) We're suing the company.
Q You said Mr. Clark made the first statement September 2004, right?
A (Through Interpreter) Yes.
Q And he made another statement around October 2004?
A (Through Interpreter) Yes.
Q And then you quit working at CalPac in November 2004, correct?
A (Through Interpreter) Yes.
Q Before Mr. Clark made these statements, did you like working at CalPac?
A (Through Interpreter) No.
Q Why not?
A (Through Interpreter) They said all of that, the department said it all to me, Chamorro monkey.
Q Before the Chamorro monkey statement was made, did you like working at CalPac?
A (Through Interpreter) Yes, I used to work there.
Q You liked working with Mr. Van Meter?
A (Through Interpreter) Yes.
Q Did you work with Mr. Quintanilla?

A (Through Interpreter) Yes.
Q Did you like working with him?
A (Through Interpreter) Yes.
Q Did you like working with the rest of the underground crew at CalPac?
A (Through Interpreter) Yes.
Q Did you see Mr. Healy before Mr. Clark made the statements?
A (Through Interpreter) No.
Q Have you ever seen Mr. Healy while working at CalPac?
A (Through Interpreter) I often see him with the other one, the one that called us a Chamorro monkey.
Q Did you ever talk to Mr. Healy?
A (Through Interpreter) No, never.
Q When was the first time you saw Mr. Healy?
A (Through Interpreter) In the shop only.
Q When was that?
A (Through Interpreter) That day that I took my check when I came out.
Q You're saying the last day you worked at CalPac was the first time you saw Mr. Healy?
A (Through Interpreter) Yes.
Q So you left CalPac in November 2004 and that's the first time you saw Mr. Healy, correct?

A (Through Interpreter) Yes.
Q So there are basically two things that made you upset while working at CalPac, correct?
A (Through Interpreter) Yes.
Q Just to be clear, you quit CalPac, correct?
A (Through Interpreter) I called into work because my father was sick and nobody wanted to answer the phone so that I could tell them that my father was sick.
Q Now I'm a little confused because earlier you said you just got out after he made the statements. Is that what you said before?
A (Through Interpreter) Begin again.
Q Earlier today you said that you just got out. Remember that?
A (Through Interpreter) No.
Q No you don't remember or no you didn't make that statement?
A (Through Interpreter) I don't remember.
Q You don't remember making that statement?
MS. LUJAN: I'll object. He's already answered the question which was just asked right before this present question.
MR. LEON GUERRERO: I don't believe the question was answered. Go ahead and answer the question.
MS. LUJAN: Excuse me. Just to interrupt. Can

you also translate what I say?
INTERPRETER: That's what I was just doing.
BY MR. LEON GUERRERO: (Continuing)
Q I'm going to change it a little bit. Maybe you didn't understand the question before. I thought you said that you just got out after you made the statements. That's what I thought you said. Is that wrong?
A (Through Interpreter) No.
Q So now I'm really confused. I thought earlier then you said that you just got out, is that right?
A (Through Interpreter) I just stopped working when they told me that.
Q When did you stop working? Was that October 2004?
A (Through Interpreter) Yes, I just stopped on that day.
Q The second time Mr. Clark made the statements, correct?
A (Through Interpreter) Yes, that's when I stopped.
Q What were you talking about as far as your father being sick and making phone calls? What's that about?
A (Through Interpreter) That day that I called in to tell them that my father was sick, then he gave me the paper to say that I was fired.
Q Your last day at CalPac was November 24, 2004, correct?

A (Through Interpreter) Yes.
(Exhibit A marked: Charge of Discrimination.)
Q Mr. Arriola, I'm giving you Exhibit A. Tell me, have you ever seen Exhibit A before? For the record, Exhibit A is the Charge of Discrimination against CalPac received by the EEOC on February 15, 2005.
A (Through Interpreter) Yes.
Q That's the Charge of Discrimination you filed against CalPac, correct?
A (Through Interpreter) Yes.
Q That's your signature on the bottom left corner, correct?
A (Through Interpreter) Yes.
Q Right above it it says "I declare under penalty of perjury that the above is true and correct." Do you see that statement?
A (Through Interpreter) Yes.
Q So you had somebody read this thing to you in Chamorro, correct?
A (Through Interpreter) Yes, Debra only.
Q I want you to look at the second paragraph under where it says "the particulars are." I'll just read it, okay? It says "On or about September 25, 2004" and you can translate it. I'll stop. "On or about October 22, 2004, I

right?

A (Through Interpreter) Yes.

Q What were you doing at the time Mr. Clark made that statement?

A (Through Interpreter) I was mixing cement for the sidewalk.

Q What were the other workers doing at that time?

A (Through Interpreter) They were at the other side digging.

Q Did you hear Mr. Clark say anything else that day besides that one comment?

A (Through Interpreter) Two times and I was with Jesse.

Q On that second time, did Mr. Clark say anything else besides saying the Chamorro monkey comment?

A (Through Interpreter) No.

Q On the second time, did anyone hear Mr. Clark make the comment besides you?

A (Through Interpreter) Jesse.

Q Anyone else?

A (Through Interpreter) Only just him.

Q Did you tell anyone else about what Mr. Clark said on that second time?

A (Through Interpreter) No.

Q After that day, did you ever see Mr. Clark again?

A (Through Interpreter) No.

Q When you were working on the job, you thought Mr. Clark worked for CalPac, is that right?

A (Through Interpreter) I don't know.

Q When you were working on the job, you didn't have any understanding of who Mr. Clark worked for, is that right?

A (Through Interpreter) I don't know.

Q When you were working for CalPac, did you know who Mr. Clark's boss was?

A (Through Interpreter) No.

Q During the time you worked for CalPac, did anyone tell you what company Mr. Clark worked for?

A (Through Interpreter) Dennis.

Q Tell me again who told you what company Mr. Clark worked for.

A (Through Interpreter) I don't know who.

Q Let me ask you again to be sure you understand me. While you were working for CalPac, did anyone that you worked with tell you the name of the company that Mr. Clark worked for?

A (Through Interpreter) Underground.

Q While you were working for CalPac, did anyone ever call you a bad name besides Mr. Clark?

A (Through Interpreter) No one.

Q How much longer did you work for CalPac? How many

days or weeks after the last time you saw Mr. Clark?

A Friday to Saturday, Monday to Friday.

Q How many weeks after the last time you saw Mr. Clark?

A (Through Interpreter) No, I never saw Clark there.

Q So you just kept working without seeing him there, is that right?

A (Through Interpreter) Yes.

Q All the way until the last day that you worked?

A (Through Interpreter) Yes.

Q Was Mr. Quintanilla or Mr. Van Meter ever mean to you on the job after you complained about Mr. Clark?

A (Through Interpreter) No, never.

Q Was Mr. Harper or Mr. Healy ever mean to you after you made the complaints about Mr. Clark?

A (Through Interpreter) No, never.

Q After you complained about Mr. Clark, did anyone make you work any harder than you had to work before you complained about Mr. Clark?

A (Through Interpreter) No.

Q I'm sorry?

A (Through Interpreter) No.

Q Have you ever been convicted of any crime?

MS. LUJAN: I'll object on the basis of relevancy.

MR. SMITH: Is he going to answer?

MS. LUJAN: Oh, he can answer, yes. You can answer the question.

A (Through Interpreter) No, I've never been imprisoned.

BY MR. SMITH: (Continuing)

Q In the last five years, have you ever been in jail?

A (Through Interpreter) No.

Q When Mr. Clark used the word Chamorro monkey, how did you understand what he was saying if you don't speak English?

A (Through Interpreter) I know because they told me. That's why I hear that when -- that Chamorro monkey.

Q Who was it that told you what Mr. Clark had said or who was it that had translated for you what Mr. Clark had said?

A (Through Interpreter) Jesse.

Q Before Jesse told you what he said, could you understand what he said?

A (Through Interpreter) Yes, Jesse also spoke in Chamorro.

Q Was it because of Jesse that you understood the meaning of the words that Mr. Clark used?

A (Through Interpreter) Yes, because I was with Jesse when I was doing the sidewalk.

Q Did he ever wear a hard hat?
A (Through Interpreter) Yes, when he gets down.
Q What color was it?
A (Through Interpreter) White.
MR. SMITH: No more questions.
MS. LUJAN: I have no questions.
MR. LEON GUERRERO: Thank you, Mr. Arriola. Appreciate your time.

ooOoo

[DEPOSITION CONCLUDED AT 1:27 P.M.]

REPORTER'S CERTIFICATE

I, Cecilia A. Flores, a Certified Shorthand Reporter, hereby certify that ANTHONY C. ARRIOLA personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 69, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 21st day of July 2007.

__________________________
Cecilia A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

CERTIFICATE OF WITNESS

I, ANTHONY C. ARRIOLA, being first duly sworn on oath, depose and say that I am the witness named in the foregoing deposition transcript and that I have read the questions and answers thereon as contained in the foregoing deposition, consisting of pages 1 through 69; that the answers are true and correct as given by me at the time of taking the deposition, except as indicated on the correction sheet.

__________________________
ANTHONY C. ARRIOLA

Date:______

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecilia A. Flores, Notary Public in and for Guam, do hereby certify that on the 9th day of May, 2007 at the hour of 9:00 a.m. there appeared before me ANTHONY C. ARRIOLA at the law offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 21st day of July, 2007.

__________________________
Cecilia A. Flores