ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services*

**FILED**
DISTRICT COURT OF GUAM

JAN 0 7 2008

JEANNE G. QUINATA
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>      Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>      Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br>**DEFENDANT DYNAMIC TECHNICAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JAMES S. YEE; MEMORANDUM IN SUPPORT OF MOTION; DECLARATION OF ELYZE J. McDONALD; EXHIBITS A-D; DECLARATION OF SERVICE** |

ORIGINAL

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Dynamic Technical Services, Inc. (hereinafter referred to as "DTS"), Defendant in the above entitled and numbered action and, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, files this Motion for Summary Judgment as to all claims asserted by Plaintiff James S. Yee (hereinafter referred to as "Plaintiff"). This motion is made upon the attached memorandum, the record in this case, including without limitation the exhibits attached and filed contemporaneously herewith, and argument presented by counsel at the hearing.

WHEREFORE, PREMISES CONSIDERED, Defendant Dynamic Technical Services respectfully requests this court to enter and order dismissing all of Plaintiff James S. Yee's claims against DTS and for such further relief to which DTS shows itself justly entitled.

DATED this 7th day of January, 2008.

CARLSMITH BALL LLP

ELYZE J. MCDONALD
Attorneys for Defendant
Dynamic Technical Services

# INDEX OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)    6

*Anderson v. Pacific Maritime Assoc.*, 336 F.3d 924 (9th Cir. 2003)  12

*Association of Mexican-American Educators v. California,*
231 F.3d 572 (9th Cir. 2000)    12-13

*Bonnette v. California Health and Welfare Agency*, 704 F.2d
1465 (9th Cir. 1983)    8

*Bristol v. Bd. of County Comm'rs,* 312 F.3d 1213 (10th Cir. 2002)  9

*British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare
Fund*, 882 F.2d 371 (9th Cir. 1989)    7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)    6-7

*Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 123
S.Ct. 1673, 155 L.Ed.2d 615 (2003)    8

*Dominguez-Curry v. Nevada Transp. Dept*, 424 F.3d 1027 (9th Cir. 2005)  16

*E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003)  8-9

*Faragher v. City of Boca Raton,* 524 U.S. 775 (1998)    15, 18

*Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983)  11, 13

*Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004 (D.Minn. 2003)  17

*Graves v. Lowery,* 117 F.3d 723 (3d Cir. 1997)    9

*Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)  19

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)    15, 18

*Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980)  11

*McZeal v. City of Seattle*, 2006 WL 3254504 (W.D.Wash. 2006)  16

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986)    16

Motion for Summary Judgment Against Plaintiff James S. Yee    Page 3 of 24
4832-1129-6258.1.059759-00001

Case 1:05-cv-00037  Document 479  Filed 01/07/2008  Page 3 of 37

*Merrick v. Farmers Ins.*, 892 F.2d 1434 (9th Cir. 1990)        19

*NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117 (3d. Cir. 1982)    8

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)    16

*Rivas v. Federacion de Asociaciones Pecuarias,* 929 F.2d 814 (1st Cir. 1991)    9

*Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971)    16

*Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d
385 (D.Conn. 2003)    17

*Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973)    10, 13

*Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir. 1978)    16, 19

*Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350 (11th Cir. 1994)    9

*Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067 (C.D.Cal. 2002)    8

**Statutes**

42 U.S.C. § 2000e(b)    7

42 U.S.C. § 2000e(f)    7

**Rules**

Federal Rule of Civil Procedure 56    6

## MEMORANDUM IN SUPPORT OF MOTION FOR
## SUMMARY JUDGMENT AGAINST PLAINTIFF JAMES S. YEE

### I.
### GROUNDS FOR MOTION

Defendant DTS brings this Motion for Summary Judgment against Plaintiff James S. Yee on the following grounds:[1]

A) Defendant DTS was not an "employer" of Plaintiff James S. Yee as defined by Title VII of the Civil Rights Act of 1964 and cannot be subject to liability under the statute.

B) There was no hostile work environment based upon the uncontroverted evidence.

C) DTS did not have any knowledge of any alleged discrimination.

To the extent co-defendant Calpac asserts there was no hostile work environment, DTS hereby joins in such motion.

### II.
### SUMMARY JUDGMENT EVIDENCE

Defendant relies on the following exhibits, attached to this motion and incorporated by reference as if fully set forth herein:

A) Selected pages of the deposition of Plaintiff James S. Yee;
B) Selected pages of the deposition of John Healy;
C) Affidavit of Dennis P. Clark; and
D) Affidavit of Linda Hayes.

### III.
### FACTUAL BACKGROUND

Plaintiff James S. Yee filed this lawsuit along with twelve other plaintiffs on December 12, 2005. The Plaintiff filed his Second Amended Complaint on September 7, 2007. All of Plaintiff's claims are brought under Title VII of Civil Rights Act of 1964. The Plaintiff was

---

[1] In Plaintiff's Second Amended Complaint, the Plaintiff does not make any retaliation claims against DTS for reduction in hours, termination, or unlawful treatment. Plfs' 2nd Am. Complaint ¶¶ 170-174.

Case 1:05-cv-00037    Document 479    Filed 01/07/2008    Page 5 of 37

employed by Defendant Calpac from August 2004 through March 2005. Ex. A. at pp. 18-19, ll. 22-25, 1-2; p. 54, ll. 17-18. During the course of his employment for Calpac, he worked on a construction project for MCI. Dennis Clark was the MCI "company representative" on this project and was an employee of DTS. Ex. C at ¶ 3. The Plaintiff alleges that Mr. Clark made discriminatory remarks in the presence of the Plaintiff on two occasions. Ex. A at p. 55, ll. 6-11; p. 79, ll. 20-23. The Plaintiff did not complain to anyone at DTS about the statements Dennis Clark allegedly made and no one at DTS became aware of Plaintiff's complaints until late December 2004 when Dennis Clark informed DTS of the existence of public protesters who were alleging that he made discriminatory comments. Ex. D at ¶ 9. Based upon these alleged statements made by Mr. Clark, the Plaintiff has filed the instant lawsuit seeking to recover damages from DTS under Title VII for hostile work environment.

## IV.
## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a court should grant summary judgment when, viewing the evidence in the light most favorable to the nonmoving party, the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. Pro. 56(e).

However, it is not necessary for the party moving for summary judgment to introduce evidence that negates the plaintiff's claim. *Celotex*, 477 U.S. 258, 323. Instead, the moving party may show in it motion that there is no evidence to support an essential element of the non-moving party's claim. *Id.* at 325. According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party: (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible. *British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989).

## V.
## ARGUMENTS & AUTHORITIES

**A.     DTS is not an "employer" of Plaintiff and cannot be liable under Title VII**

In order to be subject to liability for a hostile work environment[2] under Title VII, a defendant must be an "employer" as the statute defines that term. An "employer" is a "person engaged in an industry affecting interstate commerce who has fifteen or more employees..." 42 U.S.C. § 2000e(b). An employee is an "individual employed by an employer." 42 U.S.C. § 2000e(f). In the present case, it is uncontested that Calpac, not DTS, was the direct employer of Plaintiff Yee. Ex. A. at p. 70, l. 5; Ex. B at p. 88, ll. 18-23.

**1.     Defendant DTS is not liable under Title VII as a joint employer.**

"Two or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment of the employee. *Swallows* [*v. Barnes & Noble Book*

---

[2] Defendant expressly denies that Plaintiff was subjected to a hostile work environment as a matter of law. This topic is fully addressed in Section V.B. of this memorandum.

*Stores, Inc.*], 128 F.3d [990], 993 n. 4 [(6th Cir. 1997)] (citing *NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117, 1123 (3d. Cir. 1982))." *Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067, 1093 (C.D.Cal. 2002). In order to determine whether a joint employment relationship exists, the Ninth Circuit applies an "economic reality" test. *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983). Under that test, this court should consider all factors relevant to a particular situation when evaluating the economic realities of a relationship. *Id.* In determining joint employment, a large collection of factors has been suggested from the judiciary and governmental agencies. *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270, 1275 (9th Cir. 2003).

When determining if a joint employer relationship exists, the Third Circuit has explained it is a matter of determining which of the two, or whether both, of the parties control, in the capacity of employer, the labor relations of a given group of workers. *Browning-Ferris Indus. of Pa.*, 691 F.2d at 1122-23 (citing *NLRB v. Condenser Corp. of America*, 128 F.2d 67, 70 (3d Cir. 1942)). "The 'joint employer' concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment." *Id.*

The Supreme Court has summarized the various factors as to what it means to be an employer: "As the EEOC's standard reflects, an employer is the person, or group of persons, who owns and manages the enterprise. The employer can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of the business are to be distributed." *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 450, 123 S.Ct. 1673, 1680, 155 L.Ed.2d 615 (2003). The Ninth Circuit opined that the "Supreme Court seems to suggest that the *sine qua non* of determining whether one is an employer is that

an 'employer' can hire and fire employees, can assign tasks to employees and supervise their performance." *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d at 1277 (citing *Clackamas*, 123 S.Ct. at 1680). "Logically, before a person or entity can be a joint employer, it must possess the attributes of an employer to some degree." *Id.* Numerous courts consider the key to joint employment to be the right to hire, supervise and fire employees. *See Bristol v. Bd. of County Comm'rs,* 312 F.3d 1213, 1219 (10th Cir. 2002) (en banc); *Graves v. Lowery,* 117 F.3d 723, 727-728 (3d Cir. 1997); *Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350, 1361 (11th Cir. 1994); *Rivas v. Federacion de Asociaciones Pecuarias,* 929 F.2d 814, 820-821 (1st Cir. 1991).

In *E.E.O.C. v. Pacific Maritime Assoc.,* a Title VII sexual harassment action was brought against Pacific Maritime Association ("PMA"). 351 F.3d 1270 (9th Cir. 2003). PMA is an association of stevedoring companies ("member-employers") that performed organizational tasks on behalf of its members, negotiated a collective bargaining agreement, operated a dispatch hall jointly with a union, and provided payroll services for its members. *Id.* at 1274. The plaintiff alleged that, along with the member-employer of PMA that hired her, PMA was a joint employer of her. However, the Ninth Circuit found that PMA did not supervise the longshoremen, had no power to hire or fire longshoremen, had no power to discipline longshoremen, and did not supervise the work sites. The court found that it was undisputed that the monitoring and control over the work sites, as well as the control of the employees, was within the sole province of the member-employees. Accordingly, the Court held that PMA was not a joint employer of the plaintiff. *Id.* at 1274.

Similarly, in the present case, DTS had no authority to hire or fire Calpac employees, did not supervise Calpac employees or give them work assignments, had no power to discipline Calpac employees, did not determine wages or benefits of Calpac employees, and did not decide

how profits or losses of Calpac were to be distributed. *See* Exhibits C at ¶¶ 5-7 and D at ¶ 13. John Healy, the President of Calpac, testified that he did not have any communications with anyone at DTS prior to receiving the first EEOC complaint. Ex. B at p. 85, ll. 18-23. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Mr. Healy also testified that Mr. Clark was not a supervisor of the plaintiffs, did not give out daily work assignments, and did not hire any of the plaintiffs. *Id.* at pp. 88-89, ll. 12-17, 9-20. Therefore, as a matter of law, this uncontroverted evidence establishes that DTS was not a joint employer of the Plaintiff with Calpac.

### 2. Defendant DTS is not liable under Title VII as an indirect employer

The D.C. Circuit first addressed indirect-employer liability in *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973). The hospital ran a nursing office where patients could request the service of a private duty nurse. The hospital would then contact outside referral sources and request a private nurse be sent to the hospital. The private nurses were employees of the patients, not the hospital. In *Sibley*, a male nurse alleged that on at least two occasions hospital nurses rejected him upon arrival because he was male and the requesting patient was female. The male nurse subsequently sued under Title VII for discrimination.

On appeal, the court noted that one of the goals of Title VII was to equalize access to job opportunities. *Id.* at 1340. The court held that Title VII did not explicitly require a direct employer-employee relationship, but it did not mean that no relationship was required for a claim to fall under Title VII. The Court stated: "We think it is significant that [Title VII] has addressed the problems of interference with the direct employment relationship by labor unions and employment agencies-institutions which have not a remote but a highly visible nexus with

the creation and continuance of direct employment relationships between third parties. On the facts as alleged...[the hospital] is so circumstanced, and its daily operations are of such a character as to have such nexus to the third parties in this case..." *Id*. at 1342.

The Ninth Circuit first addressed the issue of indirect-employer liability in *Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980). The court noted for Title VII to apply, "there must be some connection with an employment relationship" though the "connection...need not necessarily be direct." *Id*. at 883. The court explained "[t]his might occur where a defendant subject to Title VII interferes with an individual's employment opportunities with another employer." *Id*. at 883 n. 3.

The Ninth circuit addressed the issue again in *Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983). In this case, the plaintiff was a Hispanic physician working for a corporation named AES. On behalf of AES, the plaintiff submitted a proposal to the defendant to operate the hospital's emergency room. The hospital allegedly turned down the proposal because too many Hispanics worked for AES. *Id*. at 1020. The court reversed a summary judgment granted to the hospital on the basis that the plaintiff lacked standing under Title VII because he was an employee of AES, not the hospital, and AES would have only been an independent contractor for the hospital. *Id*. The court held that AES's potential status as an independent contractor did not mean that the hospital had not interfered with the relationship between AES and the plaintiff. *Id*. at 1021. Additionally, the court noted the perverse result that would occur if an employer were allowed to discriminatorily interfere with an individual's employment opportunities with another employer, while it could not do so with its own employees. *Id*.

The issue of indirect-employer liability came before the court again in *Association of Mexican-American Educators v. California*, 231 F.3d 572 (9th Cir. 2000)(en banc). In this case, the plaintiffs, a class of prospective and current minority teachers, challenged the use of a skills test that was a prerequisite to employment in the public schools. *Id.* at 577. The plaintiffs alleged the test has a disparate impact on minorities. *Id.* at 578. The court found that Title VII covered the claims as the alleged discriminatory test interfered with future employment with public schools since it dictated whom the schools could hire. *Id.* at 581-82. The court emphasized that the ruling was based on the peculiar degree of control the state exercised over school districts because of the test. *Id.* at 581.

In *Anderson v. Pacific Maritime Assoc.*, the Ninth Circuit addressed the issue of whether the PMA could be liable under Title VII under indirect-employer liability. 336 F.3d 924 (9th Cir. 2003)(the PMA performed the same functions and duties as discussed in *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003), *supra*). The plaintiffs in the suit were African-American workers employed on the waterfront in Seattle and Tacoma. The plaintiffs alleged a "horrific and pervasive picture of racial animosity and discrimination" on the waterfront. *Id.* at 926. The allegations included the common use of racial slurs, racial innuendos, and racial jokes on the docks and well as the uses of racial slurs in the training materials. The plaintiffs also alleged direct, racially charged physical threats. *Id.*

The court held that the PMA could not be liable under Title VII. The court found that the alleged hostile work site was not controlled by the PMA and the PMA did not employ or supervise the plaintiffs or the alleged harassers. *Id.* at 931. "*Sibley* and its progeny extended Title VII coverage to indirect employers when those employers discriminated against *and* interfered with the employees' relationship with their employees." *Id.* (emphasis added). PMA

did not interfere with the plaintiffs' relationship with their employers since it was the employers who allowed the allegedly hostile work environment. *Id.* "*Sibley* and its Ninth Circuit progeny condone liability when there exists discriminatory 'interference' by the indirect employer *and* where the indirect employer had some peculiar control of the employee's relationship with the direct employer." *Id.* at 932 (emphasis added).

In the present case, there was no discriminatory interference by DTS and DTS had no control over the Plaintiff's relationship with Calpac. In fact, none of the above-referenced cases lends support for a finding of indirect employer liability in this case. In *Sibley*, the hospital refused to allow the male nurse to see the patient; in *Gomez*, the hospital refused to hire the company with Hispanic doctors; and in *Association of Mexican-American Educators*, the state required the job applicants to take the test with the disparate impact on minorities. In all of the referenced cases, the "indirect employer" interfered with the employment relationship between the employee and direct employer. DTS did not have any control over the employment relationship between the Plaintiff and Calpac. DTS did not have the power to hire or fire employees, discipline employees, assign work assignments to employees, promote or demote employees, or perform employee evaluations. *See* Ex. C at ¶¶ 5-7 and D at ¶ 13. John Healy testified that Dennis Clark never tried to influence Calpac to take any action that would affect the manner in which any of the plaintiffs were treated and did not make any comments to anyone at Calpac regarding any of the plaintiffs. Ex. B. at p. 87, ll. 2-6 and 12-15. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Furthermore, Healy testified that Clark and DTS never interfered in the relationship between Calpac and any of the Plaintiffs. *Id.* at p. 92, ll. 16-24.

Additionally, the work site involved in this lawsuit was not one that was controlled by DTS. Ex. D at ¶ 7. The worksite in question was a MCI worksite. Dennis Clark reported directly to MCI and took all work directives from MCI. DTS did not have any power to control the worksite, conduct any investigations on the worksite, or implement any rules for the worksite. *Id.* All of these functions were reserved to MCI. DTS did not even have the authority to remove Dennis Clark from the project. *Id.* at ¶ 6.

What the Plaintiff is essentially asking this Court to do is to create a new definition of employer for Title VII purposes. Nearly every type of construction job in the United States has a representative of some form at the construction site to accept the work performed by the contractor. In this case, MCI hired Dennis Clark to perform this function on their behalf. In cases of state road construction projects, the individual state's department of transportation sends out an inspector to ensure that the contract is being performed in accordance with contract specifications (i.e. the inspector will ensure the correct amount of asphalt is being laid and take samples of the asphalt for testing). In the residential construction industry, a governmental inspector will regularly come to a job site to inspect and approve electrical work and, if something is not correct, will communicate what needs to be corrected.

The Plaintiff claims that Mr. Clark could instruct him what to do on the jobsite, but all of the instructions were related to the inspection and approval of the project (i.e. whether the cable was deep enough and whether filling the trench was being done to contract standards). *See* Ex. A. at p. 76, ll. 1-7; p. 81, ll. 11-14. Construction site inspectors are not employers and do not have any connection with an employment relationship. Inspectors do not hire or fire, supervise, discipline, evaluate, assign tasks, or perform any other functions of an employer in an employment relationship with respect to the workers on the job site. The position argued by the

Plaintiff requires the extension of "employer" status under Title VII to any entity that desires to confirm that a construction project is being performed according to the terms of the contract or relevant construction codes.

**B.    Plaintiff's allegations do not amount to a hostile environment as a matter of law**

Regardless of DTS' status as an "employer" under Title VII, the Plaintiff has failed to establish a claim for hostile work environment. A plaintiff may bring a lawsuit under Title VII for hostile work environment based upon racial or national origin harassment. To establish the existence of a hostile work environment plaintiff must prove that the workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(internal citations and quotation marks omitted). The hostile environment must be one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. *Id.* at 21-22. The Supreme Court in *Harris* held that the courts should look to the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance." *Id.* at 23. The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n. 1 (1998)(internal citation and quotation marks omitted). Judicial standards for harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of

employment for the purposes of a Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept*, 424 F.3d 1027 (9th Cir. 2005).

The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)*. Not all workplace conduct that could be labeled as harassment affects a "term, condition, or privilege" of employment within the meaning of Title VII. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "The 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to sufficiently significant degree to violate Title VII." *Id.* (citing *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), cert. denied, 406 U.S. 957 (1972)).

The Western District of Washington held that the use of the phrase "Driving Miss Daisy" several times in the presence of an African-American worker and referring to another African-American driving a Caucasian within a two month period were not sufficient to create a racially hostile environment. *McZeal v. City of Seattle*, 2006 WL 3254504, at *5 (W.D.Wash. 2006). The court found that the comments were not so frequent or severe as to constitute a racially hostile work environment. *Id.* Furthermore, the Ninth Circuit found the use of the phrase "jungle bunny" in reference to an African-American did not create a hostile environment. *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978). The court commented that while the remark was a racially derogatory slur, it was not the sort of conduct to which Title VII was enacted to prohibit. *Id.* The court also observed that Title VII was not directed at ending all discrimination by individuals, but the eradication of discrimination by employers against employees. *Id.*

Additionally, the District Court of Connecticut found that isolated racially offensive comments did not create a hostile and abusive environment. *Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d 385, 396 (D.Conn. 2003)(complained of comments included: (1) coworker wished a hurricane over Puerto Rico would wipe out island and that "we could do without those people;" (2) "they should put Puerto Ricans on a plane and send them back to Puerto Rico;" and, (3) a nurse's negative comments that black and Puerto Rican patients were "low life pieces of shit, scum sucking dogs and welfare recipients). The District of Minnesota found that the use of the terms like "fag," "wimp," "sissy," "useless," "worthless," and "spic" failed to support a plaintiff's claim of hostile work environment based upon national origin and disability. *Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004, 1015 (D.Minn. 2003).

In the present case, Plaintiff Yee testified that there were two incidents where Dennis Clark referred to a group of Calpac workers as "island monkeys" or "monkeys." Ex. A at p. 55, ll. 6-11; p. 79, ll. 20-23. Mr. Yee was employed with Calpac from August 2004 through March 7, 2005, a period of approximately seven months. Ex. A. at pp. 18-19, ll. 22-25, 1-2; p. 54, ll. 17-18. Plaintiff alleges that, over the course of seven months of employment, two isolated statements were allegedly made by Mr. Clark. As a matter of law, this fails to amount to a hostile and abusive work environment according to the factors set out by the Supreme Court in *Harris*. The alleged discriminatory conduct was infrequent and not physically threatening, but rather a mere offensive utterance. Furthermore, if it is assumed that the two alleged statements were made, they did not unreasonably interfere with the Plaintiff's work performance. The Plaintiff testified that he was good at what he did and never got any complaints about his work, even from Mr. Clark. Ex. A. at p. 106, ll. 21-24. According to the Plaintiff's testimony, the

second, and last, alleged discriminatory statement made by Clark occurred in August or early September of 2004. The Plaintiff testified that the first statement occurred about two weeks after he started at Calpac and second occurred about two weeks later. Ex. A. at pp. 17, ll. 17-19; p. 25, ll. 12-18. Thus, Mr. Yee concedes that he did not encounter any discriminatory comments during the last six months of his employment on the job. Instead, Mr. Yee's complaints about the work environment focused on Mr. Clark not wearing a hard hat or vest, which is not actionable discriminatory conduct under Title VII. Ex. A. at pp. 98, ll. 13-24. When looking at the "totality of the circumstances," the two alleged instances of racial slurs over the course of seven months were not "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. By his own testimony, the alleged remarks were not more than episodic and were not "sufficiently continuous and concerted in order to be deemed pervasive." *Farragher*, 524 U.S. at 787 n. 1. Therefore, DTS is entitled to summary judgment against Plaintiff on his Title VII causes of action.

**C.     DTS did not have any knowledge of any alleged discrimination and cannot be held liable under Title VII**

In the unlikely event that the court finds that DTS is an "employer" of the Plaintiff under Title VII and that Plaintiff has established a hostile environment claim, DTS cannot be held liable for the alleged actions of Clark because it did not have actual or constructive knowledge of the alleged discriminatory conduct. DTS was not made aware of any alleged discriminatory conduct by Dennis Clark until it was notified by Clark about the protesters which occurred in late December 2004. Ex. D at ¶¶ 9-11. There is no evidence, as none exists, that DTS had actual knowledge of Clark's alleged discriminatory statements until the EEOC complaint was received. Additionally, there are no allegations of harassment following the time of the protest or the time the complaint was received by DTS. In fact, according to the testimony of the Plaintiff, there

had been no incidents of alleged harassment in the four months preceding the protests on Guam. Ex. A. at pp. 17, ll. 17-19; p. 25, ll. 12-18.

An employer cannot be held liable for the harassment of an employee unless the employer both knows of it and fails to take remedial action. *Silver v. KCA, Inc.*, 586 F.2d 138, 142 (9th Cir. 1978). This even holds true when there is a continuing course of harassment from an employee. *Id.* Occasional, sporadic remarks that occur in the workplace do not impose Title VII liability upon the employer. *Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)(citing *Merrick v. Farmers Ins.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990). In *Greene*, the plaintiff's claim of a hostile work environment rested upon four instances of offensive language. The plaintiff reported one incident and racial harassment ceased from that time forward. The court held that the case was properly dismissed as against the employer and that the claim may have had substance if the employer knew of the conduct and failed to take action. *Id.*

In the present case, DTS did not learn of any allegations of discriminatory remarks until Mr. Clark informed DTS of the presence of the protesters in late December 2004, approximately four months after the last alleged discriminatory comment was allegedly made by Clark, according to the Plaintiff. Ex. D at ¶ 9. The Plaintiff's EEOC Notice of Charge of Discrimination was not sent to DTS until April 6, 2005. Since DTS was not aware of the alleged harassment, it cannot be held liable under Title VII. *See Silver*, 892 F.2d at 1438-39.

Additionally, immediately upon learning that there were allegations that he had engaged in discriminatory conduct, Mr. Clark spoke at a meeting of Calpac employees and informed them that he did not make any such comments and would not discriminate against anyone based upon their Chamorro heritage. Mr. Clark informed DTS of this meeting and what he stated to the Calpac employees. There have been no allegations of discriminatory conduct by Clark or DTS

subsequent to this meeting. In fact the Plaintiff does not make any allegations of any comments by Clark for approximately the previous four months leading up to this meeting. There has not been one complaint of discriminatory comments by Clark subsequent to DTS learning of the Plaintiff's allegations in the EEOC complaint. Ex. D at ¶¶ 9-11. Therefore, the Plaintiff cannot complain of any failure by DTS to take action after it acquired knowledge of the Plaintiff's complaints. DTS cannot be held liable under Title VII because: (1) DTS did not have any knowledge of Plaintiff's allegations prior to him filing a complaint with the EEOC and (2) once DTS became aware of the complaints, immediate remedial action was taken and no subsequent discriminatory acts have been alleged by Plaintiff.

## VI.
## CONCLUSION

DTS cannot be liable to Plaintiff under Title VII because: (1) DTS was not an employer of the Plaintiff as that term is defined under Title VII; (2) Based upon the Plaintiff's own testimony, he was not subjected to a hostile work environment for purposes of Title VII; and (3) DTS did not have actual or constructive knowledge of any of Plaintiff's complaints. For these reasons, DTS moves this Honorable Court to grant is Motion for Summary Judgment against Plaintiff James S. Yee.

DATED this 7th day of January, 2008.

CARLSMITH BALL LLP

_Elyze J. McDonald_

ELYZE J. MCDONALD
Attorneys for Defendant
Dynamic Technical Services

## DECLARATION OF ELYZE J. McDONALD

I, Elyze J. McDonald, declare under penalty of perjury that the following statements are true and correct:

1.     1 have personal knowledge of the facts stated in this declaration except as otherwise indicated.

2.     I would testify competently as to these facts if called upon by the Court.

3.     I am an attorney authorized to practice law in the territory of Guam and presently employed with the law firm of Carlsmith Ball LLP, attorneys for Defendant Dynamic Technical Services in the above-captioned action.

4.     This declaration is submitted in support of Defendant Dynamic Technical Services' Motion for Summary Judgment Against James S. Yee, filed on January 7, 2008.

5.     Defendant Dynamic Technical Services is a necessary and proper party Defendant in this action.

6.     Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against James S. Yee as Exhibit "A" is a true and correct copy of the pertinent pages of the deposition testimony of James S. Yee.

7.     Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against James S. Yee as Exhibit "B" is a true and correct copy of the pertinent pages of the deposition testimony of John T. Healy.

8.     Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against James S. Yee as Exhibit "C" is a true and correct copy of the Affidavit of Dennis P. Clark the original of which has been previously filed with the Court.

9.     Attached to Defendant Dynamic Technical Services' Motion for Summary

Judgment Against James S. Yee as Exhibit "D" is a true and correct copy of the Affidavit of Linda G. Hayes the original of which has been previously filed with the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and accurate to the best of my knowledge.

Executed this 7th day of January 2008 at Hagåtña, Guam.

_____
ELYZE J. MCDONALD

# Exhibit A

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA, ) Civil Case No. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS, )
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES S.)
YEE, TEDDY B. CRUZ, JESSE B. CRUZ,)
JOHN L.G. NAUTA, and JOHN P. )
BABAUTA, )
              Plaintiffs, )
                     )
      vs. )
                     )
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS )
CLARK, WILLIAM WARD, JAI JAMES and)
DOES 1 through 10, )
                     )
_____Defendants.____)

**COPY**

## DEPOSITION OF JAMES S. YEE

Taken on Behalf of the Defendants

        BE IT REMEMBERED That, pursuant to the Guam
Rules of Civil Procedure, the deposition of JAMES S. YEE was
taken before Veronica F. Reilly, Certified Shorthand
Reporter, on Wednesday, the 7th day of February 2007, at
10:00 a.m. in the Law Offices of Blair Sterling Johnson
Martinez & Leon Guerrero, Suite 1008, Pacific News Building,
238 Archbishop Flores Street, Hagatna, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 • Fax: 671.734.1045
E-mail: veronica.reilly@hotmail.com

1   approximately; correct?

2        A.    It's a few months.  We were in Two Lovers' Point

3   area.  We were doing a cable line between that and NCS;

4   there's a back way in there and that was the first incident I

5   remember.

6        Q.    Sticking with that first incident that you remember,

7   was that shortly after you started working at CalPac?

8        A.    Roughly, yes.

9        Q.    I'm making a correction.  I see in your complaint

10  that he says on or about August 2004 is when you started

11  working for CalPac?

12       A.    (Witness nodded head.)

13       Q.    That would be approximately; correct?

14       A.    Right.

15       Q.    So around August of 2004 is when you first heard the

16  term island monkey by Dennis Clark?

17       A.    I wouldn't remember exactly if it was August, but I

18  was there because I started on that -- probably it was a

19  couple of weeks after I started, we ended up there.

20       Q.    The project with the Two Lovers' Point project,

21  right?

22       A.    Yeah, it was pulling behind Two Lovers, towards NCS.

23       Q.    By the way, I'm going to step back a little bit.

24  You had a chance to read the complaint in this case;

25  correct?  The first amended complaint?

*February 7, 2007: Mr. James S. Yee*

1    A.    Right.

2    Q.    Did you have an opportunity to review the complaint

3    shortly before you came to your deposition today?

4    A.    Yes, I briefly went through it.

5    Q.    Are there any corrections to the complaint that you

6    think should be made, specifically as it pertained to you?

7         MR. PEREZ:    Let me just state an objection and

8    the objection is that the complaint would have been drafted

9    by counsel applying legal knowledge and theories, which he

10   might not be in a position to answer whether or not

11   corrections should be made.    But having said that, you can

12   answer the question.

13   BY MR. LEON GUERRERO:  (CONTINUING)

14   Q.    Just to be clear, in the complaint, there's certain

15   allegations of facts that occurred in the complaint.    What I

16   want to know specifically is some of the stuff that you refer

17   to in your complaint.    Would you like to make any corrections

18   to them is what I'm saying?    Specifically, the allegations in

19   the complaint.

20        MR. PEREZ:    You understand the question?

21   BY MR. LEON GUERRERO:  (CONTINUING)

22   Q.    I'll give you an example.    In your complaint, you

23   say that on or about August 2004, you began working for

24   CalPac?

25   A.    (Witness nodded head.)

*February 7, 2007:  Mr. James S. Yee*

1    Q.    I imagine you don't want to make any change to that?

2    A.    That's pretty much.

3    Q.    That's what I'm asking, is there anything in there,

4  in these allegations, that you might want to make a change

5  to?  And if there isn't anything, saying no is perfectly

6  acceptable.

7            MR. PEREZ:  My only concern, Vince, let me state

8  it as an objection, is I don't know if he remembers exactly

9  what was in the complaint to say whether or not he wants to

10  make an objection.

11  BY MR. LEON GUERRERO:  (CONTINUING)

12    Q.    So then I guess, and I hate to do this, but we're

13  going to go through the complaint as it relates to you.

14  Okay?

15            MR. PEREZ:  Or if you want to give him a moment,

16  I'll let him look through it real fast.

17  BY MR. LEON GUERRERO:  (CONTINUING)

18    Q.    I'll just read it and we can just -- In your

19  complaint, starting at page 19, paragraph 132, it says,

20  "Plaintiff James S. Yee was hired by CalPac in or about

21  August 2004 to work on an installation project of underground

22  cables in Guam for MCI."  That's what your complaint says.

23  Is that pretty accurate?

24    A.    That's pretty accurate.

25    Q.    Paragraph 33 says, "During the period on or about

*February 7, 2007:  Mr. James S. Yee*

1      A.    (Witness nodded head.)

2      Q.    So with the exception, he made certain allegations

3   in the complaint also, to your knowledge?

4      A.    Uhm --

5      Q.    If you don't know, you can say you don't know.

6      A.    I don't know.

7      Q.    You also mentioned that you complained to Henry

8   Quintanilla?

9      A.    Yes.

10     Q.    For the first --

11     A.    Right.

12     Q.    When did you complain to Henry Quintanilla?

13     A.    That was up there in Tiyan.

14     Q.    But was that the same day?

15     A.    No.

16     Q.    Day after?

17     A.    This is probably a couple weeks after, during the

18  second incident.

19     Q.    So the first time you ever complained to Henry

20  Quintanilla was approximately two weeks after Mr. Clark made

21  his first statement.  Would that be correct?

22     A.    That would be hard to say, because we all eat lunch

23  together, too, so we talk about it during lunch and say it's

24  bothering me, it's just hard to be around.

25     Q.    Again, when you say we, who are you referring to?

*February 7, 2007:  Mr. James S. Yee*

1     Q.    And in the third paragraph, it says, Final Warning;

2     do you see that?

3     A.    Yes.

4     Q.    And you do recall receiving this thing; correct?

5     A.    Yes, I do.

6     Q.    The last exhibit I have is Exhibit H.

7                            (Exhibit H marked.)

8     BY MR. LEON GUERRERO: (CONTINUING)

9     Q.    Have you ever seen Exhibit H before?

10    A.    Yes, I do.

11    Q.    What is Exhibit H to your knowledge?

12    A.    This is a form they make you sign when you've been

13    released.

14    Q.    And there's a signature line there for employee

15    signature.  Is that your signature?

16    A.    Yes.

17    Q.    And it's dated March 7, 2005; correct?

18    A.    Correct.

19    Q.    And in it, it seems to indicate that you're released

20    for cause.  Do you see that?

21    A.    Yes.

22    Q.    Did you ever protest this?

23    A.    No, I did not.

24            MR. LEON GUERRERO:  I have no other questions at

25    this time.

*February 7, 2007:  Mr. James S. Yee*

1              CROSS-EXAMINATION

2  BY MS. McDONALD:

3     Q.   Mr. Yee, my name is Elyze McDonald.  I'm the

4  attorney for Dynamic Technical Services.  I'm going to ask

5  you some questions.  If I can get some clarification on what

6  you just stated to Mr. Leon Guerrero.  You mentioned two

7  incidents when you were called a monkey or an island monkey.

8  Are there any other?

9     A.   I don't recall.

10    Q.   You don't recall?

11    A.   No, I don't.

12    Q.   In the beginning, you mentioned that Dennis Clark

13  was employed by DTS; is that correct?  Did you say that

14  Dennis Clark was employed by DTS?

15    A.   Dynamic Tech?

16    Q.   Dynamic Technical Services?

17    A.   Yeah, I did.

18    Q.   How do you know that he was employed there?

19    A.   Because there were e-mails given from Don Harper to

20  Dennis Clark that were signed by Dennis Clark.  Dennis Clark

21  did the everyday inspections of what they did.

22    Q.   You were sent those e-mails?

23    A.   Excuse me?

24    Q.   You mentioned e-mails; you were sent those e-mails?

25    A.   Yes -- no, no, no, not me.  Don Harper and Dennis

*February 7, 2007:  Mr. James S. Yee*

1    Q.   For the job at Two Lovers' Point and the job at

2   Tiyan, who employed you?

3    A.   Who employed me?

4    Q.   Yes.

5    A.   My employer was CalPac.

6    Q.   Did you have any other employer?

7    A.   At the moment, no.

8    Q.   No?

9    A.   Just CalPac.

10    Q.   At the time in question, who paid your salary?

11    A.   It was CalPac.

12    Q.   And --

13    A.   I've got a check from CalPac every two weeks.

14    Q.   You got a check from CalPac?

15    A.   Yes.

16    Q.   Did you get a check from anybody else?

17    A.   No.

18    Q.   Did CalPac offer you employment benefits?

19    A.   As in?

20    Q.   Health insurance?

21    A.   Health insurance?  Yes, yes.

22    Q.   Did anybody else offer you employment benefits?

23    A.   No.

24    Q.   Such as health insurance?

25    A.   No.  Aflac.

*February 7, 2007:  Mr. James S. Yee*

1       A.     Where were we at?  We were up at NCS and we were

2    working along the fence crossing in, say we're back filling

3    the pipes, he comes over, looks at it, he goes, "Can you get

4    some better dirt to backfill this trench because there's

5    rocks," so I would have to go of course find some dirt, pull

6    up the rocks, cover it with some more dirt, make it nice and

7    pretty so the grass grows on it and everything.

8       Q.     Do you know who Dennis Clark reported to?

9       A.     I have no idea.

10      Q.     John Healy, was he a CalPac employee?

11      A.     Yes, ma'am.  He was, I guess, the president.  I'm

12   not sure.

13      Q.     Did he give you direct instructions?

14      A.     When he came around and if he needed to, he would.

15      Q.     Bruce Williams, was he a CalPac employee?

16      A.     Yes, he was.

17      Q.     Did he give you direct instructions?

18      A.     When he had to, yes.

19      Q.     I don't think we've talked about Bruce Williams

20   before.  What was his role in the project?

21      A.     It's hard to say.  He held the safety meetings every

22   Monday.  He's the one who held that.  He held, how do you

23   say?  If you needed personal protection equipment - ear

24   plugs, hard hats, vests - he was the one to see.  It's hard

25   to say what his position was.  He'd be there a lot when we

*February 7, 2007:  Mr. James S. Yee*

1    A.    No, I don't.

2    Q.    Did you ever see Dennis Clark talk to anybody about

3    you?  See or hear him talk to anybody about you?

4    A.    Not that I recall, no.  I usually don't try to

5    listen to something that I don't even know what's going on.

6    I'm always too busy working, finding something to do.

7    Q.    Did you ever see Clark report to CalPac employees?

8    A.    Report?

9    Q.    Yeah.  I mean, discuss anything with CalPac

10   employees?

11   A.    I see him talking to CalPac employees.

12   Q.    And do you know what they talked about?

13   A.    I'm usually too far to even hear.

14   Q.    Were you ever a witness to any conversations between

15   Dennis Clark and anyone at CalPac?

16   A.    Usually, I'm on a piece of equipment and I don't

17   usually want to stop and listen to what they're talking

18   about.  I'd rather not.  I don't remember, no.  It's not how

19   I am.

20   Q.    Now, we talked about two times in which you claim

21   Dennis Clark made a statement referring to you as an island

22   monkey; is that correct?

23   A.    Correct.

24   Q.    And is that the basis for your complaint?  I mean,

25   is that a basis of your complaint for discrimination?

*February 7, 2007:  Mr. James S. Yee*

1    Q.   But did your duties stay the same?

2    A.   As in?

3    Q.   What you did everyday?

4    A.   Yeah, there was a lot of work that had to be done.

5    Q.   Okay.  And did your pay stay the same?  Did your pay

6    ever go down after the statements were made?

7    A.   No, it stayed exactly where it was.

8    Q.   Did you ever hear Dennis Clark talk about any other

9    CalPac employee?

10   A.   I don't recall right now.  I can't remember anything

11   right now.  It was mostly about the work.  It was a lot about

12   make sure that the pipes are 24 inches underneath, make sure

13   that's encased in concrete.  That was it.  Just make sure

14   there's concrete over those pipes.  That's it.  I never

15   really heard him talk about any other employee.  Like I said,

16   I didn't really like hanging around.

17   Q.   I'm sorry?

18   A.   I really didn't like hanging, being around.

19   Q.   Okay.  I'm not sure if I understood.  So you never

20   heard him say anything about any other CalPac employee?

21   A.   No, I don't remember.

22   Q.   You no longer work at CalPac; is that correct?

23   A.   Correct.

24   Q.   And do you know who terminated you?

25   A.   Bill Ward, I remember.

*February 7, 2007:  Mr. James S. Yee*

1  Quintanilla one of the pets?

2      A.   I wouldn't know.  It didn't bother me if he was, as

3  long as he told me what to do and just stayed out of my way

4  while I did it.

5      Q.   So you didn't really care who the pets were then is

6  what you're saying?

7      A.   As long as it didn't affect me, because I know what

8  I'm capable of doing and I'm good at what I do, so -- I would

9  say that I was one of the only operators there.  There wasn't

10  much of what I can do -- anybody who knew what I can do, so I

11  had a lot of one-on-ones with the supervisors because I was

12  the only operator.

13      Q.   Getting back to your co-employees of CalPac.  Did

14  you get the impression that they didn't like the way Dennis

15  Clark was acting?

16      A.   None of us liked the way he would treat us, address

17  us.

18      Q.   All CalPac employees?

19      A.   (No response.)

20      Q.   Would that be correct?

21      A.   In a way, yes, because you're on a job site, you

22  come out with no vest and we have to wear a vest, you come

23  out with no hard hat, we have to wear a hard hat.  We expect

24  the same from you.  Safety is safety.

25      Q.   Dennis Clark is not from Guam; correct?

*February 7, 2007:  Mr. James S. Yee*

 1  care for MCI.

 2      Q.   Why didn't you put Dynamic Tech if you thought that

 3  was his employer?

 4      A.   Why would he care so much for MCI?  He was doing

 5  more for MCI than he was for Dynamic Tech, wasn't he?  He was

 6  watching over our job.

 7      Q.   Okay.  So that's why you wrote MCI?

 8      A.   Yeah, because he's pretty much representing them.

 9  He's looking out for MCI on this job.  Because this wasn't

10  Dynamic Tech's job, was it?

11      Q.   I don't know.  I'm asking you the questions.

12      A.   Dynamic Tech was involved but it's more the money

13  coming from MCI is what I see.  Everything we put in was MCI.

14      Q.   It was for MCI?

15      A.   Yeah.

16      Q.   It would benefit MCI?

17      A.   Well, this was MCI's ring.  It was their

18  communication ring.

19      Q.   Did you feel that Dennis Clark was displeased with

20  your work?

21      A.   I wouldn't know.  Seriously, I'm good at what I do,

22  so I'm sure -- I didn't hear any complaints even from Don or

23  those guys so I'm sure he liked it.  I'm not sure.  I didn't

24  hear anything.

25      Q.   Do you feel he was impressed with your work?

*February 7, 2007:  Mr. James S. Yee*

# REPORTER'S CERTIFICATE

DISTRICT COURT OF GUAM    )

       I, Veronica F. Reilly, Certified Shorthand Reporter, hereby certify that James S. Yee personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 111, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

       Witness my hand at Barrigada, Guam, this 22nd day of February 2007.


_____/S/_____
Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter