ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375


**FILED**
DISTRICT COURT OF GUAM

JAN 0 8 2008

**JEANNE G. QUINATA**
**Clerk of Court**

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Admitted *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555

*Attorneys for Defendant Dynamic Technical Services*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br>**DEFENDANT DYNAMIC TECHNICAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF TEDDY B. CRUZ; MEMORANDUM IN SUPPORT OF MOTION; DECLARATION OF ELYZE J. MCDONALD; EXHIBITS A-E; DECLARATION OF SERVICE** |

ORIGINAL

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz                Page 1 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037     Document 481     Filed 01/08/2008     Page 1 of 34

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

COMES NOW Dynamic Technical Services (hereinafter referred to as "DTS"), Defendant in the above entitled and numbered action and, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, files this Motion for Summary Judgment as to all claims asserted by Plaintiff Teddy B. Cruz (hereinafter referred to as "Plaintiff"). This motion is made upon the attached memorandum, the record in this case, including without limitation the exhibits attached and filed contemporaneously herewith, and argument presented by counsel at the hearing.

WHEREFORE, PREMISES CONSIDERED, Defendant Dynamic Technical Services respectfully requests this court to enter and order dismissing all of Plaintiff Teddy B. Cruz's claims against DTS and for such further relief to which DTS shows itself justly entitled.

DATED this 8th day of January, 2008.

CARLSMITH BALL LLP

ELYZE J. MCDONALD
Attorneys for Defendant
Dynamic Technical Services

---

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz                    Page 2 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037     Document 481     Filed 01/08/2008     Page 2 of 34

# INDEX OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)                     6

*Anderson v. Pacific Maritime Assoc.*, 336 F.3d 924 (9th Cir. 2003)        12

*Association of Mexican-American Educators v. California*,
231 F.3d 572 (9th Cir. 2000)                                               12-13

*Bonnette v. California Health and Welfare Agency*, 704 F.2d
1465 (9th Cir. 1983)                                                       8

*Bristol v. Bd. of County Comm'rs,* 312 F.3d 1213 (10th Cir. 2002)         9

*British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare
Fund*, 882 F.2d 371 (9th Cir. 1989)                                        7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)                            6-7

*Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 123
S.Ct. 1673, 155 L.Ed.2d 615 (2003)                                         9

*Dominguez-Curry v. Nevada Transp. Dept*, 424 F.3d 1027 (9th Cir. 2005)    15

*E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003)       8-9, 12

*Faragher v. City of Boca Raton,* 524 U.S. 775 (1998)                      14, 17

*Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983)        11, 13

*Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004 (D.Minn. 2003)       16

*Graves v. Lowery,* 117 F.3d 723 (3d Cir. 1997)                            9

*Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)           18

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)                        14, 17

*Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980)        11

*McZeal v. City of Seattle*, 2006 WL 3254504 (W.D.Wash. 2006)              15

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986)                  15

---

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz          Page 3 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037     Document 481     Filed 01/08/2008     Page 3 of 34

*Merrick v. Farmers Ins.*, 892 F.2d 1434 (9th Cir. 1990)    18

*NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117 (3d. Cir. 1982)    8

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)    15

*Rivas v. Federacion de Asociaciones Pecuarias,* 929 F.2d 814 (1st Cir. 1991)    9

*Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971)    15

*Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d 385 (D.Conn. 2003)    16

*Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973)    10, 13

*Silver v. KCA, Inc.*, 586 F.2d 138 (9th Cir. 1978)    15, 18

*Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350 (11th Cir. 1994)    9

*Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067 (C.D.Cal. 2002)    8

**Statutes**

42 U.S.C. § 2000e(b)    7

42 U.S.C. § 2000e(f)    7

**Rules**

Federal Rule of Civil Procedure 56    6

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz    Page 4 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037    Document 481    Filed 01/08/2008    Page 4 of 34

## MEMORANDUM IN SUPPORT OF MOTION FOR
## SUMMARY JUDGMENT AGAINST PLAINTIFF TEDDY B. CRUZ

### I.
### GROUNDS FOR MOTION

Defendant DTS brings this Motion for Summary Judgment against Plaintiff Teddy B. Cruz on the following grounds:[1]

A) Defendant DTS was not an "employer" of Plaintiff Teddy B. Cruz as defined by Title VII of the Civil Rights Act of 1964 and cannot be subject to liability under the statute.

B) There was no hostile work environment based upon the uncontroverted evidence.

C) DTS did not have any knowledge of any alleged discrimination.

To the extent co-defendant Calpac asserts there was no hostile work environment, DTS hereby joins in such motion.

### II.
### SUMMARY JUDGMENT EVIDENCE

Defendant relies on the following exhibits, attached to this motion and incorporated by reference as if fully set forth herein:

A) Selected pages of the deposition of Plaintiff Teddy B. Cruz;
B) Selected pages of the deposition of John Healy;
C) Affidavit of Dennis P. Clark;
D) Affidavit of Linda Hayes; and
E) Selected pages of the deposition of Jesse B. Cruz.

### III.
### FACTUAL BACKGROUND

Plaintiff Teddy B. Cruz filed this lawsuit along with twelve other plaintiffs on December 12, 2005. The Plaintiff filed his Second Amended Complaint on September 7, 2007. All of

---

[1] In Plaintiff's Second Amended Complaint, the Plaintiff does not make any retaliation claims against DTS for wrongful termination. Plfs' 2nd Am. Complaint ¶ 198.

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz      Page 5 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037     Document 481     Filed 01/08/2008     Page 5 of 34

Plaintiff's claims are brought under Title VII of Civil Rights Act of 1964. The Plaintiff was employed by Defendant Calpac from February 2004 through May 2005. Ex. A. at p. 18, ll. 7-9; p. 12-13, ll. 23-25 and 1. During the course of his employment for Calpac, he worked on a construction project for MCI. Dennis Clark was the MCI "company representative" on this project and was an employee of DTS. Ex. C at ¶ 3. The Plaintiff alleges that Mr. Clark made discriminatory remarks in the presence of the Plaintiff on two occasions. Ex. A at pp. 23-24, ll. 21-25 and 1-6. The Plaintiff did not complain to anyone at DTS about the statements Dennis Clark allegedly made and no one at DTS became aware of Plaintiff's complaints until late December 2004 when Dennis Clark informed DTS of the existence of public protesters who were alleging that he made discriminatory comments. Ex. D at ¶ 9. Based upon these alleged statements made by Mr. Clark, the Plaintiff has filed the instant lawsuit seeking to recover damages from DTS under Title VII for hostile work environment.

## IV.
## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), a court should grant summary judgment when, viewing the evidence in the light most favorable to the nonmoving party, the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz                    Page 6 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037       Document 481       Filed 01/08/2008       Page 6 of 34

judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. Pro. 56(e). However, it is not necessary for the party moving for summary judgment to introduce evidence that negates the plaintiff's claim. *Celotex*, 477 U.S. 258, 323. Instead, the moving party may show in it motion that there is no evidence to support an essential element of the non-moving party's claim. *Id.* at 325. According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party: (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible. *British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989).

## V.
## ARGUMENTS & AUTHORITIES

A.    **DTS is not an "employer" of Plaintiff and cannot be liable under Title VII**

In order to be subject to liability for a hostile work environment[2] under Title VII, a defendant must be an "employer" as the statute defines that term. An "employer" is a "person engaged in an industry affecting interstate commerce who has fifteen or more employees..." 42 U.S.C. § 2000e(b). An employee is an "individual employed by an employer." 42 U.S.C. § 2000e(f). In the present case, it is uncontested that Calpac, not DTS, was the direct employer of the Plaintiff. Ex. A at p. 88, ll. 16-17; Ex. B at p. 88, ll. 18-23.

---

[2] Defendant expressly denies that Plaintiff was subjected to a hostile work environment as a matter of law. This topic is fully addressed in Section V.B. of this memorandum.

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz                    Page 7 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037    Document 481    Filed 01/08/2008    Page 7 of 34

## 1. Defendant DTS is not liable under Title VII as a joint employer.

"Two or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment of the employee. *Swallows* [*v. Barnes & Noble Book Stores, Inc.*], 128 F.3d [990], 993 n. 4 [(6th Cir. 1997)] (citing *NLRB v. Browning-Ferris Indus. of Pa.*, 691 F.2d 1117, 1123 (3d. Cir. 1982))." *Wynn v. Nat'l Broad. Co.*, 234 F.Supp.2d 1067, 1093 (C.D.Cal. 2002). In order to determine whether a joint employment relationship exists, the Ninth Circuit applies an "economic reality" test. *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983). Under that test, this court should consider all factors relevant to a particular situation when evaluating the economic realities of a relationship. *Id.* In determining joint employment, a large collection of factors has been suggested from the judiciary and governmental agencies. *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270, 1275 (9th Cir. 2003).

When determining if a joint employer relationship exists, the Third Circuit has explained it is a matter of determining which of the two, or whether both, of the parties control, in the capacity of employer, the labor relations of a given group of workers. *Browning-Ferris Indus. of Pa.*, 691 F.2d at 1122-23 (citing *NLRB v. Condenser Corp. of America*, 128 F.2d 67, 70 (3d Cir. 1942)). "The 'joint employer' concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment." *Id.*

The Supreme Court has summarized the various factors as to what it means to be an employer: "As the EEOC's standard reflects, an employer is the person, or group of persons, who owns and manages the enterprise. The employer can hire and fire employees, can assign tasks to employees and supervise their performance, and can decide how the profits and losses of

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz                    Page 8 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037    Document 481    Filed 01/08/2008    Page 8 of 34

the business are to be distributed." *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440, 450, 123 S.Ct. 1673, 1680, 155 L.Ed.2d 615 (2003). The Ninth Circuit opined that the "Supreme Court seems to suggest that the *sine qua non* of determining whether one is an employer is that an 'employer' can hire and fire employees, can assign tasks to employees and supervise their performance." *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d at 1277 (citing *Clackamas*, 123 S.Ct. at 1680). "Logically, before a person or entity can be a joint employer, it must possess the attributes of an employer to some degree." *Id.* Numerous courts consider the key to joint employment to be the right to hire, supervise and fire employees. *See Bristol v. Bd. of County Comm'rs*, 312 F.3d 1213, 1219 (10th Cir. 2002) (en banc); *Graves v. Lowery*, 117 F.3d 723, 727-728 (3d Cir. 1997); *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1361 (11th Cir. 1994); *Rivas v. Federacion de Asociaciones Pecuarias*, 929 F.2d 814, 820-821 (1st Cir. 1991).

In *E.E.O.C. v. Pacific Maritime Assoc.*, a Title VII sexual harassment action was brought against Pacific Maritime Association ("PMA"). 351 F.3d 1270 (9th Cir. 2003). PMA is an association of stevedoring companies ("member-employers") that performed organizational tasks on behalf of its members, negotiated a collective bargaining agreement, operated a dispatch hall jointly with a union, and provided payroll services for its members. *Id.* at 1274. The plaintiff alleged that, along with the member-employer of PMA that hired her, PMA was a joint employer of her. However, the Ninth Circuit found that PMA did not supervise the longshoremen, had no power to hire or fire longshoremen, had no power to discipline longshoremen, and did not supervise the work sites. The court found that it was undisputed that the monitoring and control over the work sites, as well as the control of the employees, was within the sole province of the member-employees. Accordingly, the Court held that PMA was not a joint employer of the plaintiff. *Id.* at 1274.

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz     Page 9 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037    Document 481    Filed 01/08/2008    Page 9 of 34

Similarly, in the present case, DTS had no authority to hire or fire Calpac employees, did not supervise Calpac employees or give them work assignments, had no power to discipline Calpac employees, did not determine wages or benefits of Calpac employees, and did not decide how profits or losses of Calpac were to be distributed. *See* Exhibits C at ¶¶ 5-7 and D at ¶ 13. John Healy, the President of Calpac, testified that he did not have any communications with anyone at DTS prior to receiving the first EEOC complaint. Ex. B at p. 85, ll. 18-23. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Mr. Healy also testified that Mr. Clark was not a supervisor of the plaintiffs, did not give out daily work assignments, and did not hire any of the plaintiffs. *Id.* at pp. 88-89, ll. 12-17, 9-20. Therefore, as a matter of law, this uncontroverted evidence establishes that DTS was not a joint employer of the Plaintiff with Calpac.

    **2.**    **Defendant DTS is not liable under Title VII as an indirect employer**

The D.C. Circuit first addressed indirect-employer liability in *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973). The hospital ran a nursing office where patients could request the service of a private duty nurse. The hospital would then contact outside referral sources and request a private nurse be sent to the hospital. The private nurses were employees of the patients, not the hospital. In *Sibley*, a male nurse alleged that on at least two occasions hospital nurses rejected him upon arrival because he was male and the requesting patient was female. The male nurse subsequently sued under Title VII for discrimination.

On appeal, the court noted that one of the goals of Title VII was to equalize access to job opportunities. *Id.* at 1340. The court held that Title VII did not explicitly require a direct employer-employee relationship, but it did not mean that no relationship was required for a claim

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz          Page 10 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037    Document 481    Filed 01/08/2008    Page 10 of 34

to fall under Title VII. The Court stated: "We think it is significant that [Title VII] has addressed the problems of interference with the direct employment relationship by labor unions and employment agencies-institutions which have not a remote but a highly visible nexus with the creation and continuance of direct employment relationships between third parties. On the facts as alleged...[the hospital] is so circumstanced, and its daily operations are of such a character as to have such nexus to the third parties in this case..." *Id.* at 1342.

The Ninth Circuit first addressed the issue of indirect-employer liability in *Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980). The court noted for Title VII to apply, "there must be some connection with an employment relationship" though the "connection...need not necessarily be direct." *Id.* at 883. The court explained "[t]his might occur where a defendant subject to Title VII interferes with an individual's employment opportunities with another employer." *Id.* at 883 n. 3.

The Ninth circuit addressed the issue again in *Gomez v. Alexian Brothers Hospital*, 698 F.2d 1019 (9th Cir. 1983). In this case, the plaintiff was a Hispanic physician working for a corporation named AES. On behalf of AES, the plaintiff submitted a proposal to the defendant to operate the hospital's emergency room. The hospital allegedly turned down the proposal because too many Hispanics worked for AES. *Id.* at 1020. The court reversed a summary judgment granted to the hospital on the basis that the plaintiff lacked standing under Title VII because he was an employee of AES, not the hospital, and AES would have only been an independent contractor for the hospital. *Id.* The court held that AES's potential status as an independent contractor did not mean that the hospital had not interfered with the relationship between AES and the plaintiff. *Id.* at 1021. Additionally, the court noted the perverse result that would occur if an employer were allowed to discriminatorily interfere with an individual's

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz                                    Page 11 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037        Document 481        Filed 01/08/2008        Page 11 of 34

employment opportunities with another employer, while it could not do so with its own employees. *Id.*

The issue of indirect-employer liability came before the court again in *Association of Mexican-American Educators v. California*, 231 F.3d 572 (9th Cir. 2000)(en banc). In this case, the plaintiffs, a class of prospective and current minority teachers, challenged the use of a skills test that was a prerequisite to employment in the public schools. *Id.* at 577. The plaintiffs alleged the test has a disparate impact on minorities. *Id.* at 578. The court found that Title VII covered the claims as the alleged discriminatory test interfered with future employment with public schools since it dictated whom the schools could hire. *Id.* at 581-82. The court emphasized that the ruling was based on the peculiar degree of control the state exercised over school districts because of the test. *Id.* at 581.

In *Anderson v. Pacific Maritime Assoc.*, the Ninth Circuit addressed the issue of whether the PMA could be liable under Title VII under indirect-employer liability. 336 F.3d 924 (9th Cir. 2003)(the PMA performed the same functions and duties as discussed in *E.E.O.C. v. Pacific Maritime Assoc.*, 351 F.3d 1270 (9th Cir. 2003), *supra*). The plaintiffs in the suit were African-American workers employed on the waterfront in Seattle and Tacoma. The plaintiffs alleged a "horrific and pervasive picture of racial animosity and discrimination" on the waterfront. *Id.* at 926. The allegations included the common use of racial slurs, racial innuendos, and racial jokes on the docks and well as the uses of racial slurs in the training materials. The plaintiffs also alleged direct, racially charged physical threats. *Id.*

The court held that the PMA could not be liable under Title VII. The court found that the alleged hostile work site was not controlled by the PMA and the PMA did not employ or supervise the plaintiffs or the alleged harassers. *Id.* at 931. "*Sibley* and its progeny extended

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz      Page 12 of 23
4848-5520-1282.1 059759-00001
Case 1:05-cv-00037    Document 481    Filed 01/08/2008    Page 12 of 34

Title VII coverage to indirect employers when those employers discriminated against *and* interfered with the employees' relationship with their employees." *Id.* (emphasis added). PMA did not interfere with the plaintiffs' relationship with their employers since it was the employers who allowed the allegedly hostile work environment. *Id.* "*Sibley* and its Ninth Circuit progeny condone liability when there exists discriminatory 'interference' by the indirect employer *and* where the indirect employer had some peculiar control of the employee's relationship with the direct employer." *Id.* at 932 (emphasis added).

In the present case, there was no discriminatory interference by DTS and DTS had no control over the Plaintiff's relationship with Calpac. In fact, none of the above-referenced cases lends support for a finding of indirect employer liability in this case. In *Sibley*, the hospital refused to allow the male nurse to see the patient; in *Gomez*, the hospital refused to hire the company with Hispanic doctors; and in *Association of Mexican-American Educators*, the state required the job applicants to take the test with the disparate impact on minorities. In all of the referenced cases, the "indirect employer" interfered with the employment relationship between the employee and direct employer. DTS did not have any control over the employment relationship between the Plaintiff and Calpac. DTS did not have the power to hire or fire employees, discipline employees, assign work assignments to employees, promote or demote employees, or perform employee evaluations. *See* Ex. C at ¶¶ 5-7 and D at ¶ 13. John Healy testified that Dennis Clark never tried to influence Calpac to take any action that would affect the manner in which any of the plaintiffs were treated and did not make any comments to anyone at Calpac regarding any of the plaintiffs. Ex. B. at p. 87, ll. 2-6 and 12-15. He further testified that Mr. Clark never communicated to Calpac or attempted to influence Calpac to terminate any of the plaintiffs in this case. *Id.* at pp. 86-87, ll. 15-20 and 16-19. Furthermore, Healy testified that

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz                                    Page 13 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037     Document 481     Filed 01/08/2008     Page 13 of 34

Clark and DTS never interfered in the relationship between Calpac and any of the Plaintiffs. Ex. B. at p. 92, ll. 16-24.

Additionally, the work site involved in this lawsuit was not one that was controlled by DTS. Ex. D at ¶ 7. The worksite in question was a MCI worksite. Dennis Clark reported directly to MCI and took all work directives from MCI. DTS did not have any power to control the worksite, conduct any investigations on the worksite, or implement any rules for the worksite. *Id.* All of these functions were reserved to MCI. DTS did not even have the authority to remove Dennis Clark from the project. *Id.* at ¶ 6.

## B. Plaintiff's allegations do not amount to a hostile environment as a matter of law

Regardless of DTS' status as an "employer" under Title VII, the Plaintiff has failed to establish a claim for hostile work environment. A plaintiff may bring a lawsuit under Title VII for hostile work environment based upon racial or national origin harassment. To establish the existence of a hostile work environment plaintiff must prove that the workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(internal citations and quotation marks omitted). The hostile environment must be one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. *Id.* at 21-22. The Supreme Court in *Harris* held that the courts should look to the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance." *Id.* at 23. The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of*

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz                    Page 14 of 23
4848-5520-1282.1 059759-00001
Case 1:05-cv-00037        Document 481        Filed 01/08/2008        Page 14 of 34

*Boca Raton,* 524 U.S. 775, 787 n. 1 (1998)(internal citation and quotation marks omitted). Judicial standards for harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment for the purposes of a Title VII hostile environment claim. *Dominguez-Curry v. Nevada Transp. Dept*, 424 F.3d 1027 (9th Cir. 2005).

The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Not all workplace conduct that could be labeled as harassment affects a "term, condition, or privilege" of employment within the meaning of Title VII. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). "The 'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to sufficiently significant degree to violate Title VII." *Id.* (citing *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971), cert. denied, 406 U.S. 957 (1972)).

The Western District of Washington held that the use of the phrase "Driving Miss Daisy" several times in the presence of an African-American worker and referring to another African-American driving a Caucasian within a two month period were not sufficient to create a racially hostile environment. *McZeal v. City of Seattle*, 2006 WL 3254504, at *5 (W.D.Wash. 2006). The court found that the comments were not so frequent or severe as to constitute a racially hostile work environment. *Id.* Furthermore, the Ninth Circuit found the use of the phrase "jungle bunny" in reference to an African-American did not create a hostile environment. *Silver*

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz          Page 15 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037     Document 481     Filed 01/08/2008     Page 15 of 34

*v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978). The court commented that while the remark was a racially derogatory slur, it was not the sort of conduct to which Title VII was enacted to prohibit. *Id.* The court also observed that Title VII was not directed at ending all discrimination by individuals, but the eradication of discrimination by employers against employees. *Id.*

Additionally, the District Court of Connecticut found that isolated racially offensive comments did not create a hostile and abusive environment. *Sanchez v. University of Connecticut Health Care*, 292 F.Supp.2d 385, 396 (D.Conn. 2003)(complained of comments included: (1) coworker wished a hurricane over Puerto Rico would wipe out island and that "we could do without those people;" (2) "they should put Puerto Ricans on a plane and send them back to Puerto Rico;" and, (3) a nurse's negative comments that black and Puerto Rican patients were "low life pieces of shit, scum sucking dogs and welfare recipients). The District of Minnesota found that the use of the terms like "fag," "wimp," "sissy," "useless," "worthless," and "spic" failed to support a plaintiff's claim of hostile work environment based upon national origin and disability. *Gonzalez v. City of Minneapolis*, 267 F.Supp.2d 1004, 1015 (D.Minn. 2003).

In the present case, the Plaintiff testified that there were two incidents where Dennis Clark allegedly referred to a group of Calpac workers as "island monkeys" or "monkeys." Ex. A at pp. 23-24, ll. 21-25 and 1-6. Mr. Cruz was employed with Calpac from February 2004 through May 2005, a period of approximately fifteen months. Ex. A. at p. 18, ll. 7-9; p. 12-13, ll. 23-25 and 1. Plaintiff alleges that, over the course of fifteen months of employment, two isolated statements were allegedly made by Mr. Clark. As a matter of law, this fails to amount to a hostile and abusive work environment according to the factors set out by the Supreme Court in *Harris*. The alleged discriminatory conduct was infrequent and not physically threatening, but

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz                    Page 16 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037      Document 481      Filed 01/08/2008      Page 16 of 34

rather a mere offensive utterance. Furthermore, if it is assumed that the two alleged statements were made, they did not unreasonably interfere with the Plaintiff's work performance. The Plaintiff testified that after the two alleged statements were made, he immediately returned to working. Ex. A. at p. 95, ll. 11-12; p. 99, ll. 5-6. Furthermore, the Plaintiff never received any complaints about his work. Ex. A at p. 89, ll. 17-20. According to the Plaintiff's testimony, the only instances of alleged discriminatory statements made by Clark occurred in September and October 2004.[3] Ex. A. at p. 23, ll. 21-25. Thus, Mr. Cruz concedes that he did not encounter any discriminatory comments during the at least the last six to seven months of his employment on the job. When looking at the "totality of the circumstances," the two alleged instances of racial slurs over the course of fifteen months were not "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. By his own testimony, the alleged remarks were not more than episodic and were not "sufficiently continuous and concerted in order to be deemed pervasive." *Farragher*, 524 U.S. at 787 n. 1. Therefore, DTS is entitled to summary judgment against Plaintiff on his Title VII causes of action.

## C. DTS did not have any knowledge of any alleged discrimination and cannot be held liable under Title VII

In the unlikely event that the court finds that DTS is an "employer" of the Plaintiff under Title VII and that Plaintiff has established a hostile environment claim, DTS cannot be held liable for the alleged actions of Clark because it did not have actual or constructive knowledge of the alleged discriminatory conduct. DTS was not made aware of any alleged discriminatory conduct by Dennis Clark until it was notified by Clark about the protesters which occurred in late

---

[3] Despite Mr. Cruz's allegations of a racially hostile environment in September and October 2004, he asked his bother, Jesse Cruz, if he wanted to come back to work at Calpac in October 2004. Ex. E at p. 10, ll. 13-16 and p. 13, ll. 3-10.

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz                    Page 17 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037     Document 481     Filed 01/08/2008     Page 17 of 34

December 2004. Ex. D at ¶¶ 9-11. The Plaintiff did not make any complaints to DTS. Ex. A at p. 102, ll. 3-5. There is no evidence, as none exists, that DTS had actual knowledge of Clark's alleged discriminatory statements until the EEOC complaint was received. Additionally, there are no allegations of harassment following the time of the protest or the time the complaint was received by DTS. In fact, according to the testimony of the Plaintiff, there had been no incidents of alleged harassment in the two to three months preceding the protests on Guam.

An employer cannot be held liable for the harassment of an employee unless the employer both knows of it and fails to take remedial action. *Silver v. KCA, Inc.*, 586 F.2d 138, 142 (9th Cir. 1978). This even holds true when there is a continuing course of harassment from an employee. *Id.* Occasional, sporadic remarks that occur in the workplace do not impose Title VII liability upon the employer. *Greene v. Teledyne Electronics*, 1991 WL 113212 (9th Cir. 1991)(citing *Merrick v. Farmers Ins.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990). In *Greene*, the plaintiff's claim of a hostile work environment rested upon four instances of offensive language. The plaintiff reported one incident and racial harassment ceased from that time forward. The court held that the case was properly dismissed as against the employer and that the claim may have had substance if the employer knew of the conduct and failed to take action. *Id.*

In the present case, DTS did not learn of any allegations of discriminatory remarks until Mr. Clark informed DTS of the presence of the protesters in late December 2004, approximately four months after the last alleged discriminatory comment was allegedly made by Clark, according to the Plaintiff. Ex. D at ¶ 9. The Plaintiff's EEOC Notice of Charge of Discrimination was not sent to DTS until February 24, 2005. Since DTS was not aware of the alleged harassment, it cannot be held liable under Title VII. *See Silver*, 892 F.2d at 1438-39.

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz      Page 18 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037    Document 481    Filed 01/08/2008    Page 18 of 34

Additionally, immediately upon learning that there were allegations that he had engaged in discriminatory conduct, Mr. Clark spoke at a meeting of Calpac employees and informed them that he did not make any such comments and would not discriminate against anyone based upon their Chamorro heritage. Mr. Clark informed DTS of this meeting and what he stated to the Calpac employees. There have been no allegations of discriminatory conduct by Clark or DTS subsequent to this meeting. In fact the Plaintiff does not make any allegations of any comments by Clark for approximately the previous two months leading up to this meeting. There has not been one complaint of discriminatory comments by Clark subsequent to DTS learning of the Plaintiff's allegations in the EEOC complaint. *See* Ex. D at ¶¶ 9-11. Therefore, the Plaintiff cannot complain of any failure by DTS to take action after it acquired knowledge of the Plaintiff's complaints. DTS cannot be held liable under Title VII because: (1) DTS did not have any knowledge of Plaintiff's allegations prior to him filing a complaint with the EEOC and (2) once DTS became aware of the complaints, immediate remedial action was taken and no subsequent discriminatory acts have been alleged by Plaintiff.

## VI.
## CONCLUSION

DTS cannot be liable to Plaintiff under Title VII because: (1) DTS was not an employer of the Plaintiff as that term is defined under Title VII; (2) Based upon the Plaintiff's own testimony, he was not subjected to a hostile work environment for purposes of Title VII; and (3) DTS did not have actual or constructive knowledge of any of Plaintiff's complaints. For these reasons, DTS moves this Honorable Court to grant is Motion for Summary Judgment against Plaintiff Teddy B. Cruz.

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz          Page 19 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037     Document 481     Filed 01/08/2008     Page 19 of 34

DATED this 8th day of January, 2008.

CARLSMITH BALL LLP

_Elyze J mcdonald_

ELYZE J. MCDONALD
Attorneys for Defendant
Dynamic Technical Services

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz          Page 20 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037     Document 481     Filed 01/08/2008     Page 20 of 34

## DECLARATION OF ELYZE J. MCDONALD

I, Elyze J. McDonald, declare under penalty of perjury that the following statements are true and correct:

1.      I have personal knowledge of the facts stated in this declaration except as otherwise indicated.

2.      I would testify competently as to these facts if called upon by the Court.

3.      I am an attorney authorized to practice law in the territory of Guam and presently employed with the law firm of Carlsmith Ball LLP, attorneys for Defendant Dynamic Technical Services in the above-captioned action.

4.      This declaration is submitted in support of Defendant Dynamic Technical Services' Motion for Summary Judgment Against Teddy B. Cruz, filed on January 8, 2008.

5.      Defendant Dynamic Technical Services is a necessary and proper party Defendant in this action.

6.      Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Teddy B. Cruz as Exhibit "A" is a true and correct copy of the pertinent pages of the deposition testimony of Teddy B. Cruz.

7.      Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Teddy B. Cruz as Exhibit "B" is a true and correct copy of the pertinent pages of the deposition testimony of John T. Healy.

8.      Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Teddy B. Cruz as Exhibit "C" is a true and correct copy of the Affidavit of Dennis P. Clark the original of which has been previously filed with the Court.

9.      Attached to Defendant Dynamic Technical Services' Motion for Summary

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz                    Page 21 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037     Document 481     Filed 01/08/2008     Page 21 of 34

Judgment Against Teddy B. Cruz as Exhibit "D" is a true and correct copy of the Affidavit of Linda G. Hayes the original of which has been previously filed with the Court.

10.     Attached to Defendant Dynamic Technical Services' Motion for Summary Judgment Against Teddy B. Cruz as Exhibit "E" is a true and correct copy of the pertinent pages of the deposition testimony of Jesse B. Cruz.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and accurate to the best of my knowledge.

DATED:    this 8th day of January 2008 at Hagåtña, Guam.

*Elyze McDonald*

ELYZE J. MCDONALD

Motion for Summary Judgment Against Plaintiff Teddy B. Cruz                    Page 22 of 23
4848-5520-1282.1.059759-00001
Case 1:05-cv-00037     Document 481     Filed 01/08/2008     Page 22 of 34

# Exhibit A

## IN THE SUPERIOR COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA,
JR., JOSEPH J. HERNANDEZ, JOSEPH
T. MENDIOLA, LARRY L. CHARFAUROS,
ANTHONY C. ARRIOLA, ROBERT B.
CRUZ, JOHN L.G. NAUTA, and JOHN
P. BABAUTA,

               Plaintiffs,

        vs.

CALPAC, DYNAMIC TECHNICAL
SERVICES, MCI, JOHN HEALY, DENNIS
CLARK, WILLIAM WARD, JAI JAMES,
and DOES 1 through 10,

               Defendants.

CIVIL CASE NO. CIV05-00037

---

### DEPOSITION OF TEDDY B. CRUZ

*Taken on Behalf of Defendant CalPac*

BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of TEDDY B. CRUZ was taken before Cecille A. Flores, a Certified Shorthand Reporter, on Monday, the 16th day of April 2007, at 9:00 a.m. in the offices of Blair Sterling & Johnson, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

---

## APPEARANCES

Appearing on behalf of the Plaintiffs:

        LUJAN AGUIGUI & PEREZ
        Suite 300, Pacific News Building
        238 Archbishop Flores Street
        Hagatna, Guam 96910
        By: Ms. Delia S. Lujan, Esq.
        Phone: (671) 477-8064

Appearing on behalf of Defendant CalPac:

        BLAIR STERLING & JOHNSON
        Suite 1008, Pacific News Building
        238 Archbishop Flores Street
        Hagatna, Guam 96910
        By: Mr. Vincent E. Leon Guerrero, Esq.
        Phone: (671) 477-7857

Appearing on behalf of Defendant DTS:

        CARLSMITH BALL
        Suite 401, Bank of Hawaii Building
        134 West Soledad Avenue
        Hagatna, Guam 96910
        By: Ms. Elyze McDonald, Esq.
        Phone: (671) 472-6813

---

### INDEX

#### Examination

|                      | Direct | Cross |
|----------------------|--------|-------|
| By Mr. Leon Guerrero | 4      |       |
| By Ms. McDonald:     |        | 80    |
| By Ms. Lujan:        |        | None  |

#### EXHIBITS

| Description:                            | Page Marked: |
|-----------------------------------------|--------------|
| Exhibit A: Complaint for CalPac........ | 43           |
| Exhibit B: Complaint for MCI.......     | 44           |



COPY

---

```
 1                    TEDDY B. CRUZ,
 2  was thereupon called as a witness on behalf of Defendant
 3  CalPac, and after having been first duly sworn, was examined
 4  and testified as follows:
 5
 6                  DIRECT EXAMINATION
 7  BY MR. LEON GUERRERO:
 8      Q    Good morning, Mr. Cruz. Can you state your full
 9  name and spell your last name for the record?
10      A    Teddy B. Cruz. C-R-U-Z, Cruz.
11      Q    This is the deposition of Teddy B. Cruz in Civil
12  Case No. 05-00037 in the District Court of Guam, Van Meter
13  vs. CalPac, et al. Mr. Cruz, I imagine you talked to your
14  lawyer today or sometime before today and she explained
15  what's happening in a deposition?
16      A    Yes.
17      Q    So you know that we'll be asking you questions and
18  your answers are under oath and then after this deposition is
19  over it will be put in a booklet form and you'll have an
20  opportunity to review the booklet to make sure your answers
21  are correct. You can make corrections to your answers, but
22  if you make corrections to it then we can comment on those
23  corrections that you make. So if you don't understand the
24  question, just ask and we'll change it, okay? If you didn't
25  hear it, just tell me and I'll resay it, okay?
```

1    Q   What was that?

2    A   Retirement.

3    Q   So GMH contributes to your retirement?

4    A   Yeah.

5    Q   What else do you get?

6    A   I got annual leave, sick leave.

7    Q   What about medical benefits? Do you receive

8 anything from there?

9    A   No.

10    Q   They don't offer medical insurance?

11    A   For my common-law wife.

12    Q   Okay, what does that mean?

13    A   StayWell.

14    Q   Are you saying your common-law wife has medical

15 insurance?

16    A   Yes.

17    Q   And you receive medical insurance through your

18 common-law wife?

19    A   Yes.

20    Q   What's the name of your wife?

21    A   Carmen Samianilin.

22    Q   Can you spell that?

23    A   S-a-m-i-a-n-i-l-i-n.

24    Q   How long have you been with Miss --

25    A   Carmen?

---

1    Q   With Carmen.

2    A   13 years.

3    Q   And you've been receiving medical insurance through

4 Carmen's medical insurance?

5    A   Yeah.

6    Q   For the last 13 years?

7    A   Last three years.

8    Q   Prior to being put under Carmen's medical insurance

9 policy, did you have any medical insurance?

10    A   From CalPac when I was working at CalPac.

11    Q   CalPac provided medical insurance for you?

12    A   Yeah.

13    Q   Before your job at GMH, where were you employed at?

14    A   Cable Service.

15    Q   What was your position there?

16    A   Construction crew.

17    Q   Can you tell me the time that you were working

18 there?

19    A   When did I start or the month?

20    Q   Yes, when did you start and when did you end?

21    A   June.

22    Q   What year would that be?

23    A   That will be last year.

24    Q   June 2006?

25    A   2006.

---

1    Q   Okay.

2    A   I think all the way up -- I'm trying to think when.

3    Q   You don't have to be exact. Were you working there

4 for about a year?

5    A   No, not really a year.

6    Q   Over six months?

7    A   Less than six months.

8    Q   Over a month?

9    A   About two months.

10    Q   So approximately July, August of 2006?

11    A   Yeah.

12    Q   I notice in your Complaint that you say you were

13 terminated from CalPac in May 2005.

14    A   Yeah.

15    Q   So you were out of a job for one year?

16    A   No, just only about maybe a month then I went to

17 Cable Service.

18    Q   You started working at Cable Services in 2005?

19    A   I think so, yeah. 2005.

20    Q   So that be would June 2005?

21    A   June.

22    Q   When did you start working at GMH?

23    A   I start working GMH April 20.

24    Q   April 20, 2006?

25    A   Yeah, 2006.

---

1    Q   Wait a minute. I'm a little confused here. You

2 started working at GMH in April 2006?

3    A   (Witness nodded head.)

4    Q   Okay. So what did you do from August 2005 through

5 April 2006? Were you employed?

6    A   I stayed home for a while.

7    Q   Why did you quit Cable Services?

8    A   I got a better offer at GMH.

9    Q   That's why I'm confused. I think you said you

10 stopped working in August of 2005 for Cable Services,

11 correct?

12    A   Yeah.

13    Q   And then you say you started working for GMH around

14 April of 2006?

15    A   Six.

16    Q   So that would give you --

17    A   No, take that back. April -- same year.

18    Q   April of 2005?

19    A   Yeah.

20    Q   So you were working at GMH and Cable Services at the

21 same time?

22    A   No, one at a time.

23    Q   We'll start all over again. You were terminated or

24 you were laid off or you quit your employment from CalPac

25 around May 2005, correct?

1    A    Yeah.
2    Q    I mean, that's what it says in your Complaint unless
3 you want it make changes to your Complaint.
4    A    No, May.
5    Q    So may 2005.  Give me your work employment history
6 from May 2005.
7    A    A month later I worked for Cable Service.
8    Q    So that would be June 2005, correct?
9    A    Yeah.
10   Q    And then how long did you work there?
11   A    About three months.
12   Q    Then shortly after you left Cable Services you went
13 to GMH?
14   A    Straight after.
15   Q    Started working for GMH around August 2005?
16   A    Five.
17   Q    How much were you making at Cable Services Group?
18   A    Six some.
19   Q    What about benefits?  Did you receive any of those?
20   A    Nothing.
21   Q    No medical insurance?
22   A    No.
23   Q    Or retirement?
24   A    No.
25   Q    Who hired you at Cable Services?

1    A    Don Harper.
2    Q    Was he the person that hired you at CalPac?
3    A    Yeah.
4    Q    Do you receive increments while you were working at
5 GMH?
6    A    No.
7    Q    I'm sorry?
8    A    No.
9    Q    Before your employment at CalPac, what was the last
10 job that you had?
11   A    Guam Cold Storage.
12   Q    What were you doing there?
13   A    I was the Operations Manager.
14   Q    How much were you making there?
15   A    I was making only like 9.
16   Q    How long did you work there?
17   A    Four years.
18   Q    Why did you leave Guam Cold Storage?
19   A    Business went out of -- company closed down.
20   Q    Before Guam Cold Storage, where were you working at
21 the last job?
22   A    Jay Hoop.
23   Q    Can you spell that?
24   A    J-A-, Hoop, H-O-O-P.
25   Q    Jay Hoop?

1    A    (Witness nodded head.)
2    Q    What was your job there?
3    A    Is a warehouse driver.
4    Q    What does that mean?
5    A    Delivering merchandise to stores.
6    Q    What kind of vehicle were you using?
7    A    Van.
8    Q    Before that, what were you doing?
9    A    Huh?
10   Q    What was the last job before Jay Hoop?
11   A    Choi's Equipment Rental.
12   Q    What was your position there?
13   A    Service mechanic.
14   Q    How much were you making there?
15   A    Five some.
16   Q    You were making 5-some an hour as a mechanic?
17   A    (Witness nodded head.)
18   Q    How much were you making at Jay Hoop?
19   A    Six.
20   Q    How long did you work at Jay Hoop?
21   A    About a year.
22   Q    How long did you work at Choi's Equipment Rental?
23   A    About four years.
24   Q    Why did you leave Jay Hoop?
25   A    Better opportunity.

1    Q    That would have been Guam Cold Storage?
2    A    Cold Storage.
3    Q    Why did you leave Choi's Equipment Rental?
4    A    Company closed down.
5    Q    We're here because of a lawsuit that you joined in
6 or you're a co-plaintiff with Mr. Van Meter and the rest of
7 the group, right?
8    A    Yes.
9    Q    First of all, do you know who Henry Van Meter is?
10   A    Co-worker of us.
11   Q    That would have been at CalPac, correct?
12   A    Yeah.
13   Q    All the co-plaintiffs are co-workers with you?
14   A    Yeah.
15   Q    Did you know all of them?
16   A    Yes.
17   Q    Do you keep in touch with any of them?
18   A    Not really.
19   Q    Why is that?
20   A    I'm busy working at nights.
21   Q    Do you ever talk to them about what's going on in
22 the lawsuit?
23   A    No.
24   Q    Have you looked at any of the deposition transcripts
25 that have been prepared so far?

```
 1    A   Yes.
 2    Q   Which ones have you looked at?
 3    A   The one they just gave us.
 4    Q   Which one was that?  What's the name?
 5        (No response.)
 6    Q   Did you look at Mr. Van Meter's transcript?
 7    A   No, I looked at mine.
 8    Q   Your transcript?
 9    A   Yeah.
10    Q   Are you talking about the Notice of Deposition?  Is
11  that what you're referring to?
12    A   It's something like this.
13    Q   But you didn't look at any transcripts, any booklets
14  that showed questions and answers?
15    A   No.
16    Q   Did you review any documents before you came in
17  besides what you just referred to?
18    A   That's all.
19    Q   Okay.  Did you look at the Complaint before you came
20  in?
21    A   Yes.
22    Q   This is the Complaint filed in the District Court,
23  correct?
24    A   Yeah.
25    Q   What about your EEO complaint filed with the EEO
```

```
 1  office?  Did you look at that?
 2    A   I got that copy.
 3    Q   I want to just start with your Complaint.  I'm going
 4  to refer to Paragraph 152.  Do you want to look at it?  Take
 5  a look at Paragraph 152 and then once you find it can you
 6  just read it for the record?
 7    A   Paragraph 152, "Cruz was hired by CalPac in or
 8  around February 2004 for a construction project underground
 9  cable for Guam MCI."
10    Q   So you were hired by CalPac to do work on the MCI
11  project, correct?
12    A   Yes.
13    Q   That was the installation project for MCI?
14    A   Yes.
15    Q   Don Harper hired you on that one?
16    A   Yeah.
17    Q   Did you know Don Harper, by the way, before that?
18    A   No.
19    Q   What did Mr. Harper tell you when he hired you?
20    A   We will be installing fiber optic for MCI.
21    Q   Had you worked on construction before CalPac?
22    A   Only for Choi's Equipment Rental.
23    Q   Would Choi's Equipment Rental be considered
24  construction?  I don't know, I'm just --
25    A   It's a rental equipment.
```

```
 1    Q   But they would do construction work kind of stuff?
 2    A   They rent out some equipment.
 3    Q   Who suggested that you apply at CalPac?
 4    A   Say that over again.
 5    Q   Who referred you to CalPac?
 6    A   My --
 7    Q   If you can remember.
 8    A   My brother Robert.
 9    Q   So Robert was working at CalPac before you started
10  working there?
11    A   Yeah.
12    Q   Is Robert Cruz the same Robert Cruz that is involved
13  in this lawsuit?
14    A   Yes.
15    Q   Have you talked to your brother about this lawsuit?
16    A   Not really.
17    Q   When was the last time you talked to him about this
18  lawsuit?
19    A   I can't remember.
20    Q   Do you talk often to your brother?
21    A   Not really.
22    Q   You don't get together at family --
23    A   Not that often.
24    Q   When was the last time you got together with him
25  then?
```

```
 1    A   About last week.
 2    Q   Was that for a party?  A family party?
 3    A   Family barbecue.
 4    Q   Do you know when he's going to be deposed?
 5    A   No, I don't.
 6    Q   Do you know what his Complaint in this lawsuit is?
 7    A   No, I didn't read his part.
 8    Q   When you filed your Complaint with the District
 9  Court, did you talk to your brother about the Complaint?
10    A   I didn't ask him.
11    Q   My question was, did you talk to him about the
12  Complaint that you filed in the District Court around that
13  time?
14    A   I don't remember that.
15    Q   Did you talk to your brother about the complaint
16  that you filed with the EEOC?
17    A   I can't remember.
18    Q   Do you know if your brother filed a Complaint with
19  the EEOC before you did?
20    A   I can't remember that.
21    Q   Do you know if you were terminated or laid off or
22  removed from CalPac about the same time as your brother?
23    A   My brother was earlier.
24    Q   Do you know when he was no longer working with
25  CalPac?
```

```
 1    A    Yeah.
 2    Q    When was that?
 3    A    I can't remember when he got laid off.
 4    Q    Give me an estimate of when he was laid off.
 5    A    Eight months.
 6    Q    He was laid off months prior to you being --
 7    A    Yeah.
 8    Q    So if you were to no longer work with CalPac in May
 9  of 2005, that would mean he was laid off around September,
10  October, November, somewhere around there of 2004?
11    A    I'm not too sure.
12    Q    So you were working at CalPac when they had a
13  meeting at CalPac, is that right?
14    A    Yes.
15    Q    That was about the same time there was a protest
16  going on?
17    A    Yes.
18    Q    Was your brother protesting?
19    A    I don't remember.
20    Q    Were you aware that there was going to be a protest
21  that was going to take place?
22    A    No. No.
23    Q    When did you file your complaint with the EEOC?
24    A    Say that over again.
25    Q    When did you file a complaint with the EEOC?  If you
```

```
 1  can remember.
 2    A    I don't remember that day.
 3    Q    I want you to look at Paragraph 158 of the
 4  Complaint.  Read that, please, just to yourself.  Actually,
 5  take a look at Paragraph 155 and read that for the record,
 6  please.
 7    A    "Teddy Cruz will also file charge on December 2004."
 8    Q    So you filed --
 9    A    December 2004.
10    Q    Okay.  But you filed a complaint with the EEOC
11  around 2004 of December, correct?
12    A    Yes.
13    Q    What was your complaint that you were filing with
14  the EEOC?
15    A    I was called island monkeys.
16    Q    Your complaint was against Dennis Clark?
17    A    Dennis Clark.
18    Q    And your complaint was also against Dennis Clark's
19  employer.  Do you know who his employer is?
20    A    No.
21    Q    The name Dynamic Technical Services, do you know why
22  they were named as a Defendant in this case?
23    A    No, I don't.
24    Q    MCI is named as a Defendant in this case.  Do you
25  know why?
```

```
 1    A    'Cause it was HCI's project.
 2    Q    CalPac was named as a Defendant in this case.  Do
 3  you know why CalPac was named as a Defendant?
 4    A    'Cause CalPac didn't do nothing when I made a
 5  complaint.
 6    Q    What was the complaint that you made?
 7    A    That I was called island monkeys.
 8    Q    Who did you make the complaint to?
 9    A    I made it to Don Harper.
10    Q    When did you make this complaint to Mr. Harper?
11    A    September.
12    Q    What did Mr. Harper say about your complaint?
13    A    He'll take it up with the management.
14    Q    He said he would take it up with management?
15    A    (Witness nodded head.)
16    Q    Correct?
17    A    Yes.
18    Q    Did you ever follow up with Mr. Harper about your
19  complaint?
20    A    No.
21    Q    Let's just go back and we'll come back to your
22  Complaint.  I believe in your Complaint that you filed with
23  the court you stated that around September to October 2004,
24  Dennis Clark made some statements, correct?
25    A    Yes.
```

```
 1    Q    That's when he was referring to you and your crew as
 2  monkeys or island monkeys, correct?
 3    A    Yes.
 4    Q    How many times did he say that to you or that you
 5  actually heard it?
 6    A    I heard it twice.
 7    Q    The first time was when?
 8    A    Over at Tiyan and one over at Two Lovers' Point.
 9    Q    You stated that in your complaint that you filed
10  with the EEOC, correct?
11    A    Yes.
12    Q    Do you know when Mr. Clark left or stopped showing
13  up at the project?
14    A    Four months later after the -- after we made a
15  complaint, that's when he stopped showing up.
16    Q    You made the complaint when?
17    A    On September.
18    Q    So Mr. Harper stopped showing up when?
19    A    January.
20    Q    January 2005 he stopped showing up?
21    A    Yeah.
22    Q    You were still working around that time, correct?
23    A    Yes.
24    Q    Do you know why he stopped showing up?
25    A    Nope.
```

1   Q   Do you know if it was in 2005?

2   A   2004, I think.

3   Q   It was in 2004?

4   A   (Witness nodded head.)

5   Q   Do you know if it was before you filed your

6 complaint with the EEOC?

7   A   I can't remember.

8   Q   Who gave you the assignment to do pick-up in the

9 warehouse?

10   A   Henry Quintanilla.

11   Q   Do you recall what he told you what you were doing?

12   A   Just clean up the shop, take all the debris, all the

13 dirty stuff around the shop.

14   Q   Were you doing that with anybody else?

15   A   The three of us. John Nauta and Jesse Cruz.

16   Q   Do you recall who gave you the instructions to do

17 the clean up of the trash on base?

18   A   Henry.

19   Q   Do you know who told Henry to give you instructions

20 that day?

21   A   No.

22   Q   What was your relationship like with Henry

23 Quintanilla?

24   A   Just a friend.

25   Q   He's a friend?

1   A   Yeah. Co-worker.

2   Q   Would you ever hang out with him after work or non

3 work hours?

4   A   I can't remember.

5   Q   Did you like working with him?

6   A   He's all right.

7   Q   He's okay?

8   A   Yeah.

9   Q   He treated you okay?

10   A   I'm not too sure.

11   Q   You're not sure?

12   A   Yeah.

13   Q   Would you get instructions for assignments from

14 anybody else besides Mr. Quintanilla?

15   A   Only Henry, if I remember.

16   Q   Just Henry?

17   A   Yeah.

18   Q   You had no other supervisors?

19   A   I usually get it -- he's the lead Foreman so I get

20 it from him.

21   Q   When would he give you those assignments? During

22 the morning?

23   A   Yes.

24   Q   Did you have a meeting?

25   A   No.

1   Q   No?

2   A   (Witness shook head.)

3   Q   So when would he tell you what you were going to do?

4   A   Right after he let everybody go out and there's only

5 three of us left in the shop.

6   Q   Okay. So it would be the three of you and

7 Mr. Quintanilla and then he would tell you what to do that

8 day?

9   A   Yes.

10   Q   Were you mostly working under him during the CalPac

11 projects?

12   A   Yes.

13   Q   So he would give you the direct instructions?

14   A   Yeah.

15   Q   Was anybody else present when he would give you

16 instructions?

17   A   No.

18   Q   When did you first hear of Dynamic Technical

19 Services?

20   A   After I file for the EEOC.

21   Q   After you filed a claim with the EEOC?

22   A   Yeah.

23   Q   What did you find out about Dynamic Technical

24 Services?

25   A   That Clark was working for that company.

1   Q   Who did you think Clark was working for?

2   A   I always thought it was MCI.

3   Q   Why did you think it was MCI?

4   A   'Cause it was MCI's project.

5   Q   Any other reason?

6   A   No.

7   Q   Did anybody ever tell you he was employed by MCI?

8   A   No.

9   Q   So why did you think that it was MCI?

10   A   He was always there on the project in the beginning

11 of the project.

12   Q   Did you think he ever worked for CalPac?

13   A   No.

14   Q   Why?

15   A   'Cause he just supervise us out in the field.

16   Q   Who was your employer?

17   A   CalPac.

18   Q   CalPac? Did they pay your salary?

19   A   Yes.

20   Q   Did they hire you?

21   A   Yes.

22   Q   Were you ever evaluated on your work performance?

23   A   No.

24   Q   Henry Quintanilla was your Supervisor, right?

25   A   Yes.

```
 1    Q    And he was a CalPac employee?
 2    A    Yes.
 3    Q    Did you do what Henry Quintanilla told you to do?
 4    A    Yes.
 5    Q    Did he ever tell you you were doing a good job or a
 6  bad job?
 7    A    Not on my knowledge.
 8    Q    He never said anything about what you were doing?
 9    A    No.
10    Q    And how you were performing?
11    A    No.
12    Q    Did you think you were doing a good job?
13    A    Yes.
14    Q    Did anyone ever complain about your work performance
15  that you're aware of?
16    A    I'm not too sure.
17    Q    Okay.  Did you ever hear anybody --
18    A    No.
19    Q    -- complain about your work performance?
20    A    No.
21    Q    Do you know who Dennis Clark reported to?
22    A    No.
23    Q    Do you know how many employees Dynamic Technical
24  Services has?
25    A    No.
```

```
 1    Q    Do you know where it is based?
 2    A    No.
 3    Q    You don't?
 4    A    No.
 5    Q    Did you ever talk to Dennis Clark?
 6    A    In the beginning of the project.
 7    Q    What did you guys talk about?
 8    A    I would say good morning, hi.  That was -- that's
 9  it.
10    Q    What would he say to you?
11    A    How's your day, like that.  That's it.  We'd go back
12  to work.
13    Q    Do you know how many times that happened?
14    A    Twice.
15    Q    Twice.  And that was early in the project you said?
16    A    Yeah.
17    Q    Any other time that he talked to you?
18    A    No.
19    Q    Did he ever give you instructions about what to do?
20    A    Yes.
21    Q    What would he say?
22    A    He would tell us that trench hole has to be two feet
23  deep, you have to get it so much mile on the day.
24    Q    How many times did he give you instructions like
25  that?
```

```
 1    A    I can't remember how many times.
 2    Q    So he told you to make the trench hole deep, is that
 3  right?
 4    A    Yeah.
 5    Q    Who else was there when he would say something like
 6  that to you?
 7    A    Ton Arriola, Henry, Jerry.
 8    Q    Henry Quintanilla or Henry Van Meter?
 9    A    Van Meter.
10    Q    Who else?
11    A    Jerry.
12    Q    Jerry Apodaca?
13    A    Yeah.
14    Q    When he told you that, did he just say it to you
15  normally?
16    A    Yes.
17    Q    Did you do what he was telling you to do?
18    A    Yeah.
19    Q    What other instructions did you say he'd give you?
20    A    That's all I remember him telling us.
21    Q    The trench holes?
22    A    Yeah.
23    Q    Did you ever see Dennis Clark talk to anyone about
24  you or hear him --
25    A    I'm not too sure.
```

```
 1    Q    -- talk to anyone about you?  Did Dennis Clark ever
 2  tell you that he was unhappy with the work you were doing?
 3    A    No.
 4    Q    How many days were you on the job site?
 5    A    I can't remember.
 6    Q    How many hours in a day?
 7    A    Eight.
 8    Q    Eight?  Okay.  And how many times would you see
 9  Dennis Clark during the day?
10    A    Once.
11    Q    Once?
12    A    (Witness nodded head.)
13    Q    Do you know for how long you would see him?
14    A    15, 20 minutes.
15    Q    So for the 8 hours of the day you would only see him
16  for 15 to 20 minutes?
17    A    Yeah.
18    Q    Do you know how many months he was on the project?
19    A    I can't remember.
20    Q    I think you mentioned earlier there were two times
21  that he made statements, right?  And you had mentioned one at
22  Tiyan, right?
23    A    Yes.
24    Q    Do you recall what day that was?
25    A    I can't remember that date.
```

1    Q    You cannot?

2    A    (Witness shook head.)

3    Q    Do you know if it was in December or September?  A

4  general --

5    A    About September.

6    Q    So tell us what happened on that day at Tiyan.

7    A    He came up on the trench lines and he told all of us

8  that's down in the trench line, you island monkeys.

9    Q    He said you island monkeys?

10    A    Yeah.

11    Q    Then what happened?

12    A    He just looked at him.  I don't wanna do anything

13  that's --

14    Q    Did he say anything else?

15    A    No, he just walked away.

16    Q    Who else was there that day?

17    A    Henry.

18    Q    Henry Van Meter or Quintanilla?

19    A    Van Meter.  Ton Arriola, Jesse Cruz, John Nauta, and

20  Jerry.

21    Q    Jerry Apodaca?

22    A    Apodaca.

23    Q    What were you doing?

24    A    I was in the trench line.

25    Q    What exactly were you doing when you were in the

1  trench line?

2    A    We were cleaning the trench.

3    Q    Do you recall what time of day this was?

4    A    Oh, I don't remember what day -- what time.

5    Q    Where did Dennis Clark come from that day?

6    A    I do not know where he came from.

7    Q    Was he just standing there observing you before he

8  made this statement or did he come up and make the statement?

9    A    He just came up and looked at us and make a

10  statement.

11    Q    Who was he talking to?

12    A    All of us that's in the trench line.

13    Q    Was there anybody else in the trench besides those

14  you mentioned and yourself?

15    A    Joe Mendiola.

16    Q    Do you know if Joe Mendiola heard it?

17    A    Yes, 'cause he's with us.

18    Q    Anybody else?

19    A    Not to my knowledge.

20    Q    Was Don Harper around?

21    A    I can't remember.

22    Q    Was there anybody else around that could have heard

23  it but wasn't in the trench?

24    A    I don't know.

25    Q    Were you working or were you taking a break?

1    A    We were working.

2    Q    So you said he came up and said you island monkeys,

3  right?

4    A    Yes.

5    Q    And you looked at him?

6    A    Yes.

7    Q    Did he say anything else?

8    A    He gave us that stare then he just turn around.

9    Q    What happened after that?

10    A    That was it.

11    Q    Did you guys go back to work?

12    A    Yes.

13    Q    Did Henry Van Meter go back to work?

14    A    Yeah.

15    Q    Did you ever make a complaint about this statement

16  to anybody at CalPac?

17    A    Don Harper.

18    Q    Do you know when you complained to him?

19    A    I'm not too sure the date.

20    Q    Was it on the same day?

21    A    Close to quitting time.

22    Q    Close to quitting time?

23    A    Yeah.

24    Q    Could that have been in an hour or hours?

25    A    Hours.

1    Q    Hours after?

2    A    Yeah.

3    Q    What did you tell Don Harper?

4    A    I told Don Harper that Dennis Clark called us island

5  monkeys up at Tiyan in the trench line.

6    Q    Did you tell him individually or were you with a

7  group of guys?

8    A    By myself.

9    Q    By yourself?

10    A    (Witness nodded head.)

11    Q    Did you talk to anybody else about what happened

12  that day, the other guys that --

13    A    No.

14    Q    -- you say heard it?  No?

15    A    No.

16    Q    You never right there and then when he said it you

17  didn't talk about it?

18    A    (Witness shook head.)

19    Q    Was there any other time that he made a

20  discriminatory statement?

21    A    Two Lovers' Point.

22    Q    Do you recall when that was?

23    A    No, that day I don't remember.

24    Q    Was it after or before Tiyan?

25    A    After Tiyan.



```
 1   Q    Do you know how many days after or months?
 2   A    I don't.
 3   Q    Okay.  So what happened on that day?
 4   A    That day we were pulling fiber line then he call
 5  us...you island monkeys, you forgot something again.
 6   Q    Who was there on that day?
 7   A    John -- those guys on that list.
 8   Q    The same?
 9   A    Yeah.
10   Q    Henry Van Meter was there?
11   A    Yeah.
12   Q    And Anthony Arriola?
13   A    John Nauta.  Jesse Cruz, Ray Mendiola was there.
14   Q    Ray Mendiola?
15   A    Yeah.
16   Q    He's different from Joe Mendiola?
17   A    Yeah.
18   Q    Why did he say that you forgot something?
19   A    'Cause we were pulling a fiber line into the conduit
20  and there's supposed to be a breakaway in front of that rope
21  and when he saw that he said, you island monkeys, you forgot
22  something.
23   Q    Was that a mistake that you were doing?
24   A    Yeah, we did a mistake but we didn't deserve to be
25  called --
```

```
 1   Q    What were you doing personally?
 2   A    I was getting the machine ready for the fiber pull.
 3   Q    What machine?
 4   A    The fiber -- the fiber line machine to pull it.
 5   Q    How far away was Dennis Clark when he made that
 6  statement?
 7   A    Maybe 15 feet.
 8   Q    15 feet.  Was he speaking normally?
 9   A    Yes.
10   Q    If I can go back to Tiyan, how far away was he at
11  Tiyan when he made the statement to you?
12   A    He was just standing right over us in the trench
13  line.
14   Q    Would he be a couple of feet or 10 feet?
15   A    Maybe 3 feet away.
16   Q    Was he speaking normally when he said that at Tiyan?
17   A    I do not recall.
18   Q    You do not recall?
19   A    (Witness shook head.)
20   Q    Did he say anything else besides you island monkeys?
21   A    No.
22   Q    What did you do after he said that?
23   A    Just gave him that look again and turn around.
24   Q    But you were doing something wrong, right?
25   A    Yeah.
```

```
 1   Q    So how did you figure out he was doing something
 2  wrong?
 3   A    By the way he was saying it.  And then when he look
 4  down, I knew they did something wrong.
 5   Q    What did you do after he made that statement?
 6   A    Just continue working.
 7   Q    Did you ever submit a complaint about this
 8  statement?
 9   A    I'm not too sure.
10   Q    You don't --
11   A    I don't know.
12   Q    Did you talk to anybody about this?
13   A    I usually talk to Don Harper.
14   Q    Do you know if he talked to him about this
15  statement?
16   A    I'm not sure.
17   Q    So you guys went back to work on both days, right?
18  I mean, you just didn't talk about it?
19   A    Yes.
20   Q    Continued to do your job?
21   A    Of my knowledge.
22   Q    The first time you said you reported to Don Harper,
23  did he talk to you about it afterwards at all?
24   A    I don't remember.
25   Q    Did he tell you what he was going to do with your
```

```
 1  complaint?
 2   A    Talk to upper management.
 3   Q    Do you know if he did that?
 4   A    I'm not sure.
 5   Q    Did any of your other co-workers tell you that they
 6  had been called an island monkey?
 7   A    I heard them say it.
 8   Q    Who?
 9   A    Joe Mendiola.
10   Q    What did he say?
11   A    He said, Ted, I heard he called us island monkeys.
12  I said to report it to Don Harper.
13   Q    Do you know if he was talking about that same time
14  at Tiyan?
15   A    No.
16   Q    He wasn't talking about it?  He was talking about a
17  different time?
18   A    Yeah.
19   Q    What did he tell you about that?
20   A    That we were called island monkeys.
21   Q    Did he tell you where he was?
22   A    No, I don't know where he was at that time.
23   Q    Where did you guys talk?
24   A    At Two Lovers' Point.
25   Q    So did it happen before Two Lovers' Point?
```

```
1    A    I'm not too sure.
2    Q    What else did he say about it?
3    A    That was it.  That we were called island monkeys.
4    Q    You don't recall if it was before Dennis Clark made
5  the statement at Two Lovers' Point?
6    A    I think it's before that.
7    Q    Before?
8    A    Yeah.
9    Q    Was it before the time he made a statement at Tiyan?
10   A    I'm not sure, no.
11   Q    Anybody else talk to you about --
12   A    No.
13   Q    -- them being called monkeys or island monkeys?
14   A    No.
15   Q    Did you ever hear Dennis Clark talk about anybody
16 else?  Talk about any CalPac employees?
17   A    I can't recall.
18   Q    Did you ever hear him talk about any of the
19 co-plaintiffs in this case?
20   A    No.
21   Q    Had Dennis Clark ever said anything to you other
22 than hello and good morning and the time he told you to dig
23 deeper?  Have you ever had any other conversations with him?
24   A    No.
25   Q    You hadn't heard of Dynamic Technical Services at
```

Teddy B. Cruz: April 16, 2007

```
1  the time you made your EEOC complaint, right?
2    A    No.
3    Q    So you never submitted a complaint to Dynamic
4  Technical Services?
5    A    No.
6    Q    Do you know any other employees from Dynamic
7  Technical Services?
8    A    No.
9    Q    When did you stop working at CalPac?
10   A    2005, May.
11   Q    I think in Exhibit A on Page 3 you state under
12 penalty of perjury that you were given a letter of
13 termination from Mr. Ward.  Is that correct?
14   A    Yes.
15   Q    What did Mr. Ward say about why you were being
16 terminated?
17   A    To my recall, all he said on that paper was no
18 longer working with CalPac.
19   Q    Was there a reason?
20   A    He didn't put a reason.
21   Q    Did you ask him?
22   A    I ask him but he said there's your letter of
23 termination.  That was it.
24   Q    Before May 2005, when was the last time you had seen
25 Dennis Clark?
```

Teddy B. Cruz: April 16, 2007

```
1    A    I can't recall.
2    Q    Was it months or weeks?
3    A    It's months.
4    Q    Months?
5    A    (Witness nodded head.)
6    Q    Over two months?
7    A    I think it was over two months.
8    Q    Do you know if Dennis Clark had talked to Bill Ward
9  about you being terminated?
10   A    I'm not sure.
11   Q    Did anybody ever tell you that Mr. Clark wanted you
12 terminated?
13   A    No.
14   Q    Do you know who made the decision to terminate you?
15   A    No, I don't know.
16   Q    Were you still working on the MCI project when you
17 were terminated?
18   A    Yes.
19   Q    Do you know if it was close to completion?
20   A    I'm not too sure.
21   Q    Did you ever see Dennis Clark talk to anyone at
22 CalPac about you?
23   A    I can't remember.
24   Q    Did you ever hear anybody tell you that Dennis Clark
25 had talked to somebody at CalPac about you?
```

Teddy B. Cruz: April 16, 2007

```
1    A    No.
2    Q    Do you know if Dennis Clark knew that you complained
3  to Don Harper?
4    A    Say that question over again.
5    Q    Do you know if Dennis Clark knew that you complained
6  about him to Don Harper?
7    A    I don't know.  I can't remember.
8    Q    In other words, do you know whether or not Dennis
9  Clark knows of your complaint?
10   A    Yes.
11   Q    You think he knows?
12   A    Yeah, I think he knows.
13   Q    Why do you say that?
14   A    'Cause when they had that meeting.
15   Q    Okay.  But there were people at that meeting that
16 didn't complain, right?
17   A    Yeah.
18   Q    So why do you think he knows that you complained?
19   A    Because he was just saying it out to everybody that
20 was there.
21   Q    But you don't know that he knows that you complained
22 in particular?
23   A    I don't think so.
24   Q    You say that you suffered emotional harm and mental
25 anguish in your Complaint, is that right?
```

Teddy B. Cruz: April 16, 2007

CERTIFICATE OF WITNESS

I, TEDDY B. CRUZ, being first duly sworn on oath, depose and say that I am the witness named in the foregoing deposition transcript and that I have read the questions and answers thereon as contained in the foregoing deposition, consisting of pages 1 through 112; that the answers are true and correct as given by me at the time of taking the deposition, except as indicated on the correction sheet.

TEDDY B. CRUZ

Date:_____

REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that TEDDY B. CRUZ personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 112, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 2nd day of July 2007.

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 16th day of April, 2007 at the hour of 9:00 a.m. there appeared before me TEDDY B. CRUZ at the law offices of Blair Sterling & Johnson, Suite 1008, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 2nd day of July, 2007.

Cecille A. Flores