LUJAN AGUIGUI & PEREZ LLP
238 Archbishop Flores Street, Suite 300
Hagåtña, Guam 96910
Tel. (671) 477-8064/5; Fax. (671) 477-5297

*Attorneys for Plaintiffs*



FILED
DISTRICT COURT OF GUAM
JAN 22 2008
JEANNE G. QUINATA
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT OF GUAM
# FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, et al.,<br><br>　　　　　　Plaintiffs,<br>-vs-<br>CALPAC, et al.,<br><br>　　　　　　Defendants. | CIVIL CASE NO. 05-00037<br><br>**OPPOSITION TO DEFENDANT DYNAMIC TECHNICAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JAMES S. YEE** |

COMES NOW Plaintiff James S. Yee, respectfully submitting his opposition to Defendant Dynamic Technical Services, Inc.'s Motion for Summary Judgment Against Plaintiff James S. Yee, filed herein January 7, 2008.

## I. INTRODUCTION

Plaintiffs instituted this Title VII action on December 12, 2005, alleging that they were subjected to employment discrimination by defendants Calpac, Dynamic Technical Services ("DTS"), MCI, John Healy, Dennis Clark ("Clark"), William Ward, Jai James, and Does 1 through 10 (collectively "Defendants"). The Second Amended Complaint was filed on September 7, 2007, naming Defendants Verizon Business Purchasing, LLC, and Verizon Business Network Services, Inc., ("Verizon Defendants") in the stead of MCI. On January 7, 2008, DTS filed a motion for summary judgment against Plaintiff James S. Yee ("Plaintiff").

## II. ARGUMENT

DTS moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56, arguing that (1) DTS was not a Title VII employer of Plaintiff and therefore cannot be subject to

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. James S. Yee

1

Case 1:05-cv-00037　　Document 499　　Filed 01/22/2008　　Page 1 of 12

Title VII liability, (2) there was no hostile environment based upon "the uncontroverted evidence," and (3) DTS had no knowledge of any alleged discrimination. (Mot. Summ. J. at 5.)

Summary judgment is appropriate if the evidence, construed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. <u>Tzung v. State Farm Fire & Cas. Co.</u>, 873 F. 2d 1338, 1339-40 (9th Cir. 1989). To establish the existence of a factual dispute, the nonmoving party need not establish a material issue conclusively; only that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F. 2d 626, 630 (9th Cir. 1987).

DTS should be denied summary judgment for the following reasons:

**A. DTS was a Title VII employer of Plaintiff.**

As DTS acknowledges, although Plaintiff's direct employer was Calpac, DTS is subject to Title VII liability if it is either a "joint employer" or "indirect employer" of Plaintiff.

**1. DTS was a "joint employer" of Plaintiff.**

Plaintiff joins in the arguments raised in co-Plaintiffs John P. Babauta's, Joseph T. Mendiola's, and Jerry Apodaca's oppositions to DTS' motions for summary judgment, filed herein January 18, 2008, and in the arguments raised in other Plaintiff's oppositions to summary judgment, filed concurrently herewith, that DTS was a "joint employer" of Plaintiffs.

Additional proof of DTS' significant, peculiar control over Plaintiffs and the worksite is seen in the contract between MCI and DTS, i.e., the Outside Plant Engineering and Project Management Agreement by and between MCI WorldCom Network Services, Inc. and Dynamic Technical Services L.P., Contract No. 2621, dated September 24, 2001, ("the Agreement").

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. James S. Yees

2

Case 1:05-cv-00037   Document 499   Filed 01/22/2008   Page 2 of 12

(Second Lujan Decl.[1] Ex. 9.) The Agreement defined the Work of the Contractor (DTS) as follows:

> Contractor agrees to provide, as required by Company [MCI], all the labor, equipment, materials and expertise, and to do all things necessary for the proper performance and completion of each Project (the "Work"). The Work may include without limitation design services; engineering services; project management services; inspection services; acceptance testing; construction of telecommunications network infrastructure, which may consist of both inside and outside plaint Work; terminal and regen/amplifier facility construction or expansion; creating and managing Project Schedules and budgets; overseeing the procurement of necessary Project materials and the overall construction and testing process; coordinating operations among Company's various construction groups; communicating with landlords, regulatory agencies and other governmental authorities; as well as further duties as designated by Company. …

(Id. Ex. 9 ¶ 2.1.) The Agreement further provided that DTS "shall perform project management, engineering, **supervisory functions**, contract and document preparation, drafting, material procurement, and all portions of the Work which are similar to those stated herein with its own employees except as mutually agreed by Company and Contractor." (Id. Ex. 9 ¶ 2.1 (emphasis added).)

As for third-parties hired by MCI to physically install or construct the facilities, the Agreement provided that "**all Installers shall be under the direct supervision of Contractor (as project manager), and Contractor shall diligently manage all Installers' and Subcontractors' actions to ensure that the Projects performed hereunder are completed in a professional and timely manner.**" (Id. Ex. 9 ¶ 3.2 (emphasis added).) DTS also was required to "provide administrative, management, and related services to coordinate and monitor the activities and responsibilities of the Subcontractors and Installers with each other and with those of the Contractor, Company, or others involved in the Project to complete each Project in

---

[1] Second Declaration of Delia Lujan, filed January 22, 2008.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. James S. Yee

3

Case 1:05-cv-00037   Document 499   Filed 01/22/2008   Page 3 of 12

accordance with the Project Budget, the Project Schedule and the Contract Documents." (Id. Ex. 9 ¶ 3.6.4) DTS was required to "prepare all Subcontractor and Installer related contracts for the Work ('Contract Documents')." (Id. Ex. 9 ¶ 3.3.) DTS was required to "coordinate the sequence of construction and assignment of space in areas where the Subcontractors and Installers are performing Work." (Id. Ex. 9 ¶ 3.6.6.)

DTS was required to "furnish information regarding the progress of all Projects in a weekly report (on a form to be provided by Company) and shall furnish any additional information to the Company to assist in arriving at the prompt, high quality, and economical completion of each Project." (Id. Ex. 9 ¶ 3.6.1.) DTS was required to "track the actual cost of each Project, and … re-evaluate and forecast Project costs on a monthly basis." (Id. Ex. 9 ¶ 3.6.3.) Using the Project Schedule, DTS was required to "update all schedules incorporating the activities of the Subcontractors, Installers, and others on the Project including activity sequences and durations, allocation of labor and materials, processing of shop drawings, product data and samples, and delivery of materials or equipment requiring long lead time and procurement." (Id. Ex. 9 ¶ 3.6.5) DTS was required to "update and reissue each Project Schedule … to show current conditions and percentages of completions" and was required to "keep a daily log containing a record of weather, each Subcontractor and Installer on the site, number of workers, identification of equipment, Work accomplished, problems encountered, and other similar relevant data as the Company may require. If an update indicates that the previously approved Project Schedule may not be met, the Contractor shall immediately notify Company and recommend corrective action. The Contractor shall schedule and conduct meetings to discuss such matters as progress and scheduling with Company as set forth in the Work Order or as requested by Company." (Id.)

DTS was required to "at all times enforce strict discipline and good order among its employees and shall not employ on any Project any person not skilled in the task assigned to him

Henry G. Van Meter, et al., v. Calpac, et al. 4
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. James S. Yee
Case 1:05-cv-00037  Document 499  Filed 01/22/2008  Page 4 of 12

or her. The Contractor shall be responsible to maintain and observe, and to require its Subcontractors to maintain and observe, sound labor and safety practices and shall require each Subcontractor to take all steps reasonably necessary to avoid labor disputes or work stoppages." (Id. Ex. 9 ¶ 3.6.6.1.) DTS was also required to "coordinate and supervise the Work performed by Subcontractors and Installers to the end that the Work is carried out without conflict between trades or jurisdictional disputes and so that no Subcontractor and Installer at any time causes delay to the general progress of the Work." (Id. Ex. 9 ¶ 3.6.6.2.)

DTS was required to manage and monitor the performance of each of the Subcontractors and Installers with all due diligence to ensure that the requirements of the Contract Documents were met. DTS also was to take appropriate action against the Subcontractor or Installer when the requirements were not being fulfilled and, as to Subcontractors, to take commercially reasonable steps to assure compliance with the same, and, as to Installers, to immediately report such noncompliance to MCI's authorized representative. (Id. Ex. 9 ¶¶ 3.6.7-3.6.7.1.)

DTS, upon completion of any Project, was required to conduct acceptance testing to show that the Work has been performed in accordance with the specifications of the Work Order. (Id. Ex. 9 ¶ 3.8.1.1.) DTS also was required to provide MCI with a Certificate of Completion that signifies that the Project is completed and was required to assist MCI with the final inspection of the Project. (Id. Ex. 9 ¶ 3.8.1.2.) The Certificate of Completion had to identify all currently known and outstanding liabilities, charges, claims made by Subcontractors or Installers and potential financial obligations that were not resolved at the time of final completion. (Id. Ex. 9 ¶ 3.8.1.3.)

Clearly, DTS had extensive authority over Plaintiffs and the worksite. Therefore, DTS was a "joint employer" of Plaintiffs.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. Jones S. Ylee
5

Case 1:05-cv-00037    Document 459    Filed 01/22/2008    Page 5 of 12

### 2. Even if DTS were not a joint employer, it was an "indirect employer" of Plaintiff.

Plaintiff joins in the arguments raised in co-Plaintiffs John P. Babauta's, Joseph T. Mendiola's, and Jerry Apodaca's oppositions to DTS' motions for summary judgment, filed herein January 18, 2008, and in the arguments raised in other Plaintiff's oppositions to summary judgment, filed concurrently herewith, that DTS was an "indirect employer" of Plaintiffs.

Considering also DTS' powers under the Agreement with MCI, which is discussed in section 1 above, DTS obviously had the power to stop the hostile work environment but it did not. Therefore, DTS, if not a joint employer, was an indirect employer of Plaintiffs.

### B. Plaintiff was subjected to a hostile work environment.

To establish a hostile work environment under Title VII, an employee must show that (1) he was subjected to verbal or physical conduct based on his race or national origin, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. Galdamez v. Potter, 415 F. 3d 1015, 1023 (9th Cir. 2005).

As to the first element, the Ninth Circuit has stated that "there are no 'talismanic expressions' of racial animus necessary to sustain a harassment claim, and recognized that racially charged 'code words' may provide evidence of discriminatory intent by 'sending a clear message and carrying the distinct tone of racial motivations and implications.' " Galdamez, 415 F. 3d at 1024 n.6 (quoting McGinest v. GTE Serv. Corp., 360 F. 3d 1103, 1113 (9th Cir. 2004)). For example, the word "redneck" can suggest racial hostility. Id. In this case, Plaintiff was directly subjected to verbal abuse when Clark, his supervisor, called him and/or his fellow co-

Henry G. Van Meter, et al., v. Calpac, et al.  6
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. James S. Yees

Case 1:05-cv-00037   Document 499   Filed 01/22/2008   Page 6 of 12

workers "island monkeys" or "monkeys" on at least two occasions. (Yee Decl.[2] ¶ 6.) As Plaintiff is a Chamorro/Pacific Islander and Guamanian, Clark's conduct toward Plaintiff clearly was based on Plaintiff's race and national origin, especially since Clark did not use any similar terms to refer to non-Pacific Islanders or non-Chamorros. (Id. ¶ 20.) In fact, DTS in its motion does not argue that the alleged verbal conduct by Clark was based on something other than Plaintiff's race or national origin.

As to the second element, Clark's comments were clearly unwelcome by Plaintiff, as he complained to his supervisors after being called an "island monkey" or "monkey" by Clark. (Yee Decl. ¶ 20.) DTS does not argue in its motion that Clark's comments were welcome.

The third element of the test is satisfied by showing that the work environment was both subjectively and objectively hostile. Id. Whether an environment is objectively "hostile" or "abusive" can be determined only by looking at all the circumstances, which may include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating as opposed to a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Harris v. Forklift Sys., Inc., 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). However, no single factor is required. Id. The required severity of the conduct varies inversely with its pervasiveness or frequency. Brooks v. City of San Mateo, 229 F. 3d 917, 926 (9th Cir. 2000). Finally, the objective hostility inquiry must be considered from the perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff. Galdamez, 415 F. 3d at 1023.

---

[2] Declaration of James S. Yee in support of Opposition to Defendant Calpac's Motion for Summary Judgment, filed August 6, 2007.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. James S. Yee

7

Case 1:05-cv-00037   Document 459   Filed 01/22/2008   Page 7 of 12

A single incident of harassment may be enough to constitute a hostile work environment because the frequency of the discriminatory conduct is only one factor in the analysis. Little v. Windermere Relocation, Inc., 301 F. 3d 958, 967 (9th Cir. 2002); see also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (stating that an isolated incident can amount to a "discriminatory change[] in the 'terms and conditions of employment' when the incident is extremely serious").

As to racial epithets, the Fourth Circuit in Spriggs v. Diamond Auto Glass, stated that usage of the word "nigger" was far more than a "mere offensive utterance." 242 F. 3d 179, 185 (4th Cir. 2001). " 'Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates.' " Id. (quoting Rodgers v. Western-Southern Life Ins. Co., 12 F. 3d 668, 675 (7th Cir. 1993)). The Fourth Circuit further stated that the use of the word "**monkey**" to describe African Americans was similarly odious. Id. (emphasis added). "To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme." Id. (citing Walker v. Thompson, 214 F. 3d 615, 626 (5th Cir. 2000) (triable issue raised with regard to hostile work environment where, inter alia, supervisors verbally assailed African American employees with physically humiliating comparisons to "monkeys" and "slaves")).

Additionally, "in some cases the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment. To avoid liability under Title VII for failing to remedy a hostile environment, employers may even have to remove employees from the workplace if their mere presence would render the working environment hostile." Ellison v. Brady, 924 F. 2d 872, 883 (9th Cir. 1991) (citations omitted).

Henry G. Van Meter, et al., v. Calpac, et al.      8
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. James S. Yees

Case 1:05-cv-00037  Document 499  Filed 01/22/2008  Page 8 of 12

Conduct targeted at persons other than the plaintiff can be considered in determining a hostile work environment. Spriggs, 242 F. 3d at 184. As Title VII is concerned with the "environment" of workplace hostility, the contours of one's environment surely may exceed the individual dynamic between the complainant and his supervisor. Id. "[O]ne of the critical inquires in a hostile environment claim must be the *environment*. Evidence of general work atmosphere therefore—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." Hicks v. Gates Rubber Co., 833 F. 2d 1406, 1415-16 (10th Cir. 1987); see also Walker v. Ford Motor Co., 684 F. 2d 1355, 1359 n.2 (11th Cir. 1982) ("The fact that many of the epithets were not directed at [the plaintiff] is not determinative."). Indeed, "[s]uch evidence could be critical to a plaintiff's case, for a claim of harassment cannot be established without a showing of more than isolated indicia of a discriminatory environment." Vinson v. Taylor, 753 F. 2d 141 (D.C. Cir. 1985), aff'd in part and rev'd in part, 477 U.S. 57 (1986)).

Here, Plaintiff was subjected to a hostile work environment. Plaintiff himself was called an "island monkey" on at least two occasions. Besides being subjected to this direct abuse, Plaintiff heard from other co-workers, such as the co-plaintiffs here, that they had been called "island monkey" by Clark on other occasions when Plaintiff was not present. After he and/or other co-workers were called "island monkeys" or "monkeys," the workers were close to revolt. (Yee Decl. ¶¶ 9, 11.) In fact, Harper testified that he feared the workers would harm Clark after Clark made his discriminatory statements. (Lujan Decl.[3] Ex. 1 at 96-97, 151.) Being referred to as an "island monkey" or "monkey" by Clark, the highest-ranking supervisor on the field, greatly

---

[3] Declaration of Delia Lujan in support of Each of Plaintiffs' Oppositions to Defendant Calpac's Motion for Summary Judgment, filed August 6, 2007.

Henry G. Van Meter, et al., v. Calpac, et al.  
Civil Case No. 05-00037  
Opp'n to Def. DTS's Mot. Summ. J. Against Pl. James S. Yee

9

Case 1:05-cv-00037   Document 459   Filed 01/22/2008   Page 9 of 12

affected Plaintiff. Plaintiff was humiliated and his self-esteem lowered, making it difficult for him to work at Calpac. After the "island monkey" statements were made, Plaintiff and co-Plaintiffs would still see Clark around the MCI project and never witnessed or heard of him getting thrown off a worksite or disciplined in any way for his comments. Clark's continued presence further disturbed Plaintiff and the other co-plaintiffs and kept the working environment highly tense. Also, shortly after making his complaints, Plaintiff was excluded from meetings between supervisors and workers, when in the past he had been included in such discussions. Plaintiff was also frequently ignored by Calpac's general manager. Plaintiff also was threatened with termination and physical harm by a Calpac supervisor if he did not do as the supervisor instructed. As Plaintiff saw that essentially nothing was being done to remedy the situation by removing Clark from the MCI project or disciplining him in any way, and that instead one of the supervisors (i.e., Harper) who received the workers' complaints was reassigned off the project, and Plaintiff and others who made complaints were being singled out, Plaintiff understood that his employer agreed and accepted Clark's discriminatory conduct. (Yee Decl. ¶¶ 12-23.)

Additionally, Harper testified that everything, the working conditions, got harder after the workers made the first complaint to him regarding Clark's comments. (Lujan Decl. Ex. 1 at 174-75.) Harper also testified about the harder conditions the employees faced, working out in the sun eight or ten hours a day with a pick and shovel, and being unhappy with the situation involving Clark. (Id. Ex. 1 at 185-86.) Harper testified that the working environment deteriorated. (Id. Ex. 1 at 188.)[4]

---

[4] Furthermore, shortly after the "island monkey" incidents and Plaintiff's complaints, Calpac instituted a new policy involving time cards, where an employee would know if he still had a job if he saw his timecard in the morning upon checking in each day. If the timecard was not there, then the employee would know he was fired. The timecard policy further aggravated employment conditions as every morning after that workers would worry if they had a job at Calpac. (See, e.g., Mendiola Decl. ¶¶ 15-16.)

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against D. James
10
Case 1:05-cv-00037   Document 499   Filed 01/22/2008   Page 10 of 12

Moreover, in late December 2004, after Plaintiff and co-Plaintiffs made complaints about Clark's "island monkey" and "monkey" statements, the workers were called to a meeting where Clark addressed the workers and flatly denied making any "monkey" remarks and Calpac owner John Healy warned the workers that they could lose their job if they were caught associating at any time with former Calpac workers who were protesting the discrimination. (Lujan Decl.[5] Ex. 1 at 26, 28-31; see also Second Lujan Decl.[6] Ex. 7 at 27-31.) Thus, Plaintiff worked in a racially charged and abusive environment.

### C. DTS is subject to Title VII liability for the alleged discrimination and harassment regardless of any claimed lack of awareness of such discrimination and harassment.

Plaintiff joins in the arguments raised in co-Plaintiffs John P. Babauta's, Joseph T. Mendiola's, and Jerry Apodaca's oppositions to DTS' motions for summary judgment, filed herein January 18, 2008, and in the arguments raised in other Plaintiff's oppositions to summary judgment, filed concurrently herewith, that DTS is subject to Title VII liability for the alleged discrimination and harassment.

Additionally, while DTS claims that it took immediate corrective action in response to Plaintiffs' complaints, this cannot be so as DTS plainly admits that during the period starting in January 2004, "[d]ue to the time difference in Guam, Mr. Clark had little communication with DTS other than the weekly submittal of timesheets which was done electronically." (Second Lujan Decl. Ex. 11 at 15-16.) In fact, DTS states that it "did not perform any work in Guam" and that it had no power or authority over Clark as it related to the MCI project. (Id. Ex. 12 at 19.) How then could DTS claim that it took immediate action to correct and deter the alleged

---

[5] Declaration of Delia Lujan, filed January 18, 2008.


Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. James S. Yee

11

Case 1:05-cv-00037    Document 495    Filed 01/22/2008    Page 11 of 12

harassment and hostile work environment created by Clark? Also, while DTS states that there were no discriminatory comments made by Clark after approximately January 2005, DTS cannot get credit for a harasser's voluntary cessation of harassment. See Fuller v. City of Oakland, Cal., 47 F. 3d 1522, 1529 (9th Cir. 1995).

Even if Clark is deemed not to be a supervisor of Plaintiffs, DTS is liable for his harassment and creation of a hostile work environment since DTS knew or should have known of such harassment and hostile work environment. Here, Plaintiff and co-Plaintiffs, a total of 13 individuals, complained of Clark's actions to their supervisors. The Plaintiffs did not even know that DTS was Clark's employer, as they thought that he was an MCI representative. Don Harper directly conveyed these complaints to Clark. Under the Agreement between DTS and MCI, DTS was required to supervise its personnel, such as Clark, and Calpac, such as Plaintiffs, and ensure goodwill on the project and that the project would not be delayed. Therefore, DTS, including obviously Clark, should have known about the multiple complaints made by the 13 Plaintiffs regarding Clark's conduct. Consequently, DTS is liable for Clark's actions.

## III. CONCLUSION

Based on the foregoing, the record, and all Plaintiffs' oppositions to Defendants' motions for summary judgment, Plaintiff John L.G. Nauta respectfully requests denial of DTS' motion.

**RESPECTFULLY SUBMITTED** this 22nd day of January, 2008.

**LUJAN AGUIGUI & PEREZ LLP**

By: _____
DELIA LUJAN
*Attorneys for Plaintiffs*

---

(Footnote continued from previous page)

[6] Second Declaration of Delia Lujan, filed January 22, 2008.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. James S. Yee
12

Case 1:05-cv-00037  Document 499  Filed 01/22/2008  Page 12 of 12