
FILED
DISTRICT COURT OF GUAM
JAN 22 2008
JEANNE G. QUINATA
Clerk of Court

LUJAN AGUIGUI & PEREZ LLP
238 Archbishop Flores Street, Suite 300
Hagåtña, Guam 96910
Tel. (671) 477-8064/5; Fax. (671) 477-5297

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT OF GUAM
## FOR THE TERRITORY OF GUAM

| HENRY G. VAN METER, et al., | CIVIL CASE NO. 05-00037 |
|---|---|
| Plaintiffs, | **OPPOSITION TO DEFENDANT DYNAMIC TECHNICAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF JOHN L.G. NAUTA** |
| -vs- | |
| CALPAC, et al., | |
| Defendants. | |

COMES NOW Plaintiff John L.G. Nauta, respectfully submitting his opposition to Defendant Dynamic Technical Services, Inc.'s Motion for Summary Judgment Against Plaintiff John L.G. Nauta, filed herein January 7, 2008.

## I. INTRODUCTION

Plaintiffs instituted this Title VII action on December 12, 2005, alleging that they were subjected to employment discrimination by defendants Calpac, Dynamic Technical Services ("DTS"), MCI, John Healy, Dennis Clark ("Clark"), William Ward, Jai James, and Does 1 through 10 (collectively "Defendants"). The Second Amended Complaint was filed on September 7, 2007, naming Defendants Verizon Business Purchasing, LLC, and Verizon Business Network Services, Inc., ("Verizon Defendants") in the stead of MCI. On January 7, 2008, DTS filed a motion for summary judgment against Plaintiff John L.G. Nauta ("Plaintiff").

## II. ARGUMENT

DTS moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56, arguing that (1) DTS was not a Title VII employer of Plaintiff and therefore cannot be subject to
Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS) Mot. Summ. J. Against Pl. John L.G. Nauta

Case 1:05-cv-00037    Document 501    Filed 01/22/2008    Page 1 of 20

1

Title VII liability, (2) there was no hostile environment based upon "the uncontroverted evidence," and (3) DTS had no knowledge of any alleged discrimination. (Mot. Summ. J. at 5.)

Summary judgment is appropriate if the evidence, construed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Tzung v. State Farm Fire & Cas. Co., 873 F. 2d 1338, 1339-40 (9th Cir. 1989). To establish the existence of a factual dispute, the nonmoving party need not establish a material issue conclusively; only that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F. 2d 626, 630 (9th Cir. 1987).

DTS should be denied summary judgment for the following reasons:

**A. DTS was a Title VII employer of Plaintiff.**

As DTS acknowledges, although Plaintiff's direct employer was Calpac, DTS is subject to Title VII liability if it is either a "joint employer" or "indirect employer" of Plaintiff.

**1. DTS was a "joint employer" of Plaintiff.**

Two or more employers may be considered "joint employers" under Title VII if both employers control the terms and conditions of employment of the employee. EEOC v. Pac. Mar. Ass'n, 351 F. 3d 1270, 1275 (9th Cir. 2003). The question of joint employer status is a factual one and requires an examination into whether an employer who is claimed to be a "joint employer" "possessed sufficient control over the work of the employees to qualify as 'joint employer' with [the actual employer]." Boire v. Greyhound Corp., 376 U.S. 473, 481 (1964). "A finding that companies are 'joint employers' assumes in the first instance that companies are 'what they appear to be' independent legal entities that have merely 'historically chosen to handle jointly ... important aspects of their employer-employee relationship.' " NLRB v. Browning-Ferris Indus. of Pa., Inc., 691 F. 2d 1117, 1122 (3d Cir. 1982) (quoting NLRB v. Checker Cab

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L. G. Nauta

2

Case 1:05-cv-00037    Document 501    Filed 01/22/2008    Page 2 of 20

Co., 367 F. 2d 692, 698 (6th Cir. 1966)). The Ninth Circuit has applied an "economic reality" test to determine whether a joint employment relationship exists. Pac. Mar. Ass'n, 351 F. 3d at 1275.

The determination of whether there is a "joint employer" situation looks to which of two, or whether both, companies control, in the capacity of employer, the labor relations of a given group of workers. Browning-Ferris[1], 691 F. 2d at 1122-23 (quoting NLRB v. Condenser Corp. of Am., 128 F. 2d 67, 72 (3d Cir. 1942)). The basis of a finding of "joint employer" status is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Id. at 1123. Joint employers share or co-determine those matters governing the essential terms and conditions of employment. Id. Joint employer status depends on a company's authority to control work conditions of employees, not on its exercise, in fact, of that authority. See, e.g., Jewel Tea Co., 53 NLRB 508, 510 (1966).

In determining whether two employing entities may be considered "joint employers," the following factors have been considered: (1) the nature and degree of control over the employers; (2) day-to-day supervision, direct or indirect, including discipline; (3) authority to hire and fire the employee and set conditions of employment; (4) power to control pay rates or methods of payment; (5) control of the employee records including payroll. Torres-Lopez v. May, 111 F. 3d

---

[1] In Browning-Ferris, the Third Circuit affirmed a finding that Browning Ferris Industries of Pennsylvania, Inc. (BFI) was a joint employer with independent trucking brokers over discharged drivers. According to the court, there was substantial evidence to support a "joint employer" finding: BFI shared with the brokers the right to hire and fire the drivers, and BFI's supervisor considered himself the "boss" and acted as "boss" with respect to the employees' functions. 691 F. 2d at 1124. BFI established the work hours of the drivers, determining when the two shifts it established would start and end. Id. at 1124-25. BFI provided the drivers with the same uniforms it provided its own employees. Id. at 1125. BFI and the brokers together determined the drivers' compensation and shared in the day to day supervision of the drivers. Id. BFI directed the drivers at the transfer and landfill sites as if they were their own employees, and BFI forms were used for record keeping purposes. Id. Finally, BFI shared with the brokers the power to approve drivers, and devised the rules under which the drivers were to operate at BFI sites. Id.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS's Mot. Summ. J. Against Pl. John L. G. Nauta

3

Case 1:05-cv-00037    Document 501    Filed 01/22/2008    Page 3 of 20

6633, 639-40 (9th Cir. 1997). These factors are not exhaustive as other relevant factors may be considered. Id.

In Gallenkamp Stores Co. v. Nat'l Labor Relations Bd., the Ninth Circuit affirmed the finding of joint employer status between K-Mart and its licensees. 402 F. 2d 525, 528, 535 (9th Cir. 1968). In that case, Kmart promulgated Rules and Regulations which provided that K-Mart's manager was responsible for the over-all operation of the store, and that he was permitted to request immediate action from the licensee if he believed that the licensee had not provided sufficient help, or if any employees were inefficient or objectionable. Id. at 528. Although the Rules declared hiring and terminations to be under the supervision of each licensee's manager, they authorized K-Mart's personnel supervisor to receive applications from persons desiring employment. Id. The Rules included provisions for employee discipline, smoking restrictions, rest periods, places where employees were permitted to keep their personal belongings, employee purchases, employee wearing apparel, and identification badges, and the greeting of customers. Id. at 528-29. Under the license agreement, K-Mart alone had the authority to issue uniform Rules and Regulations for the benefit of the common enterprise, and to amend, modify or revise them. Violation of these Rules subjects the offending licensee to termination of its license by K-Mart. Id. at 529. Under the Rules, K-Mart was allowed to prescribe the number of employees it deemed necessary to operate a licensee's department. Id.

In Ref-Chem Co. v. NLRB, the Fifth Circuit affirmed a finding of joint employer status between El Paso and two companies. 418 F. 2d 127, 129 (5th Cir. 1969). The terms of the agreements with these two companies gave El Paso the right to approve employees, control the number of employees, have an employee removed, inspect and approve work, and pass on changes in pay and overtime allowed. Id. In practice, El Paso exercised its control though in

Henry G. Van Meter, et al., v. Calpac, et al.  
Civil Case No. 05-00037  
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L. G. Nauta  
4

Case 1:05-cv-00037    Document 501    Filed 01/22/2008    Page 4 of 20

varying degrees. Id. The evidence showed that El Paso shared or co-determined those matters governing essential terms and conditions of employment. Id.[2]

In this case, DTS exercised significant control over Calpac employees, including Plaintiffs, and in the work environment, just as in the above-cited cases. DTS acted as the Company Representative of MCI on the project and rights and responsibilities of Calpac and DTS were set forth in a Construction Agreement between Calpac and MCI. (Lujan Decl.[3] Ex. 6, Statement of Work ¶ 13.1.) According to the Agreement, the results of Calpac's work on the MCI project had to be done to the "complete satisfaction of the Company Representative (DTS) ...." (Id. Ex. 6 ¶ 3.2.) DTS, as Company Representative of MCI (now Verizon Defendants), had the power to inspect all of Calpac's work and materials. (Id. Ex. 6 ¶ 7.1.) Calpac was required, at all times, to furnish to DTS access and acceptable accommodation to the work wherever it was in progress. (Id. Ex. 6 ¶ 7.2.) As to Calpac's superintendents, if DTS did not consider the superintendent or necessary assistants to be satisfactory, MCI could have objected to the use of that person or persons, and Calpac had to address and resolve MCI's objections. (Id. Ex. 6 ¶ 11.1.) Regarding Calpac employees, such as Plaintiffs, Calpac was obligated to remove or have removed from the work site any employee, agent, servant, or subcontractor who, in DTS' opinion, was not strictly disciplined and orderly. (Id. Ex. 6 ¶ 11.2.) If goodwill among landowners, tenants, lessees, and other inhabitants in the community(es)surrounding the work was at risk,

---

[2] Also, in Spencer v. Byrd, the district court found that the county was a joint employer of a deputy sheriff for purposes of Title VII even though the county was not the employer of the sheriff's deputy under state law. 899 F. Supp. 1439 (M.D.N.C. 1995). In that case, the sheriff, rather than the county, had the exclusive right to hire, discharge, and supervise the plaintiff, the deputy sheriff. Id. at 1441. However, the county had the power to limit the sheriff to two deputies, and to establish the number of deputies. Id. The county also provided the deputy sheriff's compensation as it provided such compensation out of budgeted funds. Id. Thus, the county had the power to fund or to decide not to fund the deputy positions. Id.

[3] Declaration of Delia Lujan in Support of Each of Plaintiffs' Oppositions to Defendant Dynamic Technical Services' Motion for Summary Judgment Against All Plaintiffs, filed November 7, 2007.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L. G. Nauta    5
Case 1:05-cv-00037    Document 501    Filed 01/22/2008    Page 5 of 20

Calpac was required to consult with DTS and follow DTS' recommendation for restoring goodwill. (Id. Ex. 6 ¶ 12.1.) As to additions and changes in the work, DTS executed the Change Orders which made material changes to the work Calpac would perform for the MCI project. (Id. Ex. 6 ¶ 13.3.) If Calpac had a claim for extra compensation, such claim had to be substantiated with supporting data satisfactory to DTS. (Id. Ex. 6 ¶ 15.2.) DTS had the power to correct and approve Calpac's invoices for the work it performed, and only after such correction and approval by DTS and approval by MCI would MCI pay to Calpac ninety percent (90%) of the amount shown on each invoice. (Id. Ex. 6 ¶ 16.2.) At DTS' sole discretion, money could be withheld from Calpac, such as the amount necessary to protect MCI from loss when, in DTS' sole discretion, there was evidence to indicate that the work to be performed by Calpac could not be completed. (Id. Ex. 6 ¶ 16.6.) If Calpac's work was suspended by MCI and MCI decided to pay Calpac's standby costs, Calpac was required to remain at a location designated by DTS and to be available to resume work immediately upon notice from DTS. (Id. Ex. 6 ¶ 19.2.) If, during suspension, MCI chose to allow Calpac to leave the work site and to pay Calpac additional mobilization and demobilization costs, Calpac was obligated to be available to resume work within ten (10) days' written notice from DTS that the suspension had ended and the work will resume. (Id. Ex. 6 ¶ 19.2.) In the event Calpac failed to perform the work to MCI's satisfaction by the agreed upon completion date, or failed to perform the work in conformity with the agreement with MCI, or otherwise breached any provision of the agreement with MCI, MCI could have required Calpac to correct the deficiencies to the satisfaction of DTS. (Id. Ex. 6 ¶ 20.1(b).) In the event of such failure or breach by Calpac, MCI could have required Calpac to make an equitable deduction, to be determined by DTS, from the contract price if the deficiencies complained of were not corrected to the satisfaction of DTS and in such case Calpac would not be entitled to any further payment until the deficiencies were corrected. (Id. Ex. 6 ¶ 20.1(c).) In the

Henry G. Van Meter, et al., v. Calpac, et al.  
Civil Case No. 05-00037  
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L.G. Nauta

6

Case 1:05-cv-00037   Document 501   Filed 01/22/2008   Page 6 of 20

event of such failure or breach by Calpac, MCI could have terminated the work if the deficiencies complained of were not corrected to the satisfaction of DTS and in such case Calpac would not be entitled to any further payment until the deficiencies were corrected. (Id. Ex. 6 ¶ 20.1(d).) DTS also had the authority to direct Calpac to segregate and promptly remove from the work site and vicinity of the work site any work failing to conform to the terms and conditions of the agreement with MCI. (Id. Ex. 6 ¶ 20.3.) In the event Calpac had engaged a subcontractor on the MCI project, if DTS did not consider such subcontractor to be satisfactory, MCI could have objected to the use of that subcontractor and Calpac and MCI had to address and resolve MCI's objections. (Id. Ex. 6 ¶ 26.1.) If work done by any other party was contiguous to the work performed under the agreement with MCI, the respective rights of the various interests involved had to be established by DTS. (Id. Ex. 6 ¶ 27.3.) Calpac was required to enforce DTS' instructions regarding signs and advertisements. (Id. Ex. 6 ¶ 8.3.) DTS had the power to withhold signature approval of the Weekly Production Summary if Calpac failed to comply with certain cleanup procedures. (Id. Ex. 6 Statement of Work ¶ 7.1.) In the event work was performed in or around a private or public facility, DTS and Calpac were required to coordinate work operations to suit the building management's access and movement requirements. (Id. Ex. 6 Statement of Work ¶ 7.2.) DTS had the sole authority to order the cutting of any existing cable. (Id. Ex. 6 Statement of Work ¶ 11.1.) Prior to performing any work near an existing cable, Calpac was required to consult with DTS to ensure that the work was undertaken in such a manner that existing cable was properly protected. (Id. Ex. 6 Statement of Work ¶ 11.1.)

DTS' role, authority, and responsibilities in the MCI project were also set forth in Work Orders executed between MCI and DTS. (Lujan Decl. Exs. 7-8.) DTS was responsible for coordinating the activities of Calpac within an assigned geographic area. (Id. Exs. 7-8.) DTS was responsible for researching, evaluating, and recommending routes; providing engineering

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L. G. Nauta
Case 1:05-cv-00037    Document 501    Filed 01/22/2008    Page 7 of 20

7

services; supporting, coordinating, and assuring the quality of product produced by Calpac. (Id. Exs. 7-8.) DTS was required to coordinate the efforts of MCI and Calpac's forces in assisting to acquire permits, both public and environmental; review and approve for submission information to be used in ordering materials and preparing construction and splicing contracts. (Id. Exs. 7-8.) DTS was obligated to coordinate pre-bid job showings and pre-construction meetings; monitor and evaluate construction activities, including presenting required design changes to MCI for approval, review, and approve for submission to Calpac quantities provided to MCI for preparation of progress payment statements. (Id. Exs. 7-8.) DTS was required to supervise all phases of MCI-supplied material acceptance, storage, and distribution, including preparing reports of material deficiencies and surpluses; monitor and approve for submittal to MCI final audit of splicing and construction contracts. (Id. Exs. 7-8.) DTS was required to prepare, supervise, and approve for submittal to MCI all engineering and as-built documentation; perform other duties as assigned by MCI to include meeting of deadlines and maintaining effective cost controls. (Id. Exs. 7-8.) DTS also had a duty to ensure effective coordination with MCI's departments and personnel actively working on the project. (Id. Exs. 7-8.)

Deposition testimony provided by Don Harper ("Harper"), a superintendent employed by Calpac during Plaintiffs' employment, demonstrates the authority DTS, through Clark, had over Plaintiffs and the work environment. According to Harper, Clark (i.e., DTS) had to be pleased and satisfied. (Lujan Decl. Ex. 1 at 183.) Harper testified that Clark worked out of the Calpac office where he had set up his computer. (Id. Ex. 1 at 173.) Harper testified that Clark was present on the work site with Calpac employees "85 to 90 percent of the time," (id. Ex. 1 at 18-19), and that he knew of the Calpac employees by name since he was there every day with them, (id. Ex. 1 at 179). When asked who was the person responsible for supervising the work of the Calpac employees, Harper testified that "[t]he quality of the work was basically driven by Mr.

Henry G. Van Meter, et al., v. Calpac, et al.  
Civil Case No. 05-00037  
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L. G. Nauta

8

Case 1:05-cv-00037    Document 501    Filed 01/22/2008    Page 8 of 20

Clark." (Id. Ex. 1 at 59.) Harper testified that Clark would measure the quantity of work completed and that Clark was "always wheeling out, measuring, doing logs, keeping maps where we were at and measuring depths. Things like that." (Id. Ex. 1 at 71.) Harper testified that Clark would make daily reports to MCI on the progress of the project. (Id. Ex. 1 at 148.) Harper would prepare the reports, sign them, and then send them to Clark. (Id. Ex. 1 at 148-49.) Clark would then revise the reports, remove Harper's name, put his name on the reports, and then send them to MCI. (Id. Ex. 1 at 148-49.) Harper testified that Clark would communicate with "everybody." (Id. Ex. 1 at 73.) Harper testified that Clark gave direct instructions to Calpac employees "a lot." (Id. Ex. 1 at 60.) Harper stated that if Clark did not like the quality of the work performed by Calpac employees, then he would instruct them to do the work over again. (Id. Ex. 1 at 59.) "He [Clark] would want fiber handled differently and if somebody was doing it the way he didn't like it, he would stop them and tell them to do it like this or if he wanted more coverage over his conduit, he would tell someone to shovel some more right here and walk them along, tell them to shovel some more over there." (Id. Ex. 1 at 60.) When asked to give examples of direct instructions Clark would give to Calpac employees, Harper testified that Clark "would want a certain way of stacking fiber, bend radiuses, placement of conduits, the amount of backfill to be placed, the amount of compaction, separation of rock from soil." (Id. Ex. 1 at 95.) If Clark thought a Calpac employee was shoving too many rocks in the trench, Clark would stop him and tell him not to put anything in the trench, Harper stated. (Id. Ex. 1 at 95.) Harper also testified that "[i]f he [Clark] didn't like the way the traffic control was set up or something like that, he would say something." (Id. Ex. 1 at 60.) Harper also testified that Clark instructed Calpac to perform work outside of the guidelines of the permit and that Calpac just followed the guidelines of Clark. (Id. Ex. 1 at 109-112.) Harper testified that Clark complained to Calpac about Calpac employees and usually mentioned the employee by name. (Id. Ex. 1 at 165.) Harper testified that

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L. G. Nauta

9

Case 1:05-cv-00037  Document 501  Filed 01/22/2008  Page 9 of 20

Clark had screamed and yelled at Calpac employees, including Plaintiffs, on the job site regarding their covering up of conduits without putting dry mix concrete on the conduits in the area. (Id. Ex. 1 at 26.) Harper also testified that on one occasion Clark was cussing and screaming at Calpac employees regarding the work and telling them "they were ripping him off. It was almost like it was his [Clark's] project. He [Clark] referred to it as ripping 'me' off." (Id. Ex. 1 at 91-92.) Harper testified that if Clark made a complaint that he did not agree with, he still followed Clark's instruction. (Id. Ex. 1 at 166-67.) Harper further testified that he himself was removed by Calpac from the MCI project at the request of Clark (i.e., DTS) due to confrontations he had with him. (Id. Ex. 1 at 30, 170.) Also, in Calpac's position statement to the EEOC, Calpac stated that Harper was removed from the MCI project on Clark's orders. (Id. Ex. 2 at 28, 52-53.) Moreover, John Cruikshank testified in a deposition that Healy indicated to him in October 2004, after learning of Clark's discriminatory comments, that Healy (i.e., Calpac) was going to fire Harper. (Id. Ex. 3 at 64.) Clearly, DTS was a joint employer of Plaintiffs.

### 2. Even if DTS were not a joint employer, it was an "indirect employer" of Plaintiff.

The Ninth Circuit has recognized that a defendant need not be the plaintiff's direct employer and that indirect employment may be a basis for liability under Title VII. Velez v. Roche, 335 F. Supp. 2d 1022, 1027 (N. D. Cal. 2004) (citing Gomez v. Alexian Bros. Hosp. of San Jose, 698 F. 2d 1019, 1021 (9th Cir. 1983) (stating that Title VII covers those situations in which a defendant subject to the statute "interferes with an individual's employment opportunities with another employer"); Lutcher v. Musicians Union Local 47, 633 F. 2d 880, 883 (9th Cir. 1980) (stating "there must be some connection with an employment relationship for Title VII protections to apply. The connection with employment need not necessarily be direct."). In Lutcher, the Ninth Circuit stated that an indirect employer may be liable under Title VII, for

Henry G. Van Meter, et al., v. Calpac, et al.  
Civil Case No. 05-00037  
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L. G. Naputi

10

Case 1:05-cv-00037   Document 301   Filed 01/22/2008   Page 10 of 20

example, where a defendant subject to Title VII interferes with an individual's employment opportunities with another employer. 633 F. 2d at 883 n.3.

In fact, a Title VII plaintiff could assert a claim for hostile work environment against an indirect employer when the indirect employer did cause the hostile work environment or when it had the power to stop the hostile work environment so that its failure to do so constituted interference with the terms, conditions, or privileges of the plaintiff's direct employment. Velez, 335 F. Supp. 2d at 1028 (citing Anderson v. Pac. Mar. Ass'n, 336 F. 3d 924, 932 (9th Cir. 2003)).[4]

---

[4] Several other courts have also found Title VII liability in an indirect employer. For example, in Garrett v. Info. Sys. & Networks Corp., No. 5:97-CV-436-BRI, 1997 U.S. Dist. LEXIS 20845 (E.D.N.C. Nov. 21, 1997), the plaintiff, who worked for a company called I-Net, alleged that she was sexually harassed by an employee of a company called ISN while she was a contract worker with the U.S. Postal Service. The plaintiff claimed that I-Net was liable as her employer, that the USPS was liable because she worked on its premises and it directed her duties, and that ISN was liable because it knew that one of its employees was harassing her. In response to ISN's argument that it could not be held liable, the court stated that it could be: "To allow a defendant to evade liability for allegedly allowing an employee to create a hostile working environment simply because the victim of the alleged harassment was not its employee would undercut the remedial purpose of Title VII." Id. at *6.

In King v. Chrysler Corp., 812 F. Supp. 151 (E.D. Mo. 1993), the plaintiff worked for a company called Canteen, which operated a cafeteria for the employees of Chrysler on Chrysler's premises. The plaintiff claimed that she was sexually harassed by a Chrysler's employee. Chrysler contended that it was not liable since it lacked an employment relationship with the plaintiff. The court ruled against Chrysler, stating that, if it "were to accept Chrysler's position that it is not a proper defendant, Chrysler could allow a hostile work environment to exist because of the peculiar circumstances of its relationship with Canteen, although it could not do so if [the plaintiff] were in its own service." Id. at 153. The court added that this was a case in which a Chrysler employee actually participated in creating the hostile work environment. Id.

In EEOC v. Foster Wheeler Constructors, Inc., No. 98 C 1601, 1999 WL 515524, (N.D. Ill. July 14, 1999), the plaintiffs were the employees of subcontractors who were allegedly subject to a hostile environment at a construction site run by defendant. The court found that the subcontractors' employees who were employed by Title VII employers may sue the defendant [a Title VII employer) for interfering with the conditions of their employment. Id. at *10.

In Duncan v. Junior Coll. Dist. of St. Louis, No. 4:98CV01220 (CEJ), 1999 U.S. Dist. LEXIS 22451 (E.D. Mo. Nov. 15, 1999), the plaintiff was employed by a college but was assigned to perform her job duties at a General Motors facility, where she claimed she was subject to a hostile work environment. The court found that, although General Motors did not pay her salary or give her any other benefits, it could be held liable: "Plaintiff performed her job only at the GMC plant, GMC employees gave her work instructions, and a GMC employee with apparent, if not actual, authority over plaintiff was responsible for the allegedly hostile work environment. That hostile environment caused plaintiff to terminate her employment with the College." Id. at *9.

In Diana v. Schlosser, the plaintiff worked for a company that was in the business of providing on-air traffic reports for radio stations, one of which was the defendant. The plaintiff, who was assigned to do a report for the defendant, claimed that she was subjected to a hostile environment by one of the defendant's employees. Although the court found that the defendant was not the plaintiff's employer, the court found that the plaintiff could pursue

(Footnote continues on following page.)

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS) Mot. Summ. J. Against Pl. John L. Ginautu

11

Case 1:05-cv-00037   Document 301   Filed 01/22/2008   Page 11 of 20

Here, as discussed in subsection 1 above, DTS exercised significant, peculiar control over Plaintiff that it interfered with his employment. In <u>Anderson</u>, the Ninth Circuit held that defendant PMA could not be liable under Title VII since the alleged work site was not controlled by the PMA and the PMA did not employ or supervise the plaintiffs or the alleged harassers. 336 F. 3d at 931. In this case, DTS did employ the harasser and DTS, through Clark, did supervise the plaintiffs and DTS, through Clark, did exercise great control over the work site. As Clark was DTS' employer, DTS obviously had the power to stop the hostile work environment but it did not and instead waited until after EEOC charges were filed to make any attempt to ensure that Clark did not engage in harassing conduct. Therefore, DTS, if not a joint employer, was an indirect employer of Plaintiffs.

**B. Plaintiff was subjected to a hostile work environment.**

To establish a hostile work environment under Title VII, an employee must show that (1) he was subjected to verbal or physical conduct based on his race or national origin, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. <u>Galdamez v. Potter</u>, 415 F. 3d 1015, 1023 (9th Cir. 2005).

As to the first element, the Ninth Circuit has stated that "there are no 'talismanic expressions' of racial animus necessary to sustain a harassment claim, and recognized that

---

(Footnote continued from previous page)

Title VII relief against the defendant since the defendant had significant control over the plaintiff's ability to maintain substantial employment opportunity. The court stated:
> This type of arrangement is not atypical of the present-day workplace where employees of different employers often work side-by-side and where employment opportunities are controlled by those other than the direct employer. It would undermine the protections of Title VII if an employer could permit discrimination, and not be exposed to Title VII liability from certain employees whose employment opportunities it controlled, simply because those employees were not its own.

20 F. Supp. 2d 348, 352 (D. Conn. 1998).

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L. G. Nauta

12

Case 1:05-cv-00037   Document 301   Filed 01/22/2008   Page 12 of 20

racially charged 'code words' may provide evidence of discriminatory intent by 'sending a clear message and carrying the distinct tone of racial motivations and implications.'" Galdamez, 415 F. 3d at 1024 n.6 (quoting McGinest v. GTE Serv. Corp., 360 F. 3d 1103, 1113 (9th Cir. 2004)). For example, the word "redneck" can suggest racial hostility. Id. In this case, Plaintiff was directly subjected to verbal abuse when Clark, his supervisor, called him and/or his fellow co-workers "island monkeys" or "monkeys" on at least two occasions. (Nauta Decl.[5] ¶ 6.) As Plaintiff is a Chamorro/Pacific Islander and Guamanian, Clark's conduct toward Plaintiff clearly was based on Plaintiff's race and national origin, especially since Clark did not use any similar terms to refer to non-Pacific Islanders or non-Chamorros. (Id. ¶ 18.) In fact, DTS in its motion does not argue that the alleged verbal conduct by Clark was based on something other than Plaintiff's race or national origin.

As to the second element, Clark's comments were clearly unwelcome by Plaintiff, as he complained to his supervisors after being called an "island monkey" or "monkey" by Clark. (Nauta Decl. ¶ 10.) DTS does not argue in its motion that Clark's comments were welcome.

The third element of the test is satisfied by showing that the work environment was both subjectively and objectively hostile. Id. Whether an environment is objectively "hostile" or "abusive" can be determined only by looking at all the circumstances, which may include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating as opposed to a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Harris v. Forklift Sys., Inc., 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). However, no single factor is required. Id. The required severity of the

---

[5] Declaration of John L.G. Nauta in support of Opposition to Defendant Calpac's Motion for Summary Judgment, filed August 6, 2007.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L. Nauta

13

Case 1:05-cv-00037   Document 301   Filed 01/22/2008   Page 13 of 20

conduct varies inversely with its pervasiveness or frequency. Brooks v. City of San Mateo, 229 F. 3d 917, 926 (9th Cir. 2000). Finally, the objective hostility inquiry must be considered from the perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff. Galdamez, 415 F. 3d at 1023.

A single incident of harassment may be enough to constitute a hostile work environment because the frequency of the discriminatory conduct is only one factor in the analysis. Little v. Windermere Relocation, Inc., 301 F. 3d 958, 967 (9th Cir. 2002); see also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (stating that an isolated incident can amount to a "discriminatory change[] in the 'terms and conditions of employment' when the incident is extremely serious").

As to racial epithets, the Fourth Circuit in Spriggs v. Diamond Auto Glass, stated that usage of the word "nigger" was far more than a "mere offensive utterance." 242 F. 3d 179, 185 (4th Cir. 2001). " 'Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates.' " Id. (quoting Rodgers v. Western-Southern Life Ins. Co., 12 F. 3d 668, 675 (7th Cir. 1993)). The Fourth Circuit further stated that the use of the word "**monkey**" to describe African Americans was similarly odious. Id. (emphasis added). "To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme." Id. (citing Walker v. Thompson, 214 F. 3d 615, 626 (5th Cir. 2000) (triable issue raised with regard to hostile work environment where, inter alia, supervisors verbally assailed African American employees with physically humiliating comparisons to "monkeys" and "slaves")).

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037

14

Additionally, "in some cases the mere presence of an employee who has engaged in particularly severe or pervasive harassment can create a hostile working environment. To avoid liability under Title VII for failing to remedy a hostile environment, employers may even have to remove employees from the workplace if their mere presence would render the working environment hostile." Ellison v. Brady, 924 F. 2d 872, 883 (9th Cir. 1991) (citations omitted).

Conduct targeted at persons other than the plaintiff can be considered in determining a hostile work environment. Spriggs, 242 F. 3d at 184. As Title VII is concerned with the "environment" of workplace hostility, the contours of one's environment surely may exceed the individual dynamic between the complainant and his supervisor. Id. "[O]ne of the critical inquires in a hostile environment claim must be the *environment*. Evidence of general work atmosphere therefore—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." Hicks v. Gates Rubber Co., 833 F. 2d 1406, 1415-16 (10th Cir. 1987); see also Walker v. Ford Motor Co., 684 F. 2d 1355, 1359 n.2 (11th Cir. 1982) ("The fact that many of the epithets were not directed at [the plaintiff] is not determinative."). Indeed, "[s]uch evidence could be critical to a plaintiff's case, for a claim of harassment cannot be established without a showing of more than isolated indicia of a discriminatory environment." Vinson v. Taylor, 753 F. 2d 141 (D.C. Cir. 1985), aff'd in part and rev'd in part, 477 U.S. 57 (1986)).

Here, Plaintiff was subjected to a hostile work environment. Plaintiff himself was called an "island monkey" on at least two occasions. Besides being subjected to this direct abuse, Plaintiff heard from other co-workers, such as the co-plaintiffs here, that they had been called "island monkey" by Clark on other occasions when Plaintiff was not present. After he and/or other co-workers were called "island monkeys" or "monkeys," the workers were close to revolt. (Nauta Decl. ¶¶ 9, 11.) In fact, Harper testified that he feared the workers would harm Clark after

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L.G. Nauta

15

Case 1:05-cv-00037   Document 501   Filed 01/22/2008   Page 15 of 20

Clark made his discriminatory statements. (Lujan Decl.[6] Ex. 1 at 96-97, 151.) Being referred to as an "island monkey" or "monkey" by Clark, the highest-ranking supervisor on the field, greatly affected Plaintiff. Plaintiff was humiliated and his self-esteem lowered, making it difficult for him to work at Calpac. After the "island monkey" statements were made, Plaintiff and co-Plaintiffs would still see Clark around the MCI project and never witnessed or heard of him getting thrown off a worksite or disciplined in any way for his comments. Clark's continued presence further disturbed Plaintiff and the other co-plaintiffs and kept the working environment highly tense. Also, shortly after making his complaints, Plaintiff's driving privileges as the dump truck driver were taken away and he was reassigned to do the undesirable tasks, along with other Calpac workers who had also filed EEOC charges against the same Defendants. Although it was the usual practice for work crews to clean up after themselves, (e.g., pick up the debris) when they have completed their work for the day at a particular site, after Plaintiff filed EEOC charges, he was ordered to pick up the debris left behind by co-workers, which was physically demanding, more difficult, and dirtier than Plaintiff's usual assignments before he filed the EEOC charges. Also, Plaintiff and other workers who complained and filed EEOC charges were stripped of base privileges unlike others who did not make complaints. As Plaintiff saw that essentially nothing was being done to remedy the situation by removing Clark from the MCI project or disciplining him in any way, and that instead one of the supervisors (i.e., Harper) who received the workers' complaints was reassigned off the project, Plaintiff understood that his employer agreed and accepted Clark's discriminatory conduct. (Nauta Decl. ¶¶ 12-21.)

---

[6] Declaration of Delia Lujan in support of Each of Plaintiffs' Oppositions to Defendant Calpac's Motion for Summary Judgment, filed August 6, 2007.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def-DTSI MSJ Sum.D.c Against PL John L. Gil Nauta

16

Additionally, Harper testified that everything, the working conditions, got harder after the workers made the first complaint to him regarding Clark's comments. (Lujan Decl. Ex. 1 at 174-75.) Harper also testified about the harder conditions the employees faced, working out in the sun eight or ten hours a day with a pick and shovel, and being unhappy with the situation involving Clark. (Id. Ex. 1 at 185-86.) Harper testified that the working environment deteriorated. (Id. Ex. 1 at 188.)[7]

Moreover, in late December 2004, after Plaintiff and co-Plaintiffs made complaints about Clark's "island monkey" and "monkey" statements, the workers were called to a meeting where Clark addressed the workers and flatly denied making any "monkey" remarks and Calpac owner John Healy warned the workers that they could lose their job if they were caught associating at any time with former Calpac workers who were protesting the discrimination. (Lujan Decl.[8] Ex. 1 at 26, 28-31; see also Second Lujan Decl.[9] Ex. 7 at 27-31.) Thus, Plaintiff worked in a racially charged and abusive environment.

### C. DTS is subject to Title VII liability for the alleged discrimination and harassment regardless of any claimed lack of awareness of such discrimination and harassment.

The United States Supreme Court has held that an employer is vicariously liable under Title VII for the harassment of a supervisor with immediate or successively higher authority over the plaintiff employee. See Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 724, 765 (1998). When no tangible employment

---

[7] Furthermore, shortly after the "island monkey" incidents and Plaintiff's complaints, Calpac instituted a new policy involving time cards, where an employee would know if he still had a job if he saw his timecard in the morning upon checking in each day. If the timecard was not there, then the employee would know he was fired. The timecard policy further aggravated employment conditions as every morning after that workers would worry if they had a job at Calpac. (See, e.g., Mendiola Decl. ¶¶ 15-16.)

[8] Declaration of Delia Lujan, filed January 18, 2008.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037

17

action is taken, an employer may raise an affirmative defense to liability or damages: (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Ellerth, 524 U.S. at 765. However, no affirmative defense is available when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. Id.

Further, contrary to DTS' position, the Ninth Circuit has held that, under Title VII, "an employee can recover against an employer without showing that the employer had actual or constructive knowledge of the supervisor's actions or acted negligently in failing to intervene." Kohler v. Inter-Tel Technologies, 244 F. 3d 1167, 1177 (9th Cir. 2001). A Title VII plaintiff is not required to prove that his employer committed an act of harassment or had actual or constructive knowledge that a supervisor had done so. Id. Thus, an employer is vicariously liable for the acts of an agent or supervisor without regard to the employer's knowledge or fault. Id.; see also El-Hakem v. BJY Inc., 415 F. 3d 1068, 1075 n.2 (9th Cir. 2005) (quoting Nichols v. Azteca Rest. Enters., Inc., 256 F. 3d 864, 876-77 (9th Cir. 2001)) ("Under Title VII, there is a presumption that 'an employer is vicariously liable for a hostile work environment created by a supervisor.'")

Here, DTS argues that it cannot be liable for Clark's actions since it had no knowledge of Plaintiff's allegations until after they had ceased and Plaintiff was already fired. However, as stated in Kohler, DTS' alleged lack of knowledge is of no moment since DTS is vicariously liable

---

(Footnote continued from previous page)

[9] Second Declaration of Delia Lujan, filed January 22, 2008.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L. G. Nauta

18

Case 1:05-cv-00037    Document 301    Filed 01/22/2008    Page 18 of 20

for the acts of Clark, who was DTS' agent and Plaintiff's supervisor. As Plaintiff indisputably suffered a tangible employment action, i.e., reassignment, reduction of work hours, and discharge, DTS can raise no affirmative defense.

Even if DTS could raise an affirmative defense, it has failed to meet its burden of showing that it exercised reasonable care to prevent and correct promptly Clark's harassing behavior and that Plaintiff unreasonably failed to take advantage of preventive or corrective opportunities provided by DTS or to otherwise avoid harm. While DTS argues that once it became aware of the Plaintiffs' complaints, immediate remedial action was taken, this was not so as DTS plainly admits that it did not monitor or even try to control the actions of Clark, its employee, on the MCI project. (Hayes Aff. ¶¶ 5-7.) Linda G. Hayes, the current President of DTS and former Director of Recruiting during the years 2004-2005, states that neither she nor anyone else at DTS ever provided Clark with his duties on the Guam project and that after Clark was selected by MCI to serve as its company representative, neither she nor anyone else at DTS was involved in the Guam project with the exception of invoicing Clark's time to MCI for payment. (Id. ¶¶ 5-6.) Hayes states that DTS did not supervise Clark on the MCI project and that, in fact, Clark reported directly to MCI and discussed any issues regarding the project with MCI. All duties and responsibilities given to Clark regarding the Guam project came from MCI, not DTS. All issues that arose on the Guam project were handled between Clark and MCI and did not involve DTS. Hayes states that DTS did not have the authority to remove Clark from the MCI project. (Id. ¶ 6.)

Yet, despite its admission that it did not monitor or control Clark as he worked on the MCI project in Guam, DTS is still trying to claim credit for having taken immediate remedial action once it learned of the discrimination after many of the Plaintiffs had already been fired. DTS claims that Clark's statement at the December 2004 meeting that he did not make any discriminatory statements "was an appropriate action in response to the unspecified

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L. G. Nauta

19

Case 1:05-cv-00037    Document 301    Filed 01/22/2008    Page 19 of 20

discrimination allegations [DTS] had received at that time" and no complaints of Clark's actions subsequent to the meeting were ever received by DTS. (Hayes Aff. ¶ 10.) However, an alleged harasser's denial of harassment and voluntary cessation of harassing conduct cannot qualify as remedial action. DTS also claims that, after receiving the Plaintiffs' EEOC charges in 2005, Hayes reiterated the non-discrimination policies of DTS to Clark and Clark stated that he would comply with them. DTS again tries to get credit for the fact that it received no complaints of Clark making discriminatory remarks subsequent to this conversation. (Id. ¶ 11.) However, this action was insufficient as DTS simply took Clark's word once again and too late as Clark had already made the discriminatory remarks and created and allowed the hostile work environment. Also, even if Clark did not make further remarks, the discrimination and hostile work environment culminated in Plaintiff being stripped of base privileges and driving privileges, reassigned to less desirable tasks, having his work hours reduced, and being wrongfully terminated in May 2005, after DTS had notice of Plaintiff's EEOC complaints.

Additionally, DTS has offered no argument or evidence that Plaintiff failed to avail himself of preventive or corrective opportunities provided by DTS. Therefore, DTS has failed to prove an affirmative defense and so clearly is not entitled to summary judgment.

### III. CONCLUSION

Based on the foregoing, the record, and all Plaintiffs' oppositions to Defendants' motions for summary judgment, Plaintiff John L.G. Nauta respectfully requests denial of DTS' motion.

**RESPECTFULLY SUBMITTED** this 22nd day of January, 2008.

                                        **LUJAN AGUIGUI & PEREZ LLP**
                                    By: _____
                                        **DELIA LUJAN**
                                        *Attorneys for Plaintiffs*

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Def. DTS' Mot. Summ. J. Against Pl. John L.G. Nauta

20

Case 1:05-cv-00037   Document 301   Filed 01/22/2008   Page 20 of 20