# EXHIBIT 8

# EXHIBIT 9

# OUTSIDE PLANT ENGINEERING
## AND PROJECT MANAGEMENT AGREEMENT

THIS OUTSIDE PLANT ENGINEERING AND PROJECT MANAGEMENT AGREEMENT ("Agreement") is made and entered into as of this _24_ day of _SEPTEMBER_, _2001_ by and between **MCI WORLDCOM Network Services, Inc.** ("Company"), a Delaware corporation, with offices located at 6929 N. Lakewood Avenue, Tulsa, Oklahoma, 74117, on behalf of itself and for the benefit of its separate affiliates, subsidiaries, and/or divisions, and _DYNAMIC TECHNICAL SERVICES L.P._ ("Contractor"), a _TEXAS_ corporation/partnership/limited liability company/sole proprietorship, with offices located at _405 SH 121 BYPASS BLDG D - STE 100 LEWISVILLE, TX. 75067 - 8192_.

## WITNESSETH:

WHEREAS, Company is engaged in the business of providing telecommunications services and intends to obtain from time to time services for the design, engineering, project management, procurement, construction, operation, maintenance, relocation and replacement of various telecommunications network projects within the United States (each, a "Project"; together, "Projects"); and

WHEREAS, Contractor represents that it has the expertise and the personnel to perform such tasks; and

WHEREAS, Company and Contractor desire to establish the general terms and conditions under which each requested Project will be performed and to establish the responsibilities of each party hereto for the same.

NOW THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows:

## ARTICLE 1
### TERM, SCOPE AND NON-EXCLUSIVITY OF AGREEMENT

1.1    Term. Unless sooner terminated as provided for herein, this Agreement shall be effective for an initial term of one (1) year, commencing with the date first written above and continuing thereafter on a month-to-month basis until terminated by either party by giving thirty (30) days' prior written notice to the other party. Company may terminate this Agreement and any Work Order hereunder without cause upon thirty (30) days' prior written notice to Contractor. In the event of a termination by notice, Company shall compensate Contractor for all work completed through the date of termination pursuant to Article 4 hereof. In the event of termination for cause pursuant to Article 8, Company shall be entitled to exercise any remedy or remedies described in said Article as of the date of termination. At Company's option upon any termination, it may choose to allow one (1) or more Work Orders executed prior to the termination date to be completed beyond the date of termination, in which event the terms and conditions of this Agreement shall govern such Work Orders

1.2     Scope of Agreement. This Agreement shall be applicable to all Work not covered by a separate agreement between the parties, whether performed prior to the date first set forth above, as of such date or after such date.

1.3     Other Contractors. It is agreed that, during the term of this Agreement, Company may contract with other persons or firms that provide similar services or Work as Contractor. This Agreement is not exclusive and in no way constitutes a commitment from Company to purchase Work or services from Contractor.

## ARTICLE 2
## CONTRACTOR'S SERVICES

2.1     Work. Contractor agrees to provide, as required by Company, all the labor, equipment, materials and expertise, and to do all things necessary for the proper performance and completion of each Project (the "Work"). The Work may include without limitation design services; engineering services; project management services; inspection services; acceptance testing; construction of telecommunications network infrastructure, which may consist of both inside and outside plant Work; terminal and regen/amplifier facility construction or expansion; creating and managing Project Schedules and budgets; overseeing the procurement of necessary Project materials and the overall construction and testing process; coordinating operations among Company's various construction groups; communicating with landlords, regulatory agencies and other governmental authorities; as well as further duties as designated by Company. The duties generally required of Contractor's personnel and rates therefore are further described in Exhibit "D", attached hereto and made a part hereof.

2.2     Work Orders. The Work shall be set forth in a detailed Work Order (each, "Work Order"; together, "Work Orders") for each individual Project executed by Company (or Company's affiliate or subsidiary as appropriate) and Contractor. No Work Order shall be effective, nor shall Company or Contractor incur any liability therefore, unless such Work Order has been executed by duly authorized representatives of each party hereto.

2.2.1     Each Work Order shall be substantially in the form of and shall contain the information delineated in the sample Work Order, attached hereto as Exhibit "A" and made a part hereof. At a minimum, each Work Order shall contain the Project name, description of the Work to be performed, Project Staffing Plan (as hereafter defined), Project Budget, Project Schedule(s) and a list of Work to be subcontracted, if any. Upon execution of a Work Order it shall become a part of, and shall be governed by, this Agreement. Each Work Order shall be labeled so that, for example, the first executed Work Order may be Work Order No. C-XXXX.001, the second Work Order would then be Work Order No. C-XXXX.002, and so on in like manner.

Case 1:05-cv-00037     Document 505-2     Filed 01/22/2008     Page 4 of 41

## ARTICLE 3
## PERFORMANCE OF WORK

3.1   Contractor's Forces.   The Contractor shall perform project management, engineering, supervisory functions, contract and document preparation, drafting, material procurement, and all portions of the Work which are similar to those stated herein with its own employees except as mutually agreed by Company and Contractor.

3.1.1   Contractor agrees to provide Company with a detailed plan for the staffing of each Project ("Project Staffing Plan") as part of each Work Order. Each Project Staffing Plan shall identify the individuals who will fill key positions and other positions that will be required for the Project. Contractor shall provide Company with relevant employee information upon request. Contractor shall follow Company's reasonable recommendations concerning the Project Staffing Plan for each Work Order. All unscheduled or voluntary changes by Contractor in the staffing of key positions or other Contractor employees on a Project shall be subject to the prior written approval of Company.

3.1.2   Company shall have the right to request that Contractor remove any of its employees or other personnel from any Project at any time for any reason or for no reason. Contractor shall comply with such requests immediately and shall promptly replace any such removed individual with another person suitably qualified for the position so vacated.

3.2   Subcontractors and Installers.   Unless specifically permitted in a Work Order, Contractor agrees that all other contractors hired by Contractor to complete the Work hereunder shall be unaffiliated third party contractors ("Subcontractors"). The Company may contract with other persons and firms to physically install or construct the facilities (each, "Installer"; together, "Installers"). Unless Company directs otherwise in writing, all Installers shall be under the direct supervision of Contractor (as project manager), and Contractor shall diligently manage all Installers' and Subcontractors' actions to ensure that the Projects performed hereunder are completed in a professional and timely manner.

3.2.1   Where Contractor is required in a Work Order either to subcontract Work or to assume the selection process of Installers on Company's behalf, Contractor shall develop a list of qualified prospective Subcontractors and/or Installers for each Project and establish bidding schedules for the same. Company shall have the right, in its sole discretion, to review, approve, disapprove, add to or delete from the list of bidders. Unless otherwise stated in a Work Order, the Contractor shall obtain competitive bids from a minimum of three (3) bidders for each phase or portion of Work for a Project with an estimated value of less than $100,000 or a minimum of five (5) bidders for each phase or portion of Work for a Project with an estimated value greater than $100,000. Contractor must obtain a written waiver of this requirement from Company before proceeding with less than the required number of bidders.

3.2.2   Company shall pre-approve all bidding documents, addenda and other documents to be used by Contractor for the bidding process.

Case 1:05-cv-00037   Document 505-2   Filed 01/22/2008   Page 5 of 41

3.2.3    Upon the expiration of the applicable bidding period for a Project, Contractor shall prepare and deliver to Company its bid evaluation on a Company-supplied form. Contractor shall analyze all bids received, recommend that a particular bidder be selected by Company, and state the reasons therefore.

3.2.4    Any subcontracting by Contractor of part or all of any Project hereunder shall not relieve Contractor of primary responsibility for the proper performance thereof.

3.3    Contract Documents. The Contractor shall prepare all Subcontractor and Installer related contracts for the Work ("Contract Documents"). All Contract Documents shall conform to all laws and requirements of any right-of-way providers, local, state, or federal governmental agencies, permitting authorities and other requirements of the Work Order. Further, Company may require Contractor to use Company's standard contract forms.

3.3.1    The content of all Contract Documents shall comply with generally accepted industry standards. In no event shall any Contract Document expose Company to any premium payment for early completion of a Project, costs for errors, liquidated damages or other penalty payments of any kind without the prior written consent of Company, which may be withheld by Company in its sole discretion.

3.3.2    The Contractor shall report to Company any error, inconsistency or omission in the Contract Documents that may have a material impact on any Project immediately upon discovery thereof.

3.3.3    Company shall approve any and all Contract Documents prior to execution.  Following execution, Contractor shall provide Company with copies of such executed Contract Documents.  Notwithstanding such approval, Company shall not be responsible for the completeness, accuracy or context of the Contract Documents.  Contractor shall use commercially reasonable efforts to ensure that all disputes concerning errors, inconsistencies or omissions in the Contract Documents are resolved in favor of Company.

3.3.4    The Contractor shall maintain copies of all Contract Documents at the site of each Project in good order and marked reasonably current to record all changes made during the Work.

3.4    Materials. All anticipated purchases, rentals or other acquisition of materials shall be described in the applicable Work Order and included in the appropriate budget for each. All materials purchases made hereunder are subject to the bidding requirements contained in this Agreement.

3.4.1    Company hereby reserves the right to purchase or provide any and all materials necessary for the Work if desired by Company.

3.4.2    Contractor shall properly receive, inspect, protect, and handle any materials ordered pursuant to this Article.

Case 1:05-cv-00037    Document 505-2    Filed 01/22/2008    Page 6 of 41

3.5     Permits and Fees. As required by Company and specified in the Work Order, Contractor shall secure on Company's behalf, and Company shall reimburse Contractor for, all permits, governmental or permitting agency fees, and inspections that are necessary for the proper execution and completion of the Work.

3.5.1     Contractor shall not enter into or accept any license agreement, joint-use agreement, ordinance, resolution, franchise, or other agreement for the use of public or private right-of-way with any federal, state, local, public or private entity for any Project without the written approval of Company, it being agreed that Company or its duly authorized representative shall execute any such agreements. Contractor shall immediately notify Company in the event that it discovers the need for any such agreement.

3.6     Progress and Procedure. The Contractor shall, unless otherwise stated in a Work Order, follow these procedures:

3.6.1     Contractor shall furnish information regarding the progress of all Projects in a weekly report (on a form to be provided by Company) and shall furnish any additional information to the Company to assist in arriving at the prompt, high quality, and economical completion of each Project.

3.6.2     Contractor agrees that it is aware of Company's internal process designed to notify its various organizations of activities performed near existing facilities owned by Company ("Change Control"). In order to provide sufficient time for Change Control, Contractor shall provide written Change Control information to Company's applicable Authorized Representative at least four (4) days prior to the planned commencement of construction activities in, on, or around Company's active duct or fiber cables. Change Control information includes the construction location, description of Work to be performed, Work schedule, and completion date. It is the direct responsibility of Contractor to provide this information to Company's Authorized Representative in a timely manner for Company approval prior to the commencement of Work. Once Company has approved Change Control documentation, Contractor shall strictly adhere to all Change Control procedures provided by Company to Contractor until completion of the applicable Project. Further, Contractor shall keep all Subcontractors and Installers fully informed of all Change Control procedures, as they may be changed from time to time.

3.6.2.1     Contractor must independently verify the precise location of Company's active duct, fiber cables, and other facilities using non-invasive sensing equipment. Contractor recognizes and acknowledges that "as-built" drawings and other documents provided by Company may not be absolutely accurate and merely reflect Company's best estimates of the physical location of its facilities, including fiber optic cabling. Contractor agrees that, in all situations, the Work includes locating Company's fiber optic cable and other facilities and that the sole risk and responsibility for accurately locating and protecting the same rests with Contractor. In addition, in order to adequately convey the risks associated with Work on or near Company's telecommunication facilities, Contractor shall require all field personnel (whether employed by Contractor or a Subcontractor) working on or near any Project to read and sign a copy of Exhibit "F", "Acknowledgement of Responsibilities", attached hereto and made a part

Case 1:05-cv-00037     Document 505-2     Filed 01/22/2008     Page 7 of 41

hereof. Signed copies of all required Acknowledgement of Responsibilities forms shall be supplied to Company's Authorized Representative before Work is commenced on any Project.

3.6.3    Contractor shall track the actual cost of each Project, and Contractor shall re-evaluate and forecast future Project costs on a monthly basis. The tracking and re-evaluation of total Project cost will be provided to Company on a Project Financial Report ("PFR"), an example of which is attached hereto as Attachment 3 to Exhibit "A". The PFR for a given month shall be submitted to Company by the second business day of the following month.

3.6.4    The Contractor shall provide administrative, management, and related services to coordinate and monitor the activities and responsibilities of the Subcontractors and Installers with each other and with those of the Contractor, Company, or others involved in the Project to complete each Project in accordance with the Project Budget, the Project Schedule and the Contract Documents.

3.6.5    Utilizing the Project Schedule, the Contractor shall update all schedules incorporating the activities of the Subcontractors, Installers, and others on the Project including activity sequences and durations, allocation of labor and materials, processing of shop drawings, product data and samples, and delivery of materials or equipment requiring long lead time and procurement.    The Project Schedule shall include the Company's requirements and responsibilities showing portions of the Project having priority. The Contractor shall update and reissue each Project Schedule as required by Company to show current conditions and percentages of completion. The Contractor shall keep a daily log containing a record of weather, each Subcontractor and Installer on the site, number of workers, identification of equipment, Work accomplished, problems encountered, and other similar relevant data as the Company may require. If an update indicates that the previously approved Project Schedule may not be met, the Contractor shall immediately notify Company and recommend corrective action. The Contractor shall schedule and conduct meetings to discuss such matters as progress and scheduling with Company as set forth in the Work Order or as requested by Company.

3.6.6    Consistent with the various bidding documents, Contract Documents, information from Subcontractors, Installers, and other relevant information, Contractor shall coordinate the sequence of construction and assignment of space in areas where the Subcontractors and Installers are performing Work.

3.6.6.1    Contractor shall at all times enforce strict discipline and good order among its employees and shall not employ on any Project any person not skilled in the task assigned to him or her. The Contractor shall be responsible to maintain and observe, and to require its Subcontractors to maintain and observe, sound labor and safety practices and shall require each Subcontractor to take all steps reasonably necessary to avoid labor disputes or work stoppages.

3.6.6.2    The Contractor shall coordinate and supervise the Work performed by Subcontractors and Installers to the end that the Work is carried out without conflict between trades or jurisdictional disputes and so that no Subcontractor and Installer at any time causes delay to the general progress of a Project. The Contractor, all Subcontractors, and

Case 1:05-cv-00037    Document 505-2    Filed 01/22/2008    Page 8 of 41

Installers shall at all times afford each other and the Company, every reasonable opportunity for the performance of Work and the storage of materials, and shall provide access to and the use of necessary loading dock and hoist facilities, adequate storage room and necessary utilities and other services. Wherever the Work of a Subcontractor or Installer is dependent upon the Work of other Subcontractors and Installers, the Contractor shall require each Subcontractor to:

    (a)  coordinate his Work with the dependent Work;

    (b)  provide necessary dependent data and requirements;

    (c)  supply and/or install items to be built into dependent Work of others;

    (d)  make provisions for dependent Work of others;

    (e)  examine dependent drawings and specifications;

    (f)  examine previously placed dependent Work;

    (g)  check and verify dependent dimensions of previously placed Work;

    (h)  notify Contractor of previously placed dependent Work or dependent dimensions which are unsatisfactory or which will prevent a satisfactory installation of the Subcontractor's Work; and

    (i)  not proceed with its Work until any unsatisfactory dependent condition has been corrected.

        3.6.6.3    The Contractor shall develop and implement procedures for the review and processing of applications by Subcontractor and Installers for progress and final payments.

        3.6.7    Contractor shall manage and monitor the performance of each of the Subcontractors with all due diligence to ensure that the requirements of the Contract Documents are met. The Contractor shall take appropriate action against Subcontractor(s) or Installer(s) when requirements of a Contract Document are not being fulfilled and shall take commercially reasonable steps to assure compliance with the same.

        3.6.7.1    Contractor shall manage and monitor the performance of each of the Installers with all due diligence to ensure that the requirements of the Contract Documents are met. Contractor shall take appropriate action against the Installer(s) when the requirements of the Contract Documents are not being fulfilled and shall immediately report such noncompliance to Company's Authorized Representative.

    3.7    Changes. Company may, at any time, by written change order ("Change Order"), initiate changes in the drawings, specifications, Project Schedule or other aspects of a Project. Contractor may also recommend changes to the design, Project Schedule or Budget for any Project for approval by Company. In all cases, Contractor will utilize commercially reasonable efforts to minimize the effect to costs and schedules in accommodating Project changes. The purpose of a Change Order is to formally document changes in Work, Project configuration, Budget and/or Schedules. No changes shall be made to any Project without an appropriate Change Order. If the changes desired significantly alter the Work contemplated, including without limitation: (a) changes in, substitutions for, additions to or deletions of any Work; (b) changes in the specifications or drawings, (c) changes in the schedule or acceleration,

Case 1:05-cv-00037   Document 505-2   Filed 01/22/2008   Page 9 of 41

deceleration or suspension of performance of any Work; and (d) substantial changes in the location, alignment, dimensions or design of items in the Work and/or if the Company requests the Contractor to perform added Work outside the scope of such Project, then, prior to the performance of such additional Work, an adjustment in the Project Schedule, Contractor's compensation, and Project Staffing Plan may be negotiated by the parties for such Work and included in the applicable Change Order. All Change Orders must be executed by both parties and shall be substantially similar to the sample Change Order contained in Exhibit "B", attached hereto and made a part hereof, provided that Contractor shall not unreasonably refuse to execute any Change Order proposed by Company and failure to do so shall be deemed an event of default pursuant to Article 8 hereof.

3.8     Commencement and Completion of Work. The Contractor shall commence Work on the commencement date set by Company in the Work Order and shall complete the Work and turn the Project over to the Company (after final inspection and testing) ready for acceptance by Company no later than the date specified for completion in the applicable Work Order, except as this date may be changed pursuant to a Change Order or by an event of Force Majeure.

3.8.1   Final Inspection, Testing and Acceptance:

3.8.1.1     Final Inspection and Testing. Upon completion of any Project performed hereunder, Contractor shall conduct acceptance testing, in accordance with the requirements of the Work Order, to demonstrate that the Work has been performed in accordance with the specifications of the Work Order, including a review of all Contract Documents, drawings, specifications and other related documents. Company reserves the right to attend and observe all final inspections and testing. After completion of acceptance testing, Contractor shall forward to Company one copy of all test results for approval.

3.8.1.2     Upon completion of all Project requirements, Contractor shall provide Company with a Certificate of Completion that signifies the Project is completed and shall assist the Company with the final inspection of the Project. Once Company has completed the final inspection and accepted the test results and as-builts, Company shall signify its final acceptance of the Project by approving said Certificate of Completion, a sample copy of which is contained in Exhibit "C", attached hereto and made a part hereof.

3.8.1.3     The Certificate of Completion shall identify all currently known and outstanding liabilities, charges, claims made by Subcontractors or Installers and potential financial obligations that have not been resolved at the time of final completion.

3.8.1.4     Notwithstanding anything to the contrary in this Agreement, acceptance of any Work performed by Contractor for Company hereunder shall not affect the warranties set forth in Article 10 hereof.

3.9     As-Built Drawings. Drawings showing all facilities and elements as built by Contractor for Company for a Project ("As-Builts") shall meet Company specifications and shall be prepared in a computerized format acceptable to Company. Contractor shall turn over within thirty (30) calendar days after completion of testing, two (2) hard copies and one (1) soft

Case 1:05-cv-00037     Document 505-2     Filed 01/22/2008     Page 10 of 41

electronic copy of the entire set of As-Builts for each Project. For a period of three (3) years after final acceptance of each Project, Contractor will also maintain a full set of As-Builts in both hard copy and soft electronic copy in its files for each Project. Final acceptance of any Project shall be subject to Company's acceptance of As-Builts from Contractor.

3.10    Specifications and Standards. All Work for any Work Order performed hereunder shall be performed, in addition to all requirements and specifications set forth in the Work Order, in accordance with the requirements and specifications of the National Electric Code, the National Electric Safety Code (both as they currently exist or are amended) and any other requirements imposed by any governmental authority or agency having jurisdiction.

3.11    Lien Waivers. Unless otherwise prohibited by law, Contractor will waive all rights to place any lien and will require all Subcontractors to waive all rights to place any lien against the equipment, materials, or other property used in a Project and shall provide a written statement in the Contract Documents evidencing such waivers to Company prior to the commencement of any Work hereunder. Any failure by Contractor to secure such waivers that are not otherwise prohibited by law without the written consent of Company shall be promptly corrected at Contractor's expense.

3.12    Timing/Delays.

3.12.1  Time is of the essence for Company in the performance of this Agreement.

3.12.2  The term "Force Majeure" as employed herein shall mean acts of the public enemy, wars, blockades, acts of God, insurrections, riots, civil disturbances, fire, flood, earthquake, or any other cause beyond the control and without that party's fault or negligence and which that party is unable to overcome in the exercise of due diligence. "Force Majeure" shall not include financial distress, strikes or labor disputes of Contractor's personnel or Subcontractors.

3.12.2.1  If Contractor is rendered unable to comply with its obligations under this Agreement and such failure is directly attributable to a Force Majeure event, it shall give notice to Company of such Force Majeure event in writing immediately after becoming aware of the occurrence of the Force Majeure event relied on. Upon giving such notice, the obligations of the Contractor shall be suspended so long as the Force Majeure event prevents it from performing its obligations hereunder. Contractor shall give written notice to Company of the resolution of such Force Majeure event immediately upon becoming aware thereof.

3.12.2.2  If, in the reasonable opinion of Company, a Force Majeure event continues or is likely to continue for a period of more than ten (10) consecutive days, then Company may by notice to Contractor terminate all affected Work Orders or this entire Agreement. In this event, Company shall compensate Contractor for all Work completed through the date of termination pursuant to Article 4 hereof.

# ARTICLE 4
## PAYMENT AND COSTS

4.1 <u>Payment; Invoices</u>.  Contractor shall be compensated on either a unit-rate or lump-sum basis for each Project performed hereunder.

    4.1.1 <u>Unit-Rate Projects</u>.  Where a Work Order requires Contractor to complete a Project on a unit-rate basis, payment for each Project, including all reimbursable expenses authorized either in an applicable Work Order or pursuant to this Agreement, shall be made according to Exhibit "D", "Rate Schedule", attached hereto and made a part hereof.  The rates specified in Exhibit "D" shall apply to all unit-rate Projects unless differing rates are contained in the applicable Work Order.  The rates contained in Exhibit "D" shall not increase for a period of at least one (1) year from the effective date hereof and for the duration of all executed Work Orders dated within said one (1) year period.  Following the said one-year period, the parties may modify the rates contained in Exhibit "D" pursuant to a written instrument signed by the parties hereto.  Unit-rate Projects shall not exceed the maximum compensation specified in the applicable Work Order without Company's prior written authorization.  All invoices submitted by Contractor shall be in a form substantially similar to the "Sample Invoice" contained in Exhibit "E", attached hereto and made a part hereof.  Where a unit-rate Project utilizes Subcontractors, Contractor shall be reimbursed therefore at a rate no greater than the applicable bid amounts previously approved by Company.

    4.1.2 <u>Lump-sum Projects</u>.  Where a Work Order requires Contractor to complete a Project on a lump-sum basis, the amount of each lump-sum payment shall be set forth within the applicable Work Order.  The lump-sum Work Order shall also specify a payment schedule and invoice format.  Increases to any specified lump-sum amount must be authorized by Company in writing.

4.2 <u>Most Favored Pricing</u>.  Notwithstanding anything else contained in this Agreement or its associated Work Orders, the rates for labor, equipment rental, and all other Work charged to Company under this Agreement or any Work Order (except for charges subject to the bidding requirements contained herein) shall be no greater than the lowest rate Contractor charged to any other customer during a period beginning sixty (60) days prior to the date of the applicable Work Order and ending sixty (60) days following the date of said Work Order.

4.3 <u>Independent Contractor</u>.  Contractor and its employees, agents, and subcontractors are and shall remain independent contractors for all activities performed hereunder, and nothing herein shall be deemed inconsistent with that status.  Contractor and Company expressly acknowledge that no employment, partnership, or joint venture relationship is created by this Agreement.

4.4 <u>Accounting and Audit Rights</u>.  Contractor agrees to maintain, on a consistent basis and in substantial accordance with generally accepted accounting principles, such books and records as shall be necessary in order to disclose readily the basis for any charges and credits, ordinary or extraordinary, billed or due, to Company under this Agreement.  Contractor shall make such books and records available to Company or its designee for inspection or audit,

Case 1:05-cv-00037   Document 505-2   Filed 01/22/2008   Page 12 of 41

upon reasonable notice, during regular business hours at Contractor's office during the term of this Agreement and for a period of three (3) years after receipt of final payment under this Agreement.

## ARTICLE 5
## COMPANY'S RESPONSIBILITIES

5.1     Authorized Representative.     Company shall designate a representative authorized to act on Company's behalf with respect to each Project, either in the applicable Work Order or other written instrument ("Authorized Representative"). The Authorized Representative shall render decisions in a timely manner pertaining to documents submitted by the Contractor in order to avoid unreasonable delay in the orderly and sequential progress of the Work.

5.2     Company's Own Forces.     The Company reserves the right to perform construction and operations related to a Project with Company's own forces, and to award Contracts in connection with the Project which are not part of the Contractor's responsibilities pursuant to a Work Order.

## ARTICLE 6
## CONTRACTOR'S REPRESENTATIONS

6.1     Contractor Representations and Covenants.     Contractor represents to and covenants with Company as follows:

(a)     Contractor is duly organized and validly existing and Contractor has the authority to execute this Agreement and has access to sufficient personnel and expertise to perform its obligations hereunder; and

(b)     Contractor will use its commercially reasonable efforts, in good faith, to keep all required authorities in full force and effect during the term of this Agreement and to obtain any additional authorities, permissions or certifications which may be required in connection with this Agreement.

(c)     Contractor shall at all times act in good faith and to the best advantage of Company in the purchase of materials, in the employment of labor, and in all its conduct and activities relative to all Projects performed pursuant to this Agreement.

## ARTICLE 7
## INSURANCE AND BONDS

7.1     Contractor shall obtain, pay for and maintain insurance for the coverages and amounts of coverage not less than those set forth below and shall provide Company original certificates issued by insurance companies satisfactory to Company to evidence such coverages. Such certificates shall provide that there shall be no termination, non-renewal or modification of such coverage without thirty (30) days' prior written notice to Company.  Obtaining and

Case 1:05-cv-00037   Document 505-2   Filed 01/22/2008   Page 13 of 41

maintaining the insurance required hereunder is a material term of this Agreement. Accordingly, in the event of any failure by Contractor to comply with the provisions of this Article, Company may, at its option, on notice to Contractor, suspend this Agreement until there is full compliance with this paragraph, or terminate this Agreement.

7.1.1 <u>Workers' Compensation/Employer's Liability</u>. Workers' Compensation complying with the law of the state or states of operation, whether or not such coverage is required by law, and Employer's Liability insurance with limits of not less than $1,000,000 each accident, including occupational disease coverage with a limit of not less than $1,000,000 each employee and a disease policy limit of not less than $1,000,000. Such Employer's Liability policy shall be written on an occurrence form. A claims-made policy will not be accepted by Company. If work is to be performed in North Dakota, Ohio, Puerto Rico, Wyoming, Washington or West Virginia, Contractor will purchase Workers' Compensation in the State Fund established in the respective States. Stop Gap Coverage shall also be purchased.

7.1.1.1 When contract documents call for water operations, U.S. Longshoreman and Harbor Worker's Compensation insurance, Jones Act and Maritime insurance providing for transportation, wages, maintenance and cure with limits of $500,000 each employee shall be obtained. Further, an endorsement shall be attached evidencing that a claim "In Rem" shall be treated as a claim against the employer.

7.1.2 <u>Commercial General Liability/Professional Liability</u>. Commercial General Liability insurance providing coverage for bodily injury and property damage of not less than $1,000,000 each occurrence and $2,000,000 aggregate, covering all insurable obligations, operations, premises, independent contractors, products-completed operations, personal injury and advertising injury of the Contractor. The policy shall be endorsed to eliminate exclusion of injury or damage resulting from work, construction or demolition within fifty (50) feet of railroad trackage. The policy shall include no modifications that reduce the standard coverages provided under the most recent Insurance Services office, Inc. ("ISO") policy form and shall further include contractual liability coverage to provide coverage for the indemnity obligations assumed by Contractor under this Agreement. If engineering or other professional services (designing and/or consulting) are required to complete any Project undertaken pursuant to this Agreement, then Contractor shall also obtain applicable Professional Liability insurance covering the effects of errors and omissions in the performance of professional duties with a limit of not less than $2,000,000.

7.1.3 <u>Business Automobile Liability</u>. Business Automobile Liability insurance with a combined single limit for bodily injury and property damage of not less than $1,000,000 each occurrence to include coverage for all owned, non-owned and hired vehicles. Such policy shall be written on an occurrence form. A claims-made policy will not be accepted by Company.

7.1.4 <u>Excess/Umbrella</u>. Excess or Umbrella Liability coverage with a combined single limit for bodily injury and property damage of not less than $1,000,000 each occurrence with an annual aggregate of not less than $1,000,000 to apply in excess of all underlying insurance coverages stipulated above.

Case 1:05-cv-00037     Document 505-2     Filed 01/22/2008     Page 14 of 41

7.1.5 <u>Vessels/Barges</u>. When vessels or barges, owned or non-owned, are used for the operations of the Contractor, Hull insurance shall be carried in amounts equal to the full replacement value of the vessel(s) or barge(s), and protection and indemnity insurance, including contractual liability in an amount not less than $5,000,000 per occurrence plus collision and towers liability insurance, if applicable, in an amount not less than $5,000,000 per occurrence.

7.1.6 <u>Aircraft</u>. When any aircraft is used for the operations of the Contractor aircraft liability insurance shall be carried on both owned and non-owned aircraft including helicopters with a combined single limit of not less than $50,000,000 for bodily injury and property damage including passenger liability. Such insurance coverage shall include contractual liability. Aircraft Hull insurance shall be carried in amounts equal to the full replacement value of the aircraft. Hull insurance shall be carried in amounts equal to the full replacement value of any non-owned aircraft or helicopter for which the Contractor is or could be responsible for Hull damage.

7.1.7 <u>Railroad</u>. When doing work on railroad right-of-way, Contractor shall provide Railroad Protective Liability Insurance which shall name the applicable Railroad(s) as Named Insured and Company as additional insured with limits of not less than $2,000,000 per occurrence, $6,000,000 aggregate (or such other limits as may be required by the particular Railroad(s), whichever are higher) on combined bodily injury and property damage basis, including coverage for physical damage to the railroad's property.

7.2 <u>Insurance Policies</u>. Contractor shall, upon written request, provide Company with a certified copy of the involved insurance policy or policies within ten (10) business days of receipt of such request.

7.3 <u>Subrogation</u>. Contractor waives all of its express or implied right(s) of subrogation against Company, its officers, directors, agents and employees thereof, and Contractor's policies shall contain a waiver of subrogation endorsement for all claims against Company, its officers, directors, agents, and employees thereof. The above-required waivers shall also extend to companies and other legal entities that control, are controlled by, are subsidiaries of or are affiliated with Company, and the respective officers, directors, agents, employees and shareholders of such companies or entities.

7.4 <u>Additional Insured; Primary Coverage; Deductibles</u>. Contractor agrees to name Company (including its corporate parent and said parent company's affiliates and subsidiaries) as an additional insured as indicated below on all insurance policies required by this Article, excluding Workers' Compensation and Professional Liability. Those policies shall provide that the insurance coverage provided thereunder will be primary as to Company. In addition, none of the insurance policies obtained to satisfy the requirements of this Article shall include a deductible in excess of $50,000. All policies shall provide that the insurance coverage provided thereunder will be primary and noncontributory with any other applicable insurance coverage.

7.5 <u>No Limitation of Liability</u>. Neither the insurance required herein nor the amount or type of insurance maintained by Contractor shall limit or affect the extent of Contractor's liability hereunder for injury, death, loss or damage.

Case 1:05-cv-00037    Document 505-2    Filed 01/22/2008    Page 15 of 41

7.6    Contractor's Property.    Company and its affiliates shall not insure or be responsible for any loss or damage to property of any kind owned or leased by Contractor or its employees, servants and agents. Any policy of insurance covering the property owned or leased by Contractor against loss by physical damage shall provide that the underwriters have given their permission to waive their rights of subrogation against Company, its subsidiaries and affiliates and their respective directors, officers and employees.

7.7    Subcontractors.    Contractor shall require all of its subcontractors (if any) to purchase and maintain the foregoing coverages (including specified policy limits and endorsements) as well as any other coverages that Contractor considers necessary, to name Company as an additional insured, to provide written evidence of such coverage to Contractor, and to require all subcontractors to waive their right of subrogation against Company as required of Contractor above. Any deficiency in coverages, policy limits or endorsements of said subcontractor shall be the sole responsibility of Contractor. Upon Company's request, Contractor shall require its subcontractors to supply Company with original certificates of insurance evidencing such coverages.

7.8    Certificate holder and additional insured must be shown as and the original certificate sent to:

> MCI WORLDCOM, Inc. and its Affiliates and Subsidiaries
> Attn: Operations Procurement
> P.O. Box 21348
> Tulsa, Oklahoma 74121
>
> *or*
>
> 6929 North Lakewood Avenue
> Tulsa, Oklahoma 74117

7.9    Bonds/Letters of Credit.    At its option and expense, Company may require Contractor to obtain either performance and payment bonds or letters or credit (whichever Company prefers in its sole discretion) for a specific Project, or any number of Projects, performed hereunder. The amount of each bond or letter of credit shall be set by Company, but in no event shall such amount exceed the cost of the Project or Projects to be covered. Said bonds or letters of credit shall be underwritten by a surety acceptable to Company. Such bonds or letters of credit shall name the Contractor as the principal. The failure or inability of Contractor to obtain a performance and payment bond or letter of credit satisfactory to Company before commencing Work on any Project for which a bond or letter of credit has been required shall entitle Company, at its option, to immediately terminate the Project or Projects not so secured, or to immediately terminate this Agreement in its entirety. The estimated cost of such bonds and letters of credit shall be included as an optional line item in all Work Orders.

7.9.1    Subcontractor Bonds/Letters of Credit.    Company may, at its option and expense, require Contractor to secure either payment bonds or letters of credit (whichever

Case 1:05-cv-00037    Document 505-2    Filed 01/22/2008    Page 16 of 41

Company prefers in its sole discretion) of Subcontractors. Copies of all such documents shall be provided to Company for review. The estimated cost of such bonds and letters of credit shall be included as an optional line item in all Subcontractor bidding documents.

## ARTICLE 8
## DEFAULT AND TERMINATION

8.1     Default. The following events shall constitute an Event of Default hereunder.

    8.1.1     Contractor Default. Contractor shall be in default of the Agreement if:

        8.1.1.1     Contractor becomes insolvent, is adjudged a bankrupt, or makes a general assignment for the benefit of its creditors, or becomes a subject of any proceeding (voluntary or involuntary) commenced under any statute or law for the relief of debtors, or a receiver, trustee or liquidator of any of the property or income of Contractor shall be appointed which judgment, assignment, proceeding or receivership is not dismissed or discharged within ninety (90) days of the date of notice thereof.

        8.1.1.2     Contractor refuses or fails to prosecute the Work in accordance with the applicable Work Order or this Agreement in any material respect; or

        8.1.1.3     Contractor fails in any material respect to observe any other terms, provisions, conditions, covenants, representations, warranties or agreements in this Agreement or Work Order to be observed and performed on the part of the Contractor ("Material Default"). A Material Default under subsections 8.1.1.2 and 8.1.1.3 may include but is not limited to the following:

        (a)     Failure by Contractor to make proper payment to Subcontractors or others for undisputed amounts due for services, materials or labor; or

        (b)     Failure by Contractor to comply with laws, ordinances, rules and regulations or orders of any public authority having jurisdiction of which Contractor has or should have knowledge after making reasonably diligent inquiries and except as directed by Company; or

        (c)     Failure to use commercially reasonable efforts to prosecute the Work in compliance with the budget or scheduling requirements as set forth in a Work Order, subject to any equitable adjustments in budget or schedule as provided for herein; or

        (d)     Failure to immediately correct any incomplete or unacceptable items identified during any final inspection and testing (or during any applicable warranty period).

    8.1.2     Company's Remedies. In the event of a default by Contractor hereunder, if the failure is not corrected or good faith efforts are not being made to correct such failure

Case 1:05-cv-00037    Document 505-2    Filed 01/22/2008    Page 17 of 41

within ten (10) calendar days after receipt of written notice from Company to Contractor, Company may, without prejudice to any other right or remedy, immediately:

8.1.2.1 With or without terminating a Work Order, take over and/or subcontract such Work or any portion thereof and furnish such materials and/or employ such workers as may be necessary to remedy the noncompliance, then having only the obligation to pay Contractor payments due for its portion of the Work not so taken over and/or directly subcontracted by Company, provided that such Work was performed to Company's satisfaction in accordance with the applicable Work Order.

8.1.2.2 Terminate the Work Order for the Project in default or terminate this entire Agreement and all Projects hereunder and have only the obligation to pay Contractor payments due for portions of Work completed pursuant to the requirements set forth in the applicable Work Order through the date of termination.

8.1.2.3 Make a claim against Contractor's or Subcontractor's bond, letter of credit, or other security.

8.1.3 In no event shall Contractor suspend its performance of any Work under any Work Order prior to termination of the applicable Work Order or this Agreement, as appropriate.

## ARTICLE 9
## INDEMNIFICATION AND LIABILITY

9.1 Contractor shall defend, protect, indemnify and hold harmless Company, its employees, officers, directors, agents and shareholders, and the employees, officers, directors and agents of any shareholder of Company, from and against all claims, demands and causes of action of every kind and character arising in favor of any person including Contractor, Company's employees, Contractor's employees, Subcontractors or other persons, on account of personal injuries or death or damage to any property in any way incident to or arising out of or claimed to have arisen out of the Services performed by Contractor hereunder, or arising out of or incident to Contractor's operations hereunder, whether directly or indirectly due to Company's or Company's employees' negligence (except the intentional or grossly negligent acts or omissions of Company, its officers, agents, or employees). Company shall have a direct right of action against Contractor in the event Contractor fails to perform under this Article 9, and Company may recover all of the costs of such action, including its reasonable attorneys' fees.

9.2 Contractor further agrees to indemnify and hold Company harmless against the payment of any and all penalties, interest, liens or indebtedness or claims against Company's property, or for work performed, or materials furnished, or measured by the work performed, growing out of or incident to Contractor's operations hereunder. Contractor agrees to reimburse Company and Company's employees for each and every cost or charge, including court costs, all expenses of litigation and reasonable attorneys' fees, if any, which Company, its successors, assigns or employees, may incur in defending against or prosecuting any such claims, demands, causes of action or suits brought pursuant to this Agreement.

Case 1:05-cv-00037   Document 505-2   Filed 01/22/2008   Page 18 of 41

9.3     All obligations of Contractor under this Agreement to release, defend, indemnify and hold Company harmless shall also extend to officers, agents and employees of Company, and to companies and other legal entities that control, are controlled by, are subsidiaries of, or are affiliated with, Company, and the respective officers, agents and employees of such companies or entities.

9.4     The parties hereto recognize and agree that the protection of Company's fiber optic cable and fiber optic telecommunications system is vital and that any damage to Company's facilities could result in the interruption of business and significant losses to Company, including but not limited to loss of revenues. In the event that Company's fiber optic cable or some other portion of Company's fiber optic telecommunication system is severed or damaged in connection with, arising out of, or resulting from the performance of Work by Contractor pursuant to this Agreement, Contractor agrees to indemnify and reimburse Company for any and all losses and damages of any kind, suffered by Company which arise from such damage to Company's fiber optic cable or fiber optic telecommunications system. The damages recoverable by Company shall include without limitation Company's cost of restoration as well as loss of revenue suffered.

### ARTICLE 10
### WARRANTY

10.1    Warranty.  Any equipment, materials, and services supplied by Contractor, its agents, employers, suppliers, or Subcontractors, are warranted by Contractor (and its suppliers or Subcontractors where applicable) to be of good quality and workmanship and will be properly installed by Contractor or its Subcontractors as appropriate so as to make each Project suitable for its intended use(s) and all reasonable uses.  To the extent possible, Contractor shall also assign to Company all manufacturers', suppliers', or Subcontractors' warranties for all services, equipment and materials.  All warranties made hereunder shall be for a minimum period of one (1) year following Company's final acceptance of the Work for a Project unless otherwise specified in a Work Order.  If any equipment, materials, and services performed hereunder do not comply with the foregoing warranty (or result in the failure of Company's telecommunications system, or any portion thereof), Contractor shall immediately repair or replace, at its expense, both (a) the defective portion of such equipment, materials, and services, and (b) any damage to Company's telecommunications system caused by such defect.

10.1.1 Contractor warrants that all inspecting, locating, monitoring and other services performed on Company's fiber optic telecommunications system as part of the Work hereunder shall be performed in a good and workmanlike manner.

10.2    Free from Defects.  Contractor warrants to Company that all materials and equipment furnished under this Agreement shall be new (unless otherwise specified in a Work Order), free from faults and defects, and otherwise in conformance with the Work Order and this Agreement.  All Work not conforming to these requirements, including substitutions not approved and authorized by Company, may be considered defective and must be cured by

Case 1:05-cv-00037     Document 505-2     Filed 01/22/2008     Page 19 of 41

Contractor at Contractor's expense. If required by Company, Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment furnished hereunder.

## ARTICLE 11
## HAZARDOUS MATERIALS AND CONCEALED CONDITIONS

11.1 <u>Hazardous Materials</u>. In the event Contractor encounters toxic or hazardous materials during the performance of any Project, any resulting delays and costs shall be considered to be beyond its control, without its fault and outside the scope of such Project, unless such encounter is due to the negligence or willful misconduct of Contractor, its employees, officers, directors or Subcontractors. Any toxic or hazardous materials not caused by such negligent or willful misconduct shall be removed or otherwise dealt with by Company or by the appropriate government agency, organization or third party. Contractor shall have no obligation, responsibility or liability with respect to such materials. Notwithstanding the foregoing, Contractor agrees that it will be responsible for the cleanup or any other cost, damage or liability arising from any toxic or hazardous materials generated or used by Contractor, its employees or Subcontractors in the course of its performance of any Work under this Agreement (and will defend, protect, indemnify and hold harmless Company to the extent set forth in Article 9 of this Agreement). Contractor agrees in any event to cooperate fully with Company and to perform reasonable and customary investigations as to the existence of hazardous materials prior to the performance of any Work hereunder.

11.2 <u>Concealed Conditions</u>. The Contractor shall promptly, upon discovery, and before any such conditions are disturbed, notify the Company in writing of: (1) subsurface or latent physical conditions at the work-site differing materially from those indicated in the Contract Documents, or (2) previously unknown physical conditions at such site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this Agreement. The Contractor shall, at Company's direction, promptly investigate the conditions, and if it finds that such conditions do materially so differ and cause an increase or decrease in Contractor's cost of, or the time for, performance of any part of the Work under the applicable Work Order, an equitable adjustment to the such Work Order shall be negotiated in good faith and the Work Order modified accordingly.

## ARTICLE 12
## MISCELLANEOUS

12.1 <u>Title</u>. Title to all Work completed pursuant to a Work Order created hereunder, and to all materials and supplies on account of which Company has made payment, shall immediately vest in the name of Company.

12.2 <u>Assignment</u>. Contractor may not transfer, assign or otherwise delegate its obligations under this Agreement without the express written consent of Company, which may be withheld by Company in its sole discretion. Any consent to assignment by Company hereunder shall not release Contractor from its obligations under this Agreement.

Case 1:05-cv-00037     Document 505-2     Filed 01/22/2008     Page 20 of 41

12.3  _Severability._  If any provision of this Agreement is adjudicated to be invalid or unenforceable, the remainder shall be valid and enforceable, and the parties shall negotiate in good faith to recreate such provision in a valid and enforceable form to provide for the intent of such provision.

12.4  _Waiver._  Failure of Company at any time to require strict performance of any provision of this Agreement shall not constitute a waiver of that provision nor in any way limit enforcement of that provision.

12.5  _Notices._  Except as otherwise set forth herein, when any notice or other communication is required or authorized to be given hereunder, such notice shall, for all purposes, be in writing and either delivered personally to the addressee, by telex or facsimile transmission followed by mailing, or mailed registered or certified mail return receipt requested, or by express mail, postage prepaid and shall be deemed given when so delivered personally, when such telex or facsimile transmission is received or, if mailed, five (5) days after the date of mailing to the address of the respective parties at the following addresses:

(i)     If sent by Company to Contractor, addressed as follows:

> DYNAMIC TECHNICAL SERVICES INC.
> 405 SH 121 BYPASS BLDG. D -STE 100.
> LEWISVILLE, TEXAS 75067 - 8192
> Attn: x CARLOS N. MORALES
> Fax: 469-635-1299

(ii)    If sent by Contractor to Company, addressed as follows:

> MCI WORLDCOM Network Services, Inc.
> Operations Procurement
> MD 5.1-204C
> 6929 N. Lakewood Avenue
> Tulsa, OK 74117
> Attn: Contract Administration

_With copies to:_    MCI WORLDCOM Network Services, Inc.
> MD 2.2-315G
> 6929 N. Lakewood Avenue
> Tulsa, OK
> Attn: Manager, Outside Plant Construction

> And, where the notice concerns a particular Project, to Company's Authorized Representative at the address specified in the applicable Work Order, if any.

12.6  _Confidentiality._

Case 1:05-cv-00037    Document 505-2    Filed 01/22/2008    Page 21 of 41

12.6.1 Company and Contractor agree to hold, and will use their commercially reasonable efforts to cause their respective officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law, all confidential documents and information concerning this Agreement and any Work or Project performed hereunder, including field notes, drawings, specifications, studies and any other document prepared for a project appropriate to, and for use in, performance of Contractor's services under this Agreement. Except to the extent that such information can be shown to have been (i) in the public domain through no fault of the received party, or (ii) later lawfully acquired by the receiving party from third parties without an obligation of confidentiality. The obligation of Company and Contractor to hold any such information in confidence shall be satisfied if it exercises the same care with respect to such information as it would take to preserve the confidentiality of its own similar information.

12.6.2 Drawings, specifications and other documents are instruments of service through which the Work to be performed by Contractor is described. Contractor may retain one (1) record set. Contractor shall not own or claim a copyright or any other right in the drawings, specifications and other documents. All copies of them, except the record set, shall be returned to Company on request upon completion of a Project. The drawings, specifications, and other documents, and copies thereof furnished to Contractor, are for use solely with respect to a Project. They are not to be used by Contractor on other projects without the specific written consent of Company. Contractor is granted a limited license to use and reproduce applicable portions of the drawings, specifications, and other documents prepared for a Project appropriate to, and for use in, the performance of Contractor's services under this Agreement. All drawings, specifications and other documents relating to the Project are owned by Company, including drawings, specifications, and other documents generated by Contractor for Company or used to perform work for Company prior to the date of this Agreement.

12.6.3 Subject to the confidentiality requirements stated herein, neither party shall reference or use any part of this Agreement, or the names of the parties hereto, in any press release, marketing, advertising or other sales or promotional materials without the express written consent of the other party.

12.7 MCI WORLDCOM Family. All rights and benefits granted hereunder to Company may be exercised and enjoyed by any member of the MCI WORLDCOM family of entities, which for the purposes hereof shall include MCI WORLDCOM, Inc. and any subsidiary of MCI WORLDCOM, Inc., whether owned directly or indirectly, or any subsidiary of any such subsidiary. Further, for purposes of calculating discounts (if any) based on volume or quantity, the total volume of all MCI WORLDCOM family entities shall be counted to apply against the applicable volume or quantity benchmark.

12.8 No Construction Against Drafter. The parties acknowledge that this Agreement and all the terms and conditions contained herein have been fully reviewed and negotiated by the parties and that each party has been represented by counsel. Having acknowledged the foregoing, the parties agree that any principle of construction or rule of law that provides that, in

Case 1:05-cv-00037    Document 505-2    Filed 01/22/2008    Page 22 of 41

the event of any inconsistency or ambiguity, an agreement shall be construed against the drafter of the agreement shall have no application to the terms and conditions of this Agreement.

12.9 <u>Survival</u>. The provisions of Articles 9, 10, 11 and 12 shall survive the expiration or termination of the Agreement and Company and Contractor each agree to be bound thereto.

12.10 <u>Governing Law</u>. The Agreement, and all the rights and duties of the parties arising from or relating in any way to the subject matter of this Agreement or the transaction(s) contemplated by it, shall be governed by, construed, and enforced in accordance with the laws of the State of New York without regard to the conflict of law principles thereof.

12.11 <u>Entire Agreement</u>. This Agreement and all Exhibits attached hereto constitute the entire agreement between parties with respect to the subject matter hereof. This Agreement shall be binding upon the parties hereto and their permitted successors and assigns.

**IN WITNESS WHEREOF**, the parties hereto have executed this instrument, through their authorized officers, effective as of the date first above written.

MCI WORLDCOM NETWORK SERVICES, INC.

By: _____

Printed Name: MARty Heesh

Title: DiRector OSP ConstRuction

Date: 9/27/01

Approved as to form!
J.S. Short

Dynamic Telephone Services, L.P.

By: X _____

Printed Name: X Carlos H. Morris

Title: X President

Date: X 9/24/01

Federal I.D. No.: X 75-2941175

# EXHIBIT 10

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam  96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Seeking admission *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br>**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS TO PLAINTIFF JESSE B. CRUZ'S FIRST SET OF INTERROGATORIES** |



RECEIVED
MAR 02 2007
LUJAN AGUIGUI & PEREZ LLP
By: _____ 4:30

RECEIVED
FEB 26 2007
LUJAN AGUIGUI & PEREZ LLP
By: _____ 53

TO:  **Plaintiff Jesse B. Cruz, by and through his attorney of record, Delia Lujan, Lujan Aguigui & Perez, LLP, Pacific News Building, Suite 300, 238 Archbishop Flores St., Hagåtña, Guam 96910.**

DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS
TO PLAINTIFF JESSE B. CRUZ'S FIRST SET OF INTERROGATORIES        **Page 1 of 19**

Case 1:05-cv-00037    Document 505-2    Filed 01/22/2008    Page 25 of 41

COMES NOW Dynamic Technical Services, Defendant in the above-entitled and numbered action, and makes the following answers and objections to the below-enumerated interrogatories contained in Plaintiff Jesse B. Cruz's First Set of Interrogatories:

## OBJECTIONS TO DEFINITIONS

**Definition of "You," or "Your" and "Defendant".** Plaintiffs ask that DTS construe these terms in such a way to include DTS and its attorneys, employees, and agents. DTS objects to Plaintiffs' inclusion of persons and entities other than DTS, acting through its officers and employees, in the definition of these terms because it distorts the ordinary meaning of these terms, is overbroad, and causes unnecessary confusion and complexity. DTS further objects to this definition because it encompasses information and documentation protected by attorney-client and work-product privileges. Accordingly, in responding to Plaintiffs' interrogatories, DTS will construe these terms to include DTS, acting through its officers and employees.

**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS TO PLAINTIFF JESSE B. CRUZ'S FIRST SET OF INTERROGATORIES**     **Page 2 of 19**

Case 1:05-cv-00037     Document 505-2     Filed 01/22/2008     Page 26 of 41

## ANSWERS AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1:** With respect to the persons answering, or providing information used to answer, these Interrogatories, state his or her:

    (a)    Name;

    (b)    Address;

    (c)    Business address;

    (d)    Business or other telephone number;

    (e)    Job title;

    (f)    Occupation;

    (g)    Name of immediate superior;

    (h)    Employer:

    (i)    Length of employment with Defendant; and

    (j)    Length of time in current position.

**ANSWER:**    (a)    Linda G. Hayes

              (b)    2303 Mallory Dr.
                     Corinth, Texas 76210

              (c)    1125 E. Highway 121
                     Lewisville, Texas 75057

              (d)    (469) 635-1301

              (e)    President

              (f)    Management

              (g)    Mickey Redwine

              (h)    Dynamic Technical Services, LP

              (i)    6 years – 10 months

**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS
TO PLAINTIFF JESSE B. CRUZ'S FIRST SET OF INTERROGATORIES**    **Page 3 of 19**

Case 1:05-cv-00037    Document 505-2    Filed 01/22/2008    Page 27 of 41

(3)     American employees.

(4)     non-American employees, identifying each national origin category of the employees and the number of employees of each national origin category.

(5)     Chamorro employees.

(6)     non-Chamorro employees, identifying each race category of the employees and the number of employees of each race category.

(7)     Guamanian employees.

(8)     non-Guamanian employees, identifying each national origin category of the employees and the number of employees of each national origin category.

(9)     all other minority employees.

**ANSWER:**     Not applicable, given answer to Interrogatory No. 18.

**INTERROGATORY NO. 24:** State the circumstances (including the date and persons involved) in which the Defendant first learned of the Plaintiff's charge of discrimination with the Equal Employment Opportunity Commission against the Defendant and describe in detail all actions taken by the Defendant in response to the Plaintiff's EEOC charge of discrimination.

**ANSWER:**     Dynamic Technical Services received via mail from the EEOC a "Notice of Charge of Discrimination" on or about February 28, 2005. Defendant replied to the EEOC in a letter stating the Plaintiff had never been employed by Dynamic Technical Services.

**INTERROGATORY NO. 25:** Describe in full and complete detail the policies and procedures concerning disciplinary matters, including:

**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS TO PLAINTIFF JESSE B. CRUZ'S FIRST SET OF INTERROGATORIES**          **Page 18 of 19**

Case 1:05-cv-00037     Document 505-2     Filed 01/22/2008     Page 28 of 41

(a)    when they were drafted;

(b)    when they were implemented;

(c)    the names, addresses, telephone numbers, and titles of all persons who played any

role in their implementation or drafting;

(d)    whether the policies or procedures are oral or written; and

(e)    if oral, describe the policies in detail, and if written, set forth copies.

**ANSWER:**    None.


Dated: February 25, 2007



_(signature)_
ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam  96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

and

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Seeking admission *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555

*Attorneys for Defendant Dynamic Technical Service. Inc.*


36307.24\Rsp.ROGS-JCruz


**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS
TO PLAINTIFF JESSE B. CRUZ'S FIRST SET OF INTERROGATORIES**          **Page 19 of 19**

Case 1:05-cv-00037     Document 505-2     Filed 01/22/2008     Page 29 of 41

# EXHIBIT 11

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Seeking admission *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br>**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS TO PLAINTIFF JOSEPH J. HERNANDEZ'S FIRST SET OF INTERROGATORIES** |



RECEIVED
MAR 02 2007
LUJAN AGUIGUI & PEREZ LLP
By: _____ 4:30

RECEIVED
FEB 2 6 2007
LUJAN AGUIGUI & PEREZ LLP
By: _____ 3:53

**TO:  Plaintiff Joseph J. Hernandez, by and through his attorney of record, Delia Lujan, Lujan Aguigui & Perez, LLP, Pacific News Building, Suite 300, 238 Archbishop Flores St., Hagåtña, Guam 96910.**

COMES NOW Dynamic Technical Services, Defendant in the above-entitled and numbered action, and makes the following answers and objections to the below-enumerated interrogatories contained in Plaintiff Joseph J. Hernandez's First Set of Interrogatories:

## OBJECTIONS TO DEFINITIONS

**Definition of "You," or "Your" and "Defendant".** Plaintiffs ask that DTS construe these terms in such a way to include DTS and its attorneys, employees, and agents. DTS objects to Plaintiffs' inclusion of persons and entities other than DTS, acting through its officers and employees, in the definition of these terms because it distorts the ordinary meaning of these terms, is overbroad, and causes unnecessary confusion and complexity. DTS further objects to this definition because it encompasses information and documentation protected by attorney-client and work-product privileges. Accordingly, in responding to Plaintiffs' interrogatories, DTS will construe these terms to include DTS, acting through its officers and employees.

**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS TO PLAINTIFF JOSEPH J. HERNANDEZ'S FIRST SET OF INTERROGATORIES**     **Page 2 of 17**

Case 1:05-cv-00037    Document 505-2    Filed 01/22/2008    Page 32 of 41

## ANSWERS AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1:** With respect to the persons answering, or providing information used to answer, these Interrogatories, state his or her:

      (a)     Name;

      (b)     Address;

      (c)     Business address;

      (d)     Business or other telephone number;

      (e)     Job title;

      (f)     Occupation;

      (g)     Name of immediate superior;

      (h)     Employer:

      (i)     Length of employment with Defendant; and

      (j)     Length of time in current position.

**ANSWER:**

      (a)     Linda G. Hayes

      (b)     2303 Mallory Dr.
                Corinth, Texas 76210

      (c)     1125 E. Highway 121
                Lewisville, Texas 75057

      (d)     (469) 635-1301

      (e)     President

      (f)     Management

      (g)     Mickey Redwine

      (h)     Dynamic Technical Services, LP

      (i)     6 years – 10 months

DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS
TO PLAINTIFF JOSEPH J. HERNANDEZ'S FIRST SET OF INTERROGATORIES    Page 3 of 17
Case 1:05-cv-00037   Document 505-2   Filed 01/22/2008   Page 33 of 41

(f)   It is Dynamic Technical Services' understanding that MCI, Inc., WorldCom Purchasing, LLC, MCI Worldcom Network Services, Inc., and Verizon Business Purchasing, LLC, Verizon Business Network Services, Inc. are all one and the same entity due to name changes, i.e., WorldCom purchased MCI and was then called MCI WorldCom; when MCI Worldcom emerged from bankruptcy as MCI, then Verizon purchased MCI and then became known as Verizon Business. Dynamic Technical Services was issued a Master Service Agreement #2621 by MCI WorldCom Network Services, Inc. to provide Outside Plant Services.

(g)   It is Dynamic Technical Services' understanding that MCI, Inc., WorldCom Purchasing, LLC, MCI Worldcom Network Services, Inc., and Verizon Business Purchasing, LLC, Verizon Business Network Services, Inc. are all one and the same entity due to name changes, i.e., WorldCom purchased MCI and was then called MCI WorldCom; when MCI Worldcom emerged from bankruptcy as MCI, then Verizon purchased MCI and then became known as Verizon Business. Dynamic Technical Services was issued a Master Service Agreement #2621 by MCI WorldCom Network Services, Inc. to provide Outside Plant Services.

**INTERROGATORY NO. 23:** Describe in detail all communications (whether oral or written) between the Defendant and Dennis P. Clark during the period from January 2004 to the present.

**ANSWER:** Due to the time difference in Guam, Mr. Clark had little communication with DTS other than the weekly submittal of timesheets which was done electronically. Mr. Clark did contact DTS to inform me that his car had been stolen and later found burnt to the ground. His laptop was in the car when it was stolen and needed DTS to forward another timesheet template to him since he had lost all data that was on the old laptop. Mr. Clark also contacted DTS when he was in need of a digital camera and DTS shipped him a camera. From January 2004 to the

completion of the project, Mr. Clark obtained approval from MCI to fly home once and to have his wife fly to Guam. Mr. Clark provided DTS the dates and DTS made the airfare arrangements. Upon completion of the project Mr. Clark was released on 06/04/05. At that time, Mr. Clark elected COBRA benefits and continued his health coverage thru 12/31/06. During that time he submitted monthly insurance premium checks and contacted DTS a few times inquiring about upcoming projects.

**INTERROGATORY NO. 24:** State the circumstances (including the date and persons involved) in which the Defendant first learned of the Plaintiff's charge of discrimination with the Equal Employment Opportunity Commission against the Defendant and describe in detail all actions taken by the Defendant in response to the Plaintiff's EEOC charge of discrimination.

**ANSWER:** Dynamic Technical Services received via mail from the EEOC a "Notice of Charge of Discrimination" on or about February 28, 2005. Defendant replied to the EEOC in a letter stating the Plaintiff had never been employed by Dynamic Technical Services.

**INTERROGATORY NO. 25:** Describe in detail the circumstances in which Defendant terminated or participated in the termination of the Plaintiff's employment with Defendant or Defendant Calpac.

**ANSWER:** Plaintiff was never employed by, and never worked for, Dynamic Technical Services. Dynamic Technical Services has no knowledge regarding Plaintiff's employment relationship, if any, with Calpac.

Dated: February *25*, 2007

*Elyze J. McDonald* (signature)

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

and

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Seeking admission *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555

*Attorneys for Defendant Dynamic Technical Service. Inc.*

36307.24\Rsp.ROGS-Hernandez

DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS
TO PLAINTIFF JOSEPH J. HERNANDEZ'S FIRST SET OF INTERROGATORIES    Page 17 of 17

Case 1:05-cv-00037    Document 505-2    Filed 01/22/2008    Page 36 of 41

# EXHIBIT 12

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375


Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Seeking admission *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555
*Attorneys for Defendant Dynamic Technical Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>Defendants. | CIVIL CASE NO. 05-00037<br><br><br><br>**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS TO PLAINTIFF ANTHONY C. ARRIOLA'S FIRST SET OF INTERROGATORIES** |



RECEIVED
MAR 02 2007
LUJAN AGUIGUI & PEREZ LLP
By: ____ 1:30

RECEIVED
FEB 26 2007
LUJAN AGUIGUI & PEREZ LLP
By: ____ 3:53

**TO:** Plaintiff Anthony C. Arriola, by and through his attorney of record, Delia Lujan, Lujan Aguigui & Perez, LLP, Pacific News Building, Suite 300, 238 Archbishop Flores St., Hagåtña, Guam 96910.

COMES NOW Dynamic Technical Services, Defendant in the above-entitled and numbered action, and makes the following answers and objections to the below-enumerated interrogatories contained in Plaintiff Anthony C. Arriola's First Set of Interrogatories:

## OBJECTIONS TO DEFINITIONS

**Definition of "You," or "Your" and "Defendant".** Plaintiffs ask that DTS construe these terms in such a way to include DTS and its attorneys, employees, and agents. DTS objects to Plaintiffs' inclusion of persons and entities other than DTS, acting through its officers and employees, in the definition of these terms because it distorts the ordinary meaning of these terms, is overbroad, and causes unnecessary confusion and complexity. DTS further objects to this definition because it encompasses information and documentation protected by attorney-client and work-product privileges. Accordingly, in responding to Plaintiffs' interrogatories, DTS will construe these terms to include DTS, acting through its officers and employees.

**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS TO PLAINTIFF ANTHONY C. ARRIOLA'S FIRST SET OF INTERROGATORIES** **Page 2 of 19**

Case 1:05-cv-00037    Document 505-2    Filed 01/22/2008    Page 39 of 41

# ANSWERS AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1**: With respect to the persons answering, or providing information used to answer, these Interrogatories, state his or her:

    (a)    Name;

    (b)    Address;

    (c)    Business address;

    (d)    Business or other telephone number;

    (e)    Job title;

    (f)    Occupation;

    (g)    Name of immediate superior;

    (h)    Employer:

    (i)    Length of employment with Defendant; and

    (j)    Length of time in current position.

**ANSWER:**    (a)    Linda G. Hayes

    (b)    2303 Mallory Dr.
                 Corinth, Texas 76210

    (c)    1125 E. Highway 121
                 Lewisville, Texas 75057

    (d)    (469) 635-1301

    (e)    President

    (f)    Management

    (g)    Mickey Redwine

    (h)    Dynamic Technical Services, LP

    (i)    6 years – 10 months

**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS TO PLAINTIFF ANTHONY C. ARRIOLA'S FIRST SET OF INTERROGATORIES**    **Page 3 of 19**

Case 1:05-cv-00037    Document 505-2    Filed 01/22/2008    Page 40 of 41

powers or authority such entities or persons had over the Defendant's or Defendant Calpac's work or employees or agents.

**ANSWER:** Dynamic Technical Services did not perform any work in Guam. As a staffing company, Dynamic Technical Services simply hired an individual for MCI to serve as MCI's Project Manager on a Fiber Ring Project in Guam. Dynamic Technical Services did not possess any power or authority over that individual as it related to the project. MCI had the authority to control and supervise the work of that individual, and to terminate his services. Dynamic Technical Services does not know the answer to this Interrogatory, as it applies to work performed by Calpac.

Dated: February 25, 2007

*Elyze J McDonald*

ELYZE J. MCDONALD, Guam Bar No. 01-004
CARLSMITH BALL, LLP
Bank of Hawaii Building
134 West Soledad Avenue, Suite 401
P.O. Box BF
Hagåtña, Guam 96932-5027
Telephone (671) 472-6813
Facsimile (671) 477-4375

and

Arthur K. Smith, Texas Bar No. 18534100
LAW OFFICES OF ARTHUR K. SMITH
(Seeking admission *Pro Hac Vice*)
507 Prestige Circle
Allen, Texas 75002
Telephone: (469) 519-2500
Facsimile: (469) 519-2555

*Attorneys for Defendant Dynamic Technical Service. Inc.*

36307.24\Rsp.ROGS-Arriola

**DEFENDANT DYNAMIC TECHNICAL SERVICES' ANSWERS AND OBJECTIONS
TO PLAINTIFF ANTHONY C. ARRIOLA'S FIRST SET OF INTERROGATORIES** Page 19 of 19

Case 1:05-cv-00037   Document 505-2   Filed 01/22/2008   Page 41 of 41