

1  **LUJAN AGUIGUI & PEREZ** LLP
   Attorneys at Law
2  DNA Building, Suite 300
   238 Archbishop Flores Street
3  Hagåtña, Guam 96910
   Telephone (671) 477-8064/5
4  Facsimile (671) 477-5297

5  *Attorneys for Plaintiffs*

6

**FILED**
DISTRICT COURT OF GUAM

JAN 2 3 2008 pbo

**JEANNE G. QUINATA**
**Clerk of Court**

7  **IN THE UNITED STATES DISTRICT COURT OF GUAM**

8  **FOR THE TERRITORY OF GUAM**

9

10  HENRY G. VAN METER, et al.,                    CIVIL CASE NO. 05-00037

11                              Plaintiffs,          **ERRATA RE:**

           -vs-
12                                                  **EXHIBITS TO SECOND DECLARATION**
    CALPAC, et al.,                                 **OF DELIA LUJAN IN SUPPORT OF EACH**
13                                                  **OF PLAINTIFFS' OPPOSITIONS TO**
                              Defendants.           **DEFENDANT DYNAMIC TECHNICAL**
14                                                  **SERVICES' MOTIONS FOR SUMMARY**
                                                    **JUDGMENT**
15

16

17

18      Before this Honorable Court come Plaintiffs, submitting an Errata regarding the exhibits

19  attached to the Second Declaration of Delia Lujan in Support of Each of Plaintiffs' Oppositions to

20  Defendant Dynamic Technical Services' Motions for Summary Judgment, which was filed herein

21  January 22, 2008.   The Second Declaration of Delia Lujan is resubmitted with the corrected

22  exhibits, collectively attached hereto as Exhibit A.

23      **RESPECTFULLY SUBMITTED** this 23rd day of January, 2008.

24                                          **LUJAN AGUIGUI & PEREZ** LLP

25

26

27                      By:  _____
                            **DELIA LUJAN**
28                          *Attorneys for Plaintiffs*

ORIGINAL

# EXHIBIT A

**LUJAN AGUIGUI & PEREZ LLP**
Attorneys at Law
DNA Building, Suite 300
238 Archbishop Flores Street
Hagåtña, Guam 96910
Telephone (671) 477-8064/5
Facsimile (671) 477-5297

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, et al., | CIVIL CASE NO. 05-00037 |
| Plaintiffs, | |
| -vs- | **SECOND DECLARATION OF DELIA LUJAN IN SUPPORT OF EACH OF PLAINTIFFS' OPPOSITIONS TO DEFENDANT DYNAMIC TECHNICAL SERVICES' MOTIONS FOR SUMMARY JUDGMENT** |
| CALPAC, et al., | |
| Defendants. | |

I, DELIA LUJAN, hereby declare and state as follows:

1. I am an attorney representing all the plaintiffs in this matter.

2. This declaration is submitted in support of each of Plaintiffs' oppositions to Defendant Dynamic Technical Services' Motions for Summary Judgment.

3. Attached hereto as Exhibit 1 are true and correct copies of the cover page, various excerpts, and the Reporter's Certification of the deposition of Roland F. Mendiola taken on May 21, 2007.

4. Attached hereto as Exhibit 2 are true and correct copies of the cover pages, various excerpts, the Reporter's Certificate, and the Notary Public's Certificate of the deposition of Henry G. Van Meter taken on April 11, 2007.

Henry G. Van Meter, et al., v. CAL PAC, et al.
Civil Case No. 05-00037
Second Decl. Delia Lujan re each Pl's Opp'n to Def. DTS' Mots. Summ. J.

Case 1:05-cv-00037    Document 518    Filed 09/29/2008    Page 3 of 68

1

5. Attached hereto as Exhibit 3 are true and correct copies of the cover pages, various excerpts, the Reporter's Certificate, and the Notary Public's Certificate of the deposition of Larry L. Charfauros taken on May 24, 2007.

6. Attached hereto as Exhibit 4 are true and correct copies of the cover pages, various excerpts, and the Reporter's Certificate of the deposition of Robert B. Cruz taken on February 7, 2007.

7. Attached hereto as Exhibit 5 are true and correct copies of the cover pages, various excerpts, the Reporter's Certificate, and the Notary Public's Certificate of the deposition of Joseph J. Hernandez taken on February 8, 2007.

8. Attached hereto as Exhibit 6 are true and correct copies of the cover pages, various excerpts, the Reporter's Certificate, and the Notary Public's Certificate of the deposition of Jesse B. Cruz taken on April 20, 2007.

9. Attached hereto as Exhibit 7 are true and correct copies of the cover pages, various excerpts, the Reporter's Certificate, and the Notary Public's Certificate of the deposition of John L.G. Nauta taken on April 16 and 18, 2007.

10. Attached hereto as Exhibit 8 are true and correct copies of the cover pages, various excerpts, the Reporter's Certificate, and the Notary Public's Certificate of the deposition of James S. Yee taken on February 7, 2007.

11. Attached hereto as Exhibit 9 is a true and correct copy of the Outside Plant Engineering and Project Management Agreement by and between MCI WorldCom Network Services, Inc. and Dynamic Technical Services L.P., Contract No. 2621, dated September 24, 2001, which I received from counsel for DTS on or about March 2, 2007, in response to Plaintiffs' first request for production of documents to DTS.

Henry G. Van Meter, et al., v. CAL PAC, et al.                                                              2
Civil Case No. 05-00037
Second Decl. Delia Lujan re each Pls.' Opp'n to Def. DTS' Mots. Summ. J.
Case 1:05-cv-00037   Document 918   Filed 04/25/2008   Page 4 of 68

12. Attached hereto as Exhibit 10 is a true and correct copy of the Defendant Dynamic Technical Services' Answers and Objections to Plaintiff Jesse B. Cruz's First Set of Interrogatories, dated February 25, 2007, which I received from counsel for DTS on or about March 2, 2007, in response to Plaintiff Jesse B. Cruz's first set of interrogatories to DTS.

13. Attached hereto as Exhibit 11 is a true and correct copy of the Defendant Dynamic Technical Services' Answers and Objections to Plaintiff Joseph J. Hernandez's First Set of Interrogatories, dated February 25, 2007, which I received from counsel for DTS on or about March 2, 2007, in response to Plaintiff Joseph J. Hernandez's first set of interrogatories to DTS.

14. Attached hereto as Exhibit 12 is a true and correct copy of the Defendant Dynamic Technical Services' Answers and Objections to Plaintiff Anthony C. Arriola's First Set of Interrogatories, dated February 25, 2007, which I received from counsel for DTS on or about March 2, 2007, in response to Plaintiff Anthony C. Arriola's first set of interrogatories to DTS.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 22nd day of January, 2008, in Hagåtña, Guam.

_____
**DELIA LUJAN**

Henry G. Van Meter, et al., v. CAL PAC, et al.
Civil Case No. 05-00037
Second Decl. Delia Lujan re each Pl's Opp'n to Def. DTS' Mot. Summ. J.

Case 1:05-cv-00037   Document 618   Filed 01/23/2008   Page 5 of 68

3

# EXHIBIT 1

IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| HENRY G. VAN METER, ET AL, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| VS. | § | No. CIV05-00037 |
| | § | |
| | § | |
| CALPAC, ET AL | § | |
| | § | |
| Defendants | § | |

ORAL DEPOSITION OF:

ROLAND F. MENDIOLA

MAY 21, 2007

# COPY

# *Compex Legal Services*

*Houston    San Antonio    Dallas    Austin*

*(800) 969-6424*

Case 1:05-cv-00037    Document 315    Filed 08/23/2008    Page 7 of 68

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.          May 21, 2007

8

         1        A.    Yes, either him or Henry Van Meter.

         2        Q.    And who would assign you your work job, you know, for

         3    that day as well?

         4        A.    Henry Van Meter.

         5        Q.    Was there anyone else that would conduct safety

         6    meetings for CalPac?

         7        A.    It would be Don Harper.

         8        Q.    Did anyone from DTS, and by that I mean Dynamic

         9    Technical Services; did they ever conduct any safety meetings?

        10        A.    I don't recall.

        11        Q.    Did anyone from DTS ever instruct you where to work

        12    any given day?

        13        A.    Yes.

        14        Q.    Okay.  Who from DTS would assign you work?

        15        A.    Dennis Clark.

        16        Q.    And do you know that Dennis Clark worked for DTS?

        17        A.    No.

        18        Q.    Okay.  What did Mr. Clark tell you to do when you're

        19    recalling now?

        20              MR. SMITH:  Objection, form.

        21        Q.    You can go ahead and answer.

        22        A.    He would be at the job site and he would be telling

        23    us how -- you know, how -- the depth and what needed to be

        24    cemented and stuff.

        25        Q.    So, Mr. Clark was instructing you on how to perform

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.          May 21, 2007

9

1     the job on the job site?

2          A.    Yes.

3          Q.    Was that on a daily basis?

4          A.    Yes.  He was there mostly every day.

5                MR. SMITH:  Objection, nonresponsive.

6          Q.    Between the time you worked for -- as a stocker at

7     Gold Market and the time you were employed at CalPac, did you

8     have any other work?

9          A.    Yes, I did, but I don't remember the jobs.

10         Q.    Do you remember what kind of work it might have been?

11         A.    Construction.

12         Q.    Do you remember the name of the management you worked

13    for?

14         A.    I can't remember.  That's way back.

15         Q.    When were you laid off from CalPac?

16         A.    2004.

17         Q.    Do you remember what month?

18         A.    No, I don't remember.

19         Q.    Do you recall the reason why you were laid off?

20         A.    Mentioned that reduction of force, work reduction.

21         Q.    Do you have any reason to believe that there was any

22    other reason for you being laid off than reduction in

23    workforce?

24         A.    Yes.

25         Q.    Okay.  Tell me what that is.

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.          May 21, 2007

38

1    nearly quitting time.

2        Q.   And usually how often would he stay on those times he

3    came out there?

4        A.   About half an hour, 45 minutes.

5        Q.   And you didn't stop what you were doing and watch him

6    for the whole half hour or 45 minutes he was there, did you?

7        A.   No.

8        Q.   You would just keep doing your job?

9        A.   Yes.

10       Q.   But there would be times when you might look up and

11   notice him in the area, right?

12       A.   Yes.

13       Q.   Now, before the first time that Mr. Clark -- you

14   heard him say island monkeys, had you ever heard him talk

15   before that time?

16       A.   Yes.

17       Q.   And had you ever heard him speak to you and the other

18   workers before that time?

19       A.   Yes.

20       Q.   And on those occasions, would he be talking about

21   whether you were doing the job the way it was supposed to be

22   done?

23       A.   Yes.

24       Q.   And give me examples of the kinds of things he would

25   say.

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.        May 21, 2007

39

1         A.     He would like tell us how to put on the conduit, glue

2     the conduit, the depth of the trench, whether it was too

3     shallow or it was too deep.

4         Q.     And that didn't happen every day that he made those

5     comments to you, right?

6         A.     About what?

7         Q.     The only time he would address you guys in the trench

8     is if he thought he saw something that wasn't being done right.

9     Would you agree with that?

10        A.     He would always come out and had his tape measure and

11    he was always measuring the trench.

12        Q.     Right.  But the only time he would actually talk to

13    you and the other workers was when he thought there was

14    something you needed to do different than you were doing,

15    right?

16        A.     Yes.

17        Q.     Do you agree with that?

18        A.     Yes.

19        Q.     And most of the time when he was there and he talked

20    to anybody, it was to Mr. Van Meter or to Mr. Quintanilla,

21    correct?

22        A.     And to us.

23        Q.     I'm talking about who he would mostly talk to.

24        A.     Yes.

25        Q.     Would you agree it was mostly to Mr. Quintanilla and

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.        May 21, 2007

79

```
 1                    IN THE DISTRICT COURT OF GUAM

 2      HENRY G. VAN METER, ET AL,        )

 3                                        )
                                          )
 4           Plaintiffs                   )
                                          )
 5      VS.                               )   NO. CIV05-00037
                                          )
 6                                        )
        CALPAC, ET AL                     )
 7                                        )
                                          )
 8           Defendants                   )
                                          )
 9                                        )
10
                        REPORTER'S CERTIFICATION
11               DEPOSITION OF ROLAND F. MENDIOLA
                          May 21, 2007
12
13           I, JOE A. WILLIAMS, Certified Shorthand Reporter in and
14      for the State of Texas, hereby certify to the following:
15           That the witness, ROLAND F. MENDIOLA, was duly sworn by
16      the officer and that the transcript of the oral deposition is a
17      true record of the testimony given by the witness;
18           That examination and signature of the witness to the
19      deposition transcript was waived by the witness and agreement
20      of the parties at the time of the deposition;
21           That the original deposition was delivered
22      to Vincent Leon Guerrero
23           That the amount of time used by each party at the
24      deposition is as follows:
25           DAVID LUJAN - 00 HOURS:00 MINUTE(S)
```

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.     May 21, 2007

80

ARTHUR K. SMITH - 1 HOURS: 1 MINUTE(S)

That $ _____ is the deposition officer's charges to the DEFENDANT for preparing the original deposition transcript and any copies of exhibits;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

DAVID LUJAN, Attorney for Plaintiffs

THOMAS C. MOODY, III, Attorney for Defendant CALPAC

ARTHUR K. SMITH, Attorney for Defendant DZSC

That a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk pursuant to Rule 203.3.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this ___ of ____, 2007.

JOE A. WILLIAMS, Texas CSR #422

Expiration Date:  12-31-08

Firm Registration No. 281

# EXHIBIT 2

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA ) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B. )
CRUZ, ROLAND F. MENDIOLA, JAMES )
S. YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA, and JOHN )
P. BABAUTA, )
                        )
           Plaintiffs, )
                        )
           vs. )
                        )
CALPAC, DYNAMIC TECHNICAL )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES )
and DOES 1 through 10, )
                        )
           Defendants. )

**COPY**

## DEPOSITION OF HENRY G. VAN METER
Taken on Behalf of Defendant CalPac

       BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of **HENRY G. VAN**

**METER** was taken before Cecille A. Flores, a Certified

Shorthand Reporter, on Wednesday, the 11th day of April 2007,

at 2:00 p.m. in the offices of Blair Sterling Johnson

Martinez & Leon Guerrero, Suite 1008, Pacific News Building,

238 Archbishop Flores Street, Hagatna, Guam.

**RECEIVED**

MAY 1 8 2007

LUJAN AGUIGUI & PEREZ LLP
By:

1      Q      During that time.

2      A      No, I don't know.

3      Q      You don't know?

4      A      I don't know.

5      Q      Who did you think that Mr. Clark was working for at

6   that time?

7      A      MCI and CalPac.

8      Q      You think he was working for CalPac?

9      A      Well, he was my -- they told us that he's gonna be

10  a Superintendent out there in the field so whatever he says

11  we have to listen to Dennis Clark because --

12     Q      Who told you that Mr. Clark was the Superintendent?

13     A      Mr. Harper.

14     Q      So Mr. Harper told the Foremen?

15     A      Yes, that Dennis Clark is still -- whatever he says

16  goes.

17     Q      Mr. Harper indicated that he is the representative

18  of MCI, correct?

19     A      Mr. Harper -- yes, yes.

20     Q      Would you agree that he essentially would be the

21  representative of the person who hired CalPac?

22     A      You mean Dennis Clark?

23     Q      Yes.  Would you agree that Dennis Clark was the

24  representative of --

25     A      For MCI?

1    A    Yes.

2    Q    You would?

3    A    Yes.

4    Q    Okay.  That's the basis for you saying that

5 Mr. Clark was an employee of CalPac, correct?

6    A    During that time, yes.  I mean, that's the way I see

7 it because -- you know, he's -- I have to listen to him.

8 They told us to say, hey, Dennis Clark's out there on the

9 field, make sure if he sees it -- if he needs something done

10 or he needs something to correct -- if he needs to correct

11 something, do it.  So I, you know, I gotta go by the command.

12    Q    Essentially because you're working for Mr. Clark,

13 correct?

14    A    CalPac and Clark.

15    Q    Doing work for Mr. Clark?

16    A    Yes.

17    Q    Paragraph 37 says that you were discriminated.

18    A    Yes.

19    Q    And harassed?

20    A    Yes.

21    Q    Let's just break them down just so I have an idea

22 what you're talking about.  You said you were harassed by

23 Dennis Clark.

24    A    Yes.

25    Q    How were you harassed?

*Henry G. Van Meter: April 11, 2007*

1  from Agana to NAVCAM.

2      Q     What was the role of CalPac?

3      A     They won the bid.

4      Q     So MCI needed work done and CalPac bid for it, is

5  that what you're saying?

6      A     Right.

7      Q     How did you get this understanding of how that

8  relationship happened?

9      A     How?

10     Q     Yes.

11     A     While you're working you hear gossip and stuff like

12 that.  I remember we had a meeting about a project coming up

13 which was the MCI project.

14     Q     What was Dennis Clark's role?

15     A     Dennis Clark's role?

16     Q     In the project.

17     A     What I know is he was Superintendent out there on

18 the field for MCI.

19     Q     For MCI?

20     A     Yes.

21     Q     So who employed Dennis Clark, to your understanding?

22     A     What I know, during the time, all I know is MCI.

23 When I found out about Dynamic Tech is after we made our

24 complaint.

25     Q     Had you heard about Dynamic Technical Services

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand
Reporter, hereby certify that **HENRY G. VAN METER** personally
appeared before me at the time and place set forth in the
caption hereof; that at said time and place I reported in
stenotypy all testimony adduced and other oral proceedings
had in the foregoing matter; that thereafter my notes were
reduced to typewriting under my direction; and the foregoing
transcript, pages 1 to 97, both inclusive, constitutes a
full, true, and correct record of such testimony adduced and
oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 15th
day of May 2007.


Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

## NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 11th day of May, 2007 at the hour of 2:00 p.m. there appeared before me **HENRY G. VAN METER** at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand this 15th day of May, 2007.

_____
Cecille A. Flores

# EXHIBIT 3

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA
JR., JOSEPH J. HERNANDEZ, JOSEPH
T. MENDIOLA, LARRY L. CHARFAUROS,
ANTHONY C. ARRIOLA, ROBERT B.
CRUZ, ROLAND F. MENDIOLA, JAMES
S. YEE, TEDDY B. CRUZ, JESSE B.
CRUZ, JOHN L.G. NAUTA, and JOHN
P. BABAUTA,

        Plaintiffs,

  vs.

CALPAC, DYNAMIC TECHNICAL
SERVICES, MCI, JOHN HEALY, DENNIS
CLARK, WILLIAM WARD, JAI JAMES
and DOES 1 through 10,

        Defendants.

CIVIL CASE NO. CIV05-00037

DEPOSITION OF LARRY L. CHARFAUROS

*Taken on Behalf of CalPac*

BE IT REMEMBERED That, pursuant to the Federal

Rules of Civil Procedure, the deposition of LARRY L.

CHARFAUROS was taken before Cecille A. Flores, a Certified

Shorthand Reporter, on Thursday, the 24th day of May 2007, at

9:00 a.m. in the offices of Blair Sterling & Johnson, Suite

1008, Pacific News Building, 238 Archbishop Flores Street,

Hagatna, Guam.

---

INDEX

Examination

                Direct   Cross

By Mr. Leon Guerrero:  4

By Ms. Lujan:        None

EXHIBITS

Description:               Page Marked:

Exhibit A: Application for Employment................16

Exhibit B: Confession of Judgment....................19

Exhibit C: Superseding of Indictment.................26

Exhibit D: Charge of Discrimination..................27

Exhibit E: Furlough Letter...........................54

Exhibit F: PDN article...............................100

Exhibit G: Questionnaire.............................102

---

A P P E A R A N C E S

Appearing on behalf of the Plaintiffs:

    LUJAN AGUIGUI & PEREZ
    Suite 300, Pacific News Building
    238 Archbishop Flores Street
    Hagatna, Guam 96910
    By: Ms. Delia S. Lujan, Esq.
    Phone: (671) 477-8064

Appearing on behalf of CalPac:

    BLAIR STERLING & JOHNSON
    Suite 1008, Pacific News Building
    238 Archbishop Flores Street
    Hagatna, Guam 96910
    By: Mr. Vincent E. Leon Guerrero, Esq.
    Phone: (671) 477-7857

---

4

    COURT REPORTER: Good morning, my name is
Cecille Flores. My address is Suite 2E, Jugo Building, 618
Route 8, Barrigada, Guam. We are here today for the
deposition of Larry Charfauros and the date is May 24, the
time is about 9:12 a.m. We're here in the offices of Blair,
Sterling, Johnson, Martinez & Leon Guerrero. Present is
Mr. Leon Guerrero, attorney for CalPac, and Delia Lujan,
attorney for the Plaintiffs.

    LARRY L. CHARFAUROS,
was thereupon called as a witness on behalf of Defendant
CalPac, and after having been first duly sworn, was examined
and testified as follows:

    DIRECT EXAMINATION
BY MR. LEON GUERRERO:
    Q  Mr. Charfauros just for the record, can you state
your full name and spell your last name?
    A  Larry L. Charfauros, C-H-A-R-F-A-U-R-O-S.
    Q  Mr. Charfauros, we're here to take your deposition.
Have you ever had your deposition taken before?
    A  No.
    Q  You understand that the deposition is one of the
means that we can use to get information from you, correct?
    A  Yes.

COPY

37

1    A    Correct.
2    Q    How did you feel you were being discriminated
3    against?
4    A    Well, I was put down because I was called an island
5    monkey. You know what I mean?
6    Q    Maybe we should go to Paragraph 2 then. It says,
7    Beginning on September 21, 2004, you were harassed by Dennis
8    Clark, correct?
9    A    Correct.
10   Q    Dennis Clark was a representative of MCI, correct?
11   A    Correct.
12   Q    Did you believe Mr. Clark was working for CalPac?
13   A    Yes.
14   Q    Why do you believe that?
15   A    He was out there inspecting our jobs.
16   Q    Did anybody tell you he worked for CalPac?
17   A    No, all we knew he was inspector for our job site.
18   Q    Who told you that?
19   A    (No response.)
20   Q    When you say "we," you're referring to everybody in
21   the crew, right?
22   A    Right.
23   Q    Who told the crew he was an inspector for –
24   A    I don't remember who told the crew.
25   Q    Okay.

38

1    A    All I remember is he was an inspector checking our
2    trench.
3    Q    Let's take a look at Page 3 of the Complaint,
4    Paragraph 21. Why don't you go ahead and read that.
5    A    Paragraph 21?
6    Q    Yes.
7    A    "Defendant MCI is upon information and belief a
8    telecommunications business having its principal place of
9    business or primary offices in Texas and engaged in business
10   in Guam."
11   Q    Is that 21?
12   A    Yes. Oh, 21. "Defendant Dennis Clark is upon
13   information and belief a manager or supervisor employed by
14   DTS."
15   Q    That's an allegation that you and the rest of the
16   Plaintiffs made about Dennis Clark, correct?
17   A    Correct.
18   Q    Do you want to change your allegations about Dennis
19   Clark at this point?
20   A    No.
21   Q    At least specifically as it relates to Paragraph 21?
22   A    No.
23   Q    So you believe that Dennis Clark is a Manager
24   employed by DTS?
25   A    Yes.

39

1    Q    Can you tell me anywhere in this Complaint that it
2    says that Dennis Clark is employed by CalPac? If you want to
3    take a –
4    A    Take a break.
5    Q    Okay.
6                (Recess taken at 10:04 a.m.)
7                (Back on the record at 10:06 a.m.)
8    BY MR. LEON GUERRERO: (Continuing)
9    Q    Mr. Charfauros, having had a chance to look at the
10   Complaint, is there anywhere in the Complaint that it says
11   Mr. Clark was employed by CalPac?
12   A    No.
13   Q    Do you wish to change and add an allegation to this
14   Complaint that says Mr. Clark is employed by CalPac?
15   A    No.
16   Q    So you would agree with me that Mr. Clark was not
17   employed by CalPac, correct?
18   A    Correct.
19   Q    Going back to Paragraph 2 of Exhibit D it says "On
20   separate occasions, Dennis Clark made racially derogatory
21   comments to me and fellow workers by referring to us as
22   monkeys and island monkeys." Do you remember his statements
23   referring to you guys as monkeys or island monkeys?
24   A    Mostly all the job sites.
25   Q    How many times did he say this, do you remember?

40

1    A    I don't remember how many times but pretty much he
2    would be calling us island monkeys.
3    Q    Are you saying he called you island monkey each time
4    that you saw him?
5    A    I don't recall each time, but I remember him calling
6    us island monkeys.
7    Q    The other Plaintiffs in this case say it happened
8    twice. A lot of them say it happened twice. I think one
9    other says it happened three times. Mr. Harper said it
10   happened three times. Do you disagree with their –
11   A    Well, I don't recall how many times he called us
12   island monkeys because I wouldn't wanna count it.
13   Q    Okay. Well, what happened the first time? Do you
14   remember that?
15   A    First time?
16   Q    Yes.
17   A    Yeah, I remember the first time. I'll never forget
18   that.
19   Q    Who was there?
20   A    That was back at the job site in Two Lovers' Point.
21   Q    Who was there?
22   A    I don't recall who was there.
23   Q    Were there other people there at least?
24   A    Yeah. Yes, there's always a bunch of us.
25   Q    How many people do you think were there when he made

**113**

1  A   Correct, probably.

2  Q   Then you complained to Don Harper on September 25,

3  2004, correct?

4  A   Yes, correct.

5  Q   And then the last one was on October 23, 2004?

6  A   Yes.

7  Q   Correct?

8  A   Correct.

9  Q   And that would be the same day as the last incident,

10 correct?

11 A   Correct.

12 Q   Did you complain to the Department of Labor?

13 A   We tried to complain there but we weren't

14 entertained.

15 Q   Why is that?

16 A   According to them, they only represent Government of

17 Guam employees.

18 Q   Other than CalPac laying you off, do you think they

19 treated you differently when you were working for your

20 Complaints? Do you understand my question? It may have been

21 a bad question.

22 A   I don't understand. Repeat again.

23 Q   See, that's what I meant. Sorry about that. You

24 were saying that you were retaliated against, correct?

25 A   Correct.

**114**

1  Q   One of the retaliation things was you were laid off?

2  A   Correct.

3  Q   Is there anything else that they did that you think

4  they retaliated against you by? Any action by CalPac?

5  A   I think that'll be it.

6  Q   That was it?

7  A   I think so.

8  Q   Okay. I don't have any other questions at this

9  time.

10    MS. LUJAN: I don't have any questions.

11    MR. LEON GUERRERO: All right. I guess I don't

12 have any other questions. Mr. Charfauros, nice meeting you,

13 man.

14    THE WITNESS: You too, man.

15    MR. LEON GUERRERO: And by the way, I am local.

16    THE WITNESS: I hope so.

17

18             ooOoo

19    [DEPOSITION CONCLUDED AT 11:44 A.M.]

20

21

22

23

24

25

**CERTIFICATE OF WITNESS**

I, LARRY L. CHARFAUROS, being first duly sworn on oath, depose and say that I am the witness named in the foregoing deposition transcript and that I have read the questions and answers thereon as contained in the foregoing deposition, consisting of pages 1 through 114; that the answers are true and correct as given by me at the time of taking the deposition, except as indicated on the correction sheet.

_____
LARRY L. CHARFAUROS

Date:_____

**REPORTER'S CERTIFICATE**

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that LARRY L. CHARFAUROS personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 114, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 25th day of June 2007.

_____
Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

**Page 113 to Page 116**

**NOTARY PUBLIC'S CERTIFICATE**

BARRIGADA ) ss

       I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 24th day of May, 2007 at the hour of 9:00 a.m. there appeared before me LARRY L. CHARFAUROS at the law offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

       I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

       In testimony whereof, I have hereunto set my hand this 25th day of June, 2007.

       Cecille A. Flores

# EXHIBIT 4

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>Plaintiffs,<br><br>vs.<br><br>CALPAC, DYNAMIC TECHNICAL SERVICES, MCI, JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10,<br><br>Defendants. | Civil Case No. CIV05-00037<br><br>**⌐1 COPY** |

## DEPOSITION OF ROBERT CRUZ

### Taken on Behalf of the Defendants

BE IT REMEMBERED That, pursuant to the Guam Rules of Civil Procedure, the deposition of ROBERT CRUZ was taken before Veronica F. Reilly, Certified Shorthand Reporter, on Wednesday, the 7th day of February 2007, at 4:25 p.m. in the Law Offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
Email: veronica.reilly@hotmail.com

Case 1:05-cv-00037 Document 316 · Filed 01/23/2008 · Page 27 of 68

1      Q.    Who were those people?

2      A.    They were Teddy Cruz, Henry Van Meter, Henry

3    Quintanilla, Joe Hernandez, Joe Mendiola, Roland Mendiola,

4    myself, JT, you can say the whole people that was there that

5    came to work.

6      Q.    Everybody that came to work?

7      A.    (Witness nodded head.)

8      Q.    Who would preside over the meeting?

9      A.    JT or Don Harper.

10     Q.    And during a typical, I guess, a job, could you

11   describe what you did at the site?

12     A.    When we're underground, we trench, we lay conduit,

13   we pull fiber.

14     Q.    And how many people would be working with you?

15     A.    I think maybe five or six, maybe more.

16     Q.    Would those be the same individuals you mentioned:

17   Teddy Cruz, Henry Van Meter, Henry Quintanilla, Joe

18   Hernandez, Joe Mendiola and --

19     A.    Yes.

20     Q.    Did they all do the same thing you did?

21     A.    Yeah, they were all in the same area.

22     Q.    Now, you've heard of Dynamic Technical Services; is

23   that correct?

24     A.    Yes.

25     Q.    And to your understanding, what role did they have

1  during the project?

2      A.   My understanding, they were over -- they were the

3  one overlooking the project site, telling us what are we

4  going to do and how to do it.

5      Q.   When you say telling what to do and how to do it,

6  are you referring to a person?

7      A.   I'm referring to -- see, they'll let Don Harper know

8  -- Dennis will let Don Harper know what's our plan and then

9  he'll lay down to the supervisors and they'll feed it back to

10 us.

11     Q.   So when you're referring to they, DTS, you're

12 referring to Dennis Clark?

13     A.   I'm referring to Dennis Clark.

14     Q.   And did you ever actually see Dennis Clark tell Don

15 Harper what to do?

16     A.   I'm assuming.

17     Q.   You assume that?

18     A.   Yeah, because he was overlooking the project.

19     Q.   Okay.  What was your understanding of MCI's role in

20 the project?

21     A.   My understand is that I heard -- they're the one

22 that subcontract CalPac.  That's my understanding.

23     Q.   You said DTS oversaw the project site and instructed

24 what to do.  How did you achieve that understanding of DTS's

25 role?

1    Q.   Do you know how big the company is?

2    A.   No.

3    Q.   Do you know how many employees it has?

4    A.   No.

5    Q.   Did you ever have any personal interaction with

6  Dennis Clark?

7    A.   No.

8    Q.   Did you ever see him or hear him talk about you to

9  somebody else?

10   A.   No.

11   Q.   Did you ever see him talk to CalPac employees or

12 representatives about you?

13   A.   Can you repeat that again?

14   Q.   Did you ever see Dennis Clark talk to CalPac

15 representatives or employees about you?

16   A.   No.

17   Q.   Did you ever witness any conversations between

18 Dennis Clark and CalPac employees or representatives about

19 anything?

20   A.   The only one I -- was when he mentioned you island

21 monkeys.  That was the only one.

22   Q.   Let's talk about that statement, the phrase island

23 monkeys.  Could you tell me when that happened?

24   A.   That happened on September 2004.

25   Q.   What were you doing --

1       A.    We were working on the trench.

2       Q.    Okay.  Who's we?

3       A.    Me and the rest of the boys that was there.

4       Q.    Would those be Teddy Cruz, Henry Van Meter, Henry

5  Quintanilla, Joe Hernandez, Joe Mendiola and John Thomas?

6       A.    John Thomas wasn't there but the rest of the guys

7  were there.

8       Q.    Anybody else that I didn't mention?

9       A.    Yes, they had Larry Charfauros, Norman Santos.

10  That's the only names I can recall so far.

11      Q.    And you said September '04.  I think on Exhibit A,

12  it says September 25, '04; would that be the date of the

13  statement?

14      A.    Yes.

15      Q.    So you're working on the trench and what happens?

16      A.    We're working the trench, I didn't even know he

17  pulled in.  It was a hot day and he came up and he goes,

18  "What are you island monkeys doing?"  He just said it out

19  loud.

20      Q.    And what happened after that?

21      A.    After that -- Don Harper was there.  Don Harper --

22  oh, he pulled him to the side and he was talking to him.  I

23  don't know what the conversation was about.

24      Q.    Did anybody respond after he asked the question,

25  what are you island monkeys doing?

1    A.    Yes, we responded but not to him.  We went up to our

2  supervisor and told him, hey, this person that we don't know

3  is calling us island monkeys.

4    Q.    Why do you say you didn't know him?

5    A.    I mean I don't know him personally for him to come

6  up and say it to me or say it to us.

7    Q.    I'm sorry, was James Yee there?

8    A.    No, James was up more.  Because we're a group here,

9  a group there.

10    Q.    And while he was making that statement, were you

11  looking at him or were you working?

12    A.    We were right there where he was standing right near

13  us and he just said it out loud, "What are you island monkeys

14  doing?"

15    Q.    Were you guys actually in a trench?

16    A.    Some of us were in a trench, some of us were out

17  because we're covering the pipes.

18    Q.    How far below would you be?

19    A.    (Witness gestured.)

20    Q.    Couple feet?

21    A.    Yeah.

22    Q.    So how many people heard his statement?

23    A.    All of us that was there.

24    Q.    So did you immediately stop what you were doing?

25    A.    Yeah, we all stopped and Don Harper called him to

1   the side.

2       Q.    Okay.

3       A.    And then they were talking.  I don't know what they

4   were talking about.

5       Q.    Did you make a complaint to a supervisor?

6       A.    Right there on the spot.  He was right there.

7       Q.    So which supervisor did you complain to?

8       A.    Henry Quintanilla.

9       Q.    What did Mr. Quintanilla say or do?

10      A.    We just made a complaint to him and then I don't

11  know what he did after that.

12      Q.    Did you ever follow-up?

13      A.    No.

14      Q.    And how long did it take for you to make that

15  complaint to Mr. Quintanilla?

16      A.    Not long, he was just right there.  We went up and

17  go, "Hey, H, this person just yelled at us island monkeys and

18  I don't think that's right, you know.  He just said it out

19  loud."  And we made a complaint to him because he was the

20  supervisor on the field and even Don Harper was there when he

21  heard that.

22      Q.    Did you resume work right after?

23      A.    Yes, we went back to work.

24      Q.    And what did Dennis Clark do?

25      A.    He left.

1     Q.    How long was his conversation with Don Harper?

2     A.    Maybe a good ten minutes.

3     Q.    Okay.  Did he leave right thereafter or did he stand

4  around and --

5     A.    No, he just left and then we went back to work.

6     Q.    Did you ever discuss with anybody else what

7  happened?

8     A.    No.  Only the guys that was there when we made a

9  complaint to Henry.

10     Q.    After that, did you guys have a discussion about it?

11     A.    No.

12     Q.    No?  You haven't discussed what happened with

13  anybody since the statement was made?

14     A.    No.

15     Q.    Any other incidents with Dennis Clark?

16     A.    I wasn't there but I heard the other boys

17  mentioning, complaining about it.  Because we're all

18  separated.

19     Q.    About that same statement?

20     A.    About the same statement, you island monkeys or you

21  monkeys.

22     Q.    Not just same statement but same incident with you

23  at the trench?

24     A.    Yes.  But they were in the other side.

25     Q.    I'm sorry?

1      A.   See, we're here and, you know, a couple of days or

2  whatever and then -- we were separated with the boys because

3  we had to split up and then we end up hearing that Dennis is

4  mentioning it, Dennis calling saying you island monkeys, you

5  monkeys.

6      Q.   Let me see if I understand.  Later, you heard that

7  he said the same thing to other people?

8      A.   By the words of the boys that were being -- what

9  were being called.

10     Q.   So you did have discussions with other people about

11 --

12     A.   No, just mention it and we just went back to work.

13     Q.   Was that on the same day?

14     A.   No, different day.  I can't recall the day.  It  was

15 a different day.

16     Q.   It was after you, after your incident?

17     A.   I think so.

18     Q.   You think so?

19     A.   Yeah.

20     Q.   Do you recall ever hearing complaints about Dennis

21 Clark referring to people as island monkeys prior to when he

22 made that statement in your presence?

23     A.   Right.

24     Q.   You've heard it before?

25     A.   No, that's the first time I heard it.

# REPORTER'S CERTIFICATE

DISTRICT COURT OF GUAM    )

      I, Veronica F. Reilly, Certified Shorthand Reporter, hereby certify that Robert Curz personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 46, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

      Witness my hand at Barrigada, Guam, this 25th day of February 2007.

/S/
_____
Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter

# EXHIBIT 5

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA,) Civil Case No. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS, )
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, ROLAND F. MENDIOLA, JAMES S.)
YEE, TEDDY B. CRUZ, JESSE B. CRUZ,)
JOHN L.G. NAUTA, and JOHN P.      )
BABAUTA,                          )
                 Plaintiffs,      )
                                  )
          vs.                     )
                                  )
CALPAC, DYNAMIC TECHNICAL         )
SERVICES, MCI, JOHN HEALY, DENNIS )
CLARK, WILLIAM WARD, JAI JAMES and)
DOES 1 through 10,                )
                                  )
                 Defendants.      )
_____ )

**COPY**

## DEPOSITION OF JOSEPH HERNANDEZ

### Taken on Behalf of the Defendants

BE IT REMEMBERED That, pursuant to the Guam Rules of Civil Procedure, the deposition of JOSEPH HERNANDEZ was taken before Veronica F. Reilly, Certified Shorthand Reporter, on Thursday, the 8th day of February 2007, at 10:00 a.m. in the Law Offices of Blair Sterling Johnson Martinez & Leon Guerrero, Suite 1008, Pacific News Building, 238 Archbishop Flores Street, Hagatna, Guam.

Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter
Tel: 671.734.1041 * Fax: 671.734.1045
E-mail: veronica.reilly@hotmail.com
Case 1:05-cv-00037    Document 518    Filed 01/23/2008    Page 38 of 68

1    Q.    Do you know who Teddy Cruz is?

2    A.    I'm not sure who he is.

3    Q.    Do you know who Jesse Cruz is?

4    A.    Yes.

5    Q.    Was Jesse Cruz there?

6    A.    Yes.

7    Q.    Do you know who John Nauta is?

8    A.    Yes.

9    Q.    Was John Nauta there?

10   A.    Yes.

11   Q.    What about John Babauta, do you know who he is?

12   A.    Yes.

13   Q.    Was Mr. Babauta there?

14   A.    Yes.

15   Q.    Going back to the first incident when he made that

16   statement; do you know who Mr. Clark was talking to?  Was he

17   talking to you guys in general or was he talking to somebody

18   specifically?

19   A.    General.

20   Q.    In general.  What kind of relationship does Dennis

21   Clark have with CalPac employees?  Can he tell you what to

22   do?

23   A.    Can you repeat the question?

24   Q.    Can Mr. Clark tell what you to do on the job?

25   A.    Yes.

```
 1      Q.   Why is that?  Never mind that question.

 2      A.   He's the one that's instructing the foreman what to

 3 tell us what to do about handling his fiberoptic cables.

 4      Q.   His fiberoptic cable is basically MCI's cable,

 5 right?

 6      A.   Yes, but he claims it that that's his.

 7      Q.   So he works for MCI?

 8      A.   Yes.

 9      Q.   Does he work for CalPac?

10      A.   Yes.

11      Q.   He's a CalPac employee?

12      A.   Yes.

13      Q.   Why do you say he's a CalPac employee?

14      A.   Because the foremen of CalPac gets instructions from

15 Dennis Clark.

16      Q.   And that's the reason you say that Dennis Clark is a

17 CalPac employee, because he gives instructions to the

18 foreman?

19      A.   Yes.

20      Q.   Do you know if Mr. Clark works for Dynamic Technical

21 Services?

22      A.   Yes.

23      Q.   What is Dynamic Technical Services, to your

24 knowledge?

25      A.   To my knowledge, they're off island, they're not in
```

```
1   Guam.
2       Q.    Are they a company?
3       A.    Yes.
4       Q.    And Mr. Clark works for Dynamic Technical Service,
5   which we'll call DTS, okay?
6       A.    Yes.
7       Q.    So Mr. Clark works for DTS; correct?
8       A.    Yes.
9       Q.    Who told you Mr. Clark works for CalPac?  Did
10  anybody tell you that?
11      A.    I don't get what you're saying.
12      Q.    You said that Mr. Clark is an employee of CalPac;
13  correct?
14      A.    Yes.
15      Q.    Who told you that he is an employee of CalPac?
16      A.    He's always in the -- Nobody told me he's employed
17  with CalPac, but he's always in the field when we're putting
18  the fiber down to the ground, he's always inspecting us, he's
19  always checking our work.  That's how I know he's working for
20  CalPac or that's how I know he's with CalPac.
21      Q.    And you also know he's with MCI, right?
22      A.    Yes.
23      Q.    You think that he's employed by MCI?  Yes or no?
24      A.    Yes.
25      Q.    Do you think he's employed by DTS?
```

1    statements?

2        A.    I still don't understand, man, what you're trying to

3    tell me.

4        Q.    I'm trying to ask you a question.  You're saying

5    because Mr. Clark works for CalPac, the defendant approved of

6    his statements; correct?

7        A.    Yes.

8        Q.    Well let's say he doesn't work for CalPac.  Does

9    CalPac approve of his statements?

10       A.    He doesn't work for CalPac?

11       Q.    Right.

12       A.    No.

13       Q.    So CalPac would not approve of it if Mr. Clark does

14   not work for CalPac; correct?

15       A.    No.

16       Q.    Is that yes or no?

17       A.    Yes.

18       Q.    Just to clarify, the only reason you think Mr. Healy

19   approved of his statements was because you thought Mr. Clark

20   works for CalPac; correct?

21       A.    I don't thought he works for CalPac, he does work

22   for CalPac, because he was giving me orders out in the field.

23       Q.    But if he doesn't work for them?  What if we find

24   that he doesn't work for him, would you say Mr. Healy

25   approved of it?

 1      A.    He just called us a monkey.

 2      Q.    While you were working?

 3      A.    Yeah.

 4      Q.    And he just said monkey or did he say something

 5  else?

 6      A.    You island monkeys, do you know what you're doing.

 7      Q.    Island monkeys, do you know what you're doing?

 8      A.    Yeah.

 9      Q.    Who else was there?

10      A.    Several guys.

11      Q.    Do you recall which ones?

12      A.    No.  But several guys was there when he said that.

13      Q.    Okay.

14      A.    Jerry was there, Robert was there, Van Meter was

15  there.  Henry Van Meter was there.

16      Q.    And what happened from that point?  Did you continue

17  to work?

18      A.    Yes.

19      Q.    Did he say anything else?

20      A.    That's it.

21      Q.    That's all he said.  And then did he walk away?

22      A.    Who walk away?

23      Q.    Dennis Clark.

24      A.    Yes, he walked away because we did what he want us

25  to do.

1      Q.    What did he want you to do?

2      A.    Put some more cement in the trench.

3      Q.    And how do you know that's what he wanted you to do?

4      A.    Because he was angry about it because we didn't put

5  enough *nai*.

6      Q.    But how do you know that's what he wanted?  I'm

7  trying to find out how you knew that's what he wanted you to

8  do.

9      A.    That's what he was asking us to do is put more

10 cement inside.

11     Q.    So did he say that before or after he called you an

12 island monkey?

13     A.    After he saw our work and he didn't like our work,

14 so he made that comment, "you know what you're doing you

15 monkeys, you island monkeys, do you know what you're doing."

16 I froze.

17     Q.    You froze?

18     A.    Yeah, like --

19     Q.    But eventually, you started to put back -- put more

20 cement in the trench?

21     A.    Yeah.

22     Q.    Did Dennis Clark stay there or did he leave?

23     A.    I think Henry pulled him to the side, Henry Van

24 Meter pulled him to the side and said that's -- I don't know

25 what they talked about, but Henry was our foreman there *nai*.

1     A.    Yeah, it's like -- because I know like later on

2   after that last time when he said that to me, like a few days

3   later I got hurt so bad, I didn't go to work no more.

4     Q.    Okay.

5     A.    That I recall.

6     Q.    When he came up and said that to you, were you

7   pulling fiber at that time?

8     A.    Yes.

9     Q.    Did he just walk up to you?

10    A.    Yes.

11    Q.    And then what happened after he made that statement?

12    A.    He just told me to go down and tell them monkeys to

13  stop pulling.

14    Q.    And did you do that?

15    A.    I had to.  He's my supervisor.

16            MS. McDONALD:  You want to take a --

17            MR. LEON GUERRERO:  I don't know what you guys

18  want to do.  I know what our reporter wants to do.

19            MS. McDONALD:  I know.  I'm going to let our

20  reporter have a lunch.  I have a lot more.

21            MR. LEON GUERRERO:  So you want to come back

22  around 1:30 or so?

23            MS. LUJAN:  1:30 is fine.

24                        (Lunch break taken.)

25                        (Back on the record.)

1                              (Mr. James Baldwin present for

2                              Mr. Leon Guerrero.)

3    BY MS. McDONALD: (CONTINUING)

4       Q.   When we left off, we were talking about statements

5    made at the Reflection Building and I believe that was the

6    third time you had heard a statement about monkeys or island

7    monkeys; is that correct?

8       A.   Yes.

9       Q.   And you said it occurred in September sometime

10   shortly before you went on disability?

11      A.   Yes.

12      Q.   So you were pulling fiber, is that right, and then

13   he came up to you and said, "Joe, go down and tell them

14   monkeys to stop pulling fiber"?

15      A.   Yes.

16      Q.   So I think that's where we left off.  So what

17   happened after he told you that?

18      A.   I went and did what he said.

19      Q.   What did you do?

20      A.   Went down and tell the guys stop.

21      Q.   Okay.  And what did they say?

22      A.   They had to stop, because they were using the radio,

23   the radio wasn't working.

24      Q.   So they couldn't hear?  They couldn't hear what?

25      A.   They couldn't hear Dennis Clark saying stop.

1    Q.   Was he yelling at them before?

2    A.   He always yell.  The guy is yelling all the time.

3    Q.   How far was he from where I guess the people that

4    were supposed to be hearing him?  How far apart was --

5    A.   Pretty far.

6    Q.   How many feet?

7    A.   It's pretty far.  It's like really far, like from

8    here to the bathroom.

9    Q.   From here to the bathroom?

10   A.   Yeah.

11   Q.   Like thirty feet you think?

12   A.   I'm not sure.  I cannot -- It's pretty far.

13   Q.   Did they hear him yelling?

14   A.   No.

15   Q.   Do you know what he yelled?

16   A.   Yes, keep telling them to stop.

17   Q.   He was just saying stop?

18   A.   Stop.

19   Q.   And did they hear him?

20   A.   No.

21   Q.   No?  So then what happened after that?

22   A.   That's when he made that remark to tell me to tell

23   the monkeys to stop pulling the finer, "Joe, go tell the

24   monkeys stop pulling the fiber."

25   Q.   Did you say anything to him?

1    A.    No, I just went and told them guys to stop.

2    Q.    And where was Dennis Clark when you went to tell

3  them?

4    A.    Dennis Clark was right there.

5    Q.    He came with you?

6    A.    No.  No, because he's assisting the other guys below

7  on the other side.

8    Q.    The side where you used to be?

9    A.    Yeah, where I was pulling the fiber.

10   Q.    So you left that area and you went to the other

11  area?

12   A.    To the other side.

13   Q.    So he stayed back at the -- where you were?

14   A.    He's always observing everybody's work.

15   Q.    Was he observing you telling them?

16   A.    I don't know.

17   Q.    Did you look back at him?

18   A.    No, I just told them and then went back to my job.

19   Q.    So you returned back to where you were standing?

20   A.    (Witness nodded head.)

21   Q.    Was he still there?

22   A.    Yes.

23   Q.    Did you say anything to him?

24   A.    No.

25   Q.    Did he say anything to you?

1      A.    (Witness shook head.)

2      Q.    So anything happen after that?

3      A.    No, I just went to my job, you know.  I went to my

4    job -- I just went to my job and start doing, so he can leave

5    me alone, but he needed somebody to tell them other guys to

6    stop, you know.

7      Q.    Okay.

8      A.    He needed somebody.

9      Q.    So that's the third time.  Is there any other times

10   do you recall him referring to --

11     A.    This guy says that just -- I try to stay away from

12   him because I don't like the word, what he's saying to us,

13   you know.  So he says monkey just practically everyday.  If I

14   see him, he say it.  He likes saying that word.  I don't know

15   why he likes saying that word but it was offending me.

16     Q.    So he would say that everyday?

17     A.    Everyday he'll say that.  He'll say it if I just --

18   when I see him, I go the other way because I'm tired of

19   listening to him say it.  He says it with the F word, you

20   know, a B word, you know.  He says it.  I don't know why he's

21   mad like that, but he's like that.  But I don't pay no mind

22   because he's my big boss.  I do not want to lose my job.

23   When I reported him, they worked me.  They worked me till

24   they hurt me.

25     Q.    Is there any other specific instance?  I mean you

1    said everyday he would say that, but is there any other

2    specific instance that you recall?

3        A.    Them are the only incidents that I remember, but

4    everyday he says it.  If you're near him, you'll hear it and

5    I'm tired of hearing him say that.

6        Q.    So everybody would hear him?

7        A.    Yeah, everybody would hear him.

8        Q.    Everybody the supervisors?

9        A.    All the supervisors will hear him.

10       Q.    John Healy?

11       A.    John Healy, too, even the wife.

12       Q.    The wife?

13       A.    Yes.

14       Q.    When he said monkeys, was he referring to just

15   everybody or was he -- did you think he was referring to

16   several people and not others?

17       A.    I know a few times he called me that, I had to chuck

18   it up because he's my big boss.  I couldn't tell him, hey,

19   stop calling me that.  I just turned the other way.  Just

20   like I said, they worked me till they hurt me.

21       Q.    Do you think he said that to, for instance, the

22   white supervisors?  Would he say, hey monkeys?

23       A.    He never mistreat the white supervisors.

24       Q.    But he was saying monkey to everybody, right?

25       A.    Yes.

1   I said hey, you have to tell Don about this, man.

2       Q.   Did Dennis Clark ever tell you to use the

3   jackhammer?

4       A.   No.

5       Q.   Did Dennis Clark ever tell you to pick up sand bags?

6       A.   Yes.

7       Q.   He did?

8       A.   (Witness nodded head.)

9       Q.   Did he ever tell you to pick up machines?

10      A.   Yes.

11      Q.   Did he tell you that directly?

12      A.   Yes.

13      Q.   How about picking up the sand bags; did he ever tell

14  you --

15      A.   Yes.

16      Q.   And picking up cement bags?

17      A.   Yes.

18      Q.   Did he tell you that directly?

19      A.   Yes.

20      Q.   Do you know what Dynamic Technical Services is?

21      A.   Yes.

22      Q.   Could you tell me what your awareness is of Dynamic

23  Technical Service?

24      A.   That's where Dennis Clark works.

25      Q.   How did you come to that understanding?

1    Texas?

2        A.    Yes.

3        Q.    Who employed you for this job?

4        A.    CalPac.

5        Q.    CalPac?  Okay.  Who hired you for this job?

6        A.    CalPac.

7        Q.    And who paid your salary?

8        A.    Dennis Clark.

9        Q.    Dennis Clark paid your salary?

10       A.    (Witness nodded head.)

11       Q.    So you would get your paycheck from Dennis Clark?

12       A.    No, but that's what all the foremen said, that's

13   where the money is coming from, Dennis Clark.

14       Q.    When you got a paycheck, who did it come from?

15       A.    CalPac.

16       Q.    CalPac?

17       A.    (Witness nodded head.)

18       Q.    Did it say CalPac on your paycheck?

19       A.    I don't recall.  It's been a long time.  I don't

20   remember if it said CalPac or what, but I'm pretty sure the

21   money was coming from Dennis Clark.

22       Q.    Why do you say that?

23       A.    Because he was the one out there telling everybody

24   what to do.

25       Q.    But you had other people telling you what to do,

1    A.    John Healy.

2    Q.    Okay.

3    A.    That's about it.

4    Q.    Would all those guys tell you what to do?

5    A.    I listen to all them guys.

6    Q.    Do you know, is Henry Quintanilla a CalPac employee?

7    A.    Yes.

8    Q.    Is Henry Van Meter a CalPac employee?

9    A.    Yes.

10   Q.    The two other foremen that you can't recall, do you

11   know if they were CalPac employees?

12   A.    Yes.

13   Q.    They were?

14   A.    Yes.

15   Q.    And John Healy, was he a CalPac employee?

16   A.    I believe he's the owner.

17   Q.    So those are the only guys you received directions

18   from?

19   A.    And Dennis Clark.

20   Q.    And Dennis Clark.  And Dennis Clark is CalPac and

21   MCI and Dynamic?

22   A.    Yes.

23   Q.    Do you know who Henry Quintanilla reported to?

24   A.    Report what?

25   Q.    Who he reports to, who was his boss?

1    him on there, you want to get rid of him, right?  That's how

2    I saw it.  They want to get rid of me.

3         Q.   Who had the most knowledge of what your skills were?

4         A.   What do you mean most knowledge?

5         Q.   I mean who would know what your skills were?

6         A.   The foremen.

7         Q.   The foremen.  And the foremen determined what you

8    were supposed to do?

9         A.   Yes.

10        Q.   And who did what?

11        A.   Who did what, yeah.

12        Q.   And Dennis Clark wasn't a foreman?

13        A.   Dennis Clark was higher than a foreman.  Dennis

14   Clark was telling the foremen what to do.

15        Q.   Did you ever see Dennis Clark talk to anyone about

16   you?

17        A.   I don't recall, ma'am.

18        Q.   Did you ever hear him talk to anyone you?

19        A.   I don't recall.

20        Q.   Did you ever feel that Dennis Clark was displeased

21   with your work?

22        A.   Yes.

23        Q.   Can you describe that?

24        A.   Huh?

25        Q.   Can you describe those situations?

1    A.    Like not giving me breaks.

2    Q.    Who would usually give you a break?

3    A.    Usually Dennis Clark will holler out, "Break" but he

4    didn't holler out break.

5    Q.    So was that for everybody?  He hollers a break for

6    everybody?

7    A.    Just about.  Tells the foremen, hey, break.  Calls

8    them up on the radio, hey, tell your guys to break.  No

9    break.

10    Q.    When did the breaks stop?

11    A.    That's when we start reporting him in, what he's

12    saying on the job site.

13    Q.    Does everybody on the site take a break at the same

14    time?

15    A.    I'm pretty sure; yes.

16    Q.    So if there's a break, everybody breaks?

17    A.    (Witness nodded head.)

18    Q.    So when the breaks stopped, nobody took a break?

19    A.    Nobody.

20    Q.    Nobody.  And when did those breaks stop?

21    A.    I don't recall, ma'am.  It's been a while.  I don't

22    remember.

23    Q.    How else did you feel that he was displeased with

24    your work?

25    A.    Because I told the foremen that I don't know how to

# REPORTER'S CERTIFICATE

DISTRICT COURT OF GUAM    )

      I, Veronica F. Reilly, Certified Shorthand Reporter, hereby certify that Joseph Hernandez personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 151, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

      Witness my hand at Barrigada, Guam, this 9th day of March 2007.


_____
Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter

# EXHIBIT 6

# IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, JERRY APODACA) CIVIL CASE NO. CIV05-00037
JR., JOSEPH J. HERNANDEZ, JOSEPH )
T. MENDIOLA, LARRY L. CHARFAUROS,)
ANTHONY C. ARRIOLA, ROBERT B.    )
CRUZ, ROLAND F. MENDIOLA, JAMES  )
S. YEE, TEDDY B. CRUZ, JESSE B.  )
CRUZ, JOHN L.G. NAUTA, and JOHN  )
P. BABAUTA,                      )
                                 )
                Plaintiffs,      )
                                 )
            vs.                  )
                                 )
CALPAC, DYNAMIC TECHNICAL        )
SERVICES, MCI, JOHN HEALY, DENNIS)
CLARK, WILLIAM WARD, JAI JAMES   )
and DOES 1 through 10,           )
                                 )
                Defendants.      )



## DEPOSITION OF JESSE B. CRUZ

*Taken on Behalf of Defendant CalPac*

            BE IT REMEMBERED That, pursuant to the Guam
Rules of Civil Procedure, the deposition of **JESSE B. CRUZ** was
taken before Cecille A. Flores, a Certified Shorthand
Reporter, on the 20th day of April 2007, at 9:00 a.m. in the
offices of Blair Sterling & Johnson.

Case 1:05-cv-00037    Document 578    Filed 01/23/2008    Page 58 of 68

1      A      "Also before Plaintiff J. Cruz's unlawful

2  termination of employment, Plaintiff J. Cruz was informed by

3  a Foreman or other agent of Defendant CalPac that Plaintiff

4  J. Cruz should be careful about what he signs regarding the

5  charge of Discrimination and that if Plaintiff J. Cruz

6  dismisses the charge against CalPac then good things might

7  happen to Plaintiff J. Cruz."

8      Q      Who was this Foreman that you were referring to?

9      A      Henry Quintanilla.

10     Q      He talked to you about this?

11     A      Yes.

12     Q      He said not to sign the Charge of Discrimination?

13  Is that what you're saying?

14     A      Yes.

15     Q      When did he talk to you about this?

16     A      When we were out working on the field.  I don't know

17  when.  I don't recall, but he told me against the truck and

18  he was talking to me about it.  Like there's a GTA project.

19     Q      Was this after the meeting on December --

20     A      It was after.

21     Q      Then you filed your first complaint on December 22,

22  2004, correct?

23     A      Correct.

24     Q      This thing you were referring to in Paragraph 177,

25  did it take place before you filed your first charge to EEOC?

*Jesse B. Cruz: April 20, 2007*

1      A      No, after.

2      Q      Did you tell Mr. Quintanilla that you had filed

3    something with the EEOC?

4      A      Yes.

5      Q      Did you have a problem with him saying that to you?

6      A      No.

7      Q      You weren't offended by him coming up to you and

8    saying drop the charges?

9      A      No, I was just shocked that he was telling me that.

10     Q      Okay.  Did it bother you that he was asking you to

11   drop the charges?

12     A      In a way it did.

13     Q      It says you should be careful about what you sign.

14   What do you mean by that?

15     A      Paperwork.

16     Q      Was he saying that you should be truthful about what

17   you signed?

18     A      Henry telling me?

19     Q      Yes, your complaint says that you should be careful

20   about what you sign regarding the Charge of Discrimination.

21     A      Yes, he said that.

22     Q      Was he asking you to lie?

23     A      Meaning what way?

24     Q      I don't know.  I'm trying to figure out what you're

25   trying to say on this paragraph.

1      A    When Henry talked to me, he was in the truck.  He

2  told me that there's a GTA project coming up and he was

3  referring to the charges.

4      Q    Okay.

5      A    Okay?  And he mentioned that I could have -- how do

6  you say leadership or -- I could become one of the Foremen

7  too leading that GTA project.

8      Q    Okay.

9      A    Okay?

10      Q    Does Mr. Quintanilla have the power to appoint you

11  as a Foreman?

12      A    I don't know.

13      Q    What did you ask him about this?  Did you say --

14  what did you say about it?

15      A    I was just shocked when he was telling me in the

16  truck.

17      Q    Did you respond?

18      A    No, I just told him, I said, I don't know what to

19  tell you.

20      Q    And you never followed up with it, right?

21      A    No.

22      Q    Mr. Quintanilla never came back to you about --

23      A    No.

24      Q    -- changing the charge again, is that correct?

25      A    No.

*Jesse B. Cruz: April 20, 2007*

1    Q    You did together?

2    A    Yeah, Henry.

3    Q    What is your understanding of Dynamic Technical

4  Services?

5    A    The company.

6    Q    Do you know what they do?

7    A    I have no idea.

8    Q    Do you know where they're based?

9    A    (No response.)

10   Q    Do you know where they're based?

11   A    Texas.

12   Q    In Texas?  Why do you think they're based out of

13  Texas?

14   A    I have no idea.

15   Q    Did somebody say?

16   A    Huh?

17   Q    Did somebody tell you they're based out of Texas?

18   A    The address.

19   Q    How did you find out the address?

20   A    EEOC.

21   Q    Do you have any other knowledge of them being based

22  in Texas?

23   A    No.

24   Q    Do you know how many employees they have?

25   A    I have no idea.

*Jesse B. Cruz: April 20, 2007*

1     Q     Do you know what they were supposed to be doing, if
2  anything, on the MCI project?
3     A     Meaning -- I don't understand.
4     Q     To your understanding, do they have any role on the
5  MCI project?
6     A     Overseeing the work?
7     Q     Overseeing the work of --
8     A     The MCI project.
9     Q     Why do you have that understanding?  Why do you
10 think that?
11    A     Supervise us.
12    Q     Why do you think they were supervising you?
13    A     To make sure how the trench -- to make sure how the
14 cable is laid in.
15    Q     Okay.  But how did they do that?
16    A     Dig the trench -- dig the trench about two feet and
17 sand the bottom and lay the conduits on.
18    Q     Okay.  Who were the Dynamic representatives?
19    A     Dennis Clark.
20    Q     Dennis Clark?
21    A     Yeah.
22    Q     And what did he do on the job site?
23    A     Supervise.
24    Q     What do you mean by that?
25    A     Go around and checking the work the guys are doing.

*Jesse B. Cruz: April 20, 2007*

1     Q     But at the time you were working at CalPac, you

2   didn't know about DTS, right?  Didn't know about Dynamic?

3     A     At the beginning?

4     Q     Yes.  When you first saw Dennis Clark, you hadn't

5   heard of DTS, right?

6     A     No.

7     Q     When you were working on the MCI project, who was

8   your employer?

9     A     What do you mean by that?  I had Dennis Clark and

10  CalPac.

11    Q     Okay.  But who employed you to work?

12    A     CalPac.

13    Q     And they paid you?

14    A     Yes.

15    Q     They paid your salary and they hired you?

16    A     Yes.

17    Q     You said Henry Quintanilla was your Supervisor,

18  right?

19    A     Yes.

20    Q     Who else were your Supervisors?

21    A     Ted Cruz was a Foreman.

22    Q     Ted Cruz?

23    A     Yeah.

24    Q     Anybody else?

25    A     That I work under?

1      Q     Yes.

2      A     Just those two.

3      Q     Just those two?  At least these two were your

4   Supervisors the entire time?

5      A     Working together.

6      Q     The entire time you were at CalPac?

7      A     Yes.

8      Q     Who did Ted Cruz report to?

9      A     HQ.

10     Q     Who did HQ report to?

11     A     I guess John Healy.

12     Q     You don't know?

13     A     I don't know.

14     Q     Did you do what your Supervisors told you to do?

15     A     Yes.

16     Q     Did Dennis Clark ever tell what you to do?

17     A     Yes, on that -- that day he called me island monkey,

18   and he did tell me that -- he goes -- he asked me a question

19   how deep was the trench, I told him like 24 inches and to lay

20   sand and then put the conduit on top of the sand.

21     Q     Was that before or after he called you an island

22   monkey?

23     A     That was -- no, after he called me island monkey.

24     Q     So let's run through that day.  Can you tell us

25   again what you were doing on that day?

1     A     Yes.

2     Q     Who else do you recall had hours reduced?

3     A     I believe Ted and John.

4     Q     Do you recall anyone else or is it just Ted and

5   John?

6     A     No, I don't recall.

7     Q     When you said Dennis Clark was a Supervisor for the

8   MCI project, he was a Supervisor for anyone who worked on the

9   MCI project?

10    A     Yes.

11    Q     The time that you discussed the Tiyan halfway house,

12   when he said island monkey, who was he talking about?

13    A     That time when he approached us, it's only me and

14   Tony there in the trench.

15    Q     So was he talking about you and Tony?

16    A     Me and --

17    Q     Anthony Arriola?

18    A     Yes.

19           **MS. LUJAN:**  I have no other questions.

20           **MR. LEON GUERRERO:**  I have a few follow-up

21   questions.

22

23                 **RE-DIRECT EXAMINATION**

24   BY MR. LEON GUERRERO:

25    Q     Getting back to the meeting that you were just

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **JESSE B. CRUZ** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 120, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 23rd day of July 2007.


_____
Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

NOTARY PUBLIC'S CERTIFICATE

BARRIGADA ) ss

       I, Cecille A. Flores, Notary Public in and for Guam, do hereby certify that on the 20th day of April, 2007 at the hour of 9:00 a.m. there appeared before me JESSE B. CRUZ at the law offices of Blair Sterling & Johnson. The witness herein, produced to give his deposition in the within-numbered Civil Case No. CIV05-00037; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Leon Guerrero's office for the deponent's review, corrections, if any, and execution.

       I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

       In testimony whereof, I have hereunto set my hand this 23rd day of July, 2007.

_____
Cecille A. Flores