**CIVILLE & TANG, PLLC**
330 HERNAN CORTEZ AVENUE, SUITE 200
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8869/69
FACSIMILE: (671) 477-2511

**JONES DAY**
2727 NORTH HARWOOD STREET
DALLAS, TEXAS 75201-1515
TELEPHONE: (214) 220-3939
FACSIMILE: (671) 969-5100

*Attorneys for Defendants*
*Verizon Business Purchasing LLC and*
*Verizon Business Network Services, Inc.*

**FILED**
**DISTRICT COURT OF GUAM**

APR 1 1 2008

**JEANNE G. QUINATA**
**Clerk of Court**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, | CIVIL CASE NO. 05-00037 |
| Plaintiffs, | **VERIZON DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO ALL CLAIMS ASSERTED BY PLAINTIFF JOHN B. BABAUTA** |
| vs. | |
| CALIFORNIA PACIFIC TECHNICAL SERVICES LLC, a.k.a. CALPAC, DYNAMIC TECHNICAL SERVICES, VERIZON BUSINESS PURCHASING, LLC, VERIZON BUSINESS NETWORK SERVICES, INC., JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, | |
| Defendants. | |

# ORIGINAL

# TABLE OF CONTENTS

Page

I.    SUMMARY OF THE CASE ............................................................................... 1

II.   BACKGROUND .............................................................................................. 2

   A.   Factual Overview .................................................................................... 2

     1.   Verizon Hires Calpac to Install Fiber on Guam and DTS to Oversee Calpac's Installation ............................................................................ 3

     2.   The Guam International Ring Project ........................................................... 5

     3.   Plaintiff John P. Babauta ........................................................................ 6

III.  ARGUMENTS AND AUTHORITIES ............................................................... 6

   A.   Summary Judgment Standard ................................................................... 6

   B.   Verizon Was Not Plaintiff's Employer ...................................................... 6

     1.   Verizon Cannot Be Plaintiff's Indirect Employer Because Verizon Did Not Engage in Discriminatory, Retaliatory, or Harassing Acts ............................ 7

     2.   Verizon Cannot Be Plaintiff's Joint Employer Because It Did Not Control the Terms and Conditions of Plaintiff's Employment, and Contractual Oversight Is Insufficient to Establish the Requisite Control .......................................... 9

   C.   Alternatively, Even if Any Title VII Relationship Existed Between Verizon and Plaintiff, Plaintiff's Title VII Claims Against Verizon Are Barred as a Matter of Law. ............................................................................................. 14

     1.   Verizon Is Not Liable for Hostile Environment ............................................ 14

     2.   Verizon Cannot Be Liable for Discrimination or Retaliation ........................... 17

     3.   Plaintiff's Theory of Liability Represents an Unprecedented Expansion of Title VII ......................................................................................... 19

IV.   CONCLUSION .............................................................................................. 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................... 6

*Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924 (9th Cir. 2003) ........................................... 7

*Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir. 1983) .................................................... 11

*Berry v. Delta Airlines, Inc.*, 260 F.3d 803 (7th Cir. 2001) ........................................... 15

*Boire v. Greyhound Corp.*, 376 U.S. 473 (1964) ........................................................... 11

*Caldwell v. ServiceMaster Corp.*, 966 F. Supp. 33 (D.D.C. 1997)................... 14, 17, 18

*Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440 (2003) ............................. 9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................... 6

*Diana v. Schlosser*, 20 F. Supp. 2d 348 (D. Conn. 1998).................................................. 8

*Duncan v. Jr. Coll. Dist. of St. Louis*, No. 4:98CV01220 (CEJ), 1999 U.S. Dist. LEXIS
    22451 (E.D. Mo. Nov. 15, 1999) ................................................................................ 8

*EEOC v. Pac. Mar. Ass'n*, 351 F.3d 1270 (9th Cir. 2003) ............................................. 9

*El-Hakem v. BJY Inc.*, 415 F.3d 1068 (9th Cir. 2005) .................................................. 15

*Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754 (9th Cir. 1997)................................. 14, 15

*Gallenkamp Stores, Inc. v. NLRB*, 402 F.2d 525 (9th Cir. 1968) .................................. 10

*Garcia v. Courtesy Ford, Inc.*, No. C06-855RSL, 2007 WL 1192681 (W.D. Wash. Apr.
    20, 2007) ..................................................................................................................... 7

*Garrett v. Info. Sys. & Networks Corp.*, No. 5:97-CV-436-BR1, 1997 U.S. Dist. LEXIS
    20845 (E.D.N.C. Nov. 21, 1997) .............................................................................. 8

*Gomez v. Alexian Bros. Hosp. of San Jose*, 698 F.2d 1019 (9th Cir. 1983) ................... 7

*Hardage v. CBS Broad., Inc.*, 427 F.3d 1177 (9th Cir. 2005) ...................................... 16

*Int'l Chem. Workers Union Local 483 v. NLRB*, 561 F.2d 253 (D.C. Cir. 1977)....... 11, 12, 13, 19

*Int'l House v. NLRB*, 676 F.2d 906 (2d Cir. 1982) ................................................. 12, 13

*King v. Chrysler Corp.*, 812 F. Supp. 151 (E.D. Mo. 1993)............................................. 8

*Kohler v. Inter-Telegraph Techs.*, 244 F.3d 1167 (9th Cir. 2001)................................ 15

*Lutcher v. Musicians Union Local 47*, 633 F.2d 880 (9th Cir. 1980)............................. 7

*Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2004) ........................................................ 9

*Neal v. Manpower Int'l, Inc.*, No. 3:00-CV-277/LAC, 2001 WL 1923127 (N.D. Fla. Sept. 17, 2001) .................................................................................................................. 15

*Quinn v. Green Tree Credit Corp.*, 159 F.3d 759 (2d Cir. 1998) ................................... 15

*Refining-Chemical Co. v. NLRB*, 418 F.2d 127 (5th Cir. 1969) ..................................... 10

*Riesgo v. Heidelberg Harris, Inc.*, 36 F. Supp. 2d 53, 58 (D.N.H. 1997) ...................... 18

*Ruggiero v. AMR Corp.*, C 94-20160 JW, 1995 WL 549010 (N.D. Cal. Sept. 12, 1995) ...... 14, 17

*Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990 (6th Cir. 1997) ............... 11

*Takacs v. Fiore*, 473 F. Supp. 2d 647 (D. Md. 2007) ........................................... 14, 15, 16

*Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216 (9th Cir. 1995) ............................... 6

*Velez v. Roche*, 335 F. Supp. 2d 1022 (N.D. Cal. 2004)........................................... 7, 8

*Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347 (M.D. Fla. 2003)................. 18

*Williams v. Grimes Aerospace Co.*, 988 F. Supp. 925 (D.S.C. 1997) .............................. 18

*Zainalizadeh v. Neiman Marcus Group*, No. C 01-4207 JL, 2002 U.S. Dist. LEXIS 16707 (N.D. Cal. Sept. 4, 2002).................................................................................................. 6

**STATE CASES**

*Vernon v. California*, 10 Cal. Rptr. 3d 121, 134 (Cal. Ct. App. 2004)............................. 7

**BOARD DECISIONS**

*Cal. Lab. Indus., Inc.*, 249 NLRB 600 (1980) ............................................................. 13

*Westinghouse Elec. Corp.*, 163 NLRB 914 (1967)......................................................... 13

*W.L. Golightly, Inc.*, 172 NLRB 2155 (1968)................................................................ 13

**FEDERAL STATUTES**

29 C.F.R. § 1604.11(e)..................................................................................................... 15

FED. R. CIV. P. 56(c)........................................................................................................... 6

# I.    SUMMARY OF THE CASE

Plaintiff John P. Babauta ("Plaintiff") is attempting to hold Verizon liable for alleged Title VII violations despite the fact that Verizon employed neither Plaintiff nor the alleged wrongdoers. Courts in the Ninth Circuit, however, have long recognized that the scope of Title VII liability has boundaries. To succeed on a Title VII claim in cases in which a defendant did not directly employ the plaintiff, a plaintiff must initially prove the existence of an employment relationship by demonstrating that the defendant discriminatorily interfered with his employment or that the defendant controlled the terms and conditions of his employment. *See* section III.B.2, *infra.* Because it is undisputed that no Verizon employee engaged in unlawful conduct – including any involvement in any adverse employment decisions or the alleged harassment – and Verizon did not control the terms and conditions of Plaintiff's employment, Plaintiff is left to argue that Verizon is his Title VII employer because of the contractual agreement Verizon had with Plaintiff's actual employer. As explained below, courts have consistently maintained the fundamental distinction between an entity (such as Verizon, here) retaining the right to ensure satisfactory contractor performance and that entity controlling the terms and conditions of the *contractor's employees'* employment. In other words, it is one thing to say that Verizon possessed some control over the manner in which Calpac performed the contract, but it is quite another to extrapolate from that fact the notion that Verizon is the employer of Calpac's employees.

In this case, Plaintiff's evidence against Verizon amounts to nothing more than the fact that Verizon contracted for services with third parties whose employees allegedly engaged in or were subjected to discrimination and that Verizon retained the authority to ensure compliance with the performance of that contract. Such evidence is insufficient to overcome summary judgment. Even if Verizon could be considered Plaintiff's employer, Verizon cannot be liable under Title VII in the absence of evidence that Verizon knew or should have known about the alleged unlawful conduct directed toward Plaintiff. Accordingly, Verizon is entitled to summary judgment for the following reasons:

1. Verizon cannot be held to be Plaintiff's indirect employer because no individual employed by Verizon harassed, discriminated, or retaliated against Plaintiff, or otherwise engaged in any unlawful conduct;

2. Verizon cannot be held to be Plaintiff's joint employer because the mere fact that Verizon maintained some oversight over the manner in which Calpac performed its contract – in the absence of evidence that Verizon had any power to hire, promote, schedule hours for, assign tasks to, terminate, or otherwise control Plaintiff's terms and conditions of employment – cannot create a Title VII employment relationship between Verizon and Plaintiff; and

3. In the alternative, Verizon cannot be liable for harassment, discrimination, or retaliation in the absence of evidence that Verizon knew or should have known about the alleged unlawful conduct directed toward Plaintiff.[1]

## II.    BACKGROUND

A.    Factual Overview.

This case was brought by thirteen plaintiffs who assert claims of discrimination, harassment, and retaliation under Title VII of the Civil Rights Act against defendants Calpac,

---

[1] On October 5, 2007, Verizon filed a Notice of Joinder in which Verizon joined Calpac's motions for summary judgment with respect to the underlying merits of the plaintiffs' claims. Specifically, Verizon joined Calpac's motions on the following issues:

    a)    Plaintiffs have failed to establish a *prima facie* case of hostile work environment harassment.

    b)    Plaintiffs' claims are barred, in whole or in part, on the grounds that Calpac, Plaintiffs' employer, exercised reasonable care to prevent and promptly correct any harassing, discriminatory, or retaliatory conduct.

    c)    Plaintiffs' retaliation claims fail because the acts alleged do not amount to actionable retaliatory conduct.

    d)    Plaintiffs' discrimination and retaliation claims fail because Calpac, Plaintiffs' employer, had legitimate, non-discriminatory and non-retaliatory reasons for any alleged adverse employment actions that were not pretexts for discrimination or retaliation.

    e)    Plaintiffs' declarations submitted in support of their opposition briefs, which contradict their deposition testimony, cannot create a genuine issue of material fact.

The Court's granting of Calpac's motions for summary judgment against the plaintiffs on these issues would be dispositive of the plaintiffs' claims against Verizon as a matter of law. Verizon, therefore, incorporates Calpac's arguments on their motions for summary judgment into this Motion for Summary Judgment.

DTS, and Verizon.[2]

    1.      Verizon Hires Calpac to Install Fiber on Guam and DTS to Oversee
               Calpac's Installation.

In 2003, NASA entered into a contract with a predecessor to Verizon under which Verizon agreed to provide data services to NASA. (*See* Affs. of Jeff Buehler, Marty Hersh, and Larry Saunders attached as Exs. A at ¶ 3, B at ¶ 3, and C at ¶ 3, respectively, to the Declaration of G. Patrick Civille in Support of Motion for Summ. J. ("Civille Decl.") filed herewith.) Because NASA was not connected to the existing Verizon network, Verizon engaged in a bidding process to hire a contractor to install a twenty-four fiber optic conduit system on Guam for the purpose of connecting NASA to Verizon's existing network (the "Guam International Ring"). (Civille Decl., Exs. A at ¶ 3, B at ¶ 3, & C at ¶ 3.) In or about November 2003, Verizon employee Marty Hersh ("Hersh") traveled to Guam to locate contractors, facilitate the bidding process for such installation, and view and adjust the route in which the cable would be installed. (Civille Decl., Ex. B at ¶ 4.)

After completion of the bidding process, on February 13, 2004, a predecessor to Defendant Verizon Business Purchasing, LLC entered into a Construction Agreement with the winning bidder – Calpac – to construct the Guam International Ring (the "Calpac Contract"). (A copy of the Calpac Contract is attached as Ex. D to the Civille Decl.) Under the Calpac Contract, Calpac was responsible for providing the services necessary to construct the Guam International Ring, including the labor, supervision, taxes, materials, supplies, tools, equipment, light, water, fuel, power, heat, transportation, and any other necessary processes, materials, and facilities, and, as is customary with such service contracts, Calpac was required to perform the contract to Verizon's satisfaction. (*See, e.g.*, Civille Decl., Ex. D ¶¶ 2.7, 2.10, 3.3, 4.1, 4.2, 6.2, and Statement of Work.) The Calpac Contract explained the relationship between Calpac and Verizon, stating that:

        [n]othing in this Agreement shall be deemed to make [Calpac], nor

---

[2] Pursuant to the Court's November 13, 2006 Order granting the joint motion to substitute parties, Defendant MCI was dismissed, and Verizon Business Purchasing, LLC and Verizon Business Network Services, Inc. (collectively "Verizon") were substituted in its place as defendants in this case. (Nov. 13, 2006 Order at p. 1.)

> any of [Calpac's] . . . employees . . . employee of [Verizon] . . .
> [Calpac] shall at all times be an independent contractor and shall
> have sole responsibility for and control over the details and means
> for performing the Work, provided that [Calpac] is in compliance
> with the terms of this Agreement. Anything in this Agreement that
> may appear to give [Verizon] the right to direct [Calpac] as to the
> details of the performance of the Work, or to exercise a measure of
> control over [Calpac], shall mean that [Calpac] shall follow the
> desires of [Verizon] only in the results of the Work.

(Civille Decl., Ex. D at ¶ 36.1.) In or about January 2004, before construction of the Guam International Ring project began, Verizon employee Jeff Buehler ("Buehler") traveled to Guam to review and evaluate the preliminary route in which the cable would be installed. (Civille Decl., Ex. A at ¶ 4.) After this visit, no Verizon employee or personnel remained on Guam to oversee the project nor did Hersh or Buehler return to Guam at any time. (Civille Decl., Exs. A at ¶ 4 & B at ¶ 4.)

On March 3, 2004, a predecessor to Defendant Verizon Business Network Services, Inc. entered into a work order with Dynamic Technical Services, Inc. ("DTS") – which incorporated the September 24, 2001 Outside Plant Engineering Agreement between a predecessor to Verizon Business Network Services, Inc. and DTS – for DTS to provide project management services with respect to the Guam International Ring project. ("DTS Contract"). (A copy of the DTS Contract is attached as Ex. E to the Civille Decl.) Under the DTS Contract, DTS was required to supply a project manager, who was responsible for, among other things, researching and recommending routes, providing engineering services, and assuring the quality of Calpac's work. (Civille Decl., Ex. E at Work Order.) The DTS Contract provided that "[DTS] and its employees . . . are and shall remain independent contractors for all activities performed hereunder . . . [DTS and Verizon] expressly acknowledge that no employment, partnership, or joint venture relationship is created by this Agreement." (Civille Decl., Ex. E at ¶ 4.3.) DTS employee Dennis Clark ("Clark") was selected to manage the Guam International Ring project, and, among other things, he worked with Calpac to refine the construction design and fine-tune the route in which the cable was laid; worked with local government agencies to obtain necessary permits, easements, and rights of way; and inspected Calpac's installation to ensure that such work

complied with the terms of the Calpac Contract. (Civille Decl., A at ¶ 4, B at ¶ 4, & C at ¶ 4; a copy of the Feb. 8, 2007 deposition of D. Harper is attached as Ex. K to the Civille Decl. at 15:13-17; 19:21-20:23; a copy of the May 23, 2007 deposition of D. Clark is attached as Ex. L to the Civille Decl. at 30:3-13.)

2.      The Guam International Ring Project.

The Guam International Ring project began in March 2004. (Civille Decl., Ex. A at ¶ 6.) During the course of the project, Verizon employees Buehler and Larry Saunders ("Saunders"), on occasion, reviewed production reports prepared by Clark regarding the project status. (Civille Decl., Exs. A at ¶ 6 & C at ¶ 5.) In addition, they participated in weekly meetings regarding the progress of the project. (Civille Decl., Exs. A at ¶ 6 & C at ¶ 5.) Buehler also reviewed and approved invoices prepared by Calpac and DTS related to their services on the project. (Civille Decl., Exs. A at ¶ 6 & C at ¶ 5.) At no point during the Guam International Ring project did Buehler, Hersh, Saunders, or any other Verizon employee have any involvement with any employment action relating to any particular plaintiff, including any Calpac decision to hire, promote, assign tasks to, schedule hours for, or terminate any plaintiff. (Civille Decl., Exs. A at ¶ 7, B at ¶ 6, & C at ¶ 6.)

In their EEOC charges, the plaintiffs allege that Clark, who was employed by DTS, began using the terms "monkeys" or "island monkeys" in late July 2004 and that Clark last used such terms on or about October 25, 2004. (See, e.g., J Hernandez's and J. Babauta's EEOC Charges, attached as Exs. F & G to the Civille Decl.) On December 19, 2004, approximately two months after the last alleged comment was made, there was a protest on Guam claiming that Clark had made racist comments. This was the date on which Verizon first became aware of any allegations of improper conduct on the part of Calpac or Clark. (Civille Decl., Exs. A at ¶ 9, B at ¶ 9, & C at ¶ 9.) Verizon communicated in writing with Calpac on December 28, 2004 and with Calpac and DTS on January 14, 2004 reminding Calpac and DTS of their legal responsibilities and requesting that Calpac and DTS refrain from taking any discriminatory and retaliatory actions. (A copy of Verizon's correspondence is attached as Ex. H to the Civille Decl.)

-5-

3. Plaintiff John P. Babauta

Plaintiff John P. Babauta ("Plaintiff") is a former employee of Calpac. (SAC ¶ 254; a copy of the Feb. 2, 2008 deposition of J. Babauta is attached as Ex. CC to the Civille Decl. at 26:8-27:1.) Plaintiff testified that during his employment with Calpac, he heard Clark refer to Calpac workers as "island monkeys" on one occasion. (Civille Decl., Ex. CC at 62:4-7.) Plaintiff does not dispute that Clark made this comment on or about October 25, 2004. (Civille Decl., Ex. CC at 44:12-14.) Plaintiff also alleges that Calpac assigned Plaintiff unattractive tasks and did not return Plaintiff to work after his injury. (Civille Decl., Ex. CC at 73:22-25; 78:20-79:22.) Plaintiff stopped working for Calpac in May 2005. (Civille Decl., Ex. CC at 81:8-11.)

## III. ARGUMENTS AND AUTHORITIES

A. Summary Judgment Standard.

Summary judgment is appropriate if the pleadings, depositions, and answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). An issue is "genuine" if "a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 258 (1986). Summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor or where there is a "complete failure of proof concerning an essential element of the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Applying this standard, and for the reasons set forth herein, the Court should grant summary judgment in favor of Verizon.

B. Verizon Was Not Plaintiff's Employer.

"In order to come under the protection of federal and state discrimination statutes, a plaintiff must demonstrate the existence of an employment relationship." *Zainalizadeh v. Neiman Marcus Group*, No. C 01-4207 JL, 2002 U.S. Dist. LEXIS 16707, at *3 (N.D. Cal. Sept. 4, 2002).

- 6 -

"Consequently, there must be some connection with an employment relationship for Title VII protections to apply." *Lutcher v. Musicians Union Local 47*, 633 F.2d 880, 883 (9th Cir. 1980). There can be no dispute in this case that Calpac – not Verizon – directly employed Plaintiff. (Civille Decl., Ex. CC at 26:8-27:1; SAC ¶ 254, 264.) There can also be no dispute that DTS – not Verizon – directly employed the alleged harasser, Clark. (A copy of DTS's letters to the EEOC are attached as Ex. I to the Civille Decl.) Nonetheless, Plaintiff attempts to manufacture an employment relationship by alleging that Verizon was Plaintiff's indirect employer and that Verizon was a joint employer with Calpac. Neither argument has merit.

> 1. Verizon Cannot Be Plaintiff's Indirect Employer Because Verizon Did Not Engage in Discriminatory, Retaliatory, or Harassing Acts.

Under the indirect employer doctrine, the Ninth Circuit has extended liability to non-employing entities only "in instances where the indirect employer was the entity *performing the discriminatory act* . . ." *See Velez v. Roche*, 335 F. Supp. 2d 1022, 1027 (N.D. Cal. 2004) (discussing *Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924 (9th Cir. 2003)) (emphasis added). For example, the court in *Anderson* refused to extend liability to a non-employing defendant where the hostile treatment did not occur at a facility controlled by the defendant and was not caused by the defendant's employees. *See Anderson*, 336 F.3d at 932 (distinguishing facts of that case from all other cases where the indirect employer was the one performing the discriminatory act). Similarly, in *Garcia v. Courtesy Ford, Inc.*, No. C06-855RSL, 2007 WL 1192681, at *5 (W.D. Wash. Apr. 20, 2007), the court granted partial summary judgment to a non-employing defendant, explaining that "[b]ecause plaintiff has produced no evidence to support the contention that Courtesy Ford was 'the entity performing the discriminatory act,' Courtesy Ford cannot be held liable as an indirect employer." *See also Vernon v. California*, 10 Cal. Rptr. 3d 121, 134 (Cal. Ct. App. 2004) (relying on Ninth Circuit precedent and holding that where State did not exert actual control over access to employment opportunities, but merely provided general oversight and regulatory compliance, it was not an indirect employer). Conversely, in *Gomez v. Alexian Brothers Hospital of San Jose*, 698 F.2d 1019, 1020-21 (9th Cir. 1983), a non-employing hospital was subject to Title VII liability because the hospital itself rejected the plaintiff's proposal to

practice there. Verizon cannot be subject to Title VII liability merely because it contracted with the entities who employed Plaintiff and whose employees allegedly engaged in unlawful conduct.[3]

Plaintiff has no evidence whatsoever that Verizon or any of its employees engaged in any discriminatory, retaliatory, or harassing acts toward him. Rather, Plaintiff testified that it was employees or owners of Calpac and DTS – *not Verizon* – who engaged in wrongful conduct against him. Specifically, Plaintiff testified that DTS employee Clark called him (and others) "island monkeys." (Civille Decl., Ex. CC at 46:16-18.) Plaintiff also testified that Calpac and its employee, Teddy Cruz, assigned Plaintiff unattractive tasks and that Calpac did not permit Plaintiff to return work after his injury. (Civille Decl., Ex. CC at 73:22-25; 78:20-79:22.) Plaintiff did not identify a single Verizon employee who engaged in alleged unlawful conduct. Indeed, Plaintiff admits that he does not have any reason to believe that any Verizon employee was involved in the decisions to hire Plaintiff, to assign Plaintiff to projects, to assign Plaintiff's daily tasks (including unattractive tasks), to determine Plaintiff's breaks, to layoff Calpac employees, or to not return Plaintiff to work after his injury. (Civille Decl., Ex. CC at 26:8-27:1; 29:19-21; 30:13-16; 31:7-14; 33:22-34:1; 39:15-18; 39:23-40:1; 40:11-16; 69:5-16; 78:4-11; 79:19-22; Civille Decl., Exs. A at ¶¶ 7-9, B at ¶¶ 6-8, & C at ¶¶ 6-8.)[4] Under these circumstances, Verizon cannot be Plaintiff's indirect employer as a matter of law.

---

[3] In fact, the cases on which Plaintiff relies in his opposition to DTS's motions for summary judgment only underscore this fundamental point. (Pl's Opp. to DTS's Mot. for Summ. J. at 11-12.) In *Garrett v. Info. Sys. & Networks Corp.*, No. 5:97-CV-436-BR1, 1997 U.S. Dist. LEXIS 20845 (E.D.N.C. Nov. 21, 1997), *King v. Chrysler Corp.*, 812 F. Supp. 151 (E.D. Mo. 1993), *Duncan v. Junior Coll. Dist. of St. Louis*, No. 4:98CV01220 (CEJ), 1999 U.S. Dist. LEXIS 22451 (E.D. Mo. Nov. 15, 1999), and *Diana v. Schlosser*, 20 F. Supp. 2d 348 (D. Conn. 1998), all of the plaintiffs alleged that even though they were not employees of the defendants, they were harassed by employees of the defendants.

[4] To the extent Plaintiff claims that Verizon is his indirect employer merely because Verizon retained oversight over the manner in which Calpac performed the Calpac Contract or because Verizon had the power to stop the alleged harassment, the law is clear that an indirect employer relationship exists only where the alleged indirect employer engaged in discriminatory interference. *See, e.g.*, *Velez*, 335 F. Supp 2d at 1030 (noting that the non-employing entity had the power to stop the hostile work environment because the perpetrators of that environment were "direct employees" of the non-employing entity). As explained in section III.B.2, *infra.*, there is no evidence that Verizon exercised sufficient control over the terms and conditions of Plaintiff's employment with Calpac to constitute Plaintiff's indirect employer.

2. **Verizon Cannot Be Plaintiff's Joint Employer Because It Did Not Control the Terms and Conditions of Plaintiff's Employment, and Contractual Oversight Is Insufficient to Establish the Requisite Control.**

    a. **Verizon Did Not Control the Terms and Conditions of Plaintiff's Employment.**

"Two or more employers may be considered 'joint employers' if both employers control the terms and conditions of employment of the employee." *EEOC v. Pac. Mar. Ass'n*, 351 F.3d 1270, 1275 (9th Cir. 2003). "Logically, before a person or entity can be a joint employer, it must possess the attributes of an employer to some degree." *Id.* at 1277. The Ninth Circuit has recognized that "[t]he Supreme Court seems to suggest that the *sine qua non* of determining whether one is an employer is that an 'employer can hire and fire employees, can assign tasks to employees and supervise their performance.'" *Id.* (citing *Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440 (2003)); *see also Moreau v. Air France*, 356 F.3d 942, 946-47 (9th Cir. 2004) (noting that the joint employer determination requires "consideration of the total employment situation" and focusing on whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of payment, (3) determined the rate and method of payment, and (4) maintained employment records).

Once again, there is no evidence that Verizon or any of its employees hired or terminated Plaintiff, supervised or controlled Plaintiff's work schedules or conditions of payment, or engaged in any other conduct that suggests or from which it could reasonably be inferred that Verizon possessed attributes sufficient to be characterized as Plaintiff's employer. Indeed, the evidence demonstrates just the opposite. Plaintiff testified that Calpac supervisor Henry Quintanilla hired Plaintiff and that he has no facts to suggest that Calpac required Verizon's approval for his hiring. (Civille Decl., Ex. CC at 26:8-27:1.) Plaintiff further testified that Calpac employee Teddy Cruz provided Plaintiff his daily instructions and work assignments, including assignments to work on projects for clients other than Verizon. (Civille Decl., Ex. CC at 30:13-16; 31:7-14; 31:18-25.) It is undisputed that Calpac paid Plaintiff and that Verizon was not involved with Plaintiff's wages, including the amount, method, or timing of payment. (Civille

1 Decl., Ex. CC at 39:19-22; 39:23-40:1; Civille Decl., Exs. A at ¶ 8, B at ¶ 7, & C at ¶ 7.)

2 Moreover, Plaintiff received performance evaluations only from Quintanilla and has no

3 evidence suggesting that Verizon had any involvement with Plaintiff's evaluations. (Civille

4 Decl., Ex. CC at 40:2-16.) Similarly, it is undisputed that Verizon did not maintain employment

5 records regarding the workers employed by Calpac nor did Verizon conduct evaluations of any

6 individual's work – including Plaintiff's. (Civille Decl., Exs. A at ¶ 9, B at ¶ 8, & C at ¶ 8.)

7 Further, no Verizon employee supervised Plaintiff's work at any time. (Civille Decl., Exs. A at

8 ¶ 9, B at ¶ 8, & C at ¶ 8; Harper Dep. at 184:5-9.) In fact, Plaintiff admits that it was Calpac who

9 laid off workers and that he does not have any facts to suggest that Verizon was aware, approved

10 of, or had anything to with Calpac's layoffs. (Civille Decl., Ex. CC at 69:5-16.)[5]

11
12
                    b.    The Mere Fact That Verizon Retained Authority to Ensure Calpac's
                          Satisfactory Performance of the Contract Does Not Mean That
                          Verizon Was Plaintiff's Joint Employer.

13 In support of his argument that Verizon controlled the terms of his employment, it appears

14 that Plaintiff (in the absence of evidence that Verizon exercised any *actual* control over Plaintiff's

15 employment) will rely on provisions in the Calpac Contract that provided Verizon the authority to

16 approve *Calpac's* work. The mere fact that Verizon contracted with a third-party to perform

17 services and retained the right to confirm that Calpac performed the work in accordance with the

18 Calpac Contract in no way leads to a finding that Verizon controlled the terms and conditions of

19 Plaintiff's employment with Calpac. For example, Plaintiff may argue that because Verizon

20 retained the right to inspect Calpac's work and materials, it must have controlled Plaintiff's

21

22 [5] In opposing DTS's Motion for Summary Judgment on the joint employer issue, Plaintiff heavily relies on
cases that are not only factually and legally distinguishable from this case (and from the analogous facts present in
23 *Int'l Chem, infra*.) but also underscore the lack of Verizon's control over Plaintiff. (*See* Pl.'s Opp. to DTS's Mot. for
Summ. J. at 4-5.) For example, in *Gallenkamp Stores, Inc. v. NLRB*, the Ninth Circuit affirmed the finding of joint
24 employer status between K-Mart and its licensees because K-Mart had significant direct control over the terms of the
licensees' employment, including the authority to issue rules covering the licensees, the authority to require the
25 licensees to operate their departments during specific hours fixed by K-Mart, the authority to prescribe the number of
employees necessary to operate each department, and the authority to govern training requirements, coffee breaks,
26 lunch periods, smoking, employee discipline, and dress. 402 F.2d 525, 528-29 (9th Cir. 1968). Similarly, in *Ref-
Chem Co. v. NLRB*, 418 F.2d 127, 129 (5th Cir. 1969), the terms of the agreements between the parties gave the non-
27 employing entity (El Paso) the right to consent to pay raises, approve employees, control the number of employees,
have an employee removed, and inspect and approve work, and consent to overtime allowed. Moreover, the employees
28 at issue in *Ref-Chem* worked at the El Paso plant. Such level of control is not present in this case.

1    employment. (Pl's Opp. to DTS's Mot. for Summ. J. at 5.)[6] There is a fundamental difference,

2    however, between the monitoring of performance under a contract and control of the *contractor's*

3    employees. Courts and administrative boards[7] have consistently rejected arguments that

4    contractual oversight results in the existence of a joint employer relationship.

5         In *International Chemical Workers Union Local 483 v. NLRB*, 561 F.2d 253 (D.C. Cir.

6    1977), Cabot Corporation ("Cabot") contracted with a building, construction, and plant

7    maintenance firm (the "Contractor") to perform maintenance work for Cabot during a period of

8    time when Cabot employees were on strike. *Id.* at 254. In determining that Cabot was not a joint

9    employer, the court held that contractual provisions that merely ensured that the Contractor's

10   "final product was satisfactory" did not result in converting Cabot into a joint employer. *Id.* at

11   257. The court initially noted that the Contractor was – like Calpac – regularly engaged in a

12   substantial independent business in which it had more than one contract and that the contract at

13   issue was – as in this case – a temporary contract that established an independent contractor

14   relationship between the parties. *Id.* at 255-56 (noting that an independent contractor provision

15   "bespeak[s] an intent by Cabot to look primarily to results and to vest in [the Contractor] an

16   independence in the control of its employees that is at least facially inconsistent with Cabot

17   exercising any substantial degree of control over the manner and means that [the Contractor's]

18   employees were to perform their services"). (A copy of the Apr. 30, 2007 deposition of J. Healy

19   is attached as Ex. M to the Civille Decl. at 119:20-25; a copy of the May 3, 2007 deposition of J.

20   Healy is attached as Ex. N to the Civille Decl. at 39:23-40:17.) The court then examined the

21   parties' relationship, repeatedly recognizing the distinction between authority to ensure proper

22   contractual performance and control over the Contractor's employees. For example, the court

23   noted that, while Cabot retained the right to have the Contractor remove an employee from the

24         [6] Many of the provisions cited by Plaintiff in his opposition to DTS's motions for summary judgment cannot
reasonably be read to have any impact whatsoever on the terms of Plaintiff's employment, let alone sufficient impact
25   to convert Verizon into a joint employer. For example, the plaintiffs cited provisions addressing Calpac's relations
with landowners, the approval of invoices, advertisements, claims for additional payments, subcontractors, and the
26   approval of production charts. (Pl.'s Opp. to DTS's Mot. for Summ. J. at pp. 5-8.)

27         [7] The joint employer doctrine developed in the labor relations context, *see Boire v. Greyhound Corp.*, 376
U.S. 473 (1964), and was subsequently imported into the civil rights context. *See Armbruster v. Quinn*, 711 F.2d
28   1332, 1336-37 (6th Cir. 1983). Thus, courts look to both labor cases and civil rights cases for guidance. *Swallows v.
Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n.3 (6th Cir. 1997).

1 Cabot project, Cabot did not have the right to remove an employee from his employment with the

2 Contractor. *Id.* at 256-57 (further noting that the contract required the Contractor to perform

3 certain work according to Cabot's drawings and specifications and subject to Cabot's approval,

4 that Cabot's supervisors made a daily headcount of the Contractor's employees on the job, and

5 that Cabot monitored the results of the work).

6 Despite the contractual oversight authority present in *International Chemical*, the court

7 explained that provisions requiring satisfactory performance are "consistent with the usual

8 requirement of independent contracts that the result of a designated job be subject to final

9 approval by the contracting party. *Such right does not necessarily involve the contracting party*

10 *in any control of the employees in the details of their work." Id.* at 256 (emphasis added). The

11 court further explained that "[t]he monitoring [of the Contractor's work] merely aimed at a

12 satisfactory work product and did not involve Cabot in the details of the work sufficient to turn it

13 into a joint employer." *Id.* at 257 (noting that "Cabot's policing of the contracts only assured it

14 that [the Contractor] was actually incurring the expenses for which it claimed reimbursement and

15 that the final product was satisfactory"). In ultimately holding that "Cabot did not exercise the

16 type of control which would establish a joint employer relationship," the court addressed several

17 additional factors – all of which are present in this case – that weighed against a finding of a joint

18 employer relationship. *Id.* at 257. For example, the employees who performed the work pursuant

19 to the contract were – as in this case – on the Contractor's payroll, and the Contractor paid their

20 Social Security and other taxes. *Id.* at 256. Further, the Contractor – like Calpac – set the

21 employees' wage scale. *Id.* In addition, Cabot – like Verizon – had no direct control over the

22 hiring of the Contractor's employees. *Id.*

23 Similarly, in *International House v. NLRB*, 676 F.2d 906, 913 (2d Cir. 1982), the court set

24 aside a lower ruling that a student residence was a joint employer with the contractor that

25 operated its dining hall because, as the court explained, "an essential element under any

26 determination of joint employer status in a *sub-contracting case* is distinctly lacking in the instant

27 case – *some evidence of immediate supervision or control of the employees*." (emphasis added).

28 Despite the fact that the residence controlled the dining hall's hours, prices, and menus,

established quality standards, had the right to approve the actual employer's budget and inspect its books, and could limit the total number of hours worked, these rights did not involve the dining hall's day-to-day operation. *See id.* at 913-14. To the contrary, this "monitoring merely aimed at a satisfactory work product." *Id.* at 914 (quoting *Int'l Chem. Workers Union Local 483*, 561 F.2d at 257). The court further noted that the parties' "independent contractor" contractual provisions "envisioned a sub-contracting, as opposed to a joint employer, relationship." *Id.* at 913.[8]

As in *International Chemical Workers* and *International House*, the mere fact that Verizon had the right to ensure it received from Calpac that which it paid for – including the power to remove (but not terminate) unsatisfactory employees from the Guam International Ring project – can in no way lead to a finding that Verizon controlled the terms of Plaintiff's employment. Significantly, Verizon did not hire Plaintiff, terminate Plaintiff, or set Plaintiff's wage scale, Plaintiff was paid by Calpac, and Calpac withheld Plaintiff's Social Security taxes. (Civille Decl., Ex. CC at 26:8-27:1; 29:19-21; 33:22-34:1; 30:13-16; 31:7-14; 39:15-18; 39:23-40:1; 40:11-16; 69:5-16; 78:4-11; 79:19-22; Civille Decl., Exs. A at ¶¶ 7-9, B at ¶¶ 6-8, & C at ¶¶ 6-8.) Indeed, as the Calpac Contract explains, Calpac was "at all times [an] independent contractor" and, while Verizon was permitted to direct the "results of the Work," Calpac was

---

[8] The NLRB, which regularly analyzes joint employer questions, has similarly refused to apply the joint employer doctrine in analogous cases. For example, in *California Laboratory Industries, Inc.*, 249 NLRB 600, 601 (1980), the board rejected a joint employer argument where the direct employer performed services at the non-employing entity's premises, the non-employing entity retained the right to inspect the production area to ensure the work was done to its specifications, the non-employing entity's management occasionally gave directions to the employer's employees, and there was no evidence that the non-employing entity's limited participation in the management of the direct employer resulted in any decisions affecting labor relations. *See also W.L. Golightly, Inc.*, 172 NLRB 2155 (1968) (concluding there was no basis for joint employer finding where company's inspectors occasionally gave orders directly to individual Golightly employees but such orders were limited to achieving the ultimate objective of doing the job to the Company's satisfaction and not to the manner and means by which the actual work was to be performed); *Westinghouse Elec. Corp.*, 163 NLRB 914, 915 (1967) (finding no joint employment relationship existed between Westinghouse and Home Kost where control of wages, hours of employment, fringe benefits, day-to-day operations, grievances, and labor relations matters directly affecting the maintenance workers was lodged directly with Homer Kost; both companies had separate and distinct labor relations policies; Westinghouse had its own seniority system and companywide pension and insurance plan, vacation, and holiday benefits not applicable to Homer Kost employees; Westinghouse employees must pass pre-employment physicals not required of Homer Kost employees; and Westinghouse occasionally directly supervised work of the maintenance employees and reviewed their time sheets for the purpose of auditing and policing its subcontract with Homer Kost).

responsible for "details of the performance of the Work." (Civille Decl., Ex. D at ¶ 36.1.) Thus, in the absence of material evidence that Verizon or any of its employees exercised any control over the terms and conditions of Plaintiff's employment, including control over Plaintiff's hire, termination, daily schedule, performance reviews, wages, etc., Verizon cannot be held to be a joint employer with Calpac. Accordingly, Verizon is entitled to summary judgment.

C. Alternatively, Even if Any Title VII Relationship Existed Between Verizon and Plaintiff, Plaintiff's Title VII Claims Against Verizon Are Barred as a Matter of Law.

Courts have consistently recognized that an entity that neither directly employs the alleged wrongdoer or plaintiff nor is involved in the wrongdoing should only be liable under Title VII if that entity *knew or should have known* about the wrongdoing. *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997); *Takacs v. Fiore*, 473 F. Supp. 2d 647, 656 (D. Md. 2007); *Ruggiero v. AMR Corp.*, C 94-20160 JW, 1995 WL 549010, *4 (N.D. Cal. Sept. 12, 1995); *Caldwell v. ServiceMaster Corp.*, 966 F. Supp. 33, 46 (D.D.C. 1997). Plaintiff has failed to produce any evidence suggesting that any Verizon employee knew or should have known about the alleged harassing conduct (until nearly two months after the last incident) or the alleged discriminatory or retaliatory employment actions about which Plaintiff complains. Under these facts, Verizon is not liable under Title VII as a matter of law.

1. Verizon Is Not Liable for Hostile Environment.

a. Because Any Alleged Harassment Was Perpetuated Without Verizon's Knowledge, Verizon Cannot Be Liable for Hostile Environment.

Even if there is a genuine issue of material fact regarding the lack of a Title VII relationship between Plaintiff and Verizon (which there is not), Verizon cannot be held liable under Title VII for Clark's alleged harassment of Plaintiff because there is no evidence that Verizon knew or should have known about alleged harassment that stopped nearly two months before Verizon became aware that such conduct may have even occurred. A defendant may be liable for harassing conduct by *non-employees* only where the defendant knows or should have known of the harassing conduct. *See Folkerson*, 107 F.3d at 756; *see also* 29 C.F.R. § 1604.11(e)

("An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action."). Courts reason that harassing conduct should not be imputed to non-employing defendants in the absence of evidence that the defendant knew about the conduct and could have taken action. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998).[9]

Courts have consistently applied the "knows or should have known" standard in cases that involve the alleged harassing conduct of an individual not directly employed by the defendant. *See e.g., Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811, 812 (7th Cir. 2001) (applying the "knows or should have known" standard in a case involving the harassing conduct of the defendant's independent contractor). For example, in *Takacs*, 473 F. Supp. 2d at 656, the court assumed that one defendant was a joint employer with the entity that directly employed the alleged harasser and the plaintiff. The court held, however, that the defendant could not be liable for harassment under Title VII because the plaintiff did not inform the defendant of the misconduct. *See id.* Similarly, in *Neal v. Manpower International, Inc.*, No. 3:00-CV-277/LAC, 2001 WL 1923127, at *10 (N.D. Fla. Sept. 17, 2001), after assuming that the defendant constituted an "employer," the court granted the defendant's motion for summary judgment because "[the plaintiff] never made [the defendant] aware of her charge of sexual harassment."

In this case, there is no evidence that Plaintiff complained to Verizon about harassment. Plaintiff testified that he only complained to Calpac employee Teddy Cruz about Clark's alleged comment. (Civille Decl., Ex. CC at 59:8-23.) Indeed, Plaintiff was unable to identify any facts suggesting that Verizon was aware of Clark's alleged comment at the time. (Civille Decl., Ex. CC at 66:8-12.) Thus, the undisputed evidence is that Verizon did not learn about any alleged harassment until on or about December 19, 2004 – nearly two months after the last alleged incident of harassment occurred on October 25, 2004. (Civille Decl., Exs. A at ¶ 10, B at ¶ 9, &

---

[9] The cases cited by Plaintiff in response to DTS's motion for summary judgment on this argument are inapposite. In both *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1168 (9th Cir. 2001) and *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1071 (9th Cir. 2005), the defendant-employer directly employed the alleged harasser.

C at ¶ 9; a copy of the email of D. Clark is attached as Ex. J to the Civille Decl.; Civille Decl., Ex. K at 149:23-150:04.) Under these facts, Verizon cannot be liable for hostile environment as a matter of law. *See, e.g., Takacs*, 473 F. Supp. 2d at 656; *Neal*, 2001 WL 1923127, *9-10.

<blockquote>
b. Verizon Exercised Reasonable Care to Prevent and Promptly Correct Any Harassing Behavior and Plaintiff Unreasonably Failed to Take Advantage of Any Corrective Opportunities.
</blockquote>

Even if the Court finds that Plaintiff's complaints and the alleged harassing conduct can somehow be imputed to Verizon, Verizon is not liable because it exercised reasonable care and Plaintiff unreasonably failed to take advantage of any corrective opportunities. Under Title VII, an employer may avoid liability if it can show that: (1) it took no tangible employment action against the employee; (2) it exercised reasonable care to prevent and correct harassment; and (3) the employee unreasonably failed to take advantage of preventative or corrective opportunities. *See Hardage v. CBS Broadcasting, Inc.*, 427 F.3d 1177, 1183-84 (9th Cir. 2005).

The evidence is undisputed that Verizon had no involvement whatsoever in the alleged adverse employment actions taken by Calpac against Plaintiff. *See* section III.C.2, *infra*. In addition, Verizon – given its inability to exercise direct control over Calpac's and DTS' employment relations with Plaintiff – exercised reasonable care to prevent harassment by including language in its contracts with Calpac and DTS whereby those entities agreed to comply with federal laws and sound labor practices. Specifically, the Calpac Contract provided that Calpac would "comply with all applicable laws, regulations, ordinances, permits, and rules of the federal and state governments of the United States of America, and political subdivisions thereof; and any other duly constituted public authority wherein the Work is performed." (Civille Decl., Ex. D at ¶ 28.1.) Similarly, the DTS Contract provided that DTS would "enforce strict discipline and good order among its employees . . . [and] maintain and observe . . . sound labor and safety practices . . ." (Civille Decl., Ex. E at ¶ 3.6.6.1.) Further, Verizon promptly reminded Calpac and DTS of their legal responsibilities when it became aware of the complaints by communicating with Calpac and DTS regarding the allegations and sending correspondence to Calpac on December 28, 2004 and to Calpac and DTS on January 14, 2004 requesting that Calpac and DTS

refrain from taking any discriminatory and retaliatory actions. (Civille Decl., Ex. H.)

Significantly, *no instances of harassment occurred after Verizon became aware of complaints.*

Finally, Plaintiff unreasonably failed to take advantage of preventative opportunities by failing to take any steps to ensure that Verizon learned about the alleged harassment prior to his EEOC charge. If Plaintiff truly believed that Verizon was responsible for the harassing conduct or that Verizon could stop the harassment, Plaintiff would have contacted Verizon.[10] Accordingly, Verizon's actions upon learning of the allegations entitles it to assert the defense available under Title VII and, thus, entitles it to summary judgment on Plaintiff's hostile environment claim.

        2.      Verizon Cannot Be Liable for Discrimination or Retaliation.

                a.      Because the Alleged Discriminatory and Retaliatory Employment Actions Were Perpetuated Without Verizon's Involvement or Knowledge, Verizon Cannot Be Liable for Discrimination or Retaliation.

In cases involving alleged discriminatory or retaliatory conduct by third parties, a defendant cannot be liable under Title VII unless the plaintiff can show that the defendant knew or should have known about, or was involved in, the third party's unlawful acts – even if the defendant can be considered a joint employer. *Ruggiero*, 1995 WL 549010, at *4; *Caldwell*, 966 F. Supp. at 46. For example, in *Ruggiero*, the plaintiff brought a claim against his direct employer and two parent corporations alleging that he had been terminated in retaliation for encouraging employees to file sexual harassment complaints. *Ruggiero*, 1995 WL 549010, at *1-2. The court granted the parent corporations' motion for summary judgment, in part, because there was no evidence that they "were involved in the decision to terminate Plaintiff." *Id.* at *4. Similarly, in *Caldwell*, the court granted a defendant's motion for summary judgment because the defendant did not have notice of the allegedly discriminatory conduct of a third party, despite the fact that the defendant conceded that there were material facts regarding whether it was a joint employer with the third party. *See Caldwell*, 966 F. Supp. at 46; *see also Williams v. Grimes*

---

[10] In fact, as demonstrated by the December 19, 2004 protest in front of Verizon's Guam office, Calpac employees were aware that Verizon operated an office on Guam. Yet, Verizon did not learn about the complaints until the date of the protest.

1   *Aerospace Co.*, 988 F. Supp. 925, 937-38 (D.S.C. 1997) (stating that "when an employee claims

2   discrimination against two joint employers, she 'must show that [each] defendant knew or should

3   have known of the discriminatory conduct . . .'" (citation omitted) and granting defendant's

4   motion for summary judgment because there was no evidence that the plaintiff ever told the

5   defendant about the discrimination and the defendant had no reason to know of the

6   discrimination). Thus, even if there is a genuine issue of material fact regarding the lack of a

7   Title VII relationship between Plaintiff and Verizon, Verizon cannot be liable for Calpac's

8   alleged discriminatory and retaliatory employment actions because there is no evidence that

9   Verizon had knowledge of the alleged adverse employment decisions about which Plaintiff

10  complains.

11          Moreover, Verizon cannot be liable under Title VII for adverse employment decisions it

12  did not – and could not – control. In *Watson v. Adecco Employment Services, Inc.*, 252 F. Supp.

13  2d 1347, 1357-58 (M.D. Fla. 2003), the court granted a defendant's motion for summary

14  judgment, "[e]ven if [the defendant] could be considered Plaintiffs' employer under Title VII,"

15  because the defendant – a personnel agency – had no control over its client's employment

16  decisions. As the court in *Watson* explained, "a private company, cannot force its client, another

17  private company, not to discriminate or run its business in a certain manner." *Id.* at 1358 (citing

18  *Riesgo v. Heidelberg Harris, Inc.*, 36 F. Supp. 2d 53, 58 (D.N.H. 1997)).

19          Plaintiff also alleges that Calpac and its employee, Teddy Cruz, assigned Plaintiff

20  unattractive tasks and did not return Plaintiff to work after his injury. (Civille Decl., Ex. CC at

21  73:22-25; 78:20-79:22.) Plaintiff admits, however, that he is not aware of any facts suggesting

22  that Verizon had any involvement with these decisions. (Civille Decl., Ex. CC at 78:4-11; 79:19-

23  22.) In fact, no Verizon employee played any role whatsoever with respect to these alleged

24  adverse employment actions. (Civille Decl., Exs. A at ¶¶ 7-9, B at ¶¶ 6-8, & C at ¶¶ 6-8.) Under

25  these uncontested facts, Verizon cannot be liable under Title VII for discrimination or retaliation.

26

27

28

3.   Plaintiff's Theory of Liability Represents an Unprecedented Expansion of Title VII.

In an attempt to assert a claim against Verizon, Plaintiff is asking the Court to stretch Title VII coverage beyond its legal limits by arguing that Verizon should be found vicariously liable for discrimination, retaliation, and hostile environment, despite the facts that Verizon:

(a)   did not directly employ Plaintiff,

(b)   did not directly employ any individual who played any role whatsoever in – or was aware of – the adverse employment decisions alleged by Plaintiff,

(c)   did not directly employ the alleged harasser, and

(d)   did not become aware of any alleged harassment until nearly two months after the last incident of harassment occurred.

If Plaintiff's theory of imputed Title VII liability is accepted, it would lead to two untenable results. First, Plaintiff's theory could effectively impose an affirmative duty on a business to inspect, monitor, and, indeed, to control the employment actions of independent, third-party contractors hired by the business. The imposition of such a duty, however, is wholly inconsistent with the "knew or should have known" standard – a standard that necessarily recognizes that a business that does not employ the alleged wrongdoer or the plaintiff and is not involved in the wrongdoing should be held liable (if at all) only if the company *knew or should have known* about the wrongdoing. Alternatively, Plaintiff's theory could discourage a business from exercising any oversight over the performance of its contracts for fear that it will be accused of being a "joint employer." A business should not be subject to Title VII liability merely because it retains some oversight over the manner in which third-party contractors perform work that the company hires and pays them to perform. Indeed, courts have recognized that a standard services agreement between two businesses should not result in the creation of an employment relationship because, as one court explained, "a private company, cannot force its client, another private company, not to discriminate or run its business in a certain manner." *Watson*, 252 F. Supp. 2d at 1358; *see also, Int'l Chem. Workers Union Local 483*, 561 F.2d at 254.

Here, the material facts demonstrate nothing more than that Verizon contracted for

services with third parties whose employees allegedly engaged in, or were subjected to, discrimination or harassment. If Plaintiff is permitted to pursue his Title VII claims against Verizon based on these facts, any business who contracts for services and retains the right to oversee the performance of the contract could be subject to Title VII liability merely because such contractual oversight existed. Such unprecedented expansion of the scope of Title VII should be rejected.

## IV. CONCLUSION

For the foregoing reasons, Verizon respectfully requests that this Court grant its motion for summary judgment on all counts of Plaintiff's Second Amended Complaint.

Respectfully submitted this 11th day of April, 2008.

**CIVILLE & TANG, PLLC**

**JONES DAY**

By: _____
**G. PATRICK CIVILLE**
*Defendants Verizon Business*
*Purchasing LLC and Verizon Business*
*Network Services, Inc.*