# EXHIBIT W

IN THE DISTRICT COURT OF GUAM

HENRY G. VAN METER, ET AL,      )
                                )
                                )
        Plaintiffs              )
                                )
VS.                             )
                                )      NO. CIV05-00037
                                )
CALPAC, ET AL                   )
                                )
                                )
        Defendants              )
                                )
                                )

-------------------------------------

ORAL DEPOSITION OF

ROLAND F. MENDIOLA

May 21, 2007

-------------------------------------

ORAL DEPOSITION OF ROLAND F. MENDIOLA, produced as a
witness at the instance of the DEFENDANT, and duly sworn, was
taken in the above-styled and numbered cause on May 21, 2007,
from 9:00 a.m. to 10:43 a.m., before JOE A. WILLIAMS, CSR in
and for the State of Texas, reported by machine shorthand, at
the law offices of CLAY HOLLIS, 9518 Tioga Drive, San Antonio,
Texas 78230-3118, pursuant to the Guam Rules of Civil
Procedure.

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.  May 21, 2007

5

1.    A.    Toto.

2     Q.    Where did you go to high school?

3     A.    GW.

4     Q.    What was your first job when you got out of high

5  school?

6     A.    Grocery store.

7     Q.    Which store?

8     A.    Gold Market.

9     Q.    And what year did you graduate high school?

10    A.    2002.

11    Q.    How long did you work for Gold Market?

12    A.    About a year.

13    Q.    What was your next job?

14    A.    I don't recall.  It's been a while back.

15    Q.    Okay.  Do you recall -- when did you start for

16  CalPac?

17    A.    2004.

18    Q.    Remember what month?

19    A.    I don't remember what month.

20    Q.    Okay.  Who hired you at CalPac?

21    A.    Dennis Harper.

22    Q.    And what position were you hired for?

23    A.    Fiber optics.

24    Q.    Can you explain what that means, what fiber optics

25  means?

Case 1:05-cv-00037   Document 588-8   Filed 04/11/2008   Page 3 of 43

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.     May 21, 2007

7



1  little louder.  Okay, Mr. Mendiola?  If you're nervous or you

2  need to take a break at any time, let me know and we'll go off

3  the record.

4      A.  Okay.

5      Q.  Okay.  All right.  So, is there -- can you tell me,

6  were there probably other employees that aren't part of this

7  lawsuit that were part of your crew?

8      A.  I think so.  Jerry Apodaca.

9      Q.  Jerry Apodaca?

10      A.  Yes.  That's pretty much it.

11      Q.  Who were your supervisors while you were employed by

12  CalPac?

13      A.  Henry Van Meter and Dennis Harper -- I mean, Don

14  Harper.

15      Q.  Don Harper?

16      A.  Yes.

17      Q.  Tell me what your regular day was like when you came

18  to work in the morning and tell me who would meet you in the

19  morning, who would assign work for you that day.

20      A.  My supervisor, Don Harper.

21      Q.  So, tell me what happens when you report to work in

22  the morning.

23      A.  We have like a safety meeting and go over what

24  supposed to do for the day.

25      Q.  And Don Harper would conduct the safety meeting?

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.      May 21, 2007

8

1     A.    Yes, either him or Henry Van Meter.

2     Q.    And who would assign you your work job, you know, for

3   that day as well?

4     A.    Henry Van Meter.

5     Q.    Was there anyone else that would conduct safety

6   meetings for CalPac?

7     A.    It would be Don Harper.

8     Q.    Did anyone from DTS, and by that I mean Dynamic

9   Technical Services; did they ever conduct any safety meetings?

10    A.    I don't recall.

11    Q.    Did anyone from DTS ever instruct you where to work

12   any given day?

13    A.    Yes.

14    Q.    Okay.  Who from DTS would assign you work?

15    A.    Dennis Clark.

16    Q.    And do you know that Dennis Clark worked for DTS?

17    A.    No.

18    Q.    Okay.  What did Mr. Clark tell you to do when you're

19   recalling now?

20          MR. SMITH:   Objection, form.

21    Q.    You can go ahead and answer.

22    A.    He would be at the job site and he would be telling

23   us how -- you know, how -- the depth and what needed to be

24   cemented and stuff.

25    Q.    So, Mr. Clark was instructing you on how to perform

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.    May 21, 2007

9

1   the job on the job site?

2       A.   Yes.

3       Q.   Was that on a daily basis?

4       A.   Yes.  He was there mostly every day.

5            MR. SMITH:  Objection, nonresponsive.

6       Q.   Between the time you worked for -- as a stocker at

7   Gold Market and the time you were employed at CalPac, did you

8   have any other work?

9       A.   Yes, I did, but I don't remember the jobs.

10      Q.   Do you remember what kind of work it might have been?

11      A.   Construction.

12      Q.   Do you remember the name of the management you worked

13  for?

14      A.   I can't remember.  That's way back.

15      Q.   When were you laid off from CalPac?

16      A.   2004.

17      Q.   Do you remember what month?

18      A.   No, I don't remember.

19      Q.   Do you recall the reason why you were laid off?

20      A.   Mentioned that reduction of force, work reduction.

21      Q.   Do you have any reason to believe that there was any

22  other reason for you being laid off than reduction in

23  workforce?

24      A.   Yes.

25      Q.   Okay.  Tell me what that is.

Case 1:05-cv-00037    Document 588-8    Filed 04/11/2008    Page 6 of 43

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.    May 21, 2007

10

1      A.    Discrimination.

2      Q.    Tell me, what's the basis for your claim?

3      A.    I don't understand the question.

4      Q.    That's fine.  Well, you've said that there's another

5   reason for you being laid off other than CalPac reducing its

6   workforce and you said discrimination.

7      A.    Yes.

8      Q.    So, my question is what discrimination?  You know,

9   who did what to you, who said what to you and that kind of

10  thing?

11              MR. SMITH:  Objection, form.

12     A.    I believe because of Dennis Clark.

13              MR. SMITH:  Objection, nonresponsive.

14     Q.    Let's just go into this a little further.  What do

15  you allege that Dennis Clark did that you believe was

16  discrimination against you?

17     A.    Calling us island monkeys.

18     Q.    Well, let's talk about this.  When did Dennis Clark

19  use this phrase?

20     A.    At the job site.  I don't remember when he said it.

21     Q.    What job site?

22     A.    Was in Tiyan.

23     Q.    What location in Tiyan?

24     A.    Passa 90.

25     Q.    Did you hear Dennis Clark use that word directed to

Case 1:05-cv-00037    Document 588-8    Filed 04/11/2008    Page 7 of 43

Roland F. Mendiola    Henry G. Van Meter vs. CALPAC, et al.       May 21, 2007

12

1    because he called you island monkeys?

2        A.    I don't understand.

3        Q.    Okay.  Did you feel that you were inadequate to

4    perform your job because he had called you those words?

5        A.    No.

6        Q.    Other than this one occasion in Tiyan, did Dennis

7    Clark ever call you island monkey again?

8        A.    I believe twice when he mentioned it.

9            MR. SMITH:  Objection, nonresponsive.

10       Q.    Did Dennis Clark call you island monkey once again

11   after the incident at Tiyan?

12       A.    Twice.

13       Q.    Tell me when that was.

14       A.    On the same area.

15       Q.    Was it the same day?

16       A.    I don't remember if it was the same day.

17       Q.    What was the other job site then?  You said the same

18   area, but where was it at?

19       A.    In Tiyan, same.

20       Q.    Same job?

21       A.    Yes, same job.

22       Q.    Same trench?

23       A.    Yes.

24       Q.    Is it reasonable that was the same day then?

25       A.    I don't remember.

Case 1:05-cv-00037    Document 588-8    Filed 04/11/2008    Page 8 of 43

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.      May 21, 2007

14

1      Q.   Did you tell anyone at CalPac about Mr. Clark's

2   comments to you and make a complaint?

3      A.   Yes.

4      Q.   Who did you complain to?

5      A.   To my supervisors, Don Harper and Henry Van Meter.

6      Q.   And when did you complain in time?  What time period

7   was it when you complained after that incident in Tiyan?

8      A.   The same day.

9      Q.   You complained to both Don Harper and Henry Van Meter

10   on the same day?

11      A.   Yes, yes.

12      Q.   And what did they say in response to your complaint?

13      A.   That they were going to bring it up to John Healy.

14      Q.   Do you know whether or not they did bring it up with

15   John Healy?

16      A.   I don't recall.

17      Q.   Was there any verbal warning made to Mr. Clark by Mr.

18   Healy or any other manager at CalPac; do you know?

19      A.   No.

20      Q.   Okay.  Was there any written warning or other writing

21   that was given out to the employees about Mr. Clark's comments?

22      A.   I don't remember.

23      Q.   Okay.  Did Mr. Clark ever bring up the issue about

24   calling you island monkeys and apologize?

25      A.   No.

Case 1:05-cv-00037   Document 588-8   Filed 04/11/2008   Page 9 of 43

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.        May 21, 2007

15

1      Q.    Did you complain to anyone at CalPac in management

2  about Dennis Clark's comments other than that one time you

3  complained?

4      A.    No.

5      Q.    Okay.  What motivated you to join this complaint

6  filed by the law firm of Attorney Lujan?

7      A.    By being discriminated.

8      Q.    Okay.  How do you feel that you were discriminated

9  against?

10     A.    Because of Dennis Clark calling me an island monkey.

11     Q.    Did anyone else from CalPac make any other racial

12  comments or any other discriminatory comments to you while you

13  were employed?

14     A.    No.

15     Q.    Did John Healy make any comments to you?

16     A.    No.

17     Q.    Did any other manager that was employed by CalPac

18  make any other discriminatory comments to you?

19     A.    No.

20     Q.    Did anyone else from DTS make any comments to you

21  that you felt were discriminatory?

22          MR. SMITH:  Objection, form.

23     A.    Dennis Clark.

24     Q.    Other than Dennis Clark, did anyone else from DTS

25  make any discriminatory comments to you that you recall?

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.        May 21, 2007

17

1    employ you even though they were reducing their labor force?

2        A.   Yes.

3        Q.   Did CalPac owe you something to keep you employed

4    even though they were going to reduce their labor force and

5    their job was done?

6        A.   No.

7        Q.   Okay.  Have you reviewed the complaint that was filed

8    on your behalf?

9        A.   Yes.

10       Q.   I believe that your specific allegations are in count

11   eight of the first amended complaint, and that paragraph 121,

12   that's where you allege that you were harassed and

13   discriminated on the basis of your race.  Can you tell me here,

14   sitting today, what exactly is your complaint that you were

15   discriminated upon based on your race?

16       A.   Island monkeys.

17       Q.   Is that the only allegation that this complaint is

18   based on, that Dennis Clark called you island monkeys?

19       A.   Yes.

20       Q.   We're talking about one time he called you island

21   monkeys; is that correct?

22       A.   Twice.

23       Q.   Two times?

24       A.   Yes.

25       Q.   Okay.  And the same day, you said?

Case 1:05-cv-00037    Document 588-8    Filed 04/11/2008    Page 11 of 43

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.    May 21, 2007

19



1    complaints to them to bring it up to John Healy.

2            MR. SMITH:  Objection, nonresponsive.

3        Q.   Then when did you bring it up to them?

4        A.   Maybe like the next day.

5            MR. SMITH:  Objection, nonresponsive.

6        Q.   Your complaint at paragraph 123 alleges that you were

7    laid off or terminated on December 7, 2004.  Would you agree

8    with that representation?

9        A.   Yes.

10       Q.   Okay.  This paragraph says that you were unlawfully

11   terminated.  What do you mean by that?  What facts support

12   that?



13       A.   Because we weren't given a warning about us getting

14   terminated.  I had my day off and the next day I was

15   terminated.

16       Q.   And that's basically the only reason that you're

17   saying you were unlawfully terminated, because you didn't have

18   any notice?  Let me rephrase the question.  There's no other

19   basis for this complaint you're making.  You stated you were

20   unlawfully terminated based upon you not getting more than one

21   day notice; is that correct?

22       A.   Yes.

23       Q.   What do you base your claim that the conduct of

24   Dennis Clark was approved by defendant CalPac?  What do you

25   base that on?

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.          May 21, 2007

34

1          Q.    And then after the interview, he let you know that

2     you had been hired by the company; is that right?

3          A.    Yes.

4          Q.    And he let you know that you were going to be working

5     on this fiber optics project where you would be digging

6     trenches and laying cables?

7          A.    Yes.

8          Q.    And Mr. Van Meter, Mr. Quintanilla and Mr. Harper

9     were all your supervisors right from the very first day that

10    you started at CalPac; is that right?

11         A.    Yes.

12         Q.    And it was those same three men who remained your

13    supervisors all the way up until the last day that you worked

14    for CalPac?

15         A.    Yes.

16         Q.    Did Mr. Harper leave before you did?

17         A.    I don't recall.

18         Q.    All right.  And you understood that CalPac had been

19    hired to do this job by another company; is that right?

20         A.    Yes.

21         Q.    What was your understanding about who had hired

22    CalPac to do the job?

23         A.    MCI.

24         Q.    And how long after you started on the job for CalPac

25    was it before you first saw Mr. Clark on the job?

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.      May 21, 2007

37

1    you first saw him before he made that comment for the first

2    time?

3         A.   I don't remember.

4         Q.   Okay.  Now, before the first time that you were in

5    the trench and Mr. Clark was there and he made reference to you

6    and your co-workers as island monkeys, you followed the same

7    routine every day that you worked for CalPac from the beginning

8    of the day to the end of the day, right?

9         A.   Yes.

10        Q.   You got to the job site and had your safety meeting

11   with your supervisor and your co-workers, right?

12        A.   Yes.

13        Q.   Then they told you where to go?

14        A.   Yes.

15        Q.   And then you went out and you did your trenching

16   work, right?

17        A.   Yes.

18        Q.   And during that time when Mr. Clark -- how often

19   would Mr. Clark show up at the job site?

20        A.   Practically every day.

21        Q.   Was there any particular time that he would come

22   every day or --

23        A.   Come like two or three times.

24        Q.   Two or three different times during the day?

25        A.   Yes, in the morning and the afternoon and almost

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.      May 21, 2007

43

1    remember whether it was too shallow; or the complaint he was

2    making, was it a correct complaint?

3         A.   I don't remember whether it was too shallow or too

4    deep, but he appeared upset.

5         Q.   Did you have to correct any of the work that day

6    after he made the comment?

7         A.   No.  We just kept on doing what we were doing.

8         Q.   Did he give you any instructions to do anything

9    differently than you had been doing?

10        A.   I don't remember.

11        Q.   All right.  Now, you mentioned -- I want to talk

12   about this -- you said there were two times when you heard him

13   use the term island monkeys while you were around, correct?

14        A.   Yes.

15        Q.   The first time, did he -- what specifically did he

16   say when he used that term?

17        A.   I don't remember what he specifically said.

18        Q.   All right.  I mean, you agree he didn't just walk up

19   to the trench, look down and say island monkeys and then turn

20   around and leave.  He said some other things, right?

21        A.   Yes.

22        Q.   But you don't remember what they were?

23        A.   I don't remember.

24        Q.   And did he -- do you remember, when he said island

25   monkeys, what sentence he used that term in?

Case 1:05-cv-00037    Document 588-8    Filed 04/11/2008    Page 15 of 43

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.    May 21, 2007

45

1    before you complained about what he said?

2        A.    The end of the day.

3        Q.    Say again.

4        A.    At the end of the day.

5        Q.    All right.  What time of the day was it that he made

6    the comment; do you remember?

7        A.    No, I don't remember.

8        Q.    So, you don't know whether you kept working for one

9    hour or five hours before you made the complaint.  Is that

10   true?

11       A.    It was like after working hours when I reported it to

12   my supervisor.

13       Q.    After working hours when you reported it to your

14   supervisor; is that right?

15       A.    Like getting -- you know, when we were already

16   getting off, almost about off, you know.

17       Q.    And did anyone go with you to make the complaint?

18       A.    I don't remember.  I just reported it to Henry Van

19   Meter.  I myself reported it.

20       Q.    And you don't remember anyone else being with you at

21   the time; is that right?

22       A.    Yes.

23       Q.    And do you remember what you said to Mr. Van Meter?

24       A.    About -- I just made a complaint to him about Dennis

25   calling us island monkeys.

Case 1:05-cv-00037    Document 588-8    Filed 04/11/2008    Page 16 of 43

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.    May 21, 2007

52

1    Q.    Did the fact that Mr. Clark made those comments ever

2  change your attitude about how well you were going to do your

3  job or how hard you were going to work?

4    A.    No.

5    Q.    After those comments were made, did you work just as

6  hard and just as professionally as you had before he made those

7  comments?

8    A.    I had to.  It was my job.

9    Q.    And you took that seriously as a responsibility,

10  right?

11    A.    Yes, because it was my only job.

12    Q.    And after that second time, do you remember how many

13  more months went by that you worked for CalPac before you were

14  laid off?

15    A.    No, I don't remember.

16    Q.    Can't remember whether it was one week or four

17  months, right?

18    A.    Yes, I can't remember.

19    Q.    But whatever amount of time it was after that second

20  time, it never happened again, right?

21    A.    Yes.

22    Q.    And after that second time, whenever it was, no one

23  ever again made any, you know, comment to you that was related

24  to your race or your nationality, right?

25    A.    Right.

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.       May 21, 2007

53

1      Q.   And however much time went by between that second

2  time Mr. Clark said this, whether it was one day or four

3  months, Mr. Clark continued to come out to the job site on the

4  average of about three times a day and make comments about how

5  the work was going, right?

6      A.   Yes.

7      Q.   And for however long that was, whether it was one day

8  or four months, Mr. Clark never again made any kind of hostile

9  or negative or racial remarks to any of you guys, right?

10     A.   I don't know.  I don't remember.

11     Q.   So, none that you can remember?

12     A.   Yeah, none.

13     Q.   And your supervisors, whether it was one day or

14 another four months, they continued to treat you just as well

15 as they had from the very first day that you worked there,

16 correct?

17     A.   Yes.

18     Q.   And they never did anything to indicate that they

19 were mad at you or were trying to get back at you for

20 complaining about what Mr. Clark had said, right?

21     A.   Right.

22     Q.   And you never saw them get mad at any of the other

23 guys or try to get back at any of the other guys in any way for

24 any complaints they made about Mr. Clark either, right?

25     A.   I don't know.  I don't --

Case 1:05-cv-00037    Document 588-8    Filed 04/11/2008    Page 18 of 43

Roland F. Mendiola  Henry G. Van Meter vs. CALPAC, et al.    May 21, 2007

55

1      A.    I brought it up to Henry Quintanilla about it.

2      Q.    And what did he say?

3      A.    He said that reduction of force, and as soon as they

4  get more contracts they'll hire us back.

5      Q.    All right.  Did you disagree with that at the time?

6      A.    Yes.

7      Q.    What did you say to Mr. Quintanilla?

8      A.    Because, you know, it was such short notice.  I was

9  off, and the next day when I came to work I was laid off; I had

10 my laid off paper, my check was ready.

11     Q.    Right.  And you don't know whether that was one day

12 or four months after the second time that you complained about

13 Mr. Clark, right?

14     A.    Yeah, I don't remember.

15     Q.    Now, did you ever complain to anyone besides Mr. Van

16 Meter or Mr. Quintanilla about any comment that Mr. Clark made?

17     A.    Just to those two and John Harper -- Don Harper.

18     Q.    When did you complain to Mr. Harper?

19     A.    The same day.

20     Q.    Okay.  You complained -- each day this happened, you

21 complained to one of your supervisors, and it would have either

22 been Mr. Quintanilla, Mr. Van Meter or Mr. Harper, right?

23     A.    Yes.

24     Q.    Do you remember which of the three it was on that

25 second time?

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.      May 21, 2007

56

1      A.   No, I don't remember.

2      Q.   The first time it was Mr. Van Meter, right?

3      A.   Yes.

4      Q.   The second time, you don't remember which one?

5      A.   No.

6      Q.   Did you ever complain to anybody else besides those

7 three guys?

8      A.   No.

9      Q.   Did you ever go to MCI and complain?

10     A.   No.

11     Q.   At the time that Mr. Clark was out there working on

12 the job, did you just assume he was an employee of MCI?

13     A.   No.  My supervisor told us he was from MCI.

14     Q.   Okay.  And did they ever tell you he worked for

15 anybody besides MCI?

16     A.   No.

17     Q.   Was it only after you got laid off that you heard

18 something about Dynamic Technical Services?

19     A.   Yes.

20     Q.   And so you would never complain to anybody at Dynamic

21 Technical Services about Mr. Clark, right?

22     A.   Right.

23     Q.   Do you have any reason to believe that MCI had

24 anything to do with having you terminated from your job?

25     A.   No.

Case 1:05-cv-00037    Document 588-8    Filed 04/11/2008    Page 20 of 43

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.     May 21, 2007

79

```
 1                      IN THE DISTRICT COURT OF GUAM

 2
     HENRY G. VAN METER, ET AL,        )
 3                                      )
                                        )
 4          Plaintiffs                  )
                                        )
 5   VS.                                )   NO. CIV05-00037
                                        )
 6                                      )
     CALPAC, ET AL                      )
 7                                      )
                                        )
 8          Defendants                  )
                                        )
 9                                      )

10                  REPORTER'S CERTIFICATION

11             DEPOSITION OF ROLAND F. MENDIOLA
                         May 21, 2007
12
13        I, JOE A. WILLIAMS, Certified Shorthand Reporter in and

14   for the State of Texas, hereby certify to the following:

15        That the witness, ROLAND F. MENDIOLA, was duly sworn by

16   the officer and that the transcript of the oral deposition is a

17   true record of the testimony given by the witness;

18        That examination and signature of the witness to the

19   deposition transcript was waived by the witness and agreement

20   of the parties at the time of the deposition;

21        That the original deposition was delivered

22   to Vincent Leon Guerrero

23        That the amount of time used by each party at the

24   deposition is as follows:

25        DAVID LUJAN - 00 HOURS:00 MINUTE(S)
```

Case 1:05-cv-00037     Document 588-8     Filed 04/11/2008     Page 21 of 43

Roland F. Mendiola   Henry G. Van Meter vs. CALPAC, et al.      May 21, 2007

80

1      ARTHUR K. SMITH - 1 HOURS: 1 MINUTE(S)

2      That $ 425 00  is the deposition officer's charges to

3  the DEFENDANT for preparing the original deposition transcript

4  and any copies of exhibits;

5      That pursuant to information given to the deposition

6  officer at the time said testimony was taken, the following

7  includes all parties of record:

8      DAVID LURAN, Attorney for Plaintiffs

   THOMAS C. MOODY, III, Attorney for Defendant

9          CALPAC

   ARTHUR K. SMITH, Attorney for Defendant

10

11      That a copy of this certificate was served on all parties

12  shown herein on JUNE 5, 2007   and filed with the Clerk

13  pursuant to Rule 203.3.

14      I further certify that I am neither counsel for, related

15  to, nor employed by any of the parties or attorneys in the

16  action in which this proceeding was taken, and further that I

17  am not financially or otherwise interested in the outcome of

18  the action.

19      Certified to by me this 5th  of June , 2007.

20

21

22      JOE A. WILLIAMS, Texas CSR #422

       Expiration Date:  12-31-08

23      Firm Registration No. 281

24

25

COMPEX LEGAL SERVICES, INC.   (800) 969-6424

# EXHIBIT X

IN THE UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA and JOHN P. BABAUTA, | ) CIVIL CASE NO. CIV05-00037 ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| CALIFORNIA PACIFIC TECHNICAL SERVICES LLC, a.k.a. CALPAC, DYNAMIC TECHNICAL SERVICES, VERIZON BUSINESS PURCHASING LLC, VERIZON BUSINESS NETWORK SERVICES, INC., JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES and DOES 1 through 10, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

DEPOSITION TRANSCRIPT

OF

**JAMES SANTOS YEE**

January 29, 2008
(Volume 1)

# ORIGINAL

PREPARED BY:   GEORGE B. CASTRO
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates
Piti, Guam 96915
Tel:(671)688-**DEPO** • Fax:(671)472-3094

1    A    A friend of mine was operating there.

2    Q    Who was that?

3    A    That was John Viloria.  I bumped into

4 him, he told me about the job, he said they

5 needed an operator.

6    Q    Okay.  Did you have to fill out an

7 application?

8    A    Yes.

9    Q    And did you just fill it out on the

10 spot?

11    A    (Intense coughing).

12    Q    Hang on.

13    A    Excuse me.

14    Q    Do you want some water?

15    A    Uh --

16    Q    Okay.  Did you fill out the application

17 on the spot, did you take it home?

18    A    I forget already.

19    Q    Okay.  Then you were interviewed after

20 you submitted the application?

21    A    I can't say.

22    Q    Do you remember talking to anybody

23 right before you got hired?

24    A    I can't remember.

25    Q    Okay.  When you made your application,

1  as far as you knew, you were applying for a job

2  at CalPac?   And you're only applying for a job

3  only at CalPac, is that right?

4      A   Yes.

5      Q   Okay.   After you got hired, did you

6  work in the aerial unit?   I get confused.

7      A   Aerial?   No.   They had their own crew.

8      Q   So you went straight to underground?

9      A   I was underground.

10     Q   Okay.   And you would show up in the

11 morning down at the CalPac office, that was the

12 way you normally started the day?

13     A   Yeah, everybody would ---

14     Q   And who did you report to when you

15 showed up?

16     A   It would vary sometimes.

17     Q   Okay.   Who --

18     A   We'd all show up, then we go in the

19 office, figure out what they're going to do,

20 come out and whoever needed me would talk to

21 me.

22     Q   Okay.   Who were the people who might

23 need you?   Who were they?

24     A   Anywhere from Henry.

25     Q   Which Henry?

1     A     Henry Quintinilla, or Henry Van Meter,

2  or Jai James, or JT might need me. Who else is

3  there? Don might need me.

4     Q     That's Don Harper?

5     A     Yes. I think it'd be anybody there.

6     Q     Who was JT?

7     A     John Thomas is aerial.

8     Q     John Thomas in aerial, okay. So Henry

9  Quintinilla, Henry Van Meter, Jai James, Don

10  Harper, and JT; those were all foremen?

11     A     They're all my superiors.

12     Q     Okay. You were hired on as a laborer?

13     A     Operator.

14     Q     Operator? Okay. And did you also do --

15  - did you strictly do operating -- operator, so

16  you operated equipment, I take it?

17     A     Yeah.

18     Q     What kind of equipment?

19     A     We had back holes, we had trenchers, we

20  had rock saws, we had dump truck, Bobcat,

21  sometimes I just drove the rock saw -- you

22  know, cut the road, asphalt --

23     Q     Wait, what's that word? Rock saw?

24     A     Rock saw, yes.

25     Q     Okay. All right.

REPORTER'S CERTIFICATE

I, **Melinda D. Castro**, Court Reporter, do hereby certify the foregoing 34 pages to be a true and correct transcript of the audio recording made by a Notary Public Officer of Depo Resources in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision, and whereas a request for review was requested.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 2nd day of February, 2008.

Melinda D. Castro

# EXHIBIT Y

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>    Plaintiffs,<br><br>  vs.<br><br>CALIFORNIA PACIFIC TECHNICAL SERVICES, LLC, a.k.a CALPAC, DYNAMIC TECHNICAL SERVICES, VERIZON BUSINESS PURCHASING, LLC, VERIZON BUSINESS NETWORK SERVICES, INC., JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and Does 1 through 10,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) CIVIL CASE NO. CIV05-00037 |

DEPOSITION OF JAMES S. YEE

Taken on Behalf of Defendant CalPac


    BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of JAMES S. YEE was taken before Cecille A. Flores, a Certified Shorthand Reporter, on Wednesday, the 20th day of February 2008, at 1:30 p.m. in the offices of Civille & Tang, 330 Hernan Cortez Avenue, Hagatna, Guam.

1    A    I remember being --

2    Q    -- straight away after the interview?

3    A    Maybe come in the next day.

4         MR. EWERT:  I can barely hear the witness.

5         MR. CIVILLE:  James, can I ask you to sit up and

6    come a little closer?  Okay.  Robert, you just have to speak

7    up like you just did and we'll try and be louder here.

8    BY MR. CIVILLE:  (Continuing)

9    Q    As far as you know, to the best of your knowledge,

10   the decision to hire you was made by CalPac?

11   A    CalPac took me on.

12   Q    Okay.  One of the issues in this lawsuit, I just

13   want to clarify where you are on this point, is you don't

14   have any reason to believe that MCI had any anything to do

15   with your hiring?

16   A    Of me being hired?

17   Q    Yes.  They weren't involved in that decision, were

18   they, to the best of your knowledge?

19   A    I wouldn't know.

20   Q    Are you aware of anything that would suggest MCI

21   had anything to do with the decision to hire you?

22   A    I wouldn't know.  I didn't apply at MCI.

23   Q    Okay.  After you started work and went out to the

24   job site, if you had questions, you went to your supervisor?

25   A    Correct.

1   CalPac to do work to lay cable for it?

2       A   I'm not sure.  I didn't really care as long as there
3   was work.

4       Q   Were you aware that some of the projects had
5   different names like the Tycom project or an MCV project?

6       A   Of course.

7       Q   Pardon me?

8       A   Of course.

9       Q   And there's an MCI project as well?

10      A   Right.

11      Q   So Tycom, MCV, MCI.  What other projects do you
12  recall?

13      A   I don't remember.

14      Q   Did you work on all of those projects, Tycom, MCV
15  and MCI?

16      A   All of them.  I remember I worked on MCV and MCI.

17      Q   You didn't work for MCV, though?  You were not an
18  employee of MCV, were you?

19      A   No.

20      Q   You weren't an employee of MCI?

21      A   No.

22      Q   You were never employed by Tycom?

23      A   I worked for CalPac.

24      Q   You were paid by CalPac?

25      A   That's what it said on the check stub.

1    A    No, never.

2    Q    You said there were several instances which you

3  heard Dennis Clark use the term monkey or island monkey

4  inappropriately?

5    A    I've heard him say it.

6    Q    How many times have you personally heard him say it?

7    A    I heard him in Tiyan, I heard him at Two Lovers'

8  area.  Tiyan, I think, was twice.

9    Q    Anywhere else?

10    A    I can't remember right now.

11    Q    Where was the first place that you recall him saying

12  it?  Using the monkey phrase of --

13    A    I can't remember which one happened first.  There

14  was a few times but I just can't -- it's been so long.  I

15  just can't remember which one happened first.

16    Q    Well, let's take Tiyan then.

17    A    All right.

18    Q    Since you mentioned that first.

19          MR. EWERT:  Can we go off the record for a

20  second?

21          MR. CIVILLE:  So you wanna go off the record?

22  How long?

23          MR. EWERT:  I've got a phone call I need to take

24  real quick.

25          MR. CIVILLE:  Okay.  We can take a short break.

1   know if the guys at 100 feet said something to him.  I don't
2   know.
3        Q    You didn't observe anybody say anything to Dennis
4   Clark after he had made this comment?
5        A    I believe -- I do remember him walking away.
6        Q    My question was, did you see anybody say anything to
7   Dennis Clark?
8        A    I didn't see anybody.
9        Q    Okay.  You didn't say anything to Dennis Clark?
10        A    No, because I'd probably just say something stupid.
11        Q    Did you complain to anybody after this particular
12   incident you just described at Tiyan at the halfway house?
13        A    I complained to H.Q.
14        Q    So Henry Quintanilla was at the site?
15        A    I don't remember where he was at.  He's always
16   around.
17        Q    Did he say that he had heard the comment too?
18        A    I don't know.  I just told him that's not right.
19        Q    He didn't say, yeah, I heard about that or did he
20   ask you any questions about it?
21        A    No.
22        Q    Did you go up to see Henry Q. alone or did somebody
23   go with you to also make a complaint?
24        A    I'm not sure if anybody was around me at that time.
25        Q    When you talked to Henry Quintanilla?

1    Q    Anybody else?  How about the guys on the crew?  Did

2    you talk with them about it?

3    A    We probably did.

4    Q    You don't recall complaining to any of your

5    supervisors specifically about this incident by the swimming

6    pool?

7    A    By that incident, yeah, H.Q., of course.

8    Q    What did Henry say about --

9    A    He said, okay, okay, we'll see what we can do about

10   it.

11   Q    Henry said, okay, okay, I'll see what I can do about

12   it?

13   A    God, it's been so long.  I just remember letting him

14   know and he's nodding his head.  I remember 'cause we were

15   talking.

16   Q    Do you know what Henry did, if anything?

17   A    I don't know.  I don't remember.  I don't know about

18   it.

19   Q    Did you follow up with Henry and say, Henry, did you

20   do anything about this?

21   A    No, I expected him to take care of it.

22   Q    These two incidents at Tiyan, did they happen close

23   in time together or were they separated by days, weeks,

24   months?

25   A    It's hard to say there.  I can't recall that right

1  now.

2      Q    Did you ever make any --

3      A    I don't even know which one happened first.

4      Q    Pardon me?

5      A    I don't even remember which one happened first.

6      Q    You said there was also an incident at Two Lovers'

7  Point?

8      A    Right.

9      Q    Do you remember the date for that incident?

10     A    No.

11     Q    Once again, were you on the trenching machine?

12     A    No.

13     Q    What were you doing at Two Lovers' Point?

14     A    We were pulling -- supposed to pull fiber that

15  morning.

16     Q    When you say supposed to, does that mean you

17  actually didn't pull fiber?

18     A    I think we didn't pull fiber that morning.

19     Q    Who was at that site for the fiber pull or the cable

20  pull?

21     A    On that morning there, that -- on that box there it

22  was probably me, I remember Larry, I remember --

23     Q    Larry Charfauros?

24     A    Yeah.  I remember -- who else was there?  John

25  Viloria was there because he had the backhoe.  I don't

1       A       Not long.

2       Q       Did he say anything else?

3       A       I don't even know who he spoke to there.

4       Q       You don't know who he was talking to on the

5   telephone?

6       A       No.

7       Q       Did you make a complaint about this incident to

8   anybody at CalPac?

9       A       I'm not sure if I was the one who did that.  I

10  didn't do that one.  Someone complained for us there.  I

11  didn't bring it up but someone was there and I spoke to --

12  who did he talk to -- I don't know who they spoke to about

13  it.

14      Q       But you did not complain to anybody?

15      A       To my fellow co-workers, yes, that wasn't right.

16      Q       Did you complain to any Foreman or Supervisors?

17      A       No, I think somebody did that that morning.

18      Q       You don't know who?

19      A       No.  But we were all there.

20      Q       Did a Supervisor, did any of your Foremen or

21  Supervisors ever say anything to you about any of these

22  complaints that you had made or about any of these incidents

23  you've just described?

24      A       I remember H.Q. bringing it up that yeah, he did

25  talk to Don about it.

1    A    That's the days that they said that we were there on

2  that project -- on that certain area.

3    Q    Who is they who said that?

4    A    Let's see, we were talking to Norman, Don was there.

5    Q    Don Harper would give you or Norman gave you guys

6  dates of when you were at particular projects?

7    A    Don would give us dates too 'cause he had everything

8  down in our daily jots.

9    Q    Did you discuss and try to refresh each other's

10  memories about exactly what it was that Dennis Clark had

11  said?

12    A    Yeah, we discussed it.

13    Q    Some people remembered him saying one thing and some

14  people remembered him saying it differently?

15    A    Some people just remembered, yeah, what he said and

16  some people just forgot where exactly where we were at and --

17    Q    During this time that you were meeting at Don

18  Harper's house, there were also protests going on in front of

19  CalPac?

20    A    I don't remember what time that was.

21    Q    You remember the protests?

22    A    I remember the protesting.

23    Q    Were you part of those protests?

24    A    No, I was working.

25    Q    Other than talking to Henry Quintanilla and Don

1    Harper, did you talk to any other Supervisors at CalPac about
2    your complaints?
3         A    I don't remember.
4         Q    Did you ever talk directly to John Healy?
5         A    No.
6         Q    Did any of your Supervisors, did Henry Quintanilla
7    ever tell you to chill out and say, James, just shut up about
8    this stuff?
9         A    I don't remember anybody.
10        Q    Other than mentioning it or complaining about it
11   apparently on the two instances at Tiyan, did you ever bring
12   it up again at work?
13        A    No, it was a very sour thing to bring up.
14        Q    So you never brought it up?
15        A    I never did, no.
16        Q    Is there any reason that you can think of that
17   anybody at management would have thought you were making
18   trouble?
19        A    Ask me that again.
20        Q    Was there any reason that anybody at management
21   would have had to think you were making trouble for them?
22        A    In what way?
23        Q    Well, you weren't complaining about Dennis Clark,
24   correct?  Openly?  You weren't coming to work every day and
25   complaining about him?

1    A    I try not to let it get to me.

2    Q    Were you pretty successful in not letting him get to

3  you?

4    A    I was trying.

5    Q    You know, when we talk about your complaints to

6  management, I'm talking about the management of CalPac.  Do

7  you have any reason to think that John Healy would approve of

8  Dennis Clark's comments?

9    A    Why was he still coming around and running the show

10  then?

11    Q    But other than that, John Healy had never done

12  anything to suggest to you that he had those kind of feelings

13  about his work force, did he?

14    A    Me and John never spoke, really.

15    Q    Do you have any fact to suggest that MCI was aware

16  that Dennis Clark had made these comments?

17    A    It's hard to say.  Isn't he representing?  I mean,

18  they should have known.  I don't -- I don't speak to them --

19    Q    You didn't tell MCI, did you?

20    A    No, I didn't.

21    Q    You don't know of Henry Quintanilla or Don Harper or

22  John Healy telling MCI?

23    A    No, I'm not there all the time.

24    Q    John Healy or Don Harper or Henry Quintanilla, they

25  never told you that they told MCI, did they?

1     A    They never told me.

2     Q    Okay. Are you aware of any facts that would make

3 you believe that MCI would approve of what Dennis Clark said

4 if MCI knew about it?

5     A    One more time.

6     Q    If MCI actually knew what Dennis Clark had said --

7     A    Yeah.

8     Q    -- do you know of any facts that would suggest that

9 MCI approved of his comments?

10    A    I wouldn't know because I don't know if they knew.

11          MR. CIVILLE:  What time is it?

12          COURT REPORTER:  3:30.

13          MR. CIVILLE:  Why don't we take a ten minute

14 break. Robert, can you call back in about ten?

15          MR. EWERT:  Will do.

16          MR. CIVILLE:  Thank you.

17                  (Recess taken at 3:30 p.m.)

18                  (Back on the record at 3:39 p.m.)

19 BY MR. CIVILLE: (Continuing)

20    Q    We're back on the record. Mr. Yee, according to

21 what came out at your last deposition, you continued to work

22 at CalPac until March 7, 2005 when you were terminated for

23 cause. It means the company said they had a reason to fire

24 you. Do you recall that?

25    A    Yes.

```
 1      A    No, I just -- I told him I just didn't make a phone
 2   call.
 3      Q    I'm sorry, you just didn't --
 4      A    I just didn't make a phone call.
 5      Q    Okay.  Do you have any reason to think that MCI was
 6   aware of the decision to terminate you?
 7      A    I don't know.  I have no idea about that.
 8      Q    So to the best of your knowledge, the decision to
 9   terminate you was strictly a CalPac decision?
10      A    I have no idea of that.
11      Q    Okay.  I think when we had started this deposition
12   earlier before you got sick you indicated that you were
13   working at ICC?
14      A    Yes.
15      Q    Are you still there?
16      A    Yes.
17      Q    You're still making about $15 an hour?
18      A    That's correct.
19      Q    Have they provided you any benefits yet?
20      A    Umm --
21      Q    Health or retirement, anything like that?
22      A    No, not yet.
23      Q    Sick leave?
24      A    We're just working out everything right now.  They
25   just made a handbook so they're just starting to figure
```

REPORTER'S CERTIFICATE


        I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that JAMES S. YEE personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 68, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

        Witness my hand at Barrigada, Guam this 26th day of February 2008.


_____
Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA