# EXHIBIT Z

IN THE UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM

HENRY G. VAN METER, JERRY ) CIVIL CASE NO. CIV05-00037
APODACA, JR., JOSEPH J. )
HERNANDEZ, JOSEPH T. MENDIOLA, )
LARRY L. CHARFAUROS, ANTHONY )
C. ARRIOLA, ROBERT B. CRUZ, )
ROLAND F. MENDIOLA, JAMES S. )
YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA and JOHN )
P. BABAUTA, )
)
            Plaintiffs, )
)
        vs. )
)
CALIFORNIA PACIFIC TECHNICAL )
SERVICES LLC, a.k.a. CALPAC, )
DYNAMIC TECHNICAL SERVICES, )
VERIZON BUSINESS PURCHASING )
LLC, VERIZON BUSINESS NETWORK )
SERVICES, INC., JOHN HEALY, )
DENNIS CLARK, WILLIAM WARD, )
JAI JAMES and DOES 1 through )
10, )
            Defendants. )
_____)

DEPOSITION TRANSCRIPT

OF

**TEDDY B. CRUZ**
January 25, 2008

ORIGINAL

PREPARED BY:    GEORGE B. CASTRO
                **DEPO RESOURCES**
                #49 Anacoco Lane
                Nimitz Hill Estates
                Piti, Guam 96915
                Tel:(671)688-**DEPO** • Fax:(671)472-3094

1    A    No.

2    Q    -- like health insurance?

3    A    No.

4    Q    All right.  Then I think you worked at

5  CalPac from February 2004 until May 2005?

6    A    Yes.

7    Q    Okay.  After you left CalPac, laid off

8  from CalPac, where did you next work?

9    A    Cable Service.

10    Q    Okay.  And before I ask you that, how

11  much were you paid at CalPac?

12    A    $12.00

13    Q    Okay.  That was the -- that's not what

14  you started at, is it?

15    A    No.

16    Q    What did you start at?

17    A    I think minimum wage.

18    Q    So that's like, I don't know.  Is that

19  2004, that's about $4 bucks and at $4.50 an

20  hour?

21    A    I can't recall.  I'm not sure.

22    Q    Okay.  But you're pretty sure you

23  started at minimum wage?

24    A    Yeah.

25    Q    And you were hired as a laborer?

1    A   Laborer.

2    Q   Okay.  And then as time went on, did

3 you get a promotion?

4    A   Yes.

5    Q   Okay.  And you also got some pay

6 raises?

7    A   Yes.

8    Q   What was your first pay raise?

9    A   $12.00.

10    Q   You went from $4 to $12.00?

11    A   Yes.

12    Q   That's a pretty impressive raise, yeah?

13    A   Yes.

14    Q   Okay.  Were you surprised to get such a

15 large raise?

16    A   Yes.

17    Q   When did you get this raise?

18    A   Some part in the middle of the year.

19    Q   Middle of 2004?

20    A   Yes.

21    Q   So is that like, July, August,

22 September?

23    A   I can't recall.

24    Q   Who gave you the raise?

25    A   (pauses)

1    Q   Well, CalPac gave it to you, right?
2  But I mean, who at CalPac?

3    A   Don Harper.

4    Q   Okay.   Did he call you in and say,
5  "Teddy, I'm going to make your day."   I mean
6  this is a pretty significant event, wasn't it?
7  This was a pretty significant event?

8    A   Yes.

9    Q   Okay.   Do you know if anybody else who
10 got such a large raise?

11   A   Henry Van Meter.

12   Q   Okay.   He got a big bump too?

13   A   I'm not too sure.

14   Q   Okay.   What did Don Harper tell you
15 when he called you in to tell you about the
16 raise?

17   A   He just called me and said I got a
18 raise.

19   Q   That's it?

20   A   That's it.

21   Q   No enthusiasm?

22   A   No.

23   Q   No "Teddy, I'm giving you a huge raise,
24 but, you know, I'm giving you more
25 responsibility to go along with it"?

1    A   Yes, with supervisor.

2    Q   So Don said he was making you a
3 supervisor. Is that right?

4    A   Yes.

5    Q   Okay. Did you get your raise at the
6 same time Henry Van -- was it Henry Van Meter
7 who got the other big raise, you know about?

8    A   Yes.

9    Q   Were you guys promoted at the same
10 time?

11    A   I can't remember that.

12    Q   Were you hired at the same time?

13    A   I'm not too sure.

14    Q   Okay. And then you stayed at that
15 $12.00 an hour until you got laid off?

16    A   Yes.

17    Q   Okay. I'm sorry, you told me already;
18 you went to Cable Service Group?

19    A   Yes.

20    Q   And between leaving CalPac and starting
21 at Cable Service Group, how much time went by?

22    A   A month.

23    Q   Okay. So you started at Cable Service
24 Group in June or July of 2006 -- '05, I mean?

25    A   Yes.

| | | |
|---|---|---|
| 1 | Q | Okay. And you did that, I assume? |
| 2 | A | Yes. |
| 3 | Q | Who did you talk to when you came back? |
| 4 | A | Don Harper. |
| 5 | Q | And who was Don Harper? |
| 6 | A | The supervisor at that time, for |
| 7 | | CalPac. |
| 8 | Q | And he interviewed you? |
| 9 | A | Yes. |
| 10 | Q | Was anybody present in the interview |
| 11 | | besides Don Harper? |
| 12 | A | No. |
| 13 | Q | Okay. Did he tell you what kind of job |
| 14 | | you were going to be hired to do? |
| 15 | A | Labor. |
| 16 | Q | Did he tell you anything about CalPac, |
| 17 | | about the business of CalPac? |
| 18 | A | No. |
| 19 | Q | So it's a pretty short interview? |
| 20 | A | An hour. |
| 21 | Q | An hour? That's -- seems like a long |
| 22 | | time. What did you talk about for that long a |
| 23 | | period of time? |
| 24 | A | What kind of work you're going to be |
| 25 | | doing. |

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

| | |
|---|---|
| 1 | Q    Okay.  What did he tell you? |
| 2 | A    You'll mostly be doing labor works. |
| 3 | Q    Okay. |
| 4 | A    And show us around the warehouse. |
| 5 | Q    Uh-huh. |
| 6 | A    Tell us where's the project going to |
| 7 | be. |
| 8 | Q    Okay.   And the project, there were |
| 9 | different projects going on; is that right? |
| 10 | A    I can't recall. |
| 11 | Q    There was more than one job site? |
| 12 | A    I can't remember that. |
| 13 | Q    Okay.  And then after this interview, |
| 14 | did Don Harper say, "Okay, Teddy, you're |
| 15 | hired"? |
| 16 | A    Yes. |
| 17 | Q    He told you to report what, the next |
| 18 | day? |
| 19 | A    A couple of days later. |
| 20 | Q    Now, when you applied, you believed you |
| 21 | were applying to CalPac and only to CalPac; am |
| 22 | I right? |
| 23 | A    Yes. |
| 24 | Q    Okay.  And you believed that Don Harper |
| 25 | worked for CalPac and only for CalPac? |

1    A    To my knowledge?

2    Q    Yeah.  Is that right?

3    A    Yes.

4    Q    Okay.  And after you started working,

5  you received a paycheck?

6    A    Yes.

7    Q    And that paycheck was from CalPac?

8  It's a CalPac paycheck?

9    A    Yes.

10    Q    Okay.  And as far as you know, the only

11  company paying you was CalPac?

12    A    At that time.

13    Q    You mean, was there some time later

14  when somebody else paid you?

15    A    No.

16    Q    Okay.  What do you mean at that time?

17    A    I only know CalPac was paying me.

18    Q    And do you know of any facts today as

19  we're sitting here that any other company other

20  than CalPac ever paid you?

21    A    Yes.

22    Q    What facts do you know about?

23    A    My payroll check.

24    Q    What about your payroll check?

25    A    It came from CalPac.

1     Q    It came from CalPac? Yeah, that's all

2     I'm ask -- do you know, as we're sitting here

3     today, I just want to make sure, you're not

4     saying that any other company except CalPac

5     paid you?

6     A    Yes.

7     Q    Only CalPac paid you?

8     A    Only CalPac.

9     Q    Okay. That's all I'm trying to get

10    out. Thank you. When you started working at

11    CalPac, let's go through what the chain of

12    command was; you had the laborers, right?

13    A    Yes.

14    Q    And then the laborers reported to

15    foreman?

16    A    Yes.

17    Q    Who were the foremen?

18    A    Me.

19    Q    Well, that was later on. Let's talk

20    about when you started.

21    A    Okay. Yeah. Henry Quintanilla.

22    Q    Okay. Anybody else?

23    A    And Don Harper.

24    Q    Um-huh.

25    A    That's the only two I know for CalPac.

1    Q    Okay.  And who would you report to when
2 you checked in?

3    A    Henry Quintanilla.

4    Q    And Henry would give you an assignment,
5 or he'd tell you what work crew you were going
6 to be on?

7    A    Yes.

8    Q    Were you always on the underground
9 crew?

10    A    Yes.

11    Q    Okay.  And how many people were there
12 in the underground crew when you started?

13    A    I can't recall.

14    Q    Okay.  Was it more than 30?

15    A    I can't remember.

16    Q    Can you make a guess?  Was it more than
17 20?

18    A    Less than 20.

19    Q    Less than 20?

20    A    (no audible response)

21    Q    More than 10?

22    A    Yes.

23    Q    So you'd report to Henry, and then
24 Henry would assign you to a work crew?

25    A    Yes.

Q   When   you   hired   on   at   CalPac,   you
mentioned Don Harper made the decision to hire
you after your interview; am I right?

A   Yes.

Q   You   don't   have   any   reason   --   am   I
correct that as far as you know Don Harper was
acting solely for CalPac?

A   Yes.

MS.   LUJAN:   You're   asking   just   for   at
that time or for now?

MR.   CIVILLE:   Well,   yeah   --
BY MR. CIVILLE:

Q   Well,   as   far   as   you   know   sitting   here
today,   as   you're   sitting   here   today,   when   Don
Harper   hired   you,   he   was   acting   solely   for
CalPac?

A   Yes.

Q   Okay.   And   when   you   reported   in   the
morning,   and   you   went   to   Henry   Quintanilla   and
asked   for   assignment,   as   far   as   you   know   Henry
Quintanilla,   when   he   gave   you   your   assignment,
he   was   doing   that   on   behalf   of,   solely   on
behalf of CalPac?

A   Yes.

Q   Okay.   You   mentioned   that   somewhere   in,

1   I forget, I think you said July or so of '04,

2   Don Harper brought you in, and then gave you a

3   promotion and raise? I think you said it was

4   in the middle of the year, July or August?

5      A   Yeah.

6      Q   Okay. When Don Harper did that, I

7   assume he told you you'd been doing good work?

8      A   Yes.

9      Q   Okay. As far as you know, his

10   evaluation and his decision to give you a

11   promotion and a raise, he was making that

12   decision solely on behalf of CalPac?

13      A   Yes.

14      Q   You mentioned in your complaint that

15   Dennis Clark, on a couple of occasions, said

16   some things that you believed were racially

17   inappropriate. I want to talk to you about

18   that. All right?

19      A   (no audible response)

20      Q   When did you first come into contact

21   with Dennis Clark?

22      A   In Tiyan.

23      Q   Did he just show up one day, or how did

24   that happen?

25      A   He was the inspector of the project.

1     Q   Okay.  What was it about?

2     A   Good morning.  Hi.

3     Q   Okay.  And so you exchanged greetings

4 with him?

5     A   Greetings.

6     Q   Okay.  And he said good morning back to

7 you?

8     A   Yes.

9     Q   Okay.  Other than that, did you ever

10 talk one on one with Dennis Clark?

11     A   No.

12     Q   And I think you said there were two

13 times when you heard Dennis Clark say something

14 that you thought was racially inappropriate.

15 Am I right?

16     A   Yes.

17     Q   And I'm going to ask you some detailed

18 questions about that, but other than those two

19 times, did Dennis Clark behave in a pretty

20 normal way?

21     A   I can't remember that.

22     Q   You don't recall him behaving

23 inappropriately other than those two times.  Is

24 that right?

25     A   Yes.

1     Q   And I think you said the two incidents,

2  one was at Tiyan, and the other was at Two

3  Lovers Point?

4     A   Yes.

5     Q   Which was the first one?

6     A   Tiyan.

7     Q   Okay.  Do you remember the dates or the

8  month?

9     A   No.

10     Q   Do you remember, were you a laborer or

11  a supervisor, a foreman?

12     A   Supervisor.

13     Q   You were a foreman at the time?

14     A   Yes.

15     Q   Okay.  What were the circumstances?  Do

16  you remember what was going on at Tiyan on that

17  day?

18     A   They were laying down pipes.

19     Q   Okay.  Do you know which project you

20  were working on?

21     A   This is just Tiyan's project.

22     Q   Okay.  Do you know who the customer in

23  the Tiyan project was?

24     A   MCI.

25     Q   Okay.  Are you guessing or do you know

1  started?  I mean, you still went down to CalPac

2  in the morning, right?

3      A    Yes.

4      Q    Now, would somebody say, "Teddy, I want

5  you to take a crew and do this today"?

6      A    Yes.

7      Q    And who would tell you that?

8      A    Henry Quintanilla.

9      Q    So he was a foreman also, but he was

10  kind of a senior foreman?

11      A    Yes.

12      Q    And would he tell you what workers, or

13  what you were going to have on your crew, or

14  would he ask you, "Teddy, who do you want on

15  your crew today"?

16      A    No, he'll tell us who's going with me.

17      Q    And did you ever say, "Geez, Henry, I

18  don't want that guy", "I'd like somebody else,"

19  or "I need a couple more people"?

20      A    No.

21      Q    Okay.  You just, whatever Henry said,

22  that was it?

23      A    Yes.

24      Q    And once again, as far as you know,

25  Henry, when he made those decisions about the

1  trench?

2     A    A few.

3     Q    Okay.    And  all  you  can  recall  him

4  saying is "island monkeys"?

5     A    Yes.

6     Q    What did you do when he said that?

7     A    I wasn't feeling good about it.

8     Q    What did you do?

9     A    I reported it to my supervisor.

10    Q    Okay.  Did you say anything to him?   To

11 Dennis Clark?

12    A    After that incident, no.

13    Q    No.  At the time of the incident?

14    A    No.

15    Q    Did  any  of  you  work  crew  say  anything

16 to him?

17    A    I don't remember.

18    Q    Did  any  of  your  work  crew  say  anything

19 to you?

20    A    Yes.

21    Q    Who said something to you?

22    A    John Nauta, Jesse.

23    Q    Which Jesse?

24    A    Cruz.

25    Q    Is that your brother?

1    A    No.

2    Q    What does your color of your skin have

3  to do with, that you're an island monkey?

4    A    Because he was white and I was brown.

5    Q    Okay.  Do you have some reason to think

6  that white people call brown people monkeys?

7  That hasn't been your experience, has it?

8    A    No.

9    Q    Okay.  So, Nauta and your brother

10 complained to you, and then you complained to

11 Henry Quintanilla?

12   A    Don Harper.

13   Q    You went to Don Harper too?

14   A    Yes.

15   Q    Okay.  Were they together, or were

16 those two separate complaints you made?

17   A    I can't recall.

18   Q    Okay.  But you're sure you talked --

19 what did Henry Quintanilla say?

20   A    I can't recall what he said.

21   Q    What did Don Harper say?

22   A    He'll look into it.

23   Q    Okay.  Do you know, after you made this

24 complaint to Henry Quintanilla, do you know

25 what Henry did?

1    A   No.

2    Q   Do you know who he talked to?

3    A   No.

4    Q   Did you ever ask him?

5    A   No.

6    Q   Okay.  After you made the complaint to
7 Don Harper, do you know what Don Harper did?

8    A   No.

9    Q   Did you ever ask him?

10    A   No.

11    Q   Do you know who he talked to?

12    A   No.

13    Q   Okay.  Did you ever bring up this first
14 incident again?  Did you, like, the next day
15 say, "Henry, what happened?"  Or Don?

16    A   No.

17    Q   Did you follow up on that complaint?
18 Did you ask them whether they had ever followed
19 up on the complaint?

20    A   No.

21    Q   Okay.  So after that you just let it
22 lay?

23    A   Yes.

24    Q   Let it lie.  Okay.  Then work keeps
25 just going on.  Right?

1    A    Yes.

2    Q    Do you have any trouble with your work

3  crew?

4    A    Yes.

5    Q    What trouble did you have with your

6  work crew?

7    A    We got the shittiest (sic) job.

8    Q    When was that?

9    A    After the complaint.

10   Q    Okay.  Now, when was this complaint?

11  You don't recall when this was, other than you

12  were already a foreman?

13   A    Yes.

14   Q    And I know you had a lot of discussion

15  during your first deposition about shittiest

16  jobs, picking up trash; that's cleaning up the

17  job site?

18   A    Yes.

19   Q    Okay.  And that's work that had to be

20  done?

21   A    Yes.

22   Q    Okay.  And that was at different times,

23  almost all the laborers had to pick up and help

24  clean up the job site, didn't they?

25   A    Yes.

BY MR. CIVILLE:

    Q   Well, do you remember?

    A   I can't recall.

    Q   Do you remember if he didn't support you, if he said, "Guys, don't do that"?

    A   I don't remember him saying it.

    Q   Well, at the meeting at his house, weren't you guys also planning, or weren't some of the workers planning the picket and the protest?

    A   Yes.

    Q   Okay. And Don Harper was in favor of that, wasn't he?

    A   I don't know.

    Q   You don't recall him speaking out against it, do you?

    A   I don't remember.

    Q   Do you recall, he didn't kick you out of his house, did he?

    A   No.

    Q   Okay. So these, your complaints about getting what you call shitty jobs, I mean, those jobs were given to you by Henry Quintanilla, weren't they? He did the work assignments?

1    A    Yes.

2    Q    Okay.    As  far  as  you  know,  Henry  made

3    those  job  assignments  up  on  his  own,  I  mean    he

4    made  the  decision  of  job  assignments?

5    A    I  can't  remember.

6    Q    Do  you  know  of  any  facts  to  suggest

7    that  somebody  else  was  telling  Henry  what  job

8    assignments  to  make?

9    A    I  can't  recall.

10    Q    Okay.    Now,  when  you  say  you  can't

11    recall,  is  that  really  meaning  you  don't  know?

12    A    Yes.

13    Q    Okay.    Do  you  know  of  any  facts  that

14    suggest  that  MCI  or  Verizon  knew  anything  about

15    this  first  incident  with  Dennis  Clark  that  we

16    just  talked  about?

17    A    I  don't  know.

18    Q    Okay.    Do  you  know  of  any  facts  that

19    suggest  that,  until,  you  know,  there  was  a

20    meeting  that  in  December  2004,  that  John  Healey

21    called  a  group  meeting,  but  up  until  that  time,

22    do  you  have  any  facts  showing  that  John  Healey

23    knew  about  this  complaint  or  these  comments  by

24    Dennis  Clark?

25    A    I  can't  remember.

1    Q   Okay.  You said there was -- okay.  So

2  now, you make that complaint, next day, you

3  come to work, nobody says anything.  Is that

4  right?

5    A   Yes.

6    Q   After that first incident?  And then

7  you go on and just go about working as usual?

8    A   Yes.

9    Q   Then you said there was a second

10  incident, at Two Lovers Point?

11    A   Yes.

12    Q   How much longer after the first

13  incident was that?

14    A   I can't recall how long.

15    Q   Okay.  Do you know if it was more than

16  a month?

17    A   I don't know.

18    Q   As you think back about it, was it

19  close in time or did it seem spread out?

20    A   I can't remember.

21    Q   Okay.  And who was at Two Lovers Point

22  for this second incident?  Once again, you were

23  there.

24    A   I was there.

25    Q   Were you --

1    Q    Do you recall, is this during the
2  morning or afternoon?
3    A    Morning.
4    Q    Okay.  Do you recall him pulling up?
5  Or does he drive a truck?
6    A    I can't recall what kind of vehicle
7  he's driving that morning.
8    Q    Okay.  Do you know what he normally
9  drove?
10    A    I think it was a van.
11    Q    Okay.  Did it have any markings on it?
12    A    I can't remember.
13    Q    So Dennis Clark pulls up, and then, you
14  said there was some incident that happened that
15  day, what happened?
16    A    He called us island monkeys again.
17    Q    Okay.  And when you came up, did he
18  start talking to some of the foremen?
19    A    Henry --
20    Q    Quintanilla?
21    A    Yes.
22    Q    That's who he normally talked to when
23  he came out to the job site?
24    A    I think so.
25    Q    Okay.  And Henry, would Henry sometimes

1    Q    Okay.    All    right.    So    what    happened

2    then?

3    A    Dennis    Clark    said,    "You    island

4    monkeys," again that time.

5    Q    Okay.    Who    was    he    talking    to?

6    A    We    were    around    him    when    he    said    that.

7    Q    Okay.    But    had    he    been    talking    to    you

8    before that?

9    A    A couple of times.

10    Q    No, that morning.    That morning.

11    A    No.

12    Q    Okay.    Was    he    talking    to    one    of    the

13    other foremen?

14    A    Henry.

15    Q    Henry, which Henry?

16    A    Quintanilla.

17    Q    Okay.    So    he    was    talking    to    Henry

18    Quintanilla?

19    A    Yes.

20    Q    And    what    kind    of    conversation    would    he

21    and    Henry    have?    Was    it    calm,    was    it    angry,

22    were they joking?

23    A    I can't remember.

24    Q    Okay.    You    just    remember    Dennis    Clark

25    talking    to    Henry    Quintanilla,    and    during    that

1  conversation Dennis Clark says, you hear the

2  word "island monkeys"?

3      A    Yes.

4      Q    Okay. You don't know what Dennis Clark

5  said before that?

6      A    No.

7      Q    You don't know what he said after that?

8      A    No.

9      Q    Okay. But do you think he was

10 referring to you or to your work crew?

11     A    Me and my work crew.

12     Q    Okay. Were you watching Henry Van

13 Meter and Dennis Clark as they were talking?

14     A    Yes.

15     Q    Okay. Was your work crew watching them

16 or were they busy doing stuff?

17     A    Doing our stuff.

18     Q    Okay. But you were just standing there

19 watching them?

20     A    While I'm working.

21     Q    What was the work you were doing?

22     A    Offloading the machines.

23     Q    Okay. Although you were watching, you

24 could hear, you apparently heard the word

25 "island monkeys," you weren't close enough to

1   guy said?"  Did you say that to anybody?

2       A   I can't recall.

3       Q   All right.  What did you do?  Did you

4   do anything at that moment when you heard the

5   word island monkeys?

6       A   Continued working.

7       Q   Okay.  And then you finished the pull,

8   finished the shift?

9       A   Yes.

10      Q   Okay.  Did you say anything to anyone

11  later that day?

12      A   Don Harper.

13      Q   What did you say to Don Harper?

14      A   That we were called island monkeys.

15      Q   Did you say anything else, just that?

16      A   That's all.

17      Q   Okay.  And what did Don Harper say?

18      A   Nothing.

19      Q   Didn't respond to you at all?

20      A   I can't recall.

21      Q   I mean, he'd just look at you, and was

22  that Don Harper's way, he'd just look at you

23  and not say a word or?

24      A   I can't recall.

25      Q   Okay.  And you have no idea what month

1  we're in right now, when this was said?

2    A   I can't recall.

3    Q   Is it before Christmas?

4    A   I'm not too sure.

5    Q   Was it before the meeting at Don

6  Harper's house and the protest?

7    A   I'm not too sure.

8    Q   Did you say anything else after that to

9  Don Harper?

10    A   I can't remember.

11    Q   Did you complain to anyone else?

12    A   No.

13    Q   Okay.  You and your brother, did you

14  and your brother live together --

15    A   No.

16    Q   -- back then?

17    A   No.

18    Q   Okay.  Did you ride to work together?

19    A   Sometimes.

20    Q   Did you talk about it with your

21  brother, Jesse?

22    A   I can't recall.

23    Q   And other than those two instances --

24  I'm sorry.  The two instances we just talked

25  about, those were the only two instances where

1          MR. CIVILLE: Up until that point.

2    A   Yes.

3 BY MR. CIVILLE:

4    Q   What facts do you know?

5    A   When I made a complaint to the EEO

6 (sic).

7    Q   Okay. Before that?

8    A   After that.

9    Q   Okay. But before that, did you know of

10 any facts that MCI or Verizon would have known

11 about these comments by Dennis Clark?

12    A   I can't recall.

13    Q   Okay. And once again, when you say you

14 can't recall it means you don't know of

15 anything?

16    A   Yes.

17    Q   You don't know?

18    A   I don't know.

19    Q   Okay. Do you recall when you first

20 went to EEOC with your complaint?

21    A   I don't know.

22          MR. EWERT: Pat, will you get to a

23 stopping point, can we take 5 or 10 minutes?

24          MR. CIVILLE: Yeah, it's a good time

25 right now. Everybody's falling -- yeah. Let's

the reason for layoffs?

    A    No.

    Q    Do you have any basis for, or know of any facts as to why CalPac laid workers off?

    A    I can't recall.

    Q    Okay.    When the layoff of workers started, did your hours increase, stay the same, or go down?

    A    Decreased.

    Q    Okay.    And the hours of other workers, did those increase, stay the same, or go down?

    A    I don't recall.

    Q    Okay.    Now you complained in your first meeting that all the way until when you were laid off in, what, May 2005, you thought that you were getting crappier jobs, shittier jobs, I think you said; is that right?

    A    Yes.

    Q    Okay.    You talked about the clean up. What else?

    A    ID cards.

    Q    Pardon me.

    A    ID card.

    Q    You mean about the base?

    A    Yes.

1    Q    Well, that wasn't a crappier job, was

2  it?

3    A    Well, we need to get some sponsor to

4  get in.

5    Q    Okay.  And you had an ID card for a

6  year, and that expired in, sometime in early

7  2005?

8    A    I can't recall.

9    Q    Okay.  Do you remember the ID card

10 being good for a year?

11    A    Yes.

12    Q    And you had one that was good for a

13 year, right?

14    A    Yes.

15    Q    So if you started in February 2004, it

16 was good at least until that time in 2005,

17 right?

18    A    I couldn't recall.

19    Q    Okay.  Do you recall if you got one

20 immediately when you started working in 2004?

21 Or was it a couple of months later?

22    A    I don't know.

23    Q    Okay.  And this business about the ID

24 card, did you ever talk to anybody about the ID

25 card?

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

1    A    My supervisor.

2    Q    Who was your supervisor then?

3    A    Don Harper.

4    Q    And what did Don Harper say?

5    A    He'll look into it.

6    Q    Okay.    And in the mean time, CalPac

7 continued to sponsor you on to base, didn't

8 they?

9    A    Yes.

10    Q    And you said, what?    There were three

11 or four days that they sponsored you on?

12    A    Yes.

13    Q    Is that the only time you had to work

14 on base without the ID card?

15    A    Yes.

16    Q    Okay.    And then after that, was there

17 no more work on base after those four days?

18    A    I couldn't recall.

19    Q    Okay.    And what makes you think that --

20 well, first, why would the company go to the

21 effort of getting you an ID card if there was

22 only a few days more work on base?

23    A    I don't know.

24    Q    Okay.    You didn't need an ID card for a

25 full year, did you?

1    A    I can't recall.

2    Q    Can you think of any reason why you

3    needed an ID card?

4    A    To do my work in the base you need an

5    ID to enter.

6    Q    Or you had to be sponsored on, right?

7    A    Yes.

8    Q    Okay.  And CalPac sponsored you on the

9    base?

10   A    Yes.

11   Q    When they needed you to be there,

12   correct?

13   A    Yes.

14   Q    So what was the problem?

15   A    (pauses)

16   Q    Why are you complaining about that?

17   A    (lengthy pause)

18   Q    I mean, CalPac never said to you,

19   "Sorry, Teddy, we don't have an ID card, we're

20   going to have to fire you," did they?

21   A    No.

22   Q    When you needed to go on base, they

23   sponsored you on base?

24   A    Yes.

25   Q    Okay.  Okay.  Going back, you

complained about having to pick up trash, but
you've also said that all the laborers had to
pick up trash. What other job are you
complaining about that you say you were given
because you had made a complaint?

A    That's the dirtiest job right there.
To clean up after the workers.

Q    Okay. Well, who should they have given
the job to?

A    The laborers.

Q    Well, by the end there's only seven of
you left.

MS. LUJAN:    Is that a question?
Because I don't recall evidence that there were
seven at that time.

BY MR. CIVILLE:

Q    By the time you got laid off, you said
there were seven workers left. Isn't that what
you said in your first deposition?

A    I didn't recall.

Q    How many -- well, as you're sitting
here right now, how many people do you recall
being left at the time you got laid off?

A    I don't know.

Q    It's about 7, 5?

1    A   I don't recall how many left.

2    Q   Do you recall it being a very small

3 number of workers left?

4    A   I'm not too sure.

5    Q   Okay.  So you think that they, that

6 CalPac should have given the job to somebody

7 else to clean up; is that right?

8    A   I don't know.

9    Q   You don't know if they should -- I mean

10 you're saying that in the complaint, so I'm

11 asking you now.  Is that what you're saying,

12 that they should have given the job to clean up

13 the work area to somebody other than you?

14    A   I don't know.

15    Q   Okay.  So you don't know if they were -

16 - so you don't know if they were discriminating

17 against you, then?  You don't know whether they

18 should have given you the job or not; would

19 that be fair?

20    A   Yes.

21    Q   Okay.  When you got this job to clean

22 up the work area, who else was with you?  I

23 mean you were a foreman, didn't you have

24 another, you had a crew with you?

25    A   John Nauta, Jesse.

1     Q    John.  Was he laid off before you?

2     A    No.

3     Q    Was he still there when you left?

4     A    We were both laid off at the same time.

5     Q    Okay.  So he was asked to do clean up

6 or assigned to do clean up work also?

7     A    Yes.

8     Q    And those assignments were made by Don

9 Harper?

10    A    I couldn't recall.

11    Q    Okay.    Was  Henry  Quintanilla  still

12 there?

13    A    Yes.

14    Q    How about Henry Van Meter?

15    A    No.

16    Q    Okay.  Do you know if the assignments

17 were made by Henry Quintanilla?

18    A    Yes.

19    Q    So Henry would tell you, "Teddy, you

20 and your crew are going to do clean up today?"

21    A    Yes.

22    Q    Okay.  Do you have any facts to support

23 that this was being done because you had made a

24 complaint to EEOC?

25    A    No.

1      Q    Okay.   Do  you  know  of  any  workers  who
2   were  treated  better  than  you  who  did  not  make  a
3   complaint  to  EEOC?
4      A    I  do  not  know.
5      Q    Okay.   Do  you  have  any  facts,  do  you
6   know  of  any  facts  suggesting  that  MCI  or
7   Verizon  knew  that  you  were  being  assigned  to
8   clean  up?
9      A    I  don't  know.
10     Q    Okay.   Do  you  know  of  any  facts
11  suggesting  that  MCI  or  Verizon  knew  that  CalPac
12  did  not  ask  for  or  did  not  obtain  a  new  ID  pass
13  for  you?
14     A    I  don't  know.
15     Q    And  you  don't  remember  how  many  workers
16  were  on  the  job  site  by  the  time  you  were  laid
17  off?
18     A    No.
19     Q    Okay.   And  you  complained  that  the
20  CalPac  upper  management  and  supervisors  ignored
21  you  after  you  went  to  EEOC.   When  you  say  upper
22  management  or  supervisors,  who  do  you  mean?
23     A    Don  Harper.
24     Q    Okay.   And  how  did  Don  Harper  ignore
25  you?

1    A    Because   nothing   was   done   with   the

2 complaint.

3    Q    What  did  you  want  Don  Harper  to  do  at

4 that  point?    Dennis  Clark  was  long  gone.

5 Right?

6    A    I'm not too sure.

7    Q    Well,  what  do  you  mean  you're  not  too

8 sure?  Was  he  there  or  wasn't?

9    A    When I made the complaint?

10    Q    Afterwards, after January.

11    A    I couldn't recall.

12    Q    Or beginning in January.

13    A    I  don't  recall  if  he  was  there  after

14 January.

15    Q    Okay.  Was  he  there  in  May?

16    A    I am not too sure.

17    Q    So  you  don't  have,  you  don't  recall  of

18 having  any  contact  with  Dennis  Clark  between

19 January and May?

20    A    I'm not sure.

21    Q    Means you don't remember?

22    A    Yes.

23    Q    Well,  it  seemed  that  Dennis  Clark  must

24 not  have  been  a  very  big  factor  in  your  life

25 between   January   and   May   2005   if   you   don't

1 meeting that John Healy called in December
2 2004, as you're sitting here today, you don't
3 recall any discussion in that meeting about the
4 protests. Is that right?

5     A   Yes.

6     Q   Okay. You don't recall any discussions
7 about whether or not workers should be hanging
8 out or talking to the protesters on the picket
9 line? Do you remember anything about that?

10     A   I couldn't recall.

11     Q   Okay. At any time, not just at this
12 meeting in December, but at any time do you
13 recall anyone from CalPac's management talking
14 to you about the protesters?

15     A   I couldn't recall.

16     Q   Do you recall any discussion where
17 anyone from CalPac's management told the
18 workers that they would be fired if they
19 communicated with the protesters?

20     A   I couldn't recall that.

21     Q   Before you got laid off in May 2005, do
22 you recall if your hours were reduced?

23     A   Yes.

24     Q   Okay. And how about other people's
25 hours, were they reduced?

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

1      A    I don't know.

2      Q    Okay.  So you don't know if you were

3  treated  any  differently  or  not  than  anyone

4  else?

5      A    I couldn't recall that.

6      Q    Okay.  You don't recall being treated

7  differently?

8      A    (pauses)

9      Q    Is that right?

10     A    Yes.

11     Q    Okay.  Are you aware of any facts that

12 would  suggest  that  MCI  or  Verizon  made  any

13 decisions about your employment?

14          MS.  LUJAN:   When you're talking about

15 Verizon,  you're  talking  about  Verizon  as  the

16 buyer later on of MCI?

17          MR.  CIVILLE:   Yeah.

18          MS.  LUJAN:   Because  I  think  otherwise

19 that's a misleading question.

20          MR.  CIVILLE:   Yeah.  I  think  we  could

21 agree  probably  that  Verizon  really  wasn't  part

22 of  --  wasn't  in  the  picture  when  you  were

23 working there.   Later on Verizon, a  couple  of

24 Verizon  entities  bought  portions  of  MCI,  and

25 that's  the  only  reason  Verizon's  in  this

1 lawsuit. Is that a fair statement as a
2 summary?
3     MS. LUJAN: That's correct.
4     MR. CIVILLE: Okay. So, it's really
5 MCI we're talking about.
6 BY MR. CIVILLE:
7     Q My question I think was, do you have
8 any facts to suggest that MCI made any
9 decisions or told CalPac what decisions to make
10 regarding your employment?
11     A No.
12     Q Okay. Do you have any facts to suggest
13 that MCI controlled your employment in any
14 manner?
15     A No.
16     Q Okay. You know, these comments about,
17 that Dennis Clark made about island monkeys, do
18 you think about those very often? I mean,
19 other than when you have to come in for
20 something like this, do you think about that
21 stuff very much?
22     A No.
23     Q Okay. Does it bother you today?
24     A Just today.
25     Q Just today, okay. But normally you're

1  known before?

2      A    I couldn't recall that part.

3      Q    Okay. So you can't recall, so that's

4  why you don't know now?

5      A    Yes.

6      Q    You said you were given the shittiest

7  jobs. And you also said today that it was

8  after you made the complaints. Is that

9  correct?

10      A    After I made the complaints.

11      Q    Okay. Are you familiar with the

12  meaning of the word discriminate, or you're not

13  too sure what that means?

14      A    I'm not too sure what it really means.

15      Q    Okay. You knew that you were working

16  on an MCI project when you were with CalPac,

17  correct?

18      A    Yes.

19      Q    When CalPac, or when anyone makes the

20  decision to reduce your hours, do you know

21  exactly who's the person who is making that

22  decision?

23      A    No.

24      Q    When you say that someone treats you

25  with respect, are you referring only to what

# REPORTER'S CERTIFICATE

I, **Melinda D. Castro**, Court Reporter, do hereby certify the foregoing 109 pages to be a true and correct transcript of the audio recording made by a Notary Public Officer of Depo Resources in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath and that a request for review was made; and that thereafter the transcript was prepared by me or under my supervision.

I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 25th day of January, 2008.

Melinda D. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

# EXHIBIT AA

IN THE UNITED STATED DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA,<br><br>                Plaintiffs,<br><br>    vs.<br><br>CALIFORNIA PACIFIC TECHNICAL SERVICES LLC, a.k.a CALPAC, DYNAMIC TECHNICAL SERVICES, VERIZON BUSINESS PURCHASING, LLC, VERIZON BUSINESS NETWORK SERVICES, INC., JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10,<br><br>                Defendants. | CIVIL CASE NO. 05-00037 |

DEPOSITION OF JESSE CRUZ
Taken on Behalf of the defendants

BE IT REMEMBERED That, pursuant to the Guam
Rules of Civil Procedure, the deposition of Jesse Cruz was
taken before Veronica F. Reilly, Certified Shorthand Reporter,
on Thursday, the 21st day of February 2008, at 9 o'clock a.m.
in the Law Offices of Civille & Tang, 330 Hernan Cortez
Avenue, Suite 200, Hagatna, Guam.

Veronica F. Reilly, CSR-RPR

Certified Shorthand Reporter
671.734.1041 (t)
www.florescourtreporting.com

February 21, 2008:  Jesse Cruz

1      A.    Yes.

2      Q.    Okay.  When you were hired, it was your understanding

3  you were being hired to work for CalPac; correct?

4      A.    Yes.

5      Q.    Okay.  And to the best of your knowledge, you were

6  only being hired by CalPac?

7      A.    Yes.

8      Q.    Okay.  As far as you know, when Don Harper hired you,

9  he didn't have to consult with anybody, he just made the

10  decision right there when he was talking to you?

11      A.    That, I don't know.

12      Q.    Okay.  Did he hire you -- I mean, I think you said he

13  hired you during the interview?

14      A.    Correct.

15      Q.    Okay.  Did he have to go out and talk to anybody, or

16  did he just say, okay, you're hired?

17      A.    Oh, he just hired me right there.

18      Q.    Okay.  Do you have any reason to think that MCI knew

19  anything about you being hired?  That you, personally, were

20  hired?

21      A.    I believe so.

22      Q.    Why do you think that?

23      A.    Because if Don Harper hired me, he has to tell CalPac

24  and then John Healy and John Healy will tell Dynamic Tech, and

25  Dynamic Tech will tell MCI who's -- who's working on the

Civil Case No. 05-00037

1    field.

2        Q.   Okay.  Have you ever seen any documents that would

3    suggest that that happened, that took place?

4        A.   No.

5        Q.   Okay.  So you're guessing that that's what happened?

6        A.   Am I guessing?

7        Q.   Yeah, you're guessing.

8        A.   Okay.  You want to say I'm guessing.

9        Q.   Well, I mean, you don't know from --

10       A.   I don't know.  I mean, as soon as Don Harper hired

11   me, that -- you know, I was out on the field.

12       Q.   Okay.  You never had any direct contact with anybody

13   at MCI, did you?

14       A.   No.

15       Q.   Okay.  What -- now, at some point, did you become

16   aware that CalPac had different customers, more than one

17   customer?

18       A.   I don't -- what do you mean?

19       Q.   Well, there were -- do you recall there being

20   different projects, like a TIECOM project, an MCI project, an

21   MCV project --

22       A.   Yes.

23       Q.   -- an ATT project?

24       A.   Yes.

25       Q.   You remember all those projects?

Civil Case No. 05-00037

1      A.   Yes.

2      Q.   Okay.  And to the extent that you may have thought

3   about it, did you understand that each one of those projects

4   were for different customers of CalPac?

5      A.   Yes.

6      Q.   And those were companies -- or the owners of those

7   projects had hired CalPac to do some work?

8      A.   Yes.

9      Q.   Did you work on other projects besides the MCI

10  project?

11     A.   No.

12     Q.   You only worked on MCI?

13     A.   MCI project.

14     Q.   Okay.  Never did any work on TIECOM?

15     A.   No.

16     Q.   Or MCV?

17     A.   No.

18     Q.   Okay.  When you were at -- when you were given your

19  assignments at CalPac, those assignments came to you from

20  CalPac supervisors?

21     A.   Yes.

22     Q.   Okay.  And that would be Henry Quintanilla --

23     A.   Yes.

24     Q.   -- JT?

25     A.   Yes.

1     Q.   And I keep saying JT; that's John Taitano?

2     A.   Yes.

3     Q.   All right.  And Don Harper, sometimes?

4     A.   Yes.

5     Q.   Okay.  While you were working at CalPac, you were

6     aware that there were other projects besides the MCI project

7     going on?

8     A.   (No response.)

9     Q.   I mean, you were aware of, like, the TIECOM or the

10    MCV projects?

11    A.   I heard about those projects.

12    Q.   Okay.  But you were never assigned to work on --

13    A.   No.

14    Q.   -- those?  Okay.  As far as you know, is that simply

15    because CalPac -- your CalPac supervisors always assigned you

16    to the MCI project?

17    A.   Yes.

18    Q.   Okay.  If they wanted to, if they had other projects

19    going on, they could have assigned you to those projects, too?

20    A.   It's possible.

21    Q.   I mean, you didn't work for just one project, did

22    you?  You worked to do whatever CalPac's business was?

23    A.   No, I only work under MCI project.  It's just MCI.

24    Q.   No, I understand that MCI was the only project you

25    were assigned to.  I guess what I'm asking, though, is:  If

Case 1:05-cv-00037     Document 588-9     Filed 04/11/2008     Page 49 of 66

1    then I would go to JT and JT would run the cables through.

2         Q.    Okay.  And that was part of the underground division,

3    though, still?

4         A.    Yes.

5         Q.    So -- I'm sorry.  Going back to my earlier question:

6              So you had -- if there was a problem on the job site

7    or if you needed something, Henry -- you would usually go to

8    HQ?

9         A.    Yes.

10        Q.    Did you have -- do you recall, did you normally have

11   a break in the morning and a break in the afternoon?

12        A.    Yes.

13        Q.    Okay.  And when it was time, or getting about time,

14   for a break, would you simply make that decision on your own,

15   or would you ask HQ?

16        A.    Oh, HQ would get everybody and tell them, "It's

17   break," so everybody just breaks together.

18        Q.    Okay.  How about lunch time?  Same thing?

19        A.    Same thing, HQ.

20        Q.    All right.  And you had about an hour for lunch?

21        A.    I don't recall.  I believe so.  Something like that.

22        Q.    As far as you recall, did you always get a full lunch

23   break?

24        A.    Yes, I do.

25        Q.    Okay.  To the best of your knowledge, were the

Civil Case No. 05-00037

1   decisions about when to take breaks, when to take lunch, those

2   were made by CalPac?

3       A.   Yes.

4       Q.   Okay.  You don't have any reason to believe that MCI

5   or one of the other project owner -- or project customers made

6   those decisions, do you?

7       A.   I don't know.

8       Q.   Okay.  When you reported for work in the morning,

9   you'd go down to CalPac's office?

10      A.   Yes.

11      Q.   And you'd go up and see HQ and find out where you

12  were working that day?

13      A.   Yes.

14      Q.   Normally, HQ assigned you, I guess, to his crew?

15      A.   Yes.

16      Q.   Okay.  To the best of your knowledge, that was a

17  decision that HQ made?

18      A.   Yes.

19      Q.   Okay.  As far as you know, MCI didn't have anything

20  to do with that decision?

21      A.   I don't know.

22      Q.   Okay.  Do you have any reason to think MCI had

23  anything to do with that decision?

24      A.   I don't know.

25      Q.   Okay.  Let me phrase it a different way:  Do you know

Civil Case No. 05-00037

1    of any facts --

2                MS. LUJAN:   Asked and answered.

3        Q.   (By Mr. Civille)  -- that would suggest that MCI had

4    anything to do with the decision of which work crew you would

5    be placed on?

6        A.   I can't -- I don't know.  All I know is that HQ comes

7    out of the office and he just assigns me to wherever I go.

8        Q.   Okay.  And the paycheck that you received, that was a

9    CalPac paycheck?

10       A.   Yes.

11       Q.   Okay.  Do you know of any facts that would suggest

12   that MCI had anything to do with preparing your paycheck?

13       A.   I don't know about that.

14       Q.   Okay.  Were you ever given a job review, anybody

15   ever -- performance review, anybody ever come out and pull you

16   aside and say, you know, Robert[sic], we've been looking at

17   your -- watching your work, and either you're doing a good job

18   or there's some things you need to improve on?

19       A.   No.  Nobody.

20       Q.   Did you get any raises while you were there?

21       A.   No.

22       Q.   Were you ever promoted?

23       A.   No.

24       Q.   Okay.  Now, you've made an allegation of

25   discrimination and it seems to be based primarily on a comment

Civil Case No. 05-00037

1    believe it's in mid-morning. Um, I have no idea who this

2    person was at that time -- came up to me and started saying

3    that --

4        Q.   Whoa, whoa, whoa. We're going to get to that and I'm

5    going to let you -- we're going to go through that in detail.

6    But I want to slow you down here for a second.

7        So it's mid-morning. Now, when you said you were --

8    I'm sorry, you were hooking up to a conduit box, a GTA box?

9        A.   GTA box, and we have to cross -- connect the two

10   trenches together.

11       Q.   And were you hand-digging a trench?

12       A.   Yes.

13       Q.   And it was just the two of you?

14       A.   Yes.

15       Q.   Okay. Were there any supervisors around?

16       A.   No.

17       Q.   Okay. Were there any other workers in the general

18   area of the halfway house?

19       A.   Yes, they were. But we were, like, staggered, like,

20   good 2 -- 300 feet apart.

21       Q.   Okay. Was there a trenching machine being used that

22   day, or was everybody doing it by hand?

23       A.   By hand.

24       Q.   Okay. And you said that Dennis Clark, who you didn't

25   know before that, never spoken to him before?

Civil Case No. 05-00037

1       A.    No.

2       Q.    And he had never spoken to you before?

3       A.    No.

4       Q.    He walks up to where you and Tony were digging?

5       A.    Correct.

6       Q.    Is that right?  Okay.  And what is it that you recall

7  him saying?

8       A.    He was -- I recall him saying, good morning, island

9  monkeys.  You know, I was stunned, really was stunned.

10      Q.    Okay.  But -- well, yeah.  Did he say it in a

11 friendly way?

12      A.    No, I don't think he said it in a friendly way.

13      Q.    And he said good morning, right?

14      A.    Yes.

15      Q.    Okay.  So that normally implies, you know, a certain

16 friendliness.  And was he laughing when he said it?

17      A.    No.

18      Q.    All right.  Okay.  Um, I think, in your first

19 deposition, you said before you -- you saw him, you actually

20 -- you smelled cigar?

21      A.    Yes.

22      Q.    Okay.  Were you actually -- did he speak before you

23 turned around to look at him?

24      A.    Yes.

25      Q.    So you didn't -- you weren't actually looking at him

Civil Case No. 05-00037

February 21, 2008:   Jesse Cruz

1    us island monkeys, right?

2         A.    Right.

3         Q.    And you said what, I don't know?

4         A.    I don't know.

5         Q.    Okay.  And both of you were shocked that he had

6    called you this?

7         A.    Yes.

8         Q.    During your lunch break, did -- well, who else did

9    you talk to about this on that day?

10        A.    HQ.  On my lunch break.

11        Q.    Okay.  Did you and Tony go up to him together?

12        A.    Yes.

13        Q.    And what did HQ say?

14        A.    He'll bring it up to Don Harper.

15        Q.    Did he question you about -- tell me exactly what he

16   said.

17              I mean, did he ask you a couple questions to make

18   sure that he had your stories -- that he understood what you

19   were telling him?

20        A.    Yes.

21        Q.    Okay.  Did he express to you any surprise, like,

22   really?

23        A.    HQ?

24        Q.    Yes.

25        A.    Yeah.  He did.  He was really surprised.

Civil Case No. 05-00037

1    Q.   I'm just trying to think in HQ's position.  So he's

2    surprised.  Did he ask you to repeat it a couple of times, to

3    make sure he had it straight?

4    A.   He asked me what happened.  I said he came over and

5    he criticize, calling me an island monkey and how I dress, and

6    then after, he left.  And then he said he'll bring it up to

7    Don Harper.

8    Q.   Okay.  Did he say anything else, like, you know, did

9    he say, well, gee, that's not right, or did he ask you what he

10   thought Clark meant?

11   A.   He said he shouldn't be saying that.

12   Q.   Shouldn't be saying that.  Okay.

13        Now, this was sometime in October; is that right?

14   A.   Yes.

15   Q.   Okay.  And this was after you had come back to CalPac

16   for the second time?

17   A.   Yes.

18   Q.   Okay.  And you had been working for a couple weeks

19   before you saw Dennis Clark?

20   A.   Yes.

21   Q.   That time that you saw him, was that the first time

22   you actually saw him at the job site?  Dennis Clark at the job

23   site?

24   A.   I know Dennis Clark would drive a blue van and he'll

25   go up and down.

Civil Case No. 05-00037

1      A.    Mostly in his van.

2      Q.    Okay.  And he never said anything directly to you

3  again?

4      A.    Yes.

5      Q.    And he never -- did he ever say anything offensive to

6  even a group that you were in?

7      A.    That, I don't know.

8      Q.    I mean, you -- none that you recall?

9      A.    None that I recall.

10      Q.    Okay.  There started to be some problems at CalPac,

11  then, with -- there were some layoffs and protests; is that

12  right?

13      A.    Yes.

14      Q.    Did you ever talk to anybody at management at CalPac

15  about these -- what was going on?

16      A.    No.

17      Q.    Did any of your foremen ever come up and explain to

18  you what was going on?

19      A.    No.  Only -- the only thing -- Henry would come up to

20  me, just directly straight out to the field, and that was it.

21      Q.    Okay.  You know, going back to the comments that

22  Dennis Clark made; do you have any reason to think that John

23  Healy would have approved of those comments?

24      A.    Can you say that one more time?

25      Q.    Do you have any reason to think that John Healy would

Civil Case No. 05-00037

February 21, 2008:  Jesse Cruz

1    Q.   Okay.  John Healy never said that he approved of
2    racially insensitive comments, did he?

3    A.   I don't know.

4    Q.   You never heard him say it?

5    A.   I don't know.

6    Q.   Well, you would know if you heard him say it?

7    A.   That, I don't know.

8    Q.   Okay.  So when you say you don't know, you mean you
9    never heard him say it?

10   A.   I wasn't around him or anything like that.

11   Q.   Okay.  So you never heard him say it?

12   A.   I guess so, no.

13   Q.   Okay.  Are you aware of any facts that MCI was
14   aware -- was ever made aware, up until much later, that Dennis
15   Clark made this comment to you and Tony Arriola?

16   A.   That, I don't know.

17   Q.   Okay.  You don't know of any reason to believe that,
18   do you?

19   A.   (No response.)

20   Q.   Okay.  Do you know of any facts that would suggest
21   that MCI would approve of this kind of comment?

22   A.   That, I don't know.

23   Q.   Okay.  So you keep working, and then the problems
24   start, and had some of your brothers been laid off?

25   A.   Yes.

Civil Case No. 05-00037

1          You and Ted Cruz were laid off on the same day.  Your

2   brother?

3      A.   Yes.

4      Q.   And you were told that you were being laid off

5   because business was slow?

6      A.   Yes.

7      Q.   Do you have any facts to suggest that that was not

8   correct?

9      A.   No.

10     Q.   Do you have any facts which would suggest that there

11  was any kind of connection between what Dennis Clark said back

12  in October and your being laid off in May?

13     A.   I don't know.

14     Q.   Do you have any reason to think that MCI was aware

15  that you, personally, were being laid off on May 5th?

16     A.   That, I don't know.

17     Q.   As far as you know, the decision to lay you off was

18  made by CalPac?

19     A.   Yeah.

20     Q.   You don't have any reason to believe that CalPac had

21  to ask MCI for permission to lay you off?

22     A.   That, I don't know.

23     Q.   You complained, in your first deposition, that there

24  were two or maybe three times when you felt that you had been

25  left out of discussions?

Case 1:05-cv-00037    Document 588-9    Filed 04/11/2008    Page 59 of 66

1      A.    Yes.

2      Q.    Okay.  Do you have any reason to think that MCI knew

3  anything about you being left out of discussions?

4      A.    That, I don't know.

5      Q.    Okay.  You're talking about being left out of

6  discussions at CalPac, right?  Those were the discussions you

7  felt left out of?

8      A.    Meaning behind doors or going to the field?

9      Q.    No, no.  You said -- whatever you were complaining

10  about with these -- these discussions you said you were left

11  out of.  Those were discussions out in the field?

12      A.    Yes.

13      Q.    Okay.  So those would be discussions between your

14  foreman and somebody else?

15      A.    I believe so.

16      Q.    Well, you were the one who said you were left out of

17  discussions.  What discussions were you left out of?

18      A.    We're talking about when I'm -- out from the office,

19  I'll be there, and then I felt --

20      Q.    I'm sorry.  Out -- you mean out in the field?

21      A.    When they have the meeting in the morning, they come

22  out of doors and they all, like -- I'll just stand there like

23  I did something bad.  Everybody will just go around me, like

24  in circles.  Like, don't talk to Jess or like this and like

25  that.  And they'll just go out to the field, I'll get the

Case 1:05-cv-00037    Document 588-9    Filed 04/11/2008    Page 60 of 66

1    treatment also there.  And then I asked Henry what's going on,

2    and he, you know, he just don't want to talk to me.

3        Q.    Who wouldn't want to talk to you?

4        A.    Henry.  Henry just -- didn't want to answer.

5        Q.    Henry Quintanilla?

6        A.    Yes.

7        Q.    Okay.  Did you ever ask Henry about that?  Say,

8    Henry, I'm feeling -- you're hurting my feelings?

9        A.    He didn't want to talk to me.

10       Q.    Well, that's not what I asked you.

11             Did you ask him?

12       A.    I asked him, like, what's going on?  He said, Jess,

13   just -- just come to work; and Jess, wherever they assign you,

14   they assign you, and you just go to work.

15       Q.    Okay.  Isn't that the way it always was?  Just come

16   to work, get assigned, and go to work, right?

17       A.    Right.  But Henry -- at that time, I don't know what

18   happened, that morning that he made me feel like I was left

19   out, singled out.

20       Q.    Okay.  And that happened two or three times?

21       A.    Yes.

22       Q.    Over, let's see --

23       A.    After I made the complaint.

24       Q.    Okay.  So this is over a five or six-month period?

25       A.    After I made the complaint.

Civil Case No. 05-00037

1       Q.    Well, now you're -- when did you make the complaint?

2       A.    I think December?

3       Q.    Okay.  So you didn't get laid off until May.  So over

4    five-month period, from December -- actually, six months from

5    December till May, there were two or three times when you felt

6    Henry -- when he hurt your feelings, basically?  He didn't

7    say -- he kind of ignored you, you felt; is that right?

8       A.    Right.

9       Q.    Okay.  And during those days, you were -- during

10   those six months, you were going to work five days a week?

11      A.    Yes.

12      Q.    Did you ever complain to anybody that, you know,

13   Henry was hurting your feelings by ignoring you in these two

14   or three times?

15      A.    No.

16      Q.    Even on those days, those two or three times when you

17   felt ignored, you did get work assignments, right?

18      A.    Yes.

19      Q.    Okay.  Do you have any reason to think that MCI knew

20   that Henry Quintanilla was hurting your feelings like this?

21      A.    I don't know.

22      Q.    Okay.  You can't think of any facts that would show

23   that, do you?

24      A.    I don't know.

25      Q.    Okay.  You said that there was one time where you had

Civil Case No. 05-00037

1    to be sponsored on to Anderson Air Force Base; is that right?

2        A.    NCS.

3        Q.    NCS.  Sorry.  And that was one time?

4        A.    That one time.

5        Q.    Okay.  And what was -- I didn't quite understand.

6    What was your complaint about that?

7        A.    My complaint is that everybody was getting their IDs

8    to go on base.  And when I asked to get them -- to go on base,

9    they were just, like, ignoring me.  So JT will send me to --

10   after doing all the odd jobs, to go up to base, and me and Ted

11   will be waiting outside the main gate.

12       Q.    But that happened one time?

13       A.    One time.

14       Q.    Okay.  Can you think of any facts that would suggest

15   that MCI knew that -- that CalPac was sponsoring you onto the

16   base and not getting a pass for you?

17       A.    I don't know.

18       Q.    Okay.  You also, in your first deposition, said that

19   toward the end, you were getting fewer hours of work?

20       A.    Yes.

21       Q.    Okay.  And the project was winding down?

22       A.    Yes.

23       Q.    Okay.  And some of the guys in the shop, they kept

24   working; you thought they were getting 40 hours?

25       A.    Yes.

Civil Case No. 05-00037

1    Q.   Okay.  What do shop workers do?

2    A.   I guess repairs.

3    Q.   Okay.  To the equipment and whatnot?

4    A.   Yes.

5    Q.   But the laborers' force, for the most part, was being

6    reduced?

7    A.   Yes.

8    Q.   Are you claiming that this was somehow connected to,

9    you know, your complaints about Dennis Clark?

10   A.   That, I don't know.

11   Q.   Okay.  And do you know of any facts indicating that

12   MCI would have known you got reduced hours?

13   A.   That, I don't know.

14   Q.   As far as you know, the decision of how many hours of

15   work to give you, that was strictly made by CalPac; wasn't it?

16   A.   I believe so.

17   Q.   And I think you also said that there were a few times

18   towards the end where you had to do some trash pickup?

19   A.   Yes.

20   Q.   And you said that Ray Mendiola was one of the people

21   you said was not cleaning up after himself?

22   A.   Yes.

23   Q.   Okay.  And when you're talking about trash, you're

24   talking about debris, like pipes and --

25   A.   Concrete.

Civil Case No. 05-00037

1    Q.   Concrete?  Things that are involved -- we're not

2  talking about litter; we're talking about job-related debris?

3    A.   Uh-huh.

4    Q.   Okay.  And once again, do you have any reason to

5  think that -- or know of any facts that would suggest MCI was

6  aware that Ray Mendiola wasn't picking up his trash and you

7  had to pick it up?

8    A.   I don't know.

9    Q.   Okay.  As far as you know, that was something that

10  was controlled by CalPac?

11    A.   I believe so.

12    Q.   Did you ever complain to anybody about the trash?

13  You having to pick up the debris?

14    A.   I mentioned it to HQ.

15    Q.   And what did he say?

16    A.   He didn't say -- he didn't say anything to me.

17    Q.   Do you know who made the decision to lay you off?

18    A.   That, I don't know.

19    Q.   When you were -- the day you were laid off -- I

20  forget now; who gave you the message?  Who gave you the news?

21    A.   I think it's Bill Ward.

22    Q.   Was anybody with Bill when he told you this?

23    A.   No.

24    Q.   Did you have any discussion with Bill?

25    A.   No.

Civil Case No. 05-00037

REPORTER'S CERTIFICATE


I, Veronica F. Reilly, Certified Shorthand Reporter, hereby certify that Jesse Cruz personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 86, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof; that pursuant to Rule 30(e) of the Federal Rules of Civil Procedure, no request was made by the deponent or his counsel to review the original deposition transcript. Therefore, the original deposition transcript has been presented to Mr. Civille's office.

Witness my hand at Barrigada, Guam, this 28th day of February 2008.


_____
Veronica F. Reilly, CSR-RPR
Certified Shorthand Reporter