# EXHIBIT BB

IN THE UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM

HENRY G. VAN METER, JERRY ) CIVIL CASE NO. CIV05-00037
APODACA, JR., JOSEPH J. )
HERNANDEZ, JOSEPH T. MENDIOLA, )
LARRY L. CHARFAUROS, ANTHONY )
C. ARRIOLA, ROBERT B. CRUZ, )
ROLAND F. MENDIOLA, JAMES S. )
YEE, TEDDY B. CRUZ, JESSE B. )
CRUZ, JOHN L.G. NAUTA and JOHN )
P. BABAUTA, )
)
        Plaintiffs, )
)
     vs. )
)
CALIFORNIA PACIFIC TECHNICAL )
SERVICES LLC, a.k.a. CALPAC, )
DYNAMIC TECHNICAL SERVICES, )
VERIZON BUSINESS PURCHASING )
LLC, VERIZON BUSINESS NETWORK )
SERVICES, INC., JOHN HEALY, )
DENNIS CLARK, WILLIAM WARD, )
JAI JAMES and DOES 1 through )
10, )
        Defendants. )
_____ )

DEPOSITION TRANSCRIPT

OF

## JOHN L. G. NAUTA

January 15, 2008
(Volume 1)

PREPARED BY:   GEORGE B. CASTRO
            **DEPO RESOURCES**
            #49 Anacoco Lane
            Nimitz Hill Estates
            Piti, Guam 96915
            Tel:(671)688-**DEPO** • Fax:(671)472-3094
    IN THE UNITED STATES DISTRICT COURT
      FOR THE TERRITORY OF GUAM

1  mean, what -- you talked about a lot of stuff
2  with him or?
3      A   Well, you know, I'm not too sure,
4  that's quite a while --
5      Q   Okay.
6      A   -- back, you know.
7      Q   Did it seemed like a long interview?
8  How ever long it was, to you, did it seem like
9  a long time?
10     A   Well, probably less.  I can't think of
11 how --
12     Q   Okay.
13     A   -- all that time back.
14     Q   Okay.  Don Harper, is he a white guy or
15 local or a what nationality is he?  Do you
16 know?
17     A   I guess, he's an American.
18     Q   Okay.  What race is he?  Is he a white
19 guy?  Black, white, brown?
20     A   Well, an American is, I guess, white.
21     Q   Well, we're the melting pot, you know.
22 It's an all colors.  But, how about Tim
23 Camacho?  What was he?
24     A   He's a Chamorro.
25     Q   Chamorro.  And I take it you were hired

1   on the spot?

2      A   Yes, sir.

3      Q   So, it was a pretty friendly interview?

4      A   Well, more of -- you know, I guess I --

5   I have the license, you know.

6      Q   Were you hired, it wasn't clear to me

7   in reading your transcript, you talked about

8   having some truck driving duties, but you also

9   did laborer work.

10      A   Yes, sir.

11      Q   So, were you given a formal job title

12   when you were hired?

13      A   Well, I was told as a truck driver.

14   But then I go --I, you know, go down and just

15   put down the laborer work too. You know,

16   laying the conduits and the -- (pauses).

17      Q   Okay. Well, all right. Did you

18   actually end up doing truck driving for CalPac?

19      A   Truck driving too.

20      Q   And laborer work?

21      A   Yeah.

22      Q   What percentage of your time was truck

23   driving and what percentage was laborer work?

24      A   Well, I guess it all depends on when

25   they need the equipment to be transferred to

Case 1:05-cv-00037    Document 588-10    Filed 04/11/2008    Page 4 of 63

1  that.

2      Q    You were the only one, pretty much?

3      A    Yes, sir.

4      Q    Okay.  And that's for the underground

5  crew?

6      A    That's, yeah, the underground crew.

7      Q    Okay.  What is the other work crew, was

8  the aerial crew?  What were they called?

9      A    Yeah.  They were aerials.  There were

10  underground construction.

11     Q    All right.  So, the aerial crew, they

12  had their own truck drivers?

13     A    They have their own bucket trucks.

14     Q    All right.  And you did not drive for

15  the aerial crew?

16     A    No.

17     Q    When you were hired, you believed you

18  were a CalPac employee?

19     A    Yes, sir.

20     Q    Okay.  If anybody asked you who you

21  work for, you'd say "I work for CalPac"?

22     A    Yes.

23     Q    You know, during this interview with

24  Don Harper, did he explain to you a little bit

25  about what kind of business CalPac did?

1  it's only for the MCI project"? It was, you
2  were hired for whatever project CalPac had?
3      A   Well, I got a trans- -- you know, where
4  I got to transfer the equipments to and all
5  that.
6      Q   Okay.   Were you assigned from the
7  beginning to the underground department?
8      A   Yes, sir.
9      Q   And you stayed at the underground
10 department the entire time you were at CalPac?
11     A   No.
12     Q   What other department?
13     A   I was like down at TyCom, trying to
14 pull fiber into the building from -- (pauses).
15     Q   Okay.   But that was still part of the
16 underground department?
17     A   Okay, yeah, yes, sir.
18     Q   The CalPac Underground Department?
19     A   Yes, sir.
20     Q   Yeah.   Whatever project you worked on
21 for CalPac, it was you were part of the
22 underground department?
23     A   Yes, sir.
24     Q   Did you -- you know, I know people quit
25 or get, you know, fired or laid off, some

1   us doing our projects.

2      Q   What did you -- who --

3      A   Well, that's -- you know, that's what

4   we hear around when they ask, who's was that

5   guy?

6      Q   Okay. And somebody would say, he was,

7   what?

8      A   He was the inspector for the MCI

9   project.

10      Q   Okay. So, he said he was an inspector

11   for MCI, for the MCI project?

12      A   Yes, sir.

13      Q   Okay. Do you know personally know of

14   any facts about who he worked for?

15      A   No, sir.

16      Q   You said that you, and I'm sorry, I

17   think I should have asked this probably before.

18   When you were paid at CalPac, your check was a

19   CalPac check?

20      A   I believe so.

21      Q   Do you have any reason to think that

22   MCI had anything to do with the decision to

23   hire you?

24      A   (pauses)

25      Q   In other words, MCI, do you have any

1  reason to think that somebody from MCI called
2  Don Harper and said, "Hey, hire John Nauta"?
3      A    No.
4      Q    Okay.  Do you have any reason to think
5  that Don Harper showed your application to
6  anyone from MCI?
7      A    I wouldn't know that.
8      Q    I think in your earlier deposition you
9  mentioned that you had other supervisors,
10 Russel Hatfield?
11     A    Yeah.
12     Q    What race is he?  What color is he?
13 Nationality?
14     A    Well, he's -- I say he's white, but he
15 speaks Chamorro.
16     Q    Okay.  So, you're not really sure
17 whether he's -- do you think he's part
18 Chamorro?
19     A    I believe so.
20     Q    And Max Long -- Russel Hatfield, what
21 was he a super- --
22     A    He's was like my --
23     Q    I'm sorry.  Wait.  What department or
24 what job was he a supervisor of?
25     A    I believe it's all over, where they,

1  Tiyan, then it would be there, until they
2  change that work assignment.
3      Q   So, when you reported to the CalPac
4  office in the morning, did you need to talk to
5  any supervisors?
6      A   Yes.
7      Q   Who did you talk to?
8      A   Well, like Henry Quintanilla.
9      Q   And would Henry assign you to a work
10 crew for the day?
11     A   Yes, sir.
12     Q   And would you get, one day you might be
13 on one work crew and another day you'd be on
14 another work crew?
15     A   Well, I don't know until they give us a
16 work order.
17     Q   Yeah.  And that could change from day
18 to day?
19     A   Yeah.
20     Q   After Henry gave you your work
21 assignment, would you then report to the
22 foreman for that work crew?
23     A   Well, Henry is the one.  Because I
24 guess Don would tell Henry and then Henry will
25 tell.

Case 1:05-cv-00037    Document 588-10    Filed 04/11/2008    Page 9 of 63

1    Q   Told you?

2    A   Tell me and then we get our crew, get

3 our equipments and start loading it up to the

4 pickups.

5    Q   Okay.   And these were CalPac pickup

6 trucks?

7    A   Yes, sir.

8    Q   Okay.  Henry would tell you to go to a

9 crew.  Now, each crew had a foreman; is that

10 right?

11    A   Yes.

12    Q   And those foremen could be people like

13 Russel Hatfield or --

14    A   Yeah.

15    Q   -- Henry Quintanilla or Henry Van

16 Meter?

17    A   Van Meter, yeah.

18    Q   Who were some of the other foremen?

19    A   Ted Cruz.

20    Q   Max Long?

21    A   Max Long, Russel.

22    Q   So, for example, you would come in, in

23 the morning and Henry Quintanilla would tell

24 you, "John I want you to work for Ted Cruz's

25 crew today."  Is that how it worked?

1    A    Well, he would just tell me we're going

2    to be working at this project, so get the

3    equipments, you know, the tools that we need

4    and load them up.

5    Q    Would you know at that point who your

6    foreman for the day was going to be?

7    A    Well, it was -- it would be mostly

8    Henry.

9    Q    Henry. As far as you know, Don Harper

10   or CalPac made all of the work assignments?

11   A    Yes, sir.

12   Q    Okay. Do you have any facts that you

13   can think of to suggest that MCI ever made any

14   work assignments?

15   A    Not that I -- I only get it from --

16   (pauses).

17   Q    Okay. All right. So, you don't have

18   any reason to believe that MCI would call

19   somebody at CalPac and say, "Here's who I want

20   you to assign to this job."

21   A    I don't know.

22   Q    No. Okay. We've kind of talked about

23   this but let's talk about the chain of command

24   from kind of the bottom up. Okay. You had

25   workers, such as yourself, and we'll talk just

1    about the underground department.  All right?

2        A    Yes, sir.

3        Q    So, we had workers and those workers

4    reported to a foreman?

5        A    A foreman.

6        Q    And those foremen were Henry

7    Quintanilla, Ted Cruz, Henry Van Meter, Mr.

8    Hatfield or Max Long?

9        A    Yeah.

10       Q    And who did the foremen report to?

11       A    I guess to the upper management.

12       Q    Okay.  Who was next?  Who was above,

13   say, Henry Quintanilla?

14       A    Well, then, then we get there, job

15   order from Don.

16       Q    Okay.  Don Harper.  And then who did

17   Don Harper report to, do you know?

18       A    I don't know.  I don't go and --

19   (pauses).

20       Q    Okay.  Do you know, was there -- you

21   recall you talking about customers of CalPac.

22   Was AT&T also a customer?

23       A    I don't know, sir.

24       Q    The work that you performed on the

25   underground crew, now you're truck driving, you

1    A    Well, lunch break is only like, what,
2   30 minutes.

3    Q    Okay.  And who would tell you when to
4   take lunch?  Your foreman?

5    A    Yeah.

6    Q    Okay.  And how about during the
7   morning, was there like a 15-minute break in
8   the morning?

9    A    No.  There's -- no.

10   Q    Okay.  How about in the afternoon, was
11  there a --

12   A    No.

13   Q    -- 15-minute break or so in the
14  afternoon?

15   A    Not that I recall.

16   Q    The work schedule for the underground
17  crew, as far as you know, that was set by Don
18  Harper?

19   A    Well, from -- where the job sites are.

20   Q    Okay.  But the schedule of hours that
21  would be worked and -- that was all set by Don
22  Harper --

23   A    I wouldn't know.

24   Q    -- as far as you know?

25   A    I wouldn't know about that.

1    A    Yeah, I do.

2    Q    Okay.    And    that    showed    that    your

3    CalPac, I'm sorry, your W2 form showed that

4    your employer was CalPac?

5    A    I don't remember.

6    Q    Do you still have your W2 forms from

7    when you worked at CalPac?

8    A    Probably, I don't know.    I have to

9    check.

10   Q    Okay.    Were    you    ever    given    a

11   performance evaluation?    Anybody ever reviewed

12   your work on the job?

13   A    (pauses)

14   Q    Do you know what I mean by that?

15   A    Yeah.

16   Q    Okay.

17   A    Yeah, Don -- it's just like when you're

18   getting your evaluation for a raise.

19   Q    Yeah.

20   A    Yeah.

21   Q    Okay.    Who gave that to you?    You start

22   to saying Don Harper?

23   A    That would be Don.

24   Q    All right.    Did you have a meeting with

25   Don when he said that, when he gave you your

Case 1:05-cv-00037    Document 588-10    Filed 04/11/2008    Page 14 of 63

1    A    Yes, sir.

2    Q    Okay.  Did he give you a raise at that

3    time?

4    A    Yeah.

5    Q    What was your starting wage at CalPac?

6    Do you recall?

7    A    About $10.

8    Q    And you say he gave you a raise?

9    A    It's like, what, probably $0.50.

10    Q    $0.50?

11    A    About $0.50.

12    Q    So, you think you went up in February

13    2005, you went from $10.00 to $10.50 an hour?

14    A    Yes, sir.

15    Q    Okay.  CalPac, did they provide medical

16    coverage?  Medical insurance?

17    A    Well Staywell came in and -- I guess we

18    had to apply with them.

19    Q    At CalPac?

20    A    Yes, sir.

21    Q    Was that at the beginning or later on?

22    A    I think later on.

23    Q    Okay.  And did you apply for Staywell

24    when -- Staywell Health Insurance, did you --

25    A    Yeah.

1  A But, you know, it's like when you get
2 sick, you can't -- (pauses). That's all he
3 wants, just, you know, keep up with your
4 attendance at work.

5  Q Okay. Did he tell you what any of your
6 foremen had said?

7  A No.

8  Q Okay. He didn't say I've got good
9 reports from your foreman?

10  A No.

11  Q Do you have any reason to think that
12 Don Harper had to ask MCI before he gave you
13 your evaluation?

14  A I wouldn't know about that.

15  Q Okay. He never said anything about
16 that?

17  A No.

18  Q In addition to the raise, did you get a
19 promotion? Were you given another job title?
20 Or, did that stay the same?

21  A Well, it stays -- stays the same.

22  Q Okay. Were you ever made a supervisor?

23  A No.

24  Q Now, you mentioned that his name has
25 come up a couple of times and that's Dennis

1    MS. LUJAN: You're talking about his
2  earlier deposition testimony? Because he
3  didn't make any --
4    MR. CIVILLE: No. No, no, no.
5    MS. LUJAN: He didn't make any
6  testimony today.
7    MR. CIVILLE: No, I'm asking him about
8  --
9  BY MR. CIVILLE:
10   Q   You said the first time that Dennis
11 Clark made a racially improper comment was at
12 an incident at Tiyan; correct?
13   MS. LUJAN: You're referring to his
14 deposition testimony, because he hasn't
15 testified to that effect today.
16   MR. CIVILLE: Well, actually I think he
17 did.
18 BY MR. CIVILLE:
19   Q   But I'll ask you, was that the first
20 time at Tiyan?
21   A   Not that I recall.
22   Q   Well, when's the first time you recall?
23 Where? Where was the first time that you're
24 aware of Dennis Clark making a racially
25 improper comment, a comment you thought was

1   racially improper?  Where was that?

2       A    (pauses)

3       Q    Was it at Tiyan?

4       A    He made one there, but I don't know, I

5   don't recall the -- (pauses).

6       Q    What don't you recall?

7       A    (pauses)

8       Q    I'm sorry, you said you don't recall

9   but I don't know what you meant by that.

10      A    Well, I didn't understand what -- was

11  it the first time he made the remark or --

12      Q    Yeah.  That's what we're talking about.

13  The first time he made the remark, where was

14  that?

15      A    Probably at Tiyan.

16      Q    Okay.  And you're not sure when that

17  was?

18      A    I'm not too -- (pauses).

19      Q    Okay.  You don't recall the date?

20      A    I don't recall, sir.

21      Q    Okay.  But for several minutes we've

22  been going over this, you've been describing

23  being in the trench, you know, your being there

24  from  8:00  'til  about  11:15.   You  were

25  describing the incident at Tiyan --

1 when you said the office, you know, CalPac

2 moved to the new office, some time in the

3 summer of 2004, is the first time you say you

4 saw Dennis Clark; am I right?

5     A   Yeah.

6     Q   Okay.  From that moment up until this

7 incident at Tiyan, would --

8     A   That's the only time.

9     Q   That was the only time you ever heard

10 him say anything improper --

11     A   Yeah.

12     Q   -- up until that point?  Okay.  And I

13 guess my question is, what, you know, I'm

14 trying to think what was going on?  I mean, did

15 Dennis -- first, what do you recall Dennis

16 Clark actually saying at Tiyan?

17     A   I guess -- it was a hot day, you know,

18 we were all trying to get a drink of water.

19 How do you say, huddling up and, you know -- I

20 guess when he saw us all over there trying to

21 get a drink --

22     Q   Yeah.

23     A   -- I think that's when he made that

24 remark, "You guys look like a bunch of island

25 monkeys."

1    that this incident is at Tiyan.

2          MR. CIVILLE:   He's already identified

3    it.   The witness has already said it was at

4    Tiyan.

5          MS. LUJAN:   His earlier testimony was

6    he didn't know the date for the Tiyan incident.

7          MR. CIVILLE:   I asked the witness two

8    minutes ago, I said, this incident, right here,

9    was that referring to the incident at Tiyan,

10   and Mr. Nauta said, yes.  So --

11   BY MR. CIVILLE:

12      Q   So, my question is, Mr. Nauta, isn't it

13   fair to think that you heard somebody else

14   said, "Oh, Clark said island monkeys."  And now

15   you're thinking that's what you said.   But

16   that's not what you heard, is it?   You just

17   heard him say a bunch of monkeys.

18      A   No, sir.

19      Q   No?

20      A   Because he was right -- and then when

21   start saying that remarks, island monkeys, but

22   -- (pauses).

23      Q   Okay.   After you heard Clark say

24   whatever it was he said, you went up at Tiyan,

25   you went up to Henry Quintanilla; correct?

1    A    Yeah.

2    Q    And you told Henry what you had heard?

3    A    Why is he calling us a bunch of island
4 monkeys?

5    Q    Okay.  And who else went up with you to
6 complain to Henry?

7    A    Well, the guys that were trenching too.

8    Q    All of them?  Everyone went up there?

9    A    Most.

10    Q    Okay.  Who was that?  How many were
11 there?

12    A    Robert.

13    Q    Robert who?

14    A    Cruz.

15    Q    Okay.

16    A    John Babauta.  Si, Larry.

17    Q    Charfauros?

18    A    Charfauros.  And Joe.

19    Q    Which Joe?

20    A    Joe Mendiola, and Joe -- (pauses).
21 There's Teddy.

22    Q    Wait, there were two Joes or one Joe?

23    A    There's two Joe's.

24    Q    The other one was Joe Cruz?

25    A    No.  I forgot his --

Case 1:05-cv-00037   Document 588-10   Filed 04/11/2008   Page 21 of 63

1  know of any facts to suggest that John Healy

2  knew about these comments at that time?

3       A   I wouldn't know about that.

4       Q   Do you have any facts to suggest that

5  MCI knew about these comments at the time?

6       A   (no audible response)

7       Q   Or for that matter, do you know -- I'm

8  sorry, you're shaking, you have to answer out

9  loud, sir.

10       A   I don't know.

11       Q   Okay.  Now, looking at your Exhibit B,

12  the Amended Charge to Discrimination, that

13  September 25th, 2004 incident that we just

14  talked about --

15       A   Uh-huh.

16       Q   -- the one you said happened at Tiyan,

17  right?  That's the only incident that you put

18  in there; am I correct?  The only time --

19  that's the only incident of Dennis Clark

20  calling you a bunch of monkeys that you

21  referred to in your Charge of Discrimination,

22  right?

23       MS.  LUJAN:   Is the question that

24  there's only one incident mentioned in the

25  Charge of Discrimination?   Is that your

1   question?

2           MR. CIVILLE:  Well, I'll say -- well, I

3   suppose you might say that the next incident or

4   the   meeting   with   CalPac,   he   may   call   it,

5   calling that an incident.

6   BY MR. CIVILLE:

7       Q    So,   this   is   the   only   incident,   the

8   September 25th, 2004, that's the only time that

9   you told EEOC that Dennis Clark called you a

10  bunch of monkeys; right?

11      A    I guess so.

12      Q    Okay.   Now,   in   you   first   deposition,

13  you said there was actually another incident at

14  Two   Lovers   Point.     When's   the   first   time   you

15  came   forward   with   that   accusation,   the   Two

16  Lovers Point?

17      A    That was when that we made an incident

18  with Norman.

19      Q    Yeah, but --

20      A    The one I told you, that we had to dig

21  back 40 feet because the depth wasn't correct.

22      Q    Okay.   But my question is, when is the

23  first   time   you   made   that   complaint?     Because

24  you didn't tell EEOC about this incident at Two

25  Lovers   Point.     You   didn't   --   it's   right   in

1  to you at Two Lovers Point?

2      A    Well, that's the other remark.

3      Q    What other remark?

4      A    You know, it's like, "Monkeys think you

5  can get away with it" or -- (pauses).

6      Q    Okay.  And the only two people and --

7  okay.  Now you say, "Monkeys think you can get

8  away with that, like," I think you said the

9  word like.  What does that mean, you don't

10 recall exactly what he said?

11     A    No.  You know, I figured it was just --

12 he thought we're trying to get away with, you

13 know  --  but   that's   not   what   we   were   --

14 (pauses).

15     Q    Okay.  And that was said just to you

16 and to --

17     A    Norman.

18     Q    -- Norman Santos?  Okay.  Nobody else

19 was around?

20     A    No.

21     Q    Okay.  And when he said that, did he

22 say it kind of under his breath, or did he, you

23 know, say it in your face, you know?  Was his

24 back to you, was he facing you?

25     A    No,  he  was  facing  us  but  we  were

Case 1:05-cv-00037     Document 588-10     Filed 04/11/2008     Page 24 of 63

1    A    Well, yeah, because they --

2    Q    If he called you both of those?

3    A    You must be stupid enough to do that

4  right? But, no. He instead called us in that

5  animal name or -- (pauses)

6    Q    Okay. Did you have any reason to think

7  that if you had been Chinese and Norman had

8  been a white guy, he would have used a

9  different word?

10    A    Maybe he'll be calling us a bunch of

11  assholes or what, you know. I don't know.

12    Q    Okay. So, you didn't say anything to

13  anybody until you finished the trench, right,

14  that second time at Two Lovers Point?

15    A    Well, I didn't bother saying because I

16  didn't think they took any action to that.

17    Q    So, you never complained to anybody?

18  You didn't complain to a supervisor about the

19  Two Lovers Point comment?

20    A    I don't think they would believe us

21  anyway.

22    Q    Well, regardless -- I'll ask you -- I

23  don't know if I'll ask you why or not. I'm

24  just trying to find out, did you report that

25  second incident?

Case 1:05-cv-00037    Document 588-10    Filed 04/11/2008    Page 25 of 63

1    A    No, sir.

2    Q    Do you know if Norman reported that

3    second incident --

4    A    I don't know.

5    Q    -- to his foreman?  You don't know?

6    Okay.  And then when you filed the amended

7    complaint with EEOC, you did not make any

8    reference to the Two Lovers Point incident?

9    A    No, I did not.  That's my mistake.

10   Q    Okay.  You claimed that John Healy in

11   December 2004 called a meeting, and this was

12   when there were some protesters outside the

13   CalPac offices?  Do you remember that?

14   A    Yeah.

15   Q    Okay.  I mean you saw these protesters

16   everyday when you went to work?

17   A    (pauses)

18        MR. CIVILLE:  You know, by the way, we

19   have some troubles with our air con.  So, if it

20   gets warm in here, we got to turn it off right

21   now.  But do you want it back on --

22        MS. LUJAN:  I think it's (inaudible).

23        MR. CIVILLE:  -- say the word.  Okay.

24   You too, George.

25   BY MR. CIVILLE:

```
 1      Q   No, I'm talking, do you think you had
 2   your   hours   reduced   because   of   your   EEOC
 3   complaint?
 4      A   I guess, they found out about it.
 5      Q   Did anybody tell you that?
 6      A   No.
 7      Q   You're just guessing?
 8      A   I figured it was.
 9      Q   When  you  say  you  figured,  you  mean
10   you're guessing?
11      A   I  know  we're  bound  to  get  laid  off
12   pretty soon because -- (pauses).
13      Q   Okay.  But when you say your hours were
14   reduced  because  of  your  EEOC,  you  figured  it
15   was because of your EEOC complaint, nobody told
16   you that; right?
17      A   No.
18      Q   Did you ask anybody in management that
19   question?
20      A   No, I didn't ask.
21      Q   Okay.  All right.  So, you're guessing
22   that's what the reason was.
23      A   Well,  I  would  know  that  that  will  be
24   one of the -- (pauses).
25      Q   Do you have any facts to support that?
```

1    A    No, sir.

2    Q    Okay.  Do you have any facts to suggest

3    that MCI was aware that your hours had been

4    cut, your hours had been reduced?

5    A    I wouldn't know about that.

6    Q    Would you have any facts to suggest

7    that MCI was aware that there had been workers

8    laid off from the job by CalPac?

9    A    But they would probably know about it.

10   I don't know.

11   Q    Do you have any facts to support that

12   or --

13   A    I don't have.

14   Q    -- once again, if you're guessing, just

15   say I'm guessing but --

16   A    I don't know the facts of it.

17   Q    Okay.

18       MR. CIVILLE:  I'm sorry.  Can you turn

19   on the air con?

20   Q    How long did this meeting last that you

21   were talking about John Healy called?

22   A    I'd say about 45 minutes or --

23   (pauses).

24   Q    Okay.  Did he ask you for any

25   complaints that you had?

1    A    No.  He didn't say that.  Nobody.

2    Q    Nobody said that?  Okay.  The last

3 thing you mentioned at your first deposition is

4 that you felt that you were ignored, that you

5 were being -- people weren't saying hi to you,

6 and that sort of thing?

7    A    No.  It's more like -- it's like I'm

8 demoted, you know.  You don't have that -- they

9 don't call you in the morning to let you know

10 where you were heading to this morning or what

11 equipment needs to be taken out.

12   Q    When did this start?

13   A    Right there, after that meeting.

14   Q    So, in December?  December '04?

15   A    Yeah.

16   Q    Okay.

17   A    After that meeting they --

18   Q    Yeah.

19   A    -- there were changes going on by the

20 week.

21   Q    Okay.  There were more layoffs?

22   A    Well, it's more like time, hourly cuts.

23   Q    Okay.  And how many people had gotten

24 laid off, do you recall up until the December

25 meeting?

Case 1:05-cv-00037    Document 588-10    Filed 04/11/2008    Page 29 of 63

# REPORTER'S CERTIFICATE

I, **Melinda D. Castro**, Court Reporter, do hereby certify the foregoing 158 pages to be a true and correct transcript of the audio recording made by a Notary Public Officer of Depo Resources in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision, and whereas a request for review was requested.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 2nd day of February, 2008.

_____

Melinda D. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

# EXHIBIT CC

IN THE UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM

| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, JAMES S. YEE, TEDDY C. CRUZ, JESSE B. CRUZ, TEDDY L.G. NAUTA, and JOHN B. BABAUTA, | ) CIVIL CASE NO. CIV05-00037 |
|---|---|
| Plaintiffs, | ) |
| vs. | ) |
| CALIFORNIA PACIFIC TECHNICAL SERVICES LLC, a.k.a. CALPAC, DYNAMIC TECHNICAL SERVICES, VERIZON BUSINESS PURCHASING LLC, VERIZON BUSINESS NETWORK SERVICES, INC., JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, | ) |
| Defendants. | ) |

DEPOSITION TRANSCRIPT

OF

## JOHN PETER BABAUTA

February 6, 2008

PREPARED BY:   GEORGE B. CASTRO
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates
Piti, Guam 96915
Tel:(671)688-**DEPO** ▪ Fax:(671)472-3094

IN THE UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM

1    A    Cruz.

2    Q    And she's married to Teddy or --

3    A    Jesse.

4    Q    Jesse.    And you went down, and you

5  weren't even interviewed, they just -- you went

6  down and saw Henry Quintanilla?

7    A    Yes.

8    Q    And Henry said, "Come on in tomorrow

9  and start working"?

10    A    Yes.

11    Q    Okay.    As far as you knew, Henry

12  Quintanilla worked for CalPac?

13    A    Not until I got there.

14    Q    Okay.    But when you got there and

15  talked to Henry, you knew he was a supervisor

16  for CalPac?

17    A    Yes, yes.

18    Q    And you knew you were applying for a

19  job at CalPac?

20    A    Yes.

21    Q    In fact, you went to Henry's office --

22  I'm sorry, to CalPac's office to talk to Henry?

23    A    Yes.

24    Q    As far as you knew, you were only being

25  hired by CalPac?

1    A    Right.

2    Q    Did Henry tell you anything about what

3    kind of work CalPac did?

4    A    Yes.

5    Q    Did he tell you that they were in the

6    cable installation business, or cable laying

7    business?

8    A    Yes.

9    Q    And did he tell you that CalPac had

10   different customers, or did you find that out

11   later on?

12   A    I found it out later on.

13   Q    All right.  And some of those customers

14   -- can you remember any of the customers?

15   A    Yes, MCI.

16   Q    Uh-huh.

17   A    TyCom.

18   Q    Uh-huh.

19   A    And -- (pauses).

20   Q    MCV?

21   A    Yeah, MCV.

22   Q    If you remember.

23   A    Yeah, I -- MCV.

24   Q    Okay.

25   A    (pauses)

1     Q   Did that person who wore the DTS hat

2  ever talk to you?

3     A   No.

4     Q   You don't have any direct knowledge of

5  who that person worked for, other than you saw

6  they had a DTS -- hard hat, was it?

7     A   Yes.

8     Q   Okay.  That's the only way you knew

9  that, or is that the only reason you think they

10  worked for DTS, you saw the hard hat?

11     A   Yes.

12     Q   Okay.  When you started working, I

13  mean, when you were hired and Henry Quintanilla

14  told you to show up for work, you don't have

15  any information to suggest that he had to get

16  approval from MCI to make that decision, do

17  you?

18     A   Excuse me?  Could you repeat that?

19     Q   Henry, as far as you know, Henry didn't

20  have to get permission from MCI to hire you?

21     A   No.

22     Q   Is that right?  Am I right about that?

23     A   Yes.

24     Q   And once you started working, you'd

25  show up in the morning, you'd go down to

1  CalPac's office?

2      MR. CIVILLE:  I'm sorry.  Can we take

3  just a one-minute break?  I'm sorry.

4      (Off the record from 11:01 a.m. to

5  11:02 a.m.)

6  BY MR. CIVILLE:

7      Q   Well, you'd show up at the CalPac's

8  office in the morning, right?

9      A   Yes.

10     Q   And Henry Quintanilla, would he give

11 you your instructions?

12     A   Not really.

13     Q   Who would give you your instructions?

14     A   Teddy.

15     Q   Teddy Cruz?

16     A   Yes.

17     Q   Okay.  And Teddy is your brother-in-

18 law?

19     A   No.

20     Q   I'm going to get this figured out.

21 Aren't Teddy and Jesse brothers?

22     A   Yes.

23     Q   Jesse is your brother-in-law?

24     A   Yes.

25     Q   So, Teddy's your brother's brother-in-

1  law?

2      A    Yes.

3      Q    Yeah,  okay.    Or  your  brother-in-law's

4  brother;  all  right.    And  Teddy  was  a  foreman  in

5  October  when  you  started  working?

6      A    Yes.

7      Q    Okay.    You'd  go  in  in  the  morning  and

8  Teddy  would  say,  "Okay,  here's  what  we're  doing

9  today."

10     A    Yes.

11     Q    And  then  whatever  work  crew  you  were

12 on,  you'd  all  get  in  a  truck,  and  go  out  to  the

13 work  site?

14     A    Yes.

15     Q    Did  you  normally  go  out  in  a  CalPac

16 truck?

17     A    Yes.

18     Q    You've  mentioned  that  CalPac  had  a

19 number  of  customers,  the  TyCom,  the  MCI,  MCV.

20 Did  you  at  different  times  do  work  on  all  of

21 those  projects?

22     A    Well  --  yes.

23     Q    And  Teddy  would  tell  you  which  project

24 you  were  going  to  be  working  on  that  day?

25     A    Yes.

1     A   Yes.

2     Q   He was your direct boss?

3     A   I guess.

4     Q   And if you needed something at the job
5 site or if you had a question at the job site,
6 you would ask Teddy Cruz?

7     A   Yes.

8     Q   And normally your instructions came
9 from Teddy Cruz?

10    A   Yes.

11    Q   Okay.  Henry Van Meter sometimes gave
12 you instructions?

13    A   Yes.

14    Q   Henry Quintanilla sometimes gave you
15 instructions?

16    A   Yes.

17    Q   How about Don Harper?  Did he ever come
18 out to give you instructions, or would he give
19 instructions to the foremen?

20    A   He would give instructions to the
21 foremen.

22    Q   Okay.  Are you aware of any facts that
23 would suggest that MCI had anything to do with
24 the decision everyday on which work crew Teddy
25 Cruz would assign you to?

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1    A   Not that I know of.

2    Q   Okay. And when you asked Teddy Cruz

3 for something in the field or for some

4 instructions, he never said to you, "I have to

5 check with MCI"?

6    A   No.

7    MR. CIVILLE: Robert, we're getting the

8 static sound. Is this line deteriorating?

9    MR. EWERT: Yeah, I'm getting --

10 (unintelligible). It looks like it stopped

11 now.

12    MR. CIVILLE: All right. Well, if it

13 gets bad, just let me know and we'll --

14    MR. EWERT: But better yet, let me try

15 calling back in, I guess, real quick.

16    MR. CIVILLE: Okay.

17    (Off the record from 11:08 a.m. to

18 11:09 a.m.)

19 BY MR. CIVILLE:

20    Q   Mr. Babauta, when you were hired, you

21 were assigned to the underground crew? Do you

22 know if that's what it was called?

23    A   I wasn't sure. I'm not sure what we're

24 --

25    Q   Were you given a job title?

1 sometimes it's not even an hour.

2     Q   Okay. How long would you get then?

3     A   Maybe, like 30 minutes maybe, 40

4 minutes.

5     Q   Did that happen very often?

6     A   Not really.

7     Q   So, that was unusual not to get a full

8 hour?

9     A   Yeah, it was unusual.

10     Q   As far as you know, all the decisions

11 about your breaks and when to take lunch, those

12 decisions were made by CalPac, CalPac

13 supervisors?

14     A   Yes.

15     Q   Okay. You don't have any reason to

16 think that MCI made any decisions about your

17 breaks or your lunch period, do you?

18     A   No.

19     Q   Okay. The paycheck that you received

20 when you were at CalPac, that was on a CalPac

21 check?

22     A   Yes.

23     Q   Okay. And you're not aware of MCI

24 having anything to do with your CalPac check,

25 are you?

1    A   No.

2    Q   Okay.  I think you mentioned that Henry

3 Quintanilla a couple of times came around and

4 told you, you were doing a good job?

5    A   Yes.

6    Q   Was that the only performance

7 evaluation you were given?  You know, when

8 Henry Quintanilla said, "John, you're doing

9 good work"?

10    A   Yes.

11    Q   And to the best of your knowledge, MCI

12 didn't have anything to do with that

13 evaluation, did it?  That was just something

14 that came from John -- I'm sorry, from Henry

15 Quintanilla?

16    A   Yes.

17    Q   Okay.  I'm sorry.  You're going to need

18 to speak up a little bit.  Okay.  Did you ever

19 supervise any other workers?  Were you ever a

20 supervisor?

21    A   No.

22    Q   Now, we've got -- you know, you spent a

23 fair amount of time at the last deposition

24 talking about Dennis Clark.  And we're going to

25 talk about this monkey comment you said he

1    Q  Okay.  Was there anybody out there like

2  with -- you know, those rolled up plans where

3  they unroll the plans, and they'd be looking at

4  where the trench was supposed to go?  Did you

5  ever see any of the supervisors doing that?

6    A  No.

7    Q  Okay.  Now, let's talk about what

8  Dennis Clark -- this incident that you're

9  describing.  And I think you said it was in

10  October?  Do you remember the exact day?

11    A  No.

12    Q  Do you remember saying that it was

13  about October 25th, 2004?

14    A  Yeah; I'm not sure.

15    Q  Okay.  Did you review any documents

16  before today's deposition?  Did you do anything

17  to prepare yourself for today's deposition?

18    A  No.

19    Q  Have you had a chance to read over the

20  transcript of your first deposition?

21    A  No.

22    Q  Have you talked to anybody other that

23  your lawyer about today's deposition?

24    A  Just my wife, telling her I had to come

25  to my deposition.

    1        Q    Larry Charfauros?

    2        A    Yes, sir.  Robert Cruz, Joe Mendiola,

    3    John Nauta.  That's about it, I think.

    4        Q    Okay.  And Dennis Clark, at some point,

    5    came to the job site where you were?

    6        A    Yes, sir.

    7        Q    How long -- when he came, did he come

    8    in the van that he usually drove?

    9        A    Yes, sir.

   10        Q    After he drove up, what do you recall

   11    him doing, exactly?

   12        A    When he drove up?

   13        Q    Uh-huh.  Got out of his van.

   14        A    Yes.

   15        Q    All right.

   16        A    Just said, like, "How are you island

   17    monkeys doing?"  Or, you know, something like

   18    that, but --

   19        Q    Well --

   20        A    I was, like, maybe the fourth to the

   21    fifth person right behind that when he stood

   22    there.

   23        Q    So, he got out of his van and walked

   24    directly --

   25        A    Yes.

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1    A    Yeah.

2    Q    How many times did he say he heard it

3  before?

4    A    About, maybe, I think, two, three.

5  That's about it and --

6    Q    Just those three guys?

7    A    Yeah.

8    Q    And then you complained to Teddy, but

9  did you complain to anybody that day?

10   A    Well, I told -- well, we all told

11 Teddy.  Teddy told Henry, and Henry went on --

12 I think he went in the chain of command where -

13 - then it got to Don.

14   Q    Well, you all told Teddy, but Teddy was

15 right there.

16   A    Yes, Teddy was there.  I mean, I was

17 like, what you gonna do about it?  You --

18   Q    Okay.  So you asked him, you asked

19 Teddy.

20   A    Yeah, you know, him being a foreman.

21   Q    You asked Teddy what he was going to

22 do?

23   A    Yes.

24   Q    And what did Teddy say?

25   A    Then Teddy said he would talk to Henry

1    Q   Okay.   And  you  don't  know  what  if

2  anything Henry Van Meter did?

3    A   No.

4    Q   And  that  was  the  only  time  that  you

5  ever  heard  Dennis  Clark  say  anything  about

6  monkeys?

7    A   Right.

8    Q   Up  until  that  point,  when  Dennis  Clark

9  made that comment, was CalPac a pretty good job

10  for you?

11    A   No.

12    Q   It wasn't?

13    A   After he made that comment?

14    Q   Before he made the comment.

15    A   Before he made the comment?

16    Q   Yeah.

17    A   Yes.

18    Q   Okay.   I  mean,  you  had  family  or

19  extended family working there; is that right?

20    A   Right.

21    Q   And most of the guys were Chamorro?

22    A   Pretty much, yes.

23    Q   Okay.  You're Chamorro?

24    A   Yes.

25    Q   Okay.   So,  it's  a  pretty  comfortable

1     A    I'm not sure.

2     Q    Well, I'm asking you.  Do you have any

3 facts?

4     A    No.

5     Q    You don't?

6     MS. LUJAN:  It was asked and answered.

7 BY MR. CIVILLE:

8     Q    Okay.  At the time that Dennis Clark

9 made this comment, do you have any facts that

10 would suggest MCI knew that Dennis Clark had

11 made this comment?

12     A    Not that I know of.

13     Q    Okay.  Afterwards, do you have any

14 information that MCI approved of Dennis Clark

15 making this comment?

16     A    Yes.

17     Q    What facts do you have?

18     A    Because he was still working for them.

19     Q    Okay.  Do you know if John Healy ever

20 said anything to Dennis Clark about this

21 complaint?

22     A    I don't know.

23     Q    Do you know if MCI ever said anything

24 to Dennis Clark?

25     A    I don't know.

Q    Listen.    It was CalPac who gave the workers notice that they were being laid off, is that right?

A    Yes.

Q    Do you know of any facts that suggest that MCI was aware that CalPac was laying off workers?

A    Not that I know.

Q    Okay.  Do you know of any facts that MCI approved CalPac's decision to lay off any workers?

A    No.

Q    Okay.  For that matter, do you know of any facts that MCI had anything at all to do with CalPac's decision to lay off workers?

A    No.

Q    In your complaint, you mentioned that there was a meeting at CalPac on December 20th; do you remember that?

A    Yes.

Q    And were you there for the entire meeting?

A    Pretty much.

Q    Okay.  Was that a safety meeting at first and then other issues came up?

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

1   the job site?

2      A   I think so, because I haven't seen him

3   for a while.

4      Q   Okay.

5      A   Yeah.

6      Q   In fact, you didn't see him at all in

7   2005, did you?

8      A   In 2005?

9      Q   Yeah.

10     A   I'm not sure, because the last time I

11   saw Dennis it was up at the airport, and I'm

12   not sure that was in 2005.

13     Q   The airport, that was actually before

14   the meeting though, wasn't it? The time you

15   just told us about?

16     A   No, I don't think so. It was -- I'm

17   not sure if it was before the meeting or after,

18   that was the last time I saw Dennis.

19     Q   Okay. Just that one time?

20     A   Yeah. It was at the airport. That was

21   the last time.

22     Q   You also said that you thought at some

23   point that CalPac was giving you unattractive

24   jobs?

25     A   Right, yeah.

1  and insulation and wiring?

2      A   Whatever was left there, straighten up
3  the gravel, whatever, dirt.

4      Q   Okay.   And do you know of any facts
5  that would suggest that MCI was, in any way,
6  aware that you were being assigned to clean up
7  duty?

8      A   No.

9      Q   As far as you know, that was a decision
10  that was made strictly by CalPac?

11      A   Yes.

12      Q   Mr. Babauta, in your complaint, you
13  said that you suffered some emotional distress.
14  You never went to see a doctor for emotional
15  distress, did you?

16      A   No.

17      Q   Okay.   And you're not currently
18  emotionally distressed, are you?

19      A   Right now?  No.  No, not really.

20      Q   Okay.  I may have asked you this, but
21  you said that after your surgery and when you
22  thought you were ready to come back to work,
23  that you would call Mr. Ward, and he'd tell you
24  to call another, who was the other supervisor?

25      A   Russell.

1    Q    Russell?

2    A    Right.

3    Q    Mr. Russell.    And then you called Mr.

4    Russell and he'd tell you to call Mr. Ward?

5    A    Or call -- yeah, they're just giving

6    the runarounds.    Like, I even went in and

7    talked to Ms. Healy, and she was like, check

8    with, you know, come back or call tomorrow and

9    see.    When I called, they're like, "Okay, call

10   Russell."    They're just giving me the

11   runarounds.

12   Q    Okay.    All right.    And Russell also

13   worked for CalPac?

14   A    Yes.

15   Q    You don't have any reason to think that

16   MCI was aware that you were calling in and

17   talking to Russell or Ward, do you?

18   A    No.

19   Q    You don't have any reason to think that

20   MCI knew what Ward and Russell were saying to

21   you?

22   A    No.

23   Q    Okay. You don't know who Dennis Clark's

24   boss was?

25   A    I always thought it was John Healy.

 1    Q   And  one  of  things  that  you  said  was,
 2  the  facts  supporting  your  belief  was  that  Clark
 3  was  still  there  when  you  lost  your  job.   Is
 4  that  what  you  said?   Or,  did  I  hear  you  wrong?
 5    A   No.   I  said,  like  --  because  we  got
 6  laid  off  and  Dennis  Clark  was  still  working  for
 7  them.
 8    Q   Okay.   You  got  laid  off  work,  you
 9  stopped  working  in  May  of  2005;  would  that  be
10  right?
11    A   Right.
12    Q   And  your  testimony  today  and  your
13  testimony  earlier  was  that  you  didn't  see  Mr.
14  Clark  --  or  at  least  today,  you  said  you  didn't
15  see  Mr.  Clark  --  you  may  have  not  seen  Mr.
16  Clark  after  the  December  meeting.
17    A   Well,  I'm  just  saying  is,  the  last  time
18  I  ever  saw  him  was  the  airport.   I  wasn't  to
19  sure  if  it  was  before  the  December  20th  or  after
20  the  December  20th.
21    Q   Okay.
22    A   But  that  was  the  last  time  I  ever  saw
23  Dennis  Clark  was  the  airport.
24    Q   When  you  were  --  in  May,  did  you  see
25  Mr.  Clark?   Do  you  know  if  he  was  still  there?

1  REPORTER'S CERTIFICATE

2

3  I, **Melinda D. Castro**, Court Reporter, do

4  hereby certify the foregoing 86 pages to be a

5  true and correct transcript of the audio

6  recording made by a Notary Public Officer of

7  Depo Resources in the within-entitled and

8  numbered case at the time and place as set

9  forth herein.

10  I do hereby certify that prior to

11  examination the deponent was duly sworn upon

12  oath and that a request for review was made;

13  and that thereafter the transcript was prepared

14  by me or under my supervision.

15  I am not a direct relative, employee,

16  attorney or counsel of any of the parties, nor

17  a direct relative or employee of such attorney

18  or counsel, and that I am not directly or

19  indirectly interested in the matters in

20  controversy.

21  In testimony whereof, I have hereunto set

22  my hand and seal of Court this 14th day of

23  March, 2008.

24  _____

25  Melinda D. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

# EXHIBIT DD

EEOC Form 5 (5/01)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | **AMENDED** |
| ☒ EEOC | 378-2005-00190 |
| | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone No. (incl Area Code) | Date of Birth |
|---|---|---|
| Mr. Teddy B. Cruz | (671) 632-2644 | 06-03-1961 |

| Street Address | City, State and ZIP Code |
|---|---|
| 304 Kamute Loop, Astumbo GDN, Dededo, GU 96912 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| CAL PAC | 15 - 100 | (671) 646-3646 |

| Street Address | City, State and ZIP Code |
|---|---|
| P.O. Box 8950, Tamuning, GU 96931 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☒ COLOR  ☐ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 09-25-2004    Latest: 12-20-2004
☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

### AMENDED

VER 002986

I was hired by Cal Pac in February, 2004, to work on an installation project of underground cable in Guam for MCI

On September 25, 2004, I was harassed by Dennis Clark, representative of MCI and employee of Dynamic Technical Services. Dennis Clark made racially derogatory comments to me and a group of fellow co-workers by referring to us as a "bunch of monkeys."

On December 20, 2004, John Healy, Owner of Cal Pac, held a meeting in which he announced that workers would be immediately fired for notifying any authorities or agencies concerning their complaints of discrimination.

I believe that I have been discriminated against due to my racial background, Pacific Islander, and national origin, Chamorro. I further believe that non-Caucasian employees as a class have been subjected to discrimination and retaliation.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When Necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 2-2-05<br>Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

CALPAC/EEOC0573

# EXHIBIT EE

EEOC Form 5 (Rev)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 378-2005-00202 |

_____ State or local Agency, if any _____ and EEOC

| Name (indicate Mr. Ms. Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| Mr. Larry L. Charfauros | (671) 565-7087 | 05-17-1969 |

| Street Address | City, State and ZIP Code |
|---|---|
| 210 Santa Rosa Santa Rita, GU 96915 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| CAL PAC | 15 - 100 | (671) 646-3846 |

| Street Address | City, State and ZIP Code |
|---|---|
| P.O. Box 8950, Tamuning, GU 96931 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE   ☒ COLOR L.L.C.   ☐ SEX   ☐ RELIGION   ☒ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 09-21-2004    Latest 11-27-2004

☐ CONTINUING ACTION

THE PARTICULARS ARE (if additional paper is needed, attach extra sheet(s)):

I was hired by Cal Pac to work on an installation project of underground cable in Guam for MCI.

Beginning on September 21, 2004, and continuing until October 23, 2004, I was harassed by Dennis Clark, a representative of MCI. On separate occasions, Dennis Clark made racially derogatory comments to me and fellow co-workers by referring to us as "monkeys" and "island monkeys."

On November 27, 2004, I was discharged from the project, which I feel is due to my complaints to my supervisors about Dennis Clark's racially derogatory comments.

I believe that I have been discriminated and retaliated against due to my racial background, Pacific Islander, and my national origin, Chamorro. I further believe that non-Caucasian employees as a class have been subjected to discrimination and retaliation.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 1-4-05                    Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

VER 002971                    CALPAC/EEOC0205

# EXHIBIT FF

IN THE UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM

HENRY G. VAN METER, JERRY
APODACA, JR., JOSEPH J.
HERNANDEZ, JOSEPH T. MENDIOLA,
LARRY L. CHARFAUROS, ANTHONY
C. ARRIOLA, JAMES S. YEE,
TEDDY C. CRUZ, JESSE B. CRUZ,
TEDDY L.G. NAUTA, and JOHN B.
BABAUTA,

            Plaintiffs,

      vs.

CALIFORNIA PACIFIC TECHNICAL
SERVICES LLC, a.k.a. CALPAC,
DYNAMIC TECHNICAL SERVICES,
VERIZON BUSINESS PURCHASING
LLC, VERIZON BUSINESS NETWORK
SERVICES, INC., JOHN HEALY,
DENNIS CLARK, WILLIAM WARD, JAI
JAMES, and DOES 1 through 10,

           Defendants.

) CIVIL CASE NO. CIV05-00037
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DEPOSITION TRANSCRIPT

OF

# JOHN L.G. NAUTA

February 5, 2008
(Volume 2)

**COPY**

PREPARED BY:    GEORGE B. CASTRO
                **DEPO RESOURCES**
                #49 Anacoco Lane
                Nimitz Hill Estates
                Piti, Guam 96915

1    **HAGATNA, GUAM, TUESDAY, FEBRUARY 5, 2008: 3:09 P.M.**

2

3    COURT REPORTER: Let me just go on record

4    first to state that today is Tuesday, February

5    5ᵗʰ, 2008; the time is 3:09 p.m. We are here at

6    the Law Office of Civille & Tang, 330 Hernan

7    Cortes Avenue, Suite 200, Hagatna, Guam.

8    This is the continuation of Mr. John

9    Nauta's deposition and we have the same

10   appearances and we may proceed.

11

12

13            **John L.G. Nauta**

14   being previously duly sworn, was examined and

15   testified as follows:

16

17

18            **DIRECT EXAMINATION**

19   BY MR. CIVILLE:

20   Q   And Mr. Nauta, this is the continuation

21   of your deposition of January 15ᵗʰ, 2008. When

22   we left off, Mr. Nauta, we were approaching the

23   time when you were laid off in 2005, and I

24   believe you were given notice, written notice,

25   on May 4ᵗʰ, 2005 that you were being laid off?

1    A   Yes, sir.

2    Q   All right.   And you were given that

3  notice by Mr. Ward?

4    A   By Bill Ward.

5    Q   Okay.  How long did that meeting with

6  Bill Ward last when he told you, you were being

7  laid off?

8    A   Oh, it didn't last long because of --

9  (pauses).

10    Q   Okay.  If you were -- five minutes, 10

11  minutes?

12    A   Yes, about.

13    Q   Okay.  Was anything discussed during

14  that meeting, that short meeting with Bill Ward

15  -- I mean, he told you that you were leaving or

16  that you're being laid off, did you have any

17  further discussion with him?

18    A   I don't recall.

19    Q   Okay.  You said the meeting lasted

20  maybe five or 10 minutes?

21    A   Just about, when he was giving us our

22  check.

23    Q   All right.  Were you the only one he

24  was talking to when you met with him at the

25  end?

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1    Q    All right.  What other facts do you
2  think suggest that you were laid off because of
3  your complaint?
4    A    My job was taken away from me, my
5  driving privilege and -- truck driving
6  privilege.
7    Q    And what facts do you have to suggest
8  that MCI knew that your driving privileges or
9  your truck driving privileges had been taken
10  away from you?
11    A    Well, I guess they will let them know
12  that how many more people are taken out of the
13  projects.
14    Q    Okay.  Do you have any reason to think
15  -- I mean, who made the decision that these
16  driving privileges you're talking about, who
17  made the decisions about those?  Wasn't that
18  made by CalPac?
19    A    Yes, sir.
20    Q    Okay.  Can you think of any reason why
21  MCI would be involved in that decision?
22    A    Well, that's their project.  That's
23  MCI's project.
24    Q    Okay.  And they hired CalPac to do it,
25  right?  They hired CalPac to lay the --

1    A   Yes, sir.

2    Q   Okay. Are you aware of any reason why

3 MCI would know the details of what CalPac was

4 telling which worker could drive and which

5 worker couldn't drive?

6    A   No, I wouldn't know.

7    Q   Okay. After you left, after you were

8 laid off from CalPac, where's the next place

9 that you worked? What's the next job you had?

10    A   About a month or two, I went to Cable

11 Service.

12    Q   Okay. How much were you paid at Cable

13 Service?

14    A   About $8.

15    Q   What was your job title there?

16    A   The same. Truck driver.

17    Q   How long did you stay at Cable Service?

18    A   I think about a year and a half.

19    Q   Okay. Why did you leave?

20    A   I think I was having problems, you

21 know, drinking.

22    Q   Okay.

23    A   So, I guess, I don't call in after --

24 in the morning.

25    Q   Okay. So, they let you go?

# REPORTER'S CERTIFICATE

1

2

3   I, **Melinda D. Castro**, Court Reporter, do

4   hereby certify the foregoing 17 pages to be a

5   true and correct transcript of the audio

6   recording made by a Notary Public Officer of

7   Depo Resources in the within-entitled and

8   numbered case at the time and place as set

9   forth herein.

10   I do hereby certify that prior to

11   examination the deponent was duly sworn upon

12   oath and that a request for review was made;

13   and that thereafter the transcript was prepared

14   by me or under my supervision.

15   I am not a direct relative, employee,

16   attorney or counsel of any of the parties, nor

17   a direct relative or employee of such attorney

18   or counsel, and that I am not directly or

19   indirectly interested in the matters in

20   controversy.

21   In testimony whereof, I have hereunto set

22   my hand and seal of Court this 14th day of

23   March, 2008.

24

**COPY**

25

_____

Melinda D. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094