LUJAN AGUIGUI & PEREZ LLP
238 Archbishop Flores Street, Suite 300
Hagåtña, Guam 96910
Tel. 477-8064/5; Fax. 477-5297

*Attorneys for Plaintiffs*


FILED
DISTRICT COURT OF GUAM
APR 25 2008
JEANNE G. QUINATA
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT OF GUAM
# FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, et al.,<br><br>                   Plaintiffs,<br>-vs-<br>CALPAC, et al.,<br><br>                   Defendants. | CIVIL CASE NO. 05-00037<br><br>OPPOSITION TO VERIZON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO ALL CLAIMS ASSERTED BY PLAINTIFF ANTHONY C. ARRIOLA |

COMES NOW Plaintiff Anthony C. Arriola, respectfully submitting his opposition to Verizon Defendants' Motion for Summary Judgment with Respect to All Claims Asserted by Plaintiff Anthony C. Arriola, filed herein April 11, 2008.

## I. INTRODUCTION

Plaintiffs Henry G. Van Meter, Jerry Apodaca, Jr., Joseph J. Hernandez, Joseph T. Mendiola, Larry L. Charfauros, Anthony C. Arriola, Robert B. Cruz, Roland F. Mendiola, James S. Yee, Teddy B. Cruz, Jesse B. Cruz, John L.G. Nauta, and John P. Babauta (collectively "Plaintiffs") instituted this Title VII action on December 12, 2005, alleging that they were subjected to employment discrimination by defendants Calpac, Dynamic Technical Services ("DTS"), MCI, John Healy, Dennis Clark ("Clark"), William Ward, Jai James, and Does 1 through 10 (collectively "Defendants"). The Second Amended Complaint was filed on September 7, 2007, naming Defendants Verizon Business Purchasing, LLC, and Verizon Business Network Services, Inc., (collectively "Verizon Defendants" or "Verizon" or "MCI") in the stead of MCI.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

1

Case 1:05-cv-00037    Document 594    Filed 04/25/2008    Page 1 of 20

On April 11, 2008, Verizon filed a motion for summary judgment against Plaintiff Anthony C. Arriola ("Plaintiff").

**II. ARGUMENT**

Verizon moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56, arguing that (1) Verizon was not Plaintiff's employer, and (2) even if any Title VII relationship existed between Verizon and Plaintiff's Title VII claims against Verizon are bared as a mater of law. Summary judgment is appropriate if the evidence, construed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Tzung v. State Farm Fire & Cas. Co., 873 F. 2d 1338, 1339-40 (9th Cir. 1989). To establish the existence of a factual dispute, the nonmoving party need not establish a material issue conclusively; only that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F. 2d 626, 630 (9th Cir. 1987).

In opposing Verizon's motion, Plaintiff relies upon the pleadings on file, including Plaintiffs' oppositions to Calpac's and DTS' motions for summary judgment and supporting declarations, and all other pleadings filed concurrently or hereafter. Plaintiff presents the following additional arguments to support denial of Verizon's summary judgment motion:

**A. Verizon was a Title VII employer of Plaintiff.**

As Verizon acknowledges, although Plaintiff's direct employer was Calpac, Verizon is subject to Title VII liability if it is either a "joint employer" or "indirect employer" of Plaintiff.

**1. Verizon was a "joint employer" of Plaintiff.**

Two or more employers may be considered "joint employers" under Title VII if both employers control the terms and conditions of employment of the employee. EEOC v. Pac. Mar. Ass'n, 351 F. 3d 1270, 1275 (9th Cir. 2003). The question of joint employer status is a factual

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp. to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

2

Case 1:05-cv-00037    Document 594    Filed 04/25/2008    Page 2 of 20

one and requires an examination into whether an employer who is claimed to be a "joint employer" "possessed sufficient control over the work of the employees to qualify as 'joint employer' with [the actual employer]." Boire v. Greyhound Corp., 376 U.S. 473, 481 (1964). "A finding that companies are 'joint employers' assumes in the first instance that companies are 'what they appear to be' independent legal entities that have merely 'historically chosen to handle jointly ... important aspects of their employer-employee relationship.' " NLRB v. Browning-Ferris Indus. of Pa., Inc., 691 F. 2d 1117, 1122 (3d Cir. 1982) (quoting NLRB v. Checker Cab Co., 367 F. 2d 692, 698 (6th Cir. 1966)). The Ninth Circuit has applied an "economic reality" test to determine whether a joint employment relationship exists. Pac. Mar. Ass'n, 351 F. 3d at 1275.

The determination of whether there is a "joint employer" situation looks to which of two, or whether both, companies control, in the capacity of employer, the labor relations of a given group of workers. Browning-Ferris[1], 691 F. 2d at 1122-23 (quoting NLRB v. Condenser Corp. of Am., 128 F. 2d 67, 72 (3d Cir. 1942)). The basis of a finding of "joint employer" status is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Id. at 1123. Joint employers share or co-determine those matters governing the essential terms and conditions of employment. Id. Joint employer

---

[1] In Browning-Ferris, the Third Circuit affirmed a finding that Browning Ferris Industries of Pennsylvania, Inc. (BFI) was a joint employer with independent trucking brokers over discharged drivers. According to the court, there was substantial evidence to support a "joint employer" finding: BFI shared with the brokers the right to hire and fire the drivers, and BFI's supervisor considered himself the "boss" and acted as "boss" with respect to the employees' functions. 691 F. 2d at 1124. BFI established the work hours of the drivers, determining when the two shifts it established would start and end. Id. at 1124-25. BFI provided the drivers with the same uniforms it provided its own employees. Id. at 1125. BFI and the brokers together determined the drivers' compensation and shared in the day to day supervision of the drivers. Id. BFI directed the drivers at the transfer and landfill sites as if they were their own employees, and BFI forms were used for record keeping purposes. Id. Finally, BFI shared with the brokers the power to approve drivers, and devised the rules under which the drivers were to operate at BFI sites. Id.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

3

Case 1:05-cv-00037    Document 534    Filed 04/25/2008    Page 3 of 20

status depends on a company's authority to control work conditions of employees, not on its exercise, in fact, of that authority. See, e.g., Jewel Tea Co., 53 NLRB 508, 510 (1966).

In determining whether two employing entities may be considered "joint employers," the following factors have been considered: (1) the nature and degree of control over the employers; (2) day-to-day supervision, direct or indirect, including discipline; (3) authority to hire and fire the employee and set conditions of employment; (4) power to control pay rates or methods of payment; (5) control of the employee records including payroll. Torres-Lopez v. May, 111 F. 3d 6633, 639-40 (9th Cir. 1997). These factors are not exhaustive as other relevant factors may be considered. Id.[2]

In this case, Verizon, MCI at the time, had significant control over Calpac employees, including Plaintiffs, and the work environment, just as in the above-cited cases. DTS, through Linda Hayes, claims that "MCI was the party who had exclusive control over the project site[]" in

---

[2] In Gallenkamp Stores Co. v. Nat'l Labor Relations Bd., the Ninth Circuit affirmed the finding of joint employer status between K-Mart and its licensees. 402 F. 2d 525, 528, 535 (9th Cir. 1968). In that case, Kmart promulgated Rules and Regulations which provided that K-Mart's manager was responsible for the over-all operation of the store, and that he was permitted to request immediate action from the licensee if he believed that the licensee had not provided sufficient help, or if any employees were inefficient or objectionable. Id. at 528. Although the Rules declared hiring and terminations to be under the supervision of each licensee's manager, they authorized K-Mart's personnel supervisor to receive applications from persons desiring employment. Id. The Rules included provisions for employee discipline, smoking restrictions, rest periods, places where employees were permitted to keep their personal belongings, employee purchases, employee wearing apparel, and identification badges, and the greeting of customers. Id. at 528-29. Under the license agreement, K-Mart alone had the authority to issue uniform Rules and Regulations for the benefit of the common enterprise, and to amend, modify or revise them. Violation of these Rules subjects the offending licensee to termination of its license by K-Mart. Id. at 529. Under the Rules, K-Mart was allowed to prescribe the number of employees it deemed necessary to operate a licensee's department. Id.

In Ref-Chem Co. v. NLRB, the Fifth Circuit affirmed a finding of joint employer status between El Paso and two companies. 418 F. 2d 127, 129 (5th Cir. 1969). The terms of the agreements with these two companies gave El Paso the right to approve employees, control the number of employees, have an employee removed, inspect and approve work, and pass on changes in pay and overtime allowed. Id. In practice, El Paso exercised its control though in varying degrees. Id. The evidence showed that El Paso shared or co-determined those matters governing essential terms and conditions of employment. Id.

Also, in Spencer v. Byrd, the district court found that the county was a joint employer of a deputy sheriff for purposes of Title VII even though the county was not the employer of the sheriff's deputy under state law. 899 F. Supp. 1439 (M.D.N.C. 1995). In that case, the sheriff, rather than the county, had the exclusive right to hire, discharge, and supervise the plaintiff, the deputy sheriff. Id. at 1441. However, the county had the power to limit the sheriff to two deputies, and to establish the number of deputies. Id. The county also provided the deputy sheriff's

(Footnote continues on following page.)

Henry G. Van Meter, et al., v. Calpac, et al.  
Civil Case No. 05-00037  
Opp'n to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony G. Arriola

4

Case 1:05-cv-00037   Document 594   Filed 04/25/2008   Page 4 of 20

Guam. (Hayes Aff. ¶ 7.) Also, Verizon claims that MCI employee Larry Saunders was the Company Representative[3] of MCI on the project with Calpac. (Lujan Decl.[4] Ex. 1 at 11.) The rights and responsibilities of Calpac and MCI were set forth in a Construction Agreement between Calpac and MCI. (Lujan Decl.[5] Ex. 6, Statement of Work ¶ 13.1.) According to the Agreement, the results of Calpac's work on the MCI project had to be done to the "complete satisfaction of the Company Representative ...." (Id. Ex. 6 ¶ 3.2.) Saunders, as Company Representative of MCI, had the power to inspect all of Calpac's work and materials. (Id. Ex. 6 ¶ 7.1.) Calpac was required, at all times, to furnish to Saunders access and acceptable accommodation to the work wherever it was in progress. (Id. Ex. 6 ¶ 7.2.) As to Calpac's superintendents, if Saunders did not consider the superintendent or necessary assistants to be satisfactory, MCI could have objected to the use of that person or persons, and Calpac had to address and resolve MCI's objections. (Id. Ex. 6 ¶ 11.1.) Regarding Calpac employees, such as Plaintiffs, Calpac was obligated to remove or have removed from the work site any employee, agent, servant, or subcontractor who, in Saunders' opinion, was not strictly disciplined and orderly. (Id. Ex. 6 ¶ 11.2.) If goodwill among landowners, tenants, lessees, and other inhabitants in the community(es)surrounding the work was at risk, Calpac was required to consult with

---

(Footnote continued from previous page)

compensation as it provided such compensation out of budgeted funds. Id. Thus, the county had the power to fund or to decide not to fund the deputy positions. Id.

[3] Clark testified at a deposition that he was the Company Representative referenced in the contract between MCI and Calpac. (Lujan Decl. Ex. 2 at 31 (Apr. 25, 2008).) This shows how interrelated DTS and MCI's work was on the MCI project and adds to the joint employment between MCI, DTS, and Calpac.

[4] Declaration of Delia Lujan in Support of Each of Plaintiffs' Oppositions to Verizon Defendants' Motions for Summary Judgment against all Plaintiffs, filed April 25, 2008.

[5] Declaration of Delia Lujan in Support of Each of Plaintiffs' Oppositions to Defendant Dynamic Technical Services' Motion for Summary Judgment Against All Plaintiffs, filed November 7, 2007.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Verizon Def.'s Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

5

Case 1:05-cv-00037   Document 394   Filed 04/25/2008   Page 5 of 20

Saunders and follow Saunders' recommendation for restoring goodwill. (Id. Ex. 6 ¶ 12.1.) As to additions and changes in the work, Saunders executed the Change Orders which made material changes to the work Calpac would perform for the MCI project. (Id. Ex. 6 ¶ 13.3.) If Calpac had a claim for extra compensation, such claim had to be substantiated with supporting data satisfactory to Saunders. (Id. Ex. 6 ¶ 15.2.) MCI had the power to correct and approve Calpac's invoices for the work it performed, and only after such correction and approval by Saunders and approval by MCI would MCI pay to Calpac ninety percent (90%) of the amount shown on each invoice. (Id. Ex. 6 ¶ 16.2.) At Saunders' sole discretion, money could be withheld from Calpac, such as the amount necessary to protect MCI from loss when, in Saunders' sole discretion, there was evidence to indicate that the work to be performed by Calpac could not be completed. (Id. Ex. 6 ¶ 16.6.) If Calpac's work was suspended by MCI and MCI decided to pay Calpac's standby costs, Calpac was required to remain at a location designated by Saunders and to be available to resume work immediately upon notice from Saunders. (Id. Ex. 6 ¶ 19.2.) If, during suspension, MCI chose to allow Calpac to leave the work site and to pay Calpac additional mobilization and demobilization costs, Calpac was obligated to be available to resume work within ten (10) days' written notice from Saunders that the suspension had ended and the work will resume. (Id. Ex. 6 ¶ 19.2.) In the event Calpac failed to perform the work to MCI's satisfaction by the agreed upon completion date, or failed to perform the work in conformity with the agreement with MCI, or otherwise breached any provision of the agreement with MCI, MCI could have required Calpac to correct the deficiencies to the satisfaction of Saunders. (Id. Ex. 6 ¶ 20.1(b).) In the event of such failure or breach by Calpac, MCI could have required Calpac to make an equitable deduction, to be determined by MCI's Representative, from the contract price if the deficiencies complained of were not corrected to the satisfaction of MCI's Representative and in such case Calpac would not be entitled to any further payment until the deficiencies were corrected. (Id. Ex. 6 ¶ 20.1(c).) In

Henry G. Van Meter, et al., v. Calpac, et al.  
Civil Case No. 05-00037  
Opp'n to Verizon Def.'s Mot. Summ. J. with respect to All Claims Asserted By Pl. Anthony C. Arriola

6

Case 1:05-cv-00037   Document 624   Filed 04/25/2008   Page 6 of 20

the event of such failure or breach by Calpac, MCI could have terminated the work if the deficiencies complained of were not corrected to the satisfaction of Saunders and in such case Calpac would not be entitled to any further payment until the deficiencies were corrected. (Id. Ex. 6 ¶ 20.1(d).) Saunders also had the authority to direct Calpac to segregate and promptly remove from the work site and vicinity of the work site any work failing to conform to the terms and conditions of the agreement with MCI. (Id. Ex. 6 ¶ 20.3.) In the event Calpac had engaged a subcontractor on the MCI project, if Saunders did not consider such subcontractor to be satisfactory, MCI could have objected to the use of that subcontractor and Calpac and MCI had to address and resolve MCI's objections. (Id. Ex. 6 ¶ 26.1.) If work done by any other party was contiguous to the work performed under the agreement with MCI, the respective rights of the various interests involved had to be established by Saunders. (Id. Ex. 6 ¶ 27.3.) Calpac was required to enforce Saunders' instructions regarding signs and advertisements. (Id. Ex. 6 ¶ 8.3.) Saunders had the power to withhold signature approval of the Weekly Production Summary if Calpac failed to comply with certain cleanup procedures. (Id. Ex. 6 Statement of Work ¶ 7.1.) In the event work was performed in or around a private or public facility, Saunders and Calpac were required to coordinate work operations to suit the building management's access and movement requirements. (Id. Ex. 6 Statement of Work ¶ 7.2.) Saunders had the sole authority to order the cutting of any existing cable. (Id. Ex. 6 Statement of Work ¶ 11.1.) Prior to performing any work near an existing cable, Calpac was required to consult with Saunders to ensure that the work was undertaken in such a manner that existing cable was properly protected. (Id. Ex. 6 Statement of Work ¶ 11.1.)

Verizon, at the time MCI, also exerted additional control over Plaintiffs through DTS' Clark. Although Clark was directly employed by DTS, DTS claims that Clark only reported to MCI and received his duties directly from MCI while working on the MCI project in Guam, and

Henry G. Van Meter, et al., v. Calpac, et al.  7
Civil Case No. 05-00037
Opp'n to Verizon Def.s' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola
Case 1:05-cv-00037   Document 594   Filed 04/25/2008   Page 7 of 20

therefore MCI was a joint employer of Clark.[6] DTS' role, authority, and responsibilities in the MCI project were also set forth in Work Orders executed between MCI and DTS. (Lujan Decl.[7] Exs. 7-8.) DTS was responsible for coordinating the activities of Calpac within an assigned geographic area. (Id. Exs. 7-8.) DTS was responsible for researching, evaluating, and recommending routes; providing engineering services; supporting, coordinating, and assuring the quality of product produced by Calpac. (Id. Exs. 7-8.) DTS was required to coordinate the efforts of MCI and Calpac's forces in assisting to acquire permits, both public and environmental; review and approve for submission information to be used in ordering materials and preparing construction and splicing contracts. (Id. Exs. 7-8.) DTS was obligated to coordinate pre-bid job showings and pre-construction meetings; monitor and evaluate construction activities, including presenting required design changes to MCI for approval, review, and approve for submission to Calpac quantities provided to MCI for preparation of progress payment statements. (Id. Exs. 7-8.) DTS was required to supervise all phases of MCI-supplied material acceptance, storage, and distribution, including preparing reports of material deficiencies and surpluses; monitor and approve for submittal to MCI final audit of splicing and construction contracts. (Id. Exs. 7-8.) DTS was required to prepare, supervise, and approve for submittal to MCI all engineering and as-built documentation; perform other duties as assigned by MCI to include meeting of deadlines

---

[6] See Affidavit of Linda G. Hayes, filed July 19, 2007, paragraphs 4-7. Hayes also stated that MCI selected Clark to work on the MCI project. (Id. ¶¶ 4-5.) Clark also testified at his deposition that MCI employee Jeff Buehler was his "boss," (Lujan Decl. Ex. 2 at 34, 54 (Apr. 25, 2008)), that he would send daily "daily production reports" of the MCI project to MCI and that MCI's Saunders and Buehler instructed him on certain things they wanted to be put into the reports, (id. Ex. 2 at 47), that he was "under direct report to [Buehler]," and that he took his full direction from MCI officials, (id. Ex. 2 at 54). Also, the contract between DTS and MCI provided that MCI could remove any DTS employees from the MCI project "at any time for any reason or for no reason." (Civille Decl. Ex. E ¶ 3.1.2 (Apr. 11, 2008).)

[7] Declaration of Delia Lujan in Support of Each of Plaintiffs' Oppositions to Defendant Dynamic Technical Services' Motion for Summary Judgment Against All Plaintiffs, filed November 7, 2007.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

8

Case 1:05-cv-00037   Document 594   Filed 04/25/2008   Page 8 of 20

and maintaining effective cost controls. (Id. Exs. 7-8.) DTS also had a duty to ensure effective coordination with MCI's departments and personnel actively working on the project. (Id. Exs. 7-8.)

Deposition testimony provided by Don Harper ("Harper"), a superintendent employed by Calpac during Plaintiffs' employment, demonstrates the authority MCI, through DTS (Clark), had over Plaintiffs and the work environment. According to Harper, Clark (i.e., DTS) had to be pleased and satisfied. (Lujan Decl. Ex. 1 at 183.) Harper testified that Clark worked out of the Calpac office where he had set up his computer. (Id. Ex. 1 at 173.) Harper testified that Clark was present on the work site with Calpac employees "85 to 90 percent of the time," (id. Ex. 1 at 18-19), and that he knew of the Calpac employees by name since he was there every day with them, (id. Ex. 1 at 179). When asked who was the person responsible for supervising the work of the Calpac employees, Harper testified that "[t]he quality of the work was basically driven by Mr. Clark." (Id. Ex. 1 at 59.) Harper testified that Clark would measure the quantity of work completed and that Clark was "always wheeling out, measuring, doing logs, keeping maps where we were at and measuring depths. Things like that." (Id. Ex. 1 at 71.) Harper testified that Clark would make daily reports to MCI on the progress of the project. (Id. Ex. 1 at 148.) Harper would prepare the reports, sign them, and then send them to Clark. (Id. Ex. 1 at 148-49.) Clark would then revise the reports, remove Harper's name, put his name on the reports, and then send them to MCI. (Id. Ex. 1 at 148-49.) Harper testified that Clark would communicate with "everybody." (Id. Ex. 1 at 73.) Harper testified that Clark gave direct instructions to Calpac employees "a lot." (Id. Ex. 1 at 60.) Harper stated that if Clark did not like the quality of the work performed by Calpac employees, then he would instruct them to do the work over again. (Id. Ex. 1 at 59.) "He [Clark] would want fiber handled differently and if somebody was doing it the way he didn't like it, he would stop them and tell them to do it like this or if he wanted more coverage over his

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony of Arriola

9

Case 1:05-cv-00037   Document 334   Filed 04/25/2008   Page 9 of 20

conduit, he would tell someone to shovel some more right here and walk them along, tell them to shovel some more over there." (Id. Ex. 1 at 60.) When asked to give examples of direct instructions Clark would give to Calpac employees, Harper testified that Clark "would want a certain way of stacking fiber, bend radiuses, placement of conduits, the amount of backfill to be placed, the amount of compaction, separation of rock from soil." (Id. Ex. 1 at 95.) If Clark thought a Calpac employee was shoving too many rocks in the trench, Clark would stop him and tell him not to put anything in the trench, Harper stated. (Id. Ex. 1 at 95.) Harper also testified that "[i]f he [Clark] didn't like the way the traffic control was set up or something like that, he would say something." (Id. Ex. 1 at 60.) Harper also testified that Clark instructed Calpac to perform work outside of the guidelines of the permit and that Calpac just followed the guidelines of Clark. (Id. Ex. 1 at 109-112.) Harper testified that Clark complained to Calpac about Calpac employees and usually mentioned the employee by name. (Id. Ex. 1 at 165.) Harper testified that Clark had screamed and yelled at Calpac employees, including Plaintiffs, on the job site regarding their covering up of conduits without putting dry mix concrete on the conduits in the area. (Id. Ex. 1 at 26.) Harper also testified that on one occasion Clark was cussing and screaming at Calpac employees regarding the work and telling them "they were ripping him off. It was almost like it was his [Clark's] project. He [Clark] referred to it as ripping 'me' off." (Id. Ex. 1 at 91-92.) Harper testified that if Clark made a complaint that he did not agree with, he still followed Clark's instruction. (Id. Ex. 1 at 166-67.) Harper further testified that he himself was removed by Calpac from the MCI project at the request of Clark (i.e., DTS) due to confrontations he had with him. (Id. Ex. 1 at 30, 170.) Also, in Calpac's position statement to the EEOC, Calpac stated that Harper was removed from the MCI project on Clark's orders. (Id. Ex. 2 at 28, 52-53.) Moreover, John Cruikshank testified in a deposition that Healy indicated to him in October 2004,

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037

10

Case 1:05-cv-00037 Document 504 Filed 04/25/2008 Page 10 of 20

after learning of Clark's discriminatory comments, that Healy (i.e., Calpac) was going to fire Harper. (Id. Ex. 3 at 64.)

Also, Clark testified at his deposition that he was both the project manager and inspector for MCI on the project and that he "had a lot of duties." (Lujan Decl.[8] Ex. 2 at 26.) Clark admitted that he was involved in a personnel matter between Harper and Calpac boss Healy regarding a commission fee allegedly due to Harper. (Id. Ex. 2 at 32-33.) He also testified that he discussed with Healy the "crew complements," meaning "[t]he number of people on the [Calpac] crew and how many [Calpac] men it would take to do the job to complete the project." (Id. Ex. 2 at 37, 63.) He admitted to making modifications to production reports Calpac prepared 10 percent of the time. (Id. Ex. 2 at 47-48.) He also stated that 40 percent of his time he would see the Calpac employees on the job site, (id. Ex. 2 at 50), or a little over 300 working days during a 14-month period, (Id. Ex. 2 at 51), and that he stayed in Guam on the MCI project until its completion around early May 2005, (Id. Ex. 2 at 52). Clark admitted that he could have Calpac employees removed from the MCI project if they were not skilled in the work assigned to them and if their conduct endangered goodwill toward MCI of property owners and residents of communities near the work. (Id. Ex. 2 at 58.) Clark further admitted that he had power to change the work site for Calpac employees on the MCI project. (Id. Ex. 2 at 59.) He also testified that he had the authority to settle disputes between Calpac and a third party for up to $500 and that Calpac had the right to go back to him and settle with MCI. (Id. Ex. 2 at 60-61.) He also stated that his interaction at the work site in regards to the manner of work that was being done by Calpac would have been with Harper or one of the Calpac foremen. (Id. Ex. 2 at 64.)

---

[8] Declaration of Delia Lujan in Support of Each of Plaintiffs' Oppositions to Verizon Defendants' Motions for Summary Judgment against all Plaintiffs, filed April 25, 2008.

Henry G. Van Meter, et al., v. Calpac, et al. 11
Civil Case No. 05-00037
Opp'n to Verizon Defs' 3 Mot. Summ. J. with respect to All Claims Asserted by Pl Anthony C. Arriola

Case 1:05-cv-00037   Document 394   Filed 04/25/2008   Page 11 of 20

Clearly, MCI, and therefore Verizon, was a joint employer of Plaintiffs.

Verizon argues that the powers MCI had under the contracts with Calpac and DTS do not make it a joint employer. However, in contrast to the two cases, which are not controlling, it cites for support, MCI here had more than just the power to inspect work and materials. Calpac, as an "Installer," was under the "direct supervision of Contractor [DTS] (as project manager) ...." (Civille Decl. Ex. E ¶ 3.2.) Clark of DTS was MCI's sole representative in Guam for the project. MCI's company representative (claimed to be Saunders by MCI) had the power to remove Calpac employees, and Clark (acting as MCI company representative) had Harper removed from the worksite. Clark, on behalf of MCI, also gave direct instructions to Plaintiffs regarding the manner in which they performed their work, as discussed above. Additional examples of MCI's powers, discussed above, show that MCI's power over the worksite and Plaintiffs was vast.

Verizon argues that Plaintiff admits Verizon had no power or control over his work. However, Plaintiff has always maintained, even before providing deposition testimony, that all Defendants, including Verizon approved of and are responsible for the discrimination and other wrongdoing he suffered. Any deposition testimony Plaintiff gave was limited to what he saw on the field, as he has never reviewed any contracts between MCI and Calpac or MCI and DTS and therefore is personally unaware of the full extent of MCI's power. Plaintiff only testified to what he understood at the time he worked at Calpac. (Arriola Decl. ¶¶ 6-16.) However, as shown above, MCI's power over Plaintiffs and the worksite was indeed extensive, making Verizon a joint employer.

**2. Even if Verizon were not a joint employer, it was an "indirect employer."**

The Ninth Circuit has recognized that a defendant need not be the plaintiff's direct employer and that indirect employment may be a basis for liability under Title VII. <u>Velez v. Roche</u>, 335 F. Supp. 2d 1022, 1027 (N. D. Cal. 2004) (citing <u>Gomez v. Alexian Bros. Hosp. of</u>

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

12

Case 1:05-cv-00037   Document 594   Filed 04/25/2008   Page 12 of 20

San Jose, 698 F. 2d 1019, 1021 (9th Cir. 1983) (stating that Title VII covers those situations in which a defendant subject to the statute "interferes with an individual's employment opportunities with another employer"); Lutcher v. Musicians Union Local 47, 633 F. 2d 880, 883 (9th Cir. 1980) (stating "there must be some connection with an employment relationship for Title VII protections to apply. The connection with employment need not necessarily be direct."). In Lutcher, the Ninth Circuit stated that an indirect employer may be liable under Title VII, for example, where a defendant subject to Title VII interferes with an individual's employment opportunities with another employer. 633 F. 2d at 883 n.3.

In fact, a Title VII plaintiff could assert a claim for hostile work environment against an indirect employer when the indirect employer did cause the hostile work environment or when it had the power to stop the hostile work environment so that its failure to do so constituted interference with the terms, conditions, or privileges of the plaintiff's direct employment. Velez, 335 F. Supp. 2d at 1028 (citing Anderson v. Pac. Mar. Ass'n, 336 F. 3d 924, 932 (9th Cir. 2003)).[9]

---

[9] Several other courts have also found Title VII liability in an indirect employer. For example, in Garrett v. Info. Sys. & Networks Corp., No. 5:97-CV-436-BRI, 1997 U.S. Dist. LEXIS 20845 (E.D.N.C. Nov. 21, 1997), the plaintiff, who worked for a company called I-Net, alleged that she was sexually harassed by an employee of a company called ISN while she was a contract worker with the U.S. Postal Service. The plaintiff claimed that I-Net was liable as her employer, that the USPS was liable because she worked on its premises and it directed her duties, and that ISN was liable because it knew that one of its employees was harassing her. In response to ISN's argument that it could not be held liable, the court stated that it could be: "To allow a defendant to evade liability for allegedly allowing an employee to create a hostile working environment simply because the victim of the alleged harassment was not its employee would undercut the remedial purpose of Title VII." Id. at *6.

In King v. Chrysler Corp., 812 F. Supp. 151 (E.D. Mo. 1993), the plaintiff worked for a company called Canteen, which operated a cafeteria for the employees of Chrysler on Chrysler's premises. The plaintiff claimed that she was sexually harassed by a Chrysler's employee. Chrysler contended that it was not liable since it lacked an employment relationship with the plaintiff. The court ruled against Chrysler, stating that, if it "were to accept Chrysler's position that it is not a proper defendant, Chrysler could allow a hostile work environment to exist because of the peculiar circumstances of its relationship with Canteen, although it could not do so if [the plaintiff] were in its own service." Id. at 153. The court added that this was a case in which a Chrysler employee actually participated in creating the hostile work environment. Id.

In EEOC v. Foster Wheeler Constructors, Inc., No. 98 C 1601, 1999 WL 515524, (N.D. Ill. July 14, 1999), the plaintiffs were the employees of subcontractors who were allegedly subject to a hostile environment at a construction site run by defendant. The court found that the subcontractors' employees who were employed by Title

(Footnote continues on following page.)

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

13

Case 1:05-cv-00037   Document 594   Filed 04/25/2008   Page 13 of 20

Here, as discussed in subsection 1 above, MCI exercised significant, peculiar control over Plaintiff that it interfered with his employment. In Anderson, the Ninth Circuit held that defendant PMA could not be liable under Title VII since the alleged work site was not controlled by the PMA and the PMA did not employ or supervise the plaintiffs or the alleged harassers. 336 F. 3d at 931. In this case, Plaintiffs were discriminated and subject to a hostile work environment on MCI's project and work site, MCI controlled the work site, and MCI supervised the harasser and, through DTS/Clark, did supervise Plaintiffs. As the discrimination and hostile work environment occurred on MCI's project and work site and MCI had the power to remove Clark, (Civille Decl. Ex. E ¶ 3.1.2 (Apr. 11, 2008)), or any Calpac superintendents or employees, (Lujan Decl.[10] Ex. 6 ¶¶ 11.1-11.2), from the worksite, MCI obviously had the power to stop the hostile work environment but it did not and instead waited until after EEOC charges were filed to make

---

(Footnote continued from previous page)

VII employers may sue the defendant (a Title VII employer) for interfering with the conditions of their employment. Id. at *10.

In Duncan v. Junior Coll. Dist. of St. Louis, No. 4:98CV01220 (CEJ), 1999 U.S. Dist. LEXIS 22451 (E.D. Mo. Nov. 15, 1999), the plaintiff was employed by a college but was assigned to perform her job duties at a General Motors facility, where she claimed she was subject to a hostile work environment. The court found that, although General Motors did not pay her salary or give her any other benefits, it could be held liable: "Plaintiff performed her job only at the GMC plant, GMC employees gave her work instructions, and a GMC employee with apparent, if not actual, authority over plaintiff was responsible for the allegedly hostile work environment. That hostile environment caused plaintiff to terminate her employment with the College." Id. at *9.

In Diana v. Schlosser, the plaintiff worked for a company that was in the business of providing on-air traffic reports for radio stations, one of which was the defendant. The plaintiff, who was assigned to do a report for the defendant, claimed that she was subjected to a hostile environment by one of the defendant's employees. Although the court found that the defendant was not the plaintiff's employer, the court found that the plaintiff could pursue Title VII relief against the defendant since the defendant had significant control over the plaintiff's ability to maintain substantial employment opportunity. The court stated:
> This type of arrangement is not atypical of the present-day workplace where employees of different employers often work side-by-side and where employment opportunities are controlled by those other than the direct employer. It would undermine the protections of Title VII if an employer could permit discrimination, and not be exposed to Title VII liability from certain employees whose employment opportunities it controlled, simply because those employees were not its own.

20 F. Supp. 2d 348, 352 (D. Conn. 1998).

[10] Declaration of Delia Lujan in Support of Each of Plaintiffs' Oppositions to Defendant Dynamic Technical Services' Motion for Summary Judgment Against All Plaintiffs, filed November 7, 2007.

Henry G. Van Meter, et al., v. Calpac, et al.  
Civil Case No. 05-00037  
Opp'n to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

14

Case 1:05-cv-00037    Document 594    Filed 04/25/2008    Page 14 of 20

any attempt to ensure that Clark or Calpac did not engage in harassing conduct. Therefore, Verizon/MCI, if not a joint employer, was an indirect employer of Plaintiffs.

In Verizon's motion, it misrepresents the holding in Anderson, since in that case the Ninth Circuit implicitly "recognized that a Title VII plaintiff could assert a claim for hostile work environment against an indirect employer when the indirect employer *did* cause the hostile work environment or when it *had* the power to stop the hostile work environment such that its failure to do so constituted interference with the terms, conditions, or privileges of the plaintiff's direct employment." Velez, 335 F. Supp. 2d at 1028. In this case, Verizon clearly had the power to stop the hostile work environment as it could have immediately removed Clark or any Calpac employees from the worksite. Verizon does not dispute that it had the power to remove Clark or Calpac employees from the project. Therefore, Title VII liability could attach to Verizon even as an indirect employer of Plaintiffs.

**B. Verizon is subject to Title VII liability regardless of any claimed lack of awareness of the hostile work environment, discrimination, or retaliation.**

The United States Supreme Court has held that an employer is vicariously liable under Title VII for the harassment of a supervisor with immediate or successively higher authority over the plaintiff employee. See Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 724, 765 (1998). When no tangible employment action is taken, an employer may raise an affirmative defense to liability or damages: (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Ellerth, 524 U.S. at 765. However, no affirmative defense is available when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. Id.

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

15

Case 1:05-cv-00037   Document 394   Filed 04/25/2008   Page 15 of 20

Further, the Ninth Circuit has held that, under Title VII, "an employee can recover against an employer without showing that the employer had actual or constructive knowledge of the supervisor's actions or acted negligently in failing to intervene." Kohler v. Inter-Tel Technologies, 244 F. 3d 1167, 1177 (9th Cir. 2001). A Title VII plaintiff is not required to prove that his employer committed an act of harassment or had actual or constructive knowledge that a supervisor had done so. Id. Thus, an employer is vicariously liable for the acts of an agent or supervisor without regard to the employer's knowledge or fault. Id.; see also El-Hakem v. BJY Inc., 415 F. 3d 1068, 1075 n.2 (9th Cir. 2005) (quoting Nichols v. Azteca Rest. Enters., Inc., 256 F. 3d 864, 876-77 (9th Cir. 2001)).

Here, Verizon argues that it cannot be liable for Clark's actions since it had no knowledge of Clark's harassing conduct or the discriminator or retaliatory employment actions until two months after the last incident. However, as stated in Kohler, Verizon's alleged lack of knowledge is of no moment since Verizon is vicariously liable for the acts of Clark, who was Verizon/MCI's agent and Plaintiff's supervisor. As Plaintiff indisputably suffered a tangible employment action, i.e., discharge, Verizon can raise no affirmative defense.

Even if Verizon could raise an affirmative defense, it has failed to meet its burden of showing that it exercised reasonable care to prevent and correct promptly Clark's harassing behavior and that Plaintiff unreasonably failed to take advantage of preventive or corrective opportunities provided by MCI or to otherwise avoid harm.

In Faragher, the Supreme Court found that the City employer could not as a matter of law be found to have exercised reasonable care to prevent the supervisors' harassing conduct where the City had entirely failed to disseminate its policy against sexual harassment among the beach employees and that its officials made no attempt to keep track of the conduct of supervisors, and the City's policy did not include any assurance that the harassing supervisors could be bypassed

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

16

Case 1:05-cv-00037   Document 594   Filed 04/25/2008   Page 16 of 20

in registering complaints. 524 U.S. at 808. Here, MCI likewise failed to disseminate any anti-discrimination or anti-harassment policy it may have had to Clark or Plaintiffs. MCI did not provide Calpac employees, including Plaintiffs, with any complaint or grievance procedure for Plaintiffs to register complaints regarding the project or Clark's or any harasser's conduct toward them, (Arriola Decl. ¶ 9), and so made no effort to track Clark's or any harasser's conduct as to any complaints Plaintiffs had about him. In failing to provide a grievance procedure, MCI obviously failed to assure Plaintiffs that a harassing supervisor could be bypassed in registering complaints. Plaintiffs simply were informed of no way to contact MCI with their complaints. Therefore, Verizon failed to exercise reasonable care to prevent and correct Clark's or any other person's harassing behavior.

Without a grievance procedure offered to Plaintiff, Verizon's argument that Plaintiff failed to take advantage of preventive or corrective opportunities offered by MCI is laughable. Verizon appears to suggest that a plaintiff knowing a physical location (indeed one of hundreds perhaps as this was MCI) of the employer is all that an employer needs to prove its affirmative defense to Title VII liability. Verizon would have this Court ignore all the case law regarding grievance procedures and providing employees reasonable avenues to make complaints to employers. This argument is especially ridiculous in light of the fact that the undisputed MCI employees directing the project were in the mainland, hundreds if not thousands of miles from Plaintiff and Clark in Guam. The fact is, and Verizon does not dispute this, that Plaintiff did register his complaint with supervisors other than Clark for it to go up the chain of command, as this was all he knew. (Arriola Decl. ¶¶ 6-12.) Therefore, Verizon cannot prove an affirmative defense since it cannot demonstrate that Plaintiff failed to utilize corrective opportunities offered by MCI, as none were offered.

Henry G. Van Meter, et al., v. Calpac, et al.  17
Civil Case No. 05-00037
Opp'n to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

Case 1:05-cv-00037   Document 394   Filed 04/25/2008   Page 17 of 20

In its motion, Verizon argues that, as it did not directly employ Clark or Plaintiff or was involved in the wrongdoing, it can only be liable under Title VII if it knew or should have known about the wrongdoing. (Mot. Summ. J. at 14.) Even if this is the correct standard (which it is not, as Clark was MCI's agent and practically employee, and Plaintiff's supervisor), Verizon is still liable under Title VII since it should have known about Clark's and Calpac's wrongdoing and failed to provide Plaintiffs a complaint or grievance procedure.

An employee can prove that an employer knew or should have known of harassment by showing that he complained to higher management or by showing that the harassment was pervasive enough to charge the employer with knowledge. Morgan v. Fellini's Pizza, Inc., 64 F. Supp. 2d 1304, 1313 (N.D. Ga. 1999) (citing Henson v. City of Dundee, 682 F. 2d 897, 905 (11th Cir. 1982)).

Here, MCI at the very least should have known about the wrongdoing occurring on its own project, where it had the power to remove both Calpac and DTS employees. It is undisputed that Plaintiff complained about the harassment to his superiors, reaching up the chain of command to Harper. Harper testified that he took the complaint up to Calpac boss Healy and even to Clark himself, MCI's sole representative for the project in Guam. Courts have held that the appropriate person to whom an employee should complain of harassment is "(1) someone who has the authority to terminate the harassment of which the employee is complaining, or (2) someone who is obligated to, or could reasonably be expected to, refer the complaint to someone described in (1)." Morgan, 64 F. Supp. 2d at 1313 (citing Nuri v. PRC, Inc., 13 F. Supp. 2d 1296, 1304 n.8 (M.D. Ala. 1998)); see also Sims v. Health Midwest Physician Servs. Corp., 196 F. 3d

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

18

Case 1:05-cv-00037    Document 594    Filed 04/25/2008    Page 18 of 20

915, 919, 921 (8th Cir. 1999)[11]. In the absence of any grievance procedure to complain about Clark or any harasser to MCI or DTS, or even any formal complaint procedure by Calpac, Plaintiff did what was reasonable: he complained to his supervisors and expected them to take it up the chain of command, which they did. (Arriola Decl. ¶ 11.) The complaints were received by Harper, who informed Healy and Clark, and who even knew how to contact Clark's "boss" Jeff Buehler of MCI with complaints regarding Clark.[12] Therefore, Plaintiff complained to a person who could reasonably be expected to refer his complaint to someone who could terminate the harassment, and consequently MCI should have known about the harassment.

Moreover, MCI should have known about Plaintiffs' allegations since, besides MCI having daily contact with Clark regarding the progress of the project and any problems on the job site, including Clark's altercations with Harper,[13] the discrimination and hostile work environment were pervasive, as discussed more thoroughly in Plaintiffs' oppositions to Calpac's and DTS' motions for summary judgment. As discussed in those oppositions, Clark openly insulted all thirteen Plaintiffs by calling them "island monkeys" or "monkeys," some of them being insulted as much as three or four times. Although Plaintiffs were in crews spread throughout the project, each Plaintiff had heard of other Calpac employees also being called such terms by Clark. Plaintiffs all stated, and Harper confirmed, that the work environment was very tense and the workers were close to revolt. Harper took Plaintiffs' complaints regarding Clark to

---

[11] In this case, the Eighth Circuit stated that "[a]n employer may be responsible for the consequences of sexual harassment if information about the harassment came to the attention of someone who (a) has under the terms of his employment, or (b) is reasonably believed to have a duty to pass on the information to someone within the company who has the power to do something about it." Sims, 196 F. 3d at 919 (quotations omitted). The court also stated that "[i]f authorized agents with a reporting duty (or persons reasonably believed to have such a duty) acquire knowledge of sexual harassment, then the corporation acquired such knowledge." Id. at 921.

[12] Lujan Decl. Ex. 2 at 34-35 (Apr. 25, 2008).

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Verizon Defs' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

19

Case 1:05-cv-00037    Document 394    Filed 04/25/2008    Page 19 of 20

Calpac boss John Healy and even to Clark himself, MCI's sole representative on Guam during the project. In fact, Hayes of DTS stated Clark reported directly to MCI and discussed any issues regarding the Guam project with MCI and that all duties and responsibilities given to Clark regarding the Guam project came from MCI, not DTS. According to Hayes, all issues that arose on the Guam project were handled between Clark and MCI. (Hayes Aff. ¶¶ 5-7.) Therefore, MCI should have known about the harassment, hostile work environment and retaliatory conduct.

Verizon argues that even if it knew about the wrongdoing, it exercised reasonable care to prevent and promptly correct any harassing behavior and Plaintiff unreasonably failed to take advantage of any corrective opportunities. However, as explained at length above, this argument fails since Verizon completely failed to provide any means by which Plaintiff could register his complaints regarding harassment on MCI's project. Therefore, Verizon is not entitled to summary judgment.

## III. CONCLUSION

Based on the foregoing, the record, and all Plaintiffs' oppositions to Defendants' motions for summary judgment and related documents in support of the oppositions, Plaintiff Anthony C. Arriola respectfully requests that Verizon Defendants' summary judgment motion be denied.

**RESPECTFULLY SUBMITTED** this 25th day of April, 2008.

LUJAN AGUIGUI & PEREZ LLP

By: _____
DELIA LUJAN
*Attorneys for Plaintiffs*

---

(Footnote continued from previous page)

[13] See Lujan Decl. Ex. 2 at 47, 68-70 (Apr. 25, 2008).

Henry G. Van Meter, et al., v. Calpac, et al.
Civil Case No. 05-00037
Opp'n to Verizon Defs.' Mot. Summ. J. with respect to All Claims Asserted by Pl. Anthony C. Arriola

20

Case 1:05-cv-00037    Document 594    Filed 04/25/2008    Page 20 of 20