

**LUJAN AGUIGUI & PEREZ** LLP
Attorneys at Law
DNA Building, Suite 300
238 Archbishop Flores Street
Hagåtña, Guam 96910
Telephone (671) 477-8064/5
Facsimile (671) 477-5297

*Attorneys for Plaintiffs*

**FILED**
**DISTRICT COURT OF GUAM**

APR 2 5 2008 R.D.

**JEANNE G. QUINATA**
**Clerk of Court**

## IN THE UNITED STATES DISTRICT COURT OF GUAM

## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, et al., | CIVIL CASE NO. 05-00037 |
| Plaintiffs, | |
| -vs- | **DECLARATION OF DELIA LUJAN IN SUPPORT OF EACH OF PLAINTIFFS' OPPOSITIONS TO VERIZON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| CALPAC, et al., | |
| Defendants. | |

I, DELIA LUJAN, hereby declare and state as follows:

1. I am an attorney representing all the plaintiffs in this matter.

2. This declaration is submitted in support of each of Plaintiffs' oppositions to Verizon Defendants' Motions for Summary Judgment.

3. Attached hereto as Exhibit 1 is a true and correct copy of Verizon's Answers and Objections to Plaintiff Robert B. Cruz's First Set of Interrogatories, which I received from Verizon Defendants on or about November 15, 2007, in response to a First Set of Interrogatories.

4. Attached hereto as Exhibit 2 are true and correct copies of the cover pages, various excerpts, the Reporter's Certificate, and the Notary Public's Certificate of the deposition of Dennis Clark taken on May 23, 2007.

Henry G. Van Meter, et al., v. CAL PAC, et al.
Civil Case No. 05-00037

1

1    I declare under penalty of perjury under the laws of the United States that the foregoing is

2    true and correct.

3    Executed this 25th day of April, 2008, in Hagåtña, Guam.

4

5

6    _____

7    **DELIA LUJAN**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Henry G. Van Meter, et al., v. CAL PAC, et al.                                                    2
Civil Case No. 05-00037

# EXHIBIT 1

C-0053|0446

**RECEIVED**

NOV 15 2007

LUJAN AGUIGI~ ~ ~~~ LLP
~~ _____ 10:00

1  **CIVILLE & TANG, PLLC**
330 HERNAN CORTEZ AVENUE, SUITE 200
2  HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8869/69
3  FACSIMILE: (671) 477-2511

4  *Attorneys for Defendants*
*Verizon Business Purchasing, LLC and*
5  *Verizon Business Network Services, Inc.*

6

7

8                 IN THE UNITED STATES DISTRICT COURT OF GUAM

9   HENRY G. VAN METER, JERRY          ) CIVIL CASE NO. 05-00037
    APODACA, JR., JOSEPH J.            )
10  HERNANDEZ, JOSEPH T. MENDIOLA,     )
    LARRY L. CHARFAUROS, ANTHONY       )
11  C. ARRIOLA, ROBERT B. CRUZ,        )
    ROLAND F. MENDIOLA, JAMES S.       )
12  YEE, TEDDY B. CRUZ, JESSE B. CRUZ, )
    JOHN L.G. NAUTA, and JOHN P.       )
13  BABAUTA,                           ) **VERIZON'S ANSWERS TO PLAINTIFF**
                                       ) **ROBERT B. CRUZ'S FIRST SET OF**
14              Plaintiffs ,           ) **INTERROGATORIES**
                                       )
15      vs.                            )
                                       )
16  CALPAC, DYNAMIC TECHNICAL          )
    SERVICES, VERIZON BUSINESS         )
17  PURCHASING, LLC, VERIZON           )
    BUSINESS NETWORK SERVICES, INC.,   )
18                                     )
    JOHN HEALY, DENNIS CLARK,          )
19  WILLIAM WARD, JAI JAMES, and       )
    DOES 1 through 10,                 )
20                                     )
                Defendants.            )
21  _____)

22         Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendants Verizon Business

23  Purchasing, LLC and Verizon Business Network Services, Inc. (collectively "Verizon") answer

24  as follows in response to Plaintiff Robert B. Cruz's First Set of Interrogatories:

25         **OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS**

26         1.      Verizon objects to the Instructions and Definitions to the extent they impose

27  obligations beyond those required by the Federal Rules of Civil Procedure, including, but not

28

DLI-6148931v3                              1

1

limited to, any instruction or definition that could be construed to require the production of
privileged information.

    2.    Verizon objects to the definition of "Plaintiff" (Instruction/Definition No. 2) to the
extent these Interrogatories inconsistently use the singular form of the word "Plaintiff" to mean
Robert Cruz alone and also to mean the 13 plaintiffs in this action collectively. For purposes of
these responses, "Plaintiffs" refers to all plaintiffs in this action.

## ANSWERS AND OBJECTIONS

**INTERROGATORY NO. 1:** With respect to the persons answering, or providing information
used to answer, these Interrogatories, state his or her:

    (a)    Name;

    (b)    Address;

    (c)    Business address;

    (d)    Business or other telephone number;

    (e)    Job title;

    (f)    Occupation;

    (g)    Name of immediate superior;

    (h)    Employer;

    (i)    Length of employment with Defendant; and

    (j)    Length of time in current position.

**ANSWER:** Verizon objects to this Interrogatory on the grounds that it seeks information that is
neither relevant to the claims in this proceeding nor reasonably calculated to lead to the discovery
of admissible evidence. Subject to and without waiving the foregoing objections, Verizon states
that the following individuals provided information used to answer these interrogatories. These
individuals are employees of Verizon and must be contacted through Verizon's attorneys of
record.

DLI-6148931v3

2

(a)     Jeff Buehler
        Construction Manager, Regional Engineering and Construction
        2400 North Glenville
        Richardson, TX 75081
        972/729-6404

Mr. Buehler has been employed by Verizon or a predecessor to Verizon since 1994. Mr.

Buehler has held his current position since the beginning of his employment.

(b)     Marty Hersh
        Group Manager, Northeast Regional Engineering and Construction
        MD 2.2-408A
        6929 North Lakewood
        Tulsa, OK 74117
        918/590-5288

Mr. Hersh has been employed by Verizon or a predecessor to Verizon since 1987. Mr.

Hersh has held his current position for approximately 5 years.

(c)     Larry Saunders
        Regional Manager, Regional Engineering and Construction
        2400 North Glenville
        Richardson, TX 75082
        972/729-5908

Mr. Saunders has been employed by Verizon or a predecessor to Verizon since 1992. Mr.

Saunders has held his current position since approximately 1995.

**INTERROGATORY NO. 2:**  If Defendant has an affirmative action program or plan, state in

full and complete detail the nature of said affirmative action program or plan, and include as part

of your answer the name and address of the person who is responsible for implementing that

program or plan.

**ANSWER:**  Verizon objects to this Interrogatory on the grounds that it is overly broad and seeks

information that is neither relevant to the claims in this lawsuit nor reasonably calculated to lead

to the discovery of admissible evidence.  Verizon further objects to this Interrogatory on the

grounds that it is vague and ambiguous as to the meaning of "implementing."

1    **INTERROGATORY NO. 3:** If any employee or applicant for employment has ever filed an

2    internal complaint with Defendant alleging that Defendant has discriminated, state:

3            (a)     the name, address, and sex of the person who filed the complaint;

4            (b)     the employment history with Defendant of the person who filed the complaint

5    including job titles and dates;

6            (c)     state the date the complaint was filed;

7            (d)     describe the charges made in the complaint;

8            (e)     describe all actions taken on the basis of the complaint;

9            (f)     attach a copy or state the time and place where counsel for Plaintiffs may examine

10    a copy of the complaint.

11    **ANSWER:** Verizon objects to this Interrogatory on the grounds that it is overly broad, unduly

12    burdensome, and seeks information that is neither relevant to the claims in this lawsuit nor

13    reasonably calculated to lead to the discovery of admissible evidence, including, but not limited

14    to, for the reasons that the Interrogatory is not limited as to time, relevant unit, or type of alleged

15    discrimination, and requests information regarding the sex of complainants. Verizon further

16    objects to this Interrogatory on the grounds that it is vague and ambiguous as to the meaning of

17    "employment history" and "internal complaint." Subject to and without waiving the foregoing

18    objections, Verizon states that it did not employ any Plaintiff, no Plaintiff applied for employment

19    with Verizon, and Verizon did not control, or interfere with, the terms and conditions of any

20    Plaintiff's employment during any period of time potentially relevant to this lawsuit (*e.g.*,

21    December 2003 through May 2005). Verizon further states that it did not employ any of the

22    alleged wrongdoers during any period of time potentially relevant to this lawsuit (*e.g.*, December

23    2003 through May 2005), including, but not limited to, Dennis Clark. Accordingly, other than the

24    complaints made, and charged filed, in connection with this lawsuit, Verizon does not have any

25    information regarding internal complaints of discrimination against any of the alleged

26    wrongdoers.

27

28

**INTERROGATORY NO. 4:** If any employee or applicant for employment ever filed a complaint with any federal, state, or local governmental agency alleging that Defendant has discriminated, state:

      (a)     the name, address, race, and national origin of the person who filed the complaint;

      (b)     the employment history with Defendant of the person who filed the complaint, including job titles and dates;

      (c)     the date the complaint was filed;

      (d)     the charges made in the complaint;

      (e)     all actions taken on the basis of the complaint; and

      (f)     attach a copy or state the time and place where Plaintiffs' counsel may examine a copy of the complaint.

**ANSWER:** Verizon objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks information that is neither relevant to the claims in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence, including, but not limited to, for the reasons that the Interrogatory is not limited as to time, relevant unit, or type of alleged discrimination. Verizon further objects to this Interrogatory on the grounds that it is vague and ambiguous as to the meaning of "employment history." Subject to and without waiving the foregoing objections, Verizon states that it did not employ any Plaintiff, no Plaintiff applied for employment with Verizon, and Verizon did not control, or interfere with, the terms and conditions of any Plaintiff's employment during any period of time potentially relevant to this lawsuit (*e.g.*, December 2003 through May 2005). Verizon further states that it did not employ any of the alleged wrongdoers during any period of time potentially relevant to this lawsuit (*e.g.*, December 2003 through May 2005), including, but not limited to, Dennis Clark. Accordingly, other than the complaints made, and charged filed, in connection with this lawsuit, Verizon does not have any information regarding a complaint with any federal, state, or local governmental agency alleging discrimination against any of the alleged wrongdoers.

**INTERROGATORY NO. 5:** If an employee or applicant for employment ever filed a legal action alleging Defendant had discriminated, state:

1       (a)     the name, address, race, and national origin of the person who filed the legal

2  action;

3       (b)     the employment history with Defendant of the person who filed the legal action,

4  including job titles and dates of employment;

5       (c)     the date the legal action was filed;

6       (d)     the name and address of the court with which the action was filed;

7       (e)     the charges made in the legal action;

8       (f)     all actions taken on the basis of the legal action;

9       (g)     the outcome of the legal action; and

10      (h)     attach a copy or state a time and place where counsel for Plaintiffs may examine a

11  copy of the complaint.

12  **ANSWER:** Verizon objects to this Interrogatory on the grounds that it is overly broad, unduly

13  burdensome, and seeks information that is neither relevant to the claims in this lawsuit nor

14  reasonably calculated to lead to the discovery of admissible evidence, including, but not limited

15  to, for the reasons that the Interrogatory is not limited as to time, relevant unit, or type of alleged

16  discrimination and seeks "all actions taken on the basis of the legal action." Verizon further

17  objects to this Interrogatory to the extent that it seeks information protected by the attorney-client

18  privilege or any other applicable privilege. Verizon further objects to this Interrogatory on the

19  grounds that it is vague and ambiguous as to the meaning of "employment history," "charges

20  made in the legal action," and "all actions taken on the basis of the legal action." Subject to and

21  without waiving the foregoing objections, Verizon states that it did not employ any Plaintiff, no

22  Plaintiff applied for employment with Verizon, and Verizon did not control, or interfere with, the

23  terms and conditions of any Plaintiff's employment during any period of time potentially relevant

24  to this lawsuit (*e.g.*, December 2003 through May 2005). Verizon further states that it did not

25  employ any of the alleged wrongdoers during any period of time potentially relevant to this

26  lawsuit (*e.g.*, December 2003 through May 2005), including, but not limited to, Dennis Clark.

27  Accordingly, other than this lawsuit, Verizon does not have any information regarding any legal

28  action alleging discrimination against any of the alleged wrongdoers.

**INTERROGATORY NO. 6:** For those witnesses who may be called as expert witnesses, provide the following information:

      (a)    his or her name, business address, and home address;

      (b)    his or her business occupation;

      (c)    his or her title or position and the name and address of the concern or entity with which he or she is connected in business or occupation;

      (d)    whether his or her testimony is expected to be given with respect to the complaint or Defendant's answer;

      (e)    each subject matter on which he or she is expected to testify;

      (f)    a summary of his or her qualifications within each subject matter on which he or she is expected to testify;

      (g)    the substance of the facts to which he or she is expected to testify;

      (h)    the substance of the opinions to which he or she is expected to testify and a summary of the grounds for each such opinion; and

      (i)    a list of the books or publications which the expert witness considers authoritative in his or her field.

**ANSWER:** Verizon objects to this Interrogatory on the grounds that it is premature and to the extent that it seeks undiscoverable information regarding any consulting-only experts. *See* FED. R. CIV. P. 26(b)(4)(B). Subject to and without waiving the foregoing objections, Verizon states that it has not retained any expert. In the event Verizon retains a testifying expert, Verizon will identify any such expert in accordance with the Court's scheduling order and Federal Rule of Civil Procedure 26.

**INTERROGATORY NO. 7:** Describe in detail all the work performed, and the location of such work performed, by defendant Calpac pursuant to a Construction Agreement entered on February 13, 2004, by defendant Calpac and WorldCom Purchasing, LLC.

**ANSWER:** Verizon objects to this Interrogatory on the grounds that it is overly broad and vague and ambiguous. Verizon further objects to this Interrogatory to the extent that it seeks information that is neither relevant to the claims in this lawsuit nor reasonably calculated to lead

DLI-6148931v3

7

to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Verizon states that Calpac installed fiber cables in Guam from approximately March 2004 through March 2005 pursuant to a February 13, 2004 Construction Agreement between Calpac and a predecessor to Verizon Business Purchasing, LLC and its attached Statement of Work ("Calpac Agreement"). Verizon refers Plaintiffs to the Calpac Agreement and further refers Plaintiffs to documents relating to Calpac's provision of services under the Calpac Agreement that Verizon is producing or will produce subject to the entry of a protective order in response to Teddy B. Cruz's First Request for Production of Documents. To the extent Plaintiffs seek additional information regarding work performed by Calpac, such a request should be directed to Calpac.

**INTERROGATORY NO. 8:** Describe in detail all the work performed, and the location of such work performed, by Defendant pursuant to a Construction Agreement entered on February 13, 2004, by WorldCom Purchasing, LLC, and defendant Calpac.

**ANSWER:** Verizon objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and vague and ambiguous. Verizon further objects to this Interrogatory to the extent that it seeks information that is neither relevant to the claims in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Verizon states that Calpac performed the services specified in the Statement of Work attached to the Calpac Agreement, including the construction of a fiber optic underground conduit system in Guam. Verizon further states that it did not employ or supervise the individuals who performed such services and did not direct the day-to-day activities of Calpac or its employees pursuant to the Calpac Agreement.

Verizon further states that, with respect to the Guam project, Marty Hersh traveled to Guam in or about November 2003 to locate contractors to install fiber cable in Guam, to facilitate the bidding process for such installation, and to view and, make adjustments to, the route in which the cable would be laid. After a bidding process, Verizon contracted with Calpac to install the fiber cable. Verizon contracted with Dynamic Technical Services ("DTS") regarding project management for the Guam project. In or about January and February 2004, Jeff Buehler traveled

DLI-6148931v3                                                    8

1   to Guam to discuss the installation with Calpac and DTS employee Dennis Clark and to view the

2   route in which the cable would be laid. No Verizon employee or personnel remained in Guam to

3   oversee the Guam project nor did Mr. Hersh or Mr. Buehler return to Guam. Once the project

4   began, Verizon reviewed daily and weekly reports in Richardson, Texas and Tulsa, Oklahoma

5   prepared by Dennis Clark regarding the progress of the Guam project. Verizon further

6   participated in weekly conference calls with Dennis Clark regarding the progress of the Guam

7   project. Verizon further reviewed invoices prepared by Calpac and paid Calpac for its services on

8   a per unit basis.

9   **INTERROGATORY NO. 9:** Describe in detail all the work performed, and the location of such

10  work performed, by defendants Dynamic Technical Services and Dennis P. Clark pursuant to a

11  Construction Agreement entered on February 13,2004, by WorldCom Purchasing, LLC, and

12  defendant Calpac.

13  **ANSWER:** Verizon objects to this Interrogatory on the grounds that it is overly broad and vague

14  and ambiguous. Verizon further objects to this Interrogatory to the extent that it seeks

15  information that is neither relevant to the claims in this lawsuit nor reasonably calculated to lead

16  to the discovery of admissible evidence. Subject to and without waiving the foregoing objections,

17  Verizon states that Calpac performed all services specified in the Statement of Work attached to

18  the Calpac Agreement, including the construction of a fiber optic underground conduit system in

19  Guam. Verizon further states that, pursuant to a September 24, 2001 agreement between a

20  predecessor to Verizon Business Network Services, Inc. and DTS ("DTS Agreement"), DTS

21  employee Dennis Clark oversaw Calpac's installation of fiber cables in Guam from

22  approximately March 2004 through March 2005. DTS, through Mr. Clark, worked with Calpac

23  to refine the construction design and fine-tune the route in which the cable was laid. In addition,

24  DTS worked with local government agencies to obtain necessary permits, easements, and rights

25  of way. DTS also inspected Calpac's installation to ensure that such work complied with the

26  terms of the Calpac Agreement. Verizon refers Plaintiffs to the DTS Agreement and further

27  refers Plaintiffs to documents relating to DTS' provision of services under the DTS Agreement

28  that Verizon is producing or will produce subject to the entry of a protective order in response to

DLI-6148931v3                                    9

1    Teddy B. Cruz's First Request for Production of Documents. To the extent Plaintiffs seek

2    additional information regarding work performed by DTS and Dennis Clark, such a request

3    should be directed to DTS. Verizon further notes that Plaintiffs have deposed Mr. Clark.

4    **INTERROGATORY NO. 10:** Identify by name, address, telephone number, race, national

5    origin, and job title, all persons Defendant is aware of who performed work pursuant to the

6    Construction Agreement described in Interrogatory No. 7.

7    **ANSWER:** Verizon objects to this Interrogatory on the grounds that it is overly broad, unduly

8    burdensome, and vague and ambiguous. Verizon further objects to this Interrogatory to the extent

9    that it seeks information that is neither relevant to the claims in this lawsuit nor reasonably

10    calculated to lead to the discovery of admissible evidence. Subject to and without waiving the

11    foregoing objections, Verizon states that it believes that the following former or current Calpac

12    employees may have had some involvement with respect to Calpac's performance of the Calpac

13    Agreement. To the extent Plaintiffs seek additional information regarding which Calpac

14    employees "performed work" pursuant to the terms of the Calpac Agreement, such a request

15    should be directed to Calpac.

16        (a)     Tim Camacho

17
         Verizon does not have information regarding Mr. Camacho's race and national origin or

18
   his current address, telephone number, and job title.

19

20        (b)     Don Harper

21          Verizon does not have information regarding Mr. Harper's race and national origin or his

22    current address, telephone number, and job title.

23        (c)     John Healy

24          Verizon does not have information regarding Mr. Healy's current address, telephone

25    number, and job title. Verizon believes that Mr. Healy is Caucasian.

26

27

28

(d)     Jai James

Verizon does not have information regarding Mr. James' race and national origin or his current address, telephone number, and job title.

(e)     Bob Thompson

Verizon does not have information regarding Mr. Thompson's current address, telephone number, and job title.  Verizon believes that Mr. Thompson is Caucasian.

(f)     William Ward

Verizon does not have information regarding Mr. Ward's race and national origin or his current address, telephone number, and job title.

**INTERROGATORY NO. 11:**  Identify by name, address, telephone number, race, national origin, employer, and job title, the "Company Representative" of WorldCom Purchasing, LLC, described in the Construction Agreement stated in Interrogatory No. 7.

**ANSWER:**  Verizon objects to this Interrogatory on the grounds that it is overly broad and to the extent that it seeks information that is neither relevant to the claims in this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence, particularly to the extent that Verizon and Larry Saunders did not supervise Plaintiffs or have any involvement whatsoever with any employment decision regarding Plaintiffs.  Subject to and without waiving the foregoing objections, Verizon states that the Company Representative as defined by the Calpac Agreement was Larry Saunders.  Verizon refers Plaintiffs to its answer and objections to Interrogatory No. 1. Mr. Saunders is Caucasian.

**INTERROGATORY NO. 12:**  Describe in detail the work performed by the "Company Representative" pursuant to the above-described Construction Agreement, especially as it related to Defendant and its employees, including all Plaintiffs in this matter.

**ANSWER:**  Verizon objects to this Interrogatory to the extent that it assumes or infers that Verizon employed Plaintiffs, supervised Plaintiffs, or participated in, or had any involvement whatsoever with, any employment decision involving Plaintiffs.  Verizon further objects to this

1  Interrogatory on the grounds that it is overly broad and to the extent that it seeks information that

2  is neither relevant to the claims in this lawsuit nor reasonably calculated to lead to the discovery

3  of admissible evidence. Subject to and without waiving the foregoing objections, Verizon states

4  that Calpac performed all services specified in the Statement of Work attached to the Calpac

5  Agreement, including the construction of a fiber optic underground conduit system in Guam.

6  Verizon further states that it did not employ, and Verizon and Mr. Saunders did not supervise, any

7  Plaintiff during the course of the Guam project. Verizon further states that Mr. Saunders had no

8  involvement whatsoever with any employment decision involving Plaintiffs, including a

9  Plaintiff's day-to-day activities on the Guam project. Verizon further states that, with respect to

10 the Guam project, Mr. Saunders received daily and weekly reports prepared by DTS employee

11 Dennis Clark regarding the progress of the Guam project and, on occasion, discussed such reports

12 with Jeff Buehler and Marty Hersh. Mr. Saunders further participated in weekly conference calls

13 with Dennis Clark regarding the progress of the Guam project. Mr. Saunders further reviewed

14 invoices prepared by Calpac and DTS and approved or disapproved of such invoices.

15 **INTERROGATORY NO. 13:** Describe the selection process by which Defendant selected the

16 individual or other entity to perform as the "Company Representative" described in the

17 Construction Agreement stated in Interrogatory No. 7.

18 **ANSWER:** Verizon objects to this Interrogatory on the grounds that it is overly broad and to the

19 extent that it seeks information that is neither relevant to the claims in this lawsuit nor reasonably

20 calculated to lead to the discovery of admissible evidence. Subject to and without waiving the

21 foregoing objections, Verizon states that Larry Saunders was designated as the "Company

22 Representative" by virtue of his position as the Regional Manager of Outside Plant Construction

23 and the geographic region that encompassed his position responsibilities.

24 **INTERROGATORY NO. 14:** Describe the selection process by which Defendant selected

25 defendant Calpac as the company to perform the construction and installation and other work

26 described in the Construction Agreement stated in Interrogatory No. 7.

27 **ANSWER:** Verizon objects to this Interrogatory on the grounds that it is overly broad and to the

28 extent that it seeks information that is neither relevant to the claims in this lawsuit nor reasonably

1  calculated to lead to the discovery of admissible evidence. Subject to and without waiving the

2  foregoing objections, Verizon states that the construction and installation phase of the Guam

3  project was competitively bid.

4  **INTERROGATORY NO. 15:** Describe the selection process by which Defendant selected

5  defendant Dynamic Technical Services as the company to perform the design, engineering,

6  project management, procurement, construction, operation, maintenance, relocation, inspections,

7  acceptance testing, and replacement of various telecommunications network projects services and

8  other work described in the Outside Plant Engineering and Project Management Agreement by

9  and between MCI WorldCom Network Services, Inc., and defendant Dynamic Technical

10  Services, dated September 24, 2001.

11  **ANSWER:** Verizon objects to this Interrogatory on the grounds that it is overly broad and to the

12  extent that it seeks information that is neither relevant to the claims in this lawsuit nor reasonably

13  calculated to lead to the discovery of admissible evidence, particularly to the extent that the

14  Interrogatory seeks information regarding projects other than the Guam project. Subject to and

15  without waiving the foregoing objections, Verizon states that it contacted DTS and other

16  companies with whom Verizon had master agreements for the purpose of locating a company that

17  could provide acceptable project management services on Guam for a reasonable billing rate.

18  Verizon further states that it reviewed proposals presented by DTS and other such companies and,

19  on the basis of DTS' ability to provide qualified staff, meet the Guam project's schedule, and

20  DTS' billing rate, DTS was selected.

21  **INTERROGATORY NO. 16:** Describe in detail all the work performed, and the location of

22  such work performed, by defendant Dynamic Technical Services pursuant to the Outside Plant

23  Engineering and Project Management Agreement described in Interrogatory No. 15.

24  **ANSWER:** Verizon objects to this Interrogatory to the extent that it is duplicative of

25  Interrogatory No. 9. Subject to and without waiving the foregoing objection, Verizon refers

26  Plaintiffs to the DTS Agreement and its applicable attachments and work orders and to Verizon's

27  answer and objections to Interrogatory No. 9. Verizon further notes that Plaintiffs have deposed

28  Mr. Clark.

1   **INTERROGATORY NO. 17:** Describe in detail all the work performed, and the location of

2   such work performed, by Defendant pursuant to the Outside Plant Engineering and Project

3   Management Agreement described in Interrogatory No. 15.

4   **ANSWER:** Verizon objects to this Interrogatory on the grounds that it is overly broad, unduly

5   burdensome, and vague and ambiguous. Verizon further objects to this Interrogatory to the extent

6   that it seeks information that is neither relevant to the claims in this lawsuit nor reasonably

7   calculated to lead to the discovery of admissible evidence. Verizon further objects to this

8   Interrogatory to the extent that it is duplicative of Interrogatory No. 8. Subject to and without

9   waiving the foregoing objections, Verizon states that it contracted with DTS to perform the

10  services specified in the DTS Agreement and its applicable work order. Verizon further states

11  that DTS, through its employee Dennis Clark, oversaw Calpac's installation of fiber cables in

12  Guam from approximately March 2004 through March 2005. Verizon further states that it did not

13  employ or supervise the individuals, including Dennis Clark, who performed such services and

14  did not direct the day-to-day activities of DTS or its employees pursuant to the DTS Agreement.

15       Verizon further states that, with respect to the Guam project, Marty Hersh traveled to

16  Guam in or about November 2003 to locate contractors to install fiber cable in Guam, to facilitate

17  the bidding process for such installation, and to view and, make adjustments to, the route in which

18  the cable would be laid. After a bidding process, Verizon contracted with Calpac to install the

19  fiber cable. Verizon contracted with Dynamic Technical Services ("DTS") regarding project

20  management for the Guam project. In or about January and February 2004, Jeff Buehler traveled

21  to Guam to discuss the installation with Calpac and DTS employee Dennis Clark and to view the

22  route in which the cable would be laid. No Verizon employee or personnel remained in Guam to

23  oversee the Guam project nor did Mr. Hersh or Mr. Buehler return to Guam. Once the project

24  began, Verizon reviewed daily and weekly reports in Richardson, Texas and Tulsa, Oklahoma

25  prepared by Dennis Clark regarding the progress of the Guam project. Verizon further

26  participated in weekly conference calls with Dennis Clark regarding the progress of the Guam

27  project. Verizon further reviewed invoices prepared by Calpac and paid Calpac for its services on

28  a per unit basis.

DLI-6148931v3                  14

1   **INTERROGATORY NO. 18:** Describe in detail all the work performed, and the location of

2   such work performed, by defendants Dynamic Technical Services and Dennis P. Clark pursuant

3   to a Construction Agreement entered on February 13, 2004, by WorldCom Purchasing, LLC, and

4   defendant Calpac.

5   **ANSWER:** Verizon objects to this Interrogatory on the ground that it is duplicative of

6   Interrogatory No. 9. Subject to and without waiving the foregoing objection, Verizon refers

7   Plaintiffs to Verizon's answer and objections to Interrogatory No. 9.

8   **INTERROGATORY NO. 19:** Identify by name, address, telephone number, race, national

9   origin, and job title, all persons Defendant is aware of who performed work pursuant to the

10  Outside Plant Engineering and Project Management Agreement described in Interrogatory

11  No. 15.

12  **ANSWER:** Verizon objects to this Interrogatory on the grounds that it is vague and ambiguous

13  as to the meaning of "performed work pursuant to the Outside Plant Engineering and Project

14  Management Agreement." Verizon further objects to this Interrogatory to the extent that it is

15  overly broad and seeks information that is neither relevant to the claims in this lawsuit nor

16  reasonably calculated to lead to the discovery of admissible evidence, particularly to the extent

17  that the Request seeks information regarding DTS' performance under the DTS Agreement for

18  projects other than the Guam project. Subject to and without waiving the foregoing objections,

19  Verizon states that it believes that the following former or current DTS employees may have had

20  some involvement with respect to the performance of the DTS Agreement. To the extent

21  Plaintiffs seek additional information regarding which DTS employees "performed work"

22  pursuant to the terms of the DTS Agreement, such a request should be directed to DTS.

23

24      (a)     Dennis Clark
                1726 N.E. 11th Street
25              Cape Coral, FL 33904
                239/443-9195

26  Verizon does not have information regarding Mr. Clark's current job title. Verizon

27  believes that Mr. Clark is Caucasian.

28

(b)    Linda Hayes

Verizon believes that Ms. Hayes is currently President of DTS, located at: 1125 East Hwy 121, Lewisville, TX 75057, 469/635-1300. Verizon believes that Ms. Hayes is Caucasian.

(c)    Carlos Morales

Verizon believes that Carlos Morales is the former President of DTS. Verizon does not have information regarding Mr. Morales' race, national origin or current address, telephone number, or job title.

**INTERROGATORY NO. 20:** Identify and describe in detail all communications between Defendant and Donald Harper, identifying the subject and date of such communications and the persons participating in such communications.

**ANSWER:** Verizon objects to this Interrogatory on the grounds that it is vague and ambiguous and overly broad with respect to time and scope. Subject to and without waiving the foregoing objections, Verizon states that on or about November 25, 2004, Jeff Buehler received an email from Don Harper in which Mr. Harper claimed to possess documentation regarding alleged improper activities regarding Calpac and Dennis Clark. Verizon further states that, on or about December 22, 2004, Mr. Buehler and Edwin Spivey received an email from Mr. Harper in which Mr. Harper identified the law firm purportedly representing Calpac employees. Verizon further states that Mr. Buehler received a voice mail from Mr. Harper in late 2004 in which Mr. Harper stated he would call Larry Saunders. Mr. Buehler did not return Mr. Harper's call. Verizon further states that Mr. Buehler may have received emails from Mr. Harper on other occasions relating to the Guam project. Verizon further states that Mr. Harper called Mr. Saunders in late 2004 on one or more occasions. Mr. Harper told Mr. Saunders that Dennis Clark was engaging in improper activities, including going off-the-island on DTS time. Mr. Saunders asked Mr. Harper if he could provide the documentation that Mr. Harper claimed to posses. Mr. Harper said he would collect the documentation and get back to Mr. Saunders. Mr. Harper did not subsequently contact Mr. Saunders or provide Mr. Saunders documentation.

**INTERROGATORY NO. 21:** Describe in detail Defendant's relationship with defendant Dennis P. Clark, including past and/or present employment relationship.

DLI-6148931v3

16

1    **ANSWER:** Verizon objects to this Interrogatory to the extent that it assumes or infers that

2    Verizon employed Dennis Clark during the course of the Guam project. Verizon further objects

3    to this Interrogatory on the grounds that it is vague and ambiguous as to the meaning of

4    "relationship." Subject to and without waiving the foregoing objections, MCI

5    Telecommunications Corporation employed Dennis Clark from in or about April 1988 until

6    January 1995. Prior to Mr. Clark's employment by MCI Telecommunications Corporation, Mr.

7    Clark was employed by a third-party and provided services to MCI on fiber installation projects.

8    In or about December 2003, while employed by DTS, Mr. Clark provided project management

9    services on the Guam project pursuant to the DTS Agreement.

10    **INTERROGATORY NO. 22:** Describe in detail Defendant's supervision or other observation

11    of defendant Calpac's performance under the Construction Agreement described in Interrogatory

12    No. 7.

13    **ANSWER:** Verizon objects to this Request to the extent that it assumes or infers that Verizon

14    "supervised" Calpac with respect to the Guam project. Verizon further objects to this

15    Interrogatory to the extent that it is overly broad and seeks information that is neither relevant to

16    the claims in this lawsuit nor reasonably calculated to lead to the discovery of admissible

17    evidence, particularly to the extent that the Request vaguely seeks information regarding

18    Verizon's "observation" of Calpac. Verizon further objects to this Interrogatory on the grounds

19    that it is vague and ambiguous as to the meaning of "supervision or other observation." Subject

20    to and without waiving the foregoing objections, Verizon states that it did not supervise Calpac or

21    its employees or direct the day-to-day activities of Calpac and its employees on the Guam project.

22    Verizon further states that it did not formally assess or evaluate Calpac. Verizon further states

23    that, pursuant to the DTS Agreement, DTS, through its employee Dennis Clark, oversaw Calpac's

24    installation of fiber cables in Guam. Dennis Clark provided Verizon daily and weekly reports and

25    participated in a weekly conference call regarding the progress of the Guam project and to discuss

26    various issues regarding the Guam project.

27

28

1   **INTERROGATORY NO. 23:** Describe in detail Defendant's supervision or other observation

2   of the Company Representative's performance under the Construction Agreement described in

3   Interrogatory No. 7.

4   **ANSWER:** Verizon objects to this Interrogatory on the grounds that it is overly broad and seeks

5   information that is neither relevant to the claims in this lawsuit nor reasonably calculated to lead

6   to the discovery of admissible evidence, particularly to the extent that neither the Company

7   Representative nor his supervisor had any involvement whatsoever with any employment

8   decision regarding any Plaintiff. Verizon further objects to this Interrogatory on the grounds that

9   it is vague and ambiguous as to the meaning of "supervision or other observation." Subject to

10  and without waiving the foregoing objections, Verizon states that pursuant to his position as the

11  Group Manager, Outside Plant Services, Marty Hersh was Larry Saunders' supervisor. Mr. Hersh

12  did not formally evaluate Mr. Saunders with respect to the Guam project, but Mr. Hersh and Mr.

13  Saunders discussed aspects of the Guam project and reviewed and discussed various

14  documentation regarding the Guam project.

15  **INTERROGATORY NO. 24:** Describe in detail Defendant's supervision or other observation

16  of the defendant Dynamic Technical Services' performance under the Outside Plant Engineering

17  and Project Management Agreement described in Interrogatory No. 15.

18  **ANSWER:** Verizon objects to this Request to the extent that it assumes or infers that Verizon

19  "supervised" DTS with respect to the Guam project. Verizon further objects to this Interrogatory

20  to the extent that it is overly broad and seeks information that is neither relevant to the claims in

21  this lawsuit nor reasonably calculated to lead to the discovery of admissible evidence, particularly

22  to the extent that the Request seeks information regarding DTS' performance under the DTS

23  Agreement for projects other than the Guam project. Verizon further objects to this Interrogatory

24  on the grounds that it is vague and ambiguous as to the meaning of "supervision or other

25  observation." Subject to and without waiving the foregoing objections, Verizon states that it did

26  not supervise DTS or Dennis Clark or direct DTS' or Dennis Clark's day-to-day activities on the

27  Guam project. Verizon further states that it did not formally assess or evaluate DTS or Dennis

28  Clark with respect to the Guam project. Verizon further states that it reviewed daily and weekly

DLI-6148931v3                                              18

1  reports provided by Dennis Clark to Verizon regarding progress on the Guam project. In

2  addition, there was a weekly conference call with Verizon during which Dennis Clark would

3  provide updates and discuss issues regarding the Guam project, including, for example, issues

4  surrounding rights of way.

5  **INTERROGATORY NO. 25:** Identify all individuals, including their contact information, who

6  Defendant may call as a witness to testify at trial and the expected testimony of each such

7  individual.

8  **ANSWER:** Verizon objects to this Interrogatory on the grounds that it premature and to the

9  extent that it seeks to impose burdens beyond those imposed by the Federal Rules of Civil

10  Procedure. Subject to and without waiving the foregoing objections, Verizon refers Plaintiffs to

11  its Rule 26(a)(1)(A) disclosures. Verizon will identify additional witnesses it may call at trial, if

12  any, in accordance with the Court's scheduling order and Federal Rules of Civil Procedure.

Respectfully submitted this 12TH day of November, 2007.

**CIVILLE & TANG, PLLC**

**JONES DAY**

By: _____

**BRIAN LAMBERT**
*Attorneys for Defendants*
*Verizon Business Purchasing, LLC and*
*Verizon Business Network Services, Inc.*

**CIVILLE & TANG, PLLC**
330 HERNAN CORTEZ AVENUE, SUITE 200
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8869/69
FACSIMILE: (671) 477-2511

*Attorneys for Defendants*
*Verizon Business Purchasing, LLC and*
*Verizon Business Network Services, Inc.*

IN THE UNITED STATES DISTRICT COURT OF GUAM

| | |
|---|---|
| HENRY G. VAN METER, JERRY APODACA, JR., JOSEPH J. HERNANDEZ, JOSEPH T. MENDIOLA, LARRY L. CHARFAUROS, ANTHONY C. ARRIOLA, ROBERT B. CRUZ, ROLAND F. MENDIOLA, JAMES S. YEE, TEDDY B. CRUZ, JESSE B. CRUZ, JOHN L.G. NAUTA, and JOHN P. BABAUTA, <br><br> Plaintiffs , <br><br> vs. <br><br> CALPAC, DYNAMIC TECHNICAL SERVICES, VERIZON BUSINESS PURCHASING, LLC, VERIZON BUSINESS NETWORK SERVICES, INC., <br><br> JOHN HEALY, DENNIS CLARK, WILLIAM WARD, JAI JAMES, and DOES 1 through 10, <br><br> Defendants. | CIVIL CASE NO. 05-00037 <br><br><br><br><br><br><br> **VERIFICATION** |

BEFORE ME, the undersigned authority, personally appeared Jeffrey Buehler who, after being duly sworn, acknowledged that he has read **VERIZON BUSINESS PURCHASING, LLC'S AND VERIZON BUSINESS NETWORK SERVICES, INC.'S (collectively "Verizon") ANSWERS AND OBJECTIONS TO PLAINTIFF ROBERT B. CRUZ'S FIRST SET OF INTERROGATORIES**, stated that he is an authorized agent of Verizon, and that the

DLI-6148931v3

20

factual statements stated therein are true and correct based upon personal knowledge, business records, and/or information provided in good faith by persons with knowledge.

Executed on November 12, 2007

_Jeff R B_____

SWORN TO AND SUBSCRIBED BEFORE ME, a Notary Public, on the 12th day of November, 2007, to certify which witness my hand and official seal.

_Celia H Poole_

Notary Public

_____

Typed or Printed Name of Notary

My Commission Expires:

CELIA H. POOLE
MY COMMISSION EXPIRES
April 13, 2008

# CERTIFICATE OF SERVICE

I, Brian Lambert, hereby certify that on November 12, 2007, I will have caused a copy of *Verizon's Answers to Plaintiff Robert Cruz's First Set of Interrogatories* to be served via mail-delivery on the following:

> **Lujan Aguigui & Perez LLP**
> Suite 300, Pacific News Building
> 238 Archbishop Flores Street
> Hagåtña, Guam 96910
>
> **Blair Sterling Johnson Martinez**
> **& Leon Guerrero, P.C.**
> Suite 1008, Pacific News Building
> 238 Archbishop F.C. Flores Street
> Hagåtña, Guam 96910
>
> **Law Offices of Arthur K. Smith**
> 507 Prestige Circle
> Allen, TX 75002-3438

DATED at Dallas, TX, on November 12, 2007.

**CIVILLE & TANG, PLLC**

**JONES DAY**

By: _____
**BRIAN LAMBERT**
*Attorneys for Defendants*
*Verizon Business Purchasing, LLC and*
*Verizon Business Network Services, Inc.*

# EXHIBIT 2

0001
1       IN THE UNITED STATES DISTRICT COURT OF GUAM
               FOR THE TERRITORY OF GUAM

2
3

HENRY G. VAN METER, JERRY    )
4  APODACA, JR., JOSEPH J      )
    HERNANDEZ, JOSEPH T.       )
5  MENDIOLA, LARRY L.        )
    CHARFAUROS, ANTHONY C.    )
6  AARIOLA, ROBERT B. CRUZ,   )
    ROLAND F. MENDIOLA, JAMES S. ) CIVIL CASE NO. 05-00037
7  YEE, TEDDY B. CRUZ, JESSE B. )
    CRUZ, JOHN L.G. NAUTA, AND  )
8  JOHN P. BABAUTA          )
                        )
9  VS.                  )
                        )
10 CALPAC, DYNAMIC TECHNICAL   )
    SERVICES, MCI, JOHN HEALY,   )
11 DENNIS CLARK, WILLIAM WARD,  )
    JAI JAMES, AND DOES 1      )
12 THROUGH 10            )
13
14
              ---------------------
15                VIDEOTAPED
            ORAL DEPOSITION OF
16            DENNIS CLARK
            MAY 23, 2007
17           ---------------------
18
19      ORAL AND VIDEOTAPED DEPOSITION OF DENNIS
20 CLARK, produced as a witness at the instance of the
21 Defendant Dynamic Technical Services, taken in the
22 above-styled and -numbered cause on the 23rd day of
23 May, 2007, from 9:22 a.m. to 2:07 p.m., before Malissa
24 K. Morrow, a Certified Shorthand Reporter in and for
25 the State of Texas, reported by machine shorthand, at
0002
1  the offices of Baxter, Gibbs, Robison & Henderson,
2  PLLC,  2780 Virginia Parkway, Suite 401, McKinney,
3  Texas 75071, pursuant to the agreements as stated on
4  the record and/or the Federal Rules of Civil
5  Procedure.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Case 1:05-cv-00037    Document 616    Filed 04/25/2008    Page 27 of 38

15 your responsibility was?
16    A. Unfortunately, he didn't understand what my
17 responsibility was. He thought I was the inspector,
18 and he didn't -- or wouldn't accept the fact that I
19 was the project manager and assumed that I was going
20 to be on site on a continuous basis.
21    Q. Well, is there a difference between an
22 inspector and a manager?
23    A. Absolutely.
24    Q. What do you mean?
25    A. A project manager takes care of all of the

0061
1 project issues relating to the contracts and the
2 dealing with Department of Transportation, parks,
3 airport authority, Navy. I had a lot of duties.
4    Q. What's an inspector?
5    A. Inspector is a guy who goes long and ensures
6 nothing but the quality issues.
7    Q. Every day, all day?
8    A. Yeah. And a lot of the jobs -- in fact, the
9 majority of jobs I've ever done, I would have an
10 inspector for every crew that was on site. In this
11 particular job, MCI opted to send me as the sole
12 source, so I did all of the project management and the
13 inspection work also.
14    Q. Did -- did that allow you to be on site all
15 times, given all the things you had to do?
16    A. It was impossible -- impossible to be on site
17 more than 50 percent.
18    Q. All right. So what caused you to conclude
19 that Mr. Harper was angry about the fact you were
20 making the work be done over again?
21    A. He was yelling.
22    Q. All right.
23    A. You know, I mean, he was pretty loud about
24 his objection.
25    Q. Okay. And were there other times where you

0062
1 had to do the same thing, that is tell Mr. Harper that
2 the work that had been done had to be done over again
3 in a different way?
4    A. It became a -- a fairly regular process. And
5 not that he necessarily had to redo it all, but if I
6 was there and I see them digging a trench and the
7 trench was shallow to go over a conduit or a utility
8 and I told him that, you know, we're going to have to
9 go under this, you know, we'd get in the same
10 situation. And his comment was, well, you know, the
11 specification says that it's 24 inches. I said, but
12 that doesn't mean you can go over whatever you choose
13 to go over and put us at 16 inches, 12 inches, 10
14 inches. It's a decision that has to be made on the
15 spot.
16    Q. Well, where was this specification?
17    A. It's in the MCI handbook.
18    Q. Oh, so are you saying you and he would
19 disagree about what the MCI contract required as far
20 as how to do the construction?
21    A. That's correct.
22    Q. And did the contract say who had the final
23 say on how it would be done if you guys disagreed?
24    A. Well, the initial say is the project
25 coordinator's, which is mine. If, in fact, they
                                    Page 26  .

15  your responsibility was?
16      A.  Unfortunately, he didn't understand what my
17  responsibility was.  He thought I was the inspector,
18  and he didn't -- or wouldn't accept the fact that I
19  was the project manager and assumed that I was going
20  to be on site on a continuous basis.
21      Q.  Well, is there a difference between an
22  inspector and a manager?
23      A.  Absolutely.
24      Q.  What do you mean?
25      A.  A project manager takes care of all of the
0061
1  project issues relating to the contracts and the
2  dealing with Department of Transportation, parks,
3  airport authority, Navy.  I had a lot of duties.
4      Q.  What's an inspector?
5      A.  Inspector is a guy who goes long and ensures
6  nothing but the quality issues.
7      Q.  Every day, all day?
8      A.  Yeah.  And a lot of the jobs -- in fact, the
9  majority of jobs I've ever done, I would have an
10  inspector for every crew that was on site.  In this
11  particular job, MCI opted to send me as the sole
12  source, so I did all of the project management and the
13  inspection work also.
14      Q.  Did -- did that allow you to be on site all
15  times, given all the things you had to do?
16      A.  It was impossible -- impossible to be on site
17  more than 50 percent.
18      Q.  All right.  So what caused you to conclude
19  that Mr. Harper was angry about the fact you were
20  making the work be done over again?
21      A.  He was yelling.
22      Q.  All right.
23      A.  You know, I mean, he was pretty loud about
24  his objection.
25      Q.  Okay.  And were there other times where you
0062
1  had to do the same thing, that is tell Mr. Harper that
2  the work that had been done had to be done over again
3  in a different way?
4      A.  It became a -- a fairly regular process.  And
5  not that he necessarily had to redo it all, but if I
6  was there and I see them digging a trench and the
7  trench was shallow to go over a conduit or a utility
8  and I told him that, you know, we're going to have to
9  go under this, you know, we'd get in the same
10  situation.  And his comment was, well, you know, the
11  specification says that it's 24 inches.  I said, but
12  that doesn't mean you can go over whatever you choose
13  to go over and put us at 16 inches, 12 inches, 10
14  inches.  It's a decision that has to be made on the
15  spot.
16      Q.  Well, where was this specification?
17      A.  It's in the MCI handbook.
18      Q.  Oh, so are you saying you and he would
19  disagree about what the MCI contract required as far
20  as how to do the construction?
21      A.  That's correct.
22      Q.  And did the contract say who had the final
23  say on how it would be done if you guys disagreed?
24      A.  Well, the initial say is the project
25  coordinator's, which is mine.  If, in fact, they
                              Page 26

```
3        A.  He called me later in the afternoon around 4
4   o'clock and told me that he had spoken with Don and
5   had told Don that, you know, his actions were
6   objectionable; that he didn't think they were handled
7   correctly; and that therefore, he was going to remove
8   him from the MCI project.
9            He wasn't fired.  He was going to be placed
10  on another project, I believe, for MCV, which is the
11  Marianas CableVision.  And that was the resolution
12  that John came up with, was to remove him from the
13  project.
14       Q.  Did he tell you whether he had already
15  communicated that to Mr. Harper as of that time?
16       A.  He did.
17       Q.  And did he tell you anything about the
18  communication he had with Mr. Harper at that time?
19       A.  He didn't.  Just that he told him that, you
20  know, he was going to remove him from the project.
21       Q.  All right.  And when was the next time you
22  had any communication with Mr. Healy concerning the
23  fact that he had removed Mr. Harper from the project?
24       A.  The next day, I spoke to John, just in
25  general terms, and he told me that Don Harper had
0076
1   resigned; that he was not going to continue to work
2   for Calpac.
3        Q.  Did he tell you who was going to take his
4   place on the job?
5        A.  At that point he didn't.
6        Q.  Did he tell you anything else about the
7   communication he had with Mr. Harper involving
8   Mr. Harper resigning?
9        A.  Not that day, no.
10       Q.  When was the next time you had any
11  communication with Mr. Healy concerning the subject of
12  Mr. Harper?
13       A.  The next day Mr. Healy related an e-mail that
14  Mr. Harper had sent to him, stating that he had --
15  that Calpac owed him, Don Harper, $25,000 based on a 2
16  percent commission or fee that was to be paid by
17  Calpac upon the completion of the project; and that he
18  expected John to pay the $25,000 immediately.
19       Q.  Before that time, had Mr. Healy or Mr. Harper
20  ever said anything to you about any agreement like
21  that?
22       A.  I wasn't privy to anything like that, no.
23       Q.  And did -- when Mr. Healy told you about
24  this, did he tell you anything about whether, in fact,
25  he had reached any kind of agreement like that with
0077
1   Mr. Harper earlier on?
2        A.  Actually, he did say that he had agreed to
3   pay the 2 percent at the completion of the project,
4   you know, if everything went okay and -- and, you
5   know, if the job was completed sufficiently to
6   complete the contract.
7            At that point, he told me that he had, in
8   fact, written a check for $12,500, which was half of
9   the money that Don Harper was asking for.
10       Q.  All right.  And did you and Mr. Healy have
11  any discussion further about that fact that he was
12  going to be paying Mr. Harper $12,500?
13       A.  I certainly questioned the fact that he had
                        Page 32
```

25  concern for, you know, whether there was going to be

0080
1   interference with this project you wanted to be
2   completed in a timely fashion?
3       A.  Well, there were shortly -- yes.  Yes.  I
4   mean, I was concerned.
5       Q.  What were you afraid might happen?
6       A.  I was just concerned that the project might
7   get shut down; that there was -- I mean, essentially,
8   that was it.
9       Q.  Okay.  And so did Mr. Healy replace
10  Mr. Harper at that point with someone else?
11      A.  He did.  He brought in a couple of other
12  gentlemen.  And I'm sorry.  I can't even remember
13  their names at this point.  One was an operator.
14  Another was the -- he was more or less in charge of
15  the -- the equipment repair and shop area, but they
16  sometimes -- they -- they, I guess, directed the crews
17  in the mornings where to go and would sometimes be on
18  site to ensure that, you know, everybody was doing
19  what they were supposed to be doing.  But actually,
20  John Healy took a more direct approach and was there
21  on site a lot more.
22      Q.  And this was around mid-November of 2004?
23      A.  That's correct.
24      Q.  And between that time and -- the middle of
25  November 2004 and the time that the Calpac decision

0081
1   was made to let some of these workers go, did you have
2   any other conversations with Mr. Healy about
3   Mr. Harper?
4       A.  Other than -- I mean, he sent an e-mail.
5       Q.  Who's "he"?
6       A.  I'm sorry.  Don Harper sent an e-mail to my
7   boss, Jeff Bueller, with MCI, alleging that he had
8   recordings and documentation of potentially illegal or
9   unethical conduct.  I had -- I sent an e-mail -- he
10  copied me on that e-mail.
11      Q.  Who did?
12      A.  Don Harper.
13      Q.  Okay.
14      A.  I sent an e-mail to my boss, Jeff Bueller,
15  stating that -- you know, and I had already told him
16  that there was a problem with this man; that there
17  were potential allegations that he would -- that would
18  arise.  And that if anything did come forth, it was
19  potentially fabricated, and that I was sorry for any
20  inconvenience.  There was never anything forthcoming,
21  but I did, in fact, apprise Mr. Healy of the
22  allegations.
23      Q.  All right.  So after Mr. Healy replaced
24  Mr. Harper, you became aware of an e-mail that
25  Mr. Harper had sent to your boss at MCI?

0082
1       A.  That's correct.
2       Q.  In which you said that he had documents and
3   voice recordings that would show you to have been
4   involved in illegal and immoral activity; is that
5   right?
6       A.  That's correct.  And my boss -- I'm sorry.
7   My -- Jeff Bueller sent an e-mail back to me, stating
8   that he understood the situation and not to be
9   concerned; that, you know, he had complete faith in

Page 34  .

```
10  me.
11       Q.  Did you tell him that if Mr. Harper did have
12  any documents or voice recordings, that they would
13  have had to be false?
14       A.  Sure.  Fabricated.
15       Q.  By "fabricated," what do you mean?
16       A.  In other words, he would have had to have
17  doctored existing documents of some kind.
18       Q.  Made them up?
19       A.  Yeah.  There was nothing -- there was nothing
20  to be submitted.
21       Q.  All right.
22       A.  You know, and --
23       Q.  And let me ask you this.  Did Mr. Harper ever
24  submit any documents to MCI, to Calpac, to anyone that
25  were backing up his claim that, you know, you had
0083
1  committed any illegal or unethical activities?
2       A.  No.  We requested that he do so, and nothing
3  was forthcoming.  He didn't submit anything.
4       Q.  All right.  And then what about these voice
5  recordings?  Did Mr. Harper ever come up with any
6  voice recordings that he gave to the authorities, the
7  police, to -- to MCI, to Calpac, to anyone where he's
8  got your voice on tape doing anything or saying
9  anything that was illegal or improper or
10  inappropriate?
11       A.  Nothing.
12            MR. MOODY:  Objection as to form.
13            Go ahead.
14       A.  Nothing.  There weren't any, and he had
15  nothing to submit.
16       Q.  (By Mr. Smith)  Okay.  And was a demand also
17  made on him to come and back up his claims there if he
18  had anything?
19       A.  Other than the e-mails, you know, Mr. Bueller
20  told him if he had anything, submit it.
21       Q.  And did he ever do it?
22       A.  He never did.
23       Q.  All right.  And did that in any way interfere
24  with your relationship with Mr. Bueller?
25       A.  No.
0084
1       Q.  I mean, did he still have faith in you to
2  complete the job?
3       A.  Sure.
4       Q.  Did that, in any way, interfere with your
5  ability to work with John Healy or the new people he
6  put in place?
7       A.  Did not.
8       Q.  And after that, did you have any contact with
9  Mr. Harper himself before the day that these gentlemen
10  started picketing?
11       A.  I mean, there was -- there was an incident in
12  Marianas Trench, which is a bar/restaurant that I
13  frequented on occasion, where after one of these
14  blowups, he had approached me, and in the process of
15  discussing the issue, had tried to -- I don't know --
16  intimidate me, I guess, maybe.  He was telling a story
17  about him having been present when some guy that owed
18  him money had his kneecaps broken.  So, you know, but
19  it's just --
20       Q.  Well, why don't you go ahead and describe
                         Page 35
```

DennisClark

6  just a couple of days after that the picketing went
7  on?
8      A.  Yes.
9      Q.  And between the day you found out they were
10 let go and when the picketing started, did you have
11 any communication with any of the workers who had been
12 let go?
13     A.  Actually, I asked to speak to the workers
14 when the -- after the layoffs had happened and the
15 picketing had just started.
16     Q.  No.  Before the picketing.
17     A.  Before that?  No.
18     Q.  Okay.  So, like, you find out they were let
19 go.  And between that time and the time the picketing
20 starts, did you talk with any of the guys who had been
21 let go?
22     A.  I didn't.
23     Q.  Did you talk with Mr. Healy about why he did
24 what he did?
25     A.  Actually, we discussed the crew complement
0088
1  and, you know, what -- what was going to go forward as
2  how we complete the job.  And, you know, he was very
3  adamant that he hated to let the guys go around that
4  time of the year, but there just wasn't enough work to
5  keep them.
6      Q.  Did you -- was your discussion about whether
7  he still had enough guys to complete the job?
8      A.  Well, just a general discussion as to what
9  the crew complements were going to do.
10     Q.  What does that mean, "crew complements"?
11     A.  The numbers of people on the crew and how
12 many men it would take to do the job to complete the
13 project.
14     Q.  Did you express any opinion about whether --
15 about the fact that he'd let these guys go?
16     A.  I didn't.  You know, it's his company
17 business.
18     Q.  All right.  So when the -- after the
19 picketing occurred and you found out about it, what
20 did you do in response?
21     A.  Well, first, I was, like, totally shocked
22 that these -- these men that I worked with would come
23 out and accuse me of something like this, blatantly
24 untrue.
25     But Mr. Healy had a meeting in his shop with
0089
1  all of his crew to discuss the fact that there were
2  pickets out and that they would see them and the issue
3  of, you know, why he had to let the people go when he
4  let them go; that, you know, the work was winding
5  down.  And unfortunately, you know, he didn't --
6  couldn't support having that many people.
7      And I asked him if it would be okay for me to
8  speak to the group and explain to them that, you know,
9  I respected the Chamorro culture, and that I would
10 not, in any way, have disparaged or said anything that
11 would be racially insensitive to any of those people.
12 And that, you know, I was -- it was unfortunate that
13 the men had to be let go.  And that, you know, that
14 there -- obviously, Mr. Healy had no other choice.
15     Q.  All right.  And did Mr. Healy let you address
16 the guys who were still working for Calpac --

Page 37

12    A.   That's correct.
13    Q.   And have you spoken to him before?
14    A.   Actually, yes.  We had spoken on the phone.
15    Q.   All right.  How many times?
16    A.   I believe twice.
17    Q.   And that was before yesterday?
18    A.   Yes, sir.
19    Q.   Was that before yesterday?
20    A.   Yes, sir.
21    Q.   And what was the discussion about?
22    A.   Strictly about Dynamic Technical's hiring me
23  and what I had done for Dynamic Technical on the
24  island.
25    Q.   Do you consider Mr. Smith your -- your
0112
 1  attorney?
 2    A.   Actually, yes, I do.
 3    Q.   Okay.  And why do you consider him your
 4  attorney?
 5    A.   Because at the time I was working on the
 6  island, I had been in the hire of Dynamic Technical,
 7  and Dynamic Technical has agreed to supply my defense
 8  if necessary.
 9    Q.   In other words, Mr. Smith's firm is defending
10  you at DTS' expense?
11    A.   That's correct.
12    Q.   Now, were you provided any documents to
13  review in order to prepare for your deposition?
14    A.   No, sir.
15    Q.   Did you review documents in your possession
16  to prepare for this deposition?
17    A.   Yes, sir, I did.
18    Q.   What were those documents?
19    A.   The construction agreement, Exhibit A of the
20  contract, and my daily production reports.
21    Q.   Now, your daily production reports, those
22  were done daily and then sent on a weekly basis; am I
23  correct?
24    A.   No.  Those were done daily on my computer and
25  sent daily to MCI.
0113
 1    Q.   All right.  Now, who has input in the
 2  formulation of the daily production reports --
 3    A.   Just me.
 4    Q.   -- besides yourself?
 5    A.   Just me.
 6    Q.   I'm sorry?
 7    A.   Just me.  I'll take that back.  Jeff Bueller
 8  and Larry Saunders, who was Jeff Bueller's boss, had
 9  certain things they wanted to see in there, such as
10  schedules, production, and various areas of the
11  project and percentages of completion.  And that was
12  their request.
13    Q.   Now, it's my understanding that Calpac
14  personnel prepared the -- a draft of the daily
15  production report in writing and sent it to you.  And
16  then you would, you know, make -- would rather make
17  your changes in it and finalize it by putting it onto
18  the -- the -- MCI form?
19    A.   They would make a report of their production
20  and send it to me.
21    Q.   Okay.  And that would be -- would that be in
22  a finalist form to you, or would that be in a rough
Page 47

DennisClark

| | |
|---|---|
| 12 | A. That's correct. |
| 13 | Q. And have you spoken to him before? |
| 14 | A. Actually, yes. We had spoken on the phone. |
| 15 | Q. All right. How many times? |
| 16 | A. I believe twice. |
| 17 | Q. And that was before yesterday? |
| 18 | A. Yes, sir. |
| 19 | Q. Was that before yesterday? |
| 20 | A. Yes, sir. |
| 21 | Q. And what was the discussion about? |
| 22 | A. Strictly about Dynamic Technical's hiring me |
| 23 | and what I had done for Dynamic Technical on the |
| 24 | island. |
| 25 | Q. Do you consider Mr. Smith your -- your |

0112
1  attorney?
2      A. Actually, yes, I do.
3      Q. Okay. And why do you consider him your
4  attorney?
5      A. Because at the time I was working on the
6  island, I had been in the hire of Dynamic Technical,
7  and Dynamic Technical has agreed to supply my defense
8  if necessary.
9      Q. In other words, Mr. Smith's firm is defending
10 you at DTS' expense?
11     A. That's correct.
12     Q. Now, were you provided any documents to
13 review in order to prepare for your deposition?
14     A. No, sir.
15     Q. Did you review documents in your possession
16 to prepare for this deposition?
17     A. Yes, sir, I did.
18     Q. What were those documents?
19     A. The construction agreement, Exhibit A of the
20 contract, and my daily production reports.
21     Q. Now, your daily production reports, those
22 were done daily and then sent on a weekly basis; am I
23 correct?
24     A. No. Those were done daily on my computer and
25 sent daily to MCI.

0113
1      Q. All right. Now, who has input in the
2  formulation of the daily production reports --
3      A. Just me.
4      Q. -- besides yourself?
5      A. Just me.
6      Q. I'm sorry?
7      A. Just me. I'll take that back. Jeff Bueller
8  and Larry Saunders, who was Jeff Bueller's boss, had
9  certain things they wanted to see in there, such as
10 schedules, production, and various areas of the
11 project and percentages of completion. And that was
12 their request.
13     Q. Now, it's my understanding that Calpac
14 personnel prepared the -- a draft of the daily
15 production report in writing and sent it to you. And
16 then you would, you know, make -- would rather make
17 your changes in it and finalize it by putting it onto
18 the -- the -- MCI form?
19     A. They would make a report of their production
20 and send it to me.
21     Q. Okay. And that would be -- would that be in
22 a finalist form to you, or would that be in a rough

Page 47

Case 1:05-cv-00037   Document 616   Filed 04/25/2008   Page 35 of 38

12      A.  That's correct.
13      Q.  And have you spoken to him before?
14      A.  Actually, yes.  We had spoken on the phone.
15      Q.  All right.  How many times?
16      A.  I believe twice.
17      Q.  And that was before yesterday?
18      A.  Yes, sir.
19      Q.  Was that before yesterday?
20      A.  Yes, sir.
21      Q.  And what was the discussion about?
22      A.  Strictly about Dynamic Technical's hiring me
23  and what I had done for Dynamic Technical on the
24  island.
25      Q.  Do you consider Mr. Smith your -- your
0112
1  attorney?
2      A.  Actually, yes, I do.
3      Q.  Okay.  And why do you consider him your
4  attorney?
5      A.  Because at the time I was working on the
6  island, I had been in the hire of Dynamic Technical,
7  and Dynamic Technical has agreed to supply my defense
8  if necessary.
9      Q.  In other words, Mr. Smith's firm is defending
10  you at DTS' expense?
11      A.  That's correct.
12      Q.  Now, were you provided any documents to
13  review in order to prepare for your deposition?
14      A.  No, sir.
15      Q.  Did you review documents in your possession
16  to prepare for this deposition?
17      A.  Yes, sir, I did.
18      Q.  What were those documents?
19      A.  The construction agreement, Exhibit A of the
20  contract, and my daily production reports.
21      Q.  Now, your daily production reports, those
22  were done daily and then sent on a weekly basis; am I
23  correct?
24      A.  No.  Those were done daily on my computer and
25  sent daily to MCI.
0113
1      Q.  All right.  Now, who has input in the
2  formulation of the daily production reports --
3      A.  Just me.
4      Q.  -- besides yourself?
5      A.  Just me.
6      Q.  I'm sorry?
7      A.  Just me.  I'll take that back.  Jeff Bueller
8  and Larry Saunders, who was Jeff Bueller's boss, had
9  certain things they wanted to see in there, such as
10  schedules, production, and various areas of the
11  project and percentages of completion.  And that was
12  their request.
13      Q.  Now, it's my understanding that Calpac
14  personnel prepared the -- a draft of the daily
15  production report in writing and sent it to you.  And
16  then you would, you know, make -- would rather make
17  your changes in it and finalize it by putting it onto
18  the -- the -- MCI form?
19      A.  They would make a report of their production
20  and send it to me.
21      Q.  Okay.  And that would be -- would that be in
22  a finalist form to you, or would that be in a rough
                        Page 47

12      A.  That's correct.
13      Q.  And have you spoken to him before?
14      A.  Actually, yes.  We had spoken on the phone.
15      Q.  All right.  How many times?
16      A.  I believe twice.
17      Q.  And that was before yesterday?
18      A.  Yes, sir.
19      Q.  Was that before yesterday?
20      A.  Yes, sir.
21      Q.  And what was the discussion about?
22      A.  Strictly about Dynamic Technical's hiring me
23  and what I had done for Dynamic Technical on the
24  island.
25      Q.  Do you consider Mr. Smith your -- your
0112
1  attorney?
2      A.  Actually, yes, I do.
3      Q.  Okay.  And why do you consider him your
4  attorney?
5      A.  Because at the time I was working on the
6  island, I had been in the hire of Dynamic Technical,
7  and Dynamic Technical has agreed to supply my defense
8  if necessary.
9      Q.  In other words, Mr. Smith's firm is defending
10  you at DTS' expense?
11      A.  That's correct.
12      Q.  Now, were you provided any documents to
13  review in order to prepare for your deposition?
14      A.  No, sir.
15      Q.  Did you review documents in your possession
16  to prepare for this deposition?
17      A.  Yes, sir, I did.
18      Q.  What were those documents?
19      A.  The construction agreement, Exhibit A of the
20  contract, and my daily production reports.
21      Q.  Now, your daily production reports, those
22  were done daily and then sent on a weekly basis; am I
23  correct?
24      A.  No.  Those were done daily on my computer and
25  sent daily to MCI.
0113
1      Q.  All right.  Now, who has input in the
2  formulation of the daily production reports --
3      A.  Just me.
4      Q.  -- besides yourself?
5      A.  Just me.
6      Q.  I'm sorry?
7      A.  Just me.  I'll take that back.  Jeff Bueller
8  and Larry Saunders, who was Jeff Bueller's boss, had
9  certain things they wanted to see in there, such as
10  schedules, production, and various areas of the
11  project and percentages of completion.  And that was
12  their request.
13      Q.  Now, it's my understanding that Calpac
14  personnel prepared the -- a draft of the daily
15  production report in writing and sent it to you.  And
16  then you would, you know, make -- would rather make
17  your changes in it and finalize it by putting it onto
18  the -- the -- MCI form?
19      A.  They would make a report of their production
20  and send it to me.
21      Q.  Okay.  And that would be -- would that be in
22  a finalist form to you, or would that be in a rough
                                    Page 47

12    A.  That's correct.
13    Q.  And have you spoken to him before?
14    A.  Actually, yes.  We had spoken on the phone.
15    Q.  All right.  How many times?
16    A.  I believe twice.
17    Q.  And that was before yesterday?
18    A.  Yes, sir.
19    Q.  Was that before yesterday?
20    A.  Yes, sir.
21    Q.  And what was the discussion about?
22    A.  Strictly about Dynamic Technical's hiring me
23  and what I had done for Dynamic Technical on the
24  island.
25    Q.  Do you consider Mr. Smith your -- your
0112
1  attorney?
2    A.  Actually, yes, I do.
3    Q.  Okay.  And why do you consider him your
4  attorney?
5    A.  Because at the time I was working on the
6  island, I had been in the hire of Dynamic Technical,
7  and Dynamic Technical has agreed to supply my defense
8  if necessary.
9    Q.  In other words, Mr. Smith's firm is defending
10  you at DTS' expense?
11    A.  That's correct.
12    Q.  Now, were you provided any documents to
13  review in order to prepare for your deposition?
14    A.  No, sir.
15    Q.  Did you review documents in your possession
16  to prepare for this deposition?
17    A.  Yes, sir, I did.
18    Q.  What were those documents?
19    A.  The construction agreement, Exhibit A of the
20  contract, and my daily production reports.
21    Q.  Now, your daily production reports, those
22  were done daily and then sent on a weekly basis; am I
23  correct?
24    A.  No.  Those were done daily on my computer and
25  sent daily to MCI.
0113
1    Q.  All right.  Now, who has input in the
2  formulation of the daily production reports --
3    A.  Just me.
4    Q.  -- besides yourself?
5    A.  Just me.
6    Q.  I'm sorry?
7    A.  Just me.  I'll take that back.  Jeff Bueller
8  and Larry Saunders, who was Jeff Bueller's boss, had
9  certain things they wanted to see in there, such as
10  schedules, production, and various areas of the
11  project and percentages of completion.  And that was
12  their request.
13    Q.  Now, it's my understanding that Calpac
14  personnel prepared the -- a draft of the daily
15  production report in writing and sent it to you.  And
16  then you would, you know, make -- would rather make
17  your changes in it and finalize it by putting it onto
18  the -- the -- MCI form?
19    A.  They would make a report of their production
20  and send it to me.
21    Q.  Okay.  And that would be -- would that be in
22  a finalist form to you, or would that be in a rough
                              Page 47