# EXHIBIT 2

0001
1    IN THE UNITED STATES DISTRICT COURT OF GUAM
         FOR THE TERRITORY OF GUAM

2

3
   HENRY G. VAN METER, JERRY     )
4  APODACA, JR., JOSEPH J       )
   HERNANDEZ, JOSEPH T.        )
5  MENDIOLA, LARRY L.          )
   CHARFAUROS, ANTHONY C.      )
6  AARIOLA, ROBERT B. CRUZ,    )
   ROLAND F. MENDIOLA, JAMES S. )  CIVIL CASE NO. 05-00037
7  YEE, TEDDY B. CRUZ, JESSE B.  )
   CRUZ, JOHN L.G. NAUTA, AND   )
8  JOHN P. BABAUTA           )
                           )
9  VS.                    )
                           )
10 CALPAC, DYNAMIC TECHNICAL   )
   SERVICES, MCI, JOHN HEALY,   )
11 DENNIS CLARK, WILLIAM WARD,  )
   JAI JAMES, AND DOES 1       )
12 THROUGH 10              )
13
14             - - - - - - - - - - - - - - - - - - - - - -
15                VIDEOTAPED
            ORAL DEPOSITION OF
16             DENNIS CLARK
             MAY 23, 2007
17             - - - - - - - - - - - - - - - - - - - - - -
18
19       ORAL AND VIDEOTAPED DEPOSITION OF DENNIS
20 CLARK, produced as a witness at the instance of the
21 Defendant Dynamic Technical Services, taken in the
22 above-styled and -numbered cause on the 23rd day of
23 May, 2007, from 9:22 a.m. to 2:07 p.m., before Malissa
24 K. Morrow, a Certified Shorthand Reporter in and for
25 the State of Texas, reported by machine shorthand, at
0002
1  the offices of Baxter, Gibbs, Robison & Henderson,
2  PLLC,  2780 Virginia Parkway, Suite 401, McKinney,
3  Texas 75071, pursuant to the agreements as stated on
4  the record and/or the Federal Rules of Civil
5  Procedure.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23                   Page 1

24
25
0003                        ATTORNEYS OF RECORD
 1
 2
 3
 4   APPEARANCES:
 5
 6        MR. DAVID LUJAN & MS. DELIA LUJAN (via telephone)
                LUJAN AGUIGUI & PEREZ, LLP
                PACIFIC NEWS BUILDING
 7              238 ARCHBISHOP FLORES ST.
                SUITE 300
 8              HAGATNA, GUAM 96910
                (671) 477-8064
 9              COUNSEL FOR THE PLAINTIFFS

10
11        MR. ARTHUR K. SMITH
                LAW OFFICES OF ARTHUR K. SMITH
12              507 PRESTIGE CIRCLE
                ALLEN, TEXAS 75002
13              (469) 519-2500
                COUNSEL FOR THE DEFENDANT
14              DYNAMIC TECHNICAL SERVICES
15
          MR. THOMAS C. MOODY III
16              CONSOLIDATED BENEFIT SYSTEMS, INC.
                900 AUSTIN AVENUE
17              SUITE 600
                WACO, TEXAS   76701
18              (254) 751-0156
                COUNSEL FOR THE DEFENDANT CALPAC
19
20   ALSO PRESENT:
21        MS. SARAH CLOSE
                CERTIFIED LEGAL TEXAS VIDEO
22              P.O. BOX 540365
                DALLAS, TEXAS   75354
23              (972) 304-0291
24
25
0004                            INDEX
 1   ATTORNEYS OF RECORD............................... 2
 2   EXAMINATION BY MR. SMITH........................... 5
 3   EXAMINATION BY MR. MOODY.........................101
 4   EXAMINATION BY MR. LUJAN.........................111
 5   FURTHER EXAMINATION BY MR. SMITH.................189
 6   SIGNATURE AND CORRIGENDA PAGE....................192
 7   CERTIFICATION PAGE...............................193
 8                      E X H I B I T S
 9                                                  PAGE
10   NUMBER    DESCRIPTION                           51
11   1         Flight itinerary                      52
12   2         Credit card activity
13
14
15
16
17
18
19
20
21                          Page 2     .

15  your responsibility was?
16      A.  Unfortunately, he didn't understand what my
17  responsibility was.  He thought I was the inspector,
18  and he didn't -- or wouldn't accept the fact that I
19  was the project manager and assumed that I was going
20  to be on site on a continuous basis.
21      Q.  Well, is there a difference between an
22  inspector and a manager?
23      A.  Absolutely.
24      Q.  What do you mean?
25      A.  A project manager takes care of all of the
0061
1  project issues relating to the contracts and the
2  dealing with Department of Transportation, parks,
3  airport authority, Navy.  I had a lot of duties.
4      Q.  What's an inspector?
5      A.  Inspector is a guy who goes long and ensures
6  nothing but the quality issues.
7      Q.  Every day, all day?
8      A.  Yeah.  And a lot of the jobs -- in fact, the
9  majority of jobs I've ever done, I would have an
10  inspector for every crew that was on site.  In this
11  particular job, MCI opted to send me as the sole
12  source, so I did all of the project management and the
13  inspection work also.
14      Q.  Did -- did that allow you to be on site all
15  times, given all the things you had to do?
16      A.  It was impossible -- impossible to be on site
17  more than 50 percent.
18      Q.  All right.  So what caused you to conclude
19  that Mr. Harper was angry about the fact you were
20  making the work be done over again?
21      A.  He was yelling.
22      Q.  All right.
23      A.  You know, I mean, he was pretty loud about
24  his objection.
25      Q.  Okay.  And were there other times where you
0062
1  had to do the same thing, that is tell Mr. Harper that
2  the work that had been done had to be done over again
3  in a different way?
4      A.  It became a -- a fairly regular process.  And
5  not that he necessarily had to redo it all, but if I
6  was there and I see them digging a trench and the
7  trench was shallow to go over a conduit or a utility
8  and I told him that, you know, we're going to have to
9  go under this, you know, we'd get in the same
10  situation.  And his comment was, well, you know, the
11  specification says that it's 24 inches.  I said, but
12  that doesn't mean you can go over whatever you choose
13  to go over and put us at 16 inches, 12 inches, 10
14  inches.  It's a decision that has to be made on the
15  spot.
16      Q.  Well, where was this specification?
17      A.  It's in the MCI handbook.
18      Q.  Oh, so are you saying you and he would
19  disagree about what the MCI contract required as far
20  as how to do the construction?
21      A.  That's correct.
22      Q.  And did the contract say who had the final
23  say on how it would be done if you guys disagreed?
24      A.  Well, the initial say is the project
25  coordinator's, which is mine.  If, in fact, they
                              Page 26

3      A. He called me later in the afternoon around 4
4  o'clock and told me that he had spoken with Don and
5  had told Don that, you know, his actions were
6  objectionable; that he didn't think they were handled
7  correctly; and that therefore, he was going to remove
8  him from the MCI project.
9          He wasn't fired. He was going to be placed
10  on another project, I believe, for MCV, which is the
11  Marianas CableVision. And that was the resolution
12  that John came up with, was to remove him from the
13  project.
14      Q. Did he tell you whether he had already
15  communicated that to Mr. Harper as of that time?
16      A. He did.
17      Q. And did he tell you anything about the
18  communication he had with Mr. Harper at that time?
19      A. He didn't. Just that he told him that, you
20  know, he was going to remove him from the project.
21      Q. All right. And when was the next time you
22  had any communication with Mr. Healy concerning the
23  fact that he had removed Mr. Harper from the project?
24      A. The next day, I spoke to John, just in
25  general terms, and he told me that Don Harper had
0076
1  resigned; that he was not going to continue to work
2  for Calpac.
3      Q. Did he tell you who was going to take his
4  place on the job?
5      A. At that point he didn't.
6      Q. Did he tell you anything else about the
7  communication he had with Mr. Harper involving
8  Mr. Harper resigning?
9      A. Not that day, no.
10      Q. When was the next time you had any
11  communication with Mr. Healy concerning the subject of
12  Mr. Harper?
13      A. The next day Mr. Healy related an e-mail that
14  Mr. Harper had sent to him, stating that he had --
15  that Calpac owed him, Don Harper, $25,000 based on a 2
16  percent commission or fee that was to be paid by
17  Calpac upon the completion of the project; and that he
18  expected John to pay the $25,000 immediately.
19      Q. Before that time, had Mr. Healy or Mr. Harper
20  ever said anything to you about any agreement like
21  that?
22      A. I wasn't privy to anything like that, no.
23      Q. And did -- when Mr. Healy told you about
24  this, did he tell you anything about whether, in fact,
25  he had reached any kind of agreement like that with
0077
1  Mr. Harper earlier on?
2      A. Actually, he did say that he had agreed to
3  pay the 2 percent at the completion of the project,
4  you know, if everything went okay and -- and, you
5  know, if the job was completed sufficiently to
6  complete the contract.
7          At that point, he told me that he had, in
8  fact, written a check for $12,500, which was half of
9  the money that Don Harper was asking for.
10      Q. All right. And did you and Mr. Healy have
11  any discussion further about that fact that he was
12  going to be paying Mr. Harper $12,500?
13      A. I certainly questioned the fact that he had

Page 32

14  paid him anything since the job was not complete and,
15  you know, asked him what his motivation was to pay
16  that money, because I thought he was -- I thought it
17  was incorrect.
18      Q.  Had you and Mr. Healy, you know, become more
19  than just -- had just a business relationship at that
20  point?  Were you at a point where you and he could
21  talk as friends about subjects like that or --
22      A.  Actually, I had -- I had become associated
23  with Mr. Healy when he was at Marianas CableVision,
24  had had numerous dealings.  We ended up having drinks.
25  He invited me to his beach property, which is just an
0078
1   open little beach area, and we -- yeah, we had become
2   friends.
3       Q.  Okay.  Did you feel like, based on the
4   relationship you had, it was -- he wasn't going to be
5   offended by you expressing an opinion about that?
6       A.  No.  Actually, I think he recognized that I
7   was interested in his own behalf.
8       Q.  All right.  And what did he say when you
9   expressed the idea that it may not be a great idea to
10  pay some -- to pay Mr. Harper the money?
11      A.  Actually, he agreed.  But, you know, he -- he
12  was -- he had already paid the money, but he did not
13  intend to pay the remainder of the money.
14      Q.  Did he say why?
15      A.  He felt he was being extorted.
16      Q.  Extorted?  What --
17      A.  In other words, he felt that Mr. Harper was
18  trying to -- I mean, part of this e-mail stream
19  involved a statement that he would approach every
20  entity involved with the project: NASA, MCI, the
21  government, anyone involved with allegations of
22  wrongdoings and bring -- to -- to get John to pay the
23  rest of the money.
24      Q.  You're saying Mr. Harper's e-mail said that
25  Mr. Harper was going to do that?
0079
1       A.  That's correct.
2       Q.  And based on your experience, if, you know, a
3   job superintendent for a contractor goes and calls the
4   project owner like NASA, you know, MCI and the
5   government, what kind of complications can that create
6   for the contractor?
7       A.  Just the --
8              MR. LUJAN:  Object to the form of the
9   question.
10      A.  Just the negative publicity.  The -- you can
11  have a backlash where the contract gets cancelled.  I
12  mean, these public entities don't -- don't want to see
13  their name bandied about in the newspaper or dragged
14  through the court for, you know, frivolous
15  allegations.
16      Q.  (By Mr. Smith)  Okay.  And so did Mr. Harper
17  -- excuse me.  Did Mr. Healy say anything else at that
18  time on the subject of what was happening between him
19  and Mr. Harper?
20      A.  You know, other than the fact that he wasn't
21  going to pay and that he was going to pursue, you
22  know, ways to recover the situation, try not to bring
23  everybody into the picture.
24      Q.  All right.  And did that cause you any
                              Page 33

25  concern for, you know, whether there was going to be
0080
1  interference with this project you wanted to be
2  completed in a timely fashion?
3      A.  Well, there were shortly -- yes.  Yes.  I
4  mean, I was concerned.
5      Q.  What were you afraid might happen?
6      A.  I was just concerned that the project might
7  get shut down; that there was -- I mean, essentially,
8  that was it.
9      Q.  Okay.  And so did Mr. Healy replace
10  Mr. Harper at that point with someone else?
11      A.  He did.  He brought in a couple of other
12  gentlemen.  And I'm sorry.  I can't even remember
13  their names at this point.  One was an operator.
14  Another was the -- he was more or less in charge of
15  the -- the equipment repair and shop area, but they
16  sometimes -- they -- they, I guess, directed the crews
17  in the mornings where to go and would sometimes be on
18  site to ensure that, you know, everybody was doing
19  what they were supposed to be doing.  But actually,
20  John Healy took a more direct approach and was there
21  on site a lot more.
22      Q.  And this was around mid-November of 2004?
23      A.  That's correct.
24      Q.  And between that time and -- the middle of
25  November 2004 and the time that the Calpac decision
0081
1  was made to let some of these workers go, did you have
2  any other conversations with Mr. Healy about
3  Mr. Harper?
4      A.  Other than -- I mean, he sent an e-mail.
5      Q.  Who's "he"?
6      A.  I'm sorry.  Don Harper sent an e-mail to my
7  boss, Jeff Bueller, with MCI, alleging that he had
8  recordings and documentation of potentially illegal or
9  unethical conduct.  I had -- I sent an e-mail -- he
10  copied me on that e-mail.
11      Q.  Who did?
12      A.  Don Harper.
13      Q.  Okay.
14      A.  I sent an e-mail to my boss, Jeff Bueller,
15  stating that -- you know, and I had already told him
16  that there was a problem with this man; that there
17  were potential allegations that he would -- that would
18  arise.  And that if anything did come forth, it was
19  potentially fabricated, and that I was sorry for any
20  inconvenience.  There was never anything forthcoming,
21  but I did, in fact, apprise Mr. Healy of the
22  allegations.
23      Q.  All right.  So after Mr. Healy replaced
24  Mr. Harper, you became aware of an e-mail that
25  Mr. Harper had sent to your boss at MCI?
0082
1      A.  That's correct.
2      Q.  In which you said that he had documents and
3  voice recordings that would show you to have been
4  involved in illegal and immoral activity; is that
5  right?
6      A.  That's correct.  And my boss -- I'm sorry.
7  My -- Jeff Bueller sent an e-mail back to me, stating
8  that he understood the situation and not to be
9  concerned; that, you know, he had complete faith in
                                                    Page 34

```
10   me.
11        Q.  Did you tell him that if Mr. Harper did have
12   any documents or voice recordings, that they would
13   have had to be false?
14        A.  Sure.  Fabricated.
15        Q.  By "fabricated," what do you mean?
16        A.  In other words, he would have had to have
17   doctored existing documents of some kind.
18        Q.  Made them up?
19        A.  Yeah.  There was nothing -- there was nothing
20   to be submitted.
21        Q.  All right.
22        A.  You know, and --
23        Q.  And let me ask you this.  Did Mr. Harper ever
24   submit any documents to MCI, to Calpac, to anyone that
25   were backing up his claim that, you know, you had
0083
1    committed any illegal or unethical activities?
2         A.  No.  We requested that he do so, and nothing
3    was forthcoming.  He didn't submit anything.
4         Q.  All right.  And then what about these voice
5    recordings?  Did Mr. Harper ever come up with any
6    voice recordings that he gave to the authorities, the
7    police, to -- to MCI, to Calpac, to anyone where he's
8    got your voice on tape doing anything or saying
9    anything that was illegal or improper or
10   inappropriate?
11        A.  Nothing.
12             MR. MOODY:  Objection as to form.
13             Go ahead.
14        A.  Nothing.  There weren't any, and he had
15   nothing to submit.
16        Q.  (By Mr. Smith)  Okay.  And was a demand also
17   made on him to come and back up his claims there if he
18   had anything?
19        A.  Other than the e-mails, you know, Mr. Bueller
20   told him if he had anything, submit it.
21        Q.  And did he ever do it?
22        A.  He never did.
23        Q.  All right.  And did that in any way interfere
24   with your relationship with Mr. Bueller?
25        A.  No.
0084
1         Q.  I mean, did he still have faith in you to
2    complete the job?
3         A.  Sure.
4         Q.  Did that, in any way, interfere with your
5    ability to work with John Healy or the new people he
6    put in place?
7         A.  Did not.
8         Q.  And after that, did you have any contact with
9    Mr. Harper himself before the day that these gentlemen
10   started picketing?
11        A.  I mean, there was -- there was an incident in
12   Marianas Trench, which is a bar/restaurant that I
13   frequented on occasion, where after one of these
14   blowups, he had approached me, and in the process of
15   discussing the issue, had tried to -- I don't know --
16   intimidate me, I guess, maybe.  He was telling a story
17   about him having been present when some guy that owed
18   him money had his kneecaps broken.  So, you know, but
19   it's just --
20        Q.  well, why don't you go ahead and describe
                              Page 35    .
```

6   just a couple of days after that the picketing went
7   on?
8       A.   Yes.
9       Q.   And between the day you found out they were
10  let go and when the picketing started, did you have
11  any communication with any of the workers who had been
12  let go?
13      A.   Actually, I asked to speak to the workers
14  when the -- after the layoffs had happened and the
15  picketing had just started.
16      Q.   No.  Before the picketing.
17      A.   Before that?  No.
18      Q.   Okay.  So, like, you find out they were let
19  go.  And between that time and the time the picketing
20  starts, did you talk with any of the guys who had been
21  let go?
22      A.   I didn't.
23      Q.   Did you talk with Mr. Healy about why he did
24  what he did?
25      A.   Actually, we discussed the crew complement
0088
1   and, you know, what -- what was going to go forward as
2   how we complete the job.  And, you know, he was very
3   adamant that he hated to let the guys go around that
4   time of the year, but there just wasn't enough work to
5   keep them.
6       Q.   Did you -- was your discussion about whether
7   he still had enough guys to complete the job?
8       A.   Well, just a general discussion as to what
9   the crew complements were going to do.
10      Q.   what does that mean, "crew complements"?
11      A.   The numbers of people on the crew and how
12  many men it would take to do the job to complete the
13  project.
14      Q.   Did you express any opinion about whether --
15  about the fact that he'd let these guys go?
16      A.   I didn't.  You know, it's his company
17  business.
18      Q.   All right.  So when the -- after the
19  picketing occurred and you found out about it, what
20  did you do in response?
21      A.   Well, first, I was, like, totally shocked
22  that these -- these men that I worked with would come
23  out and accuse me of something like this, blatantly
24  untrue.
25           But Mr. Healy had a meeting in his shop with
0089
1   all of his crew to discuss the fact that there were
2   pickets out and that they would see them and the issue
3   of, you know, why he had to let the people go when he
4   let them go; that, you know, the work was winding
5   down.  And unfortunately, you know, he didn't --
6   couldn't support having that many people.
7           And I asked him if it would be okay for me to
8   speak to the group and explain to them that, you know,
9   I respected the Chamorro culture, and that I would
10  not, in any way, have disparaged or said anything that
11  would be racially insensitive to any of those people.
12  And that, you know, I was -- it was unfortunate that
13  the men had to be let go.  And that, you know, that
14  there -- obviously, Mr. Healy had no other choice.
15      Q.   All right.  And did Mr. Healy let you address
16  the guys who were still working for Calpac --
Page 37

| | |
|---|---|
| 12 | A. That's correct. |
| 13 | Q. And have you spoken to him before? |
| 14 | A. Actually, yes. We had spoken on the phone. |
| 15 | Q. All right. How many times? |
| 16 | A. I believe twice. |
| 17 | Q. And that was before yesterday? |
| 18 | A. Yes, sir. |
| 19 | Q. Was that before yesterday? |
| 20 | A. Yes, sir. |
| 21 | Q. And what was the discussion about? |
| 22 | A. Strictly about Dynamic Technical's hiring me |
| 23 | and what I had done for Dynamic Technical on the |
| 24 | island. |
| 25 | Q. Do you consider Mr. Smith your -- your |

0112

| | |
|---|---|
| 1 | attorney? |
| 2 | A. Actually, yes, I do. |
| 3 | Q. Okay. And why do you consider him your |
| 4 | attorney? |
| 5 | A. Because at the time I was working on the |
| 6 | island, I had been in the hire of Dynamic Technical, |
| 7 | and Dynamic Technical has agreed to supply my defense |
| 8 | if necessary. |
| 9 | Q. In other words, Mr. Smith's firm is defending |
| 10 | you at DTS' expense? |
| 11 | A. That's correct. |
| 12 | Q. Now, were you provided any documents to |
| 13 | review in order to prepare for your deposition? |
| 14 | A. No, sir. |
| 15 | Q. Did you review documents in your possession |
| 16 | to prepare for this deposition? |
| 17 | A. Yes, sir, I did. |
| 18 | Q. What were those documents? |
| 19 | A. The construction agreement, Exhibit A of the |
| 20 | contract, and my daily production reports. |
| 21 | Q. Now, your daily production reports, those |
| 22 | were done daily and then sent on a weekly basis; am I |
| 23 | correct? |
| 24 | A. No. Those were done daily on my computer and |
| 25 | sent daily to MCI. |

0113

| | |
|---|---|
| 1 | Q. All right. Now, who has input in the |
| 2 | formulation of the daily production reports -- |
| 3 | A. Just me. |
| 4 | Q. -- besides yourself? |
| 5 | A. Just me. |
| 6 | Q. I'm sorry? |
| 7 | A. Just me. I'll take that back. Jeff Bueller |
| 8 | and Larry Saunders, who was Jeff Bueller's boss, had |
| 9 | certain things they wanted to see in there, such as |
| 10 | schedules, production, and various areas of the |
| 11 | project and percentages of completion. And that was |
| 12 | their request. |
| 13 | Q. Now, it's my understanding that Calpac |
| 14 | personnel prepared the -- a draft of the daily |
| 15 | production report in writing and sent it to you. And |
| 16 | then you would, you know, make -- would rather make |
| 17 | your changes in it and finalize it by putting it onto |
| 18 | the -- the -- MCI form? |
| 19 | A. They would make a report of their production |
| 20 | and send it to me. |
| 21 | Q. Okay. And that would be -- would that be in |
| 22 | a finalist form to you, or would that be in a rough |

Page 47

23  form, where you would, you know -- they'd have the
24  liberty of adjusting the numbers or the items that --
25  you know, that would replace them by Calpac personnel?
0114
1       A.  I would receive the report for their
2   production for the day but would not modify their
3   actual production unless it was incomplete.
4       Q.  All right.  And if you -- let's say on a
5   percentage basis, sir, percentage-wise, how often
6   would you find that their report was incomplete and
7   that it required your modification?
8       A.  That's actually the -- it wasn't that the
9   report was incomplete.  It would be that the actual
10  work that they had claimed as complete was, in fact,
11  not complete.
12      Q.  Okay.
13      A.  And that --
14      Q.  So how -- percentages-wise, how often would
15  you have to modify, you know, due to any discrepancy
16  that -- or any disagreement you had with the -- what
17  -- what was set forth by Calpac?
18      A.  10 percent.
19      Q.  10 percent?  Now, was there a comment portion
20  to the daily production report?
21      A.  On mine, yes.
22      Q.  And did you note any dissatisfactions with
23  the work being performed by Calpac in the comment
24  section of those daily reports?
25      A.  Yes.
0115
1       Q.  Give me an example of what you would note as
2   far as, you know, dissatisfaction.
3       A.  On various occasions, I would note that there
4   was equipment that was broken down and slow to be
5   repaired.  I would note that the equipment being
6   utilized for a specific area on the island was not of
7   -- what I determined to be the correct size to
8   accomplish the work.  That was generally the
9   discrepancies.
10      Q.  All right.  Did you ever note that you found
11  Mr. Don Harper's performance to be, let's say, subpar
12  or below what you would consider to be, you know,
13  competent?
14      A.  I stated the issues whenever there was a
15  confrontation.
16      Q.  My question is, did you ever, you know, note
17  in the comment section that you believed Mr. Harper,
18  you know, was not -- or, rather, lacked the reckless
19  incompetency to oversee the -- or, rather, to ensure
20  that Calpac performed, you know, according to the
21  contract?
22      A.  I don't believe I did.
23      Q.  Did you ever note that the performance of
24  Calpac was subpar or not, you know, in keeping with
25  what was required on its part under the contract?
0116
1       A.  No.
2       Q.  The -- you mentioned that the incidents you
3   had with Mr. Harper, that you noted this in your daily
4   comment reports -- or, rather, daily production
5   reports?
6       A.  Some of them.
7       Q.  When you say "some of them," how many of
                        Page 48

```
19  percent of your time visiting the site?
20        A.  That's not what I said.  What I said was, is
21  that I would spend 40 percent of my time going from
22  crew to crew, verifying the specifications of
23  the job.
24        Q.  Okay.  How many crews were working on the
25  entire project, sir, during the time that, you know,
0119
1  you were overseeing them?
2        A.  As many as four and as few as one.
3        Q.  And as few as one?
4        A.  Yes.
5        Q.  Okay.  And how -- you know, the -- what was
6  the size of the crew on average?
7        A.  That's -- that's difficult to say, because
8  sometimes you would have a three-man trench crew or
9  you would have eight or nine men on a pulling crew, so
10  it depends on the work.
11        Q.  All right.  So of the -- what do you estimate
12  the total number of employees working on these four
13  crews?
14        A.  I'd say up to 20 people.
15        Q.  Of these 20 people, how many do you know by
16  name, besides Quintanilla and Norman Santos?
17        A.  Probably five or six.
18        Q.  Okay.  What are their names?
19        A.  Henry Van Meter.
20        Q.  Okay.
21        A.  Ray Mendiola, Craig Johnson.
22        Q.  I'm sorry?
23        A.  Craig or Greg Johnson.
24        Q.  Craig Johnson?  Okay.  He was in the crew?
25        A.  Yeah.  Robert -- Robert Yee.
0120
1        Q.  You mean James Yee?
2        A.  Or James Yee, yeah.  Excuse me.
3        Q.  Six.
4        A.  There were two -- two other Mendiola
5  brothers.  And -- and I'm sorry.  The first names
6  escape me, but -- and that was it.
7        Q.  All right.  Now, these were the same people
8  that, I believe, you claimed that, you know, you and
9  your wife would buy refreshments for?
10        A.  That's correct.
11        Q.  And you paid for this out of your own pocket?
12        A.  Yes, I did.
13        Q.  How often would you do this?
14        A.  I think total I did it about eight times.
15        Q.  And this was -- and you were here for what,
16  one year, fewer?
17        A.  A year and two months.
18        Q.  And you worked, on the average, six days a
19  week?
20        A.  That's correct.
21        Q.  Sometimes seven days a week?
22        A.  Generally, not seven.
23        Q.  I'm sorry?
24        A.  I said, usually not seven.
25        Q.  All right.  But on the average, six days a
0121
1  week?
2        A.  That's correct.
3        Q.  And, then, the crew worked five or six days a
                              Page 50
```

4   week?
5       A.  That's correct.
6       Q.  So which one, five or six days a week?
7       A.  They started out working six and then went to
8   five.
9       Q.  All right.  So the -- and so this would be on
10  -- so for -- let's say, the crew would be working
11  about 22 days out of the month, approximately; would
12  you agree?
13      A.  Okay.
14      Q.  You were here for 14 months?
15      A.  That's correct.
16      Q.  So you would agree that there was about a
17  little over 300 working days that -- you know, where
18  you would see the crew?
19      A.  Not having a calculator, I'll have to assume
20  you're right.
21      Q.  Well, if you don't want to assume, why don't
22  you just figure out real quick 28 times 14.
23      A.  I'll take your word for it.
24      Q.  Okay.  And so you were very generous in
25  treating them eight times, right?
0122
1       A.  I was.
2       Q.  Okay.  And that's supposed to show that --
3   it's one of the proof to indicate that you wouldn't
4   use the word or the term monkey or island monkeys,
5   right?
6               MR. SMITH:  Objection, form.
7       A.  It's not supposed to assume anything.  All I
8   did was when it was hot and they were working hard, I
9   took it on myself to get them drinks on occasion.
10      Q.  (By Mr. Lujan)  Now, you mentioned about
11  Captain Suba?
12      A.  Yes, sir.
13      Q.  You sent an e-mail to one of your bosses
14  regarding a meeting you had with Captain Suba; isn't
15  that correct?
16      A.  Actually, yes.
17      Q.  And it was about a meeting that occurred
18  between yourself, Captain Suba, and, I believe,
19  Mr. Healy and Attorney Blair?
20      A.  Yes, sir.
21      Q.  And how did you describe Suba's title?
22      A.  I believe he was -- he was the captain of the
23  police department or commander.  And I'm sorry.  I'm
24  not --
25      Q.  But that's not what you called him in your
0123
1   e-mail; isn't that correct?
2       A.  I understand that there was some exception
3   taken to my misspelling.
4       Q.  Your twice misspelling?
5       A.  I'm a notoriously poor speller, so I'm sure
6   if you look in the rest of that document, there will
7   be others.
8       Q.  Well, what did you call Captain Suba's title
9   to be?
10      A.  Captain.
11      Q.  You called him capitan; isn't that correct?
12      A.  No.  You're calling him capitan.  I called
13  him captain.
14      Q.  No.  No.  In your e-mail you said capitan; is
                          Page 51

5   that correct?
6       A.  No, I did not say that.  I spelled it as
7   captain as I understand the spelling.  I'm sorry I
8   don't spell very well.
9       Q.  You didn't spell it as c-a-p-i-t-a-n?
10      A.  I think I had another i in there.
11      Q.  My question is, you didn't -- you didn't say
12  c-a -- rather, write it as c-a-p-i-t-a-n?
13      A.  I don't have it in front of me, so I'm sorry.
14  I don't -- I don't know.
15      Q.  Okay.  Now, when did -- the six days a week

0124
1   average, you know, work for Calpac, was that in the
2   beginning of the contract?
3       A.  Yes, sir.
4       Q.  And how long did that last before it shifted
5   or decreased to five days a week?
6       A.  I would say that it was end of May, first of
7   June, they went to the five days.
8       Q.  Now, the contract was supposed to, what,
9   begin in February --
10      A.  Yes, sir.
11      Q.  -- 2004?
12      A.  Yes, sir.
13      Q.  And was to end December 31st, 2004; isn't
14  that correct?
15      A.  That's correct.
16      Q.  And my understanding is that the contract,
17  according to Mr. Healy, was not completed until late
18  April, early May of 2005?
19      A.  I think that's -- well, that's probably
20  correct.
21      Q.  And so you left, what, about three months
22  before its completion being; am I correct?
23      A.  I'm sorry.  I may be mistaken on when I left,
24  because I was there until the end of the project.
25      Q.  All right.  So when you said you left

0125
1   February of 2005, that would be a mistake?
2       A.  It could be, yes.
3       Q.  So the contract was then -- the -- Calpac's
4   work was behind schedule; wouldn't you agree?
5       A.  Yes, sir, it was.
6       Q.  And isn't it true that as soon as September
7   of 2004, that there was already a -- there was
8   already, I believe, a statement by you to Mr. Bueller
9   that the contract was not going to be completed on
10  time?
11      A.  Yes, sir, that's correct.
12      Q.  And so are you aware that in November -- late
13  November, the first layoffs occurred?
14      A.  Yes, sir.  Oh, November?
15      Q.  Are you aware that it was because the work
16  was about to be completed?
17      A.  No.  The work was slowing down.
18      Q.  Well, are you aware that the -- one of the
19  reasons for the layoffs was because the contract was
20  about to be completed?
21      A.  The contract was not about to be completed.
22      Q.  I agree with you.  But my question is, are
23  you aware that that's one of the reasons that was
24  stated as to -- you know, to justify the layoffs?
25      A.  I am not.                     Page 52

via telephone, if you could address the workers, you
know, at the end of the day?

A. I'm sorry. I don't remember doing that, no.

Q. And you said that Mr. Healy was discussing
the layoff situation with the employees when you came
there?

A. Actually -- actually, he did discuss it, but
I was already there.

Q. Okay. So what did you hear him say about
that?

A. He -- he explained that he had had to let
some of the employees go and that he felt really bad
about having to let them go at the end of the year,
but that the work was winding down, and he could no
longer support the amount of people that he had
working for him.

Q. Now, sir, I believe you told us that in order
to perform under -- you know, to perform and ensure
that MCI was getting what it bargained for under the
contract, that you studied the contract; isn't that
correct?

A. Yes, sir.

Q. And in the contract, you had the -- as the

.39

company representative, you had the discretion to have
certain people removed from the job site if you did
not like their performance; isn't that correct?

A. No, sir, that was not exactly correct.

Q. Well, if it's not exactly correct, what parts
am I correct in?

A. I have the ability to go to the contractor
and lodge an objection to the performance of a
specific individual and ask him for some kind of
recovery -- some -- some resolution to a problem
issue, but I can only lodge an objection.

Q. Now look at Section 11.2, sir, of the
contract. Do you have that?

A. Stand by, please.
I do.

Q. In regards to enforcing strict discipline and
good order among the employees -- look at the last
sentence of that paragraph, sir.

A. The last sentence in the paragraph?

Q. Yes, sir, 11.2.

A. I see it.

Q. Yes. It gives the company representative the
ability to remove or have removed from the work site
any employee, agent, servant, or subcontractor which,
in your opinion, does not satisfy the provisions of

140

that section; am I correct?

A. The first portion of that paragraph says "The
contractor shall employee on the work only persons who
are skilled in the work assigned to them and whose
conduct does not endanger goodwill towards the company
or property owners and residents of communities near
the work." So, yes, if I felt someone was not of that
standard, I could have them removed from the project.

Q. And you could even change where the work site
was, you know, to occur, isn't that correct, under the
contract?

A. I'm sorry. Say that again, please.

Q. You could even have the work site changed;

Page 58

Case 1:05-cv-00037    Document 617-2    Filed 04/28/2008    Page 15 of 27

14    isn't that correct?
15        A.   I don't think so.
16        Q.   Would you look at Section 14.1.
17        A.   Okay.  Again, that statement does not give me
18    the authority to arbitrarily change the work site.  It
19    says that if I don't have right-of-way or a permit or
20    the contractor does not have the materials to do a
21    piece of work in an area that he's working in, that,
22    yes, I can change the work site.
23        Q.   Of course.  I don't want to suggest
24    arbitrariness.  But provided certain things were not
25    met -- in spite of what the contractor wanted to do,
0141
 1    if certain things were not met, you could change the
 2    work site; isn't that correct?
 3        A.   Given these conditions, the contractor would
 4    not be able to work in the area that he intended to
 5    work in; so therefore, the work site would have to be
 6    changed.
 7        Q.   Look at Section 16.6, sir.
 8        A.   Okay.
 9        Q.   Okay.  Read that quietly, and tell me what
10    you understand that to be.  Under that section, what
11    -- what do you understand your discretion to be, sir,
12    or authority?
13        A.   Hold on just a moment, please.
14        Q.   Yes, sir.
15        A.   Okay.  My -- my understanding of that portion
16    of the contract is that if the contractor owes moneys
17    to a subcontractor, he can -- we -- we, as MCI, have
18    the obligation or have the right to withhold payment
19    of moneys owed to the contractor, in this -- in this
20    case being Calpac, until the obligation to any
21    subcontractor or other obligation is covered and paid.
22            The Section B indicates that the amount
23    necessary to protect the company -- say, the
24    contractor is unable to finish the job and another
25    contractor has to be brought in to complete the
0142
 1    project, if there was a higher cost to do that, MCI is
 2    -- has the right to withhold payments for work done
 3    until the complete project is -- is completed and the
 4    obligation to the new contractor is paid.
 5        Q.   Now, was there ever a time that you withheld
 6    -- or, rather, you recommended withholding payment to
 7    Calpac for any reason?
 8        A.   At the beginning of the project, I submitted
 9    a cure notice to Calpac: Tim Camacho, Bob Thompson,
10    because their equipment was broken down all the time,
11    and they were not -- they were well-behind schedule,
12    and I wanted them to come up with a recovery program
13    to get back on schedule.  And I did recommend
14    non-payment until that recovery schedule was produced.
15        Q.   And so how long was the payment withheld,
16    that particular payment?
17        A.   It's my understanding that the payment was
18    actually not withheld, because Mr. Thompson and
19    Mr. Camacho went directly to MCI and came up with a
20    recovery plan, and their invoicing was processed
21    through MCI's financial as -- as a standard course.
22        Q.   So in other words, they complied with --
23    really with your recommendation of that to come up
24    with some sort of plan; am I correct?
                                Page 59

25      A.  I'm sorry.  Could you repeat it, please?
0143
1       Q.  Yes.
2           They met your recommendation and came up with
3   some sort of plan?
4       A.  Yes.  They met MCI's requirement, because
5   they wouldn't -- they actually would not deal with me.
6       Q.  Now, sir, the -- the delays that -- the cost
7   of the delays in the completion date, sir, in your
8   opinion, what were the major causes?
9       A.  The major causes of the delay or the costs
10  involved?
11      Q.  I'm sorry.  Causes.
12      A.  The major -- the major causes in the delays
13  were lack of equipment, equipment being broken down,
14  and long-term fixes.  Many of the parts for the
15  equipment had to come off-island; the wrong size
16  equipment to do the work involved, for which at a
17  later date, Calpac did buy larger rock equipment.
18      Q.  Okay.  So from the very beginning -- from the
19  start of the contract, the infirmities that you -- you
20  -- you spoke of existed; am I correct?
21      A.  Yes, sir.
22      Q.  Now, sir, look at 6.8 of the agreement.  When
23  you're finished reading that, let me know, please.
24      A.  I will.
25          Okay.
0144
1       Q.  What's your understanding, you know, as to
2   this paragraph -- what authority or discretion did you
3   have in regards to this paragraph?
4       A.  This simply states that if the contractor
5   damages or has an obligation -- monetary obligation in
6   the public venue, that I have the right to settle
7   those claims for up to $500.  And then the contractor
8   can come back to me and rectify the issue with MCI.
9       Q.  So in other words, if there was a dispute
10  with -- with the contractor and someone else; am I
11  correct?
12      A.  Say he damages someone's property and --
13      Q.  A third party?
14      A.  Sir?
15      Q.  A third party?
16      A.  A third party.  -- the contractor damaged a
17  third party's property and does not fix it in a timely
18  manner or does not make a negotiable settlement with
19  that party, I have the right, under the contract, to
20  settle with that person up to $500, and the contractor
21  has the right to come back to me and settle with MCI.
22      Q.  Now, you became the judge under this
23  paragraph, right?
24      A.  I did what, sir?
25      Q.  You became a judge under this paragraph?
0145
1               MR. SMITH:  Became a judge.
2       A.  No, I'm not a judge.  I'm a -- I'm a project
3   manager.
4       Q.  What?
5       A.  I'm a project manager for this contract.
6   That's not a judge.
7       Q.  (By Mr. Lujan)  Well, it gave you the
8   authority, though, to settle claims; am I correct?
9       A.  I can settle a claim up to $500.
                                            Page 60

```
10        Q.  You could even settle claims in excess of
11    $500; isn't that correct?
12        A.  According to the MCI supervision I work for,
13    I was not to exceed $500 in any case.
14        Q.  But according to 6.8, that's what I'm asking
15    you about.  Do you find any statement in Section 6.8
16    that talks about claims of more than $500?
17        A.  One moment, please.
18            Yes, it does say that.
19        Q.  So -- and not only that, but in addition, you
20    could be -- the contractor can be charged for the cost
21    of the -- of settling those claims by the company;
22    isn't that correct?
23        A.  That's correct.
24        Q.  So it gave you a lot of power over the
25    contractor; isn't that correct?
0146
1             MR. SMITH:  Objection, form.
2         A.  No.  I wouldn't say that.  This was never --
3    this was never exercised and never thought about.
4         Q.  (By Mr. Lujan)  Now, you told us earlier
5    that, I believe, you and Healy socialized in -- you
6    know, in addition to interacting during the -- in
7    regards to the contract.
8         A.  Sometimes.
9         Q.  And you agree you told us you visited his
10    beach property in Merizo?
11        A.  I did.
12        Q.  And your wives are friends?
13        A.  I'm sorry.  I didn't understand the question,
14    sir.
15        Q.  Your wives are friends?
16        A.  My wife and his wife?
17        Q.  Yes, sir.
18        A.  Yes.
19        Q.  So is it possible that's why this was never
20    exercised, because of that?
21        A.  There was never an instance where they had a
22    claim.
23        Q.  Okay.  Now talking about the layoffs, sir.  I
24    believe you testified about an instance where you were
25    informed only two days before the -- the layoff
0147
1    occurred.  Do you remember that testimony?
2         A.  I do.
3         Q.  Now, tell me again about that, because it was
4    coming in, you know, garbled.
5             MR. SMITH:  Objection.
6         Q.  (By Mr. Lujan)  Why don't you tell me about
7    that.
8             MR. SMITH:  Objection.
9             I'm going to instruct you not to answer
10    that question.
11            If it was garbled, you should have
12    brought it up at the time.  I'm not just going to have
13    him try to remember every question he was asked and go
14    back and --
15            MR. LUJAN:  Well, I'm not asking him
16    every question.
17            MR. SMITH:  You can ask him --
18            MR. LUJAN:  I just don't think that, you
19    know, your instruction is reasonable.
20            MR. SMITH:  You can ask him whatever you
                              Page 61
```

6      Q.  Now, you testified about that there was a --
7   a -- I believe at some point you suggested to Calpac
8   that they needed to hire more people.
9      A.  I told Calpac I thought they did not have
10  enough people at the beginning of the job to
11  accomplish meeting the schedule.
12     Q.  All right.  When was that time frame, sir?
13     A.  That was in February, March of 2004.
14     Q.  So that was right after the conference began
15  and you were right there?
16     A.  Yes, sir.
17     Q.  And who was -- who did you have this
18  conversation with?
19     A.  Tim Camacho and Bob Thompson.
20     Q.  And not Mr. Healy, right?
21     A.  No, sir.
22     Q.  Mr. Healy was not working for Calpac then?
23     A.  No, sir, he was not.
24     Q.  So, sir, from the very beginning, you were
25  concerned that the contract was not going to be
0151
1   completed on schedule; isn't that correct?
2      A.  Yes, sir.
3      Q.  And after you made the suggestion that they
4   -- that they probably needed to have more people, did
5   they do that?
6      A.  They instituted a procedure to hire more
7   people, yes, sir.
8      Q.  And in spite of that, you also determined
9   that the contract would not be completed during the
10  scheduled December 31st, 2004 time period; isn't that
11  correct?
12     A.  Yes, sir.
13     Q.  Sir, in November of 2004, how much,
14  percentage-wise, you know, of the contract had been
15  complete?
16     A.  That's difficult to say without backup from
17  my dailies, but I would say probably 35 percent.
18     Q.  Was not completed?
19     A.  I'm sorry?
20     Q.  Am I correct in understanding that 35 percent
21  was uncompleted?
22          MR. SMITH:  Uncompleted.
23     A.  Uncompleted?  I'm sorry.  I thought you said
24  completed.
25     Q.  No.  Uncompleted.
0152
1      A.  Uncompleted, I'd say 65 percent of it.
2      Q.  65?  All right.  So with -- with the original
3   completion date of December 31st, 2004 and the layoffs
4   occurred -- the first layoffs occurring November 29th,
5   2004, the project was completed with one month left to
6   go on the original date -- completion date, the projet
7   was completed only in the amount of 35 percent; isn't
8   that correct?
9      A.  I thought you asked me what was completed by
10  the middle of the year, 2004.
11     Q.  No.  I was asking -- I'm sorry, sir.  The
12  latter of November 2004.
13     A.  Okay.  The latter of November 2004, there was
14  -- we were in the 75 percent to 80 percent range.
15     Q.  Of completion?
16     A.  Yes, sir.

Page 63

17    Q.   Is that of completion or uncompletion?
18    A.   That is of completion.
19    Q.   All right.  So 75 to 85 percent range?
20    A.   75 to 80.
21    Q.   To 80?  So it took another, what, about six
22   months to complete the 20 to 25 percent?
23    A.   Another four months to complete the 20
24   percent.
25    Q.   Well, if we're talking late November and the
0153
1   completion date, you know, as late as early May 2005,
2   that would have been at least five months; would you
3   agree?
4    A.   I agree that's the number of months between
5   that time frame.
6    Q.   Sir, in March of 2004, was Calpac behind
7   schedule already?
8    A.   Yes, sir.
9    Q.   Was it way behind schedule?  Would you, you
10   know, characterize it as way behind schedule?
11    A.   It was far enough behind schedule that I was
12   concerned.
13    Q.   Now, my understanding, sir, is that you did
14   not supervise the Calpac employees; is that correct?
15    A.   That's correct.
16    Q.   And any interaction you had with the laborers
17   would be on a minimal basis, such as simply to tell
18   them, you know, why don't you put that rock there, but
19   not to tell them how to do their work; am I correct?
20    A.   That's correct.
21    Q.   And your -- your interaction with the -- at
22   the work site in regards to the manner of work that
23   was being done would have been with Mr. Harper or one
24   of the foreman, one of the head; is that correct?
25    A.   Yes, sir.
0154
1    Q.   Now, how often would you interact with Dennis
2   Harper at the -- I'm sorry -- Don Harper at the job
3   sites?  Let's say --
4    A.   I would try to interact with Mr. Harper at
5   least once on every day that I was around the job
6   site.
7    Q.   Now, were you there daily at the job site?
8    A.   No, sir.  I was there probably 20 -- 40
9   percent of the time.
10    Q.   So in other words, you -- at least two days
11   out of the week?
12    A.   I was there three to four days of the week
13   but only in the neighborhood of three to four hours a
14   day.
15    Q.   Okay.  Now, so it -- was it Mr. Harper --
16   between you and the two Henrys and Don Harper, in
17   regards to discussing the work -- the ongoing work,
18   who did you interact the most between those three
19   people?
20    A.   Generally, with Don Harper.  The -- the
21   interaction with the two Henrys was usually more in
22   the line of, you know, where are you starting?  Where
23   are you stopping?  What's the plan for today?  And
24   that's it.
25    Q.   So, then, most of it was simply Harper?
0155
1    A.   Generally.

Page 64

attention of the contractor's management.

Q. All right. So my understanding is Mr. Healy did not begin working for Calpac until around October 11, October 14, 2004. Does that sound right to you, sir, based on your experience of when you began seeing him there on a full-time basis?

A. I'm sorry. I don't have that exact time frame. I'm not sure when he started actually working on site.

Q. So going back to the storm drain, did you report this to Tim Camacho?

A. I'm sorry. I would -- I don't recollect who I reported it to, but I know I reported it to -- it would have to be Tim.

Q. It would have to be him?

A. Would have to be him.

Q. He was general manager then?

A. Yes, sir.

Q. What about the three times where you -- you and he, Harper, yelled at each other, did those occur after your -- after the storm drain incident?

A. There were two times that I recollect. One was when there was a deficient restoration on concrete entries on -- on private properties and the issue of the concrete placement in Tiyan at the airport authority. Those were the two times we got into loud conversation about the issue.

Q. All right. And this would have been in front of the -- some of the crew members?

A. Yeah. Unfortunately, it was.

Q. And so you agree you were unprofessional yourself?

A. Actually, yes. I guess I have to say I was. I don't normally respond in that -- that vain.

Q. And so -- I believe you said that in one of these situations or instances, Don Harper made it personal.

A. Yes, sir.

Q. And how did he make it personal?

A. He accused me of not doing my job. And that if I really knew what I was doing on the project, that I would have been on site all the time, and this

i4

situation never would have occurred.

Q. Now, when you disagreed with the manner of work that was being done by Calpac, were you, in essence, saying that they weren't doing their jobs the way they were supposed to?

A. No, sir. All I was saying is that an error had occurred in the placement. There was a misread of the design plan. And Henry Quintanilla agreed that he had misread where he was supposed to stop with the placement of the concrete and had stopped too early and agreed that it needed to be fixed, and that's when he called Don Harper.

Q. All right. So did you -- in any of these three instances where you and Harper engaged in a shouting match, if I may use that term, sir, did you report this to either Morales or Ms. Hayes --

A. I did not.

Q. -- at DTS?

A. The only time that I reported it was the last

Page 68

0   time, when it was extremely heated.
1       Q.  And that was to Mr. Healy?
2       A.  And I went to Mr. Healy to lodge my
3   objection, so I contacted Jeff Bueller with MCI, and I
4   contacted Linda Hayes with Dynamic Technical.  So
5   everyone was aware of potential conflict with the
165
1   contract.
2       Q.  And this was -- I believe you said the final
3   situation was in November of 2004?
4       A.  Yes, sir.
5       Q.  And that is -- are you -- would that be the
6   incident where you went to Healy and then reported the
7   matter to Bueller and to Morales and Hayes at DTS?
8       A.  This was the conflict issue up at Tiyan, over
9   the concrete and removal of the conduit, and, yes,
0   that's the one I reported.
1       Q.  All right.  I'm talking about the -- I
2   believe you said the one instance where you went to
3   Healy was the last one; am I correct?
4       A.  Yes, sir.
5       Q.  And you said that was in November of 2004?
6       A.  I believe that's correct, yes.
7       Q.  Well, would it surprise you to know that
8   Mr. Harper resigned October 26th, 2004?
9       A.  It wouldn't surprise me, no.  I could -- I
0   could be off on my -- I could be off on the date.  I
1   could be off on --
2       Q.  (By Mr. Lujan)  -- November 2004, if it would
3   have occurred, but didn't occur November of 2004; am I
4   correct?
5       A.  Well, this has been three years ago, so I
166
1   could be off on my date.
2       Q.  So you went to Healy and explained about the
3   yelling incident.  What did you say to him?
4       A.  I told him that the situation had occurred
5   and that I had been accused of not doing my job.  And
6   that I felt the continued conflict on the job site was
7   counter-productive, and that I was officially lodging
8   an objection to Mr. Harper's superintendent processes.
9       Q.  Now, what did you hope to gain by that,
0   remove Harper from the project?
1       A.  I would have to say that I just needed some
2   resolution, and I was looking for a -- an answer from
3   Mr. Healy as to how he intended to improve production
4   and eliminate the destruction of conduit placement
5   based on anger.
6       Q.  Now, this incident we're talking about, this
7   is when, according to your testimony, Dennis Harper
8   destroyed 220 feet of work; am I correct?
9       A.  Yeah.  It's Don Harper.
0       Q.  I'm sorry.  Don Harper.
1       A.  Yes, that's correct.
2       Q.  So what was Healy's response, sir?
3       A.  He said he would talk to Don and determine
4   what the issues were and what had happened, and he'd
5   let me know what the resolution was.
167
1       Q.  All right.  Did he?
2       A.  He did.
3       Q.  And what was the resolution?
4       A.  He explained that he had decided to remove

Page 69

Don from the project, but that he would transfer him
over to another project that they had going with MCV.

Q. All right. And you also mentioned that --
you know, informing DTS and MCI -- Bueller at MCI,
right?

A. Yes, sir.

Q. And how did you inform them of this, sir?

A. By phone.

Q. Not in writing, then?

A. No, sir.

Q. Not in writing?

A. Actually, there was e-mail that followed the
phone conversation, stating that there had been a
conflict. And that's -- that's all that was said
about it.

Q. All right. So there was written
communication from you to -- to whom, sir?

A. It would have been to Jeff Bueller.

Q. Now, you testified about a letter from Harper
to Healy, I believe, demanding a bonus.

A. It was an e-mail.

58

Q. Yes, sir. E-mail or letter, whatever it was.

A. It was an e-mail, and, yes, there was one.

Q. And Mr. Healy discussed the contents of that
e-mail with you?

A. Yes, sir.

Q. And am I correct in understanding that you
testified that Healy told you that he had agreed to
pay 2 percent to Harper?

A. No, sir. He agreed to pay -- well, actually,
I don't know that he agreed, but he paid half of what
-- our percent he owed him.

Q. My question is, did Healy mention to you that
he had agreed with Harper that he would pay him a 2
percent bonus?

A. I didn't even know about it until after he
had given Harper the check. That's when he told me
about what the issues were and that he had decided to
pay half of it.

Q. All right. But did he, in your -- during
this conversation, did he admit to you that he had
earlier agreed with Harper that he would pay him a 2
percent bonus?

A. I don't know that he agreed that he would pay
it. He said he had had the discussion with him of
paying a 2 percent bonus if the job was completed.

59

Q. So he told you that he had paid 12,500 of the
25,000 being demanded; isn't that correct?

A. Yes, sir.

Q. He told you -- Mr. Healy told you that he had
paid 12,500 of the 25,000 that was being demanded?

A. That's correct.

Q. And according to your testimony, sir, the
reason why -- Mr. Healy told you the reason why he did
not pay the balance of the 12,500 was because he
thought it was extortion?

A. Yes. He said that he -- he felt that he was
-- it was extortion; that he was being extorted.

Q. Now, when did this conversation with Healy
take place?

A. Well, if Mr. Harper quit in October, it would

Page 70

12    A.  No, sir.
13    Q.  Now, sir, are you aware that Mr. Healy, you
14  know, when he paid the 12,500 to Mr. Harper, asked
15  Mr. Harper to come back to work for Calpac?
16    A.  No, sir, I wasn't aware of that.
17    Q.  You were?
18    A.  I was not.
19    Q.  Assuming that's true, would that surprise
20  you?
21            MR. SMITH:  Objection, form.
22    A.  I would not have cared one way or the other,
23  as long as he was working on the MCV project.
24    Q.  (By Mr. Lujan)  On the what project, sir?
25    A.  As long as he was working on the MCV,
0175
1  Marianas CableVision, project.
2    Q.  In other words, as long as he's not involved
3  in the MCI project?
4    A.  That's correct.
5    Q.  Sir, when you were first informed of the
6  protest on December 25, you know, from the MCI lady,
7  did you report this to Jeff Bueller?
8    A.  Yes, sir, I did.
9    Q.  The same day?
10    A.  I'm sorry?
11    Q.  Was it on the same day?
12    A.  Yeah.  I sent -- I sent an e-mail, but
13  there's such a time difference, he didn't get it until
14  the next day.
15    Q.  Okay.  So do you have a copy of that e-mail?
16    A.  Actually, I don't know.  I mean, I have -- I
17  have e-mail records, but I know that he would have it.
18    Q.  When is the last time you saw your e-mail --
19  a copy of your e-mail?
20    A.  I'm sorry?
21    Q.  When is the last time you saw a copy of that
22  e-mail?
23    A.  Probably May of 2005.  That's when I turned
24  in all of the files and project records to MCI, was at
25  the end of the job when I went to Dallas.
0176
1    Q.  So what did you do with the -- with the
2  e-mail in the file, gave it to MCI?
3    A.  Yes.  They -- they -- they take all of the
4  company records, all of the field records and file
5  them under the project.
6    Q.  All right.  So that e-mail, it would be in
7  the -- you know, in -- rather, in a file under this
8  MCI project?
9    A.  It should be in the project archives, yes,
10  sir.
11    Q.  Now, did Jeff Bueller, to your knowledge,
12  conduct an investigation into the allegations?
13    A.  Not that I know of, no, sir.
14    Q.  Did -- I believe another manager -- another
15  MCI official that is involved in this project -- I
16  believe Larry Sanders or Saunders?
17    A.  Larry Saunders.
18    Q.  Saunders.  Did you speak to him about this?
19    A.  I did.  Yes, sir, I did.
20    Q.  And was it the same day that you -- I'm
21  sorry.  when did you talk to him regarding this issue?
22    A.  It would have been the next day, the next
Page 73

.5          Earlier you discussed the one instance where
.6   you recommended withholding payment from Calpac, okay?
l7          A.   Yes, sir.
l8          Q.   And my question -- this question now
l9   involves, did you ever withhold payment from Calpac?
?0          A.   No, sir, not that I know of.  And that would
?1   have been MCI's supervision's decision.
?2          Q.   Now, are you aware of a maintenance contract
?3   between Calpac and MCI subsequent to this contract
?4   we're discussing?
?5          A.   Yes, sir, I am.
)187
1          Q.   Did you have any role in the negotiation of
2    that contract?
3          A.   I helped to define the -- the line items in
4    the contract, yes.
5          Q.   Did you make any recommendations to MCI, you
6    know, favorable to Calpac?
7          A.   I'll have to say that I did, from the
8    standpoint that they knew the route, had installed
9    everything, and I felt they would be the appropriate
10   party to maintain it since they knew it.
11         Q.   Now, when did this occur, sir?
12         A.   It was -- it was towards the end of the job.
13   And I'm sorry.  I don't know -- I don't remember
14   exactly which month.
15         Q.   Would it be 2005, though?
16         A.   Yes.
17         Q.   The -- there were other competitors for that
18   project; am I correct?
19         A.   Yes.  There were other bidders.  And, in
20   fact, they awarded -- actually awarded that contract
21   after I left the island.
22         Q.   Now, the other bidders were, what, a company
23   called Cable Services, I believe?
24         A.   I'm sorry, sir.  I don't know.  I believe
25   that they were one of them.
0188
1          Q.   Now, one of the companies was a company owned
2    by Tim Camacho?
3          A.   Isn't that Cable Services?
4          Q.   Yes, sir.
5          A.   I believe that that was probably one of the
6    bidders, yes.
7          Q.   And Mr. Harper works there?
8          A.   Yes.  I heard -- I heard that he was working
9    there.
10         Q.   What is the value of that contract, sir, if
11   you remember --
12         A.   I don't remember.  I'm sorry.
13         Q.   -- or if you know?
14         A.   I don't -- I don't remember.  It was awarded,
15   like I say, after I left the island.
16         Q.   Now, the -- this MCI contract, is this the
17   first time you've been a project manager for a
18   contract?
19         A.   No, sir.
20         Q.   Sir?
21         A.   No, sir.
22         Q.   So you've been project manager for MCI on
23   other contracts?
24         A.   Yes, sir.
25         Q.   Have you been a project manager and inspector

                          Page 78

1 or Henry Van Meter and refer to the people who worked
2 for them on their crew in any way as though they were
3 animals or lazy animals of any kind?
4     A.  No.  These guys worked hard.  I wouldn't have
5 any reason to do that, but, no, I did not.
6             MR. SMITH:  Pass the witness.
7             MR. MOODY:  No further questions.
8             Mr. Lujan, do you have anything further?
9             MS. LUJAN:  We have no further questions.
0             MR. MOODY:  All right.  Thank you.
1             THE VIDEOGRAPHER:  Off the record, 2:07
2 p.m.
3             (Deposition concluded, 2:07 p.m.)
4
5

192

1                 CORRIGENDA AND SIGNATURE
2 PAGE     LINE     CORRECTION              REASON
3
4
5
6
7
8
9
0
1
2
3 I, DENNIS CLARK, have read the foregoing deposition
  and herby affix my signature that same is true and
4 correct, except as noted above.
5
                                DENNIS CLARK
6
  STATE OF
7 COUNTY OF
8 BEFORE ME,                    , on this day personally
  appeared DENNIS CLARK, known to me (or proved to me
9 under oath or through            (description
  of identity card or other document) to be the person
0 whose name is subscribed to the foregoing instrument
  and acknowledged to me that they executed the same for
1 the purpose and consideration therein expressed.
2 GIVEN UNDER my hand and seal of office this
  day of                 , 2007.
3
4
                        Notary public in and for the
5                       State of _____

193

L STATE OF TEXAS        X
2 COUNTY OF DALLAS       X
3
4      I, Malissa K. Morrow, Certified Shorthand
5 Reporter, duly qualified in and for the State of
6 Texas, do hereby certify that, pursuant to agreement
7 hereinbefore set forth, there came before me DENNIS
8 CLARK, who was by me duly sworn to testify the truth,
9 the whole truth, and nothing but the truth of his
0 knowledge concerning the matters in controversy in
L this case; and that he was thereupon carefully
2 examined upon his and his testimony reduced to
3 typewriting by me or under my supervision.
                                Page 80

DennisClark

.4 I further certify that I am neither attorney, nor
.5 counsel for, nor related to the action in which the
.6 deposition is taken; and further, that I am not a
.7 relative or employee of any attorney or counsel
.8 employed by the parties hereto or financially
.9 interested in the action.
:0 I further certify the above and foregoing
:1 deposition as set forth in typewriting is a full,
:2 true, correct and complete transcript of the
:3 proceedings had at the time of taking said deposition.
:4 GIVEN UNDER MY HAND AND SEAL of office on this the
:5    day of     , 2007.
)194

1
2      MALISSA K. MORROW
       Texas CSR NO. 8145
3      Date of Expiration: 12/31/07
       FOLKS & ASSOCIATES, INC.
4      4019 N. GALLOWAY AVE., SUITE D
       MESQUITE, TEXAS 75150
5      Phone: (214) 320-9823
       Fax: (972) 682-9411
6      Firm Number: 2
7
8 TAXABLE COST: $
9
:0
:1
:2
:3
.4
.5
.6
.7
.8
.9
:0
:1
:2
:3
:4
:5

Page 81